## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No.** _____ |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

## I.

## INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty,  a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

### III.

### JURISDICTION AND VENUE

**7.**    This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.**    Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.**    Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

### IV.

### RELEVANT BACKGROUND

#### *HCLOF IS FORMED*

**10.**    Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.**    Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

**The Harbourvest Settlement with
Highland Capital Management in Bankruptcy**

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054,  Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25. Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26. While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27. In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28. HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29. On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30. HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31. On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.     Typically, the value of the securities reflected by a market price quote.

41.     However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.     There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.     Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.     Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.     It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.     For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65.    This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.    The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.    The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.    HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.    This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.    It also violated HCM's own internal policies and procedures.

71.    Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.    HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.    HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.    In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.    At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.    Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.    What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.    Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.    For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.    HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.    Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

## SECOND CAUSE OF ACTION
### *Breach of HCLOF Company Agreement*
### (By Holdco against HCLOF, HCM and HCFA)

92.      Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.      On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.      The Company Agreement governs the rights and duties of the members of HCLOF.

95.      Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.      Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.      The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.      Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.      Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

100.    Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

101.    No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

102.    Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

### THIRD CAUSE OF ACTION
#### *Negligence*
#### (By the DAF and CLO Holdco against HCM and HCFA)

103.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

104.    Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

105.    Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106.    Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

107.    It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

**108.**    It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.**    It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.**    Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.**    Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.**    Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM)

**113.**    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.**    Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.**    HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

126.    In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.    Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.    In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equalization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.    Seery was at all relevant times operating as an agent of HCM.

130.    This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.    The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.   Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.   Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

### FIFTH CAUSE OF ACTION
### *Tortious Interference*
### (CLO Holdco against HCM)

134.   Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.   At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.   At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.   Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.   HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.    Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

   a.   Actual damages;

   b.   Disgorgement;

   c.   Treble damages;

   d.   Exemplary and punitive damages;

   e.   Attorneys' fees and costs as allowed by common law, statute or contract;

   f.   A constructive trust to avoid dissipation of assets;

   g.   All such other relief to which Plaintiff is justly entitled.

Dated:  April 12, 2021                    Respectfully submitted,

                                          **SBAITI & COMPANY PLLC**

                                          */s/  Mazin A. Sbaiti*
                                          **Mazin A. Sbaiti**
                                          Texas Bar No. 24058096
                                          **Jonathan Bridges**
                                          Texas Bar No. 24028835
                                          JPMorgan Chase Tower
                                          2200 Ross Avenue – Suite 4900W
                                          Dallas, TX  75201
                                          T:  (214) 432-2899
                                          F:  (214) 853-4367
                                          E:  mas@sbaitilaw.com
                                              jeb@sbaitilaw.com


                                          **Counsel for Plaintiffs**