PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD. | § § § | Case No. 3:21-cv-00842-B |
| Plaintiff, | § § | |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | § § § § | |
| Defendants. | § § | |

**APPENDIX IN SUPPORT OF DEBTOR'S REPLY IN SUPPORT OF THE DEBTORS'**
**MOTION TO ENFORCE THE ORDER OF REFERENCE**

Highland Capital Management, L.P., a defendant in the above-captioned case (the "Debtor"

or "Highland"), hereby files this *Appendix in Support of Debtor's Reply in Support of the Debtors'*

*Motion to Enforce the Order of Reference* (the "Reply").[1]

## TABLE OF CONTENTS

| Appx. | Description |
|---|---|
| 1 | *Defendant Highland Capital Management, L.P.'s Memorandum of Law in Support of Motion for an Order to Enforce the Order of Reference*, Case No. 3:21-cv-00842-B, D.I. 23 (N.D. Tex. May 19, 2021) |
| 2 | Hearing Transcript, June 8, 2021 |
| 3 | *Debtor's Second Amended Witness and Exhibit List with Respect to Evidentiary Hearing to Be Held on June 8, 2021*, [Docket No. 2423][2] |
| 4 | *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] |
| 5 | Summary of Dondero Entity Litigation |
| 6 | Hearing Transcript, June 25, 2021 |
| 7 | *Second Amended and Restated Investment Advisory Agreement,* effective from January 1, 2017 |
| 8 | *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18, Effective July 12, 2019 |
| 9 | *In re Acis Capital Management*, *L.P., et al*, Case No. 18-30264-sgj11, D.I. 497 (Bankr. N.D. Tex. Aug. 13, 2018) |
| 10 | *Plaintiffs' Response to Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference*, Case No. 3:21-cv-00842-B, D.I. 36 (N.D. Tex. June 29, 2021) |
| 11 | *Original Complaint,* Case No. 3:21-cv-00842-B, D.I. 1 (N.D. Tex. Apr. 12, 2021) |
| 12 | *Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. 2628 (Aug. 3, 2007) |

*[Remainder of Page Intentionally Blank]*

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Reply.

[2] Unless otherwise indicated, all docket reference numbers refer to the docket maintained by the Bankruptcy Court.

Dated: July 13, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          rfeinstein@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          jelkin@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

000001

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD. | § § § | |
| Plaintiff, | § § | Case No. 3:21-cv-00842-B |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | § § § | |
| Defendants. | § § | |

## DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ORDER TO ENFORCE THE ORDER OF REFERENCE

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND......................................................................................4

    A.    Plaintiffs' Ownership and Control..........................................................4
    B.    HarbourVest's Investment and Claims against the Debtor.......................5
    C.    The HarbourVest Settlement and Objections ..........................................6
    D.    Plaintiffs Knew of the Transfer, and Plaintiff CLOH Objected to the
           Settlement ...........................................................................................7
    E.    The Dondero Parties Exercised their Right to Take Discovery...............8
    F.    The Bankruptcy Court Approves the Settlement ....................................9
    G.    The DAF and CLOH Sue the Debtor and Others in This Court.............11
    H.    Counsel for the DAF and CLOH Willfully Ignore the Gatekeeper Orders ..........12

ARGUMENT ........................................................................................................15

    A.    Plaintiffs Violated Local Rule 3.3(a) By Failing to Disclose the
           Bankruptcy Case ...............................................................................15
    B.    The Complaint Should Be Automatically Referred to the Bankruptcy
           Court .................................................................................................16
           i.    The Complaint Should Be Heard in the Bankruptcy Court. .....16
           ii.    The Order of Reference is Mandatory. ....................................17
           iii.    Any Disputes Over the Settlement or the Transfer Arise Under,
                Arise In, and Relate to Title 11 and are Core Proceedings.......18
           iv.    Any Disputes Over the Gatekeeper Orders Arise Under, Arise In,
                and Relate to Title 11 and Are Core Proceedings....................19
           v.    The Complaint Impacts Creditor Recoveries...........................20
           vi.    Mr. Seery Will Have Indemnification Claims Against the Estate. ............20
    C.    There is No Basis for a Mandatory Withdrawal of the Reference.........21
    D.    The Complaint Is Barred by the Doctrine of *Res Judicata* ..................23
    E.    This Court Should Consider Mr. Dondero's Litigious Nature ..............24

CONCLUSION.....................................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**

*Angel v. Tauch*
    *(In re Chiron Equities, LLC),*
    552 B.R. 674 (Bankr. S.D. Tex. 2016) ..................................................................... 19

*Beta Operating Co., LLC v. Aera Energy, LLC*
    *(In re Memorial Prod. Partners),*
    2018 U.S. Dist. LEXIS 161159, at *9 (S.D. Tex. Sept. 20, 2018) ........................... 22

*Burch v. Freedom Mortgage Corp.*
    *(In re Burch),*
    385 Fed. Appx. 741 (5th Cir. 2021) ........................................................... 17, 18, 25

*Celotex Corp. v. Edwards,*
    514 U.S. 300 (1995) ................................................................................................. 17

*Centrix Fin. Liq. Trust v. Sutton,*
    2019 U.S. Dist. LEXIS 154083 (D. Colo. Sept. 10, 2019) ..................................... 20

*Collins v. Sidharthan*
    *(In re KSRP, Ltd.),*
    809 F.3d 263 (5th Cir. 2015) ................................................................................... 21

*Comer v. Murphy Oil USA,*
    718 F.3d 460 (5th Cir. 2013) ................................................................................... 23

*Feld v. Zale Corp.*
    *(In re Zale Corp.),*
    62 F.3d 746 (5th Cir. 1995) ..................................................................................... 20

*Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.,*
    510 F. 2d 272 (5th Cir. 1975) .................................................................................. 23

*Houston Baseball Partners, LLC v. Comcast Corp.*
    *(In re Houston Reg'l Sports Network),*
    2014 Bankr. LEXIS 2274, at *15-25 (Bankr. S.D. Tex. May 22, 2013) ................. 21

*In re Galaz,*
    841 F.3d 316 (5th Cir. 2016) ................................................................................... 19

*In re G-I Holdings, Inc.,*
    295 B.R. 211 (D. N.J. 2003) .................................................................................... 22

DOCS_NY:43079.11 36027/002

*In re Idearc, Inc.*,
  423 B.R. 138 (Bankr. N.D. Tex. 2009) .................................................................. 18

*In re Margaux City Lights Partners, Ltd.*,
  2014 Bankr. LEXIS 4841 at *6 (Bankr. N.D. Tex. Nov. 24, 2014) ....................... 18

*In re Margulies*,
  476 B.R. 393 (Bankr. S.D.N.Y. 2012) .................................................................. 24

*In re National Gypsum*,
  14 B.R. 188 (N.D. Tex. 1991) ............................................................................... 22

*In re Republic Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) .............................................................................. 24

*Manila Indus., Inc. v. Ondova Ltd.*
  *(In re Ondova Ltd.)*,
  2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009) ........................... 22

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co.*
  *(In re Wolverine Radio Co.)*,
  930 F.2d 1132, 1143 (6th Cir. 1991) .................................................................... 24

*Miller v. Meinhard-Commercial Corp.*,
  462 F.2d 358 (5th Cir. 1972) ................................................................................ 24

*Refinery Holdings Co., L.P. v. TRMI Holdings, Inc.*
  *(In re El Paso Refinery, L.P.)*,
  302 F.3d 343 (5th Cir. 2002) ................................................................................ 21

*Rodriguez v. EMC Mortgage Corp.*
  *(In re Rodriguez)*,
  2001 U.S. App. LEXIS 30564, at *5 (5th Cir. Mar. 15, 2001) .............................. 19

*See Kuzmin v. Thermaflo, Inc.*,
  2:07-CV-00554-TJW, 2009 U.S. Dist. LEXIS 42810,
  at *4-7 (E.D. Tex. May 20, 2009) ......................................................................... 16

*Southern Pac. Transp. v. Voluntary Purchasing Groups*,
  252 B.R. 373 (E.D. Tex. 2000) ............................................................................. 22

*UPH Holdings, Inc. v. Sprint Nextel Corp.*,
  2013 U.S. Dist. LEXIS 189349, at *4 (W.D. Tex. Dec. 10, 2013) ........................ 22

*Uralkali Trading, S.A. v. Sylvite Southeast, LLC*,
  2012 U.S. Dist. LEXIS 40455, at *3 (M.D. Fla. Mar. 26, 2012) ........................... 17

iii

*Villegas v. Schmidt,*
 788 F.3d 156, 159 (5th Cir. 2015) ........................................................................ 18

*Welch v. Regions Bank,*
 2014 U.S. Dist. LEXIS 96175, at \*5 (M.D. Fla. July 15, 2014) ............................ 17

*Wood v. Wood*
 *(In re Wood),*
 825 F.2d 90 (5th Cir. 1987) ............................................................................ 17, 18

## Statutes

11 U.S.C. § 1334 ........................................................................................................ 16

28 U.S.C. § 157 ................................................................................................... passim

28 U.S.C. § 1927 ........................................................................................................ 25

## Rules

Bankr. N.D.Tex. R. 3.3 .......................................................................................... 15, 16

Bankr. N.D.Tex. R. 9014 ............................................................................................. 8

Highland Capital Management, L.P., a defendant in the above-captioned case (the "Debtor" or "Highland"), submits this memorandum of law (the "Memorandum") in support of the *Debtor's Motion for an Order to Enforce the Order of Reference* (the "Motion"). In support of its Motion, the Debtor states as follows:

## PRELIMINARY STATEMENT[1]

1.      Highland is the debtor and debtor-in-possession in a bankruptcy case currently pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), Case No. 19-34054-sgj11 (the "Bankruptcy Case"). The Bankruptcy Case has been pending since October 16, 2019, having been filed at the direction of James Dondero, who, on information and belief, is the person controlling and directing the actions of both The Charitable DAF Fund, L.P. (the "DAF") and CLO Holdco, Ltd. ("CLOH" and together with the DAF, "Plaintiffs") today. Both the DAF and CLOH have appeared and objected multiple times in the Bankruptcy Case.

2.      In one of those matters, the Bankruptcy Court approved a settlement between the Debtor and HarbourVest[2] (the "Settlement") pursuant to 11 U.S.C. §§ 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") over the objections of CLOH, a Plaintiff in this action, as well as other entities owned and/or controlled by Mr. Dondero. The Settlement is on appeal.[3]

---

[1] Concurrently herewith, the Debtor is filing the *Appendix in Support of the Debtor's Motion to Enforce the Reference* (the "Appendix"). Citations to the Appendix are notated as follows: Appx. #. The Complaint is Appx. 1.

[2] "HarbourVest" collectively refers to the following entities: HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

[3] The Settlement is being appealed by Mr. Dondero's two purported family investment trusts: The Dugaboy Investment Trust ("Dugaboy") and The Get Good Trust ("Get Good" and together with Dugaboy, the "Trusts"). The Trusts, like Plaintiffs, are controlled by Mr. Dondero. The appeal and this litigation are just one battle in Mr. Dondero's multifaceted litigation assault on the bankruptcy process.

3.      Plaintiffs filed their *Original Complaint* (the "Complaint")[4] in this Court seeking to have this Court undertake a *de facto* appeal or reconsideration of the Settlement and to assert monetary claims for actions undertaken in the Bankruptcy Case. However, the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (the "Order of Reference") (Appx. 2) in force in the Northern District of Texas required that this action be filed with the Bankruptcy Court presiding over the Bankruptcy Case. The Order of Reference was entered in 1984 and directs courts in this District to refer all proceedings arising under Title 11 and/or arising in or related to a case under Title 11 to the bankruptcy courts. A mandatory application of the Order of Reference prevents a race to the courthouse and inconsistent rulings by providing one forum to adjudicate ***all*** aspects of a bankruptcy case. Otherwise, debtors and creditors could blatantly forum shop and choose whether to file cases or claims in the bankruptcy court or the district court to evade what may be perceived as an unwelcoming court – which is precisely what has occurred in this case.[5] Here, the case for enforcing the Order of Reference is compelling. The Complaint addresses issues that not only arise in, arise under, and relate to Title 11 but which have already been adjudicated by the Bankruptcy Court. By this Motion, the Debtor requests that this Court enforce the Order of Reference and refer the Complaint to the Bankruptcy Court for adjudication

4.      The reason Plaintiffs filed the Complaint in this Court – rather than in the Bankruptcy Court – is obvious. Plaintiffs, under the direction of the Debtor's ousted founder, Mr.

---

[4] The Complaint contains a number of errors and material omissions, misstatements, misrepresentations, and mischaracterizations. The Debtor believes the Complaint is frivolous and should be dismissed on numerous grounds. The Debtor reserves all rights to contest the substance of the Complaint and intends to promptly inform Plaintiffs' counsel that the Debtor will seek sanctions if the Complaint is not withdrawn.

[5] Plaintiffs justify their conduct by contending that under the 1984 Amendments to the Bankruptcy Code, the Bankruptcy Court is a "unit" of this Court. Hence, in Plaintiffs' minds, the courts are indistinguishable and interchangeable and Plaintiffs can pick and choose where to file. That is not the law and would render the Order of Reference a nullity.

Dondero, have found little traction in the Bankruptcy Court for the serial, frivolous, and vexatious litigation positions they have taken in more than a dozen pending matters in the Bankruptcy Case and their attempts to interfere with the Debtor's business operations – actions that have cost the Debtor millions. Plaintiffs therefore determined their best course of action was to engage in blatant forum shopping with the goal of re-opening settled litigation and closed factual records in a court Plaintiffs hope will be more hospitable.[6] The Debtor will vigorously defend this action as (a) a flagrant attack on the Bankruptcy Court; (b) a frivolous attempt to avoid settled principals of bankruptcy jurisdiction through (less than) clever pleading; and (c) barred by *res judicata*. The Debtor have also sought to hold Plaintiffs and their counsel, among others, in civil contempt for attempting to add Mr. James P. Seery, Jr., the Debtor's independent, Bankruptcy Court-appointed CEO and CRO, as a defendant in this Case in clear violation of two final Bankruptcy Court orders.[7]

5.      The fact that the Complaint was not automatically referred to the Bankruptcy Court is attributable to a blatant omission by Plaintiffs in Section VIII of their Civil Cover Sheet (Appx. 3). Because this action is undoubtedly "related to" the Bankruptcy Case and the pending appeal of the Settlement, Plaintiffs' attorneys were required to disclose that a "related case" to the Complaint existed – as that term is used in the Local Civil Rules, effective September 1, 2020, of the Northern District of Texas (the "Local Rules"). Plaintiffs' failure to make such disclosure could not have

---

[6] The Complaint is not the first time that Plaintiffs have attempted to disenfranchise the Bankruptcy Court. On March 18, 2021, Mr. Dondero, Plaintiffs, and other entities owned and/or controlled by Mr. Dondero filed *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* [Docket No. 2060] (the "Recusal Motion") pursuant to which they sought to recuse the Honorable Stacey Jernigan from the Bankruptcy Case. The Recusal Motion was denied by the Bankruptcy Court and has been appealed [Docket No. 2149].

[7] On April 19, 2021, filed *Plaintiff's Motion for Leave to File First Amended Complaint in the District Court* (the "Seery Motion") in this Court seeking leave to add Mr. Seery as a defendant, and, in response, on April 23, 2021, the Debtor filed *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2247] (the "Contempt Motion"). The Bankruptcy Court ordered Plaintiffs, among others, to appear at an in person hearing on June 8, 2021, to show cause why they should not be held in contempt [Docket No. 2255] (the "Show Cause Order").

been inadvertent. And Plaintiffs have also not been candid with the Bankruptcy Court. On May 14, 2021, Plaintiffs filed a response to the Show Cause Order inaccurately claiming they had made full disclosure to this Court.[8]

6.      The Bankruptcy Court is the appropriate tribunal to address the Complaint as it clearly "arises under, arises in or relates to the Debtor's Chapter 11 case and the Settlement. The Court should send Plaintiffs a strong message that (a) such gamesmanship is not acceptable; (b) the Order of Reference will be enforced; and (c) the Complaint will be immediately sent to the Bankruptcy Court where it belongs.

## FACTUAL BACKGROUND

### A.      Plaintiffs' Ownership and Control

7.      Plaintiffs are controlled and/or directed by Mr. Dondero, the Debtor's ousted founder.[9] CLOH is an entity wholly owned and controlled by the DAF. Until at least mid-January 2021, Grant Scott, Mr. Dondero's life-long friend and college roommate, was the sole director of the DAF and of CLOH (neither of which otherwise had any officers or employees).[10] As found by the Bankruptcy Court, Mr. Dondero has engaged in a coordinated litigation campaign against the Debtor both directly and through his related entities, including Plaintiffs, with the goal of

---

[8] *See Response of the Charitable DAF Fund, L.P., CLO Holdco, Ltd., and Sbaiti & Company PLLC to Show Cause Order* [Docket No. 2313], pg. 3 (the "Bankruptcy Response") (Appx. 28). In the Bankruptcy Response, Plaintiffs prognosticate about how this Court would rule: "… [the Debtor] seem[s] to have assumed that the Motion for Leave would be granted, and that the proposed amended complaint naming Seery would be referred to [the Bankruptcy] Court for a report and recommendation." Appx. 28 at p. 12. If that were the case, Plaintiffs should have just filed in the Bankruptcy Court or, at the very least, disclosed the Bankruptcy Case in the Civil Cover Sheet.

[9] Mr. Dondero also controls, and has appeared in the Bankruptcy Case, through, among others, his two family investment trusts: Dugaboy and Get Good.

[10] Mr. Scott previously testified during a sworn deposition in the Bankruptcy Case that he had little knowledge of the investment and other activities of the DAF and CLOH and was effectively taking direction from Mr. Dondero with respect to their activities. Appx. 27, 11:10-25; 12:1-25; 13:1-25; 14:1-25; 15:1-25; 16:1-17.

"burn[ing] down the [Debtor]."[11] A list of the litigation caused by Mr. Dondero in the Bankruptcy Case since September 2020 is Appx. 4.

**B.** **HarbourVest's Investment and Claims against the Debtor**

8.      Prior to the commencement of the Bankruptcy Case, HarbourVest invested approximately $80 million (the "Investment") in HCLOF, a Guernsey-based limited company formed and managed by the Debtor and – prior to his ouster – Mr. Dondero. Immediately following the Investment, CLOH held 49.02% of HCLOF's interests, HarbourVest held 49.98%, and the remaining 1% was held by the Debtor and certain current and former Debtor employees. After the Settlement, in which HarbourVest transferred its interests to a wholly-owned subsidiary of the Debtor, the Debtor's interest in HCLOF was 50.18% and CLOH's interest remained 49.02%.

9.      HarbourVest filed Claims[12] in the Bankruptcy Case in excess of $300 million. The Claims alleged HarbourVest was fraudulently induced into the Investment based on the material factual misrepresentations and omissions of Mr. Dondero and certain of his employees, including that the Debtor: (a) did not disclose it never intended to pay an arbitration award obtained by a former portfolio manager, Joshua Terry,[13] (b) did not disclose that Mr. Dondero and the Debtor

---

[11] The Bankruptcy Court made substantial findings of facts regarding Mr. Dondero and his related entities' (including Plaintiffs') history of serial litigation in the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order"). The Confirmation Order is Appx. 5. *See* Appx. 5, ¶¶ 17-19, 77-78. The Confirmation Order approved the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as amended, the "Plan"), which included certain amendments. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Docket No. 1875]. The Plan is attached to the Confirmation Order.

[12] "Claims" collectively refers: HarbourVest 2017 Global Fund L.P. (Claim No. 143), HarbourVest 2017 Global AIF L.P. (Claim No. 147), HarbourVest Dover Street IX Investment L.P. (Claim No. 150), HV International VIII Secondary L.P. (Claim No. 153), HarbourVest Skew Base AIF L.P. (Claim No. 154), and HarbourVest Partners L.P. (Claim No, 149). The Claims are Appx. 6.

[13] This award was entered in favor of Mr. Terry against a Debtor subsidiary, Acis Capital Management, L.P. ("Acis"). Instead of satisfying the award, the Dondero-controlled Debtor caused Acis to transfer its assets in an effort to become judgment proof. Mr. Terry filed an involuntary bankruptcy petition against Acis and, after intense litigation and the appointment of a chapter 11 trustee, confirmed a chapter 11 plan, which transferred Acis to Mr. Terry. These actions resulted in Acis filing a claim of not less than $75 million (Claim No. 23) against the estate.

DOCS_NY:43079.11 36027/002

engaged in a series of fraudulent transfers for the purpose of preventing Mr. Terry from collecting on his arbitration award, (c) misrepresented why the investment manager for HCLOF was changed immediately prior to the Investment, (d) indicated the dispute with Mr. Terry would not impact investment activities, and (e) expressed confidence in HCLOF's ability to reset or redeem certain collateralized loan obligations ("CLOs"). The Claim also asserted causes of action under Racketeering Influenced Corrupt Organizations Act ("RICO") and breaches of fiduciary duty under Guernsey common law.

**C.** **The HarbourVest Settlement and Objections**

10. On December 23, 2020, the Debtor filed its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625][14] (the "Settlement Motion"), pursuant to which the Debtor sought Bankruptcy Court approval of the Settlement with HarbourVest pursuant to 11 U.S.C. §§ 105(a) and 363 and Bankruptcy Rule 9019. Appx. 7. The Debtor concurrently filed the proposed *Settlement Agreement* and *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* (the "Transfer Agreement") [Docket No. 1631-1]. Appx. 8. The Settlement Agreement expressly provided that it was subject to Bankruptcy Court approval. Appx. 7, ¶ 3.

11. Among the material terms of the Settlement was that HarbourVest would transfer its interest in Highland CLO Funding, Ltd. ("HCLOF") to the Debtor or its nominee (the "Transfer"). The Transfer was a necessary component of the Settlement. HarbourVest believed the misrepresentations entitled it to a rescission of its Investment, and HarbourVest wanted to extract itself from the Highland platform. The Settlement also provided HarbourVest with (a) an allowed, general unsecured claim in the amount of $45 million, (b) a subordinated, allowed, general

---

[14] Unless otherwise noted, all docket references refer to the docket maintained by the Bankruptcy Court.

DOCS_NY:43079.11 36027/002

unsecured claim in the amount of $35 million, and (c) other consideration more fully described in the Settlement Agreement. *See* Appx. 7, ¶ 32.

12.    The Settlement Motion fully disclosed all aspects of the Transfer, including (a) what HarbourVest was transferring; (b) the valuation (and method of valuation) of the asset being transferred to the Debtor; and (c) the method of the Transfer. (Appx. 7, ¶¶ 1(b) 32, 32 n.5; Appx. 8). Three objections were lodged against the proposed Settlement, all of which were filed by Mr. Dondero or entities controlled by him, including Plaintiff CLOH and Dondero's Trusts. Each of those objections was coordinated by Mr. Dondero.[15]

**D.    Plaintiffs Knew of the Transfer, and Plaintiff CLOH Objected to the Settlement**

13.    On January 6, 2021, Mr. Dondero filed his *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (Appx. 9) contending, among other things, that the Settlement: (a) was not "reasonable or in the best interests of the estate" because the Debtor was ***grossly overpaying*** and (b) amounted to "a blatant attempt to purchase votes in support of the Debtor's plan." *Id.*, ¶ 1. Mr. Dondero did not directly challenge the Transfer but made clear that he knew exactly what was being transferred and the valuation being placed on it: "As part of the settlement, HarbourVest will [] transfer its entire interest in [HCLOF] to an entity to be designated by the Debtor. The Debtor states that the value of this interest is approximately $22 million as of December 1, 2020." *Id.*, ¶ 1, n.3.

14.    On January 8, 2021, Dondero's Trusts filed their *Objection to the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith.* [Docket No. 1706]. (Appx. 10) Like Mr. Dondero, the Trusts made clear that they knew of the proposed Transfer and its valuation. But,

---

[15] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Proc. 21-03190-sgj, Docket No. 46], Exhibit Q.

unlike Mr. Dondero, the Trusts directly questioned (a) whether HarbourVest had the right to effectuate the Transfer, and (b) the valuation of the HCLOF interests – matters which are directly at issue in the Complaint.

15.     Finally, and notably, on January 8, 2021, Plaintiff CLOH – presumably at the direction of its parent, the DAF – filed its *Objection to HarbourVest Settlement* [Docket No. 1707]. (Appx. 11) In its objection, CLOH challenged (as it does again in the Complaint) HarbourVest's right to implement the Transfer contending, among other things, that: (a) CLOH and the other members of HCLOF had a "Right of First Refusal" under the Members Agreement (*Id.*, ¶ 3) and (b) "HarbourVest has no authority to transfer its interest in HCLOF without first complying with the Right of First Refusal" (*Id.*, ¶ 6). In support of these contentions, CLOH offered a lengthy analysis of the Members Agreement, including CLOH's purported "Right of First Refusal" under Section 6.2 thereof. *Id.*, ¶¶ 9-22.

**E.     The Dondero Parties Exercised their Right to Take Discovery**

16.     By objecting to the Settlement Motion, Mr. Dondero, the Trusts, and CLOH (collectively, the "Dondero Objectors") initiated a "contested matter" under Bankruptcy Rule 9014[16] and, accordingly, had the unfettered right to conduct discovery under Bankruptcy Rule 9014(c).[17] Thus, for example, the Dondero Objectors had the right to request documents from, and take the depositions of, the Debtor, HarbourVest, HCLOF, and/or Highland HCF Fund Advisor,

---

[16] *See also* Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas 9014-1(a) ("a response is required with respect to a contested matter").

[17] The Debtor filed the Settlement Motion on December 23, 2020, and set the hearing on the motion for January 14, 2021 [Docket No. 1626]. The DAF and CLOH allege that the Debtor "set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal." Appx. 1, ¶ 30. This is a bald lie (one of many) and absurd. The undisputed facts are that (a) the Settlement Motion was filed on regular notice; (b) no one requested or moved for an extension of the hearing date; and (c) no one contended they had insufficient time to "scrutinize the underpinnings of the deal" (at least until the filing of the Complaint).

Ltd. ("HCFA")[18] concerning the Settlement Motion, their objections thereto, and the Debtor's valuation of HarbourVest's interest in HCLOF and the method of valuation.

17.     The Dondero Objectors – all sophisticated parties represented by sophisticated counsel – exercised their discovery rights.[19] In particular, Mr. Dondero and CLOH conducted a three and a half hour deposition of Michael Pugatch, a representative of the HarbourVest claimants [Docket No. 1705]. (Appx. 12) However, none of the Dondero Objectors, including Plaintiffs, exercised their right to take discovery from the Debtor, HCLOF, or HCFA in connection with the Settlement Motion, except for informal requests for documents which were provided.

18.     Notably, despite the issue of the Transfer being "front and center," none of the Dondero Objectors, including Plaintiffs, ever asserted (as Plaintiffs do now) that: (a) the Debtor had a fiduciary duty to offer the HCLOF interests to CLOH, or (b) the Investment Advisers Act of 1940 (the "Advisers Act") was implicated in any way by the proposed Settlement, including the proposed Transfer. Further, although CLOH argued that the Members Agreement gave CLOH a right of first refusal, CLOH, in connection with the Settlement, never offered to buy the HCLOF interests or stated that it wanted to purchase those interests.

**F.     The Bankruptcy Court Approves the Settlement**

19.     On January 13, 2021, the Debtor filed its *Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Omnibus

---

[18] HCLOF, HCFA (in its capacity as the portfolio manager of HCLOF), the Debtor's designee, HCMLP Investments, LLC (as transferee), and HarbourVest (as transferors) were parties to the proposed Transfer Agreement pursuant to which the Transfer would be effectuated. Appx. 7, Ex. A; Appx. 8.

[19] Plaintiffs not only failed to disclose that the Dondero Objectors took discovery, they allege the opposite ("No discovery had taken place between the parties, and plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (*or even during its pendency*) in order to investigate its rights."). Appx. 1, ¶ 29 (emphasis added).

Reply"). Appx. 13. The Omnibus Reply set forth an extensive rebuttal to CLOH's flawed argument

that the Transfer could not be completed without HCLOF's other members being offered

HarbourVest's interest in HCLOF, as allegedly required by the "Right of First Refusal" under

Section 6.2. *Id.*, ¶¶ 26-39. Both HCLOF – which was independently represented – and

HarbourVest agreed with the Debtor's conclusions that the Members Agreement did not require

HarbourVest to offer its interests to CLOH or any other member of HCLOF. *Id.*, ¶ 37. At the

January 14, 2021, hearing, CLOH *voluntarily withdrew* its objection after reading the Debtor's

analysis of the Members Agreement:

> CLO Holdco has had an opportunity to review the reply briefing, and . . . [b]ased
> on our analysis of Guernsey law and some of the arguments of counsel on those
> pleadings and our review of the appropriate documents, I obtained authority from
> my client, Grant Scott, as trustee for CLO Holdco, *to withdraw the CLO Holdco
> objection based on the interpretation of the member agreement*.

Appx. 14 at 7:20-8:6 (emphasis added). Following CLOH's withdrawal of its objection, the Trusts

also abandoned their challenge to the Transfer. *Id.* at 22:5-20.

20.     The Debtor called two witnesses in support of the Settlement Motion, Mr. Seery

and Mr. Pugatch. Counsel for Mr. Dondero and the Trusts cross-examined the Debtor's witnesses

but did not inquire about the value of the HCLOF interests, the Debtor's fiduciary obligations, or

the Transfer (except for a line of questioning concerning which entity would hold the HCLOF

interests on behalf of the Debtor). *Id.*, at 87:18-89:21. At the conclusion of the hearing, the Court

entered an order overruling the remaining objections and approving the Settlement [Docket No.

1788] (the "Settlement Order"). Appx. 15.

21.     The Settlement Order *expressly* authorized the transfer of HarbourVest's interest

in HCLOF providing, in relevant part, that "[p]ursuant to the express terms of the [Members

Agreement] . . . HarbourVest is authorized to transfer its interest in HCLOF . . . *without the need

to obtain the consent of any party or to offer such interests first to any other investor in*

*HCLOF*." *Id.*, ¶ 6 (emphasis added). The Bankruptcy Court specifically included this language in the Settlement Order because of concerns that Mr. Dondero and his entities would "go to a different court somehow to challenge the transfer." Appx. 14 at 156:19-20.[20] The Settlement Order also clearly provided that "[t]he [Bankruptcy] Court shall retain ***exclusive jurisdiction*** to hear and determine all matters arising from the implementation of this Order." *Id.,* ¶ 7 (emphasis added).

22. Only the Trusts appealed the Settlement Order [Docket Nos. 1870, 1889]. Appx. 16. Plaintiffs elected not to appeal. However, both the Trust and Plaintiffs are controlled by Mr. Dondero, and Mr. Dondero is thus both appealing the Settlement Order and seeking reconsideration of the Settlement Order in this Court.

## G. The DAF and CLOH Sue the Debtor and Others in This Court

23. On April 12, 2021, after obtaining new counsel,[21] the DAF and CLOH filed the Complaint against the Debtor, HCFA, and HCLOF in this Court. The Complaint seeks to challenge the Transfer and Settlement approved by the Bankruptcy Court over Mr. Dondero's and Plaintiffs' objections and to re-open the Bankruptcy Court's factual record. To justify this blatant attempt to re-litigate the matter, the DAF and CLOH allege they recently learned that (a) the HCLOF interests were substantially more valuable than Mr. Seery testified, and (b) the Debtor had fiduciary and

---

[20] Appx. 14 at 156:10-25; 157:1-5 (emphasis added):

MR. MORRIS: . . . With respect to the order, I just want to make it clear that we are going to include a provision that specifically authorizes the Debtor to engage in -- to receive from HarbourVest the asset, you know, the HCLOF interest, and that that's consistent with its obligations under the agreement.

***The objection has been withdrawn, I think the evidence is what it is, and we want to make sure that nobody thinks that they're going to go to a different court somehow to challenge the transfer.*** So I just want to put the Court on notice and everybody on notice that we are going to put in a specific finding as to that.

THE COURT: All right. Fair . . . Fair enough. I do specifically approve that mechanism and find it is appropriate and supported by the underlying agreements.

And just so you know, I spent some time noodling this yesterday before I knew it was going to be settled, so I'm not just casually doing that. I think it's fine.

[21] Upon information and belief, Mr. Dondero effectively fired Mr. Scott and his counsel, John Kane of Kane Russell, after Mr. Scott withdrew CLOH's objection to the HarbourVest Settlement.

DOCS_NY:43079.11 36027/002

other duties requiring it to provide Plaintiffs with the opportunity to acquire HarbourVest's interest in HCLOF. *See, e.g.,* Appx. 1, ¶¶ 36, 49. Plaintiffs also assert claims for breach of fiduciary duty, breach of contract, negligence, violation of RICO, and tortious interference.

24.    In the Complaint, Plaintiffs recite certain facts relating to HarbourVest's Claims and the process by which the Debtor obtained Bankruptcy Court approval (*Id.*, ¶¶ 16-31) but disclose none of the undisputed facts set forth above. Plaintiffs also do not disclose that they – through their relationship to Mr. Dondero – had the same information concerning the value of the HarbourVest interests that Mr. Seery allegedly had. Finally, they do not even attempt to justify why they are seeking, in this Court, to re-litigate a Bankruptcy Court order.

**H.    Counsel for the DAF and CLOH Willfully Ignore the Gatekeeper Orders**

25.    Throughout the Complaint, Plaintiffs threatened to name Mr. Seery as a defendant,[22] and indeed, on April 19, 2021, just four days after filing the Complaint, Sbaiti & Co. ("Sbaiti"), the newly-retained counsel for the DAF and CLOH, advised the Debtor's counsel that they "intend to move for leave today in the district court seeking permission to amend our complaint to add claims against Mr. Seery. They are the same causes of action. We believe we are entitled to amend as a matter of course." Counsel asked whether they could "put your client down as unopposed?" Appx. 17. In response, the Debtor informed Sbaiti of the two "Gatekeeper Orders" (defined below), which prohibited this action, provided copies, and told them, among other things, that "[i]f you proceed to amend the complaint as you suggest [] without first obtaining Bankruptcy Court approval we reserve all rights to take appropriate action and seek appropriate relief from the

---

[22] By way of example only, Plaintiffs refer to Mr. Seery as a "potential party" and suggest that he had access to and wrongfully utilized "superior non-public information" and lied under oath about the value of the asset subject to the Transfer in his testimony to the Bankruptcy Court. Appx. 1, at Introduction, ¶¶ 6, 43-44.

Bankruptcy Court." *Id.* Later that evening, Sbaiti confirmed their intention to seek leave from this Court to sue Mr. Seery and, on April 19, 2021, filed the Seery Motion. Appx. 18.

26.     Both Gatekeeper Orders are plain, unambiguous, and final. On January 9, 2020, the Bankruptcy Court, **with Mr. Dondero's consent and agreement**, entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339] pursuant to 11 U.S.C. §§ 105 and 363 and Rule 9019 (the "<u>January Order</u>"). Appx. 19. Pursuant to the January Order, Mr. Dondero surrendered control of the Debtor and the Independent Board was appointed. To protect the Independent Board and its agents from frivolous litigation (primarily from Mr. Dondero and his related entities), the Debtor asked for, and the Bankruptcy Court included in the January Order (without objection), a "gatekeeper" provision stating in pertinent part:

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

*Id.*, ¶ 10. Mr. Seery is protected under the January Order as a member of the Independent Board and as the Debtor's CEO and CRO – an agent of the Independent Board. The January Order provided that the Bankruptcy Court "shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order. . . ."). *Id.,* ¶ 13.

27.     Seven months later, the Debtor sought Bankruptcy Court approval to appoint Mr. Seery as the Debtor's CEO and CRO. After an evidentiary hearing, the Bankruptcy Court granted the motion (without objection) and entered its *Order Approving Debtor's Motion Under*

*Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* [Docket No. 854] pursuant to 11 U.S.C. §§ 105(a) and 363(b) (the "July Order" and with the January Order, the "Gatekeeper Orders"). Appx. 20. Like the January Order, the July Order included a "gatekeeper" provision:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

*Id.*, ¶ 5. The Bankruptcy Court "retain[ed] jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of [the July] Order." *Id.,* ¶ 8.

28.    The Gatekeeper Orders are final orders, *res judicata*, and law of the case. *See* Appx. 5, ¶ 73 (finding that the Gatekeeper Orders "constitute[] law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987)").

29.    The Gatekeeper Orders also featured heavily at the Plan confirmation hearing. CLOH initially objected to the Plan, which Mr. Dondero and his proxies, including CLOH, contested.[23] In the Confirmation Order, the Bankruptcy Court provided the rationale for, and purpose of, the "gatekeeper" provisions in the Gatekeeper Orders (Appx. 5, ¶¶ 12-14) and expressly found that a "gatekeeper" provision was needed in the Plan because "Mr. Dondero and his related entities will likely commence ligation . . . after the Effective Date and do so in jurisdictions other than the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more hospitable to his claims" (Appx. 5, ¶ 78). Despite this clear finding and

---

[23] Mr. Dondero and a number of his related entities are currently appealing the Confirmation Order.

order, Plaintiffs filed the Seery Motion to add Mr. Seery as a defendant and asked this Court to disregard the Gatekeeper Orders. Although this Court denied the Seery Motion, it stated "Plaintiffs may renew their motion after Defendants are served and have appeared" leaving open the possibility that Plaintiffs may still attempt to add Mr. Seery.[24] Appx. 21.

30.    In response, on April 23, 2021, the Debtor filed the Contempt Motion in the Bankruptcy Court for an order to show cause as to why Plaintiffs should not be held in contempt. Appx. 24. Plaintiffs then filed a motion in the Bankruptcy Court purporting to seek reconsideration of the July Order [Docket No. 2248] (the "<u>Motion for Reconsideration</u>").[25] Appx. 25. The Bankruptcy Court ordered Plaintiffs, among others, to appear at an in person hearing on June 8, 2021,[26] to show cause why they should not be held in contempt. Appx. 26.

31.    Finally, on May 14, 2021, Plaintiffs filed the Bankruptcy Response in which they argue that they followed the Gatekeeper Orders by filing the Complaint in this Court rather than the Bankruptcy Court because seeking to amend the Complaint to add Mr. Seery as a defendant was not "pursuing" a claim (as used in the Gatekeeper Orders). Appx. 28 at 13.

## ARGUMENT

**A.    <u>Plaintiffs Violated Local Rule 3.3(a) By Failing to Disclose the Bankruptcy Case</u>**

32.    When Plaintiffs filed the Complaint, thereby initiating the action, their counsel was required to complete a Civil Cover Sheet, Section VIII of which required them to disclose whether there were any "related cases." Local Rule 3.3(a) requires that "[w]hen a plaintiff files a complaint and there is a related case . . . the complaint must be accompanied by a notice of related case." A

---

[24] If Mr. Seery incurs any costs defending or preparing to defend against Plaintiffs' action, Mr. Seery will be entitled to indemnification directly from the Debtor under the Debtor's limited partnership agreement (Appx. 22, § 4.1(h)) and indirectly through the Strand's indemnification obligations and the Debtor's guarantee of such obligations (Appx. 23).

[25] The Contempt Motion and the Motion for Reconsideration were re-docketed on April 27, 2021, without any changes.

[26] The hearing on the Show Cause Order will be the first in person hearing since March 2020.

"related case" is defined in pertinent part as a proceeding that "arises from a common nucleus of operative fact with the case being filed or removed, regardless whether the related case is a pending case. . . ." Local Rule 3.3(b)(3). As discussed above, although the Complaint asserts claims based on the same facts as the HarbourVest Settlement approved over Plaintiffs' objection by the Bankruptcy Court, the Civil Cover Sheet makes no mention of the Bankruptcy Case as a "related case." It merely describes the nature of the Complaint as one arising under RICO. Yet the Bankruptcy Case is indisputably related to this one.[27] Plaintiffs' failure to disclose the existence of a related case violates the Local Rules. *See Kuzmin v. Thermaflo, Inc.*, 2:07-CV-00554-TJW, 2009 U.S. Dist. LEXIS 42810, at *4-7 (E.D. Tex. May 20, 2009) (finding party violated court's local rules where they failed to indicate on civil cover sheet that case was "related to" other cases).

**B.** **The Complaint Should Be Automatically Referred to the Bankruptcy Court**

    **i.** **The Complaint Should Be Heard in the Bankruptcy Court.**

    33.    Jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11" is conferred on district courts. 11 U.S.C. §§ 1334(a), (b). District courts, in turn, may refer proceedings to the bankruptcy courts. 28 U.S.C. § 157(a) ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."). On August 3, 1984, this Court entered the Order of Reference, which provides, in pertinent part: "***any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 . . . be and they hereby are referred to the***

---

[27] Under 28 U.S.C. § 1334(a), this Court has original and exclusive jurisdiction over the Bankruptcy Case. Pursuant to 28 U.S.C. § 157 and the Order of Reference, this Court has referred matters in the Bankruptcy Case to the Bankruptcy Court. It is thus clear that the Bankruptcy case is pending in this District pursuant to this Court's jurisdiction, and as noted above the matters alleged in the Complaint related directly to litigated proceedings involving Plaintiffs and the Debtor in the Bankruptcy Case. These facts require appropriate disclosure in the Civil Cover Sheet.

*Bankruptcy Judges of this district for consideration and resolution consistent with law*." Appx.

2 (emphasis added). The Order of Reference therefore refers the following proceedings:

- **Proceedings "arising under Title 11":** A proceeding "arises under" Title 11 if it is a "cause of action created or determined by a statutory provision of title 11." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987).

- **Proceedings "arising in. . . a case under Title 11":** A proceeding "arises in" Title 11 if it deals with "administrative matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 96 (emphasis in original).[28]

- **Proceedings "related to a case under Title 11":** A proceeding "relates to" a case under Title 11 if "the outcome of [the non-bankruptcy] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 Fed. Appx. 741, 748 (5th Cir. 2021) (internal citations omitted); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal. . . with all matters connected with the bankruptcy estate"). A proceeding "relates to" a proceeding under Title 11 even if it arises from postpetition conduct if "it affects the estate, not just the debtor." *Wood*, 825 F.2d at 94.

### ii.    The Order of Reference is Mandatory.

34.    Under the plain language of the Order of Reference, "all proceedings under Title

11 or arising or related to a case under Title 11" are ***automatically*** referred to the bankruptcy

courts, and the Debtor respectfully submits that the Order of Reference is mandatory. *See Uralkali*

*Trading, S.A. v. Sylvite Southeast, LLC*, 2012 U.S. Dist. LEXIS 40455, at *3 (M.D. Fla. Mar. 26,

2012) (finding that a substantially similar order of reference in the Middle District of Florida

"mandate[d]" referral to the appropriate bankruptcy court); *Welch v. Regions Bank*, 2014 U.S.

Dist. LEXIS 96175, at *5 (M.D. Fla. July 15, 2014) ("[T]his Court has declared the enforcement

of the Standing Order of Reference mandatory"). The fact that 11 U.S.C. §§ 1334 confers original

jurisdiction on the district court does not change this requirement as district courts and bankruptcy

---

[28] Proceedings arising under and arising in Title 11 are "core proceedings" under 28 U.S.C. § 157(b). *Wood*, 825 F.2d at 96 ("[T]he phrases 'arising under' and 'arising in' are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding. . . If the proceeding is one that would arise only in bankruptcy. It is also a core proceeding. . . .").

17

courts are distinct. *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) ("Additionally, every other circuit to address the issue has maintained the distinction between the bankruptcy court and the district court, holding that 'a debtor must obtain leave of the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity'") (citations omitted).

### iii.    Any Disputes Over the Settlement or the Transfer Arise Under, Arise In, and Relate to Title 11 and are Core Proceedings.

35.    It is black letter law that the determination of whether to approve a settlement of a claim is a "core proceeding" and arises in and under Title 11. The statutory predicates for relief are 11 U.S.C. §§ 105 and 363 and under Rule 9019, which are "created by the federal bankruptcy law" and "arise only in bankruptcy." *Wood*, 825 F.2d at 96; *see also, e.g., In re Idearc, Inc.,* 423 B.R. 138, 177 (Bankr. N.D. Tex. 2009) (finding approval of a settlement under Bankruptcy Rule 9019 was a "core proceeding" under 28 U.S.C. § 157(b)); *In re Margaux City Lights Partners, Ltd.*, 2014 Bankr. LEXIS 4841 at *6 (Bankr. N.D. Tex. Nov. 24, 2014) (same); Settlement Order, ¶ 2 (same). The HarbourVest Settlement also involved the allowance of HarbourVest's Claims – a black letter core proceeding under 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include, but are not limited to – (B) allowance of disallowance of claims against the estate. . . .").

36.    Since the Complaint seeks to re-litigate the HarbourVest Settlement and to re-open the Bankruptcy Court's factual record, it is seeking a ruling from this Court as to the merits of the HarbourVest Settlement and/or to litigate matters that arose from the same operative facts as the HarbourVest Settlement – in each case, a core proceeding arising in and under Title 11. If the Settlement Order or the Transfer is to be re-assessed it must be by the Bankruptcy Court under the Bankruptcy Code and Bankruptcy Rules. This Court should enforce the Order of Reference and refer the Complaint to the Bankruptcy Court. *See Burch*, 835 Fed. Appx. at 748 ("Each of Burch's

state-court claims is premised on his interpretation of a Chapter 11 bankruptcy order, and so each arises from or is related to his Title 11 bankruptcy proceedings.").

37.     Further, the Bankruptcy Court specifically retained jurisdiction in the Settlement Order to adjudicate all disputes arising from the implementation of the Settlement Order, including the Transfer of the HCLOF interests, and therefore retained jurisdiction to hear the Complaint. *Id.* ¶7. Even if jurisdiction had not been explicitly retained, the Bankruptcy Court, like all federal courts, has jurisdiction to interpret and enforce its own orders. *Rodriguez v. EMC Mortgage Corp. (In re Rodriguez)*, 2001 U.S. App. LEXIS 30564, at *5 (5th Cir. Mar. 15, 2001); *In re Galaz*, 841 F.3d 316, 322 (5th Cir. 2016); *Angel v. Tauch (In re Chiron Equities, LLC)*, 552 B.R. 674, 684 (Bankr. S.D. Tex. 2016). The Complaint, which seeks to challenge the Transfer and re-litigate the Settlement Order, is therefore itself a core proceeding arising in and under Title 11 and should be heard in the Bankruptcy Court.

### iv.     Any Disputes Over the Gatekeeper Orders Arise Under, Arise In, and Relate to Title 11 and Are Core Proceedings.

38.     The Seery Motion was denied, and Mr. Seery has not been added as a defendant in this Case. Plaintiffs have also filed the Motion for Reconsideration in the Bankruptcy Court. However, to the extent Plaintiffs seek to add Mr. Seery as a defendant in this Case, any such proceedings must be referred to the Bankruptcy Court for the reasons forth in Section B(iii) *supra*. Like the Settlement Order, the January Order is the result of a settlement with the Committee approved under 11 U.S.C. §§ 105 and 363 and Bankruptcy Rule 9019. The "gatekeeper" provision in the January Order was also a required component of that settlement and the settlement would not have been approved without it. *See* Appx. 5, ¶ 12-14. Similarly, the July Order was the result of a motion seeking authority to appoint Mr. Seery as CEO and CRO under 11 U.S.C. §§ 105(a) and 363(b), an administrative action that only exists in Title 11 and thus "arises in" and "arises

under" Title 11. Like the January Order, the "gatekeeper" provision in the July Order was a required component of Mr. Seery's appointment. *Id.* Any attempt to add Mr. Seery as a defendant would be re-litigating a core proceeding arising under, arising in, and related to Title 11.

        **v.**      **The Complaint Impacts Creditor Recoveries.**

39.      The Debtor's Plan provides for the orderly monetization of the Debtor's assets and the distribution of the proceeds to creditors. Because the Plan is an asset monetization plan, distributions depend on two things: (a) the total amount of allowed claims against the estate and (b) the cash available to pay those claims. Consequently, the Complaint will have a material and immediate impact on the Debtor's estate. *First*, any judgment secured by Plaintiffs against the Debtor will decrease the cash available to pay the Debtor's prepetition creditors (which cash is property of the estate under 11 U.S.C. § 541). *Second*, any delay in determining the amount owed to HarbourVest or the amount owed by the Debtor to Plaintiffs will delay payments to creditors under the Plan as the Debtor will need to reserve against such claims. This impact on creditors and the Debtor's ability to satisfy its obligations under the Plan clearly impacts the Debtor's estate and should be adjudicated by the Bankruptcy Court. *Zale*, 62 F.3d at 753 ("Those cases in which courts have upheld 'related to' jurisdiction over third-party actions do so because the subject of the third party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate."); *see generally Centrix Fin. Liq. Trust v. Sutton*, 2019 U.S. Dist. LEXIS 154083 (D. Colo. Sept. 10, 2019) (finding that in a liquidating plan, the bankruptcy court has "related to" jurisdiction over all matters that impact distributions from the liquidating trust).

        **vi.**     **Mr. Seery Will Have Indemnification Claims Against the Estate.**

40.      This Court denied the Seery Motion without prejudice, but if Mr. Seery is ever added as a defendant or is compelled to retain personal counsel because of the completely unfounded and false allegations in the Complaint, Mr. Seery will have the right to indemnification

from the estate. *See* ¶ n.24 *supra*. The cost of this indemnification will immediately decrease the amount available to creditors and will delay distributions. Again, this clearly "relates to" to the Debtor's bankruptcy. *See, e.g., Collins v. Sidharthan (In re KSRP, Ltd.)*, 809 F.3d 263, 266-67 (5th Cir. 2015) (finding that bankruptcy court had jurisdiction because of potential indemnification claims even though bankruptcy court ultimately determined the indemnification claims were invalid); *Refinery Holdings Co., L.P. v. TRMI Holdings, Inc. (In re El Paso Refinery, L.P.)*, 302 F.3d 343, 349 (5th Cir. 2002) (finding "related to" jurisdiction when "RHC's claim against Texaco could conceivably have an effect on the Estate in light of the chain of indemnification provisions beginning with Texaco and leading directly to the Debtor."); *Houston Baseball Partners, LLC v. Comcast Corp. (In re Houston Reg'l Sports Network)*, 2014 Bankr. LEXIS 2274, at *15-25 (Bankr. S.D. Tex. May 22, 2013).

## C.    There is No Basis for a Mandatory Withdrawal of the Reference

41.    In the Seery Motion, Plaintiffs cite 28 U.S.C. § 157(d) for the proposition that bankruptcy courts are "prohibit[ed] . . . absent the parties consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulation organizations or activities affecting interstate commerce." Appx. 18, at 7. Plaintiffs argue that, because they pled causes of action arising under the Advisers Act and RICO, this Court will have to withdraw the reference. Plaintiffs make the same argument in the Bankruptcy Response: "Respondents expected that the motion for leave [to amend] would likely be referred to [the Bankruptcy] Court for a report and recommendation. And Respondents planned, if necessary, to move to withdraw the reference. . . ." Appx. 28 at 12.

42.    Even assuming Plaintiffs' federal law claims are not frivolous (and they are), Plaintiffs misinterpret 28 U.S.C. § 157(d)' s applicability to this case. 28 U.S.C. § 157(d) provides for mandatory withdrawal of the reference in certain instances: "The district court shall, on timely

motion of a party, so withdraw the proceeding if . . . resolution of the proceeding *requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce*." 28 U.S.C. § 157(d) (emphasis added). However, in interpreting Section 157(d), courts in this Circuit apply the majority view and require withdrawal of the reference only:

> [W]hen "substantial and material consideration" of a federal statute other than the Bankruptcy Code is necessary to the resolution of a case or proceeding. Withdrawal is not mandatory in cases that require only the "straightforward application of a federal statute to a particular set of facts." Rather, withdrawal is in order only when litigants raise "issues requiring significant interpretation of federal laws that Congress would have intended to [be] decided by a district judge rather than a bankruptcy judge."

*Southern Pac. Transp. v. Voluntary Purchasing Groups*, 252 B.R. 373, 382 (E.D. Tex. 2000) (quoting *In re National Gypsum*, 14 B.R. 188, 192-93 (N.D. Tex. 1991). As such, even the presence of a substantial federal question is not a basis for mandatory withdrawal; mandatory withdrawal is only proper when a bankruptcy court would have to interpret and apply federal law on a novel and unsettled question. *See Beta Operating Co., LLC v. Aera Energy, LLC (In re Memorial Prod. Partners)*, 2018 U.S. Dist. LEXIS 161159, at *9 (S.D. Tex. Sept. 20, 2018); *UPH Holdings, Inc. v. Sprint Nextel Corp.*, 2013 U.S. Dist. LEXIS 189349, at *4 (W.D. Tex. Dec. 10, 2013) (holding no mandatory withdrawal when, among other reasons, "the Bankruptcy Court will be tasked with 'no more than application of federal communications law to a given set of facts.") (citations omitted). Finally, "mandatory withdrawal is to be applied narrowly to ensure bankruptcy cases are litigated in the bankruptcy courts and to prevent 157(d) from becoming an 'escape hatch' from litigating cases under the Bankruptcy Code." *See, e.g., Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009) (quoting *In re G-I Holdings, Inc.*, 295 B.R. 211, 221 (D. N.J. 2003)).

43.      None of the putative federal causes of action raised by Plaintiffs require "substantial and material consideration" of a federal statute or more than the cursory application of settled federal law. In fact, most can be summarily dismissed as they either grossly misinterpret settled law, based on materially misstated facts, or assert causes of action that belong to other parties.

**D.      The Complaint Is Barred by the Doctrine of *Res Judicata***

44.      The doctrine of *res judicata* protects the finality of judgements by preventing litigants from re-litigating the same issues over and over again. "[R]es judicata has four elements: (1) the parties are identical or in privity; (2) the judgment. . . was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Comer v. Murphy Oil USA*, 718 F.3d 460, 467 (5th Cir. 2013). Each of those elements is satisfied here, and the Complaint is barred by *res judicata*. Plaintiffs had their opportunity to challenge these orders; they do not get a second bite at the apple or to re-litigate these issues in a different forum.

45.      As set forth above, the parties are identical. Plaintiffs had the right to object to the HarbourVest Settlement and the Transfer of the HarbourVest interests, and Plaintiffs (a) actually objected to the Settlement Motion arguing that they had a "Right of First Refusal" under the Members Agreement; (b) had the right to take discovery on all issues, including the value of the HarbourVest interests; (c) could have objected based on the Advisers Act or RICO; (d) deposed HarbourVest's 30(b)(6) witness; and (e) ***withdrew their objection once they realized that they did not have a "Right of First Refusal."*** The Bankruptcy Court also indisputably had jurisdiction over the matter. Although the Settlement Order is being appealed by the Trusts, it is a final judgment for purposes of *res judicata*. *See Fid. Standard Life Ins. Co. v. First Nat'l Bank & Trust Co.*, 510 F. 2d 272, 273 (5th Cir. 1975) ("A case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal."). Finally, as set forth above, the same claims or causes

23

of action are involved. The Complaint is a blatant collateral attack on the Settlement Order. *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) (finding that regardless of relief sought, it is a collateral attack if it must in some fashion overrule a previous judgment).

46.     Similarly, the January Order was entered in January 2020 with Mr. Dondero's consent and with the knowledge of Plaintiffs.[29] It was never appealed and is final. The July Order was entered in July 2020 without objection and with the knowledge of Plaintiffs. It was (a) never appealed; (b) is final;[30] and (c) the Bankruptcy Court was a court of competent jurisdiction.[31] *See In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1052-53 (5th Cir. 1987) (finding a court has jurisdiction for purposes of res judicata when no party contests subject matter jurisdiction in the original proceeding). Consequently, any attempt to add Mr. Seery to the Complaint and subsequent challenges to the Gatekeeper Orders would involve the same issues addressed by the Bankruptcy Court and must be dismissed on the basis of *res judicata*.

**E.     This Court Should Consider Mr. Dondero's Litigious Nature**

47.     This Court should also consider the history of this case when determining whether to enforce the reference, including Mr. Dondero's history of vexatious litigation (brought directly and indirectly) and the Bankruptcy Court's familiarity with the Bankruptcy Case and the interrelatedness of Mr. Dondero's byzantine web of related companies. Appx. 5, ¶¶ 77-78. In fact, the Fifth Circuit recently addressed a similar issue in *Burch v. Freedom Mortgage. Corp. (In re*

---

[29] On December 4, 2019, CLOH filed a *Notice of Appearance and Request for Copies* [Docket No. 152] in the Bankruptcy Case by and through its counsel Kane Russell Coleman Logan PC. Since then, CLOH has received notice as required by the Bankruptcy Code of all pleadings filed in the Bankruptcy Case.

[30] The Bankruptcy Court specifically found that the Gatekeeper Orders were *res judicata* in the Confirmation Order. *See* Appx. 5, ¶ 73; ¶ 28 *supra*.

[31] Plaintiffs have questioned whether the Bankruptcy Court exceeded its jurisdiction to enter the July Order in the Motion for Reconsideration. Any attempt to litigate that issue in this Court may impact the Motion for Reconsideration and must be referred to the Bankruptcy Court under the Order of Reference. *See In re Margulies*, 476 B.R. 393 (Bankr. S.D.N.Y. 2012) (citing *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1143 (6th Cir. 1991)) ("If the action between third parties will have a collateral estoppel effect on the debtor, the third party action is 'related to' the bankruptcy case for jurisdictional purposes.").

*Burch*). In *Burch*, the movant sought to avoid bankruptcy court jurisdiction over claims regarding the interpretation and enforceability of prior bankruptcy court orders. *Burch*, 385 Fed. Appx. at 747. Mr. Burch, like Mr. Dondero, had also been found to be an abusive litigant. The Fifth Circuit denied Mr. Burch's attempts to avoid bankruptcy court jurisdiction through clever pleading, calling them "frivolous," and "warn[ed] Burch that any further frivolous or abusive filings in this court, the district court, or the bankruptcy court will invite the imposition of sanctions, including dismissal, monetary sanctions, and/or restrictions on his ability to file pleadings in this court and any court subject to this court's jurisdiction." *Id.*, at 749; *see also* 28 U.S.C. § 1927 ("Any attorney or other person . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct."). Mr. Dondero, directly and through his proxies, is a frivolous and abusive litigant – hence the need for the "gatekeeper" provisions. This Court should not provide him a forum to further abuse the judicial process.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant its Motion and enter an order in the form annexed to the Motion as **Exhibit A**, and grant any further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated: May 19, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
           rfeinstein@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           jelkin@pszjlaw.com
           hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 2

000033

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                                 )  Case No. 19-34054-sgj-11
In Re:                           )  Chapter 11
                                 )
HIGHLAND CAPITAL                 )  Dallas, Texas
MANAGEMENT, L.P.,                )  Tuesday, June 8, 2021
                                 )  9:30 a.m. Docket
          Debtor.                )
                                 )  - SHOW CAUSE HEARING (2255)
                                 )  - MOTION TO MODIFY ORDER
                                 )    AUTHORIZING RETENTION OF
                                 )    JAMES SEERY (2248)
                                 )  - MOTION FOR ORDER FURTHER
                                 )    EXTENDING THE PERIOD WITHIN
                                 )    WHICH DEBTOR MAY REMOVE
                                 )    ACTIONS (2304)
_____   )

                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:          Jeffrey Nathan Pomerantz
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd.,
                           13th Floor
                         Los Angeles, CA  90067-4003
                         (310) 277-6910

For the Debtor:          John A. Morris
                         Gregory V. Demo
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

For the Debtor:          Zachery Z. Annable
                         HAYWARD & ASSOCIATES, PLLC
                         10501 N. Central Expressway,
                           Suite 106
                         Dallas, TX  75231
                         (972) 755-7104
```

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 38 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 38 of 852 PageID 1943

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,       Mazin A. Sbaiti
     CLO Holdco, Show Cause        Jonathan E. Bridges
 3   Respondents, Movants,         SBAITI & COMPANY, PLLC
     and Sbaiti & Company:         Chase Tower
 4                                 2200 Ross Avenue, Suite 4900W
                                   Dallas, TX  75201
 5                                 (214) 432-2899

 6   For Mark Patrick:             Louis M. Phillips
                                   KELLY, HART & HALLMAN, LLP
 7                                 301 Main Street, Suite 1600
                                   Baton Rouge, LA 70801
 8                                 (225) 338-5308

 9   For Mark Patrick:             Michael D. Anderson
                                   KELLY, HART & HALLMAN, LLP
10                                 201 Main Street, Suite 2500
                                   Fort Worth, TX  76102
11                                 (817) 332-2500

12   For James Dondero:            Clay M. Taylor
                                   Will Howell
13                                 BONDS ELLIS EPPICH SCHAFER
                                     JONES, LLP
14                                 420 Throckmorton Street,
                                     Suite 1000
15                                 Fort Worth, TX  76102
                                   (817) 405-6900
16
     For the Official Committee    Matthew A. Clemente
17   of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
18                                 Chicago, IL  60603
                                   (312) 853-7539
19
     For the Official Committee    Paige Holden Montgomery
20   of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                                   2021 McKinney Avenue, Suite 2000
21                                 Dallas, TX  75201
                                   (214) 981-3300
22
     Recorded by:                  Michael F. Edmond, Sr.
23                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
24                                 Dallas, TX  75242
                                   (214) 753-2062
25
```

3

1    Transcribed by:           Kathy Rehling
                               311 Paradise Cove
2                              Shady Shores, TX  76208
                               (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 40 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 40 of 852   PageID 1945

4

1              DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M.

2              THE COURT:  All right.  We have settings in Highland

3    this morning.  We have three settings.  We have the show cause

4    hearing with regard to a lawsuit filed in the District Court.

5    We have a couple of more, I would say, ministerial matters,

6    although I think we do have objections.  I know we have

7    objections.  We have a motion to extend the removal period in

8    this case as well as a motion to modify the order authorizing

9    Mr. Seery's retention.

10       So let's go ahead and start out by getting appearances

11   from the lawyers who are participating today.  I'll get those

12   now.

13              MR. MORRIS:  Good morning, Your Honor.

14              THE COURT:  Good morning.

15              MR. MORRIS:  John Morris from Pachulski, Stang, Ziehl

16   & Jones for the Debtor.  I'm joined with me this morning by my

17   colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable.

18              THE COURT:  Okay.

19              MR. MORRIS:  We do have a proposal on how to proceed

20   today, a substantial portion of which is in agreement with the

21   Respondents.

22              THE COURT:  Okay.

23              MR. MORRIS:  So, at the appropriate time, I'd be

24   happy to present that to the Court.

25              THE COURT:  All right.  Well, let's get all the

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 41 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 41 of 852 PageID 1946

5

1  appearances and then I'll hear from you on that.

2            MR. SBAITI:  Your Honor, my name is -- would you like

3  me to approach, Your Honor?

4            THE COURT:  Yes, please.

5            MR. SBAITI:  It's my first time appearing in

6  Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm

7  here on behalf of the charitable DAF Fund, CLO Holdco, and the

8  Respondents to the show cause hearing.  We are also

9  representing them as the Movants on the motion to modify the

10 Court's order appointing Mr. Seery.

11           THE COURT:  All right.  Thank you.

12           MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr.

13 Sbaiti, also representing the Charitable DAF and CLO Holdco,

14 as well as our firm that is named in the show cause order.

15           THE COURT:  Okay.

16           MR. BRIDGES:  Thank you, Your Honor.

17           THE COURT:  Thank you.

18           MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

19 Phillips from Kelly Hart Hallman here on behalf of Mark

20 Patrick in the show cause matter.  I'm joined with my

21 colleague Michael Anderson from the Kelly Hart firm here in

22 Fort Worth.  And that's the matter that we're involved in, the

23 show cause auction.

24           THE COURT:  All right.  Thank you, Mr. Phillips.

25           MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 42 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 42 of 852 PageID 1947

6

1  of Bonds Ellis Eppich Schafer Jones here on behalf of Jim

2  Dondero.  I have Mr. Will Howell here with me from my firm.

3           THE COURT:  All right.  Thank you.

4           MR. CLEMENTE:  Good morning, Your Honor.  Matthew

5  Clemente from Sidley Austin on behalf of the Committee.  I'm

6  here with my partner, Paige Montgomery.

7           THE COURT:  Okay.  Thank you.

8           MR. CLEMENTE:  Good morning.

9           THE COURT:  All right.  Just to remind people, we do

10  have participants on the WebEx, but in setting the hearing I

11  made clear that participants today needed to be here live in

12  the courtroom.  So the WebEx participants are going to be only

13  observers.

14     We have a camera on the screen here that is poised to

15  capture both the lawyer podium as well as the witness box, and

16  then another camera on the bench.

17     So, please be mindful.  We want the lawyers to speak from

18  the podium so that they are captured and heard by the WebEx.

19  And so hopefully we don't have any cords you will trip over.

20  We've worked hard to make it easy to maneuver around the

21  courtroom.

22     All right.  So, Mr. Morris, you had a proposal on how we

23  would approach this today?

24           MR. MORRIS:  I do, Your Honor.  And it's rather

25  brief, but I think it makes a lot of sense.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 43 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 43 of 852   PageID 1948

7

1          There are three motions on the calendar for today, --

2                THE COURT:  Uh-huh.

3                MR. MORRIS:  -- only one of which required the

4    personal appearance of certain parties.

5                THE COURT:  Uh-huh.

6                MR. MORRIS:  And for that reason, and because,

7    frankly, it was the first of the three motions filed, we

8    believe that that ought to go first.

9                THE COURT:  Okay.

10               MR. MORRIS:  And then it can be followed by the

11   motion for reconsideration of the July order, assuming time

12   permits, and then the motion to extend the removal deadline.

13          And with respect to the contempt motion, Your Honor, the

14   parties have agreed that each side shall have a maximum of

15   three hours to make opening statements, closing arguments,

16   direct and cross-examination of witnesses.

17          You know, I did point out to them that from time to time

18   Your Honor has used the Court's discretion to adjust the time

19   --

20               THE COURT:  Uh-huh.

21               MR. MORRIS:  -- if the Court is making inquiries, and

22   I guess we'll deal with that matter as it comes.  But as a

23   general matter, that is what we've agreed to.  And I would

24   propose that, unless anybody has any objections, that we just

25   proceed on that basis.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 44 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 44 of 852 PageID 1949

8

1          THE COURT:  Okay.

2          MR. MORRIS:  And I could -- I could go right forward.

3          THE COURT:  So, three hours in the aggregate?

4          MR. MORRIS:  Uh-huh.

5          THE COURT:  It doesn't matter how people spend it --

6    with argument, examination, cross -- three hours in the

7    aggregate?

8          MR. MORRIS:  Correct.

9          THE COURT:  Okay.  So, Nate, you'll be the timer on

10   that.

11         MR. MORRIS:  Yeah.  We thought it was very important

12   to get this done today, with people coming in from out of

13   town.

14         THE COURT:  Okay.  Sounds fine.

15         MR. MORRIS:  So does the Court want to inquire if

16   anybody has any questions or comments?

17         THE COURT:  I do.  Well, I see Mr. Bridges getting

18   up.  You confirm that that's agreeable?

19         MR. BRIDGES:  Thank you, Your Honor.  Yes, that's

20   agreeable.  We have one slight difference in our proposal.  We

21   would suggest to Your Honor that the motion for modification,

22   if Your Honor decides our way, would moot the entire motion

23   for contempt.  And we'd suggest, if that possibility is

24   realistic, that we would go first with that motion, perhaps

25   obviate having to have the evidence presented and the lengthy

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 45 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 45 of 852   PageID 1950

9

1   hearing.

2        The motion for modification, Your Honor, asks the Court to

3   reconsider -- to modify that order because of jurisdictional

4   and other shortcomings in it that make the order

5   unenforceable.  And because that's the order that is the

6   subject of the contempt motion, we'd ask Your Honor to

7   consider putting that motion first.

8              THE COURT:  Okay.  Or second?  Ahead of the contempt

9   matter?

10             MR. BRIDGES:  Ahead of the contempt matter, --

11             THE COURT:  Uh-huh.

12             MR. BRIDGES:  -- because it has a possibility --

13             THE COURT:  We have the removal matter, which I think

14   is the shortest.  All right.

15             MR. BRIDGES:  No objection to that, Your Honor.

16   That's correct.

17             THE COURT:  Okay.  So, Mr. Morris, that's fine by

18   you?

19             MR. MORRIS:  Your Honor, that doesn't make a lot of

20   sense to us.  We don't believe there's any basis for the Court

21   to reconsider, modify, or amend in any way the July order.

22   But even if we were wrong about that, that would not

23   retroactively validate conduct which was otherwise wrongful at

24   the time it was committed.

25        The contempt motion needs to go first.  The other motion

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 46 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 46 of 852   PageID 1951

10

1    will have no impact on whether or not there is a finding of

2    contempt of court.

3           THE COURT:  All right.  And update me on this.  There

4    was something filed yesterday, a notice of a proposed form of

5    order that the Debtor had proposed, that I think was not

6    agreed to, where there would be a change about any action that

7    goes forward, the cause of action would be in the sole

8    jurisdiction of the Court, and you all agreed to change that

9    part of the order, correct?

10          MR. MORRIS:  So, just as a division of labor for Your

11   Honor, I'm doing the contempt motion.

12          THE COURT:  Okay.  That's Mr. Pomerantz's?

13          MR. MORRIS:  Mr. Pomerantz is going to take care of

14   that.

15          MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Good

16   to see you again.

17          THE COURT:  Good to see you.

18          MR. POMERANTZ:  Yes, Your Honor, that's correct.  If

19   Your Honor recalls, there's really three aspects of the

20   January 9th and the July 16th order.  First, requiring people

21   to come to Bankruptcy Court before commencing or pursuing an

22   action.  Second, for the Bankruptcy Court to have the sole and

23   exclusive authority to determine whether the claim is a

24   colorable claim of willful negligence or gross misconduct.

25   And then third, if Your Honor passed the claim through the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 47 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 47 of 852   PageID 1952

11

1    gate, whether you would have jurisdiction.

2         In Your Honor's January 9th and July 16th orders, you said

3    you would have exclusive jurisdiction.  In the motion for

4    reconsideration, and particularly the reply, Movants said, if

5    you just change that and say that if passes through the gate

6    that you'd have jurisdiction only to the extent you would

7    otherwise have it, that would resolve the motion, in the same

8    way that the plan of reorganization was amended.

9         We proposed that.  They rejected it.  We put it before

10   Your Honor.  So we believe that it moots out a good portion --

11   actually, we think it should moot out the entire motion.  They

12   obviously disagree.  But we definitely agree it moots out the

13   most significant portion of their motion, which is that Your

14   Honor would take jurisdiction to adjudicate a matter on an

15   exclusive basis when you might not otherwise have jurisdiction

16   on an exclusive basis.

17              THE COURT:  Okay.  Well, --

18              MR. BRIDGES:  Your Honor, may I respond to that?

19              THE COURT:  You may.  And --

20              MR. BRIDGES:  Thank you, Your Honor.

21              THE COURT:  -- why -- could you clarify why you think

22   it would moot out the entire show cause matter?  I wouldn't be

23   retroactively changing my order.  Is that what you're

24   proposing?

25              MR. BRIDGES:  Your Honor, with all respect, we

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 48 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 48 of 852    PageID 1953

12

1    believe the order is defective and unenforceable and has to be

2    modified in order to fix it.  And because of the defects,

3    we're -- we're actually arguing, Your Honor, that it is

4    unenforceable in a contempt proceeding.  That is exactly what

5    our argument is.

6              THE COURT:  Okay.  I think I'm getting way farther

7    down this road than maybe I want to right now.  But I guess

8    here's the elephant in the room, I feel like:  *Republic Supply*

9    *versus Shoaf*.

10             MR. BRIDGES:  Uh-huh.

11             THE COURT:  The U.S. Supreme Court *Espinosa* case, for

12   that matter.  If I accept your argument that maybe there was a

13   flaw in those orders, that maybe they went too far, don't you

14   have a problem with those two cases?

15             MR. BRIDGES:  Your --

16             THE COURT:  The orders weren't appealed.

17             MR. BRIDGES:  I understand completely, Your Honor.

18             THE COURT:  Uh-huh.

19             MR. BRIDGES:  And I think the answer is no because of

20   the *Applewood* case from the Fifth Circuit.  The *Applewood* case

21   cited in our reply brief explains that in order for an order,

22   a final order of the Bankruptcy Court to have exculpatory

23   effect, in order for it to release claims, for example, that

24   the claims at issue must be enumerated in the order.  It's not

25   enough to have a blanket statement like the order, the July

Case 21-03067-sgj Doc 43 Filed 09/29/21  Entered 09/29/21 18:18:16  Page 49 of 852
Case 3:21-cv-00842-B  Document 43  Filed 07/13/21  Page 49 of 852  PageID 1954

13

1    order has, like the January order has, saying that Mr. Seery's

2    claims -- claims cannot be brought against him for ordinary

3    negligence at all.  The -- Your Honor, we're delving into my

4    argument.

5            THE COURT:  Okay.

6            MR. BRIDGES:  And I was hoping to do this on a

7    preliminary basis.

8            THE COURT:  Right.

9            MR. BRIDGES:  I don't mean to bog you down with that.

10   But Your Honor, no, mandatory authority from the Fifth Circuit

11   after *Shoaf* limits *Shoaf's* application and says that it does

12   not extinguish the claims that are not specifically enumerated

13   in the order.  And the reason for that is because it doesn't

14   give the kind of notice to the parties that they would need to

15   make an appearance and object to those orders at the time.  It

16   actually helps to stem the amount of litigation at the time

17   rather than to encourage it.

18           THE COURT:  All right.  Well, you'll get your

19   opportunity to make your full argument on this.  But I'm not

20   convinced, preliminarily, at least, to affect my decision on

21   the sequence, okay?  So even if it potentially wastes time

22   under your view of the law, I am going to do the removal

23   matter first -- the extension of time request, I should say --

24   and then the show cause and then the motion to modify.  And I

25   realize, those last two matters, everything is kind of

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 50 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 50 of 852   PageID 1955

14

1    interrelated.  All right?

2                MR. BRIDGES:  Yes, Your Honor.

3                THE COURT:  All right.  So, with that decided, is

4    there a desire on the part of the lawyers to make opening

5    statements, or shall we just go to the motions?  And, of

6    course, people can use their three hours for oral argument,

7    however much they want to use for oral argument.

8                MR. MORRIS:  Your Honor, the -- to be clear, the six-

9    hour time limit only applies to the contempt proceeding.

10               THE COURT:  Oh, yes.  Yes.  Uh-huh.

11               MR. MORRIS:  And I do want to make an opening

12   statement.

13               THE COURT:  Okay.

14               MR. MORRIS:  So, as the Movant, I'd like to go first.

15               THE COURT:  You want to make opening statements?

16               MR. BRIDGES:  Yes.  Yes, Your Honor.

17               THE COURT:  Okay.  Okay.

18               MR. BRIDGES:  I believe we've got a PowerPoint

19   prepared that I think can lay out our side of it.

20               THE COURT:  Okay.

21               MR. BRIDGES:  I don't think we're participating in

22   the motion to extend the removal time.

23               THE COURT:  Okay.

24               MR. BRIDGES:  That's going first.

25               THE COURT:  All right.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 51 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 51 of 852   PageID 1956

15

1          MR. BRIDGES:  So we'll wait until that is --

2          THE COURT:  Well, so we don't get confused on the

3   timing, let's just do the motion to extend right now.  And I

4   think we only had one objection.  As Mr. Sbaiti just pointed

5   out, they're not objecting on that one.  We have a Dondero

6   objection.  So let's, without starting the timer, hear that

7   one.  Okay?

8          MR. DEMO:  Good morning, Your Honor.  Greg Demo;

9   Pachulski, Stang, Ziehl & Jones.

10          THE COURT:  Good morning.

11          MR. DEMO:  I'll be arguing the removal motion and

12   then turn it over.

13       It's fairly basic and straightforward, Your Honor.  We're

14   asking for a further extension of the statutory deadline to

15   remove cases until December 14th, 2021.  The deadline is

16   procedural only.  As Your Honor is well aware, there's a lot

17   of moving parts in this case.  You know, we don't know to this

18   date, really, the full universe of what could actually be out

19   there.  So we're just asking for a short extension of the

20   removal period to cover through December.

21       I know that there was an objection from Mr. Dondero.  I

22   know that he argues that 9006 does not allow us to extend that

23   deadline past the effective date of the plan, and he cites one

24   case for that purpose, which is *Health Support*.  I think it's

25   out of Florida.  That case dealt with the extension of the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 52 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 52 of 852    PageID 1957

16

 1  two-year extension of the statute of limitations and was very

 2  clear that you can't use 9 --

 3         THE COURT:  You mean the 546 deadline?

 4         MR. BRIDGES:  Yes.  Yes.

 5         THE COURT:  Okay.

 6         MR. BRIDGES:  That you can't use 9006 to extend non-

 7  bankruptcy deadlines.  That's not what we're doing here, Your

 8  Honor.  We're using 9006 to extend the bankruptcy deadline to

 9  remove the cases.

10         THE COURT:  Uh-huh.

11         MR. DEMO:  And we'd just ask Your Honor for the

12  extension through December.

13         THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

14         MR. HOWELL:  Good morning, Judge.  Will Howell for

15  Mr. Dondero.

16     So, the argument here is not that the Court can't do this.

17  I was just pointing that there is an outside limit to what

18  we're doing.  And so if you look at the cases that the Debtor

19  cites in support of this motion, the one that is most apt was

20  when Judge Nelms did a fourth extension of time.  But those

21  were all 90-day extensions.  Here, we're in a situation where

22  the Debtor is asking for a fourth 180-day extension of time,

23  and this is really where the, you know, objection came -- or,

24  the response in opposition came from.  They specifically asked

25  that it be without prejudice to further extensions.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 53 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 53 of 852   PageID 1958

17

1      And so, at some point, you know, does 9006 have an outside

2  limit?  You know, do we need to see some sort of a light at

3  the end of the tunnel here?

4      So we would ask that the motion, at a minimum, be denied

5  in part with respect to this open-ended request for extension

6  beyond two years for a 90-day period.  The other cases that

7  they cite, they have one extension here, one extension there,

8  120 days here, but not 180 days after 180 days after 180 days,

9  and then asking specifically for without prejudice to further

10  extensions beyond two years.  So that's -- that's where this

11  comes from.

12          THE COURT:  All right.  Do you think it matters that

13  this is a very complex case?

14          MR. BRIDGES:  I --

15          THE COURT:  There's litigation here, there, and

16  everywhere.

17          MR. HOWELL:  I also think, you know, *Mirant* was

18  complex.  I think *Pilgrim's Pride* was complex.  I think, you

19  know, it is not out of bounds for the Court to grant a fourth

20  extension.

21          THE COURT:  Uh-huh.

22          MR. BRIDGES:  But to -- you know, at some point --

23  you know, maybe the Court could grant a 90-day extension and

24  make them come back a little more frequently to kind of corral

25  this thing, rather than just saying "This grant of 180 days,

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 54 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 54 of 852   PageID 1959

18

1    the fourth time, is going to be without prejudice to further

2    extensions."  It just gets kind of large.

3              THE COURT:  Okay.  Mr. Demo, your motion.  You get

4    the last word.

5              MR. DEMO:  Your Honor, I mean, it is without

6    prejudice for further extensions, but that doesn't mean that

7    Your Honor is granting the further extensions now.  It means

8    we'll have to come back.  We'll have to make our case for why

9    an extension is necessary.  And, you know, if Your Honor

10   doesn't want to give us another extension past December 2021,

11   Your Honor doesn't have to.  This is not an order saying that

12   it's a limitless grant.

13       You know, I'd also ask, you know, quite honestly, why Mr.

14   Dondero has such an issue with this.  He hasn't said that any

15   of these cases involve him.  He hasn't given any reasons why

16   this affects him.  He hasn't given any reason why this damages

17   him at all.  So I do, I guess, wonder as an initial matter

18   kind of why we're here, you know, why we're responding to Mr.

19   Dondero's request, when that request really has no impact on

20   him.

21       And then, Your Honor, to the extent that you are inclined

22   to limit this, I would say, you know, we would ask for a

23   reasonable extension of time.  We do think an extension of

24   time, because of the complexity of this case, through December

25   is warranted.  But if Your Honor for some reason does agree

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 55 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 55 of 852    PageID 1960

19

1    that a shorter extension is necessary under 9006 -- I don't

2    think it is -- we'd just ask that Your Honor grant us leave to

3    come back for further extensions of time.

4            THE COURT:  Okay.  All right.  I will -- I'll grant a

5    90-day extension, without prejudice for further extensions.

6            MR. DEMO:  Thank you, Your Honor.

7            THE COURT:  Maybe in 90 days we'll be farther down

8    the road and we won't need any more extensions, but you'll

9    have the ability to argue for more if you think it's really

10   necessary.  All right.  So that will bring us to around

11   September 14th, I guess.

12       All right.  Well, let's go ahead and hear opening

13   statements with regard to the show cause matter.  And again,

14   if you want to roll in arguments about the -- well, no, you

15   said the six hours only applies to show cause, so we'll not

16   hear opening statements with regard to the Seery retention

17   modification, just show cause.

18           MR. MORRIS:  All right.  Before I begin, Your Honor,

19   I have a small deck to guide --

20           THE COURT:  Okay.

21           MR. MORRIS:  -- to guide my opening statement.

22           THE COURT:  All right.

23           MR. MORRIS:  Can I approach the bench?

24           THE COURT:  You may.  And is your legal assistant

25   going to share her content --

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 56 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 56 of 852    PageID 1961

20

```
 1              MR. MORRIS:  Yes.

 2              THE COURT:  -- so people on the WebEx will see?

 3    Okay.

 4              MR. MORRIS:  That's the intention, Your Honor.

 5              THE COURT:  Okay.

 6              MR. MORRIS:  All right.  Are you ready for me to

 7    proceed?

 8              THE COURT:  I am.  And obviously, everyone has a

 9    copy?

10              MR. MORRIS:  Yes.

11              THE COURT:  Your opponents have a copy of this?

12              MR. MORRIS:  Yep.

13              THE COURT:  Okay.  Although we hope to see it on the

14    screen.

15                  OPENING STATEMENT ON BEHALF OF THE DEBTOR

16              MR. MORRIS:  Good morning, Your Honor.  John Morris;

17    Pachulski, Stang, Ziehl & Jones; for the Debtor.

18         We're here today on the Debtor's motion to hold certain

19    entities and individuals in contempt of court for violating a

20    very clear and specific court order.  I hope to be relatively

21    brief in my opening here, Your Honor, and I'd like to begin

22    where I think we must, and that is, how do we -- how do we

23    prove this and what do we have to prove?

24         The elements of a claim for contempt of court are really

25    rather straightforward.  The Movant must establish by clear
```

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 57 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 57 of 852 PageID 1962

21

1    and convincing evidence three things.

2              THE COURT:  Let me stop you and stop the clock.

3    We're not seeing the shared content.

4              MR. MORRIS:  Uh-huh.

5              THE COURT:  Did you want her to go ahead and share

6    her content?

7              MR. MORRIS:  I did.

8              THE COURT:  Okay.

9              MR. MORRIS:  I was hoping that she'd do that.

10             THE COURT:  All right.  It says it's receiving

11   content.

12             MR. MORRIS:  There we go.  It's on my screen, anyway.

13             THE COURT:  Oh, here it is.  I don't know why it's

14   not on my Polycom.  Can you all see it out there?

15        (Chorus of affirmative replies.)

16             THE COURT:  Okay.  Very good.

17             MR. MORRIS:  Okay.

18             THE COURT:  You may proceed.

19             MR. MORRIS:  Thank you, Your Honor.

20        So, there's three elements to the cause of action for

21   contempt, for civil contempt.  We have to prove by clear and

22   convincing evidence that a court order was in effect; that the

23   order required certain conduct by the Respondents; and that

24   the Respondent failed to comply with the Court's order.

25        We've cited in the footnote the applicable case law from

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 58 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 58 of 852   PageID 1963

22

1    the Fifth Circuit, and I don't believe that there's any

2    dispute that is indeed the legal standard.

3        The intent of the Respondents as to liability is

4    completely irrelevant.  It doesn't matter if they thought they

5    were doing the right thing.  It doesn't matter if they

6    believed in their heart of hearts that the court order was

7    invalid.  These are the three elements, and we will be able to

8    establish these elements not by clear and convincing evidence,

9    but if we ever had to, beyond reasonable doubt.

10        If we can go to the next slide, please.

11        We begin with the Court's order, the Court's July 9 order.

12   And that order states very clearly what conduct was required.

13   And the conduct that was required was that no entity could

14   commence or pursue -- those are really the magic words --

15   commence or pursue a claim against Mr. Seery without the

16   Bankruptcy Court doing certain things.  And we've referred to

17   this as the gatekeeper.  And the only question I believe the

18   Court has to ask today is whether the Respondents commenced or

19   pursued a claim against Mr. Seery without seeking Bankruptcy

20   Court approval, as set forth in this order.

21        I'll dispute that there's anything ambiguous about this.

22   I'll dispute that it could not be clearer what conduct was

23   prohibited.  It could not be clearer.  The only question is

24   whether the conduct constitutes the pursuit of a claim.

25        Let's see what they did.  If we could go to the next

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 59 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 59 of 852 PageID 1964

23

1    slide.  There will be no dispute about what they did.  And

2    what they did is, a week after filing a lawsuit against the

3    Debtor and two others arising out of the HarbourVest

4    settlement, a settlement that this Court approved, after

5    notice and a hearing and participation by the Respondents,

6    after they had the opportunity to take discovery, after they

7    had the opportunity to examine Mr. Seery about the value of

8    HarbourVest's interest in HCLOF, after all of that, they

9    brought a lawsuit after Mr. Patrick took control of the DAF

10   and CLO Holdco.  And that lawsuit related to nothing but the

11   HarbourVest suit, and it named in Paragraph 2, right up above,

12   Mr. Seery as a potential party.  And a week later, Your Honor,

13   they filed what we call the Seery Motion, and it was a motion

14   for leave to amend their complaint to add Mr. Seery as a

15   defendant.

16       We believe that that clearly violates the Court's July 7

17   order.  And indeed, again, these are facts.  They're not --

18   they're not in dispute.  Just look at the first sentence of

19   their motion.  The purpose of the motion was to name James

20   Seery as a defendant.  That was the purpose of the motion.

21   And the way that they made the motion, Your Honor -- and these

22   are undisputed facts -- the way they made the motion, Your

23   Honor, shows contemptuous intent.  We don't have to prove

24   intent, but I think it might be relevant when you get to

25   remedies.  Okay?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 60 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 60 of 852   PageID 1965

24

1      And so how do I -- why do I say that?  Because they made

2   this motion, Your Honor, and they didn't have to.  Everybody

3   knows that under Rule 15 they could have amended the complaint

4   if they wanted to.  If they wanted to, they didn't need the

5   Court's permission.  What they wanted to do was try to get the

6   District Court to do what they knew they couldn't.  And that's

7   contemptuous.

8      And they did it, Your Honor, without notice to the Debtor.

9   Even after the Debtor had accepted service of the complaint,

10   even after we told them, if you go down this path, we're going

11   to file a motion for contempt, they did it anyway.  They

12   didn't serve the Debtor.  They didn't give the Debtor a

13   courtesy copy.  They didn't notify the Debtor.  The only thing

14   that happened was the next day, when the District Court

15   dismissed it without prejudice, they sent us a copy of that

16   notice.  And within three days, we were here.

17      A court order was in effect.  Mr. Patrick is going to

18   admit to that.  There's not going to be any dispute about

19   that.  The order required that the Respondents come to this

20   Court before they pursue a claim against Mr. Seery, and they

21   failed to comply with that order.  The facts, again -- if we

22   can go to the next slide.  We can look at some of the detail,

23   because the timeline is mindboggling.

24      Mr. Patrick became the Plaintiffs' authorized

25   representative on March 24th.  And folks, when I took their

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 61 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 61 of 852   PageID 1966

25

1    depositions, weren't specific about dates, and that's why some

2    of the entries here refer to sometime after, but there's no

3    question that the order of events is as presented here and as

4    the evidence will show today.

5        The evidence will show that sometime after Patrick became

6    the Plaintiffs' authorized representative, Mr. Dondero

7    informed Mr. Patrick that Highland had usurped an investment

8    opportunity from the Plaintiffs.  Mr. Patrick is going to

9    testify to that.  Mr. Patrick is also going to testify that,

10   without prompting, without making a request, D.C. Sauter, the

11   general counsel of NexPoint Advisors, recommended the Sbaiti

12   firm to Mr. Patrick.  Mr. Patrick considered nobody else.

13       Mr. Patrick retained the Sbaiti firm in April.  In other

14   words, within 12 days of the filing of the complaint.  They're

15   retained and they conduct an investigation.  You're going to

16   hear the assertion of the attorney-client and the common

17   interest privilege every time I ask Mr. Dondero what he and

18   Mr. Sbaiti talked about and whether they talked about naming

19   Jim Seery as a defendant.  But with Patrick's authorization,

20   the Sbaiti firm filed the complaint on April 12th, just days

21   after they were retained.

22       It's like a -- it's an enormous complaint.  I don't know

23   how they did that so quickly.  But in any event, the important

24   point is that they all worked together.  None of this happened

25   until Mr. Patrick became the authorized representative.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 62 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 62 of 852   PageID 1967

26

1      Mr. Patrick is going to tell you, Your Honor, he's going

2   to tell you that he had no knowledge of any wrongdoing by Mr.

3   Seery prior to the time he assumed the rein of the DAF and the

4   CLO Holdco.  He had no knowledge, Your Honor, of any claims

5   that the DAF and CLO Holdco had against the Debtor until he

6   became the Plaintiffs' authorized representative and Mr.

7   Dondero spoke to him.

8      If we can flip to the next page.  Mr. Dondero has

9   effective control of the DAF.  He has effective control of CLO

10   Holdco. You're going to be bombarded with corporate documents

11   today, because they're going to show you -- and they want you

12   to respect the corporate form, they really want you to follow

13   the rules and respect the corporate form, because only Mr.

14   Scott was responsible for the DAF and CLO Holdco until he

15   handed the reins on March 24th to Mr. Patrick.  Mr. Dondero

16   has nothing to do with this.  He's going to tell you.  He's

17   going to tell you he had nothing to do with the selection of

18   Mr. Patrick as Mr. Scott's replacement.

19      The facts are going to show otherwise, Your Honor.  The

20   DAF is a $200 million charitable organization that is funded

21   almost exclusively with assets derived from Highland or Mr.

22   Dondero or the Get Good Trust or the Dugaboy Trust.  The

23   evidence is going to show that at all times these entities had

24   shared services agreements and investment advisory agreements

25   with HCMLP.  The evidence will show that HCMLP at all times

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 63 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 63 of 852   PageID 1968

27

1   was controlled by Mr. Dondero.

2        And it made sense.  The guy put in an awful lot of money

3   for charitable usage.  Is he really just going to say, I don't

4   really care who runs it?  The evidence is going to show that

5   between October 2020 and January 2021, Grant Scott actually

6   exercised independence.  Grant Scott was Mr. Dondero's

7   childhood friend.  They went to UVA together.  They were

8   roommates.  Mr. Scott was the best man at Mr. Dondero's

9   wedding.  But we were now in bankruptcy court.  We're now in

10  the fishbowl.  And I will -- this may be a little argument,

11  but there's no disputing the facts that Mr. Scott acted

12  independently, and he paid the price for it.  Mr. Scott did it

13  three times.

14       He did it when he amended CLO Holdco's proof of claim to

15  take it down to zero.  He did it again after he withdrew the

16  objection to the HarbourVest settlement motion.  And he did it

17  again when he settled the lawsuit that the Debtors had brought

18  against CLO Holdco.  And that -- and on each of those three

19  occasions, the evidence will show that Mr. Scott did not

20  communicate with Mr. Dondero in advance, that Mr. Dondero

21  found out about these acts of independence after the fact, and

22  that each time he found out about it he had a little

23  conversation with Mr. Scott.

24       Mr. Dondero is going to tell you about it, and he's going

25  to tell you that he told Mr. Scott each act was inappropriate.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 64 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21    Page 64 of 852   PageID 1969

28

1    You may have heard that word before.  Each act was not in the

2    best interests of the DAF.

3        The last of those conversations happened either on or just

4    after January 26th.  And by January 31st, Mr. Scott gave

5    notice of his resignation.  And you're going to see that

6    notice of resignation.  And he asks for releases.

7        Mr. Patrick becomes, almost two months later, the

8    successor to Mr. Scott.  Mr. Dondero is going to say he has no

9    idea how that happened.  He was just told after the fact that

10   Mr. Patrick and Mr. Scott had an agreement.  He's going to

11   tell you they had an agreement and he just heard about it

12   afterwards.  He didn't really -- for two months, I guess, he

13   sat there after Mr. Scott told him that he wanted out and did

14   nothing to try to find out who's going to take control of my

15   charitable foundation with $200 million.  He wasn't

16   interested.

17       But here's the thing, Your Honor.  If we go to the next

18   slide.  Let's see what Mr. Scott said at his deposition last

19   week.  Question, "Do you know who selected Mark?"  Answer, "I

20   do not."  Question, "Do you know how Mark was selected?"  Mark

21   is a reference to Mark Patrick.  "I do not."  "Did you ever

22   ask Mark how he was selected?"  "I did not."  "Did you ever

23   ask Mark who selected him?"  "I did not."  "Did you ever ask

24   anybody at any time how Mr. Patrick was selected to succeed

25   you?"  "No, I did not."  "Did you ever ask anybody at any time

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 65 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 65 of 852   PageID 1970

29

1  as to who made the decision to select Mr. Patrick to succeed

2  you?"  "No, I did not."

3      So I don't know what happened between Mr. Patrick and Mr.

4  Dondero when Mr. Patrick supposedly told Mr. Dondero that

5  there was an agreement with Mr. Scott, but that is news to Mr.

6  Scott.  He had no idea.

7      Your Honor, we are going to prove by clear and convincing

8  evidence that each of the Respondents violated a very clear

9  and specific court order.  And unless the Court has any other

10  questions, I'll stop for now.

11              THE COURT:  No questions.

12              MR. MORRIS:  Thank you, Your Honor.

13              THE COURT:  All right.  Who is making the argument

14  for the Respondents?

15              MR. SBAITI:  Your Honor, I am.  I'm just trying to

16  put the PowerPoint up on the WebEx.

17              THE COURT:  Okay.

18              MR. SBAITI:  Sorry about that.

19              MR. MORRIS:  Your Honor, I'll try not to make this a

20  practice, but can I inquire as to how much time I used?

21              THE COURT:  Oh.  Nate?

22              THE CLERK:  About thirteen minutes.

23              THE COURT:  Thirteen minutes?

24              MR. MORRIS:  Thank you very much.

25              THE COURT:  Okay.  All right.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 66 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 66 of 852   PageID 1971

30

1          MR. SBAITI:  Your Honor, our PowerPoint is a little

2     bit longer than that one.  May I approach with a copy?

3          THE COURT:  You may.  Uh-huh.

4        (Pause.)

5          MR. SBAITI:  Your Honor, it does feel good to be back

6     in the courtroom.

7          THE COURT:  Okay.

8          MR. SBAITI:  It's been a long time.

9          THE COURT:  Yes.  For us, too.

10         MR. SBAITI:  Jut wish it wasn't under a circumstance

11    where someone is trying to sanction me.

12       But we're going to be dividing up this oral argument a

13    little bit.  Also, to just kind of break up a little bit of

14    the monotony, because I think we have a lot to cover at the

15    opening stage of this.  And I'll try to be as expeditious as I

16    can be.

17      OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

18         MR. SBAITI:  Your Honor, the thing we -- the thing we

19    open with is the due process issue that we raised in our

20    brief.  And where this really arises from is the Court's show

21    cause order calls us violators before we've had a chance to

22    respond to the allegations and before we've obviously been

23    able to approach this hearing.  And the word violators means

24    something to us, Your Honor, because I've been a lawyer for a

25    long time, my partner has been a lawyer for a long time, our

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 67 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 67 of 852 PageID 1972

31

1　clients have never been sanctioned, we've never been

2　sanctioned, and for us to be labeled violators first by

3　counsel and then in a court order makes us wonder whether or

4　not this process is already prejudged or predetermined.

5　　　　　THE COURT:  I actually want to address that.  Turn

6　off the clock.

7　　　Just so you know, I looked this up a while back, because

8　we gave a bankruptcy judges panel at some CLE.  The average

9　bankruptcy judge in our district, back when I looked, signs

10　over 200 orders a week.

11　　　　　MR. SBAITI:  Sure.

12　　　　　THE COURT:  Many of those -- in fact, most of them --

13　are submitted by lawyers.  So, you know, a big chunk of my

14　week is signing orders.  And I obviously give more scrutiny to

15　those that are substantive in nature.  Okay?  If someone

16　submits to me a 50-page debtor-in-possession financing order,

17　I will look at that much more carefully than what I consider a

18　mere procedural order setting a hearing.

19　　　So I regret that that word was used, but I can assure you

20　I fairly quickly set that -- signed that, I should say --

21　regarding it as a merely procedural order setting a hearing.

22　Okay?  So it's as simple as that.  There was no hmm, I like

23　that word, violator.  I had a stack, if you will, an

24　electronic stack of probably 200 orders in front of me the day

25　I signed that.  Okay?

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 68 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 68 of 852   PageID 1973

32

1    So, if that makes anyone feel any better, I don't know,

2  but that's the reality.

3    Okay.  You can start the clock again.

4        MR. SBAITI:  And I appreciate Your Honor saying that.

5  It does make us feel better, both about where the -- the

6  genesis of the order and the impact and its reflection on what

7  Your Honor thinks in terms of going into this.

8    The other thing that obviously raised concerns, and I

9  assume this comes from the same place, was four days ahead of

10  that order counsel told us the Court was going to order

11  everyone to be in person, and they had advance notice of that,

12  and we weren't sure how they had advance notice of that.  I

13  guess they assumed --

14        THE COURT:  I can assure you right here on the record

15  I never had ex parte communications with any lawyer in this

16  case, on this matter or any other matter.  Okay?  Again, those

17  are pretty strong words to venture out there with, which your

18  pleading did venture out there with those words.

19    My courtroom deputy, Traci, I think answers her phone 24

20  hours a day.  So I'm quite sure she had communications with

21  the lawyers about this, just like she probably had

22  communications with you and your firm and every other firm in

23  this case.  Okay?

24        MR. SBAITI:  Like I said, Your Honor, we appreciated

25  what Your Honor -- appreciate what Your Honor said, but that

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 69 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 69 of 852   PageID 1974

33

1    issue obviously stuck out -- stuck out to us, in combination.

2    So I'll move on from that issue.

3        This has to do with the lawsuit that was filed, and the

4    lawsuit, the genesis of the lawsuit, I think it's important to

5    say, because the argument has been raised in the briefing and

6    we wanted to address it upfront, why the lawsuit comes about.

7    And it comes about because of the Advisers Act and the

8    responsibilities that the Debtor has to the assets of the

9    funds that it manages.  And the Advisers Act imposes a duty

10   not only on Highland but obviously on its control people and

11   its supervised people.  And the lawsuit has to do with HCLOF,

12   which is what HarbourVest owned a piece of.  And Highland, as

13   the advisor to HCLOF and the advisor to the DAF, owed

14   fiduciary duties to CLO Holdco, which is the DAF's holding

15   entity of its assets in HCLOF, but Highland Capital was also

16   an advisor, a registered investment advisor to the DAF

17   directly at the time.  And so those federally-imposed

18   fiduciary duties lie at the crux of that lawsuit.

19       Moving on, Mr. Seery testified at the hearing that was in

20   this Court to be -- to get him appointed, and this was Exhibit

21   2 that was presented by the Debtor, and on Page 16 at the

22   bottom he says -- of the transcript, he says, I think, from a

23   high level, the best way to think about the Debtor is that

24   it's a registered investment advisor.  As a registered

25   investment advisor, which is really any advisor of third-party

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 70 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 70 of 852    PageID 1975

34

1  money over $25 million, it has to register with the SEC, and

2  it manages funds in many different ways.

3       In the middle of the next page he says, In addition, the

4  Debtor manages about $2 billion, $2 billion in total managed

5  assets, around $2 billion in CLO assets, and then other

6  securities, which are hedge funds -- other entities, rather,

7  which are hedge funds or PE style.  Private equity style.

8       On Page 23 towards the bottom he says, As I said, the

9  Investment Advisers Act puts a fiduciary duty on Highland

10  Capital to discharge its duty to the investors.  So while we

11  have duties to the estate, we also have duties, as I mentioned

12  in my last testimony, to each of the investors in the funds.

13  CLO Holdco would be an investor in one of those funds, HCLOF.

14       He goes on to say, Some of them are related parties, and

15  those are a little bit easier.  Some of them are owned by

16  Highland.  HCLOF was not owned by Highland.  But there are

17  third-party investors in these funds who have no relation

18  whatsoever to Highland, and we owe them a fiduciary duty both

19  to manage their assets prudently but also to seek to maximize

20  value.

21       Now, the lawsuit alleges that Seery testified that the

22  HarbourVest portion of Highland CLO Funding was worth $22-1/2

23  million.  Now, Mr. Morris wants the Court to hinge on the fact

24  that, well, no one asked him whether he was lying.  But that's

25  not really the standard, and it certainly isn't the standard

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 71 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 71 of 852   PageID 1976

35

1    when someone's an investment advisor and owes fiduciary

2    duties, which include fiduciary duties to be transparent with

3    your investors.

4        It also includes fiduciary duties not to self-deal.

5        The lawsuit also alleges that, in reality, those assets

6    were worth double that -- double that amount at the time.  We

7    found out just, you know, in late March/early April that a

8    third -- from a third party who had access to the underlying

9    valuations at the time that those values were actually double

10   and that there was a misrepresentation, giving rise to the

11   lawsuit.  That change in circumstance is the key issue behind

12   the lawsuit.

13       We allege that Mr. Seery and the Debtor, as RIAs, had a

14   duty to not self-deal and be fully transparent with that

15   information, and we think both of those things were violated

16   under the Advisers Act.

17       We don't allege that the HarbourVest settlement should be

18   undone or unwound.  We can't unscramble that egg.  We do seek

19   damages, as I believe is our right, arising out of the

20   wrongdoing and the process of pushing forth the settlement.

21       I think one of the allegations in the actual motion for

22   the show cause order was that this was going to undo all of

23   the hard work that Court had done and basically unwind and try

24   to re-piece Humpty Dumpty back together again.  But that's

25   simply not the case.  Nowhere in our allegations or in the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 72 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 72 of 852   PageID 1977

36

1    relief that we request are we trying to undo the HarbourVest

2    settlement as such.

3        Now, whether the lawsuit should be dismissed under the

4    affirmative defenses that they bring up -- res judicata,

5    waiver, release -- all of those are questionable under the

6    Advisers Act, given the change of circumstance, and therefore

7    are also questions on the merits.  They don't go to the

8    colorability of the underlying claims in and of themselves,

9    which I think is important.

10        So we asked for leave to amend from the Court.  And what

11    they want us to do, Your Honor, is they want to sanction us

12    for asking.  They're saying asking for leave to amend is the

13    same thing as pursuing a claim.  And I'll get to the specifics

14    on that in a little bit.  But that's the frame.  Can we be

15    sanctioned for asking a court, any court, even if it's the

16    wrong court, for permission to bring the lawsuit?  They don't

17    cite a single case that says that that, in and of itself, is

18    sanctionable conduct, us asking.

19        So I'd like to introduce some of the Respondents.

20        Your Honor, may I have one of these waters?

21            THE COURT:  Certainly.

22            MR. SBAITI:  Thank you.

23            THE COURT:  That's why they're there, by the way.

24            MR. SBAITI:  I didn't know if they belonged to

25    somebody else.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 73 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 73 of 852   PageID 1978

37

1        THE COURT:  We've scattered water bottles around for

2    people.

3        MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

4        THE COURT:  So if you see these little ones, that's

5    for anyone.

6        MR. SBAITI:  So, this is an org chart, and you'll see

7    it as -- the exhibits that the Debtor's going to bring up.

8    And when we talk about the DAF, Your Honor -- I don't know if

9    that's visible to you.  We're on Slide 19, if you're looking

10   at it on paper.  There's a little number at the lower right-

11   hand corner.  The charitable DAF GP, LLP and then the

12   Charitable DAF Holdco, Ltd. together are the principles of the

13   Charitable DAF Fund, LP.  And so when we refer to the DAF or

14   the Charitable DAF, that's really the entity structure that

15   we're referring to.  And then the GP and Holdco Ltd. have a

16   managing member.  It used to be Grant Scott at the time this

17   was done.  Today, it's Mr. Mark Patrick, who's in the room,

18   sitting next to Mr. Bridges.

19       The DAF is a charitable fund.  It's funded over $32

20   million, as the evidence will show, including Dallas-Fort

21   Worth organizations, The Family Place, Dallas Children's

22   Advocacy, Center for Brain Health, the Crystal Ray Initiative,

23   Friends of the Dallas Police, Snowball Express, various

24   community and education initiatives, Dallas Arts, museums, the

25   Perot Museum, Dallas Zoo.  That evidence is undisputed, Your

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 74 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 74 of 852 PageID 1979

38

1  Honor.  The DAF is a real fund.  It is a real charitable fund.

2  It does real good in the community.

3      Now, Respondents -- Holdco, which you will see at the

4  bottom of that chart, is essentially the investment arm.

5  There are assets that the DAF owns in various pots, and Holdco

6  is the actual business engine that generates the money from

7  those assets that then -- that then gets passed up to the

8  charitable -- the four charitable foundations at the top.

9      I'll go back to Slide 21.  And if you look at the top,

10 Your Honor, the Dallas Foundation, Greater Kansas City

11 Community, Santa Barbara Foundation, The Community Foundation

12 of North Texas:  Those are the charities that then themselves

13 bestow the funds onto the actual recipients.  So the money

14 flows up as dividends or distributions, and then gets

15 contributed.

16     CLO Holdco invests those assets, and it's an important

17 part of the business model, so that you're not sending out

18 principal.  It's the money that CLO makes, the profits, if you

19 will, that it is able to generate that gets donated and makes

20 its way into the community.

21     So there's an important feature to the structure in that

22 it has to be able to generate money.  It's not just money that

23 sits there and waits to be distributed.  There's active

24 investing going on.

25     Mr. Mark Patrick owns the control shares of the entities

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 75 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 75 of 852   PageID 1980

39

1    comprising the DAF and CLO Holdco, as I showed you, and the

2    beneficiary charitable foundations hold what we call

3    beneficial interests, where they just get money.  They don't

4    have a vote.

5       Mr. Patrick cares about the public service the DAF engages

6    in.  He's been an advisor to the DAF, CLO Holdco, and its

7    predecessor, Mr. Scott, since its inception.  He receives no

8    compensation for the job he's doing today.  And you'll hear

9    how he became -- how he inured to the control position of the

10   DAF and CLO Holdco from him, but it doesn't involve Mr.

11   Dondero, and the absence of someone saying that it did, I

12   think, is going to be striking by the end of the presentation

13   of evidence.

14      Their only argument against you, Your Honor, is going to

15   be you just can't believe them.  But not believing witnesses

16   is not a substitute for the lack of affirmative evidence.

17      Mr. Patrick has said all along he authorized the filing of

18   the motion for leave to add Mr. Seery to the lawsuit in

19   District Court.  He doesn't believe the motion to amend

20   violated this Court's orders, for the reasons stated in our

21   responsive filings to the motions for contempt and show cause

22   order.  That's why he authorized it.

23      My firm, Sbaiti & Company, we're a small Dallas litigation

24   boutique retained by the DAF and CLO Holdco to file the

25   lawsuit.  We did an investigation.  I'm tickled to death that

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 76 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 76 of 852 PageID 1981

40

1    Mr. Morris loved our complaint so much and gave us the

2    compliment that we got it done in a short amount of time, but

3    we did get it done in a short amount of time, because, in the

4    end, it's a rather simple issue, as I was able to lay it out

5    in about three or four bullet points in a previous slide.

6        The written aspect of that doesn't take that long, as Your

7    Honor knows, but the idea that there's a suspicion that we

8    didn't write it or someone else wrote it and ghost-wrote it

9    and gave it to us, which I think is the insinuation he was

10   making, is completely unfounded.  There's no evidence of that.

11       We carefully read Your Honor's orders.  We developed a

12   good-faith basis, as required by Rule 11, that the lawsuit and

13   the motion to add Mr. Seery were not filed in bad faith or for

14   an improper purpose.  We don't think they're frivolous.  We

15   don't think they're in violation of Your Honor's orders, given

16   the current state of the law.

17       Mr. Dondero is one of the settlors of the CRT, of the

18   Charitable Remainder Trust that ultimately provided assets to

19   CLO Holdco and the DAF.  He does care about the DAF's mission.

20   I think Mr. Morris hit the nail on the head.  Of course Mr.

21   Dondero cares about what happens to it.  He's one of the

22   settlors, and it was his funds that initially were put into

23   it, so he's allowed to care.  And I don't think him caring is

24   insidious, and him caring doesn't mean he has control and

25   doesn't mean he's the driving force behind some insidious

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 77 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 77 of 852   PageID 1982

41

1   conspiracy that they're trying to insinuate exists.

2        He is an advisor to the DAF and CLO Holdco.  It is a lot

3   of money and it needs advice, and he's an advisor to Mr.

4   Patrick.  We don't run away from any of those facts, Your

5   Honor.

6        We also don't run away from the fact that he was the

7   source of some of the information that came in to that

8   complaint and that he relayed some of that information.  The

9   content, we do claim work product privilege and attorney-

10  client privilege, because he's an agent of our client, and as

11  lawyers doing an investigation, the content of our

12  communications is protected under the attorney-client and work

13  product privileges, as well as the joint interest privilege.

14  But the fact that we admit that those communications happened,

15  we're not running away from that fact.

16       So, what does he have to do with this?  It's interesting

17  that that opening argument you just heard spent about three

18  minutes on contempt and the other fourteen or fifteen minutes

19  or so on Mr. Dondero.  And only on Mr. Dondero.  There's a

20  negative halo effect, I believe, that they're trying to get

21  this Court to abide by.  They want to inflame Your Honor and

22  hopefully capture -- cultivate and then capitalize on whatever

23  antipathy you might have for Mr. Dondero, and then sweep us

24  all in under that umbrella and sanction everybody just because

25  he had some involvement.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 78 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 78 of 852 PageID 1983

42

1       But whatever involvement he has, which we admit he had

2   some involvement in helping us marshal the facts, that's not a

3   basis for us to be sanctioned if there isn't an actual

4   sanctionable conduct that -- as we say there isn't.

5       We think there's an ulterior motive.  That's why Mr.

6   Morris just announced to Your Honor, Mr. Dondero controls it

7   all.  The ulterior motive, I believe, is, down the line, when

8   they want to argue some kind of alter ego theory, they want to

9   lay that foundation here.  I don't think this is the

10  appropriate time for that foundation, and I don't think any of

11  the information and the evidence they're trying to marshal in

12  front of you is really going to be relevant to the very

13  specific question that's before Your Honor:  Does our motion

14  asking the District Court to add Mr. Seery violate your order,

15  or violate it in a way that can be -- that we can be

16  sanctioned for?  We don't believe it violates it.

17      So, the three core standards that have to be met.  First

18  of all, civil contempt requires a valid, enforceable order.

19  It's not debatable and it's not -- I don't think that's a

20  shocking statement.  Then they have to have clear and

21  convincing evidence of a violation of a specific unambiguous

22  term therein.  Mr. Morris wants his version of the word pursue

23  to be unambiguous, and I think the word pursue is unambiguous.

24  But the way he wants you to construe it makes it completely

25  ambiguous, and we'll -- I'll get to that in a moment.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 79 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 79 of 852 PageID 1984

43

1     Now, for sanctioning counsel, the Fifth Circuit has held

2     you have to find bad faith. We're adjudged under a slightly

3     separate standard under the Fifth Circuit law. So the

4     contempt motion, though, to the extent it seeks to impose

5     double and treble attorney's fees, those are in punitive

6     fines. They are not compensatory. So criminal contempt

7     standards are raised, and so they have to show a violation in

8     bad faith. In other words, our arguments that we're making

9     have to be bad faith, not simply that we're wrong, and they

10    have to show beyond a reasonable doubt, usually in front of a

11    jury. The U.S. Supreme Court explained the difference and the

12    different procedural protections that have to be involved if

13    they're really going to seek double and treble compensatory

14    damages.

15    Now, he's right. Saying we intended -- saying that we

16    didn't mean to violate it isn't necessarily a defense. But

17    what you're actually going to hear from him is the opposite

18    argument, that even though we didn't violate it, we wanted to.

19    That's what he says. That's why he quoted you the opening

20    section of our motion asking for permission to sue Mr. Seery,

21    because that's a statement of purpose. And he says you should

22    sanction them right there. That's literally what he said.

23    It's right there, their purpose. If intent is irrelevant to

24    them, it's irrelevant as to us. The fact that we wanted to

25    sue Seery is fully admitted. We don't deny the fact that we

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 80 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 80 of 852   PageID 1985

44

1   believe Mr. Seery should be a defendant in this lawsuit.  But

2   the fact that we didn't sue him is why we didn't violate the

3   order.  And they can't say that the fact that we eventually

4   wanted to sue him means we did violate the order.  That door

5   swings both ways, Your Honor.

6       We don't think any element is met.  The order, while writ

7   large, prohibits suing Mr. Seery without permission, and we

8   did not sue James Seery, pure and simple.  The July 12 --

9   14th, 2020 order purports to reserve exclusively to this Court

10  that which, according to the statutes and the case law, we

11  believe the Court can't exclusively reserve to itself.  And

12  Your Honor, the order prohibits commencing and pursuing a

13  claim against Jim Seery without coming here first to decide

14  the colorability of such a claim.

15      They, I believe, admit that we didn't commence a claim

16  against Jim Seery.  I think they've admitted that now.  So now

17  we're talking about what does pursue mean?  We didn't pursue a

18  claim against Jim Seery.  Is asking for leave to bring suit

19  the same thing as pursuing a claim?  That's the question

20  that's really before Your Honor.  Lawyers never talk of

21  pursuing a claim that hasn't been filed.  We don't say, I'm

22  pursuing a claim and I'm going to file it next week or next

23  year.  Usually, that type of language is in an order, because

24  when the order happens, there may already be claims against

25  Mr. Seery.  And so the pursuit of claim is supposed to attack

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 81 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 81 of 852 PageID 1986

45

1   those cases, to come here and show colorability, presumably,

2   before they continue on with those lawsuits. It doesn't mean

3   asking for permission.

4        If it did mean asking for permission, then complying with

5   Your Honor's order would be a violation. If the motion for

6   leave is a violation because it is pursuing a claim, if I had

7   filed that motion in this Court, it would still be pursuing a

8   claim without Your Honor's permission. I'd have to get

9   permission just to ask for permission. It puts us in this

10  endless loop of, well, if asking for permission is pursuing a

11  claim, and pursuing a claim is without permission violates the

12  Court's order, we'd always be in violation of the Court's

13  order just for asking, just for following Your Honor's edict.

14            THE COURT: I'm just, I'm going to interject. You

15  were supposed to, under the order, file a motion in this

16  Court.

17            MR. SBAITI: I understand that, Your Honor, and I

18  think that we can get to the specifics on why we disagree with

19  how the motion went, Your Honor. We hadn't sued Mr. Seery.

20  So as long as we dealt with the order, which is what our

21  position is, then we don't believe we violated the order.

22            THE COURT: You think the order was ambiguous,

23  requiring a motion to be filed in the Bankruptcy Court?

24            MR. SBAITI: Your Honor, what we believe is that the

25  order was ambiguous in terms of whether us asking for

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 82 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 82 of 852   PageID 1987

46

1    permission in the District Court was in and of itself a

2    violation of the order.  We don't think it was.  Actually, we

3    don't think the order's ambiguous to that extent.  The second

4    we file a suit against Mr. Seery and we don't have some

5    resolution of the issue, then I think the question of

6    sanctionability comes in.  But we never filed suit, Your

7    Honor.

8        The Court doesn't say I can't seek permission in the

9    District Court or that we can't go to the District Court with

10   -- which has general jurisdiction over this case, and has

11   jurisdiction, we believe, over the actual case and controversy

12   that's being raised.  But the idea of pursuit being a

13   violation of the order, of the letter of that order, is

14   nonsensical under that, it leads to an absurd result, and it's

15   plainly vague and ambiguous, Your Honor.

16       Asking Judge Boyle or asking a District Court for

17   permission is not a violation of this Court's order, not the

18   way it was written and not -- and I don't even believe it was

19   a violation necessarily of the Court's -- of the language that

20   the Court has.  We -- it doesn't unambiguously prevent us from

21   asking the District Court for leave.

22       The Court's order yesterday, Your Honor, applied this very

23   rule.  The TRO -- you said the TRO did not specifically state,

24   Turn your cell phone over.  And you denied motion for

25   sanctions on that.  That's basically the argument we're making

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 83 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 83 of 852   PageID 1988

47

1    here, Your Honor.  We think that was the correct ruling, and

2    we think the same type of ruling applies here.

3         Your order yesterday also determined that the Court

4    ultimately believes that hiring lawyers to file motions should

5    not be viewed as having crossed the line into contemptuous

6    behavior.  That's essentially the argument they want you to

7    buy, that there's somehow a vindictiveness behind this and an

8    insidious plan to violate court orders, Your Honor.  We don't

9    have any evidence of that.

10              THE COURT:  Okay.  Take the words vindictiveness and

11   insidious out of the equation.  That's making things personal,

12   and I don't like that.  The key is the literal wording of the

13   order, is it not?

14              MR. SBAITI:  Your Honor, the key, I believe, is the

15   --

16              THE COURT:  No entity may commence or pursue a cause

17   of action of any kind against Mr. Seery relating in any way to

18   his role as the chief executive officer and chief

19   restructuring officer of the Debtor without the Bankruptcy

20   Court first determining, after notice, that such claim or

21   cause of action represents a colorable claim of willful

22   misconduct or gross negligence against Mr. Seery and

23   specifically authorizing such entity to bring such a claim.

24   So I'm trying to understand why you argue that filing a motion

25   asking the District Court for permission is not inconsistent

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 84 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 84 of 852   PageID 1989

48

1    with this order.

2              MR. SBAITI:  Because it's not commencing a claim,

3    Your Honor.  It's not commencing a claim against him.

4              THE COURT:  Okay.  So is your argument that if Judge

5    Boyle authorizes amendment of the pleading to add Mr. Seery

6    and then you do it, at that point they may have grounds for a

7    motion for contempt, but not yet, because she has not actually

8    granted your motion?

9              MR. SBAITI:  Correct, Your Honor.  I mean, in a

10   nutshell.  In fact, that's one of -- I think that's probably

11   our next argument.  We think, in a sense, this argument is

12   incredibly premature.  There is three ways that this -- well,

13   I'd like to address this, so I've got -- I've got a diagram

14   that I think will actually help elucidate what our thought

15   process was.

16       There's three things she could have done.  She could have

17   referred -- referred it to Your Honor, which is what we

18   expected was likely to happen.

19             THE COURT:  But you didn't file a motion for referral

20   of the motion before her.

21             MR. SBAITI:  Well, no, I don't mean in respect of

22   enforcing the reference.  The referral we thought was most

23   likely going to happen because it's an associated case, and we

24   actually put those orders in front of her, so we expected that

25   those orders would end up -- that the question would

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 85 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 85 of 852   PageID 1990

49

1    ultimately end up in front of Your Honor on that basis.

2        She could have denied our motion outright, in which case

3    we haven't filed a claim, we haven't violated it, or she could

4    have granted our motion and done one of two things.  She could

5    have granted it to the extent that she thought leave would be

6    proper but then referred it down, or she could have decided --

7    taken the decision as the court with general jurisdiction and

8    simply decided it all on her own.  She had all of those

9    options, Your Honor, and none of them results in a claim being

10   commenced or pursued without the leave of this Court, if leave

11   is absolutely necessary, Your Honor.  And that's the point

12   that we were trying to make.

13       Your Honor, the -- there's -- you know, there's no

14   evidence that, absent an order from a court with jurisdiction,

15   that we were going to file a claim against Mr. Seery, that we

16   were going to commence or pursue a claim against Mr. Seery.

17   We were cognizant of Your Honor's order.  We considered that.

18   And the reason we filed them the way we did is because,

19   according to the statutes and the case law, this is the type

20   of case that would be subject to a mandatory withdrawal of the

21   reference.

22       And so there's this paradox that arises, Your Honor.  And

23   the paradox that arises is that we show up and immediately go,

24   well, we need to be back in the District Court.  So we filed

25   our motion there, and I don't think that was contemptuous, it

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 86 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 86 of 852 PageID 1991

50

1  wasn't intended to be contemptuous of the Court, but we showed

2  the orders to the Court, made the same arguments that we have

3  been making here, that we believe that there's problems with

4  the order, we believe the order oversteps its jurisdiction and

5  maybe is unenforceable, and it's up to that District Court, as

6  it has been in almost all of these other gatekeeper order

7  cases that get filed.  None of them result in sanctions, Your

8  Honor.  What they result in is a District Court deciding,

9  well, either they refer it or they decide I don't need to

10  refer it.  But I don't think that that is the same thing as

11  commencing or pursuing a claim in the end, Your Honor, because

12  all we did was ask for permission, and permission could have

13  been denied or granted or granted in part.

14       Your Honor, they haven't cited an injury.  You've heard

15  the testimony, Your Honor, that they -- the first time they

16  knew we had filed a motion -- which I don't understand why

17  that's the first time they knew we had filed a motion; we told

18  them we were going to file the motion -- was when I forwarded

19  an email saying that it's been denied without prejudice, Your

20  Honor.  Well, that means they didn't have to do any work to

21  respond to the motion.  They didn't have to do any work to do

22  any of the other things.

23       And one hundred percent of the damages that they're going

24  to say they incurred is the litigation of this contempt

25  hearing or this sanction motion, as opposed to some other

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 87 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 87 of 852   PageID 1992

51

1    simpler remedy, like going in to Judge Boyle and saying, Your

2    Honor, all that needs to go, which is what they eventually

3    did.  But they would have had to incur those costs anyway

4    because they're now moving to enforce the reference.  They

5    filed a 12(b)(6).  That briefing would have existed regardless

6    of whether or not we had filed our motion, regardless of

7    whether the sanctions hearing had commenced.

8         Your Honor, I'm going to let my partner, Mr. Bridges,

9    address this part of it, if I could.  I think that gets into

10   more of the questions that you asked, and I think he can

11   answer them a lot better than I can.

12             THE COURT:  Okay.

13             MR. SBAITI:  Thank you.

14             THE COURT:  That's fine.

15             MR. BRIDGES:  Thank you, Your Honor.  And I do want

16   to address pointedly the questions that you're asking.  First,

17   though, I was hoping to back up to some preliminary remarks

18   that you made and say that I find the 200 orders a week just

19   mindboggling.  It amazes me, and puts the entire hearing in a

20   different perspective for me.  I'm grateful that you shared

21   that with us.

22        Your expression of regret about naming us violators was

23   very meaningful to me.  It causes me -- well, the strong words

24   in our brief were mine.  I wrote them.  And your expression of

25   regret causes me to regret some of those words.  I'm hopeful

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 88 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 88 of 852    PageID 1993

52

1    that you can understand, at least in part, our reaction out of

2    concern.

3        And Your Honor, it's awkward for me to talk about problems

4    with your order, and that's the task that's come to me, to

5    list and talk through four of them and why we think they put

6    us in a really awkward position in deciding what to do in this

7    case, in the filing of it, in where we filed it, and in how we

8    sought leave to go forward against Mr. Seery.  That was

9    awkward and difficult for us, and I'm hopeful that I can

10   explain that and that you'll understand, if I'm blunt about

11   problems with the order, that I mean it very respectfully.

12   Two hundred orders a week is still very difficult for me to

13   get my mind around.

14       The four issues in the order start with the gatekeeping.

15   Then, secondly, in the preliminary remarks, I made mention of

16   the *Applewood* case and the notice that the order releases some

17   claims.  Its effect of --

18                THE COURT:  And by the way, I mean, you might

19   elaborate on the facts and holding of *Applewood*, because I

20   came into this thinking *Republic Supply v. Shoaf*, and for that

21   matter, as I said, *Espinosa*, were much more germane.  And so,

22   you know, you'll have to elaborate on *Applewood*.  I remember

23   that case, but it's just not one people cite as frequently as

24   those two.

25                MR. BRIDGES:  Yes, Your Honor.  And our reply brief

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 89 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 89 of 852   PageID 1994

53

1    devotes a page to the case, and I'm hopeful that I can

2    remember it well enough to give you what you're looking for

3    about it, but I would point you to our reply brief on that

4    topic as well.

5        The *Shoaf* case that *Applewood* quotes from and

6    distinguishes and expressly limits, the *Shoaf* case actually

7    has been cautioned and limited and distinguished numerous

8    times, if you Shepardize it, and the *Applewood* case is the

9    leading case, and it also is from the Fifth Circuit, that

10   describes and cabins the effects of *Shoaf*.  And in *Applewood*,

11   what happened is a bankruptcy confirmation order became final

12   with releases in it, and the court held that exculpatory

13   orders in a final order from the Bankruptcy Court do not have

14   res judicata effect and do not release claims unless those

15   claims are enumerated in the exculpatory order.  And --

16            THE COURT:  Okay.  So it was about specificity more

17   than anything else, right?

18            MR. BRIDGES:  Yes, Your Honor. It was a --

19            THE COURT:  Okay.

20            MR. BRIDGES:  -- a blanket release, a blanket --

21            THE COURT:  Okay.

22            MR. BRIDGES:  -- exculpatory order that didn't

23   specify what claims were released by what parties, and

24   therefore the parties didn't have the requisite notice.

25        In my mind, Your Honor, it's comparable to the Texas

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 90 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 90 of 852   PageID 1995

54

1    Supreme Court's holdings on what's required in a settlement

2    release in terms of a disclaimer of reliance, --

3              THE COURT:  Okay.  But, again, --

4              MR. BRIDGES:  -- that if you aren't --

5              THE COURT:  -- it's about specificity --

6              MR. BRIDGES:  Yes, Your Honor.

7              THE COURT:  -- more than anything else?  And then

8    we've got the U.S. Supreme Court *Espinosa* case subsequent.

9              MR. BRIDGES:  Okay.  Your Honor, I'm not sure what

10   *Espinosa* you're referring to.  Can you tell me why that

11   applies?

12             THE COURT:  Well, it was a confirmation order.  It

13   was in a Chapter 13 context.  And there were provisions that

14   operated to discharge student loan debt, --

15             MR. BRIDGES:  Uh-huh.

16             THE COURT:  -- which, of course, cannot be discharged

17   without a 523 action, a separate adversary proceeding.

18   Nevertheless, the confirmation order operated to do what 523

19   suggests you cannot do, discharge student loan debt through a

20   plan confirmation order.

21        The U.S. Supreme Court says, well, that's unfortunate that

22   the confirmation order did something which it doesn't look

23   like you can do, but no one ever objected or appealed.  That's

24   my recollection of *Espinosa*.  So it seems to be the same

25   holding as *Republic Supply v. Shoaf*.  And what I -- why I

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 91 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 91 of 852 PageID 1996

55

1    asked you to elaborate on *Applewood* is because it does seem to

2    deal with the specificity of the order versus the

3    enforceability, no?

4            MR. BRIDGES:  Your Honor, if it's not obvious

5    already, I'm not prepared to argue *Espinosa*.  And your

6    explanation of it is very helpful to me.  I think you're right

7    that the specificity issue from *Applewood* is what we're

8    relying on.  And it sounds like --

9            THE COURT:  Okay.  So, that being the case, how was

10   this order not specific?  Okay?

11           MR. BRIDGES:  That's easy, Your Honor, because it

12   doesn't say which parties are releasing which claims.  And

13   what we're talking specifically about there -- as we go

14   through the order, I can show you the language -- but what

15   we're talking about specifically are the ordinary negligence

16   and breach of fiduciary duty claims that your order doesn't

17   provide for at all.  Rather, it says colorability of gross

18   negligence or willful wrongdoing, if I remember the words

19   precisely, that's what must be shown to pursue a case -- a

20   cause of action against Mr. Seery, thereby -- thereby

21   indicating that claims for mere negligence, not gross

22   negligence, or breach of fiduciary duty, which is an even

23   lesser standard, that those claims are prohibited entirely.

24       And by having that kind of general all-encompassing

25   release or exculpation for potential liability involving

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 92 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 92 of 852 PageID 1997

56

1    negligence, and most importantly, fiduciary duty breach under

2    the Advisers Act, that that kind of exculpation under

3    *Applewood* is not enforceable and has no res judicata effect

4    because it wasn't -- those claims weren't enumerated in the

5    order.

6         That for it to have the intended exculpatory effect, if

7    that was what was intended, that the fiduciary duty claims and

8    the parties who those claims may belong to would have to have

9    been enumerated.

10        And indeed, that kind of specificity, what was required in

11   *Applewood*, isn't even possible for a claim that hasn't yet

12   occurred for future conduct.  It's not possible to enumerate

13   the details, any details, of a future claim, because the

14   underlying act -- if the underlying basis, facts for that

15   claim, haven't yet happened.  It's something to happen in the

16   future.

17        And here, that's what we're dealing with.  We're dealing

18   with conduct that took place well after the January and July

19   2020 orders that had that exculpatory effect.  Is -- is that

20   clear?

21             THE COURT:  Understood.

22             MR. BRIDGES:  Thank you, Your Honor.  So, the four

23   areas of the order, the four functions that the order does

24   that are problematic to us that led us to do what we have done

25   are the gatekeeping function; the release; the fact that by

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 93 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 93 of 852   PageID 1998

57

1  stating sole jurisdiction, that it had a jurisdiction-

2  stripping effect; and then, finally, jurisdiction asserting,

3  where, respectfully, Your Honor, we think to some extent the

4  order goes beyond what this Court's jurisdiction is.  And so

5  that not only claiming exclusive jurisdiction, but claiming

6  jurisdiction over all actions against Mr. Seery, as described

7  in the order, is going too far.

8      And those are the four issues I want to talk about one at

9  a time, and here -- I went two screens instead of one.  There

10  we go.  And here's the order.  I have numbered the highlights

11  here out of sequence because this is the sequence that I wish

12  to talk about them and that I think their significance to our

13  decision applies.

14      Before we get into the words of this July 16, 2020 order,

15  I want to mention the January order as well.  Although the

16  motion for contempt recites both orders, we don't actually

17  think the January order applies to us, because our lawsuit

18  against Mr. Seery is not about his role as a director at

19  Strand in any way.  We didn't make an issue of that, other

20  than in a footnote in our brief, because we don't think that

21  distinction matters much since the orders essentially say the

22  same things.

23      I'm not sure that it matters whether we have potentially

24  violated one order or two.  If Your Honor finds we've violated

25  one, I think we're on the hook regardless.  If Your Honor

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 94 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 94 of 852   PageID 1999

58

 1   finds that we didn't violate the July order, I don't think you

 2   will find that we violated the January order, either.  So my

 3   focus is on the July order.

 4        The gatekeeping function comes from the preliminary

 5   language about commencing or pursuing a claim or cause of

 6   action against Mr. Seery.  And it says what you want us to do

 7   first before bringing such a claim.

 8        The second issue of the release comes a little bit later.

 9   It's the colorable claim of willful misconduct or gross

10   negligence language.  In other words, because only claims of

11   willful misconduct or gross negligence can pass the bar, can

12   pass muster under this order, that lesser claims -- ordinary

13   negligence and breach of fiduciary duty -- that those claims

14   are released by this order.  That's the second argument.

15        Third is your reference to sole jurisdiction and the

16   effect that that has of attempting to say that other courts,

17   courts of original jurisdiction, do not have jurisdiction

18   because it solely resides here.  That's the third thing I want

19   to address.

20        And then the fourth is the notion that we have to come to

21   this Court first for any action that fits the description of

22   an action against Mr. Seery, when some actions are, through

23   acts of Congress, removed from what this Court has the power

24   to address.  Under 157(d) of Title 28, Your Honor, there are

25   some kinds of actions which withdrawal of the reference is

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 95 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 95 of 852    PageID 2000

59

1   mandatory, and therefore this court lacks jurisdiction to

2   address those.

3        And so those are the four issues I want to tackle,

4   starting with the first, the gatekeeping.  Your Honor, Section

5   28 -- Section 959 of Title 28 appears to be precisely on

6   point.  It calls -- it is called by some courts an exception

7   to the Barton Doctrine, which we believe is the only basis,

8   the Barton Doctrine, for this Court to claim that it has

9   jurisdiction or sole jurisdiction and can require us to come

10  here first.  We think the Barton Doctrine is the only basis

11  for that.  We haven't seen anything in the briefing from

12  opposing counsel indicating there was another basis for it.

13  We think we're talking about the Barton Doctrine here as the

14  basis for that.

15       959 is exception to the Barton Doctrine, and we think it

16  explicitly authorizes what we have done.

17       Secondly, Your Honor, the order, the gatekeeping functions

18  of the order are too broad because of its incorporation of the

19  jurisdictional problems and the release problem that we'll

20  talk about later.  But for problem number one, the key issue

21  that we're talking about is 959 as an exception to the Barton

22  Doctrine.  And I went the wrong way.

23            THE COURT:  So, we could go down a lot of rabbit

24  trails today, and I'm going to try not to do that, but are you

25  saying the very common practice of having gatekeeping

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 96 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 96 of 852 PageID 2001

60

1  provisions in Chapter 11 cases is just defective law under 28

2  U.S.C. § 959(a)?

3         MR. BRIDGES:  Can I say yes and no?

4         THE COURT:  Okay.

5         MR. BRIDGES:  Yes, to some extent, for some claims.

6  No as to other claims to another extent.  We are not saying

7  gatekeeping orders are altogether wrong, --

8         THE COURT:  Okay.

9         MR. BRIDGES:  -- no.

10        THE COURT:  Okay.

11        MR. BRIDGES:  There are problems with gatekeeping

12 orders that do more than what the law, Section 959 in

13 particular, allows them to do.

14        THE COURT:  Okay.  Be more explicit.  I'm not -- I

15 think you're saying, no, except when certain situations exist,

16 but I don't know what the certain situations are.

17        MR. BRIDGES:  And Your Honor, you're exactly right.

18 It's complicated, and it takes a long explanation.  Let me

19 start --

20        THE COURT:  Okay.  I really want to know, --

21        MR. BRIDGES:  Yeah, me, too.

22        THE COURT:  -- since I do these all the time, and

23 most of my colleagues do.

24        MR. BRIDGES:  Thank you, Your Honor.  And 959 is on

25 the screen.  Managers of any property --

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 97 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 97 of 852   PageID 2002

61

1          THE COURT:  Uh-huh.

2          MR. BRIDGES:  -- is what we're talking about,

3    including debtors in possession.  Now, it starts off by saying

4    trustees, receivers.  I mean, this is exactly what the Barton

5    Doctrine is about, right?  We're talking about trustees and

6    receivers, but not just them.  We're also talking about

7    managers of any property, including debtors in possession, --

8          THE COURT:  Uh-huh.

9          MR. BRIDGES:  -- may be sued without leave of the

10   court appointing that.  That's contrary to the Barton Doctrine

11   so far.

12      With respect to what I've numbered five here -- these

13   numbers are mine -- the quote is directly verbatim out of the

14   U.S. Code, but the numbering one through five is mine.  With

15   respect to what acts or transactions in carrying on business

16   connected with such property.

17      And so, Your Honor, what we're talking about isn't Barton

18   Doctrine is inapplicable, or you can't have a gatekeeping

19   order for any claims, but it's about managers of property.

20   And one of the hornbook examples of this is the grocery store

21   that files for bankruptcy and then, when --

22          THE COURT:  Slip-and-fall.

23          MR. BRIDGES:  You've got it, Your Honor.

24          THE COURT:  Uh-huh.

25          MR. BRIDGES:  And because they're managing property,

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 98 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 98 of 852   PageID 2003

62

1    --

2            THE COURT:  So your cause of action, if it went

3    forward, is the equivalent of a slip-and-fall --

4            MR. BRIDGES:  Yes, Your Honor.

5            THE COURT:  -- in a grocery store?

6            MR. BRIDGES:  Yes, Your Honor.

7            THE COURT:  Okay.  Let me skip ahead.  What about the

8    last sentence of 959(a)?

9            MR. BRIDGES:  959(b)?  Or 959(a)?

10           THE COURT:  No, of 959(a).

11           MR. BRIDGES:  What we're looking at here?

12           THE COURT:  That's the sentence that I have always

13   thought was one justification for a gatekeeper provision.  And

14   I know, you know, a lot of others feel the same.

15           MR. BRIDGES:  Are we talking about what I have listed

16   in number five here?

17           THE COURT:  No.  I'm talking about the last sentence

18   of 959(a).  Such actions, okay, shall be subject to the

19   general equity power of such court, you know, meaning the

20   Bankruptcy Court, so far as the same may be necessary to the

21   ends of justice, but this shall not deprive a litigant of his

22   right to a trial by jury.

23       Isn't that one of the provisions that lawyers sometimes

24   rely on in arguing a gatekeeper provision is appropriate?

25           MR. BRIDGES:  Certain --

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 99 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 99 of 852   PageID 2004

63

1          THE COURT:  You, Bankruptcy Judge, have the power,

2     the general equity power, so far as the same may be necessary

3     to the ends of justice?

4          MR. BRIDGES:  Your Honor, you bet.  Absolutely, there

5     is equitable power to do more.  There's no doubt that there

6     are reliance -- there is reliance on that in many instances.

7     So I'm not sure -- I'm not sure I'm responding to your point.

8          THE COURT:  Well, again, I think this is the third or

9     fourth argument down the line that really you start with in

10    the analytical framework here, but I guess I'm just saying I

11    always thought a gatekeeping provision was consistent,

12    entirely consistent with 28 U.S.C. § 959(a), the last

13    sentence.

14         MR. BRIDGES:  When you're dealing --

15         THE COURT:  You disagree with that?

16         MR. BRIDGES:  I do, Your Honor.

17         THE COURT:  Okay.

18         MR. BRIDGES:  And it's not that the Court lacks

19    equitable powers to do more.  It's that those equitable powers

20    are affected by when management of other parties, third

21    parties' property is at issue.

22       What we're talking about is similar to yesterday's

23    contempt order.  When you set the basis of describing what it

24    is that Highland's business is, that they're a registered

25    investment advisor in the business of buying, selling, and

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 100 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 100 of 852   PageID 2005

64

1 managing assets -- assets, of course, are property, and that

2 property is not just Highland's, but it's third-party

3 property, as if a railroad loses luggage belonging to its

4 customers.  Rather than the railroad with a trustee appointed

5 having mismanaged railroad property, we're talking about

6 third-party property here, third-party property that belongs

7 to the CLOs, about a billion dollars of assets in these CLO

8 SPEs that Highland manages.

9      And again, the slide that Mr. Sbaiti showed you showing

10 Highland, yes, they manage their own assets, the assets of the

11 Debtor, but also of the third parties, including the

12 Charitable DAF and CLO Holdco, and that the Advisers Act

13 imposes fiduciary duties on them that are unwaivable when

14 they're doing that.

15      In *Anderson*, the Fifth Circuit called 959 an exception to

16 the rule requiring court's permission for leave to sue.  In

17 *Hoffman v. City of San Diego* much more recently, relying on

18 this statute again, the court rejected a *Barton* challenge and

19 called it a statutory exception.  And in *Barton* itself, from a

20 century ago, the U.S. Supreme Court even acknowledged there

21 that where a receiver misappropriated the property of another

22 -- not the debtor's property, the property of another -- that

23 the receiver could still be sued personally, without leave of

24 court.

25      Absent *Barton*, absent applicability of the Barton

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 101 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 101 of 852 PageID 2006

65

1    Doctrine, Your Honor, the gatekeeper order is problematic.

2        *Barton* applies where a court has appointed a trustee, and

3    I don't think, Your Honor, under the circumstances in this

4    case, that it is fair to say Mr. Seery was appointed, as

5    opposed to approved by this Court. And it involves a

6    trustee's actions under the powers conferred on him. The

7    Barton Doctrine is not about a broader exculpation of the

8    trustee.

9        Here, what the Debtor asked for in its motion for

10   approval, approval of hiring Mr. Seery, what it asked for

11   specifically in the motion was that the Court not interfere

12   with corporate decisions absent a showing of bad faith, self-

13   interest, or gross negligence, and asking the Court to uphold

14   the board's decision to appoint Mr. Seery as the CEO as long

15   as they are attributable to any rationale business purpose.

16       At the hearing, Your Honor, at the hearing, we've quoted

17   your comments saying that the evidence amply shows a sound

18   business justification and reasonable business judgment on the

19   part of the Debtor in proposing that Mr. Seery be CEO and CRO.

20   Your Honor, respectfully, those words don't sound like the

21   judge using its discretion to choose -- appoint a trustee.

22   They sound like the Court exercising deference to the business

23   judgment of a business. And appropriately so. We don't have

24   trouble with application of the business judgment rule. Our

25   problem is with application of it and the Barton Doctrine.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 102 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 102 of 852 PageID 2007

66

1  Those two do not go together.  A trustee has protection

2  because it's acting under color of the court that appointed

3  it.  A court that merely deferred to someone else's

4  appointment, that's not what the Barton Doctrine is about.

5  The Barton Doctrine is about the court's function that the

6  trustee takes on, not deference to the business judgment of

7  the debtor in possession or the other fiduciary appointed by

8  the court.

9      Problem one was the gatekeeping.  Problem two is about the

10  release and the *Applewood* case.  Your Honor, again, ordinary

11  negligence and ordinary fiduciary duty breaches do not rise to

12  the level of gross negligence and willful misconduct.  And

13  because of that, the language of this order appears to be

14  barring them entirely.  No entity may bring a lawsuit against

15  Mr. Seery in certain circumstances without the Bankruptcy

16  Court doing what?  Determining that the cause of action

17  represents a colorable claim of willful misconduct or gross

18  negligence against Mr. Seery.

19      A breach of fiduciary duty under the Advisers Act can be

20  unintentional, it can fall short of gross negligence by miles,

21  and to exculpate Mr. Seery from those kinds of claims entirely

22  is to make him no longer a fiduciary.  A fiduciary duty that

23  is unenforceable makes someone not a fiduciary.  That's

24  plainly not what Mr. Seery thinks his role is.  It's

25  inconsistent with the Advisers Act.  And Your Honor, the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 103 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 103 of 852   PageID 2008

67

1   notion that he would not owe his clients fiduciary duties as

2   he manages their assets would require disclosures under the

3   SEC regulations.  It creates all kinds of problems to state

4   that a fiduciary under the Advisers Act does not have

5   enforceable fiduciary duties.  The order appears to be

6   releasing all of those.  But for *Applewood's* specificity

7   requirement, it would be doing that.

8        As an asset manager under the Advisers Act, Mr. Seery is

9   managing assets belonging to CLO Holdco and The Charitable

10  DAF.  That's precisely what the District Court action is

11  about, those fiduciary duties.  And Mr. Seery, in describing

12  these recently in testimony here -- forgive me for reading

13  through this, Your Honor, but it is pretty short -- Mr. Seery

14  testifies, I think, from a high level, the best way to think

15  about the Debtor is that it's a registered investment advisor.

16  As a registered investment advisor, which is really any

17  advisor of third-party money over $25 million, it has to

18  register with the SEC and it manages funds in many different

19  ways.  The Debtor manages approximately $200 million current

20  values -- it was more than that of the start of the case -- of

21  its own assets.

22       I'm pausing there, Your Honor.  $200 million of its own

23  assets, but we're about to talk about third-party assets.

24       It doesn't have to be a registered investment advisor for

25  those assets, but it does manage its own assets, which include

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 104 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 104 of 852 PageID 2009

68

1  directly-owned securities, loans, from mostly related entities

2  but not all, and investments in certain funds, which it also

3  manages.

4     And then here it comes:  In addition, the manager -- the

5  Debtor manages about roughly $2 billion, $2 billion in total

6  managed assets, around $2 billion in CLO assets, and then

7  other entities, which are hedge funds or PE style.

8     We also had to get a very good understanding of each of

9  the funds that we manage.  And as I said, the Investment

10  Advisers Act puts a fiduciary duty on Highland Capital to

11  discharge its duty to the investors.  So while we have duties

12  to the estate, we also have duties, as I mentioned in my last

13  testimony, to each of the investors in the funds.

14     Now, some of them are related parties, and those are a

15  little bit easier.  Some of them are owned by Highland.  But

16  there are third-party investors in these funds who have no

17  relation whatsoever to Highland, and we owe them a fiduciary

18  duty both to manage their assets prudently but also to seek to

19  manage -- maximize value.

20     Those duties do not require -- requires the opposite of

21  what I mean.  They don't merely require avoiding gross

22  negligence or willful wrongdoing.  When you're managing assets

23  of others, the fiduciary duties that you owe are far stricter

24  than that.  The highest duty known to law is a fiduciary duty.

25     The order is inconsistent with that testimony,

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 105 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 105 of 852 PageID 2010

69

1   acknowledging the fiduciary duties owed to The Charitable DAF

2   and to CLO Holdco.  It appears to release the Debtor -- maybe

3   not the Debtor.  My slide may be wrong about that.  It appears

4   to release Seery from having to uphold these duties.

5        In addition to problems with the gatekeeping under the

6   Barton Doctrine, in addition to the release problem and

7   *Applewood* and the unwaivable fiduciary duties under the

8   Advisers Act, there's also a problem with telling other courts

9   that they lack jurisdiction.  Your Honor knows bankruptcy

10  court law -- bankruptcy -- and the Bankruptcy Code far better

11  than I do, I'm certain.  But a first principle, I believe, of

12  bankruptcy law is that this Court's jurisdiction is derivative

13  of the District Court's.  And the only doctrine I've heard of

14  that can allow this Court to exercise exclusive jurisdiction

15  of the District Court that it sits in is the Barton Doctrine,

16  which, again, is very problematic to apply in this case, for

17  the reasons we've discussed already.

18       By claiming to have -- by stating in the order that this

19  Court has sole jurisdiction, it appears to either be inclusive

20  of the District Court, which I understand Your Honor doesn't

21  think her order can be read that way, but if it's not read

22  that way, then it results in telling the District Court that

23  it doesn't have the original jurisdiction that Congress has

24  given it.  And that's problematic in the order as well.

25            THE COURT:  Let me ask you.  If you think the word

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 106 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 106 of 852    PageID 2011

70

1    "power" had been used, or "authority," versus "jurisdiction,"

2    that would have cured it?

3          MR. BRIDGES:  I think there would still have been

4    other problems.  Would it have cured this?  I don't think so,

5    Your Honor, because, again, I think the only basis for that

6    power is the Barton Doctrine.

7          THE COURT:  Okay.

8          MR. BRIDGES:  To listen to opposing counsel, you'd

9    think that our jurisdictional argument was entirely about the

10   jurisdiction stripping.  It's not.  Frankly, Your Honor,

11   that's maybe even a lesser point.  A key problem here to is

12   the assertion of jurisdiction, not over any of the claims, but

13   over all of the claims, because of 157(d), Your Honor, because

14   some claims, some causes of action, have been put outside the

15   reach of bankruptcy, the Bankruptcy Court, and those actions

16   may in some instances fit within your description of the cases

17   that are precluded here.

18       That's a problem jurisdictionally with this Court's

19   ability to say it retains jurisdiction or that it has, that it

20   asserts jurisdiction.  Over what?  Any kind of claim or cause

21   of action against Mr. Seery relating in any way to his role as

22   the chief executive officer and chief restructuring officer of

23   the Debtor.

24       Some claims that fit into that bucket also fit into the

25   description in 157(d) of cases that require both consideration

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 107 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 107 of 852   PageID 2012

71

1    of bankruptcy law and federal laws affecting interstate

2    commerce or regulating it.  Right?  Some cases must fall into

3    -- under 157(d), despite having something to do with Mr.

4    Seery's role as a chief executive officer.  And Your Honor,

5    the Advisers Act fiduciary duty claims asserted by Respondents

6    in the District Court are such claims.  They cannot be decided

7    without considering the Advisers Act.

8         There are also RICO claims that, of course, require

9    consideration of the RICO statute.  But the Advisers Act

10   claims absolutely require consideration of both bankruptcy law

11   and this Court's order exonerating -- exculpating Mr. Seery

12   from some liability, in addition to the unwaivable fiduciary

13   duties imposed by the Advisers Act.

14        The assertion of jurisdiction here blanketed, in a blanket

15   manner, over all claims against Mr. Seery in any way related

16   to his CEO role is a 157(d) problem that the order has no --

17   has no solution for and we see no way around.  157(d) requires

18   withdrawal of the reference, makes it mandatory, when a case

19   requires considerations of federal law implicating interstate

20   commerce.

21        Your Honor, we think we had to do it the way we did,

22   filing in the District Court instead of filing here, in order

23   to preserve our jurisdictional arguments.  To come to this

24   Court with a motion and then what?  Immediately file a motion

25   to withdraw the reference on our own motion here?  To come

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 108 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 108 of 852 PageID 2013

72

1    here and ask for a decision on colorability, when first

2    colorability would exclude the claims that we're trying to

3    bring, at least some of them, the mere negligence, mere

4    fiduciary duty breaches, because they don't rise to the level

5    necessarily of gross negligence or willful wrongdoing.

6         Your Honor, coming here and asking this Court to rule on

7    that may well have waived our jurisdictional objections.

8    Coming here to this Court and doing that and immediately

9    filing a motion --

10             THE COURT:  I don't get it.

11             MR. BRIDGES:  The ordinary --

12             THE COURT:  Subject matter jurisdiction, if it's a

13   problem, it's not waivable.

14             MR. BRIDGES:  The ordinary issue -- the ordinary

15   waiver rule, Your Honor, is that when you come and ask for a

16   court to rule on something, that you waive your right to -- to

17   later -- you're estopped judicially from taking the contrary

18   position.

19             THE COURT:  Okay.  Well, again, I don't get it.  If

20   you filed your motion and I ruled in a way you didn't like,

21   you would appeal to the District Court.

22             MR. BRIDGES:  Yes, Your Honor.  An appeal to the

23   District Court, we would be entitled to do.  I understand, no

24   matter what happens here, we can appeal to the District Court.

25   That's different from whether or not, by coming here first,

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 109 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 109 of 852   PageID 2014

73

1    have we waived or have we created an estoppel situation, in

2    terms of arguing jurisdiction.

3              THE COURT:  Okay.

4              MR. BRIDGES:  Because of the problems with the order,

5    we thought we were in a situation where coming here would

6    waive rights that we could avoid waiving by asking in the

7    District Court.

8         In other words, there was a jurisdictional paradox:  How

9    does a party ask a court to do something it believes the court

10   lacks the power to do?  That's the spot we found ourselves in.

11   What were we supposed to do?

12        Your Honor, it is definitely a complex case.  And coming

13   into this matter with over 2,000 filings on the docket before

14   I had ever heard of Highland was a very daunting thing, coming

15   into this case.  And whether or not there's something that we

16   missed is certainly possible, but these orders that are the

17   subject of the contempt motion, these orders are not things

18   that we overlooked.  These are things that we studied

19   carefully, that we did not ignore or have disdain for, but

20   that affected and changed our actions.

21        And in the Slide #3 from Mr. Morris's -- from Mr. Morris's

22   presentation, in his third slide, he quotes from the first

23   page of our motion for leave, the motion that he says exhibits

24   our contemptuous behavior.

25        The second paragraph is kind of tiny print there, Your

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 110 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 110 of 852 PageID 2015

74

1   Honor, and it's not highlighted, but I'd like to read it.

2   Seery is not named in the original complaint, but this is only

3   out of an abundance of caution due to the Bankruptcy Court in

4   HCM's pending Chapter 11 proceeding having issued an order

5   prohibiting the filing of any causes of action against Seery

6   in any way related to his role at HCM, subject to certain

7   prerequisites.  In that order, the Bankruptcy Court also

8   asserts sole jurisdiction over all such causes of action.

9       Your Honor, our intent was not to violate the order.  Our

10  intent was to be cautious about how we proceeded, to fully

11  disclose what we were doing, and to do it in a District Court

12  that absolutely could refer the matter here to this Court for

13  a decision, but to do it in a way that didn't waive our

14  jurisdictional arguments, that didn't waive our arguments

15  regarding the release of the very claims we were trying to

16  bring, by first having to prove that they were colorful claims

17  of willful misconduct or gross negligence, when we were trying

18  to assert claims that weren't willful negligence or gross --

19  gross negligence or willful misconduct.  That was what I was

20  trying to say.

21      Your Honor, this was not disregard of your order.  If

22  we're wrong on the law, we're wrong on the law, but it's not

23  that we disregarded your order or lacked respect for it.  We

24  disclosed it.

25      Mr. Morris has argued in the briefs that we attempted to

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 111 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 111 of 852    PageID 2016

75

1   do this on an ex parte basis.  Your Honor, we did not attempt

2   to do this on an ex parte basis.  And if there are errors,

3   they probably are mine.  I know one error is mine.  On the

4   civil cover sheet in the filing in the District Court, I noted

5   and passed on that we should check the box for related case

6   and list this case on there.  I did not follow up to make sure

7   that it happened, and administratively, it didn't happen.  We

8   did not check the box on the civil cover sheet.  Mr. Morris is

9   correct that we failed to do that.  He's incorrect that that

10  was sneaky or intentional.  It was my error, having noticed it

11  but not followed up.

12       Your Honor, similarly, the argument that we didn't serve

13  them with the motion I think is disingenuous.  What happened,

14  Your Honor, is that counsel for the Debtor had agreed to

15  accept service of the complaint itself against the Debtor

16  before the motion for leave, and after accepting service, I

17  was under the impression that they'd be monitoring the docket,

18  especially when I emailed them, informed them that we were

19  filing the motion for leave to amend, because I was required

20  to submit a certificate of conference on that motion.  I

21  informed them in a polite email.  The polite email is not

22  quoted in their brief.  It is included in the record, and it's

23  quoted in full in our brief.

24       The email exchange indicates to them, Thank you for

25  pointing out the Court's orders.  We've carefully studied them

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 112 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 112 of 852 PageID 2017

76

 1  and we don't think what we're doing is a violation of those

 2  orders.

 3       That we didn't serve them is because we thought they

 4  already knew that the motion was coming and would be

 5  monitoring the docket, and we didn't know which lawyers they

 6  were going to have make an appearance in that case, so we

 7  wouldn't have known who to serve.  But if not serving them --

 8  first, the Rules do not require that service.  But if not

 9  serving them out of politeness --

10            THE COURT:  Mr. Morris is standing up.  Did --

11            MR. MORRIS:  I move to strike all of this, Your

12  Honor.  If Counsel wants to take the stand and raise his hand,

13  he should testify under oath.  I'm just going to leave it at

14  that.  He's not on their witness list.

15            THE COURT:  All right.  I overrule.  You can

16  continue.

17            MR. BRIDGES:  Thank you, Your Honor.

18       If failure to serve them was an error, it was mine.  I

19  know of no rule that requires it.

20            THE COURT:  Can I ask you, you were talking about the

21  cover sheet mistake in not checking the box.  What about your

22  jurisdictional statement in the actual complaint not

23  mentioning 28 U.S.C. § 1334 as a possible basis for subject

24  matter jurisdiction?  Do you think that was a mistake as well,

25  or was that purposeful, not necessary?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 113 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 113 of 852   PageID 2018

77

1          MR. BRIDGES:  Candidly, Your Honor, standing here

2    right now, I have no recollection whatsoever of it.

3          THE COURT:  You mention 28 U.S.C. § 1331, and then

4    1367 supplemental jurisdiction, but you don't mention 1334.

5          MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti

6    would have written that.

7          THE COURT:   Okay.

8          MR. BRIDGES:  I have no recollection of --

9          THE COURT:  Okay.

10         MR. BRIDGES:  -- making any decision at all --

11         THE COURT:  All right.

12         MR. BRIDGES:  -- with regards to that.

13         THE COURT:  Okay.

14         MR. BRIDGES:  Your Honor, you've been very patient

15   with a very long opening argument, and I'm very grateful for

16   that.  Please know that we take this Court's order seriously.

17   We voluntarily appeared here before the Court ordered us to do

18   so by filing our motion asking for a modification of the order

19   we're accused now of having been in violation of.

20       And the last thing I'd like to say, Your Honor, Mr.

21   Morris's brief claims that the first he knew of the motion,

22   the motion seeking leave to add Mr. Seery to the District

23   Court claim, the first he knew of that was when Mr. Sbaiti

24   forwarded him the District Court's order dismissing that

25   motion, denying that motion without prejudice.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 114 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 114 of 852   PageID 2019

78

1    Your Honor, in a civil contempt proceeding, where the

2    issue is compensating, not punishing, if the aggrieved party

3    didn't even know about the action until it had been denied by

4    the District Court, we submit that there can be no harm from

5    that having taken place.

6        That's all I have for opening.  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.

8        Before we give you a time check, do we have other opening

9    statements?

10           MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael

11   Anderson on behalf of Mr. Patrick.  If we need to take a

12   break, that's fine, too.

13           THE COURT:  Well, how long do you plan to use?

14           MR. ANDERSON:  No more than ten minutes, for sure.

15           THE COURT:  Let's go ahead and do that, and then

16   we'll take a break.

17           MR. POMERANTZ:  Your Honor, after, I would ask the

18   opportunity to respond to Mr. Bridges' argument.  Probably

19   another ten minutes.

20           THE COURT:  All right.  Let's go ahead and take a

21   ten-minute break.  And Mr. Taylor, you're going to have

22   something, because you --

23           MR. TAYLOR:  Five.

24           THE COURT:   Okay.  We'll take a ten-minute break.

25   And Nate, can you give them a time?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 115 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 115 of 852   PageID 2020

79

1          THE CLERK:  I'm showing it was about 59-1/2 minutes.

2          THE COURT:  Fifty-nine and a half?  And is that

3    subtracting some for my questioning?

4          THE CLERK:  I stopped whenever you talked, maybe a

5    little over --

6          THE COURT:   Okay.  So he stopped it whenever I asked

7    questions and you answered, so 59 minutes has been used by the

8    Respondents.

9       All right.  We'll take a ten-minute break.  We'll come

10   back at 11:35.

11         THE CLERK:  All rise.

12      (A recess ensued from 11:25 a.m. to 11:37 a.m.)

13         THE COURT:  All right.  We're going back on the

14   record in the Highland matter.  We have further opening

15   statements.  Counsel, you may proceed.

16     OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

17         MR. ANDERSON:  Thank you.  May it please the Court,

18   Counsel.  Michael Anderson on behalf of Respondent, Mark

19   Patrick.

20      Your Honor, after listening to this and looking at the

21   filings in this case, this issue of whether there's contempt

22   -- and I would argue there's not -- is ripe for decision.  We

23   have no real undisputed facts for purposes of the contempt

24   issue.  We have your Court's July order, the subject of Mr.

25   Bridge's arguments.  We have the Plaintiffs in the underlying

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 116 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 116 of 852    PageID 2021

80

1    lawsuit at issue.  They commenced the lawsuit in April of this

2    year.  There's absolutely nothing improper about that filing.

3    It's not subject to the contempt.  A week later, there is a

4    motion for leave to add Mr. Seery.  That's the issue.  There's

5    no dispute over that.  There's no dispute that Mr. Patrick

6    authorized the filing of the motion for leave.

7         And so then the question becomes we look at the Court's

8    July order, did a motion for leave, did that violate the terms

9    of the order?  The motion for leave is not commencing a

10   lawsuit.  It's also not pursuing a claim, because whether or

11   not the Court grants the motion, denies the motion, or

12   whatever the Court does, nothing happened, because the day

13   after the motion for leave was filed it was dismissed *sua*

14   *sponte* without prejudice because not all parties had been

15   served in the case.

16        It was permission asked one day.  The matter was mooted

17   the following day by the District Court.  And so that is

18   completely undisputed.

19        And so the question is, is asking permission, is that

20   commence?  I think everybody says there's no way that's

21   commencing a lawsuit because you have asked permission.  The

22   question, then, is it pursuing a claim?  And the argument,

23   well, no, that's not pursuing a claim; it's asking permission.

24        And I think it's also important to note that when the

25   motion for leave was filed, there were no secrets there.  I

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 117 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 117 of 852 PageID 2022

81

1    mean, I'm coming in this after the fact, representing Mr.

2    Patrick.  You look at a motion for leave, and right there on

3    Page 1 it talks about Your Honor's order.  Page 2, it quotes

4    the order and it gives the reasons, there's arguments being

5    made as to why that order doesn't bar adding Mr. Seery as a

6    defendant in the lawsuit, many of the arguments that Mr.

7    Bridges made.

8         So that's where we are.  And so when I hear, hey, we've

9    got six hours, three hours and three hours, and we're going to

10   split this up, you know, maybe too simplistic from Fort Worth,

11   but I'm like, wait a second, this is all undisputed.  It's

12   totally undisputed.  The -- whether or not the prior order is

13   enforceable or not enforceable, those are all legal arguments.

14   You know, no witnesses are necessary for that.  And as I

15   understood, right before we broke, counsel stood up and he's

16   going to do what generally doesn't happen in opening

17   statements, which is respond to opening statements, which

18   shows that that's a legal issue.

19        And so it really does come down to undisputed facts.

20   There's no testimony.  No -- nothing is necessary.  And a lot

21   of what this comes down to is the old statement, you know, is

22   it better to ask forgiveness or permission?  And usually that

23   statement comes up when somebody has already done something:

24   Hey, I'm going to go do it anyway and I'll ask for forgiveness

25   later.  Well, what the Plaintiffs in the underlying case did

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 118 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 118 of 852 PageID 2023

82

1    was ask permission.  Motion for leave.  That is not

2    contemptuous.  And there's literally no damages.  As was

3    pointed out, by the time counsel found out, it had already

4    been dismissed.

5        The last thing I want to point out, Your Honor, is that

6    the argument from opposing counsel was, well, under Rule 15 of

7    the Federal Rules of Civil Procedure, since parties hadn't

8    answered yet, the Plaintiffs in the underlying case could have

9    just simply added Mr. Seery as a defendant and moved on that

10   way, but then that would be another ball of wax and then we

11   would be addressing issues as far as whether or not there is a

12   violation of the Court's order, notwithstanding Mr. Bridge's

13   arguments.  But then we would have those issues.  But that's

14   not what happened.  Everybody knows that's not what happened.

15   It was a motion for leave that was resolved the following day.

16       And so, Your Honor, for those reasons, and those

17   undisputed reasons, we would request that the Court at the end

18   of this hearing deny the request for sanctions and a contempt

19   finding against our client, Mr. Patrick.

20       Mr. Phillips is going to address one brief issue

21   bankruptcy-wise I believe that was raised earlier.

22           THE COURT:  Okay.  Mr. Phillips?

23           MR. PHILLIPS:  Your Honor, thank you very much.

24   Louis M. Phillips on behalf of Mark Patrick.

25       The only thing that I would point out, Your Honor, and I'm

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 119 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 119 of 852 PageID 2024

83

1  going to do -- try to simplistically, because that's about the

2  level at which I operate, boil down the questions about the

3  order.

4        This order was an employment order.  The problem that Mr.

5  Bridges has elucidated to Your Honor is that the precise

6  effect, one of the precise effects of that order is to bar the

7  claims of third parties that arise into the future on the

8  basis of the employment of Mr. Seery, because the order

9  required that all claims asserting gross negligence or willful

10 misconduct need to be brought before you to determine that

11 they're colorable.

12       One question I have is, does it apply to the lawsuit that

13 was filed?  Doesn't apply unless the effect of the order was

14 to release those claims and preclude any party from bringing

15 those claims at all.  And while you can say correctly that

16 this Court issues gatekeeper orders all of the time, one thing

17 I cannot imagine that you would say is that in employment

18 orders you release claims of third parties existing and as may

19 arise in the future that could be brought against the party

20 employed to be a CRO of a debtor, who, by his own testimony,

21 says we do all kinds of stuff in the billions of dollars for

22 third parties that we owe fiduciary duties to.

23       There's no way, Your Honor, that you were considering your

24 July order to bar third-party claims arising from breach of

25 fiduciary duties by Mr. Seery to third parties who held third-

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 120 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 120 of 852    PageID 2025

84

1    party claims that did not involve some assertion that, in his

2    capacity as CRO, he was in some way acting within the scope of

3    his authority as CRO for the Debtor and yet committed

4    negligence against the Debtor.

5         Now, if the order was asserting that you know what a lot

6    of people in this courtroom know, that the standard of

7    liability for a CRO doing work for a debtor, just like the

8    standard of liability for the president of a corporation or an

9    officer of the corporation, is as long as you're within the

10   course and scope of your employment, your actions for the

11   corporation have -- can -- the corporation takes care of you

12   because there's no personal claim unless you're outside the

13   scope, and you're outside the scope if you commit gross

14   negligence or willful misconduct.

15        That, if you're restating the standard of care and

16   standard of liability for a CRO, we have no problem with that,

17   because Mr. Patrick did not authorize a cause of action

18   arising against Mr. Seery against the Debtors for damage to

19   the Debtors.  He authorized the filing of a complaint in the

20   District Court with jurisdiction for a third-party claim for

21   breach of a fiduciary duty to a third party that Mr. Seery

22   admits he owes, and then sought leave because they didn't

23   understand the order that Your Honor issued.  It couldn't have

24   been to release the breach of fiduciary duty claims that

25   wouldn't rise to gross negligence or willful misconduct, it

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 121 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 121 of 852   PageID 2026

85

1  couldn't be that, but it might be.  But if it did, under an

2  employment order?  That's very different from *Espinosa*, that's

3  very different from *Shoaf*, when you're at the end of a case in

4  a confirmation of a plan and you're talking about matters

5  arising in the past.

6      This order, if it has the effect it could be read to have,

7  precludes any third party from asserting a breach of fiduciary

8  duty against Seery for actions that violate the duty to that

9  third party, when Seery's biggest job, it looks to us like, is

10  running third-party money.  That could not have been what Your

11  Honor was thinking.

12      And so all I'm pointing out is I'm trying to distill down.

13  The lawsuit doesn't involve gross negligence or willful

14  misconduct allegations.  It involves breach of fiduciary duty,

15  breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick

16  authorized that lawsuit.

17      Now, what we're here for today is to determine whether the

18  complaint, which was not against the Debtor -- which was not

19  against Seery, the motion for leave, which did not -- all they

20  did was ask for permission, not forgiveness.  And we can't

21  understand how the Debtor should be saying, all they had to do

22  was amend.  Well, if they amended, would we be in hotter water

23  than we are today for asking for permission to sue?  I think

24  we would have been, that should have been the prescribed

25  course, when we are more concerned and we are more risk-averse

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 122 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 122 of 852 PageID 2027

86

1  by asking for leave rather than just amending by right.

2  Absolutely, that makes no sense.  We can't be held to be more

3  contemptuous because we asked for permission, when we could

4  have just sued him, because they're saying asking for

5  permission was wrong.  Certainly, suing him would have been

6  wrong.  That would have been easier.

7       THE COURT:  But Mr. Phillips, the issue is you all

8  didn't come to the Bankruptcy Court and ask permission.

9       MR. PHILLIPS:  Look at your order, Your Honor.

10       THE COURT:  It's right in front of me.

11       MR. PHILLIPS:  Right.  That order either doesn't

12  apply to the claims that were brought or it released the

13  claims that were brought.  That's our point.  It couldn't have

14  released them.  Does it apply to them?  Thank you.

15       THE COURT:  Okay.  Mr. Taylor?

16       MR. TAYLOR:  Good morning.

17       THE COURT:  Good morning.

18       OPENING STATEMENT ON BEHALF OF JAMES DONDERO

19       MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Jim

20  Dondero.  I'll be very brief because I know we've already

21  spent a lot of time on opening argument.  But I do think it is

22  appropriate to, one, first look at who brought the lawsuit,

23  CLO Holdco & DAF.  That was authorized -- it's undisputed it

24  was authorized by Mr. Patrick.  There is no dispute about

25  that.  There's no dispute who the Plaintiffs are.  But yet my

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 123 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 123 of 852 PageID 2028

87

1    client is up here as an alleged violator.

2        I think it's very clear, as all the parties have said,

3    there's no dispute as to there's an order, there was a

4    complaint, and there was a motion for leave.

5        It seems to me that the rest of the evidentiary hearing

6    that you may be about to go through is going to be about pin

7    the blame on Mr. Dondero.  It is undisputed that he is not a

8    control person for the DAF or CLO Holdco.  The only type of

9    evidence you will hear is going to be insinuation that he

10   somehow controls Mr. Patrick and used to control Mr. Scott.

11   There will be no direct evidence that he authorized this or

12   that he's the control person and the proper corporate

13   authorized representative that signed off on the --

14       It seems to me, Your Honor, first of all, that's a

15   discrete issue that should be able to be decided separately

16   from this, and the first gating issue is, was there indeed a

17   violation of this Court's order?  It would seem to me that

18   there is no disputes about those facts and that we should

19   bifurcate that, and if you then find that there is a violation

20   and find that there is any even need to move into who the

21   alleged violators are, that then we could have that

22   evidentiary portion.  But there is no reason to do that now

23   before there's even been found to be a violation.

24           THE COURT:  All right.  Thank you.

25       All right.  Well, someone made the point rebuttals in

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 124 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 124 of 852   PageID 2029

88

1   opening statements are not very common, --

2            MR. POMERANTZ:  Your -- Your --

3            THE COURT:  -- but you can use your three hours

4   however you want.

5               OPENING STATEMENT ON BEHALF OF THE DEBTOR

6            MR. POMERANTZ:  Your Honor, I didn't intend to stand

7   up.

8            THE COURT:  Okay.

9            MR. POMERANTZ:  I also didn't intend to have the

10  motion to modify the sealing order presented to Your Honor,

11  which it was in the course of that opening argument.  And

12  despite your comments at the beginning of the hearing, the

13  Movants have taken Your Honor down a series of rabbit holes

14  that have really no relevance to the contempt motion.  And

15  notwithstanding, as I said, your ruling that basically the

16  contempt would go first and the modification would go second,

17  there they were, persistent in making all the arguments why

18  this Court should modify the order.

19       They're just really trying to obfuscate the simple issue

20  that Mr. Morris presented and raised at the beginning of the

21  hearing:  Did they violate the order by pursuing a claim?  We

22  think the answer is undoubtedly yes.

23       I'm not going to try to address each of the issues they

24  raised in connection with the modification motion in detail.

25  I have a lengthy presentation.  I'll do it at the appropriate

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 125 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 125 of 852 PageID 2030

89

1    time.  But there are a few issues I want to address.  I want

2    to address one of the last points Mr. Bridges raised first.

3    If they thought that the order was a problem, they could have

4    filed their motion to modify that order before Your Honor.

5    They could have had that heard first.  There was no statute of

6    limitations issue in connection with the HarbourVest matter.

7    They could have come to Your Honor to do that.  But no, they

8    didn't.  They went to the District Court first, and it was

9    only after we filed our contempt motion that they came back

10   and said, well, Your Honor, you should modify the order.

11   Their argument that if they did that there would have been

12   waiver and estoppel is just an after-the-fact justification

13   for what they did and what they tried to do, which was

14   unsuccessful.  They tried to have the District Court make the

15   decision.

16        And why?  Your Honor, they've filed motions to recuse

17   before Your Honor.  They -- they -- it's no secret the disdain

18   they have for Your Honor's rulings as it relates to them.

19   They wanted to be out of this courtroom and in another

20   courtroom.

21        And their belated argument, Mr. Bridges falling on the

22   sword, that they failed to check the box, inadvertent, it's on

23   me, it's very curious.  Because if they had done so and had

24   referred to the correct 1334 jurisdictional predicate, as Your

25   Honor had mentioned, the complaint would have been referred to

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 126 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 126 of 852    PageID 2031

90

 1    this Court and the entire trajectory of the proceedings would

 2    have been different.  They would have had the opportunity to

 3    take their shot to go to District Court and argue that your

 4    order didn't apply.

 5         Your Honor, they say the January 9th order is not

 6    relevant.  It is entirely relevant.  It covered the

 7    independent directors and their agents.  Yes, Mr. Seery is an

 8    independent director, but he was also an agent of the

 9    independent directors and carried out the duties.  You heard

10    argument at the July 16th hearing that Mr. Seery had been

11    acting as the chief executive officer for several months.  And

12    why is it important?  Mr. Bridges said, well, if we violated

13    one order, we violated the other.  It's important because,

14    Your Honor, number one, Mr. Dondero supported that order.  We

15    would never have had an independent board in this case if Mr.

16    Dondero, the decision-making -- of the Debtor at that time,

17    supported that order and supported the exculpations that are

18    now claimed to have been invalid.

19         And also Your Honor heard testimony at the confirmation

20    hearing that the independent directors would never have taken

21    this job, would never have taken this job because of the

22    potential for litigation, litigation that we've now had to

23    endure for several months.  So to come back 16 months later

24    and say, well, you know, you couldn't really exculpate them,

25    it's really an employment order:  It was an employment order.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 127 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 127 of 852 PageID 2032

91

1   They know it.  We know it.  Your Honor knows it.  It was a

2   resolution of corporate governance issues that changed the

3   whole trajectory of the case, and luckily it -- luckily, Your

4   Honor approved it.

5        The question just is whether they violated the order,

6   period.  And I'll have a lot to say about res judicata, but I

7   won't go in too much in detail, but I will just briefly

8   address their arguments.  They're correct and the Court is

9   correct that there's a difference between *Applewood* and *Shoaf*.

10  And Your Honor got the exact difference.  In one case, a

11  release was not specific, *Applewood*.  In one case it was.

12  *Shoaf* hasn't been discredited by *Applewood*.  It was different

13  facts.  In fact, *Shoaf* relied on two Supreme Court cases, the

14  *Stoll* case and the *Chicot* case, both for the propositions that

15  a court that enters an order, a clear order, even if it didn't

16  have jurisdiction, that cannot be attacked in res judicata.

17  So here what we have is clear, unambiguous, you come to this

18  Court before commencing or pursuing a claim.  That's the

19  clarity.  The focus on the releases, that's not what we're

20  here for today, that's not what we're here for on a contempt

21  motion, on whether the release covered them or it didn't cover

22  them.  We're here on the clear issue of did they violate the

23  language, and we submit that they did.

24       And similarly, *Espinosa* applies.  Your Honor, just to

25  quote some language, "Appellees could have moved to remand the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 128 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 128 of 852    PageID 2033

92

1    action to state court after it improperly -- after its

2    improper removal to the federal court or challenge the

3    district court's exercise in jurisdiction on direct appeal.

4    Because they did neither, they are now barred by principles of

5    res judicata."

6        Res judicata actually does apply, and I will speak about

7    it in much more detail in the modification motion.

8        With respect to *Barton*, Your Honor, we disagree with their

9    argument that Mr. Seery is not a court-appointed agent.  We've

10   briefed it extensively in our motion to modify.  *Barton*

11   applies to debtors in possession.  *Barton* applies to general

12   partners of the debtor.  *Barton* applies to chief restructuring

13   orders -- officers who are approved by the debtor.  And it

14   applies to general counsel who are appointed by the chief

15   restructuring order.  Officer.

16       So the argument that *Barton* is somehow inapplicable is

17   just wrong.  Your Honor knows that.  Your Honor has written

18   extensively on *Barton* in connection with your *Ondova* opinion.

19       Some of the argument about 959 is all wrong, as well.

20   Your Honor got it right that 959 applies to slip-and-fall

21   cases or torts, injuries to parties that are strangers to this

22   process.  There is a legion of cases that I will cite to Your

23   Honor in connection with argument.  959 does not apply here.

24   There's nothing more core to this case than the transactions

25   surrounding the resolution of the HarbourVest claims.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 129 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 129 of 852 PageID 2034

93

1     We also disagree, Your Honor, that the complaint is

2  subject to mandatory withdrawal of the reference.  We've --

3  one of our exhibits in the motion to modify is our motion to

4  enforce the reference.  We think Movants have it completely

5  wrong.  This is not the type of case that will be subject to

6  withdrawal -- mandatory withdrawal of the reference, and in

7  any event, for this contempt motion, it's irrelevant.

8     And they argue -- one of the other points Mr. Bridges

9  raises is that, because this Court would not have had

10  jurisdiction under 157 because of the mandatory withdrawal,

11  then Your Honor could not legally act as a gatekeeper.  But

12  they haven't addressed *Villegas v. Schmidt*.  We've raised it

13  throughout this case.  And again, in these series of

14  pleadings, they don't even address it.  And *Villegas v.

15  Schmidt* was a *Barton* case.  It was a *Barton* case where the --

16  where the argument was that *Barton* does not apply because it's

17  a *Stern* claim and the Bankruptcy Court would not have

18  jurisdiction.  And *Villegas* said no, it does apply.  And Your

19  Honor even cited that in your *Ondova* case.  And why does it

20  apply?  Because there's nothing inconsistent with a Bankruptcy

21  Court having exclusive decision to make a *Barton*

22  determination.

23     In fact, in that case *Villegas* said, you can't go to the

24  District Court for that decision, it is the Bankruptcy Court's

25  decision.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 130 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 130 of 852    PageID 2035

94

1      So, again, it's a red herring, Your Honor.  Your Honor had

2  the ability to act as an exclusive gatekeeper for these types

3  of actions.

4      With that, Your Honor, I'll leave the rest of my argument

5  for the next motion.

6          THE COURT:  All right.  Thanks.

7      All right.  Nate, let's give everyone their time.

8          THE CLERK:  That was just about eight and a half

9  additional from the Debtor, and then altogether the other ones

10 were just shy of fourteen minutes.  Thirteen minutes and fifty

11 seconds for the other three combined.  Do you want me to --

12         THE COURT:  Yes, I meant for Debtor combined versus

13 --

14         THE CLERK:  Oh.  Oh.

15         THE COURT:  Respondents combined.

16         THE CLERK:  So that would be twenty one and a half

17 the Debtor.  Let me do the math on the other one.  Be an hour

18 twelve minutes and fifty seconds for --

19         THE COURT:  Okay.  All right.  Got that?  Debtors

20 used a total of twenty one and a half minutes; Responders have

21 used an hour twelve minutes and fifty seconds.

22     All right.  Mr. Morris, you may call your first witness.

23         MR. MORRIS:  Thank you very much, Your Honor.  The

24 Debtor calls Mark Patrick.

25         THE COURT:  All right.  Mr. Patrick?  Please approach

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 131 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 131 of 852    PageID 2036

Patrick - Direct                          95

1    our witness stand and I'll swear you in.  Please raise your

2    right hand.

3          (The witness is sworn.)

4              THE COURT:  All right.  Please take a seat.

5              MARK PATRICK, DEBTOR'S WITNESS, SWORN

6                      DIRECT EXAMINATION

7    BY MR. MORRIS:

8    Q    Good afternoon, Mr. Patrick.

9    A    Good afternoon.

10   Q    Can you hear me okay?

11   A    Yes, I can.

12   Q    Okay.  You have before you several sets of binders.

13   They're rather large.  But when I deposed you on Friday, we

14   did that virtually.  Now, I may direct you specifically to one

15   of the binders or one of the documents from time to time, so I

16   just wanted you to know that those were in front of you and

17   that I may be doing that.

18        Mr. Patrick, since March 1st, 2001 [sic], you've been

19   employed by Highland Consultants, right?

20   A    I believe the name is Highgate Consultants doing business

21   as Skyview Group.

22   Q    Okay.  And that's an entity that was created by certain

23   former Highland employees, correct?

24   A    That is my understanding, correct.

25   Q    And your understanding is that Mr. Dondero doesn't have an

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 132 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 132 of 852   PageID 2037

Patrick - Direct                                    96

1    ownership interest in that entity, correct?

2    A    That he does not.  That is correct.

3    Q    And your understanding is that he's not an employee of

4    that -- of Skyview, correct?

5    A    That is correct.

6    Q    Prior to joining Skyview on March 1st, you had worked at

7    Highland Capital Management, LP for about 13 years, correct?

8    A    Correct.

9    Q    Joining in, I believe, early 2008?

10   A    Correct.

11   Q    Okay.  I'm going to refer to Highland Capital Management,

12   LP from time to time as HCMLP.  Is that okay?

13   A    Yes.

14   Q    While at HCMLP, you served as a tax counselor, correct?

15   A    No, I would like to distinguish that.  I did have the

16   title tax counsel.  However, essentially all my activities

17   were in a non-lawyer capacity, being the client

18   representative.  I would engage other outside law firms to

19   provide legal advice.

20   Q    Okay.  So you are an attorney, correct?

21   A    Yes, I am.

22   Q    But essentially everything you did at Highland during your

23   13 years was in a non-lawyer capacity, correct?

24   A    Correct.

25   Q    In fact, you didn't even work in the legal department; is

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 133 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 133 of 852   PageID 2038

Patrick - Direct                                    97

1   that right?

2   A    That is correct.  I worked for the tax department.

3   Q    Okay.  Let's talk about how you became the authorized

4   representative of the Plaintiffs.  You are, in fact,

5   authorized representative today of CLO Holdco, Ltd. and

6   Charitable DAF, LP, correct?

7   A    Charitable DAF Fund, LP.  Correct.

8   Q    And those are the two entities that filed the complaint in

9   the United States District Court against the Debtor and two

10  other entities, correct?

11  A    Correct.

12  Q    And may I refer to those two entities going forward as the

13  Plaintiffs?

14  A    Yes.

15  Q    You became the authorized representative of the Plaintiffs

16  on March 24th, 2021, the day you and Mr. Scott executed

17  certain transfer documents, correct?

18  A    Correct.

19  Q    And you had no authority to act on behalf of either of the

20  Plaintiffs before March 24th, correct?

21  A    Correct.

22  Q    The DAF controls about $200 million in assets, correct?

23  A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24  Fund, LP.

25  Q    Yes.

Patrick - Direct                                    98

1   A    Around there.

2   Q    Okay.  Let me try and just ask that again, and thank you

3   for correcting me.  To the best of your knowledge, the

4   Plaintiffs control about $200 million in assets, correct?

5   A    Net assets, correct.

6   Q    Okay.  And that asset base is derived largely from HCMLP,

7   Mr. Dondero, or Mr. Dondero's trusts, correct?

8   A    Can you restate that question again, Mr. Morris?

9   Q    Sure.  The asset base that you just referred to is derived

10  largely from HCMLP, Mr. Dondero, or donor trusts?

11  A    The way I would characterize it -- you're using the word

12  derived.  I would characterize it with respect to certain

13  charitable donations --

14  Q    Uh-huh.

15  A    -- that were -- that were made at certain time periods,

16  where the donors gave up complete dominion and control over

17  the respective assets and at that time claimed a federal

18  income tax deduction for that.

19       I do -- I do believe that, as far as the donor group, as

20  you specified, Highland Capital Management, I recall, provided

21  a donation to a Charitable Remainder Trust that eventually had

22  expired and that eventually such assets went into the

23  supporting organizations.  And then I do believe Mr. Dondero

24  also contributed to the Charitable Remainder Trust No. 2,

25  which seeded substantial amounts of the original assets that

Patrick - Direct                                    99

1   were eventually composed of the $200 million.  And then from

2   time to time I do believe that Mr. Dondero's trusts made

3   charitable donations to their respective supporting

4   organizations.

5   Q    Okay.  Thank you.

6   A    Is that responsive?

7   Q    It is.  It's very responsive.  Thank you very much.  So,

8   to the best of your knowledge, the charitable donations that

9   were made that form the bases of the assets came from those

10  three -- primarily from those three sources, correct?

11  A    Well, you know, there's two different trusts.  There's the

12  Dugaboy Trust and the Get Good Trust.

13  Q    Okay.

14  A    Then you have Mr. Dondero and Highland Capital Management.

15  So I would say four sources.

16  Q    Okay.  All right.  Thank you.  Prior to assuming your role

17  as the authorized representative of the Plaintiff, you had

18  never had meaningful responsibility for making investment

19  decisions, correct?

20  A    I'm sorry.  You kind of talk a little bit fast.  Please

21  slow it down --

22  Q    That's okay.

23  A    -- and restate it.  Thank you.

24  Q    And I appreciate that.  And any time you don't understand

25  what I'm saying or I speak too fast, please do exactly what

Patrick - Direct                    100

1    you're doing.  You're doing fine.

2         Prior to assuming your role as the authorized

3    representative of the Plaintiffs, you never had any meaningful

4    responsibility making investment decisions.  Is that correct?

5    A    To whom?

6    Q    For anybody.

7    A    Well, during my deposition, I believe I testified that I

8    make investment decisions with respect to my family.  Family

9    and friends come to me and they ask me for investment

10   decisions.  I was -- in my deposition, I indicated to you that

11   I was a board member of a nonprofit called the 500, Inc.  They

12   had received a donation of stock in Yahoo!, and the members

13   there looked to me for financial guidance.  As an undergrad at

14   the University of Miami, I was a -- I was a finance major, and

15   so I do have a variety of background with respect to

16   investments.

17   Q    Okay.  So you told me that from time to time friends and

18   family members come to you for investing advice.  Is that

19   right?

20   A    That is correct.

21   Q    And when you were a young lawyer you were on the board of

22   a nonprofit that received a donation of Yahoo! stock and the

23   board looked to you for guidance.  Is that correct?

24              THE COURT:  Just a moment.  I think there's an

25   objection.

Patrick - Direct                                    101

1          MR. MORRIS:  Uh-huh.

2          THE COURT:  Go ahead.

3          MR. ANDERSON:  So far -- relevance, Your Honor.  This

4  is way out of the bounds of the contempt proceeding.  You

5  know, what he did as a young person with Yahoo! stock.  We're

6  here to -- he authorized the lawsuit.  They filed the lawsuit.

7  That's it.  Getting into all this peripheral stuff is

8  completely irrelevant.

9          THE COURT:  Your response?

10          MR. MORRIS:  My response, Your Honor, is very simple.

11  Mr. Patrick assumed responsibility, and you're going to be

12  told that he exercised full and complete authority over a $200

13  million fund that was created by Mr. Dondero, --

14          THE COURT:  Okay.

15          MR. MORRIS:  -- that funds -- that is funded

16  virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17  lovely man, and I don't mean to disparage him at all -- but he

18  has no meaningful experience in investing at all.

19          THE COURT:  All right.  Counsel, I overrule.  I think

20  there's potential relevance.

21      And may I remind people that when you're back at counsel

22  table, please make sure you speak your objections into the

23  microphone.  Thank you.

24  BY MR. MORRIS:

25  Q   When you were a young lawyer, sir, you were on the board

Patrick - Direct                              102

1    of a nonprofit that received a donation of Yahoo! stock and

2    the board looked to you for guidance, correct?

3    A    Yes, correct.

4    Q    And -- but during your 13 years at Highland, you never had

5    formal responsibility for making investment decisions,

6    correct?

7    A    That is correct.

8    Q    Yeah.  In fact, other than investment opportunities that

9    you personally presented where you served as a co-decider, you

10   never had any responsibility or authority to make investment

11   decisions on behalf of HCMLP or any of its affiliated

12   entities, correct?

13   A    That is correct.

14   Q    And at least during your deposition, you couldn't identify

15   a single opportunity where you actually had the authority and

16   did authorize the execution of a transaction on behalf of

17   HCMLP or any of its affiliates, correct?

18   A    Correct.

19   Q    And yet today you are now solely responsible for making

20   all investment decisions with respect to a $200 million

21   charitable fund, correct?

22   A    Yes, but I get some help.  I've engaged an outside third

23   party called ValueScope, and they have been as -- effectively

24   working as a "gatekeeper" for me, and I look to them for

25   investment guidance and advice, and I informally look to Mr.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 139 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 139 of 852 PageID 2044

Patrick - Direct                                                103

 1  Dondero since the time period of when I took control on March

 2  24th for any questions I may have with respect to the

 3  portfolio.  So I don't feel like I'm all by myself in making

 4  decisions.

 5  Q    Okay.  I didn't mean to suggest that you were, sir, and I

 6  apologize if you took it that way.  I was just asking the

 7  question, you are the person now solely responsible for making

 8  the investment decisions, correct?

 9  A    Yes.

10  Q    Okay.  Let's talk about the circumstances that led to the

11  filing of the complaint for a bit.  On April 12, 2021, you

12  caused the Plaintiffs to commence an action against HCMLP and

13  two other entities, correct?

14  A    Correct.

15  Q    Okay.  One of the binders -- you've got a couple of

16  binders in front of you.  If you look at the bottom, one of

17  them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18  could grab that one and turn to Exhibit 12.  Do you have that,

19  sir?

20  A    It says -- it says the original complaint.  Is that the

21  right one?

22  Q    That is the right one.  And just as I said when we were

23  doing this virtually last Friday, if I ask you a question

24  about a particular document, you should always feel free to

25  review as much of the document as you think you need to

Patrick - Direct                                          104

1    competently and fully answer the question.  Okay?

2    A    Okay.  Thank you.

3    Q    All right.  You instructed the Sbaiti firm to file that

4    complaint on behalf of the Plaintiffs, correct?

5    A    Correct.

6    Q    And to the best of your recollection, the Plaintiffs

7    returned -- retained the Sbaiti firm in April, correct?

8    A    Correct.

9    Q    So the Sbaiti firm was retained no more than twelve days

10   before the complaint was filed, correct?

11   A    Correct.

12   Q    You personally retained the Sbaiti firm, correct?

13   A    Correct.

14   Q    And the idea of filing this complaint originated with the

15   Sbaiti firm, correct?

16   A    Correct.

17   Q    Before filing -- withdrawn.  Before becoming the

18   Plaintiffs' authorized representative, you hadn't had any

19   communications with anyone about potential claims that might

20   be brought against the Debtor arising out of the HarbourVest

21   settlement, correct?

22   A    That is correct.

23   Q    Now, after you became the Plaintiffs' authorized

24   representative, Mr. Dondero communicated with the Sbaiti firm

25   about the complaint that's marked as Exhibit 12, correct?

000137

Patrick - Direct                          105

1   A    Yes.  After he brought certain information to myself and

2   then that I engaged the Sbaiti firm to launch an

3   investigation, I also wanted Mr. Dondero to work with the

4   Sbaiti firm with respect to their investigation of the

5   underlying facts.

6   Q    Okay.  Mr. Dondero did not discuss the complaint with you,

7   but he did communicate with the Sbaiti firm about the

8   complaint, correct?

9   A    I believe -- yeah.  I heard you slip in at the end "the

10  complaint."  I know he communicated with the Sbaiti firm.  I

11  can't -- I can't say what he said or didn't say with respect

12  to the -- the actual complaint.

13  Q    Okay.  But Mr. Dondero got involved in the process

14  initially when he brought some information to your attention

15  concerning the HarbourVest transaction, correct?

16  A    Correct.

17  Q    And he came to you with the HarbourVest information after

18  you assumed your role as the authorized representative of the

19  Plaintiffs on March 24th, correct?

20  A    That is correct.

21  Q    At the time he came to you, you did not have any specific

22  knowledge about the HarbourVest transaction, correct?

23  A    I did not have specific knowledge with respect to the

24  allegations that were laid out and the facts with respect to

25  the original complaint.  I think I had just had a general

Patrick - Direct                            106

1  awareness that there was a HarbourVest something or other, but

2  the specific aspects of it, I was unaware.

3  Q    Okay.  And you had no reason to believe that Mr. Seery had

4  done anything wrong with respect to the HarbourVest

5  transaction at the time you became the Plaintiffs' authorized

6  representative, correct?

7  A    That is correct.

8  Q    But you recall very specifically that some time after

9  March 24th Mr. Dondero told you that an investment opportunity

10  was essentially usurped or taken away, to the Plaintiffs' harm

11  and for the benefit of HCMLP, correct?

12  A    That is correct.

13  Q    And after Mr. Dondero brought this information to your

14  attention, you hired the Sbaiti firm to launch an

15  investigation into the facts, correct?

16  A    Correct.

17  Q    You had never worked with the Sbaiti firm before, correct?

18  A    That is correct.

19  Q    And you had hired many firms as a tax counselor at HCMLP,

20  but not the Sbaiti firm until now.  Correct?

21  A    That is correct.

22  Q    You got to the Sbaiti firm through a recommendation from

23  D.C. Sauter, correct?

24  A    Correct.

25  Q    Mr. Sauter is the in-house counsel, the in-house general

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 143 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 143 of 852 PageID 2048

Patrick - Direct                          107

 1   counsel at NexPoint Advisors, correct?

 2   A    Correct.

 3   Q    You didn't ask Mr. Sauter for a recommendation for a

 4   lawyer; he just volunteered that you should use the Sbaiti

 5   firm.  Correct?

 6   A    That is correct.

 7   Q    And you never used -- considered using another firm, did

 8   you?

 9   A    When they were presented to me, they appeared to have all

10   the sufficient skills necessary to undertake this action, and

11   so I don't recall interviewing any other firms.

12   Q    Okay.  Now, after bringing the matter to your action, Mr.

13   Dondero communicated directly with the Sbaiti firm in relation

14   to the investigation that was being undertaken.  Correct?

15   A    That is correct.

16   Q    But you weren't privy to the communications between Mr.

17   Dondero and the Sbaiti firm, correct?

18   A    I did not participate in those conversations as the --

19   what I, again, considered Mr. Dondero as the investment

20   advisor to the portfolio, and he was very versant in the

21   assets.  I wanted him to participate in the investigation that

22   the Sbaiti firm was undertaking prior to the filing of this

23   complaint.

24   Q    Let's talk for a minute about the notion of Mr. Dondero

25   being the investment advisor.  Until recently, the entity

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 144 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 144 of 852    PageID 2049

Patrick - Direct                                    108

1    known as the DAF had an investment advisory committee with HC

2    -- an investment advisory agreement with HCMLP.  Correct?

3    A    It's my understanding that the investment advisory

4    agreement existed with the Plaintiffs, CLO Holdco, as well as

5    Charitable DAF Fund, LP, up and to the end of February,

6    throughout the HarbourVest transaction.

7    Q    Okay.  And since February, the Plaintiffs do not have an

8    investment advisory agreement with anybody, correct?

9    A    That is correct.

10   Q    Okay.  So Mr. Dondero, if he serves as an investment

11   advisor, it's on an informal basis.  Is that fair?

12   A    After I took control, he serves as an informal investment

13   advisor.

14   Q    Okay.  So there's no contract that you're aware of between

15   either of the Plaintiffs and Mr. Dondero pursuant to which he

16   is authorized to act as the investment advisor for the

17   Plaintiffs, correct?

18   A    That is correct.

19   Q    Okay.  When you communicated with Grant Scott --

20   withdrawn.  You know who Grant Scott is, right?

21   A    Yes, I do.

22   Q    He's the gentleman who preceded you as the authorized

23   representative of the Plaintiffs, correct?

24   A    Yes.

25   Q    Okay.  You communicated with Mr. Scott from time to time

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 145 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 145 of 852   PageID 2050

Patrick - Direct                                    109

1   during February and March 2021, correct?

2   A    February and March are the dates?  Yes.

3   Q    Yeah.  And from February 1st until March 21st -- well,

4   withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5   Plaintiffs' authorized representative, correct?

6   A    Correct.

7   Q    And you have no recollection of discussing with Mr. Scott

8   at any time prior to March 24th any aspect of the HarbourVest

9   settlement with Mr. Scott.  Correct?

10  A    Correct.

11  Q    And you have no recollection of discussing whether the

12  Plaintiffs had potential claims that might be brought against

13  the Debtor.  Correct?  Withdrawn.  Let me ask a better

14  question.

15       You have no recollection of discussing with Mr. Scott at

16  any time prior to March 24th whether the Plaintiffs had

17  potential claims against the Debtor.  Correct?

18  A    That is correct.

19  Q    You and Mr. Scott never discussed whether either of --

20  either of the Plaintiffs had potential claims against Mr.

21  Seery.  Correct?

22  A    Correct.

23  Q    Okay.  At the time that you became their authorized

24  representative, you had no knowledge that the Plaintiffs would

25  be filing a complaint against the Debtors relating to the

Patrick - Direct                                  110

1    HarbourVest settlement less than three weeks later, correct?

2    A    That is correct.

3    Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4    see at the top it refers to Mr. Seery as a potential party.

5    Do you see that?

6    A    Yes, I do.

7    Q    Okay.  You don't know why Mr. Seery was named --

8    withdrawn.  You don't know why Mr. Seery was not named as a

9    defendant in the complaint, correct?

10   A    No, I -- that's correct.  I do not know why he was not

11   named.  That's in the purview of the Sbaiti firm.

12   Q    Okay.  And the Sbaiti firm also made the decision to name

13   Mr. Seery on Page 2 there as a potential party when drafting

14   the complaint, correct?

15   A    That's what the document says.

16   Q    And you weren't involved in the decision to identify Mr.

17   Seery as a potential party, correct?

18   A    That is correct.  Again, I rely on the law firm to decide

19   what parties to bring a suit to -- against.

20   Q    Okay.  Okay.  Do you recall the other day we talked about

21   a document called the July order?

22   A    Yes.

23   Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24   you can turn to that.  And take a moment to look at it, if

25   you'd like.  And my first question is simply whether this is

Patrick - Direct                                111

1    the July order, as you understand it.

2         (Pause.)

3    A    Yes, it is.  I was just looking for the gatekeeper

4    provision.  It looks like it's Paragraph 5.  So, --

5    Q    Okay.  Thank you for that.  About a week after the

6    complaint was filed, you authorized the Plaintiffs to file a

7    motion in the District Court for leave to amend the

8    Plaintiffs' complaint to add Mr. Seery as a defendant.

9    Correct?

10   A    I authorized the filing of a motion in Federal District

11   Court that would ask the Federal District Court whether or not

12   Jim Seery could be named in the original complaint with

13   respect to the gatekeeper provision cited in that motion and

14   with respect to the arguments that were made in that motion.

15   Q    Okay.  Just to be clear, if you turn to Exhibit 17, the

16   next tab, --

17   A    I'm here.

18   Q    -- do you see that document is called Plaintiffs' Motion

19   for Leave to File First Amended Complaint?

20   A    Yes.

21   Q    And that's the document that you authorized the Plaintiffs

22   to file on or about April 19th, correct?

23   A    Correct.

24   Q    Okay.  And can we refer to that document as the motion to

25   amend?

Patrick - Direct                                      112

1  A    Yes.

2  Q    Okay.  You were aware of the July order at Tab 16 before

3  you authorized the filing of the motion to amend.  Correct?

4  A    Yes, because it's cited in the motion itself.

5  Q    Okay.  And at the time that you authorized the filing of

6  the motion to amend, you understood that the July order was

7  still in effect.  Correct?

8  A    Yes, because it was referenced in the motion, so my

9  assumption would be it would still be in effect.

10 Q    Okay.  Before the motion to amend was filed, you're -- you

11 are aware that my firm and the Sbaiti firm communicated by

12 email about the propriety of filing the motion to amend?

13 A    Before it was filed?  Communications between your firm and

14 the Sbaiti firm?  I would have to have my recollection

15 refreshed.

16 Q    I'll just ask the question a different way.  Did you know

17 before you authorized the filing of the motion to amend that

18 my firm and the Sbaiti firm had engaged in an email exchange

19 about the propriety of filing the motion to amend in the

20 District Court?

21 A    It's my recollection -- and again, I could be wrong here

22 -- but I thought the email exchange occurred after the fact,

23 not before.  But again, I -- I just --

24 Q    Okay.  In any event, on April 19th, the motion to amend

25 was filed.  Correct?

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 149 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 149 of 852    PageID 2054

Patrick - Direct                              113

1    A    Correct.

2    Q    That's the document that is Exhibit 17.  And you

3    personally authorized the Sbaiti firm to file the motion to

4    amend on behalf of the Plaintiffs, correct?

5    A    Correct.

6    Q    And you authorized the filing of the motion to amend with

7    knowledge -- withdrawn.

8        Can you read the first sentence of the motion to amend out

9    loud, please?

10    A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11    15 of the Federal Rules of Civil Procedure for one purpose:

12    to name as defendant one James P. Seery, Jr., the CEO of

13    defendant Highland Capital Management, LP (HCM) and the chief

14    perpetrator of the wrongdoing that forms the basis of the

15    Plaintiffs' causes of action.

16    Q    And does that fairly state the purpose of the motion?

17        MR. SBAITI:  Objection, Your Honor.  Asks him to make

18    a legal conclusion about the purpose of the legal motion filed

19    in court that he didn't draft.

20        THE COURT:  Okay.  I overrule.  You can answer if you

21    have an answer.

22        THE WITNESS:  It's always been my general

23    understanding that the purpose of filing this motion was to go

24    to the Federal District Court and ask that Court of reference

25    to this Court whether or not Mr. Seery could be named with

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 150 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 150 of 852 PageID 2055

Patrick - Direct                                          114

 1  respect to the original complaint, citing again the gatekeeper

 2  provisions and citing the various arguments that we've heard

 3  much earlier.

 4  BY MR. MORRIS:

 5  Q    Okay.  You personally didn't learn anything between April

 6  9th, when the complaint was filed, and April 19th, when the

 7  motion to amend was filed, that caused you to authorize the

 8  filing of the motion to amend, correct?

 9  A    That is correct.

10  Q    In fact, you relied on the Sbaiti firm with respect to

11  decisions concerning the timing of the motion to amend.

12  Correct?

13  A    Correct.

14  Q    And you had no knowledge of whether anyone acting on

15  behalf of the Plaintiffs ever served the Debtor with a copy of

16  the motion to amend.  Correct?

17  A    Yes.  I have no knowledge.

18  Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19  provided my firm with a copy of the motion to amend.  Correct?

20  A    I cannot recall one way or another.

21  Q    Okay.  You never instructed anyone on behalf -- acting on

22  behalf of the Plaintiffs to inform the Debtor that the motion

23  to amend had been filed, correct?

24  A    That is correct.

25  Q    And that's because you relied on the Sbaiti firm on

Patrick - Direct                                      115

1    procedural issues, correct?

2    A    That is correct.

3    Q    You didn't consider waiting until the Debtor --

4         (Interruption.)

5    Q    -- had appeared in the action before authorizing the

6    filing of the motion --

7    A    Yeah, --

8              THE COURT:  Yes.  Y'all are being a little bit loud.

9    Okay.

10             A VOICE:  Sorry.

11             MR. MORRIS:  No problem.

12             MR. PHILLIPS:  I've heard that before, Your Honor,

13   and I apologize.

14             THE COURT:  I bet you have.  Thank you.

15             MR. MORRIS:  Admonish Mr. Phillips, please.

16             THE COURT:  Okay.

17             MR. MORRIS:  He's always the wild card.

18             MR. PHILLIPS:  I admonish --

19             MR. MORRIS:  He's always the wild card.

20             MR. PHILLIPS:  I admonish myself.

21             THE COURT:  All right.  I think he got the message.

22   Continue.

23   BY MR. MORRIS:

24   Q    You didn't consider waiting until the Debtor had appeared

25   in the action before filing the motion to amend, correct?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 152 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 152 of 852   PageID 2057

Patrick - Direct                        116

1   A    Again, I am the client and I rely upon the law firm that's

2   engaged with respect to making legal decisions as to the

3   timing and notice and appearance and what have you.  I'm a tax

4   lawyer.

5   Q    Okay.  You wanted the District Court to grant the relief

6   that the Plaintiffs were seeking.  Correct?

7   A    I wanted the District Court to consider, under the

8   gatekeeper provisions of this Court, whether or not Mr. Seery

9   could be named in the original complaint.  That's -- that,

10  from my perspective, is what was desired.

11  Q    All right.  You wanted the District Court to grant the

12  relief that the Plaintiffs were seeking, correct?

13          MR. SBAITI:  Objection, Your Honor.  Asked and

14  answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  Again, I would characterize this motion

17  as not necessarily asking for specific relief, but asking the

18  Federal District Court whether or not, under the gatekeeper

19  provision, that Mr. Seery could be named on there.  What

20  happens after that would be a second step.  So I kind of -- I

21  dispute that characterization.

22  BY MR. MORRIS:

23  Q    All right.  I'm going to cross my fingers and hope that

24  Ms. Canty is on the line, and I would ask her to put up Page

25  57 from Mr. Patrick's deposition transcript.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 153 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 153 of 852   PageID 2058

Patrick - Direct                          117

1              THE COURT:  There it is.

2              MR. MORRIS:  There it is.  It's like magic.  Can we

3   go down to Lines 18 through 20?

4   BY MR. MORRIS:

5   Q   Mr. Patrick, during the deposition on Friday, did I ask

6   you this question and did you give me this answer?  Question,

7   "Did you want the Court to grant the relief you were seeking?"

8   Answer, "Yes."

9   A   I -- and it was qualified with respect to Lines 12 through

10  17.  In my view, when I answered yes, I was simply restating

11  what I stated in Line 12.  I wanted the District Court to

12  consider this motion as to whether or not Mr. Seery could be

13  named in the original complaint or the amended complaint

14  pursuant to the existing gatekeeper rules and the arguments

15  that were made in that motion.  That's -- that's what I

16  wanted.  And so then when I was asked, did you want the Court

17  to grant the relief that you were seeking, when I answered

18  yes, it was from that perspective.

19  Q   Okay.  Thank you very much.  If the District Court had

20  granted the relief that you were seeking, you would have

21  authorized the Sbaiti firm to file the amended complaint

22  naming Mr. Seery as a defendant if the Sbaiti firm recommended

23  that you do so.  Correct?

24  A   If the Sbaiti firm recommended that I do so.  That is

25  correct.

Patrick - Direct                          118

1   Q    Okay.  Let's talk for a little bit about the line of

2   succession for the DAF and CLO Holdco.  Can we please go to

3   Exhibit 25, which is in the other binder?  It's in the other

4   binder, sir.

5        (Pause.)

6   Q    I guess you could look on the screen or you can look in

7   the binder, whatever's easier for you.

8   A    Yeah.  I prefer the screen.  I prefer the screen.

9   Q    Okay.

10  A    It's much easier.

11  Q    All right.  We've got it in both spots.  But do you have

12  Exhibit 25 in front of you, sir?

13  A    Yes, I do.

14  Q    All right.  Do you know what it is?

15  A    This is the organizational chart depicting a variety of

16  charitable entities as well as entities that are commonly

17  referred to the DAF.  However, when I look at this chart, I do

18  not look at and see just boxes, what I see is the humanitarian

19  effort that these boxes represent.

20           MR. MORRIS:  Your Honor, may I interrupt?

21           THE COURT:  You may.

22           MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q    I appreciate that, and when your lawyers get up to ask you

25  questions, I bet they'll want to know just what you were about

Case 21-03067-sgj Doc 43 Filed 09/29/21  Entered 09/29/21 18:18:16  Page 155 of 852
Case 3:21-cv-00842-B  Document 43  Filed 07/13/21  Page 155 of 852  PageID 2060

Patrick - Direct                    119

1   to tell me.  But I just want to understand what this chart is.

2   This chart is the DAF, CLO Holdco, structure chart.  Correct?

3   A    Correct.

4   Q    Okay.  And you were personally involved in creating this

5   organizational structure, correct?

6   A    I -- yes.

7   Q    Okay.  And from time to time, the Charitable DAF Holdco

8   Limited distributes cash to the foundations that are above it.

9   Correct?

10  A    Correct.

11  Q    All right.  I want to talk a little bit more specifically

12  about how this happens.  The source of the cash distributed by

13  Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14  entity, the Cayman Islands entity near the bottom.  Correct?

15          MR. ANDERSON:  Your Honor, I have an objection.

16  Completely irrelevant.  I'm objecting on relevance grounds.

17  This has nothing to do with the contempt proceeding.  We've

18  already gone over that he authorized the filing of the

19  complaint, that he authorized the filing of the motion to

20  amend.  It's all in the record.  This is completely irrelevant

21  at this point.

22          THE COURT:  Okay.  Relevance objection.  Your

23  response?

24          MR. MORRIS:  I believe that it's relevant to the

25  Debtor's motion to hold Mr. Dondero in contempt for pursuing

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 156 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 156 of 852    PageID 2061

Patrick - Direct                            120

1    claims against Mr. Seery, in violation of the July 7 order.  I

2    think an understanding of what the Plaintiffs are, how they're

3    funded, and Mr. Dondero's interest in pursuing claims on

4    behalf of those entities is relevant to the -- to the -- just

5    -- it's just against him.  It's not against their clients,

6    frankly.  It's just against Mr. Dondero.

7                THE COURT:  I overrule.

8                MR. MORRIS:  I'll try and -- I'll try and make this

9    quick, though.

10   BY MR. MORRIS:

11   Q    CLO Holdco had two primary sources of capital.  Is that

12   right?

13   A    Two primary sources of capital?

14   Q    Let me ask it differently.  There was a Charitable

15   Remainder Trust that was going to expire in 2011, correct?

16   A    That is correct.

17   Q    And that Charitable Remainder Trust had certain CLO equity

18   assets, correct?

19   A    Correct.

20   Q    And the donor to that Charitable Remainder Trust was

21   Highland Capital Management, LP.  Correct?

22   A    Not correct.  After my deposition, I refreshed my memory.

23   There were two Charitable Remainder Trusts that existed, which

24   I think in my mind caused a little bit of confusion.  The

25   Charitable Remainder Trust No. 2, which is the one that

Patrick - Direct                                        121

1   expired in 2011, was originally funded by Mr. Dondero.

2   Q    Okay.  So, so the Charitable Remainder Trust that we were

3   talking about on Friday wasn't seeded with capital from

4   Highland Capital Management, it came from Mr. Dondero

5   personally?

6   A    That is correct.

7   Q    Okay.  Thank you.  And the other primary source of capital

8   was the Dallas Foundation, the entity that's in the upper

9   left-hand corner of the chart.  Is that correct?

10  A    No.

11  Q    The -- you didn't tell me that the other day?

12  A    You said -- you're pointing to the Dallas Foundation.

13  That's a 501(c)(3) organization.

14  Q    I apologize.  Did you tell me the other day that the

15  Dallas Foundation was the second source of capital for HCLO

16  Hold Company?

17  A    No, I did not.  You --

18       (Pause.)

19  Q    Maybe I know the source of the confusion.  Is the Highland

20  Dallas Foundation something different?

21  A    Yes.  On this organizational chart, you'll see that it has

22  an indication, it's a supporting organization.

23  Q    Ah, okay.  So, so let me restate the question, then.  The

24  second primary source of capital for CLO Holdco, Ltd. is the

25  Highland Dallas Foundation.  Do I have that right?

Patrick - Direct                    122

1   A    Yes.

2   Q    Okay.  And the sources of that entity's capital were

3   grantor trusts and possibly Mr. Dondero personally.  Correct?

4   A    In addition -- per my refreshing my recollection from our

5   deposition, the other Charitable Remainder Trust, I believe

6   Charitable Remainder Trust No. 1, which expired later, also

7   sent a donation, if you will, or assets to -- and I cannot

8   recall specifically whether it was just the Highland Dallas

9   Foundation or the other supporting organizations that you see

10  on this chart.

11  Q    But the source of that -- the source of the assets that

12  became the second Charitable Remainder Trust was Highland

13  Capital Management, LP.  Is that right?

14  A    I think that is accurate from my recollection.  And again,

15  I'm talking about Charitable Remainder Trust No. 1.

16  Q    Okay.  So is it fair to say -- I'm just going to try and

17  summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18  is the investment arm of the organizational structure on this

19  page?

20  A    Yes.

21  Q    And is it fair to say that nearly all of the assets that

22  are in there derived from either Mr. Dondero, one of his

23  trusts, or Highland Capital Management, LP?

24  A    Yes.  It's like the Bill Gates Foundation or the

25  Rockefeller Foundation.  These come from the folks that make

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 159 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 159 of 852 PageID 2064

Patrick - Direct                                    123

1    their donations and put their name on it.

2    Q    Okay.

3              MR. MORRIS:  Now, now, Your Honor, I'm going to go

4    back just for a few minutes to how Mr. Scott got appointed,

5    because I think that lays kind of the groundwork for his

6    replacement.  It won't take long.

7              THE COURT:  Okay.  I have a question either --

8              MR. MORRIS:  Sure.

9              THE COURT:  -- for you or the witness.  I'm sorry,

10   but --

11             MR. MORRIS:  Sure.  Yeah.

12             THE COURT:  -- the organizational chart, it's not

13   meant to show everything that might be connected to this

14   substructure, right?  Because doesn't CLO Holdco, Ltd. own

15   49.02 percent of HCLOF, --

16             MR. MORRIS:  That --

17             THE COURT:  -- which gets us into the whole

18   HarbourVest transaction issue?

19             MR. MORRIS:  You're exactly right, Your Honor.

20             THE COURT:  Okay.

21             MR. MORRIS:  But that's just an investment that HCLO

22   Holdco made.

23             THE COURT:  Right.

24             MR. MORRIS:  Right?  And so I -- let me ask the

25   witness, actually.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 160 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 160 of 852   PageID 2065

Patrick - Direct                                    124

1              THE COURT:  Okay.  Thank you.  Thank you.

2              MR. MORRIS:  Let me ask the witness.  Yeah.

3              THE COURT:  I just want my brain --

4              MR. MORRIS:  Right.

5              THE COURT:  -- to be complete on this chart.

6    BY MR. MORRIS:

7    Q    Mr. Patrick, there are three entities under CLO Holdco,

8    Ltd.  Do you see that?

9    A    Yes.

10   Q    And does CLO Holdco, Ltd. own one hundred percent of the

11   interests in each of those three entities?

12   A    Yes.

13   Q    Do you know why those three entities are depicted on this

14   particular chart?  Is it because they're wholly-owned

15   subsidiaries?

16   A    Correct.

17   Q    Okay.  And CLO Holdco, Ltd. has interests in other

18   companies.  Isn't that right?

19   A    It has other investments.  That is correct.

20   Q    And the reason that they're not depicted on here is

21   because they're not wholly-owned subsidiaries, they're just

22   investments; is that fair?

23   A    That is fair.

24             MR. MORRIS:  Does that--?

25             THE COURT:  Yes.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 161 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 161 of 852   PageID 2066

Patrick - Direct                           125

1          MR. MORRIS:  Okay.

2          THE COURT:  Uh-huh.

3    BY MR. MORRIS:

4    Q    So, so let's go back to Mr. Grant for a moment.  Mr.

5    Scott, rather.  Mr. Dondero was actually the original general

6    partner.  If you look at this chart, while it's still up here,

7    you see on the left there's Charitable DAF GP, LLC?

8    A    Yes.

9    Q    And the Charitable DAF GP, LLC is the general partner of

10   the Charitable DAF Fund, LP.  Correct?

11   A    Correct.

12   Q    And on this chart, Grant Scott was the managing member of

13   Charitable DAF GP, LLC.  Right?

14   A    Correct.

15   Q    Okay.  But Mr. Dondero was the original general partner of

16   that entity, correct?

17   A    That is correct.  But I do want to point out, I just note

18   that the GP interest is indicating a one percent interest and

19   the 99 interest to Charitable DAF Holdco.  I believe that's

20   incorrect.  It's a hundred percent by Charitable DAF Holdco,

21   Ltd., and the Charitable DAF GP interest is a noneconomic

22   interest.  So that should actually reflect a zero percent to

23   the extent it may indicate some sort of profits or otherwise.

24   Q    Okay.  Thank you for the clarification.  Can you turn to

25   Exhibit 26, please, in your binder?  And is it your

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 162 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 162 of 852   PageID 2067

Patrick - Direct                           126

1   understanding that that is the amended and restated LLC

2   agreement for the DAF GP, LLC?

3   A    Yes.

4   Q    Okay.  And this was amended and restated effective as of

5   January 1st, 2012, correct?

6   A    Yes.

7   Q    And if you go to the last page, you'll see there are

8   signatures for Mr. Scott and Mr. Dondero, correct?

9   A    Yes.

10  Q    And Mr. Dondero is identified as the forming -- former

11  managing member and Mr. Scott is identified as the new

12  managing member.   Correct?

13  A    Correct.  That's what the document says.

14  Q    And it's your understanding that Mr. Dondero had the

15  authority to select his successor.  Correct?

16  A    Correct.

17  Q    In fact, it's based on your understanding of documents and

18  your recollection that Mr. Dondero personally selected Mr.

19  Scott as the person he was going to transfer control to,

20  correct?

21  A    Upon advice of Highland Capital Management's tax

22  compliance officer, Mr. Tom Surgent.

23  Q    What advice did Mr. Surgent give?

24  A    He gave advice that, because Mr. Dondero -- and this is

25  what I came to an understanding after the fact of this

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 163 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 163 of 852   PageID 2068

Patrick - Direct                                    127

 1   transaction, because I was not a part of it -- that by Mr.

 2   Dondero holding that GP interest, that it would be -- the

 3   Plaintiffs, if you will, would be an affiliate entity for

 4   regulatory purposes, and so he advised that if he -- if Mr.

 5   Dondero transferred his GP interest to Mr. Scott, it would no

 6   longer be an affiliate, is my recollection.

 7   Q   Okay.  You didn't appoint Mr. Scott, did you?

 8   A   No.

 9   Q   That was Mr. Dondero.  Is that right?

10   A   Yes.

11   Q   Okay.  Let's go to 2021.  Let's come back to the current

12   time.  Sometime in February, Mr. Scott called you to ask about

13   the mechanics of how he could resign.  Correct?

14   A   That is correct.

15   Q   But the decision to have you replace Mr. Scott was not

16   made until March 24th, the day you sent an email to Mr. Scott

17   with the transfer documents.  Correct?

18   A   That is correct.

19   Q   And it's your understanding that he could have transferred

20   the management shares and control of the DAF to anyone in the

21   world.  Correct?

22   A   Correct.

23   Q   That's what the docu... that he had the authority under

24   the documentation, as you understood it, to freely trade or

25   transfer the management shares.  Correct?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 164 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 164 of 852   PageID 2069

Patrick - Direct                    128

1   A    Wait.  Now, let's be precise here.

2   Q    Okay.

3   A    Are you talking about the GP interests or the management

4   shares held by Charitable DAF Holdco, Ltd.?

5   Q    Let's start with the management shares.  Can you explain

6   to the Court what the management shares are?

7           MR. ANDERSON:  Your Honor?  Hang on one second.  Your

8   Honor, I want to object again on relevance.  We're going way

9   beyond the scope of the contempt issue, whether or not --

10          MR. MORRIS:  This is about control.

11          MR. ANDERSON:  -- the motion to amend somehow

12  violated the prior order of this Court.  Getting into the

13  management structure, transfer of shares, that's way outside

14  the bounds.  I object on relevance.

15          THE COURT:  Okay.  Relevance objection?

16          MR. MORRIS:  Your Honor, they have probably 30

17  documents, maybe 20 documents, on their exhibit list that

18  relate to management and control.  I'm asking questions about

19  management and control.  Okay?  This is important, again, to

20  (a) establish his authority, but (b) the circumstances under

21  which he came to be the purported control person.

22          THE COURT:  Okay.  Overruled.  Go ahead.

23          THE WITNESS:  It might be helpful to look at the

24  organizational chart, but if not -- but I'll describe it to

25  you again.  With respect to the entity called --

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 165 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 165 of 852 PageID 2070

Patrick - Direct                           129

1          MR. MORRIS:  Hold on one second.  Can we put up the

2    organizational chart again, Ms. Canty, if you can?  There you

3    go.

4          THE WITNESS:  Okay.  So with respect to the

5    Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6    Scott, he organized that entity when he was the independent

7    director of the Charitable Remainder Trust, and he caused the

8    issuance of the management shares to be issued to himself.

9    And then those are, again, noneconomic shares, but they are

10   control shares over that entity.

11        And I think, to answer your question, is -- it -- he alone

12   decides who he can transfer those shares to.

13   BY MR. MORRIS:

14   Q    Do I have this right, that whoever holds the noneconomic

15   management shares has the sole authority to appoint the

16   representatives for each of the Charitable DAF entities and

17   CLO Holdco?  It's kind of a magic ticket, if you will?

18   A    It -- I think there's a -- the answer really is no from a

19   legal standpoint, because Charitable DAF Holdco is a limited

20   partner in Charitable DAF Fund, LP, so it does not have

21   authority -- authority under all -- the respective entities

22   underneath that.  It could cause a redemption, if you will, of

23   Charitable DAF Fund.  And so, really, the authority -- the

24   trickle-down authority that you're referencing is with respect

25   to his holding of the Charitable DAF GP, LLC interest.  It's a

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 166 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 166 of 852   PageID 2071

Patrick - Direct                    130

1    member-managed Delaware limited liability company.  And from

2    that, he -- that authority kind of trickles down to where he

3    can appoint directorships.

4    Q    All right.  I think I want to just follow up on that a

5    bit.  Which entity is the issuer of the manager shares, the

6    management shares?

7    A    Yeah, the -- per the organizational chart, it is accurate,

8    it's the Charitable DAF Holdco, Ltd. which issued the

9    management shares to Mr. Scott.

10   Q    Okay.  And that's why you have the arrow from Mr. Scott

11   into that entity?

12   A    Correct.

13   Q    And do those -- does the holder of the management shares

14   have the authority to control the Charitable DAF Holdco, Ltd.?

15   A    Yes.

16   Q    Okay.  And as the control person for the Charitable DAF

17   Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18   Holdco Limited owns a hundred percent of the limited

19   partnership interests of the Charitable DAF Fund, LP.

20   Correct?

21   A    Correct.

22   Q    And so does the holder of that hundred percent limited

23   partnership interest have the authority to decide who acts on

24   behalf of the Charitable DAF Fund, LP?

25   A    I would say no.  I mean, you know, just -- I would love to

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 167 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 167 of 852 PageID 2072

Patrick - Direct                                    131

1   read the partnership agreement again.  But I, conceptually,

2   what I know with partnerships, I would say the limited partner

3   would not.  It would be through the Charitable DAF GP, LLC

4   interest.

5   Q    The one on the left, the general partner?

6   A    The general partner.

7   Q    I see.  So when Mr. Scott transferred to you the one

8   hundred percent of the management shares as well as the title

9   of the managing member of the Charitable DAF GP, LLC, did

10  those two events give you the authority to control the

11  entities below it?

12  A    Yes.

13  Q    Thank you.  And so prior to the time that he transferred

14  those interests to you, is it your understanding that Mr.

15  Scott had the unilateral right to transfer those interests to

16  anybody in the world?

17  A    Yes.

18  Q    Okay.  And you have that right today, don't you?

19  A    Yes, I do.

20  Q    If you wanted, you could transfer it to me, right?

21  A    Yes, I could.

22  Q    Okay.  But of all the people in the world, Mr. Scott

23  decided to transfer the management shares and the managing

24  member title of the DAF GP to you, correct?

25  A    Restate that question again?

Patrick - Direct                                    132

1    Q    Of all the people in the world, Mr. Scott decided to

2    transfer it to you, correct?

3    A    Yeah.  Mr. Scott transferred those interests to me.

4    Q    Okay.  And you accepted them, right?

5    A    Yes.

6    Q    You're not getting paid anything for taking on this

7    responsibility, correct?

8    A    I am not paid by any of the entities depicted on this

9    chart.

10   Q    And Mr. Scott used to get $5,000 a month, didn't he?

11   A    I believe that's what he testified to.

12   Q    Yeah.  But you don't get anything, right?

13   A    Correct.

14   Q    In fact, you get the exact same salary and compensation

15   from Skyview that you had before you became the authorized

16   representative of the DAF entities and CLO Holdco.  Correct?

17   A    Correct.

18          MR. MORRIS:  Okay.  Your Honor, if I may just take a

19   moment, I may be done.

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  Your Honor, I have no further questions.

23          THE COURT:  All right.  Pass the witness.  Any

24   examination of the witness?

25                          CROSS-EXAMINATION

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 169 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 169 of 852 PageID 2074

Patrick - Cross                    133

1    BY MR. ANDERSON:

2    Q    Mr. Patrick, I just had a few follow-up questions.  When

3    you authorized the filing of the lawsuit against Highland

4    Capital Management, LP, Highland HCF Advisor Limited, and

5    Highland CLO Funding, Limited, when that lawsuit was filed in

6    April of this year, was Mr. Seery included as a defendant?

7    A    No.

8    Q    Have the two Plaintiffs in that lawsuit, have they

9    commenced any lawsuit against Mr. Seery?

10   A    No.

11   Q    Have they pursued any lawsuit against Mr. Seery?

12   A    No.

13   Q    Have they pursued a claim or cause of action against Mr.

14   Seery?

15   A    No.

16   Q    At most, did the Plaintiffs file a motion for leave to add

17   Mr. Seery as a defendant?

18           MR. MORRIS:  Objection, Your Honor.  To the extent

19   that any of these questions are legal conclusions, I object.

20   He's using the word pursue.  If he's trying -- if he's then

21   going to argue that, But the witness testified that he didn't

22   pursue and that's somehow a finding of fact, I object.

23           THE COURT:  Okay.  I understand.

24           MR. MORRIS:  Yeah.

25           THE COURT:  But I overrule.  He can answer.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 170 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 170 of 852   PageID 2075

Patrick - Cross                            134

1              MR. MORRIS:  That's fine.

2              THE WITNESS:  Can you restate the question again?

3    BY MR. ANDERSON:

4    Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

5    Did the Plaintiffs pursue a claim or cause of action against

6    Mr. Seery?

7    A    No.

8    Q    At most, did the Plaintiffs file a motion for leave to

9    file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.

Patrick - Cross                                          135

1    Q    Was there any effort whatsoever to hide the prior order of

2    the Bankruptcy Court?

3    A    No.

4            MR. ANDERSON:  Pass the witness.

5            THE COURT:  Okay.  Other examination?

6            MR. SBAITI:  Yes, Your Honor.  Just a couple of

7    questions.

8                        CROSS-EXAMINATION

9    BY MR. SBAITI:

10   Q    Do you mind flipping to Exhibit 25, which I believe is the

11   org chart, the one that you were looking at before?

12   A    Okay.

13   Q    It'll still be in --

14   A    Okay.  Yeah.

15   Q    -- the defense binder.  No reason to swap out right now.

16   A    I've got the right binders.  Some of them are repeatable

17   exhibits, so --

18   Q    Yeah.

19   A    -- I have to grab the right binder.  Yes.

20   Q    As this org chart would sit today, is the only difference

21   that Grant Scott's name would instead be Mark Patrick?

22   A    Yes.

23   Q    Was there ever a period of time where Jim Dondero's name

24   would sit instead of Grant Scott's name prior?

25   A    Yes, originally, when this -- yes.

Patrick - Cross                    136

1   Q    So did Mr. Dondero both have the control shares of the GP,

2   LLC and DAF Holdco Limited?

3   A    No, I believe not.  I believe he only held the Charitable

4   DAF GP interest and that Mr. Scott at all times held the

5   Charitable DAF Holdco, LTD interest, until he decided to

6   transfer it to me.

7   Q    Can you just tell us how Mr. Scott came to hold the

8   control shares of the Charitable DAF Holdco, LTD?

9   A    When he was the independent trustee of the Charitable

10  Remainder Trust, he caused that -- the creation of that

11  entity, and that's how he became in receipt of those

12  management shares.

13  Q    And does the Charitable DAF GP, LLC have any control over

14  Charitable DAF Fund, LP's actions or activities?

15  A    Yes, it does.

16  Q    What kind of control is that?

17  A    I would describe complete control.  It's the managing

18  member of that entity and can -- and effectively owns, you

19  know, the hundred percent interest in the respective

20  subsidiaries, and so the control follows down.

21  Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22  managing member of the GP?

23  A    Well, I think as the -- and Mr. Morris had shown me with

24  respect to that transfer occurring on March 2012.

25  Q    So nine years ago?

000169

Patrick - Cross                          137

1    A    Yes.

2    Q    Does Mr. Dondero today exercise any control over the

3    activities of the DAF Charitable -- the Charitable DAF, GP or

4    the Charitable DAF Holdco, LTD?

5    A    No.

6    Q    Is he a board member of sorts for either of those

7    entities?

8    A    No.

9    Q    Is he a board members of CLO Holdco?

10   A    No.

11   Q    Does he have any decision-making authority at CLO Holdco?

12   A    None.

13   Q    The decision to authorize the lawsuit and the decision to

14   authorize the motion that you've been asked about, who made

15   that authorization?

16   A    I did.

17   Q    Did you have to ask for anyone's permission?

18   A    No.

19              MR. SBAITI:  No more questions, Your Honor.

20              THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21        All right.  Any redirect?

22                         REDIRECT EXAMINATION

23   BY MR. MORRIS:

24   Q    Since becoming the authorized representative of the

25   Plaintiffs, have you ever made a decision on behalf of those

Patrick - Cross                    138

1  entities that Mr. Dondero disagreed with?

2  A    I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q    Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10  A    I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15  redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                  EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

Patrick - Examination by the Court          139

1    Islands?

2               THE WITNESS:  Yeah.  I'll keep it as simple as I can,

3    even though I'm a tax lawyer, so I won't get into the tax

4    rules, but the Cayman structure is modeled after what you

5    typically see in the investment management industry, and so I

6    -- and I won't reference specific entities here with respect

7    to the Highland case, but I think you'll note some

8    similarities, if you think about it.  They're -- it's

9    described as an offshore master fund structure where you have

10   a -- and that would be the Charitable DAF Fund that's

11   organized offshore, usually in the Cayman or Bermuda Islands,

12   where the general partner, typically, in the industry, holds

13   the management --

14              THE COURT:  Yeah.  Let --

15              THE WITNESS:  Okay.

16              THE COURT:  -- me just stop you.  I've seen this

17   enough --

18              THE WITNESS:  Yeah, it's

19              THE COURT:  -- to know that it happens in the

20   investment world.  But in --

21              THE WITNESS:  Yeah.

22              THE COURT:  You know, usually, I see 501(c)(3), you

23   know, domestically-created entities for charitable purposes,

24   so I'm just curious.

25              THE WITNESS:  Yes.

Patrick - Examination by the Court          140

1          THE COURT:  Uh-huh.

2          THE WITNESS:  The offshore master fund structure

3   typically will have two different types of -- they call it

4   foreign feeder funds.  One foreign feeder fund is meant to

5   accommodate foreign investors; the other foreign feeder fund

6   is meant to accommodate U.S. tax-exempt investors.

7      Why, why is it structured that way?  In order to avoid

8   something called -- I was trying not to be wonkish -- UBTI.

9   That's, let's see, Un -- Unrelated Trader Business Income.  I

10  probably have that slightly wrong.  But it's essentially,

11  it's a means to avoid active business income, which includes

12  debt finance income, which is what these CLOs tend to be, that

13  would throw off income that would be taxable normally if the

14  exempts did not go through this foreign blocker, and it

15  converts that UBTI income -- it's called (inaudible) income --

16  into passive income that flows -- that flows up to the

17  charities.

18      And so it's very typical that you'll have a U.S. tax-

19  exempt investor, when they make an investment in a fund,

20  prefer to go through an offshore feeder fund, which is

21  actually Charitable DAF Holdco, LTD.  That's essentially what,

22  from a tax perspective, represents as a UBTI blocker entity.

23  And then you have the offshore investments being held offshore

24  because there's a variety of safe harbors where the receipt of

25  interest, the portfolio interest exception, is not taxable.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 177 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 177 of 852 PageID 2082

Patrick - Examination by the Court          141

1   The creation of capital gains or losses under the -- they call

2   it the trading, 864(b) trading safe harbor, is not taxable.

3   So that's why you'll find these structures operating offshore

4   to rely on those safe harbor provisions as well as -- as well

5   as what I indicated with respect to the two type blocker

6   entities.  It's very typical and industry practice to organize

7   these way.  And so when this was set --

8          THE COURT:  It's very typical in the charitable world

9   to --

10          THE WITNESS:  In the investment management --

11          THE COURT:  -- form this way?

12          THE WITNESS:  In the investment management world,

13   when you have charitable entities that are taking some

14   exposure to assets that are levered, to set this structure up

15   in this way.  It was modeled after -- they just call them

16   offshore master fund structures.  They're known as Mickey

17   Mouse structures, where you'll have U.S. investors --

18          THE COURT:  Yes.  I -- yes, I --

19          THE WITNESS:  -- enter through a U.S. partnership,

20   and the foreign investors enter through a blocker.

21          THE COURT:  It was really just the charitable aspect

22   of this that I was --

23          THE WITNESS:  Yeah.  Yeah.

24          THE COURT:  -- getting at.

25          THE WITNESS:  Yeah.  No, but I'm just trying to

Patrick - Recross                        142

1   emphasize if --

2              THE COURT:  All right.  It's --

3              THE WITNESS:  Yeah.

4              THE COURT:  -- neither here nor there.  All right.

5         MR. SBAITI:  Your Honor, may I ask a slightly

6   clarifying leading question on that, because I think I

7   understand what he was trying to say, just for the record?

8              THE COURT:  Well, --

9         MR. MORRIS:  I object.

10             THE COURT:  -- I tell you what.  Anyone who wants to

11  ask one follow-up question on the judge's question can do so.

12  Okay?  You can go first.

13        MR. SBAITI:  I'll approach, Your Honor.

14             THE COURT:  Okay.

15                      RECROSS-EXAMINATION

16  BY MR. SBAITI:

17  Q    Would it be a fair summary of what you were saying a

18  minute ago that the reason the bottom end of that structure is

19  offshore is so that it doesn't get taxed before the money

20  reaches the charities on the U.S. side?

21  A    Tax -- it converts the nature of the income that is being

22  thrown off by the investments so that it becomes a tax

23  friendly income to the tax-exempt entity.  Passive income.

24  That's --

25  Q    So, essentially, --

Patrick - Recross                        143

1          THE COURT:  Okay.  Okay.

2          MR. SBAITI:  -- so it doesn't get taxed before it

3   hits the --

4          THE COURT:  I said one question.

5          MR. SBAITI:  Sorry, Your Honor.

6          THE COURT:  Okay.  He answered it.

7          MR. PHILLIPS:  And I have one question, Your Honor

8          THE COURT:  Okay.

9          MR. PHILLIPS:  I don't know if I need to ask this

10  question, but I'd rather not ask you if I need to ask it.

11         THE COURT:  Go ahead.

12         MR. PHILLIPS:  But if I do, you know, I could --

13         THE COURT:  Go ahead.

14         MR. PHILLIPS:  Well, okay.

15                    RECROSS-EXAMINATION

16  BY MR. PHILLIPS:

17  Q    We've talked about the offshore structure.  Are the

18  foundations in the top two tiers of the organizational chart

19  offshore entities?

20  A    No.

21  Q    They're --

22  A    They're onshore entities.  They're tax-exempt entities.

23  Q    Thank you.

24  A    The investments are offshore.

25  Q    Thank you.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 180 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 180 of 852 PageID 2085

Patrick - Further Redirect                144

1          THE COURT:  Mr. Morris?  One question.

2               FURTHER REDIRECT EXAMINATION

3   BY MR. MORRIS:

4   Q    Do you hold yourself out as an expert on the

5   organizational structures in the Caribbean for charitable

6   organizations?

7   A    I hold myself out as a tax professional versant on setting

8   up offshore master fund structures.  It's sort of a bread-and-

9   butter thing.  But there are plenty of people that can testify

10  that this is very typical.

11  Q    Uh-huh.  Okay.

12          THE COURT:  Okay.  Thank you.

13      All right.  You are excused, Mr. Patrick.  I suppose

14  you'll want to stay around.  I don't know if you'll

15  potentially be recalled today.

16      (The witness steps down.)

17          THE COURT:  All right.  We should take a lunch break.

18  I'm going to put this out for a democratic vote.  Forty-five

19  minutes?  Is that good with everyone?

20          MR. SBAITI:  Do we have to leave the building to eat,

21  Your Honor, or is there food in the building?

22          THE COURT:  I think --

23          MR. SBAITI:  I'm sorry to ask that question, but --

24          THE COURT:  Yes.  You know what, there used to be a

25  very bad cafeteria, but I think it closed.  Right, Mike?  So,

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 181 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 181 of 852 PageID 2086

145

1   you know, --

2           MR. SBAITI:  Sorry I asked that.

3           A VOICE:  Hate to miss that one.

4           THE COURT:  Is 45 minutes not enough since you have

5   to go off campus?  I'll give you an hour.  It just means we

6   stay later tonight.

7           A VOICE:  Can we just say 2:00 o'clock?

8           MR. SBAITI:  That's fine with us, Your Honor.

9           THE COURT:  2:00 o'clock.  That's 50 minutes.  See

10  you then.

11          MR. SBAITI:  Thank you.

12          A VOICE:  Your Honor, can we just get a time check?

13          THE COURT:  Okay.

14          THE CLERK:  Yeah.  The Debtors are at an hour and

15  eleven minutes.  Respondents at an hour nineteen.

16          THE COURT:  And hour and eleven and an hour and

17  nineteen.

18          A VOICE:  Wait, that's not right.

19          A VOICE:  That can't be right.

20          A VOICE:  Two hours?  We started at --

21          THE COURT:  Okay.  So, again, their side, the

22  collective Respondents?

23          THE CLERK:  An hour and eleven, responding to your

24  questions, --

25          A VOICE:  Yeah, he's not recording --

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 182 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 182 of 852   PageID 2087

146

1          THE CLERK:  So an hour and eleven and an hour and

2  nineteen.

3          THE COURT:  But they were already over an hour --

4          A VOICE:  Yeah.  It's been over three hours.

5          THE COURT:  -- with opening statements.

6          THE CLERK:  An hour and twelve.  Yes.  They were very

7  short with the questioning.  It was only like --

8          THE COURT:  Okay.  We'll double-check that over the

9  break with the court reporter.

10          A VOICE:  All right.  Thank you, Your Honor.

11          THE COURT:  We'll double-check and let you know.

12          THE COURT:  All rise.

13      (A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)

14          THE COURT:  All right.  Please be seated.  We're

15  going back on the record in Highland after our lunch break.

16  I'm going to confirm time.  We've had the Debtor an aggregate

17  of an hour and eleven minutes.  The Respondents, an aggregate

18  of an hour and twenty minutes.  Okay?  So we've gone two hours

19  and thirty-one minutes.

20     If it seems like we've been going longer, it's because we

21  did not do the clock on the opening matters regarding removal,

22  extension of time.  And then when I interjected with

23  questions, we stopped the clock.  All right?  So let's go.

24     You may call your next witness, Mr. Morris.

25          MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

Dondero - Direct                              147

1   James Dondero.

2            THE COURT:   All right.

3            A VOICE:  He had to step down the hall.  We had a

4   little trouble getting through security.  Let me --

5            THE COURT:  All right.  Mr. Dondero, you've been

6   called as the next witness.  So if you'll approach our witness

7   stand, please.  All right.  Please raise your right hand.

8        (The witness is sworn.)

9            THE COURT:  All right.  Please be seated.

10            JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

11                      DIRECT EXAMINATION

12   BY MR. MORRIS:

13   Q   Good afternoon, Mr. Dondero.

14   A   Good afternoon.

15   Q   Can you hear me?

16   A   Yes.

17   Q   Okay.  So, you were here this morning, correct?

18   A   Yes.

19   Q   All right.  So, we're going to put up -- we'll put it up

20   on the screen, but if you'd prefer to look at a hard copy in

21   the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to

22   turn to Exhibit 25.  Or you could just follow on the screen.

23   And this is a one-page document, so maybe that's easier.

24   A   Sure.

25   Q   Do you have it?  All right.

Dondero - Direct                      148

1    A    Yes.

2    Q    This is the organizational chart for what's known as the

3    DAF, correct?

4    A    Yes.

5    Q    And Mark Patrick set up this structure, correct?

6    A    I believe he coordinated.  I believe it was set up by

7    third-party law firms.  I believe it was Hutton or a firm like

8    that.

9    Q    Mr. Patrick participated in the creation of this structure

10   because you gave him the task of setting up a charitable

11   entity for Highland at that time, correct?

12   A    Yes.

13   Q    And you approved of this organizational structure,

14   correct?

15   A    Yes.

16   Q    And Grant Scott was the Trustee of the DAF for a number of

17   years, correct?

18   A    I often use that word, trustee, but technically I think

19   it's managing member.

20   Q    That's right.  I appreciate that.  I was using your word

21   from the deposition.  But is it fair to say that, to the best

22   of your knowledge, Grant Scott was the sole authorized

23   representative of the entity known as the DAF from 2011 until

24   just recently?

25   A    Sole -- I would describe it more he was in a trustee

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 185 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 185 of 852   PageID 2090

Dondero - Direct                                    149

 1  function.

 2  Q    Uh-huh.

 3  A    Advice was being provided by Highland on the investment

 4  side.  He wasn't expected to be a financial or an investment

 5  expert.  And then accounting, tax, portfolio, tracking, you

 6  know, compliance with all the offshore formation documents,

 7  that was all done by Highland as part of a shared services

 8  agreement.

 9  Q    Okay.  I appreciate that, but listen carefully to my

10  question.  All I asked you was whether he was the authorized

11  representative, the sole authorized representative for the

12  ten-year period from 2011 until recently.

13  A    Yes.

14  Q    Okay.

15  A    I believe so.

16  Q    Thank you.  You served as the managing member of the DAF

17  GP, LLC before Mr. Scott, correct?

18  A    Yes.

19  Q    Okay.  And if you turn to Exhibit 26 in your binder,

20  that's the amended and restated limited liability company

21  agreement for the DAF GP, LLC, correct?

22  A    Yes.

23  Q    And on the last page, that's your signature line, right?

24  A    Yes.

25  Q    And you stepped down as the managing member on March 12,

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 186 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 186 of 852   PageID 2091

Dondero - Direct                    150

1    2012, and were replaced by Mr. Scott, correct?

2    A    Yes.

3    Q    And as you recall it, Mr. Scott came to be appointed the

4    trustee of the DAF based on your recommendation, right?

5    A    Based on my recommendation?  Yes, I would say that's fair.

6    Q    And you made that recommendation to Mr. Patrick, right?

7    A    I -- I don't remember who I made the recommendation to.

8    But I would echo the testimony of Mark Patrick earlier that

9    the purpose of stepping down was to make the DAF unaffiliated

10   or independent versus being in any way affiliated.

11            MR. MORRIS:  I move to strike.

12   BY MR. MORRIS:

13   Q    And I'd ask you to listen carefully to my question.

14            THE COURT:  Sustained.

15   BY MR. MORRIS:

16   Q    You made the recommendation to Mr. Patrick, correct?

17   A    I would give the same answer again.

18   Q    Okay.

19            MR. MORRIS:  Can we please put up Mr. Dondero's

20   deposition transcript from last Friday at Page 297?

21       I believe, Your Honor, that the court reporter thought

22   that this was a continuation of a prior deposition, and that's

23   why the pages begin in the, you know, high in the 200s and not

24   at Page 1.  Just to avoid any confusion.

25   BY MR. MORRIS:

Dondero - Direct                               151

1  Q   Mr. Dondero, do you see the transcript in front of you?

2  A   Yes.

3  Q   Okay.  Were you asked this question and did you give this

4  answer?  "Who did you make the" -- question, "Who did you make

5  the recommendation to?"  Answer, "It would have been Mark

6  Patrick."

7  A   I don't recall right now as I sit here, and it seems like

8  I was speculating when I answered, but it -- it probably would

9  have been Mark Patrick.  I just don't have a specific

10 recollection.

11 Q   You made the recommendation to Mr. Patrick because he was

12 responsible for setting up the overall structure, correct?

13 A   I -- I can't testify to why I did something I don't

14 remember.  I think that would be --

15 Q   Can we --

16 A   -- speculative.

17 Q   Are you finished, sir?

18 A   Yeah.

19 Q   Okay.

20        MR. MORRIS:  Can we go to Page 299, please?

21 BY MR. MORRIS:

22 Q   Lines 6 through 10.  Did I ask this question and did you

23 give me this answer?  Question, "But why did you select Mr.

24 Patrick as the person to whom to make your recommendation?"

25 Answer, "Because he was responsible for setting up the overall

Dondero - Direct                              152

1    structure."

2        Were you asked that question and did you give that answer

3    last Friday?

4    A    Yes.

5    Q    Thank you.  But it's your testimony that you don't really

6    know what process led to Mr. Scott's appointment, correct?

7    A    No, I -- I said I was refreshed by Mark Patrick's

8    testimony earlier.

9    Q    Yeah.  Were you refreshed that, in fact, you specifically

10   had the authority to and did appoint Grant Scott as the

11   managing member of the DAF GP, LLC?

12   A    I -- I don't know.

13   Q    Well, you're referring to Mr. Patrick's testimony and I'm

14   asking you a very specific question.  Did you agree -- is your

15   memory refreshed now that you're the person who put Grant

16   Scott in the position in the DAF?

17   A    I -- I don't know if I owned those secret shares that --

18   well, they're not secret, but shares that could appoint

19   anybody on the planet.  I guess if I was in that box at that

20   time before Grant, then I would have had that ability.  I'm

21   not denying at all that I recommended Grant.  I'm just saying

22   I don't -- I don't remember if I went specifically to him or

23   if it was Thomas Surgent that was orchestrating it at the

24   time.  I don't remember.

25   Q    Do you deny that you had the authority to and that you did

Dondero - Direct                    153

 1    appoint Grant Scott as your successor?

 2                MR. TAYLOR:  Your Honor, objection to the extent it

 3    calls for a legal conclusion.  I can't get close to a mic, so

 4    --

 5                THE COURT:  I overrule the objection.

 6                THE WITNESS:  Can you repeat the question for me?

 7    BY MR. MORRIS:

 8    Q    Do you deny that you had the authority to and that you

 9    did, in fact, appoint Grant Scott as your successor?

10    A    It'd be better to say I don't -- I don't -- no, I don't

11    remember or I didn't know the details at the time.  But,

12    again, I -- I assume I owned those shares.  And, again, I do

13    remember recommending Grant and -- but exactly how it

14    happened, I don't remember.

15    Q    Did you hear Mark Patrick say just an hour ago that you

16    appointed Grant Scott as your successor?

17                MR. SBAITI:  Objection, Your Honor.  Misstates

18    testimony.  The witness testified he transferred shares.

19    That's different than an appointment power.

20                THE COURT:  Response?  I can't remember the exact way

21    you worded it, to be honest.

22                MR. MORRIS:  Neither can I, but I'll even take it

23    that way.

24                THE COURT:  Okay.

25                MR. MORRIS:  I think he's wrong, but I'll even take

Dondero - Direct                           154

1   it that way.

2           THE COURT:  Okay.

3   BY MR. MORRIS:

4   Q    Mr. Dondero, did you listen to Mark Patrick say that you

5   are the person who made the decision to transfer the shares to

6   Mr. Scott in 2012?

7   A    Yes, I heard him say that.

8   Q    Okay.  So, do you -- do you dispute that testimony?

9   A    I -- I don't have any better knowledge to dispute or

10  confirm.

11  Q    You and Mr. Scott have known each other since high school,

12  correct?

13  A    Yes.

14  Q    You spent a couple of years at UVA together, correct?

15  A    Yes.

16  Q    You were housemates together, correct?

17  A    Yes.

18  Q    He was the best man at your wedding, correct?

19  A    Yes.

20  Q    He's a patent lawyer, correct?

21  A    Yes.

22  Q    He had no expertise in finance when -- when he was

23  appointed as your successor to the DAF, correct?

24  A    Correct.

25  Q    To the best of your knowledge, at the time Mr. Scott

Dondero - Direct                    155

1   assumed his position, he had never made any decisions

2   concerning collateralized loan obligations, correct?

3   A    Correct, but he wasn't hired for that.  That wasn't his

4   position.

5   Q    Was he the person who was going to make the decisions with

6   respect to the DAF's investments?

7   A    My understanding on how it was structured was the DAF was

8   paying a significant investment advisory fee to Highland.

9   Highland was doing portfolio construction and the investment

10  selection of -- or the investment recommendations for the

11  portfolio.  There is an independent trustee protocol that I

12  believe was adhered to, but it was never my direct

13  involvement.  It was always the portfolio managers or the

14  traders.

15       You have to provide three similar or at least two other

16  alternatives, and then with a rationale for each of them, but

17  a rationale for why you think one in particular is better.

18  And the trustee looks at the three, evaluates them.  And the

19  way I understand it always worked, that it works at pretty

20  much every charitable trust or trust that I'm aware of, they

21  generally, if not always, pick alongside the -- or, pick the

22  recommendation of their highly-paid investment advisory firm.

23  Q    And are you the highly-paid investment advisory firm?

24  A    Highland was at the time, yes.

25  Q    And you controlled Highland, right?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 192 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 192 of 852   PageID 2097

Dondero - Direct                              156

1    A    Yes.

2    Q    Okay.  But at the end of the day, is it your understanding

3    that Mr. Scott had the exclusive responsibility for making

4    actual decisions on behalf of the charitable trust that you

5    had created?

6    A    Yeah, I mean, subject to the protocol I just described.

7    Q    Yeah, okay, so let's keep going.  Mr. Scott had no

8    experience or expertise running charitable organizations at

9    the time you decided to transfer the shares to him, correct?

10   A    Yes, I believe that's correct.

11   Q    Okay.  You didn't recommend Mr. Scott to serve as the

12   DAF's investment advisor, did you?

13   A    No.

14   Q    And until early 2021, as you testified, I believe,

15   already, HCMLP served as the DAF's investment advisor,

16   correct?

17   A    Yes.

18   Q    And until early 2021, all of the DAF's day-to-day

19   operations were conducted by HCMLP pursuant to a shared

20   services agreement, correct?

21   A    Yes.

22   Q    And from the time the DAF was formed until January 9,

23   2020, you controlled HCMLP, correct?

24   A    Yes.

25   Q    You can't think of one investment decision that HCMLP

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 193 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 193 of 852   PageID 2098

Dondero - Direct                    157

1   recommended that Mr. Scott ever rejected in the ten-year

2   period, correct?

3          MR. SBAITI:  Objection, Your Honor.  Lacks

4   foundation.

5          THE COURT:  Response?

6          MR. MORRIS:  I'm not quite sure what to say, Your

7   Honor.  The witness has already testified that HCMLP was the

8   investment advisor, made recommendations to Mr. Scott, and

9   that Mr. Scott was the one who had to make the investment

10  decisions at the end of the day.

11         MR. SBAITI:  He's not here as a witness for HCMLP.

12  He's here in his personal capacity.  There's no foundation

13  he'd have personal knowledge of which specific investments

14  were proposed, which ones were rejected or accepted.  He said

15  it was done by the portfolio manager.

16         THE COURT:  Okay.  I overrule.  He can answer if he

17  has an answer.

18  BY MR. MORRIS:

19  Q   Sir, you can't think of one investment decision that HCMLP

20  ever recommended to Mr. Scott that he rejected, correct?

21  A   I can't think of one, but I would caveat with I wouldn't

22  have expected there to be any.

23  Q   So you expected him to just do exactly what HCMLP

24  recommended, correct?

25  A   No.  I would expect him to sort through the various

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 194 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 194 of 852   PageID 2099

Dondero - Direct                                        158

1     investments when he was given three or four to choose from and

2     be able to discern that, just as we had with our expertise,

3     which was much greater than his, discern which one was the

4     best and most suitable investment, the best risk-adjusted

5     investment, that he would come to the same conclusion.

6     Q    Okay.  You can't think of an investment that Mr. Scott

7     ever made on behalf of the DAF that didn't originate with

8     HCMLP, correct?

9     A    Again, no, but I wouldn't expect there to be.

10    Q    Okay.  And that's because you expected all of the

11    investments to originate with the company that you were

12    controlling, correct?

13    A    We were the hired investment advisor with fiduciary

14    responsibility --

15    Q    Uh-huh.

16    A    -- and with a vested interest in making sure the DAF

17    performance was the best it could be.

18    Q    Okay.  Let --

19    A    He was, as you said, a patent attorney.  It would have

20    been unusual for him to second-guess.  I'm sure, in any

21    private investment or any investment that was one off or

22    didn't have comps, you know, he probably sought third-party

23    valuations.  But you would have to talk to him about that, or

24    the people at Highland that did that.

25              MR. MORRIS:  I move to strike.  It's a very simple

Dondero - Direct                         159

1    question.

2                    THE COURT:  Sustained.

3    BY MR. MORRIS:

4    Q    Sir, you can't think of one investment that Mr. Scott made

5    on behalf of the DAF that did not originate with HCMLP,

6    correct?

7    A    I'm going to give the same answer.

8    Q    Okay.  Let's go to Page 371 of the transcript, please.

9    Lines 7 through 11.

10       Oh, I apologize.  I think I might -- I think I meant 317.

11   I think I got that inverted.  Yeah.

12       Did I ask this question and did you give this answer:

13   "Can you think of any investment that Mr. Scott made on behalf

14   of the DAF that didn't original with HCMLP?"  Answer, "He

15   wasn't the investment advisor, but no, I don't -- I don't

16   recall."

17       Is that the answer you gave on Friday?

18   A    Yes.

19   Q    Thank you.  Let's --

20                    MR. SBAITI:  Just for clarification, Your Honor, --

21                    THE COURT:   Pardon?

22                    MR. SBAITI:  -- the deposition was last Tuesday, not

23   on Friday.

24                    MR. MORRIS:  I stand corrected, Your Honor.

25                    THE COURT:  Okay.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 196 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 196 of 852   PageID 2101

Dondero - Direct                    160

1          MR. MORRIS:  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  I apologize if the Court thinks I misled

4    it.

5    BY MR. MORRIS:

6    Q    Let's talk about Mr. Scott's decision during the

7    bankruptcy case that preceded his resignation.  After HCMLP

8    filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim,

9    correct?

10         MR. ANDERSON:  Your Honor, I haven't objected yet,

11   but we literally haven't covered anything that deals with

12   commencing or pursuing a claim or cause of action.  I'm going

13   to object.  This is way outside, again, the bounds of the

14   contempt hearing.  It's -- otherwise, it's other discovery for

15   something else.  It literally has nothing to do with pursue a

16   claim or cause of action.

17         THE COURT:  We have another relevance objection.

18   Your response?

19         MR. MORRIS:  Your Honor, the evidence is going to

20   show that Mr. Dondero told Mr. Scott on three separate

21   occasions that his conduct, which were acts of independence,

22   were inappropriate and were not in the best interests of the

23   DAF.  Within days of the third strike, he resigned.  Okay?

24     I think it's relevant to Mr. Dondero's control of the DAF.

25   I think that the moment that Mr. -- this is the argument I'm

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 197 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 197 of 852   PageID 2102

Dondero - Direct                               161

 1    going to make.  I'll make it right now.  You want me to make

 2    it now, I'll make it now.  The moment that Mr. Scott exercised

 3    independence, Mr. Dondero was all over him, and Mr. Scott

 4    left.  That's what happened.  The evidence is going to be

 5    crystal clear.

 6        And I think that that control of the DAF is exactly what

 7    led to this lawsuit.  And what led -- and I'm allowed to make

 8    my argument.  So that's why it's relevant, Your Honor, because

 9    I think it shows that Mr. Scott -- Mr. Scott, after exercising

10    independence, was forced out.

11            MR. ANDERSON:  That doesn't move the needle one bit

12    as to whether a lawsuit was commenced or a claim or cause of

13    action was pursued, which is the subject of the contempt

14    motion.  It doesn't move the needle one bit as to those two

15    issues, as to whether that has any bearing on was it commenced

16    or was it pursued.

17            MR. MORRIS:  Your Honor, I appreciate the very narrow

18    focus that counsel for a different party is trying to put on

19    this, but it is absolutely relevant to the question of whether

20    Mr. Dondero was involved in the pursuit of these claims.  All

21    right?  That's what the order says.  Pursue.

22            THE COURT:  All right.  Overruled.

23    BY MR. MORRIS:

24    Q    After HCMLP filed for bankruptcy, CLO Holdco filed a proof

25    of claim, correct?

Dondero - Direct                    162

1    A    I believe so.

2    Q    And in the fall of 2020, Mr. Scott amended the proof of

3    claim to effectively reduce it to zero, correct?

4    A    I -- I guess.

5    Q    And Mr. Scott made that decision without discussing it

6    with you in advance, correct?

7    A    Yes.

8    Q    But you did discuss it with him after you learned of that

9    decision, correct?

10    A    I don't -- I don't recall.  I'm willing to be refreshed,

11    but I don't remember.

12    Q    Well, you told him specifically that he had given up bona

13    fide claims against the Debtor, correct?

14    A    Let me state or clarify my testimony this way.  Um, --

15          MR. MORRIS:  Your Honor, it's really just a yes or no

16    question.  His counsel can ask him if he wants to clarify, but

17    it's really just a yes or no question.

18    BY MR. MORRIS:

19    Q    You told Mr. Scott that he gave up bona fide claims

20    against the Debtor, correct?

21          THE COURT:  Okay.

22          THE WITNESS:  I don't know if I told him then with

23    regard to those claims.

24    BY MR. MORRIS:

25    Q    Okay.  Can we go to Page 321 of the transcript?  At the

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 199 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 199 of 852 PageID 2104

Dondero - Direct                                        163

 1  bottom, Line 21?  22, I apologize.

 2      Did I ask this question and did you give this answer?

 3  "And what do you" -- Question, "And what do you recall about

 4  your discussion with Mr. Scott afterwards?"  Answer, "That he

 5  had given up bona fide claims against the Debtor and I didn't

 6  understand why."

 7      Did I ask that question and did you give that answer last

 8  Tuesday?

 9  A    Yes.

10  Q    Okay.  A short time later, in December, the Debtor filed

11  notice of their intention to enter into a settlement with

12  HarbourVest, correct?

13  A    Yes.

14  Q    And CLO Holdco, under Mr. Scott's direction, filed an

15  objection to that settlement, correct?

16  A    Yes.

17  Q    And that settlement, the substance of that settlement was

18  that the Debtor did not have the right to receive

19  HarbourVest's interests in HCLOF at the time, correct?

20  A    I don't remember the exact substance of it.

21  Q    Okay.  But you do remember that you learned that Mr. Scott

22  caused CLO Holdco to withdraw the objection, correct?

23  A    Yes, ultimately.

24  Q    Okay.  And again, Mr. Scott did not give you advance

25  notice that he was going to withdraw the HarbourVest

Dondero - Direct                                    164

 1  objection, correct?

 2  A    No, he -- he did it an hour before the hearing.  He didn't

 3  give anybody notice.

 4  Q    You learned that Mr. Scott caused CLO Holdco to withdraw

 5  its objection to the HarbourVest settlement at the hearing,

 6  correct?

 7  A    Yes.

 8  Q    And you were surprised by that, weren't you?

 9  A    I believe everybody was.

10  Q    You were sur... you were surprised by that, weren't you,

11  sir?

12  A    Yes.

13  Q    And you were surprised by that because you believed Mr.

14  Scott's decision was inappropriate, right?

15  A    Partly inappropriate, and partly because 8:00 o'clock the

16  night before he confirmed that he was going forward with the

17  objection.  And I think the DAF's objection was scheduled to

18  be first, I think.

19  Q    After you learned that Mr. Scott instructed his attorneys

20  to withdraw the CLO Holdco objection to the HarbourVest

21  settlement, you again spoke with Mr. Scott, correct?

22  A    Yes.

23  Q    And that conversation took place the day of the hearing or

24  shortly thereafter, correct?

25  A    Yes.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 201 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 201 of 852   PageID 2106

Dondero - Direct                          165

1   Q    And during that conversation, you told Mr. Scott that it

2   was inappropriate to withdraw the objection, correct?

3   A    Yes.

4   Q    And in response, Mr. Scott told you that he followed the

5   advice of his lawyers, correct?

6   A    Yes.

7   Q    But that didn't -- that explanation didn't make sense to

8   you, right?

9   A    Yes.

10  Q    In fact, you believed that Mr. Scott failed to act in the

11  best interests of the DAF and CLO Holdco by withdrawing its

12  objection to the HarbourVest settlement, correct?

13  A    Yes.

14  Q    And while you didn't specifically use the words fiduciary

15  duty, you reminded Mr. Scott in your communications with him

16  that he needed to do what was in the best interests of the

17  DAF, correct?

18  A    Yes.

19  Q    You're the founder of the DAF, correct?

20  A    I put it -- I put it in motion.  Yeah.  I tasked Mark

21  Patrick and third-party law firms to do it, but if that boils

22  down to founder, I guess yes.

23  Q    Uh-huh.  And you're the primary donor to the DAF, correct?

24  A    Yes.

25  Q    You're the investment advisor to the DAF, or at least you

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 202 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 202 of 852   PageID 2107

Dondero - Direct                    166

1  were at that time?

2  A    Yes.

3  Q    And because you served in these roles, you expected Mr.

4  Scott to discuss his decision to withdraw the HarbourVest

5  objection in advance, correct?

6  A    Yes, I -- I think it was even broader than that.  I mean,

7  he was having health and anxiety issues, and to the extent he

8  felt overwhelmed, I -- you know, yeah, you should do what's in

9  the best interests at all times, but -- but yes, I thought it

10  would be helpful if he conferred with me or Mark Patrick or

11  whoever he was comfortable with.

12  Q    Mr. Dondero, you specifically believed that Mr. Scott's

13  failure to tell you that he was going to withdraw the

14  HarbourVest objection in advance was inappropriate, right?

15  A    Yes.

16  Q    Even though he was the sole authorized representative, you

17  believed that, because you were the founder of the DAF, the

18  primary donor of the DAF, and the investment advisor to the

19  DAF, he should have discussed that before he actually made the

20  decision, correct?

21  A    No.  What I'm saying is at 8:00 o'clock at night, when he

22  confirms to numerous people he's ready to go first thing with

23  his objection, and then he or counsel or some combination of

24  them change their mind and don't tell anybody before the

25  hearing, that's odd and inappropriate behavior.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 203 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 203 of 852 PageID 2108

Dondero - Direct                 167

1          MR. MORRIS:  Can we go to Page 330 of the transcript,

2     please?

3      And Your Honor, before I read the testimony, there is an

4     objection there.  So I'd like you to rule --

5          THE COURT:  Okay.

6          MR. MORRIS:  -- before I do that.  It can be found at

7     -- on Page 330 at Line 21.

8       (Pause.)

9          MR. MORRIS:  Here we go.  Page 30, beginning at Line

10    19.  330, rather.

11         THE COURT:  Okay.

12      (Pause.)

13         THE COURT:  Okay.  I overrule that objection.

14    BY MR. MORRIS:

15    Q   Mr. Dondero, were you asked this question and did you give

16    this answer last Tuesday?  Question, "Do you believe that he

17    had an obligation to inform you in advance?"  Answer, "I don't

18    know if I would use the word obligation, but, again, as the

19    founder or the primary donor and continued donor to the DAF,

20    and as the investment advisor fighting for above-average

21    returns on a daily basis for the fund, significant decisions

22    that affect the finances of the fund would be something I

23    would expect typically a trustee to discuss with the primary

24    donor."

25         Did you give that answer the other day, sir?

Dondero - Direct                                168

1    A    Yes.

2    Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit

3    that's in District Court, does he have an the obligation to

4    tell you in advance?

5    A    Again, I wouldn't use the word obligation.  But something

6    that I think ultimately is going to be a $20 or $30 million,

7    if not more, benefit to the DAF, to the detriment of Highland,

8    if you were to give that up, I would expect him to have a

9    rationale and I would expect him to get other people's

10   thoughts and opinions before he did that.

11   Q    Okay.  But does he have to get your opinion before he

12   acts?

13   A    No, he does not.

14   Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he

15   could settle the case, and if he doesn't come to you to

16   discuss it in advance, you won't be critical of him, right?

17   A    He doesn't have the obligation, but there's -- there's a

18   reasonableness in alignment of interests.  I -- a growing

19   entrepreneur sets up a trust, a lot of times they'll put their

20   wife in charge of it, and she hires investment advisers and

21   whatever, but they've got the best interests at mind for the

22   charity or the children or whatever.

23        You know, people who go rogue and move in their own self-

24   interest or panic, that stuff can happen all the time.  It

25   doesn't make it appropriate, though.

Dondero - Direct                    169

1   Q    A couple of weeks after Mr. Scott withdraw the objection

2   to the HarbourVest settlement, he entered into a settlement

3   agreement with the Debtor pursuant to which he settled the

4   dispute between the Debtor and CLO Holdco, correct?

5   A    Yes.

6   Q    Okay.  You didn't get advance notice of that third

7   decision, correct?

8   A    No.

9   Q    Can we go to Page -- Exhibit 32 in your binder?  And this

10  is the settlement agreement between CLO Holdco and the Debtor,

11  correct?  Attached as the exhibit.  I apologize.

12  A    Yes.

13  Q    And do you understand that that's Mr. Scott's signature on

14  the last page?

15  A    Yep.

16  Q    And you learned about this settlement only after it had

17  been reached, correct?

18  A    Yep.

19  Q    And you believed Mr. Scott's decision not to pursue

20  certain claims against the Debtor or to remove HCMLP as the

21  manager of the CLOs was not in the best interests of the DAF,

22  correct?

23  A    Correct.

24  Q    And you let Mr. Scott know that, correct?

25  A    Yes.

Dondero - Direct                    170

1   Q    After learning about the settlement agreement on January

2   26th, you had one or two conversations with Mr. Scott on this

3   topic, correct?

4   A    Yes.

5   Q    And your message to Mr. Scott was that the compromise or

6   settlement wasn't in the DAF's best interest, correct?

7   A    It was horrible for the DAF.

8   Q    Uh-huh.  And you told him that, right?

9   A    Yes.

10  Q    Okay.  From your perspective, any time a trustee doesn't

11  do what you believe is in the trust's best interest, you leave

12  yourself open to getting sued, correct?

13  A    Who is "you" in that question?

14  Q    You.  Mr. Dondero.

15  A    Can you repeat the question, then, please?

16  Q    Sure.  From your perspective, any time you're a trustee

17  and you don't believe that the trustee is doing what's in the

18  best interests of the fund, the trustee leaves himself open to

19  getting sued, correct?

20  A    I don't know who the trustee leaves himself open to, but

21  as soon as you go down a path of self-interest or panic, you

22  -- you potentially create a bad situation.  But I don't know

23  who holds who liable.

24  Q    Did you believe that Mr. Scott was acting out of self-

25  interest or panic when he decided to settle the dispute with

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 207 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 207 of 852   PageID 2112

Dondero - Direct                    171

1  the Debtor on behalf of CLO Holdco?

2  A    Yes.

3  Q    Did you tell him that?

4  A    He told me that.

5  Q    He told you that he was acting out of panic or

6  desperation?  With self-int... withdrawn.  Withdrawn.  Did he

7  tell you that he was acting out of self-interest?

8  A    He was having health problems, anxiety problems, and he

9  didn't want to deal with the conflict.  He didn't want to

10  testify.  He didn't want to come to court.  He didn't want to

11  do those things.  And I told him I didn't think the settlement

12  was going to get him out of that stuff.  I think, you know, it

13  got him out of some issues, but I think you guys are going to

14  go after him for other stuff.  But he -- he panicked.

15         MR. MORRIS:  I move to strike the latter remark.

16         THE COURT:   Sustained.

17  BY MR. MORRIS:

18  Q    Shortly after you had the conversation with Mr. Scott, he

19  sent you notice of his intent to resign from his positions at

20  the DAF and CLO Holdco, correct?

21  A    Yes.

22  Q    Okay.  Let's take a look at that, please.  Exhibit 29.

23  This is Mr. Scott's notice of resignation, correct?

24  A    Yes.

25  Q    He sent it only to you, correct?

Dondero - Direct                          172

1    A    Yes.

2    Q    A couple of days before he sent this, he told you he was

3    considering resigning; isn't that right?

4    A    Yes.

5    Q    Okay.  And he told you he was considering resigning

6    because he was suffering from health and anxiety issues

7    regarding the confrontation and the challenges of

8    administering the DAF given the bankruptcy, correct?

9    A    Yes.

10   Q    He didn't tell you that he made the decision -- withdrawn.

11   Did you tell him in this same conversation -- withdrawn.  Is

12   this the same conversation where you conveyed the message that

13   the compromise or settlement wasn't in the best interests of

14   the DAF?

15   A    You mean the conversation -- or the resignation? Is that

16   -- can you rephrase the question, please?

17   Q    Yeah, I apologize.  It's my fault, sir.  You testified

18   that after the January 26th hearing you had a conversation

19   with Mr. Scott where you told him that the compromise or

20   settlement was not in the best interests of the DAF, correct?

21   A    Yes.

22   Q    Okay.  Did Mr. Scott share with you his concerns about

23   anxiety and health issues in that same conversation, or was it

24   in a subsequent conversation?

25   A    It was at or around that time.  I -- I don't remember

Dondero - Direct                    173

1    which conversation.

2    Q    Okay.

3    A    But it was right at or around that time.

4    Q    All right.  You never asked Mr. Scott to reconsider, did

5    you?

6    A    No.

7    Q    You don't recall sending this notice of resignation to

8    anyone, do you?

9    A    No.

10   Q    You don't remember notifying anyone that you'd received

11   notice of Mr. Scott's intent to resign from the DAF, do you?

12   A    It was -- yeah, no, I -- I don't remember.  It was a busy

13   time around that time and this was a secondary issue.

14   Q    Okay.  So the fact that the person who has been running

15   the DAF for a decade gives you and only you notice of his

16   intent to resign was a secondary issue in your mind?

17   A    Yes, because when I talked to him at about that time, I

18   said, okay, well, it's going to take a while.  I don't even

19   know how the mechanism works.  But don't do anything adverse

20   to the DAF, don't do anything else until, you know, you've

21   figured out transition.

22   Q    Uh-huh.

23   A    And so once he had confirmed he wouldn't do anything

24   outside normal course until he transitioned, I didn't worry

25   about this.  I had bigger issues to worry about at the time.

Dondero - Direct                    174

1  Q    In the third paragraph of his email to you, he wrote that

2  his resignation will not be effective until he approves of the

3  indemnification provisions and obtains any and all necessary

4  releases.  Do you see that?

5  A    Yes.

6  Q    And that was the condition that on January 31st Mr. Scott

7  placed on the effectiveness of his resignation, correct?

8  A    Condition?  Yeah, I -- I think he's trying to state the

9  timing will happen after that.

10  Q    After he gets the release, right?

11  A    Yes.

12  Q    And he wanted the release because you'd told him three

13  different times that he wasn't acting in the best of the DAF,

14  correct?

15          MR. TAYLOR:  Objection, Your Honor.

16          MR. SBAITI:  Objection.  Calls for --

17          MR. TAYLOR:  Objection.  Calls for speculation.

18          THE WITNESS:  Yeah, I --

19          THE COURT:  Sustained.

20          THE WITNESS:  I can't take that jump.  Yeah.

21  BY MR. MORRIS:

22   Q    In response to this email from your lifelong friend, you

23  responded, if we could scroll up, about whether divest was a

24  synonym -- if we can look at the first one -- whether divest

25  is a synonym for resigned.  Do I have that right?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 211 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 211 of 852   PageID 2116

Dondero - Direct                          175

1    A    (no immediate response)

2    Q    If you will look at your response on Monday morning at

3    9:50.

4    A    Yes.

5    Q    Okay.  And then after Mr. Scott responds, you respond

6    further, if we can scroll up, and you specifically told him,

7    "You need to tell me ASAP that you have no intent to divest

8    assets."  Correct?

9    A    Yes.

10   Q    And you wrote that because you believed some of his

11   behavior was unpredictable, right?

12   A    I think I wrote that because the term divest in investment

13   terms means sale or liquidate, but I guess it had a different

14   legal term in the way he was looking at it.  I wasn't aware at

15   that time of the shares that could be bequeathed to anybody,

16   and I think the divest refers to that, but I wasn't aware that

17   that's how the structure worked at that time, and I was

18   worried that divest could be the investment term and I -- it

19   wouldn't have been appropriate for him to liquidate the

20   portfolio.

21   Q    So, and you wanted to make sure he wasn't liquidating or

22   intending to liquidate any of the CLOs, correct?

23   A    Correct.

24   Q    Okay.  So he's still the authorized, the sole authorized

25   representative, but you wanted to make sure that he didn't do

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 212 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 212 of 852   PageID 2117

Dondero - Direct                            176

1   anything that you thought was inappropriate.  Fair?

2   A    It's because I had talked to him before this and he said

3   he wasn't going to do anything outside normal course, and then

4   the word divest scared me, but I didn't realize it was a legal

5   term in this parlance here.

6   Q    And so after he explained, you still wanted to make sure

7   that he wasn't divesting any assets, correct?

8   A    Yes.

9   Q    Okay.  Since February 1st, you've exchanged exactly one

10  text messages with Mr. Scott; is that right?

11  A    I think there've been several, several text messages.  But

12  one on his birthday.

13  Q    Yeah.  And you haven't spoken to him in months, correct?

14  A    In a couple months, yes.

15  Q    All right.  Let's talk about the replacement of Mr. Scott.

16  With -- with Mr. Scott's notice, someone needed to find a

17  replacement, correct?

18  A    Yes.

19  Q    And the replacement was going to be responsible for

20  managing a charitable organization with approximately $200

21  million of assets, most of which was seeded directly or

22  indirectly through you, correct?

23  A    Yes.

24  Q    And the replacement was going to get his and her -- his or

25  her investment advice from you and NexPoint Advisors; do I

Dondero - Direct                    177

1  have that right?

2  A    That was the plan.

3  Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott,

4  correct?

5  A    Yes.

6  Q    But it's your testimony that you had no knowledge that Mr.

7  Patrick was going to replace Mr. Scott until after it happened

8  on March 24, 2021.  Correct?

9  A    That's correct.  I believe it happened suddenly.

10  Q    So, for nearly two months after you had received notice of

11  Mr. Scott's intent to resign, you were uninvolved in the

12  process of selecting his replacement, correct?

13  A    I was uninvolved.  I'd say the process was dormant for an

14  extended period of time until Mark Patrick came on board, and

15  then Mark Patrick ran the process of interviewing multiple

16  potential candidates.

17  Q    Mark Patrick didn't have any authority prior to March

18  24th, correct?

19  A    Is March 24th the date that he transitioned the shares to

20  himself from Grant Scott?

21  Q    Yep.

22  A    That's when he then became the trustee of the DAF, yes.

23  Q    Do you know -- do you know who was instructing Mr. Patrick

24  on who to interview or how to carry the process out?

25  A    He was doing that on his own with, I think,

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 214 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 214 of 852   PageID 2119

Dondero - Direct                      178

1    recommendations from third-party tax firms.

2    Q    So Mr. Patrick was trying to find a successor to Mr.

3    Scott, even though he had no authority to do that, and you

4    were completely uninvolved in the whole process?  Do I have

5    that right?

6    A    I was uninvolved, yes.  He was trying to facilitate it for

7    the benefit of his friendship with Grant Scott and knowing

8    that it -- it -- with his resignation, it had to transition to

9    somebody.  And he enjoys working on the DAF, he enjoys the

10   charitable stuff in the community, and he was the most

11   appropriate person to work on helping Grant transition.

12            MR. MORRIS:  All right.  I move to strike, Your

13   Honor.  It's hearsay.

14            THE COURT:  Sustained.

15   BY MR. MORRIS:

16   Q    You're aware that Mr. Seery was appointed the Debtor's CEO

17   and CRO last summer, correct?

18   A    Yes.

19   Q    And you're aware that Mr. Seery's appointment was approved

20   by the Bankruptcy Court, correct?

21   A    Yes.

22   Q    And you were aware of that at the time it happened,

23   correct?

24   A    Yes.

25   Q    And even before that, in January of 2020, you consented to

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 215 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 215 of 852   PageID 2120

Dondero - Direct                    179

1    a settlement where you gave up control of the Debtor.

2    Correct?

3    A    To the independent board for a consensual Chapter 11

4    restructuring that would leave Highland intact.

5    Q    And do you understand that the gatekeeper provision in the

6    July order is exactly like the one that you agreed to in

7    January except that it applies to Mr. Seery instead of the

8    independent directors?

9    A    I -- I learned a lot about that today, but I don't think

10   it's appropriate to move what applied to the board to the CEO

11   of a registered investment advisor.

12   Q    Okay.  I'm just asking you, sir.  Listen carefully to my

13   question.  Were you aware in January 2020 that you agreed to a

14   gatekeeper provision on behalf of the independent board?

15   A    Generally, but not specifically.

16   Q    Okay.

17   A    Not -- not like what we've been going over today.

18   Q    Okay.  And you knew that Mr. Seery had applied to be

19   appointed CEO subject to the Court's approval, correct?

20   A    Wasn't it backdated to March?  I -- I think the hearing

21   was in June, but it was backdated for -- for money and other

22   purposes, right?  I -- that's my recollection.  I don't

23   remember otherwise.

24   Q    You do remember that Mr. Seery got -- he got -- his

25   appointment got approved by the Court, right?

Dondero - Direct                    180

1    A    Yes.  But, as far as the dates are concerned, I thought it

2    was either in March or retroactive to March.  Maybe it was

3    June or July.

4    Q    And you --

5    A    But I don't remember.

6    Q    Did you have your lawyers review the motion that was filed

7    on behalf of the Debtor?

8    A    I'm -- I assume they do their job.  I -- if they didn't, I

9    don't know.

10   Q    Okay.  That's what you hired them to do; is that fair?

11   A    Yes.

12   Q    Okay.  Can we go to Exhibit 12, please?  I think it's in

13   Binder 1.  You've seen this document before, correct?

14   A    Yes.

15   Q    In fact, you saw versions of this complaint before it was

16   filed, correct?

17   A    Yes, I saw one or two versions towards the end.  I don't

18   know if I saw the final version, but --

19   Q    Sir, you participated in discussions with Mr. Sbaiti

20   concerning the substance of this complaint before it was

21   filed, correct?

22   A    Some.  I would just use the word some.

23   Q    Okay.  Can you describe for me all of your conversations

24   with Mr. Sbaiti concerning the substance of this complaint?

25              MR. SBAITI:  Your Honor, I would object on the basis

000213

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 217 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 217 of 852 PageID 2122

Dondero - Direct                    181

 1   of work product privilege and attorney-client communications.

 2   He was an agent for my client, the DAF, at the time he was

 3   having these discussions with us, and our discussions with him

 4   were work product.  So to the extent he can reveal the

 5   conversations without discussing the actual content, we would

 6   raise privilege objection, Your Honor.

 7              THE COURT:  Mr. Morris?

 8              MR. MORRIS:  Your Honor, there is no privilege here.

 9   That's exactly why I asked Mr. Patrick the questions earlier

10   today.  Mr. Dondero is not party to any agreement with the DAF

11   today.  It's an informal agreement, perhaps, but there is no

12   contractual relationship, there is no privity any longer

13   between Mr. Dondero or any entity that owns and controls in

14   the DAF, as far as I know.  If they have evidence of it, I'm

15   happy to listen, but that -- that's exactly why I asked those

16   questions of Mr. Patrick earlier today.

17              THE COURT:  All right.

18              MR. SBAITI:  Your --

19              THE COURT:  That was the testimony.  There's an

20   informal arrangement, at best.

21              MR. SBAITI:  Well, Your Honor, I would suggest that

22   that doesn't necessarily mean that he isn't an agent of the

23   DAF.  It doesn't have to be a formal agreement for him to be

24   an agent of the DAF.

25      Everyone's agreed he was an advisor.  Everyone's agreed he

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 218 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 218 of 852 PageID 2123

Dondero - Direct                    182

 1  was helping out.  That is an agency relationship.  It doesn't

 2  have to be written down.  It doesn't have to be a formal

 3  investment advisory relationship.  He's still an agent of the

 4  DAF.  He was requested to do something and agreed to do it

 5  under the expectation that all of us had that those would be

 6  privileged, Your Honor.  That is -- that is sufficient -- that

 7  is sufficient, I would argue, to get us where we need to be.

 8  The privilege should apply, Your Honor, and they don't have a

 9  basis for, I would say, invading the privilege, Your Honor.

10          THE COURT:  Well, do you have any authority?  Because

11  it just sounds wrong.  He's not an employee of your client.

12  He doesn't have any contractual arrangement with your client.

13          MR. SBAITI:  Your Honor, I would dispute the idea

14  that he has no contractual arrangement with my client.  The

15  question was asked, do you have a -- do you have a written

16  agreement, and then the question was, so you don't have a

17  contract, and the answer was no, I don't have a contract,

18  building upon that first -- that first question.  But the

19  testimony as he just recounted is that there is an agreement

20  that he would advise Mr. Patrick and he would advise the DAF.

21          THE COURT:  Okay.

22          MR. SBAITI:  That's -- that's a contract.

23          THE COURT:  Okay.  My question was, do you have any

24  legal authority?  That's what I meant when I said authority.

25  Any legal authority to support the privilege applying in this

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 219 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 219 of 852   PageID 2124

Dondero - Direct                           183

1    kind of --

2           MR. SBAITI:  In an informal arrangement, Your Honor?

3    I don't have one at my fingertips at the moment, Your Honor,

4    but I don't know that that should be a reason to invade the

5    privilege.

6       And I would just add, Your Honor, I would just add, we've

7    already -- because of the purpose of these questions, you've

8    heard Mr. Morris state several times that the purpose is to

9    show that Mr. -- that Mr. Dondero had some role in advising

10   and participating in the creation of this complaint.  That's

11   been conceded by myself.  I believe it was conceded by Mr.

12   Dondero.

13      The actual specific facts, the actual specific

14   conversations, Your Honor, shouldn't be relevant at this point

15   and they shouldn't be admissible, given -- given the

16   relevancy, given the perspective of the privilege.

17          THE COURT:  Okay.

18          MR. MORRIS:  If I might --

19          THE COURT:  I overrule your objection.  I don't think

20   a privilege has been shown here --

21          MR. SBAITI:  And Your Honor, --

22          THE COURT:  -- and I think it's relevant.

23          MR. SBAITI:  -- I would ask if we could *voir dire* the

24   witness on the basis of the privilege, if that's --

25          THE COURT:  All right.  You may do so.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 220 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 220 of 852 PageID 2125

Dondero - Voir Dire                    184

                    VOIR DIRE EXAMINATION

BY MR. SBAITI:

Q    Mr. Dondero, do you have a relationship with the DAF?

A    Yes.

Q    How would you describe that relationship?

A    I view myself and my firm as the investment advisor.  I
was actually surprised by the testimony today that there
wasn't a contract in place, but there should be one.  There
should be one soon, in my opinion.

Q    Have you -- did you hear Mr. Patrick testify earlier that
he comes to you for advice?

A    Yes.

Q    Is that --

A    As he should.  Yeah.

Q    Is that true?

A    Yes.

Q    When you render that advice, do you render that advice
with some expectation about him following or listening to that
advice?

A    Okay, I think there's only been one investment or one
change in the DAF portfolio since Mark Patrick's been
involved, only one, and it was a real estate investment that I
wasn't directly involved in.  And so the people who put that
investment forward worked with Mark without my involvement,
and then I think Mark got third-party appraisal firms and

000217

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 221 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 221 of 852   PageID 2126

Dondero - Voir Dire                          185

 1   third-party valuation firms involved to make sure he was

 2   comfortable, which was a good process.

 3   Q    When you supplied information to Mr. Patrick, do you do so

 4   under the belief that there is a contractual, informal or

 5   formal, relationship?

 6            MR. MORRIS:  Objection to the form of the question.

 7            THE COURT:  Overruled.

 8            MR. SBAITI:  What specific form?

 9            THE COURT:  Overruled.

10            MR. SBAITI:  Thank you.

11            THE WITNESS:  Yes.  I believe it -- it's a

12   relationship that can and should be papered as -- soon.

13   That's my -- I mean, unless I get some reason from counsel not

14   to, I think it's something that should be memorialized.

15   BY MR. SBAITI:

16   Q    And when you have that -- in that relationship, when you

17   communicate with Mr. Patrick about matters, investment or

18   otherwise, is there an expectation of privacy?

19   A    Yes.

20   Q    When Mr. Patrick -- did Mr. Patrick request that you

21   interface with my firm and myself, as he testified earlier?

22   A    Yes.

23   Q    And when he did so, did he ask you to do so in an

24   investigatory manner?

25            MR. MORRIS:  Objection to the form of the question.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 222 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 222 of 852    PageID 2127

Dondero - Voir Dire                    186

1          THE COURT:  Sustained.  Rephrase.

2   BY MR. SBAITI:

3   Q    Did he tell you why he wanted you to talk to us?

4   A    Yeah.  At that point, he had started an investigation into

5   the HarbourVest transaction.

6   Q    And -- and when he -- when you were providing information

7   to us, did he tell you whether he wanted you to help the

8   Sbaiti firm conduct the investigation?

9   A    The -- overall, the financial numbers and tables in there

10  were prepared by not myself, but I -- I did -- I did help on

11  -- on the -- some of the registered investment advisor issues

12  as I understood them.

13  Q    Okay.  And the communications that you had with us, was

14  that part of our investigation?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes.

18  BY MR. SBAITI:

19  Q    And did you understand that we had been retained by Mr.

20  Patrick on behalf of the DAF and CLO Holdco?

21  A    Yes.

22  Q    And did you appreciate or have any understanding of

23  whether or not you were helping the law firm perform its legal

24  function on behalf of the DAF and CLO Holdco?

25  A    Perform its legal function?  I was just helping with

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 223 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 223 of 852   PageID 2128

Dondero - Voir Dire                              187

1   regard to the registered investment advisor aspects of the

2   overall, you know, like that.

3   Q    Let me ask a more simple question.  Did you -- did you

4   appreciate that you were assisting a law firm in its

5   representation of the DAF?

6   A    Yes.

7   Q    And you were helping the law -- and were you helping the

8   law firm develop the facts for a complaint?

9   A    Yes.  I would almost say, more importantly, I wanted to

10  make sure that there weren't errors in terms of understanding

11  either how CLOs worked or how the Investment Advisers Act

12  worked.  So I was -- it was almost more of a proofing.

13          MR. SBAITI:  Your Honor, based upon that, I mean,

14  he's helping a law firm perform its function for the client.

15  That's an agency relationship that gets cloaked.  You can call

16  him a consulting expert.  You can call him, to a certain

17  extent, a fact witness, Your Honor.  If we want to take a

18  break, I'm sure we could find authority on that basis for a

19  work product privilege pretty easily.

20      But he's an agent of the DAF.  Even if it's an informal

21  agency relationship, that's still agency.  He's in some

22  respects, I guess, an agent of the law firm, to the extent

23  he's helping us perform our legal work.  And it seems like

24  invading that privilege at this juncture is (a) unnecessary,

25  because we've already conceded that there's been

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 224 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 224 of 852 PageID 2129

Dondero - Voir Dire                    188

1    conversations, which I think is the relationship they wanted

2    to establish.  And it's not unusual for a law firm to use

3    someone with specialized knowledge to understand some of the

4    intricacies of the actual issues that they're -- that they're

5    getting ready to litigate.

6              THE COURT:  Okay.  I find no privilege.  All right.

7    That's the ruling.

8              MR. BRIDGES:  Your Honor, may I add one thing to the

9    objection for the record?

10             THE COURT:  Okay, we have a rule, one lawyer per

11   witness.  Okay?  So, thank you.  A District Court rule, by the

12   way, not mine.

13             MR. SBAITI:  Your Honor, may we take a short recess,

14   given the Court's ruling?

15             THE COURT:  Well, I'd really like to finish this

16   witness.  How much longer do you have?

17             MR. MORRIS:  About eight more questions.

18             THE COURT:  All right.  We'll take a break after the

19   direct, okay?

20             MR. SBAITI:  Your Honor, I would ask that we -- if

21   he's going to ask him more questions about the content of the

22   communications, I ask respectfully for a recess so we can

23   figure out what to do about that.  Because, right now, there's

24   a ruling that he's going to have to reveal privileged

25   information, and we don't have a way to go around and figure

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 225 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 225 of 852 PageID 2130

Dondero - Voir Dire                      189

1    out how to resolve that issue if we needed to.

2            THE COURT:  Okay.  I've ruled it's not privilege.

3    Okay?

4            MR. SBAITI:  I understand that, Your Honor, but --

5            THE COURT:  Your client is CLO Holdco and the DAF.

6            MR. SBAITI:  Yes, Your Honor.

7            THE COURT:  Representative, Mark Patrick.  No

8    contract with Mr. Dondero.  The fact that he may be very

9    involved I don't think gives rise to a privilege.  That's my

10   ruling.

11           MR. SBAITI:  I understand, Your Honor.  I understand,

12   Your Honor, but I'm asking for a recess so that we can at

13   least undertake to provide Your Honor with some case law on a

14   reconsideration before we go there, because that bell can't be

15   unrung.

16           MR. MORRIS:  Your Honor, if I may?

17           MR. SBAITI:  And it's --

18           THE COURT:  Uh-huh.

19           MR. MORRIS:  I'm happy to give them ten minutes, Your

20   Honor, as long as they don't talk to the witness.

21           THE COURT:  Okay.

22           MR. MORRIS:  I want to give them the opportunity.  Go

23   right ahead.

24           THE COURT:  All right.  We'll take a ten-minute

25   break.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 226 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 226 of 852 PageID 2131

Dondero - Voir Dire                 190

1          MR. SBAITI:  Thank you.

2          THE COURT:  It's 3:05.

3          THE CLERK:  All rise.

4     (A recess ensued from 3:03 p.m. until 3:17 p.m.)

5          THE CLERK:  All rise.

6          THE COURT:  Okay.  Please be seated.  Going back on

7  the record in Highland.  Mr. Sbaiti?

8          MR. SBAITI:  Yes, Your Honor.  May I approach?

9          THE COURT:  You may.

10          MR. SBAITI:  Your Honor, we have some authority to

11  support the position we'd taken.  We'd ask the Court to

12  reconsider your ruling on the privilege.

13     The first bit of authority is Section 70 of the

14  Restatement (Third) of Law Governing Lawyers.  Privileged

15  persons within the meaning of Section 68, which governs the

16  privilege, says that those persons include either agents of

17  either the lawyer or the client who facilitate communications

18  between the two in order for the lawyers to perform their

19  function.

20     Another case that we found is 232 F.R.D. 103 from the

21  Southern District of New York, 2005.  It's *Express Imperial*

22  *Bank of U.S. v. Asia Pulp Company*.  And in that case, Your

23  Honor, the consultant was a -- had a close working

24  relationship with the company and performed a similar role to

25  that of the employee and was assisting the law firm in

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 227 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 227 of 852 PageID 2132

Dondero - Voir Dire 191

1 performing their functions, and the court there found that the

2 work product privilege -- actually, the attorney-client

3 privilege -- attached in what they called a Functional

4 Equivalents Doctrine, Your Honor.

5 And here we have pretty much the same set of facts that's

6 pretty much undisputed. The fact that there -- and the fact

7 that there isn't a written agreement doesn't mean there isn't

8 a contractual arrangement for him to have rendered services

9 and advice. And the fact that he's, you know, recruited by us

10 to help us perform our functions puts him in the realm, as I

11 said, of something of a consulting expert.

12 Either way, the work product privilege, Your Honor, should

13 apply, and we'd ask Your Honor not to invade that privilege at

14 this point, Your Honor. And I'll ask you to reconsider your

15 prior ruling.

16 Furthermore, I believe Mr. Morris, you know, in making his

17 argument, is trying to create separation. The fact that he

18 has no relationship, that the privilege can be invaded, seems

19 to defeat the whole premise of his whole line of questioning.

20 So, once again, Your Honor, I just -- it's a tit for a tat

21 there, and it seems to kind of eat itself. Either he is

22 working with us, which we've admitted he is working with us,

23 us being the law firm, and helping us do our jobs, or he's

24 not. And if he's not, then this should be done.

25 THE COURT: Okay.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 228 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 228 of 852    PageID 2133

Dondero - Voir Dire                    192

```
 1              MR. MORRIS:  Your Honor, briefly?

 2              THE COURT:  Well, among other things, what do you

 3    want me to do?  Take a break and read your one sentence from

 4    the Restatements and your one case?  And could you not have

 5    anticipated this beforehand?

 6              MR. SBAITI:  Your Honor, --

 7              THE COURT:  This is not the way we work in the

 8    bankruptcy courts, okay?  We're business courts.  We have

 9    thousands of cases.  We expect briefing ahead of time.

10              MR. SBAITI:  Your Honor, this has been a rather

11    rushed process anyway.  And to be honest, --

12              THE COURT:  When was the motion filed?

13              MR. SBAITI:  Your Honor, --

14              THE COURT:  More than a month ago.

15              MR. SBAITI:  -- his deposition was a week ago.

16              THE COURT:  Well, okay.  So you could not have

17    anticipated this issue until his deposition one week ago?

18              MR. SBAITI:  Your Honor, this issue arose at the

19    deposition, obviously, because that's what he's quoting from.

20    However, at least to us, this is such a well-settled area, and

21    to be honest, --

22              THE COURT:  Such a well-settled area that you have

23    one sentence from the Restatement and one case from the

24    Southern District of New York?

25              MR. SBAITI:  No, Your Honor.  I think the work
```

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 229 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 229 of 852   PageID 2134

Dondero - Voir Dire                        193

1    product privilege lexicon -- we had ten minutes to try to find

2    something more on point than the general case law that applies

3    the work product privilege to people that work with lawyers,

4    consultants who work with lawyers, employees who work with

5    lawyers, even low-down employees who normally wouldn't enjoy

6    the privileges that attach to the corporation, when they work

7    with the company for -- when they work with the company

8    lawyers, it typically attaches.

9              THE COURT:  You know, obviously, I know a few things

10   about work product privilege, but he doesn't check any of the

11   boxes you just listed out.

12             MR. SBAITI:  I disagree, Your Honor.

13             THE COURT:  He's not an employee.  He's not a low-

14   level employee.

15             MR. SBAITI:  He's a consultant.

16             THE COURT:  With no agreement.

17             MR. SBAITI:  With a verbal agreement.  He's an

18   advisor.  And he was recruited by us, and at the request of

19   the DAF, of the head of the DAF, Mr. Patrick, to help us do

20   our job for the DAF.  I don't --

21             THE COURT:  Okay.  Mr. Morris, what do you want to

22   say?

23             MR. MORRIS:  Just briefly, Your Honor.  This issue

24   has been ripe since last Tuesday.  They directed him not to

25   answer a whole host of questions about his involvement at the

Case 21-03067-sgj Doc 43 Filed 09/29/21  Entered 09/29/21 18:18:16  Page 230 of 852
Case 3:21-cv-00842-B  Document 43  Filed 07/13/21  Page 230 of 852  PageID 2135

Dondero - Voir Dire                    194

1    deposition last Tuesday, so they've actually had six days to

2    deal with this.  That's number one.

3        Number two, there's absolutely nothing inconsistent with

4    the Debtor's position that Mr. Dondero is participating in the

5    pursuit of claims and at the same time saying that his

6    communications with the Sbaiti firm are not privileged.

7    There's nothing inconsistent about that.

8        So the argument that he just made, that somehow because

9    we're trying to create separation, that that's inconsistent

10   with our overall arching theme that Mr. Dondero is precisely

11   engaged in the pursuit of claims against Mr. Seery, I think

12   that takes care of that argument.

13       Finally, your Honor, with respect to this consultancy

14   arrangement, not only isn't there anything in writing, but

15   either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero

16   the terms of the agreement.  Is he getting paid?  Is he doing

17   it for free?  Who retained him?  Was it Mr. -- because the --

18   there's no such thing.  There's no such thing.

19       The fact of the matter is what happened is akin to I have

20   a slip-and-fall case and I go to a personal injury lawyer and

21   I bring my brother with me because I trust my brother with

22   everything.  It's not privileged.  Any time you bring in

23   somebody who is not the attorney or the client, the privilege

24   is broken.  It's really quite simple.  Unless there's a common

25   interest.  They can't assert that here.  There is no common

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 231 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 231 of 852   PageID 2136

Dondero - Voir Dire                    195

1    interest.  So --

2              THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to

3    three more minutes to *voir dire* Mr. Dondero to try to

4    establish some sort of agency relationship or other evidence

5    that you think might be relevant.

6                     VOIR DIRE, RESUMED

7    BY MR. SBAITI:

8    Q    Mr. Dondero, when you provided information to the law

9    firm, were you doing so under an agency relationship?  Do you

10   know what an agency relationship is?

11   A    Generally.  When you're working on the -- or why don't you

12   tell me?

13   Q    Tell me your understanding, so we can use --

14   A    That you're working for the benefit or as a proxy for the

15   other entity or the other firm or the other person.

16   Q    Right.  So you're working for the DAF?

17   A    Yes.

18   Q    Do you do work for the DAF?

19   A    Yes.  As I stated, I'm surprised there isn't -- when we

20   reconstituted after leaving Highland, we put in shared

21   services agreements in place and asset management agreements

22   in place and tasked people with doing that for most of the

23   entities.  There might be still a few contracts that are being

24   negotiated, but I thought most of them were in place.

25        So I would imagine that there'll be an asset management

Dondero - Voir Dire                196

1  agreement with the DAF back to NexPoint sometime soon, so it

2  -- it's --

3  Q    Let me ask you this question.  When you were providing

4  information to us and having conversations with us, were you

5  doing that as an agent of the DAF, the way you described it,

6  --

7  A    Yes.

8  Q    -- on their behalf?

9  A    Yes.

10 Q    Were you also doing it to help us do our jobs for the DAF?

11 A    Yes.

12 Q    Did you respond to requests for information from myself?

13 A    Yes.

14 Q    Did you help coordinate other -- finding other witnesses

15 or sources of information at my request?

16 A    Yes.

17 Q    Did you do so based upon any understanding that I was

18 working on behalf of the DAF for that?

19 A    Yes.  I knew -- I knew you were working for the DAF.  No

20 one else, yeah.

21 Q    And so -- and so did you provide any expertise or any in-

22 depth understanding to myself in helping me prepare that

23 complaint?

24 A    I think so, but I give a lot of credit to your firm for

25 researching things that I -- I knew reasonably well but then

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 233 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 233 of 852 PageID 2138

Dondero - Voir Dire 197

1    you guys researched in even more depth.

2          MR. MORRIS:  I'd move to strike the answer as

3    nonresponsive.

4          THE COURT:  Sustained.

5    BY MR. SBAITI:

6    Q    Let me ask the question again.  When you were providing us

7    information and expertise, were you doing so knowing you were

8    working -- helping us work for the DAF?

9    A    Yes.

10   Q    Now, did you demand any compensation for that?

11   A    No.

12   Q    Do you require compensation necessarily to help the DAF?

13   A    No.

14   Q    Do you do other things for the DAF sometimes without

15   compensation?

16   A    Right.  We do the right thing, whether we get paid for it

17   or not.  Yes.

18   Q    Had you known that our communications were not necessarily

19   part of an agency relationship with the DAF, as you understood

20   it, that you were just some guy out on the street, would you

21   have had the same conversations with us?

22   A    (sighs)

23   Q    Let me ask a better question.  If I had come to you

24   working for someone that wasn't the DAF, you didn't already

25   have a relationship with, would you have given us the same

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 234 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 234 of 852   PageID 2139

Dondero - Voir Dire                      198

1    help?

2    A    I wouldn't have been involved if it was somebody else.

3    Q    Is the reason you got involved because we were the lawyers

4    for the DAF?

5    A    Correct.

6              MR. MORRIS:  Objection.  It's just leading.  This is

7    all leading.

8              THE WITNESS:  Correct.

9              THE COURT:  Sustained.

10             MR. SBAITI:  Can --

11             THE WITNESS:  Yeah.  Sorry.

12   BY MR. SBAITI:

13   Q    Do you get -- do -- did you -- did you do work for the --

14   did you provide the help for the DAF laboring under the

15   understanding that there was an agreement?

16             MR. MORRIS:  Objection; leading.

17             THE COURT:  Sustained.

18   BY MR. SBAITI:

19   Q    Earlier you testified you believed there was an agreement?

20   A    I thought that was an agreement, and I thought there will

21   be one shortly if there isn't one, yes.

22   Q    Okay.

23   A    And so we -- I've been operating in a bona fide way in the

24   best interests of the DAF throughout -- assuming there was an

25   agreement, but even if there wasn't a formal one, I would

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 235 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 235 of 852   PageID 2140

Dondero - Voir Dire                          199

1   still be moving in the best interests of the DAF and helping

2   your firm out or --

3   Q    And you did that because you believed there was an

4   agreement or soon would be?

5   A    Yes.

6          MR. SBAITI:  Your Honor, I mean, I believe we've

7   established a dual role here, both as an agent of the DAF and

8   as an agent of the law firm, Your Honor.

9          THE COURT:  Okay.  Just a minute.  I'm looking at

10  Texas authority on common interest privilege to see if there's

11  anything that --

12     (Pause.)

13         THE COURT:  All right.  Again, it would have been

14  very nice to get briefing ahead of time.  I think this

15  absolutely could have been anticipated.

16    I do not find the evidence supports any sort of protection

17  of this testimony under work product privilege, common

18  interest privilege.  I just haven't been given authority or

19  evidence that supports that conclusion.  So the objections are

20  overruled.

21    Mr. Morris, go ahead.

22                    DIRECT EXAMINATION, RESUMED

23  BY MR. MORRIS:

24  Q    Can you describe for the Court the substance of your

25  communications with Mr. Sbaiti concerning the complaint?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 236 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 236 of 852   PageID 2141

Dondero - Direct                                    200

1   A    As I've stated, directing him toward the Advisers Act and

2   then largely in a proofing function regarding CLO nomenclature

3   and some of the other fund nomenclature that sometimes gets

4   chaotic in legal briefs.

5   Q    Did you communicate in writing at any time with anybody at

6   the Sbaiti firm regarding any of the matters that are the

7   subject of the complaint?

8   A    I can't remember anything in writing.  Almost everything

9   was verbal, on the phone.

10  Q    You don't tend to write much, right?

11  A    Periodically.

12  Q    Did you communicate with Mr. Patrick?  Did you communicate

13  with anybody in the world in writing regarding the substance

14  of anything having to do with the complaint?

15          MR. SBAITI:  Objection, Your Honor.  Argumentative.

16          THE COURT:  Overruled.

17          THE WITNESS:  I --

18          MR. SBAITI:  Your Honor, may I just -- one

19  housekeeping.  Rather than raise the same objection, may we

20  have a standing objection, just so we're not disruptive, as to

21  the privilege, just for preservation purposes, on the content

22  of these communications?  Otherwise, I'll just make the same

23  objections and we can go through it.

24          THE COURT:  Well, disruptive as it may be, I think

25  you need to object to every --

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 237 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 237 of 852   PageID 2142

Dondero - Direct                           201

1            MR. SBAITI:  Okay.

2            THE COURT:  -- question you think the privilege

3   applies to.

4            MR. SBAITI:  I will do so.  Thank you, Your Honor.

5   Uh-huh.

6   BY MR. MORRIS:

7   Q   Mr. Dondero, the question was whether you've ever

8   communicated with anybody in the world in writing concerning

9   anything having to do with the complaint?

10  A   Not that I remember.

11  Q   Okay.

12           MR. MORRIS:  I will point out, Your Honor, that last

13  week, when the privilege was asserted, I had requested the

14  production of a privilege log.  I was told -- I forget exactly

15  what I was told, but we never received one.  I'll just point

16  that out as well.

17           THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q   You provided comments to the drafts of the complaint

20  before it was filed, correct?

21  A   Yes, a few.

22  Q   Can you describe for the Court all of the comments that

23  you provided to earlier drafts of the complaint?

24           MR. SBAITI:  Your Honor, we object on the basis of

25  privilege and work product and joint -- joint interest

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 238 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 238 of 852    PageID 2143

Dondero - Direct                            202

 1    privilege.

 2               THE COURT:  Overruled.

 3               THE WITNESS:  It's along the lines of things I've

 4    said in this court several times.  The obligations under the

 5    Advisers Act cannot be negotiated away and they cannot be

 6    waived by the people involved, full stop.  I remember giving

 7    the -- Mazin the example of the only reason why we're in a

 8    bankruptcy is from an arbitration award that, even though we

 9    did what was in the best interests of the investors, we got

10    the investors out more than whole over an extended period of

11    time, they got an arbitration award that said when we

12    purchased some of the secondary interests we should have

13    offered them up to the other 800 members in the committee

14    besides the -- the 800 investors in the fund besides the eight

15    people on the committee who had approved it and that the

16    committee couldn't approve a settlement that went against the

17    Advisers Act and the Advisers Act stipulates specifically that

18    you have to offer it up to other investors before you take an

19    opportunity for yourself.  And someday, hell or high water, in

20    this court or some other, we will get justice on that.  And

21    that was the primary point that I reminded Mazin about.

22    BY MR. MORRIS:

23    Q    And that's exactly the conversation you had with Mark

24    Patrick that started this whole thing, correct?

25    A    No.

Dondero - Direct                                203

1    Q    You told Mark Patrick that you believe the Debtor had

2    usurped a corporate opportunity that should have gone to the

3    DAF, didn't you?

4    A    That was not our conversation.

5    Q    So when Mr. Patrick testified to that earlier today, he

6    just got it wrong, right?

7    A    Well, maybe later on, but it wasn't that in the beginning.

8    The beginning, any conversation I had with Mark Patrick in the

9    beginning was smelling a rat in the way that the Debtor had

10   priced the portfolio for HarbourVest.

11   Q    Hmm.  So you're the one, again, who started that piece of

12   the discussion as well, correct?

13   A    Started the -- I -- I guess I smelled a rat, but I put the

14   person who could do all the numbers in touch with the Sbaiti

15   firm.

16   Q    And was the rat Mr. Seery?

17   A    Was the rat Mr. Seery?  Or the independent board.  Or a

18   combination thereof.  I believe the independent board knew

19   exactly what Seery was doing with --

20   Q    Do you have any idea --

21   A    -- HarbourVest.

22   Q    Do you have any idea why, why the Sbaiti firm didn't name

23   the whole independent board in the -- in the motion for leave

24   to amend?

25   A    I don't know.  Maybe they will at some point.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 240 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 240 of 852   PageID 2145

Dondero - Direct                          204

1  Q    Yeah.

2  A    I don't know.

3  Q    But did you tell the Sbaiti firm that you thought the

4  whole independent board was acting in bad faith and was a rat?

5          MR. SBAITI:  Your Honor, I object on the basis of

6  privilege.

7          THE COURT:  Overruled.

8          MR. SBAITI:  All three.

9          THE WITNESS:  I knew Jim Seery was and I knew Jim

10  Seery had weekly meetings with the other independent board

11  members, so the HarbourVest settlement was significant enough

12  that it would have been approved, but I don't have direct

13  knowledge of their involvement.

14  BY MR. MORRIS:

15  Q    And so you -- but you believed Jim Seery was certainly a

16  rat, right?

17  A    Oh, I -- there was a defrauding of third-party investors

18  to the tune of not insignificant 30, 40, 50 million bucks, and

19  it was obfuscated, it was -- it was highly obfuscated in the

20  9019.

21  Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

22  A    I believe he had monthly financials.  He knew that the

23  numbers presented in the 9019 were wrong.  And if that makes

24  him a rat, that makes him a rat.  Or maybe he's just being

25  aggressive for the benefit of his incentive or for the estate.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 241 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 241 of 852   PageID 2146

Dondero - Direct                                    205

1    But I -- I believe those things wholeheartedly.

2    Q    Did you tell the Sbaiti firm you thought Jim Seery was a

3    rat?

4              MR. SBAITI:  Objection, Your Honor.  Privilege.

5              THE COURT:  Overruled.

6              THE WITNESS:  I -- I don't remember using those

7    words.

8    BY MR. MORRIS:

9    Q    Did you tell the Sbaiti Firm that you thought Jim Seery

10   had engaged in wrongful conduct?

11             MR. SBAITI:  Your Honor, objection.  Privilege.

12             THE COURT:  Overruled.

13             THE WITNESS:  I believe he violated the Advisers Act,

14   and I was clear on that throughout.

15   BY MR. MORRIS:

16   Q    Listen carefully to my question.  Did you tell the Sbaiti

17   firm that you believed that Jim Seery engaged in wrongful

18   conduct?

19             MR. SBAITI:  Objection, Your Honor.  Calls for

20   privileged communications.

21             THE COURT:  Overruled.

22             THE WITNESS:  I think I gave the answer.  I'll give

23   the same answer.  I believe he violated the Advisers Act.

24   BY MR. MORRIS:

25   Q    What other wrongful conduct did you tell the Sbaiti firm

Dondero - Direct                      206

1    you thought Mr. Seery had engaged in?

2              MR. SBAITI:  Same objection, Your Honor.

3              THE COURT:  Overruled.

4              MR. SBAITI:  Calls for privileged communications.

5              THE COURT:  Overruled.

6              THE WITNESS:  I -- I just remember the obfuscating

7    and mispricing portfolio violations of the Advisers Act was

8    all I discussed with the Sbaiti firm regarding Seery's

9    behavior.

10   BY MR. MORRIS:

11   Q    Did you talk to them about coming to this Court under the

12   gatekeeper order to see if you could get permission to sue Mr.

13   Seery?

14   A    I --

15             MR. SBAITI:  Objection, Your Honor.  Calls for

16   privileged communication.

17             THE COURT:  Overruled.

18             THE WITNESS:  I wasn't involved in any of the --

19   BY MR. MORRIS:

20   Q    Did you --

21   A    -- tactical stuff on who to sell or -- who to sue or when

22   or whatever.

23   Q    Did you tell the Sbaiti firm that you thought they should

24   sue Mr. Seery?

25             MR. SBAITI:  Objection, Your Honor.  Calls for

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 243 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 243 of 852   PageID 2148
Dondero - Direct                                207

 1  privileged communication.

 2              THE COURT:  Overruled.

 3              MR. SBAITI:  I'll also say, Your Honor, the question

 4  is getting a little argumentative.

 5              THE WITNESS:  I didn't get directly --

 6              THE COURT:  Overruled.

 7              THE WITNESS:  I didn't get directly involved in who

 8  was -- who was specifically liable.

 9  BY MR. MORRIS:

10  Q    How many times did you speak with the Sbaiti firm

11  concerning the complaint?

12  A    Half a dozen times, maybe.

13  Q    Did you ever meet with them in person?

14  A    I've only met with them in person a couple, three times.

15  And I don't think any of them -- no, it was, excuse me, it was

16  on deposition or other stuff.  It wasn't regarding this.

17  Q    Did you send them any information that was related to the

18  complaint?

19  A    I did not.

20  Q    Did you ask anybody to send the Sbaiti firm information

21  that related to the complaint?

22  A    I did not.  I -- I was aware that Hunter Covitz was

23  providing the historic detailed knowledge to the firm, but it

24  -- it wasn't -- I don't believe it was me who orchestrated

25  that.

Dondero - Direct                    208

1   Q    Did you talk to anybody at Skyview about the allegations

2   that are contained in the complaint before it was filed?

3   A    I don't -- I don't remember.

4   Q    Have you ever talked to Isaac Leventon or Scott Ellington

5   about the allegations in the complaint?

6   A    No.  They weren't involved.

7   Q    How about -- how about D.C. Sauter?  You ever speak to him

8   about it?

9   A    I don't --

10          MR. TAYLOR:  Objection, Your Honor.

11          THE WITNESS:  I don't remember.

12          MR. TAYLOR:  At this point, D.C. Sauter is indeed an

13   employee of Skybridge and is a general counsel for some of the

14   entities which he worked for.  And to the extent he's trying

15   to ask for those communications, that would be invasion of the

16   privilege.

17          MR. MORRIS:  I'll withdraw it, Your Honor.  That's

18   fair.

19          THE COURT:  Okay

20          MR. MORRIS:  That's fair.

21          THE COURT:  Question withdrawn.

22          THE WITNESS:  I thought you only had eight more

23   questions.

24          MR. MORRIS:  Opened the door.

25   BY MR. MORRIS:

Dondero - Direct                              209

1    Q   Can you describe the general fact -- withdrawn.  You

2    provided facts and ideas to the Sbaiti firm in connection with

3    your review of the draft complaint, correct?

4    A   Ideas and proofreading.

5    Q   Anything beyond what you haven't described already?

6    A   Nope.

7    Q   Okay.  Who is your primary contact at the Sbaiti firm, if

8    you had one?

9    A   Mazin.

10   Q   Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should

11   be named as a defendant in the lawsuit before it was filed?

12            MR. SBAITI:  Your Honor, calls for privileged

13   communication.  We object --

14            THE COURT:  Overruled.

15            MR. SBAITI:  -- to that answer.

16            MR. SBAITI:  Okay.

17            THE WITNESS:  Again, no.  I wasn't involved with the

18   tactics on who would be defendants and when or if other people

19   would be added.

20   BY MR. MORRIS:

21   Q   Did you -- are familiar with the motion to amend that was

22   filed by the Sbaiti firm?

23   A   I'm more familiar with it after today --

24   Q   Right.

25   A   -- than I was before.

000242

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 246 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 246 of 852   PageID 2151

Dondero - Direct                    210

1    Q    And were you aware that that motion was going to be filed

2    prior to the time that it actually was filed?

3    A    I -- I don't remember.  Probably.

4    Q    And who would have been the source of that information?

5    Would that have been Mr. Sbaiti?

6    A    Yes.

7    Q    Okay.  And did you express any support for the decision to

8    file the motion for leave to amend in the District Court?

9    A    I -- I wasn't involved.  It was very complicated legal

10   preservation conver... -- I wasn't involved.  I knew the

11   conversations were going on between different lawyers, but I

12   wasn't involved in the ultimate decision.  I didn't encourage,

13   applaud, or even know exactly what court it was going to be

14   filed in.

15           MR. MORRIS:  All right.  I have no further questions,

16   Your Honor.

17           THE COURT:   All right.  Pass the witness.

18           MR.

19   ANDERSON:  We have no questions, Your Honor.

20           THE COURT:  Okay.  Any questions from Respondents?

21           MR. SBAITI:  No questions.

22           THE COURT:  Okay.  Mr. Taylor?

23                         CROSS-EXAMINATION

24   BY MR. TAYLOR:

25   Q    Mr. Dondero, --

Dondero - Cross                          211

1   A    Yes, sir.

2   Q    -- you are not the authorized representative of CLO

3   Holdco, are you?

4   A    No.

5   Q    You're not the authorized representative for the DAF, are

6   you?

7   A    No.

8   Q    Do you know who that person is as we sit here today?

9   A    Yes.

10  Q    Who is that?

11  A    Mark Patrick.

12  Q    Thank you.

13          MR. TAYLOR:  No further questions.

14          THE COURT:  Any redirect on that cross?

15          MR. MORRIS:  I do not, Your Honor.  I would just like

16  to finish up the Debtor's case in chief by moving my exhibits

17  into evidence.

18          THE COURT:  Okay.  Mr. Dondero, you're excused.

19      (The witness steps down.)

20          THE COURT:  All right.  So you have no more

21  witnesses; you're just going to offer exhibits?

22          MR. MORRIS:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. MORRIS:  So, at Docket #2410, --

25          THE COURT:  Uh-huh.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 248 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 248 of 852 PageID 2153

212

1          MR. MORRIS:  -- the Court will find Exhibits 1

2    through 53.

3          THE COURT:  Uh-huh.

4          MR. MORRIS:  In advance, Your Honor, I've conferred

5    with the Respondents' counsel.  They had previously objected

6    to Exhibits 15 and 16, which I believe were the Grant Scott

7    deposition transcripts.  They objected to them on the grounds

8    of lack of completeness because I had taken the time to make

9    deposition designations, but I'm happy to put the entirety of

10   both transcripts into evidence, and I hope that that will

11   remove the objections to Exhibits 15 and 16.

12         THE COURT:  All right.  Before we confirm, let's just

13   make sure we have the right one.

14         MR. MORRIS:  Oh, I apologize.

15         THE COURT:  I have 16 as the July order.

16         MR. MORRIS:  I apologize.  You're absolutely right,

17   Your Honor.  What I was referring to was -- oh, goodness.  One

18   second.  (Pause.)  I was referring to Exhibits 23 and 24.

19   Those are Mr. Scott's deposition designations.  They had

20   lodged an informal objection with me on grounds of

21   completeness.  And in order to resolve that objection, we're

22   happy to put the entirety of both transcripts in.

23         THE COURT:  All right.  So if our Respondents could

24   confirm with the agreement to put in the entire depos at 23

25   and 24, you stipulate to 1 through 53?

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 249 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 249 of 852 PageID 2154

213

1        MR. PHILLIPS:  We also -- Your Honor, --

2        MR. MORRIS:  Yeah, I was going to take them one at a

3   time.  Just take those two.

4        MR. PHILLIPS:  Yeah, can we just take those two?

5   Confirmed?

6        MR. MORRIS:  Okay.

7        THE COURT:  Oh, okay.

8        MR. PHILLIPS:  Because there are other -- there are

9   other -- we exchanged objections to each other's witness and

10  exhibit lists.  And so I think you can handle the rest of them

11  kind of in a bunch, right?

12       MR. MORRIS:  Yeah.  Yeah, there's two bunches,

13  actually.

14       MR. PHILLIPS:  Yeah.

15       THE COURT:  Okay.  So you have just now stipulated to

16  23 and 24 being admitted --

17       MR. MORRIS:  Correct.

18       THE COURT:  -- with the full depos?  Okay.

19       MR. PHILLIPS:  Yes, ma'am.  Thank you.

20       THE COURT:  All right.

21     (Debtor's Exhibits 23 and 24 are received into evidence.)

22       MR. MORRIS:  And then the next two that they objected

23  to are Exhibits 15 and 16.  15 is the January order and 16 is

24  the July order.  They objected on relevance grounds.  I think

25  16 -- these are the two orders that the Debtors contend the

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 250 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 250 of 852   PageID 2155

214

1    Respondents have violated, so I don't understand the relevance
2    objection, but that's what it was and that's my response.
3          MR. PHILLIPS:  Resolved, Your Honor.
4          THE COURT:  Okay.  15 and 16 are admitted.
5       (Debtor's Exhibits 15 and 16 are received into evidence.)
6          MR. MORRIS:  Okay.  And then the last objection
7    relates to a group of exhibits.  They're Exhibits 1 through
8    11.  Those exhibits I think either come in together or stay
9    out together.  They are exhibits that relate to the
10   HarbourVest proceedings, including deposition notices,
11   including I think the transcript from the hearing, the Court's
12   order, the motion that was filed.
13      The Debtor believes that those documents are relevant
14   because they go right to the issue of the gatekeeper order and
15   had they filed, had the Respondents followed the gatekeeper
16   order, this is -- this is why they didn't do it.  You know
17   what I mean?  That's the argument, is that the Respondents,
18   one of the reasons the Respondents -- argument -- one of the
19   reasons the Respondents didn't come to this Court is because
20   they knew this Court had that kind of record before it.  And I
21   think that's very relevant.
22          THE COURT:  All right.  Response?
23          MR. PHILLIPS:  Your Honor, we think that these
24   exhibits are not relevant.  We have a very focused, we think,
25   -- we have the Court's order.  Those objections are withdrawn.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 251 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 251 of 852   PageID 2156

215

1    We have the complaint.  We have the motion to amend.  And the

2    issue is whether the motion to amend, which was dismissed one

3    day, or the next day after it was filed, constitutes criminal

4    -- constitutes contempt.

5        So we think the prior proceedings go to their underlying

6    argument, which is the lawsuit or the complaint is no good,

7    and that has nothing to do with -- there's been no foundation

8    laid and it's not relevant what happened in connection with

9    the HarbourVest settlement.  It is what it is, and there's no

10   dispute that it is what it is, but it's not relevant to

11   establish any type of -- they've even said intent is not even

12   relevant here.  So we -- that's -- we think all of that goes

13   out and simplifies the record, because it has nothing to do

14   with whether or not there was a contempt.

15           THE COURT:  Response?

16           MR. MORRIS:  We withdraw the exhibits, Your Honor.

17   I'm just going to make it simple for the Court.

18           THE COURT:  Okay.

19           MR. MORRIS:  I'm just going to make it simple for the

20   Court.

21           THE COURT:  1 through 11 are withdrawn.

22       (Debtor's Exhibits 1 through 11 are withdrawn.)

23           MR. MORRIS:  So, the balance, there was no objection.

24   So all of the Debtor's exhibits on Docket #2410 -- let me

25   restate that.  Exhibits 12 through 53 no longer have an

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 252 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 252 of 852   PageID 2157

216

1    objection.  Is that correct?

2              MR. PHILLIPS:  Yes.

3              MR. MORRIS:  Okay.  And then --

4              MR. PHILLIPS:  Confirmed.

5              THE COURT:  Okay.

6         (Debtor's Exhibits 12 through 53 are received into

7    evidence.)

8              MR. MORRIS:  Okay.  Thank you.  And then we filed an

9    amended list, I believe, yesterday --

10             THE COURT:  Uh-huh.

11             MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.

12             THE COURT:  Uh-huh.

13             MR. MORRIS:  And those exhibits are simply my firm's

14   billing records.

15             THE COURT:  Okay.

16             MR. MORRIS:  You know, we added Mr. Demo to the

17   witness list in case there was a need to establish a

18   foundation.  That's the only thing he would testify to.  I

19   don't know if there's an objection to those two exhibits,

20   because we hadn't had an opportunity to confer.

21             THE COURT:  Any objection?

22             MR. PHILLIPS:  Your Honor, we're not going to require

23   authenticity and foundation for -- we have the right, we

24   think, to say that they're not a ground -- we're not going to

25   challenge that they are the bills, and the bills say what they

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 253 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 253 of 852 PageID 2158

217

1   say.  We don't need Mr. -- we don't need a witness to

2   authenticate those exhibits.  But we reserve all substantive

3   rights with respect to the effect of those exhibits.

4           THE COURT:  All right.  54 and 55 are admitted.

5       (Debtor's Exhibits 54 and 55 are received into evidence.)

6           MR. MORRIS:  And with that, Your Honor, the Debtor

7   rests.

8           THE COURT:  Okay.  All right.  Respondents?

9       (Counsel confer.)

10          MR. PHILLIPS:  If I could have a second?

11          THE COURT:  Okay.

12          A VOICE:  Sorry, Your Honor.

13      (Pause.)

14          MR. PHILLIPS:  Your Honor, we have filed in our

15  witness and exhibit list, and I have to say I don't have the

16  number, but we'll get the docket entry number, but we have 44

17  exhibits.  There's an objection to Exhibit #2, which is --

18  thank you -- it's Document 2411, Your Honor.  Thank you.

19          THE COURT:  Uh-huh.

20          MR. PHILLIPS:  There is a pending objection to

21  Exhibit #2 which we have not resolved.  There's no objection

22  to any other exhibit.  But in reviewing our exhibit list, I

23  found that we had some -- some mistakes and duplications.

24      So, with respect to 2411, we would withdraw Exhibit 13,

25  14, and 29, and we would offer Exhibit 1, and then 30 through

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 254 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 254 of 852   PageID 2159

218

1    44, with 13, 14, and 29 deleted.

2                THE COURT:  Okay.  So 1, 3 through 12, --

3                MR. PHILLIPS:  Yes.

4                THE COURT:  -- 15 through 28, and then 30 --

5                MR. PHILLIPS:  And then 30 through 44.

6                THE COURT: -- through 44?  Do you confirm, Mr.

7    Morris?

8                MR. MORRIS:  Yes, Your Honor.  The only objection we

9    have is to Exhibit #2.

10                THE COURT:  And that's -- he's not offering that?

11                MR. MORRIS:  Yeah.

12                MR. PHILLIPS:  Not at this time, Your Honor.

13                THE COURT:  Okay.

14                MR. PHILLIPS:  We would have to have testimony about

15    that.

16                THE COURT:  Okay.  All right.  So those are admitted.

17                MR. PHILLIPS:  Okay.

18        (Mark Patrick's Exhibits 1, 3 through 12, 15 through 28,

19    and 30 through 44 are received into evidence.)

20                THE COURT:  By the way, it looks like Exhibit 44 is

21    at a different docket number, Docket 2420.  Correct?  You have

22    --

23                MR. SBAITI:  Your Honor, I believe Exhibit 44 is the

24    hearing transcript from the July approval hearing.  At least

25    that's what it's supposed to be.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 255 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 255 of 852 PageID 2160

219

```
 1              THE COURT:  Okay.

 2              MR. SBAITI:  It was Exhibit 2 on the Debtor's list,

 3   and then I think they took it off, so we had to add it.

 4              MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's

 5   right.  They -- that's correct, Your Honor.

 6              THE COURT:  Okay.

 7              MR. PHILLIPS:  Exhibit 44 was added --

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  -- because the Debtor's withdrew it,

10   and so it was added in the second -- in the supplemental and

11   amended list.  The -- the one that I was talking about was the

12   prior list.

13              THE COURT:  Okay.  So that's at Docket 2420?

14              MR. PHILLIPS:  Yes.

15              THE COURT:  You're not offering 45 or 46?

16              MR. PHILLIPS:  No, I think we'd offer 45 and 46 as

17   well.  I'm sorry.

18              THE COURT:  Okay.  Any objections, Mr. Morris?

19              MR. MORRIS:  No, Your Honor.

20              THE COURT:  Okay.  So 45 and 46 are admitted as well.

21   They're at Docket Entry 2420.

22        (Mark Patrick's Exhibits 45 and 46 are received into

23   evidence.)

24              THE COURT:  All right.  Your witnesses?

25              MR. PHILLIPS:  Your Honor, could we have five minutes
```

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 256 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 256 of 852   PageID 2161

220

1    to just see what we're -- our plan is, and then we'll be back

2    at 4:00?

3              THE COURT:  Okay.  We'll be back at 4:00.

4              MR. PHILLIPS:  Thank you.

5              THE CLERK:  All rise.

6         (A recess ensued from 3:55 p.m. until 4:04 p.m.)

7              THE CLERK:  All rise.

8              THE COURT:  Please be seated.  All right.  Back on

9    the record in Highland.  Mr. Phillips?

10             MR. PHILLIPS:  Your Honor, with the introduction of

11   the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick,

12   those Respondents, and we consider Mark Patrick a Respondent

13   although not formally named as a Respondent because he is the

14   party who authorized the filing of the Seery motion -- we

15   rest.

16             THE COURT:  You rest?  Okay.  Well, Mr. Morris,

17   closing arguments?

18             MR. MORRIS:  How much time do I have?

19             THE COURT:  You've got a lot more time than you

20   probably thought you were going to.  You're under an hour.

21             MR. MORRIS:  42 minutes?

22             THE COURT:  How much?

23             THE CLERK:  42 minutes.

24             THE COURT:  42 minutes?  Feel free not to use it all.

25             MR. SBAITI:  Out of curiosity, how long do we have?

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 257 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 257 of 852 PageID 2162

221

1          THE COURT:  You have a lot of time, which I hope you

2    won't use.

3          THE CLERK:  Hour and twenty-five minutes or so.

4          MR. SBAITI:  I was afraid it was going to be an hour

5    and twenty, so --

6          MR. PHILLIPS:  No, not either.

7          MR. MORRIS:  I don't suspect I'll use all the time.

8          THE COURT:  Okay.  Thank you.

9          MR. MORRIS:  May I proceed?

10          THE COURT:  You may.

11            CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

12          MR. MORRIS:  Good afternoon, Your Honor.  John

13    Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd

14    like to just make some closing remarks after the evidence has

15    closed.

16        This is a very, very important motion, Your Honor.  I take

17    this stuff seriously.  It's only the second contempt motion

18    I've ever brought in my life.  I've never gone after another

19    law firm.  But these facts and circumstances require it,

20    because my client is under attack, and these orders were

21    entered to prevent that.

22        It is serious stuff.  There's no question in my mind,

23    there's no question the evidence showed, clear and

24    convincingly, beyond reasonable doubt, that they violated this

25    Court's order.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 258 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 258 of 852    PageID 2163

222

1        I started off with three very simple prongs.  So simple

2    you'd think I'd remember them.  Number one, was a court order

3    in effect?  There is no dispute.  The court order was in

4    effect.

5        Number two, did the order require certain conduct by the

6    Respondent?  We believe it did.  We heard an hour-long

7    argument styled as an opening statement, but it was really

8    argument and not an opening statement, about all the defects

9    in the order.  But the one thing that is crystal clear in the

10   order are the words commence or pursue.  You've been told many

11   times by the Respondent that nobody has commenced an action

12   against Mr. Seery.  That is true.  We all know what the word

13   commence means.  We all know what the word pursue means.

14       I heard argument this morning that pursue means after a

15   claim is filed you pursue a case.  That's the way lawyers talk

16   about it.  But that doesn't make any sense, Your Honor,

17   because once you've commenced the action you've violated the

18   order.  It's commence or pursue, it's in the disjunctive, and

19   you can't read out of the order the concept of pursuit by

20   making it an event that happens after the commencement,

21   because that's exactly what they're trying to do.  They're

22   trying to read out of the order the word pursuit.

23       And I ask you to use very simple common sense.  If filing

24   a motion for leave to amend a complaint to add Mr. Seery as a

25   defendant is not pursuit, what is?  What is?  There's nothing

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 259 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 259 of 852   PageID 2164

223

1   left.  You commence an action or you do something less than

2   commencing an action when you're going after the man.  That's

3   what pursuit means.  They're going after the man.  And they

4   asked the District Court to do what they knew they couldn't.

5        Mr. Phillips is exactly right.  I made the point about

6   Rule 15 because they knew they couldn't do it.  I'm not

7   suggesting that they should have.  I'm suggesting that the

8   reason that they didn't is because they knew they were -- they

9   were in a bad place.  Because if they really just wanted to

10  name Mr. Seery as a defendant, they wouldn't have done it.

11  They knew commence was crystal clear.

12       What they're trying to do is claim that somehow there's an

13  ambiguity around the word pursuit.  Does that make any sense

14  at all?  Filing a motion for leave to amend the complaint.

15  And Mr. Patrick, to his credit, candidly admitted that if the

16  motion was granted, they were suing, yeah, as long -- as long

17  as the Sbaiti firm, you know, recommended it.  That's what

18  would have happened.

19       Those orders that you signed, nothing, absolutely

20  meaningless from their point of view.  They believed they were

21  wrong.  They believed that they were overbroad.  They believed

22  they were too narrow.  They believed they were vague.  They

23  believed they were without authority.  They don't get to be

24  the gatekeeper.  They want to be the gate -- that's this

25  Court's decision.  That's why we went through all of the

224

1    processes that we did.  And they just flagrantly said, I don't

2    agree.  I don't agree because it's wrong this way and it's

3    wrong that way and it's wrong the other way, and therefore let

4    me go find a higher authority to validate my thinking.  That's

5    not the way this process is supposed to work.

6        The independent directors and Mr. Seery relied on the

7    gatekeeper in accepting their positions.  It was a quid pro

8    quo.  Mr. Dondero agreed to the exact same provision, the

9    exact same gatekeeper provision in the January order that he

10   now complains about today, that the DAF complains about today.

11   Where were these people?

12       As the Court knows, nobody appealed either order.  The

13   Debtor, the independent board, Mr. Seery expected that the

14   plain and unambiguous words would be honored and enforced.  I

15   think that's fair.  I think that's the way the process is

16   supposed to work.

17       Instead, we have games.  We have these linguistic

18   gymnastics.  We have statements that are too cute by half.

19   Mr. Dondero won't even admit that he appointed Mr. Scott back

20   in 2012.  I couldn't even get him to do that, really, even

21   though the documents say it, even though Mr. Patrick says it.

22       I'll take the Respondents one at a time in a moment, but I

23   just want to deal with some of the more interesting arguments

24   they make.  The order was vague because it didn't say you

25   can't seek leave from the District Court to amend your

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 261 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 261 of 852 PageID 2166

225

1 complaint to add Mr. Seery. They said that that's what makes

2 the order vague.

3 Your Honor, if you had thought to put that language in,

4 you know what they would have done? They would have sued Mr.

5 Seery in New York State Supreme Court, where he lives, and

6 said, the order didn't say I couldn't do that. Where does it

7 end?

8 There's a reason why the order was crafted broadly to say

9 no commencement or pursuit without Bankruptcy Court approval.

10 You have to bring a colorable claim.

11 We heard an argument this morning that they couldn't

12 possibly have brought that motion for reconsideration first.

13 You know, the one they filed about eight hours after we filed

14 the contempt motion. They couldn't possibly have brought that

15 motion before the motion for leave to amend because somehow

16 they would have been estopped or they would have been found to

17 have waived some right.

18 How could it be that anybody reasonably believes that

19 complying with a court order results in a waiver of some

20 right? It just -- these are games. These are not good

21 arguments. And they certainly don't carry the day on a

22 contempt motion.

23 We've heard repeatedly, the District Court denied the

24 motion without prejudice, how have you been harmed? They

25 shouldn't be able to rely on the District Court's prudence to

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 262 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 262 of 852 PageID 2167

226

1    protect themselves.  The question shouldn't be, have you been

2    harmed since the District Court didn't grant the motion?  No.

3    The question should be, were we harmed by the attempt to name

4    Mr. Seery a defendant, in violation of court orders, without

5    notice?  Without notice.

6        I'm told they assumed that I'd be checking the dockets.  I

7    wasn't checking the docket, Your Honor.  I hadn't filed an

8    appearance in the case.  And, in fact, if you look at the

9    exhibits, because I could pull it out, but we put in the

10   communications between the lawyers.  The last communication

11   was from Mr. Pomerantz, and the last communication from Mr.

12   Pomerantz said, Don't do it or we're going to file a motion

13   for contempt.  That's now in the evidence.

14       So, having sent that message, I wasn't going to check the

15   docket to see if they really were going to go ahead and do it.

16   I didn't think they would.  And if they did, I certainly

17   thought I'd get notice of it.  Nothing.

18       And, again, I don't really need to establish intent at all

19   in order to meet my burden of clear and convincing evidence of

20   a contempt of court, but I think it is relevant when the Court

21   hopefully finds liability and is considering damages, because

22   that's really the most important point I have to make right

23   now, is the Court needs to enforce its own orders, because if

24   the Court doesn't, or doesn't impose a penalty that's

25   meaningful, this is just going to continue.  And Your Honor,

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 263 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 263 of 852   PageID 2168

227

1   it's all in the record.  Your Honor knows this.  Mr. Daugherty

2   has gone through it.  Right?  Mr. Terry went through it.  UBS

3   went through it.  You've seen litigation now for a year and a

4   half.  It's happening in New York, right, the Sbaiti firm is

5   reopening the Acis case.  we've got this other lawsuit that's

6   filed by an entity with like a five-tenths of one percent

7   interest who's complaining about the SSP transaction that Mr.

8   -- that the Debtor engaged in.  There's no end here.

9        We need the Court to pump the brakes.  We need the Court

10  to exercise its authority.  We need the Court to protect the

11  estate fiduciary that it approved.

12       It is true, Mr. Seery is not a trustee.  But it is also

13  true that he is a third-party outsider who came into this case

14  with the expectation and the promise in an order that he

15  wouldn't be subjected to frivolous litigation, that this Court

16  would be the arbiter of whether claims could be pursued

17  against him.  That was the code of conduct.  That was the quid

18  pro quo.  That was the deal that Mr. Seery made.  It's the

19  deal that the board members made.

20       What gives these people the right to just say, your order

21  is wrong, and because I think your order is wrong I'm going to

22  go to the District Court, and if the District Court agrees,

23  too bad, and if the District Court doesn't agree, we'll be

24  back before Your Honor, and no harm, no foul?  No.  It can't

25  be.  It can't be that that's the way this process works.  It

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 264 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 264 of 852 PageID 2169

228

1    just can't.

2        So, Your Honor, let me take the Defendants one at a time,

3    the Respondents one at a time. CLO Holdco and the DAF are

4    corporate entities. They've done what they've done. Mr.

5    Patrick, bless him, I think he's a lovely man. I don't think

6    he quite bargained for what he's getting right now, but

7    nevertheless he is where he is and he's willing to stand up

8    and be counted, and for that, at least, I admire his courage.

9    He's willing to say, I authorized those. But you know what?

10   It's a violation of the law, it's a violation of this Court's

11   order to file that motion, and so he has -- and he was very

12   candid today. He knew of the order. Right? He knew it was

13   in effect. He pointed out that it was in their papers.

14   Right?

15       They're trying to be cute, they're trying to thread this

16   needle, but it has no hole in it. They keep -- they keep

17   doing this. Well, maybe if we do it this way, maybe if we do

18   it -- no. The order was crystal clear.

19       The Sbaiti firm. They're probably fathers and husbands

20   and good people and I wish them no ill will, but this is

21   wrong. This is wrong. To come into a court you've never been

22   in before and in less than twelve days to jump the shark like

23   this in twelve -- in less than twelve days, because Mr.

24   Patrick said they weren't hired until April, and the complaint

25   was filed on the 12th.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 265 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 265 of 852   PageID 2170

229

1      We're told that they understood this was an overwhelming

2   case with two -- why don't you take your time?  What was the

3   rush?  Why not wait until the Defendant -- the Debtor appeared

4   in the action before rushing to do this?

5      It's bad conduct, Your Honor, and that's really a very

6   important point that I have to make, is that there's lots of

7   lawyers who are engaging in highly-questionable conduct here

8   that, from my perspective, goes well beyond the bounds of

9   zealous advocacy.

10      It's not aggressive lawyering.  I love aggressive

11   lawyering.  I really do.  Respectful, honest -- and I don't,

12   you know, I don't want to say that they're dishonest people.

13   I don't mean to do that.  But I think, I think they made a

14   gross error in judgment, and there's no question that they

15   violated this Court's order.

16      And then that leaves Mr. Dondero.  I don't even know what

17   to say about his testimony, Your Honor.  He pursued claims

18   against Mr. Seery.  He thinks he's a rat.  He's the one who

19   started the whole process.  He's the one who put the bug in

20   Mark Patrick's ear.  All of this is uncontested.  Right?

21   Uncontested.

22      I don't have to go back in time.  We can talk about what

23   happened to Grant Scott.  It's a very sad story.  Mr. Scott, I

24   think, did his honest best to do what he believed, on the

25   advice of counsel, was in the best interest of the DAF.  And

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 266 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 266 of 852   PageID 2171

230

1    Mr. Dondero, as you hear time and time again when he speaks

2    about Mr. Seery, it was inappropriate.  He's the arbiter of

3    what's in the best interest of entities that other people

4    control.  And they pay a price.  And they pay a price.  And so

5    Mr. Dondero felt it was his job, even though he tries to

6    distance himself from the DAF -- I have no responsibility, I

7    don't -- I'm not involved -- until, until somebody wants to

8    sue Seery and the Debtor.  Then he'll go all in on that, no

9    matter how specious the claim may be.

10         The Debtor's not going to fold its tent because a motion

11   for leave to amend was denied without prejudice.  That's not

12   the point.  The point is that people need to respect this

13   Court, people need to respect the Court's orders, and those

14   that aid and abet or otherwise support the violation of court

15   orders ought to be held to account, Your Honor.

16         I have nothing further.

17              THE COURT:  All right.  Thank you.  Respondents?

18              CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

19              MR. SBAITI:  Your Honor, the fact that we're here on

20   a motion for leave, and the motion for leave is what they're

21   saying is pursuing a claim under the Court's order, and then

22   you hear that the mere act of investigating a claim against

23   Mr. Seery is also pursuing a claim, this goes to the infinite

24   regression problem with this word pursue the way they want to

25   construe it, Your Honor.  Asking for permission is not

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 267 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 267 of 852   PageID 2172

231

1    pursuing a claim and can't be the definition of pursuing a

2    claim because it's not doing anything other than asking for

3    permission.

4        We didn't file a suit.  We didn't commence a suit.  I

5    think that's established.  We did not pursue a claim.  Mr.

6    Morris ignores, I think, the very commonsensical aspect that

7    we put out in the opening, which is that the reason pursue --

8    and sometimes the language in these types of orders is,

9    instead of pursue, it's maintain -- but the reason that word

10   is there is because sometimes the case has already been

11   started when the order is entered.  And so to pursue a claim,

12   *i.e.*, one that's already been filed as of the date of the

13   order, that would be lost if the commencement of that claim

14   hadn't happened until after the -- until the -- if the

15   commencement happened before the order was filed.  That's the

16   --

17           THE COURT:  Okay.  So are you saying it's a

18   sequential thing?

19           MR. SBAITI:  I'm not sure I understood your question,

20   Your Honor.  I'm sorry.

21           THE COURT:  Well, I'm trying to understand what it is

22   you're saying about how pursue should be interpreted.

23           MR. SBAITI:  Sure.

24           THE COURT:  I think you're saying you have to -- you

25   can either have -- well, we've got a prohibition on commencing

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 268 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 268 of 852   PageID 2173

232

1    an action.

2            MR. SBAITI:  Yes.

3            THE COURT:  And then the separate word pursue, I

4    think you're saying that must refer to you already have an

5    action that's been commenced and you're continuing on with it.

6    Is that what you're saying?

7            MR. SBAITI:  Yes, Your Honor.

8            THE COURT:  Then why not use the word continue?

9            MR. SBAITI:  Well, Your Honor, the choice of --

10           THE COURT:  Kind of like 362(a) of the Bankruptcy

11   Code, you know, is worded.

12           MR. SBAITI:  Well, Your Honor, the choice of the

13   wording of pursue at that point, Your Honor, I believe ends up

14   being ambiguous, because by filing the motion here that would

15   be pursuing a claim under that definition.  So before I got

16   permission to pursue a claim, I've got to pursue a claim.

17   That's the problem that they have with the words that they're

18   trying to get you to adopt, or the meaning of the words

19   they're trying to get you to adopt.

20       If I came to this Court and said, Judge, I need

21   permission, I need leave to file suit against Mr. Seery, and

22   then the question is, well, you're not allowed to seek leave

23   because that's pursuing the claim, it's infinitely regressive.

24   And in fact, his closing argument just proved how it's

25   infinitely regressive.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 269 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 269 of 852    PageID 2174

233

1          THE COURT:  Okay.  Let me -- I'm not following this

2   infinitely regressive or whatever the term was.

3          MR. SBAITI:  Yes.

4          THE COURT:  Just answer this very direct question.

5   Why did you not file a motion for leave in the Bankruptcy

6   Court?  That would have clearly, clearly complied with the

7   July order.

8          MR. SBAITI:  Your Honor, I believe we explained this

9   in the opening.  I took a stab at it.  Mr. Bridges took a stab

10  at it.  We did not believe coming here and asking for leave

11  and asking for -- for Your Honor to do what we don't believe

12  Your Honor can do, would effectuate an estoppel or a waiver,

13  which we didn't think was in the best interest of our client

14  to have.  Your Honor, this happens -- I don't believe this is

15  the --

16         THE COURT:  Okay.  Connect the dots.  Make that clear

17  as clear can be for me.  You file a motion for leave --

18         MR. SBAITI:  Yes.

19         THE COURT:  -- to file this District Court action

20  against the Debtor and Seery, and if I say yes, everything is

21  fine and dandy from your perspective.  If I say no, tell me

22  again what your estoppel argument is.

23         MR. SBAITI:  Your Honor, the key question is whether

24  us putting the Court's ability to decide colorability and the

25  Court's gatekeeper functions, for us to invoke those functions

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 270 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 270 of 852 PageID 2175

234

1    concerned us because there's case law that says that that

2    effectuates an estoppel.  And so we don't get our chance in

3    front of an Article III judge to make that in the first

4    instance.

5             THE COURT:  Okay.  Tell me what cases you're talking

6    about and the exact context of those cases.

7             MR. SBAITI:  Your Honor, I would have to defer to my

8    partner on this one, Your Honor.

9             THE COURT:  Okay.

10            MR. SBAITI:  So, --

11            THE COURT:  Because I'm just letting you know --

12            MR. SBAITI:  Yes.

13            THE COURT:  -- I am at a complete loss.  I'm at a

14   complete loss understanding what you're saying.  I am.

15            MR. SBAITI:  Well, Your Honor, the --

16            THE COURT:  I don't understand.  If you have followed

17   the order to the letter and I tell you no, --

18            MR. SBAITI:  Then --

19            THE COURT:  -- what, you're saying you were worried

20   you'd be estopped from appealing my order to the District

21   Court and saying abuse of discretion or invalid order in the

22   first place?  You'd be estopped from taking an appeal?

23            MR. SBAITI:  No, Your Honor.  We wouldn't be estopped

24   from taking an appeal.

25            THE COURT:  Then why didn't you follow the letter of

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 271 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 271 of 852 PageID 2176

235

1    the order?

2              MR. SBAITI:  For one thing, Your Honor, asking the

3    District Court made sense to us, given the order and given our

4    understanding of the law.  Certainly, we had other options, as

5    Your Honor is pointing out.  We could have come here.  Our

6    read of the law, our understanding of what we were doing, made

7    it -- put us in, like I said, put us in the sort of

8    jurisdictional and paradoxical position.

9              THE COURT:  This is your chance to tell me exactly

10   which law you think applies here.  What case?  What statute?

11             MR. SBAITI:  Your Honor, like I said, I don't have

12   those at the moment.

13             THE COURT:  Why not?  Your whole argument rides on

14   this, apparently.

15             MR. SBAITI:  Well, Your Honor, I don't know that our

16   whole argument rides on that.

17             THE COURT:  Okay.

18             MR. SBAITI:  I mean, our argument rides on we don't

19   think we violated the letter of the order.  I think that's

20   really what I'm -- what we're here to say, is that we didn't

21   commence a lawsuit and we didn't pursue a claim by filing for

22   leave in the District Court, just like filing for leave in

23   this Court would not be pursuing a claim.  It would be filing

24   for leave.

25             THE COURT:  I agree.  Filing a motion for leave in

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 272 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 272 of 852    PageID 2177

236

1   this Court would be exactly what the order contemplated.

2          MR. SBAITI:  I understand, Your Honor.

3          THE COURT:  What you did is not exactly what the

4   order contemplated.

5          MR. SBAITI:  Your Honor, but we're -- we're moving

6   back and forth between two concepts.  One, your question is

7   why didn't we file for leave?

8          THE COURT:  Uh-huh.

9          MR. SBAITI:  And the answer to that, I've tried to

10  explain.  And if we -- if you'd like us to bring up the case

11  law or to give you a better articulation of our concern, I'm

12  happy to defer to my partner.

13      What I'm really here to say, Your Honor, is a very simple

14  point, though.  Just because we didn't file for leave here and

15  we filed for leave in the District Court doesn't mean we

16  violated your order, and that's the point I'm trying to make,

17  Your Honor.  And I think that's the simplest point I can make.

18  Asking the Article III judge for leave to amend, for leave to

19  amend to add Mr. Seery, doesn't violate, facially, at least as

20  we read it, Your Honor's order.  It's not commencing a suit

21  and it's not -- it's not pursuing a claim against him.  It's

22  all preliminary to pursuing a claim against him, because a

23  claim hasn't even been filed.

24      The judge could have -- the judge could have -- the

25  District Court could have denied it, the District Court could

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 273 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 273 of 852 PageID 2178

237

1  have referred it down here, the District Court could have

2  decided part of it and then asked Your Honor to rule on some

3  portion of it.  There are innumerable ways that could have

4  gone.  That fork -- those forks in the road is precisely why

5  we say this is not pursuing the claim.  Otherwise, where does

6  it stop?

7     Does pursuing a claim happen just when we file the motion

8  for leave?  Why didn't it happen when we started the

9  investigation?  If pursuing a claim means having the intent

10  and taking steps towards eventually filing a lawsuit, that's

11  the point that I'm making that it is infinitely regressive,

12  and that's exactly what Mr. Morris argued to you.

13     He said Mr. Dondero, by merely speaking to me, is pursuing

14  a claim and that violates your order.  Speaking to me.  Even

15  if we had never filed it.  Speaking is pursuing a claim.

16       THE COURT:  I don't agree with that, for what it's

17  worth.

18       MR. SBAITI:  Okay.  But that was his argument.  I'm

19  just responding to it.

20       THE COURT:  Okay.

21       MR. SBAITI:  And if that's not pursuing a claim,

22  filing a motion for leave likewise wouldn't be pursuing a

23  claim.  I understand it's an official act in a court, but we

24  did it in a Court that is an adjutant to this Court.  This

25  Court is an adjutant to that Court.  It's the Court with

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 274 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 274 of 852   PageID 2179

238

1    original jurisdiction over the matter.  So we didn't go to New

2    York.  We didn't go to the state court in New York where I

3    learned Mr. Seery lives.  We came to the Northern District of

4    Texas, understanding that this Court and this Court's orders

5    had to be -- had to be addressed.  And that's the very first

6    thing we did.  We asked the Court to address it.

7         That judge could either decide to send it down here, which

8    is normally what I think -- what we understood would happen.

9    So it's not like we were avoiding it.  But we wanted to invoke

10   the jurisdiction which we, as the Plaintiff, we believe we had

11   the right to invoke.  We're allowed to choose our forum.  So

12   that's the forum we chose for the primary case, which there's

13   not a problem, no one's raised an issue with us filing the

14   underlying lawsuit.

15        Adding Mr. Seery to that lawsuit and filing a motion for

16   leave in the same court where we actually had the lawsuit,

17   knowing that it might get -- that might get decided or

18   referred in some way, doesn't strike me as being anything

19   improper, because he didn't get sued and we don't know what

20   Judge Boyle would have said had the motion gone forward.  And

21   for them to speculate and to say that, well, this is exactly

22   the type of thing you have to protect against, I completely

23   disagree.

24        The case law that they cited for you on these -- on most

25   of these orders really do discuss the fact that you have

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 275 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 275 of 852   PageID 2180

239

1    somebody who is actually protecting the underlying property of

2    the Debtor.  This claim comes from a complete third party that

3    Mr. Seery himself has admitted under oath he owes a fiduciary

4    duty to.  Two third parties.  One is an investor of a fund

5    that he manages, and one to a fund that the Debtor, with Mr.

6    Seery as the head of it, was an advisor for up until recently.

7         Those fiduciary duties exist.  We felt like there was a

8    valid claim to be brought against Mr. Seery.  And the only

9    reason -- and he says this like it's a negative; I view it as

10   a positive -- the reason he wasn't named is because of Your

11   Honor's orders.  And so we asked a Court, the Court with

12   general jurisdiction, to address it for us or to tell us what

13   to do.  And I don't see how that is a violation of this

14   Court's order, nor is it contemptuous of this Court's order.

15        If every time one of these issues came up it was a

16   contempt of the court that appointed a trustee, we'd see a lot

17   more contempt orders.

18        Interestingly, the cases that were thrown out to you in

19   the opening argument by the other side, for example, *Villages*

20   [sic] *v. Schmidt*, was a trustee case, but not one that

21   involved a sanction.  And the trustee case specifically in

22   that case held that the Barton Doctrine didn't have an

23   exception for *Stern* cases, whereas the cases we cited to you,

24   *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d

25   1027, expressly held that Section 959 is an exception to the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 276 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 276 of 852   PageID 2181

240

1   Barton Doctrine.

2       And my partner, Mr. Bridges, can walk through the issues

3   that we had on the enforceability of the order, but all -- to

4   me, all of that is sort of a secondary issue because, *prima*

5   *facie*, we didn't violate this order.  I understand it may

6   irritate the Debtor and may raise questions about why the

7   motion wasn't filed here versus the District Court.  But it

8   was a motion for leave.  In order to sanction us, Your Honor

9   would have to find that asking for permission is sanctionable

10  conduct in the gatekeeper order.  Even if we ask the wrong

11  court.  Simply asking the wrong court is sanctionable, not

12  knowing what that court would have done, not knowing what that

13  court's mindset was, not even having the benefit of the

14  argument.  And that's, I guess, where this bottom -- the

15  bottom line is for me.

16      The evidence that they put on for you, Your Honor.

17  Everything you heard was evidence in the negative.  You know,

18  they talk about the transition from Mr. Dondero to Mr. Scott

19  and Mr. Scott to Mr. Patrick, but if you actually look at the

20  evidence he wants you to see and he wants you to rule on, it's

21  the evidence that wasn't there.  It's the evidence that Mr.

22  Dondero had no control.  In fact, I believe that was the basis

23  he argued for why there should be no privilege.  And all he

24  said is that he was promoting it.

25      But the fact of the matter is, like I said, all of that is

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 277 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 277 of 852 PageID 2182

241

1    secondary to the core issue that we didn't violate the order.

2    We didn't take steps to violate the order.  We took steps to

3    try to not violate the order.  And they want you to punish us

4    to send a message.  Even used words like the Court needs to

5    enforce its own orders.  And he did that as a transition away

6    from the idea that there were no damages, Your Honor, and I

7    think that has implications.

8         And then he said you have to enforce a meaningful penalty.

9    Well, Your Honor, I don't think that is the purpose of these

10   sanctions.  These sanctions are supposed to be remedial,

11   according to the case law, according to the case law that they

12   cite.  So a meaningful --

13              THE COURT:  Coercive or remedial.

14              MR. SBAITI:  Sorry?

15              THE COURT:  Coercive or remedial.  Civil contempt.

16              MR. SBAITI:  Sure, Your Honor.  But usually coercive

17   sanctions require someone to do something or they are

18   sanctioned until they do it.

19              THE COURT:  Coerced compliance.  Coerced compliance

20   --

21              MR. SBAITI:  Yes.

22              THE COURT:  -- with an existing order.

23              MR. SBAITI:  Yes.

24              THE COURT:  Uh-huh.

25              MR. SBAITI:  The last thing, he says you have to

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 278 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 278 of 852    PageID 2183

242

1    protect the estate of the fiduciary and his expectation -- I

2    believe he's talking about Mr. Seery -- his expectation that

3    the Court would be the gatekeeper.  And Your Honor, that

4    argument rings a little bit hollow here, given that what

5    they're really saying is that we should have come here first

6    and asked for permission.  But that insinuates that, by coming

7    here, the case is dead on arrival, which I don't think is the

8    right argument.

9        I think the issue for us has been, who do we have to ask

10   and who can we ask to deal with the Court's gatekeeper order?

11   I believe we chose a court, a proper court, a court with

12   jurisdiction, to hear the issue and decide the issue.  Your

13   Court's -- Your Honor's indication of the jurisdiction of this

14   Court we believed invoked the District Court's jurisdiction at

15   the same time.

16       And so the last thing is he said -- the last thing, and

17   getting back to the core issue, is Mr. Morris wants you to

18   believe that we intended to violate the order, and now, as an

19   afterthought, we're using linguistic gymnastics to get around

20   all of that.  But it's not linguistic gymnastics.  Linguistic

21   gymnastics is saying that pursue means doing anything in

22   pursuit of a claim.  That's a little -- I believe that's

23   almost a direct quote.  They're chasing the man.  Well, that's

24   the infinite regression that I talked about, Your Honor, that

25   it's going to be impossible in any principled way to reconcile

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 279 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 279 of 852   PageID 2184

243

1    Mr. Morris's or the Debtor's definition of pursue with any

2    logical, reasonable limitation that is readable into the

3    order, Your Honor.

4        And I'm going to defer to my partner, Mr. Bridges -- oh,

5    go ahead.

6            THE COURT:  I'm going to stop you.  I mean, we have

7    the linguistic argument.  But how do you respond to this?

8            MR. SBAITI:  Sure.

9            THE COURT:  What if I tell you, in my gut, this

10   appears to be an end run?  An end run.  I mean, I'm stating

11   something that should be obvious, right?  An end run around

12   this Court.  This Court spent hours, probably, reading a

13   motion to compromise issues with HarbourVest, issues between

14   the Debtor and HarbourVest.  I had objections.  An objection

15   from CLO Holdco that was very document-oriented, as I recall.

16   Right of first refusal.  HarbourVest can't transfer its 49.98

17   percent interest in HCLOF, right?  Talk about alphabet soup.

18   We definitely have it.

19           MR. SBAITI:  Yes.

20           THE COURT:  Without giving CLO Holdco the first right

21   to buy those assets.  Read pleadings.  Law clerk and I stay up

22   late.  And then, you know, we get to the hearing and there's

23   the withdrawal -- we heard a little bit about that today --

24   withdrawal of the objection.  We kind of confirmed that two or

25   three different ways on the record.  And then I remember going

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 280 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 280 of 852 PageID 2185

244

1    to Mr. Draper, who represents the Dugaboy and Get Good Trusts.

2    You know, are you challenging the legal propriety of doing

3    this?  And he backed off any objection.

4        So the Court ended up having a hearing where we went

5    through what I would call the standard 9019 prove-up, where we

6    looked at was it in the best interest, was it fair and

7    equitable given all the risks, rewards, dah, dah, dah, dah.

8    You know, HarbourVest had initially, you know, started at a

9    $300 million proof of claim, eye-popping, but this all put to

10    bed a very complicated claim.

11           MR. SBAITI:  Yeah.

12           THE COURT:  Tell me something that would make me feel

13    better about what is, in my core, in my gut, that this is just

14    a big, giant end run around the Bankruptcy Court approval of

15    the HarbourVest settlement, which is not on appeal, right?

16    There are a gazillion appeals in this case, but I don't think

17    the HarbourVest --

18           A VOICE:  It is on -- it is on appeal, Your Honor.

19           THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I

20    may be told --

21           MR. SBAITI:  I didn't know.

22           THE COURT:  I may be told, gosh, you got it wrong,

23    Judge.  You know, that happens sometimes.

24        So, this feels like an end run.  You know, the appeal is

25    either going to prevail or not.  If it's successful, then, you

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 281 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 281 of 852   PageID 2186

245

1    know, do you really need this lawsuit?  You know, I don't --

2    okay.  Your chance.

3             MR. SBAITI:  Thank you, Your Honor.

4             THE COURT:  Uh-huh.

5             MS. SBAITI:  Your Honor, this wouldn't be the first

6    case where finality or where there was a settlement -- I'm not

7    familiar as well with bankruptcy, but certainly in litigation

8    -- where the settlement then reveals -- well, after a

9    settlement is done, after everyone thinks it's done, some new

10   facts come to light that change people's views about what

11   happened before the settlement or before the resolution.  And

12   that's what happened here, Your Honor.  This is what we've

13   pled.  And this is what we understand.

14        There were the instances of Mr. Seery's testimony where he

15   testified to the value of the HarbourVest assets.  I believe,

16   as I recall, he testified in I believe it's the approval

17   hearing that Your Honor is talking about that the settlement

18   gave HarbourVest a certain amount of claims of I think it's,

19   Series 8 and then Series 9 claims, and that those were

20   discounted to a certain dollar value that he quantified as

21   about $30, $31 million.  And the way he ratified and justified

22   the actual settlement value, the actual money or value he was

23   conferring on HarbourVest, given the critique of HarbourVest

24   claims that he was settling, is he explained it this way.  He

25   said $22-1/2 million of this whole pot that I'm giving them

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 282 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 282 of 852   PageID 2187

246

1    pays for the HarbourVest -- HarbourVest's interests in HCLOF

2    -- it's alphabet soup again -- and Highland CLO Funding,

3    Limited.  And so it's the other $9 million that's really

4    settling their claims.  And given the amount of expense it's

5    going to take, so on and so forth, $9 million seems like a

6    reasonable amount to settle them with, especially since we're

7    just giving them claims.

8        So that $22-1/2 million everyone apparently took to the

9    bank as being the value, including CLO Holdco at the time,

10   because they didn't have the underlying valuations.  Highland

11   was supposed to give the updated valuations.

12       So, fast-forward a couple of months -- and this is what

13   we've played in our lawsuit, Your Honor; this is why I don't

14   think it's an end run -- we pled in our lawsuit just a couple

15   months later Highland -- I believe some of the people that

16   worked at Highland started leaving, according to some

17   mechanisms that I saw where Highland didn't want to keep all

18   the staff and so the staff was migrated to other places.  And

19   one of those gentlemen, I believe Mr. Dondero referred to him

20   as a gentleman named Hunter Covitz, and Hunter Covitz, who's

21   also an investor in HCLOF, he owns a small piece of HCLOF, he

22   had the data, he had some of the information that showed that,

23   actually, in January, when Mr. Seery said that the HarbourVest

24   settlement was worth 22 -- excuse me, the HarbourVest

25   interests in HCLOF were worth $22-1/2 million, that they're

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 283 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 283 of 852   PageID 2188

247

1   actually worth upwards of $45 million.

2       And so that information, Your Honor, we believe gives us a

3   different -- a different take on what happened and what was

4   supposed to happen.  This is strictly about the lack of

5   transparency.

6               THE COURT:  Okay.  Assuming --

7               MR. SBAITI:  Yeah.

8               THE COURT:  -- I buy into your argument that this is

9   newly-discovered evidence --

10              MR. SBAITI:  Yes.

11              THE COURT:  -- CLO Holdco would not have had reason

12  to know -- I guess that's what you're saying, right?

13              MR. SBAITI:  I'm saying they -- they didn't know.

14              THE COURT:  That they didn't know.

15              MR. SBAITI:  Uh-huh.

16              THE COURT:  And didn't have reason to know.  I'm

17  trying to figure out who's damaged here.

18              MR. SBAITI:  Well, CLO Holdco, my client, is damaged,

19  Your Honor.

20              THE COURT:  How?

21              MR. SBAITI:  Because one of the aspects of the -- of

22  Highland, one of the issues under, excuse me, of Highland's

23  advisory, is that it has a fiduciary duty.  And that fiduciary

24  duty, at least here, entails two, if not, three prongs.  The

25  first prong is they have to be transparent.  You can't say --

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 284 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 284 of 852   PageID 2189

248

1          THE COURT:  How is -- you know, I know a lot about

2    fiduciary duties, believe it or not.  How is CLO Holdco harmed

3    and the DAF harmed?

4          MR. SBAITI:  Because, Your Honor, they lost out on an

5    investment opportunity to buy the piece of -- the HarbourVest

6    piece.  They would have been able to go out and raise the

7    money.  They had the opportunity --

8          THE COURT:  Okay.

9          MR. SBAITI:  They would have had the opportunity to

10   make a different argument.

11         THE COURT:  What you're saying, you're saying, if

12   they had known what they didn't have reason to know, that it

13   was worth, let's say, $45 million, that they would have gone

14   out and raised money and said, oh, we do want to exercise this

15   right of first refusal that we decided we didn't have and gave

16   in on, we're going to press the issue and then outbid the $22

17   million, because we know it's worth more?  Is that where

18   you're going? I'm trying to figure out where the heck you're

19   going, to be honest.

20         MR. SBAITI:  That's -- Your Honor, I'd push back on a

21   little of the phrasing, only because the way these duties --

22   the way we understand the SEC's duties work when you're an

23   investment advisor is you have a transparency obligation and

24   an obligation --

25         THE COURT:  Yes.  Yes.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 285 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 285 of 852   PageID 2190

249

1          MR. SBAITI:  -- not to divert these.  So, yes, CLO

2    Holdco would have at least had the opportunity and been

3    offered the opportunity, which it could have taken advantage

4    of, to, if the assets were really on the block for $22-1/2

5    million, they should have been able to buy their percentage

6    pro rata share of that $22-1/2 million deal.  I mean, in a

7    nutshell, that's -- that's where we believe we've been harmed.

8    And we believe that the obfuscation of those values and, to a

9    certain extent, the misrepresentation of those values in the

10   settlement is not cleansable by the argument, well, you should

11   have asked.

12        Well, you should have asked is fine in normal litigation,

13   but when the person you should have asked actually owes you a

14   positive duty to inform, we believe that the should-have-asked

15   piece doesn't really apply and there's -- and that's, that's

16   the basis of our case.

17        So it's not an end run around the settlement, Your Honor.

18   I think I opened with we're not trying to undo the settlement.

19   We're not saying HarbourVest has to take its interest back.

20   We're not saying the settlement has to go on.  We're not even

21   saying any of the things that happened in Bankruptcy Court

22   need to change.  But Section 959 is pretty clear that this is

23   management of third-party property --

24          THE COURT:  I guess -- okay.  Again, rabbit trail,

25   maybe.  But CLO Holdco still owns its same 49.02 percent

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 286 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 286 of 852 PageID 2191

250

1 interest that it did before this transaction. So if there's

2 value galore in HCLOF, it still has its 49.02 percent

3 interest. What am I missing?

4 MR. SBAITI: Oh, I think Your Honor's assuming that

5 HCLOF bought the piece back from HarbourVest. It didn't.

6 THE COURT: No, I'm not.

7 MR. SBAITI: Oh.

8 THE COURT: I'm not assuming that.

9 MR. SBAITI: Well, --

10 THE COURT: I know that now the Debtor has, what,

11 fifty point, you know, five percent of HCLOF, whereas it only

12 had, you know, a fraction.

13 MR. SBAITI: Point six-ish. Yeah.

14 THE COURT: Point six-ish, and HarbourVest had 49.98.

15 MR. SBAITI: Right.

16 THE COURT: So, again, please educate me. I'm really

17 trying to figure out how this lawsuit isn't just some crazy

18 end run around a settlement I approved. And moreover, what's

19 the damages?

20 MR. SBAITI: Well, Your Honor, --

21 THE COURT: What's the damages? CLO Holdco still has

22 its 49.02 percent interest in HCLOF.

23 MR. SBAITI: Your Honor, again, --

24 THE COURT: What am I missing? I must be missing

25 something.

251

1          MR. SBAITI:  I think so, Your Honor.

2          THE COURT:  What?

3          MR. SBAITI:  The damages is the lost opportunity, the

4   lost opportunity to own more of HCLOF.

5          THE COURT:  Oh, it could have owned the whole darn

6   thing?

7          MR. SBAITI:  I could have owned 90 -- whatever 49

8   plus 49.98, 98.98 percent.

9          THE COURT:  But --

10          MS. SBAITI:  Or some pro rata portion.

11          THE COURT:  But Mr. Seery had some information that

12   you think he was holding back from CLO Holdco that CLO Holdco

13   had no reason to know?

14          MR. SBAITI:  Yes, Your Honor.  The -- the -- what he

15   testified to that the value of those assets, excuse me, the

16   value of the HarbourVest interests in HCLOF or its share of

17   the underlying assets being $22-1/2 million was either, one,

18   intentionally obfuscated, or, two, and I don't think this

19   excuses it at all, he simply used ancient data and simply

20   never updated himself, not for the Court and not for any

21   representations to the investors, who he himself testified

22   under oath in this Court that he has a fiduciary duty to under

23   the Investment Advisers Act.

24          THE COURT:  This could get very --

25          MR. SBAITI:  So that's injury to my client, Your

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 288 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 288 of 852    PageID 2193

252

1    Honor.

2              THE COURT:  This could get really dangerous.  Maybe

3    --

4              MR. SBAITI:  I'm sorry.

5              THE COURT:  This could get really dangerous.  Maybe I

6    should cut off where I'm going on this.

7              MR. SBAITI:  Okay.

8              THE COURT:  Of course, someone dangled it out there

9    in a pleading.  You know where I'm going, right?

10             MR. SBAITI:  I'm not sure I do, Your Honor.

11             THE COURT:  Hmm.  I do read the newspaper, but

12   someone put it in a pleading.  HCLOF owns MGM stock, right?

13   Is that what this is all about?  Is that what this is all

14   about?  Or shall we not do this on the record?

15             MR. SBAITI:  Well, Your Honor, this has nothing -- I

16   don't -- I don't think this has anything to do with the MGM

17   stock one way or the other.

18             THE COURT:  You don't?  OH?

19             MR. SBAITI:  Your Honor, my charge as a counsel for

20   the DAF is pretty straightforward.  We looked at the claims.

21   We looked at the newly-discovered information.  We talked to

22   the people who had it, Your Honor.  That was our

23   investigation.  We put together a complaint.  We believed that

24   we had a good basis to file suit, despite Your Honor's -- the

25   settlement approval.  We expressly, because we understand how

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 289 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 289 of 852 PageID 2194

253

1   finality is so critical in a bankruptcy context, we expressly

2   didn't ask for rescission.  We expressly didn't ask for

3   anything that would undo the settlement.

4       Asking for damages because of how the settlement happened,

5   through no fault of the Court's, of course, but asking for

6   damages is not, at least not as I see it, an end run around

7   the Court's settlement, and it's a legitimate claim.  And I

8   don't think this is far from the first time that new evidence

9   has come up that's allowed someone to question how something

10  was done that actually -- that actually damaged them.

11          THE COURT:  Usually, they come in for a motion to

12  reopen evidence to the court who issued the order approving

13  the settlement.

14          MR. SBAITI:  Well, Your Honor, I mean, that's --

15          THE COURT:  Newly-discovered evidence.

16          MR. SBAITI:  That would be the case in a final

17  judgment, Your Honor.  But, you know, our understanding of the

18  way the settlement worked was that that was not necessarily

19  going to be -- not the direction anybody wanted to go, but

20  seeking damages on a straight claim for damages, which we're

21  allowed to seek, which I think is our prerogative to seek, we

22  went that direction.

23          THE COURT:  Okay.  Okay.

24          MR. SBAITI:  But this --

25          THE COURT:  My last question.

254

1          MR. SBAITI:  Yes, Your Honor.

2          THE COURT:  Again, I have to know.  You have filed

3    some sort of pleading to reopen litigation against Acis in New

4    York?  I'm only asking this because it's part of what's going

5    on here.  What is going on here?

6          MR. SBAITI:  Your Honor, that's a -- that's a

7    separate lawsuit, and it's not to reopen litigation against

8    Acis.  It deals with post-plan confirmation mismanagement by

9    Acis.

10          THE COURT:  Oh, okay.  Okay.

11          MR. SBAITI:  Yeah.

12          THE COURT:  All right.

13          MR. SBAITI:  But I believe there's a motion in front

14    of Your Honor, just to -- that gave notice that the suit was

15    filed, but I believe Mr. -- well, a bankruptcy lawyer filed

16    it.  I don't know.

17          THE COURT:  A motion or a notice?  I don't know.

18          MR. SBAITI:  I don't know, Your Honor.  That's above

19    my paygrade.

20          THE COURT:  I have not seen it.  Okay?

21          MR. SBAITI:  Okay.

22          THE COURT:  Maybe it's there, but no one has called

23    it to my attention.

24          MR. SBAITI:  With the Court's permission, I'm going

25    to yield time to Mr. Bridges.

000287

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 291 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 291 of 852   PageID 2196

255

1          THE COURT:  Okay.  Mr. Bridges?

2          CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

3          MR. BRIDGES:  Thank you, Your Honor.  I'm grateful

4    that you asked most of those questions to Mr. Sbaiti.  I would

5    not have been able to answer them.  The one I can answer is

6    the one about judicial estoppel.  Apparently, I did a pretty

7    lousy job earlier.  I think I'm prepared to do a better job

8    now.

9          The case law I'd like to refer you to is the Texas Supreme

10   Court's 2009 decision in *Ferguson v. Building Materials*, 295

11   S.W.3d 642.  And this was my concern and my issue, perhaps

12   because I used to teach it and so it was at the front of my

13   mind.  But contrary to what you would think and what you said

14   earlier, it's not your ruling against us that would create a

15   judicial estoppel problem.  It's if you ruled in our favor.

16   And I know that seems weird.  Let me explain.

17         The two things that have to take place for there to be

18   judicial estoppel are, first, successfully maintaining a

19   position in one proceeding, and then taking an inconsistent

20   position in another.  And Your Honor, what we talked about

21   earlier is the notion that your July order forecloses the key

22   claim that Mr. Sbaiti was just describing, that Mr. Seery

23   should have known.  Not that he was grossly negligent or did

24   intentional wrong, but that he breached fiduciary duties

25   because he should have known and should have disclosed.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 292 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 292 of 852    PageID 2197

256

1   And if your order forecloses that and we come and convince

2 you that we nonetheless have colorable claims, colorable

3 claims of gross negligence or willful wrongdoing, that we

4 ultimately are unable to prove, our lawsuit could fail, even

5 though we had proved -- in the lawsuit we had proved he should

6 have known and that he breached fiduciary duties, but we would

7 be estopped, having succeeded from coming here and asking in

8 compliance with the order and its colorability rule, that we

9 would be estopped from then saying that this Court lacked the

10 authority to have issued that order in the first place, to

11 have released the claim on the mere breach of fiduciary duty

12 or ordinary negligence.  That's the inconsistency that I was

13 concerned about.

14   By coming here rather than trying to make our objection

15 and our position known without submitting to the foreclosure

16 of that claim that is, in many ways, the most important, the

17 headliner from our District Court complaint, is the concern,

18 Your Honor.  And frankly, if Your Honor's order does foreclose

19 that, then we're in serious trouble.  That's the claim that

20 we're trying to preserve.

21   But Your Honor, I don't think it was in anyone's

22 contemplation in July of 2000 that what that order would do is

23 terminate -- 2020; sorry, Your Honor -- in July of 2020, that

24 that order would terminate future claims that might arise

25 based on future conduct that had not yet happened in Mr.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 293 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 293 of 852 PageID 2198

257

1    Seery's role.  Not in his role as a manager of the Debtor's

2    property, but in his role as a registered investment advisor

3    on behalf of his clients and their property.  And that is the

4    concern that the judicial estoppel argument is about.

5         THE COURT:  I still don't understand.  I'm very well

6    aware of judicial estoppel, the old expression, you can't play

7    fast and loose with the court.  Take one position in one

8    court, you're successful, and then take another position in

9    another court.  That's the concept.

10        MR. BRIDGES:  Coming here --

11        THE COURT:  How is this judicial estoppel if you had

12   done what I think the order required and asked this Court for

13   leave?  What -- and I said fine, you have leave.  Where's the

14   judicial estoppel problem?

15        MR. BRIDGES:  If you say fine, you have leave, but

16   that leave is only, as the order states, because we have

17   colorable claims of gross negligence, colorable claims of

18   intentional wrongdoing, what happens to our mere negligence

19   and mere breach of fiduciary duty claims?  Are they

20   foreclosed?  The order on its face --

21        THE COURT:  Well, I would interpret the order to be

22   yes, and then you could appeal me, and the Court would either

23   say it's too late to appeal that because you didn't appeal it

24   in July 2020, or fine, I'll hear your appeal.  Where's the

25   estoppel?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 294 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 294 of 852   PageID 2199

258

1          MR. BRIDGES:  Your Honor, our claims that this Court

2     lacks the authority either to have made that order in the

3     first place or the jurisdiction to rule on colorability now

4     because of Section -- the mandatory abstention provision,

5     whose section number I've now lost.  That if we come to you

6     and ask you to rule on those things, have we not thereby

7     waived on appeal our claim that you couldn't rule in the first

8     place on those things?

9          That is what our motion for leave in the District Court

10    argues, is that there's -- there are jurisdictional

11    shortcomings with your ability to decide what we're asking

12    that Court to decide.  And Your Honor, by coming here first

13    and then appealing, that's what we fear we would have lost.

14    And instead of coming here and appealing, what we -- what we

15    would have done, in the alternative, I guess, would be to come

16    here and ask you not to rule but move to withdraw the

17    reference of our own motion.

18         That two-step, filing here and filing a motion to withdraw

19    the reference on the thing we filed here, we didn't think was

20    required, nor could we find any case law or rule saying that

21    that was appropriate.

22         THE COURT:  Okay.

23         MR. BRIDGES:  These are not games, Your Honor.  We

24    were not trying to play games.  We aren't bankruptcy court

25    lawyers.  We're not regularly in front of the Bankruptcy

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 295 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 295 of 852 PageID 2200

259

1    Court.  So the notion why didn't we come here first isn't

2    exactly at the top of our mind.  The question for trial

3    lawyers typically is, where can we file this, what are the

4    permissible venues, not why don't we come to Bankruptcy Court?

5    Especially when your order appears to say that causes of

6    action that don't rise to the level of gross negligence or

7    intentional wrongdoing are already foreclosed.

8        Your Honor, the January order, I think I have to just

9    briefly address again, even though I don't understand why it

10   makes a difference.  Apparently, counsel thinks it makes a

11   difference because Mr. Dondero apparently supported it in some

12   way.  Our position is, for whatever difference it makes, the

13   January versus the July, we don't believe there's anything in

14   the District Court complaint putting at issue Mr. Seery's role

15   as a director, so we don't understand how that order is

16   implicated.

17       Again, I'm not sure that matters at all.  I'm not raising

18   it as a defense.  I'm just telling Your Honor this is all

19   about the July order, from our perspective.  Certainly, the

20   July order puts his role as a CEO -- certainly, the District

21   Court case puts his role as a CEO at issue, and that's what

22   the July order is about.

23       Your Honor, the *Applewood* case requires specifics in order

24   to terminate our rights to sue and to bring certain causes of

25   action, and without that kind of specificity, Your Honor, we

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 296 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 296 of 852   PageID 2201

260

1   believe that that order fails to preclude, fails to have

2   preclusive effect as to these later-arising claims.  And we

3   would submit not only that it was not contemplated, but that

4   it was not intended to have that effect, and that even Mr.

5   Seery's testimony suggests that that's not how he understood

6   that order to be effective.

7       Counsel argued that the Barton Doctrine does apply here

8   and rattled off the names of cases that don't -- to my

9   knowledge, no case, no case that I can find deals with this

10  type of deferential order where someone is asked -- where a

11  court is asked to defer to the business judgment of an entity

12  in approving an appointment, and nonetheless deciding that the

13  Barton Doctrine applies.  That's not what *Villegas* holds.

14  That's not what *Espinosa* holds.  I don't think *Barton* is

15  applicable in a situation like that.  Certainly, it's outside

16  of the context of what *Barton* anticipated itself over a

17  century ago when it was decided.

18      Your Honor, if we're wrong, please know we're wrong in

19  earnest.  These are not games.  These are not sneakiness.  No

20  such motivation is at issue here.  I was hopeful that that

21  would be plain from the text of the motion for leave itself.

22  If it's not, I'd offer this in addition.  The docket at the

23  District Court shows that immediately upon filing the motion

24  for leave, a proposed order was filed with it asking to have

25  the proposed complaint deemed filed, which as soon as I saw I

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 297 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 297 of 852   PageID 2202

261

1    asked us to immediately retract it and to substitute a new

2    proposed order that does not ask for the amended complaint to

3    be deemed filed.  That is not what we wanted.

4        And the fear was what if our motion is granted because the

5    District Court says you have the right, you don't even need

6    leave, but as to the Bankruptcy Court, you're on your own,

7    this is at your own risk, I'm not going to rule on any of the

8    jurisdictional questions that you attempt to raise?  We did

9    not want our complaint deemed filed for that reason.  What we

10   did want was for a court where we did not risk judicial

11   estoppel to decide whether or not our key claim under the

12   Advisers Act had been foreclosed by your July order, and that

13   was the key and motivating factor.

14       On top of that, Your Honor, instead of arguing the meaning

15   of the word pursue, let me just say this.  We understood

16   pursue in that context to refer to claims or causes of action,

17   not potential, unfiled, unasserted, contemplated claims or

18   causes of action.  That until a claim or cause of action is

19   actually asserted in some way, that it can't be pursued, and

20   that the reference here was to two kinds of action, those that

21   had not yet been commenced -- and your order foreclosed the

22   commencing of them without permission -- and those that had

23   been commenced.  And your order couldn't foreclose the

24   commencing of them because they hadn't been commenced yet, but

25   your order did foreclose pursuing them.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 298 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 298 of 852    PageID 2203

262

1    And that was my reading of what that order said.  And it

2    fits with this notion that a claim or cause of action isn't

3    something you're considering or even researching.  It didn't

4    dawn on us that researching or talking to a client about a

5    potential claim could violate the order because in some

6    respect that conversation could be in pursuit of the claim.

7        By the same notion, we didn't think asking a court with

8    original jurisdiction according to Congress, asking a court to

9    decide whether or not we were foreclosed from bringing our

10   claims in a motion for leave was violating your order.

11       We don't have much else, Your Honor.  In terms of the need

12   to enforce compliance with your orders, if we understand them,

13   we sure as heck are going to follow them.  And if we've

14   misconstrued the term pursue, I'm certainly very sorry about

15   that.

16       I appreciate counsel saying he thinks we're probably good

17   people.  I did not think what we did was any kind of gross

18   error in judgment.  I thought that what we were doing was

19   preserving our clients' rights, going to a court of competent

20   jurisdiction, and asking the question, can we do what we think

21   we ought to be able to do, but is -- frankly, Your Honor,

22   we're a bit confused about because of the order that seems on

23   its face to foreclose the very lawsuit that we think we should

24   be bringing on behalf on this charitable organization that

25   foreclosed it months before the conduct at issue that gave

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 299 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 299 of 852   PageID 2204

263

1    rise to the complaint.  And with that conundrum, knowing what

2    to do was not obvious or easy for the lawyers or for the

3    client who was dependent on his lawyers to give him good,

4    sound advice.

5        I'm very grateful for you giving us the time and for your

6    very pointed questions.  Thank you, Your Honor.

7            THE COURT:  Thank you.  All right.  Who's next?

8              CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

9            MR. ANDERSON:  May it please the Court, Michael

10   Anderson on behalf of Mr. Patrick, Mark Patrick.

11       You know, this is a contempt proceeding.  It's very

12   serious.  And, you know, my stomach aches for the people here.

13           THE COURT:  Mine does, too, by the way.

14           MR. ANDERSON:  It truly aches.

15           THE COURT:  Uh-huh.

16           MR. ANDERSON:  And I mean what I said when I did

17   opening, when I said we don't need a hearing, an evidentiary

18   hearing.  And I still don't believe we did, because it comes

19   down to what does the word pursue mean, because there's

20   already been an acknowledgement --

21           THE COURT:  Do you all want to withdraw all your

22   exhibits?  I've got a lot of exhibits that I now need to go

23   through.  If I admit them into evidence, I'm going to read

24   them.

25           MR. ANDERSON:  No, I understand.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 300 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 300 of 852 PageID 2205

264

1          THE COURT:  Uh-huh.

2          MR. ANDERSON:  But it does come down to the word

3    pursue.  Counsel has already said commence doesn't do it, and

4    so then it's pursue.

5      And I could ask Your Honor, what did you mean when you

6    said pursue in the July order, but I'm not going to say that.

7    And I asked my client on the stand, you know, did you pursue a

8    claim or cause of action?  And then it was very telling.  What

9    happened with counsel?  He stood up and objected to me even

10   asking if it was pursued.  And it dawned on me, if he's going

11   to object, does pursue have some sort of legal -- that was his

12   objection.  It was he objected on legal grounds.  Does that

13   have some sort of legal meaning?

14      This is contempt.  You can't be held in contempt unless it

15   is bright-line clear that you have deviated from a standard of

16   conduct and there's no ambiguity.  Well, clearly, there is

17   ambiguity, because over on this side of the room we say filing

18   a motion for leave can't be pursue.  We can look at the order

19   and we know it doesn't mean pursue because I just heard Your

20   Honor say you should have filed a motion for leave in this

21   Court before doing anything.  All right?  So if that -- if

22   that is what without the Bankruptcy Court first determining,

23   if that's what the motion for leave is, well, then if we go up

24   to the first sentence, No entity may commence or pursue a

25   claim or cause of action, then it has this, without the

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 301 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 301 of 852 PageID 2206

265

1 Bankruptcy Court first determining, that means -- if pursue

2 means a motion for leave, if that's what that means, then that

3 order says you can't commence or file a motion for leave

4 before you file a motion for leave. Because that's what it

5 means. If pursue means motion for leave and you've said you

6 should have come here and filed a motion for leave because it

7 says, Debtor, without the Bankruptcy Court first determining

8 that notice that such claim or cause of action represents a

9 colorable claim, and specifically authorizing. The vehicle to

10 do that would be a motion for leave, right? And you can't

11 pursue anything until a motion for leave has been filed.

12  Now, where was the motion for leave? And I understand,

13 Your Honor, you know, no expert at reading the room,

14 obviously, you're frustrated that the motion for leave was

15 filed in the District Court and not in this Court. But it

16 doesn't change the fact, and neither did any of the evidence,

17 change anything, is what does pursue mean?

18  And if someone says, well, it's obviously clear it means

19 *x*, well, is it really obviously clear it means filing a motion

20 for leave? Because nobody on my side, when you read it, when

21 you say pursue, can read it that way. And if we're going to

22 have contempt sanctions being posed, and there has to be clear

23 and convincing evidence or beyond reasonable doubt, depending

24 upon, you know, I don't think you have to get to that part,

25 but clear --

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 302 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 302 of 852   PageID 2207

266

1          THE COURT:  This is not criminal contempt.

2          MR. ANDERSON:  Clear and convincing is the civil

3    standard for contempt.

4          THE COURT:  Right.

5          MR. ANDERSON:  And if pursue is open to that much

6    interpretation, it's not the kind of thing that can be held in

7    contempt on.  And I understand the frustration.  I hear the

8    frustration.  I hear counsel talk about that was not their

9    intent when they filed it.  You know, I heard Mr. Patrick get

10   up there.  I heard counsel say, hey, Mr. Patrick's doing his

11   job, he's a good guy, seems like a good guy.  Well, Mr.

12   Patrick's up there.  Look, they filed the underlying lawsuit.

13   Nobody -- there's no motion for that in this Court about the

14   underlying lawsuit.  It's only about the motion for leave.

15   That's all we're here about.

16       And so you go to that, and we've heard all these arguments

17   about it, and we've been here almost as long as the motion for

18   leave was actually on file before it was sua sponte dismissed

19   without prejudice.

20       And so I go back to that and I say that, if pursue means

21   filing a motion for leave, then that order would require an

22   order for anyone to violate -- it would be violated upon the

23   filing of a motion for leave, because you can't pursue

24   something until the Bankruptcy Court has already first

25   determined, after notice, that such claim or cause of action

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 303 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 303 of 852 PageID 2208

267

1  represents a colorable claim and specifically authorizing the

2  entity to bring such a claim.  Because that -- we already know

3  that's a motion for leave in and of itself.  Therefore,

4  pursue, just simply filing a motion for leave will put you in

5  that.

6      But that gets into all these -- we don't need to be having

7  this discussion about, you know, is a motion for leave pursue?

8  Is pursue a motion for leave?  I've heard both arguments here.

9  It doesn't justify contempt.  And I know -- and so certainly

10  with respect to my side, I, you know -- given that, I would

11  request that the Court deny the request for contempt.

12      And again, I want to say, too, look, we hear you.

13  Absolutely hear you.  Understand the frustration.  Totally

14  hear you on that.

15      I'm going to turn over the balance of my time to Mr.

16  Phillips, --

17          THE COURT:  Okay.

18          MR. ANDERSON:  -- unless you have any questions, Your

19  Honor.  I appreciate it.

20          THE COURT:  Okay.  I do not.

21          CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

22          MR. PHILLIPS:  Your Honor, Louis M. Phillips, and

23  I'll be brief.  I'm going to try to bring it down to -- I was

24  not involved.  We are -- we are here because of the

25  indemnification provisions of CLO Holdco representing Mr.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 304 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 304 of 852 PageID 2209

268

1    Patrick individually.  My firm was not involved in the

2    litigation.  We were hired to represent CLO Holdco and some of

3    the defendants in the UCC litigation, and our role has

4    expanded to do some other stuff, particularly represent Mr.

5    Patrick because of the indemnification provisions of the

6    Holdco entity documents.  He's entitled to indemnification and

7    we're providing a defense for him.  That's why we're here.

8        So I come way after the order.  We have not been involved

9    in anything.  But I think I'm just going to try to distill

10   everything about the order and about the concern and about the

11   litigation, because the Court is asking about is this an end

12   run on the settlement?  The Court is also saying, all you had

13   to do was come here first.

14       But let's look.  We're here about one thing, the motion

15   for leave.  And as Mr. Anderson pointed out, the commence or

16   pursue a claim, according to the order, commence or pursue can

17   only occur after the Court has authorized the litigation.

18   Okay.  So that's what the order says.  You can't commence or

19   pursue.

20       Counsel for the Debtors says, well, it can't be after

21   commencement because you've already commenced the action.  So

22   pursue has to mean something before the commencement of the

23   action.  It would mean something before the commencement of

24   the action under this order.

25       But it doesn't mean something before the Court approves

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 305 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 305 of 852    PageID 2210

269

1    the commencement of the action, because commence or pursue

2    under this order does not occur before the Court has acted.

3    That's the language of the order.  It only occurs after the

4    Court has authorized it.  That's the context in which commence

5    or pursue exists, after this Court has authorized.

6        Okay.  So it can't be pursuit before the Court has

7    authorized without commencement because it only is triggered

8    by the Court's authorization of the action, which means,

9    before you commence it, actions in time take time, before you

10   commence the action, you have to pursue the action to commence

11   it.  But you can't do that until you've approved it.  All

12   right?

13       That's the temporal concern and why we say the motion for

14   leave can't be pursuit of an action under this order.  It

15   might be pursuit under another definition or another order.

16   In other words, maybe an order could be issued saying, you

17   can't file a motion for leave in any other court but this one.

18   I don't know whether it'd be a good order, but the order could

19   say that.  But when you say all you had to do was file a

20   motion for leave in this Court and everything would be okay,

21   no.  The motion for leave is not, under this order, pursuit.

22   Pursuit only occurs under this order after you've done

23   something, after Your Honor has done something.

24       So if a motion for leave is violative at the District

25   Court, the motion for leave would be violative here, because

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 306 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 306 of 852   PageID 2211

270

1    it occurs before Your Honor has taken action.

2         Now, clearly, you want people to ask, but just as clearly,

3    and this was the point of my remarks earlier at the tail-end

4    of opening, just as clearly, I have a question, because

5    frankly, I understand what these guys are saying.  These guys

6    haven't really said it.  They're a little shame-faced at what

7    these guys are asking.  Because what these guys are asking is

8    whether or not an employee Seery, as the CRO -- and we heard,

9    oh, he bargained for it, he wouldn't have done it without

10   getting the order and the protections because -- did he

11   bargain for not having to comply with the Investor Advisory

12   Act?  Did he bargain for not having a fiduciary duty to third

13   parties?  Because the one thing that Mr. Bridges has been

14   trying to tell you is that, under this order, if it's

15   interpreted one way, you would never authorize a violation of

16   the Investment Advisory Act because it wouldn't necessarily be

17   gross negligence or willful misconduct.

18        In other words, in employing Seery, did the Debtor go out

19   in this disclosure statement and say, we are advisor to $1.2

20   billion of third-party money, and guess what, our CRO has no

21   fiduciary duty to you?  We have forestalled any claim under

22   the Investment Advisory Act in our employment order.  Did that

23   happen?

24        Because if that happened, I don't know if the Court was

25   really thinking that way, because that -- that can't happen in

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 307 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 307 of 852 PageID 2212

271

1    a confirmation order before, under the Fifth Circuit

2    authority, after disclosure statement, plan, et cetera, et

3    cetera, because that's a third party release of claims that

4    may -- that haven't occurred yet. You would be releasing

5    because you would be saying you have no right. You have no

6    right. This is not temporal. This is saying you have no

7    right, if it's saying that, to bring an Investment Advisory --

8    Investment Advisory Act or a Breach of Fiduciary Duty Act

9    that's not gross negligence or willful misconduct forever upon

10   an employment order.

11       Now, if that's not what it means, then we have another

12   conundrum. The other conundrum -- and I'm new to this, maybe

13   this has been thought out by everybody, but I don't think so.

14   The other conundrum is this order doesn't apply to actions

15   that don't involve willful -- gross negligence or willful

16   misconduct. It only applies to those types of actions. So,

17   frankly, I don't know what the order does.

18       I think the problem -- I probably shouldn't be the

19   purviewer of who ought to know because my standard's probably

20   really low, given my capacity here. But I'm a guy off the

21   street. Seery gets hired to run the Debtor. Seery testifies

22   and he admits, we've got Investment Advisory Act all over the

23   place. We're making lots of fees out of administering all

24   this third-party money. Do they know? Do they know he's

25   immune? Do the third parties know?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 308 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 308 of 852   PageID 2213

272

1          Now, a standard about managing the Debtor?  Absolutely.

2     That's just pure D Chapter 11, pure D corporate, pure D

3     standard liability if you're operating an entity.  You're not

4     liable for gross negligence or willful misconduct.  You're

5     not.  And so any claim for damage to the Debtor or to the

6     estate by actions taken in the CRO capacity, absolutely.

7     Absolutely.  You don't want a bunch of yoyos suing, you did

8     something against the Debtor and the Debtor is now worth $147

9     less than it was because you did something, you were negligent

10    and you forgot to put the dog out.  No.  It's got to be gross

11    negligence or willful misconduct if you are talking about

12    running the Debtor and running the estate.

13         But that's not what we have here.  And you can ask all the

14    questions you want about whether the lawsuit's any good, but

15    that's not what's up before the Court.  What's up before the

16    Court is whether filing a motion for leave is contempt.  And

17    under this order, you're saying, all you had to do is come

18    here.  Well, in one reading of it, you'd have never got relief

19    because you can't bring the kind of action.  I foreclosed it

20    by employing Seery.  He no longer has a fiduciary duty and is

21    no longer bound by the Investment Advisory Act.  Case closed.

22    Get out of here.  Unless you can formulate something around so

23    that you can establish gross negligence or willful misconduct,

24    I've done away with all those causes of action.

25         I don't think that's what happened.  And if that's not

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 309 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 309 of 852 PageID 2214

273

1    what happened, this doesn't apply because it shouldn't apply

2    to third-party actions.  It should apply to actions for damage

3    to the estate by creditors of the estate for whom Seery is

4    acting as CRO of the Debtor, who is the -- in possession of

5    the estate.  That makes perfect sense.  Perfect sense.  And

6    nobody would say that you shouldn't have sole authority to

7    determine whether a CRO who's acting for the estate and

8    damages the estate -- because that'd be a claim against the

9    estate.  That would be an administrative claim against the

10    estate.  That is just hornbook law.

11        That's the way I see this order.  And I admit I didn't

12    write it.  I admit I didn't submit it.  I admit I didn't

13    litigate it.  I admit I'm coming in late.  But sometimes maybe

14    a fresh pair of elderly, trifocal-assisted eyes doesn't hurt.

15    Because I will tell you, Judge, on one read this Court says

16    don't bother coming here because you don't have the kind of

17    claim that can be brought, even if you're a third party.  And

18    the only way that happens is if Seery's released from any

19    obligation under the Investment Advisory Act, and I think

20    everybody would like to know that.  And he can't be sued for

21    breach of fiduciary duty to third parties that he admits he

22    owes.  I think people would like to know that.

23        And if it doesn't, then this is not -- this order is not

24    about that.  But the fact -- I've been at this 40 years, and I

25    usually don't want to talk about myself.  There's really not a

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 310 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 310 of 852   PageID 2215

274

1   lot to talk about.  But I hear Mr. Morris how he's never done

2   this, he's never done that.  I hear this, I'm a good -- you

3   know, whatever.  I'm confused.  I've been doing this 41 years.

4   Bankruptcy, 39.7.  I must be crazy, but that's what I've been

5   doing.  And I'm confused because I don't even know if they

6   needed to come here.  I don't even know if, had they come

7   here, if they could have even presented an action for gross --

8   for negligence or breach of fiduciary duty, could have --

9   gross negligence or willful misconduct?  I don't know whether

10  this order just applies to Seery's duties as CRO vis-a-vis

11  creditors of the estate and property of the estate and damage

12  to the estate.  Because that's not what we're dealing with

13  here.

14      The point is, Judge, this is contempt.  And I understand

15  Your Honor knows all about contempt.  Your Honor knows about

16  *Matter of Hipp*.  Your Honor knows about civil contempt

17  authorization for bankruptcy courts.  Your Honor knows that

18  you can't operate without the right to impose civil contempt

19  sanctions.  And Your Honor knows, and I agree with Your Honor,

20  that civil contempt is both remedial and coercive.

21      But how do you coerce around my questions?  Maybe I am all

22  wet, but if I am, I don't think I am, and I don't understand

23  that I am, and that's why I'm concerned about going off into

24  this contempt wilderness and millions in fees, when the motion

25  for leave was dismissed and when the lawsuit doesn't ask for

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 311 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 311 of 852   PageID 2216

275

1    or includes most of its claims.  I don't even -- I have not

2    studied the lawsuit.  I wasn't involved in it.  But if it's a

3    breach of fiduciary duty and Advisory Act and it says what

4    you've been told it says, that he should have pulled up

5    different stuff, that the valuation metrics were different,

6    that he shouldn't have used it, I don't know that they're

7    saying fraud.  I don't know that they're saying he knew he was

8    doing -- I think they're saying he breached the Investment

9    Advisory Act.  And that's not gross negligence or willful

10   misconduct.  Then does this order apply or this order -- does

11   this order foreclose that?

12        The fact is, I think we could have decided this on the

13   pleadings and on the order.  We didn't.  The fact that Mr.

14   Dondero did A, B, C.  And I will tell you this.  Mr. Patrick

15   has stood up.  He's going to get a harpoon, he's going to get

16   a harpoon, subject to his right to appeal.  But he has told

17   this Court.  We represent him.  We're not trying to get him

18   out of having authorized the order.  It's very important for

19   this Court to understand.  Mr. Patrick is one of these

20   entities.  Mr. Dondero can holler and scream all he wants to.

21   Mr. -- and look, did he terminate Grant Scott?  If I'm Grant

22   Scott, and this is my best friend and I was in his wedding and

23   I was his roommate and I was his best friend and I'm doing

24   this stuff for $5,000 and I do something and $5,000 a month

25   and I do something and I get hollered at and I've got a full a

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 312 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 312 of 852   PageID 2217

276

1   law practice, I'm an IP lawyer, why don't I just tell him to

2   go jump in a lake, which is the other way you could look at

3   Grant Scott leaving.  I want you to jump in a lake.  I'm out

4   of here.  I don't need this.

5      Thank you.

6         THE COURT:  All right.  Thank you.

7         MR. DEMO:  Your Honor, how much time do they have

8   left, --

9         THE COURT:  Um, --

10        MR. DEMO:  -- to be honest?

11        THE COURT:  Nate, are you -- 26 minutes?  All right.

12        MR. TAYLOR:  I'll go way under, Your Honor.

13        THE COURT:  Okay.

14         CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

15        MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on

16   behalf of Mr. Dondero.  He was named as an individual alleged

17   violator within the order.

18        THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr.

19   Anderson, who did you represent?

20        MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I

21   represent --

22        THE COURT:  You're Mr. Patrick?

23        MR. PHILLIPS:  We're Mr. Patrick.

24        THE COURT:  You're both --

25        MR. PHILLIPS:  Mr. Patrick.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 313 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 313 of 852   PageID 2218

277

 1             THE COURT:  Okay.  I'm sorry.  I'm getting my Fort

 2    Worth law firms mixed up.  Okay.

 3             MR. TAYLOR:  That's quite all right.  Clay Taylor

 4    from Bonds Ellis here on behalf of Mr. Dondero.  And we're

 5    here because he was named in the alleged violator motion

 6    within the order as an alleged violator.  We don't think that

 7    he is, for the reasons that we're about to explain, but we

 8    were ordered to appear --

 9             A VOICE:  No.

10             MR. TAYLOR:  -- and so therefore we are appearing and

11    telling you why we're not an alleged violator.

12         First of all, for all the reasons that Mr. Sbaiti and Mr.

13    Bridges and Mr. Phillips and Mr. Anderson said, the court

14    order was in effect.  We agree with that.  It required certain

15    conduct to be done.  Yes, it did.  It said you couldn't

16    commence something.  It said you couldn't pursue it.  I think

17    we have gone through what the pursuit and commence.  Nobody is

18    arguing that anything was commenced.  It comes down to

19    pursuit.

20         But let's talk about what the evidence shows about Mr.

21    Dondero.  It shows that Mr. Dondero believes that there have

22    been breaches of fiduciary duty.  He thinks that there has

23    been negligence committed.  He believes that actions should be

24    taken.  We don't run away from that.  He, frankly, told you

25    that.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 314 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 314 of 852 PageID 2219

278

 1      But here, he didn't take any action to pursue it.  The DAF

 2  did.  CLO Holdco did.  It's undisputed that he's not an

 3  officer, director, or control person for either of those

 4  entities.  The act we're here on is a motion for leave to file

 5  an amended complaint to include Mr. Seery.  That's -- Mr.

 6  Dondero didn't take any of those acts.  He believes it should

 7  have been done, but he's not the authorizing person.

 8      He might have -- let's just pretend that he thought he was

 9  authorizing something.  It doesn't matter that he thought he

10  could authorize something or that he was trying to push for

11  it.  The fact remains he can't authorize it.  You know, he can

12  say, I declare war on Afghanistan.  Well, he can't.  Congress

13  can't.  He can write a letter to his Congressman.  He already

14  wrote a letter to his Congressman.  He talked.  He talked with

15  the head of the acting CLO -- CLO Holdco and he said, I think

16  there's something wrong here.  I think you should be looking

17  into it.  You know what, he goes, you might be right.  Go talk

18  with Mazin about it.  Give him some data.  Conduct an

19  investigation.  They did.  And then they went to the

20  authorizing person and they filed a motion for leave to

21  include Mr. Seery.  Mr. Dondero did nothing wrong in that.

22      Now, there is some personal animosity.  I think that Your

23  Honor has probably seen there seems to be some personal

24  animosity between Mr. Seery and Mr. Dondero, and that's

25  unfortunate.  But just because there's some personal animosity

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 315 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 315 of 852   PageID 2220

279

1  doesn't mean that maybe something wasn't done wrong.  Maybe

2  that Mr. Dondero -- he's certainly allowed to at least tell

3  people, well, I think there was something done wrong.  And if

4  there is an action to be had, then those appropriate entities

5  can take it.  But he didn't do those things.

6      And so even if he says, just like Michael Scott, "I

7  declare bankruptcy," it doesn't matter.  You have to take the

8  certain actions.

9          THE COURT:  I got it.  I don't know if everyone did.

10         MR. TAYLOR:  Yes, well, yeah, you have to be a *The*

11 *Office* fan.

12     But so that's where we stand.  And for all the reasons the

13 prior people have discussed, I don't think that there was any

14 violation of this Court's order.  But even if there was, Mr.

15 Dondero in this situation was not the one.  We're going to

16 have to deal with the other order that came out yesterday in

17 due course, but for this discrete issue that is before this

18 Court today, Mr. Dondero didn't violate anything.

19     Thank you.

20         THE COURT:  All right.  Mr. Morris, you get the last

21 word.

22     REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23         MR. MORRIS:  Thank you, Your Honor.  These are going

24 to be discrete points because it's truly rebuttal.  I'm going

25 to try to respond to certain points.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 316 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 316 of 852 PageID 2221

280

1      Mr. Bridges and Mr. Phillips made extensive arguments

2   about why they believe the order is wrong, why it's

3   overreaching.  They tried to get into your head to think about

4   what you intended or what you thought.  The fact of the matter

5   is, the answer to all of those questions -- first of all, none

6   of it's relevant to this motion because we've got the order --

7   but the answer is very simple.  Forget about coming here to

8   seek leave to amend to add Mr. Seery.  We can avoid Mr.

9   Sbaiti's concerns about judicial estoppel or something.  Why

10  didn't they just file the motion for reconsideration?  They

11  filed that after they filed the motion for leave to amend,

12  after we filed the motion for contempt.  Only then did they

13  file the motion for reconsideration.

14      Now, we think it's ill-thought-out.  We think it's

15  problematic.  Probably not today, is my guess, we'll argue to

16  you as to why we think that motion ought to be denied.  But if

17  they truly believed that the order was infirm in any way,

18  wouldn't the proper thing to have been to come here and tell

19  you that?  Wouldn't the proper thing to be to come to the

20  court that issued the order that you have a problem with and

21  ask the court to review it again?  And if Your Honor overruled

22  the motion, to appeal it.

23      Why are we even doing this?  Why did they do it?  It's not

24  we.  Why did they do it?  Right?  And that solves almost

25  everything they've said.  That's point one.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 317 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 317 of 852 PageID 2222

281

1  Point two, the January order. The January order is very

2 important. It's important not just because it applies to

3 directors, but it's important because Mr. Dondero agreed to

4 it, and it also applies -- I want to get it -- Paragraph 10.

5 It's Exhibit 15. It applies to the independent directors and

6 the independents directors' agents. If a CEO is not an agent

7 of an independent director, I'm not sure what is. The

8 independent directors are the body that appointed the CEO.

9 The CEO, Mr. Seery, is acting on behalf of the board. This is

10 the order that Mr. Dondero agreed to. It's the order -- take

11 out the word independent director; put in Mr. Seery -- it's

12 the order everybody's complaining about. But even the January

13 order certainly applied to Mr. Seery. That's point two.

14  Point three. I've heard a lot of concerns about the

15 slippery slope and what does pursuit mean and does talking to

16 a lawyer mean pursuit and doing an investigation being

17 pursuit. I don't know, Your Honor, and I don't care, because

18 that's not what we're here to talk about. We're here to talk

19 about a specific act -- not a hypothetical, not a slippery

20 slope. We're talking about the filing of a motion for leave

21 to amend a complaint to add Mr. Seery as a defendant. That's

22 all we're talking about. So, you know, the rest of it, it's

23 just noise. And the only question is whether, and I think

24 it's pretty clear, that means pursuit.

25  Another version on the theme of was there any alternative

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 318 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 318 of 852    PageID 2223

282

1    to filing the motion in the District Court, I think there was.

2    The Sbaiti firm did file that suit against Acis in New York.

3    And if Your Honor checks the docket in the Acis bankruptcy, I

4    think you'll find that there's a motion from Mr. Rukavina, for

5    a comfort order, basically, saying that -- asking the court to

6    declare that the filing of the complaint in New York against

7    Acis didn't violate the plan injunction.  I think I have that

8    right.

9        But I point that out, Your Honor -- it's not evidence in

10    the record, but the Court can certainly take judicial notice

11    of what's on its docket -- I point that out because there's

12    another example of a lawyer who is very active in this case

13    who actually -- now, he already commenced the suit, so he did

14    -- they did both simultaneously, so I don't want to suggest

15    that that's the perfect thing to have done, but at least he's

16    here asking for -- he's bringing it to your attention, he's

17    telling you it's happened, he's asking for a comfort order,

18    and someday Your Honor may rule on it.  I don't know.

19        Number six, what's with the pursuit of Mr. Seery?  What is

20    with the pursuit of Mr. Seery?  Is there any doubt in

21    anybody's mind that the Debtor is going to have to indemnify

22    Mr. Seery and will bring in another law firm?  And while I

23    don't think it will ever happen in a hundred billion years, if

24    there is a judgment against Mr. Seery, isn't that going to be

25    the Debtor's responsibility?  Why are they even bothering to

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 319 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 319 of 852   PageID 2224

283

1    do this?  I think it's a fair question for the Court to ask.

2          I think Mr. Taylor came up and talked about animosity.

3    How do you explain going after Jim Seery?  How do you do it?

4    He's going to be indemnified.  It's in -- it's in like three

5    different orders.  It's in the confirmation order.  It's in

6    the CEO order.  It's -- it's probably as a matter of law.

7    It's in the Strand partnership agreement.  It's -- he's been

8    indemnified like 12 different times.  What is the purpose,

9    other than to make Mr. Seery's life miserable?  There is none.

10   You'll never hear a rational explanation for why they're doing

11   this.

12          THE COURT:  Just so you know, I've not looked at any

13   of the pleadings in the District Court --

14          MR. MORRIS:  And I'm not asking you to.

15          THE COURT: -- other than what has been presented to

16   me today.

17          MR. MORRIS:  Yeah.  That's fine, Your Honor.

18          THE COURT:  But I'm very flipped out about the causes

19   of action against the Debtor, --

20          MR. MORRIS:  Yeah.

21          THE COURT:   -- who hasn't reached an effective date.

22          MR. MORRIS:  Well, --

23          THE COURT:  And I'm most interested to know what the

24   defenses, motions --

25          MR. MORRIS:  We'll get to that.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 320 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 320 of 852 PageID 2225

284

1          THE COURT:  -- are going to be raised in that regard.

2          MR. MORRIS:  We will get to that in due course.

3     I do want to point out, just to be clear, because we keep

4  hearing that they learned about, you know, all of these

5  horrible things after the fact.  In the complaint, which I

6  think is Exhibit 12, --

7          THE COURT:  I'm there.

8          MR. MORRIS:  -- at Paragraph 127, the Plaintiffs

9  allege, "Mr. Seery was informed in late December 2020 at an

10 in-person meeting in Dallas, to which Mr. Seery had to fly,

11 that HCO" -- excuse me "HCLF and HCM had to suspend trading in

12 MGM Studios' securities because Seery had learned from James

13 Dondero, who was on the board, of a potential purchase of the

14 company.  The news of the MGM purchase should have caused

15 Seery to revalue."

16    I cannot begin to tell you the problems with that

17 paragraph.  We're not going to discuss them today.  I made a

18 promise to these folks that we wouldn't get into the merits of

19 the complaint.  But Your Honor was onto something before, and

20 those issues, you know, may see the light of day one day.  And

21 if they do, folks are going to have to deal with it.  But I

22 will point out that at the time the communication was made,

23 the other TRO was in effect.  We didn't bring that one to the

24 Court's attention.  But the important point there, Your Honor,

25 is December 2020.  It is December 2020.  That is the

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 321 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 321 of 852   PageID 2226

285

1   allegation that's being made against Mr. Seery.  And the fact

2   of the matter is, because I've done the research myself, the

3   Court will find that on December 23rd, the day the HarbourVest

4   settlement motion was filed, it was fully public knowledge

5   that Amazon and Apple, I think, had shut down negotiations

6   with MGM at that time.  Right?  So the big secret information,

7   it was in the public domain on December 23rd.

8        There will also never be any evidence ever that Mr. Seery

9   got on a plane and flew to Dallas in December 2020, but that's

10  a minor point.

11       I'd like to just conclude, Your Honor, by saying I've

12  heard pleas that they understand.  They understand, Your

13  Honor, now they understand.  It would be good if they promised

14  the Court that they won't seek to assert claims against Mr.

15  Seery anywhere but in this Court and comply with the order as

16  it's written.  That, that, that would be taking a little bit

17  of responsibility.

18       I have nothing further, Your Honor.

19            THE COURT:  Okay.  Thank you.

20       All right.  Let me give you some clue of when I'm going to

21  be able to rule.  I've been glancing at my email in hopes that

22  something set tomorrow would go away, but that's not

23  happening.  I've got a hearing that I've been told will take

24  all day tomorrow on a case involving a half-built hotel,

25  luxury hotel in Palm Springs, California.  So I have to spend

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 322 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 322 of 852 PageID 2227

286

1   the next I don't know how long getting ready for that hearing

2   tomorrow, and then I have what looks like a full day of

3   hearings Thursday, including you people coming back on

4   something.

5           MR. POMERANTZ:  Your Honor, I was going to address

6   that.  We have Dugaboy's motion to enforce compliance on the

7   2015(3) reports.

8           THE COURT:  That's what it was.

9           MR. POMERANTZ:  Since we haven't gotten to the motion

10  to modify the Seery order, my suggestion would be we use that

11  time -- of course, Dugaboy, I'm not sure if they're on the

12  phone.  They're not here.  I'm not sure that's time sensitive.

13  But if Your Honor wanted to have a hearing on that motion,

14  which was contemplated to take place today, the Debtor would

15  be okay having that motion heard on Thursday, perhaps by

16  WebEx, unless Your Honor wants us to stay here, which we would

17  if you do, and then reschedule the 2015(3) motion.

18      But again, that wasn't my motion.  It's Dugaboy's.  I'm

19  not sure Mr. Draper is on.  But we obviously have some

20  calendar issues.

21          MR. MORRIS:  And Your Honor, just to complete it, I

22  think also on Thursday the Court is supposed to hear HCRE and

23  Highland Capital Management Services motions for leave to

24  amend their complaint in the promissory note litigation

25  against each of them.  I think that's also on the calendar for

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 323 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 323 of 852   PageID 2228

287

1    Thursday.  I don't expect that -- I hope that doesn't take

2    very long, but that's also, I believe, on the calendar.

3            THE COURT:  Okay.  Mr. Draper, are you out there?

4            MR. PHILLIPS:  I didn't see him on the list, Your

5    Honor.  I was just looking.  But --

6            THE COURT:  Okay.  All right.  Well, --

7            MR. PHILLIPS:  What is the question?  I can send him

8    a text real quick.

9            THE COURT:  Well, just have -- if you all could

10   follow up with Traci Ellison, my courtroom deputy, tomorrow, I

11   am perfectly happy to continue the motion to modify the Seery

12   order to Thursday morning at 9:30 if Draper is willing to

13   continue the 2015 motion.

14           MR. POMERANTZ:  I know, if I was him, my first

15   question would be is what times does the Court have available?

16   We could work that through Ms. Ellison.

17           THE COURT:  Yes.  And I'm just letting you know --

18   talk to her.  Okay.  Number one, I'll do these by video, okay?

19   WebEx.  But I know I don't have any time Wednesday, and

20   Thursday's a busy day.

21       We have court Friday morning at 9:30 in--?

22           THE CLERK:  Cici's Pizza.

23           THE COURT:  Cici's Pizza?  That's not going to take

24   very long, right?

25           THE CLERK:  I don't think so.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 324 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 324 of 852 PageID 2229

288

1    THE COURT:  I can potentially do something, you know,

2    10:00 o'clock Friday morning.  Other than that, then you've

3    got to wait a while, because I have a seven-day trial, live

4    human beings in the courtroom starting next Monday.  And so my

5    point is mainly to tell you, as much as I would like to rule

6    very, very fast, it's going to be, it looks like, a couple of

7    weeks or so before I can give you a ruling on this.

8          MR. BRIDGES:  Your Honor?

9          THE COURT:  Yes?

10         MR. BRIDGES:  May I?  It's our motion.  I would

11   propose, if counsel would agree, that we just submit it on the

12   papers.

13         THE COURT:  Everybody good with that?  I'm certainly

14   good with that.

15         MR. POMERANTZ:  Your Honor, I'd like there to be

16   argument.  I have a lengthy argument.  I think I'd like to

17   address a number of the things that -- Mr. Bridges made his

18   argument today.  Okay?

19         THE COURT:  Okay.

20         MR. POMERANTZ:  His deck, it was entitled, Motion to

21   Modify.

22         THE COURT:  Okay.

23         MR. POMERANTZ:  So that's very nice of him, but I

24   would like to make my argument.

25         THE COURT:  Okay.  Let's try to nail this down right

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 325 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 325 of 852   PageID 2230

289

1  now.  Friday at 10:00 o'clock, can we do the oral argument

2  WebEx?

3         MR. POMERANTZ:  On that one, yes, Your Honor.

4         THE COURT:  On that one?  Everybody good?  Okay.  So

5  we'll come back Friday, 10:00 o'clock, WebEx, for that motion.

6      You know, I'm going to say a couple of things where --

7  I've leaned toward thinking this is a pretty simple motion

8  before me, the motion for contempt, but when people offer into

9  evidence documents, I read your documents.  Okay?  That's my

10  duty.  And so I have however many exhibits I admitted today

11  that I am going to look at and see how they sway me one way or

12  another on this issue.  But I will tell you that my gut is

13  there has been contempt of court.  Okay?  I don't see anything

14  ambiguous at all about Paragraph 5 of my July 16th, 2020

15  order.  Somebody may think I overreached, but if that was the

16  case, someone should have argued at the time I was

17  overreaching.  Someone should have appealed the order.  And I

18  think it's a *Shoaf*/*Espinosa* problem at this point for anyone

19  to argue about the enforceability of that order.

20      I think there's nothing ambiguous in the wording.  Pursue

21  is not ambiguous.  There's nothing confusing about the

22  requirement that any entity who wanted to sue or pursue a

23  claim, you know, commence claim, pursue a claim against Mr.

24  Seery, had to come to the Bankruptcy Court.  Standard-fare

25  gatekeeping order.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 326 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 326 of 852 PageID 2231

290

1    So what I'm going to be looking at is, do these documents

2    I admitted into evidence change my view on that, and then the

3    harder question is who of the alleged contemnors am I going to

4    think it's clear and convincing committed contempt and -- who

5    are the contemnors, and then, of course, what are the damages?

6    Coercive or compensatory damages?

7    So, again, you know how I feel, to the extent that's

8    helpful in your planning purposes.  I'm pretty convinced

9    contempt of court has occurred.  It's just a matter of who's a

10   contemnor and what are the damages.

11   I'll say a couple of remaining things.  I continue to be

12   frustrated, I think was the word people used, about

13   unproductive ways we all spend our time.  I am going to spend

14   I don't know how many more hours drafting another ruling on a

15   contempt motion, and attorneys' fees are through the roof.

16   And, you know, I dangled out there a question I couldn't

17   resist about MGM.

18   And I will tell you, I mean, someone mentioned about their

19   stomach aching.  Personal story, I could hardly sleep the

20   night it became public about the Amazon purchase, because,

21   silly me, maybe, I'm thinking game-changer.  This is such

22   potentially a windfall, an economic windfall.  Maybe this

23   could be the impetus to make everyone get in a room and say

24   look, we've got this wonderful windfall of money.  I don't

25   know how much is owned directly or indirectly by the Debtor of

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 327 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 327 of 852   PageID 2232

291

1    MGM stock.  I don't know how much the Debtor  manages.  I

2    don't know how much, you know, some other entity.  I know it's

3    probably spread out in many different entities.  But I know, I

4    know because I listen, that one or more of the Highland-

5    managed CLOs has some of this, and I think I read -- remember

6    that HCLOF, which now Highland owns more than 50 percent of,

7    has some of this stock.  Right?

8              MR. DONDERO:  Do you want to know what happened?

9              THE COURT:  Oh.

10             A VOICE:  No.

11             THE COURT:  Well, okay.  So, you know, I can

12    understand I'm getting into maybe uncomfortable territory in a

13    public proceeding, so I'll stop.

14        But, you know, do we need to set up a status conference?

15    Do you all need to like talk about this?  Am I just being

16    naïve?  Couldn't this be a game-changer, where maybe it would

17    give new incentive to --

18             MR. POMERANTZ:  Your Honor, I would -- he's been

19    pretty quiet through the whole hearing, Mr. Clemente.  He has

20    the Committee, that a couple of people you've heard have sold

21    claims.  They're now held by other parties.

22        You know, the door is always open.  I don't think this is

23    going to be game-changer, unfortunately.  We would like

24    nothing more, as Debtor's counsel.  We don't enjoy coming to

25    Your Honor for contempt hearings.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 328 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 328 of 852   PageID 2233

292

1      Mr. Clemente said that it was productive.  We would sure

2  participate.  But right now, we have creditors who are very

3  angry that millions and millions of dollars have been spent on

4  really a waste of time and a waste of the Court's time and a

5  waste of everyone's time and eating into the creditors' money.

6  So I would ask Mr. Clemente to address that.

7           MR. CLEMENTE:  I'm here.

8           THE COURT:  Yes, he's way in the back, hoping to be

9  ignored.

10          MR. CLEMENTE:  It's too cold, Your Honor, where I was

11  sitting.  For the record, Your Honor, --

12          THE COURT:  I noticed some entity called Muck

13  Holdings bought HarbourVest, according to the docket.

14          MR. CLEMENTE:  That's correct.  Muck Holdings bought

15  HarbourVest, and I believe also the Acis claim, and then

16  there's a different entity that bought the Redeemer claim.

17          THE COURT:  Uh-huh.

18          MR. CLEMENTE:  So, as we mentioned in our -- one of

19  our pleadings, I think it was the retention pleading for

20  Teneo, the Committee consists of two members currently, Meta-e

21  and UBS.

22          THE COURT:  Uh-huh.

23          MR. CLEMENTE:  Obviously, Your Honor just approved

24  the UBS settlement recently.  The U.S. Trustee is aware of the

25  make-up of the Committee, and is currently comfortable with

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 329 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 329 of 852    PageID 2234

293

1    the Committee maintaining a two-person membership at this

2    point.

3         In terms of whether the MGM transaction is a game-changer,

4    we've not yet seen, to Your Honor's point, how all of that

5    rolls up through the various interests that the Debtor may or

6    -- you know, may have --

7              THE COURT:  Okay.

8              MR. CLEMENTE:  -- that would be implicated by the MGM

9    transaction.  If ultimately the MGM transaction has to

10   actually occur, right?  I mean, so, you know, just based on

11   what I read in the public documents, we're not sure when that

12   transaction may actually happen.  But obviously it's a good

13   thing for the Debtor's estate because it's going to recognize

14   value for the estate.

15        In terms of whether it ultimately changes how Mr. Dondero,

16   you know, wishes to proceed, that's entirely up to him, Your

17   Honor.  But we don't see it as something at this point that

18   would suggest that there's an overall back to let's talk about

19   a pot plan because of where the MGM transaction might

20   ultimately come out.

21        So I don't know if that's helpful to Your Honor, but those

22   are -- that's my perspective.

23              THE COURT:  Well, and I'm not trying to, you know,

24   push a pot plan on anyone.

25              MR. CLEMENTE:  No, I understand.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 330 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 330 of 852 PageID 2235

294

1        THE COURT:  I'm just saying it looked like an

2    economic windfall.  I just -- I don't know how much is

3    Highland versus other entities in the so-called byzantine

4    complex, but, gosh, I just hoped that there might be something

5    there to change the dynamic of, you know, lawsuit, lawsuit,

6    lawsuit, lawsuit, motion for contempt, motion for contempt.

7        MR. CLEMENTE:  Agreed, Your Honor.

8        THE COURT:  Uh-huh.

9        MR. CLEMENTE:  And like I said, it was a very

10   positive development obviously for the creditors for the

11   Debtor.  But whether it's the game-changer that Your Honor

12   would envision, I'm not sure that I can suggest at this point

13   that it is.

14       I think that, you know, obviously, we don't like to see

15   these lawsuits continue to be filed.  That's the whole point

16   of the gatekeeper order, Your Honor.

17       THE COURT:  Uh-huh.

18       MR. CLEMENTE:  I didn't say anything during the

19   hearing, but obviously the January 9th order, as Your Honor

20   has said many times, was in the context of a trustee being

21   appointed.

22       THE COURT:  Right.  Right.

23       MR. CLEMENTE:  Right?  So, and the July 16th order,

24   very similar vein, it's an outshoot of that.  In fact, it was

25   contemplated in the January 9th settlement that a CEO could be

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 331 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 331 of 852   PageID 2236

295

1    appointed.

2        So I think, again, it's just -- it's important, the

3    context in which that January 9th order came into play, for

4    this very reason, so we could avoid this type of litigation,

5    Your Honor.

6              THE COURT:  Uh-huh.

7              MR. CLEMENTE:  And so again, I didn't -- I obviously

8    didn't rise to mention that during the hearing, but Your Honor

9    is already aware of that.  I didn't need to remind Your Honor

10   of that.

11             THE COURT:  Uh-huh.  Okay.

12             MR. CLEMENTE:  Anything else for me, Your Honor?

13             THE COURT:  No.  Thank you.

14             MR. CLEMENTE:  Okay, then, Your Honor.

15             THE COURT:  Sorry I picked on you.  But, all right.

16   Well, again, I hope the message has landed in the way I hope

17   will matter, and that is I'm going to look at your documents

18   but I feel very strongly that, unless there's something in

19   there that, whoa, is somehow eye-opening, I'm going to find

20   contempt of court.  It's just a matter of who and what the

21   damages are.  There's just not a thing in the world ambiguous

22   about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23   it as soon as we humanly can get to it.

24        Mr. Morris, anything else?

25             MR. MORRIS:  Nothing.  No, thank you.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 332 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 332 of 852   PageID 2237

296

1              THE COURT:  I guess I'll see you Thursday on the

2    WebEx.  Thank you.

3              THE CLERK:  All rise.

4         (Proceedings concluded at 6:00 p.m.)

5                          --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                              **06/09/2021**

24   _____          _____
     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

297

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                                  21
- Mr. Sbaiti                                                  31
- Mr. Bridges                                                52
- Mr. Anderson                                               80
- Mr. Phillips                                               83
- By Mr. Taylor                                              87
- By Mr. Pomerantz                                           88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                           95
- Cross-Examination by Mr. Anderson                         132
- Cross-Examination by Mr. Sbaiti                           135
- Redirect Examination by Mr. Morris                        137
- Examination by the Court                                  138
- Recross-Examination by Mr. Sbaiti                         142
- Recross-Examination by Mr. Phillips                       143
- Further Redirect Examination by Mr. Morris                144

James D. Dondero
- Direct Examination by Mr. Morris                          147
- *Voir Dire* Examination by Mr. Sbaiti                     184
- Direct Examination (Resumed) by Mr. Morris               199
- Cross-Examination by Mr. Taylor                           210

EXHIBITS

Debtor's Exhibits 1 through 11              Withdrawn 215
Debtor's Exhibits 12 through 53             Received 216
Debtor's Exhibits 15 and 16                Received 214
Debtor's Exhibits 23 and 24                Received 213
Debtor's Exhibits 54 and 55                Received 217

Mark Patrick's Exhibits 1, 3 through 12,   Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46          Received 219

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

000330

298

1
                                    INDEX
                                   Page 2
2

3   CLOSING ARGUMENTS

4   - Mr. Morris                                              221
    - Mr. Sbaiti                                              230
5   - Mr. Bridges                                             255
    - Mr. Anderson                                            263
6   - Mr. Phillips                                            267
    - Mr. Taylor                                              276
7   - Mr. Morris                                              279

8   RULINGS

9   Motion for Entry of an Order Further Extending the Period    19
    Within Which It May Remove Actions Pursuant to 28 U.S.C.
10  § 1452 and Rule 9027 of the Federal Rules of Bankruptcy
    Procedure filed by Debtor (2304)
11

12  Show Cause Hearing (2255) - *Taken Under Advisement*         285

13  Motion to Modify Order Authorizing Retention of James        285
    Seery filed by Plaintiffs CLO Holdco, Ltd., The
14  Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement*

15  END OF PROCEEDINGS                                           296

16  INDEX                                                    297-298

17

18

19

20

21

22

23

24

25

# EXHIBIT 3

000332

Case 21-03067-sgj11 Doc 43-12 Filed 09/29/21 Entered 09/29/21 18:16:19 Page 336 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 336 of 852 PageID 2241
Docket #2412 Date Filed: 6/5/2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

## DEBTOR'S WITNESS AND EXHIBIT LIST WITH RESPECT
## TO EVIDENTIARY HEARING TO BE HELD ON JUNE 8, 2021

Highland Capital Management, L.P. (the "<u>Debtor</u>") submits the following witness and

exhibit list with respect to the *Motion for Modification of Order Authorizing Retention of James*

*P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* [Docket No. 2248], which the Court has

---

1 The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



set for hearing at 9:30 a.m. (Central Time) on June 8, 2021 (the "<u>Hearing</u>") in the above-styled

bankruptcy case (the "<u>Bankruptcy Case</u>").

    **A.**    <u>**Witnesses:**</u>

        1.    James P. Seery, Jr.;

        2.    Grant Scott (by deposition designation);

        3.    Any witness identified by or called by any other party; and

        4.    Any witness necessary for rebuttal.

    **B.**    <u>**Exhibits:**</u>

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 1. | Transcript of January 9, 2020 Hearing | | |
| 2. | Transcript of July 14, 2020 Hearing | | |
| 3. | Transcript of February 2, 2021 Hearing | | |
| 4. | Transcript of February 14, 2021 Hearing | | |
| 5. | Debtor's Motion for an Order to Enforce the Order of Reference [Docket 2351-4] | | |
| 6. | DAF/CLO Holdco Structure Chart (GScott000007) [Dondero June 1, 2021 Deposition Exhibit 1] | | |
| 7. | CLO Holdco, Ltd.'s Notice of Appearance and Request for Copies [Docket No. 152] | | |
| 8. | Certificate of Service [Docket No. 296] | | |
| 9. | Order Approving Settlement With Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures For Operations in the Ordinary Course [Docket No. 339] | | |
| 10. | Certificate of Service [Docket No. 345] | | |

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 11. | Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 774] | | |
| 12. | Certificate of Service [Docket No. 779] | | |
| 13. | Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 854] | | |
| 14. | Redline of Fifth Amended Plan of Highland Capital Management, L.P. (AS MODIFIED) [Docket No. 1809] | | |
| 15. | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief [Docket No. 1943] | | |
| 16. | Transcript Designations from the January 21, 2021 Deposition of Grant Scott | | |
| 17. | Transcript Designations from the June 1, 2021 Deposition of Grant Scott | | |
| 18. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (PATRICK_000923) | | |
| 19. | Amended and Restated Service Agreement by and among HCMLP, Charitable DAF Fund, L.P., and Charitable DAF GP, LLC , effective July 1, 2014 (PATRICK_000938) | | |
| 20. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| 21. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 22. | All exhibits identified by or offered by any other party at the Hearing | | |

Dated: June 5, 2021.                     **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

000338

# EXHIBIT 16

000339

Page 1

1          GRANT SCOTT - 1/21/2021

2        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
3                  DALLAS DIVISION

4    IN RE:                          )
                                     )     Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT,    )
     L.P.                            )      Case No.
6                                    )   19-34054-sgj11
                    Debtor.          )
7    --------------------------      )
     HIGHLAND CAPITAL MANAGEMENT,    )
8    L.P.,                           )
                     Plaintiff,      )
9                                    )      Adversary
        vs.                          )    Proceeding No.
10                                   )     21-03000-sgj
     HIGHLAND CAPITAL MANAGEMENT     )
11   FUND ADVISORS, L.P.; NEXPOINT   )
     ADVISORS, L.P.; HIGHLAND        )
12   INCOME FUND; NEXPOINT           )
     STRATEGIC OPPORTUNITIES FUND;   )
13   NEXPOINT CAPITAL, INC.; and     )
     CLO HoldCo, LTD.,               )
14                                   )
                    Defendants.      )
15   ----------------------------

16

17    VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18        Thursday, 21st of January, 2021

19

20

21

22

23   Reported by: Lisa A. Wheeler, RPR, CRR

24   Job No: 188910

25

Page 10

```
 1              GRANT SCOTT - 1/21/2021
 2   choice.
 3        Q.    Okay.  And do you recall who served
 4   the subpoena on you?  Actually, let me ask a
 5   different question because I'm really not
 6   interested in the -- in the details.
 7              Did Mr. Dondero serve that subpoena
 8   on you or did somebody else?
 9        A.    His counsel for his ex-wife.
10        Q.    Mr. -- so -- so the lawyer acting on
11   behalf of Mr. Dondero's ex-wife served you with
12   the subpoena?
13        A.    Correct.
14        Q.    Okay.  You're familiar with an
15   entity called CLO HoldCo Limited; is that
16   right?
17        A.    Yes.
18        Q.    Do you know what that entity is?
19        A.    Yes.
20        Q.    What -- what -- can you describe for
21   me what CLO HoldCo Limited is.
22        A.    It's a holding company of assets
23   including collateralized loan obligation-type
24   assets.  That's a portion of the overall
25   portfolio.  It's an organization that is
```

Page 11

```
 1              GRANT SCOTT - 1/21/2021
 2   integrated with other entities as part of a
 3   charitable -- loosely what we -- what we refer
 4   to as a charitable foundation equivalent.
 5   Yeah.
 6        Q.    All right.  We'll -- we'll get into
 7   some detail about the corporate structure in a
 8   moment.  Do you personally play any role at CLO
 9   HoldCo Limited?
10        A.    Yes.  My technical title is
11   director, but I -- I don't necessarily know
12   specifically what that title means other than I
13   act, as I understand it, as -- as a trustee for
14   those -- for those assets.
15        Q.    And where did you get that
16   understanding?
17        A.    Approximately ten years ago from the
18   group that -- that set up the hierarchy.
19        Q.    And which group set up the
20   hierarchy?
21        A.    Employees at Jim Don- -- as I
22   understand it, employees of Highland along with
23   outside counsel, as I understand it, and also,
24   I guess, input from -- from Jim Dondero.
25        Q.    At the time that you assumed the
```

Page 12

```
 1              GRANT SCOTT - 1/21/2021
 2   role of director of CLO HoldCo Limited, was
 3   that entity already in existence?
 4        A.    I believe so.  I'm not certain.  I'm
 5   not certain.
 6        Q.    What are your duties and
 7   responsibilities as a director of CLO HoldCo
 8   Limited?
 9        A.    Well, my day-to-day responsibilities
10   are to interface with -- with the manager of
11   the -- of the assets of CLO.  I do have some
12   role in -- with respect to some of the entities
13   that are -- I -- I have a limited role with
14   respect to a subset of the charitable
15   foundations that receive money from the CLO
16   HoldCo structure, which is commonly referred to
17   as the DAF.  There's -- sometimes those are
18   used interchangeably.
19        Q.    What terms are used interchangeably?
20        A.    Well, the DAF and CLO HoldCo are
21   frequently -- by -- by other people they're --
22   it's the short -- it's the -- I guess it's
23   easier to use the acronym DAF than CLO HoldCo
24   Limited, so I'm frequently having to -- there
25   is a DAF entity so -- that's above -- above CLO
```

Page 13

```
 1              GRANT SCOTT - 1/21/2021
 2   in terms of the management, and so it's
 3   frequently confusing and I'm having to clarify
 4   at times which entity we're talking about,
 5   but -- but other parties frequently use those
 6   terms interchangeably.
 7        Q.    Okay.
 8              MR. MORRIS:  Lisa, when we use the
 9        phrase DAF, because you'll hear that a lot,
10        it's all caps, D-A-F.
11   BY MR. MORRIS:
12        Q.    You mentioned that you interface
13   with the manager of assets of CLOs.  Do I have
14   that right?
15        A.    Well, of all the assets.
16        Q.    Okay.  Who is the manager of the
17   assets that you're referring to?
18        A.    Highland Capital Management.
19        Q.    Highland Capital Management manages
20   all of the assets -- withdrawn.
21              Is it your understanding that
22   Highland Capital Management manages all the
23   assets that are owned by CLO HoldCo Limited?
24        A.    Yes.
25        Q.    Who makes the investment decisions
```

Page 14

GRANT SCOTT - 1/21/2021

```
 1
 2      on behalf of CLO HoldCo Limited?
 3           A.   Highland -- those managers that you
 4      mentioned.
 5           Q.   Okay.  I didn't mention anybody in
 6      particular.
 7           A.   Oh, I'm sorry.  The -- the -- the
 8      money manager -- could you repeat that
 9      question?  I'm sorry.  I'm so sorry.
10           Q.   Can you just -- can you just
11      identify for me the person who makes investment
12      decisions on behalf of CLO HoldCo Limited.
13           A.   It's -- well, it's -- it's persons
14      as I understand it.  I inter- -- interface with
15      a -- with a group, but it's -- it's Highland
16      Capital employee -- Highland Capital Management
17      employees.
18           Q.   Okay.  Can you just name any of
19      them, please.
20           A.   Hunter Covitz, Jim Dondero.  Mark
21      Okada's no longer there, but I believe he was
22      involved, and there are others that I interface
23      with.
24           Q.   Can you -- can you recall the name
25      of anybody other than Mr. Okada and Mr. Dondero
```

Page 15

GRANT SCOTT - 1/21/2021

```
 2      and Mr. Covitz?
 3           A.   Yeah.  Over the years I've worked
 4      with Tim Cournoyer, Thomas Surgent, but I
 5      think -- I think that's the core -- the core
 6      group.
 7           Q.   All right.  And is there anybody
 8      within that core group who has the final
 9      decision-making authority concerning the
10      investments in CLO HoldCo Limited?
11           A.   I don't -- I don't know.  I'm sorry.
12      Say that again.  I just want to -- I'm sorry.
13      I'm trying to be -- I'm not trying to -- I'm
14      trying to be --
15           Q.   I understand.  And --
16           A.   Sorry.  If you could just repeat it.
17           Q.   Sure.  Is there any particular
18      person who has the final decision-making
19      authority for investments that are being made
20      on behalf of CLO HoldCo Limited?
21           A.   Amongst that group I am -- I am not
22      sure.
23           Q.   Okay.  So are there any other
24      directors of CLO HoldCo besides yourself?
25           A.   No.
```

Page 16

GRANT SCOTT - 1/21/2021

```
 1
 2           Q.   Is it fair to say that you do not
 3      make decisions, investment decisions, on behalf
 4      of CLO HoldCo Limited?
 5           A.   Yes.
 6           Q.   Does CLO HoldCo Limited have any
 7      employees that you know of?
 8           A.   No.
 9           Q.   Does CLO HoldCo have any --
10      withdrawn.
11           Q.   Does CLO HoldCo Limited have any
12      officers that you know of?
13           A.   No.
14           Q.   So am I correct that you're the only
15      representative in the world of CLO HoldCo in
16      terms of being a director, officer, or
17      employee?
18           A.   Yes.
19           Q.   Do you receive any compensation from
20      CLO HoldCo for your services as the director?
21           A.   I do now.
22           Q.   When did that begin?
23           A.   I believe in the middle of 2012.
24           Q.   Okay.  And had you served as a
25      director prior to that time without
```

Page 17

GRANT SCOTT - 1/21/2021

```
 1
 2      compensation?
 3           A.   Yes.
 4           Q.   And have you been the sole director
 5      of CLO HoldCo Limited since the time of your
 6      appointment approximately ten years ago?
 7           A.   Yes.
 8           Q.   Nobody else has served in that
 9      capacity; is that right?
10           A.   That is correct.
11           Q.   There have been no employees or
12      officers of that entity during the time that
13      you've served as director, correct?
14           A.   Yes.
15           Q.   Do you know who formed CLO HoldCo
16      Limited?
17           A.   I do not.
18           Q.   Do you know why CLO HoldCo Limited
19      was formed?
20           A.   I believe so.
21           Q.   Can you explain to me why -- your
22      understanding as to why CLO HoldCo was formed.
23           A.   So as I understand things, Jim
24      Dondero wanted to create a charitable
25      foundation-like entity or entities, and tax
```

Page 22

GRANT SCOTT - 1/21/2021

1   GRANT SCOTT - 1/21/2021
2   going well.
3       Q.    And -- and I think you -- you
4   testified just now that there was kind of a
5   difference between prebankruptcy and
6   postbankruptcy.  Do I have that right?
7       A.    Yes.
8       Q.    And can you tell me -- is it fair to
9   say that before the bankruptcy, you didn't
10  devote much time to CLO HoldCo, or do I have
11  that wrong?
12      A.    Well, I -- just the time that --
13  that I mentioned just -- I'm sorry.  The -- the
14  time I just mentioned now when you asked me,
15  that was the pre period.  Excuse me.  I haven't
16  talked about the postbankruptcy period.
17      Q.    So are you -- are you -- are you
18  devoting more time or less time since the
19  bankruptcy?
20      A.    Much more.
21      Q.    Much more since the bankruptcy
22  filing?
23      A.    Yes.
24      Q.    And so why did the bankruptcy filing
25  cause you to spend more time as a director of

Page 23

1   GRANT SCOTT - 1/21/2021
2   CLO HoldCo Limited?
3       A.    Well, initially, and this would
4   be -- this would be late 2019, it was --
5   aft- -- after the bankruptcy was -- was filed
6   and I obtained counsel, who are on the phone
7   now -- or in this deposition now, excuse me,
8   that was -- that transition occurred because
9   CLO was a debtor -- excuse me, a creditor to --
10  to the debtor and had to take steps to
11  establish its -- its claim.  So if I understand
12  the -- things correctly, the -- the debtor
13  identified as part of the filing -- I don't
14  know how bankruptcy works, but if I under- --
15  if my recollection is correct, there's a
16  hierarchy from biggest to smallest, and we were
17  relatively high up.  And when I say we or I,
18  I -- I just mean CLO was relatively high up.
19  And so initially, for the first period of so
20  many months, the -- the exclusive focus was on
21  our position as a creditor -- a creditor having
22  a certain claim against a debtor.
23      Q.    Can you describe for me your
24  understanding of the nature of the claim
25  against the debtor.

Page 24

1   GRANT SCOTT - 1/21/2021
2       A.    It was various obligations that were
3   owed to -- to CLO, things that had been
4   previously donated or -- or agreements that had
5   been set up that transferred certain assets,
6   and it was basically the -- the -- the amounts
7   were derived from those sorts of transactions.
8       Q.    Okay.  You're a patent lawyer; is
9   that right?
10      A.    I -- I'm exclusively a patent
11  attorney, yes.
12      Q.    Have you been a patent lawyer on an
13  exclusive basis since the time you graduated
14  from law school?
15      A.    From law school, yes.
16      Q.    Can you just describe for me
17  generally your educational background.
18      A.    So I'm an electrical engineer by
19  training.  I graduated from the University of
20  Virginia in 1984.  I then went to graduate
21  school at the University of Illinois.  I
22  received my master's degree in 1986, and then I
23  immediately joined IBM Research at the Thomas
24  Watson Institute in New York where I was a --
25  my title was research scientist, but I was -- I

Page 25

1   GRANT SCOTT - 1/21/2021
2   guess I was more of a research engineer, if
3   that matters.  And I did that until I
4   transitioned -- or I began law school in the
5   fall of 1988, and then I graduated law school
6   in May of 1991.
7       Q.    And where did you go to law school?
8       A.    University of North Carolina.
9       Q.    Do you have any formal training in
10  investing or finance?
11      A.    I do not.
12      Q.    Do you hold yourself out as an
13  expert in any field of investment?
14      A.    None -- none at all.
15      Q.    Have you had any formal training
16  with respect to compliance issues?  You
17  mentioned compliance issues earlier.
18      A.    No.
19      Q.    Now, do you have any knowledge about
20  compliance rules or regulations?
21      A.    Minimal that I've -- that have
22  occurred organically but -- but generally, no.
23      Q.    You don't hold yourself out as an
24  expert in com- -- in the area of compliance,
25  correct?

Page 26

GRANT SCOTT - 1/21/2021

2    A.    No.  No.  I'm -- no.

3    Q.    Do you have any particular

4  investment philosophy or strategy?

5         MR. CLARK:  I'm going to object to

6  the form of the question.  And, John,

7  can -- can we get an agreement that -- I

8  know you were objecting just simply on the

9  form basis yesterday -- that objection to

10  form is sufficient today?

11         MR. MORRIS:  Sure.

12         MR. CLARK:  Okay.  And I object to

13  form.  Grant, you can answer to the extent

14  you can.

15         THE WITNESS:  I forget the question

16  now that you interrupted.  I'm sorry.

17  BY MR. MORRIS:

18    Q.    So -- so -- and I'm going to ask a

19  different question because in hindsight, that's

20  a good objection.

21         In your capacity as the director

22  of -- withdrawn.

23         Do the employees of Highland that

24  you identified earlier, do they make investment

25  decisions on behalf of CLO HoldCo Limited

Page 27

GRANT SCOTT - 1/21/2021

2  without your prior knowledge on occasion?

3    A.    On occasion, they do.

4    Q.    So there's no rule that your prior

5  approval is needed before investments are made,

6  right?

7    A.    I don't know whether they have an

8  internal guideline as to the amount that

9  triggers when they get in touch with me or

10  whether it's a new -- a change, something new,

11  or -- versus recurring.  So I don't -- I don't

12  know what they use internally for that metric.

13    Q.    Okay.  Are you aware of any

14  guideline that was ever used by the Highland

15  employees whereby they were required to obtain

16  your consent prior to effectuating transactions

17  on behalf of CLO HoldCo Limited?

18    A.    I understand there was one or more,

19  but I do not know that.

20    Q.    Okay.  Did you ever see such a

21  policy or list of rules that would require your

22  prior consent before the Highland employees

23  effectuated transactions on behalf of CLO

24  HoldCo Limited?

25    A.    Possibly some time ago, but I -- I

Page 28

GRANT SCOTT - 1/21/2021

2  don't recall.

3    Q.    Okay.  So -- withdrawn.  I'll --

4  I'll go on.

5         How did you come to be the director

6  of CLO HoldCo?

7    A.    I was asked either by Jim Dondero

8  or -- directly or indirectly by -- by Jim

9  Dondero.

10    Q.    And who is Jim Dondero?

11    A.    Well, at the time, he was the head

12  or one of the heads of Highland Capital

13  Management, a friend of mine.

14    Q.    How long have you known Mr. Dondero?

15    A.    Since high school so that -- 1976.

16    Q.    Where did you and Mr. Dondero grow

17  up?

18    A.    In northern New Jersey.

19    Q.    Do you consider him among the

20  closest friends you have?

21    A.    I think he is my closest friend.

22    Q.    Did you two go to college together?

23    A.    We actually -- for the last -- last

24  two years I was at UVA, University of Virginia,

25  excuse me, he and I were -- were at UVA.  So we

Page 29

GRANT SCOTT - 1/21/2021

2  did not start out at UVA initially, but -- but

3  we both transferred -- I transferred my

4  sophomore year.  I was actually a chemical

5  engineer at the University of Delaware when I

6  transferred in, and then he transferred in his

7  junior year.  So we were there at college for

8  two years.

9    Q.    And -- and based on your

10  relationship with him, is it your understanding

11  that one of the reasons he chose to transfer to

12  UVA is -- is to -- because you were there?

13    A.    Oh, no.  He transferred -- he --

14  he -- he transferred there because of the -- so

15  he went to the University of -- he -- he went

16  to Virginia Tech University, which is more

17  known as being an engineering school, which I

18  might have wanted to go to, and less a finance

19  business school.  And if I understand things

20  correctly, and I believe I do, he transferred

21  to UVA because of the well-known

22  business/finance program, accounting program.

23    Q.    And did you -- did you and

24  Mr. Dondero become roommates at UVA?

25    A.    We weren't roommates, but we lived

---

Page 30

```
          GRANT SCOTT - 1/21/2021
1
2    in the -- we were housemates.  I'm sorry.  We
3    were housemates.
4        Q.   So you shared a house together.  How
5    would you describe your relationship with
6    Mr. Dondero today?
7        A.   It's -- it's been strained a while,
8    for some time, but -- but generally, very good.
9    Good to very good.
10       Q.   Without -- without getting personal
11   here, can you just generally identify the
12   source of the strain that you described.
13       A.   This -- I think it would be fair to
14   say that this bankruptcy, particularly events
15   in 2020 so some months after the bankruptcy was
16   declared, things have become -- we -- we still
17   have a close friendship, but -- but things
18   are -- are a bit -- are a bit more difficult.
19       Q.   Were you ever married?
20       A.   I've never been married.
21       Q.   Did you serve as Mr. Dondero's best
22   man at his wedding?
23       A.   I did.
24       Q.   Is it fair to say that -- that
25   Mr. Dondero trusts you?
```

Page 31

```
1              GRANT SCOTT - 1/21/2021
2        MR. CLARK:  Objection, form.
3    BY MR. MORRIS:
4        Q.   Withdrawn.
5             Do you believe that Mr. Dondero
6    trusts you?
7        A.   I do.
8        Q.   Over the years, is it fair to say
9    that Mr. Dondero has confided in you?
10       MR. CLARK:  Objection, form.
11   BY MR. MORRIS:
12       Q.   You can answer if you understand it.
13       A.   I think so.
14       Q.   I -- I what's your answer?  You
15   think so?
16       A.   Maybe you can de- -- I think of
17   confide as -- could you define confide, please.
18       Q.   Sure.  Is it -- is it fair to say
19   that over the -- let me -- you've known
20   Mr. Dondero for almost 45 years, right?
21       A.   Yes.
22       Q.   And you consider him to be your
23   closest friend in the world, right?
24       A.   Yes.
25       Q.   And is it fair to say over the
```

Page 32

```
1              GRANT SCOTT - 1/21/2021
2    course of those 45 years, Mr. Dondero has
3    shared confidential information with you that
4    he didn't want you to reveal publicly to other
5    people?
6        A.   Yes.
7        Q.   And is it your understanding that
8    because of the nature of your relationship with
9    him, he asked you to serve as the director of
10   CLO HoldCo Limited?
11       A.   Yes.  I believe it's because he --
12   he trusted -- trusted me with -- with assets
13   relating to his charitable vision.  I -- I --
14   yeah.  Yes.
15       Q.   And is it your understanding that he
16   thought you would help him execute his
17   charitable vision?
18       A.   That was the point of attraction
19   initially.  I -- I wasn't for money.  I wasn't
20   being paid.  That was -- the charitable mission
21   was the attraction.
22       Q.   Does Mr. Dondero play any role in
23   the management of the CLO HoldCo Limited asset
24   pool?
25       MR. CLARK:  Objection, form.
```

Page 33

```
1              GRANT SCOTT - 1/21/2021
2        A.   I'm sorry.  Could you repeat that?
3    My -- my screen went small and then big again.
4    I was distracted.
5        Q.   What role does Mr. Dondero play with
6    respect to the management of the CLO HoldCo
7    Limited asset pool?
8        MR. CLARK:  Objection, form.
9        A.   He is with the company that manages
10   that asset pool.  He's one of the people I
11   named previously as managing that asset.
12       Q.   He is -- he -- he is the -- do you
13   understand that he has the final
14   decision-making power with respect to the
15   management of the assets that are held by CLO
16   HoldCo Limited?
17       MR. CLARK:  Objection, form.
18       A.   I believe I ansel -- answered that
19   previously.  I -- I don't know who has -- for
20   certainty I do not know who has that within
21   that company.  I don't.  If -- if -- I -- I
22   don't know, consistent with my prior answer.
23       Q.   Did you ever ask anybody who had the
24   final decision-making authority for investments
25   on behalf of CLO HoldCo Limited?
```

Page 34

GRANT SCOTT - 1/21/2021

```
2      A.   I -- I did not.
3      Q.   Did you ever make a decision on
4  behalf of -- withdrawn.
5           In your capacity as a director --
6  withdrawn.
7           In your capacity as the sole
8  director of CLO HoldCo Limited, can you think
9  of any decision that you've ever made that
10  Mr. Dondero disagreed with?
11      A.   Since -- prior to the bankruptcy,
12  no, not that I'm aware of.
13      Q.   And since the bankruptcy?
14      A.   There are decisions that I've made
15  that he's disagreed with.
16      Q.   Can you identify them?
17      A.   Yes.
18      Q.   Please do so.
19      A.   Okay.  So the reason I'm pausing is
20  I'm trying to put these in chronological order
21  and, at the same time, identify maybe some of
22  the more important ones versus the lesser
23  important ones.  One of the decisions I made
24  related to a request that I received from the
25  independent board of Highland.  I don't know
```

Page 35

GRANT SCOTT - 1/21/2021

```
2  how the request was transmitted to me, but I
3  believe the way it played out is as follows:  I
4  believe I was asked to call Jim Seery, and the
5  other -- and Russell Nelms, and the third
6  independent director, I believe his name is
7  John.  I -- I forget right now what his last
8  name is.  They were in New York, said they were
9  in a conference room.  I called in.  They were
10  very pleasant.  They identified who they were,
11  and they had a request, and the request was
12  that I agree to a transfer -- or that I -- that
13  I agree to allow certain assets that were not
14  Highland's assets but they were CLO's as-- --
15  assets -- apparently, there was no dispute
16  about that at any point in time, but that I
17  agree to allow certain assets that were due CLO
18  to be transferred to the registry of the
19  bankruptcy court.  And either on that call I
20  immediately agreed or ended the call, called my
21  attorney, and then immediately agreed.  It was
22  a very -- I accommodated the request quickly.
23      Q.   Okay.  And can you just tell me at
24  what point in time you spoke with Mr. Dondero,
25  and what did he say that you recall?
```

Page 36

GRANT SCOTT - 1/21/2021

```
2      A.   I don't know when he became aware of
3  that decision.  I'm not sure I ever volunteered
4  that the decision was even made, but at some
5  point, it became an issue because he found out
6  through -- if I understand the sequence of
7  events correctly, he found out possibly through
8  his counsel because there was ultimately
9  litigation about that issue.  It became known
10  to everyone at some point what I had done, I --
11  I think.  And subsequent to that, it became an
12  issue because of CLO HoldCo having fairly
13  significant cash flow issues with respect to
14  its expenses and obligations, including payment
15  of management fees as well as some of the
16  scheduled charitable giving that was -- that
17  was by contract already predefined.  My
18  decision to tuck that money -- or to agree
19  to -- my agreement to let that money be tucked
20  away created some -- created some -- created
21  some problems --
22      Q.   And -- and --
23      A.   -- for CLO HoldCo.
24      Q.   Okay.  And I just want you to focus
25  specifically on my question, and that is, what
```

Page 37

GRANT SCOTT - 1/21/2021

```
2  did Mr. Dondero say to you that -- that causes
3  you to testify as you did, that this is one
4  issue that he didn't agree with?
5      A.   I believe his concern was that
6  because it was money that was undisputably to
7  flow to CLO HoldCo that -- which had many, many
8  other nonliquid assets -- this was a form of a
9  liquid asset.  It was cash in effect, proceeds.
10  -- that the money should have been allowed to
11  flow to be available for obligations.  He
12  didn't under-- -- I -- I -- I don't know what he
13  was thinking, but the -- the issue was that the
14  decision to put it into escrow was -- was --
15  was in-- -- incorrect, that there was no basis
16  for it.
17      Q.   That -- that's an issue where after
18  learning of your decision, he didn't agree with
19  it; is that fair?
20      A.   That's right.
21      Q.   Okay.  Can you think of any decision
22  that you've ever made on behalf of CLO HoldCo
23  Limited where Mr. Dondero had advance knowledge
24  of what you were going to do and he objected to
25  it, but you nevertheless overruled his
```

**Page 38**

```
1                 GRANT SCOTT - 1/21/2021
2    objection and went ahead and did what -- did
3    what you thought was right?
4         A.    Okay.  Let me -- let me -- I have --
5    I'm sorry.
6         Q.    We're here.
7         A.    Oh, I'm sorry.  I'm having some
8    issues with my screen.  So that may have
9    occurred with respect to the original proof of
10   claim.  Then there was a subsequent amendment
11   to the proof of claim, and I -- I believe it --
12   I believe that he might have been aware of both
13   of those and was in disagreement with -- with
14   those.  But after working with my attorney, I
15   just -- you know, we did what we thought was
16   right, and I still think what we did was right.
17   There was an issue with respect to Har--
18   HarbourVest that occurred relatively recently
19   where he objected to a decision that I had
20   made.  As I understand it, I could have
21   contacted my attorney and changed the decision,
22   but I didn't, and I still think that was the
23   right decision.
24               We have filed plan objections.  I
25   can't say if he has any -- in that regard, I --
```

**Page 39**

```
1                 GRANT SCOTT - 1/21/2021
2    I -- I don't know what his thoughts are on
3    objections.  They would not have been
4    communicated with -- by me to him, but my
5    attorney might have consulted with his
6    attorney, and there -- they may know what that
7    difference is, but I -- that was just another
8    big decision.  I -- I -- maybe that --
9         Q.    All right.  Let me see if I can --
10   let me see if I can summarize this.  So two
11   proofs of claim.  Is it fair to say that
12   Mr. Dondero saw those proofs of claim before
13   they were filed?
14               MR. CLARK:  Objection, form.
15   BY MR. MORRIS:
16        Q.    Withdrawn.
17        A.    It --
18        Q.    Do -- do you know whether
19   Mr. Dondero saw the proofs of claim before they
20   were filed?
21        A.    I don't believe he did.
22        Q.    What -- what steps in filing the
23   proofs of claim did he object to that you
24   overruled?  Did he think there was -- something
25   should be different about them?
```

**Page 40**

```
1                 GRANT SCOTT - 1/21/2021
2         A.    So we had to interface with Highland
3    employees at some point to get information to
4    support our proof of claim, and my guess, and
5    it's just a guess, is that he was aware of
6    those inquiries.  I -- I'm sorry.  I shouldn't
7    speculate.  I don't know.  But he -- with
8    respect to the original proof of claim, I'm --
9    I'm not aware of what specifically he was
10   objecting to or was -- thought should have been
11   different, but the -- with respect to the
12   amended proof of claim, which reduced the
13   original proof of claim to zero, I think that's
14   where he had a -- an issue.
15        Q.    And did you speak with him about
16   that topic prior to the time the amended claim
17   was filed, or did you only speak with him after
18   it was filed?
19        A.    I'm not sure the timing of that.
20        Q.    And with respect to HarbourVest, did
21   he ask you to object to the settlement on
22   behalf of CLO HoldCo Limited, and is that
23   something that you declined to do?
24               MR. CLARK:  Objection, form.
25        A.    I'm -- I'm sorry.  I was confused
```

**Page 41**

```
1                 GRANT SCOTT - 1/21/2021
2    with the word.  Could you please repeat that?
3         Q.    Yes.  You mentioned HarbourVest
4    before, right?
5         A.    Yes.
6         Q.    And you mentioned that there was an
7    issue with Mr. Dondero and you concerning
8    HarbourVest; is that right?
9         A.    Yes.
10        Q.    And did that have to do with whether
11   or not CLO HoldCo Limited would -- would object
12   to the debtor's motion to get the HarbourVest
13   settlement approved?
14        A.    Would -- would get the
15   HarbourVest --
16        Q.    Settlement approved by the court.
17        A.    I'm not trying to be difficult.
18   I'm -- I'm -- could you just repeat that one
19   more time?  I'm --
20        Q.    What was -- what was --
21        A.    There was --
22        Q.    Let me try again.
23        A.    Okay.
24        Q.    What was the issue with respect to
25   HarbourVest that he objected to and -- and you
```

Page 42

GRANT SCOTT - 1/21/2021

2  overrode his objection and did what you thought
3  was right anyway?
4      A.   Okay.  Okay.  That's -- that's
5  easier for me to understand.  I'm sorry.  So I
6  had worked with my attorney or he did the work
7  and consulted with -- we consulted, but we had
8  filed an objection, motion objecting to the
9  settlement, if I understand the terminology and
10 nomenclature correctly.  Okay.  He had -- we
11 had come to an agreement that we had a very
12 valid argument.  That argument was evidenced
13 by, I guess it was, our motion that was
14 submitted to the court.  On the day of the
15 hearing to resolve this issue, we pulled our
16 request, and that was because I believed it did
17 not have a good-faith basis in law to move
18 forward on.
19     Q.   And did you discuss that issue with
20 Mr. Dondero before informing the court that CLO
21 HoldCo Limited was withdrawing its objection,
22 or did he learn about that for the first time
23 during the hearing --
24         MR. CLARK:  Objection, form.
25 BY MR. MORRIS:

Page 43

GRANT SCOTT - 1/21/2021

2      Q.   -- if you know?
3      A.   I -- I understand that he learned it
4  during the hearing.  I don't know the -- I -- I
5  don't know the -- whether there was any -- I --
6  I don't know for certain on the second half of
7  your question.
8      Q.   Let me -- let me try it -- let me
9  try it this way:  Did you speak with
10 Mr. Dondero about your decision to withdraw the
11 objection to the HarbourVest settlement prior
12 to the time your counsel made the announcement
13 in court?
14     A.   I don't -- I don't believe so.  No.
15 No.  No.  I'm sorry.  No.
16     Q.   And did --
17     A.   Okay.  No.  Here -- here's where
18 I'm -- I can clarify, okay?  I'm sorry.  I can
19 clarify.
20     Q.   That's all right.
21     A.   I gave the decision to my
22 attorney -- I -- I agreed with the
23 recommendation of my attorney, okay?  It wasn't
24 my --
25     Q.   Did you have a good --

Page 44

GRANT SCOTT - 1/21/2021

2      A.   -- thought, okay?
3          THE REPORTER:  I didn't --
4      A.   Okay.  So he --
5      Q.   It was a recommendation.
6      A.   Yeah.  So he -- he called me with a
7  recommendation.  It was highly urgent.  You
8  know, I was coming out of the men's room, had
9  my phone with me.  I got the call.
10         MR. CLARK:  Hey, Grant, I -- Grant,
11 I just want to caution you not to -- to --
12 and I don't think counsel is looking for
13 this but not to disclose the -- the
14 substance of any of your communications
15 with counsel, okay?
16         THE WITNESS:  Thank you.
17     A.   So --
18         THE WITNESS:  Thank you.  I'm -- I'm
19 sorry.
20 BY MR. MORRIS:
21     Q.   It's -- it's really a very simple
22 question.  Do you recall --
23     A.   He made a recommendation.  I -- I --
24 I think I can answer your question without
25 going off tangent.  I'm sorry.  So he -- my

Page 45

GRANT SCOTT - 1/21/2021

2  attorney made a recommendation.  I agreed with
3  it.  We with -- I -- I told him to withdraw --
4  or I authorized him to withdraw.
5      Q.   Okay.
6      A.   Then I received a communication, and
7  I -- I guess the most likely scenario is the
8  motion had been withdrawn by the time Jim
9  Dondero found out.
10     Q.   And -- and did he write to you, or
11 did he call you?  Did he send you a text?
12     A.   He called me.
13     Q.   What did he say?
14     A.   He was asking why, and I explained,
15 and I said I agreed with the decision and I was
16 sticking with the decision.
17     Q.   Let's just -- let's just move on to
18 a new topic, and let's talk about the structure
19 of -- of CLO HoldCo.  Are you generally
20 familiar with the ownership structure of CLO
21 HoldCo?
22     A.   Yeah.  I mean, in terms --
23     Q.   Are -- are you -- are you generally
24 familiar with it?  It's not a test.  I'm just
25 asking do you have a general familiarity --

Page 46

GRANT SCOTT - 1/21/2021

2    A.    With CLO HoldCo or the entities
3 associated with CLO HoldCo?
4    Q.    The latter.
5    A.    Yes, I believe so.
6    Q.    All right.  I've prepared what's
7 called a demonstrative exhibit.  It's just --
8    A.    Yes.
9    Q.    -- just -- it's a document that, I
10 think, reflects facts, but I want to ask you
11 about it.
12        MR. MORRIS:  La Asia, can we please
13    put up Exhibit 1.
14        (SCOTT EXHIBIT 1, Organizational
15    Structure: CLO HoldCo, Ltd., was marked
16    for identification.)
17 BY MR. MORRIS:
18    Q.    Okay.  Can you see that, Mr. Scott?
19    A.    Yes, I can.
20    Q.    Okay.  So I think I took the
21 information from resolutions that were attached
22 to the CLO HoldCo proof of claim, and that's
23 why you got that little footnote there at the
24 bottom of the page.  But let's start in the
25 lower right-hand corner and see if this chart

Page 47

GRANT SCOTT - 1/21/2021

1 comports with your understanding of the facts.
3        Do you know that CLO HoldCo Limited
4 was formed in the Cayman Islands?
5    A.    Yes.
6    Q.    And to the best of your knowledge,
7 is CLO HoldCo Limited 100 percent owned by the
8 Charitable DAF Fund, L.P.?  If you're not sure,
9 just say you're not sure if you don't know.
10 It's not a test.
11    A.    So the -- the -- the familiarity
12 I -- I'm -- I'm familiar with the different --
13 I'm confused with the arrangement of the boxes
14 and the ownership interest versus managerial
15 interest.  I believe that's -- that's right.
16    Q.    Okay.  And -- and you're the sole
17 director of CLO HoldCo Limited, right?
18    A.    Yes.
19    Q.    And this whole structure was -- the
20 idea for this structure, to the best of your
21 knowledge, was to implement Mr. Dondero's plan
22 for charitable giving; is that fair?
23    A.    Yes.  Ultimately, yes.
24    Q.    And is it fair to say then that
25 he -- he made the decision to establish this

Page 48

GRANT SCOTT - 1/21/2021

2 particular structure, to the best of your
3 knowledge?
4    A.    I -- I didn't -- I'm sorry.  I
5 didn't hear you very well.
6    Q.    To the best of your knowledge, did
7 Mr. Dondero make the decisions to establish the
8 structure that's reflected on this page?
9    A.    Oh, I don't know if he made the
10 decision to establish this structure, although
11 it's -- it's -- I'm sorry.  Strike that.  I --
12 if -- if what you're saying is did he approve
13 of this structure, to my knowledge, yes.
14    Q.    Okay.  Do you hold any position with
15 respect to Charitable DAF Fund, L.P.?
16    A.    I -- I -- your chart says no.  I --
17 I -- I thought I had a role there, too.
18    Q.    I don't know.  I don't have
19 information on that.  That's why I'm asking the
20 question.
21    A.    I -- I -- I believe -- yes, I
22 believe I have the same role as I do in -- in
23 CLO HoldCo.
24    Q.    And that would be director?
25    A.    Yes.

Page 49

GRANT SCOTT - 1/21/2021

2    Q.    And to the best of your knowledge,
3 is the Charitable DAF GP, LLC, the general
4 partner of Charitable DAF Fund, L.P.?
5    A.    Yes.
6    Q.    And is it your understanding that
7 you are the managing member of Charitable DAF
8 GP, LLC?
9    A.    Yes.
10    Q.    Does Charitable DAF GP, LLC, have
11 any employees?
12    A.    No.
13    Q.    Does Charitable DAF GP, LLC, have
14 any officers or directors?
15    A.    No.
16    Q.    Are you the only person affiliated
17 with Charitable DAF GP, LLC, to the best of
18 your --
19    A.    I believe so.
20    Q.    Do you receive any compensation for
21 serving as the managing member of Charitable
22 DAF GP, LLC?
23    A.    No.  The -- I don't interact with it
24 very often.  It's -- no, I don't receive any
25 compensation.

Page 50

GRANT SCOTT - 1/21/2021

2   Q.   Can you tell me in your capacity as
3   the managing member of Charitable DAF GP, LLC,
4   what's the nature of that entity's business?
5       A.   It -- it doesn't perform any
6   day-to-day operations.  My understanding is --
7   is that it's -- it's there for purposes of
8   compliance.  I can't recall the last time I had
9   any activity with respect to that.
10      Q.   How about the Charitable DAF Fund,
11  L.P.?  I apologize if I've asked you these
12  questions.
13      A.   It -- it's the same.  I -- I -- my
14  activity is almost exclusively CLO HoldCo.
15      Q.   All right.  Let me just ask the
16  questions nevertheless.  Does Charitable DAF
17  Fund, L.P., have any employees?
18      A.   Employees?  No.
19      Q.   Does it have any officers and
20  directors?
21      A.   No.
22      Q.   Are you the sole director of
23  Charitable DAF Fund, L.P.?
24      A.   Yes, I believe so.
25      Q.   So if we -- if we put under

Page 51

GRANT SCOTT - 1/21/2021

1   Charitable DAF Fund, L.P., Grant Scott,
2   director, and we put under CLO HoldCo Limited
3   Grant Scott, director, would everything on the
4   right side of that page be accurate, to the
5   best of your --
6       A.   I believe so.
7       Q.   Well, let's move to the left side of
8   the page.  Have you heard of the entity
9   Charitable DAF HoldCo Limited?
10      A.   Yes.
11      Q.   Are you the sole director of
12  Charitable DAF HoldCo Limited?
13      A.   Yes.
14      Q.   How did you become -- how did you
15  come to be the char-- the sole director of
16  Charitable DAF HoldCo Limited?
17      A.   That was when it was established.
18      Q.   And did Mr. Dondero ask you to serve
19  in that capacity?
20      A.   Yes.
21      Q.   And did Mr. Dondero ask you to serve
22  as the managing member of Charitable DA- -- DAF
23  GP, LLC?
24      A.   Yes.

Page 52

GRANT SCOTT - 1/21/2021

2       Q.   And did Mr. Dondero ask you to serve
3   as the director of Charitable DAF, L.P. --
4   withdrawn.
5           Did Mr. Dondero ask you to serve as
6   director of Charitable DAF Fund, L.P.?
7       A.   Yes.
8       Q.   To the best of your knowledge, does
9   Charitable DAF HoldCo Limited own 99 percent of
10  the limited partnership interests in Charitable
11  DAF Fund, L.P.?
12      A.   Yes.  The -- the feed -- the -- the
13  feeds -- the -- the three horizontal blocks
14  there that identify Highland Dallas Foundation,
15  Kansas City, Santa Barbara -- there's a fourth
16  of -- relatively de minimus in terms of
17  participation.  There's a fourth entity that's
18  missing.  It's Dallas -- I forget the name.
19  That -- that -- that structure is -- is a bit
20  dated --
21      Q.   Okay.
22      A.   -- as it -- as is shown.
23      Q.   Okay.  So I will tell you and we can
24  look the documents if you want, but attached to
25  CLO HoldCo Limited's claim are a number of

Page 53

GRANT SCOTT - 1/21/2021

2   resolutions, and there's one that I have in
3   mind that shows Charitable DAF HoldCo Limited
4   holding 99 percent of the limited partnership
5   interests of Charitable DAF Fund, L.P., and
6   there's another that shows it being a hundred
7   percent.  Do you -- do you know which is
8   accurate at least at this time?
9       A.   There's a 1 percent/99 percent
10  division, and I am -- I believe it's the 99
11  percent, but I'm -- I'm getting confused by
12  the -- by the arrangement.  I'm so used to
13  another arrangement.  I -- I believe the 99
14  percent is correct.
15      Q.   Okay.  Do you have any understanding
16  as to who owns the other 1 percent of the
17  limited partnership interests of Charitable DAF
18  Fund, L.P.?
19      A.   No.  This -- this is confusing to
20  me.  No.
21      Q.   Okay.  There are, at least on this
22  page, three foundations that I think you've
23  identified.  Are those three foundations
24  together with the fourth that you mentioned the
25  owners of the Charitable DAF HoldCo Limited?

Page 54

GRANT SCOTT - 1/21/2021

```
 2     A.    Owners?
 3     Q.    Yes.
 4           MR. CLARK:  Objection, form.
 5     A.    They -- they only participate in the
 6   money that flows up to them.
 7     Q.    And what does that mean exactly?
 8     A.    What's that?
 9     Q.    What does that -- what do you mean
10   by that?  Do the foundations fund Charitable
11   DAF Fund HoldCo Limited?
12     A.    Initially.  Initially, as I
13   understand it, the money flows downward into
14   the Charitable DAF HoldCo Limited before it
15   ultimately makes its way to CLO HoldCo, and
16   then each of those three entities, the various
17   foundations, obtain participation interest in
18   the money that flows back to them.
19     Q.    And -- and is that par- -- are those
20   participation interests in Charitable -- you
21   know what, let -- let me just pull up one
22   document and see if that helps.
23           MR. MORRIS:  Can we put up -- I
24       think it's Exhibit Number 5.
25           (SCOTT EXHIBIT 2, Unanimous Written
```

Page 55

GRANT SCOTT - 1/21/2021

```
 1   Consent of Directors In Lieu of Meeting,
 2   was marked for identification.)
 3           MR. MORRIS:  I apologize.  Let's go
 4       to --
 5           MS. CANTY:  I'm sorry, John.  I
 6       can't hear you.  Was that not the exhibit?
 7           MR. MORRIS:  4.
 8           MS. CANTY:  Okay.
 9           THE REPORTER:  And Mr. Morris, you
10       are -- Mr. Morris, you are breaking up just
11       a little bit at the end of your questions.
12   BY MR. MORRIS:
13     Q.    Okay.  Do you see the document on
14   the screen, sir?
15     A.    Yes, I do.
16     Q.    Okay.  And so this is a unanimous
17   written consent of the directors of the
18   Highland Dallas Foundation.  That's one of the
19   entities that was on the chart.
20           MR. MORRIS:  Can we scroll down to
21       the -- bottom of the document where the
22       signature lines are.  Right there.
23   BY MR. MORRIS:
24     Q.    Are you a director of the Highland
```

Page 56

GRANT SCOTT - 1/21/2021

```
 1   Dallas Foundation?
 2     A.    Yes, selected by them.
 3     Q.    Selected by whom?
 4     A.    By that foundation.
 5     Q.    Are you -- are you a director of all
 6   of the four foundations that feed into the
 7   Charitable DAF HoldCo Limited entities that --
 8     A.    No.
 9     Q.    Which of the four foundations are
10   you a director of?
11     A.    This and the Santa Barbara -- I'm
12   sorry, Santa Barbara and Kansas City.
13     Q.    So is -- there's one that you're not
14   a director of; is that right?
15     A.    Yes.
16     Q.    And which one is that?
17     A.    The -- could you go back to the --
18     Q.    Yeah.
19           MR. MORRIS:  Go back to the
20       demonstrative.
21     A.    It's the Highland Dallas Foundation
22   and Santa Barbara Foundation.
23     Q.    Those are the two that you're a
24   director of?
```

Page 57

GRANT SCOTT - 1/21/2021

```
 1     A.    Yes.
 2     Q.    To the best of your knowledge, does
 3   Mr. Dondero serve as the president for each of
 4   the foundations that we're talking about?
 5     A.    Yes.
 6     Q.    To the best of your knowledge, is
 7   Mr. Dondero a director of each of the
 8   foundations that we're talking about?
 9     A.    Say that again.  I'm sorry.
10     Q.    Is he also a director of each of the
11   foundations?
12     A.    Yes.
13     Q.    Do you know whether any of the
14   foundations has any employees?
15     A.    I believe they do, but I -- I -- I
16   can't say for certain.
17     Q.    Does -- withdrawn.
18           Do you know if there are any
19   officers of any of the four foundations other
20   than Mr. Dondero's service as president?
21     A.    I'm sorry.  Say that one more time,
22   please.
23     Q.    Yes.  Do you know whether any of the
24   four foundations has any officers other than
```

Page 58

GRANT SCOTT - 1/21/2021

2    Mr. Dondero's service as president?

3       A.    No.

4       Q.    You don't know, or they do not?

5       A.    I -- I don't believe anyone else

6    has.  I -- actually, I should say I don't -- I

7    don't recall.  I -- I don't know.  I don't -- I

8    don't know.

9       Q.    As a director of the Dallas and

10   Santa Barbara foundations, are you aware of any

11   officers serving for either of those

12   foundations other than Mr. Dondero?

13      A.    No.

14      Q.    Do you know who the beneficial owner

15   of the Charitable DAF HoldCo Limited entity is?

16      A.    The beneficial owner?

17      Q.    Correct.

18      A.    The various -- various trusts that

19   were used to -- that were the vehicles by which

20   the money originally was established within --

21   within -- within CLO HoldCo.

22      Q.    Would that be -- would one of them

23   be the Get Good Nonexempt Trust?

24      A.    Yes.

25      Q.    And you're a trustee of the Get Good

Page 59

GRANT SCOTT - 1/21/2021

2    Nonexempt Trust, right?

3       A.    Yes.

4       Q.    When did you become a trustee of the

5    Get Good Nonexempt Trust?

6       A.    Many years ago.  I -- I don't

7    remember.

8       Q.    Are there any other trustees of the

9    Get Good Nonexempt Trust?

10      A.    No.

11      Q.    Does the Get Good Nonexempt Trust

12   have any officers, directors, or employees?

13      A.    No.

14            MR. CLARK:  Objection, form.  Sorry.

15   BY MR. MORRIS:

16      Q.    Withdrawn.

17            Do you know whether the Get Good

18   Nonexempt Trust has any officers, directors, or

19   employees?

20      A.    It does not.

21      Q.    And I apologize if I asked this, but

22   are you the only trustee of the Get Good

23   Nonexempt Trust?

24      A.    Yes.

25      Q.    Is the Dugaboy Investment Trust also

Page 60

GRANT SCOTT - 1/21/2021

2    one of the trusts that has an interest in

3    Charitable DAF HoldCo Limited?

4       A.    Yes.

5       Q.    Are you a trustee of the Dugaboy

6    Investment Trust?

7       A.    I am not.

8       Q.    Do you know who is?

9       A.    I believe it's his sister.

10      Q.    And is that -- you're referring to

11   Mr. Dondero's sister?

12      A.    I'm sorry.  Yes.

13      Q.    And what's the basis for your

14   understanding that Mr. Dondero's siv- -- sister

15   serves as the trustee of the Dugaboy Investment

16   Trust?

17      A.    Many years ago there was a -- there

18   was a clerical error that identified me as the

19   trustee of the Dugaboy.  That error was present

20   for approximately two weeks or a week and a

21   half before it was detected and corrected, and

22   so I know from that correction that it's Nancy

23   Dondero.

24      Q.    Are there any other trusts that have

25   an interest in Charitable DAF HoldCo Limited

Page 61

GRANT SCOTT - 1/21/2021

2    besides those trusts, to the best of your

3    knowledge?

4       A.    No.

5       Q.    Is it your understanding based on

6    what we've just talked about that the Get Good

7    Nonexempt Trust and the Dugaboy Investment

8    Trust are the indirect beneficiaries of CLO

9    HoldCo Limited?

10      A.    Yes.

11      Q.    Can you tell me who the

12   beneficiaries are of the Get Good trust?

13      A.    I mean, Jim Dondero.

14      Q.    And -- and what is that -- is that

15   based on the trust agreement -- your knowledge

16   of the trust agreement?

17      A.    Yes.

18      Q.    Do you have an understanding of who

19   the beneficiary is of the Dugaboy Investment

20   Trust?

21      A.    I don't know anything about that

22   trust.

23            MR. MORRIS:  Okay.  All right.

24   Let's take a short break and reconvene at

25   3:30 Eastern Time.  We've been going for a

Page 62
GRANT SCOTT - 1/21/2021

1   while.
2
3           MR. CLARK:  Thank you.
4           MR. MORRIS:  Okay.  Thank you.
5           (Whereupon, there was a recess in
6       the proceedings from 3:20 p.m. to
7       3:31 p.m.)
8   BY MR. MORRIS:
9       Q.   Mr. Scott, earlier I think you
10  testified that you interfaced with the folks at
11  Highland in connection with your duties as the
12  director of CLO HoldCo Limited, right?
13      A.   Yes.
14      Q.   Are you aware of any written
15  agreement between Highland Capital Management
16  and CLO HoldCo Limited?
17      A.   Yes, the various servicer
18  agreements.
19      Q.   Okay.  Are you aware that
20  Mr. Dondero resigned from his position at
21  Highland Capital Management sometime in
22  October?
23      A.   No.
24      Q.   Have you communicated with anybody
25  at Highland Capital Management about the

Page 63
GRANT SCOTT - 1/21/2021

1   affairs of CLO HoldCo Limited at any time since
2   October?
3       A.   Yes.
4       Q.   Anybody other than Jim Seery?
5       A.   Yes.
6       Q.   Okay.  Let's start with Mr. Seery.
7   You've spoken with him before, right?
8
9       A.   Yes.
10      Q.   Do you have his phone number?
11      A.   Yes.
12      Q.   How many times have you spoken with
13  Mr. Seery, to the best of your recollection,
14  just generally?  It's not a test.
15      A.   Three, maybe four times.
16      Q.   Okay.  Can you identify by name
17  anybody else at Highland than you've spoken
18  with since -- in the last two or three months?
19      A.   I spoke to Jim Dondero.  I've spoken
20  with Mike Throckmorton.  The usual suspects, so
21  to speak.  Mark Patrick, Mel- -- Melissa
22  Schroth.
23      Q.   Can you recall anybody else?
24      A.   No.  No.  Sorry.
25      Q.   Did you -- did you -- withdrawn.

Page 64
GRANT SCOTT - 1/21/2021

1
2           Do you recall the subject matter of
3   your discussions with Mr. Throckmorton?
4           MR. CLARK:  Objection, form.
5   BY MR. MORRIS:
6       Q.   Withdrawn.
7           Do you recall your -- the subject
8   matter of your communications with
9   Mr. Throckmorton?
10          MR. CLARK:  Objection, form.
11  BY MR. MORRIS:
12      Q.   You can answer.
13      A.   I -- I regularly interface with
14  Mr. Throckmorton regarding approvals of
15  expenses, and he's my sort of -- he's my point
16  person for approving wire transfers and things
17  of that nature.
18      Q.   How about Mr. Patrick, what -- what
19  area of responsibility does he have with
20  respect to CLO HoldCo Limited?
21      A.   He -- he doesn't, to my knowledge.
22      Q.   Do you recall the nature of the
23  substance of any communications that you've had
24  with Mr. Patrick since -- you know, the last
25  two or three months?

Page 65
GRANT SCOTT - 1/21/2021

1
2       A.   Yes.  Or -- yes.
3       Q.   And what -- what are the nature of
4   those conversations or the substance?
5       A.   He was -- he was one of the
6   individuals that helped to establish the
7   hierarchy for the -- what I keep referring to
8   as the charitable foundation.
9       Q.   And -- and do you recall why you
10  spoke to him in the last -- or -- withdrawn.
11          Do you recall the nature of your
12  communications in the last two or three months
13  with Mr. Patrick?
14      A.   I --
15          MR. CLARK:  And hold on, Grant.  I'm
16  going to caution -- my understanding -- I
17  believe Mr. Patrick's an attorney, and so
18  I'm going to caution you that you shouldn't
19  disclose the substance of -- of those
20  communications based on the attorney-client
21  privilege.
22          MR. MORRIS:  Well, I'm -- I -- I am
23  the lawyer for the company so -- I guess
24  there are other people on the phone and I
25  appreciate that, but let's see if we can --

Page 66

GRANT SCOTT - 1/21/2021

1      I don't mean to be contentious here, so it
2  wouldn't -- I -- I'd be part of the
3  privilege anyway.
4  BY MR. MORRIS:
5      Q.    But in any event, can you tell me
6  generally -- I'm just looking for general
7  subject matter of your conversations with
8  Mr. Patrick.
9      A.    I asked him how I would go about
10  re- -- resigning my position.
11     Q.    And when did that conversation take
12  place?
13     A.    Within the last two weeks.
14     Q.    Have you made a decision to resign?
15     A.    No.
16     Q.    I think you mentioned Melissa
17  Schroth.  Do I have that right?
18     A.    Yes.
19     Q.    Can you describe generally the
20  communications you had with Ms. Schroth in the
21  last few months.
22     A.    They -- she has e-mailed me certain
23  documents that I needed to sign.  I had a
24  conversation with her about -- about some

Page 67

GRANT SCOTT - 1/21/2021

1  home -- home improvements, home construction
2  with respect to Jim Dondero's home in Colorado,
3  and that's -- I -- I think that's -- that's it.
4      Q.    Okay.  Do you recall communicating
5  with anybody at Highland in the last three
6  months other than Mr. Dondero,
7  Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?
8      A.    I -- I spoke with Jim Seery this
9  week.
10     Q.    Anybody else?
11     A.    I don't -- I don't know.
12     Q.    Okay.
13     A.    I don't think so.
14     Q.    In your communications with
15  Mr. Seery, did you two ever discuss his reasons
16  for making any trade on behalf of any CLO?
17     A.    No.
18     Q.    In your discussions with Mr. Seery,
19  did you ever tell him that you believed that
20  Highland Capital Management had breached any
21  agreement in relation to any CLO?
22     A.    Have I had that discussion with Jim
23  Seery?
24     Q.    Yes.

Page 68

GRANT SCOTT - 1/21/2021

1      A.    No.
2      Q.    In your discussions with Mr. Seery,
3  did you ever tell him that you thought Highland
4  Capital Management was in default under any
5  agreement in relation to the CLOs?
6      A.    No.
7      Q.    I want to focus in particular on the
8  shared services agreement.  In -- in your
9  discussions with Mr. Seery, did you ever tell
10  him that you believed that Highland Capital
11  Management was in default or in breach of its
12  shared services agreement with CLO HoldCo
13  Limited?
14     A.    No.
15     Q.    In your communications with
16  Mr. Seery, did you ever indicate any concern on
17  the part of CLO HoldCo Limited with respect to
18  Highland Capital's Man- -- Highland Capital
19  Management's performance under the shared
20  services agreement?
21     A.    No.
22     Q.    As you sit here today, do you have
23  any reason to believe that Highland Capital
24  Management has done anything wrong in

Page 69

GRANT SCOTT - 1/21/2021

1  connection with its performance as the
2  portfolio manager of the CLOs in which CLO
3  HoldCo Limited has invested?
4          MR. CLARK:  Object to form.
5      A.    In terms of the -- are you saying --
6  please say that again.  I'm sorry.
7      Q.    That's okay.  I ask long questions
8  sometimes so forgive me, but I'm trying to
9  get -- I'm trying to be precise so that's why
10  it's difficult sometimes.  But let me try
11  again.
12          Does CLO HoldCo Limited contend that
13  Highland Capital Management has done anything
14  wrong in the performance of its duties as
15  portfolio manager of the CLOs in which CLO
16  HoldCo has invested?
17          MR. CLARK:  Objection, form.
18     A.    Yes.  It's -- it's outlined in our
19  objections to -- to the plan.
20     Q.    Okay.  Any -- are you aware of
21  anything that's not contained within CLO Holdco
22  Limited's objection to the plan?
23          MR. CLARK:  Objection, form.
24     A.    I don't know if this is responsive

Page 70

GRANT SCOTT - 1/21/2021

2    to your quest -- request, but two -- two
3    issues, I believe, also pose an in- -- a
4    problem for CLO HoldCo.  One is we are paying
5    for services.  I think I referred to the
6    services as being soup to nuts, but we are not
7    getting the full services.  We haven't been for
8    some time.  So we're likely overpaying.  There
9    was a Highland Select Equity issue, 11-month
10   payment that was delayed which I was unaware of
11   was due.  Normally, I would have interfaced
12   with someone at Highland about that, but my
13   attorney -- but my -- my attorney had to make a
14   request for payment, and that payment was
15   ultimately made.  I -- other than that, I -- I
16   don't -- I don't know.  I don't believe so.
17        Q.   I want to distinguish between the
18   shared services agreement between Highland
19   Capital Management and CLO HoldCo Limited on
20   the one hand and on the other hand the
21   management agreements pursuant to which
22   Highland Capital Management manages certain
23   CLOs that CLO HoldCo invests in.
24             You understand the distinction that
25   I'm making?

Page 71

GRANT SCOTT - 1/21/2021

2        A.   Now I do.  I'm sorry.  I didn't
3    appreciate that.
4        Q.   Okay.  So let's just take each of
5    those pieces one at a time.  You mentioned your
6    concern about services.  That's a concern that
7    arises under the shared services agreement,
8    right?
9        A.   Yes.
10       Q.   And you mentioned something about a
11   delayed payment having to do with Highland
12   Select.  Do I have that generally right?
13       A.   Correct.
14       Q.   And is that a concern that you have
15   that arises under the shared services
16   agreement?
17       A.   It's not the agreement with respect
18   to the CLOs as I understand it.
19       Q.   Okay.  So then let's turn to that
20   second bucket.  You were aware -- you are
21   aware, are you not, that Highland Capital
22   Management has certain agreements with CLOs
23   pursuant to which it manages the assets that
24   are owned by the CLOs?
25       A.   I'm so sorry.  Could you please --

Page 72

GRANT SCOTT - 1/21/2021

2        Q.   I'll try again.
3        A.   I'm just -- I'm sorry.  I was
4    distracted and -- and I -- I'm sorry for asking
5    you to repeat it again.  Please --
6        Q.   Okay.
7        A.   Please re- --
8        Q.   Are you aware that CLO HoldCo
9    Limited has made investments in certain CLOs?
10       A.   Oh, yes, certainly.
11       Q.   And are you aware that those CLOs
12   are managed by Highland Capital Management?
13       A.   Yes.  As the -- as the servicer,
14   yes.
15       Q.   Okay.  Have you ever seen any of the
16   agreements pursuant to which Highland Capital
17   Management acts as a servicer?
18       A.   I've seen a few, yes.
19       Q.   Does CLO HoldCo Limited contend that
20   it is a party to any agreement between Highland
21   Capital Management and the CLOs?
22            MR. CLARK:  Object to form.  And I
23       just want to note for the record that
24       Mr. Scott is here testifying in his
25       individual capacity, I believe, as a

Page 73

GRANT SCOTT - 1/21/2021

2    corporate representative.
3            MR. MORRIS:  Fair enough.  But he is
4        the only representative so...
5            MR. CLARK:  Fair enough.  I just
6        want that made -- stated for the record,
7        but I also object as to form.
8            MR. MORRIS:  Got it.
9        A.   It's a third-party beneficiary under
10   the agreements.
11       Q.   And is that because of something you
12   read in the document, or is that just your
13   belief and understanding?
14       A.   My belief and understanding.
15       Q.   And is that belief and understanding
16   based on anything other than conversations with
17   counsel?
18       A.   In -- in -- recently it has, but I
19   don't recall from previous interactions over
20   the years how we discussed that or how I came
21   to -- to understand that.
22       Q.   Does HCLO [sic] HoldCo -- did -- in
23   your capacity as the sole director of HCLO
24   HoldCo Limited, are you aware of anything that
25   Highland Capital Management has done wrong in

Page 74

GRANT SCOTT - 1/21/2021

1  connection with the services provided under the
2  CLO management agreements?
3           MR. CLARK:  Objection, form.
4      A.    I -- I don't -- I don't -- I
5  don't -- your answer's no.
6      Q.    In your capacity as the director of
7  CLO HoldCo Limited, are you aware of any
8  default or breach under the CLO management
9  agreements that -- that Highland Capital
10 Management has caused?
11          MR. CLARK:  Objection, form.
12     A.    We have raised the issue about
13 ongoing sales in various -- I'm not sure
14 whether they represent a technical breach,
15 though.
16     Q.    Okay.  Are you aware of any
17 technical breach?
18          MR. CLARK:  Objection, form.
19     A.    No.
20     Q.    I'm sorry.  You said, no, sir?
21     A.    My answer's no.
22     Q.    Thank you.  Do you know who made the
23 decision to cause the CLO HoldCo Limited entity
24 to invest in the CLOs that are managed by

Page 75

GRANT SCOTT - 1/21/2021

1  Highland Capital?
2      A.    The select -- ultimately, I had to.
3      Q.    I thought you testified earlier that
4  you didn't make decisions as to investment.  Do
5  I have that wrong?
6      A.    The selection.
7      Q.    Okay.
8      A.    I -- I'm --
9      Q.    So -- so explain to me --
10     A.    I have to approve -- I have to
11 approve the selection.  I'm sorry.  But the
12 people making -- was putting that in the camp
13 of the people that make the selection.
14     Q.    Okay.  Do you know if -- do you know
15 if there are CLOs in the world that exist that
16 aren't managed by Highland Capital Management?
17          MR. CLARK:  Objection, form.
18     A.    Are there CLOs in the -- in the
19 world that are not --
20     Q.    Yes.
21     A.    Yes.  It's -- it's a well-known --
22 it's a well-known --
23     Q.    In your capacity as the director of
24 CLO HoldCo Limited, did you ever consider

Page 76

GRANT SCOTT - 1/21/2021

1  making an investment in a CLO that wasn't
2  managed by Highland?
3      A.    No.
4      Q.    Is there any particular reason why
5  you haven't given that any consideration?
6      A.    That hasn't been my role.  That's
7  not my expertise.  That's been something
8  Highland has done and, quite frankly, over the
9  years brilliantly so, no.
10     Q.    You're aware that HCM, L.P., has
11 filed for bankruptcy, right?
12     A.    Yes.
13     Q.    When did you learn that Highland had
14 filed for bankruptcy?
15     A.    After the fact sometime in late --
16 late 2019.
17     Q.    Since the bankruptcy filing, have
18 you made any attempt to sell CLO HoldCo
19 Limited's position in any of the CLOs that are
20 managed by Highland?
21     A.    No.
22     Q.    So notwithstanding the bankruptcy
23 filing, you as the director haven't made any
24 attempt to transfer out of the CLOs that are

Page 77

GRANT SCOTT - 1/21/2021

1  managed by Highland, correct?
2      A.    Correct.
3      Q.    Did you ever give any thought to
4  exiting the CLO vehicles that were managed by
5  Highland in light of its bankruptcy filing?
6      A.    No.
7      Q.    Have you ever discussed with
8  Mr. Seery anything having to do with the
9  management -- withdrawn.
10     Q.    Have you ever discussed with
11 Mr. Seery any aspect of the debtor's management
12 of the CLOs in which CLO HoldCo Limited is
13 invested?
14     A.    No.
15     Q.    You mentioned earlier a request to
16 stop trading.  Do I have that right?
17     A.    Yes.
18     Q.    Okay.  And are you aware that a
19 letter was written purportedly on behalf of CLO
20 HoldCo Limited in which a request to stop
21 trading was made?
22     A.    As a cos- -- yeah.  Yes.
23     Q.    Okay.  Have you ever seen that
24 letter before?

Page 86

GRANT SCOTT - 1/21/2021

2     Q.    How did you form your opinion that
3  the debtor doesn't have the expertise to
4  execute trades on behalf of the CLOs today?
5  What's the basis for that belief?
6     A.    I -- as I understood it, the -- the
7  people historically making that decision were
8  no longer making that decision.
9     Q.    Who besides Mr. Dondero --
10  withdrawn.
11        Who are you referring to?
12     A.    Well, Mr. Dondero is one.  I don't
13  know the names, but I -- I understood it to
14  mean that the group previously responsible, for
15  exam- -- for example, Hunter Covitz, including
16  Hun- -- him, were no longer involved in the
17  decision-making process, but...
18     Q.    How did you -- how -- how -- who
19  gave you the information that led you to
20  conclude that Hunter Covitz was no longer
21  involved in the decision-making process?
22     A.    Specifically him and that name being
23  mentioned, I -- I -- I wasn't informed of his
24  speci- -- him -- him being removed.  I was
25  under the impression that the team that had

Page 87

GRANT SCOTT - 1/21/2021

1  previously been doing that was no longer doing
2  it.
4     Q.    And what gave you that impression?
5     A.    Was communications I had with my
6  attorney.
7     Q.    Okay.  Is there any source for your
8  information that led you to conclude that the
9  team was no longer there that was able to
10  engage in the trades on behalf of the CLOs
11  other than your attorneys?
12     A.    Well, this -- this letter -- I -- I
13  think the answer is no.
14     Q.    Thank you.  Do you know if Jim -- do
15  you have an opinion or a view as to whether Jim
16  Seery is qualified to make trades?
17     A.    This --
18        MR. CLARK:  Objection, form.
19     A.    I don't know -- I spoke to Jim Seery
20  earlier this week.  You -- you asked me whether
21  I had his number.  I said I did.  That's only
22  because he called me.  My phone rang with his
23  number.  It was a number I did not recognize,
24  it was not in my contacts, but he left me a
25  voice mail so I called him back.  Then I

Page 88

GRANT SCOTT - 1/21/2021

2  updated my contacts to -- to add his name so
3  now I have his name.  And during that
4  conversation he informed me that he did have
5  that expertise --
6     Q.    And --
7     A.    -- without me making any inquiry.
8  He volunteered that.
9     Q.    But you hadn't made any inquiry
10  prior to the time that you authorized the
11  sending of this letter; is that fair?
12     A.    That's correct.
13     Q.    Do you know whether Mr. Seery, in
14  fact, engaged in transactions on behalf of the
15  debtor since he was appointed back in January?
16     A.    I do not.
17     Q.    Did you ask that question prior to
18  the time you authorized the sending of this
19  letter?
20     A.    I did not.
21     Q.    Can you identify a single
22  transaction that Jim Seery has ever made that
23  you disagree with?
24     A.    No.
25     Q.    Can you identify any transaction

Page 89

GRANT SCOTT - 1/21/2021

2  that the debtor made on behalf of any of the
3  CLOs since the time that you understand
4  Mr. Dondero left Highland that you disagree
5  with?
6     A.    No.
7     Q.    Did you have any discussion with any
8  representative of any of the entities listed on
9  this document where they told you they believe
10  Jim Seery didn't have the expertise to engage
11  in transactions on behalf of the whole -- of
12  the CLOs?
13     A.    You -- your question -- I'm -- I'm
14  sorry.  I'm trying to be -- I'm trying to be a
15  hundred perc- -- I'm trying to be accurate
16  here.
17     Q.    Let me interrupt you and just say,
18  I'm very grateful for your testimony.  I know
19  this is not easy, and I do believe that you're
20  earnestly and honestly trying to answer the
21  questions the best you can.  So no apologies
22  necessary anymore.  If you need me to repeat
23  the question or rephrase it, just say that,
24  okay?
25     A.    Please -- yes.

Page 90

GRANT SCOTT - 1/21/2021

1

2      Q.   Okay.

3      A.   Please -- please repeat that.

4      Q.   Did you ever communicate with any

5  employee, officer, director, representative of

6  any of the entities that are on this page

7  concerning the debtor's ability to service the

8  CLOs?

9      A.   I believe so.

10      Q.   And can you identify the person or

11  persons?

12      A.   I think it's Jim Dondero.

13      Q.   Anybody else other than Mr. Dondero?

14      A.   No.

15      Q.   When did you have that conversation

16  or those conversations with Mr. Dondero?

17      A.   This letter is dated the 22nd --

18      Q.   Correct.

19      A.   -- right?

20      Q.   Yes.

21      A.   I believe that's the Tuesday before

22  Christmas, and this would have been on the

23  21st, the Monday.

24      Q.   What do you recall about your

25  conversation on the 21st regarding the

---

Page 91

GRANT SCOTT - 1/21/2021

1

2  substance of this particular letter?

3      A.   Jim Dondero described why he

4  believed sales being made on an ongoing basis

5  after a request was made to stop was im- --

6  improper.

7      Q.   Do you -- do you rely on what

8  Mr. Dondero said to you during that phone call

9  on December 21st in -- in deciding to join in

10  this particular letter?

11      A.   No.

12      Q.   Did you only then rely on the

13  information you obtained from counsel?

14      A.   Yes.  I -- I -- I -- I considered

15  this letter to be nearly the most gentle

16  request imaginable amongst lawyers to maintain

17  the status quo.

18      Q.   And the request that's made in this

19  letter is perfectly consistent with what

20  Mr. Dondero told you on the 21st of December,

21  correct?

22      A.   I don't -- no.

23      Q.   How --

24      MR. MORRIS:  Can we go to the end of

25  this letter, please.  All right.  Right

---

Page 92

GRANT SCOTT - 1/21/2021

1

2  there.

3  BY MR. MORRIS:

4      Q.   Do you see the request that's in the

5  last sentence?

6      A.   Yes.

7      Q.   Is that the same thing that

8  Mr. Dondero told you should happen, that --

9  that there should be no further CLO

10  transactions at least until the issues raised

11  and addressed by the debtor's plan were

12  resolved substantively?

13      A.   Yes.

14      Q.   Is there anything that he said

15  that's inconsistent with the request that's

16  made here?

17      MR. CLARK:  Objection, form.

18      A.   This -- and can you -- can you show

19  me earlier parts?

20      Q.   Of course.  You know what, I'll

21  withdraw the question.

22      And let me see if I can do it this

23  way:  In your discussion with Mr. Dondero, did

24  he indicate that he had seen a draft of this

25  letter?

---

Page 93

GRANT SCOTT - 1/21/2021

1

2      A.   No.  And I didn't -- I didn't have a

3  discussion with him.  I -- I merely listened to

4  him.  There was no -- I -- I had no input to

5  the conversation.

6      Q.   Okay.  I -- I did -- I didn't --

7  I -- I appreciate that.  So he called you; is

8  that right?

9      A.   We -- we called in.

10      Q.   Oh, was it --

11      A.   I --

12      Q.   Was it --

13      A.   I don't know --

14      Q.   Was it --

15      A.   I don't know the sequence of the

16  calls.  I'm sorry.

17      Q.   Was there anybody on the call other

18  than you and Mr. Dondero, the call that you're

19  describing on December 21st?

20      A.   Yes, my attorney and an attorney --

21  I believe the attorney that signed this letter.

22      Q.   Okay.  And I just want to focus on

23  what Mr. Dondero said.  Did he -- did he say

24  during the call that Highland should not be

25  engaging in any further CLO transactions?

---

# EXHIBIT 17

1                        Grant Scott

2          IN THE UNITED STATES BANKRUPTCY COURT

3             FOR THE NORTHERN DISTRICT OF TEXAS

4                      DALLAS DIVISION

5     In Re:                           Case No.

6     HIGHLAND CAPITAL MANAGEMENT L.P.,   19-34054

7                  Debtor,               Chapter 11

8     _____

9     HIGHLAND CAPITAL MANAGEMENT,      Adversary No.

10    L.P.,                             21-03003-sgi

11              Plaintiff,

12    Vs.

13    JAMES D. DONDERO,

14              Defendant.

15

16        Virtual Zoom Deposition of Grant Scott

17             Tuesday, June 1, 2021

18                  At 2:00 p.m.

19

20

21

22

23    Reported by LeShaunda Cass-Byrd, CSR, RPR

24    TSG Job No. 194692

25

Page 6

```
 1                    Grant Scott
 2              GRANT SCOTT,
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5              EXAMINATION
 6   BY MR. MORRIS:
 7       Q.     Good afternoon, Mr. Scott.
 8       A.     Good afternoon, John.
 9       Q.     Okay.  As you recall, my name is John
10   Morris.  I'm an attorney with Pachulski Stang Ziehl &
11   Jones.  We represent Highland Capital Management LP, a
12   debtor in a bankruptcy case that is pending in the
13   Northern District of Texas.
14              Do you recall any of that?
15       A.     Yes.
16       Q.     Okay.  And we are here today for your
17   deposition, and I appreciate your compliance with the
18   subpoena.  Just a few ground rules to remind you, I'm
19   going to ask you a series of questions, and it's
20   important that you allow me to finish my question
21   before you begin your answer; is that fair?
22       A.     Yes.
23       Q.     And I will attempt to give you the same
24   courtesy, but if for some reason I step on your words,
25   just let me know that because I don't mean to cut you
```

Page 7

```
 1                    Grant Scott
 2   off.  Okay?
 3       A.     Okay.
 4       Q.     If there's anything that I ask you that you
 5   do not understand, will you let me know?
 6       A.     Yes, sir.
 7       Q.     If you need a break at any time, will you
 8   let me know?
 9       A.     Yes.
10       Q.     Okay.  Because this deposition is being
11   conducted remotely, we are going to be putting
12   documents on the screen.  I'm not attempting to trick
13   you in any way.  If you believe there is any of
14   portion of a document that you need to see, either to
15   put something in context or to refresh your
16   recollection, I encourage to let me know that, and I
17   will be happy to accommodate you.  Okay?
18       A.     Okay.
19       Q.     Okay.  Have you seen the subpoena that the
20   debtors served on your lawyer in this case?
21       A.     The one relating to my deposition?
22       Q.     Correct.
23       A.     Yes.
24       Q.     And are you here today pursuant to that
25   subpoena?
```

Page 8

```
 1                    Grant Scott
 2       A.     Yes.
 3       Q.     So today's deposition concerns a particular
 4   motion that the debtor filed recently where the debtor
 5   is seeking to hold certain individuals and entities in
 6   contempt of court.  Have you seen or reviewed the
 7   debtor's motion that was filed?
 8       A.     I have seen the e-mails which I kept, but I
 9   have not read them.
10       Q.     Okay.  I want to just begin with some
11   background.
12              MR. MORRIS:  And then I would ask Ms.
13   Canty to put up what we will mark as
14   Exhibit -- you know, let's pick up the
15   numbering from this morning, La Asia.  Did
16   we use 7 this morning?
17              Actually, this is going to be Exhibit
18   1.  It's the same document that we had this
19   morning.
20              MS. CANTY:  Yes.
21              MR. MORRIS:  We will call it Exhibit
22   1, and it's an organizational chart.  If we
23   can just put that on the screen.
24              (Deposition Exhibit 1 was marked for
25   identification.)
```

Page 9

```
 1                    Grant Scott
 2   BY MR. MORRIS:
 3       Q.     Okay.  Have you seen this before,
 4   Mr. Scott?
 5       A.     Yes.
 6       Q.     Do you know what it is?
 7       A.     It's the -- yes.  The DAF CLO HoldCo
 8   structure chart.
 9       Q.     And this is structure chart that you
10   produced in response to the subpoena; is that right?
11       A.     Correct.
12       Q.     You are familiar with the gentleman named
13   Mark Patrick; is that right?
14       A.     Yes.
15       Q.     Is it your understanding that Mr. Patrick
16   was one of the individuals that helped establish the
17   hierarchy that is depicted on Exhibit 1?
18       A.     Yes.
19       Q.     And what is the basis for that
20   understanding?
21       A.     That goes back many years to the
22   origination of my role.
23       Q.     Okay.  And do you recall that you assumed
24   your role in or around 2012?
25       A.     Yes.
```

Page 10

Grant Scott

2  Q.    Okay.  Did you know Mr. Patrick prior to
3  the time that you assumed your role?
4  A.    I did not.
5  Q.    Okay.  Do you know -- withdrawn.
6      Do you have any knowledge as to whether
7  anybody other than Mr. Patrick helped establish the
8  hierarchy that is depicted on Exhibit 1?
9  A.    There was a law firm name that came to
10  mind, and there was an expert, I gather, a lawyer that
11  was familiar with charitable entities that I believe
12  was involved.
13  Q.    Can you identify any -- withdrawn.
14      At the time that you understood Mr. Patrick
15  had helped to create this hierarchy, did you
16  understand who employed Mr. Patrick?
17  A.    Yes.  I believe so.
18  Q.    Who did you believe Mr. Patrick worked for
19  at that time?
20  A.    Highland Capital Management.
21  Q.    Can you identify any other person at
22  Highland Capital Management who was involved in the
23  creation of this hierarchy?
24  A.    No.
25  Q.    Okay.  Now for looking at the hierarchy

Page 11

Grant Scott

2  here, for the period for approximately 10 years prior
3  to March 24th, 2021, you served as the managing member
4  of the charitable DAF GP, LLC, correct?
5  A.    Correct.
6  Q.    And for approximately 10 years prior to
7  March 30 -- 20 -- withdrawn.
8      For approximately 10 years prior to March
9  24th, 2021, you were the sole director of charitable
10  DAF HoldCo, LTD, correct?
11  A.    Correct.
12  Q.    And for approximately 10 years prior to
13  March 24th, 2021, you were the sole director of
14  charitable DAF Fund LP, correct?
15  A.    I believe that is correct.
16  Q.    And for approximately 10 years prior to
17  March 24, 2021, you served as the sole director of CLO
18  HoldCo Limited, correct?
19  A.    Yes.  That is correct.
20  Q.    Did you serve in any capacity for any other
21  entity that is depicted on this sheet at any time
22  prior to March 24th, 2021?
23  A.    If you go -- if you look at the top of that
24  chart where it's directed at the charitable giving
25  components, I had some involvement with various

Page 12

Grant Scott

2  members of some of those organizations.
3  Q.    And would they be the ones that are
4  labelled as third parties or as supporting
5  organizations?
6  A.    The -- the third party organizations.
7  And -- and possibly the supporting organizations.
8  Q.    Do you know what the difference is between
9  a third party and a supporting organization as those
10  phrases are used on Exhibit 1?
11  A.    I don't recall anymore what the delineation
12  is between those two.
13  Q.    Okay.  Do you hold any position today with
14  any of the entities that are depicted on Exhibit 1?
15  A.    I do not -- I do not believe so.  Well, I
16  believe technically, I'm still -- I may still be a
17  director of CLO HoldCo, but I -- I'm not certain of
18  the status as of today.
19  Q.    Is there a particular reason why you may
20  remain today as a director of CLO HoldCo Limited?
21  A.    I don't know if the -- I don't know if the
22  transfer after my resignation has been completely
23  finalized, and I haven't -- yeah.  I don't know how
24  close it is to being completely finalized.  I'm not --
25  I'm not sure.

Page 13

Grant Scott

2  Q.    But your intent is to resign as the
3  director of CLO HoldCo Limited; is that right?
4  A.    Yes.
5  Q.    And the only reason that that hasn't
6  happened yet, is it fair to say, is for administrative
7  reasons?
8      MR. BRIDGES:  Objection.  Assumes
9  facts not in evidence.
10  BY MR. MORRIS:
11  Q.    You can answer.
12  A.    I --
13  Q.    Withdrawn.  I will ask a different
14  question.
15      Do you know why your intended resignation
16  from CLO HoldCo Limited has not yet become effective?
17      MR. BRIDGES:  The same objection.
18  Facts not in evidence.
19  BY MR. MORRIS:
20  Q.    You can go ahead.
21      MR. KANE:  I object to form, also.
22      Grant, go ahead.
23      THE WITNESS:  I do not.
24  BY MR. MORRIS:
25  Q.    Okay.  Do you hold any positions of any

Page 14

Grant Scott

1           Grant Scott
2    kind today with any entity that you believe is either
3    directly or indirectly owned or controlled by
4    Mr. Dondero?
5        A.      I don't believe so.
6        Q.      Do you have -- I'm just going to explore
7    that for a little bit.
8           Do you know have -- do you know whether you
9    continue to HoldCo any position with any NexBank
10   entity?
11       A.      I'm not in -- no, I don't have any
12   involvement with NexBank.
13       Q.      Okay.
14          MR. KANE:  Hey, John, can you shed a
15       little light on why that's relevant?
16          MR. MORRIS:  I'm just trying to find
17       connections between Mr. Scott and
18       Mr. Dondero because I -- I just -- I
19       think -- I think the purpose of the
20       deposition is to try to -- to try to deduce
21       facts that are related to whether or not
22       Mr. Dondero is going to be a responsible
23       party under the contempt motion.  So I'm
24       just looking for --
25          MR. KANE:  I understand.  I'm just

Page 15

Grant Scott

1           Grant Scott
2        trying to figure out Grant's -- you know,
3        whether he has a --
4           MR. MORRIS:  That is all right.  I'm
5        moving on anyway.
6           MR. KANE:  Appreciate it.
7    BY MR. MORRIS:
8        Q.      Now looking at the chart, Mr. Scott, I
9    believe you testified that you were either the
10   managing member or a director of each of the DAF
11   entities and CLO HoldCo Limited.
12          Do I have that right?
13       A.      I believe that is correct.
14       Q.      All right.  Is it your understanding that
15   Mr. --
16       A.      Excuse me.  I am sorry.  Currently or was?
17       Q.      Was.  Up until March 24th.
18       A.      Okay.  Correct.
19       Q.      All right.  Let me ask the question again
20   so it's clean.
21          Did you serve as either the managing member
22   or the director for each of the charitable DAF
23   entities and the CLO HoldCo Limited entity for
24   approximately 10 years prior to March 24th, 2021?
25          MR. KANE:  Objection.  Form.  Go

Page 16

Grant Scott

1           Grant Scott
2    ahead, Grant.
3          (Reporter clarification.)
4          THE WITNESS:  I believe so.
5    BY MR. MORRIS:
6        Q.      And is it your understanding that Mr. Mark
7    Patrick replaced you in those capacities on or about
8    March 24th, 2021?
9        A.      It's my understanding that on March 24th,
10   the management shares that I had previously -- that
11   had been in my name were transferred to him.  I am not
12   sure how that impacts the current status in the
13   various other entities.
14       Q.      Okay.  During the time that you served as
15   the managing member of the charitable DAF GP LLC, that
16   entity had no officers or employees, correct?
17       A.      I believe that is correct.
18          MR. KANE:  Object to the form.
19   BY MR. MORRIS:
20       Q.      And you served as the sole director of that
21   entity during the time that you served as the
22   director, correct?
23       A.      I believe that is correct.
24       Q.      And during the period of time that you
25   served as a director of charitable DAF HoldCo Limited,

Page 17

Grant Scott

1           Grant Scott
2    you were the only person to serve in that capacity; is
3    that correct?
4        A.      I believe so.
5        Q.      And during the period that you served as
6    director of charitable DAF HoldCo Limited, that entity
7    had no officers or employees, correct?
8        A.      I believe that is correct.
9        Q.      During the time that you served as a
10   director of charitable DAF Fund LP, you were the sole
11   director of that entity, correct?
12       A.      Correct.
13       Q.      And during the time that you served as the
14   sole director of charitable DAF Fund LP, that entity
15   had no officers or employees, correct?
16       A.      I believe that is correct.
17       Q.      You served as the sole director of CLO
18   HoldCo Limited; is that right?
19       A.      Yes.  That is correct.
20       Q.      And during the period that you served as
21   the sole director of CLO HoldCo Limited, that entity
22   had no officers or employees, correct?
23       A.      That is correct.
24       Q.      Is that why the DAF had certain agreements
25   with Highland Capital Management LP pursuant to which

Page 18

Grant Scott

2  HCMLP provided back office and advisory and investment
3  services?
4          MR. KANE:  Objection.  Form.
5          THE WITNESS:  I think that is
6      correct.
7  BY MR. MORRIS:
8      Q.    Do you recall that that DAF had agreements
9  with Highland Capital Management that were amended and
10  restated in 2014?
11          MR. KANE:  Objection.  Form.
12          THE WITNESS:  I understand there were
13      various agreements over the years that had
14      been restated.  I'm not entirely sure
15      anymore of the dates that we received
16      that --
17          MR. MORRIS:  Okay.  Let's mark --
18          THE WITNESS:  I'm sorry?
19          MR. MORRIS:  Let's mark as Exhibit
20      8 --
21          MR. BRIDGES:  Objection.  Objection.
22      Please let the witness answer his question.
23          MR. MORRIS:  Let's mark this --
24          MR. BRIDGES:  No.  Please allow the
25      witness to continue his answer.

Page 19

Grant Scott

2  BY MR. MORRIS:
3      Q.    Grant, do you have anything else to add?
4      A.    You had asked me -- you asked about a
5  specific date, I think, 2014.  I just -- I don't know
6  what the dates are or were.
7      Q.    That is what I heard you say.  Is there
8  anything else that you have to add?
9      A.    No, I don't -- I don't think so.
10     Q.    I didn't think so either.
11          MR. MORRIS:  Let's go to Exhibit 8,
12      please, the next document.
13          (Deposition Exhibit 8 was marked for
14  identification.)
15          MR. MORRIS:  Okay.  If we could just
16      scroll down a little bit.  Just to the
17      e-mail.
18  BY MR. MORRIS:
19     Q.    All right.  Were you familiar with Caitlin
20  Nelson and Helen Kim and Thomas Surgent and David Klos
21  in and around August 2004?
22     A.    I believe they were all Highland employees.
23     Q.    Okay.
24          MR. MORRIS:  Can we just scroll up to
25      the next e-mail, please?

Page 20

Grant Scott

2  BY MR. MORRIS:
3      Q.    Okay.  Do you see that Mrs. Kim sends you
4  an e-mail on August 26th, 2014?
5      A.    Yes.  I see that.
6      Q.    And do you see that she had attached for
7  your review and execution, drafts of an amended and
8  restated service agreement and amended and restated
9  advisory agreement and GP resolutions?
10     A.    I do see that.
11     Q.    Okay.  Do you have any recollection as to
12  whose idea it was to amend and restate those
13  agreements at that moment in time?
14     A.    I do not.
15     Q.    Do you have any recollection as to why
16  those agreements were amended and restated at that
17  time?
18     A.    No, I do not.
19     Q.    Okay.  Let's just scroll down and just show
20  Mr. Scott the agreements.  I'm not going to ask
21  anything substantive about it.  But do you see here is
22  the -- if we can stop right there -- the Amended and
23  Restated Service Agreement that is dated from the
24  first day of July, 2014, and it's between the DAF
25  Fund -- the charitable DAF Fund LP, the charitable DAF

Page 21

Grant Scott

2  GP LLC, as well as Highland Capital Management LP.
3      Do you see that?
4      A.    I do see that.
5      Q.    Do you recall that the entity that is
6  commonly referred to as the DAF had a service
7  agreement with Highland Capital Management LP?
8      A.    I believe that is correct.  Yes.
9      Q.    Do you recall whether -- whether the
10  service agreement was ever the subject of any
11  negotiations?
12     A.    I don't know.
13     Q.    Did you participate in any negotiations
14  concerning the service agreement that was entered --
15  entered in between the entity known as the DAF and
16  Highland Capital Management LP?
17          MR. KANE:  Objection to form.
18      John, will you clarify the time
19      period?
20  BY MR. MORRIS:
21     Q.    Right here.  2014.
22     A.    Sir, I don't recall anything about this
23  with respect to 2014.
24     Q.    Do you know if -- if the agreement was ever
25  amended at any time after 2014?  And when I use the

Page 22

Grant Scott

2 phrase "agreement," I'm specifically referring to the
3 Amended and Restated Service Agreement that we are
4 looking at.
5      A.     I believe -- I think there was a further
6 amended and restated agreement.
7      Q.     Okay.  Did you participate in any
8 negotiations concerning that further amended and
9 restated agreement?
10      A.     I don't remember.
11      Q.     Do you remember offering any comments
12 concerning any subsequent amendment or restatement?
13      A.     I don't -- I don't remember.
14      Q.     Did you ever hire outside counsel to assist
15 you in the negotiation of any service agreements with
16 Highland Capital Management LP?
17      A.     I did not.
18      Q.     Do you -- do you recall who prepared each
19 of the service agreements to which the DAF was a
20 party?
21      A.     I don't remember.
22      Q.     To the best of your recollection, would it
23 have been inhouse counsel at Highland Capital
24 Management?
25           MR. KANE:  Objection.  Form.

Page 23

Grant Scott

2           THE WITNESS:  I don't -- I don't
3      know.
4 BY MR. MORRIS:
5      Q.     Can you recall the name of any law firm
6 that was involved in the drafting or the negotiation
7 of any service agreement between the entity known as
8 the DAF and Highland Capital Management LP?
9           MR. KANE:  Objection.  Form.
10           THE WITNESS:  I don't remember any.
11 BY MR. MORRIS:
12      Q.     Can you recall during your tenure as the
13 managing member of the DAF GP LLC, whether there was
14 any particular term or provision in any service
15 agreement that was the subject of negotiation or even
16 discussion?
17      A.     I don't remember those -- any of those
18 discussions.
19      Q.     Do you know if they took place or you just
20 can't remember them?
21      A.     I just can't remember them.
22      Q.     Do you recall ever seeing multiple drafts
23 of any service agreement that you -- withdrawn.
24           Did you personally sign service agreements
25 on behalf of the entity known as the DAF?

Page 24

Grant Scott

2      A.     I believe so.
3      Q.     And the agreements that you signed on
4 behalf of that entity, were any of them -- were there
5 multiple drafts of any such agreement?
6      A.     There were frequently multiple drafts or
7 agreements.  But I just don't remember them.
8      Q.     Do you remember whether you personally ever
9 provided any comments to any particular draft?
10      A.     I do not.
11      Q.     Let me ask you this:  Are you familiar with
12 the phrase "arm's length negotiations"?
13      A.     Yes.
14      Q.     And can you tell me what your understanding
15 is of an arm's length negotiation?
16      A.     Well, it would depend on the nature of the
17 parties.  For example, a -- two strangers would
18 have -- arm's length would differ from the nature of
19 an agreement between parties maybe having fiduciary or
20 related obligations.
21      Q.     Let me ask you this --
22      A.     I don't know what the black -- I don't know
23 what the blackball definition is to that term.
24      Q.     Would you agree that arm's length
25 negotiations take place between two parties that are

Page 25

Grant Scott

2 acting out of their own self interest?
3           MR. KANE:  Objection.
4           MR. BRIDGES:  Objection to form and
5      foundation.
6 BY MR. MORRIS:
7      Q.     Withdrawn.  Withdrawn.
8           MR. BRIDGES:  Calls for a legal
9      opinion.
10 BY MR. MORRIS:
11      Q.     Mr. Scott, do you believe that the service
12 agreements between the entity known as the DAF and
13 the -- and Highland Capital Management LP were arm's
14 length agreements?
15           MR. BRIDGES:  Objection.  Again, lack
16      of foundation, calls for a legal opinion.
17           MR. MORRIS:  Okay.  I'm not asking
18      for a legal opinion.  I'm asking for
19      Mr. Scott's view of it, so I will try one
20      more time.
21 BY MR. MORRIS:
22      Q.     Mr. Scott, do you believe that the service
23 agreements between the DAF and HCMLP were the subject
24 and result of arm's length negotiations?
25           MR. BRIDGES:  Objection.  Foundation,

Page 46

```
                    Grant Scott
1
2     A.    Why did I send it at the end of January?
3     Q.    What caused you to send this e-mail at that
4  moment in time?
5     A.    Well, I mean, there are a couple of
6  reasons.  It was -- it was necessary that I do it, and
7  the time seemed right in view of the events in
8  January.  It was like a good transition point from my
9  perspective.
10    Q.    And why was it necessary at that time?
11    A.    Well, there was --
12          MR. BRIDGES:  Objection.  Assumes
13    facts not in evidence.
14 BY MR. MORRIS:
15    Q.    You can answer.
16    A.    I previously testified during this
17 deposition that throughout 2020, the desire -- or,
18 rather, the appropriateness of my wanting to resign
19 was expanding, and based on what had happened in
20 January and December as well, but mostly January, I
21 basically just did a critical mass on whether I could
22 sustain my role, given my commitments to my existing
23 firm and given my discussions with the managing
24 members of my existing firm.
25          And it -- there was just no way I could
```

Page 47

```
                    Grant Scott
1  continue with the time commitment required.  I had
2  made various promises and representations to my firm
3  throughout 2020 that the bankruptcy would be handled
4  relatively efficiently and wouldn't require a great
5  deal of time commitment.  And then I guess the straw
6  that broke the camel's back was the second lawsuit,
7  meaning me personally, and it just -- from a personal
8  standpoint, the most significant factor was just my --
9  my being overwhelmed, trying to sustain my career and
10 engage in what seem like the 2021 that was going to
11 involve my having to defend two lawsuits.  And I felt
12 like I got CLO HoldCo through the bankruptcy and then
13 that was a good jumping off point.
14    Q.    What -- why did you send this e-mail to
15 Mr. Dondero?
16    A.    I knew, or at least I reasonably believed
17 he would know where to who to send it to because I
18 wasn't exactly sure.
19    Q.    So you were the managing member of the
20 general partnership and the director of the other DAF
21 entities and CLO HoldCo Limited, and you were not sure
22 who to send your notice of resignation to.
23          Do I have that right?
24          MR. KANE:  Objection.  Form.  That's
```

Page 48

```
                    Grant Scott
1          John Kane.
2          THE WITNESS:  Yes.  I didn't know who
3          best to inform my decision.
4  BY MR. MORRIS:
5     Q.    And why did you think that Mr. Dondero
6  would know?
7          MR. BRIDGES:  Objection.  Asked and
8          answered.
9          THE WITNESS:  He knows a lot more
10         about the workings of -- I mean, it was --
11         CLO HoldCo and the charitable admission was
12         something that he worked to develop with
13         others 10 years ago, and he was committed
14         to the charity and he knew all of the
15         players and I just -- I guess I just
16         assumed he would know where to direct it.
17 BY MR. MORRIS:
18    Q.    Did you ever ask?
19    A.    He knew how to effectuate -- he knew how to
20 effectuate -- or I thought he knew how to effectuate
21 my resignation by directing it to the appropriate
22 personnel.
23    Q.    Did you ever ask him who it should be
24 directed to?
```

Page 49

```
                    Grant Scott
1     A.    No.
2     Q.    Looking at the third paragraph, it says,
3  quote, my resignation will not be effective until I
4  approve of the indemnification provisions and obtain
5  any and all releases.
6          Do you see that?
7     A.    Yes.
8     Q.    Why did you condition the effectiveness of
9  your resignation on those things?
10    A.    Well, although I'm a patent attorney and
11 basically just a technical writer that doesn't deal
12 with legal issues all of the time, it seemed like
13 appropriate language.
14          I have a number of outstanding litigations
15 where I am named personally, and the actions that I
16 took which resulted in my being sued were actions I
17 took on behalf of CLO HoldCo solely in that position,
18 and so I thought just to have the appropriate notice
19 that I would like indemnification to help -- to help
20 deal with those litigation matters.  That is all.
21    Q.    Did anybody suggest to you at any time
22 prior to the time that you sent this e-mail, that any
23 of the DAF entities or CLO HoldCo Limited might have
24 claims against you?
```

Page 50

Grant Scott

1
2    A.    No.  No.
3    Q.    Were you concerned that Mr. Dondero or
4  anyone acting on his behalf might sue you?
5    A.    No.
6    Q.    Did Mr. Dondero ever threaten to sue you?
7    A.    No.
8    Q.    Did you ever obtain the Indemnity provision
9  and any and all necessary releases that you asked for
10  in this e-mail?
11    A.    Not yet.
12    Q.    And what does that mean?
13    A.    I understand that those provisions are --
14  indemnification proposals are in the works, I think.
15    Q.    And do you know who is negotiating --
16  withdrawn.
17        Is somebody negotiating those
18  indemnification and release provisions on your behalf?
19    A.    My -- my attorney would be.
20    Q.    And do you know if your attorney is
21  negotiating with anybody concerning potential
22  indemnification and release provisions for you?
23    A.    I don't know specifically, no.
24    Q.    Do you know if he is -- if -- from whom do
25  you want to obtain releases?

Page 51

Grant Scott

2        MR. BRIDGES:  Objection.  Facts not
3    in evidence.
4  BY MR. MORRIS:
5    Q.    Withdrawn.
6        When you refer to any and all necessary
7  releases, who did you want to obtain releases from?
8    A.    CLO HoldCo.
9    Q.    Anybody else?
10    A.    Well, I mean, and -- and the related
11  entities in that structure chart that you showed.
12  I'm -- I'm -- understand that to me, that is just
13  boilerplate legal language to put in a resignation,
14  you know, just to cross the T's, dot the I's, so to
15  speak.  I'm not anticipating that will be -- that will
16  be a problem.  I am sorry.
17    Q.    You asked for this more than three months
18  ago now, right?
19    A.    Correct.
20    Q.    Do you know why you haven't gotten what you
21  asked for more than three months ago?
22        MR. BRIDGES:  Objection.  Form.
23        THE WITNESS:  I -- I don't.
24  BY MR. MORRIS:
25    Q.    But you still want the releases, right?

Page 52

Grant Scott

1
2    A.    I would like to, yes.
3    Q.    Did you ever have any discussion with
4  Mr. Dondero about the releases that you wanted?
5    A.    No.
6    Q.    Have you communicated with Mr. Dondero
7  since -- since you sent this e-mail?
8    A.    Yes.
9    Q.    Other than the birth date text that he sent
10  to you, have you spoken with him?
11    A.    In February.
12    Q.    So you haven't spoken to him since then?
13    A.    That is correct.
14    Q.    What did you speak to him about in
15  February?
16    A.    He called me to ask me if I knew anything
17  about in particular -- I think it might have been an
18  asset of CLO HoldCo, if I was aware of whether it had
19  been purchased or sold, and I just told him I didn't
20  know what he was -- I didn't know what -- I didn't
21  know what he was referring to.  That was the last
22  conversation that we had.
23    Q.    Can I refer to the period from the date of
24  this --
25        MR. MORRIS:  Actually, let's look

Page 53

Grant Scott

1
2  at -- let's scroll up a little bit, please.
3  BY MR. MORRIS:
4    Q.    Did Mr. Dondero ever try to talk you out of
5  resigning?
6    A.    No.
7        MR. MORRIS:  Can you scroll up?
8        THE WITNESS:  I -- I am sorry.  I
9    need to correct that.  I had conversations
10    with him where I had expressed, not so much
11    a desire to resign, but a belief that it --
12    it made strategic sense or was appropriate.
13    And it had to do with this issue of my
14    independence, and he suggested that family
15    members and friends are not precluded from
16    occupying positions of trust like trustees
17    and things like that, and that there was
18    nothing per se wrong with my -- my activity
19    with CLO HoldCo by virtue of being a friend
20    of his.  So in that sense, he was trying to
21    talk me out of that, I guess.
22  BY MR. MORRIS:
23    Q.    When did that conversation take place?
24    A.    We had a number of those in 2020 and
25  January of 2021.

Page 54

Grant Scott

1           Grant Scott
2          MR. MORRIS:  Can we scroll up just a
3   little bit on this e-mail, please?
4          MR. BRIDGES:  May I ask what exhibit
5   number this is?  I've lost track.  I am
6   sorry.
7          MS. CANTY:  This is Exhibit 5 from
8   earlier.  We are continuing the numbers.
9   So this was marked as Exhibit 5 in this
10   morning's deposition.
11          MR. BRIDGES:  Thank you so much.
12   BY MR. MORRIS:
13      Q.    Do you see where Mr. Dondero wrote to
14   you -- it's just above the yellow highlighting
15   at -- 9:57 a.m.  This is the next day.  Quote, you
16   need to tell me ASAP that you have no intent to divest
17   assets.
18          Do you see that?
19      A.    Yes.
20      Q.    Did Mr. -- do you have any understanding as
21   to why he said that to you?
22      A.    I know that he was mistaken in that
23   statement.
24      Q.    Right.  Do you have any understanding as to
25   whether Mr. Dondero had the ability to stop you from

Page 55

Grant Scott

1           Grant Scott
2   selling assets?
3      A.    No.  It wasn't -- it was a misunderstanding
4   about what the word "divest" meant in the subject
5   line.
6      Q.    And did you understand that until you
7   corrected him, he was concerned and he expressed the
8   concern to you not to sell any assets?
9          MR. KANE:  Objection to form.
10          THE WITNESS:  No.  It had -- I am
11   sorry.  There -- the term "divest" was
12   maybe not a term I should have used.
13   However, my understanding was that my -- my
14   status at CLO HoldCo had a property related
15   aspect to it.  And I used that term to
16   emphasize that I would need to -- that that
17   property aspect would need to be
18   transferred, meaning to the next entity or
19   person.  He mistook it as something being
20   sold.  It had nothing to do with that.
21          That is all.
22   BY MR. MORRIS:
23      Q.    I understand that.  But did you
24   understand -- did you have any understanding as to
25   what interest he had and whether or not assets were

Page 56

Grant Scott

1           Grant Scott
2   being sold?
3          MR. BRIDGES:  Object to form.
4          MR. KANE:  Objection.  Asked and
5          answered.
6   BY MR. MORRIS:
7      Q.    You can answer.
8      A.    No.  I had -- I had no idea what he was --
9      Q.    Okay.  Let's -- let's -- can we -- can we
10   call the period of time between the time you sent this
11   notice of your intent to resign in March 24, 2021 as
12   the interim period?
13      A.    Sure.
14      Q.    And that's the period during which you had
15   expressed your intent to resign, but your resignation
16   had not yet become effective; is that fair?
17      A.    I guess it was the period of time when --
18   yes.  I guess that is correct.
19      Q.    Okay.  Is it fair to say that there were
20   certain things you needed to do during the interim
21   period on behalf of CLO HoldCo and the DAF entities
22   before -- even before your resignation became
23   effective?
24      A.    Yes.
25      Q.    Okay.  Was someone designated to act as

Page 57

Grant Scott

1           Grant Scott
2   your liaison with respect to matters concerning the --
3   the DAF entities and the CLO HoldCo during the interim
4   period?
5          MR. KANE:  Objection.  Form.
6          THE WITNESS:  I had conversations
7   with Mark Patrick in February when I came
8   to -- to believe he -- he would be director
9   elect, so to speak, in terms -- in terms of
10   moving forward.
11   BY MR. MORRIS:
12      Q.    During the interim period, did you have any
13   understanding as to whether Mr. Patrick had any
14   authority to act on behalf of any of the DAF entities
15   or CLO HoldCo?
16          MR. KANE:  Objection.  Form.
17          THE WITNESS:  I came to believe he
18   did, upon signing the management shared
19   transfer agreement.
20   BY MR. MORRIS:
21      Q.    Okay.  So that was -- that was on or about
22   March 24th, 2021, right?
23      A.    Correct.
24      Q.    So I'm asking just about the interim period
25   between January 31st, 2021 when you sent your notice

Grant Scott

2  of intent to resign, and March 24th. That is what I
3  am defining as the interim period.
4        So with that understanding, did you have
5  any reason to believe that Mr. Patrick had any
6  authority to act on behalf of any of the DAF entities
7  or CLO HoldCo during the interim period?
8     A.    Well, it was -- he was part of a group of
9  entity -- a group of individuals that were with an
10  entity that had taken over from -- from Highland, and
11  so in -- certainly in that capacity, he -- as -- as
12  occurred for 10 years or more prior, that -- in that
13  role, you certainly had rights to -- to perform or to
14  act on CLO's behalf here.
15     Q.    And what entity are you referring to?
16     A.    I think it's the Highgate Consulting Group,
17  the Highland employees that took over -- or that
18  created that entity.
19     Q.    And did the -- do you have an understanding
20  as to whether the Highgate Employment Group succeeded
21  to Highland Capital Management LP in the shared
22  services capacity or in the investment advisory
23  capacity or something else?
24        MR. BRIDGES: Object to form.
25        (Reporter clarification.)

Grant Scott

2        THE WITNESS: I'm not entirely sure
3     of that.
4  BY MR. MORRIS:
5     Q.    So is --
6     A.    But he -- but --
7     Q.    I am sorry. Did you finish your answer?
8     A.    I'm not -- I'm not sure of the delineation
9     between the two.
10     Q.    So on what basis did you believe that
11  Mr. Patrick had the authority to act on behalf of the
12  DAF entities and CLO HoldCo during the interim period?
13        MR. BRIDGES: Objection. Asked and
14     answered.
15        THE WITNESS: We had -- we had had a
16     number of conversations. And over the
17     course of a number of weeks, I came to -- I
18     came to understand that he would be the
19     director going forward. So...
20  BY MR. MORRIS:
21     Q.    How did you come to that understanding?
22     A.    Through the conversations that we had had,
23  I guess.
24     Q.    What conversations did you have with Mr. --
25  were these conversations with Mr. Patrick?

Grant Scott

2     A.    They were conversations about the workings
3  with outside counsel to arrange the -- to arrange the
4  transfer of my responsibilities to another person or
5  entity at first, and then I came to learn that that
6  person was -- was -- would be Mark.
7     Q.    Do you know who selected mark?
8     A.    I do not.
9     Q.    Do you know how Mark was selected?
10     A.    I -- I do not.
11     Q.    Did you ever ask Mark how he was selected?
12     A.    I did not.
13     Q.    Did you ever ask Mark who selected him?
14     A.    I did not.
15     Q.    Did you ever ask anybody at any time how
16  Mr. Patrick was selected to succeed you?
17     A.    No, I did not.
18     Q.    Did you ask anybody at any time as to who
19  made the decision to select Mr. Patrick to succeed
20  you?
21     A.    No, I did not.
22        MR. BRIDGES: Objection. Facts not
23     in evidence and foundation.
24  BY MR. MORRIS:
25     Q.    Okay. Do you have any understanding today,

Grant Scott

2  as to who has the authority to select your --
3  withdrawn.
4        Do you have any understanding today, as to
5  who had the authority to select your replacement?
6     A.    I do not.
7        MR. MORRIS: All right. Let's take a
8     short break. And I am certainly -- I'm
9     closer to the end than the beginning. It's
10     3:22 Eastern Time. Let's come back at
11     3:35, please, and hopefully I will be
12     finished by about 4, 4:15.
13        (Recess taken.)
14  BY MR. MORRIS:
15     Q.    I want to go back, Mr. Scott, to the time
16  that you became appointed the managing member of the
17  general partnership and to the director of the other
18  DAF entities and CLO HoldCo. Do you remember how that
19  came to be?
20     A.    My recollection is that various law firms
21  and Mark Patrick had a role in its creation and
22  configuration following some -- it's -- I believe it's
23  modeled after some expert -- expert in the field. I
24  am sorry. I don't know if I answered your question.
25     Q.    You did not. So let me try it again. Do

Page 62

```
1                    Grant Scott
2      you recall how it came to be that you assumed those
3      positions?
4           A.      Ten years ago I accepted that role.
5           Q.      And who offered the role to you?
6           A.      Jim Dondero.
7           Q.      Did -- did you communicate with anybody
8      other than Mr. Dondero concerning the opportunity that
9      he presented to you to assume these roles prior to the
10     time you accepted the position?
11                  MR. KANE:  Objection.  Form.
12     BY MR. MORRIS:
13          Q.      Withdrawn.
14          A.      Possibly or --
15          Q.      Withdrawn.  Let me ask -- let me ask --
16     it's a good objection.
17                  Mr. Scott, prior to the time that you
18     assumed your positions with the DAF entities and
19     CLO HoldCo, did you speak with anybody other than
20     Mr. Dondero, about the duties and responsibilities of
21     those positions?
22                  MR. KANE:  Objection to form.
23                  THE WITNESS:  The only thing that
24           comes to mind is Hunton & Williams.  But
25           I -- I'm not sure.  I don't know.
```

Page 63

```
1                    Grant Scott
2      BY MR. MORRIS:
3           Q.      Do you have any memory of interviewing with
4      anybody?
5           A.      I don't have any recollection of that, no.
6           Q.      Did you submit a resume of any kind?
7           A.      Possibly a CV.  But I -- I just don't
8      remember anymore.
9           Q.      Do you know who made the decision to select
10     you to serve in those capacities?
11                  MR. KANE:  Objection.  Form.
12                  THE WITNESS:  I don't know.
13     BY MR. MORRIS:
14          Q.      Did anybody -- withdrawn.
15                  Did you meet with Patrick before or after
16     you assumed these roles?
17          A.      It's going back 10 years.  I -- I'm not
18     sure.
19                  MR. MORRIS:  Can we put up on the
20           screen a document that we marked this
21           morning.  I believe it's Exhibit 2.
22     BY MR. MORRIS:
23          Q.      And this is a document titled An Amended
24     and Restated Limited Liability Company Agreement of
25     Charitable DAF GP LLC.
```

Page 64

```
1                    Grant Scott
2                    Do you see that?
3           A.      Yes.
4           Q.      And do you see that it's effective January
5      1, 2012?
6                   And if we could go to the last page.  And
7      is that your signature, sir?
8           A.      That is correct.
9           Q.      And is this the document that you signed on
10     March 12th, 2012, pursuant to which you became the
11     general partner of the DAF GP?
12                  MR. KANE:  Objection.  Form.
13                  THE WITNESS:  It's not March 12th.
14           It's dated as March 21st, just to clarify,
15           but I believe so.
16     BY MR. MORRIS:
17          Q.      I appreciate that.  I'm going to ask the
18     question again, just because I was wrong and I want to
19     get it right.
20                  Is this the document you signed on or about
21     March 21, 2012, pursuant to which you became the
22     managing member of the DAF GP, LLC?
23          A.      I believe so.
24          Q.      Okay.  And you replaced Mr. Dondero in that
25     capacity; is that right?
```

Page 65

```
1                    Grant Scott
2           A.      Yes.
3           Q.      And your recollection is that Mr. Dondero
4      presented the opportunity to you; is that right?
5                   MR. KANE:  Objection.  Form.
6                   THE WITNESS:  Yes.  I guess you could
7           call it an opportunity.
8      BY MR. MORRIS:
9           Q.      And do you have any recollection as to
10     whether or not anybody else was involved in the
11     decision to offer the opportunity to you?
12          A.      I -- I don't recall.
13          Q.      Okay.  We can take that down, please.
14                  Do you recall whether Mr. Patrick was
15     involved in your selection as the replacement
16     management member of the DAF GP, LLC in 2012?
17          A.      I have no recollection.
18                  MR. KANE:  Objection to form.
19                  Yes.  Okay.
20     BY MR. MORRIS:
21          Q.      I want to go back to what we had defined
22     earlier as the interim period, and that was the period
23     between January 31st, 2021, when you sent in that
24     notice and March 24, 2021, when you transferred the
25     shares.  That is what we were calling the interim
```

Page 66

```
                    Grant Scott
 1
 2   period, right?
 3        A.    Yes.
 4        Q.    Okay.  Is it fair to say that Mr. Patrick
 5   served as your primary contact with respect to matters
 6   concerning CLO HoldCo and the DAF during the interim
 7   period?
 8        A.    Yes.
 9        Q.    Okay.  And, in fact, Mr. Patrick gave you
10   instructions on what to do for the DAF and the
11   CLO HoldCo on certain matters during the interim
12   period, correct?
13             MR. KANE:  Objection to form.
14             THE WITNESS:  Periodically, yes.
15   BY MR. MORRIS:
16        Q.    I am sorry.  What is the answer?
17        A.    Periodically, yes.
18        Q.    Okay.  Did somebody ever tell you that you
19   should follow Mr. Patrick's instructions?
20        A.    No, I don't believe so.
21        Q.    And, Mr. Patrick, to the best of your
22   knowledge, didn't HoldCo any positions with any of the
23   DAF entities or CLO HoldCo Limited, correct?
24             MR. KANE:  Objection to form.
25             MR. BRIDGES:  Object to foundation.
```

Page 67

```
                    Grant Scott
 1
 2   BY MR. MORRIS:
 3        Q.    You can answer.
 4        A.    During the interim period?
 5        Q.    Correct.
 6        A.    I do not believe so.
 7        Q.    If Mr. Patrick didn't hold any positions,
 8   why did you follow his instructions?
 9             MR. BRIDGES:  Objection.
10             MR. KANE:  Objection.  Go ahead,
11        sorry.
12             MR. BRIDGES:  Facts not in evidence.
13             MR. KANE:  And objection to form.
14   BY MR. MORRIS:
15        Q.    You can answer, sir.
16        A.    Yes.  Well, there -- I mean, there was a
17   lot of activity that was required to transfer over
18   from how things had been handled under Highland, to
19   how they would now be handled under -- with the
20   services being provided by Highgate, and he was a
21   member, and he was the point person, I guess, and he
22   was my main interface to get those large numbers of
23   issues resolved.
24             There was -- you know, it was a very busy,
25   challenging time.
```

Page 68

```
                    Grant Scott
 1
 2        Q.    Did you sign any agreement on behalf of any
 3   of the DAF entities or CLO HoldCo with the entity that
 4   you are referring to as Highgate?
 5        A.    I'm not sure.
 6        Q.    Do you have any recollection at all of ever
 7   signing any agreements in your capacity as the
 8   authorized representative of any of the DAF entities
 9   or CLO HoldCo and Highgate?
10             MR. KANE:  Objection.  Form.
11             THE WITNESS:  I -- I don't recall.
12   BY MR. MORRIS:
13        Q.    And I may have asked you this already.  If
14   I have, I'm sure there will be an objection.  But do
15   you recall if Highgate was providing services
16   equivalent to the shared services that Highland
17   previously provided, or was it providing investment
18   advisory services of the type Highland previously
19   provided?
20             MR. KANE:  Objection to form.
21             MR. BRIDGES:  Objection.
22   BY MR. MORRIS:
23        Q.    You can answer.
24        A.    I don't know the delineation of the
25   services they were providing.
```

Page 69

```
                    Grant Scott
 1
 2        Q.    Do you know whether during the interim
 3   period, any entity other than Highgate was providing
 4   services on behalf of any of the DAF entities or
 5   CLO HoldCo?
 6        A.    Well, I knew from various wires that were
 7   approved, that various entities were providing
 8   services.  Law firms, for example.
 9        Q.    But was there any -- any entity other than
10   Highgate that was providing any of the services that
11   had previously been provided by Highland?
12        A.    Well, Highland provided a lot of legal
13   services.  I don't know that Highgate had the same
14   capability.  So I don't know how to answer that.
15        Q.    All right.  I'm going to try a different
16   way.
17             Before -- before 2021, the DAF entities had
18   both a shared services arrangement and an investment
19   advisory arrangement with Highland.
20             Do I have that right?
21        A.    Yes.
22        Q.    During the interim period, Highland was no
23   longer providing any of those services, correct?
24        A.    That's what I understand, yes.
25        Q.    Did anybody replace Highland in the
```

Page 70

```
 1                    Grant Scott
 2  provision of those services during the interim period?
 3              MR. BRIDGES:  Objection, asked and
 4       answered.
 5  BY MR. MORRIS:
 6       Q.    You can answer, sir.
 7       A.    I mean, besides the services Highgate
 8  were -- was -- were providing, I'm not sure.
 9       Q.    And -- and I do know that I've asked this
10  before, but now with that context:  Do you know
11  whether Highgate was providing services of the shared
12  services type, or the investment advisory type, or you
13  just don't know?
14              MR. BRIDGES:  Objection to the form.
15              THE WITNESS:  At least I would think
16       mostly the shared services type.
17  BY MR. MORRIS:
18       Q.    Okay.  Is it your understanding that under
19  the shared services agreement, that Highgate had the
20  ability to make decisions on behalf of any of the DAF
21  entities or CLO HoldCo?
22              MR. BRIDGES:  Objection.
23              MR. KANE:  Objection to form.
24              MR. BRIDGES:  Misstates testimony.
25              THE WITNESS:  Yeah, my prior
```

Page 71

```
 1                    Grant Scott
 2       testimony was I didn't see the agreements,
 3       so I don't know.
 4  BY MR. MORRIS:
 5       Q.    You haven't seen any agreement with
 6  Highgate; is that right?
 7       A.    I don't recall that I have.
 8       Q.    Do you have any understanding as to whether
 9  Highgate had the authority to bind any of the DAF
10  entities or CLO HoldCo during the interim period?
11              MR. BRIDGES:  Objection.  Calls for a
12       legal conclusion.
13              THE WITNESS:  I don't know.
14  BY MR. MORRIS:
15       Q.    Do you have any understanding as to whether
16  Mark Patrick had the ability as an individual to bind
17  any of the DAF entities or CLO HoldCo during the
18  interim period?
19              MR. BRIDGES:  Objection.  Calls for a
20       legal conclusion.
21              MR. KANE:  Objection.  Calls for a
22       legal conclusion.
23              THE WITNESS:  I don't know.
24  BY MR. MORRIS:
25       Q.    Okay.  And I'm just asking as a matter of
```

Page 72

```
 1                    Grant Scott
 2  fact, to be clear.  I'm not asking for any legal
 3  conclusions.  I'm asking for your understanding as the
 4  authorized representative of the DAF entities and
 5  CLO HoldCo during the interim period.
 6              So with that -- with that background as the
 7  authorized entity, then -- withdrawn.
 8              As the authorized representative during the
 9  interim period, did you have any understanding as to
10  whether Mr. Patrick had the authority to bind any of
11  the DAF entities or CLO HoldCo during that time?
12              MR. KANE:  Objection.
13              MR. BRIDGES:  Objection.  Calls for
14       legal conclusion.  Also, objection as to
15       vagueness of the question.
16  BY MR. MORRIS:
17       Q.    I'm sorry, Mr. Scott, did you answer?
18       A.    I did not.  No, I have not.  I --
19       Q.    I apologize.
20       A.    I don't know what the status of his legal
21  authorization was.
22       Q.    Do you recall that in early March, you
23  bought a couple of events to Mr. Patrick's attention?
24       A.    I know that I forwarded documents to his
25  attention, yes.
```

Page 73

```
 1                    Grant Scott
 2       Q.    And why did you forward documents to
 3  Mr. Patrick's attention during the interim period?
 4       A.    Because I was resigning, and I understood
 5  that he was essentially going to be, or was the
 6  director elect, and I just thought it appropriate to
 7  bring such things to his attention.
 8       Q.    And when did you -- when did you learn that
 9  he was doing to be the director elect?
10       A.    I -- I believe it was February.  Sometime
11  in February.
12       Q.    Do you recall how you learned that he was
13  going to become the director elect?
14       A.    I can't point to a specific conversation.
15  I can't -- I can't point to the specific conversation.
16  At some point, it went from being some future third
17  party, and I came to believe it would be him.  I'm
18  not -- I'm not sure of the timing.
19       Q.    Okay.  Do you know from whom you learned
20  that he was going to be the director elect?
21       A.    I believe it was him.
22       Q.    Okay.  So he told you that he was going to
23  replace you; is that right?
24       A.    I don't know that he said it specifically.
25  I don't remember our conversations.
```

Page 74

Grant Scott

2  Q.   Did you ever do anything to confirm with
3  anybody that Mark Patrick was going to be the director
4  elect, or did you just take his word for it?
5  A.   I did not independently confirm it, no.
6  Q.   Did you ever ask Mr. Dondero if -- if he
7  approved of the selection of Mr. Patrick as your
8  successor?
9  A.   I did not.
10 Q.   Did you ever discuss with Mr. Dondero, the
11 topic of who would be your successor?
12 A.   Going back.  Prior to the interim period, I
13 had recommended him, Mark.
14 Q.   Did you -- did you discuss Mr. Patrick's
15 selection as your successor with anybody in the world
16 at any time other than Mr. Patrick?
17 A.   I talked with my attorney about it.  But I
18 don't think so.  No.
19 Q.   Did you talk with anybody that you believed
20 was authorized to make the decision on behalf of the
21 DAF entities and CLO HoldCo about your successor?
22 A.   No, I did not.
23      MR. MORRIS:  Can we put up the
24      document that was marked, La Asia, on Page
25      7, as Bates number 80.

Page 75

Grant Scott

2      (Deposition Exhibit 10 was marked for
3  identification.)
4  BY MR. MORRIS:
5  Q.   Do you see that -- if you scroll just down
6  a little bit.  I guess not.
7      Mr. Patrick wrote an e-mail to you and
8  said, "The successor will respond to this complaint,"
9  and at the top you wrote "understood" --
10 A.   Yes.
11 Q.   -- or the top of the e-mail.
12      Do you recall that in early March, you
13 received a new complaint in which CLO HoldCo was named
14 the defendant?
15 A.   I believe this -- this was the unsecured
16 creditors' committee complaint; is that correct?
17 Q.   I think so, but it's your testimony.  I'm
18 just asking you if you recall that in early March,
19 CLO HoldCo was sued?
20 A.   Yes.  I think this was the second lawsuit
21 that I was referring to personally.
22 Q.   Okay.  And so this -- this actually
23 occurred after the time you had already given notice,
24 right?
25 A.   Yes.

Page 76

Grant Scott

2  Q.   Yeah.  And was the first lawsuit, the one
3  that you settled, before you gave notice?
4  A.   No.  The -- no, both lawsuits are pending.
5  Q.   Okay.  Do you know when the -- who's the
6  plaintiff in the first one?
7  A.   Acis.
8      (Reporter clarification.)
9      THE WITNESS:  Acis, A-C-I-S.
10 BY MR. MORRIS:
11 Q.   So the debtor never sued you personally; is
12 that right?
13 A.   Not yet.
14 Q.   And is it right that Mr. Patrick told you
15 that -- that the successor will respond to the
16 complaint?
17 A.   Yes.
18 Q.   Now, he's not referring to himself yet, is
19 he?
20 A.   That appears correct, yes.
21 Q.   Does that refresh your recollection that
22 you had not known yet as of March 2nd who the
23 successor would be?
24 A.   I guess it does.
25      MR. MORRIS:  Can we put up the next

Page 77

Grant Scott

2  exhibit, please, the one ending in -- the
3  one Bates number 85.  And please remind us,
4  La Asia, what exhibit number are we up to?
5      MS. CANTY:  We're up to 10, but the
6  one I'm about to put up is Exhibit 6 from
7  earlier today.
8      MR. MORRIS:  Thank you very much.
9  BY MR. MORRIS:
10 Q.   Now, if we can just scroll down a little
11 bit.  Do you remember something called an Adherence
12 Agreement being discussed in March of 2021?
13 A.   A what agreement?
14 Q.   Adherence Agreement.
15 A.   I see that.  Was it directed to me?
16 Q.   Yeah.  If we can just scroll up.
17      Okay.  So right there, do you see that
18 Thomas Surgent sends it to Mr. Kane?  The subject is
19 'Adherence Agreement."
20 A.   Yes.
21 Q.   And you do see that you forwarded that
22 e-mail to Mr. Patrick on the same day, March 2nd?
23 A.   Yes.
24 Q.   And it says "This relates to the second
25 issue from the debtor."

Page 86

Grant Scott

1
2     MR. BRIDGES: Objection.
3     MR. MORRIS: Withdrawn. Withdrawn.
4  BY MR. MORRIS:
5     Q.    You didn't provide a substantive response
6  to Elysium; is that right?
7     MR. KANE: Objection. Assumes facts
8     not in evidence.
9     MR. MORRIS: That is why I'm asking
10    the question.
11 BY MR. MORRIS:
12    Q.    Go ahead, Mr. Scott. You can answer.
13    A.    I did not provide a substantive response to
14 their inquiry.
15    Q.    Okay. Thank you.
16          Can we go to the top. In fact -- in fact,
17 you were instructed by Mr. Patrick to do nothing,
18 correct?
19    MR. BRIDGES: Objection. Misstates
20    the testimony.
21    THE WITNESS: No.
22 BY MR. MORRIS?
23    Q.    Sir, the e-mail says "Do nothing," correct?
24    A.    That is correct, and they were handling it,
25 not me.

Page 87

Grant Scott

1
2     Q.    Okay. Now, did you resign on or about
3  March 24th, 2021?
4     A.    Yes. That's -- that's when the transfer --
5  share of transfer.
6     Q.    Okay.
7     MR. MORRIS: Can we put the next
8     exhibit up, please. It's the one at the
9     top at page 10. It's file 3, document 5.
10    MR. BRIDGES: Mr. Morris, can I ask
11    you how it is for time because you told us
12    earlier -- you teased us with a 4:15 end
13    time, potentially.
14    MR. MORRIS: Yeah, I'm just on the
15    last couple of documents.
16    MR. BRIDGES: Thank you.
17    MR. MORRIS: You bet.
18 BY MR. MORRIS:
19    Q.    Do you see this is a document called an
20 Assignment and Assumption of Membership Interest
21 Agreement?
22    A.    Yes.
23    MR. MORRIS: And if we can scroll
24    down.
25 BY MR. MORRIS:

Page 88

Grant Scott

1
2     Q.    Did you sign this document?
3     A.    Yes, sir.
4     Q.    Okay. Do you know what this document is?
5     A.    I believe it's the Management Share
6  Transfer Agreement.
7     Q.    Okay. And do you know who prepared it?
8     A.    I do not.
9     Q.    Did you assign something pursuant to this
10 document?
11    A.    Yes. The -- the -- the management shares.
12    MR. MORRIS: Okay. Can we go to the
13    first page, please?
14 BY MR. MORRIS:
15    Q.    And do you see in paragraph 1, there is a
16 description of the assignment and assumption of the
17 signed interest?
18    A.    Yes, I see that.
19    Q.    Okay. Does that paragraph describe
20 everything that you assigned to Mr. Patrick?
21    A.    In this agreement. Yes.
22    MR. BRIDGES: Objection. Calls --
23    objection. Calls for a legal conclusion.
24    MR. KANE: I join the objection.
25 BY MR. MORRIS:

Page 89

Grant Scott

1
2     Q.    You can answer, sir.
3     A.    Yes. I mean, it says what it says. But
4  yes, that is what I was transferring.
5     Q.    And can you identify for me anything that
6  you know that you ever assigned to Mr. Patrick that is
7  not set forth in paragraph 1?
8     MR. BRIDGES: Objection. Form.
9     THE WITNESS: I'm unaware of
10    anything.
11 BY MR. MORRIS:
12    Q.    Do you know if -- if the items and assets
13 that are set forth in paragraph 1 had any value?
14    MR. KANE: Objection. Form.
15    THE WITNESS: They had value, maybe
16    not monetary.
17 BY MR. MORRIS:
18    Q.    And what value did they have?
19    A.    I believe they had the property interest
20 that I referred to previously.
21    Q.    And what property interest are you
22 referring to?
23    MR. KANE: Objection. Form. Calls
24    for a legal conclusion.
25 BY MR. MORRIS:

Page 90

Grant Scott

2  Q. You can answer. Sir, it's your words we
3  need.
4  A. The shares were the -- these management
5  shares were the -- I was treating as property.
6  Q. Do you have any understanding as to what
7  the value of the management shares was at the time you
8  entered into this agreement?
9  A. I did not.
10  Q. Did you have any understanding as to
11  whether those management shares held any particular
12  rights at the time you entered into this agreement?
13  MR. KANE: Objection to form.
14  THE WITNESS: My understanding was
15  they had my rights previously. Ultimately.
16  BY MR. MORRIS:
17  Q. And what rights did you believe flowed from
18  the management shares?
19  A. The controlling rights that flowed down to
20  the various entities.
21  Q. Did you receive anything in return in
22  exchange for your assignment of these property
23  interests and the other assets set forth in paragraph
24  1?
25  A. It allowed me to finally resign. That is

Page 91

Grant Scott

2  what I received. I mean, it ended my -- it ended my
3  role as a -- maybe as an agent, or an employee or
4  whatever. Those are my substantive rights, as I
5  understood it.
6  Q. Okay. So you -- you surrendered the
7  substantive rights in an exchange -- you no longer had
8  your substantive rights?
9  MR. BRIDGES: Objection. Asked and
10  answered.
11  MR. KANE: Objection. Form.
12  BY MR. MORRIS:
13  Q. You can answer, sir. Did you get anything
14  other than -- withdrawn.
15  Did you get anything other than what you
16  already described?
17  A. Relief. Yes.
18  Q. Excellent. Did you ever consider assigning
19  these interests or assets to anybody other than
20  Mr. Patrick?
21  A. I did not.
22  Q. Did you ever consider -- did you have any
23  belief as to whether the interests that were assigned
24  were freely tradeable?
25  MR. BRIDGES: Objection. Calls for a

Page 92

Grant Scott

2  legal conclusion.
3  MR. KANE: I join the objection.
4  THE WITNESS: I didn't make -- I did
5  not make an assessment of that.
6  BY MR. MORRIS:
7  Q. Do you know -- withdrawn.
8  Do you have any understanding as to whether
9  there were any restrictions on the transferability of
10  the interests that you assigned pursuant to this
11  agreement?
12  MR. KANE: Objection. Calls for a
13  legal conclusion.
14  THE WITNESS: I did not.
15  BY MR. MORRIS:
16  Q. Did you let anybody know that you were
17  willing to assign the interests that are described in
18  paragraph 1 other than Mr. Patrick?
19  A. Anyone that I -- conceivably, anyone that I
20  let know that was at all familiar with the structure,
21  anyone that was informed of my desire to resign would
22  have arguably have known that.
23  Q. Okay. I'm not asking you to put yourself
24  in the shoes of anybody else. I'm asking for what you
25  recall telling people.

Page 93

Grant Scott

2  Did you ever tell anybody at any time that
3  you were ready, willing and able to transfer and
4  assign the interests that are in this document other
5  than Mr. Patrick and your lawyers?
6  A. I am sorry. I misunderstood your question.
7  The answer is no.
8  Q. Did you ever think to try to assign these
9  interests for a profit?
10  A. Good grief, no.
11  (Reporter clarification.)
12  A. No.
13  Q. Did you -- was anybody, other than
14  Mr. Patrick, ever identified as a potential assignee
15  of the interests that are described in paragraph 1?
16  MR. KANE: Objection to form.
17  THE WITNESS: I was unaware of any.
18  BY MR. MORRIS:
19  Q. Okay. Did you make any effort to identify
20  anybody other than Mr. Patrick as a potential assignee
21  for the interests that are set forth in paragraph 1?
22  A. No, I did not.
23  Q. Did any -- did anybody acting on your
24  behalf, to the best of your knowledge, ever make any
25  efforts to identify any potential assignee other than

**Page 94**

```
1                    Grant Scott
2    Mr. Patrick for the interests set forth in paragraph
3    1?
4            MR. BRIDGES:  Objection.  Foundation.
5            THE WITNESS:  I don't have that
6       knowledge.  No.
7            MR. MORRIS:  Can we go to the next
8       exhibit, please?
9            (Deposition Exhibit 14 was marked for
10   identification.)
11   BY MR. MORRIS:
12       Q.    Okay.  And do you see that these are
13   written resolutions dated the next day, March 25th?
14       A.    Yes.
15       Q.    And these resolutions provide for the
16   shared transfer described in the document?
17       A.    It appears so, yes.
18       Q.    And are these the management shares that
19   you were referring to earlier?
20       A.    I believe so.
21       Q.    Did you believe at the time that you owned
22   all of the management shares of charitable DAF HoldCo
23   Limited?
24       A.    That was my understanding.
25       Q.    How did you acquire those shares?
```

**Page 95**

```
1                    Grant Scott
2        A.    I'm not sure the exact timing, but I
3    believe that was all established when I became
4    involved.
5        Q.    Did you pay anything of value for the
6    shares at the time that you acquired them?
7        A.    I am -- I don't believe so, no.
8        Q.    Did you need to obtain anybody's approval
9    before you could transfer the shares?
10       A.    No.  I don't believe so.
11       Q.    Did you make any effort to obtain anybody's
12   approval before you transferred the shares?
13       A.    I did not.
14       Q.    Did you have any reason to believe that
15   Mr. Dondero approved of the transfer of the management
16   shares to Mr. Patrick?
17       A.    I -- I don't know that.
18       Q.    Did you testify earlier, that you had
19   discussed with Mr. Dondero in January, Mark Patrick
20   succeeding you?
21           MR. BRIDGES:  Objection.  Misstates
22       prior testimony.
23   BY MR. MORRIS:
24       Q.    You can answer, sir.
25       A.    I believe it was prior to that.
```

**Page 96**

```
1                    Grant Scott
2        Q.    Were you paid anything of value for your
3    services as the, either the managing member of the DAF
4    GP, or as a director of any of the other DAF or
5    CLO HoldCo Limited entities at any time?
6        A.    For a majority of the years, yes, I
7    received a monthly statement.
8        Q.    And is that -- how much was the monthly
9    statement?
10       A.    I believe it was $5,000.
11       Q.    Did it ever increase to an amount more than
12   $5,000?
13       A.    No.
14       Q.    Did you receive anything else of value for
15   your service to the DAF entities and CLO HoldCo
16   Limited other than the $5,000 monthly stipend that you
17   just described?
18       A.    I did not.
19       Q.    Do you recall that after you resigned, you
20   got reappointed, and then subsequently replaced again
21   by Mr. Patrick?
22           MR. KANE:  Objection to form.
23       (Reporter clarification.)
24           THE WITNESS:  Can you repeat -- did
25       you say -- it went away, and then it came
```

**Page 97**

```
1                    Grant Scott
2    back.  I don't understand the question.  I
3    am sorry.
4    BY MR. MORRIS:
5        Q.    That is okay.  I just saw this in the
6    documents, and I thought it was odd.  But let me put
7    the documents up and see if you can shed any light.
8            MR. MORRIS:  Let's start with the
9        next exhibit, Patrick File 3, Document 9.
10           (Deposition Exhibit 15 was marked for
11   identification.)
12   BY MR. MORRIS:
13       Q.    And do you see in the resolutions, if we
14   can go up just a bit, dated March 24th, and it was
15   resolved that you were removed as a director of the
16   company and Mr. Patrick was appointed as your
17   replacement, if that is a fair characterization?
18           Do you see that?
19       A.    I see that.
20           MR. MORRIS:  And now if we can put up
21       the next document.
22           (Deposition Exhibit 16 was marked for
23   identification.)
24   BY MR. MORRIS:
25       Q.    So this is a week later.  It's March 31st.
```

Page 98

Grant Scott

1        Grant Scott
2        MR. MORRIS:  And if we can just
3    scroll down and see if it's signed.
4  BY MR. MORRIS:
5    Q.    Do you see that Mr. Patrick was removed as
6  the director and you were reappointed?
7    A.    Yes, I do see that.
8    Q.    Do you have any understanding as to why
9  Mr. Patrick resigned and reappointed you as the
10  director a week later?
11    A.    I don't have -- I don't -- I don't know.
12    Q.    Did you even know this happened?
13    A.    Is my signature on that agreement?
14    Q.    No.
15    A.    I'm not sure.
16    Q.    Do you have any -- do you have any
17  recollection as -- as to whether or not you were ever
18  reappointed as the director of the company on or about
19  March 31st, 2021?
20    A.    I don't know if I have received any
21  communication about this or not.
22    Q.    Okay.
23        MR. MORRIS:  Can we go to the next
24    document, please?
25        (Deposition Exhibit 17 was marked for

Page 99

Grant Scott

1  identification.)
2        MR. KANE:  Mr. Morris, can you help
3    me with the exhibit numbers?  Was that 16,
4    or are we still on 15, additional portions
5    of it?
6        MS. CANTY:  That was 16 but not going
7    to 17.
8        MR. KANE:  Thank you.  I apologize.
9        MR. MORRIS:  That is okay, Jonathan.
10    We will get to everything and clear up any
11    confusion.
12  BY MR. MORRIS:
13    Q.    So if you go to the bottom of that
14  document, can you see that it was signed?
15        All right.  Do you see Mr. Patrick signed
16  this document?
17    A.    Yes, I see that.
18    Q.    Do you see that it's dated -- if we can go
19  back up to the top.  It's April 2nd, and do you see
20  that you are -- pursuant to these resolutions, you
21  were removed as the director again and replaced by
22  Mr. Patrick?
23    A.    Yes, I see that.  And they seem to be
24  correcting an error of some sort.

Page 100

Grant Scott

1        Grant Scott
2    Q.    Did anybody ever describe for you or
3  explain to you what error had been made?
4    A.    I am sorry.  I'm not familiar with these
5  documents.
6    Q.    Okay.  Is it fair to say that -- well, I
7  will just leave it at that.
8        So nobody ever informed you that there was
9  a mistake that had to be corrected; is that right?
10        MR. BRIDGES:  Objection.  Asked and
11    answered.
12  BY MR. MORRIS:
13    Q.    You can answer.
14    A.    I don't know that there was this -- this
15  may have -- I don't know that there was a mistake.
16    Q.    You have no knowledge of --
17    A.    I have no knowledge of this.  I was in a
18  very complex process.  I think there...
19    Q.    And nobody ever asked -- nobody ever asked
20  your consent to be reappointed as the director of the
21  company, correct?
22        MR. BRIDGES:  Objection.  Asked and
23    answered.
24        THE WITNESS:  I didn't receive any
25    communications about this.

Page 101

Grant Scott

1        Grant Scott
2  BY MR. MORRIS:
3    Q.    And so you didn't provide your consent to
4  be reappointed as the director of the company,
5  correct?
6        MR. BRIDGES:  Objection.  Asked and
7    answered.
8        THE WITNESS:  That's correct.
9  BY MR. MORRIS:
10    Q.    Okay.  Did you become aware that after you
11  resigned, that DAF and CLO HoldCo started a lawsuit
12  against the debtor and some other defendants related
13  to the HarbourVest settlement?
14    A.    I did become aware of it, yes.
15    Q.    And were you aware of the lawsuit -- were
16  you aware that DAF and CLO HoldCo were considering
17  filing the lawsuit before it was actually commenced?
18    A.    No.
19    Q.    Did you have any communications with
20  anybody at any time about the possibility that the DAF
21  and CLO HoldCo would commence a lawsuit against the
22  debtor and others relating to the HarbourVest
23  settlement prior to the time that the lawsuit was
24  commenced?
25    A.    I did not.

Page 102

```
              Grant Scott
1
2      Q.    So is it fair to say that you did not
3  provide any information to anybody at any time to
4  support the claim -- the complaint that was filed
5  against the debtor and the other defendants in the
6  lawsuit that was brought by the DAF and CLO HoldCo?
7         MR. BRIDGES:  Objection.  Foundation.
8         THE WITNESS:  I didn't provide
9      anything with respect to the litigation
10     that was filed.
11 BY MR. MORRIS:
12     Q.    And did anybody ever ask you for
13 information relating to potential claims against the
14 debtor and others?
15     A.    No.
16     Q.    Did you ever have any discussions with
17 anybody at any time as to whether Jim Seery should be
18 named as a defendant in the lawsuit that was bought by
19 the DAF and CLO HoldCo against the debtor and others?
20     A.    No.
21        MR. MORRIS:  I have no further
22 questions.  Thank you, Mr. Scott.
23        MR. BRIDGES:  I don't have any
24 questions.
25        MR. KANE:  Can I -- I've got a couple
```

Page 103

```
              Grant Scott
1
2      just follow-up for clarification purposes.
3             EXAMINATION
4  BY MR. KANE:
5      Q.    Grant, earlier you were testifying about
6  resigning and noted -- I believe your testimony was
7  one of the reasons was an issue of independence.  Can
8  you clarify what you meant by issue of independence?
9      A.    I came to believe that there was a
10 perception, and my friendship with Jim Dondero
11 precluded my -- my independence.
12     Q.    Perception by whom?
13     A.    The judge in the case.
14        (Reporter clarification.)
15     A.    The judge in the bankruptcy case.
16     Q.    Was there a specific reason or instance
17 that caused you to have that belief?
18     A.    Yes.  When I spoke with you about the --
19     Q.    Well, I don't want to go into any
20 attorney-client communications.
21     A.    I am sorry.
22     Q.    So let me ask you a different question.
23 Were you provided a transcript of the Court's ruling
24 on the escrow hearing for the registry dispute?
25     A.    I believe so.
```

Page 104

```
              Grant Scott
1
2      Q.    And did you read that transcript?
3      A.    I believe we discussed it.  I'm not -- I'm
4  not sure.
5      Q.    Did you have a recollection that Judge
6  Jernigan made a comment or comments about you and
7  Jim Dondero during her ruling?
8      A.    Yes.
9      Q.    Do you believe that Judge Jernigan's
10 comments were inaccurate?
11        MR. MORRIS:  Objection to the form of
12     the question.  No foundation.  Leading.
13 BY MR. KANE:
14     Q.    I will rephrase.  I will rephrase.
15     I will ask it -- a different question.
16 Mr. Scott, do you believe that you acted
17 independently during the bankruptcy case?
18     A.    Yes.
19     Q.    Do you believe you acted in the best
20 interests of CLO HoldCo?
21     A.    Yes, I do.
22        MR. KANE:  I'm done.
23        MR. MORRIS:  Just some follow-up
24     questions, Mr. Scott.
25
```

Page 105

```
              Grant Scott
1
2             EXAMINATION
3  BY MR. MORRIS:
4      Q.    Did you ever testify before Judge Jernigan?
5      A.    I have not.
6      Q.    So is it fair to say that you had no reason
7  to believe that she could ever access your credibility
8  as a witness?
9         MR. BRIDGES:  I'm going to object.
10        That calls for a legal conclusion.
11 BY MR. MORRIS:
12     Q.    You can answer.
13     A.    From -- from what I understand from the
14 transcript of that hearing, a number of comments were
15 made by the judge regarding my independence, that sort
16 of thing, that made me -- that made me think that
17 maybe I could just remove that as an issue in the case
18 by resigning.  That is essentially, what my conclusion
19 was from that hearing.
20     Q.    But you didn't resign at the time that the
21 judge made those statements, did you?
22        MR. BRIDGES:  Objection.
23        Argumentative.
24 BY MR. MORRIS:
25     Q.    You can answer.
```

Page 106

Grant Scott

2    A.    I did not at that time.
3    Q.    In fact, you didn't resign for probably
4    seven months after, correct?
5         MR. BRIDGES:  Objection.  Asked and
6    answered.  Really?
7         THE WITNESS:  Yes.
8    BY MR. MORRIS:
9    Q.    And you continued to actively participate
10   in the bankruptcy case, correct?
11   A.    That is correct.
12   Q.    And months later, you made the decision to
13   amend CLO HoldCo's proof of claim, correct?
14   A.    Correct.
15   Q.    And months later, you made the decision to
16   file an objection to the HarbourVest settlement,
17   correct?
18   A.    Correct.
19   Q.    And months after this hearing, you made the
20   decision to withdraw that objection, correct?
21        MR. BRIDGES:  Objection to repeating
22        the same questions from the last two hours
23        over and over again.  Are we going to keep
24        going all the way to the end.
25   BY MR. MORRIS:

Page 107

Grant Scott

2    Q.    Only -- only if people keep opening the
3    door.
4         Can you please answer my question?
5    A.    Yes, I removed the objection.
6    Q.    And -- and you remained in the case, and
7    you remained active in the case, and you filed on
8    behalf of your -- withdrawn.
9         You stayed in the case even after
10   CLO HoldCo was sued by the debtor, correct?
11   A.    Yes.
12   Q.    And you stayed in the case long enough to
13   negotiate a settlement on behalf of CLO HoldCo with
14   the debtor, correct?
15   A.    Correct.
16   Q.    And you can't identify anything that the
17   judge said following the escrow hearing that had
18   anything to do with you personally, correct?
19        MR. KANE:  Objection.  Form.
20        MR. MORRIS:  Withdrawn.
21   BY MR. MORRIS:
22   Q.    Can you identify anything that the judge
23   said following the escrow hearing that had to do with
24   your independence?
25   A.    I don't remember -- I'm -- what I'm telling

Page 108

Grant Scott

2    you is -- let's just be clear here since I think the
3    point is -- is being missed.  The issue of when I
4    wanted to resign or when I first thought about
5    resigning has been raised.  It was raised during my
6    first deposition with you as well.  And what I'm
7    saying is -- is that after I heard about the hearing,
8    and what was said, I don't remember the exact
9    language.  My first reflection was, hey, maybe that
10   is -- maybe that is -- if I'm going to be in this
11   court having to make a claim, maybe it would be best
12   if it wasn't being made by me.  That is all.
13   Q.    And I appreciate that.  And I am just
14   trying to test the credibility of that statement.
15   Okay?
16        MR. BRIDGES:  Objection to the
17        sidebar.
18   BY MR. MORRIS:
19   Q.    Did Judge Jernigan ever issue a ruling
20   against you personally?
21        MR. BRIDGES:  Asked and answered.
22   Objection.
23        MR. MORRIS:  It is not asked and
24   answered.
25   BY MR. MORRIS:

Page 109

Grant Scott

2    Q.    But go ahead, sir.
3    A.    Not against me personally.
4    Q.    Did Judge Jernigan ever issue a ruling
5    against CLO HoldCo Limited?
6    A.    Well, to my --
7         MR. BRIDGES:  Objection.  Objection.
8    Calls for legal conclusion as to the
9    meaning of "against."
10        (Reporter clarification.)
11        THE WITNESS:  The denial of the
12   escrow motion created a fairly big headache
13   for CLO HoldCo in the remainder of 2020.
14        So I believe that was a ruling
15   against CLO HoldCo, to answer your
16   question.
17   BY MR. MORRIS:
18   Q.    Okay.  Are you aware of any others?
19        MR. BRIDGES:  Objection.  Calls for a
20   legal conclusion as to the meaning of
21   "against."
22   BY MR. MORRIS:
23   Q.    You can answer.
24   A.    I don't know that she's made any other
25   rulings except to approve the settlement.

Page 110

Grant Scott

1

2       Q.       Which settlement are you referring to?

3       A.       The -- the TRO settlement.

4       Q.       And were you on the -- did you listen in to

5    the hearing during that hearing when -- when the judge

6    approved the settlement?

7       A.       I did not.

8       Q.       Did you read the transcript?

9       A.       I did not.

10      Q.       Did anybody ever tell you that the judge

11   said anything during that hearing to question your

12   independence?

13               MR. KANE:  Objection to the extent it

14          calls for attorney/client privileged

15          information.

16               THE WITNESS:  No.  No, I think you

17          misunderstand.  I had one data point to go

18          on, and that's what made me start the

19          process of thinking of resigning.  That's

20          all.

21   BY MR. MORRIS:

22      Q.       I appreciate that.

23      A.       The issue -- the issue has been raised

24   repeatedly, whether it was my idea or somebody else's

25   idea, that's all I'm saying.  If you can, it was my

Page 111

Grant Scott

1

2    idea.

3       Q.       Okay.  And I'm asking you if you have any

4    other data points after that hearing to support the

5    notion that Judge Jernigan questioned your

6    independence?

7       A.       No.

8               MR. MORRIS:  I have no further

9          questions.

10              MR. BRIDGES:  Me either.

11              MR. KANE:  I'm done.  Thank you.

12   Mr. Scott.

13              (Deposition adjourned at 4:42 p.m.)

Page 112

Grant Scott

1

2                REPORTER'S CERTIFICATE

3        I, LESHAUNDA CASS-BYRD, CSR No. B-2291, RPR,

4    Registered Professional Reporter, certify that the

5    foregoing proceedings were taken before me at the time

6    and place therein set forth, at which time the witness

7    was put under oath by me;

8        That the testimony of the witness, the questions

9    propounded, and all objections and statements made at

10   the time of the examination were recorded

11   stenographically by me and were thereafter

12   transcribed;

13       That the foregoing is a true and correct

14   transcript of my shorthand notes to taken.

15   I further certify that I am not a relative or employee

16   of any attorney or the parties, nor financially

17   interested in the action.

18       I declare under penalty of perjury under the laws

19   of North Carolina that the foregoing is true and

20   correct.

21       Dated this June 1, 2021.

22

23       *Leshaunda Byrd*

24            LESHAUNDA CASS-BYRD, CCR-B-2291, RPR

25

Page 113

1    ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No. Now Reads      Should Read  Reason

6    ____ ____ _____    _____   _____

7    ____ ____ _____    _____   _____

8    ____ ____ _____    _____   _____

9    ____ ____ _____    _____   _____

10   ____ ____ _____    _____   _____

11   ____ ____ _____    _____   _____

12   ____ ____ _____    _____   _____

13   ____ ____ _____    _____   _____

14   ____ ____ _____    _____   _____

15   ____ ____ _____    _____   _____

16   ____ ____ _____    _____   _____

17   ____ ____ _____    _____   _____

18   ____ ____ _____    _____   _____

19   ____ ____ _____    _____   _____

20

21                          _____

22   SUBSCRIBED AND SWORN BEFORE ME            Signature of Deponent

23   THIS _____ DAY OF _____, 2021.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____

# EXHIBIT 4

Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 09/29/22 13:18:16 Page 385 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 385 of 852   PageID 2290
Docket #1943  Date Filed: 02/22/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

## ORDER (I) CONFIRMING THE FIFTH AMENDED
## PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
## MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.    entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.



*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "Disclosure Statement") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.    set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "Objection Deadline"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "Plan");

c.    set January 5, 2021, at 5:00 p.m. prevailing Central Time,  as the deadline for voting on the Plan (the "Voting Deadline") in accordance with the Disclosure Statement Order;

d.    initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.    reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1-B to the Disclosure Statement Order;

f.    reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "Plan Supplements");

g.    reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

2

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "<u>List of Assumed Contracts</u>");

h.      reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "<u>Confirmation Brief</u>"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "<u>Voting Certifications</u>").

i.      reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

3

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.      reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.      conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.      heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.      considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.    **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.    **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

for this process, among other duties specified in the Plan's Claimant Trust Agreement.  There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.    **Confirmation Requirements Satisfied.**  The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7.  Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code.  The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.    **Not Your Garden Variety Debtor**.  The Debtor's case is not a garden variety chapter 11 case.  The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.  It was founded in 1993 by James Dondero and Mark Okada.  Mark Okada resigned from his role with Highland prior to the

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

5.      **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the

Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

6.      **The Highland Enterprise.** Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these

affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7. **Debtor's Operational History.** The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business. The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits." The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8. **Not Your Garden Variety Creditor's Committee**. The Debtor and this chapter 11 case are not garden variety for so many reasons. One of the most obvious standouts in this case is the creditor constituency. The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11. For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. The Debtor also did not have problems with its trade vendors or landlords.

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a. **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b. **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.   **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.   **Meta-E Discovery ("Meta-E").** Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9.   **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure**. Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

11

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its

then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr.

Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and

perhaps worse).

        12.      **Post-Petition Corporate Governance Settlement with Committee.**  After

spending many weeks under the threat of the potential appointment of a trustee, the Debtor and

Committee engaged in substantial and lengthy negotiations resulting in a corporate governance

settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement,

among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as

an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero

agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any

Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor.

The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the

commencement of any litigation against the three independent board members appointed to

oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the

exculpation of those board members by limiting claims subject to the "gatekeeper" provision to

those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "<u>January 9 Order</u>" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "<u>Settlement Motion</u>").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "<u>Stipulation</u>").

13.     **Appointment of Independent Directors.**    As part of the Bankruptcy

Court-approved settlement, three eminently qualified independent directors were chosen to lead

Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen

by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are

each technically independent directors of Strand (Mr. Dondero had previously been the sole

director of Strand and, thus, the sole person in ultimate control of the Debtor).    The three

independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr.

Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and

Foreign Representative.    Suffice it to say that this settlement and the appointment of the

independent directors changed the entire trajectory of the case and saved the Debtor from the

appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent

directors.  They were the right solution at the right time.  Because of the unique character of the

Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent

directors was a far better outcome for creditors than the appointment of a conventional chapter 11

trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in

particular, knew and had vast experience at prominent firms with high-yield and distressed

investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring

large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not

only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver

through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis,

the former affiliate of Highland that the Bankruptcy Court presided over and which company was

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a

chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was

a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience.

While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland

complex shortly after he was appointed (which the Bankruptcy Court had to address).  The Acis

trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the

case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the

Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14. **Conditions Required by Independent Directors.**  Given the experiences

in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified

persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer,

as it would be in an ordinary chapter 11 case.  The independent board members were stepping into

a morass of problems. Naturally, they were worried about getting sued no matter how defensible

their efforts—given the litigation culture that enveloped Highland historically.  Based on the

record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything

always ended in litigation at Highland.  The Bankruptcy Court heard credible testimony that none

of the independent directors would have taken on the role of independent director without (1) an

adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification

from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims;

and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent

directors without the Bankruptcy Court's prior authority.  This gatekeeper provision was also

14

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine" (first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)). The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16 Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy Court finds that, like the Committee, the independent board members have been resilient and unwavering in their efforts to get the enormous problems in this case solved.  They seem to have at all times negotiated hard and in good faith, which culminated in the proposal of the Plan currently before the Bankruptcy Court.  As noted previously, they completely changed the trajectory of this case.

15.    **Not Your Garden Variety Mediators.**  And still another reason why this was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis, UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators because mediation among these parties seemed like such a Herculean task—especially during COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

16

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a.   *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization*
     (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.   *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland*
     *Capital Management, L.P. (filed by Highland Capital Management Fund Advisors,*
     *L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland*
     *Funds II and its series, Highland Global Allocation Fund, Highland Healthcare*
     *Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund,*
     *Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland*
     *Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx*
     *Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real*
     *Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No.
     1670];

c.   A *Joinder to the Objection filed at 1670 by:  NexPoint Real Estate Finance Inc.,*
     *NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint*
     *Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily*
     *Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors,*
     *L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III,*
     *L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V,*
     *L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII,*
     *L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the*
     *foregoing* [Docket No. 1677];

d.   *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan*
     *of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE*
     *Partners LLC)* [Docket No. 1673]; and

e.   *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by*
     *NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and*
     *NexBank)* [Docket No. 1676].  The entities referred to in (i) through (v) of this
     paragraph are hereinafter referred to as the "Dondero Related Entities").

17.   **Questionability of Good Faith as to Outstanding Confirmation**

**Objections.**  Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.    **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

18

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief.  Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated.  Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863.  The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888].  At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years.  Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero.  Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities.  Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor.  Mr. Dondero appears to be in control of these entities as well.

19.     **Background Regarding Dondero Objecting Parties.**  To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith.  Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.  In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence.  Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing.  The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20.     **Other Confirmation Objections.**  Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

20

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

a.  *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

b.  *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

c.  *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

d.  *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

e.  *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

f.  *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

21.  **Capitalized Terms.**  Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

21

22.     **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.     **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

DOCS_SF:104487.21 36027/002
000403

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25.     **Plan Supplement Documents.**   Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements.   The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26.     **Retained Causes of Action Adequately Preserved.**   The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27.     **Plan Modifications Are Non-Material.**   In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the "Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because, among other things, they do not materially adversely change the treatment of the claims of any creditors or interest holders who have not accepted, in writing, such supplements and modifications.  Among other things, there were changes to the projections that the Debtor filed shortly before the Confirmation Hearing (which included projected distributions to creditors and a comparison of projected distributions under the Plan to potential distributions under a hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.  Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021 [Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors or interest holders but, rather, simply update the estimated distributions based on Claims that were settled in the interim and provide updated financial data.  The filing and notice of the Plan Supplements and Plan Modifications were appropriate and complied with the requirements of

24

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required.  The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code.  The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28.    **Notice of Transmittal, Mailing and Publication of Materials.**  As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29.    **Voting.**  The Bankruptcy Court has reviewed and considered the Voting Certifications.  The procedures by which the Ballots for acceptance or rejection of the Plan were

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30. **Bankruptcy Rule 3016(a).**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31. **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32. **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33. **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

26

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34. **Classification of Priority Claims.** Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims. Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35. **Classification of Unsecured Claims.** Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8. Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims). The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor. Class 8 Creditors

27

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

29

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests.  The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39.     **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).**  Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan.  Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40.     **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).**  Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes.  Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41.     **No Discrimination (11 U.S.C. § 1123(a)(4)).**  The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest.  The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan.  Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

42. **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**   Article IV of the Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the establishment of: (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor; and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are included in the Plan Supplements.

a. **The Claimant Trust.**   The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner).  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b. **The Litigation Sub-Trust.**   The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement.   The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

31

      c.    **The Reorganized Debtor**.  The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

      43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).** The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

44. **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee. The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board. The Claimant Trust Oversight Board will consist of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker. Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee. Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors. They are therefore intimately familiar with the Debtor, its business, and assets. The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties. The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

33

45.    **Selection of Trustees.**  The Plan Supplements disclose that Mr. Seery will

serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted

above, Mr. Seery has served as an Independent Board member since January 2020, and as the

Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive

management and restructuring experience, as evidenced from his curriculum vitae which is part of

the record.   The evidence shows that Mr. Seery is intimately familiar with the Debtor's

organizational structure, business, and assets, as well as how Claims will be treated under the Plan.

Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment

post-emergence as the Claimant Trustee.   Mr. Seery, upon consultation with the Committee,

testified that he intends to employ approximately 10 of the Debtor's employees to enable him to

manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets,

instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that

the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by

a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall

initially be paid $150,000 per month for services rendered after the Effective Date as Claimant

Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses

and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight

Board within forty-five (45) days after the Effective Date.   The Bankruptcy Court has also

reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and

has substantial experience in bankruptcy litigation matters, particularly with respect to his prior

experience as a litigation trustee for several litigation trusts, as set forth on the record of the

34

Confirmation Hearing and in the Confirmation Brief.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries.  The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders.  Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46.    **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**
Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47.    **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.**  Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.  In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

35

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain Dondero Related Entities that the changes made to certain assumptions and projections from the Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections. Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial Projections do not constitute materially adverse change to the treatment of Claims or Equity

Interests.  Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data.   Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets.  The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48.     **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).**  The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

a.     The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

37

b.    The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.    Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.    While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.    On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation.  As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.    On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero.  The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.    The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020.  The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.    Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.    Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful.  This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

49.      **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**
Article II.B of the Plan provides that Professionals will file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such claims.  The procedures set forth in the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

50.      **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**  Article IV.B of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee and the members thereto.  For the reasons more fully explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation of any insider to be employed or retained by the Reorganized Debtor, if applicable, and compensation for any such insider.  The appointment of such individuals is consistent with the interests of Claims and Equity Interests and with public policy.  Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

51.      **No Rate Changes (11 U.S.C. § 1129(a)(6)).**  The Plan does not provide for any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

52.   **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**   The "best interests"
test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity
Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date
of the Plan, that is not less than the amount that such Holder would so receive or retain if the
Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor
filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its
advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021,
in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor
provided an updated version of the Liquidation Analysis to the then-objectors of the Plan,
including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed
the Amended Liquidation Analysis/Financial Projections.   The Amended Liquidation
Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues,
and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the
Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued
at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in
market conditions and other factors; (3) expected revenues and expenses arising in connection with
the Debtor's continued management of the CLOs pursuant to management agreements that the
Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding
two or three employees to assist in the management of the CLOs, the Debtor also increased
modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and
professional fees; and (5) an increase in projected recoveries on notes resulting from the

40

acceleration of term notes owed to the Debtor by the following Dondero Related Entities: NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class 7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b) Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation based on Mr. Seery's testimony, including the following credible reasons he posited, among others:

    a.    The nature of the Debtor's assets is complex. Certain assets relate to complicated real estate structures and private equity investments in operating businesses. Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

    b.    Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

    c.    A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

      d.      The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

      e.      The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.     **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.     **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

42

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.     **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**   Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.     **Feasibility (11 U.S.C. § 1129(a)(11)).**  Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

43

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57.     **Payment of Fees (11 U.S.C. § 1129(a)(12)).**  All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code. The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.

58.     **Retiree Benefits.**  The Plan provides for the assumption of the Pension Plan (to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to the extent applicable.

59.     **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).**  Sections 1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii) is not a nonprofit corporation (section 1129(a)(16)).

60.     **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).**  The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11, which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

44

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

a.   <u>Class 8</u>.   The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.   While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.   Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

b.   <u>Class 10 and Class 11</u>.   There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.   Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.   Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).   The Plan does not discriminate unfairly as to Equity Interests.   As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.   Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

61.     **Only One Plan (11 U.S.C. § 1129(c)).**  The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62.     **Principal Purpose (11 U.S.C. § 1129(d)).**  Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63.     **Satisfaction of Confirmation Requirements.**  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64.     **Good Faith Solicitation (11 U.S.C. § 1125(e)).**  The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.     **Discharge (11 U.S.C. § 1141(d)(3)).**  The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

46

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude.  Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

      66.    **Retention of Jurisdiction.**  The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

      67.    **Additional Plan Provisions (11 U.S.C. § 1123(b)).**  The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

      68.    **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts").  With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8]  Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69.      **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).**  All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70.      **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).**  The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71.    **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties.  Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties.  The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties.  The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases.  The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

49

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").  Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.  The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

72.    **Exculpation.**  Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").  As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

50

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order.  The January 9 Order was not appealed.  In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence.  Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73.    **Existing Exculpation of Independent Directors.**  The Bankruptcy Court also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order.  The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987). The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

74. **The Exculpation Provision Complies with Applicable Law.** Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co*., 584 F.3d 229 (5th Cir. 2009), for several reasons:

a.   First, the statutory basis for *Pacific Lumber's* denial of exculpation for certain
     parties other than a creditors' committee and its members is that section 524(e) of
     the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific
     Lumber*, 253 F.3d. at 253. However, *Pacific Lumber* does not prohibit all
     exculpations under the Bankruptcy Code and the court in such case specifically
     approved the exculpations of a creditors' committee and its members on the
     grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
     implies committee members have qualified immunity for actions within the scope
     of their duties…. [I]f members of the committee can be sued by persons unhappy
     with the committee's performance during the case or unhappy with the outcome of
     the case, it will be extremely difficult to find members to serve on an official
     committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
     Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008)). *Pacific Lumber's*
     rationale for permitted exculpation of creditors' committees and their members
     (which was clearly policy-based and based on a creditors' committee qualified
     immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
     and their disinterestedness and importance in chapter 11 cases) does not preclude
     exculpation to other parties in a particular chapter 11 case that perform similar roles
     to a creditors' committee and its members. The Independent Directors, and by
     extension the Chief Executive Officer and Chief Restructuring Officer, were not

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.  Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

DOCS_SF:104487.21 36027/002
000434

75.     **Injunction.**  Section IX.D of the Plan provides for a Plan innunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.  The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.     **Gatekeeper Provision**.  Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").  The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

54

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77.    **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

DOCS_SF:104487.21 36027/002
000436

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

      78.    **Findings Regarding Dondero Post-Petition Litigation.**  The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place."  The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims.  The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79. **Necessity of Gatekeeper Provision.** The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles. The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("<u>AON</u>"), regarding his efforts to obtain D&O insurance. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision. Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017). Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants. Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80.      **Statutory Authority to Approve Gatekeeper Provision.**      The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a).   The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881).   The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue

Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81.      **Jurisdiction to Implement Gatekeeper Provision.**   The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge

Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005).  Based upon the rationale of the Fifth Circuit in *Villegas

v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.*  The Bankruptcy Court's determination of whether

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82.    **Resolution of Objections of Scott Ellington and Isaac Leventon**.  Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a.    Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00.  Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection.  If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b.    Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c.    The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims.  The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.      The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims.  As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.      Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant.  Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan.   Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan.  If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims).  In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims.  Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.      Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7).  If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

60

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.      The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date.  If the Debtor does not make an election, then Option A will apply.

h.      Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.      Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.      The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.      For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.      **Confirmation of the Plan.**  The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, including the

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

      **B.**     **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such.  To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

      **C.**     **Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

      **D.**     **Plan Supplements and Plan Modifications.**  The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  The Plan Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the Bankruptcy Code.  Accordingly, the Plan, as modified, is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

      **E.**     **Deemed Acceptance of Plan.**  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have accepted the Plan as modified by the Plan Modifications.  No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

      **F.**     **Vesting of Assets in the Reorganized Debtor.**  Except as otherwise provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan upon the Effective Date.  The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

> **G.** **Effectiveness of All Actions.** All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

> **H.** **Restructuring Transactions.** The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

I.   **Preservation of Causes of Action.**  Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order).  In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

J.   **Independent Board of Directors of Strand.**  The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors.  For avoidance of doubt, the Assumed Contracts

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

       **K.**    **Cancellation of Equity Interests and Issuance of New Partnership Interests.**  On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.  As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

  **L.**  **Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

  **M.**  **Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

67

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

N.     **Compromise of Controversies.**  In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

O.     **Objections to Claims**.  The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

P.     **Assumption of Contracts and Leases.**  Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan.   Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.   Modifications, amendments, supplements, and restatements to any of the

DOCS_SF:104487.21 36027/002
000449

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

**Q.      Rejection of Contracts and Leases.**  Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan.  To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

**R.      Assumption of Issuer Executory Contracts.**  On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

69

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a cumulative amount of $525,000 (the "Cure Amount") as follows:

    a.    $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

    b.    $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

    **S.**    **Release of Issuer Claims.**  Effective as of the Confirmation Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

      **T.**    **Release of Debtor Claims against Issuer Released Parties.**  Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.  Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

> U.    **Authorization to Consummate.**  The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan.  The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

> V.    **Professional Compensation.**  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

       **W.**    **Release, Exculpation, Discharge, and Injunction Provisions. The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

       **X.**    **Discharge of Claims and Termination of Interests.** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y. **Exculpation.** Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.**     **Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

75

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance

Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.

**AA.    Injunction.   Upon entry of this Confirmation Order, all Enjoined**

**Parties are and shall be permanently enjoined, on and after the Effective Date, from taking**

**any actions to interfere with the implementation or consummation of the Plan.  Except as**

**expressly provided in the Plan, this Confirmation Order, or a separate order of the**

**Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after**

**the Effective Date, with respect to any Claims and Equity Interests, from directly or**

**indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or**

**other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative**

**or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,**

**levying, attaching (including any prejudgment attachment), collecting, or otherwise**

**recovering, enforcing, or attempting to recover or enforce, by any manner or means, any**

**judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)**

**creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or**

**encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any**

**right of setoff, directly or indirectly, against any obligation due to the Debtor or against**

**property or interests in property of the Debtor, except to the limited extent permitted under**

**Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

DOCS_SF:104487.21 36027/002
000457

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.  Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

77

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

BB.    **Duration of Injunction and Stays.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.

CC.    **Continuance of January 9 Order and July 16 Order.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

DD.    **No Governmental Releases.**  Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

DOCS_SF:104487.21 36027/002
000459

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

EE.    **Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

> **FF.  Cancellation of Notes, Certificates and Instruments.**  Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

**GG.    Documents, Mortgages, and Instruments.**    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

**HH.    Post-Confirmation Modifications.**    Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

**II.    Applicable Nonbankruptcy Law.**  The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**JJ.    Governmental Approvals Not Required.**  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

81

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

**KK.     Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

**LL.     Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

**MM.   Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

NN.    **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.    **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.    **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.    **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

applicable nonbankruptcy law. In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a.    The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law. The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan. The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b.    The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full. In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default. Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default. If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith. The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

**RR.   Resolution of Objections of Scott Ellington and Isaac Leventon.**
Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects.  The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date.  If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

   a.   Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

   b.   The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

   c.   Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan.  Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

   d.   The Senior Employees' Objection is deemed withdrawn.

**SS.   No Release of Claims Against Senior Employee Claimants**.  For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

> **TT.** **Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

> (a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

> > (1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

> > (2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

> > (3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

> (b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

UU.     **IRS Proof of Claim.**   Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

87

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25, 2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**   All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.   The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

DOCS_SF:104487.21 36027/002
000469

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust.  The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

   **ZZ.**  **Miscellaneous.**  After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

89

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post confirmation reporting requirements.

###END OF ORDER###

DOCS_SF:104487.21 36027/002
000471

**<u>Exhibit A</u>**

**Fifth Amended Plan (as Modified)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS ............................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law....................1

    B.    Defined Terms .............................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS................16

    A.    Administrative Expense Claims.....................................................16

    B.    Professional Fee Claims..............................................................17

    C.    Priority Tax Claims...................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ...............................................................18

    A.    Summary...............................................................................18

    B.    Summary of Classification and Treatment of Classified Claims and
Equity Interests......................................................................18

    C.    Elimination of Vacant Classes.......................................................19

    D.    Impaired/Voting Classes.............................................................19

    E.    Unimpaired/Non-Voting Classes....................................................19

    F.    Impaired/Non-Voting Classes.......................................................19

    G.    Cramdown.............................................................................19

    H.    Classification and Treatment of Claims and Equity Interests.....................19

    I.    Special Provision Governing Unimpaired Claims.................................24

    J.    Subordinated Claims..................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ....................................24

    A.    Summary..............................................................................24

    B.    The Claimant Trust..................................................................25

        1.    Creation and Governance of the Claimant Trust and Litigation
Sub-Trust.....................................................................25

        2.    Claimant Trust Oversight Committee....................................26

000474

3.    Purpose of the Claimant Trust. ................................................27

4.    Purpose of the Litigation Sub-Trust. .....................................27

5.    Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.    Compensation and Duties of Trustees. ...................................29

7.    Cooperation of Debtor and Reorganized Debtor. ..................29

8.    United States Federal Income Tax Treatment of the Claimant Trust. ...............................................................................................29

9.    Tax Reporting. .........................................................................30

10.   Claimant Trust Assets. ...........................................................30

11.   Claimant Trust Expenses. .......................................................31

12.   Trust Distributions to Claimant Trust Beneficiaries. ..............31

13.   Cash Investments. ...................................................................31

14.   Dissolution of the Claimant Trust and Litigation Sub-Trust. ................31

C.    The Reorganized Debtor ...................................................................32

1.    Corporate Existence ................................................................32

2.    Cancellation of Equity Interests and Release............................32

3.    Issuance of New Partnership Interests .....................................32

4.    Management of the Reorganized Debtor ..................................33

5.    Vesting of Assets in the Reorganized Debtor ...........................33

6.    Purpose of the Reorganized Debtor .........................................33

7.    Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ....................................33

D.    Company Action ...............................................................................34

E.    Release of Liens, Claims and Equity Interests...................................35

F.    Cancellation of Notes, Certificates and Instruments..........................35

**Page**

G. Cancellation of Existing Instruments Governing Security Interests ................. 35

H. Control Provisions ........................................................... 35

I. Treatment of Vacant Classes ................................................. 36

J. Plan Documents ............................................................. 36

K. Highland Capital Management, L.P. Retirement Plan and Trust ....................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................ 37

A. Assumption, Assignment, or Rejection of Executory Contracts and
Unexpired Leases ........................................................... 37

B. Claims Based on Rejection of Executory Contracts or Unexpired
Leases ..................................................................... 38

C. Cure of Defaults for Assumed or Assigned Executory Contracts and
Unexpired Leases ........................................................... 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................. 39

A. Dates of Distributions ...................................................... 39

B. Distribution Agent ......................................................... 39

C. Cash Distributions ......................................................... 40

D. Disputed Claims Reserve .................................................... 40

E. Distributions from the Disputed Claims Reserve ............................... 40

F. Rounding of Payments ...................................................... 40

G. *De Minimis* Distribution ................................................... 41

H. Distributions on Account of Allowed Claims .................................. 41

I. General Distribution Procedures .............................................. 41

J. Address for Delivery of Distributions ........................................ 41

K. Undeliverable Distributions and Unclaimed Property .......................... 41

L. Withholding Taxes ......................................................... 42

- iii -

**Page**

M.  Setoffs .................................................................................................. 42

N.  Surrender of Cancelled Instruments or Securities ............................... 42

O.  Lost, Stolen, Mutilated or Destroyed Securities ................................ 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS ............................ 43

A.  Filing of Proofs of Claim .................................................................... 43

B.  Disputed Claims .................................................................................. 43

C.  Procedures Regarding Disputed Claims or Disputed Equity Interests .............. 43

D.  Allowance of Claims and Equity Interests .......................................... 44

    1.  Allowance of Claims ..................................................................... 44

    2.  Estimation ...................................................................................... 44

    3.  Disallowance of Claims ................................................................ 44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ................................................ 45

A.  Conditions Precedent to the Effective Date ......................................... 45

B.  Waiver of Conditions ........................................................................... 46

C.  Dissolution of the Committee .............................................................. 46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ......... 47

A.  General .................................................................................................. 47

B.  Discharge of Claims ............................................................................. 47

C.  Exculpation .......................................................................................... 47

D.  Releases by the Debtor ......................................................................... 48

E.  Preservation of Rights of Action .......................................................... 49

    1.  Maintenance of Causes of Action ................................................. 49

    2.  Preservation of All Causes of Action Not Expressly Settled or
Released ........................................................................................ 49

000477

**Page**

F.      Injunction ...................................................................................50

G.      Duration of Injunctions and Stays.............................................51

H.      Continuance of January 9 Order ...............................................51

ARTICLE X. BINDING NATURE OF PLAN ...........................................51

ARTICLE XI. RETENTION OF JURISDICTION.......................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ....................................54

A.      Payment of Statutory Fees and Filing of Reports .....................54

B.      Modification of Plan ..................................................................54

C.      Revocation of Plan ....................................................................54

D.      Obligations Not Changed...........................................................55

E.      Entire Agreement .......................................................................55

F.      Closing of Chapter 11 Case .......................................................55

G.      Successors and Assigns..............................................................55

H.      Reservation of Rights .................................................................55

I.      Further Assurances .....................................................................56

J.      Severability ................................................................................56

K.      Service of Documents ................................................................56

L.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code...........................................................57

M.      Governing Law ..........................................................................58

N.      Tax Reporting and Compliance ................................................58

O.      Exhibits and Schedules ..............................................................58

P.      Controlling Document ...............................................................58

000478

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), proposes the following chapter 11 plan of reorganization (the "<u>Plan</u>") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.   Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.   **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.     "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.     "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.     "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.     "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.     "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.     "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.      "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.      "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.      "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.     "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15.    "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16.    "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19.    "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20.    "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21.    "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22.    "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23.    "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24.    "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.    "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.    "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.    "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.    "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.    "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.    "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31.     "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33.     "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34.     "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35.     "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36.     "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37.     "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38.     "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41.     "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51.      "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52.      "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53.      "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54.      "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55.      "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56.      "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57.      "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58.      "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59.      "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.      "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61.      "*Estate Claims*" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [D.I. 354].

62.    "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.    "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.    "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.    "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

000487

69.    "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.    "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.    "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.    "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.    "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.    "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.    "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.    "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.    "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.    "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.    "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.    "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

10

81.    "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.    "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.    "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.    "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.    "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.    "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.    "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.    "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.    "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.    "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.    "Petition *Date*" means October 16, 2019.

92.    "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102.    "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103.    "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.    <u>Administrative Expense Claims</u>**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.**    **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**    **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

000496

## C.    Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

## D.    Impaired/Voting Classes

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

## E.    Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

## F.    Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

## G.    Cramdown

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## H.    Classification and Treatment of Claims and Equity Interests

1.    *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.    *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.    *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

000498

4.  *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.  *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.  *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.      _Class 9 – Subordinated Claims_

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.      _Class 10 – Class B/C Limited Partnership Interests_

- *Classification*:   Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.      _Class 11 – Class A Limited Partnership Interests_

- *Classification*:   Class 11 consists of the Class A Limited Partnership Interests.

000501

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.  Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J.  Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

## A.  Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

## B.    The Claimant Trust[2]

### 1.    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2. *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.     *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.     *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)    the payment of the Claimant Trust Expenses;

(ii)    the payment of other reasonable expenses of the Claimant Trust;

(iii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)    the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)    the orderly monetization of the Claimant Trust Assets;

(vi)    litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)    the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)    the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)    the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.    *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.    *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.    *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trust makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9. *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.  *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.  *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.  *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.  *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.    **The Reorganized Debtor**

### 1.    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.    *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.    *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date.  Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order.  Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4.    *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

## D.      **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

### E.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G.    Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H.    Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

## I.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.**   **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.**   **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B.    Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.    **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.    **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.    **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.    **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

### G.   *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim.  *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

### H.   Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### I.   General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise.  All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

### J.   Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

### K.   Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.** **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.** **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.** **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

### O.     Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

### A.     Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

### B.     Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

### C.     Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

## D.      **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

### 1.      *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### 2.      *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### 3.      *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.     Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.    <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.    <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided, however, the foregoing*

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.     **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.   **Preservation of Rights of Action**

### 1.   *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### 2.   *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.      Injunction**

      **Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

      **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

      **The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

      **Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

## G.    Duration of Injunctions and Stays

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

## H.    Continuance of January 9 Order

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.   The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:   (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

## D.     Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

## E.     Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

## F.     Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

## G.     Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

## H.     Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.     **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.     **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.     **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> **If to the Claimant Trust:**
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

## L.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**    **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**    **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**    **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**    **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

58

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

**Exhibit B**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19.     Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20.     Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21.     Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22.     Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23.     Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24.     Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25.     Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26.     Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27.     Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28.     Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29.     Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30.     Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31.     Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32.     Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33.     Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34.     Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35.     Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

3

51. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

# EXHIBIT 5

## UPDATED SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION*

*In re Highland Capital Management, L.P.*, **Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)**

| | | | | |
|---|---|---|---|---|
| 9/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* **[D.I. 1087]** | | | |
| | **Objectors**: | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal is being briefed. |
| 11/18/20 | *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements* **[D.I. 1424]** | | | |
| | **Objectors**: | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459] | N/A |
| 11/19/20 | *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course* **[D.I. 1439]** | | | |
| | **Movant**: | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
| 12/8/20 | *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* **[D.I. 1522]** | | | |
| | **Movants**: | Advisors Funds | Movants argued that the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

**\* The following is by way of summary only and does not include discovery disputes or similar matters. Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact. The Debtor reserves all rights that it may have whether in law or in equity.**

| 12/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith* **[D.I. 1625]** | | | |
|---|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal is being briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* **[D.I. 1752]** | | | |
| | **Movants**: | Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | *James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith* **[D.I. 1784]** | | | |
| | **Objector**: | Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

2

| Date | Matter | | | | |
|---|---|---|---|---|---|
| 1/22/20 | *Objections to Fifth Amended Plan of Reorganization* **[D.I. 1472]** | | | | |
| | **Objectors**:[1] | | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | | | |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | *Application for Allowance of Administrative Expense Claim* **[D.I. 1826]** | | | | |
| | **Movants**: | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | *NexBank's Application for Allowance of Administrative Expense Claim* **[D.I. 1888]** | | | | |
| | **Movant**: | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

000546

| 2/8/21 | *James Dondero Motion for Status Conference* **[D.I. 1914]** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N/A. |
| 2/28/21 | *Motions for Stay Pending Appeal* | | | | |
| | **Movants**: | | The only parties requesting a stay pending appeal were the Dondero Entities. They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| | Dondero [D.I. 1973] | Advisors [D.I. 1955] | | | |
| | Funds [D.I. 1967] | Trusts [D.I. 1971] | | | |

| 3/18/21 | *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* **[D.I. 2060]** | | | | |
|---|---|---|---|---|---|
| | **Movants**: | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. |
| | | Advisors | | | |
| | | Trusts | | | |
| | | HCRE | | | |
| 4/15/21 | *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* **[D.I. 2199]** | | | | |
| | **Movants**: | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "<u>UBS</u>") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008. The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293]. The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308]. UBS also filed a reply [D.I. 2310]. The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors have until June 7 to appeal. |

| | | | | |
|---|---|---|---|---|
| 4/23/21 | *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* **[D.I. 2247]** | | | |
| | **Movants**: Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders. The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |
| 4/23/21 | *Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* **[D.I. 2242]** | | | |
| | **Movants**: Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | The Court denied DAF and CLOH have appealed. [D.I. 2513] |
| 4/20/21 | *Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief* **[D.I. 2229]** | | | |
| | **Movants**: Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility. The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness. Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |

5

| 4/29/21 | _Motion to Compel Compliance with Bankruptcy Rule 2015.3_ **[D.I. 2256]** | | | |
|---|---|---|---|---|
| **Movants:** | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

### _Highland Capital Management, L.P. v. James D. Dondero_, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)

| 12/7/20 | _Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero_ **[D.I. 2]** | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

000549

| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* **[D.I. 48]** | | |
|---|---|---|---|
| **Movant**: | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd.*, Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)**

| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* **[D.I. 2]** | | |
|---|---|---|---|
| **Movant**: | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor believes it has reached an agreement in principle with the Funds and Advisors that will settle this matter. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

000550

### *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*, Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | |
|---|---|---|---|
| **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the action was moot. | N/A |

### *Highland Capital Management, L.P. v. James Dondero*, Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | |
|---|---|---|---|
| **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* [D.I. 21] | | |
| **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. | N/A |

000551

### *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* [D.I. 20] | | | | |
| | **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 52]. | N/A |

### *Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note. NPA did not pay the note when and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* [D.I. 19] | | | | |
| | **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 42].. | N/A |

### *Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("HCMS"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | *Defendants Motion to Withdraw the Reference* [D.I. 19] | | | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. | |

9

*Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | *Defendants Motion to Withdraw the Reference* [D.I. 20] | | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. |

*Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd.*, Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)

| 4/12/21 | *Original Complaint* | | | |
|---|---|---|---|---|
| | **Movants**: | DAF<br><br>CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22]. On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26] | N/A |
| 4/19/21 | *Plaintiff's Motion for Leave to File First Amended Complaint in the District Court* | | | |
| | **Movants:** | DAF<br><br>CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

000553

*PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*, **Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)**

**4/12/21** <u>*Original Complaint*</u>

| | | | | |
|---|---|---|---|---|
| **Movants**: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous. The Debtor will take all appropriate actions. | The Complaint was recently filed and is currently in litigation. | N/A |

*The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, **Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)**

**4/12/21** <u>*Original Complaint*</u>

| | | | | |
|---|---|---|---|---|
| **Movants**: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

000554

# EXHIBIT 6

000555

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                   )    Case No. 19-34054-sgj-11
 In Re:                            )    Chapter 11
                                   )
 HIGHLAND CAPITAL                  )    Dallas, Texas
 MANAGEMENT, L.P.,                 )    Friday, June 25, 2021
                                   )    9:30 a.m. Docket
          Debtor.                  )
                                   )    EXCERPT:  MOTION FOR
                                   )    MODIFICATION OF ORDER
                                   )    AUTHORIZING RETENTION OF JAMES
                                   )    P. SEERY, JR. DUE TO LACK OF
                                   )    SUBJECT MATTER JURISDICTION
                                   )    (2248)
 _____)

                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                       UNITED STATES BANKRUPTCY JUDGE.

 WEBEX APPEARANCES:

 For the Debtor:               Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
                                13th Floor
                               Los Angeles, CA  90067-4003
                               (310) 277-6910

 For the Debtor:               John A. Morris
                               PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
                               (212) 561-7700

 For CLO Holdco, Ltd. and      Jonathan E. Bridges
 The Charitable DAF Fund,      Mazin Ahmad Sbaiti
 LP:                           SBAITI & COMPANY, PLLC
                               JP Morgan Chase Tower
                               2200 Ross Avenue, Suite 4900 W
                               Dallas, TX  75201
                               (214) 432-2899

 For Get Good Trust and        Douglas S. Draper
 Dugaboy Investment Trust:     HELLER, DRAPER & HORN, LLC
                               650 Poydras Street, Suite 2500
                               New Orleans, LA  70130
                               (504) 299-3300
```

2

```
 1    APPEARANCES, cont'd.:

 2    For the Official Committee   Matthew A. Clemente
      of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 3                                 One South Dearborn Street
                                   Chicago, IL  60603
 4                                 (312) 853-7539

 5    Recorded by:                 Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
 6                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
 7                                 (214) 753-2062

 8    Transcribed by:              Kathy Rehling
                                   311 Paradise Cove
 9                                 Shady Shores, TX  76208
                                   (972) 786-3063
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 561 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 561 of 852    PageID 2466

3

1          <u>DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.</u>

2       (Transcript excerpt begins at 11:33 a.m.)

3          THE CLERK:  All rise.

4          THE COURT:  All right.  Please be seated.  We are

5    back on the record, and our last motion this morning is the

6    Motion to Reconsider filed by CLO Holdco and the DAF.  Do we

7    have Mr. Bridges and Mr. Sbaiti back with us now?

8          MR. BRIDGES:  Yes, Your Honor.  I have changed seats

9    because of audio problems we're having here, but we're both

10   here.

11         THE COURT:  Okay.  Well, I think we heard an

12   agreement that you all have agreed that you're going to have

13   an hour and a half each, and I presume that means everything:

14   opening statements, arguments, evidence.  So, we'll start the

15   clock.  Nate, it's 11:35.  So, Mr. Bridges, your opening

16   statement?

17    OPENING STATEMENT ON BEHALF OF CLO HOLDCO AND THE CHARITABLE

18                         DAF, LP

19         MR. BRIDGES:  Thank you, Your Honor.  We're here on a

20   motion to modify an order that we'd submit has already been

21   modified by the plan confirmation order, although that order

22   has not yet become effective.

23      The modification there was to add the phrase "to the

24   extent legally permissible" to the Court's assertion of

25   jurisdiction in what is essentially the same gatekeeper

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 562 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 562 of 852   PageID 2467

4

1    provision that's at issue here.  We submit that change is an

2    admission or at least a strong indication that the unmodified

3    order, at least as applied in some instances, contains

4    legally-impermissible provisions.  The entire argument today

5    from our side is about what's not legally permissible in that

6    order.

7          And that starts with our concerns regarding the

8    application of 28 U.S.C. § 959(a).  As Your Honor knows well,

9    959(a) is a provision of law that the Fifth Circuit and

10   *Collier on Bankruptcy* call an exception to the *Barton*

11   doctrine.  I know from the last time we were here that the

12   Court is already aware of what 959(a) says.  It's the second

13   sentence, I understand, which the Court pointed to in our

14   previous hearing that creates general equity powers or

15   authorizes the Court to use its general equity powers to

16   exercise some jurisdiction, some control over actions that

17   fall within the first sentence of 959(a).  But that second

18   sentence also prohibits explicitly the Court's using general

19   equity powers to deprive a litigant of his right to trial by

20   jury.

21         Here, we're not under *Barton*, the statutory exception to

22   *Barton* applies, because Mr. Seery is a manager of hundreds of

23   millions of third-party investor property.  Instead, we're

24   here under the Court's general equity powers, as authorized by

25   959(a).  And those equity powers cannot deprive the right to

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 563 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 563 of 852   PageID 2468

5

1  trial by jury.

2       But the order does deprive trials by jury, first by

3  asserting sole jurisdiction here, where jury trials are

4  unavailable, and secondly, by abolishing any trial rights for

5  claims that do not involve gross negligence or intentional

6  misconduct.

7       Movants' third cause of action in the District Court case

8  is for ordinary negligence.  It comes with a Seventh Amendment

9  jury right.  But it's barred by the order because the order

10  only allows colorable claims involving gross negligence or

11  intentional conduct, not ordinary negligence.

12       Movants' second cause of action in the District Court case

13  is for breach of contract.  That comes with a Seventh

14  Amendment jury right, but it's barred by the order because the

15  order only allows colorable claims of gross negligence or

16  intentional misconduct, not negligent or faultless breaches of

17  contractual obligations.

18       Movants' first cause of action in the District Court case,

19  breach of Advisers Act fiduciary duties, comes with a jury

20  right.  It's also barred by the order because the order only

21  allows colorable claims involving gross negligence or

22  intentional misconduct.

23       You see there what I mean.  Congress couldn't have been

24  clearer.  Courts cannot deprive litigants of their day in

25  court before a jury of their peers by invoking general equity

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 564 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 564 of 852 PageID 2469

6

1    powers.  Those powers don't trump the constitutional right to

2    a jury trial.

3        Yet this Court's order purports to do precisely that, not

4    only for the Movants, but also for future potential litigants

5    who may have claims that have not even accrued yet.  If those

6    claims are for ordinary negligence or breach of contract or

7    breach of fiduciary duties and don't rise to the level of

8    gross negligence or intentional misconduct, this order says

9    that those claims are barred, and it would deprive them of

10   their day in court.

11       The Court's general equity powers are simply not broad

12   enough to uphold such an order.

13       This issue is even more problematic when the causes of

14   action at issue fall within the mandatory withdrawal of the

15   reference provisions of 28 U.S.C. § 157(d).  As this Court

16   knows, it lacks jurisdiction over proceedings that require

17   consideration of non-bankruptcy federal law regulating

18   interstate commerce.  Some such claims -- Movants' Advisers

19   Act claim, for instance -- do not involve culpability rising

20   to the level of gross negligence or intentional misconduct,

21   but the order purports to bar them nonetheless, despite this

22   Court's lacking jurisdiction over the subject matter of those

23   claims.

24       Even if there is gross negligence or intentional

25   misconduct, the order states that this Court will have sole

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 565 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 565 of 852   PageID 2470

7

1   jurisdiction over such claims.  And that can't be right if

2   withdrawal of the reference is mandatory.

3       Opposing counsel will tell you that 157(d) is inapplicable

4   here because they think our claims in the District Court won't

5   require substantial consideration of the Advisers Act or any

6   other federal laws regulating interstate commerce.  But their

7   cases don't come anywhere close to making that showing, as the

8   briefing demonstrates.

9       And in any case, that argument is beside the point.  This

10  order is contrary to 157(d) because it asserts jurisdiction

11  over claims that 157(d) does not apply -- I'm sorry, does

12  apply to.  And that's true regardless of whether Movants'

13  claims are among those.

14      The idea that there's no substantial consideration of

15  federal law, however, in the District Court case is undermined

16  by Mr. Seery's testimony in support of his appointment in

17  which he confirmed that the Advisers Act applies to him and

18  that he has fiduciary duties under that Act to the investors

19  of the funds he manages.

20      Your Honor, importantly, the Advisers Act isn't the

21  typical federal statute with loads of case law under it.  It's

22  actually an underdeveloped, less-relied-upon statute, and most

23  -- most of the law under that Act is promulgated by regulation

24  and supervised by the SEC.  As a registered investment

25  advisor, Mr. Seery is bound by that Act, which he admits, he

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 566 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 566 of 852   PageID 2471

8

1    agrees to.  But to flesh out what his duties are requires a

2    close exam of more than three dozen regulations under 17

3    C.F.R. Part 275.

4        The obligations include robust duties of transparency and

5    disclosure, as well as duties against self-dealing and the

6    necessity of obtaining informed consent, none of which are

7    waivable, these duties.

8        The proceedings here in this Court reflect an effort to

9    have those unwaivable duties waived.  The allegations in the

10   District Court are essentially insider trading allegations

11   that the Debtor and Mr. Seery knew or should have known

12   information that they had a duty under the Advisers Act to

13   disclose to their advisees.  Both under the Act and

14   contractually, they had those duties.  And, instead, they did

15   not disclose and consummated a transaction that benefited

16   themselves nonetheless.

17       In considering those claims, the presiding court will have

18   to consider and apply the Advisers Act and the many

19   regulations promulgated under it, in addition to other federal

20   laws regulating interstate commerce.  For that reason,

21   withdrawal of the reference on the District Court action is

22   mandatory.  That's the two major -- that's two major problems

23   out of four with the order that we're here on today.

24       First, it deprives litigants of their right to trial, to a

25   jury trial, when Section 959(a) says that can't be done.  And,

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 567 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 567 of 852   PageID 2472

9

1    two, the order asserts jurisdiction -- sole jurisdiction, even

2    -- over proceedings in which withdrawal of the reference is

3    mandatory under 157(d).

4         The fourth major problem is what the Court called

5    specificity at the previous hearing.  The Fifth Circuit's

6    *Applewood Chair* case holds that the rule from *Shoaf* does not

7    apply without a "specific discharge or release," and that that

8    release has to be enumerated and approved by the Bankruptcy

9    Court.  Thus, the order here can't exculpate Mr. Seery of

10   liability for ordinary negligence and the like in a blanket

11   fashion.  The claims being released must be identified.

12        That's what happened in *Shoaf*.  Shoaf's guaranty

13   obligation was explicitly released.  That's also what happened

14   in *Espinosa*.  Espinosa's plan listed his student loan as his

15   only specific indebtedness.  But it's not what happened here.

16   And it couldn't happen here, because the ordinary negligence

17   and similar claims being discharged by the order had not yet

18   accrued and thus were not even in existence at the time the

19   order issued.

20        Instead, what we have here is a nonconsensual, nondebtor

21   injunction or release that's precisely what the Fifth Circuit

22   refused to enforce in the *Pacific Lumber* case.

23        So, lack of specificity is the third major problem with

24   the order.  And that brings us to the fourth problem, which is

25   the *Barton* doctrine.  *Barton* is the only possible basis for

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 568 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 568 of 852 PageID 2473

10

1 this Court to assert exclusive or sole jurisdiction over

2 anything.  Outside of *Barton*, it's plain black letter law that

3 the District Court's jurisdiction is equal to and includes

4 anything that this Court's derivative jurisdiction would also

5 reach.

6       But the exception to the *Barton* doctrine in 959(a) plainly

7 applies here, leaving no basis for exclusivity with regards to

8 jurisdiction and the District Court.  That's because Mr. Seery

9 is carrying on the business of a debtor and managing the

10 property of others, rather than merely administering the

11 bankruptcy estate.  The exclusive jurisdiction function of the

12 *Barton* doctrine has no applicability because 959(a) creates

13 that exception here.

14      Under its general equity powers, yes, 959(a) still

15 authorizes this Court to exercise some control over actions

16 against Mr. Seery, but short of depriving litigants of their

17 day in court.  And nothing in 959(a), that exception to

18 *Barton*, says that the Court can nonetheless exercise

19 exclusivity in that jurisdiction.  Those general equity powers

20 do not create exclusive or sole jurisdiction.  They do not

21 deprive the District Court of its Congressionally-granted

22 original jurisdiction.

23      Moreover, Mr. Seery is not an appointed trustee entitled

24 to the protections of the *Barton* doctrine in any case.  His

25 appointment was a corporate decision that the Court was asked

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 569 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 569 of 852   PageID 2474

11

1   not to interfere with.  The Court was asked to defer under the

2   business judgment rule to the Debtor's appointment of Mr.

3   Seery.  And the Court did so.

4        As we asserted last time, no authority that we can find

5   combines these two unrelated doctrines, the *Barton* doctrine

6   and the business judgment rule.  And they don't go together.

7   None of the testimony or the briefing or argument, in the July

8   order, in the January order that preceded it, none of that

9   indicated that Mr. Seery would be a trustee or the functional

10  equivalent of a trustee.  The word "trustee" does not appear

11  in any of those briefs or transcripts.

12       Opposing -- and because of that, the District Court suit

13  is not about -- well, not because of that.  The District Court

14  suit simply is not about any trustee-like role that Mr. Seery

15  may have played anyway.  Opposing counsel will try to convince

16  you otherwise, will tell you that the District Court case is a

17  collateral attack on the settlement, but it's not.  Wearing

18  his estate administrator hat, Mr. Seery can settle claims in

19  this court.  Wearing his advisor hat, he has to fulfill his

20  Advisers Act duties and properly advise his clients.

21       He doesn't have to wear both hats, and it seems highly

22  unusual that he would choose to fill both of those roles

23  simultaneously.  But he has chosen both roles.  And the

24  District Court case is a hundred percent about his role as an

25  advisor.  Did he comply with the Act?  Did he do the things

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 570 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 570 of 852    PageID 2475

12

1    that his advisor role obligated him to do as a manager of that

2    property?

3        The District Court suit really is only being used to

4    illustrate the issues that we're raising here.  It's

5    important, it's timely to address those issues now because of

6    the District Court action, but that's an illustration of the

7    problems with the order.  It is not exclusively that that

8    action is what we're attempting to address.  Rather, the order

9    exculpating Mr. Seery from ordinary negligence liability and

10   similar liability is problematic, is contrary to the law.  On

11   top of that, the Court is asserting jurisdiction over gross

12   negligence and intentional misconduct claims.  To the extent

13   that 157(d) applies, it is problematic and contrary to law as

14   well.

15            THE COURT:  Okay.  We're occasionally getting some

16   breakup of your sound.  So please -- I don't know what you can

17   do to adjust, but it was just now, and intermittently we get a

18   little bit of garbly.  So if you could just say your last

19   sentence one more time, and we'll see if it improves.

20            MR. BRIDGES:  Your Honor, I'm not sure I can say this

21   last sentence again.

22            THE COURT:  Okay.

23            MR. BRIDGES:  I was -- I was mentioning that the

24   District Court case is an illustration of our argument.  Our

25   argument is not merely that the District Court case should be

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 571 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 571 of 852 PageID 2476

13

1   exempted or excepted from the order. Our argument is that the

2   order is legally infirm and that the District Court case and

3   the claims there illustrate some of those infirmities, but

4   that the infirmities go beyond just what's at issue in the

5   District Court case.

6        In sum, there are four problems with the order that render

7   parts of it legally infirm. It deprives the right of a jury

8   trial -- in fact, of any trial -- in contravention of 959(a)

9   for some causes of action.

10       It asserts jurisdiction -- two, it asserts jurisdiction

11  over claims that are subject to the mandatory withdrawal of

12  the reference provision (garbled) 157(d).

13       And three, it lacks the specificity required to discharge

14  future claims under *Applewood*.

15       Finally, Your Honor, number four, the order relies on the

16  *Barton* doctrine, which doesn't apply and which 959(a) creates

17  an exception to.

18       Movants respectfully submit the order should be modified

19  for those reasons.

20            MR. SBAITI: Tell him Mark Patrick is here, for the

21  record.

22            THE COURT: All right. I have a couple of follow-up

23  questions for you. I want to drill down on the issue of your

24  client not having appealed the July 2020 order. Or the

25  HarbourVest settlement order, for that matter. Tell me as

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 572 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 572 of 852   PageID 2477

14

1  directly as possible why you don't view that as a big problem.

2  Because it's high on my list of possible problems here.

3       MR. BRIDGES:  I understand, Your Honor.  The

4  *Applewood Chair* case is our -- our defense to that argument,

5  that without providing specifics as to the claims being

6  discharged in the July order, that *Shoaf* cannot apply to

7  create a res judicata effect from the failure to appeal that

8  order.

9       THE COURT:  But is that really what we're talking

10 about, a discharge of certain claims?  We're talking about a

11 protocol that the Court established which wasn't appealed.

12      MR. BRIDGES:  Your Honor, your order does many

13 things.  We're talking about a few of them in one paragraph of

14 the order.  And in that order -- in that paragraph, yes, it

15 creates a protocol for determining the colorability of some

16 claims, claims that rise to the level of gross negligence or

17 intentional misconduct.  It does not create a protocol for

18 claims that fall below that threshold, claims for ordinary

19 negligence, as an example.

20      THE COURT:  Okay.

21      MR. BRIDGES:  For breach of contract that's not

22 intentional, is not grossly negligent, it's just a breach of

23 contract.  It can even be faultless.  There's still liability.

24 There's still a jury right under the Seventh Amendment for

25 faultless breach of contract.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 573 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 573 of 852    PageID 2478

15

1    The protocols in the order do not address such claims

2    other than to bar them.  To discharge them.  And thus, yes,

3    it's a release, it's a discharge of those claims.  It can be

4    viewed as a permanent injunction against bringing such claims.

5    It's what's -- it's what's not allowed by the *Applewood Chair*

6    case and by *Pacific Lumber*.

7        THE COURT:  All right.  So you're arguing that was --

8    the wording of the order was not specific enough to apprise

9    affected parties of what they were releasing, they're

10    releasing claims based on ordinary negligence against Mr.

11    Seery?  That's not specific enough?

12        MR. BRIDGES:  Correct.  Future unproved claims, the

13    factual basis for which has not happened yet.  Those cannot be

14    and were not disclosed with any specificity in this order.

15    If we compare it to *Shoaf* and to *Espinosa*, in *Shoaf* what

16    we had was a guaranty, Shoaf's guaranty on a transaction that

17    was listed in the actual release, describing what the

18    transaction was that was being -- that the guaranty was being

19    released for.

20    In *Espinosa*, what we had was a student loan --

21        THE COURT:  Right.

22        MR. BRIDGES:  -- that was listed in the plan

23    specifically, as the only specific indebtedness.

24    Here, we don't have any of that specificity.  What we have

25    is a notice to the entire world, Your Honor, that for an

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 574 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 574 of 852   PageID 2479

16

 1    unlimited period of time any claim for ordinary negligence,

 2    for ordinary breach of contract or fiduciary duty against Mr.

 3    Seery is barred if it relates to his CEO role.  And his CEO

 4    role means as a manager of property, exactly precisely what

 5    959(a) is talking about.

 6        Those jury rights (garbled) claims cannot be released,

 7    discharged, expunged, done away with, in an order that isn't

 8    explicit.

 9        On top of that, even in an explicit order, 959(a) tells

10    the Court it cannot deprive a litigant of its jury trial

11    right.

12            THE COURT:  Well, as anyone knows who's been around a

13    while in this case, my brain sometimes goes down an unexpected

14    trail, and maybe this one is one of those situations.  Are

15    there contracts that your clients would rely on in potential

16    litigation?

17            MR. BRIDGES:  Yes, Your Honor.

18            THE COURT:  What are those contracts?

19            MR. BRIDGES:  It is a management contract.  I don't

20    think I can give you the specifics at this moment, but I

21    probably can before we're done here today.  A management

22    contract in which the Debtor provides advisory and management

23    services to the DAF --

24            THE COURT:  Well, you know, the shared services

25    agreements that we heard so much about in this case?  A shared

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 575 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 575 of 852 PageID 2480

17

1　service agreement?  I can't remember, you know, which entities

2　have them and which do not at times.  So, --

3　　　　MR. BRIDGES:  The shared services agreement is one of

4　those contracts, Your Honor.

5　　　　THE COURT:  Okay.

6　　　　MR. BRIDGES:  It's not the only one.

7　　　　THE COURT:  And what are the others?

8　　　　MR. BRIDGES:  There's -- the other is the investment

9　advisory agreement.

10　　　　THE COURT:  Those two?

11　　　　MR. BRIDGES:  (no response)

12　　　　THE COURT:  Those are the only two?

13　　　　MR. BRIDGES:  There may be one other, Your Honor.

14　I'm not sure.

15　　　　THE COURT:  Are they in evidence?

16　　　　MR. BRIDGES:  I can find out shortly.

17　　　　THE COURT:  Are they in evidence?  We haven't talked

18　about evidence yet, but are they going to be in evidence,

19　potentially?

20　　　　MR. BRIDGES:  They are referenced in the District

21　Court case, the complaint, which is in evidence.

22　　　　THE COURT:  I'm asking, are --

23　　　　MR. BRIDGES:  But those contracts I don't believe are

24　listed as exhibits here in this motion, no.

25　　　　THE COURT:  They are not?  Okay.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 576 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 576 of 852    PageID 2481

18

1    Well, what my brain is thinking about here is, of the

2    umpteen agreements I've seen -- more than umpteen -- of the

3    many, many agreements I've seen over time in this case, so

4    often there's a waiver of jury trial rights, as I recall, as

5    well as an arbitration clause.  I just was curious, hmm, you

6    know, you talked a lot about your clients' jury trial rights:

7    do we know that these agreements have not waived those?

8         MR. BRIDGES:  Your Honor, I think I can answer that

9    by the end of our hearing.  I don't have an answer off the top

10    of my head.  What I can tell you is a jury right has been

11    demanded in the federal court complaint, which is in evidence,

12    and that opposing counsel has brought no evidence indicating

13    that they have the defense of our having waived the right to a

14    jury trial here.

15         THE COURT:  Okay.  Well, I just --

16         MR. BRIDGES:  Or arbitra...

17         THE COURT:  -- would think that you would know that.

18    Does anyone know that on the Debtor's side off the top of your

19    head?

20         MR. POMERANTZ:  I do not, Your Honor.

21         THE COURT:  Uh-huh.

22         MR. POMERANTZ:  And to Mr. Bridges' last point, we

23    have filed a motion to dismiss.  We have not answered the

24    complaint.  So any time to object to their jury trial right

25    would be in the context of the answer.  So the implication

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 577 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 577 of 852    PageID 2482

19

1  that we have not raised the issue and therefore it doesn't

2  exist is just not a correct implication and connection he's

3  trying to draw.

4        THE COURT:  Okay.  All right.

5     Well, let me also ask you about this.  I'm obsessing a

6  little over the *Barton* doctrine and your insistence that it

7  does not provide authority or an analogy here.

8     Well, for one thing, is there anything in the Fifth

9  Circuit case *Sherman v. Ondova* that you think either helps you

10  or hurts you on that point?  I'm intimately familiar with it,

11  although I haven't read it in a while, because it was my

12  opinion that the Fifth Circuit affirmed.  And I spent a lot of

13  time thinking about that.  It was a trustee, a traditional --

14  well, no, a Chapter 11 trustee and his counsel.  But anything

15  from that case that you think is worthy of pointing out here?

16        MR. BRIDGES:  No, Your Honor.  I'm not -- nothing

17  comes to mind.  That case is not fresh on my mind.

18     What I would tell you is that *Barton* doctrine and the

19  business judgment rule are incompatible, and the appointment

20  of a trustee never involves application of the business

21  judgment rule or deference to the Debtor or another party in

22  terms of making that appointment.

23     The *Barton* doctrine, as it applies to trustees, is viewed

24  as an extension, to some extent, of judicial immunity to the

25  trustee, who is chosen by, selected by the Court and assigned

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 578 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 578 of 852   PageID 2483

20

1   by the Court to carry out certain functions.  That --

2              THE COURT:  Well, let me --

3              MR. BRIDGES:  -- quasi-immunity --

4              THE COURT:  -- stop you there.  You say it's an

5   extension of immunity.  But isn't it, by nature, really a

6   gatekeeping provision?  It's a gatekeeping provision, right?

7   Before you even get to immunity, maybe, in a lawsuit, it's a

8   gatekeeping function that the Supreme Court has blessed, you

9   know, obviously in the context of a receiver, but appellate

10  courts have blessed it in the bankruptcy context.  The

11  Bankruptcy Court can be the gatekeeper on whether the trustee

12  or someone I think in a similar position can get sued or not.

13      And then we had that Fifth Circuit case after *Ondova*.  It

14  begins with a V, *Villegas* or something like that.  Didn't

15  that, I don't know, further ratify, if you will, the whole

16  *Barton* doctrine by saying, oh, just because they're noncore

17  claims, state law or non-bankruptcy law claims, doesn't mean,

18  after *Stern*, the Bankruptcy Court still cannot serve the

19  gatekeeper function.

20      Tell me what you disagree.  That's my kind of combined

21  reading of all of that.

22              MR. BRIDGES:  Your Honor, I have to parse it out.

23  There's a lot to unpack there.  If I can make sure to get in

24  the follow-ups, I can start with saying it's okay for the

25  Court in many instances to act as a gatekeeper.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 579 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 579 of 852   PageID 2484

21

1          THE COURT:  Okay.

2          MR. BRIDGES:  Both under *Barton* -- under *Barton*, or

3   when the *Barton* exception in 959(a) applies, under the Court's

4   general equitable powers, that gatekeeping functions are not

5   across-the-board prohibited, --

6          THE COURT:  Okay.

7          MR. BRIDGES:  -- and we aren't trying to argue that

8   they're prohibited across the board.

9          THE COURT:  Okay.

10         MR. BRIDGES:  Now, to try to dig into that a little

11  deeper, the order does two things:  gatekeeping as to some

12  claims, and, frankly, discharging or barring other claims.

13  Those are two separate functions.

14      The first one, the gatekeeping, may be, in some

15  circumstances, which we'll come to, many circumstances, may be

16  allowable, may be even mandatory under *Barton*, not even

17  requiring an order from this Court, for the gatekeeping of

18  *Barton* to apply.  But nonetheless, allowable in many instances

19  under the Court's general equity powers under 959(a).  That

20  part is right about gatekeeping.

21      It does not create jurisdiction in this Court where 157(d)

22  deprives this Court of jurisdiction.  Just because it's

23  related to bankruptcy isn't enough to say that the Court

24  therefore has jurisdiction if, one, if mandatory withdrawal of

25  the reference is required.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 580 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 580 of 852   PageID 2485

22

1      Furthermore, Your Honor, that gatekeeping function, under

2  the equity powers authorized by 959(a), will not allow a court

3  to discharge or -- or deprive, is the word I'm looking for --

4  deprive a litigant of their right to a trial -- a specific

5  kind of trial, a jury trial -- but a trial.  And by crafting

6  an order that says certain kinds of claims that do (garbled)

7  jury rights are barred, rather than just providing a

8  gatekeeper provision, flat-out bars them, that doesn't -- that

9  doesn't comply with 959.

10             THE COURT:  Okay.

11             MR. BRIDGES:  Your Honor, if I could add one last

12  thing.

13             THE COURT:  Go ahead.

14             MR. BRIDGES:  The Supreme Court's *Stern* case points

15  out that -- that it's -- well, actually, it's the *Villegas*

16  case from the Fifth Circuit --

17             THE COURT:  The one I mentioned.

18             MR. BRIDGES:  -- points out that *Stern* -- *Stern* --

19  yes, you did.  *Stern* did not create an exception to the *Barton*

20  doctrine.  And that gives -- that endorses a *Barton* court's

21  ability to perform gatekeeping, even over claims that *Stern*

22  says there would not be jurisdiction over.

23      Contrast that with 959(a), which *Collier on Bankruptcy* and

24  the Fifth Circuit have held is an exception to the *Barton*

25  doctrine.  Because of that exception, *Barton* no longer

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 581 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 581 of 852   PageID 2486

23

 1   applies, and what you're using in invoking a gatekeeper order

 2   is the Court's inherent equitable powers, its general powers

 3   in equity.  And those equity powers are cabined.  They're

 4   broad, but they're cabined by 959(a)'s prohibition of doing

 5   away with a litigant's right to a trial, a jury trial.

 6       Now, I also -- counsel is telling me I should note for the

 7   record that Mr. Mark Patrick is here as a representative of

 8   our clients.  But Your Honor, I'll -- I will quit now unless

 9   you have further questions for me.

10       THE COURT:  All right.  I do not at this time.  Mr.

11   Morris or Mr. Pomerantz, who's going to make the argument?

12       MR. POMERANTZ:  It's me, Your Honor.

13        OPENING STATEMENT ON BEHALF OF THE DEBTOR

14       MR. POMERANTZ:  And I'll start with the jury trial

15   right.  In the last few minutes, we have been able to

16   determine that the Second Amended and Restated Investment

17   Advisory Agreement between the DAF and the Debtor has a broad

18   jury trial waiver under 14(f).  And in addition, as I will

19   include in my discussion, there is no private right of action

20   under the Investment Advisers Act.

21       I think those two points are fatal to Movants' argument,

22   and probably I can get away with not even responding to the

23   others.  But since I prepared a lengthy presentation to

24   address the issues that were raised today, and also the half

25   hour that Mr. Bridges spent with Your Honor on June 8th in

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 582 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 582 of 852 PageID 2487

24

1  which was his first opening statement on the motion for

2  reconsideration, I'll now proceed.

3           THE COURT:  All right.

4           MR. POMERANTZ:  The arguments that the Movants made

5  in the original motion essentially boil down to one legal

6  proposition, that the Court did not have jurisdiction to enter

7  the July 16th order because those orders impermissibly

8  stripped the District Court from jurisdiction, in violation of

9  (inaudible) Supreme Court precedent and 28 U.S.C. Section

10  157(d).

11      As with all things Dondero, the arguments continue to

12  morph, and you heard argument at the contempt hearing on June

13  8th and further argument today that now the prospective

14  exculpation for negligence in the order is also unenforceable

15  and should be modified.

16      Movants continue to try to distance themselves from the

17  January 9th order and argue that it is not relevant because

18  they seek to pursue claims against Mr. Seery as CEO and not as

19  an independent director.  Movants ignore, however, that the

20  January 9th order not only protects Mr. Seery in his role as

21  the independent director, but also as an agent of the board.

22  I will walk the Court through my arguments on that issue in a

23  few moments.

24      Of course, the Movants had no explanation, Your Honor, for

25  the question of why it took them until May of 2021, 10 months

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 583 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 583 of 852    PageID 2488

25

1    after the entry of the July 16th order that appointed Mr.

2    Seery as CEO and CRO, and 16 months after the Court appointed

3    the independent board, with Mr. Dondero's blessing and

4    consent, as a substitute for what would have surely been the

5    imminent appointment of a Chapter 11 trustee.

6        Movants try to distance themselves from the prior orders

7    by essentially arguing that the DAF is a newcomer to the

8    Chapter 11 and is not under Mr. Dondero's control but is

9    rather managed separately and independently by Mr. Patrick,

10   who recently replaced Mr. Scott.

11       The Movants admit, as they must, that the DAF is the

12   parent and the sole shareholder of CLO Holdco and conducts its

13   business through CLO Holdco, and both entities conduct their

14   business through one individual.  It was Grant Scott then;

15   it's Mark Patrick now.  So even if Mr. Dondero does not

16   control the DAF and CLO Holdco, which issue was the subject of

17   lengthy testimony in connection with the DAF hearing, both the

18   DAF and the CLO Holdco are bound by the Debtor's res judicata

19   argument, which I will discuss shortly.

20       In any event, I really doubt the Court is convinced that

21   the DAF operates truly independently of Mr. Dondero any more

22   than the Court has been convinced that the Advisors, the

23   Funds, Dugaboy and Get Good, all operate independently from

24   Mr. Dondero.  The only explanation for the delay is that Mr.

25   Dondero has been and continues to be unhappy with the Court's

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 584 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 584 of 852 PageID 2489

26

1   rulings and has now hired a new set of lawyers in a desperate

2   attempt to evade this Court's jurisdiction. Having failed in

3   their attempt to recuse Your Honor from the case, this is

4   essentially their last hope.

5      And these new lawyers, Your Honor, have not only filed

6   this DAF lawsuit in the District Court which is the subject of

7   the contempt motion and today's motion, but they also filed

8   another lawsuit in the District Court on behalf of an entity

9   called PCMG, another Dondero entity, challenging yet another

10   of Mr. Seery's postpetition decisions.

11      And there's no doubt that this is only the beginning. Mr.

12   Dondero recently told Your Honor at a hearing that there were

13   many more sets of lawyers waiting in the wings. And as the

14   Court remarked at the hearing on the Trusts' motion to compel

15   compliance with Rule 2015.3, the Trusts were trying through

16   that motion to obtain information about the Debtor's control

17   entities so that they could file more lawsuits against the

18   Debtor, a concern that Mr. Draper unconvincingly denied.

19      I would like to focus the Court preliminarily on exactly

20   what the January 9th and July 16th orders do, because Movants

21   try to confuse things by casting the entire order with a broad

22   brush of their jurisdictional overreach arguments, and they

23   misinterpret Supreme Court and Fifth Circuit precedent.

24      I would like to put up on the screen the language of

25   Paragraph 10 of the January 9th order and Paragraph 35

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 585 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 585 of 852   PageID 2490

27

1   (garbled) of the July 16th.

2       Your Honor is very familiar with these orders, I'm sure,

3   having dealt with them in connection with confirmation and in

4   prior proceedings.  But to recap, the orders essentially do

5   three things.

6       First, they require the parties to first come to the

7   Bankruptcy Court before commencing or pursuing a claim against

8   certain parties.

9       Second, they provided the Court with the sole jurisdiction

10  to make a finding of whether the party has asserted a

11  colorable claim of negligence -- of willful misconduct or

12  gross negligence.

13      And lastly, the orders provided the Court with exclusive

14  jurisdiction over any claims that the Court determined were

15  colorable.

16      The protected parties under the January 9th order are the

17  independent directors, their agents and advisors, which, as I

18  mentioned earlier, includes Mr. Seery -- who, at least as of

19  March 2020, was acting as the agent on the board's behalf as

20  the CEO -- for any actions taken under their direction.

21      The protected parties under the July 16th order are Mr.

22  Seery, as the CEO and CRO, and his agents and advisors.

23      Movants spend a lot of time in their moving papers and

24  reply arguing that the Court may not assert exclusive

25  jurisdiction over any claims that pass through the gate.  They

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 586 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 586 of 852 PageID 2491

28

1    also spend a lot of time arguing that the Bankruptcy Court

2    does not even have jurisdiction at all to assert -- to

3    adjudicate claims against Mr. Seery because such claims are

4    subject to mandatory withdrawal under Section 157(d).

5         The Debtor doesn't agree, and has briefed why mandatory

6    withdrawal of the reference is inapplicable.  The Debtor has

7    also filed in the District Court a motion to enforce the

8    reference in effect in this district which refers cases in

9    this district arising under, arising in, or related to Chapter

10   11 to the Bankruptcy Court.

11        The motion to enforce the reference, Your Honor, which

12   extensively briefs this issue, is contained in Exhibit 3 of

13   the Debtor's exhibits.

14        We were somewhat surprised that the complaint filed in the

15   District Court wasn't automatically referred to this Court

16   under the standing order in effect in this district, given the

17   related bankruptcy case, the Court's prior approval of the

18   HarbourVest settlement, and the appeal in the District Court

19   of the HarbourVest settlement.

20        When we dug a little further, we found out that Movants

21   filed a civil case cover sheet accompanying the complaint in

22   the District Court.  They neglected in that initial filing to

23   point out that there was any related case to the lawsuit they

24   filed.

25        Mr. Bridges fell on his sword at the contempt hearing on

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 587 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 587 of 852   PageID 2492

29

1    June 8th and took complete responsibility for the oversight.

2    I commend him for not trying to argue that the bankruptcy

3    case, the HarbourVest settlement, and the District Court

4    appeal are not related cases that would require disclosure, an

5    argument that surely would have been unsupportable.

6        But as I said at the contempt hearing, I find it curious

7    that such an important issue was overlooked, an issue which

8    would have likely changed the entire trajectory of the

9    proceedings and landed the DAF lawsuit in this Court rather

10   than the District Court.

11       And this Tuesday, Your Honor, Movants filed a revised

12   civil cover sheet with the District Court.  Although they

13   referenced the bankruptcy case as a related case, they didn't

14   bother to mention the appeal already pending in the District

15   Court regarding the HarbourVest settlement -- surely, a

16   related case.

17       Your Honor also asked Mr. Bridges at the June 8th hearing

18   whether it was an oversight or intentional that he didn't

19   mention 28 U.S.C. Section 1334 as a basis for jurisdiction in

20   his complaint.  Mr. Bridges had no answer for Your Honor then,

21   and has given no answer now.  His only comment at the hearing

22   last time was that it must have been Ms. Sbaiti that wrote it

23   because he had no recollection of it.

24       So, Your Honor, it's no surprise that Movants conveniently

25   found themselves in the District Court, which was their

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 588 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 588 of 852 PageID 2493

30

1     ultimate strategy from the get go.

2        In any event, Your Honor, we have briefed the withdrawal

3     of the reference issue. A response by the Movants is due --

4     CLO Holdco and DAF is due on June 29th. And we hope the

5     District Court will decide soon thereafter whether to enforce

6     the reference.

7        While I'm happy to argue why Movants' mandatory withdrawal

8     of the reference argument is [not] persuasive, I don't think

9     it's necessary, but I do, again, want to highlight that there

10     is no private right of action under the Investment Advisers

11     Act.

12        Your Honor, it's not really relevant to today's hearing,

13     since we have argued in opposition to the motion before Your

14     Honor that resolving the issue of the Bankruptcy Court's

15     jurisdiction to adjudicate claims contained in the complaint

16     as they relate to Mr. Seery is premature at this point. The

17     January 9th and July 16th orders first require the Court to

18     determine whether a claim is colorable. It's not until this

19     Court determines if a claim is colorable that the decision on

20     where the lawsuit should be tried is relevant.

21        Having said that, Your Honor, we read the Movants' reply

22     brief very carefully and noticed in Footnote 6 that the

23     Movants state that modifying the exclusive grant of

24     jurisdiction to adjudicate any claims that pass through the

25     gate to include the language "to the extent permissible by

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 589 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 589 of 852   PageID 2494

31

1    law," in the same way the Debtor modified the plan, would

2    resolve the motion.  So let's look at the provision as it

3    exists in the plans.

4        Ms. Canty, if you can put up the next demonstrative,

5    please.

6        This provision provides that the Bankruptcy Court will

7    have sole and exclusive jurisdiction to determine whether a

8    claim or cause of action is colorable, and, only to the extent

9    legally permissible and provided in Article XI, shall have

10   jurisdiction to determine -- to adjudicate the underlying

11   colorable claim or cause of action.

12       The Movants request in their reply brief in Footnote 6

13   that the July 16th order be given the plan treatment.  That

14   treatment:  sole authority to determine colorability and

15   jurisdiction, and, to the extent legally permissible, to

16   adjudicate underlying claim, only if jurisdiction existed.

17       After reviewing the reply brief and prior to the June 8th

18   hearing, we decided that we would agree to modify both the

19   January 9th and the July 16th orders to provide that the

20   Bankruptcy Court would only have jurisdiction to adjudicate

21   claims that pass through the colorability gate to the extent

22   permissible by law.

23       Prior to the June 8th hearing, Mr. Morris and I had a

24   conversation with Mr. Bridges.  We conferred about a potential

25   resolution and a proposed modification.  Mr. Bridges indicated

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 590 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 590 of 852   PageID 2495

32

1   they were interested in exploring a resolution and wanted to

2   --

3          MR. BRIDGES:  Objection, Your Honor.

4          THE COURT:  There's an objection?

5          MR. BRIDGES:  Objection, Your Honor.  There's a Rule

6   408 settlement discussion.  He's welcome to talk about the

7   results, but he shouldn't be talking about what was -- what

8   was proposed by opposing counsel in a settlement conversation.

9          THE COURT:  Okay.  I overrule.

10          MR. POMERANTZ:  Your Honor, this was not --

11          THE COURT:  I don't think this is a 408 issue.

12   Continue.

13          MR. BRIDGES:  Thank you.

14          MR. POMERANTZ:  The stipulation and order which we

15   provided to counsel is attached to my declaration, which is

16   found at Document 2418, and it was filed in connection with a

17   Notice of Revised Proposed Orders that we filed at Docket

18   2417.  And I would like to put up on the screen the relevant

19   paragraphs of the order that we provided to the Movants.

20      So, you see, we agreed to modify each of the orders at the

21   end to do what the plan says.  The Court would only have

22   jurisdiction for claims passing through the gate if the Court

23   had jurisdiction and it was legally permissible.

24      Movants' counsel, however, responded with a mark-up that

25   went beyond -- went beyond what Movants proposed in Footnote 6

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 591 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 591 of 852   PageID 2496

33

1   and sought to fundamentally change the January 9th and July

2   16th orders in ways that were not acceptable to the Debtor and

3   not even contemplated by the original motion.

4       Ms. Canty, can you put up on the screen the relevant

5   paragraphs of the response we received?

6       Specifically, Your Honor, you see at the first part they

7   wanted to provide that the only -- the order only applied to

8   claims involving injury to the Debtor, presumably as opposed

9   to alleged injuries to affiliated funds or third parties.

10  They also provided that the Court's ability to make the

11  initial colorability determination was also qualified by "to

12  the extent permissible by law" in the way that the Court --

13  that the Debtor agreed to modify the ultimate adjudication

14  jurisdiction provision.

15      Your Honor, Movants haven't even talked about this back

16  and forth.  They haven't talked about their about-face.  And

17  I'll leave it for Your Honor to read their Footnote 6 that

18  said it would resolve their motion, the back and forth, our

19  proposal, and now Mr. Bridges' modified, morphed arguments

20  that now point out other issues.

21      In any event, Your Honor, we made the change, and we think

22  it should resolve the motion, or at least it resolves part of

23  the motion.  There can't be any argument that the Court is

24  trying to exert exclusive jurisdiction on claims that pass

25  through the gate.

Case 21-03067-sgj Doc 43 Filed 09/29/21  Entered 09/29/21 18:18:16  Page 592 of 852
Case 3:21-cv-00842-B  Document 43  Filed 07/13/21  Page 592 of 852  PageID 2497

34

1      What apparently remains from the arguments raised by the

2  Movants is the argument that the Court does not even have

3  jurisdiction to act as a gatekeeper in the first place because

4  it doesn't have jurisdiction of the underlying lawsuit.  And

5  on June 8th and today, they've added a new argument, that the

6  orders impermissibly exculpate Mr. Seery and others, violate

7  their jury trial rights, and are contrary to the Fifth Circuit

8  precedent.

9      Movants claims that the orders are a jurisdictional

10  overreach, a violation of constitutional proportions, a

11  violation of due process, and inconsistent with several U.S.

12  Supreme Court cases.  But, of course, they cite no cases whose

13  facts are even remotely similar to this one.  Instead, they

14  are content to rely on general statements regarding bankruptcy

15  jurisdiction, how it is derived from district court

16  jurisdiction and is constitutionally limited, legal

17  propositions which are not terribly controversial or even

18  applicable to these facts.

19      There are several arguments -- I mean, there are several

20  reasons, Your Honor, why Movants' arguments fail.  Initially,

21  Movants have not cited any authority, any statute, or any rule

22  which would allow this Court to revisit the January 9th and

23  July 16th orders.  As I will discuss in a moment, Your Honor,

24  *Republic v. Shoaf*, a case the Court is very familiar in and

25  relied on in connection with plan confirmation, bars a

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 593 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 593 of 852   PageID 2498

35

 1   collateral attack on these orders under the doctrine of res

 2   judicata.

 3       Similarly, as the Court remarked on June 8th, the Supreme

 4   Court's *Espinosa* decision, which rejected an attack based upon

 5   Federal Rule of Civil Procedure 60(b)(4) to a prior order that

 6   may have been unlawful, prohibits the Court from now

 7   reconsidering the January 9th and July 16th orders.

 8       But even if Your Honor rules that res judicata does not

 9   apply, there are two independent reasons why the orders were

10   not an unlawful extension of the Court's jurisdiction.  The

11   first is because the Court had jurisdiction to enter both of

12   those orders as the ability to determine the colorability of

13   claims is within the jurisdiction of the Court.  The second is

14   because the orders are justified by the *Barton* doctrine.

15       Lastly, Your Honor, Movants' argument that the Court may

16   not act as a gatekeeper to determine the colorability of a

17   claim for which it may not have jurisdiction is incorrect, and

18   as Your Honor has mentioned and as Mr. Bridges unconvincingly

19   tried to distinguish, the Fifth Circuit *Villegas v. Schmidt*

20   case is a case on point and resolves that issue.

21       Turning to res judicata, Your Honor, it prevents the Court

22   from revisiting these governance orders.  CLO Holdco had

23   formal notice of the Seery CEO motion and the opportunity to

24   respond.  It failed to do so.  It is clearly bound.

25       As reflected on Debtor's Exhibit 4, CLO Holdco is a

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 594 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 594 of 852 PageID 2499

36

1    wholly-owned subsidiary of the DAF.  The DAF is its sole

2    shareholder.  There is no dispute about that.  Importantly, at

3    the time of both the January and July orders, Grant Scott was

4    the only human being authorized to act on behalf of CLO Holdco

5    and the DAF.  The DAF did not respond to the Seery CEO motion,

6    either.

7        And why is that important, Your Honor?  It's because

8    Movants argue in their reply that the DAF cannot be bound by

9    res judicata because they did not receive notice of the July

10   16th order.  However, Your Honor, that is not the law.  Res

11   judicata binds parties to the dispute and their privies, and

12   the DAF is bound to the prior orders even though it did not

13   receive notice.

14       There are several cases, Your Honor, that stand for this

15   unremarkable proposition.  First I would point Your Honor to

16   the Fifth Circuit's opinion of *Astron Industrial Associates v.*

17   *Chrysler*, found at 405 F.2d 958, a Fifth Circuit case from

18   1968.  In that case, Your Honor, the Fifth Circuit held that

19   the appellant was barred by the doctrine of res judicata from

20   bringing a claim because its parent, which was its sole

21   shareholder, would have been bound by res judicata.

22       *Astron* is consistent with the 1978 Fifth Circuit case of

23   *Pollard v. Cockrell*, 578 F.2d 1002 (1978).  And the Northern

24   District of Texas in 2000 case of *Bank One v. Capital*

25   *Associates*, 2000 U.S. Dist. LEXIS 11652, found that a parent

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 595 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 595 of 852    PageID 2500

37

1   and a sole shareholder of an entity couldn't assert res

2   judicata as a defense when those claims could have been

3   brought against its wholly-owned subsidiary.

4       And lastly, Your Honor, the 2011 Southern District of

5   Texas case, *West v. WRH Energy Partners*, 2011 LEXIS 5183, held

6   that res judicata applied with respect to a partnership's

7   general partner because the general partner was in privity

8   with the partnership.

9       These cases are spot on and make sense.  DAF is CLO

10  Holdco's parent.  Grant Scott was the only live person to

11  represent these entities in any capacity at the relevant

12  times.  Accordingly, just as CLO Holdco is bound, DAF is

13  bound.

14      Allowing DAF to assert a claim when its wholly-owned and

15  controlled subsidiary is barred would allow entities to

16  transfer claims amongst their related entities in order to

17  relitigate them and they would never be finality.  And, of

18  course, Jim Dondero, as we know, consented to the January 9th

19  order, which provided Mr. Seery protection in a variety of

20  capacities.

21      And as Your Honor has pointed out, and as Mr. Bridges

22  didn't have an answer for, neither CLO Holdco nor the DAF or

23  any other party appealed any of the governance orders.  And

24  nobody challenged the validity of these orders at the

25  confirmation hearing, where the terms of these orders were

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 596 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 596 of 852   PageID 2501

38

1    front and center.

2         And importantly, Your Honor, the orders are clear and

3    unambiguous.  They require a Bankruptcy Court [sic] to seek

4    Bankruptcy Court approval before they commence or pursue an

5    action against the independent board, the CEO, CRO, or their

6    agents.  And they clearly and unambiguously set the standard

7    of care for actions prospectively:  gross negligence or

8    willful misconduct.

9         The Bankruptcy Court had jurisdiction to enter the

10   governance orders, which, as expressly indicated in the

11   orders, were core proceedings dealing with the administration

12   of the estate.  No one challenged this finding of core

13   jurisdiction.  And as I will discuss later, the failure to

14   challenge core jurisdiction is waived under applicable Supreme

15   Court and Fifth Circuit precedent.

16        Your Honor, the Court [sic] does not argue that Movants

17   have waived their right to seek adjudication of a lawsuit that

18   passes through the colorability gate by an Article III Court.

19   The issue is not before the Court, but the changes to the

20   order that the Debtor agreed to make clearly -- clearly will

21   provide Mr. Bridges' clients the ability to make that

22   determination.

23        The Debtor is, however, arguing that the Movants have

24   waived their right to contest the core jurisdiction of the

25   Bankruptcy Court to make the determination that the claims are

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 597 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 597 of 852    PageID 2502

39

1    colorable in the first place, and to challenge the exculpation

2    provisions provided to the beneficiaries of those orders.

3        Accordingly, Your Honor, the elements of res judicata are

4    satisfied.  Both proceedings involve the same parties.  The

5    prior judgment was entered by a court of competent

6    jurisdiction.  The prior order was a final judgment on its

7    merits.  And they involved the same causes of action.

8        Importantly, the members of the independent board,

9    including Jim Seery, relied on the protections contained in

10    the January 9th and July 16th orders and would not have

11    accepted these appointments if the protections weren't

12    included.  And how do we know this?  Because each of them,

13    both Mr. Seery and Mr. Dubel, both testified at the

14    confirmation hearing on this very topic.

15        And I would like to put up on the screen an excerpt from

16    Mr. Seery's testimony at confirmation, which is testimony

17    included in the February 2nd, 2021 transcript, which is

18    Exhibit 2 of the Debtor's exhibits.

19            THE COURT:  Okay.

20            MR. POMERANTZ:  And I would like to just read this,

21    Your Honor.

22        "Q    Okay.    You mentioned that there were certain

23            provisions of the January 9th order that were important

24            to you and the other independent directors.  Do I have

25            that right?"

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 598 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 598 of 852   PageID 2503

40

1          MR. POMERANTZ:  A little bit later on, Mr. Seery

2     testifies:

3          "A    And then ultimately there'll be another provision

4          in the agreement here, I don't see it off the top of my

5          head, but a gatekeeper provision.  And that provision"

6          --

7          "Q    Hold on one second, Mr. Seery."

8              MR. POMERANTZ:  Please scroll.

9          "Q    So, Paragraph 4 and 5, were those -- were those --

10         were those provisions put in there at the insistence of

11         the prospective independent directors?

12         "A    Yes.

13         "Q    Okay.  Can we go to Paragraph 10, please?  There

14         you go."

15         Mr. Morris:  Is this the other provision that you were

16    referring to?

17         "A    This is -- it's become to be known as the

18         gatekeeper provision, but it's a provision that I

19         actually got from other cases -- again, another very

20         litigious case -- that I thought it was appropriate to

21         bring it into this case.  And the concept here is that

22         when you are dealing with parties that seem to be

23         willing to engage in decade-long litigation and

24         multiple forums, not only domestically but even

25         throughout the world, it seemed important and prudent

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 599 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 599 of 852   PageID 2504

41

1    to me and a requirement that I set out that somebody

2    would have to come to this Court, the Court with

3    jurisdiction over these matters, and determine whether

4    there was a colorable claim.  And that colorable claim

5    would have to show gross negligence and willful

6    misconduct -- i.e., something that would not otherwise

7    be indemnifiable" --

8         MR. POMERANTZ:  Hold on one second.

9    "A   So, basically, it set an exculpation standard for

10   negligence.     It exculpates the directors from

11   negligence, and if somebody wants to bring a cause

12   against the directors, they have to come to this Court

13   first to get a finding that there's a colorable claim

14   for gross negligence or willful misconduct."

15   "Q   Would you have accepted the engagement as an

16   independent director without the Paragraphs 4, 5, and

17   10 that we just looked at?

18   "A   No, these were very specific requests.    The

19   language here has been smithed, to be sure, but I

20   provided the original language for Paragraph 10 and

21   insisted on the guaranty provisions above to ensure

22   that the indemnity would have some support.

23   "Q   And ultimately did the Committee and the Debtor

24   agree to provide all the protections afforded by

25   Paragraphs 4, 5, and 10?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 600 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 600 of 852   PageID 2505

42

1      "A   Yes."

2           MR. POMERANTZ:  So, Your Honor, these -- this

3      testimony also applied to as well as the CEO.

4           The testimony was echoed by Mr. Dubel, another member of

5      the board.  And I'm not going to put his testimony on the

6      screen, but it can be found at Pages 272 to 281 of Exhibit 2,

7      which is the February 2nd transcript.

8           Movants argue, however, that res judicata doesn't apply

9      because the Court didn't have jurisdiction to enter these

10     orders.  And they argue that the order stripped the District

11     Court of this jurisdiction.  As I previously described, the

12     Debtor is prepared to modify the governance orders to provide

13     that the Court shall retain jurisdiction to -- on claims that

14     pass through the gate only to the extent legally permissible.

15     The modification does not appear to be good enough for the

16     Movants.  They continue to argue that the Bankruptcy Court

17     can't even act as the exclusive gatekeeper to determine

18     whether such actions are colorable as a prerequisite for

19     commencing or pursuing an action.

20          The problem Movants run into is the Fifth Circuit's

21     opinion of *Republic v. Shoaf* and various Supreme Court

22     decisions, including *Espinosa*.

23          In *Shoaf*, the Fifth Circuit held that a party cannot

24     subsequently challenge a confirmed plan that clearly and

25     unambiguously released a third party, even if the Bankruptcy

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 601 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 601 of 852 PageID 2506

43

1   Court lacked jurisdiction to approve the release in the first

2   place.  Movants' proper recourse was to appeal the governance

3   orders, not to seek to collaterally attack them.

4       In *Shoaf*, the Fifth Circuit held that the confirmed plan

5   was res judicata with respect to a suit by the creditor

6   against the guarantor.  And in so ruling, the Fifth Circuit

7   says that the prong of res judicata standard that requires an

8   order, prior order to be made by a court of competent

9   jurisdiction is satisfied regardless of whether the issue was

10  actually litigated.  This is because whenever a court enters

11  an order, it does so by implicitly making a finding of its

12  jurisdiction, a determination that can't be attacked.  And in

13  fact, in the January 9th and the July 16th orders, it wasn't

14  implicit, the Court's jurisdiction; it was set out that the

15  Court had core jurisdiction.

16      Movants try to brush *Shoaf* aside, arguing that is the only

17  case the Debtor cites to support res judicata argument and is

18  a narrow opinion that has been questioned and distinguished.

19  That's just not correct, Your Honor.  Movants ignore that we

20  have cited two United States Supreme Court cases, *Stoll v.*

21  *Gottleib* and *Chicot County Drainage District*, upon which the

22  Fifth Circuit based its *Shoaf* decision.  In each case, the

23  U.S. Supreme Court gave res judicata effect to a Bankruptcy

24  Court order that made a ruling party -- that a ruling party

25  later claimed was beyond the Court's jurisdiction to do so.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 602 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 602 of 852    PageID 2507

44

1    In *Stoll*, it was a release of guaranty without jurisdiction,

2    like *Shoaf*.   In *Chicot*, it was an extinguishment of a bond

3    claim without jurisdiction.

4         Similarly, Your Honor, the U.S. Supreme Court held in

5    *Espinosa* that a party was not entitled to reconsideration of a

6    Bankruptcy Court order under Federal Rule of Civil Procedure

7    60(b)(4) discharging a student loan without making the

8    required statutory finding of undue hardship in an adversary

9    proceeding.   And the Supreme Court reasoned in that opinion as

10   follows:  A judgment is not void, for example, simply because

11   it may have been erroneous.   Similarly, a motion under

12   60(b)(4) is not a substitute for a timely appeal.   Instead,

13   60(b)(4) applies only in the rare instance where a judgment is

14   premised either on a certain type of jurisdictional error or a

15   violation of due process that deprives a party of notice or

16   the opportunity to be heard.

17        Federal courts considering Rule 60(b)(4) motions that

18   assert a judgment is void because of a jurisdictional defect

19   generally have reserved it only for the exceptional case in

20   which the court that rendered the judgment lacked even an

21   arguable basis for jurisdiction.   This case is not the

22   exceptional -- exceptional circumstance that was referred to

23   by *Espinosa*.

24        In addition, we argue in our brief, and I'll get to in a

25   few moments, that both of the orders are justified under the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 603 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 603 of 852    PageID 2508

45

1    *Barton* doctrine.

2         Actually, before I go to that, Your Honor, I think Movants

3    are really trying to distinguish *Espinosa* by arguing that the

4    Court's order exculpating Mr. Seery for negligence liability

5    did not provide people, mom-and-pop investors, with the due

6    process informing them that they would not be able to assert

7    duty claims based upon mere negligence.  I think that's the

8    core of Mr. Bridges' argument, that, hey, you entered an

9    order, you gave this exculpation, it was inappropriate, and it

10   couldn't be done.

11        There are several problems with Movants' argument.  First,

12   Movants mischaracterize both the facts and the law in

13   connection with the Debtor's relationship with its investors.

14   The Debtor is the registered investment advisor for HCLOF as

15   well as approximately 15 to 18 CLOs.  The only investor in

16   HCLOF other than the Debtor is CLO Holdco.  The investors in

17   the CLOs are the retail funds advised by the Dondero advisors

18   and the other -- and other institutional investors.

19   Accordingly, the thousands of investors, the mom-and-pop

20   investors whose due process rights have allegedly been

21   trampled by the January 9th and July 16th orders, are not

22   investors in any funds managed by the Debtor.

23        And, of course, I have mentioned, as I've mentioned

24   before, no non -- non-Dondero investor, be it a mom-and-pop

25   investor, another institutional investor, anyone unrelated to

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 604 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 604 of 852 PageID 2509

46

1  Mr. Dondero, has ever appeared in this Court to challenge the

2  Debtor's activities.

3      But more fundamentally, Your Honor, the Debtor does not

4  owe fiduciary duties to investors in any of the funds that the

5  Debtor advises.  The fiduciary duty that the Debtor owes is to

6  the funds themselves, not the investors in the funds.

7      And while Movants point to Mr. Seery's prior testimony to

8  support the argument that the Debtor owes a duty to investors,

9  Mr. Seery was not testifying as a lawyer and his testimony

10  just cannot change the law.

11      As to each of the funds that the Debtor manages, HCLOF and

12  the CLOs, they were each provided with actual notice of the

13  January 16th -- the July 16th order and didn't object.  And as

14  Your Honor will recall, the Trustees for the CLOs, the party

15  that could potentially have claims for breach of fiduciary

16  duty, they participated in the January 9th hearing.  They came

17  to the Court and were concerned about the protocols that the

18  Debtor was agreeing to with the Committee.  We revised them.

19  The Trustees didn't object.  They didn't object then; they

20  didn't object now.  And, in fact, they consented to the

21  assumption of the contracts between the Debtor and the CLOs.

22      So the argument that the orders, by having this

23  exculpation for future conduct, violated due process rights of

24  anyone and is the type -- essentially, the type of order that

25  *Espinosa* would have contemplated could be attacked, is --

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 605 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 605 of 852 PageID 2510

47

1 relies on faulty legal and factual premises.  No duty to

2 investors.  No private right of action.  And both -- and all

3 the funds received due process.

4      In addition, Your Honor, as we argue in our brief and I'll

5 get to in a few moments, both of the orders are justified

6 under the *Barton* doctrine, as Mr. Seery is entitled to

7 protection based upon how courts around the country have

8 interpreted the *Barton* doctrine.  As such, Mr. Seery is

9 performing his role both as an agent of the independent board

10 under the January 9th order, as a CEO under the July 16th

11 order, as a quasi-judicial officer.  And as Your Honor

12 examined in the *Ondova* opinion which you mentioned, trustees

13 are entitled to qualified immunity for damage to third parties

14 resulting from simple negligence, provided that the trustee is

15 operating within the scope of his duties and is not acting in

16 an *ultra vires* manner.

17      So, exculpating the independent directors, their agents,

18 and the CEO in the January 9th and July 16th orders was a

19 recognition by this Court that they would be entitled to

20 qualified immunity, much in the same way trustees are.

21      No doubt that Movants contend that this was error and that

22 the Court overreached.  However, the remedy for that overreach

23 was an appeal, not a reconsideration 16 months later.  The

24 Court's orders based upon the determination that in this

25 highly contentious case that these court officers needed to be

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 606 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 606 of 852   PageID 2511

48

1    protected from negligence suits is not the exceptional case

2    where the Court lacked any arguable basis for jurisdiction.

3    Accordingly, this Court must follow *Espinosa*, *Shoaf*, *Stoll*,

4    and *Chicot* and reject the attack on the prior court orders.

5         The only case Movants cite to challenge the Supreme

6    Court's decision -- to challenge the Supreme Court precedent I

7    mentioned and the Fifth Circuit's *Shoaf* decision is the

8    *Applewood* case.  *Applewood* is totally consistent with *Shoaf*.

9    *Applewood* also involved a plan that purported to release a

10   guaranty claim that the guarantor argued was res judicata in

11   subsequent litigation regarding the guaranty.  The Fifth

12   Circuit held in that case that the plan was not res judicata.

13   It made that ruling because the plan did not contain clear and

14   unambiguous language releasing the guaranty.  In that way, the

15   Fifth Circuit distinguished *Shoaf*.

16        *Applewood* and *Shoaf* are consistent.  A Bankruptcy Court

17   order will be given res judicata effect, even if the Court

18   didn't have jurisdiction to enter it, if the order was clear

19   and unambiguous.  In *Shoaf*, the release was.  In *Applewood*, it

20   wasn't.

21        Movants argued on June 8th and argue now that the

22   *Applewood* case really argues -- really deals with prospective

23   exculpation of claims.  I went back and read Mr. Bridges'

24   comments carefully of June 8th.  He said *Applewood*,

25   exculpation.  Well, that's just not correct.  *Applewood* is all

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 607 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 607 of 852 PageID 2512

49

1    about requiring specificity of a (garbled) to give it res

2    judicata effect.  Claims that existed at that time, were they

3    described clearly and unambiguously?  Yes?  *Shoaf* applies.

4    No?  *Applewood* does -- applies.

5        So how should the Court apply these principles here?  The

6    Court approved a procedure for certain claims in the

7    governance orders.   The procedure:  come to Bankruptcy Court

8    before pursuing a claim against the independent directors and

9    Seery or their agents so that the Court can make a

10   colorability determination.  Clear and unambiguous.  The

11   governance orders each provide that the Bankruptcy Court had

12   jurisdiction to enter the orders, and the orders were not

13   appealed.

14       Movants attempt to confuse the Court and argue *Applewood*

15   is on point because the January 9th and July 16th orders do

16   not clearly identify specific claims that Movants now have

17   that are being released.  And because they're not specific,

18   then basically it's an ambiguous release and *Applewood*

19   applies.

20       The problem with the Movants' argument is that neither the

21   January 9th or July 16th orders released claims that existed

22   at that time.  If they did, and if there wasn't an adequate

23   description, I might agree with Mr. Bridges that *Applewood*

24   applied.  But there were no claims.  It was prospective.  It

25   was a standard of care.  The Court clearly and unambiguously

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 608 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 608 of 852   PageID 2513

50

1    said what the standard of care would be going forward.

2    Clearly, under *Shoaf* and Supreme Court precedent, they are

3    entitled to res judicata because it's a clear and unambiguous

4    provision.  *Applewood* just simply doesn't apply.

5        Mr. Phillips at the last hearing made an impassioned plea

6    to the Court for a narrow interpretation of the exculpation

7    provisions in the January 9th and July 16th orders, and he

8    argued that the Court could not possibly have intended for the

9    exculpation for negligence to apply on a go forward basis.  He

10   thus argued to the Court that the Court should construe the

11   exculpation narrowly and only apply it to potential claims of

12   harm caused to the Debtor, as opposed to harm caused to third

13   parties, which he said included thousands of innocent

14   investors.

15       Of course, Mr. Phillips made those arguments unburdened by

16   the actual facts and the prior proceedings which led to the

17   entry of these orders, because, as he was the first to admit,

18   he only became involved in the case a month ago.

19       As the Court recalls, and as reinforced by Mr. Seery's and

20   Mr. Dubel's testimony I just mentioned, the exculpation

21   provisions were included precisely to prevent Mr. Dondero,

22   through any one of the entities he's owned and controlled, the

23   Movants being two of those, from asserting baseless claims

24   against the beneficiaries of those orders, exactly the

25   situation Mr. Seery now finds himself in.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 609 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 609 of 852   PageID 2514

51

1      And, again, it bears emphasizing:  throughout this case,

2  not one of the purported public investors Mr. Phillips

3  lamented would be prevented from holding Mr. Seery responsible

4  for his conduct has ever appeared in this case to object about

5  anything.  And none of the directors of the funds, the funds

6  where the Debtor acts as an investment adviser, have ever

7  stepped foot in this court, either.

8      Even if the Court declines to apply res judicata, Your

9  Honor, to prevent challenges to the governance orders, the

10  Court has the jurisdiction, had the jurisdiction to include

11  the gatekeeping provisions in those orders.  The Bankruptcy

12  Court derives its jurisdiction from 28 U.S.C. Section 157, and

13  bankruptcy jurisdiction is divided into two parts:  core

14  matters, which are those arising in or arising under Title 11,

15  and noncore matters, those matters which are related to a

16  Chapter 11 case.

17      Bankruptcy Courts may enter final orders in core

18  proceedings, and with the consent of parties, noncore

19  proceedings.  If a party does not consent to a final judgment

20  in the noncore matters or waives its right to consent, then

21  the Bankruptcy Court -- or does not waive its right to

22  consent, then the Bankruptcy Court issues a report and

23  recommendation to the District Court.

24      The seminal Fifth Circuit case on bankruptcy court

25  jurisdiction is the 1987 case of *Wood v. Wood*, 825 F.2d 90.

1    There, the Fifth Circuit held that the Bankruptcy Court has

2    related to jurisdiction over matters if the outcome of that

3    proceeding could conceivably have any effect on the estate

4    being administered in the bankruptcy.

5        More recently, the Fifth Circuit, in the 2005 case, in

6    *Stonebridge Tech's*, elaborated on when a matter has a

7    conceivable effect on the estate such as to confer Bankruptcy

8    Court jurisdiction.  There, the Fifth Circuit held that an

9    action is related to bankruptcy if the outcome could alter the

10    debtor's rights, liabilities, options, or freedom of action,

11    either positively or negatively, and which in any way impacts

12    upon the handling and the administration of the bankruptcy

13    estate.  It is against this backdrop, Your Honor, that the

14    Court should evaluate its jurisdiction to have entered the

15    orders.

16        So, again, what did the orders do?  They established

17    governance over the Chapter 11 debtor with new independent

18    directors being approved.  They established the procedures and

19    protocols of how transactions were going to be presented to

20    and approved by the Committee.  They vested in the Committee

21    certain related-party claims, and they provided for the

22    procedures parties would have to follow to assert any claims

23    against the independent directors and the CRO and the agents

24    and advisors.

25        Your Honor, it's hard to imagine that there is a more core

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 611 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 611 of 852    PageID 2516

53

1    order than the entry of these orders.  At the time the orders

2    were entered, the Court was well aware of the potential for

3    acrimony from Mr. Dondero and his related entities, and

4    included the gatekeeper provisions to prevent the Debtor's

5    estate from being embroiled in frivolous litigation against

6    the board and the CEO.

7        Such protections were clearly within the Court's

8    jurisdiction, both to protect the administration of the estate

9    but also under applicable Fifth Circuit law dealing with

10   vexatious litigants, as set forth in the *Baum* and *Carroll*

11   cases that the Court cited in its confirmation order.

12       Not that it was hard to predict, but the last several

13   months have reinforced how important the gatekeeping

14   provisions in the order are and how important similar

15   provisions in the plan are.

16       The Court heard extensive testimony at the confirmation

17   hearing regarding the havoc continued litigation by Mr.

18   Dondero and his related entities would cause, which

19   predictions have unfortunately been borne out by the

20   unprecedented blizzard of litigation involving Mr. Dondero and

21   his related entities that has consumed the Court over the last

22   several months and caused the estate to incur millions of

23   dollars in fees that could have been used to pay its

24   creditors.

25       And these attacks are continuing.  As I mentioned before,

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 612 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 612 of 852    PageID 2517

54

1    in addition to the DAF lawsuit, Sbaiti & Co. filed an action

2    against the Debtor on behalf of PCMG, another related entity,

3    alleging postpetition mismanagement of the Select Fund.

4        And to complete the hat trick, they are the lawyers

5    seeking to sue Acis in the Southern District of New York for

6    allegedly post-confirmation matters.

7        The Court knew then and certainly knows now that the

8    potential for sizable indemnification claims could consume the

9    estate.  The Court used that as the potential basis for

10   determining that the orders were within its jurisdiction, just

11   as it used that potential to justify the exculpation

12   provisions in the plan as being consistent with *Pacific*

13   *Lumber*.

14       Movants also ignore the cases -- and we cited in our

15   opposition -- where courts in this district, including Judge

16   Lynn in *Pilgrim's Pride* in 2010 and Judge Houser in the *CHC*

17   *Group* in 2016, approved gatekeeper provisions that provided

18   the Bankruptcy Court with exclusive jurisdiction to adjudicate

19   claims against postpetition fiduciaries.

20       Movants also ignore cases outside this district, including

21   *General Motors* and *Madoff*, which we cited in our brief as

22   examples of cases where Bankruptcy Courts have been used as

23   gatekeepers to determine if claims are colorable or being

24   asserted against the correct entity.

25       And there's another reason, Your Honor, why Movants may

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 613 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 613 of 852   PageID 2518

55

1    now not contest the Court's jurisdiction to have entered those

2    orders.  Each of those orders, as I said before, include a

3    finding that the Court had core jurisdiction to enter the

4    orders.  No party contested that finding or refused to consent

5    to the core jurisdiction.

6         Under well-established Supreme Court precedent, parties

7    can waive their right to challenge the Bankruptcy Court's

8    jurisdiction, core jurisdiction, by failing to object.  In

9    *Wellness v. Sharif* in 2015, the Supreme Court expressly held

10   that Article III was not violated if parties knowingly and

11   voluntarily consented to adjudication of *Stern v. Marshall*-

12   type alter ego claims, and that the consent need not be

13   express, so long as it was knowing and voluntary.

14        And *Wellness* confirmed the pre-*Stern* opinion of the Fifth

15   Circuit in the 1995 *McFarland* case, which held that a person

16   who fails to object to the Bankruptcy Court's assumption of

17   core jurisdiction is deemed to have consented to the entry of

18   a final order by the Bankruptcy Court.

19        Your Honor, I'd now like to turn to the *Barton* doctrine.

20   The Court also has jurisdiction to have entered the orders

21   based upon the *Barton* doctrine.  The *Barton* doctrine dates

22   back to an old United States Supreme Court case and provides

23   as a general rule that, before a suit may be brought against a

24   trustee, consent from the appointing court must be obtained.

25        Movants essentially make two arguments why the *Barton*

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 614 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 614 of 852 PageID 2519

56

1    doctrine doesn't apply.

2         First, Movants, without citing any authority, argue that

3    it does not apply to Mr. Seery because he is not a trustee or

4    receiver and was not appointed by the Court.  Although the

5    doctrine was originally applied to receivers, it has been

6    extended over time to cover various court-appointed

7    fiduciaries and their agents in bankruptcy cases, including

8    debtors in possession, officers and directors of the debtor,

9    and the general partner of the debtor.  And although Mr.

10   Bridges says he couldn't find one case that applied the *Barton*

11   doctrine to a court-retained professional, I will now talk

12   about several such cases.

13        In *Helmer v. Pogue*, a 2012 case cited in our brief, the

14   District Court for the Northern District of Alabama

15   extensively analyzed the *Barton* doctrine jurisprudence from

16   the Eleventh Circuit and beyond and concluded that it applied

17   to debtors in possession.  The *Helmer* Court relied in part on

18   a prior 2000 decision of the Eleventh Circuit in *Carter v.*

19   *Rodgers*, which held that the doctrine applies to both court-

20   appointed and court-approved officers of the debtor, which is

21   consistent with the law in other circuits.

22        And subsequently, the Eleventh Circuit again considered --

23   and in that case, the distinction of a court-appointed as a

24   court-retained professional was -- was not persuasive to the

25   Court, and the Court held that a court-retained professional

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 615 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 615 of 852    PageID 2520

57

1    can still have *Barton* protection, notwithstanding that he

2    wasn't appointed, the argument that Mr. Bridges tries to make.

3        And subsequently, --

4            THE COURT:  I wonder, was that -- was that Judge

5    Clifton Jessup, by chance?  Or maybe Bennett?

6            MR. POMERANTZ:  Your Honor, this was -- this was the

7    Eleventh Circuit *Carter v. Rodgers*, so I think Judge Jessup

8    was --

9            THE COURT:  Oh, I thought you were still talking

10   about the Alabama case.  No?

11           MR. POMERANTZ:  Yeah, the Alabama -- well, the

12   Alabama case referred to the Eleventh Circuit case, *Carter v.*

13   *Rodgers*, --

14           THE COURT:  Okay.

15           MR. POMERANTZ:  -- and the appointment and -- or

16   retention issue was discussed in the *Carter v. Rodgers* case.

17           THE COURT:  Okay.

18           MR. POMERANTZ:  And subsequently, the Eleventh

19   Circuit again considered the contours of the *Barton* doctrine

20   in *CDC Corp.*, a 2015 case, 2015 U.S. App. LEXIS 9718.  In that

21   case, which Your Honor referenced in your *Ondova* opinion,

22   which I will discuss in a few moments, the Eleventh Circuit

23   held that a debtor's general counsel who had been approved by

24   the Court, who was appointed by a chief restructuring officer

25   who was also approved by the Court, was covered by the *Barton*

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 616 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 616 of 852 PageID 2521

58

1    doctrine for acts taken in furtherance of the administration

2    of the estate and the liquidation of the assets.

3         And the Eleventh Circuit last year, in *Tufts v. Hay*, 977

4    F.3d 204, reaffirmed that court-approved counsel who function

5    as the equivalent of court-appointed officers are entitled to

6    protection under *Barton*.  While the Court in that case

7    ultimately ruled that counsel could be sued without first

8    going to the Bankruptcy Court, it did so because it determined

9    that the suit between two sets of lawyers would not have any

10   effect on the administration of the estate.

11        So, Your Honor, not only is there authority, there is

12   overwhelming authority that Mr. Seery is entitled to the

13   protections.

14        In *Gordon v. Nick*, a District -- a case from 1998 from the

15   Fourth Circuit, the Court that the *Barton* doctrine applied to

16   a lawsuit against a general partner who was responsible for

17   administering the bankruptcy estate.

18        And as I mentioned, Your Honor, and as Your Honor

19   mentioned, Your Honor had reason to look at the *Barton*

20   doctrine in length and in depth in the 2017 *Ondova* opinion.

21   And in the course of the opinion, Your Honor discussed one of

22   the policy rationales for the doctrine, which you took from

23   the Seventh Circuit's *Linton* opinion, and you said as follows:

24   "Finally, another policy concern underlying the doctrine is a

25   concern for the overall integrity of the bankruptcy process

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 617 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 617 of 852 PageID 2522

59

1   and the threat of trustees being distracted from or

2   intimidated from doing their jobs.  For example, losers in the

3   bankruptcy process might turn to other courts to try to become

4   winners there by alleging the trustee did a negligent job."

5        Here, the independent board was approved by the Court as

6   an alternative to the appointment of a Chapter 11 trustee.

7   And it and its agent, including Mr. Seery as the CEO, even

8   before the July 16th order, were provided protections in the

9   form of the gatekeeper order and exculpation.

10       I'm sure the Court has a good recollection of the January

11  9th hearing -- we've talked about it a lot in the proceedings

12  before Your Honor -- where the Debtor and the Committee

13  presented the governance resolution to Your Honor.  And as

14  Your Honor will recall, the appointment of the board was a

15  hotly-contested issue among the Debtor and the Committee and

16  was heavily negotiated.  And the appointment of the

17  independent board was even contested by the United States

18  Trustee at a hearing on January 20th, 2020.

19       I refer the Court to the transcripts of the hearings on

20  January 9th and January 20th of 2020, which clearly

21  demonstrate that appointing this board and giving it the

22  rights and protections and its agents the rights and

23  protections was not your typical corporate governance issue,

24  but it was essentially the Court's alternative to appointing a

25  trustee.  And recognizing that the members of the independent

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 618 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 618 of 852 PageID 2523

60

1   board were essentially officers of the Court, the Court

2   approved the gatekeeper provision, requiring parties first to

3   come and seek the Court's permission before suing them, in

4   order to prevent them from being harassed by frivolous

5   litigation.

6       And the independent board was given the responsibility in

7   the January 9th order to retain a CEO it deemed appropriate,

8   and it did so by retaining Mr. Seery.

9       Recognizing the *Barton* doctrine as it applies to Mr. Seery

10  is consistent with a legion of cases throughout the United

11  States, and Movants' argument that Mr. Seery is not court-

12  appointed is just wrong.

13      Second, Your Honor, Movants cite without any authority,

14  argue that even if the *Barton* doctrine applied there is an

15  exception which would allow it to pursue a claim against Mr.

16  Seery without leave of the Court.

17      The Debtor agrees the 28 U.S.C. § 959 is an exception to

18  the *Barton* doctrine.  Section 959(a) provides that trustees,

19  receivers, or managers of any property, including debtors in

20  possession, may be sued without leave of the court appointing

21  them with respect to any of their acts or transactions in

22  carrying on business connected with such property.

23      As the Court also pointed out at the June 8th hearing, and

24  Mr. Bridges alluded to in his argument, the last sentence of

25  959(a) provides that such actions -- clearly referring to

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 619 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 619 of 852 PageID 2524

61

1    actions that may be pursued without leave of the appointing

2    court -- shall be subject to the general equity power of such

3    court, so far as the same may be necessary to the ends of

4    justice.

5        And Mr. Bridges made a plea, saying you can't take away my

6    jury trial right there.  You just cannot do that.  Well, I

7    have two answers to that, Your Honor.  One, they relinquished

8    their jury trial right.  We've established that.  Okay?

9        The second is allowing Your Honor to act as a gatekeeper

10   has nothing to do with their jury trial right.  Allowing Your

11   Honor to act as a gatekeeper allows you to determine whether

12   the action could go forward, and it'll either go forward in

13   Your Honor's court or some other court.

14       And the argument that the exculpation was essentially a

15   violation of 959 is just -- is just -- it just is twisting

16   what happened.  You have an exculpation provision.  We already

17   went through the authority the Court had to give an

18   exculpation.  With respect to these litigants who are before

19   Your Honor -- we're not talking about anyone else who's coming

20   in to try to get relief from the order; we're talking about

21   these litigants -- we've already established that they were

22   here, they're bound by res judicata.  So their 959 argument

23   goes away.

24       And as the Court -- and separate and apart from that, the

25   issue at issue in the District Court litigation is -- is not

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 620 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 620 of 852 PageID 2525

62

1     even subject to 959.

2          Mr. Bridges says, well, of course it is because it deals

3     with the administration of the estate.  I'd like to refer to

4     what the Court said -- this Court said in its *Ondova* opinion:

5     The exception generally applies to situations in which the

6     trustee is operating a business and some stranger to the

7     bankruptcy process might be harmed, such as a negligence claim

8     in a slip-and-fall case, and is inapplicable to suits based

9     upon actions taken to further the administering or liquidating

10    the bankruptcy estate.

11         And your *Ondova* opinion is consistent with the Third and

12    Eleventh Circuit opinions Your Honor cited in your opinion, as

13    well as numerous other --

14         (Interruption.)

15              MR. POMERANTZ:  -- from the -- from around the

16    country, including cases from the First, Second, Sixth,

17    Seventh, and Ninth Circuits.  And I'm not going to give all

18    the cites to those cases, but it's not a -- it's not a

19    remarkable proposition that Your Honor relied on in *Ondova*.

20         In addition, several of these cases, including the

21    Eleventh Circuit's *Carter* opinion, have been cited with

22    approval by the Fifth Circuit in *National Business Association*

23    *v. Lightfoot*, a 2008 unpublished opinion for this very point.

24    The *Barton* exception of 959 does not apply to actions taken in

25    the administration of the case and the liquidation of assets

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 621 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 621 of 852   PageID 2526

63

1    in the estate.

2        Suffice it to say that it's clear that the Section 959

3    exception to *Barton* has no applicability in this case.

4    Movants, hardly strangers to the bankruptcy case, want to sue

5    Mr. Seery for acts taken relating to a settlement of very

6    complex and significant claims against the estate.  They want

7    to sue a court-appointed fiduciary for doing his job,

8    resolving claims against the estate and his management of the

9    bankruptcy estate.  And they want to do this outside of the

10   Bankruptcy Court.

11       Settlement of the HarbourVest claim, which is where this

12   claim arises under -- whether it's a collateral attack now or

13   not, and we say it is, is for another issue -- but it clearly

14   arises in the context of settlement of the HarbourVest claim,

15   is the quintessential act to further the administration and

16   liquidation of the bankruptcy estate, and certainly doesn't

17   fall within the 959 exception.

18       Movants seem to be arguing that 959(a) makes a distinction

19   between claims against Mr. Seery that damaged the Debtor and

20   claims against Mr. Seery that damaged third parties.  However,

21   the Movants make up that distinction, and it's not in the

22   statute, it's not in the case law.  The focus is not on who

23   the conduct damages, but it's rather on whether the conduct

24   was taken in connection with the administration or the

25   liquidation of the estate.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 622 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 622 of 852 PageID 2527

64

1      And even if the Debtor is wrong, Your Honor, which it's

2  not, the savings clause allows the Court to determine whether

3  leave to be -- sue will be granted.  Given that these claims

4  are asserted by Dondero-related entities, if not controlled

5  entities, no serious argument exists that the equities do not

6  permit this Court to determine if leave to sue is appropriate.

7      Accordingly, Movants' argument that the orders create this

8  tension with 959 is simply an over-dramatization.  And in any

9  event, Your Honor, there's a basis independent of *Barton* that

10 supports the jurisdiction to enter the orders, as I mentioned.

11     But even if the orders only relied on *Barton*, there is an

12 easy fix to Movants' concerns:  let them come to court and

13 argue that the type of suit they are bringing allegedly falls

14 within the exception of 959.

15     Your Honor, Movants argue that the Bankruptcy Court may

16 not act as a gatekeeper if it would not have jurisdiction to

17 deal with the underlying action.  They essentially argue that

18 an Article I judge may not pass on the colorability of a

19 claim, that it should be decided by an Article III judge.

20 This is the same argument, Your Honor, that Your Honor

21 rejected in connection with plan confirmation and which I

22 touched on earlier.

23     And the reason why Your Honor rejected it is because

24 there's no law to support it.  In fact, there is Fifth Circuit

25 law that holds to the contrary.  And we talked about a little

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 623 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 623 of 852    PageID 2528

65

1   bit the Fifth Circuit case decided is *Villegas v. Schmidt* in

2   2015.  And *Villegas* is a simple case.  Schmidt was appointed

3   trustee over a debtor and liquidated its estate and the

4   Bankruptcy Court approved his final fees.  Four years later,

5   Villegas and the prior debtor sued Schmidt in District Court,

6   the district in which the Bankruptcy Court was pending,

7   arguing that he was negligent in the performance of his

8   duties.  The District Court dismissed the case because

9   Villegas failed to obtain Bankruptcy Court approval to bring

10  the suit under the *Barton* doctrine.

11      On appeal, Villegas argued *Barton* didn't apply for two

12  reasons.  First, that *Stern v. Marshall* created an exception

13  to the *Barton* doctrine for claims that the Bankruptcy Court

14  would not have the jurisdiction to adjudicate.  And second,

15  that *Barton* did not apply if the suit is brought in the

16  District Court, which exercises supervisory authority over the

17  Bankruptcy Court that appointed the trustee.  Pretty much the

18  argument that was made by Movants at the contempt hearing.

19      The Fifth Circuit rejected both arguments.  It held that

20  the existence of a *Stern* claim does not impact the Bankruptcy

21  Court's authority because *Stern* did not overrule *Barton* and

22  the Supreme Court had cautioned circuit courts against

23  interpreting later cases as impliedly overruling prior cases.

24      More importantly, the Fifth Circuit pointed to a post-

25  *Stern* 2014 case, *Executive Benefits v. Arkison*, 573 U.S. 25

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 624 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 624 of 852 PageID 2529

66

1    (2014), which held that *Stern* does not decide how a Bankruptcy

2    Court or District Courts should proceed when a *Stern* creditor

3    is identified, as support for the argument that *Barton* is

4    still good law, even dealing with a *Stern* claim.

5        Second, the Fifth Circuit, joining every circuit to have

6    addressed the issue, ruled that the District Court and the

7    Bankruptcy Court are distinct from one another and the

8    Bankruptcy Court has the exclusive authority to determine the

9    colorability of *Barton* claims and that the supervisory

10   District Court does not.

11       Movants didn't address *Villegas* in their reply.  Briefly

12   tried to distinguish it, unconvincingly, today.  The bottom

13   line is *Villegas* is directly applicable.  Your Honor cited it

14   in the *Ondova* opinion for precisely the proposition that

15   *Barton* applies whether or not the Court has authority to

16   adjudicate the claim.

17       Accordingly, Your Honor, it was within the Court's

18   jurisdiction to require a party to seek approval of Your Honor

19   on the colorability of a claim before an action may be

20   commenced or pursued against the protected parties, even if

21   Your Honor wouldn't have authority to adjudicate the claim at

22   the end of the day.

23       In fact, some courts have even addressed the proper

24   procedure for doing so, requiring the putative plaintiff to

25   not only seek leave of Bankruptcy Court but also to provide a

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 625 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 625 of 852    PageID 2530

67

1    draft complaint and a basis for the Court to determine if the

2    claim is colorable.

3        Movants have done neither, and they should not be

4    permitted to modify the final orders of the Court as a

5    workaround.

6        Your Honor, that concludes my presentation.  I'm happy to

7    answer any questions Your Honor may have.

8            THE COURT:  All right.  Not at this time.  All right.

9    I'm going to figure out, do we need a break or not, depending

10   on what Mr. Bridges tells me.  I assume we're just doing this

11   on argument today.  I think that's what I heard.  No witnesses

12   or exhibits.

13           MR. BRIDGES:  That is correct, Your Honor.

14           THE COURT:  Okay.  Mr. Bridges, how long do you

15   expect your rebuttal to take so I can figure out does the

16   Court need a break?

17           MR. BRIDGES:  Fifteen minutes plus whatever it takes

18   to submit agreed-to exhibits.

19           THE COURT:  Okay.  Let's take a five-minute bathroom

20   break.  We'll come back.  It's -- what time is it?  It's 1:11

21   Central time.  We'll come back in five minutes.

22           THE CLERK:  All rise.

23       (A recess ensued from 1:11 p.m. until 1:17 p.m.)

24           THE CLERK:  All rise.

25           THE COURT:  All right.  Please be seated.  We're

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 626 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 626 of 852    PageID 2531

68

 1    going back on the record in the Highland matters.

 2        Mr. Bridges, time for your rebuttal.  I want to ask you a

 3    question right off the bat.  Mr. Pomerantz pointed out

 4    something that was on my list that I forgot to ask you when

 5    you made your initial presentation.  What is the authority

 6    you're relying on?  You did not cite a statute or a rule *per*

 7    *se*, but I guess we can probably all agree that Bankruptcy Rule

 8    9024 and Federal Rule 60 is the authority that would govern

 9    your motion, correct?

10        MR. BRIDGES:  I don't agree, Your Honor.  I don't

11    believe this is a final order that we're contesting here.  And

12    I think that's demonstrated by the Court's final confirmation

13    -- plan -- plan confirmation order that seeks to modify this

14    order or will modify this order upon being -- being effective.

15    So I don't think so.

16        In the alternative, if we are challenging a final order,

17    then I think you're right as to the rules that would be

18    controlling.

19        THE COURT:  All right.  Well, let me back up.  Why

20    exactly do you say this would be an interlocutory order as

21    opposed to a final order?

22        MR. BRIDGES:  Because of its nature, Your Honor.

23    While the appointment in the order or the approval of the

24    appointment in the order might, as a separate component of the

25    order, have -- have finality, the provisions -- the provisions

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 627 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 627 of 852    PageID 2532

69

1   in it relating to gatekeeping and exculpation are, we think,

2   by their very nature, quite obviously interlocutory and not

3   permanent.  They don't seem to indicate an intention by any of

4   the parties that, 30 years from now, if Mr. Seery is still CEO

5   at Highland, long after the bankruptcy case has ended, that

6   nonetheless parties would be prohibited from bringing claims,

7   strangers to this action would be prohibited from bringing

8   claims related to his CEO role.

9        I think the nature of it demonstrates that, the

10  modifications to it, and even the inclusion of it in the final

11  plan confirmation, as well as -- can't read that.

12           THE COURT:  Can you give me some authority?  Because

13  as we know, there's a lot of authority out there in the

14  bankruptcy universe on what discrete orders are interlocutory

15  in nature that a bankruptcy judge might routinely enter and

16  which ones are final.  You know, it would just probably, if I

17  flipped open *Collier's*, I could -- you know, it would be mind-

18  numbing.

19       So what authority can you rely on?  I mean, is there any

20  authority that says an employment order is not a final order?

21  That would be shocking to me if you have cases to that effect,

22  but, I mean, of course, sometimes we do interim on short

23  notice and then final.  But this would be shocking to me if

24  there is case authority to support the argument this is not a

25  final order.  But I learn something new every day, so maybe I

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 628 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 628 of 852   PageID 2533

70

1    would be shocked and there is.

2            MR. BRIDGES:  Your Honor, I'd point you to *In re*

3    *Smyth*, 207 F.3d 758, and *In re Royal Manor*, 525 B.K. 338

4    [sic], for the proposition that retaining a bankruptcy

5    professional is an interlocutory order.

6            THE COURT:  Okay.  Stop for a moment.  The *Smyth*

7    case.  Which court is that?

8            MR. BRIDGES:  Fifth Circuit.

9            THE COURT:  Okay.  So tell me the facts.  I'm

10   surprised I don't know about this case.  But, again, I don't

11   know every case.  So, it held that an employment order is an

12   interlocutory order?

13           MR. BRIDGES:  Appointing counsel.  A professional in

14   the bankruptcy context, Your Honor.

15           THE COURT:  Counsel for a debtor-in-possession?  An

16   order approving counsel was an interlocutory order?

17           MR. BRIDGES:  Yes, or the Trustee's counsel.

18           THE COURT:  Or the Trustee's counsel?  Okay.  What

19   were the circumstances?  Was this on an expedited basis and

20   there wasn't a follow-up final order, or what?

21           MR. BRIDGES:  Your Honor, I don't have -- I don't

22   have that at the tip of my memory.  I'm sorry.

23           THE COURT:  Okay.  And the other one, 525 B.R. 338,

24   what court was that?

25           MR. BRIDGES:  It's a Bankruptcy Court within the

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 629 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 629 of 852 PageID 2534

71

1   Sixth Circuit.  I'm not certain which district.

2           THE COURT:  All right.  Well, maybe one of you two

3   over there can look them up and give me the context, because

4   that is surprising authority.  Or other lawyers on the WebEx

5   maybe can do some quickie research.

6      Okay.  We'll come back to that.  But assuming that this

7   was a final order, which I have just been presuming it was,

8   Rule 60 is the authority you're going under?  9024 and Rule

9   60, correct?

10          MR. BRIDGES:  Your Honor, we have not invoked those

11  rules.  Alternatively, I think you're right that they would

12  control if we are wrong about the interlocutory nature of the

13  order.

14          THE COURT:  Well, you have to be going under certain

15  -- some kind of authority when you file a motion.  So I'm --

16          MR. BRIDGES:  As an alternative --

17          THE COURT:  I'm approaching this exactly, I assure

18  you, as the District Court or a Court of Appeals would.  You

19  know, you start out, what is the legal authority that is being

20  invoked here?

21          MR. BRIDGES:  Well, --

22          THE COURT:  So I just assume Rule 60.  I can't, you

23  know, come up with anything else that would be the authority.

24          MR. BRIDGES:  Yes, Your Honor.  You also have

25  inherent power to modify orders that are in violation of the

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 630 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 630 of 852 PageID 2535

72

1   law.  And we pointed you to --

2          THE COURT:  Now, is that right?  Is that really

3   right?  Why do we have Rule 60 if I can just willy-nilly, oh,

4   I feel like I got that wrong two years ago?  I can't do that,

5   can I?  Rule 60 is the template for when a court can do that.

6   Parties are entitled to rely on orders of courts.  And that's

7   why we have Rule 60, right?  So, --

8          MR. BRIDGES:  Your Honor, I think -- I think that

9   we're miscommunicating.  I'm trying not to rely on Rule 60 in

10   the first instance because in the first instance we view this

11   as not a final order.  So, in the first instance, --

12          THE COURT:  I got that.  And I've got my law clerks

13   looking up your cases to see if they convince me.  But I'm

14   asking you to go to layer two.  Assuming I don't agree with

15   you these are final orders, what is your authority for the

16   relief you're seeking?

17          MR. BRIDGES:  Yes, Your Honor.  Rule 60 would apply

18   in the alternative.

19          THE COURT:  All right.

20          MR. BRIDGES:  That's correct.

21          THE COURT:  So, which provision?  Which provision of

22   Rule 60?  (b) what?

23          MR. BRIDGES:  Your Honor, I'm not prepared to concede

24   any of them.  I don't have the rule in front of me.

25          THE COURT:  You're not prepared to concede what?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 631 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 631 of 852   PageID 2536

73

1          MR. BRIDGES:  Any of the provisions of Rule 60.  Just

2    (b)(1), (b)(2), especially, but I'm -- I'm -- Rule 60 is our

3    basis, as is the particulars (b)(1), (2), (6) --

4         (Garbled audio.)

5          THE COURT:  Okay.  You're breaking up.  Can you

6    restate?

7          MR. BRIDGES:  (b)(1), (2), and (6), as -- as well as

8    any other provision, Your Honor, of Rule 60.

9          THE COURT:  Okay.  Well, so (1), mistake,

10   inadvertence, surprise, excusable neglect.  Which one of

11   those?

12         MR. BRIDGES:  All of the above, Your Honor.

13         THE COURT:  Surprise?  Who's surprised?

14         MR. BRIDGES:  Your Honor, I think every potential

15   litigant who discovers that your order purports to bar

16   prospective unaccrued claims at the time the order issued

17   would be surprised.

18      Frankly, I think Mr. Seery would be surprised, given his

19   testimony that he owes fiduciary duty -- duties that he must

20   abide by and that he appears to have, as I continue to

21   represent to clients, to advisees, and to the SEC, that those

22   duties are owing.

23         THE COURT:  Okay.  I'm giving you one more chance

24   here to make clear on the record what provision of Rule 60(b)

25   are you relying on, okay?  I need to know.  It's not in your

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 632 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 632 of 852    PageID 2537

74

1    pleading.

2              MR. BRIDGES:  Your Honor, --

3              THE COURT:  So tell me specifically.  I can only --

4              MR. BRIDGES:  -- (b)(1) --

5              THE COURT:  -- come up with a result here if I know

6    exactly what's being presented.

7              MR. BRIDGES:  Your Honor, (b)(1), (b)(2), and (b)(6)

8    --

9              THE COURT:  Which, okay, there are multiple parts to

10   (1).  You're saying somebody's surprised by the ruling.  I

11   don't know who.  Really, all that matters is your client, the

12   Movants.  You're saying, even though they participated, --

13             MR. BRIDGES:  Yes, Your Honor.

14             THE COURT:  -- got notice, they're somehow surprised?

15   Why are they surprised?

16             MR. BRIDGES:  Yes, Your Honor.

17             THE COURT:  Do you have evidence of their surprise?

18             MR. BRIDGES:  Your Honor, our brief shows the

19   intentions of all involved were not the interpretation of that

20   order being advanced at this -- at this point in time.  And

21   so, yes, I believe that is evidence.  The transcripts of the

22   hearings I believe evidence that as well, that the

23   understanding of everyone involved was not that future --

24   unspecified future claims that had not accrued yet would be

25   released under (b)(1).  Yes, Your Honor.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 633 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 633 of 852   PageID 2538

75

1          THE COURT:  Okay.

2          MR. BRIDGES:  Under (b)(2), --

3          THE COURT:  I don't have any evidence of that.  All I

4    have is the clear wording of the order.  Okay.  Let me just --

5    just let me go through this.

6       Assuming Rule 60 (1) through (6) are what you're arguing

7    here, what about Rule 60(c):  a motion under Rule 60(b) must

8    be made within a reasonable time?  We're now 11 months --

9          MR. BRIDGES:  Your Honor, --

10         THE COURT:  We're now 11 months past the July 2020

11   order.  What is your authority for this being a reasonable

12   time?

13         MR. BRIDGES:  Yes, Your Honor.  If I may back up one

14   step before answering your question.  Under (b)(2), we're

15   relying on newly-discovered evidence that was discovered in

16   late March and caused both the filing of this motion and the

17   filing of the District Court action.

18      Under (b)(4), we believe that the order is --

19         THE COURT:  Let me stop.  Let me stop.  What is my

20   evidence that you're putting in the record that's newly

21   discovered?

22         MR. BRIDGES:  The evidence is detailed in the

23   complaint that is in the record.  You know, --

24         THE COURT:  That's not evidence.

25         MR. BRIDGES:  -- honestly, Your Honor, --

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 634 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 634 of 852   PageID 2539

76

1              THE COURT:  That is not evidence.  Okay?  A lawyer-

2     drafted complaint in another court is not evidence.  Okay?

3              MR. BRIDGES:  Your Honor, I think, to be technical,

4     that there is not a record yet, that we have evidence yet to

5     be admitted on our exhibit list.  I believe in this

6     circumstance -- I understand that, in general, allegations in

7     a pleading are not evidence.  In this instance, when we're

8     talking about whether or not new facts led to the filing of a

9     lawsuit, I do believe that the allegations in the lawsuit are

10    evidence of those new facts.

11             THE COURT:  All right.  Go on.

12             MR. BRIDGES:  Under (b)(4), we believe the order is,

13    in part, void.  It is void because of the jurisdictional and

14    other defects noted in our argument.

15       And also, under (b)(6) (garbled) ground for relief that

16    we're appealing to the equitable powers of this Court to

17    correct errors and manifest injustice towards not just the

18    litigants here but to correct the order of the Court to make

19    it comply with -- with the law, with the statutes promulgated

20    by Congress and to respect the jurisdiction of the District

21    Court.

22             THE COURT:  All right.  Do you agree with Mr.

23    Pomerantz that the case law standard for Rule 60(b)(4) is

24    exceptional circumstances?  It's only applied so that a

25    judgment is voided in exceptional circumstances.  Do you

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 635 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 635 of 852    PageID 2540

77

1    disagree with that case authority?

2           MR. BRIDGES:  I would -- I would agree, in part, that

3    unusual circumstances is not the ordinary case.  I'm not

4    entirely sure what you mean by exceptional, but I think we're

5    on the same page.

6           THE COURT:  Okay.  It's not what I mean.  That's just

7    the case law standard.  And I'm asking, do you agree with Mr.

8    Pomerantz that that is the standard set forth in case law when

9    applying 60(b)(4)?  There have to be some sort of exceptional

10   circumstances where there's just basically no chance the Court

11   had authority to do what it did.

12          MR. BRIDGES:  Out of the ordinary would be the phrase

13   I would use, Your Honor.

14          THE COURT:  Okay.  So I guess then I'll go from

15   there.  Is it your argument that gatekeeping provisions in the

16   bankruptcy world are out of the ordinary?

17          MR. BRIDGES:  The exculpation of Mr. Seery for

18   liability falling short of gross negligence or intentional

19   wrongdoing in connection with his continuing to conduct the

20   business of the Debtor as an investment advisor subject to the

21   Advisers Act, yes, I would say that is out of the ordinary,

22   that it is extraordinary, that it is --

23          THE COURT:  Okay.  What is your authority or evidence

24   on that?  Because this Court approves exculpation provisions

25   regularly in connection with employment orders, and pretty

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 636 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 636 of 852 PageID 2541

78

1   much every judge I know does.  In fact, I'm wondering why this

2   isn't just a term of compensation.  You know, he's going to do

3   x, y, z in the case.  His compensation is going to be a, b, c,

4   d, e.  And by the way, we're going to set a standard of

5   liability for his performance as CEO or investment banker,

6   financial advisor, whatever, so that no one can sue him

7   regarding his performance of his job duties unless it rises to

8   the level of gross negligence, willful misconduct.

9       It's a term of employment that, from my vantage point,

10  seems to be employed all the time.  So it would be anything

11  but exceptional circumstances.  Do you have authority or

12  evidence --

13          MR. BRIDGES:  Your Honor, frankly, --

14          THE COURT:  -- to the contrary?

15          MR. BRIDGES:  Your Honor, frankly, I'm astonished at

16  your view of that situation, that it would merely be a term of

17  his employment, that vitiates the entire fiduciary duty

18  standard created by the Advisers Act that tells him, with

19  hundreds of millions of dollars of assets under management for

20  people he's advising as a registered investment advisor,

21  people he's advising who believe that he has a fiduciary duty

22  to them and that it's enforceable, that the SEC, who monitors,

23  believes he has an enforceable fiduciary duty to those people,

24  and that he's testified that he has fiduciary duties to those

25  people, and that Your Honor is saying no, just as a regular

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 637 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 637 of 852   PageID 2542

79

1    term of employment we have undone the Advisers Act's

2    imposition of an unwaivable fiduciary duty.

3        Your Honor, the order is void to the extent that it

4    attempts to do so.

5        This is not an ordinary employment agreement, Your Honor.

6    This is an attempt to exculpate someone from the key thing

7    that our entire investment system depends upon, regulation by

8    the SEC and the requirement in investment advisors to act as

9    fiduciaries when they manage the money of another.

10       It would be the equivalent of telling lawyers who are

11   appointed in a bankruptcy proceeding that they don't have any

12   duties to their client, or at least not fiduciary duties.

13   That the lawyers merely owe a duty not to be grossly negligent

14   to their clients.  That's not an ordinary term of employment,

15   Your Honor.

16            THE COURT:  All right.  So I guess we're back to my

17   question, was this brought within a reasonable time under Rule

18   60(c)?

19            MR. BRIDGES:  It was brought very quickly after the

20   new evidence was discovered at the end of March, Your Honor,

21   yes.

22            THE COURT:  Okay.  Well, I guess I'll just ask you

23   one more question before you continue on with your rebuttal

24   argument.  I mean, again, I want your best argument of why

25   *Villegas* doesn't absolutely permit the gatekeeping provisions

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 638 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 638 of 852 PageID 2543

80

 1   that you're challenging.  And many cases were cited by Mr.

 2   Pomerantz in his brief where courts have extended the *Barton*

 3   doctrine to persons other than trustees.  And so what is your

 4   best rebuttal to that?

 5          MR. BRIDGES:  Your Honor, we've already given it.

 6   I'm afraid --

 7          THE COURT:  Okay.  If you don't want to say more, --

 8          MR. BRIDGES:  -- what I have is not --

 9          THE COURT:  -- I'm not going to make you say more.

10          MR. BRIDGES:  I --

11          THE COURT:  I'm just telling you what's on my brain.

12          MR. BRIDGES:  I do.  I want to -- I am apologizing in

13   advance for repeating, but yes, *Villegas*, *Villegas*, however

14   that case is pronounced, says that *Stern* is not an exception

15   to the *Barton* doctrine.

16          THE COURT:  Uh-huh.

17          MR. BRIDGES:  959(a) is an exception to the *Barton*

18   doctrine.  You are not operating under the *Barton* doctrine

19   here.  Even counsel's brief, the Debtor's brief, doesn't say

20   *Barton* applies.  It says it's consistent with *Barton*.

21      Your Honor, in our previous hearing, you directed me to

22   the second sentence of 959(a) because you believe it's what

23   empowers you to do the gatekeeping.  It limits the gatekeeping

24   that you can do by protecting jury rights, the right to trial,

25   says you cannot discharge, undo, deprive a litigant of their

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 639 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 639 of 852 PageID 2544

81

1  right to a trial, a jury trial.

2        THE COURT:  Well, you mentioned it again, jury trial

3  rights.  Do you have any argument --

4        MR. BRIDGES:  Yes, Your Honor.

5        THE COURT:  -- of why that hasn't flown out the

6  window?

7        MR. BRIDGES:  Yes, Your Honor.  I am told that

8  Section 14(f) that counsel for the Debtor referred to is not a

9  waiver of jury rights at all.  It is an arbitration agreement.

10 Your Honor is probably familiar how arbitration agreements

11 work, is that they need not be elected.  They need not be

12 invoked by the parties.  When they are, they create a

13 situation where arbitration may be required.  But a waiver of

14 a jury right outside of arbitration is not part of this

15 arbitration clause, or of any.  The issue is not briefed or in

16 evidence before the Court.  We're relying on representations

17 of counsel as to what that provision contains.  That Mr. Seery

18 wasn't even a party to that agreement, the advisory agreement,

19 with the Charitable DAF.  The arbitration agreement is subject

20 to defenses that are not at issue here before the Court.  That

21 Movants' rights, their contractual rights to invoke the

22 arbitration clause, also appear to be terminated by the

23 orders' assertion of sole jurisdiction in this matter.

24     Your Honor, yes, our jury rights survive Section 14(f) in

25 the advisory agreement with the DAF for all of those potential

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 640 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 640 of 852   PageID 2545

82

1    reasons.

2        On top of that, it doesn't go to all of our causes of

3    action.  It goes to the contract cause of action.  And to the

4    extent they can argue that the other claims are subject to

5    arbitration, that also is a defense and -- defensible and

6    complex issue requiring the application of the Federal

7    Arbitration Act, requiring consideration of the Federal

8    Arbitration Act, which this Court doesn't have jurisdiction to

9    do under 157(d).

10            THE COURT:  What?  Repeat that.

11            MR. BRIDGES:  Yes.  This Court does not have

12   jurisdiction to determine whether or not arbitration --

13   arbitration is enforceable due to the mandatory withdrawal of

14   the reference provisions of 157(d).

15            THE COURT:  That's just not consistent with Fifth

16   Circuit authority.  *National Gypsum*.  What are some of these

17   other arbitration cases?  I've written an article on it.  I

18   can't remember them.  That's just not right.  Bankruptcy

19   courts look at arbitration clauses all the time.  Motions to

20   compel arbitration.

21            MR. BRIDGES:  Your Honor, under 157(d), in the

22   circumstances of this case, if the Court is going to take into

23   consideration an arbitration clause under the Federal

24   Arbitration Act, when that clause is not in evidence and is

25   not before the Court, then Movants respectfully move to

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 641 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 641 of 852 PageID 2546

83

1  withdraw the reference of your consideration of that issue and

2  of any proceeding and ask that you would issue only a report

3  and recommendation rather than an order on that issue.

4         THE COURT: Okay. I regret that we even got off on

5  this trail. I'm sorry. So just proceed with your rebuttal

6  argument as you had envisioned it, Mr. Bridges.

7         MR. BRIDGES: Thank you, Your Honor.

8      Debtor's counsel says there's no private right of action

9  under the Advisers Act. That is both inaccurate and

10 misleading. The Advisory Act creates, imposes fiduciary

11 duties that state law provides the cause of action for. It is

12 a state law breach of fiduciary duty claim regarding --

13 regarding fiduciary duties imposed as a matter of law by the

14 Investment Advisers Act that is Count One in the District

15 Court action.

16     Furthermore, that Act does create a private right of

17 action for rescission. That would be rescission of the

18 advisory agreement with the Charitable DAF, not rescission of

19 the HarbourVest settlement.

20     Second, Your Honor, the notion that this Court has related

21 to jurisdiction is irrelevant and beside the point. I would

22 like to note for the record that the District Court civil

23 cover sheet that omitted to state that this was a related

24 action has been corrected, has been amended, and that that has

25 taken place.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 642 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 642 of 852 PageID 2547

84

1    Counsel for the Debtor also appears to agree with us that

2    the order ought to be modified for having asserted exclusive

3    jurisdiction over colorable claims to the extent it's not

4    legally permissible to do.  And in trying to invoke the

5    discussions between us as to how the orders might be fixed,

6    what counsel does is tries to cabin the legally-permissible

7    caveat to just the second half of the paragraph at issue.  It

8    is both -- both portions, the gatekeeping and the subsequent

9    hearing of the claims, that should be limited to the extent it

10   would be impermissible legally for this Court to make those

11   decisions.

12   On top of that, Your Honor, merely stating "to the extent

13   legally permissible" would result in a considerable amount of

14   ambiguity in the order that would lead it, I fear, to be

15   unenforceable as a matter of law.

16   Next, Your Honor, when Debtor's counsel talks about the

17   authority in this case, it feels like we're ships passing in

18   the night.  He says that we're wrong in asserting that no case

19   we can find involves both the *Barton* doctrine and the

20   application of the business judgment rule where the Court is

21   asked to defer, and he mentions cases that apply the *Barton*

22   doctrine to an approval rather than an appointment.  The Court

23   is asked to --

24   (Garbled audio.)

25   THE COURT:  I lost you for a moment.  Could you

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 643 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 643 of 852 PageID 2548

85

1  repeat the last 30 seconds?

2          MR. BRIDGES:  Thank you, Your Honor.  Yes.  He points

3  -- opposing counsel points us to case law where the *Barton*

4  doctrine has been applied despite the Bankruptcy Court having

5  merely approved rather than appointed the trustee or the, I'm

6  sorry, the professional.  But in doing so, he doesn't

7  reference any case that has done so in the context of business

8  judgment rule deference.  It's like we're ships passing in the

9  night.

10     What we're saying isn't that a mere approval can never

11  rise to the level of the *Barton* doctrine.  What we're saying

12  is that, in combination with the business judgment rule

13  deference, the two cannot go together.  There's no authority

14  for saying that they do.

15     We -- I further feel like we're ships passing in the night

16  when he talks about *Shoaf*.  Counsel says that in *Shoaf* there

17  was a confirmed final plan and it specifically identified the

18  released guaranty.  And yeah, that distinguishes it from this

19  case, just as it distinguished -- just as the *Applewood Chair*

20  case distinguished it when there's not that specific

21  identification.  And here, we don't even have a final plan

22  confirmation at the time these orders are being issued.

23  Without that express -- express notion of what the claims are

24  being discharged, *Shoaf* doesn't apply.

25     There, there was a guaranty to a party on a specific

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 644 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 644 of 852   PageID 2549

86

1    indebtedness that was listed, identified with specificity, and

2    disappeared as a result of the judgment, as a result of the

3    judgment in the underlying case.  Here, we're talking about

4    any potential claim that might arise in the future.  As of the

5    July order's issuance, it didn't apply on its -- either it

6    didn't apply to future claims that had not yet accrued or else

7    in violation of *Applewood Chair*, it was releasing claims

8    without identifying them.

9         Who does Seery owe a fiduciary duty to?  Is it, as

10   Debtor's counsel says, only to the funds and not to the

11   investors, or does he also owe those duties to the investors

12   as well?  Your Honor, that is going to be a hotly-contested

13   issue in this litigation, and it involves -- it requires

14   consideration of the Advisers Act and the multitude of

15   accompanying regulations.  To just state that his fiduciary

16   duties are limited in a way that couldn't affect anyone that

17   is -- whose claims are precluded by the July order is both

18   wrong on the law and is invoking something that will be a

19   hotly-contested issue that falls under 157(d), where, again,

20   this Court doesn't have the jurisdiction to decide that, other

21   than in a report and recommendation.

22        The order is legally infirm because it's issued without

23   jurisdiction for doing that as well.

24        Finally, Your Honor, I think (garbled) wrong direction

25   with a statement that suggests that Mr. Seery is an agent of

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 645 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 645 of 852    PageID 2550

87

1   the independent directors under the January order.  He is, in

2   fact, not an independent agent -- not an agent of any of the

3   independent directors, but, at most, of the company that is

4   controlled by the board, not -- not of individual directors

5   who could confer on him -- who could confer on him any

6   immunity that they have obtained from the January order just

7   by having appointed him.

8        The proposed order from the other side failed to address

9   either the ambiguity in the order or its attempt to exculpate

10  Mr. Seery from the liability, including liability for which

11  there is a jury trial right, and it is not a fix to the

12  problem for that reason.

13       In order to make the order enforceable and to fix its

14  infirmities, the Court would have to do significantly more.

15  It would have to both apply the caveat from the final

16  confirmation plan order, rope that caveat to the first part of

17  the relevant paragraph, as well as the second part, and it

18  would have to provide directive clarity to be enforceable

19  rather than too vague.

20       Your Honor, I think that's all I have.

21            THE COURT:  Okay.  Just FYI, my law clerk pulled the

22  *Smyth* case from 21 years ago from the Fifth Circuit.  And

23  while it more prominently deals with the issue of whether

24  trustees -- in this case, it was a Chapter 11 trustee -- could

25  be subjected to personal liability for damages to the

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 646 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 646 of 852 PageID 2551

88

1    bankruptcy estate --

2         (Echoing.)

3         THE COURT:  Someone, put your phone on mute.  I don't

4    know who that is.

5         It dealt with, you know, the standard of liability, that

6    the trustee could not be sued for matters not to the level of

7    gross negligence.

8         But it does say, in the very last paragraph, to my shock

9    and amazement, that -- it's just one sentence in a 10-page

10   opinion -- orders appointing counsel -- and it was talking

11   about the trustee's lawyer he hired to handle appeals to the

12   Fifth Circuit -- orders appointing counsel under the

13   Bankruptcy Code are interlocutory and are not generally

14   considered final and appealable.  And it cites one case from

15   1993, the Middle District of Florida.  Live and learn.  There

16   is one sentence in that opinion that says that.  But I don't

17   know that it's hugely impactful here, but I did not know about

18   that opinion and I'm rather surprised.

19        All right.  You were going to walk me through evidence,

20   you said?

21        MR. BRIDGES:  Well, do I -- Your Honor, do you want

22   to do that first before I submit --

23        THE COURT:  Yes, please.

24        MR. BRIDGES:  -- my rebuttal argument?

25        THE COURT:  Please.

1              MR. BRIDGES:  Okay.

2              THE COURT:  Uh-huh.

3              MR. BRIDGES:  Your Honor, we would submit and offer

4   Exhibits 1 through 44, with the exception of those that have

5   been withdrawn, that are 2, 13 --

6              THE COURT:  Okay.  Slow down.  Slow down.  I need to

7   get to the docket entry number we're talking about.  Are we

8   talking -- are your -- the Debtor's exhibits are at 2412.  But

9   Nate, I misplaced my notes.  Where are Charitable DAF and

10  Holdco's?

11             THE CLERK:  I have 2411.

12             THE COURT:  2411?  Is that it?

13             MR. BRIDGES:  2420, Your Honor.

14             THE COURT:  2420?  Okay.  Give me a minute.  (Pause.)

15  2420?

16             MR. BRIDGES:  Yes, Your Honor.

17             THE COURT:  Okay, I'm there.  And it's which

18  exhibits?

19             MR. BRIDGES:  It's Exhibits 1 through 44, Your

20  Honor, with four exceptions.  We have agreed to withdraw

21  Exhibit 2, 13, 14, and 29.

22             THE COURT:  All right.

23             MR. BRIDGES:  Also, Your Honor, we'd like to submit

24  Debtor's Exhibit 1, which is under Exhibit 49 on our list,

25  would be anything offered by the other side.  But we'd like

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 648 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 648 of 852    PageID 2553

90

1    to make sure that Debtor's Exhibit 1 gets in the record as

2    well.

3         THE COURT:  Let me back up.  When I pull up the

4    docket entry you just told me, I have Exhibits 44, 45, and 46

5    only.  Am I misreading this?

6         MR. BRIDGES:  I have a chart showing Exhibits 1

7    through 49 titled Docket 2420 filed 6/7/21.

8         THE COURT:  Okay.  The docket entry number you told

9    me, 2420, it only has three exhibits:  44, 45, and 46.  So,

10   first off, I understand -- are you offering 45 and 46 or not?

11        MR. BRIDGES:  No, Your Honor.

12        THE COURT:  Okay.  So you said you were offering 1

13   through 44 minus certain ones.  44 is here.

14        MR. BRIDGES:  Yes.

15        THE COURT:  But I've got to go back to a different

16   docket number.

17        THE CLERK:  It's actually 2411.

18        THE COURT:  It's at 2411.  That has all the others?

19        THE CLERK:  Yes.

20        THE COURT:  Okay.

21     So, Mr. Pomerantz, do you have any objection to Exhibits

22   1 through 44, which he's excepted out 2, 13, 14, and 29, and

23   then he's added Debtor's Exhibit 1?  Any objection?

24        MR. POMERANTZ:  I don't believe so.  I just would

25   confirm with John Morris, who has been focused on the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 649 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 649 of 852   PageID 2554

91

1    exhibits, just to confirm.

2            THE COURT:  Mr. Morris?

3            MR. MORRIS:  No objection, Your Honor.  It's fine.

4            THE COURT:  Okay.  They're admitted.

5        (Movants' Exhibits 1, 3 through 12, 15 through 28, and 30

6    through 44 are received into evidence.  Debtor's Exhibit 1 is

7    received into evidence.)

8            THE COURT:  So, any --

9            MR. BRIDGES:  Thank you, Your Honor.

10            THE COURT:  Anything you wanted to call to my

11    attention about these?

12            MR. BRIDGES:  Your Honor, the things that we

13    mentioned in the argument, for sure, but especially that the

14    word "trustee" is not used in the January hearing's

15    transcript, nor is it under discussion in that transcript

16    that it would be a trustee-like role being played by the

17    Strand directors, as well as the transcript of the July

18    hearing on the order at issue here, Your Honor, where you are

19    asked to defer both in that transcript and in the motion, the

20    motion that was at issue in that hearing, you are asked to

21    defer to the business judgment of the company.

22        And finally, Your Honor, I'd ask you to look at the

23    allegations in the District Court complaint.

24            THE COURT:  All right.

25        Mr. Pomerantz or Morris, let's see what exhibits you're

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 650 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 650 of 852 PageID 2555

92

 1   wanting the Court to consider.  Your exhibits, it looks like,

 2   are at Docket Entry 2412.

 3          MR. MORRIS:  As subsequently amended at 2423.

 4          THE COURT:  Oh.  All right.  So which ones are you

 5   offering?

 6          MR. MORRIS:  We're offering all of the exhibits on

 7   2423, which is 1 through 17.

 8      (Echoing.)

 9          THE COURT:  Whoops.  We got some distortion there.

10   Say again?

11          MR. MORRIS:  Yeah.  All of the exhibits that are on

12   2423, which are Exhibits 1 through 17.  But I want to make

13   sure that, as I did earlier, that that has the exhibits that

14   we're relying on.  Does that --

15      (Pause.)

16          THE COURT:  Okay.  Let me make sure I know what's

17   going on here.  You're double-checking your exhibits, Mr.

18   Morris?

19          MR. MORRIS:  Yes, Your Honor.

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  Your Honor, we start with Docket No.

23   2419, --

24          THE COURT:  Okay.

25          MR. MORRIS:  -- which was the amended exhibit list.

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 651 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 651 of 852   PageID 2556

93

1    And that actually had Exhibits 1 through 17.  And then that

2    was amended at Docket 2423.  So, the exhibits on both of

3    those lists.

4              THE COURT:  Well, they're one and the same, it looks

5    like, right?

6              MR. MORRIS:  Yes.

7              THE COURT:  Okay.  So you're offering those?

8              MR. MORRIS:  I think -- yeah.

9              THE COURT:  Any objection?

10              MR. BRIDGES:  No objection.

11              THE COURT:  All right.  They're admitted.

12         (Debtor's Exhibits 1 through 17 are received into

13    evidence.)

14              MR. POMERANTZ:  Your Honor, if I may take a few

15    moments to respond to Mr. Bridges' reply?

16              THE COURT:  All right.   Is he still within his hour

17    and a half?

18              THE CLERK:  At an hour and one minute.

19              THE COURT:  Okay.  All right.  You have a little

20    time left, so go ahead.

21              MR. POMERANTZ:  Thank you, Your Honor.

22         So look, I -- it sort of was really not fair to us.  Mr.

23    Bridges was really making things up on the fly.  He was

24    changing the theories of his case and responding to Your

25    Honor.  But I'm going to do my best to respond to the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 652 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 652 of 852   PageID 2557

94

1   arguments made, many of which I sort of anticipated.

2       I'll first start with the issue that Your Honor raised,

3   which was whether this is under Rule 60 or not.  Mr. Bridges

4   identified a couple of cases, said that the order was

5   interlocutory, said that somehow the orders have anything to

6   do with a plan confirmation order.  They do not.  Your Honor

7   didn't hear that argument at the plan confirmation.  The

8   January 9th and July 16th orders are old and cold.  There's

9   an exculpation provision in the plan.  There's a gatekeeper

10  in the plan.  The provisions do not overlap entirely.  The

11  gatekeeper applies prospectively.  The exculpation provision

12  includes additional parties.

13      So the arguments that basically the plan had anything to

14  do -- and the fact that the plan is not a final order -- has

15  anything to do with the January 9th and July 16th orders is

16  just wrong.  It's just wrong.

17      More fundamentally, Your Honor, as Your Honor pointed

18  out, the *Smyth* case is a professional employment order.  And

19  ironically, if you abide by the *Smyth* case, that order is

20  never appealable because it's interlocutory.

21      But more fundamentally, Your Honor, that's dealing with

22  327 professionals.  And again, there's not much analysis in

23  the *Smyth* case, but we're not dealing with a 327

24  professional.  We're dealing with orders that were approved

25  under 363.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 653 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 653 of 852 PageID 2558

95

1    So the premise of the argument that Rule 60(b) -- 60

2    doesn't apply and they have other arguments just doesn't make

3    any sense.

4    Okay. So now that gets us to Rule 60. And Your Honor,

5    Your Honor hit the nail on the head. They haven't presented

6    any evidence. Allegations in a complaint aren't evidence.

7    They can't stand up there and say surprise evidence. They

8    had the opportunity -- and this hearing's been continued a

9    few weeks -- they had the opportunity to bring it up, and

10   it's -- they had the opportunity to claim that there was

11   surprise, but they just didn't. Okay?

12   So to go on to the Rule 60 arguments. Surprise.

13   Surprise and reasonable delay are really -- go hand in hand

14   with Mr. Bridges' argument. He says, well, we didn't find

15   out that -- months after the order was entered that he

16   violated a duty to us, so we are surprised by that, and it's

17   a reasonable time. Well, Your Honor, the order provided for

18   an exculpation. CLO Holdco and DAF knew that it applied to

19   an exculpation. They were bound. They knew based upon that

20   order that they would not be able to bring claims for normal

21   negligence. There is no surprise.

22   If you take Mr. Bridges' argument to its conclusion, he

23   could wait until the end of the statute of limitations after

24   an order and have come in four years from now and say, Your

25   Honor, we just found out facts so we should go back four

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 654 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 654 of 852 PageID 2559

96

1    years before.  That, Your Honor, that's not how the surprise

2    works.  That's not how the reasonable time works.

3        Mr. Bridges did not contest that they're bound by res

4    judicata.  He did not contest that the exculpation itself was

5    clear and unambiguous.  Of course he argued Your Honor

6    couldn't enter an order saying there was exculpation, again,

7    with no authority.  And he seemed surprised, as I suspect he

8    should, since he's not a bankruptcy lawyer, that retention

9    orders, whether it's investment bankers, financial advisors,

10   include exculpations all the time.  So there's no grounds

11   under surprise.

12       There's no grounds -- the motions are late under 60(c).

13       And they're not void.  I went through a painstaking

14   analysis, Your Honor, and I described in detail what the

15   *Espinosa* case held, and the exceptional circumstances which

16   Mr. Bridges tried to get away from as much as he could.

17   Maybe he can try to get away from language in a district

18   Court opinion, in a Bankruptcy Court opinion, in a Circuit

19   Court opinion.  You can't get away from language in a Supreme

20   Court opinion.  The Supreme Court opinion said exceptional

21   circumstances, where there was arguably no basis for

22   jurisdiction for what the Court did.  They have not even come

23   close to convincing Your Honor that there was absolutely no

24   basis.

25       Now, they disagree.  We granted, we think it's a good-

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 655 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 655 of 852   PageID 2560

97

1  faith disagreement, but they haven't come close to

2  establishing the *Espinosa* standard, so their motion under 60

3  does not -- it fails.

4      And I don't think -- look, these are good lawyers.  Mr.

5  Bridges and Mr. Sbaiti are good lawyers.  They didn't just

6  inadvertently not mention Rule 60.  They never mentioned it

7  because they knew they had no claim under Rule 60.

8      Your Honor, Mr. Bridges has made comments about the

9  fiduciary duty of Mr. Seery, about what the Investor's Act

10  provides.  He's just wrong on the law.  Now, Your Honor

11  doesn't have to decide that.  Whichever court adjudicates the

12  DAF lawsuit will have to decide it.  But there is no private

13  cause of action for damages.  There are no fiduciary duties to

14  the investors.

15      And what Mr. Bridges doesn't even mention, in that the

16  investment agreement that's so prominent in his complaint,

17  they waived claims other than willful misconduct and gross

18  negligence against Highland.  They waived those claims.  So

19  for Mr. Bridges to come in here and argue that there's some

20  surprise, when he hasn't even bothered to look at the document

21  that's underlying the contractual relationship between the DAF

22  and the Debtor, is -- you know, I'll just say it's

23  inadvertence.

24      Your Honor, Mr. Bridges tried to argue that Mr. Seery is

25  not a beneficiary of the January 9th order.  He's not an

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 656 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 656 of 852    PageID 2561

98

1    agent.  Well, again, Your Honor, Mr. Bridges wasn't there.

2    Your Honor and we were.  On January 9th, an independent board

3    was picked, and at the time Mr. Dondero ceased to become the

4    CEO.  So you have three gentlemen coming in -- Mr. Seery, Mr.

5    Dubel, and Mr. Nelms -- coming in to run Highland, in a very

6    chaotic time.  They had to act through their agents.  There

7    was no expectation that this board was going to actually run

8    the day-to-day operations of the Debtor.  Of course not.  They

9    needed someone to run.  And they picked Mr. Seery.  And the

10    argument that well, he's an agent of the company, he's not an

11    agent of the board, that just doesn't make sense.  The

12    independent board had to act.  The directors had to act.  And

13    the directors, how do they deal with that?  They acted through

14    Mr. Seery.  So he is most certainly governed by the January

15    9th order.

16        Your Honor, I want to talk about the jury trial right.

17    Mr. Bridges said that Paragraph 14 is an arbitration clause

18    and not a jury trial waiver.  Now, again, I will forgive Mr.

19    Bridges because I assume he didn't read the provision, okay,

20    and he -- somebody told him that, and that person just got it

21    wrong.  But what I would like to do is read for Your Honor

22    Paragraph 14(f).  It doesn't have to do with arbitration.

23    It's a waiver of jury trial.  14(f), Jurisdiction Venue,

24    Waiver of Jury Trial.  The parties hereby agree that any

25    action, claim, litigation, or proceeding of any kind

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 657 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 657 of 852   PageID 2562

99

1    whatsoever against any other party in any way arising from or

2    relating to this agreement and all contemplated transactions,

3    including claims sounding in contract, equity, tort, fraud,

4    statute defined as a dispute shall be submitted exclusively to

5    the U.S. District Court for the Northern District of Texas, or

6    if such court does not have subject matter jurisdiction, the

7    courts of the State of Texas, City of Dallas County, and any

8    appellate court thereof, defined as the enforcement court.

9    Each party ethically and unconditionally submits to the

10   exclusive personal and subject matter jurisdiction of the

11   enforcement court for any dispute and agrees to bring any

12   dispute only in the enforcement court.  Each party further

13   agrees it shall not commence any dispute in any forum,

14   including administrative, arbitration, or litigation, other

15   than the enforcement court.  Each party agrees that a final

16   judgment in any such action, litigation, or proceeding is

17   conclusive and may be enforced through other jurisdictions by

18   suit on the judgment or in any manner provided by law.

19        And then the kick, Your Honor, all caps, as jury trial

20   waiver always are:  Each party irrevocably and unconditionally

21   waives to the fullest extent permitted by law any right it may

22   have to a trial by jury in any legal action, proceeding, cause

23   of action, or counterclaim arising out of or relating to this

24   agreement, including any exhibits, schedules, and appendices

25   attached to this agreement or the transactions contemplated

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 658 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 658 of 852 PageID 2563

100

1   hereby.  Each party certifies and acknowledges that no

2   representative of the owner of the other party has represented

3   expressly or otherwise that the other party won't seek to

4   enforce the foregoing waiver in the event of a legal action.

5   It has considered the implications of this waiver, it makes

6   this waiver knowingly and voluntarily, and it has been induced

7   to enter into this agreement by, among other things, the

8   mutual waivers and certifications in this section.

9        Your Honor, I will forgive Mr. Bridges.  I assume he just

10  did not read that.  But to represent to the Court that that

11  language does not contain a jury trial waiver is -- is just

12  wrong.

13            THE COURT:  All right.  I'm going to stop right

14  there.  And you were reading from the Second Amended and

15  Restated Shared Services Agreement between Highland --

16            MR. POMERANTZ:  Not shared services.  I'm reading

17  from the Second Amended and Restated Investment Advisory

18  Agreement --

19            THE COURT:  Investment --

20            MR. POMERANTZ:  -- between the Charitable DAF, the

21  Charitable DAF GP, and Highland Capital Management.  The

22  agreement whereby the Debtor was the investment advisor to the

23  Charitable DAF Fund and the Charitable DAF GP.

24            THE COURT:  All right.  Well, Mr. Bridges, I'm going

25  to bounce quickly back to you.  This is your chance to defend

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 659 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 659 of 852   PageID 2564

101

1 │ your honor.

2 │         MR. BRIDGES:  Yeah, we're -- we're looking at a

3 │ different agreement, where -- where literally the words that

4 │ were read to you are not in the agreement in front of us and

5 │ it is news to me.  So, Your Honor, this is a problem --

6 │         THE COURT:  What is the agreement you're looking at?

7 │         MR. BRIDGES:  It is the Amended -- I assume that

8 │ means First Amended -- Restated Advisory Agreement.

9 │         MR. POMERANTZ:  Your Honor, we are happy to file this

10 │ agreement with the Court so the Court has the benefit of it in

11 │ connection with Your Honor's ruling.

12 │         THE COURT:  Okay.  I would like you to do that.  Uh-

13 │ huh.

14 │         MR. BRIDGES:  I'd like -- I'd like to request -- I'll

15 │ withdraw that.

16 │         THE COURT:  Okay.  Go on, Mr. Pomerantz.

17 │         MR. POMERANTZ:  Mr. Bridges, if you could put us on

18 │ mute.  If you could put us on mute, Mr. Bridges, so I don't

19 │ hear your feedback.  Thank you.

20 │     Mr. Bridges also complains about the language "to the

21 │ extent permissible by law."  As Your Honor knows and as has

22 │ been my practice over 30 years, that language is probably in

23 │ every plan where there's a retention of jurisdiction:  to the

24 │ extent permissible by law.  And Mr. Bridges says that this

25 │ will create ambiguity in the order that couldn't be enforced.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 660 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 660 of 852    PageID 2565

102

1    There's no basis for that.  Our including the language "to the

2    extent permissible by law" in the orders, as we are prepared

3    to do, is consistent with the plan confirmation order where we

4    addressed that issue.  And we addressed that issue because we

5    didn't want to put Your Honor in a position where thereby Your

6    Honor may have an action before Your Honor that passes the

7    colorability gate that Your Honor may not be able to assert

8    jurisdiction.  And since jurisdiction can't be waived in that

9    regard, we will agree to amend that.

10       There's nothing ambiguous about that, and there's no

11    reason, though, that clause has to modify the Court's ability

12    to act as a gatekeeper, because, as we've argued *ad nauseam*,

13    gatekeeper provisions where the Court has that ability is not

14    only part of general bankruptcy jurisprudence but also part of

15    the Bankruptcy Code.

16       Counsel says that *Barton* doesn't apply because the

17    business judgment of Your Honor was used in retaining Mr.

18    Seery as opposed to in some other capacity.  There's no basis

19    for that, Your Honor.  A court-appointed -- a court-approved

20    CEO, CRO, professional, they are all entitled to protection

21    under the *Barton* act.  And the argument -- and again, this is

22    separate and apart from whether he's entitled to protection

23    under the January 9th order. But the argument that because it

24    was the business judgment -- again, business judgment in doing

25    something that Your Honor expressly contemplated under the

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 661 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 661 of 852   PageID 2566

103

1    January 9th corporate governance order -- there's just no law

2    to support that.  And I guess he's trying to get around the

3    plethora of cases that deal with the situation where *Barton*

4    has been extended.

5        Your Honor, Mr. Bridges, again, in arguing that we're

6    ships passing in the night on *Shoaf* and *Applewood* and

7    *Espinosa*, no, we're not ships passing in the night.  We have a

8    difference in agreement on what these cases stand for.  These

9    cases stand for the proposition that a clear and unambiguous

10   provision, plain and simple, if it's clear and unambiguous, it

11   will be given res judicata effect.  The release in *Shoaf*,

12   clear and unambiguous.  The release in *Applewood*, not.  The

13   issue here is the exculpation language.  That was clear and

14   unambiguous.  It applied prospectively.  The argument makes no

15   sense that we didn't identify -- we didn't identify claims

16   that might arise in the future, so therefore an exculpation

17   clause doesn't apply?  That doesn't make any sense.

18       Your Honor clearly exculpated parties.  Mr. Dondero knew

19   it.  CLO Holdco knew it.  The DAF knew it.  So the issue Your

20   Honor has to decide is whether that exculpation was a clear

21   and unambiguous provision such that it should be entitled to

22   res judicata effect.  And we submit that the answer is

23   unequivocally yes.

24       That's all I have, Your Honor.

25           THE COURT:  All right.  Well, --

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 662 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 662 of 852   PageID 2567

104

1          MR. MORRIS:  Your Honor?  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  This is John Morris.

4          THE COURT:  Yes?

5          MR. MORRIS:  I just want to, with respect to the

6    exhibits, I know there was no objection, but I had cited to

7    Docket Nos. 2419 and 2423.  The original exhibit list is at

8    Docket No. 2412.  So it's the three of those lists together.

9    2412, as amended by 2419, as amended by 2423.  Thank you very

10   much.

11         THE COURT:  All right.  Thank you.  All right.

12         MR. BRIDGES:  Your Honor, I still have no objection

13   to that, but may I have the last word on my motion?

14         THE COURT:  Is there time left?

15         THE CLERK:  Yes.

16         THE COURT:  Okay.  Go ahead.

17         MR. BRIDGES:  I just need a minute, Your Honor.  They

18   agreed to change the order.  They proposed it to us.  They

19   proposed it in a proposed order to you.  They can't also say

20   that it cannot be changed.

21       Secondly, Your Honor, in *Milic v. McCarthy*, 469 F.Supp.3d

22   580, the Eastern District of Virginia points out that the

23   Fourth Circuit treats appointment of estate professionals as

24   interlocutory orders as well.

25       That's all.  Thank you, Your Honor.

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 663 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 663 of 852   PageID 2568

105

1          THE COURT:  All right.  Here's what we're going to

2     do.  We've been going a very long time.  I'm going to take a

3     break to look through these exhibits, see if there's anything

4     in there that I haven't looked at before and that might affect

5     the decision here.  So we will come back at 3:00 o'clock

6     Central Time -- it's 2:22 right now -- and I will give you my

7     bench ruling on this.  All right.

8        So, Mike, they can all stay on the line, right?

9        Okay.  You can stay on, and we'll be back at 3:00 o'clock.

10          THE CLERK:  All rise.

11       (A recess ensued from 2:22 p.m. to 3:04 p.m.)

12          THE CLERK:  All rise.

13          THE COURT:  All right.  Please be seated.  All right.

14    Everyone presented and accounted for.  We're going back on the

15    record.

16          MR. POMERANTZ:  Your Honor, before you start, this is

17    Jeff Pomerantz.  We had sent to your clerk, and hopefully it

18    got to you, a copy of the Second Amended and Restated

19    Investment Advisory Agreement.  We also copied Mr. Sbaiti with

20    it as well.  And we would also like to move that into

21    evidence, just so that it's part of the Court's record.

22          THE COURT:  All right.

23          MR. BRIDGES:  We would object to that, Your Honor.

24    We haven't had an opportunity to even verify its authenticity

25    yet.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 664 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 664 of 852 PageID 2569

106

1          THE COURT:  All right.  Well, I'll tell you what.

2    I'm going to address this in my ruling.  So it's not going to

3    be part of the record for this decision, and yet -- well, I'll

4    get to it.

5       All right.  So we're back on the record in Case Number 19-

6    34054, Highland Capital.  The Court has deliberated, after

7    hearing a lot of argument and allowing in a lot of documentary

8    evidence, and the Court concludes that the motion of CLO

9    Holdco, Ltd. and The Charitable DAF to modify the retention

10   order of James Seery, which was entered almost a year ago, on

11   July 16th, 2020, should be denied.

12      This is the Court's oral bench ruling, but the Court

13   reserves discretion to supplement or amend in a more fulsome

14   written order what I'm going to announce right now, pursuant

15   to Rule 7052.

16      First, what is the Movants' authority to request the

17   modification of a bankruptcy court order that has been in

18   place for so many months, which was issued after reasonable

19   notice to the Movants, and after a hearing, which was not

20   objected to by the Movants, or appealed, when the Movants were

21   represented by sophisticated counsel, I might add, and which

22   order was relied upon by parties in this case, most notably

23   Mr. Seery and the Debtor, and in fact was entered after

24   significant negotiations involving a sophisticated court-

25   appointed Unsecured Creditors' Committee with sophisticated

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 665 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 665 of 852   PageID 2570

107

1    professionals and sophisticated members, and after negotiation

2    with an independent board of directors, court-appointed, one

3    of whose members is a retired bankruptcy judge?  What is the

4    Movants' authority?

5        Movants fumbled a little on that question, in that the

6    exact authority wasn't set forth in the motion.  But Movants'

7    primary argument is that Movants think the Seery retention

8    order was an interlocutory order and that the Court simply has

9    the inherent authority to modify it as an interlocutory order.

10        The Court disagrees with this analysis.  I do not think

11    the Fifth Circuit's *Smyth* case dictates that the Seery

12    retention order is still interlocutory.  The Seery retention

13    order was an order entered pursuant to Section 363 of the

14    Bankruptcy Code, not a Section 327 professionals to a debtor-

15    in-possession, professionals to a trustee employment order

16    such as the one involved in the *Smyth* case.

17        But even if the Seery retention order is interlocutory --

18    the Court feels strongly that it's not, but even if it is --

19    the Court believes it would be an abuse of this Court's

20    inherent discretion or authority to modify that order almost a

21    year after the fact and under the circumstances of this case.

22        Now, assuming Rule 60(b) applies to the Movants' request,

23    the Court determines that the Movants have not made their

24    motion anywhere close to within a reasonable time, as Rule

25    60(c) requires, nor do I think the Movants have demonstrated

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 666 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 666 of 852 PageID 2571

108

1    any exceptional circumstances to declare the order or any of

2    its provisions void.  The Movants have put on no evidence that

3    constitutes surprise or constitutes newly-disputed evidence.

4    So why are there no exceptional circumstances here such that

5    the Court might find, you know, a void order or void

6    provisions of an order?

7         First, this Court concludes that there's no credible

8    argument that the Court overreached its jurisdiction with the

9    gatekeeping provisions in the order.  Gatekeeping provisions

10   are not only very common in the bankruptcy world -- in

11   retention orders and in plan confirmation orders, for example

12   -- but they are wholly consistent with the *Barton* case, the

13   U.S. Supreme Court's *Barton's* case, and its progeny that has

14   become known collectively as the *Barton* doctrine.  Gatekeeping

15   provisions are wholly consistent with 28 U.S.C. Section

16   959(a)'s complete language.

17        The Fifth Circuit has blessed gatekeeping provisions in

18   all sorts of contexts.  It has blessed them in the situation

19   of when *Stern* claims are involved in the *Villegas* case.  It

20   even blessed Bankruptcy Courts' gatekeeping functions a long

21   time ago, in 1988, in a case that I don't think anyone

22   mentioned in the briefing, but as I've said, my brain

23   sometimes goes down trails, and I'm thinking of the *Louisiana*

24   *World Exposition* case in 1988, when the Fifth Circuit blessed

25   there a procedure where an unsecured creditors' committee can

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 667 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 667 of 852 PageID 2572

109

1    bring causes of action against persons, such as officers and

2    directors or other third parties, if they first come to the

3    Bankruptcy Court and show a colorable claim.  They have to

4    come to the Bankruptcy Court, show they have a colorable claim

5    and they're the ones that should be able to pursue them.  Not

6    exactly on point, but it's just one of many cases that one

7    could cite that certainly approve gatekeeper functions of

8    various sorts of Bankruptcy Courts.

9        It doesn't matter which court might ultimately adjudicate

10   the claims; the Bankruptcy Court can be the gatekeeper.

11       And the Court agrees with the many cases cited from

12   outside this circuit, such as the case in Alabama, in the

13   Eleventh Circuit, and there was another circuit-level case, at

14   least one other, that have held that the *Barton* doctrine

15   should be extended to other types of case fiduciaries, such as

16   debtor-in-possession management, among others.

17       Finally, as I pointed out in my confirmation ruling in

18   this case, gatekeeping provisions are commonplace for all

19   types of courts, not just Bankruptcy Courts, when vexatious

20   litigants are involved.  I have commented before that we seem

21   to have vexatious litigation behavior with regard to Mr.

22   Dondero and his many controlled entities.

23       Now, as far as the Movants' argument that there was not

24   just improper gatekeeping provisions but actually an improper

25   discharge in the Seery retention order of negligence claims or

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 668 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 668 of 852 PageID 2573

110

1    other claims that don't rise to the level of gross negligence

2    or willful misconduct, again, I reiterate there's nothing

3    exceptional in the bankruptcy world about exculpation

4    provisions like this. They absolutely are a term of

5    employment very often. Just like compensation, they're

6    frequently requested, negotiated, and approved. They are

7    normal in the corporate governance world, generally. They are

8    normal in corporate contracts between sophisticated parties.

9    And most importantly of all, even if this Court overreached

10    with the exculpation provisions in the Seery retention order,

11    even if it did, res judicata bars the attack of these

12    provisions at this late stage, under cases such as *Shoaf,*

13    *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14    case from the U.S. Supreme Court, and even *Applewood*, since

15    the Court finds the language in this order was clear,

16    specific, and unambiguous with regard to the gatekeeping

17    provisions and the exculpation provisions.

18        Last, and this is the part where I said I'm going to get

19    to this agreement that has been submitted, the Second Amended

20    and Restated Investment Advisor Agreement or whatever the

21    title is. I am more than a little disturbed that so much of

22    the theme of the Movants' pleadings and arguments, and I think

23    even representations to the District Court, have been they

24    have these sacred jury trial rights, these inviolate jury

25    trial rights, and an Article I Court like this Court should

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 669 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 669 of 852   PageID 2574

111

1   have no business through a gatekeeping provision impinging on

2   the possible pursuit of an action where there's a jury trial

3   right.

4        I was surprised initially when I thought about this.  I

5   thought, wow, I've seen so many agreements over the months.  I

6   can't say every one of them waived the jury trial right, but I

7   just remembered seeing that a lot, and seeing arbitration

8   provisions, and so that's why I asked.  It just was lingering

9   in my brain.  So I'm going to look at what is submitted.  I'm

10  not relying on that as part of my ruling.  As you just heard,

11  I had a multi-part ruling, and whether there's a jury trial

12  right or not is irrelevant to how I'm choosing to rule on this

13  motion.  But I do want to see the agreement, and then I want

14  Movants within 10 days to respond with a post-hearing trial

15  brief either saying you agree that this is the controlling

16  document or you don't agree and explain the oversight, okay?

17  Because it feels like a gross omission here to have such a

18  strong theme in your argument -- we have a jury trial right,

19  we have a jury trial right, by God, the gatekeeping

20  provisions, among other things, impinge on our sacred pursuit

21  of our jury trial right -- and then maybe it was very

22  conspicuous in the controlling agreement that you'd waived

23  that, the Movants had waived that.

24       So, anyway, I'm requiring some post-hearing briefing, if

25  you will, on whether omissions, misrepresentations were made

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 670 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 670 of 852    PageID 2575

112

1    to the Court.

2        Anyway, so I reserve the right to supplement or amend this

3    ruling with a more fulsome written order.  I am asking Mr.

4    Pomerantz to upload a form of order that is consistent with

5    this ruling, and --

6            MR. POMERANTZ:  Your Honor, we will do so.  I do have

7    one thing to bring to the Court's attention, unrelated to the

8    motion, before Your Honor leaves the bench.

9            THE COURT:  All right.  So just a couple of follow-up

10   things.  Have you -- I'm not clear I heard what you said about

11   this agreement.  Did you email it to my courtroom deputy or

12   did you file it on the docket?

13           MR. POMERANTZ:  We emailed it to your courtroom

14   deputy.  We're happy to file it on the docket.  And we also

15   provided a copy to Mr. Sbaiti.

16       I would note for the Court that it's signed both by The

17   Charitable DAFs by Grant Scott, just for what it's worth.

18           THE COURT:  Okay.  All right.  Well, I'm trying to

19   think what I want -- I do want you to file it on the docket,

20   and I'm trying to think of what you label it.  Just call it

21   Post-Hearing Submission or something and link it to the motion

22   that we adjudicated here today.  And then, again, you've got

23   10 days, Mr. Bridges, to say whatever you want to say about

24   that agreement.

25       I guess the last thing I wanted to say is we sure devoted

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 671 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 671 of 852 PageID 2576

113

1   a lot of time to this motion today.  We have -- this is a

2   recurring pattern, I guess you can say.  We have a lot of

3   things that we devote a lot of time to in this case that I get

4   surprised, but it is what it is.  You file a motion.  I'm

5   going to give it all the attention Movants and Respondents

6   think it warrants.  I'm going to develop a full record,

7   because, you know, there's a recurring pattern of appeals

8   right now, 11 or 12 appeals, I think, not to mention motions

9   to withdraw the reference.  If we're going to have higher

10  courts involved in the administration of this case, I'm going

11  to make a very thorough record so nobody is confused about

12  what we did, what I considered, what my reasoning was.

13      So I kind of think it's unfortunate for us to have to

14  spend case resources and so much time and fees on things like

15  this, but I'm going to make sure a Court of Appeals is not

16  ever confused about what happened and what we did.  So that's

17  just the way it's going to be.  And I feel like we have no

18  choice, given, again, the pattern of appeals.

19      All right.  So, with that, Mr. Pomerantz, you had one

20  other case matter, you said?

21          MR. POMERANTZ:  Yes.  But before I get to that, Your

22  Honor, I assume that, in response to the Movants' submission

23  on the agreement, that we would have right at four or seven

24  days to respond if we deem it's appropriate?

25          THE COURT:  I think that's reasonable.  That's

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 672 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 672 of 852   PageID 2577

114

1    reasonable.

2              MR. POMERANTZ:  Okay.  Thank you, Your Honor.

3              THE COURT:  So let me think of how I want to do this.

4    I'll just do a short scheduling order of sorts that just, it

5    says in one or two paragraphs, at the hearing on this motion,

6    the Court raised questions about the jury trial rights and the

7    Debtor has now submitted the controlling agreements, I'm

8    giving the Movants 10 days to respond to whether this is

9    indeed a controlling agreement, and why, if it is, the Movants

10   have heretofore taken the position they have jury trial

11   rights.  And then I will give you seven days thereafter to

12   reply, and then the Court will set a further status conference

13   if it determines it's necessary.  Okay?

14        So, Nate, we'll do a short little order to that effect.

15   Okay?

16             MR. POMERANTZ:  Thank you, Your Honor.

17        I -- again, before I raise the other issue, I want to pick

18   up on a comment Your Honor just made towards the end.  I know

19   the Court has been frustrated with the time and effort we've

20   been spending.  The Debtor and the creditors have been

21   extremely frustrated, because in addition to the time and

22   effort everyone's spending, we're spending millions of

23   dollars, millions of dollars on litigation that --

24             THE COURT:  It's one of the reasons you needed an

25   exit loan, right?

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 673 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 673 of 852   PageID 2578

115

1          MR. POMERANTZ:  Right.  No, exactly.  That's

2    frivolous, that we think is made in bad faith.

3          And Your Honor, and everyone else who's hearing this on

4    behalf of Mr. Dondero, should understand we're looking into

5    what appropriate authority Your Honor would have to shift some

6    of the costs.  Your Honor did that in the contempt motion.

7    Your Honor can surely do that in connection with the notes

8    litigation.  But all this other stuff that is requiring us to

9    spend hundreds and hundreds of hours and spend millions of

10   dollars, we are clearly looking into whether it would be

11   appropriate and what authority there is.  I just wanted to let

12   Your Honor know that.

13         And in connection with that, the last point, Your Honor, I

14   can't actually even believe I'm saying this, but there was

15   another lawsuit filed -- we just found out in the break -- on

16   Wednesday night by the Sbaiti firm on behalf of Dugaboy in the

17   District Court.

18         Now, to make matters worse, Your Honor, the litigation

19   relates to alleged improper management by the Debtor of Multi-

20   Strat.  If Your Honor will recall, at many times I've told

21   this Court what Dugaboy's claims they filed in this case.

22   Dugaboy has a claim that is filed in this case for

23   mismanagement postpetition of Multi-Strat.  Now the Sbaiti

24   firm, in addition to representing CLO Holdco, in addition to

25   representing the DAF, and whatever the Plaintiffs' lawyers are

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 674 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 674 of 852   PageID 2579

116

1    in that other District Court, PCMG, and in connection with the

2    Acis matter, they've decided they haven't had enough.  They've

3    now filed another motion that -- you know, why they filed it

4    in District Court and there's a proof of claim on the same

5    issues, I don't know.  But I thought Your Honor should know.

6    I'm not asking Your Honor to do anything about it.  But we

7    will act aggressively, strongly, and promptly.

8         Thank you, Your Honor.

9         THE COURT:  All right.  Well, you've reminded me of

10   what came out earlier today about the entity -- I left my

11   notepad in my chambers -- PMC or PMG or something.

12       Mr. Bridges, we're not going to have a hearing right now

13   on me doing anything, but what are you thinking?  What are you

14   doing?

15        MR. BRIDGES:  Your Honor, I'm not trying to duck your

16   question.  I literally have no involvement with any other

17   claim, and we would have to ask Mr. Sbaiti to answer your

18   questions.

19        THE COURT:  All right.  Is he there?

20        MR. BRIDGES:  He is.

21        THE COURT:  I'll listen.

22        MR. BRIDGES:  I'll switch seats and give him this

23   chair.

24        MR. SBAITI:  Sorry, Your Honor.  We had two computers

25   going and weren't able to use the sound on one, so we ended up

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 675 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 675 of 852   PageID 2580

117

1    turning that off.

2         Your Honor, I'm not sure what the question is about when

3    you say what are we thinking.  We have a client that's asked

4    us to file something, and when we're advised by bankruptcy

5    counsel that it's not prohibited for us to do so, and don't

6    know why we're precluded from doing so, and when the time

7    comes I'm sure we'll be able to explain to Your Honor --

8    someone will be able to explain to Your Honor why what we're

9    doing, despite Mr. Pomerantz's exacerbation, or excuse me,

10   exasperation, why that wasn't improper.  It's our belief that

11   it wasn't improper or a violation of the Court's rule.

12         THE COURT:  Just give me a quick shorthand *Readers'*

13   *Digest* of why you don't think it's improper.

14         MR. SBAITI:  Sure.  My understanding is, Your Honor,

15   there's not a rule that says we can't file it against the

16   Debtor for postpetition actions.  So that, that's as -- that's

17   as much as I understand.  And I'm going to -- I'm not trying

18   to duck it, either.  And if I'm wrong about that and someone

19   wants to correct me on our side offline and if we have to

20   explain to the Court why that's so or what rule has been

21   violated, I'm sure we'll be able to put together something for

22   that.  But that's what I've been advised.

23         THE COURT:  Have you done thorough --

24         MR. POMERANTZ:  Your Honor, I think what --

25         MR. SBAITI:  (garbled), Your Honor.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 676 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 676 of 852 PageID 2581

118

1          THE COURT:  Have you done thorough research yourself?

2   Your Rule 11 signature is on the line, not some bankruptcy

3   counsel you talked to.  Have you done the research yourself?

4          MR. SBAITI:  Well, Your Honor, I've relied on the

5   research and advice of people who are experts, and I believe

6   my Rule 11 obligations also allow me to do that, so yes.

7          MR. POMERANTZ:  Your Honor, I think we're entitled to

8   know if it's Mr. Draper's firm who has been representing

9   Dugaboy.  He's the bankruptcy counsel.  I don't think it's an

10  attorney-client privilege issue.  If Mr. Sbaiti is going to be

11  here and sort of say, hey, bankruptcy counsel said it was

12  okay, I think we would like to know and I'm sure Your Honor

13  would like to know who is that bankruptcy counsel.

14         THE COURT:  Yes.  Fair enough.  Mr. Sbaiti?

15         MR. SBAITI:  Your Honor, in consultation with Mr.

16  Draper and with consultation with other counsel that we've

17  spoken to, that has been our understanding.

18         THE COURT:  Who's the other counsel?

19         MR. SBAITI:  Well, we've talked to Mr. Rukavina about

20  some of these things for the PCMG and the Acis case.  We've

21  talked to the people who, when they tell us you can't do this

22  because they're bankruptcy counsel for our client, then we

23  don't do something.  So, and I'm not trying to throw anybody

24  under the bus, but my understanding of what goes on in

25  Bankruptcy Court is incredibly limited, so, you know, and if

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 677 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 677 of 852 PageID 2582

119

1   it's a mistake then I'll own it, if I have a mistaken

2   understanding, but I also wasn't anticipating having to make a

3   presentation about this right here right now, so --

4           THE COURT:  Well, you're filing lawsuits that involve

5   this bankruptcy case during the hearing, so --

6           MR. SBAITI:  Oh, we didn't file it during the

7   hearing, Your Honor.  It was filed last night, I believe.

8           THE COURT:  Okay.  Well, I assume that you're going

9   to go back and hit the books, hit the computer, and be

10  prepared to defend your actions, because your bankruptcy

11  experts, they may think they know a lot, but the judge is not

12  very happy about what she's hearing.

13          MR. POMERANTZ:  Your Honor, if I may ask when Your

14  Honor intends to issue the contempt ruling in connection with

15  the June 8th hearing?  I strongly believe -- and, obviously,

16  this has nothing to do with the contempt hearing; this

17  happened after -- but I strongly believe that sending a

18  message that Your Honor is inclined to hold counsel in

19  contempt, which obviously is one of the violators we said

20  should be held in contempt, it may be important to do that

21  sooner rather than later so that people know that Your Honor

22  is serious.

23          THE COURT:  All right.  Well, I understand and

24  respect that request.  And let me tell you all, I had a seven-

25  day -- okay.  You all were here on that motion June 8th.  I

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 678 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 678 of 852 PageID 2583

120

1    had a seven-day, all-day, every-day, 9:00 to 5:00, 45-minute

2    lunch break, in-person hearing with a dozen or so live

3    witnesses that I just finished Tuesday at 5:00 o'clock.  So

4    you all were here on the 8th, and then -- what day was that --

5    what was -- Tuesday, I finished.  Tuesday was the 22nd.  So I

6    started on the 14th, okay?  So you all were here on the 8th

7    and I had a live jury trial -- I mean, not jury trial, a live

8    bench trial -- live human beings in the courtroom, beginning

9    June 14th.  So you're here the 8th.  June 14th through 22nd, I

10   did my trial.  And here we are on the 25th.  And guess what, I

11   have another live human-being bench trial next week, Monday

12   through Friday.

13       So we've been working in other things like this in between

14   those two.  So I'm telling you that not to whine, I'm just

15   telling you that, that's the only reason I didn't get out a

16   quick ruling on this, okay?

17            MR. POMERANTZ:  And Your Honor, I was not at all

18   making that comment to imply anything about the Court.

19            THE COURT:  Well, --

20            MR. POMERANTZ:  The time and effort that you have

21   given to this case is extraordinary, --

22            THE COURT:  Okay.

23            MR. POMERANTZ:  -- so please don't misunderstand my

24   comment.

25            THE COURT:  Okay.  And I didn't mean to express

Case 21-03067-sgj Doc 43 Filed 09/29/21    Entered 09/29/21 18:18:16    Page 679 of 852
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 679 of 852    PageID 2584

121

1   annoyance or anything like that.  I guess what I'm trying to

2   do is I don't want anyone to mistake the delay in ruling on

3   the contempt motion to mean I'm just not that -- you know, I'm

4   not prioritizing it, other things are more serious to me or

5   important to me, or I'm going to take two months to get to it.

6   It's literally been I've been in trial almost all day long

7   every day since you were here.  But trust me, I'm about as

8   upset as upset can be about what I heard on June 8th, and I'm

9   going to get to that ruling, and I know what I'm going to do.

10  And, well, like I said, it's just a matter of figuring out

11  dollars and whom, okay?  There's going to be contempt.  I just

12  haven't put it on paper because I've been in court all day and

13  I haven't come up with a dollar figure.  Okay?

14      So I hope -- I don't know if that matters very much, but

15  it should.

16      All right.  We stand adjourned.

17      (Proceedings concluded at 3:35 p.m.)

18                          --oOo--

19

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                      **06/29/2021**

24  _____    _____
    Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

122

INDEX

*Excerpt*
*11:33 a.m. to 3:35 p.m.*

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Bridges                                              3
- By Mr. Pomerantz                                          23

WITNESSES

-none-

EXHIBITS

Movants' Exhibits 1, 3 through 12, 15 through     Received 91
28, and 30 through 44

Debtor's Exhibit 1                                Received 91
Debtor's Exhibits 1 through 17                    Received 93

RULINGS                                                     106

END OF PROCEEDINGS                                          121

INDEX                                                       122

# EXHIBIT 7

## SECOND AMENDED AND RESTATED
## INVESTMENT ADVISORY AGREEMENT

THIS SECOND AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "*Agreement*"), dated to be effective from January 1, 2017 (the "*Effective Date*") is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "*Fund*"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "*General Partner*"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "*Investment Advisor*"). Each of the signatories hereto is sometimes referred to herein individually as a "*Party*" and collectively as the "*Parties*."

## RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor entered into that certain Investment Advisory Agreement dated January 1, 2012 (the "*Original Agreement*");

WHEREAS, the Parties amended and restated the Original Agreement in its entirety on the terms set forth in that certain Amended and Restated Investment Advisory Agreement dated July 1, 2014 (the "*Existing Agreement*");

WHEREAS, the parties desire to amend and restate the Existing Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree, and the Existing Agreement is hereby amended and restated in its entirety, as follows:

1. <u>Investment Advisory Services</u>. Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2. <u>Custody</u>. The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian"). The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the Financial Instruments. The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

3.     <u>Authority of the Investment Advisor</u>.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

(a)     investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

(b)     engaging in such other lawful Financial Instruments transactions;

(c)     research and analysis;

(d)     purchasing Financial Instruments and holding them for investment;

(e)     entering into contracts for or in connection with investments in Financial Instruments;

(f)     investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

000680

(g)      possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)      lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)      opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)      opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)      combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("***Other Accounts***") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)      entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)      organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)      causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)      engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)      voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.      <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a) to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b) to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c) to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d) to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e) to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

5. Valuation of Financial Instruments. Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6. Status of the Investment Advisor. The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients. The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

4

7.     <u>Investments</u>.    ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.     <u>Reimbursement by the General Partner</u>.  The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "***Sub-Advisor***"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; *provided, however*, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

9.     <u>Expenses</u>.

(a)     The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

000683

(b)     To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

10.     Fees.

(a)     The Fund shall pay the Investment Advisor a quarterly fee (the "*Management Fee*") equal to 2.0% per annum (0.5% per quarter) of the Net Assets (as defined below) of the Fund, payable in advance at and calculated as of the first business day of each calendar quarter.  For purposes of calculating the Management Fee, the Net Assets of the Fund will be determined before giving effect to any of the following amounts payable by the Fund generally or in respect of any Investment which are effective as of the date on which such determination is made: (i) any fee payable to the Investment Advisor as of the date on which such determination is made; (ii) any capital withdrawals or distributions payable by the Fund which are effective as of the date on which such determination is made; and (iii) withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdback or other amounts specially allocated ending as of the date on which such determination is made.  The Management Fee shall be prorated for partial periods and any applicable excess fees should be returned to the Fund by the Investment Advisor.  Capital contributions made to the Fund after the commencement of a calendar quarter shall be subject to a prorated Management Fee based on the number of days remaining during such quarter.

(b)     Subject to clauses (c) and (d) below, at the end of each Calculation Period (as defined below), an amount equal to 20% of the net capital appreciation of the Fund's Investments (as defined below) after deducting the Management Fee shall be paid to the Investment Advisor (the "***Performance Fee***"); *provided*, *however*, that the net capital appreciation upon which the calculation of the Performance is based shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (as defined below) maintained on the books and records of the Fund. The amount of the unrecovered balance remaining in the Loss Recovery Account at the time of calculating the Performance Fee shall be the amount existing immediately prior to its reduction pursuant to the second clause of the second sentence of clause (c) below.

(c)     There shall be established on the books of the Fund a memorandum account (the "***Loss Recovery Account***"), the opening balance of which shall be zero.  At the end of each Calculation Period, the balance in the Loss Recovery Account shall be adjusted as follows: first, if there has been, in the aggregate, net capital depreciation of the Fund's Investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period (or with respect to the initial Calculation Period, since the Effective Date), an amount equal to such net capital depreciation shall be credited to the Loss Recovery Account, and, second, if there has been, in the aggregate, net capital appreciation of the Fund's investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period, an amount equal to such net capital appreciation, before taking into account any Performance Fee to be paid to the Investment Advisor, shall be debited to and reduce any unrecovered balance in the Loss Recovery Account, but not below zero. Solely for purposes of this paragraph, in determining the Loss Recovery Account, net capital appreciation and net capital

6

depreciation for any applicable Calculation Period shall be calculated by taking into account the amount of the Management Fee paid for such period.

(d)     In the event that all or a portion of the Fund's capital is distributed or withdrawn while there exists an unrecovered balance in the Loss Recovery Account, the unrecovered balance in the Loss Recovery Account shall be reduced as of the beginning of the next Calculation Period by an amount equal to the product obtained by multiplying the balance in such Loss Recovery Account by a fraction, the numerator of which is the amount distributed or withdrawn with respect to the immediately preceding distribution or withdrawal date, and the denominator of which is the total fair value of the Fund's Investment immediately prior to such distribution or withdrawal.

(e)     For purposes of this Section 10, the net capital appreciation and net capital depreciation of the Fund's Investments for any given period will be calculation in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided upon the General Partner's request.  As soon as reasonably practicable following the end of a Calculation Period, the Investment Advisor shall deliver, or cause to be delivered, to the General Partner a statement showing the calculation of the Performance Fee, if any, with respect to such Calculation Period.  The Performance Fee, if any, shall be payable within three (3) business days of the General Partner's receipt of such statement.

(f)     Payments due to the Investment Advisor shall be made by wire transfer to:

|           |                                                              |
|-----------|--------------------------------------------------------------|
| Bank Name: | Compass Bank                                                |
| ABA#:      | 113010547                                                    |
| FBO:       | Highland Capital Management, L.P. (Master Operating Account) |
| Acct#:     | 0025876342                                                   |

(g)     For purposes of this Section 10, the following terms have the definitions set forth below:

"*Calculation Period*" means the period commencing on the Effective Date (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period, and ending as of the close of business on the first to occur of the following: (i) the last day of a calendar year; (ii) the distribution or withdrawal of capital of the Fund (but only with respect to such distributed or withdrawn amount); (iii) the permitted transfer of all or any portion of a partner's interest in the Fund; and (iv) the final capital distribution of the Fund following its dissolution;

"*Investments*" means all investments, securities, cash, receivables, financial instruments, contracts and other assets, whether tangible or intangible, owned by the Fund;

"***Net Assets***" means, with respect to the Fund as of any date, the excess of the total fair value of all Investments over the total liabilities, debts and obligations of the Fund, in each case, calculated on an accrual basis in accordance with accounting principles generally accepted in the United States and the then current valuation policy of the Service Provider, a copy of which will be provided to the General Partner upon request; and

"***Services Agreement***" means that certain Second Amended and Restated Service Agreement, dated effective as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

## 11.    Exculpation; Indemnification.

(a)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "***Covered Person***" and collectively, "***Covered Persons***") shall be subject to the provisions of this Section.

(b)    To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)    Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)    To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "***Indemnified***

000686

*Party*"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence. As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment

Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct, fraud or gross negligence or the ability to waive or limit such Losses under applicable law. Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements. Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

12.     <u>Activities of the Investment Advisor and Others</u>. The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund. Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate. In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund. The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar. The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager. Each of the General Partner and the Fund acknowledges that it has received, reviewed and had an opportunity with respect to (a) a copy of Part 2 of the Investment Advisor's Form ADV, and (b) the supplemental disclosures attached hereto as <u>Exhibit A</u>, each of which further describes conflicts of interest relating to the Investment Advisor, its affiliates and their respective advised accounts.

13.     <u>Term</u>. This Agreement shall remain in effect through an initial term concluding December 31, 2017 and shall be automatically extended for additional one-year terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

14.     <u>Miscellaneous</u>.

(a)     <u>Notices</u>. Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

000688

If to the Investment Advisor, to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Telephone Number: (972) 628-4100
Facsimile Number: (972) 628-4147

If to the General Partner or the Fund, to:

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention: Grant Scott
Telephone Number: (919) 854-1407
Facsimile Number: (919) 854-1401

(b) <u>Entire Agreement</u>. This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c) <u>Amendments and Waivers</u>. No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties. No amendment to this Agreement may be made without first obtaining the required approval from the Fund. The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d) <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns. Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent. No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; <u>provided</u>; <u>however</u>, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e) <u>Governing Law</u>. Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

11

(f)     Jurisdiction; Venue; Waiver of Jury Trial.  The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("*Dispute*") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("*Enforcement Court*").  Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court.  Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court.  Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g)     Headings.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)     Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)     Survival.  The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j)     Pronouns.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(k)    <u>Arm's-Length Agreement</u>.  The General Partner and the Fund have approved this Agreement and reviewed the activities described in Section 12 and in the Investment Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

13

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:  6/21/17

CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:

CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general partner

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:

14

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:

CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general
partner

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

000693

# EXHIBIT A

## Supplemental Disclosures

**Potential Conflicts of Interest**

The scope of the activities of Highland Capital Management, L.P. (the "***Investment Adviser***"), its affiliates, and the funds and clients managed or advised by the Investment Adviser or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on Charitable DAF Fund, L.P. and its subsidiaries (collectively, the "***Fund***") in the future that cannot be foreseen or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts. Additional conflicts are described in the Investment Adviser's Form ADV. You are urged to review the Investment Adviser's Form ADV in its entirety prior to investing in the Fund.[1]

*Highland Group & Highland Accounts*. None of the Investment Adviser, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "***Highland Group***") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Adviser is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Adviser or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations and collateralized loan obligations that invest in leveraged loans (collectively, "***CDOs***") and other vehicles managed by members of the Highland Group (collectively, "***Highland Accounts***") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Adviser may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Adviser has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the

---

[1] The Investment Adviser's latest Form ADV filed and Part 2 Brochures can be accessed here: https://adviserinfo.sec.gov/IAPD/IAPDFirmSummary.aspx?ORG_PK=110126

Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained by the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Adviser will devote to the Fund only as much time as the Investment Adviser deems necessary and appropriate to manage the Fund's business.

The Investment Adviser undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*. It is the policy of the Investment Adviser to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Adviser has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order for any accounts cannot be fully allocated under prevailing market conditions, the Investment Adviser may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Adviser will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the U.S. Investment Advisers Act of 1940, as amended. The Investment Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all investment opportunities that are suitable for it.

The Investment Adviser and/or its affiliates may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day for the Fund, the Highland Accounts or affiliates of the Investment Adviser are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Highland Group Trading*. As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types. The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets oriented investment activities. The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest. In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund. In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund. The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund. In addition, in managing the Fund's portfolio, the Investment Adviser may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Adviser in accordance with its fiduciary duties to its other clients, the Investment Adviser may take, or be required to take, actions which adversely affect the interests of the Fund.

The Highland Group has invested and may continue to invest in investments that would also be appropriate for the Fund. Such investments may be different from those made by the Fund. The Highland Group does not have any duty, in making or maintaining such investments, to act in a way that is favorable to the Fund or to offer any such opportunity to the Fund, subject to the Investment Adviser's internal allocation policy. The investment policies, fee arrangements and other circumstances applicable to such other accounts and investments may vary from those applicable to the Fund and its investments. The Highland Group may also provide advisory or other services for a customary fee with respect to investments made or held by the Fund, and neither the Fund nor its investors shall have any right to such fees. The Highland Group may also have ongoing relationships with, render services to or engage in transactions with other clients who make investments of a similar nature to those of the Fund, and with companies whose securities or properties are acquired by the Fund.

As further described below, in connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Adviser to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Adviser's inability to use such information for

advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Adviser will devote as much time to the Fund as the Investment Adviser deems appropriate to perform its duties in accordance with the Fund's advisory agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Adviser's other accounts.

*Various Activities of the Investment Adviser and its Affiliates.* The directors, officers, personnel, employees and agents of the Investment Adviser and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories or provide banking, agency, insurance and/or other services, and receive arm's length fees in connection with such services, for the Fund or its investments or other entities that operate in the same or a related line of business as the, for other clients managed by the Investment Adviser or its affiliates, or for any obligor or issuer in respect of the CDOs, and the Fund shall have no right to any such fees. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund. The Fund may compete with other Highland Accounts for capital and investment opportunities.

There is no limitation or restriction on the Investment Adviser or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Investment Adviser's investment committee, the Investment Adviser or its affiliates have to other clients.

The Investment Adviser and its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout of an investment of the Fund or another account. In such circumstances, the Investment Adviser or its affiliates may take positions on behalf of themselves or another account that are adverse to the interests of the Fund.

The Investment Adviser and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CDOs, Highland Accounts and other investments purchased by the Fund. Such transactions shall be subject to fees that are intended to be no greater than arm's-length fees, and the Fund shall have no right to any such fees. There is no expectation for preferential access to transactions involving CDOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Adviser and/or its affiliates and the Fund shall not have any right to any such fees.

*Investments in Highland Accounts Managed by the Investment Manager or its Affiliates.* The Fund may invest a significant portion of its capital in Highland Accounts. The Investment Adviser or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Highland Accounts. If the Fund invests in Highland Accounts in secondary transactions, the Fund will indirectly pay the fees (senior and subordinated) of such Highland Accounts and any

carried interest. If the Fund provides all of the equity for a Highland Account, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis. The Investment Adviser or its affiliates will have conflicting division of loyalties and responsibilities regarding the Fund and a Highland Account, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Fund would not be subordinated to those of a Highland Account or to other interests of the Investment Adviser.

*Multiple Levels of Fees*. The Investment Adviser and the Highland Accounts are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if investors in the Fund were able to invest directly in the Highland Accounts or their respective underlying investments. Investors in the Fund should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a Highland Account may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees).

*Cross Transactions and Principal Transactions.* The Investment Adviser may effect client cross-transactions where the Investment Adviser causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates. The Investment Adviser may engage in a client cross-transaction involving the Fund any time that the Investment Adviser believes such transaction to be fair to the Fund and such other client.

The Investment Adviser may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Adviser and/or its affiliates, in each case in accordance with applicable law, which will include the Investment Adviser obtaining independent consent on behalf of the Fund prior to engaging in any such principal transaction between the Fund and the Investment Adviser or its affiliates.

The Investment Adviser may advise the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Fund may invest in securities of obligors or issuers in which the Investment Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Adviser's own investments in such companies. Moreover, the Fund may invest in assets originated by the Investment Adviser or its affiliates. In each such case, the Investment Adviser and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Fund and the other parties to such trade. Under certain circumstances, the Investment Adviser and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Adviser's valuation procedures to another client managed or advised by the Investment Adviser or such affiliates. In addition, the Investment Adviser may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law. The Investment Adviser may obtain independent consent

in writing on behalf of the Fund, which consent may be provided by the managing member of the General Partner or any other independent party on behalf of the Fund, if any such transaction requires the consent of the Fund under Section 206(3) of the U.S. Investment Advisers Act of 1940, as amended.

*Material Non-Public Information*. There are generally no ethical screens or information barriers among the Investment Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Investment Adviser, any of its personnel or its affiliates were to receive material non-public information about a particular obligor or issuer, or have an interest in causing the Fund to acquire a particular security, the Investment Adviser may be prevented from advising the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material nonpublic information, it is possible that such controls could fail and result in the Investment Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material nonpublic information could have adverse effects on the Investment Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Adviser's ability to perform its portfolio management services to the Fund. In addition, while the Investment Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Investment Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Investment Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

*Conflicts Relating to Equity and Debt Ownership by the Fund and Affiliates.* In certain circumstances, the Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Adviser to reconcile the conflicting interests in the Fund and such other accounts in a way that protects the Fund's interests. Additionally, the Investment Adviser or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Adviser in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Adviser's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Other Fees*. The Investment Adviser and its affiliates are permitted to receive consulting fees, investment banking fees, advisory fees, breakup fees, director's fees, closing fees, transaction fees and similar fees in connection with actual or contemplated investments. Such fees will not reduce

or offset the Management Fee.  Conflicts of interest may also arise due to the allocation of such fees to or among co-investors.

*Soft Dollars*.  The Investment Adviser's authority to use "soft dollar" credits generated by the Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Adviser may give the Investment Adviser an incentive to select brokers or dealers for transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Adviser rather than giving exclusive consideration to the interests of the Fund.

# EXHIBIT 8

000701

*Conformed to Federal Register version*

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 276**

**[Release No. IA-5248; File No. S7-07-18]**

**RIN: 3235-AM36**

**Commission Interpretation Regarding Standard of Conduct for Investment Advisers**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Interpretation.

**SUMMARY:** The Securities and Exchange Commission (the "SEC" or the "Commission") is publishing an interpretation of the standard of conduct for investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act" or the "Act").

**DATES:** Effective July 12, 2019.

**FOR FURTHER INFORMATION CONTACT:** Olawalé Oriola, Senior Counsel; Matthew Cook, Senior Counsel; or Jennifer Songer, Branch Chief, at (202) 551-6787 or *IArules@sec.gov*, Investment Adviser Regulation Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549-8549.

**SUPPLEMENTARY INFORMATION:** The Commission is publishing an interpretation of the standard of conduct for investment advisers under the Advisers Act [15 U.S.C. 80b].[1]

---

[1]     15 U.S.C. 80b. Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified, and when we refer to rules under the Advisers Act, or any paragraph of these rules, we are referring to title 17, part 275 of the Code of Federal Regulations [17 CFR 275], in which these rules are published.

# TABLE OF CONTENTS

I.    INTRODUCTION

    A.    Overview of Comments

II.   INVESTMENT ADVISERS' FIDUCIARY DUTY

    A.    Application of Duty Determined by Scope of Relationship

    B.    Duty of Care

        1.    *Duty to Provide Advice that is in the Best Interest of the Client*

        2.    *Duty to Seek Best Execution*

        3.    *Duty to Provide Advice and Monitoring over the Course of the Relationship*

    C.    Duty of Loyalty

III.  ECONOMIC CONSIDERATIONS

    A.    Background

    B.    Potential Economic Effects

## I.    INTRODUCTION

Under federal law, an investment adviser is a fiduciary.[2]  The fiduciary duty an investment adviser owes to its client under the Advisers Act, which comprises a duty of care and a duty of loyalty, is important to the Commission's investor protection efforts.  Also important to the Commission's investor protection efforts is the standard of conduct that a broker-dealer owes to a retail customer when it makes a recommendation of any securities transaction or investment strategy involving securities.[3]  Both investment advisers and broker-dealers play an important

---

[2]    *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) ("SEC v. Capital Gains"); *see also infra* footnotes 34–44 and accompanying text; Investment Adviser Codes of Ethics, Investment Advisers Act Release No. 2256 (July 2, 2004); Compliance Programs of Investment Companies and Investment Advisers, Investment Advisers Act Release No. 2204 (Dec. 17, 2003); Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5, 2000).  Investment advisers also have antifraud liability with respect to prospective clients under section 206 of the Advisers Act.

[3]    *See* Regulation Best Interest, Exchange Act Release No. 34-86031 (June 5, 2019) ("Reg. BI Adoption").  This final interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Final Interpretation") interprets section 206 of the Advisers Act, which is applicable to both SEC- and

000703

role in our capital markets and our economy more broadly. Investment advisers and broker-dealers have different types of relationships with investors, offer different services, and have different compensation models. This variety is important because it presents investors with choices regarding the types of relationships they can have, the services they can receive, and how they can pay for those services.

On April 18, 2018, the Commission proposed rules and forms intended to enhance the required standard of conduct for broker-dealers[4] and provide retail investors with clear and succinct information regarding the key aspects of their brokerage and advisory relationships.[5] In connection with the publication of these proposals, the Commission published for comment a separate proposed interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Proposed Interpretation").[6] We stated in the Proposed Interpretation, and we continue to believe, that it is appropriate and beneficial to address in one release and reaffirm—and in some cases clarify—certain aspects of the fiduciary duty that an investment adviser owes

---

state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act. This Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty. It is not, however, intended to be the exclusive resource for understanding these principles. Separately, in various circumstances, case law, statutes (such as the Employee Retirement Income Security Act of 1974 ("ERISA")), and state law impose obligations on investment advisers. In some cases, these standards may differ from the standard enforced by the Commission.

[4] Regulation Best Interest, Exchange Act Release No. 83062 (Apr. 18, 2018) ("Reg. BI Proposal").

[5] Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 4888 (Apr. 18, 2018) ("Relationship Summary Proposal").

[6] Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation, Investment Advisers Act Release No. 4889 (Apr. 18, 2018).

3

to its clients under section 206 of the Advisers Act.[7] After considering the comments received, we are publishing this Final Interpretation with some clarifications to address comments.[8]

### A. Overview of Comments

We received over 150 comment letters on our Proposed Interpretation from individuals, investment advisers, trade or professional organizations, law firms, consumer advocacy groups, and bar associations.[9] Although many commenters generally agreed that the Proposed Interpretation was useful,[10] some noted the challenges inherent in a Commission interpretation covering the broad scope of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act.[11] Some of these commenters suggested modifications to or withdrawal

---

[7] Further, the Commission recognizes that many advisers provide impersonal investment advice. *See, e.g.*, Advisers Act rule 203A-3 (defining "impersonal investment advice" in the context of defining "investment adviser representative" as "investment advisory services provided by means of written material or oral statements that do not purport to meet the objectives or needs of specific individuals or accounts"). This Final Interpretation does not address the extent to which the Advisers Act applies to different types of impersonal investment advice.

[8] In the Proposed Interpretation, the Commission also requested comment on: licensing and continuing education requirements for personnel of SEC-registered investment advisers; delivery of account statements to clients with investment advisory accounts; and financial responsibility requirements for SEC-registered investment advisers, including fidelity bonds. We are continuing to evaluate the comments received in response.

[9] Comment letters submitted in File No. S7-09-18 are available on the Commission's website at https://www.sec.gov/comments/s7-09-18/s70918.htm. We also considered those comments submitted in File No. S7-08-18 (Comments on Relationship Summary Proposal) and File No. S7-07-18 (Comments on Reg. BI Proposal). Those comments are available on the Commission's website at https://www.sec.gov/comments/s7-08-18/s70818.htm and https://www.sec.gov/comments/s7-07-18/s70718.htm.

[10] *See, e.g.*, Comment Letter of North American Securities Administrators Association (Aug. 23, 2018) ("NASAA Letter") (stating that the Proposed Interpretation is a "useful resource"); Comment Letter of Invesco (Aug. 7, 2018) ("Invesco Letter") (agreeing that "there are benefits to having a clear statement regarding the fiduciary duty that applies to an investment adviser").

[11] *See, e.g.*, Comment Letter of Pickard Djinis and Pisarri LLP (Aug. 7, 2018) ("Pickard Letter") (noting the Commission's "efforts to synthesize case law, legislative history, academic literature, prior Commission releases and other sources to produce a comprehensive explanation of the fiduciary standard of conduct"); Comment Letter of Dechert LLP (Aug. 7, 2018) ("Dechert Letter") ("It is crucial that any universal interpretation of an adviser's fiduciary duty be based on sound and time-tested principles. Given the difficulty of defining and encompassing all of an adviser's responsibilities to its clients, while also accommodating the diversity of advisory arrangements, interpretive issues will arise in the future."); Comment Letter of the Hedge Funds Subcommittee of the Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association (Aug. 24, 2018) ("ABA Letter") ("We note at

4

of the Proposed Interpretation.[12] Although most commenters agreed that an investment adviser's fiduciary duty comprises a duty of care and a duty of loyalty, as described in the Proposed Interpretation, they had differing views on aspects of the fiduciary duty and in some cases sought clarification on its application.[13]

Some commenters requested that we adopt rule text instead.[14] The relationship between an investment adviser and its client has long been based on fiduciary principles not generally set forth in specific statute or rule text. We believe that this principles-based approach should continue as it expresses broadly the standard to which investment advisers are held while allowing them flexibility to meet that standard in the context of their specific services. In our view, adopting rule text is not necessary to achieve our goal in this Final Interpretation of reaffirming and in some cases clarifying certain aspects of the fiduciary duty.

---

the outset that it is difficult to capture the nature of an investment adviser's fiduciary duty in a broad statement that has universal applicability.").

[12] *See, e.g.*, Comment Letter of L.A. Schnase (Jul. 30, 2018) (urging the Commission not to issue the Proposed Interpretation in final form, or at least not without substantial rewriting or reshaping); Comment Letter of Money Management Institute (Aug. 7, 2018) ("MMI Letter") (urging the Commission to "revise the interpretation so that it reflects the common law principles in which an investment adviser's fiduciary duty is grounded"); Dechert Letter (recommending that we withdraw the Proposed Interpretation and instead rely on existing authority and sources of law, as well as existing Commission practices for providing interpretive guidance, in order to define the source and scope of an investment adviser's fiduciary duty).

[13] *See, e.g.*, Comment Letter of Cambridge Investment Research Inc. (Aug. 7, 2018) ("Cambridge Letter") (stating that "greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability to craft such policies and procedures, as well as support the elimination of confusion for retail clients and investment professionals"); Comment Letter of Institutional Limited Partners Association (Aug. 6, 2018) ("ILPA Letter 1") ("Interpretation will provide more certainty regarding the fiduciary duties owed by private fund advisers to their clients."); Comment Letter of New York City Bar Association (Jun. 26, 2018) ("NY City Bar Letter") (stating that the uniform interpretation of an investment adviser's fiduciary duty is necessary).

[14] Some commenters suggested that we codify the Proposed Interpretation. *See, e.g.,* Comment Letter of Roy Tanga (Apr. 25, 2018); Comment Letter of Financial Engines (Aug. 6, 2018) ("Financial Engines Letter"); ILPA Letter 1; Comment Letter of AARP (Aug. 7, 2018) ("AARP Letter"); Comment Letter of Gordon Donohue (Aug. 6, 2018); Comment Letter of Financial Planning Coalition (Aug. 7, 2018) ("FPC Letter").

5

## II.  INVESTMENT ADVISERS' FIDUCIARY DUTY

The Advisers Act establishes a federal fiduciary duty for investment advisers.[15]  This

fiduciary duty is based on equitable common law principles and is fundamental to advisers'

relationships with their clients under the Advisers Act.[16]  The investment adviser's fiduciary duty

is broad and applies to the entire adviser-client relationship.[17]  The fiduciary duty to which

advisers are subject is not specifically defined in the Advisers Act or in Commission rules, but

reflects a Congressional recognition "of the delicate fiduciary nature of an investment advisory

relationship" as well as a Congressional intent to "eliminate, or at least to expose, all conflicts of

interest which might incline an investment adviser—consciously or unconsciously—to render

advice which was not disinterested."[18]  An adviser's fiduciary duty is imposed under the

---

[15]  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) ("Transamerica Mortgage v. Lewis") ("§ 206 establishes federal fiduciary standards to govern the conduct of investment advisers.") (quotation marks omitted); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing SEC v. Capital Gains, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); SEC v. Capital Gains, *supra* footnote 2; Amendments to Form ADV, Investment Advisers Act Release No. 3060 (July 28, 2010) ("Investment Advisers Act Release 3060") ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003) ("Investment Advisers Act Release 2106")).

[16]  *See* SEC v. Capital Gains, *supra* footnote 2 (discussing the history of the Advisers Act, and how equitable principles influenced the common law of fraud and changed the suits brought against a fiduciary, "which Congress recognized the investment adviser to be").

[17]  The Commission has previously recognized the broad scope of section 206 of the Advisers Act in a variety of contexts.  *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15; Timbervest, LLC, et al., Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) (" [O]nce an investment advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the advisory relationship."); *see also SEC v. Lauer*, 2008 WL 4372896, at 24 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'"); Thomas P. Lemke & Gerald T. Lins, Regulation of Investment Advisers (2013 ed.), at § 2:30 ("[T]he SEC has … applied [sections 206(1) and 206(2)] where fraud arose from an investment advisory relationship, even though the wrongdoing did not specifically involve securities.").

[18]  *See* SEC v. Capital Gains, *supra* footnote 2; *see also* In the Matter of Arleen W. Hughes, Exchange Act Release No. 4048 (Feb. 18, 1948) ("Arleen Hughes") (Commission Opinion) (discussing the relationship of

6

Advisers Act in recognition of the nature of the relationship between an investment adviser and a client and the desire "so far as is presently practicable to eliminate the abuses" that led to the enactment of the Advisers Act.[19] It is made enforceable by the antifraud provisions of the Advisers Act.[20]

An investment adviser's fiduciary duty under the Advisers Act comprises a duty of care and a duty of loyalty.[21] This fiduciary duty requires an adviser "to adopt the principal's goals,

---

trust and confidence between the client and a dual registrant and stating that the registrant was a fiduciary and subject to liability under the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934).

[19] *See* SEC v. Capital Gains, *supra* footnote 2 (noting that the "declaration of policy" in the original bill, which became the Advisers Act, declared that "the national public interest and the interest of investors are adversely affected … when the business of investment advisers is so conducted as to defraud or mislead investors, or to enable such advisers to relieve themselves of their fiduciary obligations to their clients. It is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, *are to mitigate and, so far as is presently practicable to eliminate* the abuses enumerated in this section") (citing S. 3580, 76th Cong., 3d Sess., § 202 and Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28) (emphasis added).

[20] *Id.*; Transamerica Mortgage v. Lewis, *supra* footnote 15 ("[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations."). Some commenters questioned the standard to which the Advisers Act holds investment advisers. *See, e.g.,* Comment Letter of Stark & Stark, PC (undated) ("The duty of care at common law and under the Advisers Act only requires that advisers not be negligent in performing their duties.") (internal citation omitted); Comment Letter of Institutional Limited Partners Association (Nov. 21, 2018) ("ILPA Letter 2") ("The Advisers Act standard is a lower simple 'negligence' standard."). Claims arising under Advisers Act section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence. *Robare Group, Ltd., et al. v. SEC*, 922 F.3d 468, 472(D.C. Cir. 2019) ("Robare v. SEC"); *SEC v. Steadman*, 967 F.2d 636, 643, n.5 (D.C. Cir. 1992) (citing SEC v. Capital Gains, *supra* footnote 2) ("[A] violation of § 206(2) of the Investment Advisers Act may rest on a finding of simple negligence."); *SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009) ("the government need not show intent to make out a section 206(2) violation"); *SEC v. Gruss*, 859 F. Supp. 2d 653, 669 (S.D.N.Y. 2012) ("Claims arising under Section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence."). However, claims arising under Advisers Act section 206(1) require scienter. *See, e.g.*, Robare v. SEC; *SEC v. Moran*, 922 F. Supp. 867, 896 (S.D.N.Y. 1996*); Carroll v. Bear, Stearns & Co.*, 416 F. Supp. 998, 1001 (S.D.N.Y. 1976).

[21] *See, e.g.*, Investment Advisers Act Release 2106, *supra* footnote 15. These duties were generally recognized by commenters. *See, e.g.*, Comment Letter of Consumer Federation of America (Aug. 7, 2018) ("CFA Letter"); Comment Letter of the Investment Adviser Association (Aug. 6, 2018) ("IAA Letter"); Comment Letter of Investments & Wealth Institute (Aug. 6, 2018); Comment Letter of Raymond James (Aug. 7, 2018); FPC Comment Letter. *But see* Dechert Letter (questioning the sufficiency of support for a duty of care).

7

objectives, or ends."[22]  This means the adviser must, at all times, serve the best interest of its

client and not subordinate its client's interest to its own.  In other words, the investment adviser

cannot place its own interests ahead of the interests of its client.  This combination of care and

loyalty obligations has been characterized as requiring the investment adviser to act in the "best

interest" of its client at all times.[23]  In our view, an investment adviser's obligation to act in the

best interest of its client is an overarching principle that encompasses both the duty of care and

the duty of loyalty.  As discussed in more detail below, in our view, the duty of care requires an

investment adviser to provide investment advice in the best interest of its client, based on the

client's objectives.  Under its duty of loyalty, an investment adviser must eliminate or make full

and fair disclosure of all conflicts of interest which might incline an investment adviser—

consciously or unconsciously—to render advice which is not disinterested such that a client can

provide informed consent to the conflict.[24]  We believe this is another part of an investment

adviser's obligation to act in the best interest of its client.

### A.  Application of Duty Determined by Scope of Relationship

An adviser's fiduciary duty is imposed under the Advisers Act in recognition of the

---

[22]   Arthur B. Laby, *The Fiduciary Obligations as the Adoption of Ends*, 56 Buffalo Law Review 99 (2008); *see also* Restatement (Third) of Agency, §2.02 Scope of Actual Authority (2006) (describing a fiduciary's authority in terms of the fiduciary's reasonable understanding of the principal's manifestations and objectives).

[23]   Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that "under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Investment Advisers Act Release 2106, *supra* footnote 15).  *See SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("SEC v. Tambone") ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund…"); *SEC v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y 1996) ("SEC v. Moran") ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").  Although most commenters agreed that an adviser has an obligation to act in its client's best interest, some questioned whether the Proposed Interpretation appropriately considered the best interest obligation as part of the duty of care, or whether it instead should be considered part of the duty of loyalty. *See, e.g.*, MMI Letter; Comment Letter of Investment Company Institute (Aug. 7, 2018) ("ICI Letter").

[24]   *See infra* footnotes 67-70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

nature of the relationship between an adviser and its client—a relationship of trust and

confidence.[25]  The adviser's fiduciary duty is principles-based and applies to the entire

relationship between the adviser and its client.  The fiduciary duty follows the contours of the

relationship between the adviser and its client, and the adviser and its client may shape that

relationship by agreement, provided that there is full and fair disclosure and informed consent.[26]

With regard to the scope of the adviser-client relationship, we recognize that investment advisers

provide a wide range of services, from a single financial plan for which a client may pay a one-

time fee, to ongoing portfolio management for which a client may pay a periodic fee based on

the value of assets in the portfolio.  Investment advisers also serve a large variety of clients, from

retail clients with limited assets and investment knowledge and experience to institutional clients

with very large portfolios and substantial knowledge, experience, and analytical resources.[27]  In

our experience, the principles-based fiduciary duty imposed by the Advisers Act has provided

sufficient flexibility to serve as an effective standard of conduct for investment advisers,

regardless of the services they provide or the types of clients they serve.

     Although all investment advisers owe each of their clients a fiduciary duty under the

Advisers Act, that fiduciary duty must be viewed in the context of the agreed-upon scope of the

---

[25]     *See, e.g.*, Hearings on S. 3580 before Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess. (leading investment advisers emphasized their relationship of "trust and confidence" with their clients); SEC v. Capital Gains, *supra* footnote 2 (citing same).

[26]     Several commenters asked that we clarify that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies through contract.  *See, e.g.*, MMI Letter; Financial Engines Letter; ABA Letter.

[27]     This Final Interpretation also applies to automated advisers, which are often colloquially referred to as "robo-advisers."  Automated advisers, like all SEC-registered investment advisers, are subject to all of the requirements of the Advisers Act, including the requirement that they provide advice consistent with the fiduciary duty they owe to their clients.  *See* Division of Investment Management, Robo Advisers, IM Guidance Update No. 2017-02 (Feb. 2017), *available at* https://www.sec.gov/investment/im-guidance-2017-02.pdf (describing Commission staff's guidance as to three distinct areas under the Advisers Act that automated advisers should consider, due to the nature of their business model, in seeking to comply with their obligations under the Advisers Act).

9

relationship between the adviser and the client. In particular, the specific obligations that flow from the adviser's fiduciary duty depend upon what functions the adviser, as agent, has agreed to assume for the client, its principal. For example, the obligations of an adviser providing comprehensive, discretionary advice in an ongoing relationship with a retail client (*e.g.*, monitoring and periodically adjusting a portfolio of equity and fixed income investments with limited restrictions on allocation) will be significantly different from the obligations of an adviser to a registered investment company or private fund where the contract defines the scope of the adviser's services and limitations on its authority with substantial specificity (*e.g.*, a mandate to manage a fixed income portfolio subject to specified parameters, including concentration limits and credit quality and maturity ranges).[28]

While the application of the investment adviser's fiduciary duty will vary with the scope of the relationship, the relationship in all cases remains that of a fiduciary to the client. In other words, an adviser's federal fiduciary duty may not be waived, though it will apply in a manner that reflects the agreed-upon scope of the relationship.[29] A contract provision purporting to waive the adviser's federal fiduciary duty generally, such as (i) a statement that the adviser will not act as a fiduciary, (ii) a blanket waiver of all conflicts of interest, or (iii) a waiver of any

---

[28]   *See, e.g., infra* text following footnote 35.

[29]   Because an adviser's federal fiduciary obligations are enforceable through section 206 of the Advisers Act, we would view a waiver of enforcement of section 206 as implicating section 215(a) of the Advisers Act, which provides that "any condition, stipulation or provision binding any person to waive compliance with any provision of this title. . . shall be void." *See also* Restatement (Third) of Agency, § 8.06 Principal's Consent (2006) ("[T]he law applicable to relationships of agency as defined in § 1.01 imposes mandatory limits on the circumstances under which an agent may be empowered to take disloyal action. These limits serve protective and cautionary purposes. Thus, an agreement that contains general or broad language purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is not likely to be enforceable. This is because a broadly sweeping release of an agent's fiduciary duty may not reflect an adequately informed judgment on the part of the principal; if effective, the release would expose the principal to the risk that the agent will exploit the agent's position in ways not foreseeable by the principal at the time the principal agreed to the release. In contrast, when a principal consents to specific transactions or to specified types of conduct by the agent, the principal has a focused opportunity to assess risks that are more readily identifiable.").

specific obligation under the Advisers Act, would be inconsistent with the Advisers Act,[30]

regardless of the sophistication of the client.[31]

---

[30]    *See* sections 206 and 215(a). Commenters generally agreed that a client cannot waive an investment adviser's fiduciary duty through agreement. *See* Dechert Letter; Comment Letter of Ropes & Gray LLP (Aug. 7, 2018) ("Ropes & Gray Letter"), at n.20; *see also supra* footnote 29. In the Proposed Interpretation, we stated that "the investment adviser cannot disclose or negotiate away, and the investor cannot waive, the federal fiduciary duty." One commenter disputed this broad statement, believing that it called into question "the ability of an investment adviser and client to define the scope of the adviser's services and duties." ABA Letter; *see also* Financial Engines Letter. We have modified this statement to clarify that a general waiver of the fiduciary duty would violate that duty and to provide examples of such a general waiver.

[31]    Some commenters mentioned a 2007 No-Action Letter in which staff indicated that whether a clause in an advisory agreement that purports to limit an adviser's liability under that agreement (a so-called "hedge clause") would violate sections 206(1) and 206(2) of the Advisers Act depends on all of the surrounding facts and circumstances. Heitman Capital Management, LLC, SEC Staff No-Action Letter (Feb. 12, 2007) ("Heitman Letter"). A few commenters indicated that the Heitman Letter expanded the ability of investment advisers to private funds, and potentially other sophisticated clients, to disclaim their fiduciary duties under state law in an advisory agreement. *See, e.g.*, ILPA Letter 1; ILPA Letter 2. The commenters' descriptions of the Heitman Letter suggest that it may have been applied incorrectly. The Heitman Letter does not address the scope or substance of an adviser's federal fiduciary duty; rather, it addresses the extent to which hedge clauses may be misleading in violation of the Advisers Act's antifraud provisions. Another commenter agreed with this reading of the Heitman Letter. *See* Comment Letter of American Investment Council (Feb. 25, 2019). In response to these comments, we express below the Commission's views about an adviser's obligations under sections 206(1) and 206(2) of the Advisers Act with respect to the use of hedge clauses. Accordingly, because we are expressing our views in this Final Interpretation, the Heitman Letter is withdrawn.

    This Final Interpretation makes clear that an adviser's federal fiduciary duty may not be waived, though its application may be shaped by agreement. This Final Interpretation does not take a position on the scope or substance of any fiduciary duty that applies to an adviser under applicable state law. *See supra* footnote 3. The question of whether a hedge clause violates the Advisers Act's antifraud provisions depends on all of the surrounding facts and circumstances, including the particular circumstances of the client (*e.g.*, sophistication). In our view, however, there are few (if any) circumstances in which a hedge clause in an agreement with a retail client would be consistent with those antifraud provisions, where the hedge clause purports to relieve the adviser from liability for conduct as to which the client has a non-waivable cause of action against the adviser provided by state or federal law. Such a hedge clause generally is likely to mislead those retail clients into not exercising their legal rights, in violation of the antifraud provisions, even where the agreement otherwise specifies that the client may continue to retain its non-waivable rights. Whether a hedge clause in an agreement with an institutional client would violate the Advisers Act's antifraud provisions will be determined based on the particular facts and circumstances. To the extent that a hedge clause creates a conflict of interest between an adviser and its client, the adviser must address the conflict as required by its duty of loyalty.

11

### B. Duty of Care

As fiduciaries, investment advisers owe their clients a duty of care.[32] The Commission

has discussed the duty of care and its components in a number of contexts.[33] The duty of care

includes, among other things: (i) the duty to provide advice that is in the best interest of the

client, (ii) the duty to seek best execution of a client's transactions where the adviser has the

responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice

and monitoring over the course of the relationship.

### 1. Duty to Provide Advice that is in the Best Interest of the Client

The duty of care includes a duty to provide investment advice that is in the best interest

of the client, including a duty to provide advice that is suitable for the client.[34] In order to

---

[32] *See* Investment Advisers Act Release 2106, *supra* footnote 15 (stating that under the Advisers Act, "an adviser is a fiduciary that owes each of its clients duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting," which is the subject of the release, and citing SEC v. Capital Gains *supra* footnote 2, to support this point). This Final Interpretation does not address the specifics of how an investment adviser might satisfy its fiduciary duty when voting proxies. *See also* Restatement (Third) of Agency, § 8.08 (discussing the duty of care that an agent owes its principal as a matter of common law); Tamar Frankel & Arthur B. Laby, The Regulation of Money Managers (updated 2017) ("Advice can be divided into three stages. The first determines the needs of the particular client. The second determines the portfolio strategy that would lead to meeting the client's needs. The third relates to the choice of securities that the portfolio would contain. The duty of care relates to each of the stages and depends on the depth or extent of the advisers' obligation towards their clients.").

[33] *See, e.g.*, Suitability of Investment Advice Provided by Investment Advisers; Custodial Account Statements for Certain Advisory Clients, Investment Advisers Act Release No. 1406 (Mar. 16, 1994) ("Investment Advisers Act Release 1406") (stating that advisers have a duty of care and discussing advisers' suitability obligations); Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 23170 (Apr. 28, 1986) ("Exchange Act Release 23170") ("an adviser, as a fiduciary, owes its clients a duty of obtaining the best execution on securities transactions"). We highlight certain contexts, but not all, in which the Commission has addressed the duty of care. *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15.

[34] In 1994, the Commission proposed a rule that would have made express the fiduciary obligation of investment advisers to make only suitable recommendations to a client. Investment Advisers Act Release 1406, *supra* footnote 33. Although never adopted, the rule was designed, among other things, to reflect the Commission's interpretation of an adviser's *existing* suitability obligation under the Advisers Act. In addition, we do not cite Investment Advisers Act Release 1406 as the source of authority for the view we express here, which at least one comment letter suggested, but cite it merely to show that the Commission has long held this view. *See* Comment Letter of the Managed Funds Association and the Alternative Investment Management Association (Aug. 7, 2018) (indicating that the Commission's failure to adopt the proposed suitability rule means "investment advisers are not subject to an express 'suitability' standard

provide such advice, an adviser must have a reasonable understanding of the client's objectives.

The basis for such a reasonable understanding generally would include, for retail clients, an

understanding of the investment profile, or for institutional clients, an understanding of the

investment mandate.[35]   The duty to provide advice that is in the best interest of the client based

on a reasonable understanding of the client's objectives is a critical component of the duty of

care.

   *Reasonable Inquiry into Client's Objectives*

   How an adviser develops a reasonable understanding will vary based on the specific facts

and circumstances, including the nature of the client, the scope of the adviser-client relationship,

and the nature and complexity of the anticipated investment advice.

   In order to develop a reasonable understanding of a retail client's objectives, an adviser

should, at a minimum, make a reasonable inquiry into the client's financial situation, level of

financial sophistication, investment experience, and financial goals (which we refer to

collectively as the retail client's "investment profile").  For example, an adviser undertaking to

formulate a comprehensive financial plan for a retail client would generally need to obtain a

---

under existing regulation").  We believe that this obligation to make only suitable recommendations to a client is part of an adviser's fiduciary duty to act in the best interest of its client.  Accordingly, an adviser must provide investment advice that is suitable for its client in providing advice that is in the best interest of its client.  *See* SEC v. Tambone, *supra* footnote 23 ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund…."); SEC v. Moran*, supra* footnote 23 ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").

[35]   Several commenters stated that the duty to make a reasonable inquiry into a client's investment profile may not apply in the institutional client context. *See, e.g.,* Comment Letter of BlackRock, Inc. (Aug. 7, 2018); Comment Letter of Teachers Insurance and Annuity Association of America (Aug. 7, 2018); Comment Letter of Allianz Global Investors U.S. LLC (Aug. 7, 2018) ("Allianz Letter"); Comment Letter of John Hancock Life Insurance Company (U.S.A.) (Aug. 3, 2018).  Accordingly, we are describing the duty as a duty to have a reasonable understanding of the client's objectives.  While not every client will have an investment profile, every client will have objectives.  For example, an institutional client's objectives may be ascertained through its investment mandate.

13

range of personal and financial information about the client such as current income, investments, assets and debts, marital status, tax status, insurance policies, and financial goals.[36]

In addition, it will generally be necessary for an adviser to a retail client to update the client's investment profile in order to maintain a reasonable understanding of the client's objectives and adjust the advice to reflect any changed circumstances.[37]  The frequency with which the adviser must update the client's investment profile in order to consider changes to any advice the adviser provides would itself turn on the facts and circumstances, including whether the adviser is aware of events that have occurred that could render inaccurate or incomplete the investment profile on which the adviser currently bases its advice.  For instance, in the case of a financial plan where the investment adviser also provides advice on an ongoing basis, a change in the relevant tax law or knowledge that the client has retired or experienced a change in marital status could trigger an obligation to make a new inquiry.

By contrast, in providing investment advice to institutional clients, the nature and extent of the reasonable inquiry into the client's objectives generally is shaped by the specific investment mandates from those clients.  For example, an investment adviser engaged to advise on an institutional client's investment grade bond portfolio would need to gain a reasonable understanding of the client's objectives within that bond portfolio, but not the client's objectives

---

[36]  Investment Advisers Act Release 1406, *supra* footnote 33.  After making a reasonable inquiry into the client's investment profile, it generally would be reasonable for an adviser to rely on information provided by the client (or the client's agent) regarding the client's financial circumstances, and an adviser should not be held to have given advice not in its client's best interest if it is later shown that the client had misled the adviser concerning the information on which the advice was based.

[37]  Such updating would not be needed with one-time investment advice.  In the Proposed Interpretation, we stated that an adviser "must" update a client's investment profile in order to adjust the advice to reflect any changed circumstances.  We believe that any obligation to update a client's investment profile, like the nature and extent of the reasonable inquiry into a retail client's objectives, turns on what is reasonable under the circumstances.  Accordingly, we have revised the wording of this statement in this Final Interpretation.

14

within its entire investment portfolio. Similarly, an investment adviser whose client is a registered investment company or a private fund would need to have a reasonable understanding of the fund's investment guidelines and objectives. For advisers acting on specific investment mandates for institutional clients, particularly funds, we believe that the obligation to update the client's objectives would not be applicable except as may be set forth in the advisory agreement.

*Reasonable belief that advice is in the best interest of the client*

An investment adviser must have a reasonable belief that the advice it provides is in the best interest of the client based on the client's objectives. The formation of a reasonable belief would involve considering, for example, whether investments are recommended only to those clients who can and are willing to tolerate the risks of those investments and for whom the potential benefits may justify the risks.[38] Whether the advice is in a client's best interest must be evaluated in the context of the portfolio that the adviser manages for the client and the client's objectives.

For example, when an adviser is advising a retail client with a conservative investment objective, investing in certain derivatives may be in the client's best interest when they are used to hedge interest rate risk or other risks in the client's portfolio, whereas investing in certain directionally speculative derivatives on their own may not. For that same client, investing in a particular security on margin may not be in the client's best interest, even if investing in that same security without the use of margin may be in the client's best interest. However, for

---

[38] Item 8 of Part 2A of Form ADV requires an investment adviser to describe its methods of analysis and investment strategies and disclose that investing in securities involves risk of loss which clients should be prepared to bear. This item also requires that an adviser explain the material risks involved for each significant investment strategy or method of analysis it uses and particular type of security it recommends, with more detail if those risks are significant or unusual. Accordingly, investment advisers are required to identify and explain certain risks involved in their investment strategies and the types of securities they recommend. An investment adviser needs to consider those same risks in determining the clients to which the adviser recommends those investments.

15

example, when advising a financially sophisticated client, such as a fund or other sophisticated client that has an appropriate risk tolerance, it may be in the best interest of the client to invest in such derivatives or in securities on margin, or to invest in other complex instruments or other products that may have limited liquidity.

Similarly, when an adviser is assessing whether high risk products—such as penny stocks or other thinly-traded securities—are in a retail client's best interest, the adviser should generally apply heightened scrutiny to whether such investments fall within the retail client's risk tolerance and objectives. As another example, complex products such as inverse or leveraged exchange-traded products that are designed primarily as short-term trading tools for sophisticated investors may not be in the best interest of a retail client absent an identified, short-term, client-specific trading objective and, to the extent that such products are in the best interest of a retail client initially, they would require daily monitoring by the adviser.[39]

A reasonable belief that investment advice is in the best interest of a client also requires that an adviser conduct a reasonable investigation into the investment sufficient not to base its advice on materially inaccurate or incomplete information.[40] We have taken enforcement action where an investment adviser did not independently or reasonably investigate securities before recommending them to clients.[41]

---

[39]    *See* Exchange-Traded Funds, Securities Act Release No. 10515 (June 28, 2018); SEC staff and FINRA, Investor Alert, Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold Investors (Aug. 1, 2009); SEC Office of Investor Education and Advocacy, Investor Bulletin: Exchange-Traded Funds (ETFs) (Aug. 2012); *see also* FINRA Regulatory Notice 09-31, Non-Traditional ETFs – FINRA Reminds Firms of Sales Practice Obligations Relating to Leveraged and Inverse Exchange-Traded Funds (June 2009).

[40]    *See, e.g.*, Concept Release on the U.S. Proxy System, Investment Advisers Act Release No. 3052 (July 14, 2010) (indicating that a fiduciary "has a duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information").

[41]    *See, e.g.*, In the Matter of Larry C. Grossman, Investment Advisers Act Release No. 4543 (Sept. 30, 2016) (Commission Opinion) ("*In re* Grossman") (in connection with imposing liability on a principal of a

16

The cost (including fees and compensation) associated with investment advice would generally be one of many important factors—such as an investment product's or strategy's investment objectives, characteristics (including any special or unusual features), liquidity, risks and potential benefits, volatility, likely performance in a variety of market and economic conditions, time horizon, and cost of exit—to consider when determining whether a security or investment strategy involving a security or securities is in the best interest of the client. When considering similar investment products or strategies, the fiduciary duty does not necessarily require an adviser to recommend the lowest cost investment product or strategy.

Moreover, an adviser would not satisfy its fiduciary duty to provide advice that is in the client's best interest by simply advising its client to invest in the lowest cost (to the client) or least remunerative (to the investment adviser) investment product or strategy without any further analysis of other factors in the context of the portfolio that the adviser manages for the client and the client's objective. Rather, the adviser could recommend a higher-cost investment or strategy if the adviser reasonably concludes that there are other factors about the investment or strategy that outweigh cost and make the investment or strategy in the best interest of the client, in light of that client's objectives. For example, it might be consistent with an adviser's fiduciary duty to advise a client with a high risk tolerance and significant investment experience to invest in a private equity fund with relatively higher fees and significantly less liquidity as compared with a fund that invests in publicly-traded companies if the private equity fund was in the client's best

---

registered investment adviser for recommending offshore private investment funds to clients), *stayed in part,* Investment Advisers Act No. 4563 (Nov. 1, 2016), *response to remand,* Investment Advisers Act Release No. 4871 (Mar. 29, 2018) (reinstating the Sept. 30, 2016 opinion and order, except with respect to the disgorgement and prejudgment interest in light of the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017)).

000718

interest because it provided exposure to an asset class that was appropriate in the context of the client's overall portfolio.

An adviser's fiduciary duty applies to all investment advice the investment adviser provides to clients, including advice about investment strategy, engaging a sub-adviser, and account type.[42] Advice about account type includes advice about whether to open or invest through a certain type of account (*e.g.*, a commission-based brokerage account or a fee-based advisory account) and advice about whether to roll over assets from one account (*e.g.*, a retirement account) into a new or existing account that the adviser or an affiliate of the adviser manages.[43] In providing advice about account type, an adviser should consider all types of accounts offered by the adviser and acknowledge to a client when the account types the adviser offers are not in the client's best interest.[44]

---

[42]  In addition, with respect to prospective clients, investment advisers have antifraud liability under section 206 of the Advisers Act, which, among other things, applies to transactions, practices, or courses of business which operate as a fraud or deceit upon prospective clients, including those regarding investment strategy, engaging a sub-adviser, and account type. We believe that, in order to avoid liability under this antifraud provision, an investment adviser should have sufficient information about the prospective client and its objectives to form a reasonable basis for advice before providing any advice about these matters. At the point in time at which the prospective client becomes a client of the investment adviser (*e.g.*, at account opening), the fiduciary duty applies. Accordingly, while advice to prospective clients about these matters must comply with the antifraud provisions under section 206 of the Advisers Act, the adviser must also satisfy its fiduciary duty with respect to any such advice (*e.g.*, regarding account type) when a prospective client becomes a client.

[43]  We consider advice about "rollovers" to include advice about account type, in addition to any advice regarding the investments or investment strategy with respect to the assets to be rolled over, as the advice necessarily includes the advice about the account type into which assets are to be rolled over. As noted below, as a general matter, an adviser's duty to monitor extends to all personalized advice it provides to the client, including, for example, in an ongoing relationship, an evaluation of whether a client's account or program type (for example, a wrap account) continues to be in the client's best interest. *See infra* text accompanying footnote 52.

[44]  Accordingly, in providing advice to a client or customer about account type, a financial professional who is dually licensed (*i.e.*, an associated person of a broker-dealer and a supervised person of an investment adviser (regardless of whether the professional works for a dual registrant, affiliated firms, or unaffiliated firms)) should consider all types of accounts offered (*i.e.*, both brokerage accounts and advisory accounts) when determining whether the advice is in the client's best interest. A financial professional who is only a supervised person of an investment adviser (regardless of whether that advisory firm is a dual registrant or affiliated with a broker-dealer) may only recommend an advisory account the adviser offers when the account is in the client's best interest. If a financial professional who is only a supervised person of an

### 2. Duty to Seek Best Execution

An investment adviser's duty of care includes a duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades (typically in the case of discretionary accounts).[45] In meeting this obligation, an adviser must seek to obtain the execution of transactions for each of its clients such that the client's total cost or proceeds in each transaction are the most favorable under the circumstances. An adviser fulfills this duty by seeking to obtain the execution of securities transactions on behalf of a client with the goal of maximizing value for the client under the particular circumstances occurring at the time of the transaction. Maximizing value encompasses more than just minimizing cost. When seeking best execution, an adviser should consider "the full range and quality of a broker's services in placing brokerage including, among other things, the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness" to the adviser.[46] In other words, the "determinative factor" is not the lowest possible commission cost, "but whether the transaction represents the best qualitative execution."[47] Further, an

---

investment adviser chooses to advise a client to consider a non-advisory account (or to speak with other personnel at a dual registrant or affiliate about a non-advisory account), that advice should be in the best interest of the client. This same framework applies in the case of a prospective client, but any advice or recommendation given to a prospective client would be subject to the antifraud provisions of the federal securities laws. *See supra* footnote 42 and Reg. BI Adoption, *supra* footnote 3.

[45] *See* Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, Exchange Act Release No. 54165 (July 18, 2006) (stating that investment advisers have "best execution obligations"); Investment Advisers Act Release 3060, *supra* footnote 15 (discussing an adviser's best execution obligations in the context of directed brokerage arrangements and disclosure of soft dollar practices); *see also* Advisers Act rule 206(3)-2(c) (referring to adviser's duty of best execution of client transactions).

[46] Exchange Act Release 23170, *supra* footnote 33.

[47] *Id.*

19

investment adviser should "periodically and systematically" evaluate the execution it is receiving

for clients.[48]

### 3. Duty to Provide Advice and Monitoring over the Course of the Relationship

An investment adviser's duty of care also encompasses the duty to provide advice and

monitoring at a frequency that is in the best interest of the client, taking into account the scope of

the agreed relationship.[49] For example, when the adviser has an ongoing relationship with a

client and is compensated with a periodic asset-based fee, the adviser's duty to provide advice

and monitoring will be relatively extensive as is consistent with the nature of the relationship.[50]

Conversely, absent an express agreement regarding the adviser's monitoring obligation, when

the adviser and the client have a relationship of limited duration, such as for the provision of a

---

[48]     *Id*. The Advisers Act does not prohibit advisers from using an affiliated broker to execute client trades. However, the adviser's use of such an affiliate involves a conflict of interest that must be fully and fairly disclosed and the client must provide informed consent to the conflict. *See also* Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1732 (Jul. 17, 1998) (discussing application of section 206(3) of the Advisers Act to certain principal and agency transactions). Two commenters requested that we prescribe specific obligations related to best execution. Comment Letter of the Healthy Markets Association (Aug. 7, 2018); Comment Letter of ICE Data Services (Aug. 7, 2018). However, prescribing specific requirements of how an adviser might satisfy its best execution obligations is outside of the scope of this Final Interpretation.

[49]     *Cf.* SEC v. Capital Gains, *supra* footnote 2 (describing advisers' "basic function" as "furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments" (quoting Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28)). *Cf.* Barbara Black, *Brokers and Advisers-What's in a Name?*, 32 Fordham Journal of Corporate and Financial Law XI (2005) ("[W]here the investment adviser's duties include management of the account, [the adviser] is under an obligation to monitor the performance of the account and to make appropriate changes in the portfolio."); Arthur B. Laby, *Fiduciary Obligations of Broker-Dealers and Investment Advisers*, 55 Villanova Law Review 701 (2010) ("Laby Villanova Article") (stating that the scope of an adviser's activity can be altered by contract and that an adviser's fiduciary duty would be commensurate with the scope of the relationship) (internal citations omitted).

[50]     However, an adviser and client may scope the frequency of the adviser's monitoring (*e.g.*, agreement to monitor quarterly or monthly and as appropriate in between based on market events), provided that there is full and fair disclosure and informed consent. We consider the frequency of monitoring, as well as any other material facts relating to the agreed frequency, such as whether there will also be interim monitoring when there are market events relevant to the client's portfolio, to be a material fact relating to the advisory relationship about which an adviser must make full and fair disclosure and obtain informed consent as required by its fiduciary duty.

20

one-time financial plan for a one-time fee, the adviser is unlikely to have a duty to monitor. In other words, in the absence of any agreed limitation or expansion, the scope of the duty to monitor will be indicated by the duration and nature of the agreed advisory arrangement.[51] As a general matter, an adviser's duty to monitor extends to all personalized advice it provides to the client, including, for example, in an ongoing relationship, an evaluation of whether a client's account or program type (for example, a wrap account) continues to be in the client's best interest.[52]

### C. Duty of Loyalty

The duty of loyalty requires that an adviser not subordinate its clients' interests to its own.[53] In other words, an investment adviser must not place its own interest ahead of its client's interests.[54] To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients

---

[51]     *See also* Laby Villanova Article, *supra* footnote 49, at 728 (2010) ("If an adviser has agreed to provide continuous supervisory services, the scope of the adviser's fiduciary duty entails a continuous, ongoing duty to supervise the client's account, regardless of whether any trading occurs. This feature of the adviser's duty, even in a non-discretionary account, contrasts sharply with the duty of a broker administering a non-discretionary account, where no duty to monitor is required.") (internal citations omitted).

[52]     Investment advisers also may consider whether written policies and procedures relating to monitoring would be appropriate under Advisers Act rule 206(4)-7, which requires any investment adviser registered or required to be registered under the Advisers Act to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules thereunder by the adviser and its supervised persons.

[53]     Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that "[u]nder the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Investment Advisers Act Release 2106, *supra* footnote 15). The duty of loyalty applies not just to advice regarding potential investments, but to all advice the investment adviser provides to an existing client, including advice about investment strategy, engaging a sub-adviser, and account type. *See supra* text accompanying footnotes 42-43.

[54]     For example, an adviser cannot favor its own interests over those of a client, whether by favoring its own accounts or by favoring certain client accounts that pay higher fee rates to the adviser over other client accounts. The Commission has brought numerous enforcement actions against advisers that allocated trades to their own accounts and allocated less favorable or unprofitable trades to their clients' accounts. *See, e.g., SEC v. Strategic Capital Management, LLC and Michael J. Breton*, Litigation Release No. 23867 (June 23, 2017) (partial settlement) (adviser placed trades through a master brokerage account and then allocated profitable trades to adviser's account while placing unprofitable trades into the client accounts in

21

of all material facts relating to the advisory relationship.[55] Material facts relating to the advisory relationship include the capacity in which the firm is acting with respect to the advice provided. This will be particularly relevant for firms or individuals that are dually registered as broker-dealers and investment advisers and who serve the same client in both an advisory and a brokerage capacity. Thus, such firms and individuals generally should provide full and fair disclosure about the circumstances in which they intend to act in their brokerage capacity and the circumstances in which they intend to act in their advisory capacity. This disclosure may be accomplished through a variety of means, including, among others, written disclosure at the beginning of a relationship that clearly sets forth when the dual registrant would act in an advisory capacity and how it would provide notification of any changes in capacity.[56] Similarly, a dual registrant acting in its advisory capacity should disclose any circumstances under which its advice will be limited to a menu of certain products offered through its affiliated broker-dealer or affiliated investment adviser.

---

violation of fiduciary duty and contrary to disclosures). In the Proposed Interpretation, we stated that the duty of loyalty requires an adviser to "put its client's interest first." One commenter suggested that the requirement of an adviser to put its client's interest "first" is very different from a requirement not to "subordinate" or "subrogate" clients' interests, and is inconsistent with how the duty of loyalty had been applied in the past. *See* Comment Letter of the Asset Management Group of the Securities Industry and Financial Markets Association (Aug. 7, 2018) ("SIFMA AMG Letter"). Accordingly, we have revised the description of the duty of loyalty in this Final Interpretation to be more consistent with how we have previously described the duty. *See* Investment Advisers Act Release 3060, *supra* footnote 15 ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own.") (citing Investment Advisers Act Release 2106, *supra* footnote 15). In practice, referring to putting a client's interest first is a plain English formulation commonly used by investment advisers to explain their duty of loyalty in a way that may be more understandable to retail clients.

[55]  *See* SEC v. Capital Gains, *supra* footnote 2 ("Failure to disclose material facts must be deemed fraud or deceit within its intended meaning."); Investment Advisers Act Release 3060, *supra* footnote 15 ("as a fiduciary, an adviser has an ongoing obligation to inform its clients of any material information that could affect the advisory relationship"); *see also* General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship.").

[56]  *See also* Reg. BI Adoption, *supra* footnote 3, at 99.

22

In addition, an adviser must eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.[57] We believe that while full and fair disclosure of all material facts relating to the advisory relationship or of conflicts of interest and a client's informed consent prevent the presence of those material facts or conflicts themselves from violating the adviser's fiduciary duty, such disclosure and consent do not themselves satisfy the adviser's duty to act in the client's best interest.[58] To illustrate what

---

[57]    In the Proposed Interpretation, we stated that an adviser must seek to avoid conflicts of interest with its clients. Proposed Interpretation, *supra* footnote 6. Some commenters requested clarity on what it means to "seek to avoid" conflicts of interest. *See, e.g.,* Comment Letter of Schulte Roth & Zabel LLP (Aug. 8, 2018); ABA Letter (stating that this wording could be read to require an adviser to first seek to avoid a conflict, before addressing a conflict through disclosure, rather than being able to provide full and fair disclosure of a conflict, and only seek avoidance if the conflict cannot be addressed through disclosure). The Commission first used this phrasing when adopting amendments to the Form ADV Part 2 instructions. *See* Investment Advisers Act Release 3060, *supra* footnote 15 and General Instruction 3 to Part 2 of Form ADV ("As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship."). The release adopting this instruction clarifies the Commission's intent that it capture the fiduciary duty described in SEC v. Capital Gains and Arleen Hughes. *See* Investment Advisers Act Release 3060, *supra* footnote 15, at n.4 and accompanying text (citing SEC v. Capital Gains, *supra* footnote 2, and Arleen Hughes, *supra* footnote 18, as the basis of this language). Both of these cases emphasized that the adviser, as a fiduciary, should seek to avoid conflicts, but at a minimum must make full and fair disclosure of the conflict and obtain the client's informed consent. *See* SEC v. Capital Gains, *supra* footnote 2 ("The Advisers Act thus reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested."); Arleen Hughes, *supra* footnote 18 ("Since loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal" but if a fiduciary "chooses to assume a role in which she is motivated by conflicting interests, . . . she may do so if, but only if, she obtains her client's consent after disclosure . . ."). We believe the Commission's reference to "seek to avoid" conflicts in the Form ADV Part 2 instructions is consistent with the Final Interpretation's statement that an adviser "must eliminate or at least expose all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested" as well as the substantively identical statements in SEC v. Capital Gains, *supra* footnote 2, and Arleen Hughes, *supra* footnote 18. While an adviser may satisfy its duty of loyalty by making full and fair disclosure of conflicts of interest and obtaining the client's informed consent, an adviser is prohibited from overreaching or taking unfair advantage of a client's trust.

[58]    As noted above, an investment adviser's obligation to act in the best interest of its client is an overarching principle that encompasses both the duty of care and the duty of loyalty. *See* SEC v. Tambone, *supra* footnote 23 (stating that Advisers Act section 206 "imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . . and *includes* an obligation to provide 'full and fair disclosure of all material facts'") (emphasis added) (citing SEC v. Capital Gains, *supra* footnote 2). We describe

constitutes full and fair disclosure, we are providing the following guidance on (i) the appropriate level of specificity, including the appropriateness of stating that an adviser "may" have a conflict, and (ii) considerations for disclosure regarding conflicts related to the allocation of investment opportunities among eligible clients.

In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent.[59] For example, it would be inadequate to disclose that the adviser has "other clients" without describing how the adviser will manage conflicts between clients if and when they arise, or to disclose that the adviser has "conflicts" without further description.

---

above in this Final Interpretation how the application of an investment adviser's fiduciary duty to its client will vary with the scope of the advisory relationship. *See supra* section II.A.

[59]   Arleen Hughes, *supra* footnote 18, at 4 and 8 (stating, "[s]ince loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal. To prevent any conflict and the possible subordination of this duty to act solely for the benefit of his principal, a fiduciary at common law is forbidden to deal as an adverse party with his principal. An exception is made, however, where the principal gives his informed consent to such dealings," and adding that, "[r]egistrant has an affirmative obligation to disclose all material facts to her clients in a manner which is clear enough so that a client is fully apprised of the facts and is in a position to give his informed consent."); *see also Hughes v. Securities and Exchange Commission*, 174 F.2d 969 (1949) (affirming the SEC decision in Arleen Hughes); General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them"); Investment Advisers Act Release 3060, *supra* footnote 15; Restatement (Third) of Agency §8.06 ("Conduct by an agent that would otherwise constitute a breach of duty as stated in §§ 8.01, 8.02, 8.03, 8.04, and 8.05 [referencing the fiduciary duty] does not constitute a breach of duty if the principal consents to the conduct, provided that (a) in obtaining the principal's consent, the agent (i) acts in good faith, (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and (iii) otherwise deals fairly with the principal; and (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship."). *See infra* footnotes 67-70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

24

Similarly, disclosure that an adviser "may" have a particular conflict, without more, is not adequate when the conflict actually exists.[60] For example, we would consider the use of "may" inappropriate when the conflict exists with respect to some (but not all) types or classes of clients, advice, or transactions without additional disclosure specifying the types or classes of clients, advice, or transactions with respect to which the conflict exists. In addition, the use of "may" would be inappropriate if it simply precedes a list of all possible or potential conflicts regardless of likelihood and obfuscates actual conflicts to the point that a client cannot provide informed consent. On the other hand, the word "may" could be appropriately used to disclose to a client a potential conflict that does not currently exist but might reasonably present itself in the future.[61]

Whether the disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the material fact or conflict. Full and fair disclosure for an institutional client (including the specificity, level of detail, and explanation of terminology) can differ, in some cases significantly, from full and fair disclosure for a retail client because institutional clients generally have a greater capacity and more resources than

---

[60] We have brought enforcement actions in such cases. *See, e.g.,* In the Matter of The Robare Group, Ltd., et al., Investment Advisers Act Release No. 4566 (Nov. 7, 2016) (Commission Opinion) (finding, among other things, that adviser's disclosure that it *may* receive a certain type of compensation was inadequate because it did not reveal that the adviser actually had an arrangement pursuant to which it received fees that presented a potential conflict of interest); *aff'd in part and rev'd in part on other grounds Robare* v. SEC, *supra* footnote 20; *In re Grossman, supra* footnote 41 (indicating that "the use of the prospective 'may' in [the relevant Form ADV disclosures] is misleading because it suggested the mere possibility that [the broker] would make a referral and/or be paid 'referral fees' at a later point, when in fact a commission-sharing arrangement was already in place and generating income"). *Cf. Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) ("The Commission noted the critical distinction between disclosing the risk that a future event *might* occur and disclosing actual knowledge the event *will* occur.") (emphasis in original). For Form ADV Part 2 purposes, advisers are instructed that when they have a conflict or engage in a practice with respect to some (but not all) types or classes of clients, advice, or transactions, to indicate as such rather than disclosing that they "may" have the conflict or engage in the practice. General Instruction 2 to Part 2 of Form ADV.

[61] We have added this example of a circumstance where "may" could be appropriately used in response to the request of some commenters. *See, e.g.,* Pickard Letter; ICI Letter; Ropes & Gray Letter; IAA Letter.

25

retail clients to analyze and understand complex conflicts and their ramifications.[62]

Nevertheless, regardless of the nature of the client, the disclosure must be clear and detailed

enough for the client to make an informed decision to consent to the conflict of interest or reject

it.

When allocating investment opportunities among eligible clients, an adviser may face

conflicts of interest either between its own interests and those of a client or among different

clients.[63] If so, the adviser must eliminate or at least expose through full and fair disclosure the

conflicts associated with its allocation policies, including how the adviser will allocate

investment opportunities, such that a client can provide informed consent.[64] When allocating

investment opportunities, an adviser is permitted to consider the nature and objectives of the

client and the scope of the relationship.[65] An adviser need not have *pro rata* allocation policies,

or any particular method of allocation, but, as with other conflicts and material facts, the

---

[62]     *Arleen Hughes, supra* footnote 18 (the "method and extent of disclosure depends upon the particular client involved," and an unsophisticated client may require "a more extensive explanation than the informed investor").

[63]     *See* Restatement (Third) of Agency, § 8.01 General Fiduciary Principle (2006) ("Unless the principal consents, the general fiduciary principle, as elaborated by the more specific duties of loyalty stated in §§ 8.02 to 8.05, also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.").

[64]     The Commission has brought numerous enforcement actions alleging that advisers unfairly allocated client trades to preferred clients without making full and fair disclosure. *See* Staff of the U.S. Securities and Exchange Commission, *Study on Investment Advisers and Broker-Dealers As Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act* (Jan. 2011), *available at* https://www.sec.gov/news/studies/2011/913studyfinal.pdf, at 23–24 (citing enforcement actions). This Final Interpretation sets forth the Commission's views regarding what constitutes full and fair disclosure. *See, e.g., supra* text accompanying footnote 59; *see also* Barry Barbash and Jai Massari, *The Investment Advisers Act of 1940; Regulation by Accretion*, 39 Rutgers Law Journal 627 (2008) (stating that under section 206 of the Advisers Act and traditional notions of fiduciary and agency law, an adviser must not give preferential treatment to some clients or systematically exclude eligible clients from participating in specific opportunities without providing the clients with appropriate disclosure regarding the treatment).

[65]     An adviser and a client may even agree that certain investment opportunities or categories of investment opportunities will not be allocated or offered to a client.

26

adviser's allocation practices must not prevent it from providing advice that is in the best interest of its clients.[66]

While most commenters agreed that informed consent is a component of the fiduciary duty, a few commenters objected to what they saw as subjectivity in the use of the term "informed" to describe a client's consent to a disclosed conflict.[67] The fact that disclosure must be full and fair such that a client can provide informed consent does not require advisers to make an affirmative determination that a particular client understood the disclosure and that the client's consent to the conflict of interest was informed. Rather, disclosure should be designed to put a client in a position to be able to understand and provide informed consent to the conflict of interest. A client's informed consent can be either explicit or, depending on the facts and circumstances, implicit.[68] We believe, however, that it would not be consistent with an adviser's fiduciary duty to infer or accept client consent where the adviser was aware, or reasonably should have been aware, that the client did not understand the nature and import of the conflict.[69]

---

[66]     In the Proposed Interpretation, we stated that "in allocating investment opportunities among eligible clients, an adviser must treat all clients fairly." Some commenters interpreted this statement to mean that it would be impermissible for an adviser to allocate a particular investment to one eligible client instead of a second eligible client, even when the second client had received full and fair disclosure and provided informed consent to such an investment being allocated to the first client. *See, e.g.,* Ropes & Gray Letter; SIFMA AMG Letter. We have removed that sentence from this Final Interpretation and replaced it with this discussion that clarifies our views regarding allocation of investment opportunities.

[67]     *See, e.g.,* Comment Letter of LPL Financial LLC (Aug. 7, 2018); Ropes & Gray Letter.

[68]     We do not interpret an adviser's fiduciary duty to require that full and fair disclosure or informed consent be achieved in a written advisory contract or otherwise in writing. For example, an adviser could provide a client full and fair disclosure of all material facts relating to the advisory relationship as well as full and fair disclosure of all conflicts of interest which might incline the adviser, consciously or unconsciously, to render advice that was not disinterested, through a combination of Form ADV and other disclosure and the client could implicitly consent by entering into or continuing the investment advisory relationship with the adviser.

[69]     *See* Arleen Hughes, *supra* footnote 18 ("Registrant cannot satisfy this duty by executing an agreement with her clients which the record shows some clients do not understand and which, in any event, does not contain the essential facts which she must communicate."). In the Proposed Interpretation, we stated that inferring or accepting client consent to a conflict would not be consistent with the fiduciary duty where "the material facts concerning the conflict could not be fully and fairly disclosed." Some commenters expressed

27

In some cases, conflicts may be of a nature and extent that it would be difficult to provide disclosure to clients that adequately conveys the material facts or the nature, magnitude, and potential effect of the conflict sufficient for a client to consent to or reject it.[70] In other cases, disclosure may not be specific enough for a client to understand whether and how the conflict could affect the advice it receives. For retail clients in particular, it may be difficult to provide disclosure regarding complex or extensive conflicts that is sufficiently specific, but also understandable. In all of these cases where an investment adviser cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent, the adviser should either *eliminate* the conflict or adequately *mitigate* (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and informed consent are possible.

Full and fair disclosure of all material facts relating to the advisory relationship, and all conflicts of interest which might incline an investment adviser—consciously or unconsciously— to render advice which was not disinterested, can help clients and prospective clients in evaluating and selecting investment advisers. Accordingly, we require advisers to deliver to their clients a "brochure," under Part 2A of Form ADV, which sets out minimum disclosure requirements, including disclosure of certain conflicts.[71] Investment advisers are required to

---

agreement with this statement. *See, e.g.,* CFA Letter (agreeing that "advisers should be precluded from inferring or accepting client consent to a conflict" where the material facts concerning the conflict could not be fully and fairly disclosed). Other commenters expressed doubt that such disclosure could be impossible. *See, e.g.,* Allianz Letter ("[W]e have not encountered a situation in which we could not fully and fairly disclose the material facts, including the nature, extent, magnitude and potential effects of the conflict."). In response to commenters, we have replaced the general statement about an inability to fully and fairly disclose material facts about the conflict with more specific examples of how advisers can make such full and fair disclosure. *See supra* text accompanying footnotes 59-66.

[70] As discussed above, institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications. *See supra* text accompanying footnote 62.

[71] Investment Advisers Act Release 3060, *supra* footnote 15; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of

28

deliver the brochure to a prospective client at or before entering into a contract so that the prospective client can use the information contained in the brochure to decide whether or not to enter into the advisory relationship.[72]  In a concurrent release, we are requiring all investment advisers to deliver to retail investors, at or before the time the adviser enters into an investment advisory agreement, a relationship summary, which would include, among other things, a plain English summary of certain of the firm's conflicts of interest, and would encourage retail investors to inquire about those conflicts.[73]

## III.  ECONOMIC CONSIDERATIONS

As noted above, this Final Interpretation is intended to reaffirm, and in some cases clarify, certain aspects of an investment adviser's fiduciary duty under the Advisers Act.  The Final Interpretation does not itself create any new legal obligations for advisers.  Nonetheless, the Commission recognizes that to the extent an adviser's practices are not consistent with the Final Interpretation provided above, the Final Interpretation could have potential economic effects.  We discuss these potential effects below.

---

interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship.  This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them.").  *See also* Robare v. SEC, *supra* footnote 20 ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

[72]  Investment Advisers Act rule 204-3.  *See* Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that, "A client may use this disclosure to select his or her own adviser and evaluate the adviser's business practices and conflicts on an ongoing basis.  As a result, the disclosure clients and prospective clients receive is critical to their ability to make an informed decision about whether to engage an adviser and, having engaged the adviser, to manage that relationship.").  To the extent that the information required for inclusion in the brochure does not satisfy an adviser's disclosure obligation, the adviser "may have to disclose to clients information not specifically required by Part 2 of Form ADV or in more detail than the brochure items might otherwise require" and this disclosure may be made "in [the] brochure or by some other means."  General Instruction 3 to Part 2 of Form ADV.

[73]  Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 5247 (June 5, 2019) ("Relationship Summary Adoption").

29

## A. Background

The Commission's interpretation of the standard of conduct for investment advisers under the Advisers Act set forth in this Final Interpretation would affect investment advisers and their associated persons as well as the clients of those investment advisers, and the market for financial advice more broadly.[74] As of December 31, 2018, there were 13,299 investment advisers registered with the Commission with over $84 trillion in assets under management as well as 17,268 investment advisers registered with states with approximately $334 billion in assets under management and 3,911 investment advisers who submit Form ADV as exempt reporting advisers.[75] As of December 31, 2018, there are approximately 41 million client accounts advised by SEC-registered investment advisers.[76]

These investment advisers currently incur ongoing costs related to their compliance with their legal and regulatory obligations, including costs related to understanding the standard of conduct. We believe, based on the Commission's experience, that the interpretations set forth in this Final Interpretation are generally consistent with investment advisers' current understanding of their fiduciary duty under the Advisers Act.[77] However, we recognize that as the scope of the

---

[74] *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A (discussing the market for financial advice generally).

[75] Data on investment advisers is based on staff analysis of Form ADV, particularly Item 5.F.(2)(c) of Part 1A for Regulatory Assets under Management. Because this Final Interpretation interprets an adviser's fiduciary duty under section 206 of the Advisers Act, this interpretation would be applicable to both SEC- and state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act.

[76] Item 5.F.(2)(f) of Part 1A of Form ADV.

[77] *See supra* section II.B.i. For example, some commenters asked that we clarify from the Proposed Interpretation that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies, through contract. *See, e.g.,* MMI Letter; Financial Engines Letter; ABA Letter. *See supra* footnotes 67–69 and accompanying text, including clarifications addressing these commenters' concerns. More generally, some commenters requested clarifications from the Proposed Interpretation, and we are issuing this Final Interpretation to address those issues raised by commenters, as discussed in more detail above.

30

adviser-client relationship varies and in many cases can be broad, there may be certain current circumstances where investment advisers interpret their fiduciary duty to require something less, and other current circumstances where they interpret their fiduciary duty to require something more, than this Final Interpretation. We lack data to identify which investment advisers currently understand their fiduciary duty to require something different from the standard of conduct articulated in this Final Interpretation. Based on our experience over decades of interacting with the investment management industry as its primary regulator, however, we generally believe that it is not a significant portion of the market.

One commenter suggested that the Proposed Interpretation's discussion of how an adviser fulfills its fiduciary duty appeared to be based in the context of having as a client an individual investor, and not a fund.[78] This commenter indicated its concerns about the ability of a fund manager to infer consent from a client that is a fund, and that issues regarding inferring consent from funds could significantly increase compliance costs for venture capital funds.[79] Our discussion above in this Final Interpretation includes clarifications to address comments, and expressly acknowledges that while all investment advisers owe each of their clients a fiduciary duty, the specific application of the investment adviser's fiduciary duty must be viewed in the context of the agreed-upon scope of the adviser-client relationship.[80] This Final Interpretation, as compared to the Proposed Interpretation, includes significantly more examples of the application of the fiduciary duty to institutional clients, and clarifies the Commission's interpretation of what constitutes full and fair disclosure and informed consent, acknowledging a number of comments

---

[78] *See* Comment Letter of National Venture Capital Association (Aug. 7, 2018) ("NVCA Letter").

[79] *Id.*

[80] *See supra* section II.A.

31

on this topic.[81] We believe that these clarifications will help address some of this commenter's concerns with respect to increased compliance costs for venture capital funds, in part by clarifying how the fiduciary duty can apply to institutional clients. We continue to believe, based on our experience with investment advisers to different types of clients, that advisers understand their fiduciary duty to be generally consistent with the standards of this Final Interpretation.

### B. Potential Economic Effects

Based on our experience as the long-standing regulator of the investment adviser industry, the Commission's interpretation of the fiduciary duty under section 206 of the Advisers Act described in this Final Interpretation generally reaffirms the current practices of investment advisers. Therefore, we expect there to be no significant economic effects from this Final Interpretation. However, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, we acknowledge that affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them. Further, to the extent certain investment advisers currently understand the practices necessary to comply with their fiduciary duty to be different from those discussed in this Final Interpretation, there could be some economic effects, which we discuss below.

*Clients of investment advisers*

The typical relationship between an investment adviser and a client is a principal-agent relationship, where the principal (the client) hires an agent (the investment adviser) to perform

---

[81] In particular, this Final Interpretation expressly notes our belief that a client generally may provide its informed consent implicitly "by entering into or continuing the investment advisory relationship with the adviser" after disclosure of a conflict of interest. *See supra* footnote 68.

32

some service (investment advisory services) on the principal's behalf.[82]  Because investors and investment advisers are likely to have different preferences and goals, the investment adviser relationship is subject to agency problems, including those resulting from conflicts: that is, investment advisers may take actions that increase their well-being at the expense of investors, thereby imposing agency costs on investors.[83]  A fiduciary duty, such as the duty investment advisers owe their clients, can mitigate these agency problems and reduce agency costs by deterring investment advisers from taking actions that expose them to legal liability.[84]

To the extent this Final Interpretation causes a change in behavior of those investment advisers, if any, who currently interpret their fiduciary duty to require something different from this Final Interpretation, we expect a potential reduction in agency problems and, consequently, a reduction of agency costs to the client.[85]  For example, an adviser that, as part of its duty of loyalty, fully and fairly discloses[86] a conflict of interest and receives informed consent from its client with respect to the conflict may reduce agency costs by increasing the client's awareness of the conflict and improving the client's ability to monitor the adviser with respect to this conflict.  Alternatively, the client may choose to not consent given the information the adviser

---

[82]     See, e.g., James A. Brickley, Clifford W. Smith, Jr. & Jerold L. Zimmerman, *Managerial Economics and Organizational Architecture* (2004), at 265 ("An agency relationship consists of an agreement under which one party, the principal, engages another party, the agent, to perform some service on the principal's behalf."); *see also* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 Journal of Financial Economics 305-360 (1976) ("Jensen and Meckling").

[83]     See, e.g., Jensen and Meckling, *supra* footnote 82.

[84]     See, e.g., Frank H. Easterbrook & Daniel R. Fischel, *Contract and Fiduciary Duty*, 36 Journal of Law & Economics 425-46 (1993).

[85]     To the extent that this Final Interpretation clarifies the fiduciary duty for investment advisers, one commenter suggested it may then clarify what clients expect of their investment advisers.  *See* Cambridge Letter (stating that "greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability to craft such policies and procedures, as well as support the elimination of confusion for retail clients and investment professionals").

[86]     As discussed above, whether such a disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the conflict.  *See supra* section II.C.

33

discloses about a conflict of interest if the perceived risk associated with the conflict is too significant, and instead try to renegotiate the contract with the adviser or look for an alternative adviser or other financial professional. In addition, the obligation to fully and fairly disclose a current conflict may cause the adviser to take other actions, for example eliminating or adequately mitigating (*i.e.*, modifying practices to reduce) that conflict rather than taking the risk that the client will not provide informed consent or will look for an alternative adviser or other financial professional. The extent to which agency costs would be reduced by such a disclosure is difficult to assess given that we are unable to ascertain the total number of investment advisers that currently interpret their fiduciary duty to require something different from the Commission's interpretation,[87] and consequently we are not able to estimate the agency costs such advisers currently impose on investors. In addition, we believe that there may be potential benefits for clients of those investment advisers, if any, to the extent this Final Interpretation is effective at strengthening investment advisers' understanding of their obligations to their clients. Further, to the extent that this Final Interpretation enhances the understanding of any investment advisers of their duty of care, it may potentially raise the quality of investment advice and also lead to increased compliance with the duty to monitor, for example whether advice about an account or program type remains in the client's best interest, thereby increasing the likelihood that the advice fits with a client's objectives.

In addition, to the extent that this Final Interpretation causes some investment advisers to properly identify circumstances in which conflicts may be of a nature and extent that it would be

---

[87] One commenter did not agree that the discussion of fiduciary obligations in the Proposed Interpretation applied to advisers to funds as well as advisers to retail investors. *See* NVCA Letter. As discussed above, this Final Interpretation has clarified the discussion to address this commenter's concerns and acknowledges that the application of the fiduciary duty of an adviser to a retail client would be different from the specific application of the fiduciary duty of an adviser to a registered investment company or private fund.

000735

difficult to provide disclosure to clients that adequately conveys the material facts or nature,

magnitude, and potential effect of the conflict sufficient for clients to consent to it or reject it, or

in which the disclosure may not be specific enough for clients to understand whether and how

the conflict could affect the advice they receive, this Final Interpretation may lead those

investment advisers to take additional steps to improve their disclosures or to determine whether

adequately mitigating (*i.e.,* modifying practices to reduce) the conflict may be appropriate such

that full and fair disclosure and informed consent are possible. This Final Interpretation may

also cause some investment advisers to conclude in some circumstances that they cannot fully

and fairly disclose a conflict of interest to a client such that the client can provide informed

consent. We would expect that these advisers would either eliminate the conflict or adequately

mitigate (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and

informed consent would be possible. Thus, to the extent this Final Interpretation would cause

investment advisers to better understand their obligations and therefore to modify their business

practices in ways that (i) reduce the likelihood that conflicts and other agency costs will cause an

adviser to place its interests ahead of the interests of the client or (ii) help those advisers to

provide full and fair disclosure, it would be expected to ameliorate the agency conflict between

investment advisers and their clients. In turn, this may improve the quality of advice that the

clients receive and therefore produce higher overall returns for clients and increase the efficiency

of portfolio allocation. However, as discussed above, we would generally expect these effects to

be minimal because we believe that the interpretations we are setting forth in this Final

Interpretation are generally consistent with investment advisers' current understanding of their

fiduciary duty under the Advisers Act. Finally, this Final Interpretation would also benefit

35

clients of investment advisers to the extent it assists the Commission in its oversight of investment advisers' compliance with their regulatory obligations.

*Investment advisers and the market for investment advice*

In general, we expect this Final Interpretation to affirm investment advisers' understanding of the fiduciary duty they owe their clients under the Advisers Act, reduce uncertainty for advisers, and facilitate their compliance. Further, by addressing in one release certain aspects of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act, this Final Interpretation could reduce investment advisers' costs associated with comprehensively assessing their compliance obligations. We acknowledge that, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them. Moreover, as discussed above, there may be certain investment advisers who currently understand their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation. Those investment advisers would experience an increase in their compliance costs as they change their systems, processes, disclosures, and behavior, and train their supervised persons, to align with this Final Interpretation. However, this increase in costs would be mitigated by potential benefits in efficiency for investment advisers that are able to understand aspects of their fiduciary duty by reference to a single Commission release that reaffirms—and in some cases clarifies—certain aspects of the fiduciary duty.[88] In addition, and as discussed above, in the case of an investment adviser that believed it owed its clients a lower

---

[88] As noted above, *supra* footnote 3, this Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty. It is not, however, intended to be the exclusive resource for understanding these principles.

36

standard of conduct, there will be client benefits from the ensuing adaptation of a higher standard of conduct and related change in policies and procedures.

Moreover, to the extent any investment advisers that understood their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation change their behavior to align with this Final Interpretation, there could also be some economic effects on the market for investment advice. For example, any improved compliance may not only reduce agency costs in current investment advisory relationships and increase the value of those relationships to current clients, it may also increase trust in the market for investment advice among all investors, which may result in more investors seeking advice from investment advisers. This may, in turn, benefit investors by improving the efficiency of their portfolio allocation. To the extent it is costly or difficult, at least in the short term, to expand the supply of investment advisory services to meet an increase in demand, any such new demand for investment advisory services could put some upward price pressure on fees. At the same time, however, if any such new demand increases the overall profitability of investment advisory services, then we expect it would encourage entry by new investment advisers—or hiring of new representatives by current investment advisers—such that competition would increase over time. Indeed, the recent growth in the investment adviser segment of the market, both in terms of number of firms and number of representatives,[89] may suggest that the costs of expanding the supply of investment advisory services are currently relatively low.

Additionally, we acknowledge that to the extent certain investment advisers recognize, as a result of this Final Interpretation, that their fiduciary duty is stricter than the fiduciary duty as they currently interpret it, it could potentially affect competition. Specifically, this Final

---

[89]     *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A.1.d.

000738

Interpretation of certain aspects of the standard of conduct for investment advisers may result in additional compliance costs for investment advisers seeking to meet their fiduciary duty. This increase in compliance costs, in turn, may discourage competition for client segments that generate lower revenues, such as clients with relatively low levels of financial assets, which could reduce the supply of investment advisory services and raise fees for these client segments. However, the investment advisers who already are complying with the understanding of their fiduciary duty reflected in this Final Interpretation, and who may therefore currently have a comparative cost disadvantage, could find it more profitable to compete for the clients of those investment advisers who would face higher compliance costs as a result of this Final Interpretation, which would mitigate negative effects on the supply of investment advisory services. Further, as noted above, there has been a recent growth trend in the supply of investment advisory services, which is likely to mitigate any potential negative supply effects from this Final Interpretation.[90]

One commenter discussed that, in its view, any statement in the Proposed Interpretation that certain circumstances may require the elimination of material conflicts, rather than full and fair disclosure or the mitigation of such conflicts, could lead to an effect on the market and costs to advisers, if such a requirement would cause advisers who had not shared that interpretation to change their business models or product offerings or the ways in which they interact with

---

[90] Beyond having an effect on competition in the market for investment adviser services, it is possible that this Final Interpretation could affect competition between investment advisers and other providers of financial advice, such as broker-dealers, banks, and insurance companies. This may be the case if certain investors base their choice between an investment adviser and another provider of financial advice, at least in part, on their perception of the standards of conduct each owes to their customers. To the extent that this Final Interpretation increases investors' trust in investment advisers' overall compliance with their standard of conduct, certain of these investors may become more willing to hire an investment adviser rather than one of their non-investment adviser competitors. As a result, investment advisers as a group may become more competitive compared to that of other types of providers of financial advice. On the other hand, if this Final Interpretation raises costs for investment advisers, they could become less competitive with other financial advice providers.

38

clients.[91]  We disagree that this Final Interpretation includes a requirement to eliminate conflicts of interest. As discussed in more detail above, elimination of a conflict is one method of addressing that conflict; when appropriate advisers may also address the conflict by providing full and fair disclosure such that a client can provide informed consent to the conflict.[92]  Further, we believe that any potential costs or market effects resulting from investment advisers addressing conflicts of interest may be decreased by the flexibility advisers have to meet their federal fiduciary duty in the context of the specific scope of services that they provide to their clients, as discussed in this Final Interpretation.

The commenter also drew particular attention to the question of whether the Commission's discussion of the fiduciary duty in the Proposed Interpretation applied to advisers to institutional clients as well as those to retail clients.  The same commenter indicated that failing to accommodate the application of the concepts in the Proposed Interpretation to sophisticated clients could risk changing the marketplace or limiting investment opportunities for sophisticated clients, increasing compliance burdens for advisers to sophisticated clients, or chilling innovation.  As explained above, this Final Interpretation, as compared to the Proposed Interpretation, discusses in more detail the ability of investment advisers and different types of clients to shape the scope of the relationship to which the fiduciary duty applies.[93]  In particular, this Final Interpretation acknowledges that while advisers owe each of their clients a fiduciary duty, the specific obligations of, for example, an adviser providing comprehensive, discretionary advice in an ongoing relationship with a retail client will be significantly different from the

---

91      *See* Dechert Letter.

92      *See supra* section II.C.

93      *See supra* footnotes 78-81 and accompanying text.

39

obligations of an adviser to an institutional client, such as a registered investment company or private fund, where the contract defines the scope of the adviser's services and limitations on its authority with substantial specificity.[94]

Finally, to the extent this Final Interpretation causes some investment advisers to reassess their compliance with their duty of loyalty, it could lead to a reduction in the expected profitability of advice relating to particular investments for which compliance costs would increase following the reassessment.[95]  As a result, the number of investment advisers willing to advise a client to make these investments may be reduced.  A decline in the supply of investment adviser advice regarding these types of investments could affect efficiency for investors; it could reduce the efficiency of portfolio allocation for those investors who might otherwise benefit from investment adviser advice regarding these types of investments and are no longer able to receive such advice.  At the same time, if providing full and fair disclosure and appropriate monitoring for highly complex products (*e.g.*, those with a complex payout structure, such as those that include variable or contingent payments or payments to multiple parties) results in these products becoming less profitable for investment advisers, investment advisers may be discouraged from supplying advice regarding such products.  However, investors may benefit from (1) no longer receiving inadequate disclosure or monitoring for such products, (2) potentially receiving advice regarding other, less complex or expensive products that may be more efficient for the investor, and (3) only receiving recommendations for highly complex or high cost products for which an

---

[94]     *See supra* section II.A.

[95]     For example, such products could include highly complex, high cost products with risk and return characteristics that are hard for retail investors to fully understand, or where the investment adviser and its representatives receive complicated payments from affiliates that create conflicts of interest that are difficult for retail investors to fully understand.

40

investment adviser can provide full and fair disclosure regarding its conflicts and appropriate monitoring.

**List of Subjects in 17 CFR Part 276**

Securities.

**Amendments to the Code of Federal Regulations**

For the reasons set out above, the Commission is amending Title 17, chapter II of the Code of Federal Regulations as set forth below:

**PART 276–INTERPRETATIVE RELEASES RELATING TO THE INVESTMENT ADVISERS ACT OF 1940 AND GENERAL RULES AND REGULATIONS THEREUNDER**

1.    Part 276 is amended by adding Release No. IA–5428 and the release date of June 5, 2019, to the end of the list of interpretive releases to read as follows"

| Subject | Release No. | Date | Fed. Reg. Vol. and Page |
|---|---|---|---|
| * * * * * * * | | | |
| Commission Interpretation Regarding Standard of Conduct for Investment Advisers | IA-5248 | June 5, 2019 | [Insert FR Volume Number] FR [Insert FR Page Number] |

41

By the Commission.


Dated: June 5, 2019.


Vanessa A. Countryman,

Acting Secretary.

000743

# EXHIBIT 9

000744

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104) (admitted *pro hac vice*)
W. Austin Jowers (GA 405482) (admitted *pro hac vice*)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING
LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

**JOINT OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. AND
HIGHLAND CLO FUNDING, LTD. TO FINAL APPROVAL OF DISCLOSURE
STATEMENT AND TO CONFIRMATION OF THE JOINT PLAN FOR ACIS CAPITAL
MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**

Highland Capital Management, L.P. ("**Highland**") and Highland CLO Funding, Ltd.

("**HCLOF**") hereby file their joint objection (the "**Objection**") to final approval of the

disclosure statement [Doc. No. 442] (as amended, the "**Disclosure Statement**") and to

confirmation of the *First Amended Joint Plan for Acis Capital Management, L.P. and Acis*

**PAGE 1**

*Capital Management GP, LLC* [Doc. No. 441] (as amended, the "**Plan**"),[1] and respectfully state as follows:[2]

# I.
## PRELIMINARY STATEMENT

"If at first you don't succeed, try, try again." –*William Edward Hickson*

1.      In proposing Plans A, B and C, it would appear that the Chapter 11 Trustee has taken this old adage to heart.  Although originally penned as a motivator to would-be teachers, in the context of these bankruptcy proceedings, this approach by the Chapter 11 Trustee has proven to be a colossal waste of time and resources at a cost to the estates that eclipses not only the value of the estates' assets, but the very pre-petition claims the Chapter 11 Trustee is purportedly responsible for paying.  The result of this case appears to be nothing more than functionally administratively insolvent estates with mountains of administrative claims continuing to accrue daily.

2.      By their literal interpretation, the Chapter 11 Trustee's Plans, supported by unequivocal admissions in his pleadings, establish that post-petition, he has intentionally breached pre-petition contractual obligations of the Debtors to create a purported $100 million post-petition claim against the estates for an entity that had no claims against the estates when the Orders for Relief were entered.  By his own account, he has rendered the estates administratively insolvent.  Having thus admitted to putting the estates into this predicament— which under almost every other measure would be considered a flagrant breach of fiduciary

---

[1] Defined terms herein shall be as set forth in the Plan unless otherwise provided herein.

[2] HCLOF has filed no proof of claim in these cases, seeks no monetary relief from the Debtors, and has moved to amend its pending adversary proceeding claim to reflect that it no longer seeks the equitable claims that it sought previously (such claims are moot in any event).  Nonetheless, HCLOF objects on the basis that the proposed plans propose either to take its property or alter its contractual and legal rights.  HCLOF asserts no creditor standing in any of the objections set forth herein, and makes these objections as a party in interest given the substantial harm the plans propose to impose on it.

**PAGE 2**

duty—he is now championing to "fix" the situation by either (i) taking non-estate property from the purported (involuntary) claimant and selling it along with some executory contracts of the estates that are otherwise valueless, then distributing the ill-gotten proceeds after carving off a substantial fee for himself, or (ii) re-writing multiple securities contracts to which the estates are not a party in order to not only insulate the estates from the consequences of his self-proclaimed intentional breach, but to radically alter the bargained-for rights of third party market participants in five collateralized loan obligation funds with over $2 billion at stake, none of which ever belonged to the Debtors.

3.        What the Chapter 11 Trustee is proposing under each of Plans A, B and C violates some of the most basic tenets of Title 11 and ignores the very confines of this Court's jurisdiction.   These Plans are patently unconfirmable with an unconscionable premise: that a Chapter 11 Trustee should be handsomely rewarded for an intentional post-petition breach of the estates pre-petition contractual obligations.   Such a conclusion is beyond the pale no matter how allegedly noble  the cause.   These cases should be either dismissed or, at most, converted back to Chapter 7 liquidation.

## II.
## RELEVANT BACKGROUND

4.        On January 30, 2018, Joshua N. Terry ("**Terry**") filed involuntary petitions for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("**Acis GP**," and with Acis LP, the "**Debtors**").  A Chapter 7 Trustee was thereafter appointed.

5.        On May 4, 2018, the Chapter 7 Trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**").  Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis*

*Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

6.      On May 11, 2018, after a hearing on the matter, the Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206].  Thereafter, the United States Trustee appointed Robin Phelan as Chapter 11 Trustee (the "**Chapter 11 Trustee**").[3]

7.      On July 5, 2018, the Chapter 11 Trustee filed the initial Plan [Doc. No. 383], which proposed three (3) alternatives – Plans A, B and C.  In summary, Plan A of the Chapter 11 Trustee's Plan proposes to transfer HCLOF's Equity Notes, along with the portfolio management agreements (the "**PMAs**") to which Acis LP is a counter-party, to a third party "plan funder," which is Oaktree.  Through this transaction, the Chapter 11 Trustee claims that all creditors will be satisfied in full.  Alternatively, the Chapter 11 Trustee has proposed Plans B and C, which are effectively identical in their treatment of creditors  and call for Acis LP to retain the PMAs and pay out creditors from future cash flow streams therefrom, as well as potential recoveries from estates' causes of action.  Both Plans B and C require radical modification to of the CLO Indentures, ostensibly to ensure the future income stream to the estates.

8.      On July 13, 2018, the Chapter 11 Trustee filed (i) the Disclosure Statement [Doc. No. 405]; (ii) the *First Modification to the Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Doc. No. 406]; and (iii) *the Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan, and Setting Related Deadlines; (C)*

---

[3] Mr. Phelan was initially appointed on May 11, 2018 as the Chapter 11 Trustee of Acis LP and was appointed on May 16, 2018 as the Chapter 11 Trustee of Acis GP.

*Approving Forms for Voting and Notice; and (D) Granting Related Relief* [Doc. No. 407] (the "**Motion for Conditional Approval**").

9.　　　On July 24, 2018, Highland and HCLOF filed respective objections to the Motion for Conditional Approval, [Doc. No. 431] and [Doc. No. 432].  On July 28, 2018, Highland filed a supplement to such objection [Doc. No. 440].  In each objection, Highland and HCLOF reserved rights to object to the final approval of the Disclosure Statement.

10.　　　On July 29, 2018, the Chapter 11 Trustee amended the Plan and Disclosure Statement following an expedited hearing on the Motion for Conditional Approval held earlier that day.  Thereafter, on July 30, 2018, the Court entered the *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV) Approving Related Matters* [Doc. No. 446] (the "**Conditional Approval Order**"), conditionally approving the Disclosure Statement, setting an August 21, 2018 combined hearing for final approval of the Disclosure Statement and confirmation of the Plan, and setting related deadlines, including a compressed and expedited discovery schedule (the "**Discovery Schedule**").

11.　　　The Conditional Approval Order required the Chapter 11 Trustee to file a "**Limited Issues Brief**" on or before 4:00 p.m. on August 10, 2018, addressing: (a) issues related to section 1142 of the Bankruptcy Code in connection with the proposed transfer of HCLOF's subordinated notes under the Plan A alternative, and (b) issues related to sections 365 and 1123(a)(5)(F) of the Bankruptcy Code in connection with the proposed modification of the existing Indentures under the proposed Plan B and Plan C (collectively, the "**Limited Issues**").

Also as per the Conditional Approval Order, the deadline for parties to respond to the Limited Issues Brief is 4:00 p.m. on August 16, 2018.

12.     Per the Discovery Schedule, the  Chapter 11 Trustee filed the Limited Issues Brief on August 10, 2018 [Doc. No. 493].  Highland and/or HCLOF intend to timely respond to the Limited Issues Brief per the Discovery Schedule.  As such, while certain Limited Issues are mentioned herein, Highland and HCLOF reserve all rights on those issues for subsequent objection.  Per the Discovery Schedule, this joint objection is to cover matters other than the Limited Issues; provided, however, discovery is actually occurring after the deadline to file this objection.  Thus, Highland and HCLOF reserve their rights to supplement these objections.

### III.
### OBJECTION

13.     In order to confirm the Plan, the Chapter 11 Trustee bears the burden of establishing the various provisions of Bankruptcy Code section 1129 by a preponderance of the evidence.  *See In re Couture Hotel Corp.*, 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015).  The Plan is deficient on almost every applicable subsection of 1129 and, as a result, the Plan is unconfirmable as a matter of law.

**A.     The Bankruptcy Court Lacks Subject Matter Jurisdiction to Confirm the Plan**

14.     The Bankruptcy Court lacks subject matter jurisdiction over this proceeding and, therefore, proceeding with confirmation of any plan will be void *ab initio*.  This Court should have dismissed the involuntary petitions that were filed by Joshua Terry in bad faith, and because this Court lacks subject matter jurisdiction over essentially a two-party dispute subject to arbitration.  *See* Brief of Appellant Neutra (Case No. 3:18-cv-01056 (N.D. Tex.), [Doc. No. 11].

15.     Even assuming this Court has subject matter over this proceeding, the Plans violate the strictures of that jurisdiction in at least two critical and insurmountable ways:

      a.   Plan A is premised on the taking of non-estate property without its owners consent; and

      b.   Plans B and C are premised on radically altering non-estate executory contracts.

16.     The Court's lack of subject matter jurisdiction is so fundamental, that frankly the Court need look no further. The Chapter 11 Trustee has presented the Court with patently unconfirmable Plans. Section 1129(a)(1) and (a)(2) require, respectively, that the plan and the plan proponent, comply with the applicable provisions of the Bankruptcy Code. The Chapter 11 Trustee's Plan A, however, asks this Court to exceed its constitutional and statutory authority to infringe upon the rights of a non-creditor and effect a taking of non-estate property (the "**Equity Notes**") via an equitable subrogation theory that is completely contrary to the law, and convert that non-estate property into "property of the estate," so that he can then sell it to a third party (Oaktree). This Court cannot approve this scheme because it has no jurisdiction to do so. Confirming Plan B or C likewise would require the Court to exceed its authority because both plans are premised on the nonconsensual alteration of non-executory contracts. Worse yet, the amendments will be to the determent of third parties who are not creditors of these estates and who are not remotely implicated in these proceedings. This Court simply has no such jurisdiction.

17.     It is fundamental that bankruptcy courts do not have subject matter jurisdiction over property that does not belong to a debtor's estate. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 525 (5th Cir. 2014) (bankruptcy court did not have in rem jurisdiction over assets that were not "property of the estate"); *see also Scott v. Bierman*, 429 F. App'x. 225, 231 (4th Cir. 2011) ("[A] bankruptcy court's jurisdiction does not extend to property not part of a debtor's estate."); *see also NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network, Inc.)*, 267 B.R. 46, 59

(Bankr. D. Del. 2001) (same); *In re Funneman*, 155 B.R. 197, 199-200 (Bankr. S.D. Ill. 1993) (partnership property was not property of the debtor-partner's estate and, therefore, outside the court's subject matter jurisdiction).

18.     These jurisdictional principles exist to protect the very type of non-debtor property interests that are at issue in this case. And they apply even when the property would benefit a debtor's estate. *See, e.g., Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1013 (5th Cir. 1985) (noting the limitations placed on the trustee's strong arm powers by section 541, and stating that "Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own.").

19.     Before the Court can order a transfer of the Equity Notes to Oaktree, it would necessarily have to find that they constitute "property of the estate." If the Court cannot conclude that the Equity Notes are property of the estate, then it will lack jurisdiction to order their transfer by any means. *See, e.g., In re Murchison*, 54 B.R. 721, 725 (Bankr. N.D. Tex. 1985). (finding that the court was without jurisdiction to approve the sale of property that was not property of the estate: "Because the criterion of § 541(a)(1) has not been satisfied, § 363(b)(1) cannot apply.").[4]

20.     Section 541 of the Bankruptcy Code defines "property of the estate" as, in relevant part, (i) "all legal or equitable interests of the debtor in property as of the commence of the case," (ii) "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title," and (iii) "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. §§ 541(a)(1), (a)(3), (a)(7).

---

[4] Bankruptcy courts have been held to be without jurisdiction to order the sale of non-estate assets, even where the sale was entirely consensual. *See, e.g., First Nat'l Bank v. Community Trust Bank*, No. 05-1610, 2006 WL 724882, at *4 (W.D. La. Mar. 21, 2006) ("Since the property was not part of the bankruptcy estate, the Bankruptcy Court had no authority or jurisdiction to order the consensual sale and, therefore, the sale was void").

21.     Neither the Chapter 11 Trustee nor his proposed transferee, Oaktree, dispute that the Equity Notes are the property of HCLOF.  *See* July 6, 2018 Hrg. Tr. at 71:19-25; 119:11-18. Nor has the Chapter 11 Trustee obtained an interest in the Equity Notes via any of the Bankruptcy Code sections enumerated in section 541(a)(3).  Thus, for the Equity Notes to be "property of the estate," they would necessarily have to be "property that the estate[s] acquire after the commencement of the case" under section 541(a)(7).[5]

22.     Upon first blush, that would seem to require only that the Chapter 11 Trustee prevail upon his equitable subrogation theory, thereby converting the Equity Notes into "property of the estate."   However, even if the Chapter 11 Trustee successfully can obtain ownership of the Equity Notes, such property acquired post-petition is not "property of the estate" under section 541(a)(7).

23.     Under controlling Fifth Circuit law, section 541(a)(7) only applies to "property interest that are themselves traceable to 'property of the estate' or generated in the normal course of the debtor's business."  *In re TMT Procurement Corp.*, 764 F.3d at 524-25 ("As we previously recognized in *In re McLain*, 'Congress enacted § 541(a)(7) to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate") (citing *In re McLain*, 516 F.3d 301 (5th Cir. 2008)) (emphasis added); *see also In re Cent. Med. Ctr.*, 122 B.R. 568 (Bankr. E.D. Mo. 1990) ("Congress did not intend Section 541 'to enlarge a debtor's rights against others beyond those

---

[5] The Chapter 11 Trustee also does not, and cannot, dispute the axiom that the debtor in possession or trustee steps into the shoes of a debtor and possesses no greater rights than that of the debtor. *See Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 748 (3d Cir. 2013) ("It is a given that the trustee or debtor-in-possession can assert no greater rights than the debtor himself had on the date the bankruptcy case was commenced.") (internal alterations omitted); *In re Gibralter Res., Inc.*, 197 B.R. 246, 253 (Bankr. N.D. Tex. 1996) ("the general rule is that a trustee has no greater rights than the debtor and stands in the shoes of the debtor"); *In re Brooks*, 60 B.R. 155, 160 (Bankr. N.D. Tex. 1986) ("Of course, a bankruptcy trustee can acquire no greater rights in property than the debtor possessed.") (citation omitted)).  The Debtors had no right to sell the Equity Notes before the commencement of these bankruptcy cases and have no such rights now.

existing at the commencement of the case..'") (citing *In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir. 1985)). That is not the case with the Equity Notes, which are not traceable to any property of the estate, but under the Chapter 11 Trustee's (unsupportable) theory, are property of the estate as a result of a subrogation right that purportedly vested with the estates post-petition.

24. The property at issue in *In re TMT Procurement* was certain corporate shares that were pledged by a non-debtor third party into a court-ordered escrow that served as the collateral for the debtors' DIP loan. *In re TMT Procurement Corp.*, 764 F.3d at 524. The shares never belonged to the debtors at issue. *Id.* at 524-25. The corporation whose shares had been pledged appealed the orders of the district court (which had withdrawn the reference from the bankruptcy court), arguing that the district court did not have jurisdiction to issue orders with respect to the shares, which were not "property of the estate." *Id.* at 522-23.

25. The Fifth Circuit, vacating the district court's order, rejected the debtors' argument that the shares were property of the estate under section 541(a)(7). In doing so, the Fifth Circuit made clear that: "[T]he Vantage Shares are not 'property of the estate' under § 541(a)(7) because they were not created with or by property of the estate, they were not acquired in the estate's normal course of business, and they are not traceable to or arise out of any pre-petition interest included in the bankruptcy estate." *Id.* at 525 (rejecting also the argument that the tracing limitation did not apply to corporate debtors in chapter 11 bankruptcies).

26. The Plan does not satisfy sections 1129(a)(1) and (a)(2) because it seeks to impermissibly expand the scope of estate property and requires the Court to exceed its jurisdiction. The Equity Notes were not "property of the estate" at the commencement of these cases and the Chapter 11 Trustee has not obtained the Equity Notes through one of the

**PAGE 10**

enumerated sections in Section 541(a)(3). Nor are the Equity Notes traceable to any property of the estate. Therefore, the Plan cannot be confirmed. *See In re Cent. Med. Ctr.*, 122 B.R. at 573 (holding that the plan failed to satisfy section 1129(a) "[b]ecause the Plan violates Section 541(a) due to its improper expansion of the estate's interest" in certain funds in which it only had a reversionary interest at the commencement of the case; the plan "baldly seeks to divest the bondholders of property which is rightfully theirs.").

## B.   Sections 1129(a)(1), (3) – The Plan Violates the Bankruptcy Code and Violates Other Applicable Law

27.    Bankruptcy Code section 1129(a)(1) requires that a plan comply "with the applicable provisions of this title," and section 1129(a)(3) states that a plan cannot be proposed "by any means forbidden by law." As to section 1129(a)(1), the Plan violates well-accepted tenets of bankruptcy law because the Chapter 11 Trustee seeks to (i) take possession of non-estate property and (ii) fundamentally alter non-debtor executory contracts. These are included among the Limited Issues and will be set forth in the response to the Limited Issues Brief.

28.    As to section 1129(a)(3), despite the Chapter 11 Trustee's obfuscations regarding "transfers" and other similar self-serving characterizations, the practical reality is that the Plan A transaction effects a sale of the Equity Notes to Oaktree. The Equity Notes are undoubtedly securities. *See Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990); *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542-43 (S.D.N.Y. 2013) (finding sale of CLO notes to be a sale of a security under *Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010)). Any sale of securities must comport with the requirements of federal securities laws, including the Securities Act of 1933 (the "**'33 Act**").[6]

---

[6] Moreover, none of the Indentures or other relevant documents permit the Chapter 11 Trustee, on behalf of Acis, or otherwise, to market HCLOF's Equity Notes for sale. The Chapter 11 Trustee cannot sell the Equity Notes in violation of the terms of the Indentures, and seek at the same time to retain the benefits of the Indentures.

**PAGE 11**

29.     Section 77e of the '33 Act makes it unlawful "to offer to sell or offer to buy . . .

any security, unless a registration statement has been filed as to such security."  15 U.S.C.

§ 77e(c).[7]  The Chapter 11 Trustee has not filed a registration statement covering his proposed

sale of the Equity Notes.

30.     Section 1145(a)(1) and (a)(2) do not absolve the Chapter 11 Trustee from

compliance with these requirements because Oaktree is not receiving the Equity Notes on

account of claims against the estates.  *See also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d

412, 425 (S.D.N.Y. 2007) ("[T]he section 1145(a) exemption is available only when the offerees

are receiving the securities, at least in part, in exchange for claims against or interests in the

debtor which they hold." (internal citation omitted)).

31.     The mechanism set forth in the Plan for the transfer of the Equity Notes makes

plain that Oaktree is not the initial transferee (or subrogee).  Instead, the initial transferee are the

bankruptcy estates.  As described, the estates will then transfer the notes to Oaktree.  Because

Oaktree will not be receiving the Equity Notes in exchange for claims or interests that Oaktree

has against the Debtors, the section 1145(a) exemption cannot, and does not, apply.

32.     Bankruptcy Code section 1145 provides a limited exemption when the Chapter 11

Trustee sells a security "of an issuer other than the debtor or an affiliate"  11 U.S.C. §

1145(a)(3).  The exemption allows trustees to raise cash for an estate while protecting purchasers

by requiring that adequate information about the securities is available.  This "portfolio

securities" exemption should be strictly construed because public policy strongly supports the

registration of securities.  *See Quinn & Co. v. S.E.C.*, 452 F.2d 943, 946 (10th Cir. 1971); 8

---

[7] In any litigation or enforcement action, it would be the Chapter 11 Trustee's burden to show the applicability of an exemption to this requirement.  *E.g.*, *SEC v. Carrillo Huettell LLP*, No. 13 Civ. 1735(GBD)(JCF), 2017 WL 213067, at *3 n.7 (S.D.N.Y. Jan. 17, 2017).  The Chapter 11 Trustee has not argued that any of these exemptions apply.  *See* 15 U.S.C. § 77d (providing exemptions to registration requirements).

PAGE 12

Collier on Bankr. ¶ 1145.02 (16th ed. 2018).  This exemption requires that (1) the debtor own the security on the date the bankruptcy petition was filed; (2) any exempt securities are not securities of the debtor's affiliates; (3) the issuer of the securities is in full compliance with registration and disclosure laws; and (4) the volume of the securities sold be limited to less than 4% of shares outstanding.  11 U.S.C. § 1145(a)(3).

33.     The Chapter 11 Trustee's Plan A transaction clearly does not qualify for this exemption.  First, neither the Chapter 11 Trustee nor the Debtors owned the Equity Notes on the date the bankruptcy petition was filed, nor do they own them now.  Second, the proposed sale would be far in excess of the 4% threshold permitted by the exemption.  Because the section 1145 exemptions do not apply, the Chapter 11 Trustee will be in violation of the '33 Act.

34.     In addition to violating the '33 Act, the Plan violates the Investment Advisors Act of 1940 (the "**IAA**").  It is clear that the Chapter 11 Trustee owes fiduciary duties to HCLOF and its investors.  In agreeing to manage the CLO investments, Acis LP represented to the CLOs that it is "registered as an investment adviser" under the IAA and agreed to perform its portfolio management services consistent with the IAA. *See, e.g.*, 2013-1 PMA § 17(b)(i).  The IAA imposes a fiduciary duty on Acis LP to act for the benefit of the CLO and its investors, including Equity Noteholders like HCLOF.  *See Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 36 (1979) ("Congress intended to impose enforceable fiduciary obligations" in passing the Act); 15 U.S.C. § 80b-6.[8]  The scope of Acis LP's (and thus the Chapter 11 Trustee's) fiduciary duties is broad.  The Chapter 11 Trustee's obligations include a duty to refrain from conduct that directly harms the CLOs, as well as the more general duty of undivided loyalty.  *See Bullmore v. Banc of*

---

[8] Acis LP also owes fiduciary duties as an investment advisor under New York's common law.  *See Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div. 2007) ("Professionals such as investment advisors, who owe fiduciary duties to their clients, 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties . . . .'") (citations omitted).

4815-0110-1423.4
000757

*Am. Sec. LLC*, 485 F. Supp. 2d. 464, 471 (S.D.NY. 2007) (applying New York law). Each of the plans proposed by the Chapter 11 Trustee rest upon a flagrant violation of Acis LP's fiduciary duties: Plan A proposes to sell HCLOF's property without its consent and Plan B and Plan C propose to impermissibly modify the Indentures to strip HCLOF and the other noteholders of their right to call a redemption. These issues will be more thoroughly addressed in HCLOF and Highland's response to the Chapter 11 Trustee's Limited Issues Brief.

35.    Moreover, the Chapter 11 Trustee cannot disclaim the duties he owes to the CLOs and the investors under the contracts and securities laws, including the IAA. In one analogous case, *In re New Center Hospital*, 200 B.R. 592 (E.D. Mich. 1996), the chapter 11 trustee sought to escape the duties of the debtor-hospital as the administrator of an employee benefit plan governed by ERISA. The chapter 11 trustee argued that if he were to administer the plan, he would be required to act solely in the interest of the ERISA plan beneficiaries which would be in conflict with his duties to the bankruptcy estates; therefore, he could not serve as an ERISA fiduciary and a bankruptcy estate fiduciary at the same time. *Id.* The district court rejected this argument and overturned the decision of the bankruptcy court, concluding that, "[t]he Bankruptcy Trustee assumes the positon of the debtor as to that debtor's many obligations. Courts have held that statutory obligations that bind the debtor will subsequently bind the bankruptcy estate." *Id.* (internal citations omitted). Likewise, the Chapter 11 Trustee is bound to perform the obligations and duties of Acis LP under relevant contract and applicable law, including the IAA. Because the Chapter 11 Trustee has put forth a Plan that violates such duties, he cannot meet the section 1129(a)(3) standard that the Plan is not "forbidden by law."

**C.    Section 1129(a)(3) – The Plan Was Not Proposed in Good Faith**

36.    Bankruptcy Code section 1129(a)(3) further provides that a plan must be proposed in good faith. The Chapter 11 Trustee, as proponent of the Plan, bears the burden of

**PAGE 14**

demonstrating that it was filed in good faith. *In re Barnes*, 309 B.R. 888, 892 (Bankr. N.D. Tex. 2003). A good faith plan "must fairly achieve a result consistent with the [Bankruptcy] Code." *Id.* (quoting *In re Block Shim Dev. Co. – Irving*, 939 F.2d 289, 292 (5th Cir. 1991)). Good faith itself is "evaluated in light of the totality of the circumstances surrounding establishment of [the] plan, mindful of the purposes underlying the Bankruptcy Code." *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013). The ultimate goal of the analysis is to determine the "subjective motive" of a plan proponent. *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 694 (Bankr. N.D. Tex. 2013).

37. The record demonstrates there was virtually no negotiation of the economic terms of the Oaktree proposal, and in particular there was no effort by the Chapter 11 Trustee to secure the highest possible price for the Equity Notes.[9] The purported consideration for the PMAs was clearly based not on any actual metric of value for those contract rights, but on an amount necessary to pay Josh Terry's claim. Certainly as to the Equity Notes, this was not a negotiation between a willing seller and a willing buyer – the seller was not even present. It is instead a scheme, concocted in bad faith, to take property from one party and provide a windfall to other parties.

38. Moreover, improper motives have tainted these bankruptcy cases from the beginning. Joshua Terry initiated these proceedings on the eve of a state court hearing to consider the very relief he then requested from this Court. From the very beginning, Terry has made clear his motivation for initiating the involuntary bankruptcy: to prevent Acis LP from

---

[9] The Chapter 11 Trustee has testified that he engaged in no substantive negotiation concerning the sale price of the Equity Notes. *See* Transcript of July 6, 2018 hearing at 75:14-16; 76:6-8:

> MR. MALONEY. Was there any negotiation over the price formula that they were proposing for the subordinated notes?
> MR. PHELAN. No . . .
> . . .
> Q. Now you didn't ask that they increase that at all?
> A. No.

**PAGE 15**

meeting its contractual obligation to effectuate the reset requested by the equity—so that the Debtors could continue to earn management fees they are not entitled to.[10]

39.     The Chapter 11 Trustee has adopted Terry's cause.

40.     At the end of the day, these bankruptcy cases and the Plan amount to nothing but a free option play by Terry, the Chapter 11 Trustee, and Oaktree to monetize PMAs with less than nominal value, at the expense of Highland (who is effectively funding the administrative expenses of these cases on account of the substantial management fees being withheld from it) and HCLOF (who is being denied its contractual rights with non-debtor parties and stripped of its own property against its will to fund that payment).  The Chapter 11 Trustee has nothing to lose from this strategy – he can turn an asset with little or no value into a big pay day for Terry and himself.  Oaktree similarly has nothing to lose – if it doesn't end up getting the Equity Notes, it walks away with all its expenses paid and a $2.5 million break-up fee for its time.

41.     In these circumstances, the Court should not make a good faith finding.

## D.     Section 1129(a)(5) – The Plan Does Not Properly Disclose or Address Insider Issues

42.     Bankruptcy Code section 1129(a)(5)(A)(i) requires a plan proponent to disclose "The identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."  Under both Plan B and Plan C, Terry is slated to receive 100% of the equity in the Reorganized Debtor (as well as, inexplicably, any residual assets of the Acis Trust upon payment in full of all creditors).  Terry therefore clearly comes within the definition of individuals described in section 1129(a)(5)(A)(i).

---

[10] Among the things acknowledged by Terry at the involuntary trial in March 2018 was the fact that he "had no issues with the rest or refinance transaction. [Rather,] the issue was that these collateral-management agreements were transferred for no consideration to Acis."  March 21, 2018 Hrg. Tr. At 132:16-19.  Note, however, that fees would not continue to be payable under the PMAs following a reset in any circumstance.  *See also Id.* at 27:22-28:1: "Q: And you knew there was an extreme likelihood that the [reset] transaction was not going forward as a result of the bankruptcy filing, correct?  MR. TERRY: Yes, that was our goal on filing the involuntary petitions."

PAGE 16

While Terry's identity is disclosed in Plans B and C, his affiliations are not.  Specifically, the Chapter 11 Trustee makes no effort to describe Terry's relationship and affiliations with other parties in interest in this case including (without limitation) Oaktree, Brigade Capital Management, L.P., and Cortland Capital Markets Services LLC.  Furthermore, the Chapter 11 Trustee does not disclose or otherwise describe the post-petition affiliation between Terry and the Chapter 11 Trustee himself.  Discovery in this matter has revealed, and evidence at the confirmation hearing will further demonstrate, that Terry has essentially acted as the co-trustee in this case.  This includes: taking it upon himself to market the Debtors' assets, introducing the Chapter 11 Trustee to Oaktree, participating in most substantive communications with Oaktree, and participating in the formulation of a Plan that (under Plans B and C) hands control of the Debtors over to him.  On this record, it is clear that Terry's affiliations have not been disclosed, in violation of section 1129(a)(5)(A)(i).

43.     While Terry's undisclosed affiliations is a significant issue in and of itself, the relationship between Terry and the Chapter 11 Trustee raises yet another, troubling issue.  The facts of this case lead inexorably to the conclusion that Terry is an insider of the Plan proponent (i.e., the Chapter 11 Trustee).  The term "insider" is defined in Bankruptcy Code section 101(31) to "include" parties who have certain officer, director, or ownership interests in a debtor.  However, the concept of a non-statutory insider has been recognized by many courts, including the Supreme Court.  *See U.S. Bank N.A. v. Village at Lakeside, LLC*, 138 S. Ct. 960 (2018).  The Fifth Circuit has identified the following factors to consider when determining whether a party is non-statutory insider: (1) the closeness of the relationship between the party and the debtor; and (2) whether the transactions between the party and the debtor were conducted at arms-length.  *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

**PAGE 17**

Importantly, cases recognize that control over the debtor is <u>not</u> a requirement for determining non-statutory insider status. *See, e.g., In re The Village at Lakeridge, LLC*, 814 F.3d 993, 1001 (9th Cir. 2016); *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 n.5 (10th Cir. 2008).

44.    The ultimate point of analyzing whether any party is an insider is to determine whether such party is using "their privileged position to disadvantage non-insider creditors." *See In re South Beach Secs., Inc.*, 376 B.R. 881, 888 (Bankr. N.D. Ill. 2007).  Insider status is also critical for determining whether a party's desire to obtain, or maintain, control over a debtor is motivating the party.  *See In re Rexford Props., LLC*, 557 B.R. 788, 799 (Bankr. C.D. Cal. 2016) (noting that insiders seeking to retain ownership of the reorganized debtor were "influenced by totally different considerations from those motivating the other creditors.") (quoting *In re Featherworks Corp.*, 25 B.R. 634, 640 (1st Cir. BAP 1982)).

45.    In this case, the Chapter 11 Trustee is the proponent of the Plan.  Plan proponent insiders should be scrutinized because they, like a debtor insider, may be using a plan process to benefit their "privileged position."  For example, in *In re Allegheny Int'l, Inc.*, 118  B.R. 282 (Bankr. W.D. Pa. 1982), the court found that a non-debtor plan proponent (Japonica Partners, L.P.) was considered an insider because Japonica during the case had access to "voluminous and thorough" information available only to insiders.  Moreover, the court noted that while Japonica "did not have actual control or legal decision making power [over the debtor] . . . [Japonica] attempted to influence, in not very subtle ways, decisions made by the debtor." *Id.* at 298.

46.    Terry's actions fit perfectly into such a non-statutory insider analysis.  A review of the Plan makes plain Terry's favorable treatment.  His claim is separately classified, the claim is treated the same as an entirely secured claim would be, despite the fact that Terry did not even

**PAGE 18**

alleged his claim was fully secured, he is being permitted to use $1 million to acquire Acis LP's equity, despite the fact that the claim on file is less than $1 million, and the Chapter 11 Trustee has made no indication that Terry's secured claim may be avoided, despite the fact that the garnishment took place well within the 90-day pre-petition preference period.

47.     In addition, while Terry is not in formal "control" of the Chapter 11 Trustee, Terry had access to voluminous insider information during the pendency of this case and he clearly influenced decisions made by the Chapter 11 Trustee.  Nothing about the relationship between Terry and the Chapter 11 Trustee suggests that they acted at arms-length.  Moreover, Terry used his close relationship to further his non-creditor motivation to put into place provisions that will allow him to take sole control over the Reorganized Debtor.  Thus, Terry meets every single element for establishing that he is a non-statutory insider of the Plan proponent in this case.  Moreover, any attempt by the Chapter 11 Trustee to distinguish the facts and cases on the basis that the Chapter 11 Trustee is not the same entity as the Debtors is specious.  Once again, the Chapter 11 Trustee is the Plan proponent in this case.  If a Chapter 11 trustee were able to hide behind an "I am not the debtor" argument, then it would follow that parties could engage in all manner of inside dealing and wrongful acts with a trustee with impunity.  That makes no sense.  The non-statutory insider analysis is designed to identify whether a party has a close relationship that allows the party to influence the process to further non-creditor goals (i.e., control).  Terry meets that test with respect to the Plan proponent in this case.  And, as discussed below, the fact that Terry is a non-statutory insider means the Chapter 11 Trustee cannot cram down the Plan.

**PAGE 19**

E.     **Sections 1129(a)(7) and 1129(b) – The Plan Is Not In the Best Interest of Creditors and Is Not Fair And Equitable**

48.     Bankruptcy Code sections 1129(a)(7) and 1129(b) require that a plan be in the best interest of creditors and otherwise fair and equitable.  First and foremost, Plans A, B, and C are premised on actions that are not supported by the law.  How could it ever be in the best interest of creditors for a plan proponent to act outside the law?  The Plan is a legal fallacy and, even if confirmed, will be the subject of years of litigation and ever-increasing administrative expense claims.  That is not in the creditors' best interests.

49.     Also, included in a best interest of creditors analysis is a determination that creditors who have not accepted the plan will receive no less under the Plan then they would in a hypothetical Chapter 7 liquidation.  *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993).  This requires a valuation analysis comparing what the creditor would receive if the property were sold today versus the value such creditor would receive as a creditor in a Chapter 7 case.  *Id.*

50.     The Chapter 11 Trustee cannot meet his burden on this valuation issue with respect to HCLOF.[11]  It is undisputable that HCLOF was not a creditor as of the Petition Date.  That is, the basis for the Chapter 11 Trustee asserting that HCLOF is a creditor is the equitable relief sought in an adversary proceeding brought by HCLOF against the Chapter 11 Trustee after the Petition Date.  In a hypothetical Chapter 7 case, there would simply be an orderly liquidation and therefore no need to twist the law of equitable relief and subrogation to support a plan process and HCLOF would keep its subordinated notes.  As such, any liquidation analysis by the Chapter 11 Trustee is a non-sequitur from the beginning because it would be based on the facially incorrect assumption that HCLOF was a creditor on the Petition Date.  Moreover, even if

---

[11] As noted, HCLOF asserts no creditor standing.

**PAGE 20**

4815-0110-1423.4
000764

that flaw is simply ignored (and there is no reason to do so), the valuation numbers do not add up.  The Plan proposes to pay HCLOF amounts based entirely on a May 2018 letter sent by Highland.  Evidence has shown in this case that circumstances have changed dramatically since May 2018, and further, that  HCLOF values its Equity Notes  much higher than what is being proposed under the Plan.  The Chapter 11 Trustee bears the burden of rebutting that valuation evidence and, based on the record of this case, he will not be able to meet such burden.  In fact, the Chapter 11 Trustee has not even substantively included HCLOF in its analysis purporting to satisfy section 1129(a)(7)[12] and he has advanced no expert witness to address the valuation issues necessary to do so at the confirmation hearing.  Therefore, the Chapter 11 Trustee cannot satisfy the required test under section 1129(a)(7).

**F.      Sections 1129(a)(8), (10) and 1129(b) – The Plan Does Not Meet the Requirements for Cram Down**

51.      Bankruptcy Code sections 1129(a)(8) requires that each impaired class vote in favor of a plan.  Bankruptcy Code section 1129(a)(10) permits a plan proponent to cram down a plan on non-voting classes, as long as one class of impaired creditors votes in favor of the plan.  Insider votes are not counted for the purposes of consent under 1129(a)(10).  Section 1129(b), in turn, requires in a cram down plan that the plan not unfairly discriminate and is fair and equitable to the non-voting creditors.  Based on the record of this case, it is assumed that Class 3 (the Terry Secured Claim) will be the only class with the claim amount and numerosity to be deemed (according to the Chapter 11 Trustee) a consenting class.  Therefore, in order to meet the cram down confirmation requirements, the Chapter 11 Trustee has the burden of showing that: (i) Terry is impaired; (ii) Terry is not an insider; and (iii) cramming the Plan down solely on

---

[12] The Chapter 11 Trustee's liquidation analysis is attached as Exhibit 2-D to the Disclosure Statement.  The amount of the Class 2 HCLOF claim is listed as "TBD."  *Id.*

**PAGE 21**

Terry's vote does not unfairly discriminate and is fair and equitable to other creditors. The Chapter 11 Trustee cannot meet such a burden.

52.     The Fifth Circuit interprets the concept of impairment broadly to include any alternation of a creditor's rights. *In re Village at Camp Bowie I, L.P.*, 710 F.3d at 245. However, a broad interpretation does not mean that the concept of impairment does not exist. The policy reason for requiring an impaired class to accept the plan under a cram down is to ensure that at least one group of creditors that is "hurt . . . nonetheless favors the plan." *In re One Times Square Assocs. Ltd. P'ship*, 165 B.R. 773, 776-77 (S.D.N.Y. 1994) (emphasis added).

53.     Here, no viable argument can be made that Terry is impaired under Plan A because Plan A proposes to pay Terry in full with interest. The interest element, of course, compensates Terry for any delay in receiving what he alleges he is owed. Paying a creditor in full with interest is the very definition of non-impairment. Using a lone creditor, let alone in insider such as Terry, should not be sufficient to fulfill the section 1129(a)(10) requirement. This is a textbook case of using artificial impairment to generate an impaired accepting class.

54.     Moreover, even if Terry were considered impaired under Plan A, Terry's votes should not be counted under any of the plans (A, B, or C) because Terry is a non-statutory insider. The basis for deeming Terry a non-statutory insider is set forth above. Because of his status as such, the Chapter 11 Trustee is prohibited by the plain language of section 1129(a)(10) from relying on Terry's votes to support a plan.

55.     The final requirement for a cram down plan is that it is fair and equitable and does not unfairly discriminate. Whether a plan is proposed in good faith is a critical element of this determination. *See In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247 (citing *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989)). Because, as set forth above, the Chapter 11

PAGE 22

Trustee is unable to establish that the Plan was proposed in good faith, he likewise will be unable to establish that he meets the cram down standard. The Plan also unfairly discriminates on a number of different bases. Moreover, the Chapter 11 Trustee provides no basis for classifying Highland's claims separately under the Plan, other than to gerrymander the classes.

## G.  Section 1129(a)(10) – The Plan's Claim Classifications are Improper

56.  A further requirement under section 1129(a)(10) and related case law is that claims be properly classified under a plan. *See, e.g., In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (prohibiting the gerrymandering of classes to create a consenting impaired class). Claims that are "substantially similar" must be classified together. Terry's claim treatment under the Plan is a blatant example of gerrymandering. Terry has alleged a partial secured claim based on pre-petition garnishment of certain funds. However, the garnishment occurred within the 90-day preference period and is *per se* avoidable. As such, Terry is nothing more than a general unsecured creditor in this case. His claim should be classified alongside other general unsecured creditors in Class 4.

57.  Highland is a general unsecured creditor in the case, but its claim has been separately classified from other general unsecured creditors. Similarly, HCLOF is a Class 2 claimant under Plan A, but is effectively a Class 5B claimant under Plan B and Plan C. Presumably, the Chapter 11 Trustee bases such separate classification and disparate treatment on his allegation that Highland and/or HCLOF are liable for a fraudulent transfer. However, that matter remains subject to an on-going adversary proceeding. In other words, the Chapter 11 Trustee has simply made an allegation and is yet to prove his case. Permitting separate classification based on unproven allegations would seem an invitation for plan proponents to

PAGE 23

engage in all manner of mischief in order to craft around the requirement that substantially similar claims be classified together.[13]

### H.    Section 1129(a)(11) – The Plan is Not Feasible

58.    Bankruptcy Code section 1129(a)(11) has been interpreted to require a finding that a plan is economically feasible.  This requires the Chapter 11 Trustee to demonstrate that the plan has a "reasonable assurance of commercial viability." *In re Briscoe Enters., Ltd. II*, 994 F.2d at 1166.  Moreover, the Chapter 11 Trustee must "present proof through reasonable projections that there will be sufficient cash flow to funder the [Plan]."  *See In re Couture Hotel Corp.*, 536 B.R. 712, 737 (Bankr. N.D. Tex. 2015).

59.    On the record before the Court, the Chapter 11 Trustee has failed to demonstrate sufficient funds to meet all the obligations set forth in the Plan.  That includes the very substantial administrative expense burden that appears to have surpassed the total claims alleged by the Chapter 11 Trustee to be payable in this case.

### I.    The Plan Cannot Effect an Assumption and Assignment of the PMAs Without Consent.

60.    The Plan A transaction cannot be confirmed because it proposes to assume and assign the PMAs to Oaktree (*see* Plan § 2.17(c)) in violation of section 365(c)(1) of the Bankruptcy Code and without the requisite consent. *See* 11 U.S.C. § 365(c)(1) (trustee "may not

---

[13]  HCLOF and Highland object to the Chapter 11 Trustee's apparent attempt to litigate the fraudulent transfer claims currently pending in the adversary proceeding as part of the plan confirmation process.  As set forth in their separately-filed joint motion to strike the expert report of Kevin Haggard of Miller Buckfire, any such attempts are procedurally improper and inconsistent with the parties' understanding and agreed-upon schedule.  Highland and HCLOF have a right under the Bankruptcy Code and applicable rules to litigate the fraudulent transfer claims in a proceeding subject to the heighted procedural protections available in an adversary proceeding—not in the context of a harried and accelerated confirmation process (a process of the Trustee's own making).  *See In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008) ("[W]here the Rules require an adversary proceeding—which entails a fundamentally different, and heightened, level of procedural protections—to resolve a particular issue, a creditor has the due process right not to have that issue without one.").  The Court should not condone this type of "litigation by ambush."  *See In re Vidal*, No. 12-11758 BLS, 2013 WL 441605, at \*5 (Bankr. D. Del. Feb. 5, 2013) (applying *Mansaray-Ruffin* to avoid "lien-stripping by ambush").

**PAGE 24**

assume or assign any executory contract . . . if applicable law excuses a party, other than the

debtor, to such contract . . . from accepting performance from or rendering performance to an

entity other than the debtor . . . and such party does not consent to such assumption or

assignment"); *In re Cedar Chem. Corp.*, 294 B.R. 224, 232 (Bankr. S.D.N.Y. 2003) ("a contract

otherwise unassignable under § 365(c)(1) can be assumed and assigned if the non-debtor party

consents").  The IAA and New York state law provide the relevant "applicable law" prohibiting

assignment and excusing HCLOF from accepting performance from anyone other than Acis

and/or Highland.

61.     The IAA prohibits the assumption and assignment of the PMAs to Oaktree

without, among other things, the Equity Noteholders' consent.  Section 205(a)(2) of the IAA

prohibits investment advisers (i.e., Acis LP) from entering into an investment advisory contract

with a client (here, the CLOs) that "fails to provide, in substance, that no assignment of such

contract shall be made by the investment adviser without the consent of the other party by the

contract."  15 U.S.C. § 80b–5(a)(2).  Section 202(a)(1) of the IAA defines "assignment"

generally to include "any direct or indirect transfer . . . of an investment advisory contract" by an

adviser.  15 U.S.C. § 80b–2(a)(1) (emphasis added).

62.     Section 14 of the PMAs (titled "Delegations/Assignments") provides the

provisions intended to satisfy section 205(a)(2) of the IAA.  Those sections, in relevant part,

prohibit Acis from assigning its responsibilities under the PMAs without the written consent of

each relevant CLO, at least a majority of the Equity Notes of each CLO, at least a majority of the

Controlling Class (as defined in the indentures), and satisfaction of the Global Rating Agency

Condition.  *See*, *e.g.*, 2013-1 PMA, § 14(a).  Acis cannot transfer, either directly or indirectly, its

responsibilities under the PMAs without first satisfying the requisite conditions, including

**PAGE 25**

obtaining the written consent of a majority of the Equity Noteholders of each CLO (which the Chapter 11 Trustee has not obtained).

63.　　The *CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, No. 17 Civ. 9463, 2018 U.S. Dist. LEXIS 90174 (S.D.N.Y. May 23, 2018) case does not mandate a different result. First, the language the Trustee quotes is from a decades-old SEC no-action letter. *Id.* at *12 (quoting *SEC No-Action Letter, Am. Century Cos.*, 1997 WL 1879138, at *5 (Dec. 23, 1997)). SEC no-action letters are only binding with respect to the party requesting guidance, have no precedential value unless the SEC agrees to allow a party to rely on them, and the SEC is free to change their interpretation at any time. *See* SEC, Fast Answers, available at https://www.sec.gov/fast-answers/answersnoactionhtm.html. Second, CWCapital did not decide whether the IAA separately requires client consent. 2018 U.S. Dist. LEXIS 90174, at *12-13. Third, a reported case from a court in this District recently found to be well-pleaded a cause of action for "assigning the benefits of [an] agreement to provide investment advisory services to others" based on the IAA. *Douglass v. Beakley*, 900 F. Supp. 2d 736, 748 (N.D. Tex. 2012).

64.　　The proposed assumption and assignment undermines the public policy reasons for section 205(a)(2) of the IAA. The Chapter 11 Trustee's transfer of portfolio management duties to Oaktree thus violates section 205(a)(2) of the IAA, and in turn, violates section 365(c)(1) of the Bankruptcy Code. The Chapter 11 Trustee and this Court cannot ignore the dictates of the IAA. *Cf. In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 78-79 (Bankr. S.D.N.Y. 2007) (local ordinances provided "applicable law" that prohibited assignment).

65.　　The PMAs are also a personal services contract that cannot be assigned under New York law without consent. *See Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 482 (N.Y. 2006) (hotel management contract held below to be personal services contract;

**PAGE 26**

"personal services contracts generally may not be assigned absent the principal's consent")
(citing 9 Corbin, Contracts § 865 [interim ed.]; 3 Farnsworth, Contracts §§ 11.4, 11.10 [3d ed]);
*Marriott Int'l, Inc. v. Eden Roc, LLLP*, 104 A.D.3d 583, 584 (N.Y. App. Div. 1st Dep't 2013)
("The parties' detailed management agreement places full discretion with plaintiffs to manage
virtually every aspect of the hotel.  Such an agreement, in which a party has discretion to execute
tasks that cannot be objectively measured, is a classic example of a personal services contract
that may not be enforced by injunction"); *see also* 6A N.Y. Jur., Assignments § 11 ("[T]he
principle that all ordinary business contracts are assignable is subject to the exception that
executory contracts for personal services or those involving a relationship of personal confidence
are not assignable by one party unless the other party consents or waives the right to object.
Thus, as a general rule, an employment contract for the performance of personal duties or
services is not assignable by the employer so as to vest in the assignee the right to the labor of
someone who never agreed to such employment.  In fact, generally, no executory contract for
personal services can be assigned by either party.").

66.      Under New York law, personal service contracts are generally those that depend
on the skill or reputation of the performing party.  *See In re Schick*, 235 B.R. 318, 323 (Bankr.
S.D.N.Y. 1999) ("Faced with a state law restricting assignment . . . a court must inquire into its
rationale and uphold the restriction under section 365(c) if the identity of the contracting party is
material to the agreement").  As one bankruptcy court has stated with respect to New York law
on the issue:

> It is well settled that when an executory contract is of such a nature as to be based
> upon personal services or skills, or upon personal trust or confidence, the debtor-
> in-possession or trustee is unable to assume or assign the rights of the bankrupt in
> such contract. . . .   It is patently unfair in such cases to require a non-debtor third
> party to accept performance from anyone other than the original contract vendee,

unless the contract clearly provides for the right to assign to another contract vendee.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996); *see also Donald Rubin, Inc. v. Schwartz*, 559 N.Y.S. 2d 307, 310 (N.Y. App. Div. 1990) (describing a consulting agreement as being "in the nature of a personal services contract"); *Carbo Indus., Inc. v. Coastal Ref & Mktg., Inc.*, 154 F. App'x 218, 220 (2d Cir. 2005) ("this case does not fall within the limited exception developed for 'personal services contracts'—*e.g.*, consulting contracts.") (citing *Donald Rubin*, 559 N.Y.S. 2d at 310) (emphasis added).

67.    As has been previously explained, HCLOF and its investors invested in reliance on the skill and expertise of Highland to manage the CLOs.  In this case, a witness put on by the Chapter 11 Trustee – Zach Alpern of Stifel, Niocolas – testified to the fact investors pick sub-advisors based on the fact that different advisors "have different styles and make different creditor choices."[14]  Mr. Alpern further testified that "equity holders make an informed decision when they make their investment and their opinion of the advisor is one of the considerations that they may make at the time of their investment, and it's a consideration that they probably take into account whether they hold or sell that investment."[15]

68.    Replacing Acis/Highland with Oaktree/Brigade frustrates the investment objective of the parties, denies them the benefit of their bargain, and undermines and violates the IAA as well as black-letter New York law relating to personal service contracts.  The assumption and assignment of the PMAs cannot be approved.

---

[14] *See* Transcript of August 1, 2018 hearing on the Chapter 11 Trustee's *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC*, at 67:24-25.
[15] *Id.* at 69:9-14.

4815-0110-1423.4
000772

**J.     The Disclosure Statement Should Not be Finally Approved**

69.     As to the Disclosure Statement, Highland and HCLOF renew their objections to its final approval based on the fact that it describes a patently unconfirmable Plan.  *See In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007); *In re Arnold*, 471 B.R. 578, 586 (Bankr. C.D. Cal. 2002).

**IV.**
**RESERVATION OF RIGHTS**

70.     Nothing herein shall be construed as an admission of, or concession to, any fact contained in the Disclosure Statement or the Plan, and Highland and HCLOF reserve all rights to contest and rebut any and all factual allegations at the Confirmation Hearing.  As previously mentioned herein, because discovery is ongoing per the Discovery Schedule, Highland and HCLOF reserve their rights to amend these Objections.

WHEREFORE, Highland and HCLOF respectfully request entry of an order (i) denying confirmation of the Plan; (ii) denying final approval of the Disclosure Statement; and (iii) granting such other and further relief to which Highland and HCLOF are entitled.

**PAGE 29**

Dated:  August 13, 2018

Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone:  (214) 999.3000
Facsimile:  (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104) (admitted *pro hac vice*)
W. Austin Jowers (GA 405482)
Paul R. Bessette (TX 02263050) (admitted *pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING,**
**LTD.**

4815-0110-1423.4
000774

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on August 13, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Melina Bales*
Melina Bales

# EXHIBIT 10

000776

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P. and
CLO Holdco, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| **Defendants.** | § | |

### PLAINTIFFS' RESPONSE TO DEFENDANT HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR AN ORDER TO ENFORCE THE ORDER OF REFERENCE

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

I.    PRELIMINARY STATEMENT .......................................................................... 1

II.   BACKGROUND ................................................................................................. 2

III.  ARGUMENT & AUTHORITY .......................................................................... 3

    A.   The Motion Should Be Denied Because Withdrawal of
        the Reference is Mandatory ....................................................................... 3

    B.   Automatic Referral is Unnecessary and Would Be Inefficient ................ 9

        1.   The causes of action asserted by the Plaintiffs do not
            "arise under," or "arise in" Title 11 are not "core"
            proceedings ..................................................................................... 10

        2.   The Bankruptcy Court has limited post-confirmation
            "related to" jurisdiction ................................................................. 12

    C.   The *Res Judicata* Argument is Not Relevant to the Relief
        Sought in This Motion ............................................................................. 15

    D.   The Local Rule 3.3 Argument is Unavailing ......................................... 16

    E.   The Litigious-Nature Argument is Likewise Unavailing ...................... 17

    F.   Plaintiffs' Cross-Motion Should be Granted ......................................... 18

VI.   CONCLUSION ................................................................................................. 19

000778

# TABLE OF AUTHORITIES

## Cases

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
  203 F.3d 914 (5th Cir. 2000) .................................................................15

*Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*,
  266 F.3d 388 (5th Cir.2001) ..................................................................18

*Beitel v. OCA, Inc. (In re OCA, Inc.)*,
  551 F.3d 359 (5th Cir. 2008) .................................................................13

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013)...................................................................6

*Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners, L.P.)*,
  No. H-18-411, 2018 U.S. Dist. LEXIS 161159 (S.D. Tex. 2018)............................7

*Burch v. Freedom Mortg. Corp. (In re Burch)*,
835 F. App'x 741 (5th Cir. 2021) ............................................................18

*Celotex Corp. v. Edwards*,
  514 U.S. 300 (1995)..........................................................................15

*Chalmers v. Gavin*,
  No. 3:01-CV-528-H, 2002 U.S. Dist. LEXIS 5636 (N.D. Tex., Apr. 2, 2002) ....................15

*Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.)*,
  309 B.R. 217 (Bankr. N.D. Tex. 2004)......................................................14

*Davis v. Dall. Area Rapid Transit*,
  383 F.3d 309 (5th Cir. 2004) .................................................................15

*Davis v. Life Inv'rs Ins. Co. of Am.*,
  282 B.R. 186 (S.D. Miss.2002).................................................................10

*Faulkner v. Eagle View Capital Mmgt. (In re The Heritage Org., L.L.C.)*,,
  454 B.R. 353 (Bankr. N.D. Tex. 2011).......................................................13

*Faulkner v. Kornman*,
  No. 10-301, 2015 Bankr. LEXIS 700 (Bankr. S.D. Tex. 2015) ...............................14

*Feld v. Zale Corp. (In re Zale Corp.)*,
  62 F.3d 746 (5th Cir.1995) ...................................................................12

ii

*Gupta v. Quincy Med. Ctr.*,
  858 F.3d 657 (1st Cir. 2017) ........................................................................ 11-124

*In re Cont'l Airlines Corp.*,
  50 B.R. 342 (S.D. Tex. 1985), *aff'd*, 790 F.2d 5th Cir. 1986) ..................................4

*In re Exide Techs.*,
  544 F.3d 196 (3d Cir. 2008) ...................................................................................10

*In re Harrah's Entm't*,
  No. 95-3925, 1996 U.S. Dist. LEXIS 18097 (E.D. La. 1996) .....................1, 5, 9, 19

*In re IQ Telecomms., Inc.*,
  70 B.R. 742 (N.D. Ill. 1987) .....................................................................................6

*In re Nat'l Gypsum Co.*,
  134 B.R. 188 (N.D. Tex. 1991) ................................................................................8

*In re Pegasus Gold Corp.*,
  394 F.3d 1189 (9th Cir. 2005) ...............................................................................14

*Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  454 B.R. 307 (S.D.N.Y. 2011) ............................................................................ 3-4

*Kuzmin v. Thermaflo, Inc.*,
  No. 2:07-cv-00554-TJW, 2009 U.S. Dist. LEXIS 42810
  (E.D. Tex. May 20, 2009) .................................................................................. 16-17

*Legal Xtranet, Inc. v. AT&T Mgmt. Servx., l.P. (In re Legal Xtranet, Inc.*),
  453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011) .............................................10, 11

*LightSquared Inc. v. Deere & Co.*,
  2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) .................................................. 3-4

*Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc).*,
  783 F.2d 1283 (5th Cir. 1986) ...............................................................................15

*Montana v. Goldin (In re Pegasus Gold Corp.)*,
  394 F.3d 1189 (9th Cir. 2005) ...............................................................................14

*Price v. Rochford*,
  947 F.2d 829 (7th Cir. 1991) .................................................................................14

*Rannd Res. v. Von Harten (In re Rannd Res.)*,
  175 B.R. 393 (D. Nev. 1994) ............................................................................... 5-6

iii

*Reynolds v. Tombone*,
   Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS 9995
   (N.D. Tex., June 24, 1999)...................................................................................15

*Risby v. United States*,
   No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798 (N.D. Tex. 2006) ..................15

*SEC v. Capital Gains Research Bureau, Inc.*,
   375 U.S. 180, 84 S. Ct. 275 (1963).........................................................................6

*S. Pac. Transp. Co.  v. Voluntary Purchasing Grps.*
   252 B.R. 373 (E.D. Tex. 2000) ................................................................................8

*Stern v. Marshall*,
   564 U.S. 462 (2011)........................................................................................10, 13

*Stoe v. Flaherty*,
   436 F.3d 209 (3d Cir. 2006)...................................................................................11

*TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*,
   764 F.3d 512 (5th Cir. 2014) ............................................................................3, 18

*Travelers Indem. Co. v. Bailey*,
   557 U.S. 137 (2009)...............................................................................................15

*Travelers Ins. Co. v. St. Jude Hosp.*,
   37 F.3d 193 (5th Cir. 1994) ...................................................................................15

*Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp. (In re Am. Home Mortg. Holding)*,
   477 B.R. 517 (Bankr. D. Del. 2012) ......................................................................14

*TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC,*
   622 B.R. 680 (Bankr. N.D. Tex. 2020)...................................................................10

*UPH Holdings, Inc. v. sprint Nextel Corp.*,
   No. A-13-CA-748-SS, 2013 U.S. Dist. LEXIS 189349
   (W.D. Tex. 2013) ................................................................................................ 7-8

*United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*,
   301 F.3d 296 (5th Cir. 2002) .................................................................................10

*Valley Historic Ltd. P'ship v. Bank of N.Y.*,
   486 F.3d 831 (4th Cir. 2007) .................................................................................15

*Wood v. Wood (In re Wood)*,
   825 F.2d 90 (5th Cir.1987) ....................................................................................11

*Zerand-Bernal Grp. v. Cox,*
  23 F.3d 159 (7th Cir. 1994)------------------------------------------------------------------15

## **Rules & Statutes**

Fed. R. Civ. P. 12(b)(6)...........................................................................................18

LRCi 3.3..............................................................................................................16, 17

LRCi 7(a) .................................................................................................................17

LRCi 7(h) .................................................................................................................17

LRCi 7(i) ..................................................................................................................17

LRCi 7.1(i) ...............................................................................................................17

17 C.F.R. 275.206(4)-7 .............................................................................................7

27 C.F.R. part 275 .....................................................................................................7

15 U.S.C. § 80b-1 ......................................................................................................8

28 U.S.C. § 157(d) ........................................................................................6,18, 19

28 U.S.C. § 1927 ......................................................................................................18

## **Other**

Collier on Bankruptcy ¶ 3.02[2] (16th ed. 2010)....................................................13

Investment Advisers Act of 1940 ...................................................................... *passim*

Investment Advisers Act Release No. 2106 (Jan. 31, 2003) .....................................7

Investment Advisers Act Release No. 3060 (July 28, 2010) .....................................7

Investment Advisers Act Release No. 4197 (Sept. 17, 2015)....................................7

Racketeer Influenced and Corrupt Organizations Act (RICO).......................... *passim*

Securities Act of 1933, § 12(2) ..................................................................................6

Securities Exchange Act of 1934, § 10 .......................................................................6

Securities Exchange Act, Rule 10b-5 ..........................................................................6

v

**PLAINTIFFS' RESPONSE TO DEFENDANT HIGHLAND CAPITAL
MANAGEMENT, L.P.'S MOTION FOR AN ORDER TO ENFORCE
<u>THE ORDER OF REFERENCE AND CROSS MOTION</u>**

## I.

### PRELIMINARY STATEMENT

Plaintiffs The Charitable DAF Fund, L.P. and CLO Holdco Ltd. oppose Defendant Highland Capital Management, L.P.'s Motion for an Order to Enforce the Order of Reference.

This action primarily involves fiduciary duties imposed upon Registered Investment Advisers by the Investment Advisers Act of 1940 ("Advisers Act") and corresponding state law claims for breach of those duties. It also involves causes of action under the civil RICO statute, for which breaches of Advisers Act fiduciary duties serve as the predicate act. As a result, presiding over this action will require extensive consideration of federal laws regulating interstate commerce, which renders withdrawal of the reference to bankruptcy court mandatory under 28 U.S.C. § 157(d) ("The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.").

No authority requires this Court to refer this action to the bankruptcy court, only to have it return on a motion for withdrawal of the reference. The opposite is true. *In re Harrah's Entm't*, No. 95-3925, 1996 U.S. Dist. LEXIS 18097, at *11 (E.D. La. 1996) (Clement, J.) ("Although 'related to' bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal

---

of the reference. Rather than *waste judicial resources* on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit." (emphasis added)). Defendant's arguments to the contrary are unsupported by law.

Defendant's attempts to smear Plaintiffs with 12 pages of irrelevant facts and a 926-page appendix provide no additional support for the Motion. This action involves matters well outside the experience of bankruptcy courts and requires adjudication in an Article III court.

Because the reasons for denying Defendant's Motion are also reasons that this Court should withdraw the reference under 28 U.S.C. § 157(d), and because deciding the same issue twice would be inefficient and unnecessary, Plaintiffs cross-move for withdrawal of the reference.

## II.

## BACKGROUND

Defendant's factual assertions include considerable bluster and vitriol, unsupported by the lengthy materials in its appendix. Importantly, the opening sentence under the heading "Factual Background" is unsupported and false. Memorandum of Law [Doc. 23] ¶ 7. Plaintiffs are not controlled or directed by James Dondero; Plaintiffs are both controlled and directed by Mark Patrick. APP_16-17, 22; *see also* APP_10-14; *see generally* APP_1-22. And Patrick's testimony to this extent went unchallenged in a hearing before the bankruptcy court earlier this month. *Id*.

Of equal importance is Defendant's assertion that all aspects of the Harbourvest settlement, including the valuation of the assets involved, were fully disclosed. Memorandum of Law [Doc. 23] ¶ 12. This statement is unsupported by the appendix cite accompanying it, which at most constitutes a self-serving denial. And it is a hotly contested issue between the parties. The impetus to this action, in fact, was Plaintiffs having learned that the value of the assets transferred in the Harbourvest settlement was *not* as represented. Original Complaint ("Complaint" [Doc. 1]), ¶¶ 36-

48. Plaintiffs disagree with much of the remainder of what Defendant presents as "fact" in its Memorandum of Law. But Plaintiffs respectfully submit that none of it is relevant to resolution of the present Motion. And so, for brevity's sake, Plaintiffs have not elected to engage in a blow-by-blow effort to litigate those issues.

Instead, Plaintiffs' brief will focus on the nature of their causes of action as that pertains to which court—district or bankruptcy—should preside over them.

### III.

### ARGUMENT & AUTHORITY

Plaintiffs respectfully submit that Defendant's Motion should be denied and Plaintiffs' cross-motion granted for the reasons provided below:

### A. The Motion Should Be Denied Because Withdrawal of the Reference Is Mandatory

Because the Complaint relies extensively on and largely is predicated on the Investment Advisers Act of 1940, withdrawal of the reference to the bankruptcy court is mandatory here under 28 U.S.C. § 157(d). That statute requires withdrawal of the reference when a proceeding "requires consideration" of non-bankruptcy federal laws regulating interstate commerce:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d); *cf. TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *LightSquared Inc. v. Deere & Co.*, 2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) (quoting *Investor Prot. Corp. v. Bernard*

*L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. 2011), for the proposition that, "[i]n determining whether withdrawal is mandatory, the Court 'need not evaluate the merits of the parties' claims; rather, it is sufficient for the Court to determine that the proceeding will involve consideration of federal non-bankruptcy law'"); *In re Cont'l Airlines Corp.*, 50 B.R. 342, 360 (S.D. Tex. 1985), *aff'd*, 790 F.2d 5th Cir. 1986) ("While that second clause [of § 157(d)] might not apply when some 'other law' *only tangentially affects the proceeding*, it surely does apply when federal labor legislation *will likely be material* to the proceeding's resolution.") (emphasis added).

Plainly here, the claims in the Complaint at least involve federal laws "regulating organizations or activities affecting interstate commerce." The Advisers Act and the RICO statute are such laws, and at least the first and fourth counts of the Complaint sound under them. *See, e.g.*, Complaint ¶¶ 57 & n.5, 66, 69, 74 & n.6, 89 (explicitly invoking various provisions of the Advisers Act and accompanying regulations), 114, 117, 131, 132 (invoking the RICO statute). Defendant's entire argument against withdrawal of the reference thus turns on whether these laws "must be considered."

It is remarkable that Defendant suggests these statutes need not be considered. The briefing already puts at issue significant, hotly contested issues regarding the interplay of bankruptcy law and the Advisers Act, including

1. Whether Defendant owed fiduciary duties under the Advisers Act that are unwaivable;

2. To whom such duties are owed and whether they were violated;

3. Whether such Advisers Act fiduciary duties can be terminated by a blanket release in a bankruptcy settlement;

4. Whether *res judicata* applies to bar claims for breach of Advisers Act duties that had not yet accrued at the time of the action alleged to have barred them;

---

5. Whether a contractual jury waiver is enforceable as to claims for breach of unwaivable Advisers Act fiduciary duties;

6. Whether such waivers can be enforced as to non-parties to the waiver;

7. Whether breach of Advisers Act fiduciary duties can serve as a predicate for civil RICO liability under the RICO statute, among other significant legal issues.

Presiding over this action most certainly will require consideration of all these issues.

Before joining the Fifth Circuit, Judge Clement addressed a motion similar to Defendant's during her time in the Eastern District of Louisiana. There, in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097, at *7-8 (E.D. La. 1996), she denied a motion to refer a federal securities action to bankruptcy court, despite finding that the bankruptcy court had related-to jurisdiction. Judge Clement wrote,

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference. Rather than waste judicial resources on a meaningless referral to bankruptcy court, the Court will retain jurisdiction over this suit.

*Id*. at *11.

Judge Clement rejected the argument Defendant parrots here that the case would "only involve the simple application of established federal securities laws." *Id*. at *7. Instead, she relied on alleged "violations of several federal securities laws" and the plaintiff's attempt "to hold defendants directly liable and secondarily liable based on a 'controlling person' theory for certain acts and omissions." *Id*. Without any need to analyze how "established" the applicable law might be, Judge Clement concluded, [t]his federal securities litigation involves more than simple application of federal securities laws and will be complicated enough to warrant mandatory withdrawal under § 157(d)." *Id*. (citing *Rannd Res. v. Von Harten (In re Rannd Res.)*, 175 B.R.

---

393, 396 (D. Nev. 1994), for the proposition that withdrawal of the reference is mandatory where resolution requires more than simple application of federal securities laws, even though that court's determination was based solely on a review of the complaint's alleged violations of § 12(2) of the Securities Act of 1933, § 10 of the Securities Exchange Act of 1934, and Rule 10b-5).

This authority applies here. In the Complaint, Plaintiffs allege violations of federal securities law (the Advisers Act), as well as the RICO statute. Deciding even the pending motion to dismiss will require far more than simple application of these laws. Nothing more is necessary to satisfy § 157(d). *Cf. In re IQ Telecomms., Inc.*, 70 B.R. 742, 745 (N.D. Ill. 1987) ("Nevertheless, Central's second amended complaint easily meets [the § 157(d)] standard. Count 2 of the complaint consists of 76 pages and alleges that 29 individuals and entities violated RICO by engaging in a pattern of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and 139 specific instances of bankruptcy fraud, 18 U.S.C. § 152.").

Although it is unnecessary here to demonstrate that Plaintiffs' Advisers Act allegations will require application of *underdeveloped* law, that is certainly the case. As the Third Circuit pointed out in 2013, there is considerable "confusion" in the case law stemming from the fact that federal law (the Advisers Act) provides "the duty and the standard to which investment advisers are to be held," but "the cause of action is presented as springing from state law." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502 (3d Cir. 2013). The *Belmont* court further suggests the "confusion [that this situation] engenders may explain why there has been *little development in either state or federal law* on the applicable standards." *Id*. (emphasis added). "Half a century later," the *Belmont* court tells us, "courts still look primarily to *Capital Gains Research* [,*Inc.*, 375 U.S. 180, 192 (1963),] for a description of an investment adviser's fiduciary duties." *Id*. at 503;

---

*see also* Plaintiffs' Response to Motion to Dismiss (addressing Defendant's erroneous argument that the Advisers Act creates no private right of action).

This observation is bolstered by the necessity of relying extensively on SEC regulations and rulings in the Complaint. *See* Complaint ¶ 57 & n.5 (invoking Investment Advisers Act Release Nos. 3060 (July 28, 2010), and 2106 (Jan. 31, 2003), 66 (17 C.F.R. 275.206(4)-7), 69 (27 C.F.R. part 275 and Rule 10b5-1), 74 & n.6 (Advisers Act Release No. 4197 (Sept. 17, 2015)).

None of the cases Defendant cites even remotely suggests that this type of complicated litigation involving underdeveloped securities laws does not require "consideration" of federal laws. In its lead case, *Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners, L.P.)*, No. H-18-411, 2018 U.S. Dist. LEXIS 161159 (S.D. Tex. 2018), the court only held that a state-law contract claim did not require substantial reliance on federal law merely because it involved a trust created under federal law (the OCSLA). *Id.* at *16-17. Moreover, the court's determination appears to have relied primarily, if not solely, on the fact that the bankruptcy court had already submitted a memorandum opinion on the defendant's summary judgment motion, disposing of the case without the need to rely on non-bankruptcy federal law. *Id.* at *14-15, 17.

Next, Defendant cites *UPH Holdings, Inc. v. Sprint Nextel Corp.*, No. A-13-CA-748-SS, 2013 U.S. Dist. LEXIS 189349 (W.D. Tex. 2013), which is, at most, only slightly on point. There, the court declined to withdraw the reference with regard to a turnover action under the Bankruptcy Code, with little analysis other than having repeated the parties' arguments. Thus, it is difficult to draw any significance from the decision. But the court seems to rely on the fact that "the primary dispute center[ed] around the existence of a 'regulatory black hole,' a span of time during which the rules concerning how to set [a telecom] intercarrier compensation rate were left undetermined." *Id.* at *6. And for that reason, the court seemed to believe there was little non-bankruptcy federal

law to consider. *Id.* at 7. Here, in contrast, the causes of action do not arise under the Bankruptcy Code, and there is an extensive regulatory scheme that, plainly, must be considered.

The other cases Defendant cites add little to the analysis, except that *S. Pac. Transp. Co. v. Voluntary Purchasing Gps*, 252 B.R. 373, 382 (E.D. Tex. 2000), holds against Defendant's position, having determined that even the court's "limited" role in approving a CERCLA settlement "necessarily involves the substantial and material consideration of CERCLA and not merely its straightforward application to the facts of this case." *Id.* at 384. The court's reason for this conclusion: its decision "will require the court to examine the unique facts of the case in light of those CERCLA provisions which create the causes of action at issue." *Id.* Of course, the same examination will be necessary here.

Notably, in *S. Pac. Transp.*, the court also stated, "[i]t is well settled that CERCLA is a statute "'rooted in the commerce clause' and is precisely 'the type of law . . . Congress had in mind when it enacted the statutory withdrawal provision [in § 157(d)].'" *Id.* at 382 (quoting *In re Nat'l Gypsum Co.*, 134 B.R. 188, 191 (N.D. Tex. 1991), (alterations in original)). The court could just as easily have been talking about the Advisers Act. *See* 15 U.S.C. § 80b-1 ("Upon the basis of facts disclosed by the record and report of the Securities and Exchange Commission made pursuant to section 30 of the Public Utility Holding Company Act of 1935, and facts otherwise disclosed and ascertained, it is hereby found that investment advisers are of national concern, in that, among other things—(1) their advice, counsel, publications, writings, analyses, and reports are furnished and distributed, and their contracts, subscription agreements, and other arrangements with clients are negotiated and performed, by the use of the mails and means and instrumentalities of interstate commerce; (2) their advice, counsel, publications, writings, analyses, and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in interstate

over-the-counter markets, securities issued by companies engaged in business in interstate

commerce, and securities issued by national banks and member banks of the Federal Reserve

System; and (3) the foregoing transactions occur in such volume as substantially to affect interstate

commerce, national securities exchanges, and other securities markets, the national banking

system and the national economy.").

In sum, the Complaint alleges violations of non-bankruptcy federal law. In presiding over

the case—indeed, in addressing the currently pending Motion to Dismiss—this Court will have to

substantially and materially consider those laws and their interplay with bankruptcy law. Under

§ 157(d), this requires withdrawal of the reference, and Defendant's motion should be denied.

**B. Automatic Referral Is Unnecessary and Would Be Inefficient**

As noted previously, Judge Clement's ruling in *In re Harrah's Entm't*, 1996 U.S. Dist.

LEXIS 18097 (E.D. La. 1996), establishes that reference to the bankruptcy court—only to have

the reference withdrawn—is unnecessary:

> Although "related to" bankruptcy jurisdiction exists over the non-debtor
> plaintiffs' non-bankruptcy federal securities claims against non-debtor
> defendants, placing that bankruptcy jurisdiction in the bankruptcy court is
> inappropriate because plaintiffs would be entitled to a mandatory
> withdrawal of the reference. *Rather than waste judicial resources on a
> meaningless referral to bankruptcy court, the Court will retain jurisdiction
> over this suit.*

*Id*. at *11 (emphasis added).

Defendant nonetheless argues this Court must do precisely that. Plaintiffs submit this is

both wrong and tenuous, because at this stage of the bankruptcy proceedings—post confirmation—

it is unclear that the bankruptcy court has jurisdiction at all.

---

1. **The causes of action asserted by the Plaintiffs do not "arise under," or "arise in" Title 11 and are not "core" proceedings.**

In the Complaint, Plaintiffs do not seek relief that would undo or reverse any settlement approved by the bankruptcy court. Neither do they attempt an end run around the provisions of any approval, Defendant's protestations notwithstanding. A proper jurisdictional analysis demonstrates Plaintiffs' causes of action asserted here are not core proceedings within the bankruptcy court's jurisdiction, for the reasons addressed below.

First of all, "the 'core proceeding' analysis is properly applied not to the case as a whole, but as to each cause of action within a case.*" Legal Xtranet, Inc. v. AT&T Mgmt. Servs., L.P. (In re Legal Xtranet, Inc.*), 453 B.R. 699, 708–09 (Bankr. W.D. Tex. 2011*); Davis v. Life Inv'rs Ins. Co. of Am.*, 282 B.R. 186, 193 n. 4 (S.D. Miss.2002); *see also In re Exide Tech*s., 544 F.3d 196, 206 (3d Cir. 2008) ("A single cause of action may include both core and non-core claims. The mere fact that a non-core claim is filed with a core claim will not mean the second claim becomes 'core.'").

Second, the Fifth Circuit has explained that "§ 157 equates core proceedings with the categories of 'arising under' and 'arising in' proceedings; therefore, a proceeding is core under section 157 if it invokes a substantive right provided by title 11[, it 'arises under' the Bankruptcy Code,] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case[, it 'arises in' a bankruptcy case]." *United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 692–93 (Bankr. N.D. Tex. 2020); *Stern v. Marshall*, 564 U.S. 462, 476 (2011).

---

Third, none of the Plaintiffs' five causes of action—breach of fiduciary duty under the Advisers Act, breach of contract related to the HCLOF Company Agreement, negligence, RICO, and tortious interference—arise under title 11. That is, none of the substantive rights of recovery are created by federal bankruptcy law. And plainly so. Because "[a]rising under' jurisdiction [only] involve[s] cause[s] of action created or determined by a statutory provision of title 11," this is indisputably the case. *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir.1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right, created by federal bankruptcy law, that could not exist outside of bankruptcy).

Fourth and finally, for similar reasons, none of Plaintiffs' causes of action "arise in" a bankruptcy case. "Claims that 'arise in' a bankruptcy case are claims that by their nature, *not their particular factual circumstance*, could *only* arise in the context of a bankruptcy case." *Legal Xtranet, Inc*., 453 B.R. at 708–09 (emphasis added) (citing *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006). Defendants contend that, because the factual circumstances giving rise to the causes of action included the HarbourVest Settlement, which was approved by the bankruptcy court, this somehow transforms these causes of action into core claims. *See* Memorandum of Law ¶ 36. But it is the nature of the causes of action that determines whether they are core, not their "particular factual circumstance."

To illustrate the point, in *Gupta v. Quincy Med. Ctr.,* 858 F.3d 657, 660 (1st Cir. 2017), the bankruptcy court issued a sale order which approved an asset purchase agreement whereby the purchaser became obligated to make certain payments to employees. The purchaser failed to make these payments so the employees sued the purchaser in bankruptcy court, and the bankruptcy rendered a judgment in favor of the employees. On appeal, the district court concluded that the bankruptcy court lacked subject matter jurisdiction over the claims—claims plainly related to and

existing only because of the approved sale order that gave rise to them. The First Circuit affirmed,

explaining as follows:

> [T]he fact that a matter would not have arisen had there not been a bankruptcy case
> does not ipso facto mean that the proceeding qualifies as an 'arising in' proceeding.
> Instead, the fundamental question is whether the proceeding by its nature, *not its
> particular factual circumstance*, could arise only in the context of a bankruptcy
> case. In other words, it is not enough that Appellants' claims arose in the context
> of a bankruptcy case or even that those claims exist only because Debtors
> (Appellants' former employer) declared bankruptcy; rather, "arising in"
> jurisdiction exists only if Appellants' claims are the type of claims that can only
> exist in a bankruptcy case.

*Id.* at 664–65 (emphasis added).

Like the claims in *Gupta*, the Plaintiffs' causes of action here arose in the context of a

transaction approved in a bankruptcy case. But obviously, the causes of action are not "the type of

claims that can only exist in a bankruptcy case." And that ends the analysis. Because Plaintiffs'

causes of action do arise under the Bankruptcy Code, and because they are not claims that could

only arise in the context of bankruptcy, this action is not a core proceeding.

### 2. The Bankruptcy Court has limited post-confirmation "related to" jurisdiction.

Plaintiffs do not contest that this action is related to the bankruptcy case in some fashion.

That is why they amended the Civil Cover Sheet to note the bankruptcy matter. But "related to"

jurisdiction is a term of art with differing requirements depending on the status of the bankruptcy

case. In its current, post-confirmation status, Plaintiffs submit that the bankruptcy court lacks even

"related to" jurisdiction over this action.

"Related to" jurisdiction is meant to avoid piecemeal adjudication and promote judicial

economy by aiding in the efficient and expeditious resolution of all matters connected to the

debtor's estate. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir.1995).

Importantly, proceedings merely "related to" a case under title 11 are considered "non-core"

---

proceedings. *Stern*, 564 U.S. at 477; Collier on Bankruptcy ¶ 3.02[2], p. 3–26, n.5 (16th ed. 2010) ("The terms 'non-core' and 'related' are synonymous."). The jurisdictional standard for related to jurisdiction varies depending on whether the proceeding at issue was commenced pre or post confirmation. *See Beitel v. OCA, Inc. (In re OCA, Inc.),* 551 F.3d 359, 367 at n.10 (5th Cir. 2008). And "after confirmation of a reorganization plan, a stricter post-confirmation standard applies." *See Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390–91 (5th Cir.2001) (explaining this distinction).

Essentially, "after a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Id*. 266 F.3d at 390; *Faulkner v. Eagle View Capital Mmgt. (In re The Heritage Org., L.L.C.),* 454 B.R. 353, 358 (Bankr. N.D. Tex. 2011).

Here, on February 22, 2021, the Bankruptcy Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Bankruptcy Court Dkt. No. 1943]. The Complaint was filed on April 12, 2021. Thus, the proceeding was commenced post confirmation.

Defendant does not argue that this action involves "matters pertaining to the implementation or execution of the plan," as required under *Craig's Stores*. It does not even cite to that authority. Certainly Plaintiffs can think of no way that their action affects plan implementation or execution. Thus, it seems, Defendant's argument for bankruptcy court jurisdiction fails entirely.

While Defendant does argue that the bankruptcy court has "related to" jurisdiction as a result of a judgment potentially reducing available cash to pay creditors under the Confirmed Plan, Memorandum of Law ¶ 39, this is precisely the argument that the Fifth Circuit rejected in *Craig's*

*Stores*. *See Coho Oil & Gas, Inc. v. Finley Res., Inc.* (*In re Coho Energy, Inc.*), 309 B.R. 217, 220 (Bankr. N.D. Tex. 2004) (recognizing the rejection of this argument). As the Fifth Circuit explained: "while Craig's insists that the status of its contract with the Bank will affect its distribution to creditors under the plan, the same could be said of any other post-confirmation contractual relations in which Craig's is engaged." 266 F.3d at 391. And that type of effect does not meet the threshold for post-confirmation related-to jurisdiction.

Defendant also contends that there is post-confirmation "related to" jurisdiction because the lawsuit will delay payments to creditors under the Confirmed Plan. *Id.* But this is just a re-packaged reduction-in-assets argument. The same would be true of any post-confirmation lawsuit against Defendant and does not meet the "more exacting theory of post-confirmation bankruptcy jurisdiction" required by *Craig's Stores*.

Defendant may argue that the bankruptcy court's confirmation order has not yet gone effective due to having been appealed. But even if this distinction matters, at minimum, there ought to be a sliding scale toward narrower application of "related to" jurisdiction once the bankruptcy court has issued a final confirmation order. *See Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005) (stating "post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction, and … the *Pacor* formulation [used to analyze related-to jurisdiction] may be somewhat overbroad in the post-confirmation context"); *Faulkner v. Kornman*, No. 10-301, 2015 Bankr. LEXIS 700 (Bankr. S.D. Tex. 2015) (stating "[t]he general rule is that post-confirmation subject matter jurisdiction is limited"); *Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp (In re Am. Home Mortg. Holding)*, 477 B.R. 517, 529-30 (Bankr. D. Del. 2012) (stating "[a]fter confirmation… the test for 'related to 'jurisdiction becomes more

---

stringent if the plaintiff *files* its action after the confirmation date") (emphasis in original); *cf. rabbd*

v. Rochford*, 947 F.2d 829, 832 n.1 (7th Cir. 1991) (noting that "after a bankruptcy is over, it may well be more appropriate to bring suit in district court").

Finally, the retention of jurisdiction in the confirmed plan does nothing to alter the forgoing analysis. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). A bankruptcy court may not "retain" jurisdiction it does not have. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). "[N]either the parties nor the bankruptcy court can create § 1334 jurisdiction by simply inserting a retention of jurisdiction provision in a plan of reorganization if jurisdiction otherwise is lacking." *Valley Historic Ltd. P'ship. v. Bank of N.Y.*, 486 F.3d 831, 837 (4th Cir. 2007); *see also Zerand– Bernal Group, Inc. v. Cox*, 23 F.3d 159, 164 (7th Cir. 1994) ("[O]rders approving [a] bankruptcy sale [or] . . . plan of reorganization . . . [cannot] confer jurisdiction. A court cannot write its own jurisdictional ticket.").

## C. The Res Judicata Argument Is Not Relevant to the Relief Sought in This Motion

Defendant's *res-judicata* argument does not belong in this Motion. It has no bearing on the issue presented here. This is because, to begin with, *res judicata* is always addressed by the second court in the second action. *See, e.g., Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc).*, 783 F.2d 1283 (5th Cir. 1986); *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309 (5th Cir. 2004); *Travelers Ins. Co. v. St. Jude Hosp.*, 37 F.3d 193 (5th Cir. 1994); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914 (5th Cir. 2000); *Risby v. United States*, No. 3:04-CV-1414-H, 2006 U.S. Dist. LEXIS 8798 (N.D. Tex. 2006); *Chalmers v. Gavin*, 2002 U.S. Dist. LEXIS 5636, 2002 WL 511512 (N.D. Tex. Apr. 2, 2002); *Reynolds v. Tombone*, Civil No. 3:96-CV-3330-BC, 1999 U.S. Dist. LEXIS

9995 (N.D. Tex. June 24, 1999). Moreover, *res judicata* is not a basis for referring a matter to the bankruptcy court, and Defendant offers no authority for the notion that it is.

Instead of arguing that its *res judicata* affirmative defense should result in referral to the bankruptcy court, Defendant argues that "the Complaint . . . must be dismissed on the basis of *res judicata*. Memorandum of Law at 24; *see also id.* at 23 (subheading: "The Complaint Is Barred by the Doctrine of Res Judicata"). But dismissal is the relief sought in Defendant's pending Motion to Dismiss, which raises the same *res judicata* arguments asserted here. Plaintiffs therefore will address *res judicata* in their concurrently filed response to the Motion to Dismiss.

### D. The Local Rule 3.3 Argument Is Unavailing

Defendant argues that Plaintiffs failed to disclose the related bankruptcy case by omitting it on the Civil Cover Sheet accompanying the Complaint, although Defendant does not request that the Court take any action as a result of the omission.

Plaintiffs submit that the omission was inadvertent, harmless, and has been corrected. The omission was inadvertent in that Plaintiffs intended to identify the Highland bankruptcy on the Civil Cover Sheet but inadvertently failed to do so and have since submitted an amended Civil Cover Sheet correcting the error. [Doc. 33]. The omission was harmless because the Complaint discloses both the bankruptcy and its relationship to the present action, a disclosure that was supplemented by Plaintiffs' Motion for Leave to Amend, which provides additional detail regarding the related bankruptcy case and attaches two orders issued in that case. Complaint ¶¶ 15-36; Motion for Leave and Exhibits [Docs. 6, 6-1, 6-2].

Defendant refers the Court to *Kuzmin v. Thermaflo.*, No. 2:07-cv-00554-TJW, 2009 U.S. Dist. LEXIS 42810, at *4-7 (E.D. Tex. May 20, 2009), for the proposition that failing to disclose a related case is a violation of the Local Rules. In *Kuzmin*, however, the plaintiff was faulted for

numerous failings, including (1) the failure to submit a Civil Cover Sheet at all, (2) the failure, upon receiving notice of the deficiency, to provide sufficient information for the clerk to identify the related action, and (3) filing a third action without any information indicating it was related to the previous two. *Id.* at *5. The court continued, finding that plaintiff's counsel in that case had also committed violations of the mandate for professionalism in the Texas Lawyer's Creed by failing to communicate about the filings with known counsel for the opposition. *Id.* at *6-12.

Plaintiffs respectfully submit that the *Kuzmin* case is inapposite. Plaintiffs here did not fail to submit a Civil Cover Sheet. They corrected the omission after it was brought to their attention, and their original filing did disclose, in the text of the Complaint, the information that was inadvertently omitted from the Civil Cover Sheet. Further, Plaintiffs here communicated promptly with counsel for the Defendant regarding the action and the related bankruptcy case by asking the Defendant's counsel in the related action if they would accept service of the Complaint and whether they objected to Plaintiffs' Motion for Leave to Amend.

These circumstances, Plaintiffs submit, do not rise to the level of a violation of Local Rule 3.3 or, alternatively, they constitute a harmless, corrected error at most. Plaintiffs ask the Court to treat them as no worse than Defendant's failure to include a certificate of conference with this Motion (Local Rule 7(h)), or its failure to confer with Plaintiffs' counsel before filing it (Local Rule 7(a)), or its failure to paginate its appendix consecutively (Local Rule 7(i)).

Finally, Plaintiffs submit that the omission complained of does not justify or even relate to the relief sought in this Motion.

### E. The Litigious-Nature Argument Is Likewise Unavailing

Defendant's claims regarding James Dondero's litigiousness are likewise unconnected to the relief they are requesting here. Dondero is not a party to this case. Neither does he control either Plaintiff. APP_16-17.

For this argument, Defendant relies solely on *Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 F. App'x 741 (5th Cir. 2021), and 28 U.S.C. § 1927 ("Any attorney or other person . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). Neither authority addresses whether jurisdiction appropriately lies here or in the bankruptcy court. It appears that they are cited here merely to raise the specter of potential sanctions.

Plaintiffs respectfully submit that their claims here have merit and are not frivolous. And Defendant's contrary position can and should be addressed in connection with Defendant's pending motion under Rule 12(b)(6) rather than in connection with this Motion.

### F. Plaintiffs' Cross-Motion Should Be Granted

For the same reasons Defendant's Motion should be denied, Plaintiffs' cross-motion should be granted. Presiding over this action will require consideration of non-bankruptcy federal laws regulating interstate commerce, as well as their interplay with the Bankruptcy Code. Thus, the mandatory-withdrawal-of-the-reference provision of 28 U.S.C. § 157(d) applies.

Moreover, the bankruptcy court's jurisdiction is limited, both by § 157(d) and by plan confirmation. *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *Bank of La. v. Craig's*

*Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390–91 (5th Cir.2001) (explaining that, "after confirmation of a reorganization plan, a stricter post-confirmation standard applies," and "after a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").

No authority requires this Court to refer this action to the bankruptcy court, only to have it return on a motion for withdrawal of the reference. The opposite is true. *In re Harrah's Entm't,* No. 95-3925, 1996 U.S. Dist. LEXIS 18097, at *11 (E.D. La. 1996) (Clement, J.). Thus, this Court should deny Defendant's Motion, withdraw the reference under § 157(d), and retain jurisdiction over this action.

## VI.

## CONCLUSION

For all of these reasons, Plaintiffs respectfully submit Defendant's Motion should be denied.

---

Dated:  June 29, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s Jonathan Bridges*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

---

# EXHIBIT 11

000803

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

## I.

## INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty,  a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

## III.

## JURISDICTION AND VENUE

**7.**     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.**     Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.**     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.**     Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.**     Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054,  Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).  Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.      An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.      As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.      HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.      Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.      At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.      It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.      On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.      The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.     Typically, the value of the securities reflected by a market price quote.

41.     However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.     There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.     Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.     Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.     It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.     For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.    Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.    Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.    Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.    Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.    That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.    The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

---

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.    Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.    Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.    Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.    Seery's knowledge is imputed to HCM.

80.    Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

**SECOND CAUSE OF ACTION**
*Breach of HCLOF Company Agreement*
**(By Holdco against HCLOF, HCM and HCFA)**

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

**100.**    Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.**    No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.**    Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

**103.**    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.**    Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.**    Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.**    Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.**    It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

**108.**    It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.**    It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.**    Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.**    Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.**    Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM)

**113.**    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.**    Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.**    HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

126.    In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.    Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company.  The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.    In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equalization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.    Seery was at all relevant times operating as an agent of HCM.

130.    This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.    The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice ... for obtaining money or property by means of false ... pretenses, [or] representations[.]"

132.     Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.     Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
*Tortious Interference*
**(CLO Holdco against HCM)**

134.     Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.     At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.     At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.     Section 6.2 of HCLOF Company agreement provides that when a member "other than ... CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.     HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.     HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.     But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.     Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## <u>JURY DEMAND</u>

142.     Plaintiff demands trial by jury on all claims so triable.

## VII.

## <u>PRAYER FOR RELIEF</u>

143.     Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.   Actual damages;

    b.   Disgorgement;

    c.   Treble damages;

    d.   Exemplary and punitive damages;

    e.   Attorneys' fees and costs as allowed by common law, statute or contract;

    f.   A constructive trust to avoid dissipation of assets;

    g.   All such other relief to which Plaintiff is justly entitled.

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*

**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
  jeb@sbaitilaw.com

**Counsel for Plaintiffs**

---

Original Complaint

# EXHIBIT 12

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 275**

**[Release No. IA-2628; File No. S7-25-06]**

**RIN 3235-AJ67**

**Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission is adopting a new rule that prohibits advisers to pooled investment vehicles from making false or misleading statements to, or otherwise defrauding, investors or prospective investors in those pooled vehicles. This rule is designed to clarify, in light of a recent court opinion, the Commission's ability to bring enforcement actions under the Investment Advisers Act of 1940 against investment advisers who defraud investors or prospective investors in a hedge fund or other pooled investment vehicle.

**EFFECTIVE DATE:** September 10, 2007.

**FOR FURTHER INFORMATION CONTACT:** David W. Blass, Assistant Director, Daniel S. Kahl, Branch Chief, or Vivien Liu, Senior Counsel, at 202-551-6787, Division of Investment Management, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549-5041.

**SUPPLEMENTARY INFORMATION:** The Commission is adopting new rule 206(4)-8 under the Investment Advisers Act of 1940 ("Advisers Act").[1]

---

[1] 15 U.S.C. 80b. Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified.

## I.      INTRODUCTION

On December 13, 2006, we proposed a new rule under the Advisers Act that would prohibit advisers to pooled investment vehicles from defrauding investors or prospective investors in pooled investment vehicles they advise.[2] We proposed the rule in response to the opinion of the Court of Appeals for the District of Columbia Circuit in Goldstein v. SEC, which created some uncertainty regarding the application of sections 206(1) and 206(2) of the Advisers Act in certain cases where investors in a pool are defrauded by an investment adviser to that pool.[3] In addressing the scope of the exemption from registration in section 203(b)(3) of the Advisers Act and the meaning of "client" as used in that section, the Court of Appeals expressed the view that, for purposes of sections 206(1) and (2) of the Advisers Act, the "client" of an investment adviser managing a pool is the pool itself, not an investor in the pool. As a result, it was unclear whether the Commission could continue to rely on sections 206(1) and (2) of the Advisers Act to bring enforcement actions in certain cases where investors in a pool are defrauded by an investment adviser to that pool.[4]

---

[2] Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles; Accredited Investors in Certain Private Investment Vehicles, Investment Advisers Act Release No. 2576 (Dec. 27, 2006) [72 FR 400 (Jan. 4, 2007)] (the "Proposing Release"). In the Proposing Release, we also proposed two new rules that would define the term "accredited natural person" under Regulation D and section 4(6) of the Securities Act of 1933 [15 USC 77d(6)] ("Securities Act"). As proposed, these rules would add to the existing definition of "accredited investor" and apply to private offerings of certain unregistered investment pools. On May 23, 2007, we voted to propose more general amendments to the definition of accredited investor. Proposed Modernization of Smaller Company Capital-Raising and Disclosure Requirements, Securities Act Release No.   (   , 2007) [72 FR   (   , 2007)]. We plan to defer consideration of our proposal to define the term accredited natural person until we have had the opportunity to evaluate fully the comments we received on that proposal together with those we receive on our May 2007 proposal.

[3] 451 F.3d 873 (D.C. Cir. 2006) ("Goldstein").

[4] Prior to the issuance of the Goldstein decision, we brought enforcement actions against advisers alleging false and misleading statements to investors under sections 206(1) and (2) of the Advisers Act. See, e.g., SEC v. Kirk S. Wright, International Management Associates, LLC, Litigation Release No. 19581 (Feb. 28, 2006); SEC v. Wood River Capital Management, LLC,

Case 21-03067-sgj Doc 43 Filed 09/29/21   Entered 09/29/21 18:18:16   Page 836 of 852
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 836 of 852   PageID 2741

3

In its opinion, the Court of Appeals distinguished sections 206(1) and (2) from section 206(4) of the Advisers Act, which is not limited to conduct aimed at clients or prospective clients of investment advisers.[5]  Section 206(4) provides us with rulemaking authority to define, and prescribe means reasonably designed to prevent, fraud by advisers.[6]  We proposed rule 206(4)-8 under this authority.

We received 45 comment letters in response to our proposal.[7]  Most commenters generally supported the proposal.  Eighteen endorsed the rule as proposed, noting that the rule would strengthen the antifraud provisions of the Advisers Act or that the rule would clarify the Commission's enforcement authority with respect to advisers.[8]  Others, however, urged that we

---

Litigation Release No. 19428 (Oct. 13, 2005); SEC v. Samuel Israel III; Daniel E. Marino; Bayou Management, LLC; Bayou Accredited Fund, LLC; Bayou Affiliates Fund, LLC; Bayou No Leverage Fund, LLC; and Bayou Superfund, LLC, Litigation Release No. 19406 (Sept. 29, 2005); SEC v. Beacon Hill Asset Management LLC, Litigation Release No. 18745A (June 16, 2004).

[5]   See Goldstein, supra note 3, at note 6.  See also United States v. Elliott, 62 F.3d 1304, 1311 (11th Cir. 1995).

[6]   Section 206(4) of the Advisers Act makes it unlawful for an investment adviser to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative" and authorizes us "by rules and regulations [to] define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

[7]   We received over 600 comment letters that addressed the proposed amendments to the term "accredited natural person" under Regulation D and section 4(6) of the Securities Act.  All of the public comments we received are available for inspection in our Public Reference Room at 100 F Street, NE, Washington DC, 20549 in File No. S7-25-06, or may be viewed at www.sec.gov/comments/s7-25-06/s72506.shtml.

[8]   E.g., Letter of the Alternative Investments Compliance Association (Mar. 5, 2007); Letter of the CFA Center for Financial Market Integrity (Mar. 9, 2007) ("CFA Center Letter"); Letter of the Coalition of Private Investment Companies (Mar. 9, 2007); Letter of the Commonwealth of Massachusetts (Mar. 9, 2007) ("Massachusetts Letter"); Letter of the Department of Banking of the State of Connecticut (Mar. 8, 2007); Letter of the North America Securities Administrators Association (Apr. 2, 2007) ("NASAA Letter"); and Letter of the U.S. Chamber of Commerce (Mar. 9, 2007).  Another commenter observed that the proposed rules are broadly similar to current U.K. legislation and regulations.  See Letter of Alternative Investment Management Association (Mar. 9, 2007) ("AIMA Letter").

make revisions that would restrict the scope of the rule to more narrowly define the conduct or acts it prohibits.[9]

Today, we are adopting new rule 206(4)-8 as proposed. The rule prohibits advisers from (i) making false or misleading statements to investors or prospective investors in hedge funds and other pooled investment vehicles they advise, or (ii) otherwise defrauding these investors. The rule clarifies that an adviser's duty to refrain from fraudulent conduct under the federal securities laws extends to the relationship with ultimate investors and that the Commission may bring enforcement actions under the Advisers Act against investment advisers who defraud investors or prospective investors in those pooled investment vehicles.

## II.    DISCUSSION

Rule 206(4)-8 prohibits advisers to pooled investment vehicles from (i) making false or misleading statements to investors or prospective investors in those pools or (ii) otherwise defrauding those investors or prospective investors. We will enforce the rule through civil and administrative enforcement actions against advisers who violate it.

Section 206(4) authorizes the Commission to adopt rules and regulations that "define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." In adopting rule 206(4)-8, we intend to employ all of the broad authority that Congress provided us in section 206(4) and direct it at adviser conduct affecting an investor or potential investor in a pooled investment vehicle.

---

[9]    E.g., Letter of American Bar Association (Mar. 12, 2007) ("ABA Letter"); Letter of Davis Polk & Wardwell (Mar. 9, 2007) ("Davis Polk Letter"); Letter of Dechert LLP (Mar. 8, 2007) ("Dechert Letter"); Letter of New York City Bar (Mar. 8, 2007) ("NYCB Letter"); Letter of Schulte Roth & Zabel LLP (Mar. 9, 2007) ("Schulte Roth Letter"); and Letter of Sullivan & Cromwell LLP (Mar. 9, 2007) ("Sullivan & Cromwell Letter").

### A.  Scope of Rule 206(4)-8

Some commenters questioned the scope of the rule, arguing that the Commission should define fraud.[10]  We believe that we have done so, only more broadly than some commenters would have us do.  As the Proposing Release indicated, our intent is to prohibit all fraud on investors in pools managed by investment advisers.  Congress expected that we would use the authority provided by section 206(4) to "promulgate general antifraud rules capable of flexibility."[11]  The terms material false statements or omissions and "acts, practices, and courses of business as are fraudulent, deceptive, or manipulative" encompass the well-developed body of law under the antifraud provisions of the federal securities laws.  The legal authorities identifying the types of acts, practices, and courses of business that are fraudulent, deceptive, or manipulative under the federal securities laws are numerous, and we believe that the conduct prohibited by rule 206(4)-8 is sufficiently clear and well understood.[12]

---

[10]      E.g., ABA Letter, supra note 9; Letter of Debevoise & Plimpton LLP (Mar. 14, 2007); and NYCB Letter, supra note 9.

[11]      S.Rep. No. 1760, 86th Cong., 2d. Sess. (June 28, 1960) at 4.  See rule 206(4)-1(a)(5) [17 CFR. 275.206(4)-1(a)(5)] under the Advisers Act; rule 17j-1(b) [17 CFR 270.17j-1(b)] under the Investment Company Act of 1940 [15 U.S.C. 80a-1] ("Investment Company Act"); and rule 13e-3(b)(1) [17 CFR 240.13e-3(b)(1)] under the Securities Exchange Act of 1934 [15 U.S.C. 77a] ("Exchange Act").

[12]      Loss, Seligman, & Paredes, Securities Regulation, Chap. 9 (Fraud) (Fourth Ed. 2006); Hazen, Treatise on The Law of Securities Regulation, Vol. 3, Ch. 12 (Manipulation and Fraud – Civil Liability; Implied Private Remedies; SEC Rule 10b-5; Fraud in Connection With the Purchase or Sale of Securities; Improper Trading on Nonpublic Material Information) (Fifth Ed. 2005).  See, e.g., Superintendent of Insurance of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 11 n. 7 (1971) ("'We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.  Novel or atypical methods should not provide immunity from the securities laws.'" (quoting A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (CA2 1967))); Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477 (1977) ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices.").  Moreover, the established legal principles are sufficiently flexible to encompass future novel factual scenarios.  United States v. Brown, 555 F.2d 336, 339-40 (2d Cir. 1977) ("The fact that there is no litigated fact pattern precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved but hardly provides an escape from the penal sanctions of the securities fraud provisions here involved.").

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 839 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 839 of 852 PageID 2744

6

### 1. Investors and Prospective Investors

Rule 206(4)-8 prohibits investment advisers from making false or misleading statements to, or engaging in other fraud on, investors or prospective investors in a pooled investment vehicle they manage. The scope of the rule is modeled on that of sections 206(1) and (2) of the Advisers Act, which make unlawful fraud by advisers against clients or prospective clients. Rule 206(4)-8 prohibits false or misleading statements made, for example, to existing investors in account statements as well as to prospective investors in private placement memoranda, offering circulars, or responses to "requests for proposals," electronic solicitations, and personal meetings arranged through capital introduction services.

Some commenters argued that the rule should not prohibit fraud against prospective investors in a pooled investment vehicle, asserting that such fraud does not actually harm investors until they, in fact, make an investment.[13] We disagree. False or misleading statements and other frauds by advisers are no less objectionable when made in an attempt to draw in new investors than when made to existing investors.[14] For similar policy reasons that we believe led Congress to apply the protections of sections 206(1) and (2) to prospective clients, we have decided to apply those of rule 206(4)-8 to prospective investors.[15] We believe that prohibiting false or misleading statements made to, or other fraud on, any prospective investors is a means reasonably designed to prevent fraud.

---

[13]    Davis Polk Letter, supra note 9; Dechert Letter, supra note 9; NYCB Letter, supra note 9; Letter of the Securities Industry and Financial Markets Association (Mar. 9, 2007); Sullivan & Cromwell Letter, supra note 9.

[14]    See CFA Center Letter, supra note 8.

[15]    We have used the term "prospective investor" to give the term similar scope to the term "prospective client" in sections 206(1) and (2). See, e.g., In the Matter of Ralph Harold Seipel, 38 S.E.C. 256, 257-58 (1958) (the solicitation of clients is part of the activity of an investment adviser and it is immaterial for purposes of an enforcement action under sections 206(1) and (2) that an adviser engaging in fraudulent solicitations was not successful in his efforts to obtain clients).

### 2. Unregistered Investment Advisers

Rule 206(4)-8 applies to both registered and unregistered investment advisers.[16] As we noted in the Proposing Release, many of our enforcement cases against advisers to pooled investment vehicles have been brought against advisers that are not registered under the Advisers Act, and we believe it is critical that we continue to be in a position to bring actions against unregistered advisers that manage pools and that defraud investors in those pools.[17] The two commenters that expressed an explicit view on this aspect of the proposal supported our application of the rule to advisers that are not registered with the Commission.[18]

### 3. Pooled Investment Vehicles

The rule we are adopting today applies to investment advisers with respect to any "pooled investment vehicle" they advise. The rule defines a pooled investment vehicle[19] as any investment company defined in section 3(a) of the Investment Company Act[20] and any privately offered pooled investment vehicle that is excluded from the definition of investment company by reason of either section 3(c)(1) or 3(c)(7) of the Investment Company Act.[21] As a result, the rule

---

[16]  A few commenters requested that we clarify how we intend to apply rule 206(4)-8 to offshore advisers' interaction with non-U.S. investors. See AIMA Letter, supra note 8; Letter of Jones Day (Mar. 9, 2007); Sullivan & Cromwell Letter, supra note 9. Our adoption of this rule will not alter our jurisdictional authority.

[17]  Proposing Release, supra note 2, at note 14.

[18]  Massachusetts Letter, supra note 8; NASAA Letter, supra note 8.

[19]  Rule 206(4)-8(b).

[20]  15 U.S.C. 80a-3(a). Unless otherwise noted, when we refer to the Investment Company Act, or any paragraph of the Investment Company Act, we are referring to 15 U.S.C. 80a of the United States Code, at which the Company Act is codified.

[21]  Section 3(c)(1) of the Investment Company Act excludes from the definition of investment company an issuer the securities (other than short-term paper) of which are beneficially owned by not more than 100 persons and that is not making or proposing to make a public offering of its securities. Section 3(c)(7) of the Investment Company Act excludes from the definition of investment company an issuer the outstanding securities of which are owned exclusively by persons who, at the time of acquisition of such securities, are "qualified purchasers" and that is not making or proposing to make a public offering of its securities. "Qualified purchaser" is

applies to advisers to hedge funds, private equity funds, venture capital funds, and other types of privately offered pools that invest in securities, as well as advisers to investment companies that are registered with us.[22]

Several commenters supported applying the protection of the new antifraud rule to investors in all these kinds of pooled investment vehicles, noting, for example, that every investor, not just the wealthy or sophisticated that typically invest in private pools, should be protected from fraud.[23] Some other commenters urged us not to apply the rule to advisers to registered investment companies, arguing that the rule is unnecessary because other provisions of the federal securities laws prohibiting fraud are available to the Commission to address these matters.[24] They expressed concern that application of another antifraud provision with different elements would be burdensome. These commenters claimed that the rule would, for example, make it necessary for advisers to conduct extensive reviews of all communications with clients. But the other antifraud provisions available to us contain different elements because they were not specifically designed to address frauds by investment advisers with respect to investors in pooled investment vehicles. In some cases, the other antifraud provisions may not permit us to

---

defined in section 2(a)(51) of the Investment Company Act generally to include a natural person (or a company owned by two or more related natural persons) who owns not less than $5,000,000 in investments; a person, acting for its own account or accounts of other qualified purchasers, who owns and invests on a discretionary basis, not less than $25,000,000; and a trust whose trustee, and each of its settlors, is a qualified purchaser.

[22] We have brought enforcement actions under the Advisers Act against advisers to these types of funds. See, e.g., In the Matter of Askin Capital Management, L.P and David J. Askin, Investment Advisers Act Release No. 1492 (May 23, 1995) (hedge fund); In the Matter of Thayer Capital Partners, Investment Advisers Act Release No. 2276 (Aug. 12, 2004) (private equity fund); SEC v. Michael A. Liberty, Litigation Release No. 19601 (Mar. 8, 2006) (venture capital fund).

[23] E.g., NASAA Letter, supra note 8.

[24] E.g., ABA Letter, supra note 9; Letter of Investment Adviser Association (Mar. 9, 2007); Letter of Investment Company Institute (Mar. 9, 2007) ("ICI Letter"); Sullivan & Cromwell Letter, supra note 9. Commenters noted in particular that section 34(b) of the Investment Company Act already prohibits an adviser from making fraudulent material statements or omissions in a fund's registration statement or in required records.

proceed against the adviser.[25]  As a result, the existing antifraud provisions may not be available

to us in all cases.  As we discussed above, before the <u>Goldstein</u> decision we had brought actions

against advisers to mutual funds under sections 206(1) and (2) for defrauding investors in mutual

funds.[26]  Because, before the <u>Goldstein</u> decision, advisers to pooled investment vehicles operated

with the understanding that the Advisers Act prohibited the conduct that this rule prohibits, we

believe that advisers that are attentive to their traditional compliance responsibilities will not

need to alter their business practices or take additional steps and incur new costs as a result of

this rule's adoption.

### B.  Prohibition on False or Misleading Statements

Rule 206(4)-8(a)(1) prohibits any investment adviser to a pooled investment vehicle from

making an untrue statement of a material fact to any investor or prospective investor in the

pooled investment vehicle, or omitting to state a material fact necessary in order to make the

statements made to any investor or prospective investor in the pooled investment vehicle, in the

light of the circumstances under which they were made, not misleading.[27]

The provision is very similar to those in many of our antifraud laws and rules that,

depending upon the circumstances, may also be applicable to the same investor

---

[25]     This may be the case with respect to section 34(b) of the Investment Company Act, for example,
if the adviser's fraudulent statements are not made in a document described in that section, or
with respect to rule 10b-5 under the Exchange Act, where the fraudulent conduct does not relate
to a misstatement or omission in connection with the purchase or sale of any security.

[26]     <u>See, e.g.</u>, <u>In the Matter of Van Kampen Investment Advisory Corp.</u>, Investment Advisers Act
Release No. 1819 (Sept. 8, 1999); <u>In the Matter of  The Dreyfus Corporation</u>, Investment
Advisers Act Release No. 1870 (May 10, 2000); <u>In the Matter of Federated Investment
Management Company</u>, Investment Advisers Act Release No. 2448 (Nov. 28, 2005).

[27]     A fact is material if there is a substantial likelihood that a reasonable investor in making an
investment decision would consider it as having significantly altered the total mix of information
available.  <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988); <u>TSC Industries, Inc. v.
Northway, Inc.</u>, 426 U.S. 438, 449 (1976).  <u>See also</u> <u>In the Matter of Van Kampen Investment
Advisory Corp.</u>, <u>supra</u> note 26; <u>In the Matter of the Dreyfus Corporation</u>, <u>supra</u> note 26.

communications.[28]  Sections 206(1) and (2) have imposed similar obligations on advisers since

1940 and, before Goldstein, were commonly accepted as imposing similar requirements on

communications with investors in a fund.  For these reasons, and because the nature of the duty

to communicate without false statements is so well developed in current law, we believe that

commenters' concerns about the breadth of the prohibition or any chilling effect the new rule

might have on investor communications are misplaced.[29]  Advisers to pooled investment vehicles

attentive to their traditional compliance responsibilities will not need to alter their

communications with investors.

Rule 206(4)-8(a)(1) prohibits advisers to pooled investment vehicles from making any

materially false or misleading statements to investors in the pool regardless of whether the pool

is offering, selling, or redeeming securities.  While the new rule differs in this aspect from rule

10b-5 under the Exchange Act, the conduct prohibited is similar.  The new rule prohibits, for

example, materially false or misleading statements regarding investment strategies the pooled

investment vehicle will pursue, the experience and credentials of the adviser (or its associated

persons), the risks associated with an investment in the pool, the performance of the pool or other

funds advised by the adviser, the valuation of the pool or investor accounts in it, and practices

---

[28]    See, e.g., sections 12 and 17 of the Securities Act [15 U.S.C. 77l, 77q]; section 14 of the Exchange Act [15 U.S.C. 78n]; section 34 of the Investment Company Act; rules 156, 159, and 610 under the Securities Act [17 CFR 230.156, 230.159, 230.610]; rules 10b-5, 13e-3, 13e-4, and 15c1-2 under the Exchange Act [17 CFR 240.10b-5, 240.13e-3, 240.13e-4, 240.15c1-2]; and rule 17j-1 under the Investment Company Act [17 CFR 270.17j-1]).

[29]    Letter of Managed Funds Association (Mar. 9, 2007) ("MFA Letter"); NYCB Letter, supra note 9; Davis Polk Letter, supra note 9; Dechert Letter, supra note 9; Letter of Seward & Kissel LLP (Mar. 8, 2007) ("Seward & Kissel Letter").

the adviser follows in the operation of its advisory business such as how the adviser allocates investment opportunities.[30]

### C. Prohibition of Other Frauds

Rule 206(4)-8(a)(2) makes it a fraudulent, deceptive, or manipulative act, practice, or course of business for any investment adviser to a pooled investment vehicle to "otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."[31] As we noted in the Proposing Release, the wording of this provision is drawn from the first sentence of section 206(4) and is designed to apply more broadly to deceptive conduct that may not involve statements.[32]

Some commenters asserted that section 206(4) provides us authority only to adopt prophylactic rules that explicitly identify conduct that would be fraudulent under the new rule.[33] We believe our authority is broader. We do not believe that the commenters' suggested approach would be consistent with the purposes of the Advisers Act or the protection of investors. That approach would have us adopt the rule prohibiting fraudulent communications but not fraudulent conduct.[34] But, section 206(4) itself specifically authorizes us to adopt rules defining and prescribing "acts, practices and courses of business," (*i.e.*, conduct), and does not explicitly refer to communications, which, nonetheless, represent a form of an act, practice, or

---

[30]     We have previously brought enforcement actions alleging these or similar types of frauds. See Proposing Release, supra note 2, at note 29.

[31]     Rule 206(4)-8(a)(2).

[32]     See Section II.C of the Proposing Release, supra note 2.

[33]     ABA Letter, supra note 9; ICI Letter, supra note 24; Schulte Roth Letter, supra note 9; Sullivan & Cromwell Letter, supra note 9.

[34]     See, e.g., ABA Letter, supra note 9.

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 845 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 845 of 852 PageID 2750

12

course of business.  In addition, rule 206(4)-8 as adopted would provide greater protection to investors in pooled investment vehicles.

Alternatively, commenters would have us adopt a rule prohibiting identified known fraudulent conduct or would have us provide detailed commentary describing specific forms of fraudulent conduct that the rule would prohibit.[35]  Either approach would fail to prohibit fraudulent conduct we did not identify, and could provide a roadmap for those wishing to engage in fraudulent conduct.  This approach would be inconsistent with our historical application of the federal securities laws under which broad prohibitions have been applied against specific harmful activity.

### D.  Other Matters

We noted in the Proposing Release that, unlike violations of rule 10b-5 under the Exchange Act, the Commission would not need to demonstrate that an adviser violating rule 206(4)-8 acted with scienter.[36]  Commenters questioned whether the rule should encompass negligent conduct, arguing that it would "expand the concept of fraud itself beyond its original meaning."[37]  We read the language of section 206(4) as not by its terms limited to knowing or deliberate conduct.  For example, section 206(4) encompasses "acts, practices, and courses of business as are . . . deceptive," thereby reaching conduct that is negligently deceptive as well as conduct that is recklessly or deliberately deceptive.  In addition, the Court of Appeals for the District of Columbia Circuit concluded that "scienter is not required under section 206(4)."[38]

---

[35]     Id.

[36]     Section II.B of the Proposing Release, supra note 2.

[37]     See ABA Letter, supra note 9 at page 3.

[38]     SEC v. Steadman, 967 F.2d 636, at 647 (D.C. Cir. 1992).  The court in Steadman analogized section 206(4) of the Advisers Act to section 17(a)(3) of the Securities Act, which the Supreme Court had held did not require a finding of scienter, id. (citing Aaron v. SEC, 446 U.S. 680 (1980)).  In discussing section 17(a)(3) and its lack of a scienter requirement, the Steadman court

We believe use of a negligence standard also is appropriate as a method reasonably designed to prevent fraud. As the Supreme Court noted in U.S. v. O'Hagan, "[a] prophylactic measure, because its mission is to prevent, typically encompasses more than the core activity prohibited."[39] In O'Hagan, the Court held that under section 14(e) "the Commission may prohibit acts, not themselves fraudulent under the common law or §10(b), if the prohibition is 'reasonably designed to prevent . . . acts and practices [that] are fraudulent.'"[40] Along these lines, the prohibitions in rule 206(4)-8 are reasonably designed to prevent fraud. We believe that, by taking sufficient care to avoid negligent conduct, advisers will be more likely to avoid reckless deception. Since the Commission clearly is authorized to prescribe conduct that goes beyond fraud as a means reasonably designed to prevent fraud, prohibiting deceptive conduct done negligently is a way to accomplish this objective.

Rule 206(4)-8 does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law. Nor does the rule alter any duty or obligation an adviser has under the Advisers Act, any other federal law or regulation, or any state law or regulation (including state securities laws) to investors in a pooled investment vehicle it advises.[41] The rule, for example, will permit us to bring an enforcement action against an investment adviser that violates a fiduciary duty imposed by other law if the violation of such law or obligation also constitutes an act, practice, or course of

---

observed that, similarly, a violation of section 206(2) of the Advisers Act could rest on a finding of simple negligence. Id. at 643, note 5. But see Aaron at 690-91 (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)); cf. S. Rep. No. 1760, 86th Cong., 2d. Sess. (June 28, 1960) at 8 and H. R. Rep. 2179, 86th Cong., 2d Sess. (Aug. 26, 1960) at 8 (comparing section 206(4) to section 15(c)(2) of the Exchange Act).

[39]    U.S. v. O'Hagan, 521 U.S. 642, 672-73 (1997).

[40]    Id. at 673.

[41]    For example, under the Uniform Limited Partnership Act, advisers who serve as general partners owe fiduciary duties to the limited partners. UNIF. LIMITED PARTNERSHIP ACT § 408 (2001).

Case 21-03067-sgj Doc 43 Filed 09/29/21 Entered 09/29/21 18:18:16 Page 847 of 852
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 847 of 852 PageID 2752

14

business that is fraudulent, deceptive, or manipulative within the meaning of the rule and section 206(4).[42]

Finally, the rule does not create a private right of action.[43]

## III.   PAPERWORK REDUCTION ACT

The Paperwork Reduction Act of 1995 does not apply because rule 206(4)-8 does not impose a new "collection of information" within the meaning of the Paperwork Reduction Act of 1995.  The rule does not create any filing, reporting, recordkeeping, or disclosure requirements for investment advisers subject to the rule.  Accordingly, there is no "collection of information" under the Paperwork Reduction Act that requires the approval of the Office of Management and Budget under 44 U.S.C. 3501.

## IV.   COST-BENEFIT ANALYSIS

The Commission is sensitive to costs imposed by our rules and the benefits that derive from them.  In the Proposing Release, we encouraged commenters to discuss any potential costs and benefits that we did not consider in our discussion.  Three commenters addressed the issue of cost.  Two of them stated their belief that the rule would increase advisers' costs of compliance, by, for example, making it necessary for advisers to conduct extensive reviews of all communications with clients.[44]  One stated that the rule would achieve a reasonable balance of

---

[42]   For example, if an adviser has a duty from a source other than the rule to make a material disclosure to an investor in a fund and negligently or deliberately fails to make the disclosure, the rule would apply to the failure.

[43]   The Supreme Court has held that "there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment adviser's contract, but that the Act confers no other private causes of action, legal or equitable."  Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 at 24 (1979) (footnote omitted).

[44]   NYCB Letter, supra note 9; Seward & Kissel Letter, supra note 29.

providing important benefits to investors at an acceptable cost.[45]  None of the three commenters,

however, provided analysis or empirical data in connection with their statements.

The rule makes it a fraudulent, deceptive, or manipulative act, practice, or course of

business within the meaning of section 206(4) for any investment adviser to a pooled investment

vehicle to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading, to any investor or prospective investor in the pooled investment

vehicle.  The rule also makes it a fraudulent, deceptive, or manipulative act, practice, or course

of business within the meaning of section 206(4) for any investment adviser to a pooled

investment vehicle to otherwise engage in any act, practice, or course of business that is

fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the

pooled investment vehicle.  For the reasons discussed, we do not believe that the rule will require

advisers to incur new or additional costs.

Investment advisers to pooled investment vehicles should not be making untrue

statements or omitting material facts or otherwise be engaged in fraud with respect to investors

or prospective investors in pooled investment vehicles today, because federal authorities, state

authorities, and private litigants often can, and do, seek redress from the adviser for the untrue

statements or omissions or other frauds.  In most cases, the conduct that the rule prohibits is

already prohibited by federal securities statutes,[46] other federal statutes (including federal wire

fraud statutes),[47] as well as state law.[48]

---

[45]     CFA Center Letter, supra note 8.

[46]     See, e.g., section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and section 17(a) of the Securities
Act [15 U.S.C. 77q] which would apply when the false statements are made "in connection with
the purchase or sale of a security" or involve the "offer or sale" of a security, and section 34(b) of
the Investment Company Act which makes it unlawful "to make any untrue statement of a

We recognize that there are costs involved in assuring that communications to investors and prospective investors do not contain untrue or misleading statements and preventing other frauds.  Advisers have incurred, and will continue to incur, these costs due to the prohibitions and deterrent effect of the law and rules that apply under these circumstances.  While each of the provisions noted above may have different limitation periods, apply in different factual circumstances, or require the government (or a private litigant) to prove different states of mind than the rule, as discussed above we believe that the multiple prohibitions against fraud, and the consequences under both criminal and civil law for fraud, should currently cause an adviser to take the precautions it deems necessary to refrain from such conduct.

Furthermore, prior to Goldstein, advisers operated with the understanding that the Advisers Act prohibited the same conduct that would be prohibited by the rule.  Accordingly, we do not believe that advisers to pooled investment vehicles attentive to their traditional compliance responsibilities will need to take steps or alter their business practices in such a way that will require them to incur new or additional costs as a result of the adoption of the rule.

---

material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to [the Investment Company Act] . . . . "

[47]    See, e.g., 18 U.S.C. 1341 (Frauds and Swindles) and 18 U.S.C. 1343 (Fraud by wire, radio, or television) which make it a criminal offense to use the mails or to communicate by means of wire, having devised a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, and 18 U.S.C. 1957 (Engaging in monetary transactions in property derived from specified unlawful activity) which makes it a criminal racketeering offense to engage or attempt to engage in a transaction in criminally derived property of a value greater than $10,000.

[48]    See, e.g., Metro Communications Corp. BVI v. Advanced Mobilecomm Technologies, 854 A.2d 121, 156 (Del. Ch. 2004) (court held that plaintiff-former member of LLC had sufficiently alleged a common law fraud claim based on allegation that a series of reports by LLC's managers contained misleading statements; court stated that "[i]n the usual fraud case, the speaking party who is subject to an accusation of fraud is on the opposite side of a commercial transaction from the plaintiff, who alleges that but for the material misstatements or omissions of the speaking party he would not have contracted with the speaking party").

We also recognize that the rule may cause some advisers to pay more attention to the information they present to better guard against making an untrue or misleading statement to an investor or prospective investor and to reevaluate measures that are intended to prevent fraud. As a consequence, some advisers might seek guidance, legal or otherwise, and more closely review the information that they disseminate to investors and prospective investors and the antifraud related policies and procedures they have implemented. While increased concern about making false statements or committing fraud could be attributable to the new rule, advisers should already be incurring these costs to ensure truthfulness and prevent fraud, regardless of the rule, because of the myriad of laws or regulations that may already apply.

The principal benefit of the rule is that it clearly enables the Commission to bring enforcement actions under the Advisers Act, if an adviser to a pooled investment vehicle disseminates false or misleading information to investors or prospective investors or otherwise commits fraud with respect to any investor or prospective investor. As noted above, the existing antifraud provisions may not be available to us in all cases. Through our enforcement actions we are able to protect fund investor assets by stopping ongoing frauds,[49] barring persons that have committed certain specified violations or offenses from being associated with an investment adviser,[50] imposing penalties,[51] seeking court orders to protect fund assets,[52] and to order disgorgement of ill-gotten gains.[53] Moreover, we believe that rule 206(4)-8 will deter advisers to pooled investment vehicles from engaging in fraudulent conduct with respect to investors in

---

[49]     See section 203(k) of the Advisers Act (Commission authority to issue cease and desist orders).

[50]     See section 203(f) of the Advisers Act (Commission authority to bar a person from being associated with an investment adviser).

[51]     See section 203(i) of the Advisers Act (Commission authority to impose civil penalties).

[52]     See section 209(d) of the Advisers Act (Commission authority to seek injunctions and restraining orders in federal court).

[53]     See section 203(j) of the Advisers Act (Commission authority to order disgorgement).

those pools and will provide investors with greater confidence when investing in pooled investment vehicles.

## V. REGULATORY FLEXIBILITY ACT ANALYSIS

The Commission certified, pursuant to section 605(b) of the Regulatory Flexibility Act, that rule 206(4)-8 will not have a significant economic impact on a substantial number of small entities.[54] This certification was included in the Proposing Release.[55] While we encouraged written comment regarding this certification, none of the commenters responded to this request.

## VI. STATUTORY AUTHORITY

We are adopting new rule 206(4)-8 pursuant to our authority set forth in sections 206(4) and 211(a) of the Advisers Act (15 U.S.C. 80b-6(4) and 80b-11(a)).

**List of Subjects**

**17 CFR Part 275**

Reporting and recordkeeping requirements, Securities.

## VII. TEXT OF RULES

For the reasons set out in the preamble, Title 17, Chapter II of the Code of Federal Regulations is amended as follows:

**PART 275 – RULES AND REGULATIONS, INVESTMENT ADVISERS ACT OF 1940**

1. The authority citation for Part 275 continues to read in part as follows:

Authority: 15 U.S.C. 80b-2(a)(11)(F), 80b-2(a)(17), 80b-3, 80b-4, 80b-4a, 80b-6(4), 80b-6a, and 80b-11, unless otherwise noted.

\*  \*  \*  \*  \*

---

[54]    5 U.S.C. 605(b).

[55]    Section VII.A of the Proposing Release, supra note 2.

19

2.      Section 275.206(4)-8 is added to read as follows:

**§206(4)-8 Pooled investment vehicles.**

(a)      <u>Prohibition</u>.  It shall constitute a fraudulent, deceptive, or manipulative act,

practice, or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b-

6(4)) for any investment adviser to a pooled investment vehicle to:

(1)      Make any untrue statement of a material fact or to omit to state a material fact

necessary to make the statements made, in the light of the circumstances under which they were

made, not misleading, to any investor or prospective investor in the pooled investment vehicle;

or

(2)      Otherwise engage in any act, practice, or course of business that is fraudulent,

deceptive, or manipulative with respect to any investor or prospective investor in the pooled

investment vehicle.

(b)      <u>Definition</u>.  For purposes of this section "pooled investment vehicle" means any

investment company as defined in section 3(a) of the Investment Company Act of 1940 (15

U.S.C. 80a-3(a)) or any company that would be an investment company under section 3(a) of

that Act but for the exclusion provided from that definition by either section 3(c)(1) or section

3(c)(7) of that Act (15 U.S.C. 80a-3(c)(1) or (7)).

By the Commission.

Nancy M. Morris
Secretary

August 3, 2007