Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 1 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 1 of 33 PageID 2884
Guernsey Judgment 10/2013 – Jackson and Dear et al

Judgment 10/2013

Jackson and Dear et al
Royal Court
26th March 2013

---

**Derivative action – strike out application.**

## IN THE ROYAL COURT OF THE ISLAND OF GUERNSEY
## (ORDINARY DIVISION)

Between:　　　　　　　　**ALEXANDER JACKSON**　　　　　　**Plaintiff**

-　and -

**PATRICK DEAR (1)**

**READE GRIFFITH (2)**

**RUPERT DOREY (3)**

**DAVID JEFFREYS (4)**

**BYRON KNIEF (5)**

**GREVILLE WARD (6)**

**TETRAGON FINANCIAL GROUP LIMITED (7)**

**TETRAGON FINANCIAL GROUP
MASTER FUND LIMITED (8)**　　　　**Defendants**

## JUDGMENT ON STRIKE OUT
## APPLICATION
### of Lieutenant Bailiff Patrick John Talbot QC

Date of hearings:　12th and 13th October, 28th, 29th and 30th November and
1st and 2nd December 2011

Judgment handed down:　26th March 2013

**Advocate Jeremy Le Tissier** appeared on behalf of the Plaintiff

**Advocate Christian Hay** appeared on behalf of the First and Second Defendants
("**the Executive Directors**")

**Advocate Tim Corfield** appeared on behalf of the Third, Fourth, Fifth and Sixth Defendants
(together referred to as "**the Independent Directors**")

**Advocate Simon Davies** appeared on behalf of the Seventh and Eighth Defendants (together
referred to as "**Tetragon**")

Case 21-03067-sgj Doc 59-1 Filed 09/29/21   Entered 09/29/21 18:48:45   Page 2 of 33
Case 3:21-cv-00842-B   Document 59-1   Filed 08/30/21   Page 2 of 33   PageID 2885
Guernsey Judgment 16/2013 – Jackson and Beale et al

1. These proceedings are, it is believed, the first derivative action placed on the court rôle of the Royal Court of Guernsey.  They relate to a real estate joint venture transaction called the GreenOak Real Estate Transaction ("**the GORE Transaction**"), into which Tetragon, both of which are Guernsey companies, entered on about 29 July 2010.  At the heart of the Plaintiff's claim is the board meetings of both companies held on that day and the resolution passed that day by a 6-1 majority which approved Tetragon entering into the GORE Transaction, the 6 being the First to Sixth Defendants and the 1 being the Plaintiff.  Accordingly, the Plaintiff was the only director who opposed Tetragon doing so.

2. The Plaintiff, who was then a director of Tetragon, expressed disapproval of the then proposed transaction, both in correspondence and in e-mails to his fellow directors of Tetragon and their advisers in the months preceding 29 July 2010 and also during a joint board meeting of both Tetragon companies held, largely as a telephone directors' meeting, on 29 July 2010.  The board meeting appears to have taken about two hours, and, in due course, it was resolved at the meeting, by a resolution of all directors except the Plaintiff, that Tetragon should enter into the GORE Transaction.  In other words, the Executive Directors and the Independent Directors voted in favour of the resolution and the Plaintiff voted against the resolution.

3. In the derivative action, the Plaintiff seeks to contend, on behalf of Tetragon, that the Executive Directors and the Independent Directors broke their directors' duties, and acted negligently, in deciding that Tetragon should enter into the GORE Transaction.  As part of the Plaintiff's claims, on behalf of Tetragon, against the Executive Directors only he also contends that they broke their fiduciary duties to Tetragon in voting in favour of the GORE Transaction.

4. Historically, the courts in England took a restrictive approach to allowing derivative claims.  In the words of Lord Eldon in Carlen v Drury (1812)1 Ves & B 154:

> *"This court is not to be required on each occasion to take the management of every playhouse and brewhouse in the kingdom."*

5. Over the years the attitude of the English courts to derivative actions developed and there is a valuable exposition of this development in the judgment of Lord Millett in **Waddington Ltd v Chan Chun Hoo** (2008) 9 HKCFA 63.

6. The shortest way to describe the development is to cite further from Lord Millett's judgment.

> *"The common law derivative action*
>
> *47. A company is a legal entity separate and distinct from its members. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders. If the company has a cause of action, this represents a legal chose in action which represents part of its assets. Accordingly, where a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and the company alone can sue. This is the first rule in Foss v. Harbottle (1843) 2 Hare 461. No action lies at the suit of a shareholder suing as such, though exceptionally he may be permitted to bring a derivative action in right of the company and recover damages on its behalf: see Wallersteiner v. Moir(No.2) [1975] 1 QB 373 CA at p.390; Prudential Assurance Co. Ltd v. Newman Industries Ltd (No.2) [1982] Ch 204 CA ("Prudential") at p.210; Johnson v. Gore Wood & Co. [2002] 2 AC 1 at p.61 et seq.*

Case 21-03067-sgj   Doc 59-1   Filed 09/29/21   Entered 09/29/21 18:48:45   Page 3 of 33
Case 3:21-cv-00842-B   Document 59-1   Filed 08/30/21   Page 3 of 33   PageID 2886
Guernsey Judgment 16/2013   Jackson and Beard et al

*48. The injustice which would result if a derivative action were not available where the company is controlled by the alleged wrongdoers is vividly described by Lord Denning MR in Wallersteiner v. Moir (No.2) (supra) at p.390:*

> *"But suppose [the company] is defrauded by insiders who control its affairs - by directors who hold a majority of the shares - who then can sue for damages? Those directors are themselves the wrongdoers. If a board meeting is held, they will not authorise the proceedings to be taken by the company against themselves. If a general meeting is called, they will vote down any suggestion that the company should sue them themselves. Yet the company is the one person who is damnified. It is the one person who should sue. In one way or another some means must be found for the company to sue. Otherwise the law would fail in its purpose. Injustice would be done without redress." (my emphasis)*

*49. Sir James Wigram V-C recognised the problem in Foss v. Harbottle itself. He suggested that proceedings could be brought by the individual shareholders in their private characters seeking the protection of the rights to which they were entitled in their corporate character. This suggestion was adopted, and it became accepted practice for minority shareholders to file a bill in the Companies Court and ask for leave to use the name of the company to bring an action: see Atwool v. Merryweather(1867-8) LR 5 Eq pp 464-7n. If they made out a reasonable case for being allowed to do so, the court would appoint them as representatives of the company to bring proceedings in the name of the company against the wrongdoers. If the action was successful, any damages recoverable were payable to the company.*

*50. The need to apply to the court for leave to use the company's name provided a useful filter to prevent frivolous and abusive actions or actions which it was not in the interests of the company to bring. It also gave the court an opportunity to adjourn the proceedings in order to discover whether the impugned transactions, if capable of ratification by the company (not for example being ultra vires or a fraud on the minority),would be ratified by the independent shareholders.*

*51. This filter was soon abandoned. The minority shareholders were permitted to bring an action against the wrongdoers without the leave of the court, joining the company as defendant in order to receive any damages that might be awarded: see Menier v. Hooper's Telegraph Works (1874) 9 Ch App 350. Since the company was a defendant it could not also be a plaintiff, and accordingly the action was traditionally framed as an action by the plaintiff "on behalf of himself and all other shareholders in the company except the defendants". In reality, as every one appreciated, the action was brought on behalf of the company in which the cause of action was vested. This form of action was described by Lord Davey in Burland v. Earle [1902] AC 83 at p.93 as a "mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress".*

*52. By the 1980's the absence of any appropriate filter to prevent unmeritorious claims or claims which it was not in the interests of the company to pursue was having unfortunate results. A defendant's only recourse was to apply to strike out the action under RSC O.18 r.19 or to have the plaintiff's right to bring a derivative action determined as a preliminary issue. Matters came to a head in Prudential, where the determination of the preliminary issue threatened to subject the company to a 30-day action in*

Case 21-03067-sgj Doc 59-1 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 4 of 33
Case 3:21-cv-00842-B  Document 59-1  Filed 08/30/21    Page 4 of 33  PageID 2887
Guernsey Judgment 16/2013  Jackson and Seal et al

*order to decide whether the plaintiffs were entitled to bring a 30-day action. There was, as the Court of Appeal observed, a dilemma, for at the time of the application the alleged fraud had not been proved. Either the court must assume the truth of every allegation in the statement of claim as in a true demurrer, in which case the company and its innocent shareholders might be subjected to groundless claims, or the action had to be fought to a conclusion before the plaintiffs' right to bring a derivative action could be established. Neither course was acceptable.*

*53. The solution which the Court of Appeal found in Prudential was to require the plaintiff, whether at the trial of a preliminary issue or on an application to strike out the proceedings, to establish a prima facie case both that the company was entitled to the relief claimed and that the plaintiff was entitled to bring the claim on its behalf by way of a derivative action. In an appropriate case the court could adjourn the proceedings in order to ascertain whether the independent shareholders considered that it was in the interests of the company to pursue the claim.*

*54. This approach was followed in Smith v. Croft (No.2)* [1988] Ch 114 *and was subsequently adopted by the Rules Committee when the Rules of the Supreme Court were amended by adding O.15 r.12A (later CPR r.19.9 and now s.260 of the Companies Act 2006). This imposed a requirement for the plaintiff in a derivative action to obtain the leave of the court to continue the action, thereby providing the filter which had been discarded more than a century earlier. The plaintiff has consistently been required on the application for leave to establish a prima facie case both that the company would be likely to succeed if it brought the action itself and that the case falls within an exception to the rule in Foss v. Harbottle."*

7.  It was accepted before me that the Royal Court would entertain a derivative action. Furthermore, it was not really argued before me on behalf of the Defendants that the Royal Court would not entertain a double or other multiple derivative action.  Like Lord Millett in Waddington Ltd v Chan Chun Hoo, at paragraphs 61-80, I am convinced that public policy requires the Royal Court to entertain double derivative actions and I find that our customary law allows such actions to be brought.  On this point I also draw attention to the very recent judgment of Mr Justice Briggs in Universal Project Management v Fort Gilkicker [2013] EWHC 348 where the learned judge, who at paragraph 34 had described derivative actions as the means by which a court may do justice in cases of wrongdoer control, said, at paragraphs 45-47:

> *"First, there was before 2006 a common law procedural device called the derivative action by which the court could permit a person or persons with the closest sufficient interest to litigate on behalf of a company by seeking for the company relief in respect of a cause of action vested in it. Those persons would usually be a minority of the company's members, but might, if the company was wholly owned by another company, be a minority of the holding company's members. These were not separate derivative actions, but simply examples of the efficient application of the procedural device, designed to avoid injustice, to different factual circumstances."  (See also paragraph 26 of the judgment.)*

8.  It therefore follows that the English common law, primarily under the 'fraud on a minority' exception to the rule in Foss v Harbottle (1843) 2 Hare 461, per Wigram V.-C., allowed shareholders under certain, limited circumstances to bring claims on behalf of their companies. The two basic requirements at common law for a derivative action were: (i) that the alleged wrong or breach of duty was by a director and was incapable of

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 5 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 5 of 33 PageID 2888
Guernsey Judgment 16/2013 Jackson and Bear et al

being ratified by a simple majority of the members (e.g. a fraudulent breach by a director or the deliberate misappropriation of company assets, but not a bona fide misuse of powers or an incidental profit making); and (ii) that the alleged wrongdoers are in control of the company, so that the company, which is the "proper plaintiff" cannot claim by itself.

