Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 1 of 21
Prudential Assurance Co. Ltd v Newman Industries Ltd. (1982) Ch. 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 1 of 21 PageID 2917

# *204 **Prudential Assurance** Co. Ltd. v **Newman** Industries Ltd. and Others (No. 2)

 Positive/Neutral Judicial Consideration

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
5 October 1981

**Report Citation**
[1976 P. No. 112]; [1982] 2 W.L.R. 31
[1982] Ch. 204



Court of Appeal

Cumming-Bruce , Templeman and Brightman L.JJ.

1981 March 23, 24, 25, 26, 27, 30, 31; April 1, 2, 3, 6, 7, 8, 9, 13, 14, 15, 28, 29, 30; May 1, 5, 6, 11, 12, 13, 14, 15, 18, 19, 20, 21, 22; June 2, 3, 4, 5, 10, 11, 22; July 27, 28, 30, 31; Oct. 5

*Company—Shareholder—Rights against company directors—Minority shareholder's action—Directors advising acquisition of another company's assets—Majority of shareholders voting to acquire assets—Directors having no control over voting rights —Whether minority shareholder entitled to bring action on behalf of itself, company and other shareholders suffering damage —Whether right to bring derivative action to be determined as preliminary issue*

The plaintiffs, P Ltd., held 3.2 per cent. of the issued ordinary shares in N Ltd., the first defendant. B, the second defendant, was at the material time the chairman and chief executive of N Ltd. and the third defendant, L, was a non-executive director and its vice-chairman. B was also the non-executive chairman of the fourth defendant, T.P.G., and its vice-chairman and chief executive.

Between 1972 and the end of 1974, T.P.G. acquired the assets of S Ltd. whose shares were beneficially owned by B and L and which owned 35 per cent. of T.P.G.'s shares and some of N Ltd.'s shares. T.P.G. increased its holding in Ltd. to 25 per cent. and also acquired shares in various other companies which it financed by the issue of its own shares and bank loans. By January 1975, T.P.G. was in serious financial difficulties and the "January agreements" were entered into whereby, undisclosed to the board of N Ltd., N Ltd. agreed to buy T.P.G.'s holdings in two companies for £85,000 and £146,000 respectively, and under the agreement, unbeknown to the board, N Ltd. paid £215,950.

B then prepared a memorandum ("the strategy document") which recommended that the board of N Ltd. should purchase from T.P.G. all its assets, except its shareholding in N Ltd. and a loan from S Ltd. of £100,000, in consideration of N Ltd. assuming T.P.G.'s liabilities and paying T.P.G. the sum of £350,000. At a board meeting all the directors except M agreed to accept the proposals in principle. On M's suggestion a report was obtained from N Ltd.'s auditors. The January agreements were concealed from the auditors who valued the assets as £325,000 and the board of N Ltd. accepted that valuation as a basis of negotiation.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 2 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd. (1982) Ch. 204 (1981)
Case 3:21-cv-00842-B   Document 59-2   Filed 08/30/21   Page 2 of 21   PageID 2918

On June 3, 1975, B signed the agreement on behalf of N Ltd. ("the June agreement") for the purchase of the assets of T.P.G. for £325,000 which was conditional, as required by Stock Exchange regulations, on the approval of the shareholders of N Ltd. and T.P.G. Extraordinary general meetings *205 of both companies were convened. The notice which convened the extraordinary general meeting of N Ltd. contained a letter signed by B, with documents annexed ("the circular") which recommended shareholders to vote in favour of the proposal and which referred to a payment of £216,000 by N Ltd. as being an advance payment for the purchase of T.P.G.'s assets. All the members of a committee of the board approved the letter apart from M. The extraordinary general meeting was postponed as a result of the pressure by M, the plaintiffs and other institutional investors in order that a report be prepared by a merchant bank, but before the report was ready, the meeting was held on July 29, 1975, and a resolution passed approving the purchase of T.P.G.'s assets by N Ltd.

By an amended writ and statement of claim, the plaintiffs claimed, inter alia, declaratory relief and as against B, L and T.P.G. damages on behalf of the plaintiffs, N Ltd. and all the shareholders of N Ltd. on July 29, 1975, who like the plaintiffs had suffered damage and were entitled to relief. The plaintiffs were claiming in a direct capacity, in a derivative action on behalf of N Ltd. and in a representative capacity on behalf of the shareholders.

By a summons of May 10, 1979, the defendants applied to have heard as a preliminary issue whether the plaintiffs as a minority shareholder in N Ltd. were entitled to maintain the claim against them. On June 18, 1979, Vinelott J. refused the application and dismissed the summons.

On the hearing of the action in February 1980, Vinelott J. held, inter alia, that B and L, in order to benefit T.P.G. had conspired to injure N Ltd. and indirectly its shareholders whereby the shareholders had suffered damage and that, on the evidence, the interests of justice required that the plaintiffs as a minority shareholder in N Ltd. should be permitted to prosecute an action on behalf of the company.

On appeal by B and L:-

Held, allowing the appeal in part, (1) that on the evidence the serious findings against B and L of conspiracy and fraudulent conduct were not substantiated other than that they dishonestly concealed the January agreements and payments thereunder from the directors and shareholders of N Ltd. in order to facilitate the acceptance of the proposals in the strategy document; and that the dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment by N Ltd. of £216,000 to T.P.G. whereby the assets purchased by N Ltd. were overvalued by £45,000, thereby causing damage to N Ltd. by that amount (post, pp. 232B-D, 234D-E).

(2)  That where fraud was practised on a company, it was the company that prima facie should bring the action and it was only in circumstances where the board of the company was under the control of the fraudsters that a derivative action should be brought; that the question whether a company was under the control of those practising an alleged fraud on it should be determined before a derivative action was heard and, accordingly, the judge erred in not determining as a preliminary issue whether the plaintiffs should be allowed to proceed in their derivative action (post, pp. 211A, B, 221A-B); but that, since the action had been heard and N Ltd. had indicated that it would, as a party to the action, take the benefit of an order made in its favour, the question *206 whether the plaintiffs had status to bring the derivative action did not arise for determination (post, p. 220C-F).

*Per curiam.* It is doubtful whether it is a practical test of an exception to the rule in *Foss v. Harbottle (1843) 2 Hare 461* that the justice of the case requires the bringing of a derivative action (post, pp. 221F - 222B). The right to bring a derivative action should not be determined as a preliminary issue on the hypothesis that all the allegations in the statement of claim of "fraud" and "control" are facts. Whatever may be the properly defined boundaries of the exception to the rule, the plaintiff before proceeding with his action ought at least to be required to establish a prima facie case that the company is entitled

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 3 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd (1982) Ch 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 3 of 21 PageID 2919

to the relief claimed and the action falls within the proper boundaries of the exception to the rule in *Foss v. Harbottle* (post, pp. 221F - 222B).

(3) That the plaintiffs' personal action, to which the representative action was linked, was an action to recover damages on the basis that the company in which the plaintiffs were interested had suffered damage; that, since the plaintiffs' right as holders of shares was merely a right of participation in the company on the terms of the articles of association, any damage done to the company had not affected that right and, accordingly, the action was misconceived (post, pp. 222F - 223B).

*Order of Vinelott J. [1981] Ch. 257; [1980] 3 W.L.R. 543; [1980] 2 All E.R. 841 varied in part.*

The following cases are referred to in the judgment:

Atwool v. Merryweather (1867) L.R. 5 Eq. 464; 37 L.J.Ch. 35 .
Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503, C.A. .
Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450 .
Cotter v. National Union of Seamen [1929] 2 Ch. 58, C.A. .
East Pant Du United Lead Mining Co. Ltd. v. Merryweather (1864) 2 Hem. & M. 254 .
Edwards v. Halliwell [1950] 2 All E.R. 1064, C.A. .
Foss v. Harbottle (1843) 2 Hare 461 .
Gray v. Lewis (1873) L.R. 8 Ch.App. 1035 .
Heyting v. Dupont [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97 ; [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A. .
Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474 .

The following additional cases were cited in argument:

Cockburn v. Thompson (1809) 16 Ves.Jun. 321 .
Wallworth v. Holt (1841) 4 My1. &; Cr. 619.

APPEAL from Vinelott J.

The plaintiffs, Prudential Assurance Co. Ltd., held 3.2 per cent. of the issued ordinary shares of the first defendant, Newman Industries Ltd. The second defendant, Alan Frank Bartlett, was at the material time the chairman and chief executive of Newman and the third defendant, John Knox Laughton, was a non-executive director and its vice-chairman. Mr. Bartlett was also the non-executive chairman of the fourth defendant, Thomas Poole & Gladstone China Ltd. (T.P.G.) and Mr. Laughton its vice-chairman and chief executive.

**\*207**

Between 1972 and the end of 1974, T.P.G. acquired interests in various companies including the assets of Strongpoint Ltd., whose shares were beneficially owned by Mr. Bartlett and Mr. Laughton and which owned 35 per cent. of the shares of T.P.G. and a number of Newman shares. T.P.G. also increased its holding in Newman to 25 per cent. and acquired shares in Alfred Clough Ltd., S. Newman Ltd. (a private company), Dover Engineering Ltd., Metropole Industries Ltd. and Agar Cross Ltd. T.P.G. also formed a new company, Smithamcote Ltd., to acquire shares in two other companies in exchange for shares in Smithamcote. T.P.G. took 49 per cent. of voting shares of Smithamcote and sold to Smithamcote for £100,000 (which remained outstanding as a debt due from Smithamcote) shares of an investment company into which had been put T.P.G.'s minority holding of shares of S. Newman Ltd. T.P.G.'s acquisitions were financed by the issue of its own shares and loans from banks. By January 1975 it was in serious financial difficulty and, in those circumstances, the "January agreements" were entered into by which, undisclosed to the Newman board, Newman agreed to buy T.P.G.'s shareholdings in Metropole and Dover for £85,000 and £146,000 respectively. The amount was above the value of those shares on the Stock Exchange and, under the agreements, Newman paid £215,950 unknown to the Newman board, although the sum mentioned in the circular referred to below was £216,000.