9.  The original Cause was lodged on 25 February 2011 and the strike-out application was served on 28 April 2011.   It is clear that the application was made under rule 52 of the Royal Court Civil Rules 2007 and the inherent jurisdiction of the Court and was founded on a claim that the Cause disclosed no reasonable ground for bringing the action and should be struck out as an abuse of process since the Plaintiff was unable to satisfy the proper test relating to the bringing of derivative actions, a matter to which I shall refer later.

10. During the lengthy oral hearings in October to December 2011  the oral and written arguments of the parties ranged widely across legal authorities and textbook writings within the Commonwealth, and covered, *inter alia*, (i) the approach which Counsel submitted that the Royal Court should take on applications to strike out derivative and double derivative actions generally, including the correct evidential approach for the Court to take on such applications, (ii) the current state of the company law of Guernsey on the rule in *Foss v Harbottle* relating to the conduct of the internal affairs of Guernsey companies, the law relating to ratification by shareholders of decisions of the boards of directors of Guernsey  companies and legal issues relating to the meaning and effect of Rule 3.01 of the Guernsey Authorised Closed Ended Investment Scheme Rules ("the Scheme Rules") and of section 298 of the Companies (Guernsey) Law, 2008, which is the latest consolidation of Guernsey company law statutes.  In connection with the customary or common law relating to companies within the Bailiwick I was reminded by Advocate Le Tissier for the Plaintiff that Lieutenant Bailiff Southwell QC had said in *Flightlease Holdings (Guernsey) Ltd v Flightlease (Ireland) Ltd* (2009) that

> "*the concept of a limited company was imported into Guernsey law from English law [and] … since its importation into Guernsey in the late 1880s, it has naturally been appropriate to look to English law to help in the solution of problems concerning companies which are not covered by Guernsey statutes or customary law.*"

I respectfully agree and propose to take the same approach on this application.

11. It is important for me at the outset to state, as Mr Le Tissier also submitted, that, whatever the correct test may be for me to apply on the Defendants' strike out application, I should be careful not to conduct a mini-trial or to allow the application to become satellite litigation.  I believe that that object was attained during the long oral hearings and in preparing this judgment I have re-read all the transcripts and the long and helpful written submissions of Counsel, together with the affidavit evidence lodged for both sides to the application and am satisfied that I have neither conducted a mini-trial nor allowed satellite litigation to arise.  I am particularly aware as well that I heard the application at a very early stage of the proceedings, before any Defences have been lodged, and before disclosure of documents and lodging of witness statements or, with the exception of a report from Mr Graham Harrison for the Plaintiff filed in late November 2011, upon which much submission was made, before any experts' reports have been prepared; this is an important point for me to bear in mind throughout this judgment since experience tells us that much could change after disclosure of documents.

12. Both sides clearly, and I think understandably, regard the application as extremely important to them and, bearing in mind the financial extent of the GORE Transaction,

Case 21-03067-sgj Doc 59-1 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 6 of 33
Case 3:21-cv-00842-B  Document 59-1  Filed 08/30/21    Page 6 of 33  PageID 2889
Guernsey Judgment 16/2013  Jackson and Searle et al

they have committed large resources in terms of time and money towards the arguments presented to the Court for and against the application. But I hope they will forgive me if in this judgment I do not do full justice to all the arguments of Counsel, which proved most helpful to me; for I am conscious that I should only determine those questions which I consider necessary for me to decide in order for me to decide whether or not to strike out the Cause. The original Cause was amended in draft on two later occasions during the oral hearings and in this judgment all later references to the Cause should be treated as being to the second draft Cause, which was presented to me by Mr Le Tissier, according to my note, on 12 October 2011, and upon the basis of which all Counsel were happy to proceed for the purposes of the application.

13. Before turning to an analysis of the Cause I must decide two important questions which will partly govern the way in which I approach the allegations of breach of duty and negligence in the Cause.

14. First, does the full rigour of the rule in *Foss v Harbottle* apply in Guernsey or, as the Plaintiff contends, has the rule been relaxed here, as it has been in England as a result of section 260(3) of the Companies Act 2006, so as to allow derivative actions where the alleged cause of action of a company is in negligence or breach of duty and where there is no element of actual or equitable fraud alleged?

15. In my judgment, the rule applies in Guernsey as it did in England before the change in the law brought into English law by section 260(3). My reasons are these. First, although the substantive and procedural changes brought into English law by sections 260 to 263 by the 2006 Act must have been available to the States and the Law Officers when the proposals which led to the 2008 Law were before the States, no proposal was made for similar changes to be introduced in our law by the 2008 Law, where no mention appears of either the rule in *Foss v Harbottle* or derivative actions and no equivalent of sections 260 to 263 appear at all. Secondly, although I was reminded by Mr Le Tissier of the guidance of the Court of Appeal in *Morton v Paint* (1996) 21 GLJ 61 and of some criticism of the limited effect, in particular, of the fraud on the minority exception to the rule in textbooks and learned articles and in the Report of the Law Commission which led to the English statutory changes, I was not satisfied either that this criticism was entirely widespread or that it was clear which way Guernsey law should proceed, taking into account Lord Lowry's five "*aids to navigation*" in the House of Lords case of *C v Director of Public Prosecutions* [1996] 1 AC 1. For, after all, the Plaintiff only seeks the inclusion into Guernsey law of the substantive change made in section 260(3) and not the detailed procedural changes contained in sections 261 and 263, in particular, which impose a preliminary stage, in two parts, where a Plaintiff for derivative relief is obliged to require the permission of the High Court to bring the derivative action before the action can be instituted. The procedural changes are very detailed and complex. In my judgment, such a limited inclusion of section 260(3) into our law cannot be justified. I consider that such a change would require an amendment of the Companies Law and that I should introduce such a change by some sort of judicial law-making. I add that I also agree with the submission of Mr Davies relating to *Morton v Paint* which appears at paragraph 7.5 of his Outline of Applicable Law.

16. On the topic of the aids to navigation towards a change of the law, I am doubtful whether or not the proposal for which Mr Le Tissier contends in this part of his case would find favour with the States and so I am wary of imposing my own remedy by importing either section 260(3) alone or the entire English code on derivative actions in sections 260 to 264 of the Companies Act 2006 and caution must, as I see it, prevail since the States have legislated in the field of company law soon after the passing of the 2006 Act leaving the rule in *Foss v Harbottle* untouched. It might also well be said that to accede to the Plaintiff's suggested change to our law I would be setting aside a

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 7 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 7 of 33 PageID 2890
Guernsey Judgment 16/2013 – Jackson and Beattie et al

fundamental doctrine of Guernsey company law. Finally, paragraph 7.12 of Mr Davies' Outline of Applicable Law gives, as he there submitted, an idea of the wide consultation process which was apparently gone through before the Companies Law 2008 was brought into Guernsey's statute law. In my judgment, any change in our law to replace the rule in *Foss v Harbottle* so as to allow cases in negligence or breach of duty as a new exception to the rule must be a matter for the States to consider, and not for me to decide is necessary or appropriate.

17. If I were wrong on this point, I would not have been able to agree that only section 260(3) had become part of Guernsey law some time before the passing of the Companies Law 2008 but would have been forced to conclude that it was a case of 'All or Nothing' and that all the statutory code had then come into our law. As the Defendants rightly submit, the new English statutory code relating to the bringing of derivative actions is "*a composite whole*".

18. Secondly, I must rule on the submissions of the parties about the correct test to apply on the strike out application.

19. The Plaintiff seemed to me to be contending that all that he needed to establish was that his case as set out in the Cause was an arguable case and that therefore, in accordance with established law in Guernsey on strike out applications under what is now rule 52 of the Royal Court Civil Rules 2007, he should be permitted to have a full trial of the derivative action on behalf of Tetragon against the Executive Directors and the Independent Directors on all the different bases on which his case is put in the Cause. He cited a large amount of cases in support of the arguable test, but, understandably since this is the first derivative action known to have been started in the Royal Court, none of them relates to a derivative action. Furthermore, little of Mr Jackson's affidavit evidence dealt with the facts leading up to the Board meetings on 29 July 2010, including the negotiations which the Second Defendant largely conducted leading to the term sheet signed on 18 May 2010 and the later negotiations which produced amendments to the terms on the term sheet.

20. In support of the application to strike out the Defendants submit that, in accordance with the approach taken by Wigram V.-C in *Foss v Harbottle* itself, the Court of Appeal in *Prudential Assurance Co. Ltd v Newman Industries No. 2* [1982] Ch. 204 and Knox J. in *Smith v Croft No. 2* [1988] Ch. 114 the Plaintiff must first establish that he has a *prima facie* case on all or any of the seven alleged causes of action pleaded in the Cause and, to the extent that there is such a *prima facie* case established, that any of such causes of action come within an exception to the rule in *Foss v Harbottle* – see also paragraph 17 of the judgment of Briggs J. in *Universal Project Management v Fort Gilkicker*. Accordingly, the Defendants argue that the usual demurrer approach to strike out applications on the ground that a Cause does not disclose a reasonable cause of action is not to correct test to apply when a defendant applies in the Royal Court to strike out a derivative action and drew my attention to the helpful list of six general principles governing derivative actions provided by Lord Justice Peter Gibson in *Barrett v Duckett* [1995] BCC 362, which I think it would be helpful to include at this stage.

> "*The general principles governing actions in respect of wrongs done to a company or irregularities in the conduct of its affairs are not in dispute:*
>
> *1. The proper plaintiff is prima facie the company.*
>
> *2. Where the wrong or irregularity might be made binding on the company by a simple majority of its members, no individual shareholder is allowed to maintain an action in respect of that matter.*

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 8 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 8 of 33 PageID 2891
Guernsey Judgment 16/2013 – Jackson and Bearer al

*3. There are however recognised exceptions, one of which is where the wrongdoer has control which is or would be exercised to prevent a proper action being brought against the wrongdoer: in such a case the shareholder may bring a derivative action (his rights being derived from the company) on behalf of the company.*

*4. When a challenge is made to the right claimed by a shareholder to bring a derivative action on behalf of the company, it is the duty of the Court to decide as a preliminary issue the question whether or not the plaintiff should be allowed to sue in that capacity.*

*5. In taking that decision it is not enough for the Court to say that there is no plain and obvious case for striking out; it is for the shareholder to establish to the satisfaction of the Court that he should be allowed to sue on behalf of the company.*

*6. The shareholder will be allowed to sue on behalf of the company if he is bringing the action bona fide for the benefit of the company for wrongs to the company for which no other remedy is available. Conversely if the action is brought for an ulterior purpose or if another adequate remedy is available, the Court will not allow the derivative action to proceed."* [The highlighting is mine.]