Mr. Bartlett then prepared a memorandum ("the strategy document"), which made a recommendation to the Newman board, inter alia, that Newman should purchase from T.P.G. all its assets, except its shareholding in Newman and a loan from Strongpoint of £100,000, in consideration for Newman assuming T.P.G.'s liabilities and paying to T.P.G. the sum of £350,000. At a board meeting all the directors, except Mr. Angus Murray, agreed to accept the recommendation in principle and, on Mr. Murray's suggestion, a report was to be obtained from Newman's auditors, Deloitte & Co. Mr. Cooper of Deloitte made a valuation of the net assets to be acquired by Newman but, in making that valuation, the January agreements were concealed from him, and, after

© 2021 Thomson Reuters.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 4 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd (1982) Ch 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 4 of 21 PageID 2920

speaking to Mr. Laughton, he increased his provisional assessment of the assets from £235,000 to £325,000. The board accepted that valuation as a basis for negotiation. On June 3, Mr. Bartlett signed on behalf of Newman an agreement for the purchase of the assets of T.P.G. for £325,000 ("the June agreement") but the agreement was conditional on the approval of Newman and T.P.G. As the agreement was between companies having among their directors the same people, the Stock Exchange regulations required that the agreement be approved at extraordinary general meetings of Newman and T.P.G. With the notice convening the extraordinary general meeting of Newman, a letter signed by Mr. Bartlett with documents annexed ("the circular") was sent to the shareholders. The letter stated that the directors of the Newman board recommended that the shareholders voted in favour of the proposal. The letter had been approved by the members of a committee of the board except for Mr. Murray, who objected to it on the basis that not all the directors had considered and approved the proposals. The extraordinary general meeting was postponed as a result of pressure from Mr. Murray, the plaintiffs and other institutional investors, so that  *208  a report could be prepared by the merchant bankers, Schroder, Wagg & Co. The report could not be produced in time, and a resolution was passed at an extraordinary general meeting of Newman held on July 29, 1975, approving the purchase of T.P.G.'s assets by Newman.

By an amended writ and statement of claim, the plaintiffs, Prudential Assurance Co. Ltd., sued (i) on behalf of themselves and all the shareholders of Newman other than Mr. Bartlett and T.P.G.; (ii) in the plaintiffs' personal capacity; and (iii) on behalf of all the shareholders of Newman on July 29, 1975, who like the plaintiffs had suffered damage and were entitled to damages. They claimed, inter alia, a declaration that the circular sent by Newman to their shareholders and signed by Mr. Bartlett, was and had at all times been misleading and/or tricky; damages against Mr. Bartlett and Mr. Laughton for conspiracy and breach of duty; and further or in the alternative as against the fourth defendant T.P.G., a declaration that in entering into the agreement of June 3, 1975, or in the alternative in receiving the money under the terms of the agreement, when it knew or ought reasonably to have known that for Newman to enter into the agreement, upon the terms on which it did so, involved a conspiracy and breach of duty on the part of Mr. Bartlett and Mr. Laughton, T.P.G. (a) acquired the benefit of the agreement as constructive trustees of Newman and, accordingly, held the benefit of the agreement on trust for Newman, and (b) was liable to account to Newman for the full amount of the loss suffered by Newman as a result of the acquisition of the benefit.

By their defence the defendants denied the allegations made by the plaintiffs and claimed that the plaintiffs were not entitled to any of the relief claimed. They sought to have heard as a preliminary issue whether the plaintiffs, as a minority shareholder in Newman, were entitled under the rule in *Foss v. Harbottle (1843) 2 Hare 461* to maintain the claim against them. On June 18, 1979, Vinelott J. refused the defendants' application: see *[1981] Ch. 229* , 233.

Vinelott J. found that Mr. Bartlett and Mr. Laughton had conspired to injure Newman and indirectly the shareholders with the result that Newman had acquired T.P.G.'s assets for £445,000 more than Newman need have paid for them. He held that since the plaintiffs' personal, derivative and representative claims were all founded on the conspiracy to injure Newman, there was no objection to them being joined in one action and, although Mr. Bartlett and Mr. Laughton did not have control of Newman, it was doubtful whether the shareholders would have the independent advice which would enable them to exercise a proper judgment on whether Newman should bring an action and, in those circumstances, justice required the court to entertain the action of a minority shareholder.

The defendants Mr. Bartlett and Mr. Laughton appealed. On July 27, 28, 30, 31 the Court of Appeal delivered a reserved judgment divided into seven chapters under the headings: (1) Introduction; (2) The position of Newman Ltd. and T.P.G. Ltd. on March 31, 1973; (3) Events after March 31, 1973; (4) The proceedings; (5) The law; (6) The examination  *209  of the judgment of Vinelott J.; and (7) Conclusions. Only chapters 5 and 7 are included in this report.

On July 31, no order was made by the court and the matter was adjourned for argument on the form of the order and costs. On October 5 the parties stated that all outstanding matters between them had been settled.

The second and third defendants, Mr. Bartlett and Mr. Laughton, appeared in person on the hearing of the appeal.

*Leonard Caplan Q.C., Peter Curry Q.C.* and *Philip Heslop* for the plaintiffs.

*Robert Reid Q.C.* and *David Hodge* for the first defendant.

The fourth defendant did not appear and was not represented on the hearing of the appeal.

*Judith Jackson,* on October 5, for the second and third defendants.

© 2021 Thomson Reuters.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 5 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd (No2) Ch. 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 5 of 21 PageID 2921

*Jules Sher Q.C.* and *Charles Turnbull,* on October 5, for the fourth defendant.

*Caplan Q.C.* for the plaintiffs. The rule in *Foss v. Harbottle (1843) 2 Hare 461* is a rule of procedure and not of substantive law. A minority shareholder can sue the company where the needs of justice so require. The rule is of respectable antiquity and on the facts of the present case, the plaintiffs were entitled to prosecute an action on behalf of the company as a minority shareholder in the interests of justice.

[On June 10, 1981, the court stated that argument on the exception to the rule in *Foss v. Harbottle* was not open to the plaintiffs as a demurrer because the preliminary issue was not the subject of appeal in the court. The preliminary point had been overtaken by the decision in the trial before Vinelott J. *[1981] Ch. 257* . For these reasons, the court did not wish to hear further argument on the matter.]

*Cur. adv. vult.*

July 27, 28, 30, 31. CUMMING-BRUCE, TEMPLEMAN andBRIGHTMAN L.JJ.

took it in turns to read the following judgment of the court. In the course of the introduction their Lordships said:

The great length of this judgment has naturally caused us to consider whether it would be sensible to hand down a typed or printed version, as an alternative to the many hours in court which will inevitably be spent on delivering our judgment. We have rejected this obvious and convenient expedient for two reasons. First, the appellants have been found guilty by the trial judge of a civil conspiracy in circumstances which, subject to stricter procedures, could equally well have led to their conviction on a charge of criminal conspiracy. In such circumstances we think that whichever way our verdict may go we should express our conclusions orally in open court. Secondly, the delay which would be caused by typing or printing and then proof-reading a written judgment suitable for handing down would postpone judgment over the Long Vacation. When men's reputations are at stake, we do not think it is right to impose an avoidable two months delay. [Having read chapters one to four, they continued:]
  *\*210  Chapter 5 - The law*

As we have indicated, when, on January 9, 1976, the writ was issued the plaintiffs, Prudential Assurance Co. Ltd., sued only in their personal capacity and sought only to establish that the June agreement had not been duly approved at a valid meeting. When the writ was first amended in red on March 8, 1976, the title of the plaintiffs was altered so as to indicate that it was suing on behalf of Newman, the first defendant, using the time-honoured formula for this purpose "On behalf of themselves and all other shareholders, etc...." The writ was also amended by adding Mr. Laughton and T.P.G. as defendants. The writ was expanded by claiming as against T.P.G. rescission of the agreement and damages; and also, as against Mr. Bartlett and Mr. Laughton, damages for breach of duty and damages for conspiracy.

As we have already related, it was a matter of debate in the court below whether the action as reconstituted was exclusively a "derivative" action for an injury allegedly done to Newman, as counsel for Mr. Bartlett and Mr. Laughton assumed, or was additionally a "personal" action for injury allegedly done to the plaintiffs and other shareholders. Whether the action as then constituted and the claim as then formulated could properly be regarded as pursuing both derivative and personal remedies is not a matter which we need to consider.

A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested. This is sometimes referred to as the rule ir *Foss v. Harbottle (1843) 2 Hare 461* when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence. The rule in *Foss v. Harbottle* also embraces a related principle, that an individual shareholder cannot bring an action in the courts to complain of an irregularity (as distinct from an illegality) in the conduct of the company's internal affairs if the irregularity is one which can be cured by a vote of the company in general meeting. We are not concerned with this aspect of the rule.

The classic definition of the rule in *Foss v. Harbottle* is stated in the judgment of Jenkins L.J. in *Edwards v. Halliwell [1950] 2 All E.R. 1064* as follows. (1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 6 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd ('[1982] Ch. 204 (1981)')
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 6 of 21 PageID 2922

if the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm *211 a transaction which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue.

By their summons issued on May 10, 1979, Mr. Bartlett and Mr. Laughton invoked the rule in *Foss v. Harbottle.* After some 2½ days of argument Vinelott J. dismissed the summons on June 18, 1979, not on the ground that the plaintiffs were entitled to bring a derivative action but on the ground that it was more convenient to decide that issue after the action had been tried. For reasons which we explain later we have no doubt whatever that that was a wrong decision.