21. I accept the Defendants' submissions as being the correct test on their application to strike out the Cause. In my view, the valiant contentions of Mr Le Tissier simply do not apply to an application to strike out a derivative action where very different considerations apply than in an orthodox strike out application and the two-stage *prima facie* test is so long-standing under common law as really to preclude much argument to the contrary, absent statutory provision like those in sections 261 and 263 of the Companies Act 2006, but even there a *prima facie* test of a special nature is required to be satisfied by a claimant seeking relief in a derivative action – see especially ***Prudential Assurance Co. Ltd v Newman Industries No. 2*** at pp. 211A-B and 221H-222B for further details of the reasoning of the Court of Appeal. The same test has also been adopted recently in the Grand Court of the Cayman Islands by Foster J. in ***Renova Resources v Gilbertson*** [2009] CILR 268, where the learned judge, rightly in my view, said that a *prima facie* case was more than a good arguable case – paragraph 33. At paragraph 35 he provided a further analysis of a *prima facie* case, with which I respectfully agree:

> *"35 The purpose of requiring the plaintiff to obtain leave to continue the derivative action, as I understand it, is to prevent the expense and time of (and to protect the defendants against) vexatious or unfounded litigation which has little or no prospect of success or which is clearly brought by an aggrieved shareholder for his own reasons rather than in the interests of the company. The phrase "*prima facie*" has various shades of meaning but literally means "at first sight." Given that there is not to be a mini-trial of the plaintiff's case, it seems to me that I must form a view of the plaintiff's case based on my first impressions, having regard to my assessment of all the evidence before me, including that submitted by the defendants. For the plaintiff to obtain leave to continue with the action, I consider that I must be satisfied in the exercise of my discretion that its case is not spurious or unfounded, that it is a serious as opposed to a speculative case, that it is a case brought bona fide on reasonable grounds, on behalf of and in the interests of the company and that it is sufficiently strong to justify granting leave for the action to continue rather than dismissing it at this preliminary stage."*

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 9 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 9 of 33 PageID 2892
Guernsey Judgment 16/2013 Jackson and Bear et al

22. I now turn back to the facts, which are largely agreed. There may be an element of overlap between the summary included above, but I have decided to give as full a recital of the facts so that the appropriate test in relation each part of the Cause can be addressed against the background of the full facts, in so far as it has been possible at this early procedural stage of the proceedings.  I shall do so partially by reliance on the Defendants' Recap Note of the first two days of the oral hearing, *i.e.* 12 and 13 October 2011, and their Remainder of the Facts document which completed their analysis of the facts.  I have found these documents particularly helpful, but I have also checked the central documents to ensure that the references are accurate and I have removed, I believe, all comments from the Defendants' Notes which are not strictly factual.

23. In the past decade, the Plaintiff and the Executive Directors have collaborated in two main business ventures.  First, in 2002, they founded Polygon and the Polygon Global Opportunities Master Fund.  As that fund grew, they built up business in London and New York and elsewhere.  They did so through two subsidiaries of the fund's investment manager Polygon Investments Limited ("PIL").  In 2005, they founded the Seventh and Eighth Defendants,Tetragon Financial Group Limited ("TFG") and Tetragon Financial Group Master Fund Limited (the "Master Fund") (together, Tetragon or the "Fund") and also its investment manager, Tetragon Financial Management ("TFM").  Tetragon is a closed-ended investment company under the Protection of Investors (Bailiwick of Guernsey) Law, 1987.  It is managed on a day to day basis by TFM under the terms of an investment management agreement (the "IMA"), to which I shall refer below.

24. In 2008, the Plaintiff was asked by The Executive Directors to resign from the Polygon manager.  The Plaintiff agreed to 'exit his interests' in Polygon in favour of The Executive Directors but remained in the Tetragon business and became a director of the Fund and continued as a member of TFM's Investment Committee.

25. In 2009, a related-party transaction took place, which was referred to as the "LCM Transaction", and to which I shall refer later.

26. In 2010, TFM considered a second related-party transaction, the GORE Transaction.  The GORE Transaction was a related-party transaction because of Polygon's participation in the joint venture.  The First and Second Defendants were interested in the GORE Transaction by virtue of their ownership of Polygon; so was the Plaintiff (though his interest was by then a declining economic interest).

27. Under the terms of the IMA, TFM had two options where a significant related-party transaction was under consideration.  It could either submit it to the board of Tetragon and obtain approval from a majority of the directors not interested in the transaction, or it could obtain a fairness opinion from a recognised bank or firm.  In this case, it is common ground that TFM did both.  A fairness opinion was obtained from Houlihan Lokey, to which I refer in detail below, and approval was sought and obtained at the board meeting on 29 July 2010 from all the Independent Directors.

28. At that time, Tetragon's Board comprised Tetragon's three founders, the Plaintiff and the Executive Directors, and the Independent Directors.  Mr Ward had become an Independent Director on 30 April 2010 in place of Mr Olesky.

29. The affidavit evidence from the Defendants shows that the Independent Directors are experienced professional men and that the purpose of their appointment was to protect the interests of non-voting shareholders in TFG. Two of them are Guernsey residents, one is English and the other is a United States citizen. The Independent Directors were separately advised by US lawyers Simpson Thacher and by Carey Olsen in relation to

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 10 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 10 of 33 PageID 2893
Guernsey Judgment 16/2013 - Jackson and Dear et al

the GORE Transaction and Tetragon was represented by US lawyers Cravath Swaine & Moore and by Ogier.

30. The Independent Directors swore affidavits confirming that they were alive to the interests of the Executive Directors in the GORE Transaction. The clear effect of this evidence is that in the knowledge that the Executive Directors were interested through their interests in Polygon in the GORE Transaction, and with the benefit of independent legal advice in the US and Guernsey, and with the benefit of a fairness opinion from Houlihan Lokey, all of the Independent Directors voted in favour of the GORE Transaction. The Plaintiff also accepts that Independent Directors acted at all material times in good faith; there is no allegation against the Independent Directors which is based on actual or equitable fraud or breach of fiduciary duty.

31. It also appears that the Plaintiff and all the other members of the Board, i.e. the Executive Directors and the Independent Directors, received the same documents and electronic materials in the run-up to the board meeting held on 29 July 2010.

**The Structure of Tetragon**

      **a. Tetragon's structure diagram**



Case 21-03067-sgj Doc 59-1 Filed 09/29/21   Entered 09/29/21 18:48:45   Page 11 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21   Page 11 of 33   PageID 2894
Guernsey Judgment 16/2013 - Nielson and Bear et al

32. The Tetragon structure diagram, which is a useful tool, was helpfully explained to me during Mr Davies' oral submissions.  I draw from those submissions and from the Recap Note itself for the following explanation.

33. It is the Master Fund which makes investments; TFG's only investment is in shares in the Master Fund and TFG feeds funds through to the Master Fund.

34. Tetragon has ten voting shares, which are held by Polygon Credit Holdings II Limited, ("PCH II"), a Cayman Islands company, which is owned by the three founders, the Executive Directors and the Plaintiff.  The Plaintiff and the Second Defendant each own 40% and the First Defendant owns 20%.  PCH II is not a Defendant in these proceedings, but Mr Davies accepted that, if the derivative action were not struck out, PCH II would have to be joined so as to be bound by any judgment after the full trial.

35. Public investors hold TFG's non-voting shares.  Most of them hold through Euroclear and so their identity is not visible to Tetragon.  In 2007, there was an IPO of 30 million non-voting shares which was over-subscribed.  TFG's shares are traded on the NYSE Euronext Amsterdam stock exchange.  As a listed entity, TFG is subject to disclosure obligations, including as regards process and directors' interests.  At the time of the IPO, 70 million shares held by existing investors were exchanged into interests in the listed entity.  Overall, the IPO concerned some U.S.$1.35 billion investor funds, new and existing.  Mr Côté refers to the IPO in this first affidavit at paragraph 22.

36. Following the IPO, Tetragon's website has contained all of Tetragon's up-to-date disclosures.  What is now available to prospective investors is real-time disclosure on the website – paragraph 48 of Mr Côté's first affidavit.  TFM, the investment manager, is a Delaware limited partnership.  TFM manages Tetragon's investments in return for a flat fee of 1.5% of Tetragon's net asset value, plus a 25% performance fee on any increase in net asset value above a hurdle rate (which at the time of the IPO was approximately 8% and which fluctuates based on LIBOR).

37. 50% of the economics in TFM are owned by a Delaware corporation called HRW Holdings, which is owned in turn by David Wishnow, Michael Rosenberg and Jeffrey Herlyn.  Each of them swore affidavits supporting the position of Tetragon on the strike out application.  Mr Wishnow's relevant financial interests are in TFM, and he is also (like Mr Rosenberg and Mr Herlyn) a non-voting shareholder in Tetragon. His view, having participated in the negotiation of the GORE term sheet, and having witnessed and supported the presentation of the transaction to Tetragon's board, is that the GORE Transaction was in Tetragon's interests.

38. Messrs. Wishnow, Rosenberg and Herlyn have no interest in Polygon.  They are members of TFM's Investment and Risk Committees and they have not been joined as Defendants in these proceedings;  it is clear that they thought the GORE Transaction was in Tetragon's best interests.

39. The balance of 50% of the economics in TFM is beneficially owned by the Second Defendant, the Plaintiff and the First Defendant through another Polygon Cayman Islands entity, PCH.  PCH holds all the voting shares in TFM, and 50% of the economics.

40. In voting terms, the Second Defendant and the Plaintiff each has a 40% interest in PCH, and the First Defendant 20%.  In economic terms, because of the 50% economic interest which PCH has in TFM, the Second Defendant and the Plaintiff each have a 20% interest and the First Defendant has a 10% interest in TFM.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21   Entered 09/29/21 18:48:45   Page 12 of 33
Case 3:21-cv-00842-B   Document 59-1   Filed 08/30/21   Page 12 of 33   PageID 2895
Guernsey Judgment 16/2013  Jackson and Dear et al

**Polygon's structure diagram**



41. TFM sources its infrastructure services from two Polygon entities shown in the Polygon diagram (*i.e.* staff, offices, equipment and computer systems), PIP LP (U.S.) and PIP LLP (U.K.). PIP stands for Polygon Investment Partners. PIP LP is a Delaware limited partnership and PIP LLP is an English limited liability partnership, and they provide infrastructure services in New York and in London respectively.

42. PIP LP and PIP LLP are owned by Polygon Investments Limited, PIL, and in turn PIL is shown as being owned by the Plaintiff and the Executive Directors. Since the breakdown in relations between the Plaintiff and his two co-founders back in 2008, the Plaintiff 'exited' his interest in PIL, leaving the Executive Directors, I was told, by the end of 2012 as the sole owners of PIL and the service providers. PIL was the original Polygon business (which is sometimes referred to as "old Polygon").

43. To the right of PIL on the Polygon structure diagram is Polygon Holdco (which is sometimes referred to as "new Polygon"). The Plaintiff has no interests in Polygon Holdco. There is a distinction between old Polygon, where the Plaintiff had a residual declining interest, and new Polygon because the 13% Polygon equity interest in the GORE Transaction is on the Polygon Holdco (new Polygon) side, and the provision of services to GORE, is on the PIL (old Polygon) side.

44. As is required by company law, there is a set of Articles for each of TFG and the Master Fund. As the provisions mirrored each other, it was agreed that the submissions of Counsel would relate to the Articles of TFG.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21   Entered 09/29/21 18:48:45   Page 13 of 33
Case 3:21-cv-00842-B   Document 59-1   Filed 08/30/21   Page 13 of 33   PageID 2896
Guernsey Judgment 16/2013   Jackson and Dear et al

45. Article 6(a) states that TFG's share capital is U.S.$1 million divided into ten "voting shares" and 999,999,990 unclassified shares.  Article 6(b) provides:

> "*Unclassified shares may be issued as Non-Voting Shares.*"

All ten Voting Shares have been issued and all of them are owned by PCH II.  It is also common ground that more than 100 million non-voting (unclassified) shares have been issued.

46. Dividends are dealt with at Articles 106 and 107:

> "*The Directors may, upon the recommendation of the Manager, declare periodic dividends from time to time in respect of Non-Voting Shares, in accordance with the respective rights of the Members, subject to the approval of the Voting Shares by Resolution…  No dividends shall be declared or paid on the Voting Shares.*"

47. By Article 138, on a winding up the maximum that PCH II could realise is less than one US cent.

48. All the voting shares carry the right to vote.  Article 12 provides that the non-voting shareholders can only vote where the resolution at issue will, if passed, adversely affect the rights attaching to the non-voting shares.