Although not a party to the summons of May 10, Newman supported it. Newman was represented by leading counsel, who made a forceful statement on day 1 to the effect that, although the action was brought for the benefit of Newman, "it is the concern of the board that the company shall not be killed by kindness." He added that not only was it the view of the board that the action was one which they did not wish to pursue on behalf of the company but that it was quite contrary to the interests of the company that the transaction should now be the subject of any rescission or criticism. He said: "I am therefore concerned ... that this action ... shall not proceed - a fortiori ... it should be disposed of as quickly as possible." This protest was repeated at the close of the plaintiffs' case on day 34, when counsel formally withdrew in order to avoid needless expense. This is what counsel then told the court:

> "My clients, Newman Industries Ltd., are necessary formal parties to this action, but they are neither prosecuting it as a corporate entity nor now defending it in a combative role. The circumstances of the case ... as far as my researches go are unique. They are unique from the company's point of view in this particular material respect in that, although the action is framed in part as a minority shareholder's action, there is in fact no shareholding or board control vested in the personal defendants. Indeed, as regards the Newman board Mr. Laughton has not been a director since before the commencement of this action, and Mr. Bartlett, although holding such office, has at all material times been but one only of a number of directors comprising the present Newman board. As I indicated briefly to your Lordship at the commencement of this trial, my learned junior and I were at pains to defend it by decision of the independent board, that is to say Mr. Bartlett taking no part in that decision. The independent board, so I have it, was motivated by the desire and wish that your Lordship might be afforded every assistance which a substantial public quoted company might be expected to render a court concerned with its affairs.... The independent board itself has throughout maintained the view that, whilst it was powerless to prevent the Prudential from pursuing the action, it was not one it, the independent board, *212 wished to adopt on Newman's behalf, nor had it been approached by any shareholder requesting that it should. It has been and in fact remains the view of the independent board that any advantage to the company which this action could procure for it is vastly outweighed by harm being inflicted upon it by the action continuing with the consequent adverse publicity and other side effects."

Observe what was being said on behalf of Newman to the judge: "any advantage to the company which this action could procure is *vastly outweighed* by harm being inflicted upon it." This was an apparently responsible statement made by eminent leading counsel on the instructions of persons said to be the independent members of the board. The judge does not refer to this statement in his judgment; he does not say that he did not believe it; he does not say that he regarded the independent members of the board as acting under the influence of Mr. Bartlett. He does not seem to have asked himself the all-important question: "Ought I to be trying a derivative action?"

The assertion by Newman's counsel that the independent board "was powerless to prevent the Prudential from pursuing the action" may have been based on the supposition that the plaintiffs had on the facts alleged in the statement of claim a personal cause of action for damages against Mr. Bartlett and Mr. Laughton independently of Newman's cause of action for damages. This supposition, if it existed, was erroneous for reasons which we explain later. It would have been open to Newman to have issued its own summons before the trial in order to test the right of the Prudential to pursue a derivative action, and to have supported it with evidence proving the objectiveness of the board's view and explaining the potential injury to Newman which would be caused by the proceedings.

At the end of the day the judge found that a fraud had been committed by Mr. Bartlett and Mr. Laughton against Newman. The judge then addressed his mind to the question whether the right of a shareholder to sue in a case of fraud extended beyond a

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 7 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd. (1982) Ch. 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 7 of 21 PageID 2923

case of voting control by the wrongdoers. It was not pleaded, and could not be alleged, that Mr. Bartlett and Mr. Laughton had voting control. The conclusion reached by the judge was that a shareholder was entitled to prosecute an action on behalf of the company if "the interests of justice do require that a minority action should be permitted" see *[1981] Ch. 257* , 327; and that this was established in the instant case because the judge was satisfied on the evidence as a whole:

> "that there was no way in which Prudential could have ensured that the question whether proceedings should be brought by Newman would be fairly put to the shareholders or even that a full investigation would be made into all the circumstances surrounding the transaction including in particular Mr. Cooper's valuation."

In widening the scope of the accepted exception to the rule in *Foss v. Harbottle* by holding that a derivative action can be maintained whenever the interests of justice so require, the judge, at pp. 322-323, drew attention to references to "the justice of the case" which appear in some of the *\*213* reported authorities on this topic: *Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474* , 480 and *Edwards v. Halliwell [1950] 2 All E.R. 1064* , 1067; to which may be added *Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503* , 518; *Cotter v. National Union of Seamen [1929] 2 Ch. 58* , 69 and *Heyting v. Dupont [1964] 1 W.L.R. 843* , 851.

We turn now to certain of the authorities, starting with *Foss v. Harbottle, 2 Hare 461* . It came before Sir James Wigram V.-C., on demurrer. The facts are narrated in that report at intimidating length and can be summarised as follows. The company concerned was the Victoria Park Company, which had been incorporated by Act of Parliament in 1837 to develop certain plots of land. There were eight promoters, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane. The directors were the first five of these gentlemen.

Lane was the architect and Bunting the solicitor. Foss and Turton were the complaining shareholders. They filed a bill on behalf of themselves and all other shareholders in the company (except the defendants) against the eight promoters, including the assignees of three of them who had become bankrupt. It was alleged that the plots had been bought by the company in pursuance of an arrangement fraudulently concocted between seven of the promoters to enable them to derive a personal benefit from the establishment of the company and the sale to it of the plots at exorbitant prices. It was further alleged, at pp. 478-479, 480:

> "... the defendants concealed from the plaintiffs ... the several fraudulent and improper acts of the ... defendants, and the plaintiffs ... had only recently ascertained the particulars thereof ... and they were unable to set forth the same more particularly, - the defendants having refused to make any discovery thereof, or to allow the plaintiffs to inspect the books, accounts, or papers of the company ... and that at [general meetings of the company] false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed."

The bill charged that, in the circumstances, the defendants were jointly and severally liable to make good to the company the losses incurred in consequence of the wrongful and fraudulent acts and proceedings to which they were parties or privies. The defendants (except Byrom, who took no part) demurred to the bill on the ground that the corporation was not before the court, and that the defect could not be cured by making the corporation a defendant because the plaintiffs were not entitled to represent the corporation.

For the purposes of the application Wigram V.-C. made the assumption that the company was entitled, as matters then stood, to complain of the transactions mentioned in the bill. He continued at pp. 490-491, 492:

> "... the bill ... is brought by two individual corporators, professedly on behalf of themselves and all the other members of the corporation, *\*214* except those who committed the injuries complained of, - the plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.

> "It was not, nor could it successfully be argued, that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation. In law, the corporation, and the aggregate members of the corporation, are not the same thing for purposes like this; and the only question can be, whether the facts alleged in this case justify a departure from the rule which prima facie would require that the corporation should sue in its own name and in its corporate character, or in the name of some one whom the law has appointed to be its representative.... If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except

© 2021 Thomson Reuters.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 8 of 21
Prudential Assurance Co Ltd v. Newman Industries Ltd. [1982] Ch. 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 8 of 21 PageID 2924

that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth v. Holt,* and other cases, would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

"But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, - rules, which, though in a sense technical, are founded on general principles of justice and convenience; and the question is, whether a case is stated in this bill, entitling the plaintiffs to sue in their private characters."

Wigram V.-C. then proceeded to answer this question in the negative, for the reasons indicated in the following extracts from his judgment, at pp. 492-493:

"... the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within the scope of the company's powers, as well as to control the directors in any acts which they may have originated.... The first ground of complaint is one which, though it might prima facie entitle the corporation to rescind the transactions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of confirmation at the option of the corporation...."

Wigram V.-C. then considered the second ground of complaint (which we need not deal with) and continued, at pp. 493, 494-495:

"... whilst the supreme governing body, the proprietors at a special *215 general meeting assembled, retain the power of exercising the functions conferred upon them by the act of incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the plaintiffs on the present record ... the majority of the proprietors at a special general meeting assembled, independently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the court may be declaring the acts complained of to be void at the suit of the present plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority, is decisive to show that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained, it must be shown either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is, whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those transactions are to be impeached in a court of justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights."

These questions were answered against the plaintiffs.

The next case which falls for consideration related to the fraudulent promotion of some worthless lead mines. There were in fact two actions. It is important to observe that in the first action there was a motion to strike out, but no such motion in the second action, which proceeded to trial. The first action is reported as *East Pant Du United Lead Mining Co. Ltd. v. Merryweather (1864) 2 Hem. & M. 254* . It was alleged that Merryweather, a director of the company, acting in concert with one of his co-directors, Whitworth, had fraudulently sold the mines to the company for £4,000 cash, which they shared between themselves, and 600 shares, to be allotted to Merryweather. In June 1864 a bill was filed in the name of the company against Merryweather to set aside the sale. In August the defendant moved to strike out the bill by way of demurrer. The court adjourned the application in order to allow an opportunity for a general meeting to be held. The meeting was held in October. A *216 resolution was

© 2021 Thomson Reuters.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 9 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd (1982) Ch 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 9 of 21 PageID 2925

proposed for adopting the proceedings and continuing the action. Whitworth proposed an amendment to stay the action and refer the dispute to arbitration. The amendment was put to the vote, and a poll was taken. Out of 668 votes cast 324 were against the stay and 344 were in favour of the stay, but of the latter 78 votes were cast by Merryweather and 28 votes by Whitworth; if Merryweather had not voted, the motion would have been supported by only 266 votes and would have been lost. It was argued by counsel for the company, at p. 257:

> "If a minority of a company were allowed to file a bill in the company's name, charging fraud against some of the majority, and alleging that those persons were not to be considered as shareholders or entitled to vote, and thus endeavouring to turn their minority into a majority so as to acquire the right to use the name of the company, any company's affairs might be made the subject of litigation, upon allegations of fraud which might be entirely false; and yet, as this could not be proved till the hearing, irremediable mischief might be done in the meantime."

Page Wood V.-C. acceded to the motion, expressing his reasons, at p. 261:

> "Then comes the question, has the company now sanctioned the suit? To decide that it has done so, would be to discard Mr. Merryweather's votes, and to do that would, in effect, be to decide now on this application the question at issue in the suit. But if I assume, as upon this motion I must assume, that Mr. Merryweather was entitled to the 600 shares which he actually holds in the company, the further question occurs, has he a right to vote in respect of such shares upon a question in which he is personally interested? Now as to the management of the company by the board, no director is entitled to vote as a director in respect of any contract in which he is interested; but the case is different when he acts as one of the whole body of shareholders. The shareholders of one company may have dealings with interests in other companies, and therefore it would be manifestly unfair to prevent an individual shareholder from voting as a shareholder in the affairs of the company. At a general meeting, therefore, Mr. Merryweather's votes must be held to be good, so long as he continues to hold his shares. Further than this, the court cannot be asked now to give an opinion, for to do so would be to decide the very question at issue in the cause."

A shareholder then began another action in December, suing on behalf of himself and all other shareholders (except Merryweather and Whitworth) against Merryweather, Whitworth and the company. This is reported as *Atwool v. Merryweather* in a footnote to *Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450* , 464, and more fully in *37 L.J.Ch. 35* . On this occasion the defendant did not move to strike out the bill. The action was fought to a finish. Page Wood V.-C. held, first, that the contract was a complete fraud, and secondly, that there was not such a defect in the constitution of the suit as would be fatal according to the authority of *Foss v. Harbottle.* Page Wood V.-C. referred to the fact that there was  *\*217*  plainly a majority of shareholders, independent of those implicated in the fraud, who supported the bill.