49. So, as the Defendants accurately put it, the voting shares afford control but with no economic interest, and the non-voting shares offer economic participation but no control.  This is the structure into which non-voting shareholders in TFG (and persons acquiring interests in such shares on the Amsterdam Stock Exchange) enter.

50. I shall now address Articles concerning the Board. The provisions concerning the Board begin at Article 80 which provides that the number of directors shall be seven unless otherwise determined by Resolution of the Voting Shares.  At all times up until the approval of the GORE Transaction on 29 July 2010, there was a board of seven directors.  The Plaintiff was removed as a director of Tetragon on 24 January 2011 and thereafter there have been six directors.

51. Article 81 provides that

> "[*E*]*xcept as provided not less than a majority of Directors shall be Independent Directors.*"

52. Article 83 is the general provision that the business of the company shall be managed by the directors, but

> "*subject … to any directions given by Resolution of the holders of Voting Shares*".

53. Article 91 is a very important Article dealing with directors' interests.  It states:

> "*Provided that he has disclosed to the Directors the nature and extent of any interests of his in accordance with the Companies Law, a Director, notwithstanding his office: (a) may be a party to, or otherwise interested in,*

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 14 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 14 of 33 PageID 2897
Guernsey Judgment 16/2013 – Jackson and Deal et al

> *any transaction or arrangement with the Company or in which the Company is otherwise interested".*

54. Article 91 (c) provides that a director

> *"shall not ... by reason of his office, be accountable to the Company for any benefit which he derives from any such office ... or from any such transaction or arrangement ... and no such transaction or arrangement shall be void or voidable on the ground of any such interest or benefit or because such Director is present at or participates in the meeting of the Directors or a committee thereof that approves such transaction or arrangement, provided that [the interest] and the material facts as to the interest ... have been disclosed or are known to the Directors ... and the Directors ... in good faith authorise the transaction or arrangement".*

55. Article 91 (c) (ii) provides that the approval of the board must include the votes of a majority of the directors who are not interested in the transaction.

> *"or such transaction is otherwise found by the Directors (before or after the fact) to be fair to the Company as of the time it is authorised".*

56. Both those routes were followed in relation to the GORE Transaction. The GORE Transaction was approved by a majority of the directors not interested in the transaction at the board meeting on 29 July 2010, *i.e.* by all four Independent Directors, and on 7 June 2011, the then directors, who by then did not include the Plaintiff, resolved that the GORE Transaction was fair to Tetragon.

57. Article 92(a) provides:

> *"For the purposes of the preceding Article: a general notice given to the Directors that a Director is to be regarded as having an interest of the nature and extent specified in the notice in any transaction or arrangement with a specified person or class of persons shall be deemed to be sufficient disclosure of his interest in any such transaction or arrangement".*

58. Article 93 provides that

> *"the affirmative vote of* five *Directors shall constitute a resolution of the Directors".*

59. Article 94 provides that

> *"The quorum for the transaction of the business of the Directors shall be five".*

60. Article 99 is also an important article and provides that directors can vote, and have their vote counted, on transactions they are interested in as long as they have disclosed their interest in accordance with the articles and the Companies Law.

61. Broadly speaking these provisions reflect sections 162, 166 and 167 of the Companies Law regarding disclosure of interests and entitlement to vote. Section 162 provides that immediately after becoming aware of the fact that he is interested in a transaction or proposed transaction with the company a director must make disclosure to the board of directors on either of the two alternative bases set out in paragraphs (i) and (ii) of the

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 15 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 15 of 33 PageID 2898
Guernsey Judgment 10/2013 Jackson and Deal et al

section.

62. The Recap Note, with the definitions used in this judgment, provided as follows:

> "*At the time the GORE Transaction was considered, the Board consisted of seven directors, of whom at least four had to be independent. Five directors are required, first for an affirmative vote, secondly for a quorum, and thirdly to pass a written resolution. The point to note here is the central role played by the Independent Directors in the management of the company. As a practical matter, the relevant business of the company cannot be conducted without the participation of at least two of the Independent Directors and no resolutions are going to be passed without the support of at least two. Under Article 91, the power to decide whether a related-party transaction is to be approved rests on the route followed on 29 July 2010: with the directors who had no interest in the underlying transaction. In the case of GORE, that was the Independent Directors. The minimum requirement for approval was the votes of three of the four Independent Directors, i.e., majority Independent Director approval. On the other route, where the directors additionally needed to determine the fairness of the transaction to the company, (i.e. the route subsequently taken on 7 June 2011), the minimum requirement for approval was again the three of the four Independent Directors (if five votes from the then six directors was to be achieved).*"

63. As I have mentioned, the Cause is concerned with a decision reached by the Board, including each of the four Independent Directors, first on 29 July 2010 and then again on 7 June 2011. After a period of negotiation, which seems to have commenced in about January/February 2010, with the benefit of independent legal advice from Simpson Thacher and Carey Olsen, considerable additional materials were provided to them for them to review and after considering a fairness opinion from Houlihan Lokey, obtained by TFM under the terms of the IMA, and after questioning Houlihan Lokey during the board meeting, the Independent Directors decided on 29 July 2010 that the GORE Transaction should be approved.

**The Investment Management Agreement**

64. The IMA is an agreement governed by New York law. The first and second parties to the IMA are the Seventh and Eighth Defedants, Tetragon. The fourth party is TFM, the Investment Manager, which was then known as Polygon Credit Management LP, but has since changed its name to Tetragon Financial Management LP, *i.e.* TFM. Details of the provisions of the IMA are pleaded in paragraphs 27 and 28 of the Cause.

65. By Clause 2 TFM was appointed as exclusive investment manager to the Funds (Clause 2 (a)). Clause 2 (b) provides:

> "*Subject to Clause 4 hereof, the Manager shall have full power and discretionary authority on behalf of and for the account of the Funds to manage and invest cash and other assets of the Funds pursuant to and in accordance with the investment objective of the Funds*".

66. Clause 4 (a) of the IMA provides that

> "*the Manager shall have the authority ... to determine the investment strategy to be pursued in furtherance of the investment objective of the Funds*".

It is common ground that Tetragon's investment objective is and always has been "*to generate distributable income and capital appreciation*", which I described during oral argument as a very broad objective indeed.

67. Clause 4 (c) provides:

> "*In carrying out its duties under this Agreement, the Manager shall have due regard to the investment objective to generate distributable income and capital appreciation*".

68. Much mention was made in argument of Clause 4(d) of the IMA, which provides as follows:

> "*The Manager is authorized to enter into transactions on behalf of the Funds with persons who are Affiliates of the Manager*".  ("*Affiliates*" is defined by reference to the U.S. Securities Act and it was not disputed that for these purposes Polygon would be an "*Affiliate of the Manager".)*

69. Under clause 4(d) TFM is authorised to enter into transactions

> "*provided that in connection with any such transaction that exceeds $5 million of aggregate investment the Manager informs the Boards of Directors of the Offshore Fund and the Master Fund and obtains either (i) the approval of a majority of the members of the Boards of Directors that do not have a material interest in such transaction (whether as part of a board resolution or otherwise) or (ii) an opinion from a recognized investment bank, auditing firm or other appropriate professional firm substantively to the effect that the financial terms of the transaction are fair to the Funds from a financial point of view*".

70. So, where a related-party transaction might exceed US $5 million, TFM may either obtain board approval from a majority of the disinterested directors, or itself obtain a fairness opinion, or, as in this case, both.

**The LCM Transaction**

71. I was introduced by Mr Davies in his oral submissions on 12 and 13 October 2011 in more detail to the first related-party transaction into which Tetragon entered in November 2009, the LCM Transaction, under which Tetragon acquired an operating business.  Previously it seems that Tetragon had been holding investment securities, which primarily were CLOs, collateralised loan obligations.  The LCM Transaction is not directly at issue in these proceedings but a number of its features were similar to those of the GORE Transaction.  The Plaintiff ultimately voted in favour of the LCM Transaction at the Board meeting when it was approved by all of the directors.

72. The similar features were shown to have included these:

> i.    Each transaction represented, for Tetragon, the acquisition of an interest in an operating business.

> ii.   Each transaction involved related-party aspects, with Polygon receiving equity in exchange for the provision of infrastructure and service at cost.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 17 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 17 of 33 PageID 2900
Guernsey Judgment 10/2013 Jackson and Dear et al

     iii.    A fairness opinion was obtained by TFM from the same provider, Houlihan Lokey.

     iv.    TFM also submitted each transaction to Tetragon's board for majority approval by those with no interest in it, who on each occasion were the Independent Directors.

     v.    External US lawyers were retained for the Independent Directors.

     vi.    During negotiations the Plaintiff on each occasion argued that the transaction was outside Tetragon's investment objectives.

73. LCM was owned by Calyon, which is the investment banking arm of the Credit Agricole group. While it was part of Calyon, LCM had used Calyon's infrastructure including offices, non-investment staff (*i.e.*, legal, compliance, financial control, computer systems and technology) in managing the loan assets. If Tetragon acquired LCM from Calyon, that infrastructure would no longer be available to LCM from Calyon and so LCM would need either to develop its own 'infrastructure capability' or source it from a third party.

74. When the LCM acquisition opportunity arose, the Second Defendant and the First Defendant proposed that the same Polygon entities should make infrastructure services available to LCM at cost, in exchange for the right to receive a percentage of LCM's profits.

75. Because Polygon was owned by the Executive Directors, and because the Plaintiff had a continuing but declining interest (see above), the related-party provisions of the IMA came into play. As with the GORE Transaction, TFM both obtained Board approval (on 3 November 2009) and obtained a fairness opinion which was submitted to the Board as one part of the materials to be considered by them in deciding whether or not to enter the LCM Transaction.

76. As with the GORE Transaction, external US lawyers Simpson Thacher were retained to assist the Independent Directors.

77. In the event, all of the members of Tetragon's Board, including the Plaintiff, voted in favour of the LCM Transaction, but originally, as I have mentioned, the Plaintiff had opposed it. In a letter dated 20 October 2009 to the Board, the Plaintiff set out his objections "*I write to express my strong opposition. It is wrong to divert 16.5% of the operating profits from LCM to two entities that are owned by Reade Griffith and Paddy Dear.*" The Plaintiff also complained that the proposed investment represented a significant departure from Tetragon's investment objectives. In his letter the Plaintiff accepted that the investment mandate was broad but said that he had some doubts as to whether it was broad enough to encompass the purchase of an operating business.

78. Another complaint in common with the GORE Transaction was the Plaintiff's allegation of what he called 'double-dipping', *i.e.* that Tetragon was unnecessarily paying two sets of fees. He alleged:

    "*The Related-party Transaction cannot withstand scrutiny. It is double dipping and an unlawful diversion of profits to a related-party. Our shareholders are essentially being charged twice for the same services by a related-party. Any shareholder or regulator who heard about this will be outraged for very good reason.*"

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 18 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 18 of 33 PageID 2901
Guernsey Judgment 16/2013 Jackson and Deal et al

But on 3 November 2009 the Plaintiff voted in favour of Tetragon entering the LCM Transaction.

**The GORE Transaction**

79. The negotiations which led to Polygon and Tetragon entering into the GORE Transaction began in about January/February 2010. To a large extent the Second Defendant conducted those parts of the negotiations which were with the 'GORE Founders'. Later, after the original version of the Term Sheet, which comprised the detailed terms which had been negotiated, had been prepared, which was by 18 May 2010, and especially between about 16 June 2010 and 28 July 2010, the proposed transaction was reviewed by members of the Board before the Board meeting was held on 29 July 2010. During that period the Plaintiff raised objections to the proposed GORE Transaction and was represented by lawyers, The Nelson Law Firm, Fladgate LLP in London and Appleby in Guernsey.