The principles which seem to emerge from these two cases are (i) that if the defendant against whom fraud is alleged applies to strike out the action in limine, it will not be assumed that he was guilty of fraud so as to disentitle him from casting his votes at a general meeting against the action; but, (ii) that if the action is in fact fought to a conclusion, and the court finds the defendant guilty of fraud, it will in those circumstances discount the votes of those implicated in the fraud in reaching a conclusion whether the plaintiff is authorised to sue on the company's behalf. What the two cases leave open is the question in what circumstances the alleged delinquent, or the company, can halt the proceedings in limine.

Vinelott J. placed considerable reliance on this case in widening the accepted exception to the rule in *Foss v. Harbottle.* He said *[1981] Ch. 257* , 320:

> "... *Atwool v. Merryweather, L.R. 5 Eq. 464* shows that the court has jurisdiction to entertain a claim by a minority shareholder and to make an order in favour of the defendant company even where the other defendants, alone or together with the plaintiffs, do not have a majority of votes in general meeting and where the other shareholders are not parties. If that is so, then as I see it, the exception can only be founded on a general jurisdiction of the court to make an order for recovery of property or damages in favour of a defendant company against co-defendants where the jurisdiction is invoked by a minority shareholder."

We doubt whether *Atwool v. Merryweather* goes so far in support of the judge's conclusion. It was not a case in which the company or the delinquents sought to stop the action in limine. The action had been fought to a conclusion, the liability of

the defendant directors had been established, and nothing, therefore, remained except for the company to reap the benefit of the judgment. The court could hardly deny the right of the plaintiff to an order in favour of the company to give effect to its proved rights, in the face of a resolution which, excluding the votes of the proven fraudsters, was a majority resolution. Page Wood V.-C. said, at p. 468:

> "having it plainly before me that I have a majority of the shareholders, independent of those implicated in the fraud, supporting the bill, it would be idle to go through the circuitous course of saying that leave must be obtained to file a bill for the company, and pro forma have a totally different litigation."

There is a clear distinction to be drawn between the application of the rule in *Foss v. Harbottle* when it is sought to stay proceedings in limine, and its application when nothing remains but to enforce a judgment in a derivative action which has been permitted to proceed.

A simple application of the first aspect of the rule in *Foss v. Harbottle* is to be found in *Gray v. Lewis (1873) L.R. 8 Ch.App. 1035* . The facts, shortly stated, were as follows: Charles Lafitte & Co. Ltd. ("the company") was incorporated in December 1865 to purchase the right to extend to this  *\*218*  country the business of Charles Lafitte & Co. of Paris ("the partnership"). The plaintiff Gray subscribed for shares. The company never acquired anything from the partnership, and was ordered to be wound up in November 1866. Shortly thereafter Gray filed a bill on behalf of himself and all other shareholders in the company, against the company, its directors, its liquidator and the National Bank, alleging that the assets of the company had been misapplied by the National Bank and by the directors of the company, and seeking an order that the bank and the directors of the company might be declared liable to make "good to the shareholders of the company" the loss sustained "by the shareholders." Sir Richard Malins V.-C. made a decree declaring that the bank and the directors were liable to replace the money, and directed that the amount found due should be paid into court. The National Bank, and Lewis and Henshaw, two of the directors, appealed. The appeal of the National Bank was compromised with the concurrence of the liquidator, on the basis (clearly unobjectionable) that the National Bank should discharge the debts of the company. The appeal by Lewis and Henshaw came before the Court of Appeal in Chancery, and was allowed. The reasons were put trenchantly by James L.J., with whom Mellish L.J. agreed, in these words at p. 1050:

> "The bill should not have been filed by a shareholder on behalf of himself and all other shareholders. It is very important, in order to avoid oppressive litigation, to adhere to the rule laid down in *Mozley v. Alston (1847) 1 Ph. 790* and *Foss v. Harbottle, 2 Hare 464* , which cases have always been considered as settling the law of this court, that where there is a corporate body capable of filing a bill for itself to recover property either from its directors or officers, or from any other person, that corporate body is the proper plaintiff, and the only proper plaintiff. One object of incorporating bodies of this kind was, in my opinion, to avoid the multiplicity of suits which might have arisen where one shareholder was allowed to file a bill on behalf of himself and a great number of other shareholders. The shareholder who first filed a bill might dismiss it, and if he was a poor man the defendant would be unable to obtain his costs, then another shareholder might file a bill, and so on. It was also stated to us in the course of the argument that even after the plaintiff had dismissed his bill against a particular defendant a fresh bill might be filed against the defendant so dismissed. Therefore there might be as many bills as there are shareholders multiplied into the number of defendants. The result would be fearful, and I think the defendant has a right to have the case made against him by the real body who are entitled to complain of what he has done.

> "Now in this case I am of opinion that the only person - if you may call it a person - having a right to complain was the incorporated society called Charles Laffitte & Co. In its corporate character it was liable to be sued, and was entitled to sue; and if the company sued in its corporate character, the defendant might allege a release or a compromise by the company in its corporate character - a defence which would not be open in a suit where a plaintiff is suing on behalf of himself and other shareholders. I think it is of the utmost  *\*219*  importance to maintain the rule laid down in *Mozley v. Alston* and *Foss v. Harbottle,* to which, as I understand, the only exception is where the corporate body has got into the hands of directors and of the majority, which directors and majority are using their powers for the purpose of doing something fraudulent against the minority, who are overwhelmed by them, as in *Atwool v. Merryweather, L.R. 5 Eq. 464* , where Page Wood V.-C. under those circumstances, sustained a bill by a shareholder on behalf of himself and others, and there it was after an attempt had been made to obtain a proper authority from the corporate body itself in public meeting assembled."

This case highlights what the rule in *Foss v. Harbottle* is primarily concerned with, namely, is a plaintiff shareholder entitled to prosecute an action on behalf of the company for a wrong done to it, or ought the action to be struck out on the footing that it is for the company and not for a shareholder to sue? That is what *Foss v. Harbottle* itself was about, and what the first *East*

© 2021 Thomson Reuters.

*Pant Ducase, 2 Hem. & M. 254* , was about. The second *East Pant Du* case, *Atwool v. Merryweather, L.R. 5 Eq. 464* , raised a related but different question, namely, if at the end of the day fraud is proved, are the circumstances such that the company is capable of condoning the fraud? Clearly not, if the fraud will only be confirmed by a majority by the use of the fraudsters' own voting power.

It is commonly said that an exception to the rule in *Foss v. Harbottle* arises if the corporation is "controlled" by persons implicated in the fraud complained of, who will not permit the name of the company to be used as plaintiffs in the suit: see *Russell v. Wakefield Waterworks Co., L.R. 20 Eq. 474* , 482. But this proposition leaves two questions at large, first, what is meant by "control," which embraces a broad spectrum extending from an overall absolute majority of votes at one end, to a majority of votes at the other end made up of those likely to be cast by the delinquent himself plus those voting with him as a result of influence or apathy. Secondly, what course is to be taken by the court if, as happened in *Foss v. Harbottle,* in the *East Pant Du* case and in the instant case, but did not happen in *Atwool v. Merryweather,* the court is confronted by a motion on the part of the delinquent or by the company, seeking to strike out the action? For at the time of the application the existence of the fraud is unproved. It is at this point that a dilemma emerges. If, upon such an application, the plaintiff can require the court to assume as a fact every allegation in the statement of claim, as in a true demurrer, the plaintiff will frequently be able to outmanoeuvre the primary purpose of the rule in *Foss v. Harbottle* by alleging fraud and "control" by the fraudster. If on the other hand the plaintiff has to prove fraud and "control" before he can establish his title to prosecute his action, then the action may need to be fought to a conclusion before the court can decide whether or not the plaintiff should be permitted to prosecute it. In the latter case the purpose of the rule in *Foss v. Harbottle* disappears. Either the fraud has not been proved, so cadit quaestio; or the fraud has been proved and the delinquent is accountable unless there is a valid decision of the board or a valid decision of the company in general meeting, reached without impropriety or unfairness, to condone the fraud.

*\*220*

We think that this brief look at the authorities is sufficient for present purposes. For it so happens that this court cannot properly on this appeal decide the scope of the exception to the rule in *Foss v. Harbottle.* The reason is this. Vinelott J. permitted the action by the plaintiffs on behalf of Newman to proceed, and there was no appeal from that decision. In the result he found that Newman was entitled as against Mr. Bartlett and Mr. Laughton to damages for conspiracy and breach of fiduciary duty, and he directed an inquiry as to damages subject to a stay in case of an appeal. Thereafter, Newman had three choices, subject to the operation of the stay. First, it might do nothing. In this case the plaintiffs would be entitled, if they so desired, to issue a summons to proceed with the inquiry. Secondly, Newman might decide for some proper reason, assuming that a proper reason might exist, and duly resolve at a proper board or general meeting, to proceed no further with the claim against Mr. Bartlett and Mr. Laughton. In this event, assuming that the resolution of the board or of the company in general meeting was in all respects proper, the plaintiffs would be unable to proceed with the inquiry because a valid release could be pleaded by Mr. Bartlett and Mr. Laughton. Thirdly, Newman might adopt the order which the plaintiffs had obtained on its behalf and pursue the inquiry accordingly. This would occasion no procedural problem nor even any special procedural step. Any party, plaintiff or defendant, can issue a summons to proceed upon an order. It would not be necessary for Newman to apply to be made a plaintiff, or to start a fresh action and rely upon the principle of res judicata, as was suggested at one time in the course of the argument. The order has been made. Newman is a party to the action. Newman can enforce the order. If this course were adopted, the rule in *Foss v. Harbottle* is irrelevant. The rule has no room to operate where the company itself is proceeding with an action, or to enforce a judgment, pursuant to a valid board or company resolution.