80. There can, in my judgment, be absolutely no doubt that each of the Plaintiff and the Independent Directors of Tetragon had the opportunity to use, and did use, the services of skilled lawyers during the period of negotiations and that the lawyers for the parties reviewed all aspects of the proposed transactions most carefully.

81. It is also noteworthy, I think, that no allegations are made by the Plaintiff that any negligent advice was given to the Independent Directors by either Simpson Thacher or Carey Olsen or to Tetragon or TFM by either Cravath Swaine & Moore or Ogier. So, the Plaintiff's derivative action is directed against the Executive Directors and the Independent Directors, and not against either TFM or Mr Wishnow, Mr Herlyn or Mr Rosenberg of TFM or Houlihan Lokey or any of the lawyers and other advisers used by TFM, the Independent Directors or Tetragon.

82. The three real estate specialists at the heart of the proposed GORE Transaction, John Carrafiell, Sonny Kalsi and Fred Schmidt, (together "the GORE Founders",) had previously worked at Morgan Stanley. The Second Defendant knew Mr Carrafiell personally and all members of the Investment Committee of TFM met the GORE Founders in February 2010.

83. The Plaintiff's first impression of the proposed GORE Transaction appears to have been a favourable one. In his e-mail dated 25 February 2010 and sent by him to the other members of the Investment Committee of TFM he set out his reaction:

> "*It could be an exciting deal to do. ... I think that these are exactly the type of deals that Tetragon should be looking at.*" In this e-mail he added: "*From TFG's point of view a big stake in there* [sic] *firm is exciting.*"

84. The GORE Transaction was referred to its Board for approval because of Polygon's participation and because it was recognised that the Second Defendant and the First Defendant owned Polygon. This was the same review and approval process as had been followed for the LCM Transaction.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 19 of 33
Case 3:21-cv-00842-B    Document 59-1    Filed 08/30/21    Page 19 of 33    PageID 2902
Guernsey Judgment ??/2013 – Jackson and Dear et al

85.  The first communication from TFM to the Board in connection with the approval was an e-mail from Mike Adams, Associate Counsel for TFM, to Tetragon's Board dated 22 June 2010.  The Investment Committee of TFM had met on 18 June 2010 and, whilst at that meeting the Plaintiff had objected to the proposed GORE Transaction, the majority of the committee had agreed with it.  Attached to Mr Adams' e-mail were:

    i.    a letter from the Second Defendant to the Board dated 18 June 2010,

    ii.    a confidential presentation from TFM to the Directors,

    iii.    extracts from the IMA and the articles of both Tetragon companies, the Term Sheet, and

    iv.    a business plan.

86.  The Second Defendant's letter of 18 June 2010 included the following:

> "*Tetragon has continually sought to realise TFG's potential to become a broad-based financial services firm, capable of pursuing attractive investment opportunities.*"

The Second Defendant then set out his belief that Tetragon

> "*can function not only as an investment holding company, but also as a company.*"

He also referred to the LCM transaction as a

> "*… first natural step in realising its potential ... receives very positive feedback from shareholders and analysts.*"

He also considered that

> "*... there's an opportunity to further fulfil TFG's potential*"

and he said that TFM was very excited to present a proposed real estate joint venture, which he believed would build on recent success.

87.  The Second Defendant continued:

> "*Due to the fact that various Polygon entities will be involved in the Transaction (including entities owned by Paddy and myself as well as owned by Paddy, Alex and myself), the three of us may be considered to have an "interest" in the proposed Transaction.*" "*…As you will recall under the articles and the IMA, these sorts of related party transactions need to be approved by the boards, including a majority of the disinterested directors, or the directors need to find that the affiliate transaction is fair to each of the companies, or be otherwise authorised.*"

In the final paragraph of his letter the Second Defendant said:

> "*... there will be a detailed discussion of the related party matters.  We understand the board should take whatever time the directors consider is necessary to evaluate the terms of the related party aspects of the joint venture and to consult with outside advisers as appropriate.*"

88.  The presentation from TFM to the Board which was attached to Mr Adams' e-mail summarised the principal terms of the GORE venture; the headings used included: "*Why*

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 20 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 20 of 33 PageID 2903
Guernsey Judgment ??/2013 – Jackson and Dear et al

*Real Estate*", "*Why Green Oak*", "*Why with Polygon*", *etc*. The summary paragraph of the presentation stated:

> "*Given that Polygon and the other infrastructure providers are related parties to TFG and TFGMFL it is important that the relationships of the joint venture partners be thoroughly disclosed and properly thought through, and we look forward to working with the Boards of Directors on that aspect of the transaction*".

89.  The GORE Term Sheet, a document upon which great attention was given during the argument of Counsel, was also attached to Mr Adams' e-mail of 22 June 2010.  The Term Sheet is helpfully pleaded in depth in paragraphs 37 and 43-50 of the Cause.

90.  The parties to the Term Sheet were identified as:

    i.  the three real estate professionals who were going to form GreenOak Real Estate, *i.e.* the GORE Founders;

    ii.  the Polygon holding company which was going to receive an equity interest in GORE and which was going to provide working capital for the joint venture;

    iii.  the two Polygon "*Infrastructure Providers*": the US and UK partnerships which were going to participate because the joint venture would require an operational centre and trading and support facilities; and

    iv.  Tetragon which was going to provide working capital and a financing commitment in exchange for an equity interest.

91.  The GORE Founders' interest in the venture was described and it was stated that between them they would own 77% of the joint venture vehicle.  Polygon was to receive 13% and Tetragon 10% and their interests were to be non-dilutable.  The GORE Founders would also receive a 3.6% interest in Polygon HoldCo.  (There were forfeiture provisions if a GORE Founder were to leave.)

92.  Under the heading "*Options in TFG*" the Term Sheet provided that the GORE Founders would receive options on 3% of Tetragon's shares at a strike price of US $5.50, vesting only after five years.  The shares were to be issued for cash.  There was a further forfeiture provision to the extent that a GORE Founder was not active in the business at the vesting date of the options.  Changes in Tetragon's favour were negotiated to this aspect of the GORE Transaction after the Term sheet was signed as shown in the Defendants' Counsel's summary headed "Changes to the GORE Transaction post Term Sheet".  The negotiated change was that the TFG options were only to vest after five years and following the GORE Founders' repayment of all working capital loans and were conditional on the GORE Founders being actively involved in the management of the real estate business.

93.  The Term Sheet also provided that the GORE Founders would manage the venture, subject to the Board which was to include one appointee from each of Polygon and Tetragon.  Reference was also made to an Infrastructure Services Agreement under which PIP LP and PIP LLP were to provide operational, financial control, trade settlement, marketing, legal, compliance, payroll and other infrastructural services to GORE at cost.

94.  Under the heading "*Co-investment of TFG Master Fund*" the Term Sheet provided that Tetragon was to make available US $100 million which could be drawn by GORE for co-investment purposes, subject to various constraints including a condition that the amount drawn down in respect of any given investment programme could not be more than 9% of the total equity contributed to that programme, and that those co-investments were on the

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 21 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 21 of 33 PageID 2904
Guernsey Judgment ??/2013 – Jackson and Dear et al

best terms made available to any other investor in a given opportunity, which was referred to in the proceedings as a "*most favoured nation*" clause.

95. A further change was made to the proposed GORE Transaction after the Term Sheet was signed to ensure that Tetragon did not find itself committed only to less attractive investments, allowing it to choose (if it wished) to increase its participation in any investment up to the maximum of 9%.

96. The Term Sheet also provided that working capital loans were to be made by both Polygon Holdco and Tetragon of US $10 million each.

97. Under the heading "*Time Commitments and Exclusivity*" each GORE Founder agreed to devote his whole time and attention to the business of GORE.

98. Finally, there was a "*Condition Precedent*" set out in these terms in the Term Sheet, which was signed by the Second Defendant on 18 May 2010, *i.e.* about ten weeks before 29 July 2010:

> "*The obligations of the Parties set forth in this Term Sheet shall be subject to Tetragon obtaining the requisite approval from the Board of Directors of Tetragon.*"

Accordingly, the Term Sheet acknowledged that its terms would not be binding unless and until Tetragon Board approval was obtained.

99. The "*Exclusivity*" and "*Documentation/Binding Effect*" section of the Term Sheet referred to a 60-day exclusivity period in which an initial business plan was to be formally agreed between the parties and if the initial business plan was not agreed within this period, the Term Sheet "*shall automatically terminate and no Party shall have any liability or obligation to any other Party*". (This provision was not enforced by any party in the period of the first 60 days of the GORE Transaction.)

100. On 2 July 2010, Mr Adams circulated by e-mail to the directors of Tetragon a further background presentation headed "*GreenOak Real Estate Advisers*", which provided information about the GORE Founders and their credentials and about the market environment and also dealt with the TFM rationale underlying the proposed GORE Transaction.

101. Also on 2 July 2010, Mr Adams sent to the Board under separate cover a document containing extracts from Tetragon's IPO Prospectus, the Tetragon website, Tetragon's 2009 annual report and various other materials relating to Tetragon's investment objective and its strategy, asset selection and uses of cash. Under the heading "*Risk Factors*" from the IPO Prospectus the following extract appeared:

> "*The Issuer and the Master Fund have approved a very broad investment objective and the Investment Manager will have substantial discretion when making investment decisions.*"

The Board were reminded of disclosure material about the ability of TFM to change the investment strategy and to expand asset classes and investment vehicles over time.

102. On 6 July 2010 the Plaintiff wrote to the other members of the Tetragon Board expressing his opposition to the proposed GORE Transaction. The letter is addressed to the Directors as a whole, care of Gary Horowitz at Simpson Thacher, the US lawyers for the Independent Directors. (Mr Horowitz was the partner advising the Independent Directors.)

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 22 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 22 of 33 PageID 2905
Guernsey Judgment ??/2013 – Jackson and Dear et al

103. The Plaintiff expressed his opposition to the proposed joint venture amongst Tetragon and certain affiliates, and in the introduction he listed four specific complaints:

    i. First, that Tetragon should not be investing in real estate. The Plaintiff asserted that: "*My consent is required to change the general nature of Tetragon's business*" and "*I do not intend to provide my consent*".

    ii. Secondly, he referred to the track record of the GORE Founders.

    iii. Thirdly, he said: "*The Price Tetragon is Paying is High; the Terms are Poor*". He predicted that Tetragon's stock price would fall if the GORE joint venture went forward, which at the time when the evidence for the Defendants was sworn and the oral hearings held, had turned out to be an inaccurate prediction on his part. For example, whereas Tetragon's stock price was US $4.27 when the GORE Transaction was announced, it had risen to US $7.80 by the time the Cause was issued seven months later.

    iv. Fourthly, he raised the related-party issue as between Polygon and Tetragon.

104. Accordingly, by 6 July 2010 the Plaintiff had informed the Executive Directors and the Independent Directors in some detail of the grounds of his opposition to the then proposed GORE Transaction. Furthermore, in his letter of 6 July 2010 the Plaintiff had made some other contentions in his position as a shareholder in PCH II; he argued that under the Memorandum and Articles of Association of PCH II any change in the general nature of Tetragon's business was something which required his approval as the Class B shareholder in PCH II.

105. All the other directors of Tetragon were, therefore, on notice that the Plaintiff strongly objected to the proposed GORE Transaction, both as a director of Tetragon and as a PCH II shareholder.