Newman by its counsel, acting (as we must assume) upon due authority conferred by the company, stated before us that if the finding of fraud stood it would accept the benefit of the order made in its favour. That is the end of *Foss v. Harbottle* so far as this appeal is concerned. It is plainly impossible for Mr. Bartlett or Mr. Laughton to prevent the board of Newman instructing its solicitors to proceed with the inquiry, and recovering from Mr. Bartlett and Mr. Laughton what may be certified to be due.

It was in the light of these considerations that we declined to hear any argument from Mr. Caplan and Mr. Curry on the topic of *Foss v. Harbottle.* However desirable it might be in the public interest that we should express our conclusions on Vinelott J.'s analysis of the rule in *Foss v. Harbottle* and what he saw as the exception to it, it was necessary for us to bear in mind that the rule had ceased to be of the slightest relevance to the case. It would have been a grave injustice to all parties to increase the already horrendous costs of this litigation by allowing time for argument on an interesting but irrelevant point. Such consideration of the law as appears in this judgment is, apart from a few *\*221* missions made by Mr. Bartlett, merely a reflection of our own thoughts without the benefit of sustained argument.

In the result it would be improper for us to express any concluded view on the proper scope of the exception or exceptions to the rule in *Foss v. Harbottle.* We desire, however, to say two things. First, as we have already said, we have no doubt whatever that

Vinelott J. erred in dismissing the summons of May 10, 1979. He ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action. It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were entitled in law to subject the company to a 30-day action. Such an approach defeats the whole purpose of the rule in *Foss v. Harbottle* and sanctions the very mischief that the rule is designed to prevent. By the time a derivative action is concluded, the rule in *Foss v. Harbottle* can have little, if any, role to play. Either the wrong is proved, thereby establishing conclusively the rights of the company; or the wrong is not proved, so cadit quaestio. In the present case a board, of which all the directors save one were disinterested, with the benefit of the Schroder-Harman report, had reached the conclusion before the start of the action that the prosecution of the action was likely to do more harm than good. That might prove a sound or unsound assessment, but it was the commercial assessment of an apparently independent board. Obviously the board would not have expected at that stage to be as well informed about the affairs of the company as it might be after 36 days of evidence in court and an intense examination of some 60 files of documents. But the board clearly doubted whether there were sufficient reasons for supposing that the company would at the end of the day be in a position to count its blessings; and clearly feared, as counsel said, that it might be killed by kindness. Whether in the events which have happened Newman (more exactly the disinterested body of shareholders) will feel that it has all been well worth while, or must lick its wounds and render no thanks to those who have interfered in its affairs, is not a question which we can answer. But we think it is within the bounds of possibility that if the preliminary issue had been argued, a judge might have reached the considered view that the prosecution of this great action should be left to the decision of the board or of a specially convened meeting of the shareholders, albeit less well informed than a judge after a 72-day action.

So much for the summons of May 10. The second observation which we wish to make is merely a comment on Vinelott J.'s decision that there is an exception to the rule in *Foss v. Harbottle* whenever the justice of the case so requires. We are not convinced that this is a practical test, particularly if it involves a full-dress trial before the test is applied. On the other hand we do not think that the right to bring a derivative action should be decided as a preliminary issue upon the hypothesis that all the allegations in the statement of claim of "fraud" and "control" are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding   *222  with his action to establish a prima facie case (i) that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in *Foss v. Harbottle.* On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting.

We turn to the personal action. In the statement of claim, as amended on day 12. the plaintiffs pleaded that Mr. Bartlett and Mr. Laughton

"in breach ... of their obligation to the shareholders ... conspired together to benefit T.P.G. at the expense of ... the shareholders," and that "in furtherance of such conspiracy and in breach of ... their obligation to the shareholders ... the defendants Bartlett and Laughton procured the circular to be ... distributed ... well knowing and intending it to be misleading and tricky"; and "by reason of the foregoing the defendants Bartlett and Laughton are in breach of ... their obligation to the shareholders."

In the amended prayer the plaintiffs in their personal capacity as a shareholder in Newman claimed damages for conspiracy against Mr. Bartlett and Mr. Laughton, and a declaration to the like effect on behalf of all other shareholders who had suffered damages and were on the register on July 29, 1975 (the date of the adjourned extraordinary general meeting). Counsel for the plaintiffs agreed before us that no facts are relied upon in support of the personal claim which are not relied upon in support of the derivative claim.

Vinelott J. upheld the plaintiffs' personal claim, and also the representative claim with which it was linked. He began with the proposition, which accorded with his findings, that Newman had been induced by fraud to approve an agreement under which Newman paid more (he thought about £445,000 more) than the value of the assets acquired and thus £445,000 more than it needed to pay; therefore Newman's indebtedness to its bankers immediately after the transaction (about £5m.) was £445,000 more than it would have been but for the fraud; therefore the fraud caused a reduction in net profits, which must have affected the quoted price of Newman shares; therefore, the plaintiffs suffered some damage in consequence of the conspiracy and that was sufficient to complete the cause of action, the quantum of damages being left to an inquiry.

© 2021 Thomson Reuters.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 13 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd (1982) Ch 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 13 of 21 PageID 2929

In our judgment the personal claim is misconceived. It is of course correct, as the judge found and Mr. Bartlett did not dispute, that he and Mr. Laughton, in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting. But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the *223 market value of his shares, or equal to the likely diminution in dividend, because such a "loss" is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only "loss" is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent. shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company.

Counsel for the plaintiffs sought to answer this objection by agreeing that there cannot be double recovery from the defendants, but suggesting that the personal action will lie if the company's remedy is for some reason not pursued. But how can the failure of the company to pursue its remedy against the robber entitle the shareholder to recover for himself? What happens if the robbery takes place in year 1, the shareholder sues in year 2, and the company makes up its mind in year 3 to pursue its remedy? Is the shareholder's action stayed, if still on foot? Supposing judgment has already been recovered by the shareholder and satisfied, what then?

A personal action could have the most unexpected consequences. If a company with assets of £500m. and an issued share capital of £50m. were defrauded of £500,000 the effect on dividends and share prices would not be discernible. If a company with assets of £10m. were defrauded, there would be no effect on share prices until the fraud was discovered; if it were first reported that the company had been defrauded of £500,000 and subsequently reported that the company had discovered oil in property acquired by the company as part of the fraud and later still reported that the initial loss to the company could not have exceeded £50,000, the effect on share prices would be bewildering and the effect on dividends would either be negligible or beneficial.

The plaintiffs in this action were never concerned to recover in the personal action. The plaintiffs were only interested in the personal action *224 as a means of circumventing the rule in *Foss v. Harbottle. The* plaintiffs succeeded. A personal action would subvert the rule in *Foss v. Harbottle* and that rule is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that the company observes the limitations of its memorandum of association and the right to ensure that other shareholders observe the rule, imposed upon them by the articles of association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration. In this case it is neither necessary nor desirable to draw any general conclusions.

The rule in *Foss v. Harbottle* is founded on principle but it also operates fairly by preserving the rights of the majority. We were invited to give judicial approval to the public spirit of the plaintiffs who, it was said, are pioneering a method of controlling companies in the public interest without involving regulation by a statutory body. In our view the voluntary regulation of companies is a matter for the City. The compulsory regulation of companies is a matter for Parliament. We decline to draw general conclusions from the exceptional circumstances of the present case. But the results of the present action give food for thought. Vinelott J. thought it possible that Newman had suffered damage amounting to £445,000 by the fraud of Mr. Bartlett

© 2021 Thomson Reuters.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 14 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd. (1982) Ch. 204 (1981)
Case 3:21-cv-00842-B    Document 59-2    Filed 08/30/21    Page 14 of 21    PageID 2930

and Mr. Laughton. Counsel for Newman submitted in the court below that damage to Newman by the prosecution of the action exceeded the benefits liable to be derived from the action. The costs of the proceedings at the end of the trial were said in newspaper reports to be in the region of £750,000. If the judge's order is upheld and if the damages suffered by Newman are assessed at £445,000 and the costs at £750,000 then those damages and about 95 per cent. of the costs will fall on T.P.G. pursuant to the judge's order except in so far as they are recovered from Mr. Bartlett and Mr. Laughton. If Newman recover any damages they must indemnify the plaintiffs thereout against the difference between the costs of the plaintiffs paid by T.P.G. and (with small exceptions) the costs of the plaintiffs on a common fund basis. Part of Newman's costs must be borne by Newman in any event. Part of the plaintiffs' costs must be borne by the plaintiffs in any event.

If this appeal succeeds the burden of the costs on the plaintiffs will be enormous. The innocent shareholders of Newman, T.P.G. and the plaintiffs may well wonder, whether this appeal succeeds or not, if there is not something to be said after all for the old fashioned rule in *Foss v. Harbottle.*   *225  [Their Lordships then read Chapter 6 in which they examined the judgment of Vinelott J. and continued:]


Chapter 7 - Conclusions

The problems involved in this case were caused by the fact that the Prudential were the wrong plaintiffs.

If, indeed, Mr. Bartlett and Mr. Laughton defrauded Newman then the proper plaintiff was Newman. In an action by Newman against Mr. Bartlett and Mr. Laughton for defrauding the company, and against T.P.G. for enjoying the fruits of the fraud, the circular would be largely evidential The principal frauds pleaded would have been frauds practised on the directors and practised on Mr. Cooper. Each fraudulent representation or fraudulent concealment would have been pleaded with particularity. Furthermore, in an action by Newman against Mr. Bartlett and Mr. Laughton all the documents necessary to enable Newman to plead its case and to make sensible discovery would have been in the possession of Newman at the outset. Newman would have known which documents held by T.P.G. were relevant to be discovered. Newman would then have been in a position to determine which of the discovered documents were sufficiently important to produce to the court.

Mr. Caplan frankly admitted that the plaintiffs pleaded and relied upon the circular because that was the only document revealed to the plaintiffs as a shareholder and the only document upon which they could make out a case on the pleadings prior to discovery. Mr. Caplan also frankly admitted that conspiracy was only pleaded because the plaintiffs thought that a direct action could not succeed in the absence of a plea of conspiracy. The direct action was only pleaded because it was feared that the derivative action might be defeated by the rule in *Foss v. Harbottle, 2 Hare 461* .