106. On the same day, 6 July 2010, the Plaintiff's New York lawyers, The Nelson Law Firm, wrote a letter to the Executive Directors, which was copied to Simpson Thacher, the US lawyers for the Independent Directors. The letter threatened legal action in the event that the GORE Transaction proceeded. It accused the Executive Directors of breaches of fiduciary duty, and described the GORE transaction as "*… a thinly-veiled effort to funnel Tetragon's assets to Polygon to support its elaborate infrastructure*". The Nelson Law Firm letter was also copied to Mr Côté of PIP LLP (General Counsel to TFM), Cravath Swaine & Moore LLP (the Fund's U.S. Counsel), Fladgate LLP (the Plaintiff's London lawyers), the directors c/o Simpson Thacher (the Independent Directors' US lawyers) and the Plaintiff himself.

At the end of their letter The Nelson Law Firm said:

    "*On behalf of The Plaintiff, we therefore demand that PCH II cause Tetragon to reject the proposed GORE joint venture and terminate any further discussions with Polygon, GORE or any of its principals in contemplation thereof. Any failure by you to cause Tetragon to reject the GORE joint venture forthwith will subject you to liability for breach of your duty to The Plaintiff as the sole Class B shareholder of PCH II and for breach of contract. You should be aware that The Plaintiff intends to take all lawful actions necessary to enforce his rights.*"

(It is to be noted that it does not seem to be part of the Plaintiff's case in the Cause that the Executive Directors committed breaches of PCH II's Articles.)

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 23 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 23 of 33 PageID 2906
Guernsey Judgment ??/2013 – Jackson and Dear et al

107. On 8 July 2010 Tetragon's US law firm, Cravath Swaine & Moore, responded to The Nelson Law Firm's letter dated 6 July 2010 and explained why, in their view, the Plaintiff did not in fact have a right of veto at a PCH II level:

> "*You are wrong in asserting that The Plaintiff's consent to the investment transactions with respect of GreenOak Real Estate is required pursuant to Article 36 of the articles of PCH II. You don't even explain why the articles restrict actions taken by separate legal entities, which are not bound by and do not have rights or obligations under such articles. That is not surprising. Article 36(a) does not impose any limits on the businesses which may be pursued by Tetragon. Such limits, if any, are confined to the organisational documents of Tetragon and the IMA… The PCH II articles only apply to actions taken by PCH II, and Article 36(a) only gives the Plaintiff rights with respect to PCH II not Tetragon.*"

108. On 15 July 2010, TFM sent additional material to Simpson Thacher relating to the share option valuation in response to the Independent Directors' request, promising some information on the GORE Founders' track record and scheduling a board call. Attached to that document was a Board Information Pack , the introduction to which stated:

> "*The following slides have been compiled in response to questions raised by the Board of TFG when considering the proposed investment in GORE… How should we approach the valuation of the 3% options being awarded by TFG as part of the consideration for the transaction; anticipated fee flows and cash flow implications?*"

TFM next dealt with valuation of the options and the reasons, as they saw them, for the options, saying that they were intended to be a low cost means of aligning interests of the GORE Founders with those of Tetragon's shareholders, which only pay out if GORE and TFG are successful and were intended to incentivise everyone to work together to improve the share price of GORE. So, TFM explained, if Tetragon's value increased as a result of the GORE venture being successful, it would only be then that the options would become exercisable; and in order to achieve that, the GORE Founders would have to work hard and be successful. Then the valuation of the options was explained and fee flows considered. TFM also explained the then current management fee structure.

109. Under the heading "*GORE investments*", TFM said that if the GORE Transaction proceeded, GORE would receive management fees and, in that context as well, Tetragon has most favoured nation status and so would incur a management fee equal to the lowest management fee applicable to any other equity investor in the relevant programme. The fee structure set out and considered by the Board and their advisers, including the Plaintiff and his advisers, was, it seems, in general terms at least, the same as the structure agreed to by the Plaintiff in relation to LCM, when one of his original objections to the had been to such so-called "double-dipping".

110. A section followed in which TFM explained that the proposed investment in the GORE Transaction would leave plenty of money left in Tetragon to pursue its other initiatives, to pay dividends and to pay operating expenses.

111. On 16 July 2010, additional information relating to the GORE Founders was sent by e-mail from Simpson Thacher to the Independent Directors including relating to information to the track record of the three GORE Founders. On 13 July 2010, Simpson Thacher had also circulated further materials to the Independent Directors, including the news reports relating to Mr Kalsi's leave from Morgan Stanley.

112. The Independent Directors were therefore made aware, prior to the Board meeting on 29 July 2010, of information relating to Mr Kalsi and his circumstances.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 24 of 33
Case 3:21-cv-00842-B    Document 59-1    Filed 08/30/21    Page 24 of 33    PageID 2907
Guernsey Judgment ??/2013 – Jackson and Dear et al

113. On 21 July 2010, the Plaintiff's Guernsey lawyers, Appleby, wrote directly to Simpson Thacher's letter dated 8 July 2010.  The Plaintiff's three main concerns were said to be (i) the disclosure of interests, (ii) the Prospectus and straying from the path of CLOs, which he said were a core part of the Tetragon business, and (iii) Rule 3.01 of the Scheme Rules. First, Appleby mentioned commercial reasons why Tetragon should not proceed and then noted that there were "*specific legal reasons why the Directors must be prudent in considering the transaction*".  In the next paragraph of their letter Appleby contended that there would be a change in investment objectives if the proposed GORE Transaction proceeded which should be put to non-voting shareholders for their approval, and in their final paragraph they stated, somewhat surprisingly I think, that the letter was "*written entirely without prejudice*".

114. It must, in my judgment, have been made clear to the Independent Directors, and to the Executive Directors, from the Plaintiff's objections and his US and Guernsey lawyers' arguments about the proposed GORE Transaction, that they should take all necessary steps to satisfy themselves of the validity of the commercial arguments put by TFM for Tetragon to invest in the GORE Transaction and to obtain legal advice from both their US lawyers and their Guernsey lawyers.  The affidavits of the Independent Directors demonstrated that this correspondence did, in fact, heighten the level of concern and attention given by them and their advisers to the proposed GORE Transaction.

115. One of the ingredients in the consideration by all the Tetragon directors of the GORE Transaction and in the Independent Directors' evaluation of the related-party components was the so-called fairness opinion obtained by TFM from Houlihan Lokey under the terms of the IMA.  The Plaintiff argued that the instructions to Houlihan Lokey should have come from the Independent Directors or the whole board of Tetragon rather than from TFM; but, since the IMA makes it clear that the Investment Manager, *i.e.* TFM, should obtain a fairness opinion, it is clear to me that there is no merit in this point.

116. The Fairness Opinion was one of the components of the process which the Board, including the Plaintiff and the Independent Directors, went through before voting on investment by Tetragon in the GORE Transaction.  The Fairness Opinion was addressed to TFG.

117. At the top of the second page of the Fairness Opinion, the Polygon element was referred to: "*as to which we express no opinion*".  Both before and at the board meeting on 29 July 2010 the Plaintiff was critical of the fact that Houlihan Lokey did not undertake any comparison of the benefits receivable under the transaction by, on the one hand, Tetragon, and, on the other hand, Polygon.  However, as the Defendants rightly submitted, the IMA did not require any comparative analysis to be undertaken.  The effect of clause 4(d) of the IMA was that if TFM was going to proceed with a related-party transaction without going to the Board of Tetragon, then what was required under the IMA was

> "*an opinion from a recognized investment bank, auditing firm or other appropriate professional firm substantively to the effect that the financial terms of the transaction are fair to the Funds from a financial point of view.*"

118. In The Fairness Opinion Houlihan Lokey also stated:

> "*You have requested that Houlihan Lokey… provide an opinion… as to whether, as of the date hereof, the Aggregate Consideration to be received in the Transaction pursuant to the Term Sheet is fair to TFG from a financial point of view after giving effect to the Transaction and the Polygon Transaction.*"

The Fairness Opinion later stated:

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 25 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 25 of 33 PageID 2908
Guernsey Judgment ??/2013 – Jackson and Dear et al

"*Based upon and subject to the foregoing, and in reliance thereon, it is our opinion that, as of the date hereof, Aggregate Consideration to be received in the Transaction pursuant to the Term Sheet is fair to TFG from a financial point of view after giving effect to the Transaction and the Polygon Transaction.*"

119. On 26 July 2010, notice was given of the board meeting of Tetragon to be held on 29 July 2010 and an agenda was circulated. Point C of the agenda read: "*Update on GreenOak Real Estate business proposal*". Whereas approval of the GORE Transaction was not expressly listed on the agenda, in the light of what had preceded the board meeting, the directors including the Plaintiff were, in my view, adequately put on notice that it would be discussed and that, if the directors agreed, put to the vote. In any event, In an e-mail exchange between the Plaintiff and Mr Adams dated 27 July 2010, the Plaintiff asked whether the GORE Transaction was going to be considered, Mr Adams confirmed that it was on the agenda, and the Plaintiff responded: "*OK thanks*".

120. After the agenda was circulated, on 27 July 2010 Mr Adams distributed various further materials to Tetragon's Board. The e-mail attached a further set of slides called the "*GreenOak Real Estate Opportunity Further Board Information Pack*" which had been compiled in response to further questions raised by the Board of Tetragon.

121. The additional slides considered six main issues:

   o "*Transaction Origination and GreenOak Founders Background*"

   o "*Deal Terms*"

   o "*Valuation of TFG options*"

   o "*Controls*"

   o "*Background and information on GP Co-Investment*"

   o "*Anticipated fee flows and waterfall of distributions*".

Further information was provided about the GORE Founders. The "*GreenOak Real Estate Opportunity Further Board Information Pack*" included a section called "*Deal Terms: Comparative of relative value received*". The slides also set out TFM's view that the terms of the GORE Transaction were not, in terms of comparative relative value, unduly favourable to Polygon and set out what Tetragon was getting and what it was giving. The slides also included the calculations underlying those figures. The directors addressed themselves to the issue of relative comparative value and took due account of the related-party issue. In relation to the options, the Board were informed that two exercises had been conducted, that TFM had sought to value them and that Houlihan Lokey had valued them. The slides analysed the different approaches adopted.

122. The Plaintiff wrote two further e-mails to the Independent Directors. The first was dated 28 July 2010, the day before the scheduled board meeting, and was addressed to the four Independent Directors and Mr Horowitz. The Plaintiff attacked the fairness opinion. He contended:

   o that Houlihan Lokey was wrong not to place any value on Tetragon's US $100 million co-investment commitment;

   o that the value they had put on the Tetragon share options was wrong. The Plaintiff argues that the price of US$5.50 was "*completely wrong*". He

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 26 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 26 of 33 PageID 2909
Guernsey Judgment ??/2013 – Jackson and Dear et al

described it as a "*ridiculously low price*".

The Plaintiff also argued that the Independent Directors should have engaged a separate financial institution.

123. Very early on the morning of the 29 July 2010, the day of the board meeting, a further e-mail was sent by the Plaintiff addressed to the Independent Directors and the First Defendant and copied to Simpson Thacher. The Plaintiff attached a four page spreadsheet analysis and commentary setting out his assessment and valuation of the respective contributions of Tetragon and Polygon.

124. The board meeting at the heart of these proceedings took place, as has been mentioned by me several times, on 29 July 2010. Several lawyers attended, including two lawyers from Cravath Swaine & Moore for Tetragon, two lawyers from Simpson Thacher for the Independent Directors, two lawyers from Ogier for Tetragon including Advocate Simpson and two representatives from State Street Fund Services, Tetragon's company secretary. Mr Côté, Mr Adams and Mr Robinson were in attendance, all of whom are internal lawyers from TFM.