In these circumstances discovery was a shambles, there was no proper selection of documents to be used at the trial because no one knew what to select and what to discard, and the pleadings were never adequately clarified or timeously amended. The complications and obscurities of the statement of claim and the reliance on the circular and the enormous weight of the discovered documents made it impossible for the defendants adequately to prepare for the trial or to foresee the course or length of the trial or to cope with the many trials of strength with regard to their recollection and probity.

The obscurities and confusion of the pleadings, the mass of documentary evidence, the fact that the Prudential, not being the proper plaintiffs, had no knowledge of what had gone on inside Newman and the assumed need to prove conspiracy led to the plaintiffs submitting that every Newman and T.P.G. document and every act or omission by Mr. Bartlett or Mr. Laughton was a badge of fraud, and to submit that Mr. Cooper's valuation was only explicable by cunning on the part of Mr. Laughton and incompetence on the part of Mr. Cooper, and that the directors of Newman were bemused and the advisers of Newman blinded.

The task of the judge was made very difficult because the pleadings of the plaintiffs were concentrated on the circular for tactical reasons   *226  connected with the personal action; the statement of claim was vague and obscure; the real issues were buried under general assertions of trickiness. The defendants' advisers, no doubt overwhelmed by the number of ingenious accusations of fraud which emerged, were not able adequately to assist the judge by defining those accusations which were material and sounded in damages, those accusations which were relevant but which did not give rise to any damage, and those accusations which were wholly irrelevant save as to credit.

As the case proceeded and the nature of the plaintiffs' accusations were gradually disclosed, it is not surprising that the judge decided to intervene and himself to ask questions in order to clarify the evidence being given by the witnesses. But we must criticise some of the interventions of the judge. When Mr. Murray was giving evidence, some of the interventions appeared only capable of being answered in a way which would confirm the views already formed by the judge. In the case of the evidence

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 15 of 21
Prudential Assurance Co v. v. Newman Industries Ltd. (1982) Ch. 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 15 of 21 PageID 2931

of Mr. Bartlett and Mr. Cooper some of the judge's interventions indicated that he had already formed a hostile view of the explanations that the witnesses were trying to give. Experienced counsel represented the plaintiffs and Mr. Bartlett. The judge should have allowed Mr. Scott to elucidate from his witnesses the evidence that they were trying to give, without interruption save in so far as it was necessary for clarification. and it was for Mr. Scott and Mr. Caplan to make their points in cross-examination. It is not appropriate for leading questions to be put from the Bench.

The judge found a conspiracy which had never been pleaded, and fraudulent conduct which had never been particularised. The plaintiffs, in this court, attempted to overwhelm us with 30 or more accusations of fraud, but in the end fell back on six claims which they submitted had been pleaded and found proven. Of those six the second was abandoned in the course of the submissions of Mr. Caplan.

The first claim concerns the commercial reasons. Those reasons must be read in the context of the information furnished by the circular with regard to the size of the minority shareholdings which were to be acquired in associated companies, the activities and trading results of the principal associated companies and the management influence said to have been obtained by the vendor T.P.G. through those minority shareholdings. So read, the commercial reasons informed the Newman shareholders that Newman would benefit from a development and expansion of Newman's international trade which would result from a partnership between Newman and the associated companies secured by the acquisition of T.P.G.'s minority shareholdings. In effect, Mr. Bartlett was imparting to the Newman shareholders his belief that he could influence the management of the affairs of Newman and the associated companies for the benefit of all concerned. So he believed. Therefore, to this limited extent the circular was not misleading or tricky to the knowledge of Mr. Bartlett and Mr. Laughton. But it does not follow, because there were valid commercial reasons for the transaction, that Mr. Bartlett and Mr. Laughton, as directors of Newman, recommended the transaction to the Newman shareholders in the bona fide belief that it was a transaction into *227 which Newman ought to enter. On this aspect we express our conclusion later.

The second claim was abandoned. The third claim was that the circular was tricky and misleading in concealing that the attributed values of quoted associated companies were much higher than their current stock market values: see statement of claim added by amendment after the trial began, and the judgment *[1981] Ch. 257*, 294, 297.

The argument is that appendix 3 of the circular ought to have included a comparison between the stock market price and Mr. Cooper's value of each quoted shareholding in Metropole, Dover, Agar Cross and Clough.

The exact charge against Mr. Bartlett and Mr. Laughton is still not spelled out. The claim may mean that Mr. Bartlett and Mr. Laughton believed that Mr. Cooper's value exceeded a fair value for Newman to pay. It may mean that Mr. Bartlett and Mr. Laughton knew and believed that it was excessive for Newman to pay a price significantly in excess of the stock market price. It may mean that Mr. Bartlett and Mr. Laughton believed that Mr. Cooper's value represented a fair price for Newman to pay but realised that nevertheless the shareholders of Newman ought to have an opportunity of comparing the Stock Exchange price with Mr. Cooper's value. Whichever charge is made we consider that it has not been proved.

There is no evidence that Mr. Bartlett or Mr. Laughton thought that the value of the shares of Clough, Dover, Agar Cross and Metropole suggested in Mr. Laughton's letter to Mr. Cooper of April 11, 1975, was excessive for Newman to pay. There is no evidence that they were afraid of revealing Stock Exchange prices. Mr. Bartlett gave evidence that he did not believe that Stock Exchange prices were a reliable guide to the value of the shareholdings, carrying with them the opportunities and potentialities for which they had been purchased and which Newman acquired from T.P.G. Neither Mr. Cooper nor Schroders appear to have taken the view that Stock Exchange prices were a reliable guide. It was impossible for Mr. Bartlett to explain to the shareholders in the circular that Clough was a buy or sell situation together with the reasons. It was impossible to reveal to the shareholders the plans of Mr. Laughton and Mr. Bartlett with regard to Dover, Metropole and Agar Cross.

The fourth claim was that the circular was tricky and misleading in the indication that the £100,000 Smithamcote loan was worth its face value: statement of claim, paragraph 16; judgment *[1981] Ch. 257*, 296. The evidence is that Mr. Bartlett and Mr. Laughton believed that the loan was worth the S. Newman Ltd. shares and that the S. Newman Ltd. shares were worth more than £100,000.

The fifth claim is that the circular was tricky and misleading in the indication that the £30,000 Abbott debt was worth its face value: statement of claim, paragraph 16A added after the trial began, and judgment at p. 297. The evidence is that Mr. Bartlett and Mr. Laughton believed the Abbott loan to be worth £30,000 and that T.P.G. was willing to give Newman a guarantee of payment of principal and interest.

© 2021 Thomson Reuters.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21 Entered 09/29/21 18:48:45 Page 16 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd. [1982] Ch 204 (1981)
Case 3:21-cv-00842-B Document 59-2 Filed 08/30/21 Page 16 of 21 PageID 2932

It did not occur to Mr. Cooper to reduce the value of the debt because of the terms of the payment or the rate of interest. That being so, it is *228 not permissible to infer that Mr. Bartlett or Mr. Laughton considered that the value of the loan ought to be reduced and fraudulently concealed their belief.

The sixth claim is that the circular was tricky and misleading in that it concealed the January agreements: statement of claim, paragraph 18A.

We have already indicated that there was ample evidence to justify the finding of the judge that the January agreements, and the payments thereunder, were dishonestly concealed from the directors of Newman (to the extent that we have indicated) and from the shareholders of Newman with the object, inter alia, of facilitating the acceptance of the proposals set forth in the strategy document, and that this dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment of £216,000 by Newman to T.P.G.

As Mr. Angus Murray made plain in his evidence, he was always puzzled because it was difficult, in discussions with Mr. Bartlett, to discover whether, as he spoke, he was wearing a Newman or a T.P.G. hat. T.P.G. was a dealing and investment holding company. Newman was a trading company. If T.P.G. identified and developed a commercial opportunity, the moment might come when it would be sensible, in the interests of the companies, for Newman to take over the T.P.G. interest in a particular company. Hence Mr. Bartlett's proposals for "restructure" of Newman and T.P.G. interests in associated companies in early December 1974. and in its development of opportunities by improving the management of associates T.P.G. introduced into its associated companies those directors of Newman who were most suited to bring T.P.G.'s plans to fruition. Further, the T.P.G. holding in Newman shares, and the option held by Newman over shares of T.P.G., had the double effect that T.P.G. had a financial interest in the success of Newman, and Newman could use T.P.G.'s shareholding to protect Newman from a takeover by a third party at a time when its shares were unduly depressed on the market as a consequence of the general financial climate which had nothing to do with the profitability or assets of Newman. The period at the end of 1974, when T.P.G. was in serious liquidity trouble, coincided with the occasion when Mr. Bartlett genuinely regarded Newman as needing strengthening through diversification as Newman's existing manufacturing activities showed signs of contraction. Mr. Bartlett and Mr. Laughton were optimists, and Mr. Bartlett was always eager to impress his personal commercial judgment upon his colleagues on the Newman board. He met his match in Mr. Angus Murray, who was a concerned about the administrative capacity and organisation in Newman, worried about the risk of muddle through the close relationship of Newman and T.P.G., and rightly cautious about the risk of overstretching Newman's resources. He knew very little about the T.P.G. shareholdings, or about the reasons of Mr. Laughton in selecting them. In this his position was vastly different from that of Mr. Bartlett, Mr. Laughton, Mr. Bush and Mr. Baldwin, and from officials such as Mr. Gollop who understood the opportunities presented to Newman when the chance for stepping into T.P.G.'s shoes presented itself to Newman in February 1975. The first *229 serious Newman boardroom conflict was manifested on January 2, 1975. The evidence proves that Mr. Bartlett, with Mr. Laughton's support, then used every weapon available to carry the board with him as far as he could. He kept Mr. Murray in the dark and proceeded to enter into the January agreements and to arrange payments of the consideration to T.P.G. which in the event amounted to £216,000, knowing full well that Mr. Murray would have tried to prevent it had he known what w as happening. Once embarked on this course Mr. Bartlett and Mr. Laughton could or would not disclose to Mr. Murray and the Newman board as a board what they had done, and Mr. Bartlett ended by confusing the history of the £216,000 to Mr. Fryer of the Stock Exchange and misrepresenting it to the shareholders on July 8.

But these deceptions of Mr. Murray and of the shareholders at the extraordinary general meeting were not because they believed that the net consideration of £350 to £325,000 was too high. We are satisfied that throughout Mr. Bartlett believed that his original figure was about right and was content to rely upon his expectation that Deloittes would, after their independent investigation, arrive at much the same conclusion.