125. The meeting was chaired by one of the Independent Directors, the Third Defendant Mr Rupert Dorey. All three principals of the Investment were in attendance, *i.e.* Mr Wishnow, Mr Herlyn and Mr Rosenberg. Declarations of interest were recorded and it seems that there was no suggestion made by the Plaintiff during the meeting that the disclosures were to any extent inadequate, or that it was improper for the Executive Directors to participate in the discussion of the GORE Transaction and the vote to approve it. On about 25 November 2011 the Plaintiff disclosed that he had secretly taped a large part of the Board meeting and rather late in the day a transcript was produced of this tape, which proved useful and assisted all parties and the Court in following the course of the meeting, which seems to me to have been conducted professionally and courteously and without anyone hurrying matters on unduly or seeking to limit discussion by the Board before any vote to approve the GORE Transaction. Although this tape was available to the Plaintiff and his lawyers at the time of the resumed hearing on 12 and 13 October 2011, no mention of it was made until about 25 November 2011, just before the oral hearing resumed. In the event, the transcript of the tape proved to be the best place for me to visit in order to form a view of the Board meeting against the allegations made by the Plaintiff in the Cause.

126. On the following day 30 July 2010 there was the exchange of friendly e-mails between the Plaintiff and Mr Dorey. The Plaintiff wrote the following words which made a great deal of impact on me when I read them and which, in my judgment, probably represent the feelings of the Plaintiff at the end of the Board meeting on 29 July 2010 as well as anything could:

> "*Rupert, thank you for your comments. While I do not agree with the final decision, I do appreciate the time all of you spent listening to and considering my comments on the transaction. The transaction was quite complicated and needed a lot of analysis which I hope I helped with. I left the meeting feeling that I had done everything that needed to be done and said what needed to be said. We reached different conclusions, but guess that will happen from time to time.*"

127. On 2 September 2010 draft minutes of the Board meeting held on 29 July 2010 were circulated by Mr Adams for comments by the directors. The Plaintiff objected to them. His original comments included a suggestion that: "*The minutes should include that the related party instructed Houlihan Lokey*".

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 27 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 27 of 33 PageID 2910
Guernsey Judgment ??/2013 – Jackson and Dear et al

128. In response to the Plaintiff's comments on the draft minutes, Cravath Swaine & Moore, Ogier and Simpson Thacher sent a joint reply by e-mail to the Plaintiff on 23 September 2010. They said:

> "*Our three firms were represented at the meeting and we believe that the minutes already accurately reflect the discussion which took place at the meeting, including with respect to the legal standards governing the Board's consideration and approval of the GORE transactions. As such, no changes in this regard need to be made to the minutes.*"

129. On 10 November 2010, Mr Dorey sought confirmation that the minutes of the Board meeting of 29 July 2010 could be signed. The Plaintiff again objected, but gave no specific objections to the draft, which Mr Dorey then requested on 11 November 2010. On 12 November 2010 the Plaintiff identified two changes which he wanted to propose

> "*Paragraph (5) on page 4 needs to be deleted. The board never discussed the arms-length requirement.*
>
> *Paragraph (3) of page 4 needs to reflect that Houlihan Lokey did not examine the GORE/Polygon transaction and therefore did not and could not give the board an opinion on whether TFG was getting as good a deal as Polygon was getting. It should also be clear that Houlihan Lokey was not engaged by the Master Fund. [The Executive Directors engaged them and gave them all of their instructions.*"

130. On 17 December 2010, Appleby sent letters before action to Tetragon, for the attention of the First to Sixth Defendants, setting out the basis of the Plaintiff's claim against the director Defendants. The letter before action was passed on to the First to Sixth Defendants by Tetragon, as appears from Ogier's letter to Appleby dated 5 January 2011.

131. The Cause was presented on 25 February 2011; attached to it was a helpful diagram explaining the complicated corporate structure of the corporations involved in the GORE Transaction. I have considered this diagram as well as the two structure plans included within this judgment and hope that in this judgment I have adequately described those companies or corporations which were centrally involved in Tetragon entering into the GORE Transaction.

132. As one would expect, the lodging of the Cause had been preceded by correspondence between Advocate Jeremy Le Tissier of Appleby, on behalf of the Plaintiff, and Ogier, the Advocates for Tetragon. Advocate Simon Davies of Ogier represented Tetragon on the hearings before me and, by arrangement agreed between himself and Advocate Christian Hay of Collas Crill, who appeared for the Executive Directors, and Advocate Tim Corfield of Carey Olsen, who appeared for the Independent Directors, made the principal written and oral submissions on behalf of all the Defendants. This course enabled the Defendants' submissions to be made with very little duplication.

133. By order of the Deputy Bailiff dated 13 May 2011, the Defendants' obligation to table defences to the Cause was stayed pending determination of their strike-out application.

134. By letter dated 7 March 2011 Ogier gave Appleby notice of Tetragon's intention to apply, with the Executive Directors and the Independent Directors, to strike out the Cause and informed them that Tetragon opposed the claims which the Plaintiff was bringing derivatively for Tetragon and considered the claims "*without merit or prospects of success*". In due course, on 28 April 2011 the Defendants issued the strike out application.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 28 of 33
Case 3:21-cv-00842-B    Document 59-1    Filed 08/30/21    Page 28 of 33    PageID 2911
Guernsey Judgment ??/2013 – Jackson and Dear et al

135.    Since I think it would be helpful, and since I have concluded that the test adopted taken by the Court of Appeal in *Prudential v Newman Industries* is the test which I must apply on this application, I now remind myself of the test which I must apply to the application.  The Plaintiff must first establish that he has a *prima facie* case on all or any of the seven alleged causes of action pleaded in the Cause and, to the extent that there is such a *prima facie* case established, that any of such causes of action come within the exception to the rule in *Foss v Harbottle*.  If and to the extent that he cannot do so, either all or such relevant part of the Cause which does not 'pass the test' must be struck out as an abuse of process.  I should not apply any lesser test, for instance whether the Plaintiff has satisfied me that all or part of his case is arguable or tenable or stands a reasonable chance of success and I have not allowed myself to be distracted by any argument of Mr Le Tissier, however attractively it may have been put, that some lesser test 'will do'.  The *prima facie* case test is understandably quite a high hurdle for the Plaintiff to get over and the reason for that is, I believe, the Courts' traditional view in England, at least before the changes introduced by the Companies Act 2006 and quite possibly thereafter too, that the right to bring a derivative action is to be regarded as an exceptional right.

136.    For the reasons which follow I have decided that the Plaintiff cannot achieve the standard required by the test which I must apply to his case on any part of his derivative action and also that, since Mr Le Tissier accepted, as I think he had to accept, during his oral submissions in reply that the Plaintiff's case for relief under the oppressed minority provisions of the Companies Law depended on the same facts as his 'true' derivative action claims, it must follow that the Plaintiff's alternative claim under the Companies Law for minority shareholders' relief or the equivalent falls to be struck out as well.

137.    The primary conclusion which I came to when reviewing the relevant facts of the case at this preliminary stage was that the starting point was that, as Lewison J. put it in *Iesini v Westrip Holdings Ltd* [2010] BCC 420, Courts are ill-equipped to enter the commercial arena and decide commercial issues; the converse to this point is the first rule in *Foss v Harbottle* itself which, as a general rule, leave matters of a commercial nature, sometimes in the earlier cases called matters of internal administration or internal management, to the directors to decide.  This point came out of the documents, as I read them, loud and clear in this case.  Although I cannot decide the point and the proper test to be applied does not require or allow me to do so, but only, I think, to form a provisional view, the approach taken by the Plaintiff when objecting to the GORE Transaction at all times up to and after the Board meeting certainly suggests to me that he seemed to understand that the majority decision taken by all the other directors of Tetragon on 29 July 2010 to approve the GORE Transaction was taken by them on commercial grounds after considering his objections carefully and after taking into account the very considerable body of materials supplied to all directors and the exchanges between their lawyers and that he was bound by it under the internal rules of Tetragon, that is to say, under Tetragon's constitution as provided in the Articles.  The Plaintiff's e-mail to the Third Defendant on 30 July 2010, the very next day after the board meeting on 29 July 2010, in my view, demonstrates the point I am making quite well.

138.    Turning now to the Cause, which I have read several times and taken into account most carefully in preparing this judgment, I remind myself that it is the second draft amended version, handed up by Mr Le Tissier on 12 October 2011, which is the version of the Cause to which all submissions were finally directed.

139.    In section D of the Cause the Plaintiff claims that the Executive Directors are obliged to account to Tetragon for the benefits derived by them from the GORE Transaction since they had breached their duty of full and frank disclosure to Tetragon.  The case is that they had not disclosed the nature and extent of their interests so as to come within the protection given by article 91(c).  The pleading is short and the Cause does not set out in full detail the whole range of correspondence, e-mails and presentations which I have mentioned above.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 29 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 29 of 33 PageID 2912
Guernsey Judgment ??/2013 – Jackson and Dear et al

Under this head of claim I have considered articles 91 and 92 and the terms of section 162 of the Companies Law.

140. The central point, in my judgment, is whether or not the Executive Directors, and especially Mr Griffith, disclosed sufficient details of their interests in the GORE Transaction to enable the other directors to understand what their interests were and the extent of their interests. As Vinelott J. was satisfied in ***Movitex Ltd v Bulfield*** [1986] 2 BCC when examining the articles of the company in question, I am also satisfied first that the effect of articles 91 and 92 of Tetragon's articles is to exclude the no conflicts rule which otherwise affects self-dealing by a director.

141. I am satisfied that the Executive Directors disclosed their ownership of Polygon and that they owned almost 100% of it, subject to the Plaintiff's declining interest in one part of the Polygon structures. I agree with the submissions set out in paragraph 3 of the Outline of Tetragon's submissions of 30 November 2011 in relation to the heads of claim in the Cause. In my judgment, the disclosure in the Second Defendant's letter of 18 June 2010 and the further oral disclosures made at the board meeting, tempered, as Mr Davies put it in his Outline, by the directors' prior familiarity with Polygon and its ownership, was adequate disclosure to satisfy the articles and section 162. As to Mr Le Tissier's argument that such disclosure was not made immediately and therefore did not satisfy the strict requirement of section 162, I reject this argument for the reasons submitted by Advocate Hay for the Executive Directors in his written submissions of 30 November 2011 as further developed in his oral submissions. In particular, I accept Mr Hay's submissions on both section 162 and the compliance by his clients with the disclosure requirements of article 91. Further, I accept Mr Hay's practical, common-sense interpretation of the requirement in section 162 for the disclosure to be made '*immediately*', *i.e.* that it meant the final oral disclosure at the board meeting on 29 July 2010 when considered against the background of the previous disclosure, and I am satisfied that his analysis of the disclosure by the Executive Directors, under the headings of mode, timing and nature of disclosure, demonstrates clearly that the Plaintiff cannot show a *prima facie* case of breach by them of their duties of disclosure leading to an obligation to account, as relied on by him under section D of the Cause. It follows that I am also of the view that the Plaintiff has not established a *prima facie* case that the Executive Directors should, in the context of this area of company law, be regarded as '*wrongdoers*' thus bringing into play a consideration of the exceptions to the rule in ***Foss v Harbottle***, in particular the fraud on the minority exception.

142. If I were wrong in this conclusion, I would also have decided that the Plaintiff was not able to pursue this head of claim since the resolution of the board of directors of Tetragon on 7 June 2011 that the GORE Transaction was fair to Tetragon as of the time that it was authorised on 29 July 2010 complied with the part of article 91 which absolves a director from a liability to account for profits if the transaction in question is found by the board of directors, before or after the fact, to be fair to the company as of the time that it was authorised.