The judge accepted the plaintiffs' submission that Mr. Bartlett and Mr. Laughton must have known, and did know, that £350 to £325,000 was much too much. So he never had to consider the question whether the explanation of the facts lay in an attempt by Mr. Bartlett, with Mr. Laughton's concurrence, to keep Mr. Murray in the dark and thus carry the rest of the board with him.

So what the judge would have found about this explanation must remain unknown. But we are ourselves satisfied that this is the inference that should be drawn from the evidence of primary fact about the concealment of the January agreements and the advance payments of £216,000 made pursuant thereto.

Turning from the plaintiffs' claims as submitted in this court to the issues which we indicated in chapter 6, the first issue is whether Mr. Bartlett and Mr. Laughton genuinely believed that it was in Newman's interest to accept the proposals contained

in the strategy document. The evidence establishes that the transaction recommended in the strategy document, namely, the purchase by Newman of the undertaking of T.P.G. with certain exceptions, was a gamble from the start. In our judgment Mr. Angus Murray was quite right in 1975 in urging that it was not a gamble which Newman ought to take. The question, however, is whether Mr. Bartlett and Mr. Laughton genuinely believed that it was a gamble which it was in the interests of Newman to take, or whether they merely put forward the strategy document because T.P.G. needed to be rescued from a gamble which had failed. If Mr. Bartlett and Mr. Laughton urged Newman to gamble on the strategy document transaction not because they believed Newman should take the gamble but only because they could see no other way of rescuing T.P.G., then Mr. Bartlett and Mr. Laughton were fraudulent; it would matter not that they hoped the gamble would succeed and were content for the price to be assessed by an independent valuer. If, on the other hand, they believed that the strategy document recommendation was for the benefit of Newman because it represented  *230  a golden opportunity for Newman to reap the benefit of T.P.G.'s initiative at a fair price, then they were not fraudulent.

Quite rightly, counsel for the plaintiffs emphasised, both here and below, the financial difficulties which faced T.P.G. It does not follow that Mr. Bartlett and Mr. Laughton were guilty of fraud or breach of duty because the transaction benefited T.P.G. more than Newman, or even that it was inspired as a rescue operation for T.P.G. If a conflict of interest and duty arises because a transaction is proposed between two companies, and directors of one company are also directors of the other company, there are two, and only two, possible legal views on the legal viability of the transaction. Either the transaction is one which the directors can properly propose to each company, *despite* their conflict of interest and duty, or it is one which they cannot properly propose *because* of their conflict of interest and duty. The second view is basically correct in the case of overlapping trusteeships. The first view is rightly accepted as correct in the present case.

If, as we must assume, the transaction could properly go ahead despite the conflict of interest and duty, then Mr. Bartlett and Mr. Laughton were entitled to propose the transaction in order to benefit T.P.G.; and similarly they were entitled to propose the transaction in order to benefit Newman. Indeed, they were not entitled to propose the transaction except for the purpose of benefiting both Newman and T.P.G.

The court cannot and will not enter into an inquiry in order to discover whether the transaction would benefit one company more than the other, or whether Mr. Bartlett and Mr. Laughton believed it would. If such an inquiry were relevant, it would mean that the court would have to hold such a transaction void unless the transaction would be, or was thought to be, of equal benefit (whatever that might mean) to each company. Such an inquiry would be quite impracticable. It also follows that the transaction is capable of being upheld although initiated as a rescue operation for T.P.G. Every contract of sale must be initiated either by the vendor or by the purchaser. If a sale is legally viable between a particular vendor and a particular purchaser, the existence and nature and weight of the pressures affecting the initiator may explain the existence of a fraud but do not justify an inference of fraud.

The judge's findings that there was a conspiracy to benefit T.P.G. at the expense of Newman appear to indicate that he believed that the strategy document was not bona fide propounded by Mr. Bartlett and Mr. Laughton in the interests of Newman. But this and other indications in the judgment to the like effect are contradicted by the judge's comment *[1981] Ch. 257* , 330, that Mr. Bartlett

"may well have believed that it would be for the ultimate benefit of Newman that it should be placed in relation to the network of associated companies in the central position which was originally to have been occupied by T.P.G."

We need not resolve these contradictions in the judgment because we do not consider that a dishonest motive on the part of Mr. Bartlett and Mr.  *231*  Laughton in urging the adoption of the recommendations contained in the strategy document can now sound in damages.

Even if the recommendation by Mr. Bartlett and Mr. Laughton that Newman should gamble on the strategy document proposal was not bona fide made in the interests of Newman, in the result Newman did gamble, and gambled successfully. For obvious reasons Newman decided to keep the fruits of the gamble rather than demand repayment of the stake and hand over the fruits. If a punter is induced by fraud to bet on a horse and the horse loses, then the punter can recover his stake from the fraudster. But if the horse wins, then the punter cannot both keep his winnings and claim back his stake. In the present case Newman decided to keep its winnings. It is true that the purchase of the Smithamcote shares shows a loss against the value attributed to the Smithamcote shares by Mr. Cooper, but the transaction offered by T.P.G. and accepted by Newman was one transaction in which Newman gambled £1.5 million and obtained advantages which it has elected to keep. If Newman were induced to purchase the T.P.G. assets by fraud, then Newman, on discovering the fraud, could rescind the contract of purchase and claim damages, or,

Case 21-03067-sgj Doc 59-2 Filed 09/29/21   Entered 09/29/21 18:48:45   Page 18 of 21
Prudential Assurance Co Ltd v Newman Industries Ltd. (1982) Ch. 204 (1981)
Case 3:21-cv-00842-B   Document 59-2   Filed 08/30/21   Page 18 of 21   PageID 2934

alternatively, claim damages for the fraud without rescission. But Newman having abandoned the remedy of rescission because the gamble paid off, has suffered no damage as a result of that fraud.

The second issue is whether Mr. Bartlett and Mr. Laughton believed that £350,000 was a fair price for Newman to pay for the acquisition of T.P.G.'s undertaking. The net consideration of £350,000 was based on assets worth £1.5 million subject to liabilities of £1,150,000. If Mr. Bartlett and Mr. Laughton thought that the assets were not worth £1.5 million but were only worth, for example, £1.3 million, then irrespective of any fraud involved in inducing Newman to gamble at all, Mr. Bartlett and Mr. Laughton were guilty of fraud in advising Newman to pay a price which to the knowledge of Mr. Bartlett and Mr. Laughton exceeded the price which Newman should be advised to pay. The fact that the gamble succeeded and that Newman intend to keep its winnings is irrelevant. Newman, on this hypothesis, lost £200,000 because they paid £200,000 more than Mr. Bartlett and Mr. Laughton knew to be a fair price for Newman to pay to acquire the assets.

In our judgment, however, there was no, or no sufficient, evidence from which the judge could properly find that Mr. Bartlett and Mr. Laughton did not genuinely believe that the assets were worth £1.5 million subject to an independent valuation.

There was no challenge to Mr. Bartlett's explanation of the origin of the figure of £350,000 in the strategy document or in the origin of the pro forma balance sheet. There was no, or no sufficient, evidence to support the theory of a conspiracy to procure a persuadable accountant instead of a non-persuadable merchant banker to act as valuer and then to persuade the valuer to accept inflated values for the Smithamcote shares, the Smithamcote loan and the Abbott loan, which were not capable of being inflated. There is no evidence that Mr. Laughton did not genuinely believe in the values he put forward in his letter dated April 11, 1975. All the events which we have chronicled and all the  *232  contemporaneous written evidence go to show that Mr. Bartlett and Mr. Laughton were confident rather than crooked and that Mr. Laughton's disappointment when Mr. Cooper first put forward a net consideration of less than £350,000 was genuine. The theory that Mr. Laughton then over-persuaded Mr. Cooper over the telephone is not supported by any evidence and was contradicted by Mr. Cooper. The theory that Mr. Cooper was over-persuaded was then fortified by the theory that Mr. Cooper was not competent.

The third issue is whether Mr. Bartlett or Mr. Laughton made false representations to, or knowingly concealed facts from, Mr. Cooper which might influence his valuation.

There is no, or no sufficient, evidence of any false representations to, or deliberate concealment from, Mr. Cooper in relation to any matter other than the January agreements and the payments thereunder. Again the plaintiffs' theories are unsupported by the contemporaneous evidence. We have dealt fully with the facts and inferences which are relevant to the January agreements and to the payments thereunder.

It must now be accepted that the January agreements and the payments thereunder were dishonestly concealed from the board of Newman to the extent indicated. They were not disclosed to Mr. Cooper. They should have been disclosed to Mr. Cooper because by accepting and retaining £215,950 in advance under the January agreements T.P.G. was adhering to the prices specified in the January agreements. Thus Mr. Bartlett should have mentioned the January agreements in the body of the strategy document, should have mentioned the January agreements to the board and should have told Mr. Cooper the facts concerning the January agreements and the payments. The January agreements and the payments should have been disclosed also because Mr. Laughton, who had agreed on behalf of T.P.G. to sell 800,000 Dover shares for £146,000 and to sell the Metropole shares for £85,000, had written to Mr. Cooper on April 11, 1975, saying that 832,000 Dover shares were worth £240,000 and that the Metropole shares were worth £350,000. The last payment of the instalments of the aggregate sum of £215,950 was made after Mr. Cooper had been instructed. Mr. Laughton should have told Mr. Cooper that £215,950 had been paid in advance when he was putting forward his arguments that £75,000 should be included in Mr. Cooper's valuation under the heading of interest. When Mr. Cooper later found out about the payment of £215,950 he was allowed to believe that the payments had been made on account of the strategy document transaction. Then Mr. Bartlett lied about the origin and purpose of the payments in advance to the shareholders at the extraordinary general meeting. He did that in order to conceal the existence of the January agreements, but there was no point in concealing the January agreements unless they were thought to be relevant or possibly relevant to the strategy document proposals and to the value of the assets. If Mr. Bartlett had been truthful at the extraordinary general meeting then at the very least there would, or might, have been a demand for Mr. Cooper to reconsider his valuation in the light of the January agreements and the payments thereunder. When the circular was prepared Mr. Bartlett knew that the January agreements  *233  were material because in evidence he said that the position was that if the strategy document proposals had not been accepted by the shareholders, then the January agreements would have been put forward. When the circular was prepared Mr. Bartlett and Mr. Laughton must have known that the statement that £216,000 was an advance payment for the strategy document transaction was at best a half-truth. They were originally payments on account of the January agreements and those payments had never been formally ratified and continued as payments on account of the strategy document proposal.