143. In section E of the Cause the Plaintiff argues that the Executive Directors are liable to account to Tetragon for profits derived by them from the GORE Transaction for breaching their duties to Tetragon by placing themselves in a conflict of interest. The head of claim is developed in paragraphs 92 to 94 of the Cause and the Plaintiff claims in paragraph 95 that there had been no authorisation or approval by Tetragon of such breaches.

144. For the reasons given under head D above, I conclude that the Plaintiff has failed to establish a *prima facie* case under head E and this claim must be struck out as well. In particular, against the background of the disclosure by the Executive Directors of the details of the proposed GORE Transaction (see especially paragraph 140 above) the Plaintiff cannot, in my judgment, establish such a case.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 30 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 30 of 33 PageID 2913
Guernsey Judgment ??/2013 – Jackson and Dear et al

145. I now turn to section B of the Cause where the Plaintiff claims that the GORE Transaction was not in the best interests of Tetragon and that the Executive Directors and the Independent Directors acted in breach of their duty to act in the best interests of Tetragon in passing the resolution to approve Tetragon entering into the GORE Transaction at the board meeting on 29 July 2010. The point is pleaded in detail at paragraphs 77 to 81 of the Cause.

146. I am not satisfied that the Plaintiff can establish a *prima facie* case under this head of a breach of duty by any of the Executive Directors and the Independent Directors. The duty in question is, in my judgment, properly to be examined subjectively. The Court should not attempt to substitute its view of whether a reasonable director would or would not have concluded that the GORE Transaction was in the best interests of Tetragon for the views of the directors. Furthermore, it is not suggested by the Plaintiff that any of the Executive Directors and the Independent Directors acted in bad faith. Their position was, and remains, that the GORE Transaction was in the best interests of Tetragon and that they voted in favour of Tetragon entering into it for that reason, just as much as the Plaintiff voted against the resolution since he was of the view that GORE Transaction was not in the best interests of Tetragon. Nor, in my judgment, can the Plaintiff establish to the required standard of a *prima facie* case that any of the Executive Directors and the Independent Directors failed to consider or understand the objections which he and his lawyers had raised either before or at the board meeting before the vote took place. I am persuaded, on the necessarily provisional basis at this stage of the proceedings, that this head of claim raises commercial issues and that the Plaintiff cannot show a *prima facie* case of breach of this duty. As the Defendants submitted, and as is often discussed in the case on this area of the law, such questions involve commercial judgement on the part of directors and the Courts are, as a general rule, ill-equipped to enter into consideration of such matters.

147. In summary, there is, in my judgment, no evidence before the Court to establish a *prima facie* case under head B. The Plaintiff did obtain, at a rather late stage of the application, a written report from Mr Graham Harrison, an expert in the area of investments occupied by Tetragon. But I was not persuaded that I could safely accept his evidence as determinative of the required test under this head of claim, or, indeed, of any head of claim since, for no fault of Mr Harrison's, he was instructed to produce his report on the basis of what I consider to have been far too limited a selection of facts and documents.

148. Under head F in the Cause, the Plaintiff claims that each of the Executive Directors and the Independent Directors acted negligently or, as it is pleaded, in breach of the duty to act to act with reasonable care, skill and diligence. The details of the claim are pleaded in paragraphs 97 to 99 of the Cause. It is clear from the opening words in paragraph 97, and it was also made clear in argument, that the facts underlying this claim were essentially the same as those relied upon by the Plaintiff under heads D, E and B of the Cause.

149. I am not persuaded that the Plaintiff has established a *prima facie* case under head F. As the Defendants submitted under paragraph 19 of Mr Davies' Outline document,

> "[T]he directors spent five weeks analysing the transaction and reviewing materials prepared by [TFM] among others. It is common ground that they sought and received independent legal advice. The fact that they reached one conclusion, while [the Plaintiff] reached another, does not found a claim in negligence."

I entirely agree with this submission.

150. I also agree that, in a case like this case, where the Plaintiff does not suggest that the company should seek to rescind its entry into the transaction in question, it is to be expected that the case in damages should be carefully and fully pleaded. When the original version of the Cause was lodged, the case in damages was, in my view, rather minimally pleaded and

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 31 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 31 of 33 PageID 2914
Guernsey Judgment ??/2013 – Jackson and Dear et al

the argument of Mr Le Tissier was that the loss to Tetragon from entering into the GORE Transaction would be found out on the carrying out of an inquiry as to damages. I thought then that this was a case of putting the cart before the horse and that, on an application to strike out a derivative action, the Plaintiff would be expected to plead his (or, to be more precise, Tetragon's) case in damages, and to support it in evidence, sufficiently fully as to be able to establish a *prima facie* case. I still hold this view, but no more than provisionally, although the case in damages has been more fully pleaded in the Cause, the draft of which was presented on 12 October 2011, which I think was amended to include the views of Mr Harrison and a Mr Deetz, who helped the Plaintiff and his advisers in presenting a case to the Court, but who did not give evidence himself. But, since I have held that the Plaintiff has not on the facts shown a *prima facie* case of negligent breach of duty against any of the Executive Directors or the Independent Directors, it is not, in my view, either necessary or appropriate for me to deal further, at this preliminary stage of the proceedings, with the pleaded case in damages.

151. I now turn to heads of claim A and AA in the Cause, which are developed in paragraphs 63 to 76 of the Cause. The Scheme Rules are rules issued by the Guernsey Financial Services Commission ("the GFSC") and they impose requirements for the disclosure of information to investors and for notification in certain circumstances to the GFSC itself.

152. Under rule 3.01 of the Scheme Rules "*relevant persons*" as defined in subsection 1 are prohibited from doing certain things unless the arm's length requirement in subsection 9 is satisfied. This requirement is that the relevant arrangements must be at least as favourable to Tetragon as would be any comparable arrangement effected on normal commercial terms negotiated at arm's length with an independent party. Under subsection 1 it is the obligation of the directors to take "*all reasonable steps to ensure*" that the relevant persons do not breach the arm's length requirement. Attention was drawn to subsections 4 and 5 of rule 3.01.

153. Interesting and lengthy argument was put to me by both parties on the impact, if any, of the Scheme Rules to the GORE Transaction. I do not find it necessary for me to decide these questions on this application. The Plaintiff's arguments that rule 3.01 was engaged were, in my judgment, *possibly* correct, but, in the light of my conclusion on the application of the proper test on this application to which I now turn, I shall not decide the questions relating to the application of rule 3.01.

154. I agree with the submissions of the Defendants at paragraph 14 of Mr Davies' Outline document and in paragraphs 4 to 22 of his further Outline document of, I think, 1 or 2 December 2011, and I have decided that if the Scheme Rules were engaged, the Plaintiff has not established a *prima facie* case of breach of the rules by any of the Executive Directors or the Independent Directors. I am satisfied that the Plaintiff has not shown to the required standard of a *prima facie* case that they failed to take reasonable steps to ensure that the arm's length requirement was met.

155. The important points of evidence to note are, in my judgment, that the Independent Directors sought legal advice from Simpson Thacher, and more importantly on this aspect of the case, from their Guernsey Advocates Carey Olsen, and also sought the views of TFM and Houlihan Lokey. Furthermore, as is made clear from pages 170-180 of the transcript of the Board meeting on 29 July 2010, issues relating to the Scheme Rules were raised and discussed during the meeting itself, including a passage where Mr Simpson of Ogier referred the directors, including, of course, the Plaintiff, to the requirements of rule 3.01. Further, in my judgment, the Plaintiff's case under this head is, at most, well described as a mere technicality and he has not satisfied me, in any event, that there is *prima facie* case that Tetragon has suffered any loss by virtue of the alleged breaches of rule 3.01.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 32 of 33
Case 3:21-cv-00842-B Document 59-1 Filed 08/30/21 Page 32 of 33 PageID 2915
Guernsey Judgment ??/2013 – Jackson and Dear et al

156. A further claim, as developed in paragraphs 74 to 76 of the Cause, the claim under head AA of the Cause, was added to the draft Cause in the 2nd amended draft. The claim is alleged to arise under section 34 of the Protection of Investors (Bailiwick of Guernsey) Law, 1987. The Plaintiff, who was intimately involved in the events leading up to the board meeting on 29 July 2010 in his capacity as a director of Tetragon, claims to be entitled as an investor in Tetragon, *i.e.* as a person adversely affected by the alleged breaches by the Executive Directors and the Independent Directors; (*ex hypothesi* he must, I think, on his own case also have been in such breach of duty to Tetragon.)

157. I found this argument surprising and a little difficult to follow. But, in any event, I was persuaded that, in the event that I had found that the Plaintiff had not established a *prima facie* case of a breach of rule 3.01, the case under section 34 cannot possibly get off the ground. In such circumstances, I consider the claim now to be virtually hopeless and it should be struck out of the Cause. In any event, although the claim under section 34 was made by the Plaintiff personally, it was made clear in paragraph 76 of the Cause that any damages recovered by the Plaintiff "*shall accrue for the benefit of [Tetragon]*" and I formed the view that the claim was realistically part of the derivative claims put forward by him on behalf of Tetragon, and not a personal claim of any substance.

158. I now turn to head of claim C in the Cause as developed in paragraphs 82 to 87 of the Cause for damages from the Executive Directors and the Independent Directors for breach of section 298 of the Companies Law, which relates to the provision of a certificate within a Guernsey company's records, in circumstances where the terms of the section so require.

159. This is also, in my view, an almost hopeless claim for the fundamental reason that the Companies Law provides no civil remedy for a Guernsey company when such a breach has been established. Accordingly, any such breach cannot, in my judgment, sound in damages at the suit of Tetragon. The claim under head C must, therefore, be struck out on this ground alone. If I were wrong, I would have decided that the preponderance of the evidence went to show that the provisions of section 298 were complied with in relation to the option price included within the terms of the GORE Transaction and that the Plaintiff was not able to establish a *prima facie* case that the statute had not been complied with by the board of directors. I would also mention, in passing from the point, that the Plaintiff himself was a director of Tetragon during the period from 29 July 2010 to about 24 January 2011 and it would have been his responsibility as well as that of the rest of the Board to have ensured that section 298 had been complied with.

160. Since I have decided (i) that the entire Cause should be struck out as the Plaintiff has not satisfied me that he has a *prima facie* case under any of the derivative claims in the Cause and (ii) that his alleged personal claim under section 34 of the Protection of Investors (Bailiwick of Guernsey) Law, 1987 was almost hopeless, I have not proceeded to deal with the detailed submissions of both sides relating to matters which would only arise on the second stage of the test set out in **Prudential Assurance v Newman Industries**. The second stage of the test would only come into play if a court were to find that a *prima facie* case had been established, in which event the court would then proceed to decide whether or not any of the claims set out in the pleading of the case, *i.e.* in our procedure under the Cause, were able to stand free from the application of the rule in **Foss v Harbottle** as a result of an exception to the rule applying. No such point requires a decision in this case since the Plaintiff has not satisfied the first limb of the test and I have accordingly struck out all of the derivative claims. On this basis the arguments based on ratification do not require a decision from me either.

161. As I did in my judgment on the injunction application, I apologise to the parties and to Counsel that it has taken me such a very long time to deliver this judgment and thank them for their patience and polite enquiries in the meantime.

Case 21-03067-sgj Doc 59-1 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 33 of 33
Case 3:21-cv-00842-B   Document 59-1   Filed 08/30/21   Page 33 of 33   PageID 2916
Guernsey Judgment ??/2013 – Jackson and Dear et al

162.  I shall hear any ancillary applications flowing from this judgment on Tuesday 26 March 2013.


**PATRICK TALBOT QC**
**Lieutenant Bailiff**
**26 March 2013**