Case 21-03067-sgi Doc 59-2 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 19 of 21
Prudential Assurance Co v Newman Industries Ltd. (1982) Ch. 204 (1981)
Case 3:21-cv-00842-B    Document 59-2    Filed 08/30/21    Page 19 of 21    PageID 2935

If the circular had been revised so as to disclose the January agreements and the payments, then Mr. Cooper, as a member of Deloittes considering and playing a prominent part in the production of the circular, would have had at least an opportunity to inquire about the January agreements and to reconsider his valuation in the light of those agreements.

The judge appears to have found that Mr. Bartlett and Mr. Laughton dishonestly concealed the January agreements and the payments thereunder from Mr. Cooper, because in his judgment Vinelott J. said:

"Mr. Cooper was not told of the sale in January of the shares in Metropole to Newman at the price of £85,000. He agreed that if he had known of this sale he would have found it impossible to attribute any value to the shares of Metropole except the agreed £85,000."

The judge made a similar comment about the Dover shares.

It is unsatisfactory that because the statement of claim was directed wholly to the circular, Mr. Bartlett and Mr. Laughton were not directly accused, and the judge did not directly hold, that Mr. Bartlett and Mr. Laughton dishonestly concealed the January agreements and the payments thereunder from Mr. Cooper. But we consider that the dishonest concealment from the board and the shareholders (amply proved) necessarily involved dishonest concealment from Mr. Cooper, even if Mr. Bartlett and Mr. Laughton did not appreciate wholly or at all the significance to Mr. Cooper of the January agreements in connection with value. Mr. Bartlett's untrue statements to the shareholders at the extraordinary general meeting and his acquiescence in misleading Mr. Cooper and in the form of the circular support the inference that from start to finish Mr. Bartlett and Mr. Laughton were dishonest in concealing the agreements from everybody concerned, namely, the board, Mr. Cooper and the shareholders. Although the statement of claim was directed in terms solely to the circular, Mr. Bartlett and Mr. Laughton must have appreciated, once the statement of claim raised the issue of the January agreements, that they were accused of concealing the January agreements and the payments thereunder at all times from January 7, 1975, until completion of the sale in July 1975, including concealment from Mr. Cooper. Mr. Bartlett gave evidence to explain why the January agreements and the payments thereunder were not disclosed and that explanation was not accepted by the judge.

It is not possible to be certain whether and to what extent Mr. Cooper's valuation would have been affected by a disclosure of the January agreements and payments. It was only after some tendentious *234 cross-examination by Mr. Caplan and some forceful intervention by the judge that Mr. Cooper was persuaded to reach the conclusion which the judge had already reached, and to make the remarks upon which the judge relied.

Nevertheless we think that Mr. Cooper must have been impressed, and ought to have been impressed, by the fact that T.P.G. had accepted the prices specified in the January agreements as fair and reasonable values for the Dover and Metropole shares, provided that the £215,950 was paid by instalments beginning in January. and £215,950 was paid in advance by Newman and accepted by T.P.G. between January and April 1975. Had Mr. Cooper known the facts he would have valued the Dover shares at £150,000, i.e. the January price of £146,000 for 800,000 Dover shares adjusted for the fact that Mr. Cooper was valuing 832,000 shares. He would have valued the Metropole shares at £85,000, the January price, instead of £100,000. This would have reduced the net consideration by £45,000, originally from £225,000 to £180,000.

On this basis the damage caused to Newman by the dishonest concealment of the January agreements and the payments thereunder from Mr. Cooper was £45,000. The damages are not affected by the fact that Newman have accepted the transaction from T.P.G. and have kept their winnings instead of reclaiming their stake.

In the result we consider that the evidence, the statement of claim and the judgment of Vinelott J. establish Newman's entitlement to damages for dishonest concealment of the January agreements. That concealment caused foreseeable loss to Newman of £45,000. Where such dishonest concealment causes foreseeable loss, a cause of action in fraud is established, even though the defendants did not deliberately intend to cause the loss. This fraud having been established, we do not consider that the uncertain character of the pleadings requires this court to relieve Mr. Bartlett or Mr. Laughton from the consequences of that fraud.

No amount of further evidence by Mr. Laughton or any other witness could explain away the admitted fact that T.P.G. had accepted £215,950 as advance consideration under the January agreements, that Mr. Angus Murray and Mr. Cooper knew nothing of the January agreements or the payments thereunder and that Mr. Bartlett, with the acquiescence and knowledge of Mr. Laughton, lied to the shareholders about the nature of the payments.

© 2021 Thomson Reuters.

Case 21-03067-sgj Doc 59-2 Filed 09/29/21    Entered 09/29/21 18:48:45    Page 20 of 21
Prudential Assurance Co2;2v Newman Industries Ltd. [1982] Ch. 204 (1981)
Case 3:21-cv-00842-B    Document 59-2    Filed 08/30/21    Page 20 of 21    PageID 2936

The issue of fraud in connection with the January agreements was clearly raised by the pleadings, albeit that the express allegation was directed to the circular. The dishonest concealment of the January agreements was, we think, clearly established by the evidence. We have commented adversely on the manner in which the whole action was clouded by the pleadings and the presentation of the case, but we do not consider that these defects enabled Mr. Bartlett and Mr. Laughton to escape from the consequences of the one relevant fraud which was pleaded, proved, argued and decided.

We wish to hear argument in due course about costs in the court below and in this court. T.P.G. may wish to ask this court to review the order for costs against them made by the judge. We also wish to hear *235* argument about the plaintiffs' costs and their possible responsibility for Newman's costs in the light of the plaintiffs' responsibility for pleading the personal action and thereby prevailing upon the judge to hear the derivative action despite the protests of Newman. We also wish to hear arguments as to whether the enormous costs incurred by the plaintiffs as a result of their own pleadings and presentation of the case ought to be visited upon Mr. Bartlett and Mr. Laughton. We also wish to hear argument whether in the exceptional circumstances of the present case Mr. Bartlett and Mr. Laughton are entitled to be relieved by the plaintiffs in respect of the costs, or part of the costs, which were incurred by Mr. Bartlett and Mr. Laughton themselves in repelling the indiscriminate attacks which were made upon them, in a case in which the dishonesty which alone founds our finding of damages was never clearly pleaded. We may have to consider whether it was practicable for the defendants to consider paying something into court, if they were so minded - not£450,000, but perhaps £45,000 or thereabouts - and so save themselves the risk of paying lawyers' costs due to one side or the other of half a million or more. At present we know nothing about the costs of this lamentable litigation, and we wish to know about the figures involved on all sides as costs in the High Court and this court. We expect all parties to present those figures when we hear the argument about costs on the date arranged for restoring the appeal in order to settle the order of the court, and to decide upon the proper orders for costs. We wish to hear argument as to whether the £45,000 should be paid by T.P.G., who benefited from the fraud, or by Mr. Bartlett and Mr. Laughton.

We would add this. The plaintiffs have painted Mr. Bartlett and Mr. Laughton as crooks, deliberately milking Newman of vast sums of money for their own benefit. This very serious allegation, persisted in to the end in this court, has not been proved. Mr. Bartlett and Mr. Laughton have successfully established that that case was based on a series of misunderstandings. The plaintiffs have proved that in order to win the boardroom battle in January, and to carry through a transaction which has proved to be advantageous to Newman, Mr. Bartlett and Mr. Laughton kept Mr. Angus Murray in the dark about the January agreements and the advance payments made thereunder. Once embarked on this course of concealment they could not, or would not, make a belated disclosure of the matters they had concealed, and so were led into two further concealments - from Mr. Cooper and ultimately from the shareholders. It was foreseeable that as a consequence of the non-disclosure to Mr. Cooper his valuation would be too high, and though £45,000 is not a great amount in relation to £1.5 million, it is significant enough to escape the description of minimal.

We are sorry that Mr. Laughton was not here to hear this court pronounce that all but one of the serious allegations made against him were not proved.

Before we rise we would say one thing. It is proposed to restore the case in order to determine the form of the order and to hear the submissions of the parties about costs, and the date that is provisionally arranged is October 2. It is difficult to predict how long the submissions *236* of the parties will be. There are five parties concerned and the submissions may be fairly long. Mr. Bartlett and Mr, Laughton in the court below evidently spent a small fortune on their own costs and we know nothing about their present financial position; but if it is practicable for them, they may think that there would be great advantage in their instructing their solicitors again to instruct counsel, who are already familiar with the case, in order to argue those questions of costs which Mr. Bartlett and Mr. Laughton wish to submit, and also to make any submissions which are appropriate on how the liability for the£45,000 should fall as between T.P.G., who enjoyed the cash consideration from the purchase, and the two personal defendants. Whether it will be practicable for Mr. Bartlett and Mr. Laughton to dig again into their pockets for the purpose of legal representation on the order for costs we do not know. As we have said, we do not know what the figures are. It may be that the figures altogether might run into, not five figures but six. So that if it is practicable for the two gentlemen we have mentioned to make a further investment - whether it would be properly described as commercial judgment or a gamble we know not - that might be to their advantage.

*

October 5. On the resumed hearing, counsel announced that the parties had agreed the terms of a settlement and by consent the following order was made.

© 2021 Thomson Reuters.

**Representation**

Solicitors: C. F. Whitehorn ; Macfarlanes .

**Representation**

Solicitors: Simmons & Simmons ; C. F. Whitehorn ; Macfarlanes ; Hopkins, Fuller .

*Hearing adjourned. Appeal allowed in part. Respondent's notice dismissed. Order of Vinelott J. varied to extent stated in judgment. Leave granted to fourth defendant to proceed with appeal from judgment of Vinelott J. in terms of amended notice of appeal. On basis that all parties had agreed terms of settlement on all matters (including any party's rights to damages, costs or any other relief) no further order made. All further proceedings stayed. (L. G. S. )*

(c) Incorporated Council of Law Reporting for England & Wales