# EXHIBIT 1

# CLAIM 143

Claim #143  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor     Highland Capital Management, L.P.

United States Bankruptcy Court for the: Northern    District of Texas
                                                     (State)

Case number    19-34054

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1:    Identify the Claim

| | | |
|---|---|---|
| **1. Who is the current creditor?** | HarbourVest 2017 Global Fund L.P. | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.    From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| HarbourVest 2017 Global Fund L.P.<br>Attn: Erica Weisgerber<br>Debevoise and Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022, U.S.A. | See summary page |
| Contact phone   2129096000 | Contact phone   6173483773 |
| Contact email   eweisgerber@debevoise.com | Contact email   agoren@harbourvest.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.    Claim number on court claims registry (if known) _____    Filed on ____/____/____
                                                               MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

19340542004080000000000055

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?** $ _See Annex_____. Does this amount include interest or other charges?

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410        **Proof of Claim**

| | | | Amount entitled to priority |
|---|---|---|---|

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.   $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/08/2020
                   MM / DD / YYYY

/s/Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

| Name | Michael Pugatch | | |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Managing Director - Company: HarbourVest 2017 Global Fund L.P., by Harbo

Company    by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____          Email    _____

---

1934054200408000000000055

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global Fund L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| HarbourVest 2017 Global Fund L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| U.S.A. |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 4:40:16 p.m. Eastern Time |
| **Title:** |
| Managing Director - Company: HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its Gen Partner |
| **Company:** |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member |

VN: 0DB62642624B41D1B004FEABCD97B964

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof  of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HarbourVest 2017 Global Fund L.P. (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("<u>Confirmation Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.     Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.     Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.     The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.     Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.     This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.    This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.    The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

# CLAIM 147

**Fill in this information to identify the case:**

Debtor ____Highland Capital Management, L.P.____

United States Bankruptcy Court for the: ____Northern____ District of ____Texas____
                                                                          (State)

Case number ____19-34054____

---

Official Form 410

# Proof of Claim
04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

---

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

HarbourVest 2017 Global AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HarbourVest 2017 Global AIF L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone  2129096000
Contact email  eweisgerber@debevoise.com

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone  6173483773
Contact email  agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____
                                                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

---

1934054200408000000000059

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No |
| | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | |
|---|---|
| 7. **How much is the claim?** | $ _See Annex_ . **Does this amount include interest or other charges?** |
| | ☐ No |
| | ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☑ No |
| | ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No |
| | ☐ Yes. Identify the property: _____ |

**Proof of Claim**

1934054200408000000000059

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | | |
|---|---|---|---|---|---|
| | | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** | |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
|---|---|---|

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  04/08/2020
                  MM / DD / YYYY

/s/Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

Name  Michael Pugatch
      First name       Middle name       Last name

Title  Managing Director-Company: HarbourVest 2017 Global AIF L.P., by Harbour\

Company  Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone  _____       Email  _____

1934054200408000000000059

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest 2017 Global AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| HarbourVest 2017 Global AIF L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See Annex | None |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | |
| No | **Amount Unsecured:** |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 4:49:59 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest 2017 Global AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative |
| **Company:** |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

VN: D6DFC1C831960C5278458EB4F287C249

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.      This annex (the "<u>Annex</u>") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "<u>Proof of Claim</u>") and describes in more detail the claims of HarbourVest 2017 Global AIF L.P. (the "<u>Claimant</u>") against the debtor Highland Capital Management, L.P. (the "<u>Debtor</u>").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").   Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "<u>Acis</u>"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") on January 30, 2018.   The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("<u>CLO</u>") business.   *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("<u>Involuntary Petition Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No. 118].   As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("<u>Confirmation Ruling</u>") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.     This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.     Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12. In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13. The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14. Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

# CLAIM 150

**Fill in this information to identify the case:**

Debtor _____ Highland Capital Management, L.P. _____

United States Bankruptcy Court for the: __Northern_____ District of __Texas___
                                                                            (State)

Case number ___19-34054_____

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1. | Who is the current creditor? | HarbourVest Dover Street IX Investment L.P. |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | Has this claim been acquired from someone else? | ☑ No |
|---|---|---|
| | | ☐ Yes.   From whom? _____ |

| 3. | Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | See summary page | See summary page |
| | | Contact phone   2129096000 | Contact phone   6173483773 |
| | | Contact email   eweisgerber@debevoise.com | Contact email   agoren@harbourvest.com |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | | __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| 4. | Does this claim amend one already filed? | ☑ No |
|---|---|---|
| | | ☐ Yes. Claim number on court claims registry (if known) _____   Filed on _____ |
| | | MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

1934054200408000000000060

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7.** **How much is the claim?** $ _See Annex_____ . **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

**9.** **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11.** **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200408000000000060

| | | | Amount entitled to priority |
|---|---|---|---|
| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
| | | ☐ Yes. *Check all that apply:* | |
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |
| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |
| | | $_____ | |

---

### Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   __04/08/2020__
                     MM / DD / YYYY

__/s/Michael Pugatch__
Signature

**Print the name of the person who is completing and signing this claim:**

Name    __Michael Pugatch__
        First name          Middle name          Last name

Title   __Managing Director-Company: HarbourVest Dover Street IX Investment L.P.,__

Company __Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investme__
        Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone   _____        Email   _____

1934054200408000000000060

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Dover Street IX Investment L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| HarbourVest Dover Street IX Investment L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| U.S.A. |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 4:59:00 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners Ireland Limited, its Alter |
| **Company:** |
| Inv Fund Mgr, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

VN: 2FF3E3B762AB4570A51AF333808C6C3D

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.     This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Dover Street IX Investment L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.     The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF").  Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.  The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business.  *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118].  As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.  Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.  Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.  The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8. Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9. This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10. This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11. The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

# CLAIM 153

Claim #153  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

Debtor ___ Highland Capital Management, L.P. ___

United States Bankruptcy Court for the: ___ Northern ___ District of ___ Texas ___
(State)

Case number ___ 19-34054 ___

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

---

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

HV International VIII Secondary L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor ___

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes. From whom? ___

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HV International VIII Secondary L.P.
Attn: Erica Weisgerber
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022, U.S.A.

Contact phone  2129096000
Contact email  eweisgerber@debevoise.com

**Where should payments to the creditor be sent?** (if different)

See summary page

Contact phone  6173483773
Contact email  agoren@harbourvest.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes. Claim number on court claims registry (if known) ___  Filed on ___
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? ___

---

Proof of Claim

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☒ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |
| 7. **How much is the claim?** | $ <u>See Annex</u> . **Does this amount include interest or other charges?**<br><br>  ☐ No<br><br>  ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br><u>See Annex</u> |
| 9. **Is all or part of the claim secured?** | ☒ No<br><br>☐ Yes. The claim is secured by a lien on property.<br><br>  **Nature or property:**<br><br>  ☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br><br>  ☐ Motor vehicle<br><br>  ☐ Other. Describe: _____<br><br>  **Basis for perfection:** _____<br>  Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>  **Value of property:**    $_____<br>  **Amount of the claim that is secured:**    $_____<br>  **Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)<br><br>  **Amount necessary to cure any default as of the date of the petition:**    $_____<br><br>  **Annual Interest Rate** (when case was filed)_____%<br>  ☐ Fixed<br>  ☐ Variable |
| 10. **Is this claim based on a lease?** | ☒ No<br><br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____ |
| 11. **Is this claim subject to a right of setoff?** | ☒ No<br><br>☐ Yes. Identify the property: _____ |

1934054200408000000000065

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
|---|---|---|---|
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |
| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ | | |

---

| **Part 3:** | **Sign Below** |
|---|---|

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br><br>☑ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  04/08/2020<br> MM / DD / YYYY<br><br><br> /s/Michael Pugatch<br> Signature<br><br>**Print the name of the person who is completing and signing this claim:** |

| Name | Michael Pugatch | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Managing Director-Company: HV International VIII Secondary L.P.,  by HI| | |
| Company | by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LL| | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | | | |
| | | | |
| Contact phone | _____ | Email | _____ |

**Proof of Claim**

1934054200408000000000065

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HV International VIII Secondary L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| HV International VIII Secondary L.P. c/o HarbourVest Partners, LLC | |
| One Financial Center | |
| Boston, MA, 02111 | |
| U.S.A. | |
| **Phone:** | |
| 6173483773 | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| agoren@harbourvest.com | |
| **DISBURSEMENT ADDRESS** | |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| | |
|---|---|
| **Submitted By:** | |
| Michael Pugatch on 08-Apr-2020 5:16:54 p.m. Eastern Time | |
| **Title:** | |
| Managing Director-Company: HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, | |
| **Company:** | |
| by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member | |

VN: 671DA480298CC9959BF07710FFD6AEBF

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**ANNEX TO PROOF OF CLAIM**

1.      This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HV International VIII Secondary L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.      The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis

bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF.    *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm.  Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8. Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9. This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10. This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11. The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.    In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.    The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.    Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

# CLAIM 154

**Fill in this information to identify the case:**

Debtor _____ Highland Capital Management, L.P. _____

United States Bankruptcy Court for the: __Northern__    District of __Texas__
                                                                          (State)

Case number ___ 19-34054 ___

---

Official Form 410

# Proof of Claim
04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

---

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

HarbourVest Skew Base AIF L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| HarbourVest Skew Base AIF L.P.<br>Attn: Erica Weisgerber<br>Debevoise and Plimpton LLP<br>919 Third Avenue<br>New York, NY 10022, U.S.A. | See summary page |
| Contact phone __2129096000__<br>Contact email __eweisgerber@debevoise.com__ | Contact phone __6173483773__<br>Contact email __agoren@harbourvest.com__ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.   Claim number on court claims registry (if known) _____     Filed on _____
                                                                                            MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

---

1934054200408000000000064

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | $ <u>See  Annex</u>                              . **Does this amount include interest or other charges?**<br><br>☐  No<br><br>☐  Yes. Attach statement itemizing interest, fees, expenses, or other<br>          charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. | **What is the basis of the claim?** |

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>  See  Annex                                                              </u>

| | |
|---|---|
| 9. | **Is all or part of the claim secured?** |

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐  Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐  Motor vehicle

☐  Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                              $_____

**Amount of the claim that is secured:**      $_____

**Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐  Fixed

☐  Variable

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No<br><br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**      $_____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No<br><br>☐ Yes. Identify the property: _____ |

1934054200408000000000064

| | | | Amount entitled to priority |
|---|---|---|---|
| **12.** **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
| | ☐ Yes. *Check all that apply:* | | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| **13.** **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |
| | $_____ |

| **Part 3:** | **Sign Below** |
|---|---|

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
|---|---|
| | ☐ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☑ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date ___04/08/2020___
                   MM / DD / YYYY

___/s/Michael Pugatch___
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Michael Pugatch | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVe: | | |
| Company | Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investme | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | | | |

| Contact phone | _____ | Email | _____ |
|---|---|---|---|

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Skew Base AIF L.P. | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| HarbourVest Skew Base AIF L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | | |
| No | **Amount Unsecured:** | |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 5:11:50 p.m. Eastern Time |
| **Title:** |
| Managing Director-Company: HarbourVest Skew Base AIF L.P., by HarbourVest Partners Ireland Limited, its Alternative Inv |
| **Company:** |
| Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its Gen Ptr |

VN: 37ADBC619BCE5E389F8F25C4DAB7545F

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

## ANNEX TO PROOF OF CLAIM

1.     This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Skew Base AIF L.P. (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2.     The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings

in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.      Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.      Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.      The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such

documents. However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.      This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time. The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.      Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor,

as well as defenses, offsets and counterclaims. This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.      Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.      This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.      This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.      The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or

other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

# CLAIM 149

Claim #149  Date Filed: 4/8/2020

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern ___ District of Texas |
| | (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | HarbourVest Partners L.P. on behalf of funds and accounts under management |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| | | |
|---|---|---|
| 2. | **Has this claim been acquired from someone else?** | ☑ No |
| | | ☐ Yes.  From whom? _____ |

| 3. | **Where should notices and payments to the creditor be sent?** | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | See summary page | See summary page |
| | | Contact phone   2129096000 | Contact phone   6173483773 |
| | | Contact email   eweisgerber@debevoise.com | Contact email   agoren@harbourvest.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No |
| | | ☐ Yes.  Claim number on court claims registry (if known) _____   Filed on ___ / ___ / _____ |
| | | MM / DD / YYYY |

| | | |
|---|---|---|
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | | ☐ Yes. Who made the earlier filing? _____ |

1934054200408000000000061

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

---

**7. How much is the claim?**

$ _See Annex_____ . **Does this amount include interest or other charges?**

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See Annex_____

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

**Proof of Claim**

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* |

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| | |
|---|---|
| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ |

## Part 3: Sign Below

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br><br>☑ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date  04/08/2020
                   MM / DD / YYYY

/s/Michael Pugatch
Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Michael Pugatch |
| | First name    Middle name    Last name |
| Title | Managing Director |
| Company | HarbourVest Partners L.P., on behalf of funds and accounts under manage |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | |
| Contact phone | _____ Email _____ |

1934054200040800000000000061

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| HarbourVest Partners L.P. on behalf of funds and accounts under management | Yes, supporting documentation successfully uploaded |
| Attn: Erica Weisgerber | **Related Document Statement:** |
| Debevoise and Plimpton LLP | |
| 919 Third Avenue | **Has Related Claim:** |
| New York, NY, 10022 | No |
| U.S.A. | **Related Claim Filed By:** |
| **Phone:** | |
| 2129096000 | **Filing Party:** |
| **Phone 2:** | Authorized agent |
| **Fax:** | |
| **Email:** | |
| eweisgerber@debevoise.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| HarbourVest Partners L.P. c/o HarbourVest Partners, LLC |
| One Financial Center |
| Boston, MA, 02111 |
| U.S.A. |
| **Phone:** |
| 6173483773 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| agoren@harbourvest.com |
| **DISBURSEMENT ADDRESS** |

| | | |
|---|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** | |
| | No | |
| | **Acquired Claim:** | |
| | No | |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See Annex | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** | |
| See Annex | None | |
| **Has Priority Claim:** | **Priority Under:** | |
| No | | |
| **Has Secured Claim:** | **Nature of Secured Amount:** | |
| No | **Value of Property:** | |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** | |
| No | | |
| **Based on Lease:** | **Arrearage Amount:** | |
| No | **Basis for Perfection:** | |
| **Subject to Right of Setoff:** | **Amount Unsecured:** | |
| No | | |

| |
|---|
| **Submitted By:** |
| Michael Pugatch on 08-Apr-2020 5:06:59 p.m. Eastern Time |
| **Title:** |
| Managing Director |
| **Company:** |
| HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its Gen Partner |

VN: EA86458428780C11DA6B606EDE1FA40A

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Highland Capital Management, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | |

**ANNEX TO PROOF OF CLAIM**

1. This annex (the "Annex") is part of and is incorporated by reference into the attached proof of claim (together with the Annex, the "Proof of Claim") and describes in more detail the claims of HarbourVest Partners L.P. on behalf of funds and accounts under management (the "Claimant") against the debtor Highland Capital Management, L.P. (the "Debtor").

2. The Claimant manages investment funds that are limited partners in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018. The Acis bankruptcy filing resulted from a dispute between Debtor and its former employee, Joshua Terry, who served as portfolio manager for Debtor's collateral loan obligations funds ("CLO") business. *See, e.g.*, *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petition* ("Involuntary Petition Ruling") [Case No. 18-30264 (SGJ), Dkt. No. 118]. As noted in more detail in the Court's *Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third*

*Amended Joint Plan* ("Confirmation Ruling") [Case No. 18-30264 (SGJ), Dkt. No 827] and related filings in the Acis bankruptcy cases, there has been extensive litigation regarding alleged improper conduct associated with the management of, and transactions relating to, Acis, including transactions with and related to HCLOF. *See, e.g.*, *id.*; *Second Amended Complaint* [Case No. 18-03078(SGJ), Dkt. No. 157].

3.     Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF. *See, e.g.*, Involuntary Petition Ruling ¶ 27; *see also* Confirmation Ruling.

4.     Claimant hereby files this Claim to assert any and all of its rights to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the foregoing harm, including for any amounts due or owed under the various agreements with the Debtor in connection with HCLOF (including, but not limited to, the Subscription and Transfer Agreement for Ordinary Shares Highland CLO Funding, Ltd., dated as of November 15, 2017, the Members Agreement Relating to the Company, dated as of November 15, 2017, the Highland CLO Funding, Ltd. Offering Memorandum dated November 15, 2017), and any and all legal and equitable claims or causes of action relating to the foregoing harm.

5.     The Claimant has not attached the documentation supporting this Claim to this Proof of Claim because the documentation is voluminous and the Debtor has copies of such documents.   However, any requested relevant documents will be provided to the Official Committee of Unsecured Creditors, the Court, the United States Trustee and the Debtor in the event of a dispute regarding this Proof of Claim and will be made available for review by other parties in interest as appropriate upon reasonable request and after consultation with the Debtor and execution of appropriate confidentiality agreements.

6.     This Proof of Claim is filed with a full reservation of rights, including the right to amend, update, modify, supplement or otherwise revise this Proof of Claim in any respect at any time.  The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release of any of the Claimant's rights against any person, entity or property accruing to it against the Debtor and its estate; (b) a waiver of the Claimant's rights to assert that 28 U.S.C. § 157(b)(2)(C) is unconstitutional; (c) a consent or submission by the Claimant, or waiver of the Claimant's rights to object, to the jurisdiction of this Court with respect to the subject matter of any of the claims described herein, or any objection or other proceeding commenced with respect to any of the claims described herein, or any other proceeding commenced in the Debtor's chapter 11 case against or otherwise involving the Claimant; (d) a waiver or release of any right of the Claimant, or consent by the Claimant, to a trial by jury in this or any other court or proceeding; (e) a waiver or release of, or any limitation on, any right of the Claimant to have orders entered only after *de novo* review by a United States District Judge; (f) an election of remedies; or (g) a waiver of, or any other limitation on, any right of the Claimant to request withdrawal of the reference with respect to any matter, including, without limitation, any matter relating to this Proof of Claim.

7.     Claimant's express reservation of all rights and causes of action, includes, without limitation, contingent or unliquidated rights that it or its affiliates may have against the Debtor, as well as defenses, offsets and counterclaims.  This description and classification of claims by the Claimant is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights of the Claimant.

8.     Furthermore, the Claimant expressly reserves its rights to (a) file additional proofs of claim for additional claims that may be based on the same or additional documents or facts or other liability or indebtedness of the Debtor to the Claimant under contract or otherwise; (b) assert claims for cure of defaults in any agreement that the Debtor or any trustee appointed in this chapter 11 case may seek to assume; (c) assert any and all other claims, causes of action, defenses, offsets or counterclaims against the Debtor or any other parties; (d) file a request for payment of an administrative expense under 11 U.S.C. §§ 503 and 507 for any or all of the claims or rights of payment described above and any additional amounts; and (e) seek recovery through any relevant third parties, including any of the Debtor's insurance coverage providers.

9.     This Proof of Claim does not encompass all claims that the Claimant or its affiliates may have that arise after the Petition Date and are entitled to administrative priority, and the Claimant expressly reserves its right to file such claim or any similar claim at the appropriate time, including any such post-petition claims arising under these service contracts.

10.     This Proof of Claim is filed without prejudice to the filing by the Claimant of additional proofs of claim or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor.  The Claimant does not, by this Proof of Claim or any amendment or other action, waive any rights with respect to any scheduled claim.

11.     The Claimant reserves the right to withdraw, amend, clarify, modify or supplement this Proof of Claim to assert additional claims, causes of action or additional grounds for this Proof of Claim (including adding any additional contracts, agreements, obligations or other relationships between the Claimant and the Debtor), as well as the right to file any separate or additional proofs of claim with respect to the claims set forth herein or otherwise, including for the purpose of fixing and liquidating any contingent or unliquidated claim set forth herein, or to file additional proofs of claim in respect of additional amounts or for any other reason.

12.     In executing and filing this Proof of Claim, the Claimant does not submit to the jurisdiction of the Bankruptcy Court for the Northern District of Texas for any purpose other than with respect to this Proof of Claim against the Debtor, and does not waive or release any rights or remedies against any other person or entity that may be liable for all or part of this Proof of Claim.

13.     The Claimant otherwise reserves its rights, and nothing herein shall prejudice the Claimant's rights, under any order of the Court previously entered in this chapter 11 case.

14.     Payments on account of this Proof of Claim should be sent to the Claimant at the address specified for notices to the Claimant in Part 1.3 of the Proof of Claim.

***

5

# EXHIBIT 2

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ------------------------------------- | § | |
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| ------------------------------------- | § | |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
## SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
## AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address
for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦
1934054201223000000000013

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

### JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

## RELEVANT BACKGROUND

### A.     Procedural Background

3.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.      On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.      In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.      On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

**B.     Overview of HarbourVest's Claims**

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.    **Summary of HarbourVest's Factual Allegations**

14.    At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").  Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.    The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.  Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.    HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.    For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes"). The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.  The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.    In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19.     Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20.     After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof.  The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21.     On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC.  *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case").  The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee").  A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.     Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.     On September 11, 2020, HarbourVest filed its Response.  The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.     On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion").  In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.     Settlement Discussions**

28.     In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.     In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims.  In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30.     During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31.     After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

**F.     Summary of Settlement Terms**

32.     The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

*See generally* Morris Dec. Exhibit 1.

### BASIS FOR RELIEF REQUESTED

33.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court."  *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'"  *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.     There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.     First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.     The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39. Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40. Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41. No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42. Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# EXHIBIT 3

EXECUTION VERSION

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "Debtor"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "HarbourVest Party," and collectively, "HarbourVest"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "Bankruptcy Court");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("HCLOF") and acquired an a 49.98% ownership interest in HCLOF (the "HarbourVest Interests");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "HarbourVest Claims"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response");

**WHEREAS**, on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion" and together with the HarbourVest Response, the "HarbourVest Pleadings");

1

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.     **Settlement of Claims.**

(a)     In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

(i)     an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

(ii)     an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

(b)     On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.     **Releases.**

(a)     Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

EXECUTION VERSION

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

4. **Representations and Warranties**. Subject in all respects to Section 3 hereof:

(a) each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b) the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. **Plan Support.**

(a) Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b) In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c) The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.  **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.  **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.  **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.    **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.    **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.    **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.    **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.    **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

**EXECUTION VERSION**

14.    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

                                **HIGHLAND CAPITAL MANAGEMENT, L.P.**

                                By:     /s/ James P. Seery, Jr.

                                Name: James P. Seery, Jr.

                                Its:      CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch

Name: Michael Pugatch

Its:     Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch

Name: Michael Pugatch

Its:     Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch

Name: Michael Pugatch

Its:     Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch

Name: Michael Pugatch

Its:     Managing Director

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:    /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

9

# Exhibit A

**TRANSFER AGREEMENT**

**FOR ORDINARY SHARES OF**

**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of December **[__]**, 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. <u>Transfer of Shares and Advisory Board</u>

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 183646253v.3

3. <u>Transferors' Representations and Warranties</u>. Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a. This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b. This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c. As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>. Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a. each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b. the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c. the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a. Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

b.  The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.  This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.  The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.  This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.  Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.  This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 183646253v.3

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

**FUND:**
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

ActiveUS 183646253v.3

20

*[Additional Signatures on Following Page]*

ActiveUS 183646253v.3

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC

By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:    HIPEP VIII Associates L.P.
           Its General Partner

By:    HarbourVest GP LLC
           Its General Partner

By:    HarbourVest Partners, LLC
           Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
           Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
           Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
           Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
           Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
           Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
           Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global Fund L.P.**

By:   HarbourVest 2017 Global Associates L.P.
      Its General Partner

By:   HarbourVest GP LLC
      Its General Partner

By:   HarbourVest Partners, LLC
      Its Managing Member


By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 183646253v.3

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | [_____] | [_____] |
| HarbourVest 2017 Global AIF L.P. | [_____] | [_____] |
| HarbourVest 2017 Global Fund L.P. | [_____] | [_____] |
| HV International VIII Secondary L.P. | [_____] | [_____] |
| HarbourVest Skew Base AIF L.P. | [_____] | [_____] |

9

# EXHIBIT 4

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

## JAMES DONDERO'S OBJECTION TO DEBTOR'S MOTION FOR ENTRY
## OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST
### [Relates to Docket No. 1625]

James Dondero ("Respondent"), a creditor, indirect equity security holder, and party in

interest in the above-captioned bankruptcy case, hereby files this Objection to *Debtor's Motion for*

*Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153,*

*154)* [Docket No. 1625] (the "Motion") filed by Highland Capital Management, L.P. (the

"Debtor"). Through the Motion, the Debtor seeks approval of its compromise with HarbourVest

2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX

Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and

HarbourVest Partners L.P. (collectively, "HarbourVest") pursuant to Rule 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this objection, Respondent respectfully represents as follows:

<h2 style="text-align:center">I.    INTRODUCTION</h2>

1.     Under Bankruptcy Rule 9019, the Bankruptcy Court is tasked with making an independent judgment on the merits of a proposed settlement to ensure that the proposed settlement is "fair, equitable, and in the best interest of the estate."[1] While Respondent recognizes the Debtor's efforts in arranging a settlement, there are at least three significant issues with the terms of the settlement that merit denial of the Motion: (i) the proposed settlement is not reasonable or in the best interest of the estate given the weakness of the HarbourVest Claim (as hereinafter defined); (ii) the proposed settlement is a blatant attempt to purchase votes in support of Debtor's plan by giving HarbourVest a significant claim to which it would not otherwise be entitled; and (iii) the proposed settlement seeks to improperly classify the HarbourVest Claim[2] in two separate classes in order to gerrymander an affirmative vote on its reorganization plan. Moreover, the proposed settlement does not satisfy the factors for approval fixed by case law. On information and belief, Debtor's CEO/CRO, Mr. Seery, has previously asserted on multiple occasions that the HarbourVest Claim had no value and that the Debtor could resolve such claim for no more than $5 million. While Respondent and Mr. Seery have had a number of disagreements in this case, Respondent agrees with Mr. Seery's initial conclusion that the HarbourVest Claim is substantially without merit. Respondent understands that any settlement will not necessarily provide the best possible outcome for the Debtor, but in this instance the proposed settlement far exceeds the bounds of reasonableness and, on its face, is an attempt by the Debtor to purchase votes in favor

---

[1] *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

[2] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. *See* Claim Nos. 143, 147, 149, 150, 153, and 154.

of confirmation of its Plan. Given the Debtor's prior positions as to the merits of HarbourVest Claim it is necessary for the Court to closely scrutinize the settlement to determine why the Debtor now believes granting HarbourVest a net claim of nearly $60 million[3] resulting from HarbourVest's investment in a non-debtor entity (which was and is managed by a non-debtor) to be in the best interest of the estate. Upon close scrutiny, Respondent believes the Court will find that the proposed settlement is not reasonable or in the best interest of the estate and the Motion therefore should be denied.

## II.  BACKGROUND

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

3.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in Delaware.

4.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].

5.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

---

[3] The proposed settlement provides that HarbourVest shall receive an allowed general unsecured (Class 8) claim in the amount of $45 million and an allowed subordinated general unsecured (Class 9) claim in the amount of $35 million. As part of the settlement, HarbourVest will then transfer its entire interest in Highland CLO Funding, Ltd. ("HCLOF") to an entity to be designated by the Debtor. The Debtor states that the value of this interest is approximately $22 million as of December 1, 2020.

6.     In connection with the Settlement Order, an independent board of directors was appointed on January 9, 2020, for the Debtor's general partner, Strand Advisors, Inc. (the "Board").  The members of the Board are James P. Seery, Jr., John S. Dubel, and Russell F. Nelms.

7.     On July 16, 2020, this Court entered an order authorizing the Debtor to employ James P. Seery, Jr. as Chief Executive Officer and Chief Restructuring Officer of the Debtor. *See* Docket No. 854.

8.     On April 8, 2020, HarbourVest filed Proofs of Claim Numbers 143, 149, 149, 150, 153, and 154 (collectively, the "HarbourVest Claim")[4].

9.     On July 30, 2020, the Debtor filed *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906] (the "Debtor Objection"), which contained an objection to the HarbourVest Claim.

10.     On September 11, 2020, HarbourVest filed *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "HarbourVest Response").

11.     On December 23, 2020, the Debtor filed the Motion seeking approval of a proposed settlement of the HarbourVest Claim under Rule 9019. Docket No. 1625.

### III.     LEGAL STANDARD

12.     The merits of a proposed compromise should be judged under the criteria set forth in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).  *TMT Trailer* requires that a compromise must be "fair and equitable."  *TMT Trailer*, 390

---

[4] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. *See* Claim Nos. 143, 147, 149, 150, 153, and 154.

U.S. at 424; *In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984). The terms "fair and equitable," commonly referred to as the "absolute priority rule," mean that (i) senior interests are entitled to full priority over junior interests; and (ii) the compromise is reasonable in relation to the likely rewards of litigation. *In re Cajun Electric Power Coop.*, 119 F.3d 349, 355 (5th Cir. 1997); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

13.      In determining whether a proposed compromise is fair and equitable, a Court should consider the following factors:

(i)      the probabilities of ultimate success should the claim be litigated;

(ii)      the complexity, expense, and likely duration of litigating the claim;

(iii)      the difficulties of collecting a judgment rendered from such litigation; and,

(iv)      all other factors relevant to a full and fair assessment of the wisdom of the compromise.

*TMT Trailer*, 390 U.S. at 424.

14.      In considering whether to approve a proposed compromise, the bankruptcy judge "may not simply accept the trustee's word that the settlement is reasonable, nor may he merely 'rubber stamp' the trustee's proposal." *In re Am. Res. Corp.*, 841 F.2d 159, 162 (7th Cir. 1987). "[T]he bankruptcy judge must apprise himself of all facts necessary to evaluate the settlement and make an informed and independent judgment about the settlement." *See TMT Trailer*, 390 U.S. at 424, 434.

15.      While the trustee's business judgment is entitled to a certain deference, "business judgment is not alone determinative of the issue of court approval." *See In re Endoscopy Ctr. of S. Nev., LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011). Further, the business judgment rule does not provide a debtor with "unfettered freedom" to do as it wishes. *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) ("[A]s a fiduciary holding its estate in trust and responsible

to the court, a debtor in possession must administer its case and conduct its business in a fashion amenable to the scrutiny to be expected from creditor and court oversight."). The Court must conduct an "intelligent, objective and educated evaluation"[5] of the proposed settlement "to ensure that the settlement is fair, equitable, and in the best interest of the estate and creditors." *See In re Mirant Corp.*, 348 B.R. 725, 739 (Bankr. N.D. Tex. 2006) (quoting *Conn. Gen. Life Ins. Co. v. Foster Mortgage Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995)).

## IV.   ARGUMENT AND AUTHORITIES

16.     As discussed in detail below, there are three significant issues with the terms of the settlement that merit denial of the Motion: (i) the proposed settlement is not reasonable or in the best interest of the estate given the weakness of the HarbourVest Claim; (ii) the proposed settlement is a blatant attempt to purchase votes in support of Debtor's plan by giving HarbourVest a substantial claim to which it is not entitled; and (iii) the proposed settlement seeks to improperly classify HarbourVest's one claim in two separate classes in order to gerrymander an affirmative vote on its reorganization plan. For these and certain additional reasons as discussed below, the Motion should be denied.

### A. Through its Claim, HarbourVest Seeks to Revisit this Court's Orders in the Acis Case

17.     As an initial matter, through its proofs of claim, HarbourVest appears to be second guessing the Court's judgment in the Chapter 11 case of Acis Capital Management, LP and Acis Capital Management GP, LLC (collectively, "Acis") and seeking to revisit the Court's orders entered in that case years ago. HarbourVest appears to being arguing that the TRO and injunction

---

[5] *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) ("To assure a proper compromise the bankruptcy judge, must be apprised of all the necessary facts for an intelligent, objective and educated evaluation. He must compare the terms of the compromise with the likely rewards of litigation.").

entered in the Acis case that prevented redemptions or resets in the CLOs are now the root cause of the decrease in value of its investment in HCLOF.

18. Specifically, the claim states that HarbourVest incurred "financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF."[6]

19. Essentially, HarbourVest is saying that the orders entered in the Acis case did not actually protect the investors and their investments, but instead were a triggering cause for the alleged diminution in value of its investment in HCLOF. Nevertheless, even though the value of HCLOF dropped dramatically only after the Effective Date of Acis's Plan, years later and despite the lack of Debtor involvement in managing HarbourVest's investment, HarbourVest now seeks to impute liability to the Debtor through a flimsy narrative designed to recoup investment losses unrelated to the Debtor and for which the Debtor owed HarbourVest no duty.

20. That HarbourVest now, years later, seeks to revisit this Court's Acis orders raises a number of issues, including those as to HarbourVest's involvement (or lack thereof) in the Acis case, whether the orders, Plan, or Confirmation Order in the Acis case may bar some of the relief requested by HarbourVest here, and questions related to the merits of the HarbourVest Claim and the legal grounds allegedly supporting it.

---

[6] See Proof of Claim 143, para. 3 ("Due to the Acis bankruptcy and certain conduct alleged to have been undertaken by the Debtor (to whom Acis subcontracted its functions) and Debtor's employees (who were officers, employees, and agents of Acis), the Claimant has suffered significant harm. Such harm includes, but is not limited to, financial harm resulting from, among other things (i) court orders in the Acis bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise regulated the activity of HCLOF; and (ii) significant fees and expenses related to the Acis bankruptcy that were charged to HCLOF.").

**B. The HarbourVest Claim Lacks Merit and the Proposed Settlement is Not Reasonable**

21.     Based on the HarbourVest Claim and its filed response to the Debtor's objection, Respondent believes that the HarbourVest claim is meritless and the proposed settlement is not reasonable, fair and equitable, or in the best interest of the estate.

22.     First, the proposed settlement is concerning particularly because HarbourVest's bare bones proof of claim contains very little in terms of allegations of specific conduct against the Debtor that would give rise to a $60 million claim against this estate. While HarbourVest's response to the Debtor's claim objection is lengthy, it contains very little in real substance supporting its right to such a claim against the estate. The response also omits a number of key facts that are relevant and potentially fatal to its claim for damages against the Debtor's estate. Among them is the fact that Acis (and thereafter Reorganized Acis), along with Mr. Joshua Terry, managed HarbourVest's investment for years after it was made.[7] Despite this fact, HarbourVest's alleged damages appear to be based largely on the difference between the value of its initial investment at confirmation of Acis's Plan and the current value of the investment—which amount was directly determined by the performance of the CLOs that Acis managed during this time.[8] Neither the claim nor the response directly address the implications of Acis's management of the CLOs during the period following HarbourVest's investment. Nor does HarbourVest address or discuss performance of the CLOs, the market forces that may have caused HarbourVest's investment to lose value, or other factors influencing the current value of its investment. The

---

[7] *See, e.g.*, HarbourVest Proof of Claim 143, p. 5 ("The Claimant is a limited partner in one of the Debtor's managed vehicles, Highland CLO Funding, Ltd. ("HCLOF"). Acis Capital Management GP, L.L.C. and Acis Capital Management L.P. (together, "Acis"), the portfolio manager for HCLOF, filed for chapter 11 in the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 30, 2018.").

[8] *See* HarbourVest Response, Docket No. 1057, para. 40 ("HarbourVest has been injured from the Investment: not only has the Investment failed to accrue value, its value plummeted. The Investment's current value is far less than HarbourVest's initial contribution.").

speculative nature of the damages and the lack of specificity of the HarbourVest Claim and the role of Acis in the loss of value to HarbourVest all call into question the reliability of the allegations and the legal basis for the claim amount awarded in the settlement.

23.     Also absent from Harbourvest's papers is any discussion of any contract or agreement between (i) HarbourVest and the Debtor; and (ii) any agreement that was executed in conjunction with HarbourVest's initial investment. While the proof of claim references a number of agreements, there is no explanation in the claim or in HarbourVest's response to the Debtor's claim objection of how these agreements give rise to liability against the *Debtor*. For example, neither the claim nor the HarbourVest Response (which includes more than 600 pages of attachments) attach *any* written agreement between HarbourVest and **any other party**. While HarbourVest has alleged a number of claims sounding in tort, many of those claims cannot exist absent a contract or other express relationship between the parties. Moreover, the terms of the relevant contracts themselves likely contain a number of provisions that may call into question Debtor's liability or would be otherwise relevant to merits of the HarbourVest Claim. For example, HarbourVest in its papers appears to assert or imply that the Debtor made a number of false or fraudulent representations to solicit HarbourVest's investment, but then fails to discuss or even identify the applicable agreements it alleges it was induced into signing in connection with its investment (this despite the substantial value of the investment when the Acis plan was confirmed).

24.     Given these issues, among many others, the HarbourVest Claim is unsustainable both from a liability and damages standpoint and there are many very high hurdles HarbourVest would have to clear in seeking to prove liability against the Debtor and in proving its damages. For a long period of time, its investment was managed by Acis and the investment's performance was directly tied to Acis's inadequate performance as portfolio manager. Further, the value of

HarbourVest's investment is also directly tied to various market forces that may have impacted its value. The HarbourVest Claim is largely lacking in relevant facts and omits much salient information, such as who it contracted with in connection with its investment, the terms of such agreements, who controlled its investment during the entire period from November 2017 to the present, and the performance of its investment during the last two years. Given these issues, HarbourVest will be unable to demonstrate a causal connection between any conduct of the Debtor and the alleged damages it suffered from a reduction in value of its investment.

25.     Because of the speculative nature of the HarbourVest Claim, and the fact that very little pleading or litigation has occurred, the proposed settlement in granting such a large claim is unreasonable, not fair and equitable, and not in the best interest of the estate. The lack of pending litigation, narrowing of threshold questions, and lack of detail in HarbourVest Claim make it impossible to determine whether the huge claim awarded under the proposed settlement is justified under the facts. Accordingly, the Motion should be denied.

**C.  The Proposed Settlement is an Improper Attempt by the Debtor to Purchase Votes in Support of its Plan and the Separate Classification of the HarbourVest Claim Constitutes Gerrymandering in Violation of 11 U.S.C. § 1122**

26.     The proposed settlement is a flagrant attempt by the Debtor to purchase votes in support of its Plan by giving HarbourVest a significant claim to which it has not shown itself entitled. Moreover, the separate classification of the HarbourVest Claim into two separate classes constitutes impermissible gerrymandering in violation of section 1122 of the Bankruptcy Code. The proposed settlement essentially gives HarbourVest a claim it is not entitled to in exchange for votes in two separate classes. This is not a proper basis for a settlement and the Court should deny the Motion.

27.     Section 1122 of the Bankruptcy Code provides as follows:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

28.　　"Chapter 11 requires classification of claims against a debtor for two reasons. Each class of creditors will be treated in the debtor's plan of reorganization based upon the similarity of its members' priority status and other legal rights against the debtor's assets. Proper classification is essential to ensure that creditors with claims of similar priority against the debtor's assets are treated similarly." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991).

29.　　"Section 1122 consequently must contemplate some limits on classification of claims of similar priority. A fair reading of both subsections suggests that ordinarily substantially similar claims, those which share common priority and rights against the debtor's estate, should be placed in the same class." *Id.* at 1278.

30.　　The Fifth Circuit has stated that there is "one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 1279. The Court observed:

> There must be some limit on a debtor's power to classify creditors in such a manner. . . . Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (quoting *In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986)).

31.     Here, the HarbourVest settlement and the classification of the HarbourVest Claim under the Plan blatantly violate the Fifth Circuit's "one rule" concerning the classification of claims under section 1122. To the extent that HarbourVest even has a legitimate claim, not only should its claim be classified together with other unsecured creditors, its claim should be classified solely in one class. To allow the Debtor to do otherwise as proposed is improper gerrymandering in order to obtain a consenting class in express violation of section 1122.

### D.  There Are Other Reasons for the Court to Closely Scrutinize the Proposed Settlement that May Warrant Denial of the Motion

32.     There are a number of other reasons for the Court to closely scrutinize the proposed settlement that may warrant denial of the Motion.

33.     First, the granting to HarbourVest of a claim in the total amount of $80 million potentially allows HarbourVest to achieve a significant windfall at the expense of other creditors and equity holders. The Debtor has asserted numerous times that the estate is solvent and, for this reason, the purported subordinated claim of $35 million (if allowed and approved) may be worth just as much as its general unsecured claim. This is a huge figure in this case, outshined only by the Redeemer Committee, which has an actual arbitration award obtained after lengthy litigation. By contrast, the HarbourVest Claim contains only a few paragraphs of generalized allegations that essentially argue that the Debtor's alleged actions related to the Acis bankruptcy, and this Court's orders in the Acis case, are a "but for" cause of the loss of its investment. While the HarbourVest Response is lengthy, it lacks necessary details for the Court to determine whether HarbourVest *may* be entitled to the relief requested by the Motion. The other significant creditors in this case— *inter alia*, Redeemer, UBS and Acis—all had pending claims that were litigated. Nor is HarbourVest a trade creditor, vendor, or other contract counter-party of the Debtor. The HarbourVest Claim is thus uniquely situated in this case and, given the size and the nature of its

claims, should invite close scrutiny. Under these facts, the potential allowance of an $80 million claim (less the value of its share in HCLOF, which may suffer by continued management by Acis) against the estate for an investment which was not held or managed by the Debtor would be a huge undue windfall.

34.     Second, the Motion states that HarbourVest will vote its proposed allowed Class 8 (proposed at $45 million) and Class 9 (proposed at $35 million) claims in support of confirmation. There are at least two potential issues with this proposal. First, the deadline for parties to submit ballots was January 5, 2021, and as of the close of business on January 5, the HarbourVest Claim has not been allowed for voting purposes.[9] Second, the Motion and proposed settlement agreement state that the HarbourVest Claim will be allowed for voting purposes only as a general unsecured claim in the amount of $45 million. It is unclear how HarbourVest can, or would be authorized to, vote its purported Class 8 and 9 Claims in support of the Plan after the voting deadline and when the settlement provides only for a voting claim in Class 8.

35.     Third, while the Motion addresses the factor of probability of success in the litigation, it does not discuss in detail the cost of doing so in relation to the amount to be paid to HarbourVest under the settlement or the likelihood that the Debtor will succeed in the litigation. In addition, unlike the claims filed by Acis and UBS, the HarbourVest Claim does not arise from pending litigation. At this point, relatively little litigation has occurred and the parties have not addressed threshold issues that might dramatically narrow the scope of the HarbourVest Claim. Rule 9019 requires an analysis as to whether the probability of success in litigation is outweighed by the consideration achieved under the settlement.  *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (The Court must "compare the terms of the compromise with the likely rewards

---

[9] The hearing on the 3018 and 9019 motions are set concurrently with confirmation.

of litigation."). Given the excessive amount to be paid under the settlement and the weakness of the HarbourVest Claim, this factor weighs in favor of denial of the Motion.

36.     Fourth, it is unclear from the settlement papers whether the transfer by HarbourVest of its interest in HCLOF to the Debtor or an entity the Debtor designates will cause the value of the investment to be received by the Debtor's estate. Further, the interest of HCLOF being conveyed under the proposed settlement may be subject to the Acis plan injunction, which could potentially prevent the Debtor's estate from realizing the value of this interest. In the event the Court is inclined to approve the settlement, the order should make clear that the available value of the investment should be realized by the Debtor's estate.

## CONCLUSION

For the reasons set forth above, Respondent respectfully requests that the Court enter an order denying the Motion and providing Respondent such other and further relief to which he may be justly entitled.


**[Remainder of Page Intentionally Left Blank]**

Dated: January 6, 2021        Respectfully submitted,

*/s/ D. Michael Lynn*
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: john.wilson@bondsellis.com
Email: bryan.assink@bondsellis.com

**ATTORNEYS FOR JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 6, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

*/s/ Bryan C. Assink*
Bryan C. Assink

# EXHIBIT 5

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF  AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

The Dugaboy Investment Trust and Get Good Trust (jointly, "Objectors"), submit this

Objection for the purpose of objecting to the *Debtor's Motion for Entry of an Order Approving*

*Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions*

*Consistent Therewith* [Dkt. #1625] (the "Motion") filed by Highland Capital Management, L.P.

(the "Debtor"). Through the Motion, the Debtor seeks approval of its compromise with

HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover

Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF

L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest") pursuant to Rule 9019 of the



Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this objection, Objectors respectfully represent as follows:

## I. INTRODUCTION

1.　Objectors recognize that Courts favorably view settlements and, as a matter of course, generally approve settlements as being in the best interest of the bankruptcy estate. The settlement proposed herein, however, is different than other settlements inasmuch as it represents a 180 degree departure from the Debtor's own analysis of the Claim of HarbourVest and the fact that the settlement is tied to HarbourVest approving the Debtor's plan. Little or no information is provided by the Debtor as to why its initial analysis was flawed and what information or legal principal it discovered to change a zero claim into a massive claim that will have a significant impact on the recovery to creditors.

## II. BACKGROUND

2.　On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

3.　On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in Delaware.

4.　On December 4, 2019, the venue of this case was transferred. [Dkt. #186].

5.　On July 16, 2020, this Court entered an order authorizing the Debtor to employ James P. Seery, Jr. as Chief Executive Officer and Chief Restructuring Officer of the Debtor. [See Dkt. #854].

6.      On April 8, 2020, HarbourVest filed Proofs of Claim Numbers 143, 149, 149, 150, 153, and 154 (collectively, the "HarbourVest Claim")[1].

7.      On July 30, 2020, the Debtor filed *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Dkt. #906] (the "Debtor Objection"), which contained an objection to the HarbourVest Claim.

8.      On September 11, 2020, HarbourVest filed *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No Liability Claims; and (F) Insufficient-Documentation Claims* [Dkt. #1057] (the "HarbourVest Response").

9.      The Debtor, in its *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. #1473 pgs. 40-41], described its position relative to the HarbourVest Claim as follows:

> The Debtor intends to **vigorously** defend the HarbourVest Claims on various grounds ….. The HarbourVest Entities invested approximately $80,000,000.00 in HCLOF but seek an allowed claim in excess of 300 million dollars (after giving effect to treble damages for the alleged RICO violations)

10.     On December 23, 2020, the Debtor filed the Motion seeking approval of a proposed settlement of the HarbourVest Claim under Rule 9019. [Dkt. # 1625].

11.     The proposed settlement provides HarbourVest with the following:

a.      An allowed, general unsecured claim in the amount of $45,000,000.00 [Dkt. #1625 pg. 9 pp.f]; and

---

[1] While HarbourVest has filed a number of claims, each filed claim is exactly the same except in the name of the claimant. See Claim Nos. 143, 147, 149, 150, 153, and 154.

       b.   A $35,000,000 claim in Class 9 [Dkt. #1625 pg. 9 pp.f].

12.     An integral element of the settlement requires that HarbourVest will "support confirmation of the Debtor's Plan including, but not limited to, voting its claims in support of the Plan."

13.     The settlement also contains a provision that HarbourVest will transfer its entire interest in HCLOF to an entity to be designated by the Debtor. It is unclear whether HarbourVest has a right to transfer the interest and secondly, what the Debtor will do with the interest [Dkt. #1625 pp.f].

14.     The sole support for the Motion is the Declaration of John Morris [Dkt. #1631] which fails to account for the enormous change in the Debtor's position between November 24, 2020 when the Disclosure Statement was approved and December 23, 2020 when the Motion was filed, a period of less than thirty (30) days.

15.     The Declaration of John Morris [Dkt. #1631] also contains no information as to the potential cost of the litigation, whether HarbourVest can transfer the interest or reasons, other than conclusory reasons, as to why the settlement is beneficial to the estate. The Debtor makes the assertion that the interest it is acquiring was worth $22,000,000.00 as of December 1, 2020 without advising as to the basis for the valuation. Is it a book value and, if not, what was the methodology employed to arrive at the valuation? The Court has no basis to evaluate the settlement without essential information as to 1) how the asset being acquired is valued; 2) can the Debtor acquire the interest; and 3) how will the Debtor bring value to the estate in connection with the interest inasmuch as the Debtor has discretion as to where to place the asset to be acquired.

## A.    LEGAL STANDARDS

16.     The law relative to approval of motions pursuant to BR 9019 is well settled.  The settlement must be fair and equitable**.** *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).  The factors the Court should consider are the following:

(i)     the probabilities of ultimate success should the claim be litigated;

(ii)    the complexity, expense, and likely duration of litigating the claim;

(iii)   the difficulties of collecting a judgment rendered from such litigation; and,

(iv)    all other factors relevant to a full and fair assessment of the wisdom of the compromise.

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).

17.     Although the Debtor's business judgment is entitled to a certain deference, "business judgment" is not alone determinative of the issue of court approval. *See In re Endoscopy Ctr. of S. Nev., LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011).   However, notwithstanding the business judgment rule, a debtor does not have unfettered freedom to do what it wishes.  *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) ("[A]s a fiduciary holding its estate in trust and responsible  to the court, a debtor in possession must administer its case and conduct its business in a fashion amenable to the scrutiny to be expected from creditor and court oversight.").

## B.     ISSUES WITH THE SETTLEMENT

18.     Objectors believe that the following issues are not explained or addressed in the Motion and, thus, the Motion should be denied:

a)   The settlement represents a radical change in the Debtor's position that was set forth in its Disclosure Statement.   While the Debtor asserts that its position is

based on its fear of parties' oral testimony, the size of the transactions at issue make the case a document case, as opposed to who said what, when and how. A review of the applicable documents to determine whether they support the Debtor's initial position is warranted, as opposed to stating that the case is based upon the credibility of a witness. This settlement is not the settlement of an automobile accident where the parties are disputing who ran a red light;

b) The settlement requires HarbourVest to support and vote in favor of the Debtor's Plan. On its face this appears to be vote buying. The settlement should not be conditioned upon HarbourVest's support or non-support of the Plan and its vote in favor or against the Plan; and

c) No information is provided as to whether the Debtor can acquire the interest in HCLOF, liquidate the interest, who will receive the interest, or how will the estate benefit from the interest to be acquired.

## CONCLUSION

The settlement with HarbourVest has too many questions to be approved on the record before this Court and the parties, due to the Notice of the Motion, the holidays and the press of other litigation in this case, do not have the time to adequately investigate the propriety of the settlement.

January 8, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216

gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust
and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 8th day of January, 2021, a copy of the above and foregoing *Objection To Debtor's Motion For Entry Of An Order Approving Settlement With Harbourvest (Claim Nos. 143, 147, 149, 150, 153, 154) And Authorizing Actions Consistent Therewith* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com

- Megan F. Clontz     mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok     andrew.clubok@lw.com
- Leslie A. Collins     lcollins@hellerdraper.com
- David Grant Crooks     dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Gregory V. Demo     gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com
- Casey William Doherty     casey.doherty@dentons.com, dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@dentons.com
- Douglas S. Draper     ddraper@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn     lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver     Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards     jonathan.edwards@alston.com
- Jason Alexander Enright     jenright@winstead.com
- Robert Joel Feinstein     rfeinstein@pszjlaw.com
- Matthew Gold     courts@argopartners.net
- Bojan Guzina     bguzina@sidley.com
- Thomas G. Haskins     thaskins@btlaw.com
- Melissa S. Hayward     MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held     mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse     ghesse@HuntonAK.com, amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman     jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood     lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com
- Warren Horn     whorn@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- John J. Kane     jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman     jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer     pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman     kurtzman@kurtzmansteady.com
- Phillip L. Lamberson     plamberson@winstead.com
- Lisa L. Lambert     lisa.l.lambert@usdoj.gov
- Paul M. Lopez     bankruptcy@abernathy-law.com
- Faheem A. Mahmooth     mahmooth.faheem@pbgc.gov, efile@pbgc.gov

- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com, cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com;velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com

- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

*/s/Douglas S. Draper*

{00374914-6}                                  10

# EXHIBIT 6

Joseph M. Coleman (State Bar No. 04566100)
John J. Kane (State Bar No. 24066794)
**KANE RUSSELL COLEMAN LOGAN PC**
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-SGJ |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

## CLO HOLDCO, LTD.'S OBJECTION TO HARBOURVEST SETTLEMENT

**TO THE HONORABLE STACEY G. JERNIGAN, U.S. BANKRUPTCY JUDGE:**

CLO Holdco, Ltd. (**"CLO Holdco"**) respectfully files this *Objection to Harbourvest Settlement* (the **"Harbourvest Settlement Objection"**) which seeks entry of an order from this Court denying the Debtor's *Motion for Entry of an Order Approving Settlement with Harbourvest (Claims Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* (the **"Harbourvest Settlement Motion"**) for the reasons stated below. In support of the Harbourvest Settlement Objection, CLO Holdco respectfully states as follows:

### I.
### BACKGROUND

**A.      TRANSFERRING SHARES IN HCLOF**

1.      CLO Holdco owns 75,061,630.55 shares, or about 49.02% of Highland CLO Funding, Ltd. ("**HCLOF**").   Other shareholders include Harbourvest 2017 Global AIF L.P., Harbourvest Global Fund L.P., Harbourvest Dover Street IX Investment L.P., and Harbourvest Skew Base AIF L.P., and HV International VIII Secondary L.P. (collectively, "**Harbourvest**"). Harbourvest owns approximately 49.98% of HCLOF.   The remaining 1% is owned by the Debtor and a five other investors.

2.      HCLOF is governed by a *Members Agreement Relating to the Company* dated November 15, 2017 by and between each of the members of HCLOF, including Harbourvest, the Debtor, and CLO Holdco (the "**Member Agreement**").   A copy of that agreement is attached hereto as **Exhibit A**.

3.      Section 6 of the Member Agreement addresses the "Transfer or Disposals of Shares." MEMBER AGREEMENT, § 6.   The Member Agreement places strict restrictions on the sale or transfer of shares to entities other than the initial Member's own affiliates.   *See id.* at §§ 6.1, 6.2. Before a Member can transfer its interests to a party other than its own affiliates it must: (i) obtain the prior written consent of the Portfolio Manager; and (ii) "offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter" (the "**Right of First Refusal**").   *Id.*   As further stated in section 6.2 of the Member Agreement, "The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred." *Id.* at § 6.2.

**B.      THE HARBOURVEST SETTLEMENT**

4.      On December 23, 2020, the Debtor filed the Harbourvest Settlement Motion.   On the following day, the Debtor filed a copy of the Settlement Agreement referenced in the

Harbourvest Settlement Motion (the **"Settlement Agreement"**) [Dkt. No. 3]. In the Settlement Agreement, Harbourvest represents and warrants that it is authorized to transfer its interest in HCLOF to the Transferee, HCMLP Investments, LLC (the **"Transferee"**). SETTLEMENT AGREEMENT, Ex. A. § 3. Further, the Transferee and Debtor agree to be bound by the terms and conditions of the Member Agreement. *Id.* at § 1.c.

5.      In exchange for conveniently classified allowed claims under the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the **"Plan"**) [Dkt. No. 1472], Harbourvest agrees to vote in favor of the Plan and to transfer all of its interests in HCLOF to the Transferee. SETTLEMENT AGREEMENT, § 1.

6.      As detailed below, CLO Holdco objects to the Harbourvest Settlement Motion because Harbourvest has no authority to transfer its interests in HCLOF without first complying with the Right of First Refusal. The only way to effectuate such a transfer without first providing other members the Right of First Refusal is an intentionally inaccurate interpretation of the Member Agreement's contractual provisions that would render specific passages redundant and meaningless. More simply put, the only way Harbourvest and the Debtor could effectuate the Settlement Agreement is by violating fundamental tenets of contract interpretation.

## II.
## ARGUMENTS AND AUTHORITIES

### A.      CONTRACT INTERPRETATION – AVOIDING REDUNDANCIES AND SURPLUS LANGUAGE

7.      The Fifth Circuit recognizes fundamental tenets of contract interpretation, and notes that "contracts should be read as a whole, viewing particular language in the context in which it appears. *Woolley v. Clifford Chance Rogers & Wells, L.L.P.*, 51 F. App'x 930 (5th Cir. 2002) (citing Restatement (Second) of Contracts § 202 (1981)). The Fifth Circuit has applied substantially the same tenets of contract interpretation across the laws of various jurisdictions, and consistently reasons that "[a]ll parts of the agreement are to be reconciled, if possible, in order to avoid an

inconsistency. A specific provision will not be set aside in favor of a catch-all clause." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 947 (5th Cir. 1981) (internal citations omitted); and *see Hawthorne Land Co. v. Equilon Pipeline Co., LLC*, 309 F.3d 888, 892–93 (5th Cir. 2002); *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016); *Wooley*, 51 F.Appx. at 930.

8.      Reconciliation of terms that would otherwise render other parts of a contract redundant is fundamental to proper contract interpretation. *Hawthorne Land*, 309 F.3d at 892-93. As the Firth Circuit explained in *Hawthorne Land*, "each provision of a contract must be read in light of the other provisions so that each is given the meaning suggested by the contract as a whole. A contract should be interpreted so as to avoid neutralizing or ignoring a provision or treating it as surplusage." *Id.* (internal citations and quotations omitted). In other words, provisions of a contract should be read to create harmony, not internal inconsistencies, redundancies, and unnecessary surplus language. *See, e.g., Luv N' Care*, 844 F.3d at 447 (overturning district court on appeal by interpreting contract in manner that eliminated perceived redundancy).

## B.      ANALYZING THE MEMBER AGREEMENT

9.      Section 6.1 of the Member Agreement will almost certainly be cited by the Debtor and Harbourvest as authority for their entry into the Settlement Agreement, regardless of whether other Members or the Portfolio Manager consent. It states, in pertinent part, that:

> No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "Transfer"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio Manager…

MEMBER AGREEMENT, § 6.1. Harbourvest will likely stress that under the terms of the Member Agreement, it can transfer its interests so long as the transfer is to "an Affiliate of an initial Member." Indeed, the Debtor will no doubt point out to this Court that Harbourvest is

conveniently transferring its interests in HCLOF to an Affiliate of the Debtor, and that the Debtor is an initial Member listed in the Member Agreement.

10.     Section 6.1, however, must be read in the context of the Member Agreement, and in conjunction with the transfer restrictions found in section 6.2.  Read together it is clear that the consent exception allowing a transfer in 6.1 was intended to allow a Member to transfer its shares to *its* own Affiliate, without required consents and effectuating a Right of First Refusal.  Doing so would allow inter-company transfers within a corporate structure without the need for complicated procedures.  Applying Fifth Circuit precedent, this interpretation fits squarely within the agreement and gives weight to the terms of section 6.2 of the Member Agreement, as explained below.

### (i)     Surplusage – Specific Allowance of Transfers by CLO Holdco to Debtor Affiliates

11.     Recall that both CLO Holdco and the Debtor are initial Members to the Member Agreement.  MEMBER AGREEMENT, p. 3.  Section 6.2 of the Member Agreement states, in pertinent part, that "Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, *in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal*) a Member must first…" comply with the Right of First Refusal.  *Id.* at § 6.2 (emphasis added).  The italicized language above is important for two reasons: (i) it specifically enumerates that CLO Holdco can transfer its interests to Debtor Affiliates without having to pursue the Right of First Refusal; and (ii) it allows only limited transfers between Members, as opposed to between a Member and an Affiliate of an initial Member.

12.     If, as the Debtor and Harbourvest will likely argue, Members are allowed to transfer their interests to any Affiliates of any other initial Members, there is absolutely no need for the Member Agreement to specifically authorize CLO Holdco to transfer its interests to the Debtor's Affiliates.  Per Fifth Circuit fundamentals of contract interpretation, that purported redundancy

should <u>not</u> be discarded as mere surplusage, and the Member Agreement should be interpreted in a manner that gives weight to that provision. *Hawthorne Land*, 309 F.3d at 892-93.

13.     If the Member Agreement is read to literally allow all "Transfers to Affiliates of an initial Member" there would be no reason to expressly set forth allowed transfers between specific Members and other Member's Affiliates. If the Member Agreement sought to list all allowed transfers between Members and their Affiliates, it should have similarly noted that any Member could transfer its interest to any Harbourvest Member entity, as each Harbourvest Member entity is an Affiliate of the other Harbourvest Member entities. Alternatively, if the specific enumeration of CLO Holdco and the Highland Principals' transfer rights was surplusage, it would presumably have listed other parties' rights, or had inclusive language such as "including but not limited to" or "for example." The Member Agreement lacks such language and, as a result, should be interpreted in a manner that both gives weight to the specific provision while reconciling other provisions of the contract.

**(ii)     Absurd Results – Disparate Transfer Rights Between Members**

14.     Note that the Member Agreement does not generally allow a transfer of interests from Member to Member unless specifically enumerated. Section 6.2 specifically allows only CLO Holdco and the Highland Principals to make transfers to other Members, but those other Members include only the Debtor or another Highland Principal. MEMBER AGREEMENT, § 6.2. It does not allow the Debtor to transfer interests to any Member, and does not expressly allow any Member, other than limited transfers by CLO Holdco and the Highland Principals, to transfer interests to any other Member. *Id.* For instance, if the Debtor wished to transfer its interests to CLO Holdco, it would first have to offer *all* of the other Members their Right of First Refusal. *Id.*

15.     Similarly, if Harbourvest wished to transfer its interest to CLO Holdco, it could not do so without first providing the Right of First Refusal to all other Members. *Id.* As noted above,

however, allowing a Member to transfer its interest to an Affiliate of any initial Member would allow _all_ of the Members to transfer their interests to any Harbourvest Member entity, as the Harbourvest Members are Affiliates of each other.  Given the specific enumeration of CLO Holdco and the Highland Principals' rights to inter-Member transfers, it would be inconsistent to expand that specific provision to allow all transfers by all Members to any Harbourvest entity without first providing a Right of First Refusal.

16.     Such a reading would lead to absurd results.  It would grant similarly situated Members profoundly disparate rights under the agreement, and could easily lead to manipulation. For instance, because the Harbourvest Members are technically Affiliates of an initial Member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer.  No other Member could do that.  For instance, if CLO Holdco wished to acquire other Members' interests, the transferring member (including Harbourvest) would have to offer a Right of First Refusal in _every instance_.  To resolve that potential disparate treatment—though CLO Holdco and Harbourvest own nearly identical ownership interests in HCLOF—CLO Holdco would have to form an Affiliate and acquire interests through the Affiliate.  That simply _cannot_ be the intended result of the Member Agreement.

17.     Instead, the Member Agreement must be read to require Harbourvest to provide a Right of First Refusal to the other Members of HCLOF before transferring its interests to either the Debtor or the Transferee.

## C.     THE RIGHT OF FIRST REFUSAL IN BANKRUPTCY

18.     Most cases addressing third party rights of first refusal in bankruptcy involve the assignment of leases and landlords' rights of first refusal.  In those cases, courts analyze whether such a provision in the _debtor's_ contract is a defacto restriction on assignment that may be excised

from the agreement. This case is very different. Here, it is a creditor that owes a right of first refusal to another non-debtor entity.

19.     Even so, at least one court has issued telling commentary on a bankruptcy court's ability to excise provisions of a bargained-for contract, stating "A bankruptcy court's authority to excise a bargained for element of a contract is questionable and modification of a nondebtor contracting party's rights is not to be taken lightly." *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 51-52 (Bankr. M.D.N.C. 2003) (citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1991)). CLO Holdco was unable to find any case that would allow a bankruptcy court to invalidate or otherwise excise a third party's right of first refusal in what largely amounts to a non-debtor contract.

20.     As the Member Agreement requires Harbourvest to provide a Right of First Refusal to the non-Debtor Members under section 6.2 of the Agreement, and such Members have 30 days to review and determine whether to purchase their pro-rata shares offered by Harbourvest, Harbourvest lacks contractual authority to enter into the Settlement Agreement.

## D.     HARBOURVEST'S LACK OF AUTHORITY PRECLUDES ENFORCEMENT OF SETTLEMENT

21.     Harbourvest has not completed its conditions precedent to the transfer of its interest to Transferee under the Member Agreement. As detailed above, and in section 6.2 of the Agreement, Harbourvest must effectuate the Right of First Refusal before it can transfer its interests in HCLOF. MEMBER AGREEMENT, § 6.2. Harbourvest is, in essence, bound by the condition precedent of effectuating the Right of First Refusal before it is authorized under the Member Agreement to enter into the Settlement Agreement.

22.     Courts should not enforce a settlement agreement where a party has a condition precedent to entry into the agreement and fails to satisfy that condition. *In re De La Fuente*, 409 B.R. 842, 846 (Bankr. S.D. Tex. 2009). As noted in part in *De La Fuente*, the court would not recognize

or enforce a settlement where the parties were subject to conditions precedent before the settlement could be effective, and the conditions precedent were not satisfied. This Court should similarly deny Harbourvest's proposed settlement, as it would deny the Members' Right of First Refusal, which is the benefit of their bargain under the Member Agreement.

## III.
## PRAYER FOR RELIEF

WHEREFORE, CLO Holdco requests that this Court grant the Objection and enter an order denying the Harbourvest Settlement Motion.

DATED: January 8, 2020

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By:    */s/ John J. Kane*
     Joseph M. Coleman
     State Bar No. 04566100
     John J. Kane
     State Bar No. 24066794

901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

ATTORNEYS FOR CLO HOLDCO, LTD.

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2020, a true and correct copy of the foregoing CLO Holdco Objection was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case; and via e-mail upon the United States Trustee at Lisa.L.Lambert@usdoj.gov and upon the following parties:

Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue, Suite 2000
Dallas, Texas 74201
Email:  pmontgomery@sidley.com
          preid@sidley.com
          jhoffman@sidley.com

Bojan Guzina
Matthew A. Clemente
Dennis M. Twomey
Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603
Email:  bguzina@sidley.com
          mclemente@sidley.com
          dtwomey@sidley.com
          alyssa.russell@sidley.com

Counsel for Harbourvest:
M. Natasha Labovitz
Erica S. Weisgerber
Daniel E. Stroik
Vickie L. Driver
Christina W. Stephenson
Email: nlabovitz@debevoise.com
          eweisgerber@debevoise.com
          destroik@debevoise.com
          vickie.driver@crowedunlevy.com
          crissie.stephenson@crowedunlevy.com

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Email:  ipomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com

Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Email:  MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

_/s/ John J. Kane_
John J. Kane

# EXHIBIT 7

Page 1

1

2   IN THE UNITED STATES BANKRUPTCY COURT
 FOR THE NORTHERN DISTRICT OF TEXAS
3          DALLAS DIVISION

4  IN RE:

5                    CHAPTER 11

6                    CASE NO.
 HIGHLAND CAPITAL          19-34054-
7 MANAGEMENT, L.P.          SGJLL

8
    Debtor.
9

10

11     Confidential - Under Protective Order

12        REMOTE DEPOSITION OF
          MICHAEL PUGATCH
13     Zoom Videoconference
          01/11/2021
14        1:07 P.M. (EDT)

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  AMANDA GORRONO, CLR
  CLR NO. 052005-01
25  JOB NO. 188591

Page 2

```
1
2               01/11/2021
3             1:07 P.M. (EDT)
4
5
6      REMOTE ORAL DEPOSITION OF MICHAEL
7   PUGATCH, held virtually via Zoom
8   Videoconferencing, pursuant to the
9   Federal Rules of Civil Procedure before
10  Amanda Gorrono, Certified Live Note
11  Reporter, and Notary Public of the State
12  of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S:- (Via Remote)
3   PACHULSKI STANG ZIEHL & JONES
4   Attorneys for Debtor
5   780 Third Avenue
6   New York, New York 10017
7   BY:  JOHN MORRIS, ESQ.
8        HAYLEY WINOGRAD, ESQ.
9
10  BONDS ELLIS EPPICH SCHAFER JONES
11  Attorneys for Jim Dondero
12  420 Throckmorton Street
13  Fort Worth, Texas 76102
14  BY: JOHN WILSON, ESQ.
15      BRYAN ASSINK, ESQ.
16
17  DEBEVOISE & PLIMPTON
18  Attorneys for HarbourVest
19  919 Third Avenue
20  New York, New York 10022
21  BY:  ERICA WEISGERBER, ESQ.
22       M. NATASHA LABOVITZ, ESQ.
23       EMILY HUSH, ESQ.
24       DANIEL STROIK, ESQ.
25
```

Page 4

```
1
2   A P P E A R A N C E S: (Via Remote)
3   KANE RUSSELL COLEMAN & LOGAN
4   Attorneys for CLO Holdco Limited
5   Bank of America Plaza
6   901 Main Street
7   Dallas, Texas 75202
8   BY:  JOHN KANE, ESQ.
9
10  HELLER, DRAPER, HAYDEN, PATRICK, & HORN
11  Attorneys for The Dugaboy Investment
12  Trust and the Get Good Trust
13  650 Poydras Street
14  New Orleans, Louisiana 70130
15  BY:  DOUGLAS DRAPER, ESQ.
16
17  LATHAM & WATKINS
18  Attorney For UBS
19  885 Third Avenue
20  New York, New York
21  BY: SHANNON MCLAUGHLIN, ESQ.
22
23
24
25
```

Page 5

```
1
2   A P P E A R A N C E S: (Via Remote)
3   KING & SPALDING
4   Attorney for Highland CLO Funding, Ltd.
5   1180 Peachtree Street, NE
6   Atlanta, Georgia 30309
7   BY:  MARK MALONEY, ESQ.
8
9
10
11  ALSO PRESENT:
12  ALIZA GOREN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1
2       I N D E X
3
WITNESS        EXAMINATION BY      PG
4  MICHAEL PUGATCH  MR. WILSON    10, 148
                    MR. KANE     122
5                   MS. WEISGERBER   147
6
7       E X H I B I T S
7
EXHIBIT
   DESCRIPTION          PAGE
9  Exhibit 1  Proof of Claim 143 filed   16
10     4/08/2020 nine pages.......
11 Exhibit 2  Proof of Claim 149 filed   17
12     4/08/2020 nine pages.......
13 Exhibit 3  Declaration of Michael    18
14     Pugatch in Support of
15     Motion of HarbourVest
16     Pursuant to Rule 3018(a)...
17 Exhibit 4  Member Agreement 28 pages..  21
18 Exhibit 5  HarbourVest Response to    22
19     Debtor's First Omnibus
20     Objection 617 pages........
21 Exhibit 6  Offering Memorandum 122    61
22     pages.....................
23 Exhibit 7  Share Subscription and    63
24     Transfer Agreement 31
25     pages.....................

Page 7

1
2  Exhibit 8  E-mail 08/15/2017..........  68
3  Exhibit 9  11/29/2017 E-mail with    79
4     cover letter Highland
5     Capital Management.........
6  Exhibit 10  2004 Examination of    83
7     Investor in Highland CLO
8     Funding Ltd. 10/10/2018....
9  Exhibit 11  Declaration of John A.    109
10     Morris in Support of the
11     Debtor'S Motion For Entry
12     of an Order Approving
13     Settlement With
14     Harbourvest (Claim Nos.
15     143, 147, 149, 150, 153,
16     154) and Authorizing
17     Actions, 82 pages..........
18
19
20       R E Q U E S T S
21 DESCRIPTION          PG
22 Transcript be marked Confidential    10
23 under the Protective Order.............
24
25

Page 8

1
2       MR. WILSON:  I'm John Wilson
3  with the firm of Bonds Ellis Eppich
4  Schafer Jones LP.  And I represent Jim
5  Dondero.
6       MR. MORRIS:  John Morris and
7  Hayley Winograd of Pachulski Stang
8  Ziehl & Jones for the Debtor.
9       MS. WEISGERBER:  Erica
10  Weisgerber from Debevoise & Plimpton
11  for HarbourVest.
12       MR. KANE:  John Kane of Kane
13  Russell Coleman & Logan, for CLO
14  Holdco Limited.
15       MR. DRAPER:  Douglas Draper of
16  Heller Draper & Horn, for The Dugaboy
17  Investment Trust and the Get Good
18  Trust.
19       MS. McLAUGHLIN:  Shannon
20  McLaughlin from Latham & Watkins LLP
21  for UBS.
22       MR. MALONEY:  Mark Maloney from
23  King & Spalding, on behalf of Highland
24  CLO Funding Limited.
25       MS. WEISGERBER:  I'm joined on

Page 9

1
2  the line by my colleagues from
3  Debevoise, Natasha Labovitz and Emily
4  Hush, and Aliza Goren from HarbourVest
5  is on the line, as well.
6       MR. WILSON:  As a preliminary
7  matter, the witness' counsel has
8  produced some documents to us that
9  they've requested be subject to the
10  confidentially order or a brief
11  protective order entered at Document
12  Number 382, in this case.
13       And she's also requested that
14  all counsel and participants in this
15  deposition agree to be bound by the
16  terms of that order, because some of
17  the documents that were produced are
18  stamped "confidential," and they want
19  to maintain that confidentially.
20       Do we have an agreement of all
21  counsel and participants on the
22  deposition to be bound by the terms of
23  that agreed protective order?
24       (All agreed.)
25       MS. WEISGERBER:  Okay.  I think

Page 10

Confidential - Pugatch

1  that was everyone. Thank you all for
2  confirming. And the deposition will
3  be marked "confidential" until and
4  unless HarbourVest designates the
5  testimony otherwise.
6      MR. WILSON: And that's fine.
7      (Whereupon, a request for
8  Transcript be marked Confidential
9  under the Protective Order was made.)
10 M I C H A E L  P U G A T C H,
11      called as a witness, having been
12 first duly affirmed by a Notary Public of
13 the State of New York, was examined and
14 testified as follows:
15 EXAMINATION
16 BY MR. WILSON:
17     Q. All right. Mr. Pugatch, how do
18 you pronounce your name? I'm sorry.
19     A. Yep, you've got it. Pugatch.
20     Q. Pugatch. Okay. Can you state
21 your full name for the record?
22     A. Yeah. Michael Pugatch.
23     Q. Okay. And you've been
24 designated by HarbourVest to discuss some

Page 11

Confidential - Pugatch

1  matters related to the 9019 motion. And
2  specifically we asked that HarbourVest
3  produce a witness who could talk about the
4  negotiations of the settlement with the
5  Debtor, and also the factual allegations
6  underlying HarbourVest's Proof of Claim,
7  and those described in HarbourVest's
8  response to the claim objection, including
9  without limitation, its investment with
10 Acis/HCLOF in the alleged representations
11 made by the Debtor and/or Acis/HCLOF to
12 HarbourVest, and any and all agreements
13 entered into between HarbourVest and any
14 other party related to its investment.
15     Q. Do you agree that you're the
16 best person to talk about these matters on
17 behalf of HarbourVest?
18     A. Yes. Yes.
19     Q. Okay. Have you given a
20 deposition before?
21     A. I have.
22     Q. Okay. So you understand how it
23 works that you're under oath, and that I'm
24 going to be asking questions and you're

Page 12

Confidential - Pugatch

1  going to be giving answers. If at any
2  time I ask a question that you don't
3  understand, or we've had some problems
4  with sometimes connectivity issues with
5  Zoom. But yeah, any time that you don't
6  understand my question or you didn't catch
7  it, I'll be happy to repeat it.
8      Also, one thing I found with
9  Zoom is that it's easier to talk over
10 people. I'll try not to talk over you. I
11 would ask that you try to ensure that I've
12 finished asking my question before you
13 start your answer. And I will likewise
14 try to ensure that you've finished your
15 answer before start my next question.
16     And at any time during this
17 deposition if you feel the need to take a
18 break, that's totally okay with me. The
19 one thing that I would ask is if I've just
20 asked a question, that you answer the
21 question before requesting the break.
22     And if we have that agreement
23 and the ground rules, then I think I'm
24 ready to start asking you my questions.

Page 13

Confidential - Pugatch

1      A. Sounds good.
2      Q. What's your current address?
3      A. 47 Wayne Road in Needham,
4  Massachusetts.
5      Q. Okay. And where are you located
6  today?
7      A. At that address.
8      Q. Okay. That's your home address?
9      A. Correct.
10     Q. And is anyone in the room with
11 you there?
12     A. No.
13     Q. And did you talk with anyone
14 about your deposition today?
15     A. Only counsel.
16     Q. Okay. And did you go over the
17 facts of the underlying investment and the
18 settlement negotiations with your counsel?
19     MS. WEISGERBER: I'm going to
20     object on privilege grounds. He
21     can -- he prepared for the deposition
22     with counsel. I don't think you can
23     inquire into specifics of the
24     preparation.

Page 14

Confidential - Pugatch

1    MR. WILSON: Okay. Well, you
2    know, he was designated to talk about
3    these matters, and I'm just asking if
4    he discussed these matters with his
5    counsel his before his testimony.
6    That's all. I'm not asking the
7    substance of those communications.
8        MS. WEISGERBER: You're asking
9    about conversations with counsel. How
10   about you just ask if he's prepared to
11   talk about those topics today?
12       MR. WILSON: Okay.
13   BY MR. WILSON:
14   Q.   Are you prepared to talk about
15   those topics today?
16   A.   Yes.
17   Q.   Okay. Now, HarbourVest has
18   filed several proofs of claim in this
19   matter, and it looks like those are
20   numbered 143 on behalf of HarbourVest,
21   217 Global Fund L.P., and 144 HarbourVest
22   2017 Global AIF, 149 HarbourVest Partners
23   L.P., 150 HarbourVest Dover Street, IX
24   Investment L.P., 153 HarbourVest -- or I'm

Page 15

Confidential - Pugatch

1    sorry, HV International VIII Secondary
2    L.P., and 154 HarbourVest Skew Base AIF
3    LP.
4        And you're here to talk on
5    behalf of all of those entities, and you
6    have, for purpose of this settlement and
7    you're -- the 9019 motion, these proofs of
8    claim are all lumped together as one
9    claim; is that correct?
10       MS. WEISGERBER: I'm just going
11   to object quickly and clarify that
12   he's not here as a 30(b)(6) witness,
13   but he is here as someone from
14   HarbourVest who signed those proofs of
15   claim. So with that, I'll let you
16   continue.
17   A.   I'll just answered the question,
18   yes, as a representative on behalf of all
19   of those entities. I would defer to
20   counsel, from a legal perspective, whether
21   these are treated as a single or separate
22   claims.
23       MR. WILSON: Okay. And we can
24   move on for now.

Page 16

Confidential - Pugatch

1    I'm going to submit the first
2    exhibit. It's going to be Exhibit
3    No. 1 to the deposition. I'm sending
4    it by E-mail, and I'm also going to
5    use a share screen.
6        (Whereupon, Exhibit 1, Proof of
7    Claim 143 filed 4/08/2020 nine pages,
8    was marked for identification.)
9        MR. WILSON: So this document
10   right here is Claim Number 143 filed
11   on April 8, 2020, and this one is
12   filed on behalf of HarbourVest 2017
13   Global Fund L.P.
14       If we go down, scroll to the
15   annex to proof of claim, it's Page 5
16   of the document. It says that the
17   Claimant is a limited partner in one
18   of the Debtor's managed vehicles,
19   Highland CLO Funding, Ltd.
20       And I'm going to now send out an
21   E-mail with Exhibit No. 2. I'm going
22   to pull this Exhibit No. 2 document up
23   on the share screen, as well. I guess
24   that's right.

Page 17

Confidential - Pugatch

1        (Whereupon, Exhibit 2, Proof of
2    Claim 149 filed 4/08/2020 nine pages,
3    was marked for identification.)
4    BY MR. WILSON:
5    Q.   Can you see the official proof,
6    official form 410 proof of claim on your
7    screen?
8    A.   The first one that you shared?
9    Q.   I'm now on Exhibit No. 2. Is it
10   showing up on your screen?
11   A.   No.
12   Q.   Okay. Actually, I'm sorry. Is
13   it now showing up on your screen?
14   A.   Now, it's showing up, yep.
15   Q.   Okay. So this one is Proof of
16   Claim 149, filed on the same date. And
17   this one's filed on behalf HarbourVest
18   Partners L.P. And I'm going to scroll
19   down to the annex to proof of claim, which
20   looks largely like the annex to the
21   previous proof of claim we looked at.
22       But this one says, in Paragraph
23   No. 2, the Claimant manages investment
24   funds that are limited partners in one of

Page 18

Confidential - Pugatch

1 the Debtor's managed vehicles, Highland
2 CLO Funding, Ltd.
3
4 And can you tell me why this
5 HarbourVest Partners L.P. filed a separate
6 proof of claim, from the entities that
7 were investors in HCLOF?
8 A. I would only be able to answer
9 that, based on conversations with counsel.
10 Q. But in any event, HarbourVest
11 Partners L.P. did not invest in HCLOF,
12 correct?
13 A. Not directly on behalf of
14 itself, no.
15 Q. All right. I'm going to stop
16 that share screen.
17 MR. WILSON: And this is going
18 to be Exhibit Number 3.
19 (Whereupon, Exhibit 3,
20 Declaration of Michael Pugatch in
21 Support of Motion of HarbourVest
22 Pursuant to Rule 3018(a), was marked
23 for identification.)
24 MR. WILSON: And Exhibit No. 3
25 that I've just submitted via E-mail,

Page 19

Confidential - Pugatch

1
2 and I'm about to put it up on the
3 screen, is the Declaration of
4 HarbourVest. Let me get it up here,
5 so you can see it. This is the
6 declaration of Michael Pugatch in
7 support of motion of HarbourVest
8 pursuant to Rule 3018(a).
9 BY MR. WILSON:
10 Q. Have you seen this document
11 before?
12 A. Yes.
13 Q. And, in fact, this is your
14 declaration; is that correct?
15 A. Yes.
16 Q. And at the first line of this,
17 of Paragraph 1 says that you're the
18 managing director of HarbourVest Partners
19 LLC?
20 A. Correct.
21 Q. And how is HarbourVest Partners
22 LLC connected to these claims?
23 A. That is the corporate entity or
24 managing member of all of the underlying
25 funds that are managed on behalf of

Page 20

Confidential - Pugatch

1
2 HarbourVest Partners L.P.
3 Q. And you're the managing director
4 of that entity?
5 A. A managing director to that
6 entity, yes.
7 Q. You said "a managing director,"
8 are there others?
9 A. Yes.
10 Q. Who are the others?
11 A. There are over 50 managing
12 directors at HarbourVest Partners LLC.
13 Q. And are you the managing
14 director that has charge of this
15 particular HarbourVest investment, the one
16 in HCLOF?
17 A. Yes.
18 MR. WILSON: All right. I beg
19 your patience. I'm trying to conduct
20 this deposition solo. I've got a lot
21 of stuff I've got to go through. So
22 I'll do my best to do it efficiently.
23 But this next exhibit I'm going
24 to submit is going to be Exhibit No.
25 4. I'm sending it in the E-mail now.

Page 21

Confidential - Pugatch

1
2 (Whereupon, Exhibit 4, Member
3 Agreement 28 pages, was marked for
4 identification.)
5 BY MR. WILSON:
6 Q. Can you see this on your share
7 screen?
8 A. I can.
9 Q. This is the Members Agreement
10 relating to the Company.
11 A. (Nods.)
12 Q. I'm just going to scroll down.
13 Okay. So this is the signature page for
14 the HarbourVest entities that were
15 invested in this company. And it says
16 that you were the authorized person to
17 sign on behalf of the first two entities:
18 HarbourVest Dover Street, HarbourVest 2017
19 Global, and then the next one here it says
20 you're managing director. And here we see
21 that HarbourVest Partners LLC.
22 And if we scroll down, we see
23 that you're the managing director of
24 HarbourVest Partners LLC, again, on behalf
25 of HV International, and that you're an

Confidential - Pugatch

1
2 authorized person on behalf of HarbourVest
3 Skew Base.
4       So you signed all these
5 agreements on behalf of the HarbourVest
6 entities, when HarbourVest made its
7 investment in HCLOF. Would that be
8 correct?
9     A.   Correct.
10     Q.   Okay. Sorry that was
11 cumbersome, but I needed to get through
12 it.
13       MR. WILSON: I'm going to now
14 stop that share screen. And I'll need
15 to go to Exhibit No. 5. I'm E-mailing
16 out Exhibit No. 5 right now.
17       (Whereupon, Exhibit 5,
18 HarbourVest Response to Debtor's First
19 Omnibus Objection 617 pages, was
20 marked for identification.)
21 BY MR. WILSON:
22     Q.   This is -- I'll do another share
23 screen -- this is Docket 1057 filed in the
24 Highland bankruptcy. And this is
25 HarbourVest Response to Debtor's First

Confidential - Pugatch

1
2 Omnibus Objection.
3       Did you participate in the
4 creation of this document?
5     A.   Yes.
6     Q.   So you had an opportunity to
7 review this document, before it was filed?
8     A.   Correct.
9     Q.   And you agree with the
10 statements and the positions taken in this
11 document?
12     A.   I do.
13     Q.   All right. So what this says in
14 Paragraph 8, that by the summer of 2017,
15 HarbourVest was engaged in preliminary
16 discussions with Highland, regarding the
17 investment.
18       First off, why was HarbourVest
19 engaged in preliminary discussions with
20 Highland?
21     A.   Highland had approached
22 HarbourVest with an investment
23 opportunity. This was really borne out of
24 discussions that we had with them around a
25 couple of investment opportunities, that

Confidential - Pugatch

1
2 this opportunity with HCLOF being the one
3 that by the summer of 2017, as stated
4 here, was in, was advancing through
5 discussions.
6     Q.   And which individuals at
7 Highland were you engaged in discussions
8 with? By "you," I mean HarbourVest.
9     A.   Yeah, I mean, originally it was
10 through a couple of members of their
11 investor relations team. My first point
12 of contact was with Brad Eden, and then
13 subsequently progressed to a larger subset
14 of employees of Highland.
15     Q.   And who on behalf of HarbourVest
16 was engaging in these discussions?
17     A.   It was primarily myself, my
18 colleague, or two -- two colleagues
19 primarily, alongside myself.
20     Q.   I'm sorry. I didn't catch the
21 last part.
22     A.   Sorry. Myself and two other
23 colleagues primarily.
24     Q.   And who are these two other
25 colleagues?

Confidential - Pugatch

1
2     A.   Dustin Willard and then a more
3 junior member of the HarbourVest team.
4     Q.   When you say "the HarbourVest
5 team," what does that mean?
6     A.   So the broader investment team
7 and specifically in this context, the
8 secondary investment team at HarbourVest,
9 that this was an opportunity for.
10     Q.   So who made the final decision,
11 on behalf of HarbourVest, to make this
12 investment?
13     A.   Ultimately it was a decision
14 made by the investment committee of
15 HarbourVest.
16     Q.   And who's on that investment
17 committee?
18     A.   It's a four-member committee
19 comprised of managing directors within the
20 firm.
21     Q.   And who are those managing
22 directors?
23     A.   I don't recall at the time who
24 the members were. I can tell you the
25 members now, of that committee. It has

Page 26

Confidential - Pugatch

1     Confidential - Pugatch
2  changed or evolved over time.
3     Q.   And that committee included you?
4     A.   I was involved in the
5  decisionmaking of that, yes, correct.
6     Q.   So you were part of the four-man
7  committee that made this decision?
8     A.   Yes.
9     Q.   All right.  I'm going to go back
10 to what we've marked as Exhibit 3, which
11 is your declaration.  And it says in
12 Paragraph 2, that HarbourVest is a passive
13 minority investor in Highland CLO funds,
14 HCLOF, and by the way, I haven't stated
15 this before, but in this deposition if I
16 say HCLOF, I'm going to be referring to
17 Highland CLO funds.
18       But it says that the vehicle is
19 managed by Highland Capital Management,
20 L.P.
21       And why do you say that that
22 vehicle was managed by Highland Capital
23 Management, L.P.?
24    A.   I believe that is the named
25 investment manager of HCLOF, per the

Page 27

Confidential - Pugatch

1     Confidential - Pugatch
2  organization documents of that vehicle.
3     Q.   You believe that that was the
4  investment manager on the organization
5  documents, which --
6     A.   Of the various transaction
7  documents that we entered into, in
8  connection with our investment.
9     Q.   Would those have been the
10 documents that you had entered on November
11 the 15 of 2017?
12    A.   Yes.
13    Q.   Okay.  It says that HarbourVest
14 initially invested $73,522,928 for roughly
15 49 percent interest in HCLOF; and more
16 specifically, that would be a 49.98
17 percent interest in HCLOF, correct?
18    A.   Sounds right, yes.
19    Q.   Okay.  And then HarbourVest
20 contributed an additional $4,998,501
21 following a capital call, and it's
22 received three dividends, each totally
23 $1,570,429.
24       Is all of that correct?
25    A.   Yes.

Page 28

Confidential - Pugatch

1     Confidential - Pugatch
2     Q.   And has HarbourVest received any
3  additional dividends, since the making of
4  this declaration?
5     A.   No, we have not.
6     Q.   Now, I want to skip down to
7  Paragraph 3, where it says that
8  HarbourVest expected proceeds from the
9  original HCLOF investment were projected
10 to exceed 135 million.
11       Do you agree with that?
12    A.   That was the original projected
13 value of the investment, yes.
14    Q.   Well, whose expectation was
15 that?
16    A.   Those were figures, as I recall,
17 that were originally provided to us by
18 Highland to form the basis of our due
19 diligence that we went through, and
20 penultimately were included as part of our
21 investment thesis in making the
22 investment.
23    Q.   So your testimony is that
24 Highland told you that your investment
25 would be worth over $135 million?

Page 29

Confidential - Pugatch

1     Confidential - Pugatch
2     A.   Yes.
3        MS. WEISGERBER:  Objection to
4  the form.  Misstates testimony.
5        Go ahead, Mike.
6     A.   That was, that was part of our
7  original due diligence, on the investment
8  opportunity.
9     Q.   When you say part of your due
10 diligence, are you saying that the number
11 originated from Highland or that the
12 number originated from your due diligence
13 operations?
14       MS. WEISGERBER:  Objection to
15 form.
16    A.   The number originally came from
17 Highland and formed the basis upon which
18 we conducted due diligence on the
19 investment opportunity.
20    Q.   And after performing due
21 diligence, you were satisfied that that
22 was a reasonable projection?
23    A.   Yes.
24    Q.   And what was the, what was the
25 estimated date, in which the value of your

Page 30

Confidential - Pugatch

1    investment would exceed the $135 million?
2        MS. WEISGERBER: Objection to
3    form.
4        A.   I don't recall exactly.  That
5    would have been over, over several years.
6    And again, this was the -- this was the
7    projected value based on the original
8    investment or the assets that were held by
9    HCLOF, at the time of our investment.
10       Q.   Now, when you talk about a
11   portfolio manager -- I'm sorry, when you
12   talk about investment manager, are you
13   referring to the portfolio manager?
14       A.   No.
15       Q.   So what's the difference in an
16   investment manager and a portfolio
17   manager?
18       A.   So in the context of this
19   investment, the investment manager.  We --
20   we had -- HarbourVest had an investment
21   with HCLOF.  Highland was the investment
22   manager of HCLOF that in turn held equity
23   positions in a variety of CLOs, which had
24   various portfolio managers associated with

Page 31

Confidential - Pugatch

1    those, all Highland affiliates.
2        Q.   And so who was the portfolio
3    manager for the HarbourVest investment in
4    HCLOF?
5        MS. WEISGERBER: Objection to
6    form.
7        A.   There were various underling
8    portfolio managers, depending on the
9    underlying CLO position.
10       Q.   Well, who was the initial
11   portfolio manager?
12       A.   So, again it would depend on
13   which underlying assets we're talking
14   about.  HCLOF was a diversified portfolio
15   of multiple underlying CLO equity
16   positions, all with portfolio managers
17   that were Highland affiliates, as we
18   understood it.
19       Q.   Well, I'm going to go back to
20   Exhibit 1, Paragraph 2, this says, in the
21   second sentence, "Acis Capital Management
22   GP, LLC, and Acis Capital Management,
23   L.P., together Acis, the portfolio manager
24   for HCLOF," and then it continues on,

Page 32

Confidential - Pugatch

1    "filed for Chapter 11."
2        Is this proof of claim correct,
3    when it states that Acis Capital
4    Management GP, LLC, and Acis Capital
5    Management, L.P., were the portfolio
6    manager for HCLOF?
7        MS. WEISGERBER: Objection to
8    form.
9        A.   I know that there was an issue
10   with the portfolio manager for at least
11   the Acis CLOs that were held by HCLOF.
12       Q.   Well, how do you distinguish
13   between the Acis CLOs and the Highland
14   CLOs?  Is that based on who was managing
15   them?
16       MS. WEISGERBER: Objection to
17   form.
18       A.   Again, they were all underlying
19   investments of HCLOF.  We didn't
20   distinguish the portfolio manager, if you
21   will, of those vehicles, other than again
22   they were Highland affiliates.
23       Q.   But it's fair to say that Acis
24   was managing at least a portion of the

Page 33

Confidential - Pugatch

1    HCLOF investment, correct?
2        A.   Correct.  The underlying
3    investments held by HCLOF, correct.
4        Q.   And did anything -- from the
5    time that you -- well, let's just go to
6    the -- I think we had the members
7    agreement up a second ago.  This would
8    have been Exhibit 4.
9        Yeah, right here.  No. 14,
10   Highland HCF Advisor, Ltd. is listed as
11   the portfolio manager on the members
12   agreement.
13       Is that accurate, that Highland
14   HCF Advisor, Ltd. was the portfolio
15   manager?
16       MS. WEISGERBER: Objection to
17   form.  Can you state as of what date
18   you're asking, Counsel?
19       MR. WILSON:  Well, the date of
20   this memorandum is, it says right
21   here, 15 November 2017.
22   BY MR. WILSON:
23       Q.   So as of the date November 15,
24   2017, who was the portfolio manager for

Page 34

1     Confidential - Pugatch
2 this investment?
3    A.  I don't recall the specific
4 names of the various entities that sat
5 below the HCLOF level or below Highland
6 Capital, as the investment manager of
7 HCLOF.
8    Q.  Well, are you familiar with a
9 company called Brigade?
10    A.  Yes.
11    Q.  And was that company a
12 sub-manager of this investment?
13     MS. WEISGERBER: Objection to
14 form.
15    A.  Not at the time of our
16 investment.
17    Q.  Not at the time. Well, when did
18 the portfolio managers begin to change in
19 this investment?
20     MS. WEISGERBER: Objection to
21 form.
22    A.  Do you mean subsequent to our
23 investment?
24    Q.  Yes.
25    A.  So as I understand it in

Page 35

1     Confidential - Pugatch
2 connection with the Acis bankruptcy that
3 took place, there was a change in the
4 underling either portfolio manager of
5 certain of the CLOs, the Acis-managed CLOs
6 or Acis-branded CLOs, I should say, and/or
7 sub-advisor of those CLOs.
8    Q.  And was that at the direction of
9 the Chapter 11 trustee?
10     MS. WEISGERBER: Objection.
11    A.  That's my understanding.
12    Q.  And so when this investment was
13 initially made, was Highland HCF Advisor,
14 Ltd. the portfolio manager of the entire
15 investment?
16     MS. WEISGERBER: Objection to
17 form.
18    A.  I don't recall the specifics
19 underneath the HCLOF entity.
20    Q.  Well, there aren't any other
21 portfolio managers listed on this
22 document, that I can see.
23     Is there any place in this
24 document that you can point me to that
25 would identify another portfolio manager?

Page 36

1     Confidential - Pugatch
2     MS. WEISGERBER: Objection to
3 form. The document speaks for itself.
4    A.  Again, I think we may be
5 distinguishing here between portfolio
6 manager at the HCLOF level and portfolio
7 manager sub-advisor, again, I'm not sure
8 the proper terminology as it relates to
9 each of the underlying CLOs that were
10 partially owned by HCLOF.
11    Q.  Well, after the Acis bankruptcy
12 was filed, and after the Chapter 11
13 trustee appointed Acis as a portfolio
14 manager of at least part of HCLOF, did
15 Highland HCF Advisor continue to serve as
16 portfolio manager?
17     MS. WEISGERBER: Objection to
18 form.
19    A.  All of HarbourVest's interaction
20 was with Highland as the investment
21 manager of HCLOF. My understanding of the
22 change in those entities related to the
23 portfolio management of the underlying
24 Acis CLOs, not a change in the portfolio
25 manager, at the HCLOF level.

Page 37

1     Confidential - Pugatch
2    Q.  Well, Highland is listed as a
3 member under this -- Highland Capital
4 Management LLP is listed as a member under
5 this Member Agreement; is that correct?
6     MS. WEISGERBER: Objection to
7 form.
8    A.  If that's what the document
9 says, yes.
10    Q.  I'm going to look -- let me stop
11 my share screen for a second.
12     All right. I'm now at the top
13 of Page 5 of this Exhibit 4, where it
14 says, "Dover IX shall mean HarbourVest
15 Dover Street IX Investment L.P."
16     And Dover IX was the largest
17 single investor of the HarbourVest Group;
18 is that correct?
19    A.  Correct.
20    Q.  All right. I'm now going to go
21 down to Paragraph 5. I'm sorry, it's not
22 Paragraph 5. Paragraph 4, where it says
23 "Composition of Advisory Board" in
24 Paragraph 4.1, The Company shall establish
25 an Advisory Board composed of two

Page 38

Confidential - Pugatch

1 Confidential - Pugatch
2 individuals, one of whom shall be a
3 representative of CLO Holdco and one of
4 whom shall be a representative of
5 Dover IX.
6 And did this Advisory Board get
7 created?
8 A. I believe it was created, yes.
9 Q. And who was the representative
10 for CLO Holdco on the Advisory Board?
11 A. I don't know.
12 Q. Who was the representative for
13 Dover IX on the Advisory Board?
14 A. I can't recall whether it was
15 myself or one other colleague who jointly
16 manages this investment with me.
17 Q. You don't recall if you were on
18 the Advisory Board?
19 A. The Advisory Board never met
20 formally under its capacity as an Advisory
21 Board.
22 Q. Well, if you look down in
23 Paragraph 4.3, I've got my mouse pointed
24 here, I don't know if you can see it.
25 About two-thirds of the way down in this

Page 39

1 Confidential - Pugatch
2 paragraph it says, "The consent of the
3 Advisory Board shall be required to
4 approve the following actions," and then
5 it lists a number of things.
6 Did the Advisory Board not have
7 to -- was it not required that the
8 Advisory Board ever meet, because they
9 didn't take any of these actions?
10 MS. WEISGERBER: Objection.
11 Objection to form.
12 A. There may have been one or two
13 actions taken by the Advisory Board, I'm
14 looking at the list here to see what those
15 may even have been, during the duration of
16 our investment; but if so, those would
17 have been written resolutions or written
18 consents, as opposed to any meeting that
19 was convened amongst the entire Advisory
20 Board.
21 Q. Okay. And the entire Advisory
22 Board is just two individuals, correct?
23 A. Correct, that's my
24 understanding.
25 Q. Okay. And if you go up a few

Page 40

1 Confidential - Pugatch
2 sentences above that in Paragraph 4.3 it
3 says, The portfolio manager shall not act
4 contrary to advice of the Advisory Board
5 with respect to any action or
6 determination expressly conditioned herein
7 or in the offering memorandum on the
8 consider approval of the Advisory Board.
9 So the portfolio manager did not
10 have the authority to disregard the advice
11 of the Advisory Board; is that correct?
12 MS. WEISGERBER: Objection to
13 form; misstates the document.
14 A. With respect to the limited role
15 that the Advisory Board would have to
16 play, yes, that would be my read.
17 Q. Now, what is your understanding
18 of a reset transaction?
19 A. Has to do with a refinancing and
20 reset of the investment period of an
21 underlying CLO.
22 Q. And would a reset transaction be
23 contained within this -- these actions
24 that the Advisory Board's consent is
25 required to approve?

Page 41

1 Confidential - Pugatch
2 A. No, it would not.
3 MS. WEISGERBER: Objection.
4 MR. MALONEY: Join.
5 Q. It would not?
6 A. It would not.
7 Q. Well, if a reset was to be
8 proposed, who would have the discretion to
9 make that decision to enter a reset
10 transaction?
11 MS. WEISGERBER: Objection to
12 form and foundation.
13 MR. MALONEY: Join.
14 A. That would be Highland as the
15 manager of HCLOF, who owns the equity
16 position to the underlying CLOs.
17 Q. So you're saying that Highland
18 would have the exclusive authority to
19 enter a reset transaction?
20 A. Correct.
21 MS. WEISGERBER: Objection to
22 form.
23 MR. MALONEY: Join.
24 Q. What if HarbourVest objected to
25 a reset transaction? Would it have any

Page 42

1     Confidential - Pugatch
2  rights or remedies, in your understanding?
3        MS. WEISGERBER: I'm going to
4    object to form. And also just object
5    to the extent that this is calling for
6    legal conclusions.
7        Mike --
8        MR. WILSON: I've ask the
9    witness, within his understanding of
10   the way this investment worked.
11       MS. WEISGERBER: If you have an
12   understanding separate from any other
13   conversations with counsel, Mike, you
14   can certainly answer.
15   A.   Within my understanding,
16  HarbourVest would not have had any ability
17  or rights to object to a reset or for
18  similar actions by Highland, as the
19  manager of the HCLOF.
20   Q.   Okay. And just to, just for
21  clarity, in 4.2 it says that, All actions
22  taken by the Advisory Board shall be (i)
23  by a unanimous vote of all of the members
24  of the Advisory Board in attendance; or
25  (ii), by written consent in lieu of a

Page 43

1     Confidential - Pugatch
2  meeting signed by all of the members of
3  the Advisory Board.
4        And we've talked about how there
5  were two members, one of which represented
6  CLO Holdco and one of which represented
7  HarbourVest, and it was your testimony
8  that you don't recall a meeting ever being
9  conducted that you believed that there had
10  been some written consents issued by the
11  Advisory Board; is that correct?
12       MS. WEISGERBER: Objection to
13   form.
14   A.   That is my recollection, yes.
15   Q.   I'm sorry? I didn't hear your
16  answer.
17   A.   That is my recollection, yes.
18   Q.   Okay. So what is the Advisory
19  Board's general function in your
20  understanding?
21       MS. WEISGERBER: Objection to
22   form.
23       You can answer, Mike, if you
24   know, other than, you know, legal
25   conclusions, things like that, legal

Page 44

1     Confidential - Pugatch
2  advice.
3        And also, Mike, you're welcome
4  to look at the document, I think John
5  is E-mailing you the documents as
6  well. I don't know if you have the
7  full document in front of you.
8        THE WITNESS: Yeah, I can pull
9   it up here.
10   A.   I mean, my understanding is the
11  Advisory Board, the Advisory Board's
12  involvement is as spelled as in Section
13  4.3 of the agreement that you have on the
14  screen. And that is the extent of the
15  role that the Advisory Board would play.
16   Q.   Well, but as a practical matter,
17  what did that entail?
18       MS. WEISGERBER: Objection to
19   form.
20   A.   Again, as a practical matter,
21  the listed items, which I can't see, that
22  are off the screen further down in 4.3 are
23  the items that would require approval by
24  the Advisory Board.
25   Q.   But other than those items, the

Page 45

1     Confidential - Pugatch
2  Advisory Board was not a routine part of
3  the decision-making of the portfolio
4  manager?
5        MS. WEISGERBER: Objection to
6   form.
7   A.   Not at all.
8   Q.   Did you say "not at all"?
9   A.   Not at all, no.
10   Q.   I'm going to refer back to
11  Exhibit 5, which was Document -- or Docket
12  1057. I'll put that back on the share
13  screen. I wanted you to scroll, sorry.
14  It's a long document.
15       I want you to look at
16  Paragraph 37, which should be on your
17  screen. And it says that these are
18  misrepresentations that HarbourVest
19  alleges were made by Highland. And the
20  first bullet point states that, "Highland
21  never informed HarbourVest that Highland
22  had no intention of paying the Arbitration
23  Award and was undertaking steps to ensure
24  that Mr. Terry could not collect on his
25  judgment."

Page 46

Confidential - Pugatch

1
2    Now, Mr. Terry did not have an
3  arbitration award against Highland; is
4  that correct?
5        MS. WEISGERBER: Objection to
6    form and foundation.
7    A.   My understanding is there was an
8  Arbitration Award, awarded for the benefit
9  of Mr. Terry.
10   Q.   But that award was against Acis,
11  correct?
12       MS. WEISGERBER: Objection to
13   form.
14   A.   I don't know all of the details.
15  I do know that Acis was a subsidiary of
16  Highland, and there was an arbitration
17  award that was for the benefit of
18  Mr. Terry.
19   Q.   But you would agree with me that
20  if, if Highland, or I'm sorry if Mr. Terry
21  had an arbitration award against Acis,
22  then Highland would not have any
23  obligation to pay that award?
24       MR. MORRIS: Objection to the
25   form of the question.

Page 47

Confidential - Pugatch

1
2        MS. WEISGERBER: Objection to
3    the form.  Objection to the extent
4    that it calls for a legal conclusion.
5        I don't -- Mike, if you have a
6    layman's understanding of the answer
7    to that question, you're welcome to
8    answer.  But if not, don't answer.
9    A.   My understanding was Acis was a
10  controlled subsidiary of Highland's.
11   Q.   Okay.  Well, the next bullet
12  point says that, "Highland did not inform
13  HarbourVest that it undertook the
14  transfers to siphon assets away from Acis,
15  L.P., and that such transfers would
16  prevent Mr. Terry from collecting on the
17  Arbitration Award."
18       So if your understanding was
19  that Highland was responsible for the
20  arbitration award, then why is it relevant
21  that Highland siphoned assets away from
22  Acis, L.P.?
23       MS. WEISGERBER: Objection to
24   form.  Misstates testimony.
25       Can you clarify that question,

Page 48

Confidential - Pugatch

1
2  John?  I think the beginning of it was
3    a little muddled.
4  BY MR. WILSON:
5    Q.   Well, this objection says that
6  Highland had -- or response to objection,
7  says that Highland had no intention of
8  paying the arbitration award, but that
9  seems to conflict with the next bullet
10  point that says that it undertook
11  transfers to siphon assets away from Acis,
12  L.P., to prevent Mr. Terry from collecting
13  on the arbitration award.
14       So where were those assets being
15  siphoned to?
16       MS. WEISGERBER: Objection to
17   form and foundation.
18       If you're capable of answering
19   that question, Mike, you can.
20   A.   I don't know the specific
21  details of where those assets were
22  siphoned off to, other than it was to
23  another Highland affiliate.
24   Q.   The next sentence says that,
25  "Highland simply did not inform

Page 49

Confidential - Pugatch

1
2  HarbourVest and represented to HarbourVest
3  that the reason for changing the portfolio
4  manager for HCLOF was because Acis was
5  toxic in the industry."
6        Do you see that?
7    A.   Yes.
8    Q.   And it seems when I read these
9  documents that have been filed in the
10  Highland bankruptcy, and also the Acis
11  bankruptcy, that there's a difference in
12  position as to which entity, being either
13  Highland or HarbourVest, had the belief
14  that the Acis name was toxic.  Can you
15  shed any light on that?
16       MS. WEISGERBER: Objection to
17   form.
18   A.   I can unequivocally say that the
19  idea to change the portfolio manager or
20  the idea that the Acis brand was toxic did
21  not come from HarbourVest.
22   Q.   That was not at HarbourVest's
23  suggestion or insistence?
24   A.   Absolutely not.
25   Q.   Well, whose suggestion was it

Page 50

Confidential - Pugatch

1
2 that the Acis name was toxic?
3    A.   Somebody at Highland.
4    Q.   Do you know who?
5    A.   I don't recall the conversation
6 where that first came up or who said, or
7 who at Highland said that.
8    Q.   But that conversation did occur
9 prior to HarbourVest's investment?
10    A.   Yes.
11    Q.   So Acis was previously the
12 portfolio manager for HCLOF prior to
13 November 15, 2017, and now November 17 --
14 or 15th, 2017, the portfolio manager was
15 changed.
16        And what is HarbourVest's
17 position as to why that change in
18 portfolio manager damaged it?
19        MS. WEISGERBER: Objection;
20 form, objection to the extent it calls
21 for a legal conclusion.
22        Mike, you can answer --
23        MR. WILSON: I'm not asking for
24 a -- with all due respect, I'm not
25 asking for a legal conclusion. I'm

Page 51

Confidential - Pugatch

1
2 asking for his understanding why the
3 change in the portfolio manager
4 damaged HarbourVest.
5        MS. WEISGERBER: Same objection.
6        You can provide any
7 non-privileged answer that you have,
8 Mike, if any.
9    A.   Ultimately my understanding is
10 that that change in portfolio manager and
11 the subsequent litigation between Acis,
12 Highland, and Josh Terry led to material
13 diminution in value, as it relates to the
14 underlying assets of HCLOF stemming from
15 Highland's decision not to comply with the
16 arbitration award to Mr. Terry.
17    Q.   Okay. Now, if you go up to
18 Page 4 in this document, it says that on
19 October 27th, and this is Paragraph 11
20 now, "On October 27, 2017, Acis' portfolio
21 management rights for HCLOF were
22 transferred to Highland HCF"; is that
23 correct?
24    A.   That sounds right, yes.
25    Q.   And this is over two weeks prior

Page 52

Confidential - Pugatch

1
2 to HarbourVest's investment, correct?
3    A.   Correct.
4    Q.   So HarbourVest had full
5 knowledge that that the portfolio manager
6 of HCLOF was being changed prior to its
7 investment, correct?
8    A.   Correct.
9        MS. WEISGERBER: Objection to
10 form.
11        And just to clarify, you're
12 asking him, HarbourVest, he's
13 testifying on behalf of himself. I
14 could just take a standing objection
15 to that because I know sometimes
16 you're just saying HarbourVest meaning
17 Mike, so...
18 BY MR. WILSON:
19    Q.   Okay. And just to be clear,
20 HCLOF changed its portfolio manager on
21 October 27, 2017, but after the Acis
22 bankruptcy was initiated the Chapter 11
23 trustee made changes to the portfolio
24 manager, correct?
25        MS. WEISGERBER: Objection to

Page 53

Confidential - Pugatch

1
2 form, foundation.
3    A.   I know there were changes
4 subsequent to the Acis bankruptcy, to the
5 underlying management of the Acis CLOs.
6    Q.   All right. I'm going to go back
7 to Paragraph 37, and I want to look at
8 these next two bullet points.
9        It says that, in the third
10 bullet point, that "Highland indicated to
11 HarbourVest that the dispute with
12 Mr. Terry (which appeared on a litigation
13 schedule presented to HarbourVest during
14 diligence) would have no impact on
15 investment activities."
16        And that would be the opinion of
17 Highland, correct?
18        MS. WEISGERBER: Objection to
19 form. The opinion of Highland? Is
20 that what you meant to ask?
21        MR. WILSON: Right.
22 BY MR. WILSON:
23    Q.   That's Highland expressing its
24 opinion to HarbourVest, correct?
25        MS. WEISGERBER: Objection to

Confidential - Pugatch

1
2    form.
3    A.   I would just say Highland
4    presented that as facts to HarbourVest.
5    Q.   Okay.  And the next one, it says
6    that "Highland expressed confidence in the
7    ability of HCLOF to reset or redeem the
8    CLOs notwithstanding that Highland was
9    using HCLOF as part of its scheme to avoid
10   the pending Arbitration Award."
11       That's again an opinion, right,
12   that Highland expressed confidence in the
13   ability of HCLOF?
14       MS. WEISGERBER:  Objection to
15   form.  Objection to the extent it
16   calls for a legal conclusion.
17   A.   Ultimately, their ability, or
18   HCLOF's ability to reset or redeem the
19   CLOs would be subject to market conditions
20   and the ability to actually affect those
21   transactions, but they expressed their,
22   you know, their belief or view in HCLOF's
23   ability to do that notwithstanding the,
24   that change in portfolio manager.
25   Q.   Well, in Paragraph 39 on that

Confidential - Pugatch

1
2    same page, it says, "In reliance on
3    Highland's misrepresentations and
4    omissions, HarbourVest invested in HCLOF."
5        Now, HarbourVest is a
6    sophisticated investor, correct?
7    A.   Correct.
8    Q.   And if we were to go to
9    Paragraph 36, it says, right here in the
10   middle, "These facts were material:
11   indeed, HarbourVest expressed concern and
12   requested further information regarding
13   the Transfers, the Arbitration Award, and
14   their implications for HCLOF, and the
15   investment's closing date was delayed."
16       And the closing date was
17   ultimately November 15, 2017, correct?
18   A.   Correct.
19   Q.   What was the initial closing
20   date that had to be delayed?
21   A.   I believe it was scheduled for
22   November 1st.
23   Q.   So HarbourVest had full
24   knowledge of these facts that it, that it
25   lays out here forming the basis of the

Confidential - Pugatch

1
2    alleged misrepresentations, and they
3    requested further information regarding
4    those facts.
5        Did they receive any further
6    information?
7        MR. MORRIS:  Objection to the
8    form of the question.
9        MS. WEISGERBER:  Objection to
10   form.  Misstates testimony.
11   A.   We did have subsequent
12   conversations and, I believe, receive
13   subsequent information describing the
14   intent around, and the, you know, new
15   structure, pro forma structure, of the
16   action that Highland had undertaken.  And
17   part of the reason for the delay in the
18   closing was to ensure that we had adequate
19   time to diligence those changes, ask
20   questions, in connection with a thorough
21   due diligence process, and ensure that the
22   underlying legal structure was still
23   sound.
24   Q.   And HarbourVest was investing
25   over $73 million, correct?

Confidential - Pugatch

1
2    A.   Right.
3    Q.   And HarbourVest had made
4    investments of this nature previously,
5    correct?
6    A.   We did.
7        MR. WEISGERBER:  Objection to
8    form.
9    A.   HarbourVest has made hundreds of
10   investment over its years, yes.
11   Q.   And HarbourVest has conducted
12   due diligence regarding its investments in
13   the past, correct?
14   A.   Correct.
15   Q.   And HarbourVest received
16   additional information on items of concern
17   and reviewed that information and
18   satisfied itself that this was an
19   appropriate investment, correct?
20       MS. WEISGERBER:  Objection to
21   form.  Misstates testimony.
22   A.   On the back of
23   misrepresentations by Highland, yes.
24       MR. WILSON:  Well, I think
25   that's nonresponsive and I object.

Page 58

Confidential - Pugatch

1     Confidential - Pugatch
2    Q.  I'm just, I'm just, reading from
3  your pleading that you filed in the
4  bankruptcy, where you say that these were
5  material facts, and HarbourVest sought
6  more information regarding these facts.
7  And then you've testified that they
8  performed additional due diligence
9  regarding that information they received,
10  and then they determined that the
11  investment was appropriate, correct?
12    MS. WEISGERBER:  Objection to
13  form.  Misstates testimony.
14    Go ahead, Mike.
15    A.  Yeah, that is correct, on the
16  back of the additional information we
17  received from Highland.
18    And I would add, with, you know,
19  with the benefit of external advisors and
20  outside counsel reviewing those structural
21  changes, as well.
22    Q.  All right.  Thank you.
23    Now, going back to your
24  declaration, which we've marked as
25  Exhibit 3, Paragraph 3 says that "The

Page 59

Confidential - Pugatch

1     Confidential - Pugatch
2  unaudited net asset value of HCLOF, as of
3  August 31, 2020, was $44,587,820."
4    And is that a -- is that a book
5  value, I guess?
6    A.  That is a fair market value, in
7  accordance with the valuation policy of
8  HCLOF.
9    Q.  Do you happen to know the net
10  asset value of HCLOF as of February 1,
11  2019?  And I don't want an exact number, I
12  just want an approximation.
13    A.  No, I do not.
14    Q.  Do you know where I could get
15  that information?
16    A.  Presumably from the Debtor.
17    Q.  We'll come back to this in a
18  minute, but I'm going to --
19    MS. WEISGERBER:  I think we've
20  been going about an hour, John, if we
21  can take a quick break.
22    MR. WILSON:  Yeah, a break is
23  fine.
24    MS. WEISGERBER:  Actually,
25  Mike...

Page 60

Confidential - Pugatch

1    Confidential - Pugatch
2    MR. WILSON:  I'm sorry?  I
3  didn't hear you.
4    MS. WEISGERBER:  It can be up to
5  Mike.
6    Mike, do you want to take a
7  quick break?  Do you want to keep
8  going?
9    MR. WILSON:  No, we can, if
10  y'all need a break, we can take a
11  break, like 10, 15 minutes.
12    THE WITNESS:  Yeah, why don't we
13  take a break, please.
14    MR. WILSON:  What do y'all
15  prefer?  10, 15?
16    MS. WEISGERBER:  Ten minutes is
17  fine.
18    Mike, is that good with you.
19    THE WITNESS:  Yeah, ten-minute
20  break is fine.
21    MR. WILSON:  Okay.  Well, we'll
22  break till, let's say, 1:20 central
23  time.
24    THE WITNESS:  Perfect.
25    MR. WILSON:  All right.  Thanks

Page 61

Confidential - Pugatch

1    Confidential - Pugatch
2  guys.
3    (Recess taken.)
4    MR. WILSON:  Yes, I just sent
5  out an E-mail with Exhibit 6, and I'm
6  going to pull that up on the screen
7  share, as well.
8    (Whereupon, Exhibit 6, Offering
9  Memorandum 122 pages, was marked for
10  identification.)
11  BY MR. WILSON:
12    Q.  All right.  So this is the
13  Offering Memorandum, and I'm looking at
14  the bottom of Page 1 -- I mean, the top of
15  Page 1, I'm sorry.
16    The Company that was being
17  invested in is Highland CLO Funding, Ltd.
18  Do you see that, Mr. Pugatch?
19    MS. WEISGERBER:  Objection to
20  form.
21    A.  I do.  Okay.
22    Q.  And then this document defines
23  Highland, as Highland Capital Management,
24  L.P.  Do you see that?
25    A.  Yes.

Page 62

Confidential - Pugatch

1
2 Q. Okay. Now, if we go down to, I
3 guess it's Page 8 of this document, and
4 this first full paragraph at the top, it
5 says, "No voting member of the Advisory
6 Board shall be a controlled affiliate of
7 Highland."
8 Do you see that?
9 A. I do.
10 Q. And then it also says that, "It
11 being understood that none of CLO Holdco
12 Ltd., it's wholly-owned subsidiaries, or
13 any of their respective directors or
14 trustees shall be deemed to be a
15 controlled affiliate of Highland, due to
16 their preexisting non-discretionary
17 advisory relationship with Highland."
18 Do you see that?
19 A. Yes.
20 Q. So there were no affiliates of
21 Highland on the Advisory Board, correct?
22 MS. WEISGERBER: Objection to
23 form.
24 A. For voting purposes under the
25 document, that is how this reads, correct.

Page 63

Confidential - Pugatch

1
2 MR. WILSON: All right. I'm
3 going to turn to the next exhibit.
4 And this is going to be Exhibit No. 7
5 coming in the E-mail. I'm also going
6 to put Exhibit No. 7 on the screen.
7 (Whereupon, Exhibit 7, Share
8 Subscription and Transfer Agreement 31
9 pages, was marked for identification.)
10 Q. All right. Do you see that?
11 The "Subscription and Transfer Agreement
12 For Ordinary Shares"?
13 A. Yep.
14 Q. All right. So what this
15 document says is that, it repeats that
16 Highland HCLF Advisory Ltd. is the
17 portfolio manager. Highland CLO Funding
18 Ltd. is the fund, and CLO Holdco Ltd. is
19 the existing shareholder.
20 And if we go down to the bottom
21 half of this page, it says that
22 HarbourVest was acquiring its shares in
23 this investment from CLO Holdco, correct?
24 A. Yes.
25 MS. WEISGERBER: Objection to

Page 64

Confidential - Pugatch

1
2 form.
3 Q. And prior to the date of this
4 document, which I believe is November 15,
5 2017, CLO Holdco held 100 percent of the
6 shares of HCLOF, correct?
7 MS. WEISGERBER: Objection to
8 form, foundation.
9 A. I don't recall. I know they
10 were the largest, the largest investor. I
11 don't recall if it was 100 percent.
12 Q. Well, if you look at the chart
13 below Paragraph A, it says that CLO Holdco
14 Ltd. immediately prior to the placing on
15 100 percent share percentage.
16 Do you have any reason to
17 disagree with that?
18 A. No.
19 MS. WEISGERBER: Objection to
20 form.
21 Q. All right. Now, below CLO
22 Holdco Ltd., these are the five
23 HarbourVest entities that have filed
24 proofs of claim in this bankruptcy,
25 correct?

Page 65

Confidential - Pugatch

1
2 MS. WEISGERBER: Objection to
3 form.
4 A. Those are the five HarbourVest
5 entities with a direct investment in
6 HCLOF.
7 Q. And each one of those entities
8 has filed a proof of claim in this
9 bankruptcy, correct?
10 A. Yes.
11 Q. And the largest -- I think we
12 discussed this earlier, but Dover Street
13 IX is the largest of those investors, with
14 a 35.49 percent share percentage, correct?
15 MS. WEISGERBER: Objection to
16 form.
17 A. Correct.
18 Q. And if you take the total of
19 those investments of the HarbourVest
20 entities, you get a 49.98 percent total.
21 Is that your understanding?
22 MS. WEISGERBER: Objection to
23 form.
24 A. I know it has 49 percent, and
25 some percentage. I'll take your math as

Page 66

Confidential - Pugatch

1  correct.
2
3     Q.   And 49.98 percent is larger than
4  the next largest shareholder, which is CLO
5  Holdco which is 49.02 percent, correct?
6        MS. WEISGERBER:  Objection to
7     form.
8     A.   In taking all of the HarbourVest
9  entities, collectively, yes, correct.
10    Q.   And so I want to go back to
11 earlier where we saw in documents filed by
12 HarbourVest, where it refers to itself as
13 a passive investor.  What do you, I
14 apologize if I've already asked you this
15 question, but what do you mean by passive
16 investor?
17    A.   Meaning we were a minority
18 investor in HCLOF.  HCLOF was fully
19 controlled by Highland as the investment
20 manager.  So HarbourVest did not have any
21 governance, rights, or control as it
22 related to the ongoing investment
23 management and decisionmaking of HCLOF.
24    Q.   HarbourVest has the largest
25 percentage of the shares of any of these

Page 67

Confidential - Pugatch

1
2  investors, correct?
3        MS. WEISGERBER:  Objection to
4     form.
5     A.   Taken collectively, yes.
6     Q.   And HarbourVest owned one of the
7  two spots on the Advisory Board, correct?
8        MS. WEISGERBER:  Objection to
9     form.
10    A.   Correct.
11    Q.   And if you look down below the
12 HarbourVest entities on this chart, you
13 see that Highland Capital Management, L.P.
14 is purchasing a .63 percent interest,
15 correct?
16        MS. WEISGERBER:  Objection to
17    form.  The document speaks for itself.
18    A.   According to the document, yes.
19    Q.   Do you have any reason to
20 disagree with that document?
21        MS. WEISGERBER:  Objection to
22    form.
23    A.   I do not.
24        MR. WILSON:  All right.  I'm
25    going to stop that screen share.  I'm

Page 68

Confidential - Pugatch

1
2  going to E-mail out the next exhibit.
3  This was Exhibit 8 that I just sent,
4  and I'll pull it up on the screen
5  share.
6        (Whereupon, Exhibit 8, E-mail
7     08/15/2017, was marked for
8     identification.)
9     Q.   Now, I'll represent to you that
10 I received this document this morning from
11 your counsel.  Do you recognize this
12 E-mail?  Have you seen it before?
13    A.   Yes, I have.
14    Q.   And this E-mail is sent by Brad
15 Eden.  I think you mentioned that he was
16 one of the representatives that was
17 involved in the pre-investment discussions
18 with Highland?
19    A.   Correct.
20    Q.   And I think you told me that
21 Dustin Willard was involved in those
22 discussions on the HarbourVest side,
23 correct?
24    A.   Correct.
25    Q.   And so this is an E-mail sent on

Page 69

Confidential - Pugatch

1
2  August 15, 2017 from Brad Eden to Dustin
3  Willard.  Are you familiar with Thomas
4  Surgent?
5     A.   Yes.
6     Q.   Was he involved in those
7  discussions with you and HarbourVest as
8  well?
9     A.   In some of those discussions,
10 yes.
11    Q.   Okay.  So when it says, "Dustin,
12 attached is a legal summary.  Of course,
13 Thomas is available to answer any
14 follow-up questions."  Do you know if
15 Thomas was consulted with any follow-up
16 questions?
17    A.   I recall --
18        MS. WEISGERBER:  Objection to
19    form.
20    A.   -- having follow-up
21 conversations with Highland, I don't --
22 around these legal summaries.  I don't
23 recall with whom.
24    Q.   Okay.  And just to show you the
25 attachment that's referenced in the

Page 70

Confidential - Pugatch

1  
2  E-mail, this says that SEC financial
3  crisis matter crusader, Terry, Daugherty
4  and UBS. So and then I guess these are --
5  this is information provided by Highland
6  to HarbourVest regarding these matters.
7  Why were these particular matters
8  addressed in this E-mail, to your
9  knowledge?
10     MS. WEISGERBER: Objection to
11     form and foundation.
12     A.   These were all outstanding
13  litigation matters that we had become
14  aware of in connection with our diligence
15  that we asked for a further explanation
16  from Highland on the underlying substance.
17     Q.   Now, did you become
18  independently aware of these in the course
19  of your due diligence, or were these
20  brought to your attention by Highland
21  first?
22     A.   I don't know.
23     MS. WEISGERBER: Objection to
24     form.
25     Q.   You don't know?

Page 71

Confidential - Pugatch

1
2     A.   (Nods.)
3     Q.   Okay. And particularly with
4  respect to Mr. Terry, is it your opinion
5  that there are any material
6  misrepresentations made in this summary?
7     MS. WEISGERBER: Objection to
8     form. Objection to the extent it
9     calls for a legal conclusion.
10     Mike, to the extent you have an
11     answer that does not infringe on
12     conversations with counsel, you can
13     provide it.
14     A.   Yeah, I would say our
15  understanding or interpretation of that,
16  or the answer to that question would be
17  based on conversations with counsel.
18     Q.   Well, this document was provided
19  to you in the course of the discussions
20  prior to HarbourVest's investment, and
21  you've stated that Highland, or you've
22  taken the position that Highland made
23  material misrepresentations to
24  HarbourVest, in the course of these
25  discussions.

Page 72

Confidential - Pugatch

1
2     Does this document evidence
3  those material misrepresentations?
4     MS. WEISGERBER: Objection to
5     form. Objection to the extent it
6     calls for a legal conclusion.
7     A.   Yeah, same answer as previous.
8     Q.   Well, I'm not asking you for a
9  legal conclusion. I'm asking you are
10  there misrepresentations in this document
11  that you claim Highland made?
12     MS. WEISGERBER: Same
13     objections.
14     I think misrepresentations calls
15     for a legal conclusion regarding legal
16     misrepresentations, actionable
17     misrepresentations. So if he doesn't
18     have any non-privileged testimony to
19     give, he can't give any testimony.
20     MR. WILSON: Well, I'm here
21     today to investigate HarbourVest's
22     claim and one of the basis of
23     HarbourVest's claim is
24     misrepresentation. So I'm trying to
25     figure out what those

Page 73

Confidential - Pugatch

1
2  misrepresentations were.
3     And I would ask that the witness
4     tell me if there's a misrepresentation
5     in this document that was provided in
6     this E-mail.
7     MS. WEISGERBER: Same
8     objections.
9     Mike, if you have a general
10     understanding of, generally,
11     misrepresentations that HarbourVest
12     believes were made in connection or
13     regarding the Terry litigation,
14     et cetera, you can provide that
15     information.
16     THE WITNESS: Yeah, sure.
17     A.   So in general, my understanding
18  and the way that Highland had
19  characterized the ongoing litigation with
20  Mr. Terry was that it was nothing more
21  than an employment dispute with a former
22  employee and that, you know, the
23  arbitration -- well, actually, it was
24  before the Arbitration Board, but the
25  ongoing litigation had no impact, bearing,

Page 74

Confidential - Pugatch

1 or ultimate result on the underlying CLOs
2 that Highland managed, including the Acis
3 CLOs.
4 Q. So you're saying that
5 Highland --
6 MR. MORRIS: John, I'm sorry to
7 interrupt. Before you go on, somebody
8 with the initials DSD just joined the
9 deposition. Can you please identify
10 yourself?
11 MR. DRAPER: This is Douglas
12 Draper. I just changed machines.
13 MR. MORRIS: Okay. No problem,
14 Doug. Thank you.
15 BY MR. WILSON:
16 Q. So, and I'm not trying to put
17 words in your mouth, but is the gist of
18 what you're telling me that Highland
19 represented that this was a minor dispute
20 with a former employee and it would not
21 affect its CLO business?
22 A. Correct.
23 MS. WEISGERBER: Objection to
24 form.
25

Page 75

Confidential - Pugatch

1 A. Correct.
2 Q. Well, are there any more
3 specific E-mails or written
4 communications, that you're aware of, that
5 would contain misrepresentations by
6 Highland to HarbourVest?
7 MS. WEISGERBER: Objection to
8 form.
9 Are you asking about from
10 today's production, or are you asking
11 about just, in general?
12 MR. WILSON: Well, you produced
13 two E-mails to us today. I'm just
14 asking if there's anything else he's
15 aware of where there's written
16 misrepresentations from Highland to
17 HarbourVest.
18 MS. WEISGERBER: Mike, if you
19 have an answer separate from
20 conversations with lawyers, et cetera,
21 you can certainly answer.
22 A. Yeah, my understanding of the
23 documents I reviewed that were part of the
24 production to you earlier today, there is
25

Page 76

Confidential - Pugatch

1 another document that would also include
2 misrepresentations on the part of this,
3 the Terry lawsuit and ultimate impact on
4 the CLO business.
5 BY MR. WILSON:
6 Q. And what document is that?
7 A. That was the E-mail, E-mail with
8 an attachment around a response to a Wall
9 Street Journal article and some of the
10 content in the E-mail itself.
11 Q. Okay. We'll look at that one.
12 What was the -- HarbourVest had
13 seen the Terry Arbitration Award, correct?
14 MS. WEISGERBER: Objection to
15 form.
16 Q. Prior to making its investment
17 in HCLOF?
18 A. We were aware of the existence
19 and the outcome of the Arbitration Award.
20 Q. Had you read the Arbitration
21 Award?
22 A. No.
23 Q. Well, how did you know the
24 substance of the Arbitration Award without
25

Page 77

Confidential - Pugatch

1 reading it?
2 MS. WEISGERBER: Objection to
3 form.
4 A. We were informed by Highland of
5 the outcome of the ongoing litigation and
6 the outcome of the Arbitration Award.
7 Q. Was that part of the
8 documentation that you requested Highland
9 provide you to continue your due
10 diligence, before making the investment?
11 MS. WEISGERBER: Objection to
12 form.
13 A. We certainly requested more
14 color around the outcome of that, and any
15 impact that it could have to HCLOF or the
16 ongoing viability of Highland's CLO
17 business.
18 Q. And what, what were you provided
19 with respect to the Terry Arbitration
20 Award?
21 MS. WEISGERBER: Objection to
22 form.
23 A. The existence of that award, the
24 quantum of that award, the judgment of
25

Page 78

Confidential - Pugatch

1
2 just under $8 million in connection with
3 that award. That was the information that
4 was disclosed at -- and represented as a
5 settlement or, you know, arbitration
6 ruling, in connection with the employee
7 litigation, wrongful termination suit.
8      Q.   So did HarbourVest not request a
9 copy of the Arbitration Award to review?
10      MS. WEISGERBER:  Objection to
11 form.
12      A.   We did not specifically, no.
13      Q.   And so, to this day, have you
14 read the Arbitration Award?
15      A.   I have not.
16      MS. WEISGERBER:  Objection to
17 form.
18      Q.   You have not?
19      A.   I have not.
20      MR. WILSON:  Okay.  I think my
21 last E-mail went out with Exhibit 9 on
22 it.  I will pull that up.
23      Q.   Can you see that on the screen
24 share?
25      A.   Yes.

Page 79

Confidential - Pugatch

1
2      (Whereupon, Exhibit 9,
3 11/29/2017 E-mail with cover letter
4 Highland Capital Management, was
5 marked for identification.)
6      Q.   Okay.  So I think this is out of
7 order, but this should have been first in
8 the exhibit.  But this is an E-mail from
9 Hunter Covitz to Dustin Willard, Michael
10 Pugatch and Nick Bellisario, carbon copies
11 to Trey Parker and Brad Eden.
12      And Trey Parker and Brad Eden
13 are Highland affiliates, right?
14      A.   Yes.
15      Q.   And we've talked about Dustin
16 Willard.  Who's Nick Bellisario?
17      A.   He was another member of the
18 HarbourVest team.
19      Q.   And was he on the, the
20 four-member board that you talked about
21 earlier, that made the investment
22 decision?
23      A.   No, he was the junior member of
24 the investment team that I alluded to.
25      Q.   Okay.  And this, this E-mail

Page 80

Confidential - Pugatch

1
2 came out about two weeks after the
3 HarbourVest investment, correct?
4      A.   Correct.
5      Q.   And it's your opinion or
6 position that this E-mail contains
7 misrepresentations that Highland made to
8 HarbourVest?
9      MS. WEISGERBER:  Objection to
10 form.  Objection to the extent it
11 calls for a legal conclusion.
12      A.   Yes.
13      Q.   And there was a Wall Street
14 Journal article that had come out shortly
15 before this E-mail, correct?
16      A.   Correct.
17      Q.   And how did you became aware of
18 that Wall Street Journal article?
19      A.   I certainly would have seen it.
20 I may have been sent it separately by
21 Highland, I don't recall.
22      Q.   You don't recall if you saw it
23 independently or Highland telling you
24 about it?
25      A.   I don't.

Page 81

Confidential - Pugatch

1
2      Q.   And what did you -- what was
3 your reaction to receiving these E-mails
4 from Highland regarding that article?
5      MS. WEISGERBER:  Objection to
6 form.
7      A.   The article or the accusations
8 in the article were something that
9 required more explanation from our
10 perspective.
11      Q.   And attached to this E-mail
12 was -- we just scrolled through it a
13 second ago -- but a letter from James
14 Dondero that was sent to the
15 editor-in-chief of the Wall Street
16 Journal, Mr. Gerard Baker, on November
17 28th.
18      And did you read this
19 attachment?
20      A.   Yes.
21      Q.   And did this attachment to this
22 E-mail aleve your concerns that you had
23 regarding the article?
24      MS. WEISGERBER:  Objection to
25 form.

Confidential - Pugatch

1     Confidential - Pugatch
2   A. I wouldn't say alleviated the
3 concerns but certainly provided an
4 explanation or refute to some of the
5 claims made in the, in the article.
6   Q. And do you contend that this
7 letter that was written to Gerard Baker
8 and provided later to HarbourVest was a
9 material misrepresentation?
10   MS. WEISGERBER: Objection to
11 form.
12   Don't answer that, Mike. It
13 calls for a legal conclusion.
14   MR. WILSON: I'm asking for his
15 understanding.
16   Q. Do you contend that there's
17 misrepresentations in this letter?
18   MS. WEISGERBER: Material
19 misrepresentations absolutely calls
20 for a legal conclusion, John.
21   MR. WILSON: Well, I've
22 shortened it to misrepresentations.
23 So I just want to know if he thinks
24 there's anything that's misrepresented
25 in this letter.

1     Confidential - Pugatch
2   MS. WEISGERBER: Same
3 objections.
4   Mike, if you have an
5 understanding, separate from
6 conversations with lawyers, you can
7 answer.
8   A. I would need to reread the
9 letter to definitively answer that outside
10 of conversations with counsel.
11   Q. But to be clear, this letter was
12 issued two weeks after HarbourVest's
13 investment, correct?
14   A. Correct.
15   MS. WEISGERBER: Objection;
16 asked and answered.
17   MR. WILSON: I'm going to now
18 send out the next exhibit, which is
19 going to be Exhibit No. 10.
20   (Whereupon, Exhibit 10, 2004
21 Examination of Investor in Highland
22 CLO Funding Ltd. 10/10/2018, was
23 marked for identification.)
24   MR. WILSON: It just went
25 through. So I'm going to pull it up

1     Confidential - Pugatch
2 on my screen share.
3   So this Exhibit 10, the document
4 I received this morning, filed in the
5 Acis bankruptcy, it looks like, well,
6 let's see, dated in, dated October 10,
7 2018.
8 BY MR. WILSON:
9   Q. Have you seen this document
10 before?
11   A. Yes.
12   Q. And it's a motion for 2004
13 Examination of Investor in Highland CLO
14 Funding, Ltd., correct?
15   A. Sorry. Was there a question,
16 John?
17   Q. Yeah. I was just asking you to
18 confirm that this was the motion for 2004
19 Examination of Investor in Highland CLO
20 Funding?
21   A. Yes.
22   Q. And so if I scroll down to
23 Paragraph 6, which is on, it looks like
24 it's on Page 4. In the second sentence,
25 it says that "Although HCLOF/ALF was a one

1     Confidential - Pugatch
2 time wholly-owned by an affiliate of
3 Highland, it did an offering memorandum in
4 November of 2017 and as a result, is now
5 owned 49.985% by certain affiliates of a
6 large investor and manager of private
7 equity funds."
8   And that's defined as investor.
9 So the Investor is the HarbourVest
10 entities collectively, correct?
11   A. Correct.
12   Q. All right. And then the next
13 sentence, says that "Despite its large
14 ownership percentage in HCLOF in the
15 alleged millions in losses that will
16 result if the Acis CLOs are not reset to
17 make them consistent with prevailing
18 market conditions the Investor has not yet
19 appeared in this case or taken any
20 position in this bankruptcy case."
21   Do you see that?
22   A. I do.
23   Q. Is that correct?
24   MS. WEISGERBER: Objection to
25 form.

Page 86

Confidential - Pugatch

1
2  A.  Is what correct?
3  Q.  Well, I guess, I'm most
4  concerned with this last part of the
5  sentence.  It starts with "The Investor
6  has not yet appeared in this case or taken
7  any position in the bankruptcy case."
8      Do you agree with that?
9      MS. WEISGERBER:  Objection to
10  form.
11      Mike, if you want to look at the
12  whole document, you're welcome to.
13  This is not a document that's a
14  HarbourVest-prepared document.
15  BY MR. WILSON:
16  Q.  Maybe a better way of asking the
17  question is:  As of the date of this
18  document, which was in October of 2018,
19  had HarbourVest appeared in the Acis
20  bankruptcy?
21  A.  No, we did not.
22  Q.  And had they asserted any
23  positions regarding the Acis bankruptcy?
24  A.  Not through the court.
25      MS. WEISGERBER:  Objection to

Page 87

Confidential - Pugatch

1
2  form.
3  Q.  Okay.  Had Highland encouraged
4  HarbourVest to participate in the Acis
5  bankruptcy?
6      MS. WEISGERBER:  Objection to
7  form.
8  A.  No.
9  Q.  They did not?
10      MS. WEISGERBER:  Objection to
11  form.
12  Q.  Highland did not encourage
13  HarbourVest to participate in the Acis
14  bankruptcy?
15  A.  When you say "participate," can
16  you define that, please.
17  Q.  Well, appear in the case, as
18  stated in this motion.
19  A.  No, they had not.
20  Q.  Did Harbour -- I'm sorry -- did
21  Highland keep HarbourVest apprised of the
22  events that occurred in the Acis
23  bankruptcy?
24      MS. WEISGERBER:  Objection to
25  form.  I'm just going to restate my

Page 88

Confidential - Pugatch

1
2  objection to the extent you're asking
3  questions about HarbourVest.  This is
4  Mr. Pugatch answering, based on his
5  knowledge.
6  A.  We were kept informed from time
7  to time throughout the Acis bankruptcy
8  proceeding.
9  Q.  Well, did you, in fact, have
10  weekly conference calls with Highland
11  representatives regarding the Acis
12  bankruptcy?
13      MS. WEISGERBER:  Objection to
14  form.
15  A.  I don't recall them being
16  weekly, no.
17  Q.  You can agree with me you
18  participated in the conference calls with
19  Highland regarding the Acis bankruptcy?
20  A.  Yes.
21      MS. WEISGERBER:  Same objection.
22  Q.  And on what, on what --
23      MR. WILSON:  Sorry.  Strike
24  that.
25  Q.  With what regularity would you

Page 89

Confidential - Pugatch

1
2  estimate those conference calls occurred,
3  if it's not weekly?
4      MS. WEISGERBER:  Objection to
5  form.
6  A.  From memory, maybe once, once a
7  month on average.  Sometimes more
8  frequently, sometimes less frequently.
9  Q.  Did Highland provide you with
10  documents and evidence that were filed in
11  the Acis bankruptcy?
12      MS. WEISGERBER:  Objection to
13  form.
14      We're really starting to get
15  pretty far afield here, John, from
16  HarbourVest.  You know, I'm not sure
17  where you're going with this.  This is
18  a settlement motion that's teed up for
19  the court.
20      You're welcome to keep going,
21  but at some point we're going to cut
22  it off.
23      MR. WILSON:  Well, I think -- I
24  don't think I'm going to go too far
25  down this path, but I think this

Page 90

1      Confidential - Pugatch
2    directly relates to the claims that
3    HarbourVest has made.  But I'll repeat
4    my question.
5  BY MR. WILSON:
6    Q.   Did Highland provide HarbourVest
7  with documents and evidence that were
8  filed in the Acis bankruptcy?
9      MS. WEISGERBER:  Objection to
10   form.
11   A.   I don't recall what documents
12 Highland may have provided to us, at that
13 point in time.
14   Q.   I don't want you to recall
15 specific documents that were provided, but
16 did, did Highland provide documents from
17 the Acis bankruptcy to HarbourVest?
18     MS. WEISGERBER:  Objection to
19   form.  Asked and answered.
20   A.   I don't recall.
21   Q.   You don't?
22   A.   (Nods.)
23   Q.   Would you dispute that between
24 2018 and 2019 that Highland provided over
25 40,000 pages of documents related to the

Page 91

1      Confidential - Pugatch
2  Acis bankruptcy to HarbourVest?
3      MS. WEISGERBER:  Objection to
4    form, foundation.
5    A.   I don't know and I don't recall.
6    Q.   And the Acis plan became
7  effective on February 1st, 2019.  Is that
8  your understanding?
9    A.   I believe so, yes.
10   Q.   And do you -- I asked you this
11 earlier, but I'm going to ask again.  Do
12 you have any understanding of what the
13 value of HCLOF was, at that date?
14   A.   I don't recall.
15     MS. WEISGERBER:  Objection to
16   form.
17   Q.   You don't?
18   A.   I don't recall, no.
19   Q.   And there was an injunction put
20 in place in the Acis bankruptcy that
21 prevented certain actions with respect to
22 HCLOF, correct?
23     MS. WEISGERBER:  Objection to
24   form, foundation.
25     MR. MALONEY:  Join.

Page 92

1      Confidential - Pugatch
2    A.   Yes.
3    Q.   Now, I'm going to go back up to
4  Paragraph 2.  This says that Acis LP
5  manages the Acis CLOs, that certain
6  portfolio management agreement between
7  Acis, and then it goes on.  So what are
8  the Acis CLOs, as it relates to the
9  investment that HarbourVest made?
10     MR. MALONEY:  Objection to the
11   form of the question.
12     MS. WEISGERBER:  Objection to
13   form.
14   A.   The Acis CLOs -- or HCLOF owned
15 equity in certain of the Acis CLOs as a
16 portion of its investment portfolio.
17   Q.   And I think you were trying to
18 distinguish earlier between who the
19 portfolio manager was.  And that would
20 depend on whether it was an Acis CLO or a
21 Highland CLO; is that correct?
22     MR. MALONEY:  Objection to form.
23     MS. WEISGERBER:  Objection to
24   form, misstates testimony.
25   A.   I was referencing the portfolio

Page 93

1      Confidential - Pugatch
2  manager of the underlying CLOs, yes.
3    Q.   But we can agree that Acis had
4  responsibility for managing at least a
5  portion of HCLOF, correct?
6    A.   Highland --
7      MR. WILSON:  Objection to form.
8      MR. MALONEY:  Objection to form
9    as well, foundation, and legal
10   conclusion.
11     (Reporter clarification.)
12   A.   It's my understanding it's
13 Highlands' subsidiaries, yes.
14   Q.   Okay.  Well, I'm going to go
15 down to Paragraph 4, at the top of your
16 screen here where it says, "Recently
17 William Scott, the director of HCLOF,
18 testified that he wants to reset the Acis
19 CLOs to bring them in line with current
20 market interest rates, that the inability
21 to do the reset is causing damages to
22 HCLOF in the amount of approximately
23 $295,000 per week."
24     Is that an accurate statement?
25     MS. WEISGERBER:  Objection to

1     Confidential - Pugatch
2 form and foundation.
3     MR. MALONEY: Mark Maloney.
4 Object to form and foundation.
5     A. I don't know. You'd have to ask
6 William Scott.
7     Q. Well, were you aware, I mean,
8 there's a citation to a, well, I don't
9 know if there's a citation on this one.
10 But it says that he recently testified.
11 Were you aware that he testified that he
12 wanted to reset the Acis CLOs?
13     MS. WEISGERBER: Same objection.
14 We're really getting far afield.
15     MR. WILSON: I'm just asking if
16 he was aware that this statement
17 occurred.
18     A. At some point in time, yes, I
19 became aware of that.
20     Q. Okay. Do you agree that the
21 inability to do a reset was causing
22 damages in the amount of $295,000 per
23 week?
24     MS. WEISGERBER: Objection to
25 form and foundation. This is not a

1     Confidential - Pugatch
2 HarbourVest-prepared document.
3     MR. WILSON: Well, I understand
4 that. I'm just asking if he agrees
5 with it.
6     A. I don't have enough information
7 to assess that, specifically the $295,000
8 per week number.
9     Q. I want to go down to Paragraph 7
10 of this document, and this is going to be
11 at the top of Page 5. It says
12 "Mr. Ellington also testified that because
13 it would be putting in additional capital
14 in connection with any reset CLOs, the
15 Investor," and we discussed that that's
16 HarbourVest, "had the ability to start
17 'calling the shots' and dictate the terms
18 of any reset transactions."
19     Do you agree with that?
20     A. No.
21     MS. WEISGERBER: Objection to
22 form.
23     Q. I want to go down to Paragraph
24 9.
25     It says, "The Trustee also needs

1     Confidential - Pugatch
2 information regarding whether the Investor
3 presently has any concerns about pursuing
4 reset transactions with the Reorganized
5 Acis and Brigade, under the plan now that
6 Acis has been able to successfully serve
7 as the portfolio manager for the Acis CLOs
8 on a post-petition basis, and there are no
9 impediments to the ability of the
10 Reorganized Acis and Brigade to pursue a
11 reset on the Acis CLOs."
12     Do you know whether the Investor
13 had any concerns about pursuing a reset?
14     MS. WEISGERBER: Objection to
15 form, foundation.
16     A. The context of a reset or
17 refinancing of the various CLOs in HCLOF
18 was part of the original investment
19 thesis. So there would not have been
20 concerns about the ability to do so. Our
21 concerns were more in the inability to do
22 so, as a result of the Acis bankruptcy.
23     Q. But here, you've got the Trustee
24 representing in Paragraph 5, that
25 according to the Trustee's Second Amended

1     Confidential - Pugatch
2 Joint Plan, it provides for such a reset
3 to be performed by the Reorganized Acis
4 and supervised by Brigade Capital
5 Management.
6     And it appears to me that the
7 Trustee is trying to get the Investor's
8 position on whether a reset should be
9 pursued. And I'm just asking you whether
10 HarbourVest objected to a reset at this
11 time?
12     MS. WEISGERBER: I'm going to
13 object to all of the colloquy before.
14 I'm going to object to any extent
15 Mike's being asked about what the
16 Trustee wanted or viewed. If you want
17 to ask your question in isolation, go
18 ahead.
19     Q. What was HarbourVest's position
20 regarding a reset, as of the date that
21 this was filed, and I'll look again,
22 October 10, 2018?
23     MS. WEISGERBER: Objection to
24 form. Objection to the extent it's
25 asking HarbourVest's position. And I

1    Confidential - Pugatch
2  cannot conceive how this is relevant
3  to the 9019 motion before the court
4  right now.
5        Nonetheless, Mike, if you have
6  an answer, on behalf of yourself, you
7  can answer.
8    A.   HarbourVest was a passive
9  minority investor in HCLOF. It had no
10  ability to control the underlying
11  portfolio management or ability to reset,
12  refinance, or call in any of the equity of
13  the underlying CLOs. That was all under
14  the purview of Highland.
15    Q.   Did you understand that
16  Mr. Ellington had given sworn testimony
17  that the Investor is the party calling the
18  shots for HCLOF, with respect to any reset
19  transactions?
20        MS. WEISGERBER: Objection to
21  form.
22    A.   I did became aware of it, yes.
23    Q.   When did you become aware of
24  that?
25    A.   At some point subsequent to that

1    Confidential - Pugatch
2  testimony being given.
3    Q.   But was it when you read this
4  motion that we're looking at as
5  Exhibit 10?
6        MS. WEISGERBER: Objection to
7  form.
8    A.   It may have been. I don't
9  recall the exact time or medium that I
10  became aware of that.
11    Q.   Was a deposition given as a
12  result of this motion?
13        MS. WEISGERBER: Objection to
14  form. If you have the whole document,
15  Mike, that may make sense.
16        MR. WILSON: Well, this motion
17  at the top says it's a Motion for 2004
18  Examination of Investor. And then
19  attached to this motion are some
20  document requests, and then deposition
21  topics for a corporate representative
22  of the Investor, and then a proposed
23  order.
24  BY MR. WILSON:
25    Q.   Do you recall whether a

1    Confidential - Pugatch
2  deposition was given, after this motion
3  was filed?
4    A.   Yes.
5    Q.   And who was the designated
6  deponent?
7    A.   I was.
8    Q.   And were documents produced, as
9  a result of this?
10    A.   Yes, there were.
11    Q.   And were you asked at that
12  deposition what the Investor's position on
13  a reset was?
14        MS. WEISGERBER: Objection to
15  form.
16        If you recall.
17    A.   I don't recall specifically that
18  question being asked.
19    Q.   Well, do you know what
20  the Debtor's position -- I'm sorry, the
21  Debtor's -- the Investor's position on a
22  reset was as of that day?
23        MS. WEISGERBER: Objection to
24  form. Asked and answered.
25    A.   I would just say again, in

1    Confidential - Pugatch
2  general, the original investment thesis
3  here was predicated on a refinancing reset
4  of the various CLOs, and we were not in
5  control as a passive minority investor
6  here to --
7    Q.   Well, you said you weren't in
8  control, but what would HarbourVest's
9  preference have been?
10        MS. WEISGERBER: Objection to
11  form.
12    A.   I do not recall.
13        MS. WEISGERBER: If you recall.
14    A.   I don't recall the specifics
15  around what Acis CLO were referring to
16  here or what the specific implications of
17  a reset were at that time; but regardless,
18  that was a decision for the investment
19  manager of HCLO.
20    Q.   But was it your opinion, your
21  personal opinion, that a reset was
22  appropriate?
23        MS. WEISGERBER: Objection to
24  form.
25    A.   Again, we were not the portfolio

Page 102

Confidential - Pugatch

1 manager of HCLOF. We were not in control
2 of those decisions or making
3 recommendations on those decisions. That
4 was the delegated authority of Highland,
5 as the investment manager.
6 Q. I'm not asking for that. I'm
7 asking for your personal feelings toward a
8 reset.
9 MS. WEISGERBER: Same objection.
10 He's only answering on behalf of
11 himself, and it's been asked and
12 answered three times since.
13 MR. WILSON: Well, he hasn't
14 answered the question. He's just told
15 me they don't have the authority to do
16 the reset.
17 MS. WEISGERBER: And he told you
18 the other information he'd be required
19 to even have an opinion on it. So
20 same objection stands. It's not a
21 specific enough question for him.
22 Mike, you're welcome, if you
23 have, if you have an answer, you're
24 welcome to give it.

Page 103

Confidential - Pugatch

1 A. Yeah, the investment guidelines
2 of HCLOF, from the documents that we
3 signed at the time we entered into the
4 transaction, laid out the specific, again,
5 investment guidelines that HCLOF would be
6 guided under, including the opportunity to
7 refinance or reset various CLOs over time,
8 in accordance with Highland's, you know,
9 expectations and ultimate decision to do
10 so.
11 Q. But did you believe, at this
12 time, that a reset was appropriate?
13 MS. WEISGERBER: Objection to
14 form. This is asked and answered
15 several times now, I think we should
16 move on. He's given you an answer.
17 MR. WILSON: Well, I want to
18 know what his personal opinion was
19 about whether the reset was
20 appropriate.
21 A. What reset are you referring to?
22 Q. A reset as of October 10, 2018.
23 At that time, did you believe that a reset
24 was appropriate?

Page 104

Confidential - Pugatch

1 A. A reset of what?
2 MS. WEISGERBER: Same objection.
3 Q. A reset as been discussed all
4 through this motion, the same reset we're
5 talking about.
6 MS. WEISGERBER: Objection.
7 Same objections. I just don't see how
8 he could possibly answer this vague
9 question.
10 Q. Okay. So William Scott,
11 director of HCLOF, testified that he
12 wanted to reset the Acis CLOs because if
13 they don't, they are losing $295,000 a
14 week.
15 Did you think that a reset was
16 appropriate in line with what Mr. Scott
17 believed?
18 MR. MALONEY: Objection to form,
19 foundation.
20 MS. WEISGERBER: Same
21 objections. And asked and answered
22 numerous times.
23 A. We were not managing the
24 portfolio. We were an investor in a

Page 105

Confidential - Pugatch

1 company, an investment company that was
2 managing this. We were not, I was not
3 proximate enough to any of the underlying
4 happenings of the look through CLO
5 positions of HCLOF to have an informed
6 view on this, at this time.
7 Q. Is your testimony that you did
8 not have an opinion as to whether the Acis
9 CLO should be reset in late 2018?
10 MS. WEISGERBER: Objection to
11 form. Misstates testimony.
12 A. My view is that the original
13 investment guidelines here called for a
14 reset or refinance of the CLOs and that
15 Highland was subsequently in full control
16 of whether or not to pursue this, and we,
17 HarbourVest, as an investor had no ability
18 to object or to force that on a go-forward
19 basis.
20 MR. WILSON: Objection.
21 Nonresponsive.
22 Q. I want to know your personal
23 opinion of whether you thought a reset was
24 appropriate in October of 2018.

Page 106

Confidential - Pugatch

1  Confidential - Pugatch
2      MR. MORRIS: Objection to the
3  form of the question. That's been
4  asked and answered.
5      MR. WILSON: He has yet to give
6  his answer to --
7      MR. MORRIS: He just told you he
8  didn't have enough information. He
9  just told you that, crystal clear.
10     MR. WILSON: Well, I'm not going
11 to argue with you, John, but I just
12 want an answer to my question.
13     His answer, he wouldn't agree
14 with my, with my summation that he had
15 no opinion, so I just want to know
16 what his opinion is.
17     MS. WEISGERBER: Same
18 objections.
19     You're not giving him enough
20 information to answer the question,
21 and at this point, it would be
22 speculation. We can just keep going
23 in circles on this, but your --
24     MR. WILSON: His opinion would
25 be speculation?

Page 107

1  Confidential - Pugatch
2      MS. WEISGERBER: He said that,
3  he actually testified at some point
4  that he doesn't recall specifics of
5  the time, so that was another piece of
6  the puzzle.
7      I mean, I don't want to be
8  coaching the witness or giving
9  testimony here, but I think you're not
10 listening to the things he's saying,
11 John, just because you don't like it.
12 BY MR. WILSON:
13     Q.  Mr. Pugatch, did you have an
14 opinion, in October of 2019, about whether
15 the Acis CLOs should be reset?
16     MS. WEISGERBER: Objection to
17 form.
18     A.  I don't recall any definitive
19 opinion I would have had, but as stated,
20 was not proximate enough to have an
21 informed opinion, in any event.
22     Q.  And to your knowledge, have the
23 Acis CLOs ever been reset?
24     MS. WEISGERBER: Objection to
25 form, foundation.

Page 108

1  Confidential - Pugatch
2      A.  I do not believe that any of the
3  Acis CLOs were ever reset.
4      Q.  All right. So who negotiated
5  this claim, the settlement of this claim
6  on behalf of HarbourVest?
7      A.  I did.
8      Q.  And who negotiated for the
9  Debtor?
10     A.  Jim Seery.
11     Q.  And when did those negotiations
12 begin?
13     A.  It started sometime in November,
14 I believe.
15     Q.  And are you aware that Jim Seery
16 has ever taken the position that the
17 HarbourVest claim was worthless?
18     MS. WEISGERBER: Objection to
19 form, foundation.
20     A.  No, I'm not aware of that.
21     Q.  Has Jim Seery ever offered
22 $5 million to settle the HarbourVest
23 claim?
24     A.  Not to my knowledge.
25     MS. WEISGERBER: Objection to

Page 109

1  Confidential - Pugatch
2  form.
3      MR. WILSON: I'm going to send
4  out Exhibit 11.
5      (Whereupon, Exhibit 11,
6  Declaration of John A. Morris in
7  Support of the Debtor'S Motion For
8  Entry of an Order Approving Settlement
9  With Harbourvest (Claim Nos. 143, 147,
10 149, 150, 153, 154) and Authorizing
11 Actions, 82 pages, was marked for
12 identification.)
13 BY MR. WILSON:
14     Q.  I want pull this up on the
15 screen share. This Exhibit 11 is the
16 Declaration of John Morris in Support of
17 the Debtor's 9019 Motion, bears
18 Document 1631. And attached to this
19 exhibit is a trim cut copy of the
20 Settlement Agreement executed December 23,
21 2020.
22     And the Settlement Agreement has
23 Paragraph 1, Settlement of Claims, that
24 HarbourVest is going to receive a
25 $45 million unsecured, general unsecured

Page 110

Confidential - Pugatch

1    Confidential - Pugatch
2  claim, and a $35 million subordinated
3  claim.
4        And then Part B of that
5  paragraph states that HarbourVest is going
6  to transfer all its rights, titles, and
7  interests to its investment in CLOF to the
8  Debtor or its nominee.
9        Is that your understanding of
10 the general terms of this settlement?
11       MS. WEISGERBER: Objection to
12 form.
13 A.   Yes, it is.
14 Q.   Okay. And also in Paragraph 5,
15 Each HarbourVest party agrees that it will
16 vote all of HarbourVest claims held by
17 such HarbourVest party to accept the plan.
18       And I won't read all of that.
19 But the gist of this paragraph is that
20 HarbourVest is going to vote for the
21 Debtor's proposed plan; is that correct?
22       MS. WEISGERBER: Objection to
23 form.
24 A.   Yes, correct.
25 Q.   And how did that term come to be

Page 111

1    Confidential - Pugatch
2  in this Settlement Agreement?
3        MS. WEISGERBER: Objection to
4  form.
5  A.   I believe it was put there as
6  part of the drafting of the ultimate
7  agreement to the fund.
8  Q.   Well, whose suggestion was it
9  that it be added to the drafting?
10       MS. WEISGERBER: Objection to
11 form.
12 A.   I believe that it came from
13 Debtor's counsel, as they took the lead on
14 drafting the documentation here.
15 Q.   Did Jim Seery ever tell you that
16 it was important to him that HarbourVest
17 vote in support of the plan?
18       MS. WEISGERBER: Objection to
19 form.
20 A.   I don't recall that ever being
21 discussed. Certainly it was not the
22 prominent feature of any of the
23 discussions or negotiations that I ever
24 had with Jim.
25 Q.   Okay.

Page 112

1    Confidential - Pugatch
2        MR. WILSON: I'm going to take a
3  ten-minute break, and I think I'm
4  almost ready to wrap up. So I want to
5  stop my screen share. And let's,
6  well, let's start back at 2:30, and I
7  think I'll be quick. Thank you.
8        (Recess taken.)
9  BY MR. WILSON:
10 Q.   Mr. Pugatch, earlier you
11 testified that consistent with your
12 declaration you filed that as of August
13 31, 2020, the value of HCLOF was
14 $44.5 million. And then if we look at --
15 I don't remember which --
16       Okay. So this would have been
17 Exhibit 7. I'll do a share screen.
18       As of November 15, 2017 these
19 shares were purchased at $1.02 and change
20 apiece, and there were a total number of
21 143 million shares.
22       Was the value of this investment
23 roughly $150 million, as of November 15,
24 2017?
25       MS. WEISGERBER: Objection to

Page 113

1    Confidential - Pugatch
2  form. Foundation.
3        MR. MALONEY: Join.
4        MS. WEISGERBER: I don't know,
5  Mike, if you're comfortable doing that
6  math or what.
7  A.   Yes, approximately that's
8  correct.
9  Q.   Okay. And you know, and I've
10 read your papers and you talk about
11 attorneys' fees that you say weren't
12 appropriate to be charged to HCLOF and
13 that part of it, but as to the loss of
14 value of the actual investment, what's
15 your understanding of what led to that?
16       MS. WEISGERBER: Objection to
17 form. Objection to the extent it
18 calls for a legal conclusion.
19       Mike, to the extent you have a
20 nonlegal opinion on that, that's not
21 based on conversations with counsel,
22 you can answer.
23 A.   Yeah, I think a lot of the value
24 erosion was due to the inability to
25 refinance, reset a number of the

Page 114

Confidential - Pugatch

1 underlying CLOs that was part of the
2 original investment thesis here, largely
3 as a result of the ongoing litigation,
4 that Highland was involved in, and the
5 subsequent Acis bankruptcy.
6
7     Q.   And so during the period of time
8 when the injunction prohibited certain
9 actions with respect to this investment,
10 is it your opinion that this investment
11 was losing value?
12       MR. MALONEY:  Objection.
13       MS. WEISGERBER:  Objection to
14     form.
15     A.   Can you repeat the question,
16 John?
17     Q.   Well, I guess I want to know,
18 like, in a, on a timeline kind of basis,
19 do you think that the significant
20 reduction of value occurred prior to or
21 after the confirmation of the Acis plan on
22 February 1, 2019?
23       MS. WEISGERBER:  Objection to
24     form.  Objection to the extent it
25     calls for a legal conclusion.

Page 115

Confidential - Pugatch

1
2     You can give your lay opinion,
3 if you have one, Mike.
4     A.   I think it's all been as a
5 result of the events leading up to the
6 Acis bankruptcy, including the inability
7 to refinance or reset the CLOs which would
8 have been to the benefit of the CLO equity
9 holders including HCLOF.
10     Q.   And so what, what was the cause
11 of the inability to reset?
12       MS. WEISGERBER:  Same
13     objections:  form, foundation, legal
14     conclusion.
15       If you have a non-privileged
16     answer, Mike, go ahead.
17     A.   Yeah, my understanding was
18 originally the TRO, preventing Highland
19 and HCLOF from pursuing that, and then
20 subsequent to the Acis bankruptcy ruling,
21 a similar injunction that remained around
22 the inability for the equity holders of
23 those CLOs to redeem or refinances or
24 reset.
25     Q.   So do you -- is there any

Page 116

Confidential - Pugatch

1
2 component, in your opinion, of the loss of
3 value of these investments due to
4 portfolio mismanagement?
5       MS. WEISGERBER:  Objection to
6     form, foundation, legal conclusion, or
7     expert opinion, calling for
8     speculation.
9       If you have a view, Mike.
10     A.   Yeah.  Can you be more specific
11 with the question, John?
12     Q.   Well, I'll ask it a different
13 way.
14     Do you think that portfolio
15 mismanagement was a portion of the cause
16 of the reduction in value?
17       MS. WEISGERBER:  Same objection.
18     A.   I can't speculate as to, you
19 know, the underlying management decisions
20 around the CLOs, but what I do know is
21 that the mismanagement and
22 misrepresentations at the HCLOF level,
23 that would ultimately result in the Acis
24 bankruptcy and subsequent to that, the TRO
25 and the inability to refinance or reset

Page 117

Confidential - Pugatch

1
2 that has been the, far and away, the
3 largest contributor to loss of value
4 within the portfolio.
5     Q.   One of the allegations that
6 HarbourVest has made is that Highland
7 improperly changed the portfolio manager.
8 Is it your opinion that if that had not
9 been done, the portfolio manager had not
10 been changed at the inception of
11 HarbourVest's investment, that that would
12 have preserved any value of this fund?
13       MR. MORRIS:  Objection to the
14     form of the question.
15       MS. WEISGERBER:  Same objection.
16     Calling for speculation, hypothetical
17     lay opinion.
18       If you have testimony, go ahead,
19     Mike.
20     A.   Sorry, could you just repeat the
21 question, John?  I want to make sure I'm
22 answering it correctly.
23     Q.   I guess I just want to know, and
24 I think you kind of hinted at this a
25 little bit earlier today, but I guess what

Page 118

Confidential - Pugatch

1  Confidential - Pugatch
2  I really want to know is do you think that
3  the particular portfolio manager made a
4  difference in the loss of value that HCLOF
5  suffered?
6      MS. WEISGERBER: Same
7  objections.
8      A.  Again, it sounds like you're
9  asking a different question there than
10  what I thought I understood your question
11  to be initially. What I would say to that
12  is the decision originally to change the
13  portfolio manager, and ultimately the
14  events that took place following the
15  Arbitration Award for Mr. Terry, resulted
16  in the subsequent Acis bankruptcy, which
17  in turn has led to the destruction of
18  value, because of the inability to
19  refinance or reset, the underlying CLOs.
20      Q.  So HarbourVest is not alleging
21  that the portfolio manager made any
22  particular decisions or participated in
23  any mismanagement that led to reduction in
24  value?
25      MS. WEISGERBER: Objection to

Page 119

1  Confidential - Pugatch
2  form.
3      A.  When you're asking about
4  portfolio manager, are we referring to the
5  portfolio manager at the underlying CLO
6  level or at the HCLOF level? I think
7  there are two different levels here of
8  portfolio management.
9      Q.  Well, I'm talking about the
10  portfolio manager, and you can tell me
11  which one it is, but which portfolio
12  manager has the ability to, to impact the
13  performance of these funds?
14      MR. MORRIS: Objection.
15      A.  If you're referring to HCLOF,
16  the --
17      MS. WEISGERBER: Objection to
18  form.
19      A.  -- investment manager, or the
20  portfolio manager of HCLOF has the ability
21  to drive value creation by virtue of its
22  equity position in the underlying CLOs.
23      Q.  Well, which portfolio manager
24  makes the day-to-day decisions about
25  selling assets, trading assets, that, that

Page 120

1  Confidential - Pugatch
2  I guess --
3      A.  If you're referring to
4  underlaying credits, that would be the
5  portfolio manager in each of the
6  individual CLOs. The impact in value to
7  the equity investment in the CLOs is a
8  decision at the HCLOF level, where the
9  majority of that value erosion has
10  resulted from the inability to refinance
11  or reset those CLO entities.
12      Q.  And that's what we're talking
13  about when you said that they, that
14  Highland changed the portfolio manager,
15  you're talking about at the HCLOF level,
16  right?
17      MS. WEISGERBER: Objection to
18  form.
19      A.  Well, I was responding to the
20  question that I thought you asked. I
21  wasn't necessarily stating that.
22      Q.  I guess all I'm really trying to
23  do here is just understand HarbourVest's
24  position. And it sounds to me, and
25  correct me if I'm wrong, it sounds to me

Page 121

1  Confidential - Pugatch
2  that what you're saying is that the
3  diminution of value wasn't attributable to
4  poor investment decisions by a portfolio
5  manager, as much as it was the
6  consequences in the Acis bankruptcy of the
7  change in portfolio manager; is that fair?
8      MS. WEISGERBER: Objection to
9  form. Misstates testimony.
10      A.  Yes, it is. That is my general
11  understanding, yes.
12      MR. WILSON: Okay. No further
13  questions.
14      MR. MORRIS: All right. Well,
15  thank you very much.
16      THE REPORTER: Does anybody have
17  any other questions?
18      MR. KANE: Yes. This is John
19  Kane with CLO Holdco. I'll jump on
20  video. I've got some questions, but
21  I'm going to be relatively short. If
22  anybody else has a little bit heavier
23  schedule, let me know.
24      All right. I'll take that as a
25  go-ahead.

Page 122

Confidential - Pugatch

1 EXAMINATION
2 EXAMINATION
3 BY MR. KANE:
4 Q. This is John Kane. I represent
5 CLO Holdco.
6 Hi, Mike Pugatch. It's nice to
7 talk to you.
8 A. Likewise.
9 Q. I just wanted to briefly
10 confirm. I believe you testified you
11 participated in negotiations that lead to
12 the Settlement Agreement, that is part of
13 the 9019 motion, before the bankruptcy
14 court; is that correct?
15 A. Correct.
16 Q. And did you actively negotiate
17 the terms of that Settlement Agreement?
18 A. Yes.
19 Q. As in dollar amounts, what the
20 consideration exchanged, how it would
21 work, that kind of stuff, obviously with
22 the assistance of counsel?
23 A. Yes. All of that. The
24 negotiations were, you know, over the
25 course of a number of weeks and a number

Page 123

Confidential - Pugatch

1 of conversations directly with the Debtor,
2 with counsel, all-hands calls, et cetera.
3 Q. Okay. And as part of that in
4 the Settlement Agreement, you say the
5 HarbourVest entities were members in HCLOF
6 are in essence selling their shares to the
7 Debtor, and also in exchange getting some
8 claims back in the Debtor's plan. Is that
9 a fair summary?
10 MS. WEISGERBER: Objection to
11 form. Compound question.
12 Q. Let me ask it a different way.
13 A. Can you re-ask that, please?
14 Q. Yeah. I'm happy to do that.
15 Why don't you describe for me
16 how you would summarize that settlement?
17 A. Largely, as I think you just
18 described it, which was in exchange for,
19 in exchange for the, both the unsecured
20 creditors' claim, and subordinated
21 creditors' claim, that settlement value is
22 in exchange for us transferring the
23 interest in HCLOF to the Debtor, as part
24 of that overall negotiating package.

Page 124

Confidential - Pugatch

1 Q. And what would you estimate, I
2 going to have to imagine, let me rephrase
3 the question.
4 Have you guys done kind of an
5 internal best guess of what your unsecured
6 and subordinated claims would be, under
7 the plan, the value?
8 MS. WEISGERBER: Objection.
9 Objection to form.
10 A. Just to be clear, John, are you
11 referring to the expected recovery value
12 of our claims?
13 Q. Yes, sir.
14 MS. WEISGERBER: Objection to
15 form. Can we just clarify, so you're
16 talking about what they'll recover
17 ultimately? Is that the question,
18 John? I'm confused myself. I just
19 want to be sure I am following.
20 MR. KANE: Yeah. So I'm asking
21 Mike how much he believes, based on
22 his analysis, that HarbourVest is
23 likely to recover from the $45 million
24 allowed general unsecured claim and

Page 125

Confidential - Pugatch

1 $35 million allowed subordinated
2 claim, if the settlement is approved
3 and the plan is confirmed.
4 MS. WEISGERBER: Objection to
5 form.
6 But you can answer, if you have
7 an answer, Mike.
8 A. We do have a sense. It's really
9 a range of projected outcomes, as you can
10 imagine, based on the recoveries, based
11 informed by conversations with the Debtor.
12 Q. And what is that range of value?
13 MS. WEISGERBER: Objection to
14 form.
15 A. Our understanding, again, based
16 on those conversations, is that the
17 general unsecured claim could be valued in
18 a 75 to 80 cents on the dollar recovery.
19 And then a, you know, that the junior
20 class claim is really sort of upside
21 potential, to the extent there is more
22 recovery or more asset value of the
23 estate, for the benefit of creditors over
24 time.

Page 126

Confidential - Pugatch

1
2　Q.　What is your understanding of
3　the current value of the HarbourVest
4　shares in HCLOF that would be transferred
5　under this Agreement?
6　A.　It's roughly $22.5 million of
7　their value.
8　Q.　So doing a little bit of, you
9　know, back-of-the-table-cloth math, how do
10　you allocate value between the releases
11　that you are receiving and the shares that
12　you are transferring?
13　　　MR. KANE:　I'm sorry.　Let me
14　rephrase that.　Let me ask that
15　question differently.
16　Q.　In addition to the claims under
17　the plan, HarbourVest is providing the
18　Debt -- sorry, in addition to the shares
19　that are being transferred, HarbourVest is
20　providing to the Debtor certain releases
21　for its litigation claims; is that
22　correct?
23　　　MS. WEISGERBER:　Objection to
24　form.
25　A.　Correct.

Page 127

Confidential - Pugatch

1
2　Q.　So how has HarbourVest allocated
3　value, as far as this Settlement Agreement
4　is concerned?
5　　　And to make sure we're on the
6　same page about what I'm asking,
7　HarbourVest is trading a bundle of sticks,
8　right?　And there's really two things
9　within that bundle of sticks, and please
10　confirm that's correct, you're trading
11　shares, and in addition, releases; is that
12　right?　In exchange you're getting back
13　claims that have a potential future value.
14　　　So, how have you allocated value
15　among the shares transferred and the
16　releases that are being granted?
17　　　MR. MORRIS:　Objection.
18　　　MS. WEISGERBER:　Objection.
19　　　You can go ahead, Mike.
20　A.　Yeah.　So ultimately we looked
21　at it as a package, and so it was less
22　about the attribution of value between the
23　two different sticks, as you described it,
24　and more about the overall package value
25　in exchange for the transfer of our

Page 128

Confidential - Pugatch

1
2　interest and the release of the claims
3　that we had outstanding as the Debtor.
4　　　MR. KANE:　Now, I want to turn
5　your attention to what I've included
6　in the chat.　You can pull it down
7　pretty easily if you want.　But it
8　would be Holdco Depo Exhibit 2.　If
9　that would be easier than a screen
10　share, if you'd like, I'm happy to do
11　that as well.
12　　　MS. WEISGERBER:　Which document
13　is it, John?　Because I just can't
14　pull stuff off the Zoom right now.
15　　　MR. KANE:　Oh, I'm sorry.　It's
16　the Settlement Agreement with the
17　attached exhibits.　I can share my
18　screen so we're all on the same page.
19　　　Just to confirm we're looking at
20　the same thing, here's the Settlement
21　Agreement.　There's a docket entry at
22　the top so you can see it, 1631 filed
23　by the Debtor 12/24/20.
24　　　This is Exhibit 1 to the
25　Declaration of John Morris in Support

Page 129

Confidential - Pugatch

1
2　of Debtor's Motion for an Entry
3　Approving Settlement with HarbourVest.
4　BY MR. KANE:
5　Q.　Now, this Settlement Agreement
6　is a document that you assisted in
7　negotiations; is that correct?
8　A.　Correct.
9　Q.　Okay.　And here in Section 1B,
10　this addresses the transfer of the shares
11　of the HarbourVest entities to a Debtor
12　affiliate; is that correct?
13　　　MS. WEISGERBER:　Objection to
14　form.
15　A.　Correct.
16　Q.　Is that your understanding,
17　Mr. Pugatch?
18　A.　Yes, correct.
19　Q.　Okay.　Thank you.　Section 4A,
20　and is this your understanding that
21　HarbourVest is representing that it has
22　the authority to enter into this agreement
23　and to transfer the shares to the Debtor's
24　affiliate if this is approved?
25　　　MS. WEISGERBER:　Objection to

Page 130

Confidential - Pugatch

1
2 form. The document speaks for itself.
3     Is that a question, John?
4     MR. KANE: Yeah. I asked if
5 that was his understanding, that this
6 is a representation by HarbourVest
7 that it has the authority to transfer
8 the shares if the Settlement Agreement
9 is approved.
10     MS. WEISGERBER: Objection to
11 form. Objection to the extent it
12 calls for a legal conclusion.
13     To the extent you have a
14 nonlegal conclusion, non-privileged
15 understanding, Mike, you can share
16 that.
17     A.   Yeah, I'm just saying I can only
18 answer that based on conversations with
19 counsel.
20     MR. KANE: Okay. I won't push
21 that. That's fine.
22     Q.   If we keep going down here as
23 part of this attachment, there's a
24 Transfer Agreement, Exhibit A to the
25 Settlement Agreement. Are you familiar

Page 131

Confidential - Pugatch

1
2 with this document?
3     A.   Yes. I've seen it.
4     Q.   And did you assist with the
5 preparation or negotiation of this
6 Agreement?
7     A.   Yes.
8     Q.   Okay. Did you understand that
9 HarbourVest would need the consent of the
10 HCLOF portfolio advisor to effectuate the
11 transfer?
12     MS. WEISGERBER: Objection to
13 form. Objection to the extent it
14 calls for a legal conclusion.
15     Mike, if you have a view other
16 than from privileged conversation, you
17 can answer, otherwise do not answer.
18     A.   Yeah, I'm sorry. I can only
19 answer that based on conversation with
20 counsel and the read of the document.
21     Q.   So to make sure I understand
22 that, you have no independent
23 understanding of whether or not consent
24 was required from the portfolio manager
25 before you could effectuate a transfer; is

Page 132

Confidential - Pugatch

1
2 that correct?
3     MS. WEISGERBER: Same objection.
4     I think you can give your
5 general understanding, but then not
6 get into specific conversations.
7     A.   My understanding of that is
8 based on conversations with counsel, but
9 yes, that is my understanding, John.
10     Q.   Okay. I'm going to highlight a
11 passage here. Can you see this
12 highlighted area? "Whereas, the Portfolio
13 Manager desires to consent to such
14 transfers and to the admission of
15 Transferee as a shareholder..."
16     Were you aware of that
17 provision?
18     MS. WEISGERBER: Objection to
19 form.
20     A.   Yes. It's in the document.
21     Q.   Do you have any understanding of
22 why that provision was included in this
23 agreement?
24     MS. WEISGERBER: Objection to
25 form. Objection to the extent it

Page 133

Confidential - Pugatch

1
2 calls for a privileged conversation.
3     A.   As I answered before, based on
4 conversations with counsel, my
5 understanding is that consent is requiring
6 in connection to transfer.
7     Q.   I'd like to turn your attention
8 now -- this is a document you've seen
9 before during your deposition. This is
10 the member's agreement related to the
11 Company for HCLOF. This is previously
12 produced by the Debtor, that's why it's
13 got the Bates stamp on it. This is dated
14 November 15, 2017.
15     Are you familiar with this
16 document?
17     A.   Yes.
18     Q.   Do you see on Line 14, in the
19 between, on Page 1 shows Highland HCF
20 Advisor, Ltd. as the portfolio manager?
21     A.   Yes, I see that.
22     Q.   I know there was quite a bit
23 of -- quite a few questions about this
24 earlier, but you understand that Highland
25 HCF Advisor, Ltd. is still the HCLOF

Page 134

Confidential - Pugatch

1  portfolio manager?
2      MS. WEISGERBER: Objection to
3  form.
4      A.  Honestly, I don't have -- I
5  don't have enough information to answer
6  that definitively.
7      Q.  Okay.  Going back to the
8  Settlement Agreement, there's a reference
9  in here to a defined term, "portfolio
10  manager."
11      Do you see that?
12      A.  Yep.
13      Q.  And is this the same one that's
14  listed in the Member Agreement, Highland
15  HCF Advisor, Ltd.?
16      A.  I believe that seems to be the
17  position, yes.
18      Q.  Okay.  So when we're talking
19  about down here, "Whereas, the Portfolio
20  Manager desires to consent," this consent
21  provision is referring to the same
22  definition of portfolio manager that's
23  included in this Member Agreement; is that
24  correct?
25

Page 135

Confidential - Pugatch

1      MR. MORRIS:  Objection to the
2  form.
3      MS. WEISGERBER:  Objection --
4  same objections.  Objection to the
5  extent it calls for privileged
6  information.
7      A.  That sounds like a legal
8  conclusion.
9      Q.  I would have thought it was
10  reading, Mr. Pugatch.
11      A.  Well, if you're asking me to
12  definitively confirm that, that sounds
13  like a legal interpretation.
14      Q.  Let me ask that a different way.
15      Do you understand that the
16  portfolio manager is listed as Highland
17  HCF Advisor, Ltd. in the Member Agreement?
18      A.  Yes.
19      Q.  And in this Transfer Agreement,
20  the portfolio manager is listed as
21  Highland HCF Advisor, Ltd.?
22      A.  Yes.
23      Q.  And those are the same entities?
24      A.  Yes.
25

Page 136

Confidential - Pugatch

1      Q.  All right.  Are you familiar
2  with Section 6 of this Member Agreement?
3      A.  (Nods.)
4      Q.  Have you ever read this
5  document?
6      A.  I have.
7      Q.  Okay.  And can you give me your
8  understanding of what must take place
9  under this document for HarbourVest to
10  transfer its shares?
11      MS. WEISGERBER:  Object to the
12  form.  Object to the extent it calls
13  for a legal conclusion.  Object to the
14  extent it calls for any privileged
15  information or conversations.
16      Mike, to the extent you have an
17  independent understanding, separate
18  from conversations with counsel, you
19  can answer the question.
20      A.  I would say my understanding of
21  what's required in connection with the
22  transfer is based on conversations with
23  counsel.
24      Q.  Do you believe that the

Page 137

Confidential - Pugatch

1  HarbourVest entities can transfer its
2  shares without obtaining the consent of
3  the portfolio manager?
4      MS. WEISGERBER:  Objection to
5  form.  Objection to the extent it
6  calls for a legal conclusion.
7      Same instruction, Mike, as to
8  privileged conversations.
9      A.  Again, my view on that would be
10  based on conversations with counsel.
11      Q.  Are you aware of whether
12  HarbourVest provided any notice to other
13  members of its intent to transfer its
14  shares to the Debtor's affiliate under the
15  Settlement Agreement, other than the
16  filing of the 9019 motion?
17      MS. WEISGERBER:  Same objection.
18  But there is a factual question in
19  there if you can answer it, Mike, but
20  no privileged conversation.
21      A.  Yeah, I'm not aware of that.
22      Q.  Did you provide members 30 days
23  after the receipt of notice of
24  HarbourVest's intent to transfer its
25

Page 138

1    Confidential - Pugatch
2  shares to the Debtor's affiliate and
3  provide those members with an opportunity
4  to purchase their pro rata amount of the
5  shares?
6        MS. WEISGERBER: Same objection.
7    A.   No.
8    Q.   And just to make sure I'm not
9  asking this question in a way that you
10  don't understand what I'm asking: Do you
11  see this highlighted provision here?
12    A.   Yes.
13    Q.   I'm asking whether HarbourVest
14  provided members 30 days after the receipt
15  of a notice letter and an opportunity to
16  purchase their entire pro rata share of
17  the shares proposed to be transferred by
18  the HarbourVest entities?
19        MS. WEISGERBER: Objection to
20  form. Objection to the extent it
21  calls for privileged conversations or
22  a legal conclusion. Objection to the
23  extent it's asking about one piece of
24  the document.
25        And you're welcome to look at

Page 139

1    Confidential - Pugatch
2  the full document if you'd like, Mike.
3  I think it was one of the ones that
4  was E-mailed as well, or maybe you
5  were able to pull it down.
6        THE WITNESS: Yeah, no, I was.
7  Thank you.
8    A.   And I'm sorry, John, could you
9  just repeat the question?
10  BY MR. KANE:
11    Q.   Yeah, sure, absolutely. And I'm
12  not calling for any conversations with
13  counsel. I'm asking you if you know
14  whether HarbourVest did something or not.
15  So let's -- let's keep it to that, because
16  I --
17        MR. KANE: Erica, I appreciate
18  your concerns, but I really don't want
19  to have any disclosures from Mike
20  about his discussions with you on
21  whether something needed to be done or
22  not. I'm asking simply the facts of
23  whether HarbourVest did it or not.
24    Q.   So did HarbourVest provide
25  notice, 30 days' notice, to the members

Page 140

1    Confidential - Pugatch
2  listed under this Member Agreement of
3  HarbourVest's intent to transfer the
4  shares that are the subject to the
5  Settlement Agreement?
6    A.   No.
7    Q.   Has HarbourVest provided any
8  members with a right of first refusal and
9  a cash purchase price for which it would
10  sell its shares instead of transferring
11  those shares to the Debtor or the Debtor's
12  affiliate under the Settlement Agreement?
13        MS. WEISGERBER: Same
14  objections. Objection to form.
15  Objection to extent it calls for a
16  legal conclusion or privileged
17  conversations, including -- regarding
18  the specifics of that provision.
19        I don't think that's a purely
20  factual question.
21    Q.   Did HarbourVest offer to sell
22  the shares to the other members? That's
23  not a factual question?
24        MS. WEISGERBER: Objection --
25    A.   On the basis of that factual

Page 141

1    Confidential - Pugatch
2  question, no.
3    Q.   So let me ask this question
4  again, I don't recall if I got an answer
5  or not.
6        Did HarbourVest affirmatively
7  seek to obtain the consent of Highland HCF
8  Advisors to transfer its shares to the
9  Debtor affiliate under the Settlement
10  Agreement?
11        MS. WEISGERBER: Same
12  objections. Same instruction
13  regarding the privileged conversation.
14    A.   I mean, as a Highland-affiliated
15  entity, the Debtor, who's obviously the
16  other party here involved in the transfer,
17  you know, was involved in these
18  discussions.
19    Q.   I'm sorry. Would you mind
20  clarifying? Did you say that Highland HCF
21  Advisors was involved in those discussions
22  or the Debtor was involved in those
23  discussions and you assume Highland HCF
24  Advisors was?
25        MS. WEISGERBER: Objection to

Page 142

Confidential - Pugatch

1     Confidential - Pugatch
2  form. Misstates testimony.
3     A.   Sorry, could you just repeat the
4  question, please, John?
5     Q.   Yes, Mr. Pugatch.
6         I'm actually just trying to get
7  some clarification from you, because I
8  don't think I understood your answer
9  about -- I had asked just -- again, I
10  don't want any correspondence with your
11  counsel or what your counsel advised, I'm
12  asking: Do you know whether HarbourVest
13  sought written consent from Highland HCF
14  Advisor for its -- or to transfer its
15  shares to the Debtor or the Debtor's
16  affiliate under the Settlement Agreement?
17        MS. WEISGERBER: Same objection.
18     A.   My understanding is HarbourVest
19  did not explicitly have those
20  conversations or seek that consent.
21     Q.   Okay. Are you aware of whether
22  HarbourVest received any written consent
23  from Highland HCF Advisors, other than
24  what's in the Transfer Agreement attached
25  to the Settlement Agreement?

Page 143

1     Confidential - Pugatch
2     A.   I am not.
3        MS. WEISGERBER: Same objection.
4     Q.   Do you know if HarbourVest has
5  any written consent? Not just to seek it,
6  but do you know if HarbourVest has a piece
7  of paper, other than the transfer
8  agreement, in which Highland HCF advisors
9  provided its consent to the transfer of
10  shares to the Debtor's affiliate?
11        MS. WEISGERBER: Same
12  objections.
13     A.   I would have to speak with
14  counsel. I am not aware of that directly,
15  no.
16     Q.   Are you aware of whether
17  HarbourVest had any correspondence with
18  HCLOF representatives about effectuating
19  the transfer of the shares to the Debtor's
20  affiliate under the Settlement Agreement?
21        MS. WEISGERBER: Same objection.
22        You can answer.
23     A.   We have had discussions with
24  them, yes.
25     Q.   Did HCLOF representatives

Page 144

1     Confidential - Pugatch
2  provide consent, whether written or
3  otherwise, to the transfer?
4     A.   I am not aware that that consent
5  has been provided as of yet.
6     Q.   Are you aware of whether any
7  HarbourVest representatives have had
8  conversations with the Debtor's
9  representatives about the necessity of
10  consent to the transfer of their shares?
11        MS. WEISGERBER: Objection to
12  form --
13        MR. KANE: I'll re-ask the
14  question. I want to clarify that
15  point.
16  BY MR. KANE:
17     Q.   Mr. Pugatch, are you aware of
18  whether any HarbourVest representatives
19  had conversations with the Debtor's
20  representatives about the necessity of
21  obtaining the HCLOF portfolio manager's
22  written consent before transferring the
23  shares to the Debtor's representative or
24  affiliate under the terms of the
25  Settlement Agreement?

Page 145

1     Confidential - Pugatch
2        MS. WEISGERBER: Objection to
3  form.
4        And, John, I'm sorry to do this,
5  can you just clarify what you mean by
6  "representative"?
7        MR. KANE: Yeah. I mean,
8  anybody that has agency authority to
9  act on behalf of the Debtor in
10  negotiations, in the preparation of
11  the documents, in negotiation of the
12  terms of the Settlement Agreement.
13        I mean, I think that it's, you
14  know, a pretty broad term here.
15        MS. WEISGERBER: Objection to
16  form. Objection to the extent it
17  calls for discussions with counsel.
18        As a factual matter, if you have
19  an answer, you can give it.
20     A.   I'm aware of conversations that
21  have taken place about all of the terms of
22  the Transfer Agreement in connection with
23  the settlement, with all parties.
24     Q.   Is it your understanding based
25  on those conversations that written

Page 146

Confidential - Pugatch

1 consent of the portfolio manager as
2 defined in the Transfer Agreement was
3 required before the shares could be
4 transferred under the Settlement
5 Agreement?
6
7      MS. WEISGERBER:  Objection to
8   the form.  Objection to the extent it
9   calls for a legal conclusion or
10   privileged conversation.  And I think
11   that one does, John.
12   A.    Yeah, I can only answer that
13 based on conversation with lawyers.
14   Q.    Wasn't the question whether --
15 I'm sorry.  Maybe I forgot my own
16 question.
17      But I thought it was based on
18 your conversations with the Debtor's
19 representative, was it your understanding,
20 not based on your conversation with
21 counsel.
22      MS. WEISGERBER:  Can you repeat
23   the whole question because I
24   definitely misunderstood it then too.
25   Q.    Okay.  Based on your

Page 147

Confidential - Pugatch

1
2 conversations with the Debtor's
3 representatives, was it your understanding
4 that the consent of the portfolio manager
5 was required for the shares to be
6 transferred from the HarbourVest entities
7 to the Debtor's affiliate under the terms
8 of the Settlement Agreement?
9      MS. WEISGERBER:  Okay.  Same
10   objections.  Also objection to the
11   extent there is a common interest
12   privilege.
13   A.    I don't recall having that
14 explicit conversation with representative
15 of the Debtor.
16      MR. KANE:  I'll pass the
17   witness.
18      Thank you, Mr. Pugatch.
19      MR. MORRIS:  Anybody else?
20   Thank you, all.
21      MS. WEISGERBER:  Can we --
22   before we break, could we have a
23   two-minute break and then come back
24   before we conclude.
25 BY MS. WEISGERBER:

Page 148

Confidential - Pugatch

1
2   Q.    Mr. Pugatch, during Mr. Wilson's
3 questioning, I believe his last question
4 related to identifying as between two
5 choices the primary source or the cause of
6 HarbourVest's damages.
7      In your opinion, is -- are
8 HarbourVest damages attributable to any
9 one cause?
10   A.    No, I would say there were
11 multiple root causes of the damages and
12 diminution in value that was suffered in
13 connection with the investment.
14      MS. WEISGERBER:  Okay.  I don't
15   have any further questions.
16      MR. WILSON:  I think I'd like to
17   ask a couple more.
18 BY MR. WILSON:
19   Q.    Mr. Pugatch, I think you
20 testified earlier that the investment in
21 HCLOF was comprised of multiple CLOs,
22 correct?
23   A.    Correct.
24   Q.    And some of those CLOs were
25 managed by Acis, to your understanding?

Page 149

Confidential - Pugatch

1
2      MS. WEISGERBER:  Objection.
3   A.    Correct.
4      MS. WEISGERBER:  Just to
5   clarify, John, is this within the
6   scope of the questions I asked
7   Mr. Pugatch?
8      MR. WILSON:  I believe it is.
9   I'm going to be really short.  But
10   so --
11      MS. WEISGERBER:  I would like to
12   have a standing objection to the
13   extent it's not within the scope of
14   the questions that was asked to
15   Mr. Pugatch.
16 BY MR. WILSON:
17   Q.    So some of those CLOs you
18 contend are managed by Acis?
19      MS. WEISGERBER:  Objection to
20   form.
21   A.    A majority.
22   Q.    And just generally, do you
23 contend that Highland managed the balance
24 of those CLOs?
25      MR. MORRIS:  Objection to the

Page 150

Confidential - Pugatch

1 form of the question.
2 MS. WEISGERBER: Objection.
3 Same objection.
4 A. Yes.
5 Q. Yes. Okay. Thank you.
6 And I just had two more
7 questions.
8 So, if there was going to be a
9 reset, that would have to be done at the
10 CLO level, each CLO would have to be
11 reset?
12 MR. MORRIS: Objection.
13 MS. WEISGERBER: Objection to
14 form.
15 A. That is correct.
16 Q. And do you know of any specific
17 CLO that requested a reset but was not
18 granted a reset?
19 MR. MORRIS: Objection to form.
20 MS. WEISGERBER: Same objection.
21 And foundation.
22 A. When you say "CLOs who requested
23 a reset," can be more clear, please?
24 Q. We just talked about how this
25

Page 151

Confidential - Pugatch

1 investment is comprised of multiple CLOs
2 and each one of those CLOs would have to
3 be reset, according to its own terms, I
4 guess. Do you know of any one of those
5 CLOs that requested a reset?
6 MR. MORRIS: Objection to the
7 form of the question.
8 MS. WEISGERBER: Same objection.
9 A. I'm aware of Highland having in
10 its capacity as manager of the HCLOF
11 having requested or pursued resets of
12 certain of the Acis HCLOs.
13 Q. Your understanding is that
14 Highland requested a reset of the Acis
15 CLOs?
16 MS. WEISGERBER: Objection to
17 form.
18 A. I'm sorry. I'm trying to
19 understand what you said.
20 MS. WEISGERBER: I'm really
21 wondering how this relates at all to
22 the scope of the questions I asked Mr.
23 Pugatch on follow up.
24 I think it's time to wrap this
25

Page 152

Confidential - Pugatch

1 up, John.
2 MR. WILSON: This was my last
3 question, I just need an answer to it.
4 And I think he tried to answer, but I
5 didn't understand what he said.
6 MS. WEISGERBER: Objection. Can
7 you re-ask the question so we have a
8 clear question.
9 MR. WILSON: Well, Madam Court
10 Reporter, can you read back his last
11 response?
12 (Record read.)
13 BY MR. WILSON:
14 Q. Can you repeat what you intended
15 to answer to the last question?
16 MS. WEISGERBER: Same objection.
17 If you recall, Mike.
18 A. I'm sorry, John. Can you just
19 repeat the question, please, make sure I'm
20 answering what you want me to answer.
21 Q. My question is the same as it's
22 been: Are you aware of any CLO that
23 requested a reset and was not granted one?
24 MS. WEISGERBER: Objection to
25

Page 153

Confidential - Pugatch

1 form. Objection to foundation.
2 MR. MORRIS: Objection to the
3 form of the question.
4 A. Again, my understanding is the
5 CLOs do not request the reset. Highland,
6 as manager of HCLOF in its capacity as
7 majority equity owner of certain of the
8 CLOs, have requested a reset post our
9 original investment.
10 Q. Okay.
11 MR. WILSON: I'll pass the
12 witness.
13 MS. WEISGERBER: I think we're
14 done.
15 THE REPORTER: Will everyone put
16 their orders on the record, please?
17 MR. MORRIS: John Morris for the
18 Debtor. Expedited, please.
19 MR. WILSON: John Wilson. I'm
20 not sure what arrangements my office
21 has previously made, but we want an
22 expedited transcript, as well.
23 THE REPORTER: Do you want a
24 rough too?
25

Page 154

1  Confidential - Pugatch

2  MR. WILSON:  Yes, please.

3  MR. MORRIS:  Yes, please.

4  MS. WEISGERBER:  Same for

5  HarbourVest, please.

6  MR. MALONEY:  I don't need an

7  expedited transcript.  I'd just be

8  happy to get one regular copy.  I'll

9  take whatever you would produce in the

10  ordinary course.  Same as what

11  everyone else ordered.

12     (Time Noted:  4:35 p.m. EDT.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 155

1

2     ACKNOWLEDGEMENT OF DEPONENT

3

4     I, MICHAEL PUGATCH, do hereby

5  acknowledge that I have read and

6  examined the foregoing testimony, and

7  the same is a true, correct and

8  complete transcription of the

9  testimony given by me, and any

10   corrections appear on the attached

11   Errata sheet signed by me.

12

13

14  _____  _____

15   (DATE)           (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

Page 156

1

2  CERTIFICATE OF SHORTHAND REPORTER-NOTARY

3     PUBLIC

4     I, Amanda Gorrono, the officer

5  before whom the foregoing deposition

6  was taken, do hereby certify that the

7  foregoing transcript is a true and

8  correct record of the testimony given;

9  that said testimony was taken by me

10  stenographically and thereafter

11  reduced to typewriting under my

12  direction; and that I am neither

13  counsel for, related to, nor employed

14  by any of the parties to this case and

15  have no interest, financial or

16  otherwise, in its outcome.

17     IN WITNESS WHEREOF, I have

18  hereunto set my hand this 12th day of

19  January, 2021.

20

21  _____

22  AMANDA GORRONO, CLR

   CLR NO:  052005 - 01

23

   Notary Public in and for the State of New

24  York

   County of Suffolk

25

Page 157

1     ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg. No. Now Reads   Should Read  Reason

6  ___ ___ _____  _____  _____

7  ___ ___ _____  _____  _____

8  ___ ___ _____  _____  _____

9  ___ ___ _____  _____  _____

10  ___ ___ _____  _____  _____

11  ___ ___ _____  _____  _____

12  ___ ___ _____  _____  _____

13  ___ ___ _____  _____  _____

14  ___ ___ _____  _____  _____

15  ___ ___ _____  _____  _____

16  ___ ___ _____  _____  _____

17  ___ ___ _____  _____  _____

18  ___ ___ _____  _____  _____

19  ___ ___ _____  _____  _____

20

         _____

21          Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS ____ DAY OF _____, 20___.

24  _____

25  (Notary Public)   MY COMMISSION EXPIRES:_____

Index: $1,570,429..additional

**$**

**$1,570,429** 27:23
**$1.02** 112:19
**$135** 28:25 30:2
**$150** 112:23
**$22.5** 126:6
**$295,000** 93:23
94:22 95:7 104:14
**$35** 110:2 125:2
**$4,998,501** 27:20
**$44,587,820** 59:3
**$44.5** 112:14
**$45** 109:25 124:24
**$5** 108:22
**$73** 56:25
**$73,522,928** 27:14
**$8** 78:2

**(**

**(i)** 42:22

**0**

**08/15/2017** 68:7

**1**

**1** 16:4,7 19:17 31:21
59:10 61:14,15
109:23 114:22
128:24 133:19
**10** 60:11,15 83:19,20
84:3,6 97:22 99:5
103:23
**10/10/2018** 83:22
**100** 64:5,11,15
**1057** 22:23 45:12
**11** 32:2 35:9 36:12
51:19 52:22 109:4,5,
15

**11/29/2017** 79:3
**12/24/20** 128:23
**122** 61:9
**135** 28:10
**14** 33:10 133:18
**143** 14:21 16:8,11
109:9 112:21
**144** 14:22
**147** 109:9
**149** 14:23 17:3,17
109:10
**15** 27:11 33:22,24
50:13 55:17 60:11,15
64:4 69:2 112:18,23
133:14
**150** 14:24 109:10
**153** 14:25 109:10
**154** 15:3 109:10
**15th** 50:14
**1631** 109:18 128:22
**17** 50:13
**1:20** 60:22
**1B** 129:9
**1st** 55:22 91:7

**2**

**2** 16:22,23 17:2,10,24
26:12 31:21 92:4
128:8
**2004** 83:20 84:12,18
99:17
**2017** 14:23 16:13
21:18 23:14 24:3
27:11 33:22,25
50:13,14 51:20 52:21
55:17 64:5 69:2 85:4
112:18,24 133:14
**2018** 84:7 86:18
90:24 97:22 103:23
105:10,25
**2019** 59:11 90:24
91:7 107:14 114:22

**2020** 16:12 59:3
109:21 112:13
**217** 14:22
**23** 109:20
**27** 51:20 52:21
**27th** 51:19
**28** 21:3
**28th** 81:17
**2:30** 112:6

**3**

**3** 18:18,19,24 26:10
28:7 58:25
**30** 137:23 138:14
139:25
**30(b)(6)** 15:13
**3018(a)** 18:22 19:8
**31** 59:3 63:8 112:13
**35.49** 65:14
**36** 55:9
**37** 45:16 53:7
**382** 9:12
**39** 54:25

**4**

**4** 20:25 21:2 33:9
37:13,22 51:18 84:24
93:15
**4.1** 37:24
**4.2** 42:21
**4.3** 38:23 40:2 44:13,
22
**4/08/2020** 16:8 17:3
**40,000** 90:25
**410** 17:7
**47** 13:4
**49** 27:15 65:24
**49.02** 66:5

**49.98** 27:16 65:20
66:3
**49.985%** 85:5
**4A** 129:19

**5**

**5** 16:16 22:15,16,17
37:13,21,22 45:11
95:11 96:24 110:14
**50** 20:11

**6**

**6** 61:5,8 84:23 136:3
**617** 22:19
**63** 67:14

**7**

**7** 63:4,6,7 95:9 112:17
**75** 125:19

**8**

**8** 16:12 23:14 62:3
68:3,6
**80** 125:19
**82** 109:11

**9**

**9** 78:21 79:2 95:24
**9019** 11:2 15:8 98:3
109:17 122:13
137:17

**A**

**ability** 42:16 54:7,13,
17,18,20,23 95:16
96:9,20 98:10,11
105:18 119:12,20
**absolutely** 49:24
82:19 139:11

**accept** 110:17
**accordance** 59:7
103:9
**accurate** 33:14
93:24
**accusations** 81:7
**Acis** 31:22,23,24
32:4,5,12,14,24 35:2
36:11,13,24 46:10,
15,21 47:9,14,22
48:11 49:4,10,14,20
50:2,11 51:11 52:21
53:4,5 74:3 84:5
85:16 86:19,23 87:4,
13,22 88:7,11,19
89:11 90:8,17 91:2,6,
20 92:4,5,7,8,14,15,
20 93:3,18 94:12
96:5,6,7,10,11,22
97:3 101:15 104:13
105:9 107:15,23
108:3 114:6,21
115:6,20 116:23
118:16 121:6 148:25
149:18 151:13,15
**Acis'** 51:20
**Acis-branded** 35:6
**Acis-managed** 35:5
**Acis/hclof** 11:11,12
**acquiring** 63:22
**act** 40:3 145:9
**action** 40:5 56:16
**actionable** 72:16
**actions** 39:4,9,13
40:23 42:18,21 91:21
109:11 114:9
**actively** 122:16
**activities** 53:15
**actual** 113:14
**add** 58:18
**added** 111:9
**addition** 126:16,18
127:11
**additional** 27:20
28:3 57:16 58:8,16
95:13

**address** 13:3,8,9

**addressed** 70:8

**addresses** 129:10

**adequate** 56:18

**admission** 132:14

**advancing** 24:4

**advice** 40:4,10 44:2

**advised** 142:11

**advisor** 33:11,15
35:13 36:15 131:10
133:20,25 134:16
135:18,22 142:14

**advisors** 58:19
141:8,21,24 142:23
143:8

**advisory** 37:23,25
38:6,10,13,18,19,20
39:3,6,8,13,19,21
40:4,8,11,15,24
42:22,24 43:3,11,18
44:11,15,24 45:2
62:5,17,21 63:16
67:7

**affect** 54:20 74:22

**affiliate** 48:23 62:6,
15 85:2 129:12,24
137:15 138:2 140:12
141:9 142:16 143:10,
20 144:24 147:7

**affiliates** 31:2,18
32:23 62:20 79:13
85:5

**affirmatively** 141:6

**affirmed** 10:13

**afield** 89:15 94:14

**agency** 145:8

**agree** 9:15 11:16
23:9 28:11 46:19
86:8 88:17 93:3
94:20 95:19 106:13

**agreed** 9:23,24

**agreement** 9:20
12:23 21:3,9 33:8,13
37:5 44:13 63:8,11
92:6 109:20,22
111:2,7 122:12,17

**agreements** 11:13
22:5

**agrees** 95:4 110:15

**ahead** 29:5 58:14
97:18 115:16 117:18
127:19

**AIF** 14:23 15:3

**aleve** 81:22

**Aliza** 9:4

**all-hands** 123:3

**allegations** 11:6
117:5

**alleged** 11:11 56:2
85:15

**alleges** 45:19

**alleging** 118:20

**alleviated** 82:2

**allocate** 126:10

**allocated** 127:2,14

**allowed** 124:25
125:2

**alluded** 79:24

**alongside** 24:19

**Amended** 96:25

**amount** 93:22 94:22
138:4

**amounts** 122:19

**analysis** 124:23

**and/or** 11:12 35:6

**annex** 16:16 17:20,
21

**answering** 48:18
88:4 102:11 117:22

123:5 126:5 127:3
128:16,21 129:5,22
130:8,24,25 131:6
132:23 133:10 134:9,
15,24 135:18,20
136:3 137:16 140:2,
5,12 141:10 142:16,
24,25 143:8,20
144:25 145:12,22
146:3,6 147:8

**answers** 12:2

**apiece** 112:20

**apologize** 66:14

**appeared** 53:12
85:19 86:6,19

**appears** 97:6

**appointed** 36:13

**apprised** 87:21

**approached** 23:21

**approval** 40:8 44:23

**approve** 39:4 40:25

**approved** 125:3
129:24 130:9

**Approving** 109:8
129:3

**approximately**
93:22 113:7

**approximation**
59:12

**April** 16:12

**arbitration** 45:22
46:3,8,16,21 47:17,
20 48:8,13 51:16
54:10 55:13 73:23,24
76:14,20,21,25 77:7,
20 78:5,9,14 118:15

**area** 132:12

**argue** 106:11

**arrangements**
153:21

**article** 76:10 80:14,
18 81:4,7,8,23 82:5

**asserted** 86:22

**assess** 95:7

**asset** 59:2,10 125:23

**assets** 30:9 31:14
47:14,21 48:11,14,21
51:14 119:25

**assist** 131:4

**assistance** 122:22

**assisted** 129:6

**assume** 141:23

**attached** 69:12
81:11 99:19 109:18
128:17 142:24

**attachment** 69:25
76:9 81:19,21 130:23

**attendance** 42:24

**attention** 70:20
128:5 133:7

**attorneys'** 113:11

**attributable** 121:3
148:8

**attribution** 127:22

**August** 59:3 69:2
112:12

**authority** 40:10
41:18 102:5,16
129:22 130:7 145:8

**authorized** 21:16
22:2

**Authorizing** 109:10

**average** 89:7

**avoid** 54:9

**award** 45:23 46:3,8,
10,17,21,23 47:17,20
48:8,13 51:16 54:10
55:13 76:14,20,22,25
77:7,21,24,25 78:3,9,
14 118:15

**awarded** 46:8

**aware** 70:14,18 75:5,
16 76:19 80:17 94:7,
11,16,19 98:22,23
99:10 108:15,20
132:16 137:12,22
142:21 143:14,16
144:4,6,17 145:20
151:10 152:23

**B**

**back** 26:9 31:20
45:10,12 53:6 57:22
58:16,23 59:17 66:10
92:3 112:6 123:9

127:12 134:8 147:23
152:11

**back-of-the-table-
cloth** 126:9

**Baker** 81:16 82:7

**balance** 149:23

**bankruptcy** 22:24
35:2 36:11 49:10,11
52:22 53:4 58:4
64:24 65:9 84:5
85:20 86:7,20,23
87:5,14,23 88:7,12,
19 89:11 90:8,17
91:2,20 96:22 114:6
115:6,20 116:24
118:16 121:6 122:13

**Base** 15:3 22:3

**based** 18:9 30:8
32:15 71:17 88:4
113:21 124:22
125:11,16 130:18
131:19 132:8 133:3
136:23 137:11
145:24 146:13,17,20,
25

**basis** 28:18 29:17
55:25 72:22 96:8
105:20 114:18
140:25

**Bates** 133:13

**bearing** 73:25

**bears** 109:17

**beg** 20:18

**begin** 34:18 108:12

**beginning** 48:2

**behalf** 8:23 11:18
14:21 15:6,19 16:13
17:18 18:13 19:25
21:17,24 22:2,5
24:15 25:11 52:13
98:6 102:11 108:6
145:9

**belief** 49:13 54:22

**believed** 43:9 104:18

**believes** 73:12
124:22

**Bellisario** 79:10,16

**benefit** 46:8,17 58:19 115:8 125:24

**bit** 117:25 121:22 126:8 133:22

**board** 37:23,25 38:6, 10,13,18,19,21 39:3, 6,8,13,20,22 40:4,8, 11,15 42:22,24 43:3, 11 44:11,15,24 45:2 62:6,21 67:7 73:24 79:20

**Board's** 40:24 43:19 44:11

**Bonds** 8:3

**book** 59:4

**borne** 23:23

**bottom** 61:14 63:20

**bound** 9:15,22

**Brad** 24:12 68:14 69:2 79:11,12

**brand** 49:20

**break** 12:19,22 59:21,22 60:7,10,11, 13,20,22 112:3 147:22,23

**briefly** 122:9

**Brigade** 34:9 96:5,10 97:4

**bring** 93:19

**broad** 145:14

**broader** 25:6

**brought** 70:20

**bullet** 45:20 47:11 48:9 53:8,10

**bundle** 127:7,9

**business** 74:22 76:5 77:18

**C**

**call** 27:21 98:12

**called** 10:12 34:9 105:14

**calling** 42:5 95:17 98:17 116:7 117:16 139:12

**calls** 47:4 50:20 54:16 71:9 72:6,14 80:11 82:13,19 88:10,18 89:2 113:18 114:25 123:3 130:12 131:14 133:2 135:6 136:13,15 137:7 138:21 140:15 145:17 146:9

**capable** 48:18

**capacity** 38:20 151:11 153:7

**capital** 26:19,22 27:21 31:22,23 32:4, 5 34:6 37:3 61:23 67:13 79:4 95:13 97:4

**carbon** 79:10

**case** 9:12 85:19,20 86:6,7 87:17

**cash** 140:9

**catch** 12:7 24:20

**causing** 93:21 94:21

**central** 60:22

**cents** 125:19

**cetera** 73:14 75:21 123:3

**change** 34:18 35:3 36:22,24 49:19 50:17 51:3,10 54:24 112:19 118:12 121:7

**changed** 26:2 50:15 52:6,20 74:13 117:7, 10 120:14

**changing** 49:3

**Chapter** 32:2 35:9 36:12 52:22

**characterized** 73:19

**charge** 20:14

**charged** 113:12

**chart** 64:12 67:12

**chat** 128:6

**choices** 148:5

**circles** 106:23

**citation** 94:8,9

**claim** 11:7,9 14:19 15:9,10,16 16:8,11, 16 17:3,7,17,20,22 18:6 32:3 64:24 65:8 72:11,22,23 108:5, 17,23 109:9 110:2,3 123:21,22 124:25 125:3,18,21

**Claimant** 16:18 17:24

**claims** 15:23 19:22 82:5 90:2 109:23 110:16 123:9 124:7, 13 126:16,21 127:13 128:2

**clarification** 93:11 142:7

**clarify** 15:12 47:25 52:11 124:16 144:14 145:5 149:5

**clarifying** 141:20

**clarity** 42:21

**class** 125:21

**clear** 52:19 83:11 106:9 124:11 150:24 152:9

**CLO** 8:13,24 16:20 18:3 26:13,17 31:10, 16 38:3,10 40:21 43:6 61:17 62:11 63:17,18,23 64:5,13, 21 66:4 74:22 76:5 77:17 83:22 84:13,19 92:20,21 101:15 105:5,10 115:8 119:5 120:11 121:19 122:5 150:11,18 152:23

**CLOF** 110:7

**CLOS** 30:24 32:12, 14,15 35:5,6,7 36:9, 24 41:16 53:5 54:8, 19 74:2,4 85:16 92:5, 8,14,15 93:2,19 94:12 95:14 96:7,11, 17 98:13 101:4 103:8 104:13 105:15

107:15,23 108:3 114:2 115:7,23 116:20 118:19 119:22 120:6,7 148:21,24 149:17,24 150:23 151:2,3,6,16 153:6,9

**closing** 55:15,16,19 56:18

**coaching** 107:8

**Coleman** 8:13

**colleague** 24:18 38:15

**colleagues** 9:2 24:18,23,25

**collect** 45:24

**collecting** 47:16 48:12

**collectively** 66:9 67:5 85:10

**colloquy** 97:13

**color** 77:15

**comfortable** 113:5

**committee** 25:14,17, 18,25 26:3,7

**common** 147:11

**communications** 14:8 75:5

**company** 21:10,15 34:9,11 37:24 61:16 105:2 133:11

**comply** 51:15

**component** 116:2

**composed** 37:25

**Composition** 37:23

**Compound** 123:12

**comprised** 25:19 148:21 151:2

**conceive** 98:2

**concern** 55:11 57:16

**concerned** 86:4 127:4

**concerns** 81:22 82:3 96:3,13,20,21 139:18

**conclude** 147:24

**conclusion** 47:4 50:21,25 54:16 71:9 72:6,9,15 80:11 82:13,20 93:10 113:18 114:25 115:14 116:6 130:12, 14 131:14 135:9 136:14 137:7 138:22 140:16 146:9

**conclusions** 42:6 43:25

**conditioned** 40:6

**conditions** 54:19 85:18

**conduct** 20:19

**conducted** 29:18 43:9 57:11

**conference** 88:10, 18 89:2

**confidence** 54:6,12

**confidential** 9:18 10:1,4,9 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1

113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1

**confidentially** 9:10, 19

**confirm** 84:18 122:10 127:10 128:19 135:13

**confirmation** 114:21

**confirmed** 125:4

**confirming** 10:3

**conflict** 48:9

**confused** 124:19

**connected** 19:22

**connection** 27:8 35:2 56:20 70:14 73:12 78:2,6 95:14 133:6 136:22 145:22 148:13

**connectivity** 12:5

**consent** 39:2 40:24 42:25 131:9,23 132:13 133:5 134:21 137:3 141:7 142:13, 20,22 143:5,9 144:2, 4,10,22 146:2 147:4

**consents** 39:18 43:10

**consequences** 121:6

**consideration** 122:20

**consistent** 85:17 112:11

**consulted** 69:15

**contact** 24:12

**contained** 40:23

**contend** 82:6,16 149:18,23

**content** 76:11

**context** 25:7 30:19 96:16

**continue** 15:17 36:15 77:10

**continues** 31:25

**contrary** 40:4

**contributed** 27:20

**contributor** 117:3

**control** 66:21 98:10 101:5,8 102:2 105:16

**controlled** 47:10 62:6,15 66:19

**convened** 39:19

**conversation** 50:5,8 131:16,19 133:2 137:21 141:13 146:10,13,20 147:14

**conversations** 14:10 18:9 42:13 56:12 69:21 71:12,17 75:21 83:6,10 113:21 123:2 125:12,17 130:18 132:6,8 133:4 136:16,19,23 137:9, 11 138:21 139:12 140:17 142:20 144:8, 19 145:20,25 146:18 147:2

**copies** 79:10

**copy** 78:9 109:19

**corporate** 19:23 99:21

**correct** 13:10 15:10 18:12 19:14,20 22:8, 9 23:8 26:5 27:17,24 32:3 33:2,3,4 37:5, 18,19 39:22,23 40:11 41:20 43:11 46:4,11 51:23 52:2,3,7,8,24 53:17,24 55:6,7,17, 18 56:25 57:5,13,14, 19 58:11,15 62:21,25 63:23 64:6,25 65:9,

14,17 66:2,5,9 67:2, 7,10,15 68:19,23,24 74:23 75:2 76:14 80:3,4,15,16 83:13, 14 84:14 85:10,11,23 86:2 91:22 92:21 93:5 110:21,24 113:8 120:25 122:14,15 126:22,25 127:10 129:7,8,12,15,18 132:2 134:25 148:22, 23 149:3 150:16

**correctly** 117:22

**correspondence** 142:10 143:17

**counsel** 9:7,14,21 13:16,19,23 14:6,10 15:21 18:9 33:19 42:13 58:20 68:11 71:12,17 83:10 111:13 113:21 122:22 123:3 130:19 131:20 132:8 133:4 136:19,24 137:11 139:13 142:11 143:14 145:17 146:21

**couple** 23:25 24:10 148:17

**court** 86:24 89:19 98:3 122:14 152:10

**cover** 79:3

**Covitz** 79:9

**created** 38:7,8

**creation** 23:4 119:21

**creditors** 125:24

**creditors'** 123:21,22

**credits** 120:4

**crisis** 70:3

**crusader** 70:3

**crystal** 106:9

**cumbersome** 22:11

**current** 13:3 93:19 126:3

**cut** 89:21 109:19

### D

**damaged** 50:18 51:4

**damages** 93:21 94:22 148:6,8,11

**date** 17:17 29:25 33:18,20,24 55:15, 16,20 64:3 86:17 91:13 97:20

**dated** 84:6 133:13

**Daugherty** 70:3

**day** 78:13 100:22

**day-to-day** 119:24

**days** 137:23 138:14

**days'** 139:25

**Debevoise** 8:10 9:3

**Debt** 126:18

**Debtor** 8:8 11:6,12 59:16 108:9 110:8 123:2,8,24 125:12 126:20 128:3,23 129:11 133:12 140:11 141:9,15,22 142:15 145:9 147:15 153:19

**Debtor's** 16:19 18:2 22:18,25 100:20,21 109:17 110:21 111:13 123:9 129:2, 23 137:15 138:2 140:11 142:15 143:10,19 144:8,19, 23 146:18 147:2,7

**Debtor's** 109:7

**December** 109:20

**decision** 25:10,13 26:7 41:9 51:15 79:22 101:18 103:10 118:12 120:8

**decision-making** 45:3

**decisionmaking** 26:5 66:23

**decisions** 102:3,4 116:19 118:22

119:24 121:4

**declaration** 18:20 19:3,6,14 26:11 28:4 58:24 109:6,16 112:12 128:25

**deemed** 62:14

**defer** 15:20

**define** 87:16

**defined** 85:8 134:10 146:3

**defines** 61:22

**definition** 134:23

**definitive** 107:18

**definitively** 83:9 134:7 135:13

**delay** 56:17

**delayed** 55:15,20

**delegated** 102:5

**depend** 31:13 92:20

**depending** 31:9

**Depo** 128:8

**deponent** 100:6

**deposition** 9:15,22 10:3 11:21 12:18 13:15,22 16:4 20:20 26:15 74:10 99:11,20 100:2,12 133:9

**describe** 123:16

**describing** 56:13

**designated** 10:25 14:3 100:5

**designates** 10:5

**desires** 132:13 134:21

**destruction** 118:17

**details** 46:14 48:21

**determination** 40:6

**determined** 58:10

**dictate** 95:17

**difference** 30:16 49:11 118:4

**differently** 126:15

**diligence** 28:19 29:7,10,12,18,21 53:14 56:19,21 57:12 58:8 70:14,19 77:11

**diminution** 51:13 121:3 148:12

**direct** 65:5

**direction** 35:8

**directly** 18:13 90:2 123:2 143:14

**director** 19:18 20:3, 5,7,14 21:20,23 93:17 104:12

**directors** 20:12 25:19,22 62:13

**disagree** 64:17 67:20

**disclosed** 78:4

**disclosures** 139:19

**discretion** 41:8

**discuss** 10:25

**discussed** 14:5 65:12 95:15 104:4 111:21

**discussions** 23:16, 19,24 24:5,7,16 68:17,22 69:7,9 71:19,25 111:23 139:20 141:18,21,23 143:23 145:17

**dispute** 53:11 73:21 74:20 90:23

**disregard** 40:10

**distinguish** 32:13, 21 92:18

**distinguishing** 36:5

**diversified** 31:15

**dividends** 27:22 28:3

**docket** 22:23 45:11 128:21

**document** 9:11 16:10,17,23 19:10

23:4,7,11 35:22,24 36:3 37:8 40:13 44:4, 7 45:11,14 51:18 61:22 62:3,25 63:15 64:4 67:17,18,20 68:10 71:18 72:2,10 73:5 76:2,7 84:3,9 86:12,13,14,18 95:2, 10 99:14,20 109:18 128:12 129:6 130:2 131:2,20 132:20 133:8,16 136:6,10 138:24 139:2

**documentation** 77:9 111:14

**documents** 9:8,17 27:2,5,7,10 44:5 49:9 66:11 75:24 89:10 90:7,11,15,16,25 100:8 103:3 145:11

**dollar** 122:19 125:19

**Dondero** 8:5 81:14

**Doug** 74:15

**Douglas** 8:15 74:12

**Dover** 14:24 21:18 37:14,15,16 38:5,13 65:12

**drafting** 111:6,9,14

**Draper** 8:15,16 74:12,13

**drive** 119:21

**DSD** 74:9

**due** 28:18 29:7,9,12, 18,20 50:24 56:21 57:12 58:8 62:15 70:19 77:10 113:24 116:3

**Dugaboy** 8:16

**duly** 10:13

**duration** 39:15

**Dustin** 25:2 68:21 69:2,11 79:9,15

---

**E**

**E-MAIL** 16:5,22 18:25 20:25 61:5

63:5 68:2,6,12,14,25 70:2,8 73:6 76:8,11 78:21 79:3,8,25 80:6, 15 81:11,22

**E-MAILED** 139:4

**E-MAILING** 22:15 44:5

**E-MAILS** 75:4,14 81:3

**earlier** 65:12 66:11 75:25 79:21 91:11 92:18 112:10 117:25 133:24 148:20

**easier** 12:10 128:9

**easily** 128:7

**Eden** 24:12 68:15 69:2 79:11,12

**editor-in-chief** 81:15

**effective** 91:7

**effectuate** 131:10,25

**effectuating** 143:18

**efficiently** 20:22

**Ellington** 95:12 98:16

**Ellis** 8:3

**Emily** 9:3

**employee** 73:22 74:21 78:6

**employees** 24:14

**employment** 73:21

**encourage** 87:12

**encouraged** 87:3

**engaged** 23:15,19 24:7

**engaging** 24:16

**ensure** 12:12,15 45:23 56:18,21

**entail** 44:17

**enter** 41:9,19 129:22

**entered** 9:11 11:14 27:7,10 103:4

**entire** 35:14 39:19,21 138:16

**entities** 15:6,20 18:6 21:14,17 22:6 34:4 36:22 64:23 65:5,7, 20 66:9 67:12 85:10 120:11 123:6 129:11 135:24 137:2 138:18 147:6

**entity** 19:23 20:4,6 35:19 49:12 141:15

**entry** 109:8 128:21 129:2

**Eppich** 8:3

**equity** 30:23 31:16 41:15 85:7 92:15 98:12 115:8,22 119:22 120:7 153:8

**Erica** 8:9 139:17

**erosion** 113:24 120:9

**essence** 123:7

**establish** 37:24

**estate** 125:24

**estimate** 89:2 124:2

**estimated** 29:25

**event** 18:10 107:21

**events** 87:22 115:5 118:14

**evidence** 72:2 89:10 90:7

**evolved** 26:2

**exact** 59:11 99:9

**Examination** 10:16 83:21 84:13,19 99:18 122:2

**examined** 10:14

**exceed** 28:10 30:2

**exchange** 123:8,19, 20,23 127:12,25

**exchanged** 122:20

**exclusive** 41:18

**executed** 109:20

**exhibit** 16:3,7,22,23 17:2,10 18:18,19,24 20:23,24 21:2 22:15, 16,17 26:10 31:21 33:9 37:13 45:11 58:25 61:5,8 63:3,4, 6,7 68:2,3,6 78:21 79:2,8 83:18,19,20 84:3 99:5 109:4,5,15, 19 112:17 128:8,24 130:24

**exhibits** 128:17

**existence** 76:19 77:24

**existing** 63:19

**expectation** 28:14

**expectations** 103:10

**expected** 28:8 124:12

**expedited** 153:19,23

**expert** 116:7

**explanation** 70:15 81:9 82:4

**explicit** 147:14

**explicitly** 142:19

**expressed** 54:6,12, 21 55:11

**expressing** 53:23

**expressly** 40:6

**extent** 42:5 44:14 47:3 50:20 54:15 71:8,10 72:5 80:10 88:2 97:14,24 113:17,19 114:24 125:22 130:11,13 131:13 132:25 135:6 136:13,15,17 137:6 138:20,23 140:15 145:16 146:8 147:11 149:13

**external** 58:19

---

**F**

**fact** 19:13 88:9

**facts** 13:18 54:4 55:10,24 56:4 58:5,6 139:22

**factual** 11:6 137:19 140:20,23,25 145:18

**fair** 32:24 59:6 121:7 123:10

**familiar** 34:8 69:3 130:25 133:15 136:2

**feature** 111:22

**February** 59:10 91:7 114:22

**feel** 12:18

**feelings** 102:8

**fees** 113:11

**figure** 72:25

**figures** 28:16

**filed** 14:19 16:8,11,13 17:3,17,18 18:5 22:23 23:7 32:2 36:12 49:9 58:3 64:23 65:8 66:11 84:4 89:10 90:8 97:21 100:3 112:12 128:22

**filing** 137:17

**final** 25:10

**financial** 70:2

**fine** 10:7 59:23 60:17, 20 130:21

**finished** 12:13,15

**firm** 8:3 25:20

**follow** 151:24

**follow-up** 69:14,15, 20

**force** 105:19

**forgot** 146:15

**form** 17:7 28:18 29:4, 15 30:4 31:7 32:9,18 33:18 34:14,21 35:17 36:3,18 37:7 39:11 40:13 41:12,22 42:4 43:13,22 44:19 45:6 46:6,13,25 47:3,24

**foundation** 41:12 46:6 48:17 53:2 64:8 70:11 91:4,24 93:9 94:2,4,25 96:15 104:20 107:25 108:19 113:2 115:13 116:6 150:22 153:2

**four-man** 26:6

**four-member** 25:18 79:20

**frequently** 89:8

48:17 49:17 50:20 52:10 53:2,19 54:2, 15 56:8,10 57:8,21 58:13 61:20 62:23 64:2,8,20 65:3,16,23 66:7 67:4,9,17,22 69:19 70:11,24 71:8 72:5 74:25 75:9 76:16 77:4,13,23 78:11,17 80:10 81:6, 25 82:11 85:25 86:10 87:2,7,11,25 88:14 89:5,13 90:10,19 91:4,16,24 92:11,13, 22,24 93:7,8 94:2,4, 25 95:22 96:15 97:24 98:21 99:7,14 100:15,24 101:11,24 103:15 104:19 105:12 106:3 107:17, 25 108:19 109:2 110:12,23 111:4,11, 19 113:2,17 114:14, 24 115:13 116:6 117:14 119:2,18 120:18 121:9 123:12 124:10,16 125:6,15 126:24 129:14 130:2, 11 131:13 132:19,25 134:4 135:3 136:13 137:6 138:20 140:14 142:2 144:12 145:3, 16 146:8 149:20 150:2,15,20 151:8,18 153:2,4

**forma** 56:15

**formally** 38:20

**formed** 29:17

**forming** 55:25

**found** 12:9

**front** 44:7

**full** 10:22 44:7 52:4 55:23 62:4 105:16 139:2

**fully** 66:18

**function** 43:19

**fund** 14:22 16:14 63:18 111:7 117:12

**Funding** 8:24 16:20 18:3 61:17 63:17 83:22 84:14,20

**funds** 17:25 19:25 26:13,17 85:7 119:13

**future** 127:13

**G**

**general** 43:19 73:9, 17 75:12 101:2 109:25 110:10 121:10 124:25 125:18 132:5

**generally** 73:10 149:22

**Gerard** 81:16 82:7

**gist** 74:18 110:19

**give** 72:19 102:25 106:5 115:2 132:4 136:8 145:19

**giving** 12:2 106:19 107:8

**Global** 14:22,23 16:14 21:19

**go-ahead** 121:25

**go-forward** 105:19

**good** 8:17 13:2 60:18

**Goren** 9:4

**governance** 66:21

**GP** 31:23 32:5

**granted** 127:16 150:19 152:24

**ground** 12:24

**grounds** 13:21

**Group** 37:17

**guess** 16:24 59:5 62:3 70:4 86:3 114:17 117:23,25 120:2,22 124:6 151:5

**guided** 103:7

**guidelines** 103:2,6 105:14

**guys** 61:2 124:5

**H**

**half** 63:21

**happen** 59:9

**happenings** 105:5

**happy** 12:8 123:15 128:10

**Harbour** 87:20

**Harbourvest** 8:11 9:4 10:5,25 11:3,13, 14,18 14:18,21,22, 23,24,25 15:3,15 16:13 17:18 18:5,10, 21 19:4,7,18,21 20:2, 12,15 21:14,18,21,24 22:2,5,6,18,25 23:15, 18,22 24:8,15 25:3,4, 8,11,15 26:12 27:13, 19 28:2,8 30:21 31:4 37:14,17 41:24 42:16 43:7 45:18,21 47:13 49:2,13,21 51:4 52:4, 12,16 53:11,13,24 54:4 55:4,5,11,23 56:24 57:3,9,11,15 58:5 63:22 64:23 65:4,19 66:8,12,20, 24 67:6,12 68:22 69:7 70:6 71:24 73:11 75:7,18 76:13 78:8 79:18 80:3,8 82:8 85:9 86:19 87:4, 13,21 88:3 89:16 90:3,6,17 91:2 92:9 95:16 97:10 98:8 105:18 108:6,17,22 109:9,24 110:5,15, 16,17,20 111:16 117:6 118:20 123:6 124:23 126:3,17,19 127:2,7 129:3,11,21

130:6 131:9 136:10 137:2,13 138:13,18 139:14,23,24 140:7, 21 141:6 142:12,18, 22 143:4,6,17 144:7, 18 147:6 148:8

**Harbourvest's** 11:7, 8 36:19 49:22 50:9, 16 52:2 71:20 72:21, 23 83:12 97:19,25 101:8 117:11 120:23 137:25 140:3 148:6

**Harbourvest-prepared** 86:14 95:2

**Hayley** 8:7

**HCF** 33:11,15 35:13 36:15 51:22 133:19, 25 134:16 135:18,22 141:7,20,23 142:13, 23 143:8

**HCLF** 63:16

**HCLO** 101:19

**HCLOF** 18:7,11 20:16 22:7 24:2 26:14,16,25 27:15,17 28:9 30:10,22,23 31:5,15,25 32:7,12, 20 33:2,4 34:5,7 35:19 36:6,10,14,21, 25 41:15 42:19 49:4 50:12 51:14,21 52:6, 20 54:7,9,13 55:4,14 59:2,8,10 64:6 65:6 66:18,23 76:18 77:16 85:14 91:13,22 92:14 93:5,17,22 96:17 98:9,18 102:2 103:3, 6 104:12 105:6 112:13 113:12 115:9, 19 116:22 118:4 119:6,15,20 120:8,15 123:6,24 126:4 131:10 133:11,25 143:18,25 144:21 148:21 151:11 153:7

**HCLOF's** 54:18,22

**HCLOF/ALF** 84:25

**HCLOS** 151:13

**hear** 43:15 60:3

**heavier** 121:22

**held** 30:9,23 32:12 33:4 64:5 110:16

**Heller** 8:16

**Highland** 8:23 16:20 18:2 22:24 23:16,20, 21 24:7,14 26:13,17, 19,22 28:18,24 29:11,17 30:22 31:2, 18 32:14,23 33:11,14 34:5 35:13 36:15,20 37:2,3 41:14,17 42:18 45:19,20,21 46:3,16,20,22 47:12, 19,21 48:6,7,23,25 49:10,13 50:3,7 51:12,22 53:10,17, 19,23 54:3,6,8,12 56:16 57:23 58:17 61:17,23 62:7,15,17, 21 63:16,17 66:19 67:13 68:18 69:21 70:5,16,20 71:21,22 72:11 73:18 74:3,6, 19 75:7,17 77:5,9 79:4,13 80:7,21,23 81:4 83:21 84:13,19 85:3 87:3,12,21 88:10,19 89:9 90:6, 12,16,24 92:21 93:6 98:14 102:5 105:16 114:5 115:18 117:6 120:14 133:19,24 134:15 135:17,22 141:7,20,23 142:13, 23 143:8 149:23 151:10,15 153:6

**Highland's** 47:10 51:15 53:3 77:17 103:9

**Highland-affiliated** 141:14

**Highlands'** 93:13

**highlight** 132:10

**highlighted** 132:12 138:11

**hinted** 117:24

**Holdco** 8:14 38:3,10 43:6 62:11 63:18,23 64:5,13,22 66:5 121:19 122:5 128:8

**holders** 115:9,22

**home** 13:9

**Honestly** 134:5

**Horn** 8:16

**hour** 59:20

**hundreds** 57:9

**Hunter** 79:9

**Hush** 9:4

**HV** 15:2 21:25

**hypothetical** 117:16

---

**I**

**idea** 49:19,20

**identification** 16:9 17:4 18:23 21:4 22:20 61:10 63:9 68:8 79:5 83:23 109:12

**identify** 35:25 74:10

**identifying** 148:4

**ii** 42:25

**imagine** 124:3 125:11

**immediately** 64:14

**impact** 53:14 73:25 76:4 77:16 119:12 120:6

**impediments** 96:9

**implications** 55:14 101:16

**important** 111:16

**improperly** 117:7

**inability** 93:20 94:21 96:21 113:24 115:6, 11,22 116:25 118:18 120:10

**inception** 117:10

**include** 76:2

**included** 26:3 28:20 128:5 132:22 134:24

**including** 11:9 74:3

103:7 115:6,9 140:17

**independent** 131:22 136:18

**independently** 70:18 80:23

**individual** 120:6

**individuals** 24:6 38:2 39:22

**industry** 49:5

**inform** 47:12 48:25

**information** 55:12 56:3,6,13 57:16,17 58:6,9,16 59:15 70:5 73:15 78:3 95:6 96:2 102:19 106:8,20 134:6 135:7 136:16

**informed** 45:21 77:5 88:6 105:6 107:21 125:12

**infringe** 71:11

**initial** 31:11 55:19

**initially** 27:14 35:13 118:11

**initials** 74:9

**initiated** 52:22

**injunction** 91:19 114:8 115:21

**inquire** 13:24

**insistence** 49:23

**instruction** 137:8 141:12

**intended** 152:15

**intent** 56:14 137:14, 25 140:3

**intention** 45:22 48:7

**interaction** 36:19

**interest** 27:15,17 67:14 93:20 123:24 128:2 147:11

**interests** 110:7

**internal** 124:6

**International** 15:2 21:25

**interpretation** 71:15 135:14

**interrupt** 74:8

**invest** 18:11

**invested** 21:15 27:14 55:4 61:17

**investigate** 72:21

**investing** 56:24

**investment** 8:17 11:10,15 13:18 14:25 17:24 20:15 22:7 23:17,22,25 25:6,8, 12,14,16 26:25 27:4, 8 28:9,13,21,22,24 29:7,19 30:2,9,10,13, 17,20,21,22 31:4 33:2 34:2,6,12,16,19, 23 35:12,15 36:20 37:15 38:16 39:16 40:20 42:10 50:9 52:2,7 53:15 57:10, 19 58:11 63:23 65:5 66:19,22 71:20 76:17 77:11 79:21,24 80:3 83:13 92:9,16 96:18 101:2,18 102:6 103:2,6 105:2,14 110:7 112:22 113:14 114:3,9,10 117:11 119:19 120:7 121:4 148:13,20 151:2 153:10

**investment's** 55:15

**investments** 32:20 33:4 57:4,12 65:19 116:3

**investor** 24:11 26:13 37:17 55:6 64:10 66:13,16,18 83:21 84:13,19 85:6,8,9,18 86:5 95:15 96:2,12 98:9,17 99:18,22 101:5 104:25 105:18

**Investor's** 97:7 100:12,21

**investors** 18:7 65:13 67:2

**involved** 26:4 68:17, 21 69:6 114:5 141:16,17,21,22

**involvement** 44:12

**isolation** 97:17

**issue** 32:10

**issued** 43:10 83:12

**issues** 12:5

**items** 44:21,23,25 57:16

**IX** 14:24 37:14,15,16 38:5,13 65:13

---

**J**

**James** 81:13

**Jim** 8:4 108:10,15,21 111:15,24

**John** 8:2,6,12 44:4 48:2 59:20 74:7 82:20 84:16 89:15 106:11 107:11 109:6, 16 114:16 116:11 117:21 121:18 122:4 124:11,19 128:13,25 130:3 132:9 139:8 142:4 145:4 146:11 149:5 152:2,19 153:18,20

**Join** 41:4,13,23 91:25 113:3

**joined** 8:25 74:9

**Joint** 97:2

**jointly** 38:15

**Jones** 8:4,8

**Josh** 51:12

**Journal** 76:10 80:14, 18 81:16

**judgment** 45:25 77:25

**jump** 121:19

**junior** 25:3 79:23 125:20

---

**K**

**Kane** 8:12 121:18,19 122:3,4 124:21

126:13 128:4,15
129:4 130:4,20
139:10,17 144:13,16
145:7 147:16

**kind** 114:18 117:24
122:21 124:5

**King** 8:23

**knowledge** 52:5
55:24 70:9 88:5
107:22 108:24

---

**L**

**L.P.** 14:22,24,25 15:3
16:14 17:19 18:5,11
20:2 26:20,23 31:24
32:6 37:15 47:15,22
48:12 61:24 67:13

**Labovitz** 9:3

**laid** 103:5

**large** 85:6,13

**largely** 17:21 114:3
123:18 125:11

**larger** 24:13 66:3

**largest** 37:16 64:10
65:11,13 66:4,24
117:3

**late** 105:10

**Latham** 8:20

**lawsuit** 76:4

**lawyers** 75:21 83:6
146:13

**lay** 115:2 117:17

**layman's** 47:6

**lays** 55:25

**lead** 111:13 122:11

**leading** 115:5

**led** 51:12 113:15
118:17,23

**legal** 15:21 42:6
43:24,25 47:4 50:21,
25 54:16 56:22
69:12,22 71:9 72:6,9,
15 80:11 82:13,20
93:9 113:18 114:25

115:13 116:6 130:12
131:14 135:8,14
136:14 137:7 138:22
140:16 146:9

**letter** 79:3 81:13
82:7,17,25 83:9,11
138:15

**level** 34:5 36:6,25
116:22 119:6 120:8,
15 150:11

**levels** 119:7

**lieu** 42:25

**light** 49:15

**likewise** 12:14 122:8

**limitation** 11:10

**limited** 8:14,24 16:18
17:25 40:14

**list** 39:14

**listed** 33:11 35:21
37:2,4 44:21 134:15
135:17,21 140:2

**listening** 107:10

**lists** 39:5

**litigation** 51:11
53:12 70:13 73:13,
19,25 77:6 78:7
114:4 126:21

**LLC** 19:19,22 20:12
21:21,24 31:23 32:5

**LLP** 8:20 37:4

**located** 13:6

**Logan** 8:13

**long** 45:14

**looked** 17:22 127:20

**losing** 104:14 114:11

**loss** 113:13 116:2
117:3 118:4

**losses** 85:15

**lot** 20:20 113:23

**LP** 8:4 15:4 92:4

**lumped** 15:9

---

**M**

**machines** 74:13

**Madam** 152:10

**made** 10:10 11:12
22:6 25:10,14 26:7
35:13 45:19 52:23
57:3,9 71:6,22 72:11
73:12 79:21 80:7
82:5 90:3 92:9 117:6
118:3,21 153:22

**maintain** 9:19

**majority** 120:9
149:21 153:8

**make** 25:11 41:9
85:17 99:15 117:21
127:5 131:21 138:8
152:20

**makes** 119:24

**making** 28:3,21
76:17 77:11 102:3

**Maloney** 8:22 41:4,
13,23 91:25 92:10,22
93:8 94:3 104:19
113:3 114:12

**managed** 16:19 18:2
19:25 26:19,22 74:3
148:25 149:18,23

**management** 26:19,
23 31:22,23 32:5,6
36:23 37:4 51:21
53:5 61:23 66:23
67:13 79:4 92:6 97:5
98:11 116:19 119:8

**manager** 26:25 27:4
30:12,13,14,17,18,
20,23 31:4,12,24
32:7,11,21 33:12,16,
25 34:6 35:4,14,25
36:6,7,14,16,21,25
40:3,9 41:15 42:19
45:4 49:4,19 50:12,
14,18 51:3,10 52:5,
20,24 54:24 63:17
66:20 85:6 92:19
93:2 96:7 101:19
102:2,6 117:7,9
118:3,13,21 119:4,5,
10,12,19,20,23

120:5,14 121:5,7
131:24 132:13
133:20 134:2,11,21,
23 135:17,21 137:4
146:2 147:4 151:11
153:7

**manager's** 144:21

**managers** 30:25
31:9,17 34:18 35:21

**manages** 17:24
38:16 92:5

**managing** 19:18,24
20:3,5,7,11,13 21:20,
23 25:19,21 32:15,25
93:4 104:24 105:3

**Mark** 8:22 94:3

**marked** 10:4,9 16:9
17:4 18:22 21:3
22:20 26:10 58:24
61:9 63:9 68:7 79:5
83:23 109:11

**market** 54:19 59:6
85:18 93:20

**Massachusetts**
13:5

**material** 51:12 55:10
58:5 71:5,23 72:3
82:9,18

**math** 65:25 113:6
126:9

**matter** 9:7 14:20
44:16,20 70:3 145:18

**matters** 11:2,17
14:4,5 70:6,7,13

**Mclaughlin** 8:19,20

**meaning** 52:16
66:17

**meant** 53:20

**medium** 99:9

**meet** 39:8

**meeting** 39:18 43:2,
8

**member** 19:24 21:2
25:3 37:3,4,5 62:5
79:17,23 134:15,24
135:18 136:3 140:2

**member's** 133:10

**members** 21:9 24:10
25:24,25 33:7,12
42:23 43:2,5 123:6
137:14,23 138:3,14
139:25 140:8,22

**memorandum**
33:21 40:7 61:9,13
85:3

**memory** 89:6

**mentioned** 68:15

**met** 38:19

**Michael** 10:23 18:20
19:6 79:9

**middle** 55:10

**Mike** 29:5 42:7,13
43:23 44:3 47:5
48:19 50:22 51:8
52:17 58:14 59:25
60:5,6,18 71:10 73:9
75:19 82:12 83:4
86:11 98:5 99:15
102:23 113:5,19
115:3,16 116:9
117:19 122:6 124:22
125:8 127:19 130:15
131:15 136:17 137:8,
20 139:2,19 152:18

**Mike's** 97:15

**million** 28:10,25 30:2
56:25 78:2 108:22
109:25 110:2 112:14,
21,23 124:24 125:2
126:6

**millions** 85:15

**mind** 141:19

**minor** 74:20

**minority** 26:13 66:17
98:9 101:5

**minute** 59:18

**minutes** 60:11,16

**mismanagement**
116:4,15,21 118:23

**misrepresentation**
72:24 73:4 82:9

**misrepresentations**

45:18 55:3 56:2
57:23 71:6,23 72:3,
10,14,16,17 73:2,11
75:6,17 76:3 80:7
82:17,19,22 116:22

**misrepresented**
82:24

**misstates** 29:4
40:13 47:24 56:10
57:21 58:13 92:24
105:12 121:9 142:2

**misunderstood**
146:24

**month** 89:7

**morning** 68:10 84:4

**Morris** 8:6 46:24 56:7
74:7,14 106:2,7
109:6,16 117:13
119:14 121:14
127:17 128:25 135:2
147:19 149:25
150:13,20 151:7
153:3,18

**motion** 11:2 15:8
18:21 19:7 84:12,18
87:18 89:18 98:3
99:4,12,16,17,19
100:2 104:5 109:7,17
122:13 129:2 137:17

**mouse** 38:23

**mouth** 74:18

**move** 15:25 103:17

**muddled** 48:3

**multiple** 31:16
148:11,21 151:2

---

**N**

**named** 26:24

**names** 34:4

**Natasha** 9:3

**nature** 57:4

**necessarily** 120:21

**necessity** 144:9,20

**needed** 22:11 139:21

**Needham** 13:4

**negotiate** 122:16

**negotiated** 108:4,8

**negotiating** 123:25

**negotiation** 131:5
145:11

**negotiations** 11:5
13:19 108:11 111:23
122:11,24 129:7
145:10

**net** 59:2,9

**nice** 122:6

**Nick** 79:10,16

**Nods** 21:11 71:2
90:22 136:4

**nominee** 110:8

**non-discretionary**
62:16

**non-privileged** 51:7
72:18 115:15 130:14

**Nonetheless** 98:5

**nonlegal** 113:20
130:14

**nonresponsive**
57:25 105:22

**Nos** 109:9

**Notary** 10:13

**notice** 137:13,24
138:15 139:25

**notwithstanding**
54:8,23

**November** 27:10
33:22,24 50:13
55:17,22 64:4 81:16
85:4 108:13 112:18,
23 133:14

**number** 9:12 16:11
18:18 29:10,12,16
39:5 59:11 95:8
112:20 113:25
122:25

**numbered** 14:21

**numerous** 104:23

---

**O**

**oath** 11:24

**object** 13:21 15:12
42:4,17 57:25 94:4
97:13,14 105:19
136:12,13,14

**objected** 41:24
97:10

**objection** 11:9 22:19
23:2 29:3,14 30:3
31:6 32:8,17 33:17
34:13,20 35:10,16
36:2,17 37:6 39:10,
11 40:12 41:3,11,21
43:12,21 44:18 45:5
46:5,12,24 47:2,3,23
48:5,6,16 49:16
50:19,20 51:5 52:9,
14,25 53:18,25
54:14,15 56:7,9 57:7,
20 58:12 61:19 62:22
63:25 64:7,19 65:2,
15,22 66:6 67:3,8,16,
21 69:18 70:10,23
71:7,8 72:4,5 74:24
75:8 76:15 77:3,12,
22 78:10,16 80:9,10
81:5,24 82:10 83:15
85:24 86:9,25 87:6,
10,24 88:2,13,21
89:4,12 90:9,18 91:3,
15,23 92:10,12,22,23
93:7,8,25 94:13,24
95:21 96:14 97:23,24
98:20 99:6,13
100:14,23 101:10,23
102:10,21 103:14
104:3,7,19 105:11,21
106:2 107:16,24
108:18,25 110:11,22
111:3,10,18 112:25
113:16,17 114:12,13,
23,24 116:5,17
117:13,15 118:25
119:14,17 120:17
121:8 123:11 124:9,
10,15 125:5,14
126:23 127:17,18
129:13,25 130:10,11
131:12,13 132:3,18,
24,25 134:3 135:2,4,
5 137:5,6,18 138:6,

19,20,22 140:14,15,
24 141:25 142:17
143:3,21 144:11
145:2,15,16 146:7,8
147:10 149:2,12,19,
25 150:3,4,13,14,20,
21 151:7,9,17 152:7,
17,25 153:2,3

**objections** 72:13
73:8 83:3 104:8,22
106:18 115:13 118:7
135:5 140:14 141:12
143:12 147:10

**obligation** 46:23

**obtain** 141:7

**obtaining** 137:3
144:21

**occur** 50:8

**occurred** 87:22 89:2
94:17 114:20

**October** 51:19,20
52:21 84:6 86:18
97:22 103:23 105:25
107:14

**offer** 140:21

**offered** 108:21

**offering** 40:7 61:8,13
85:3

**office** 153:21

**official** 17:6,7

**omissions** 55:4

**Omnibus** 22:19 23:2

**one's** 17:18

**ongoing** 66:22
73:19,25 77:6,17
114:4

**operations** 29:13

**opinion** 53:16,19,24
54:11 71:4 80:5
101:20,21 102:20
103:19 105:9,24
106:15,16,24 107:14,
19,21 113:20 114:10
115:2 116:2,7 117:8,
17 148:7

**opportunities** 23:25

**opportunity** 23:6,23
24:2 25:9 29:8,19
103:7 138:3,15

**opposed** 39:18

**order** 9:10,11,16,23
10:10 79:7 99:23
109:8

**orders** 153:17

**Ordinary** 63:12

**organization** 27:2,4

**original** 28:9,12 29:7
30:8 96:18 101:2
105:13 114:3 153:10

**originally** 24:9 28:17
29:16 115:18 118:12

**originated** 29:11,12

**outcome** 76:20 77:6,
7,15

**outcomes** 125:10

**outstanding** 70:12
128:3

**owned** 36:10 67:6
85:5 92:14

**owner** 153:8

**ownership** 85:14

**owns** 41:15

---

**P**

**Pachulski** 8:7

**package** 123:25
127:21,24

**pages** 16:8 17:3 21:3
22:19 61:9 63:9
90:25 109:11

**paper** 143:7

**papers** 113:10

**paragraph** 17:23
19:17 23:14 26:12
28:7 31:21 37:21,22,
24 38:23 39:2 40:2
45:16 51:19 53:7
54:25 55:9 58:25
62:4 64:13 84:23
92:4 93:15 95:9,23

96:24 109:23 110:5, 14,19

**Parker** 79:11,12

**part** 24:21 26:6 28:20 29:6,9 36:14 45:2 54:9 56:17 75:24 76:3 77:8 86:4 96:18 110:4 111:6 113:13 114:2 122:12 123:4, 24 130:23

**partially** 36:10

**participants** 9:14,21

**participate** 23:3 87:4,13,15

**participated** 88:18 118:22 122:11

**parties** 145:23

**partner** 16:18

**partners** 14:23 17:19,25 18:5,11 19:18,21 20:2,12 21:21,24

**party** 11:15 98:17 110:15,17 141:16

**pass** 147:16 153:12

**passage** 132:11

**passive** 26:12 66:13, 15 98:8 101:5

**past** 57:13

**path** 89:25

**patience** 20:19

**pay** 46:23

**paying** 45:22 48:8

**pending** 54:10

**penultimately** 28:20

**people** 12:11

**percent** 27:15,17 64:5,11,15 65:14,20, 24 66:3,5 67:14

**percentage** 64:15 65:14,25 66:25 85:14

**Perfect** 60:24

**performance** 119:13

**performed** 58:8 97:3

**performing** 29:20

**period** 40:20 114:7

**person** 11:17 21:16 22:2

**personal** 101:21 102:8 103:19 105:23

**perspective** 15:21 81:10

**piece** 107:5 138:23 143:6

**place** 35:3,23 91:20 118:14 136:9 145:21

**placing** 64:14

**plan** 91:6 96:5 97:2 110:17,21 111:17 114:21 123:9 124:8 125:4 126:17

**play** 40:16 44:15

**pleading** 58:3

**Plimpton** 8:10

**point** 24:11 35:24 45:20 47:12 48:10 53:10 89:21 90:13 94:18 98:25 106:21 107:3 144:15

**pointed** 38:23

**points** 53:8

**policy** 59:7

**poor** 121:4

**portfolio** 30:12,14, 17,25 31:3,9,12,15, 17,24 32:6,11,21 33:12,15,25 34:18 35:4,14,21,25 36:5,6, 13,16,23,24 40:3,9 45:3 49:3,19 50:12, 14,18 51:3,10,20 52:5,20,23 54:24 63:17 92:6,16,19,25 96:7 98:11 101:25 104:25 116:4,14 117:4,7,9 118:3,13, 21 119:4,5,8,10,11, 20,23 120:5,14

**performance** 121:4,7 131:10,24 132:12 133:20 134:2, 10,20,23 135:17,21 137:4 144:21 146:2 147:4

**portion** 32:25 92:16 93:5 116:15

**position** 31:10 41:16 49:12 50:17 71:22 80:6 85:20 86:7 97:8, 19,25 100:12,20,21 108:16 119:22 120:24 134:18

**positions** 23:10 30:24 31:17 86:23 105:6

**possibly** 104:9

**post** 153:9

**post-petition** 96:8

**potential** 125:22 127:13

**practical** 44:16,20

**pre-investment** 68:17

**predicated** 101:3

**preexisting** 62:16

**prefer** 60:15

**preference** 101:9

**preliminary** 9:6 23:15,19

**preparation** 13:25 131:5 145:10

**prepared** 13:22 14:11,15

**presented** 53:13 54:4

**presently** 96:3

**preserved** 117:12

**pretty** 89:15 128:7 145:14

**prevailing** 85:17

**prevent** 47:16 48:12

**prevented** 91:21

**preventing** 115:18

**previous** 17:22 72:7

**previously** 50:11 57:4 133:11 153:22

**price** 140:9

**primarily** 24:17,19, 23

**primary** 148:5

**prior** 50:9,12 51:25 52:6 64:3,14 71:20 76:17 114:20

**private** 85:6

**privilege** 13:21 147:12

**privileged** 131:16 133:2 135:6 136:15 137:9,21 138:21 140:16 141:13 146:10

**pro** 56:15 138:4,16

**problem** 74:14

**problems** 12:4

**proceeding** 88:8

**proceeds** 28:8

**process** 56:21

**produce** 11:4

**produced** 9:8,17 75:13 100:8 133:12

**production** 75:11,25

**progressed** 24:13

**prohibited** 114:8

**projected** 28:9,12 30:8 125:10

**projection** 29:22

**prominent** 111:22

**pronounce** 10:19

**proof** 11:7 16:7,16 17:2,6,7,16,20,22 18:6 32:3 65:8

**proofs** 14:19 15:8,15 64:24

**proper** 36:8

**proposed** 41:8 99:22 110:21 138:17

**protective** 9:11,23 10:10

**provide** 51:6 71:13 73:14 77:10 89:9 90:6,16 137:23 138:3 139:24 144:2

**provided** 28:17 70:5 71:18 73:5 77:19 82:3,8 90:12,15,24 137:13 138:14 140:7 143:9 144:5

**providing** 126:17,20

**provision** 132:17,22 134:22 138:11 140:18

**proximate** 105:4 107:20

**Public** 10:13

**Pugatch** 10:1,18,20, 21,23 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,20 19:1,6 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1,18 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1, 10 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1,4 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,13 108:1 109:1 110:1 111:1 112:1,10 113:1 114:1 115:1 116:1

117:1 118:1 119:1 120:1 121:1 122:1,6 123:1 124:1 125:1 126:1 127:1 128:1 129:1,17 130:1 131:1 132:1 133:1 134:1 135:1,11 136:1 137:1 138:1 139:1 140:1 141:1 142:1,5 143:1 144:1,17 145:1 146:1 147:1,18 148:1,2,19 149:1,7,15 150:1 151:1,24 152:1 153:1

**pull** 16:23 44:8 61:6 68:4 78:22 83:25 109:14 128:6,14 139:5

**purchase** 138:4,16 140:9

**purchased** 112:19

**purchasing** 67:14

**purely** 140:19

**purpose** 15:7

**purposes** 62:24

**pursuant** 18:22 19:8

**pursue** 96:10 105:17

**pursued** 97:9 151:12

**pursuing** 96:3,13 115:19

**purview** 98:14

**push** 130:20

**put** 19:2 45:12 63:6 74:17 91:19 111:5 153:16

**putting** 95:13

**puzzle** 107:6

## Q

**quantum** 77:25

**question** 12:3,7,13, 16,21,22 15:18 46:25 47:7,25 48:19 56:8 66:15 71:16 84:15 86:17 90:4 92:11 97:17 100:18 102:15,

22 104:10 106:3,12, 20 114:15 116:11 117:14,21 118:9,10 120:20 123:12 124:4, 18 126:15 130:3 136:20 137:19 138:9 139:9 140:20,23 141:2,3 142:4 144:14 146:14,16,23 148:3 150:2 151:8 152:4,8, 9,16,20,22 153:4

**questioning** 148:3

**questions** 11:25 12:25 56:20 69:14,16 88:3 121:13,17,20 133:23 148:15 149:6, 14 150:8 151:23

**quick** 59:21 60:7 112:7

**quickly** 15:12

## R

**range** 125:10,13

**rata** 138:4,16

**rates** 93:20

**re-ask** 123:14 144:13 152:8

**reaction** 81:3

**read** 40:16 49:8 76:21 78:14 81:18 99:3 110:18 113:10 131:20 136:5 152:11, 13

**reading** 58:2 77:2 135:11

**reads** 62:25

**ready** 12:25 112:4

**reason** 49:3 56:17 64:16 67:19

**reasonable** 29:22

**recall** 25:23 28:16 30:5 34:3 35:18 38:14,17 43:8 50:5 64:9,11 69:17,23 80:21,22 88:15 90:11,14,20,21 91:5,

14,18 99:9,25 100:16,17 101:12,13, 14 107:4,18 111:20 141:4 147:13 152:18

**receipt** 137:24 138:14

**receive** 56:5,12 109:24

**received** 27:22 28:2 57:15 58:9,17 68:10 84:4 142:22

**receiving** 81:3 126:11

**recently** 93:16 94:10

**recess** 61:3 112:8

**recognize** 68:11

**recollection** 43:14, 17

**recommendations** 102:4

**record** 10:22 152:13 153:17

**recover** 124:17,24

**recoveries** 125:11

**recovery** 124:12 125:19,23

**redeem** 54:7,18 115:23

**reduction** 114:20 116:16 118:23

**refer** 45:10

**reference** 134:9

**referenced** 69:25

**referencing** 92:25

**referring** 26:16 30:14 101:15 103:22 119:4,15 120:3 124:12 134:22

**refers** 66:12

**refinance** 98:12 103:8 105:15 113:25 115:7 116:25 118:19 120:10

**refinances** 115:23

**refinancing** 40:19 96:17 101:3

**refusal** 140:8

**refute** 82:4

**regularity** 88:25

**related** 11:2,15 36:22 66:22 90:25 133:10 148:4

**relates** 36:8 51:13 90:2 92:8 151:22

**relating** 21:10

**relations** 24:11

**relationship** 62:17

**release** 128:2

**releases** 126:10,20 127:11,16

**relevant** 47:20 98:2

**reliance** 55:2

**remained** 115:21

**remedies** 42:2

**remember** 112:15

**Reorganized** 96:4, 10 97:3

**repeat** 12:8 90:3 114:15 117:20 139:9 142:3 146:22 152:15, 20

**repeats** 63:15

**rephrase** 124:3 126:14

**reporter** 93:11 121:16 152:11 153:16,24

**represent** 8:4 68:9 122:4

**representation** 130:6

**representations** 11:11

**representative** 15:19 38:3,4,9,12 99:21 144:23 145:6

146:19 147:14

**representatives** 68:16 88:11 143:18, 25 144:7,9,18,20 147:3

**represented** 43:5,6 49:2 74:20 78:4

**representing** 96:24 129:21

**request** 10:8 78:8 153:6

**requested** 9:9,13 55:12 56:3 77:9,14 150:18,23 151:6,12, 15 152:24 153:9

**requesting** 12:22

**requests** 99:20

**require** 44:23

**required** 39:3,7 40:25 81:9 102:19 131:24 136:22 146:4 147:5

**requiring** 133:5

**reread** 83:8

**reset** 40:18,20,22 41:7,9,19,25 42:17 54:7,18 85:16 93:18, 21 94:12,21 95:14,18 96:4,11,13,16 97:2,8, 10,20 98:11,18 100:13,22 101:3,17, 21 102:9,17 103:8, 13,20,22,23,24 104:2,4,5,13,16 105:10,15,24 107:15, 23 108:3 113:25 115:7,11,24 116:25 118:19 120:11 150:10,12,18,19,24 151:4,6,15 152:24 153:6,9

**resets** 151:12

**resolutions** 39:17

**respect** 40:5,14 50:24 71:4 77:20 91:21 98:18 114:9

**respective** 62:13

**responding** 120:19

**response** 11:9 22:18,25 48:6 76:9 152:12

**responsibility** 93:4

**responsible** 47:19

**restate** 87:25

**result** 74:2 85:4,16 96:22 99:12 100:9 114:4 115:5 116:23

**resulted** 118:15 120:10

**review** 23:7 78:9

**reviewed** 57:17 75:24

**reviewing** 58:20

**rights** 42:2,17 51:21 66:21 110:6

**Road** 13:4

**role** 40:14 44:15

**room** 13:11

**root** 148:11

**rough** 153:25

**roughly** 27:14 112:23 126:6

**routine** 45:2

**Rule** 18:22 19:8

**rules** 12:24

**ruling** 78:6 115:20

**Russell** 8:13

**S**

**sat** 34:4

**satisfied** 29:21 57:18

**Schafer** 8:4

**schedule** 53:13 121:23

**scheduled** 55:21

**scheme** 54:9

**scope** 149:6,13

151:23

**Scott** 93:17 94:6 104:11,17

**screen** 16:6,24 17:8, 11,14 18:16 19:3 21:7 22:14,23 37:11 44:14,22 45:13,17 61:6 63:6 67:25 68:4 78:23 84:2 93:16 109:15 112:5,17 128:9,18

**scroll** 16:15 17:19 21:12,22 45:13 84:22

**scrolled** 81:12

**SEC** 70:2

**secondary** 15:2 25:8

**Section** 44:12 129:9, 19 136:3

**seek** 141:7 142:20 143:5

**Seery** 108:10,15,21 111:15

**sell** 140:10,21

**selling** 119:25 123:7

**send** 16:21 83:18 109:3

**sending** 16:4 20:25

**sense** 99:15 125:9

**sentence** 31:22 48:24 84:24 85:13 86:5

**sentences** 40:2

**separate** 15:22 18:5 42:12 75:20 83:5 136:18

**separately** 80:20

**serve** 36:15 96:6

**settle** 108:22

**settlement** 11:5 13:19 15:7 78:5 89:18 108:5 109:8, 20,22,23 110:10 111:2 122:12,17 123:5,17,22 125:3 127:3 128:16,20

129:3,5 130:8,25 134:9 137:16 140:5, 12 141:9 142:16,25 143:20 144:25 145:12,23 146:5 147:8

**Shannon** 8:19

**share** 16:6,24 18:16 21:6 22:14,22 37:11 45:12 61:7 63:7 64:15 65:14 67:25 68:5 78:24 84:2 109:15 112:5,17 128:10,17 130:15 138:16

**shared** 17:9

**shareholder** 63:19 66:4 132:15

**shares** 63:12,22 64:6 66:25 112:19,21 123:7 126:4,11,18 127:11,15 129:10,23 130:8 136:11 137:3, 15 138:2,5,17 140:4, 10,11,22 141:8 142:15 143:10,19 144:10,23 146:4 147:5

**shed** 49:15

**short** 121:21 149:9

**shortened** 82:22

**shortly** 80:14

**shots** 95:17 98:18

**show** 69:24

**showing** 17:11,14,15

**shows** 133:19

**side** 68:22

**sign** 21:17

**signature** 21:13

**signed** 15:15 22:4 43:2 103:4

**significant** 114:19

**similar** 42:18 115:21

**simply** 48:25 139:22

**single** 15:22 37:17

**siphon** 47:14 48:11

**siphoned** 47:21 48:15,22

**sir** 124:14

**Skew** 15:3 22:3

**skip** 28:6

**solo** 20:20

**sophisticated** 55:6

**sort** 125:21

**sought** 58:5 142:13

**sound** 56:23

**sounds** 13:2 27:18 51:24 118:8 120:24, 25 135:8,13

**source** 148:5

**Spalding** 8:23

**speak** 143:13

**speaks** 36:3 67:17 130:2

**specific** 34:3 48:20 75:4 90:15 101:16 102:22 103:5 116:10 132:6 150:17

**specifically** 11:3 25:7 27:16 78:12 95:7 100:17

**specifics** 13:24 35:18 101:14 107:4 140:18

**speculate** 116:18

**speculation** 106:22, 25 116:8 117:16

**spelled** 44:12

**spots** 67:7

**stamp** 133:13

**stamped** 9:18

**standing** 52:14 149:12

**stands** 102:21

**Stang** 8:7

**start** 12:14,16,25 95:16 112:6

**started** 108:13

**starting** 89:14

**starts** 86:5

**state** 10:14,21 33:18

**stated** 24:3 26:14 71:21 87:18 107:19

**statement** 93:24 94:16

**statements** 23:10

**states** 32:4 45:20 110:5

**stating** 120:21

**stemming** 51:14

**steps** 45:23

**sticks** 127:7,9,23

**stop** 18:15 22:14 37:10 67:25 112:5

**Street** 14:24 21:18 37:15 65:12 76:10 80:13,18 81:15

**Strike** 88:23

**structural** 58:20

**structure** 56:15,22

**stuff** 20:21 122:21 128:14

**sub-advisor** 35:7 36:7

**sub-manager** 34:12

**subject** 9:9 54:19 140:4

**submit** 16:2 20:24

**submitted** 18:25

**subordinated** 110:2 123:21 124:7 125:2

**Subscription** 63:8, 11

**subsequent** 34:22 51:11 53:4 56:11,13 98:25 114:6 115:20 116:24 118:16

**subsequently** 24:13 105:16

**subset** 24:13

**subsidiaries** 62:12 93:13

**subsidiary** 46:15 47:10

**substance** 14:8 70:16 76:25

**successfully** 96:6

**suffered** 118:5 148:12

**suggestion** 49:23, 25 111:8

**suit** 78:7

**summaries** 69:22

**summarize** 123:17

**summary** 69:12 71:6 123:10

**summation** 106:14

**summer** 23:14 24:3

**supervised** 97:4

**support** 18:21 19:7 109:7,16 111:17 128:25

**Surgent** 69:4

**sworn** 98:16

---

**T**

**taking** 66:8

**talk** 11:4,17 12:10,11 13:14 14:3,12,15 15:5 30:11,13 113:10 122:7

**talked** 43:4 79:15,20 150:25

**talking** 31:14 104:6 119:9 120:12,15 124:17 134:19

**team** 24:11 25:3,5,6, 8 79:18,24

**teed** 89:18

**telling** 74:19 80:23

**Ten** 60:16

**ten-minute** 60:19 112:3

**term** 110:25 134:10 145:14

**termination** 78:7

**terminology** 36:8

**terms** 9:16,22 95:17 110:10 122:17 144:24 145:12,21 147:7 151:4

**Terry** 45:24 46:2,9, 18,20 47:16 48:12 51:12,16 53:12 70:3 71:4 73:13,20 76:4, 14 77:20 118:15

**testified** 10:15 58:7 93:18 94:10,11 95:12 104:12 107:3 112:11 122:10 148:20

**testifying** 52:13

**testimony** 10:6 14:6 28:23 29:4 43:7 47:24 56:10 57:21 58:13 72:18,19 92:24 98:16 99:2 105:8,12 107:9 117:18 121:9 142:2

**thesis** 28:21 96:19 101:2 114:3

**thing** 12:9,20 128:20

**things** 39:5 43:25 107:10 127:8

**thinks** 82:23

**Thomas** 69:3,13,15

**thought** 105:24 118:10 120:20 135:10 146:17

**till** 60:22

**time** 12:3,6,17 25:23 26:2 30:10 33:6 34:15,17 56:19 60:23 85:2 88:6,7 90:13 94:18 97:11 99:9 101:17 103:4,8,13,24 105:7 107:5 114:7 125:25 151:25

**timeline** 114:18

**times** 102:13 103:16 104:23

**titles** 110:6

**today** 13:7,15 14:12, 16 72:21 75:14,25 117:25

**today's** 75:11

**told** 28:24 68:20 102:15,18 106:7,9

**top** 37:12 61:14 62:4 93:15 95:11 99:17 128:22

**topics** 14:12,16 99:21

**total** 65:18,20 112:20

**totally** 12:19 27:22

**toxic** 49:5,14,20 50:2

**trading** 119:25 127:7,10

**transaction** 27:6 40:18,22 41:10,19,25 103:5

**transactions** 54:21 95:18 96:4 98:19

**transcript** 10:9 153:23

**transfer** 63:8,11 110:6 127:25 129:10, 23 130:7,24 131:11, 25 133:6 135:20 136:11,23 137:2,14, 25 140:3 141:8,16 142:14,24 143:7,9,19 144:3,10 145:22 146:3

**Transferee** 132:15

**transferred** 51:22 126:4,19 127:15 138:17 146:5 147:6

**transferring** 123:23 126:12 140:10 144:22

**transfers** 47:14,15 48:11 55:13 132:14

**treated** 15:22

**Trey** 79:11,12

**trim** 109:19

**TRO** 115:18 116:24

**Trust** 8:17,18

**trustee** 35:9 36:13 52:23 95:25 96:23 97:7,16

**Trustee's** 96:25

**trustees** 62:14

**turn** 30:23 63:3 118:17 128:4 133:7

**two-minute** 147:23

**two-thirds** 38:25

---

**U**

**UBS** 8:21 70:4

**ultimate** 74:2 76:4 103:10 111:6

**ultimately** 25:13 51:9 54:17 55:17 116:23 118:13 124:18 127:20

**unanimous** 42:23

**unaudited** 59:2

**underlaying** 120:4

**underling** 31:8 35:4

**underlying** 11:7 13:18 19:24 31:10, 14,16 32:19 33:3 36:9,23 40:21 41:16 51:14 53:5 56:22 70:16 74:2 93:2 98:10,13 105:4 114:2 116:19 118:19 119:5, 22

**underneath** 35:19

**understand** 11:23 12:4,7 34:25 95:3 98:15 120:23 131:8, 21 133:24 135:16 138:10 151:20 152:6

**understanding** 35:11 36:21 39:24 40:17 42:2,9,12,15

**43:20 44:10 46:7 47:6,9,18 51:2,9 65:21 71:15 73:10,17 75:23 82:15 83:5 91:8,12 93:12 110:9 113:15 115:17 121:11 125:16 126:2 129:16,20 130:5,15 131:23 132:5,7,9,21 133:5 136:9,18,21 142:18 145:24 146:19 147:3 148:25 151:14 153:5

**understood** 31:19 62:11 118:10 142:8

**undertaken** 56:16

**undertaking** 45:23

**undertook** 47:13 48:10

**unequivocally** 49:18

**unsecured** 109:25 123:20 124:6,25 125:18

**upside** 125:21

---

**V**

**vague** 104:9

**valuation** 59:7

**valued** 125:18

**variety** 30:24

**vehicle** 26:18,22 27:2

**vehicles** 16:19 18:2 32:22

**viability** 77:17

**video** 121:20

**view** 54:22 105:7,13 116:9 131:15 137:10

**viewed** 97:16

**VIII** 15:2

**virtue** 119:21

**vote** 42:23 110:16,20 111:17

**voting** 62:5,24

## W

**Wall** 76:9 80:13,18 81:15

**wanted** 45:13 94:12 97:16 104:13 122:9

**Watkins** 8:20

**Wayne** 13:4

**week** 93:23 94:23 95:8 104:15

**weekly** 88:10,16 89:3

**weeks** 51:25 80:2 83:12 122:25

**Weisgerber** 8:9,10, 25 9:25 13:20 14:9 15:11 29:3,14 30:3 31:6 32:8,17 33:17 34:13,20 35:10,16 36:2,17 37:6 39:10 40:12 41:3,11,21 42:3,11 43:12,21 44:18 45:5 46:5,12 47:2,23 48:16 49:16 50:19 51:5 52:9,25 53:18,25 54:14 56:9 57:7,20 58:12 59:19, 24 60:4,16 61:19 62:22 63:25 64:7,19 65:2,15,22 66:6 67:3, 8,16,21 69:18 70:10, 23 71:7 72:4,12 73:7 74:24 75:8,19 76:15 77:3,12,22 78:10,16 80:9 81:5,24 82:10, 18 83:2,15 85:24 86:9,25 87:6,10,24 88:13,21 89:4,12 90:9,18 91:3,15,23 92:12,23 93:25 94:13,24 95:21 96:14 97:12,23 98:20 99:6, 13 100:14,23 101:10, 13,23 102:10,18 103:14 104:3,7,21 105:11 106:17 107:2, 16,24 108:18,25 110:11,22 111:3,10, 18 112:25 113:4,16 114:13,23 115:12 116:5,17 117:15

118:6,25 119:17 120:17 121:8 123:11 124:9,15 125:5,14 126:23 127:18 128:12 129:13,25 130:10 131:12 132:3, 18,24 134:3 135:4 136:12 137:5,18 138:6,19 140:13,24 141:11,25 142:17 143:3,11,21 144:11 145:2,15 146:7,22 147:9,21,25 148:14 149:2,4,11,19 150:3, 14,21 151:9,17,21 152:7,17,25 153:14

**wholly-owned** 62:12 85:2

**Willard** 25:2 68:21 69:3 79:9,16

**William** 93:17 94:6 104:11

**Wilson** 8:2 9:6 10:7, 17 14:2,13,14 15:24 16:10 17:5 18:17,24 19:9 20:18 21:5 22:13,21 33:20,23 42:8 48:4 50:23 52:18 53:21,22 57:24 59:22 60:2,9,14,21, 25 61:4,11 63:2 67:24 72:20 74:16 75:13 76:6 78:20 82:14,21 83:17,24 84:8 86:15 88:23 89:23 90:5 93:7 94:15 95:3 99:16,24 102:14 103:18 105:21 106:5,10,24 107:12 109:3,13 112:2,9 121:12 148:16,18 149:8,16 152:3,10,14 153:12, 20

**Wilson's** 148:2

**Winograd** 8:7

**witness'** 9:7

**wondering** 151:22

**words** 74:18

**work** 122:21

**worked** 42:10

**works** 11:24

**worth** 28:25

**worthless** 108:17

**wrap** 112:4 151:25

**written** 39:17 42:25 43:10 75:4,16 82:7 142:13,22 143:5 144:2,22 145:25

**wrong** 120:25

**wrongful** 78:7

## Y

**y'all** 60:10,14

**years** 30:6 57:10

**York** 10:14

## Z

**Ziehl** 8:8

**Zoom** 12:6,10 128:14

# EXHIBIT 8

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket Nos. 1625, 1697, 1706, 1707** |
| | ) | |

## DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154), AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210113000000000010

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") in support of its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim No.143,147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion").[2]  In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      If granted, the Motion will resolve a $300 million general unsecured claim against the Debtor's estate for less than $16.8 million in actual value.[3]  The settlement is another solid achievement for the Debtor and – not surprisingly – is opposed by no one except Mr. Dondero and entities affiliated with him.

2.      As discussed in the Motion, in November 2017, HarbourVest invested $80 million in exchange for a 49.98% membership interest in HCLOF – an entity managed by a subsidiary of the Debtor.  The balance of HCLOF's interests are held by CLO Holdco, Ltd. (an entity affiliated with Mr. Dondero), the Debtor, and certain of the Debtor's employees. Subsequent to its investment in HCLOF, HarbourVest incurred substantial losses on its investment in HCLOF and filed claims against the Debtor's estate.

3.      HarbourVest asserts claims for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

[3] Under the proposed settlement, HarbourVest would receive an allowed, general unsecured claim of $45 million and an allowed, subordinated claim of $35 million.  Based on the estimated recovery for general unsecured creditors of 87.44% (which is a recovery based on certain outdated assumptions discussed *infra*), HarbourVest's $45 million general unsecured claim is estimated to be worth approximately $39.3 million and the $35 million subordinated claim, which is junior to the general unsecured claim, is currently estimated to have value only if there are litigation recoveries.  In addition, HarbourVest is transferring to an affiliate of the Debtor its interest in HCLOF, which is estimated to be worth approximately $22.5 million.  Thus, HarbourVest's estimated recovery on its general unsecured and subordinated claims is estimated at approximately $16.8 million on a net economic basis.  This estimate, however, is dated and is based on the claims that were settled as of the filing of the Debtor's plan in November 2020.

2

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. In furtherance of these claims, HarbourVest alleges it was misled by the Debtor and its employees, including Mr. Scott Ellington (then the Debtor's general counsel), and that subsequent to investing in HCLOF, Mr. Dondero and the Debtor used HCLOF both as a piggybank to fund the litigation against Acis Capital Management, L.P. ("Acis") and as a scapegoat for the Debtor's litigation strategy, in each case to HarbourVest's substantial detriment.

4.      Specifically, HarbourVest alleges that:

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest about its intentions with respect to Mr. Terry's arbitration award against Acis and orchestrated a series of fraudulent transfers and corporate restructurings, the true purpose of which was to denude Acis of assets and make it judgment proof;

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest as to the intent and true purpose of these restructurings and led HarbourVest to believe that Mr. Terry's claims against Acis were meritless and a simple employment dispute that would not affect HarbourVest's investment;

- the Debtor, through Mr. Dondero, improperly exercised control over or misled HCLOF's Guernsey-based board of directors to cause HCLOF to engage in unnecessary, unwarranted, and resource-draining litigation against Acis;

- the Debtor improperly caused HCLOF to pay substantial legal fees of various entities in the Acis bankruptcy that were unwarranted, imprudent, and not properly chargeable to HCLOF; and

- the Debtor used HarbourVest as a scapegoat in its litigation against Acis by asserting that the Debtor's improper conduct and scorched-earth litigation strategy was at HarbourVest's request, which was untrue.

5.      The Debtor believed, and continues to believe, that it has viable defenses to HarbourVest's claims. Nevertheless, those defenses would be subject to substantial factual disputes and would require expensive and time-consuming litigation that would likely be resolved only after a lengthy trial all while the Debtor (or its successor) assumes the risk that the defenses might fail. The evidence will show that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the

principals and their counsel. The evidence will also show that one of HarbourVest's primary concerns in settling its claim was that part of that settlement would include the extrication of HarbourVest from the Highland web of entities and the related litigation. The proposed settlement accomplishes that and does so in compliance with HCLOF's governing agreements.

6. Pursuant to the proposed settlement, (a) HarbourVest will receive (i) an allowed, general unsecured claim in the amount of $45 million, and (ii) an allowed, subordinated claim in the amount of $35 million; (b) HarbourVest will transfer its 49.98% interest in HCLOF (valued at approximately $22.5 million) to a wholly-owned subsidiary of the Debtor; and (c) the parties will exchange mutual and general releases. The Debtor believes that the proposed settlement is reasonable and results from the valid and proper exercise of its business judgment. And the Debtor's creditors apparently agree. None of the major parties-in-interest or creditors in this case has objected to the Motion: not the Committee, the Redeemer Committee, Acis, Patrick Daugherty, or UBS.

7. In distinction, the only objecting parties are Mr. Dondero, his family trusts (the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts")), and CLO Holdco (a wholly-owned subsidiary of Mr. Dondero's Charitable Donor Advised Fund, L.P. (the "DAF")) (collectively, the "Objectors"). Each of the Objectors has only the most tenuous economic interest in and connection to the Debtor's settlement with HarbourVest. Each of the Objectors is also controlled directly or indirectly by Mr. Dondero who has coordinated each of the Objectors litigation strategies against the Debtor.[4] Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy – should be rebuffed, and the objections overruled. The following is a brief summary of the objections.

---

[4] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q.

| Pleading | Objection/Reservation | Response |
|---|---|---|
| *Objection of James Dondero* [Docket No. 1697] (the "<u>Dondero Objection</u>") | Because HarbourVest was damaged by the injunction entered in Acis, the settlement seeks to revisit this Court's rulings in Acis. | Mr. Dondero is misdirecting the Court. HarbourVest's claim arises from the misrepresentations of Mr. Dondero, Mr. Ellington, and others, not this Court's rulings in Acis, including the failure to disclose the fraudulent transfer of assets. |
| | The settlement is not fair and equitable because it does not address (1) Acis's mismanagement, (2) how the Debtor is liable for HarbourVest's damages, (3) the success on the merits, (4) the costs of litigation, and (5) the Debtor's ability to realize the value of the HCLOF interests in light of the Acis injunction. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. The Debtor has assessed the value of the HCLOF interests in light of all factors, including the Acis injunction. |
| | The HarbourVest settlement represents a substantial windfall to HarbourVest. | Mr. Dondero ignores the economics of this case, which have value breaking in Class 8 (General Unsecured Claims). The value of the settlement is not $60 million; it is approximately $16.8 million against a claim of $300 million. There is no windfall. |
| | The HarbourVest settlement is improper gerrymandering because it provides HarbourVest with a general unsecured claim and a subordinated claim in order to secure votes for the plan. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| *Objection of the Dugaboy Investment Trust and Get Good Trust* [Docket No. 1706] (the "<u>Trusts Objection</u>") | The settlement represents a radical change in the Debtor's earlier position on the HarbourVest settlement. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. |
| | The settlement appears to buy HarbourVest's vote. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| | No information is provided as to whether the Debtor can acquire HarbourVest's interest in HCLOF or the value of that interest to the estate. | As discussed below, the HCLOF interest will be transferred to a wholly-owned subsidiary of the Debtor. Mr. Seery will testify as to the benefit of the HCLOF interests to the estate. |
| *Objection of CLO Holdco* [Docket No. 1707] ("<u>CLOH Objection</u>") | HarbourVest cannot transfer its interests in HCLOF unless it complies with the right of first refusal. | CLO Holdco misinterprets the operative agreements and tries to create ambiguity where none exists. |

5

8.     These objections are just the latest objections filed by Mr. Dondero and his related entities to any attempt by the Debtor to resolve this case,[5] including the Debtor's settlement with Acis [Docket No. 1087] and the seven separate objections filed by Mr. Dondero and his related entities to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[6]  It will not shock this Court to hear that each of the Objectors is also objecting to the Plan.  In contradistinction, the Debtor has heard this Court's admonishments about old Highland's culture of litigation as evidenced by this case, Acis's bankruptcy, and beyond.  Although the Debtor has vigorously contested claims when appropriate, the Debtor has also sought to settle claims and limit the senseless fighting.  The Debtor has successfully resolved the largest claims against the estate, including the claims of the Redeemer Committee, Acis, and, as recently announced to this Court, UBS.  The Debtor would ask this Court to see through the pretense of the Dondero-related entities' objections to the HarbourVest settlement and approve it as a valid exercise of the Debtor's business judgment.

---

[5] As an example of Mr. Dondero's litigiousness, on January 12, 2021, Mr. Dondero filed notice that he will be appealing the preliminary injunction entered against him earlier on January 12, 2021.

[6] (1) *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661]; (2) *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667]; (3) *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]; (4) *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670]; (5) *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; (6) *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]; and (7) *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].

6

## **REPLY**

### A. Standing

9. **James Dondero.** In the Dondero Objection, Mr. Dondero asserts he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. While that claim is ostensibly true, it is tenuous at best. On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[7] More than nine months later, Mr. Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[8]

10. Mr. Dondero's claim as an "indirect equity security holder" is also a stretch. Mr. Dondero holds no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests. The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be satisfied.

11. **Dugaboy and Get Good.** Dugaboy and Get Good are sham Dondero "trusts" with only the most attenuated standing. Dugaboy has filed three proofs of claim [Claim Nos. 113; 131; 177]. In two of these claims, Dugaboy argues that (1) the Debtor is liable to Dugaboy

---

[7] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice. *See* Docket No. 1460.

[8] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

7

for its postpetition mismanagement of the Highland Multi Strategy Credit Fund, L.P., and (2) this Court should pierce the corporate veil and allow Dugaboy to sue the Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a Debtor-managed investment vehicle. The Debtor believes that each of the foregoing claims is frivolous and has objected to them. [Docket No. 906].

12. In its third claim, Dugaboy asserts a claim against the Debtor arising from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the total limited partnership interests in the Debtor). Similarly, Get Good filed three proofs of claim [Claim Nos. 120; 128; 129] arising from its prior ownership of limited partnership interests in the Debtor. Because each these claims arises from an equity interest, the Debtor will seek to subordinate them under 11 U.S.C. § 510 at the appropriate time. As set forth above, these interests are out of the money and are not expected to receive any economic recovery.

13. Consequently, Mr. Dondero, Dugaboy, and Get Good's standing to object to the HarbourVest settlement is attenuated and their chances of recovery in this case are extremely speculative at best. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing). Mr. Dondero, Dugaboy, and Get Good's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected. "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity

8

holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

**B.**   **Mr. Dondero's Objection and his "Trusts" Objection Are Without Merit**

14.   As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate.   *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).   In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views" and (ii) whether the settlement is the product of arm's length bargaining and not of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted).   *See also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

15.   **The Settlement Seeks to Revisit the Acis Orders.**   In the Dondero Objection, Mr. Dondero argues that HarbourVest's claim is based on the financial harm caused to HarbourVest from Acis's bankruptcy and the orders entered in the Acis bankruptcy.   Mr. Dondero extrapolates from this that HarbourVest is seeking to challenge this Court's rulings in Acis.   (Dondero Obj., ¶¶ 17-20)   Mr. Dondero misinterprets HarbourVest's claims and the dangers such claims pose to the Debtor's estate.

16.   HarbourVest's claims are for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. HarbourVest is not arguing that Acis or this Court caused its damages; HarbourVest is arguing that *the Debtor* – led by Mr. Dondero – (a) misled HarbourVest as to the nature of Mr. Terry's claims against the Debtor and the litigation with Acis, (b) knowingly and intentionally failed to disclose that the Debtor was engaged in the fraudulent transfer of assets to prevent Mr. Terry from collecting his judgment, and (c) that *the Debtor* – under the control of Mr. Dondero – improperly engaged in a crusade against Mr. Terry and Acis, which substantially damaged HarbourVest and its investment in HCLOF, in each case in order to induce HarbourVest to invest in HCLOF.

17.     Again, HarbourVest does not contend that Acis caused its damages.  Rather, HarbourVest contends that the fraudulent transfer of assets as part of the Debtor's crusade against Mr. Terry and Acis and the false statements and omissions about those matters caused HarbourVest to make an investment it would never have made had Mr. Dondero and the Debtor been honest and transparent.  The Acis litigation – in HarbourVest's estimation – never should have happened.  Acis did not cause HarbourVest's damages.  Mr. Dondero's crusade against Mr. Terry and the Debtor's allegedly fraudulent statements to HarbourVest about the fraudulent transfers, Mr. Terry and Acis caused HarbourVest's damages.

18.     **The HarbourVest Claim Lacks Merit.**  In their objections, Mr. Dondero and the Trusts argue that the HarbourVest settlement is not fair and equitable and not in the best interests of the estate because (a) it does not address the Debtor's arguments against the HarbourVest claims and (b) there is a lack of pending litigation seeking to narrow the claims against the estate. These arguments only summarily address the first two factors of *Cajun Electric*, which deal with success in the litigation, and, in doing so, mischaracterize the dangers to the Debtor's estate

10

posed by HarbourVest's claims. (Dondero Obj., ¶¶ 21-25; Trusts Obj., ¶ 18(a))

19.      Both the Dondero Objection and – to a much lesser extent - the "Trusts" Objection allege that (a) HarbourVest's losses were caused by Acis and its (mis)management of HCLOF's investments (Dondero Obj.,¶ 22, 24), (b) there is no contract that supports HarbourVest's claims (Dondero Obj. ¶ 23; Trusts Obj., ¶ 18(a)), (c) there is no causal connection between HarbourVest's losses and the Debtor's conduct (Dondero Obj., ¶ 24), and (d) the Debtor should litigate all or a portion of HarbourVest's claim before settling (Dondero Obj., ¶ 25). Again, though, as set forth above, both Mr. Dondero and the "Trusts" seek to shift the cause of HarbourVest's damages away from the Debtor's misrepresentations and to Mr. Terry's management of HCLOF's investments. This is simple misdirection.

20.      HarbourVest's claims are that it invested in HCLOF based on the Debtor's fraudulent misrepresentations. Fraudulent misrepresentation sounds in tort, not contract. *See, e.g., Clark v. Constellation Brands, Inc.*, 348 Fed. Appx. 19, 21 (5th Cir. 2009) (referring to party's claim based on fraudulent misrepresentation as a tort); *Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp. 2d 712, 717 (S.D. Tex. 2000) (noting that party had common law duty not to commit intentional tort of fraudulent misrepresentation). There is thus no need for HarbourVest to point to a contractual provision to support its claim.[9] Moreover, in order to defend against HarbourVest's claims, the Debtor would need to elicit evidence showing that its employees did not make misrepresentations to HarbourVest. Such a defense would require the Debtor to rely on the veracity of Mr. Ellington's testimony, among others. That is a high hurdle, and no reasonable person would expect the Debtor to stake the resolution of HarbourVest's $300 million claim on the Debtor's ability to convince this Court that Mr. Ellington was telling HarbourVest

---

[9] Subsequent to filing the Motion, the Objectors requested all agreements between HarbourVest, HCLOF, and the Debtor, and such agreements were provided.

the truth.  This is especially true in light of the evidence supporting Mr. Ellington's recent termination for cause and the evidence recently provided by HarbourVest supporting its claim for fraudulent misrepresentations.

21.     Finally, neither Mr. Dondero nor the "Trusts" even address the third factor analyzed by the Fifth Circuit:  all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views."  This is telling because no creditor or party in interest has objected to the settlement.  Mr. Dondero and his proxies' preference for constant litigation should not outweigh the preference of the Debtor and its creditors for a reasonable and expeditious settlement of HarbourVest's claims.

22.     **The HarbourVest Settlement Is a Windfall to HarbourVest.**  Both the Dondero Objection and the "Trusts" Objection argue that the HarbourVest settlement represents a substantial windfall to HarbourVest.  Both Mr. Dondero and the "Trusts" ignore the facts.  Specifically, Mr. Dondero argues that HarbourVest is receiving $60 million dollars in *actual* value for its claims.  Mr. Dondero's contention, however, wrongly assumes that both the $45 million general unsecured claim and the $35 million subordinated claim provided to HarbourVest under the settlement will be paid 100% in full and that HarbourVest will receive $80 million in cash.  From that $80 million, Mr. Dondero subtracts $20 million, which represents the value Mr. Dondero ascribes to HarbourVest's interests in HCLOF that are being transferred to the Debtor.  Mr. Dondero's math ignores the reality of this case.

23.     The Debtor very clearly disclosed in the projections filed with the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.,* [Docket No. 1473] (the "Projections") that general unsecured claims would receive an 87.44% recovery *only if* the claims of UBS, HarbourVest, Integrated Financial Associates, Inc., Mr.

12

Daugherty, and the Hunter Mountain Investment Trust were zero. Because of the Debtor's success is settling litigation, that assumption is proving to be inaccurate. Regardless, even if general unsecured claims receive a recovery of 87.44%, because the subordinated claims are junior to the general unsecured claims, the subordinated claims' projected recovery is currently zero. As such, assuming the HCLOF's interests are worth $22.5 million,[10] the actual recovery to HarbourVest will be less than $16.8 million. This is not a windfall. HarbourVest's investment in HCLOF was $80 million and its claim against the estate was over $300 million. The settlement represents a substantial discount.

24. **Improper Gerrymandering and/or Vote Buying.** Each of Mr. Dondero and the Trusts argue in one form or another that the HarbourVest settlement is improper as it provides HarbourVest a windfall on its claims in exchange for HarbourVest voting to approve the Plan. These unsubstantiated allegations of vote buying should be disregarded. As an initial matter, and as set forth above, HarbourVest is *not* getting a windfall. HarbourVest is accepting a substantial discount in the settlement. HarbourVest's incentive to support the Plan comes from HarbourVest's determination that the Plan is in its best interests. There is also nothing shocking about a settling creditor supporting a plan. Indeed, it would be nonsensical for a creditor to settle its claims and then object to the plan that would pay those claims.

25. More importantly, HarbourVest's votes in Class 9 (Subordinated Claims) are not needed to confirm the Plan. As will be set forth in the voting declaration, Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 8 (General Unsecured Claims) have voted in favor of the Plan.[11] In brief, the Plan was approved without HarbourVest's Class 9 vote,

---

[10] It is currently anticipated that Mr. James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, will testify as to the value of the HCLOF interests to the Debtor's estate.

[11] The Debtor anticipates that Mr. Dondero and his related entities will argue that neither Class 7 nor Class 8 voted to accept the Plan because of the votes cast against the Plan in those Classes by current and former Debtor

and the Debtor, therefore, has no need to "buy" HarbourVest's Class 9 claims. Accordingly, any claims of gerrymandering or vote buying are without merit.

## C. CLOH Objection

26. CLO Holdco (and to a much lesser extent, the "Trusts") object to HarbourVest's transfer of its interests in HCLOF as part of the settlement. Currently, the settlement contemplates that HarbourVest will transfer 100% of its collective interests in HCLOF to HCMLP Investments, LLC ("HCMLPI"), a wholly-owned subsidiary of the Debtor. As set forth in the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* (which was appended as Exhibit A to the Settlement Agreement) [Docket No. 1631-1], each of the Debtor, HarbourVest, Highland HCF Advisors, Ltd. (HCLOF's investment manager) ("HHCFA"), and HCLOF agree that HarbourVest is entitled to transfer its interests to HCMLPI pursuant to that certain *Members Agreement Relating to the Company*, dated November 15, 2017 (the "Members Agreement"),[12] without offering that interest to other investors in HCLOF.

27. The *only* party to object to the transfer of HarbourVest's interests in HCLOF to HCMLPI is CLO Holdco. CLO Holdco holds approximately a 49.02% interest in HCLOF and is the wholly-owned subsidiary of the DAF, Mr. Dondero's donor-advised fund. CLO Holdco argues that the Member Agreement requires HarbourVest to offer its interest first to the other investors in HCLOF before it can transfer its interests to HCMLPI. In so arguing, CLO Holdco attempts to create ambiguity in an unambiguous contract and to use that ambiguity to disrupt the Debtor's settlement with HarbourVest.

28. As an initial matter, the Debtor and CLO Holdco agree that the transfer of HarbourVest's interests in HCLOF to HCMLPI is governed by Article 6 (Transfers or Disposals

employees, including Mr. Ellington and Mr. Isaac Leventon. The Debtor will demonstrate at confirmation that those objections are without merit and that Class 7 and Class 8 voted to accept the Plan.

[12] A true and accurate copy of the Members Agreement is attached hereto as Exhibit A.

14

of Shares) of the Members Agreement (an agreement governed by Guernsey law). (CLOH Obj., ¶ 3) The parties diverge, however, as to how to interpret Article 6. The Debtor, as set forth below, believes Article 6 is clear in that it allows HarbourVest to transfer its interests in HCLOF to any "Affiliate of an initial Member party" without requiring the right of first refusal in Section 6.2 of the Members Agreement. CLO Holdco's position appears to be that the Members Agreement, despite its clear language, should be interpreted as limiting transfers to an "initial Member's *own* affiliates" and that any other transfer requires the consent of HHCFA and satisfaction of the right of first refusal. (*Id.* (emphasis added)) CLO Holdco's reading is contrary to the actual language of the Members Agreement.

29. First, Section 6.1 of the Members Agreement provides, in pertinent part:



(Members Agmt, § 6.1 (emphasis added)) Under the Members Agreement, "Affiliate" is defined, in pertinent part, as "███████████████████████████████████████

██████████████████████████████████████████████████████████████████████

(Id., § 1.1) A "Member" in turn is a ██████████████████████." The "initial Member[s]" are the initial Members of HCLOF listed on the first page of the Members Agreement and include the Debtor, HarbourVest, and CLO Holdco.

30. As such, under the plain language of Section 6.1, HarbourVest is entitled – without the consent of any party – to "Transfer" its interests in HCLOF to an "Affiliate" of any of the Debtor, HarbourVest, or CLO Holdco. And that is exactly what is contemplated by the settlement. HarbourVest is transferring its interests to HCMLPI, a wholly owned and controlled subsidiary of the Debtor, and therefore an "Affiliate" of the Debtor. That transfer is indisputably

15

allowed under Section 6.1; it is a transfer to an "Affiliate of an initial Member." CLO Holdco may, tongue in cheek, call this structure "convenient" but that sarcasm is an attempt to avoid the fact that the Members Agreement clearly allows HarbourVest to transfer its interest to HCMLPI without the consent of any party.[13] The fact that CLO Holdco does not now like the language it previously agreed to when CLO Holdco and the Debtor were both controlled by Mr. Dondero is not a reason to re-write Section 6.1 of the Members Agreement.

31.      Second, Section 6.2 of the Members Agreement is also unambiguous and, by its plain language, allows HarbourVest to "Transfer" its interests in HCLOF to "Affiliates of an initial Member" (*i.e.*, HCMLPI) without having to first offer those interests to the other Members (such obligation, the "ROFO"). CLO Holdco attempts to create ambiguity in Section 6.2 by arguing that it must be read in conjunction with Section 6.1 and that interpreting the plain language of Section 6.2 to allow HarbourVest to transfer its interests to HCMLPI without restriction makes certain other language surplus and meaningless. (CLOH Obj., ¶ 11-13) Again, CLO Holdco is attempting to create controversy and ambiguity where none exists.

32.      Section 6.2 of the Members Agreement provides, in pertinent part:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████

(Members Agmt., § 6.2 (emphasis added)) Like Section 6.1, Section 6.2 is clear on its face. It exempts from the requirement to comply with the ROFO two categories of "Transfers": (1) Transfers to "affiliates of an initial Member" from Members *other than* CLO Holdco and the

---

[13] Although HHCFA's consent is not necessary for HarbourVest to transfer its interests to HCMLPI, HHCFA will consent to the transfer.

"Highland Principals" (*i.e.*, the Debtor and certain of its employees)[14] and (2) Transfers from CLO Holdco or a Highland Principal to the Debtor, the Debtor's "Affiliates," or another Highland Principal. The fact that a narrower exemption is provided to CLO Holdco and the Debtor than to HarbourVest (or any other Member) under Section 6.2 is of no moment; the language says what it says and was agreed to by all Members, including CLO Holdco, when they executed the Members Agreement.

33. In addition, and although not relevant, the language of Section 6.2 makes sense in the context of the deal. Although CLO Holdco and the Debtor may have disclaimed an "Affiliate" relationship, they are related through Mr. Dondero and invest side by side with the Debtor in multiple deals.[15] The different standards in Section 6.2 serve to ensure that HarbourVest's (or any successor to HarbourVest) right to Transfer its shares without satisfying the ROFO is limited to three parties: (i) HarbourVest's Affiliates, (ii) the Debtor's Affiliates, and (iii) CLO Holdco's Affiliates. This restriction keeps the relative voting power of each Member static and ensures that CLO Holdco and the Debtor, together, will *always* have more than fifty percent of HCLOF's total interests and that HarbourVest will *always* have less than fifty percent. This counterintuitively also explains the greater restrictions placed on CLO Holdco and the "Highland Principals." The Highland Principals include certain Debtor employees. Those employees – as well as CLO Holdco and the Debtor – are prohibited from transferring their HCLOF interests outside of the Dondero family. This restriction makes sense. If, for example, a Debtor employee wanted to transfer its interests to an Affiliate of HarbourVest, HarbourVest could have more than fifty percent of the HCLOF interests because of the thinness

---

[14] **Highland Principals** means: ███████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████ (Members Agmt., § 1.1)

[15] There can be no real dispute that Mr. Dondero effectively controls CLO Holdco.

DOCS_NY:41952.8 36027/002

of the Dondero-family's majority (approximately 0.2%). At the time the Members Agreement was executed, CLO Holdco and the Debtor were under common control. Section 6.2 preserves those related entities' control over HCLOF by restricting transactions that would transfer that control unless the ROFO is complied with.

34. As such, and notwithstanding CLO Holdco's protestations, Section 6.1 and Section 6.2 are consistent as written and clear on their face. This consistency is further evidenced by HCLOF's Articles of Incorporation[16] and HCLOF's offering memorandum, which each include language identical to Section 6.1 and 6.2 of the Members Agreement.[17] It seems highly unlikely, if not implausible, that sophisticated parties such as CLO Holdco would include the exact same language in six separate places over three documents without a reason for that language and without the intent that such language be interpreted as it is clearly written – not as CLO Holdco now wants it to be interpreted. Accordingly, since HarbourVest is transferring its interests to HCMLPI, an Affiliate of an initial Member, the plain language of Section 6.2

---

[16] *See* Articles of Incorporation, adopted November 15, 2017, a true and correct copy of which is attached hereto as Exhibit B.



(Articles of Incorporation, § 18.1)

(*Id.*, § 18.2)

[17] *See* Offering Memorandum, dated November 15, 2017, a true and correct copy of which is attached hereto as Exhibit C.



(Offering Memorandum, page 89)

exempts HarbourVest from having to comply with the ROFO.

35.     Third, and finally, CLO Holdco makes the nonsensical argument that because Section 6.2 provides different treatment to similarly situated Members that this Court should re-write Section 6.2.  (CLOH Obj., ¶¶ 15-17)  Contracts provide different treatment to ostensibly similarly situated parties all the time and no one objects that that creates an absurd result.  It just means that different parties bargained for and received different rights.

36.     CLO Holdco's attempt to justify why this Court should re-write the Members Agreement to correct the "disparate treatment" is also unavailing.  As an example of the absurd result caused by the "disparate treatment," CLO Holdco states:  "[B]ecause the HarbourVest Members are technically Affiliates of an initial member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer."  (*Id.*, ¶ 16)  The scenario posited by CLO Holdco, however, is *exactly* the scenario prevented by the clear language of Section 6.2.  For HarbourVest to obtain control of HCLOF, it would – as a matter of mathematical necessity – need the interests held by CLO Holdco (49.02%) and/or the Highland Principals (1% in the aggregate).  Section 6.2, however, *expressly* prohibits CLO Holdco and the Highland Principals from transferring their interests to HarbourVest or its Affiliates without satisfying the ROFO.  As set forth above, it is Section 6.2 that prevents control from being transferred away from the Dondero family without compliance with the ROFO.  In fact, Section 6.2 would only break down if the limiting language in Section 6.2 were read out of it in the manner advocated by CLO Holdco.

37.     Ultimately, Article 6 of the Members Agreement is clear as written and expressly allows HarbourVest to transfer its interests to HCMLPI.  If CLO Holdco had an objection to the rights provided to HarbourVest under the Members Agreement, CLO Holdco

19

should have raised that objection three and a half years ago before agreeing to the Members Agreement. CLO Holdco should not be allowed to create ambiguity in an unambiguous contract or to re-write that agreement to impose additional restrictions on HarbourVest. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996) (enforcing the "unambiguous language in a contract as written," noting that where a contract is unambiguous, a party may not create ambiguity or "give the contract a meaning different from that which its language imports") (internal quotations omitted); *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity.").

38. It should go without saying, but CLO Holdco (and the other parties to the Members Agreement) should also be required to satisfy their obligations under the Members Agreement and execute the "Adherence Agreement" as required by Section 6.6 of the Members Agreement in connection with the Transfer of HarbourVest's interests to HCMLPI or any other permitted Transfer.

39. Finally, and notably, although CLO Holdco spends considerable time arguing that HarbourVest should be required to comply with the ROFO, nowhere in the CLOH Objection does CLO Holdco state that it wishes to purchase HarbourVest's interests in HCLOF. This omission is telling. CLO Holdco and the other Objectors have no interest in actually exercising their alleged right of first refusal contained in the Members Agreement. Rather, their only interest is in causing the Debtor to spend time and money responding to a legion of related (and coordinated) objections.[18]

---

[18] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q; Exhibit T (email from Mr. Dondero as forwarded to Mr. Ellington stating "Holy bananas….. make sure we object [to the HarbourVest Settlement]"); Exhibit Y.

*[Remainder of Page Intentionally Blank]*

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully requests that the Court grant the Motion.

Dated: January 13, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:  jpomerantz@pszjlaw.com
  ikharasch@pszjlaw.com
  jmorris@pszjlaw.com
  gdemo@pszjlaw.com
  hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# EXHIBIT 9

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION

                                   )    Case No. 19-34054-sgj-11
In Re:                             )    Chapter 11
                                   )
HIGHLAND CAPITAL                   )    Dallas, Texas
MANAGEMENT, L.P.,                  )    Thursday, January 14, 2021
                                   )    9:30 a.m. Docket
         Debtor.                   )
                                   )    - MOTION TO PREPAY LOAN
                                   )       [1590]
                                   )    - MOTION TO COMPROMISE
                                   )       CONTROVERSY [1625]
                                   )    - MOTION TO ALLOW CLAIMS OF
                                   )       HARBOURVEST [1207]
_____    )

                     TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:             Jeffrey Nathan Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

For the Debtor:             John A. Morris
                            Gregory V. Demo
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For the Official Committee  Matthew A. Clemente
of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                            One South Dearborn Street
                            Chicago, IL  60603
                            (312) 853-7539

For CLO Holdco, Ltd.:       John J. Kane
                            KANE RUSSELL COLEMAN LOGAN, P.C.
                            901 Main Street, Suite 5200
                            Dallas, TX  75202
                            (214) 777-4261
```

2

APPEARANCES, cont'd.:

| | |
|---|---|
| For James Dondero: | John T. Wilson |
| | D. Michael Lynn |
| | John Y. Bonds, III |
| | Bryan C. Assink |
| | BONDS ELLIS EPPICH SCHAFER |
| |   JONES, LLP |
| | 420 Throckmorton Street, |
| |   Suite 1000 |
| | Fort Worth, TX  76102 |
| | (817) 405-6900 |

For Get Good Trust and          Douglas S. Draper
Dugaboy Investment Trust:     HELLER, DRAPER & HORN, LLC
                              650 Poydras Street, Suite 2500
                              New Orleans, LA  70130
                              (504) 299-3300

For HarbourVest, et al.:      Erica S. Weisgerber
                              M. Natasha Labovitz
                              Daniel E. Stroik
                              DEBEVOISE & PLIMPTON, LLP
                              919 Third Avenue
                              New York, NY  10022
                              (212) 909-6621

For Highland CLO Funding,     Rebecca Matsumura
Ltd.:                         KING & SPALDING, LLP
                              500 West 2nd Street, Suite 1800
                              Austin, TX  78701
                              (512) 457-2024

Recorded by:                  Michael F. Edmond, Sr.
                              UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
                              (214) 753-2062

Transcribed by:               Kathy Rehling
                              311 Paradise Cove
                              Shady Shores, TX  76208
                              (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1        <u>DALLAS, TEXAS - JANUARY 14, 2021 - 9:41 A.M.</u>

2            THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas, Dallas Division, is

4   now in session, the Honorable Stacey Jernigan presiding.

5            THE COURT:  Good morning.  Please be seated.  All

6   right.  We're a little late getting started because we had

7   lots of reading material for the Court today.  All right.

8   This is Judge Jernigan, and we have a couple of Highland

9   settings.  The HarbourVest matters are the primary thing we

10  have set today, and then we also have a Debtor's motion

11  pursuant to protocols for authority for Highland Multi-Strat

12  to prepay a loan.

13      All right.  Well, let's get a few appearances.  First, for

14  the Debtor team, who do we have appearing this morning?

15            MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

16  Pomerantz, John Morris, and Greg Demo here on behalf of the

17  Debtor.

18            THE COURT:  Okay.  Thank you.

19      All right.  We have objections on HarbourVest.  Who do we

20  have appearing for Mr. Dondero this morning?

21            MR. WILSON:  Your Honor, it's John Wilson, and I'm

22  also joined by Michael Lynn, John Bonds, and Bryan Assink.

23            THE COURT:  Okay.  I'm sorry.  Could -- the court

24  reporter does yeoman's work in this case.  Let me just make

25  sure we got all three of those names.  Say again, Mr. Wilson.

1          MR. WILSON:  John Bonds and Michael Lynn and Bryan

2     Assink.

3          THE COURT:  Oh, okay.  So, see, I thought I heard

4     somebody Wilson in all of that, which was why I was pressing

5     the issue.

6        All right.  Is Mr. Dondero present on the video for

7     today's hearing?

8          MR. WILSON:  I believe he is, Your Honor.

9          THE COURT:  Mr. Dondero, could you confirm that you

10    are out there?  (No response.)  Okay.  My court reporter says

11    he sees the name out there.  Is he in your office?

12         MR. WILSON:  Your Honor, he is appearing remotely

13    from my office.  I'm not sure exactly where he's appearing

14    from.

15         THE COURT:  Okay.  Well, Mr. Dondero, if you're out

16    there and you're speaking up to confirm you're present, we're

17    not hearing you.  Maybe your device is on mute.  So please

18    unmute yourself.

19       (No response.)

20         THE COURT:  All right.  I'm going to take some other

21    appearances and you -- you need to try to communicate with

22    your client and let him know I need to confirm he's present.

23    Okay?

24       All right.  Meanwhile, let's go to our other Objectors.

25    CLO Holdco.  Who do we have appearing today?

1       MR. KANE:  John Kane; Kane Russell Coleman & Logan;

2  on behalf of CLO Holdco.

3       THE COURT:  All right.  Thank you, Mr. Kane.

4    We had an objection from Dugaboy Investment Trust and Get

5  Good Trust.  Who do we have appearing?

6       MR. DRAPER:  Douglas Draper, Your Honor, for -- for

7  Draper.

8       THE COURT:  All right.  Thank you, Mr. Draper.

9    All right.  I think those were the only written objections

10 we had.  Mr. Pomerantz, do you confirm, we don't have any

11 other objectors for the motions set, correct?

12      MR. POMERANTZ:  Your Honor, there was those three.

13      THE COURT:  I'm sorry.  I didn't catch your full

14 sentence.

15      MR. POMERANTZ:  That is correct, Your Honor.  There

16 were three objections to the motion.

17      THE COURT:  Okay.  Mr. Clemente, you're there for the

18 Creditors' Committee?

19      MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

20 Clemente on behalf of the Official Committee of Unsecured

21 Creditors.

22      THE COURT:  All right.  Good morning.  Thank you.

23 All right.  We have a lot of other folks on the video.  I'm

24 not going to go ahead and take a roll call of other lawyers.

25      MS. WEISGERBER:  Your Honor?

```
1              THE COURT:  Yes?

2              MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

3   Weisgerber from Debevoise on behalf of HarbourVest.

4              THE COURT:  Okay.

5              MS. WEISGERBER:  And I'm joined by Natasha Labovitz

6   and Dan Stroik --

7              THE COURT:  Okay.

8              MS. WEISGERBER:  -- from Debevoise as well.

9              THE COURT:  Thank you.  I was neglectful in not

10  getting your appearance, because, of course, you're at the

11  front and center of this motion to compromise, and I did see

12  that you filed a reply brief yesterday afternoon.  Okay.

13  Thank you.

14      All right.  Do we have -- do we have Mr. Dondero on the

15  line?  I'm going to check again.

16      (No response.)

17             THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18  so please unmute your device.

19             MR. WILSON:  Your Honor, it appears to me that Mr.

20  Dondero's device was unmuted as soon as you asked if he was

21  available.  I sent him a communication a second ago asking if

22  he's having technical difficulties.  I have not received a

23  response, so I --

24             MR. DONDERO:  Hello.  Can anybody hear me?

25             THE COURT:  Oh.
```

1          MR. WILSON:  Okay.  I hear him.

2          THE COURT:  Mr. Dondero?

3          MR. DONDERO:  Hello?

4          THE COURT:  Is that you?

5          MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

6    everything since the beginning.  It's just we've had technical

7    difficulties.  I couldn't use the Highland offices.  We've

8    been trying to set up something else.

9          THE COURT:  All right.

10         MR. DONDERO:  But I'm on now, if -- yes.

11         THE COURT:  All right.  Very good.  Well, I'm glad

12   we've got you.

13      All right.  Well, Mr. Pomerantz, how did you want to

14   proceed this morning?

15         MR. POMERANTZ:  Your Honor, we could take up the

16   HarbourVest motion first, and I will turn it over to John

17   Morris.  He and Greg Demo will be handling that.  And then

18   after that we can handle the other motion, which is unopposed.

19         THE COURT:  All right.  Mr. Morris?

20         MR. KANE:  Your Honor, this is -- sorry.  This is

21   John Kane for CLO Holdco.  Just very briefly, if I may.  And

22   this will affect, I think, the Debtor's case in chief, so I'll

23   expedite things a little bit, I believe.

24      CLO Holdco has had an opportunity to review the reply

25   briefing, and after doing so has gone back and scrubbed the

1    HCLOF corporate documents.  Based on our analysis of Guernsey

2    law and some of the arguments of counsel in those pleadings

3    and our review of the appropriate documents, I obtained

4    authority from my client, Grant Scott, as Trustee for CLO

5    Holdco, to withdraw the CLO Holdco objection based on the

6    interpretation of the member agreement.

7         THE COURT:  All right.  Well, thank you for that, Mr.

8    Kane.  I think that -- that eliminates one of the major

9    arguments that we had anticipated this morning.  So, thank you

10   for that.

11       Any other housekeeping matters that maybe someone had that

12   I didn't ask about?

13        MS. MATSUMURA:  Yes, Your Honor.  This is Rebecca

14   Matsumura from King & Spalding representing Highland CLO

15   Funding, Ltd.  I just wanted to put on the record, we -- our

16   client had requested that some of its organizational documents

17   be filed under seal.  But we have given permission for the

18   parties to present the relevant excerpts, to the extent it's

19   still relevant after Mr. Kane's announcement, in court.  And

20   we'd just ask that the underlying documents remain sealed, but

21   we're not going to object if they show them on a PowerPoint or

22   anything like that.

23       So, to the extent that you had that on your radar, I just

24   wanted to clear that up for the proceedings.

25        THE COURT:  All right.  Well, I did sign an order

1  late last night.  I don't know if it's popped up on the

2  docket.

3          MS. MATSUMURA:  Yes, Your Honor.  That's what this

4  referred to.  That was what -- these are the documents that

5  were being sealed.  And so I just wanted to note, if you --

6  you know, if the Debtor puts up an excerpt of those documents

7  and you're like, wait a minute, didn't I seal those, that we

8  were the party that requested them be under seal and we're

9  fine with them being shown in court, as long as the underlying

10  documents aren't publicly accessible.

11          THE COURT:  Okay.  Got you.  Thank you.

12      All right.  Any other housekeeping matters?

13          MR. MORRIS:  Yes, Your Honor.  This is John Morris

14  from Pachulski Stang for the Debtor.  Good morning.

15          THE COURT:  Good morning.

16          MR. MORRIS:  The only other matter that I wanted to

17  raise, and I can do it now or I can do it later, or Your Honor

18  may tell me that it's not appropriate to do at this time, is

19  to schedule the Debtor's motion to hold Mr. Dondero in

20  contempt for violation of the TRO.

21          THE COURT:  All right.  Well, let's do that at the

22  conclusion today.  And please make sure I do it.  I think I

23  was going to address this last Friday, and we went very late

24  and it slipped off my radar screen.  But I did see from my

25  courtroom deputy that you all were reaching out to her

1  yesterday to get this set, and then Mr. Dondero's counsel

2  reached out to her and said, We're going to file an objection

3  to a setting next Wednesday, or I think you had asked for a

4  setting next Tuesday or Wednesday.

5           MR. MORRIS:  I did.

6           THE COURT:  And I don't -- I don't know if that

7  response/objection was ever filed last night.  I haven't seen

8  it if it was.  So, we'll -- please, make sure I don't forget.

9  We'll take that up at the end of today's matters.  All right.

10 Well, --

11          MR. MORRIS:  All right.  So, --

12          MS. WEISGERBER:  Your Honor, one last housekeeping

13 item from -- I'm joined this morning by Michael Pugatch of

14 HarbourVest, who will present some testimony this morning.  I

15 just want to confirm he's on the line and confirm no

16 objections to him sitting in for the rest of the hearing.

17          THE COURT:  All right.  Mr. Pugatch, this is Judge

18 Jernigan.  Could you respond?  Are you there with us?

19          MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20 Pugatch from HarbourVest here.

21          THE COURT:  All right.  Very good.  I think we had

22 you testify once before in the Acis matter, if I'm not

23 mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24 I can't remember.

25    All right.  So, we're going to let Mr. Pugatch sit in on

1  this.  Anyone want to say anything about that?  I consider him

2  a party representative, so I don't -- I don't think anyone

3  could invoke the Rule.

4      All right.  Very good.  Well, let's go forward if there

5  are no more housekeeping matters.

6            MR. MORRIS:  Okay.

7            THE COURT:  Mr. Morris?

8            MR. MORRIS:  Thank you.  Thank you very much, Your

9  Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10 Debtor.

11     It's a rather straightforward motion today.  It's a motion

12 under Rule 9019, pursuant to which the Debtor requests the

13 Court's authority and approval to enter into a settlement

14 agreement with HarbourVest that will resolve a number of

15 claims that HarbourVest has filed against the Debtor.

16     What I -- the way I propose to proceed this morning, Your

17 Honor, is to give what I hope is an informative but relatively

18 brief opening statement.  I'll defer to HarbourVest and its

19 counsel as to whether they want to make a presentation in

20 advance of the offer of evidence.  Any objecting party, I

21 suppose, should then be given the opportunity to present their

22 case to the Court.  Then the Debtor will call Jim Seery, the

23 Debtor's CEO and CRO.  We will offer documents into evidence.

24 I would propose then that the objecting parties take the

25 opportunity to ask Mr. Seery any questions they'd like on the

1 matter.

2     After the Debtor rests, I think HarbourVest would like to

3 put Mr. Pugatch on the stand to offer some testimony on their

4 behalf. And I think that that will conclude the case. We can

5 finish up with some closing arguments as to what we believe

6 the evidence showed, but that's the way that I'd like to

7 proceed, if that's okay with the Court.

8         THE COURT: All right. That sounds fine.

9         OPENING STATEMENT ON BEHALF OF THE DEBTOR

10         MR. MORRIS: Okay. So, as I said, Your Honor, this

11 is a -- this should be a very straightforward motion under

12 Rule 9019. The standard is well-known to the Court. There

13 are four elements to a 9019 motion. The Debtor clearly has

14 the burden of proof on each one. And we easily meet that

15 burden, Your Honor.

16     The standard, just to be clear, the first part is that we

17 have to establish a probability of success, with due

18 consideration for uncertainty of law and fact. The second one

19 is the complexity, likely duration, expense and inconvenience

20 of the litigation. The third part of the test is the

21 paramount interest of creditors. And the fourth part of the

22 test is whether or not the proposed settlement was reached

23 after arm's-length negotiations.

24     The Debtor believes that it easily meets this standard,

25 and frankly, is a little bit frustrated that it's being forced

1   to incur the expense by Mr. Dondero in going through this

2   process.

3      A plain reading, a fair reading of the economics here

4   relative to the claim shows that this is a very reasonable

5   settlement.  I don't need to go beyond that, Your Honor.  I

6   don't even need to use the word reasonable.  It surely meets

7   the lowest standard.

8      We've prepared a couple of demonstrative exhibits, Your

9   Honor.  I'm going to use them with Mr. Seery.  But I'd like to

10   just put one up on the screen now, if I may.

11      Ms. Canty, can you please put up Demonstrative Exhibit #3?

12      Demonstrative Exhibit #3 is an outline of the economics of

13   the settlement.  It includes the various pieces, the

14   components that the parties have agreed to.  And it shows, at

15   least from the Debtor's perspective, just what HarbourVest is

16   being given here.

17      Up on the screen is a demonstrative exhibit.  It has

18   citations to the evidence that will be admitted by the Court.

19   The first line shows that HarbourVest will receive a $45

20   million allowed general unsecured nonpriority claim.  And that

21   -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22   Page 2.

23      That claim is discounted by the expected recovery that

24   general unsecured creditors are supposed to get.  As of

25   November, in the liquidation analysis that was part of the

1   disclosure statement -- that's the citation in the footnote --

2   the Debtor believed that unsecured creditors were estimated to

3   recover approximately eighty-seven and a half cents on the

4   dollar.  And so we just did the arithmetic there to get to the

5   net economic value of the proposed general unsecured claim.

6       And from that, we reduced $22-1/2 million because that is

7   the net asset value of HarbourVest's interest in HCLOF, which,

8   pursuant to the settlement agreement, it will transfer back to

9   the Debtor, so that the net economic value is approximately

10  $16.8 million.

11      You will hear testimony from Mr. Seery that this number

12  is, in fact, overstated, and it's overstated because, since

13  the time the disclosure statement was filed in November, a

14  number of events have occurred that will -- that have caused

15  the estimated recovery percentage to be reduced from

16  approximately 87-1/2 percent to something lower than that.  We

17  don't have the exact number, Your Honor, but Mr. Seery will --

18  and the evidence will show that there's been more expenses,

19  that there's been some resolution of certain claims.  There's

20  been some positive issues, too.  But that number is probably

21  in the 70s somewhere.

22      And in any event, I think the point here is, Your Honor,

23  HarbourVest invested $80 million in HCLOF, which was going to

24  participate in the investment in CLOs.  They filed a claim for

25  $300 million, through treble damages and other claims.  But

 1   the net economic impact of this is going to be somewhere

 2   probably in between $12 and $14 million.  I'll let Mr. Seery

 3   give more precision to that.  And it represents less than -- a

 4   less than five percent recovery on the total claim.

 5       And we think it's important for the Court to keep that in

 6   mind.  What are the economics here?  Are we overpaying?  Is

 7   this an unreasonable settlement?  And I think the evidence

 8   will show that the Debtor is not, but that this settlement

 9   that you see before you was the product of arm's length, and

10   I'm going to go in reverse order of the four-part test under

11   9019.

12       So, the last part is whether or not the settlement, the

13   proposed settlement was the product of arm's-length

14   negotiation.  You'll hear lots of evidence that this

15   settlement that's up on the screen right now very much was the

16   product of arm's-length negotiation.

17       The third part of the test, Your Honor, is whether it

18   meets the paramount interest of creditors.  You know,

19   regrettably, Mr. Dondero is the only purported creditor who is

20   objecting here.  He may have done so through different

21   vehicles, but every objecting party here is a debtor [sic]

22   owned and controlled by Mr. Dondero.  No other creditor -- not

23   the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty

24   -- nobody is objecting to this settlement except for Mr.

25   Dondero.  And we believe that that highlights the Debtor's

1    ability to meet the third prong of the test, and that is these

2    are -- this settlement is in the paramount interest of

3    creditors.

4        Again, going in reverse, the second part of the test is

5    the complexity, duration, and expense of litigation.  There

6    will be no disputed evidence that we meet -- the Debtor easily

7    meets this prong of the test.  The evidence is going to show

8    that HarbourVest's claim is based on fraud, fraud in the

9    inducement, fraudulent statements and omissions, the kind of

10   case, Your Honor, that I'm sure you're familiar with that is

11   incredibly fact-intensive, that will be incredibly difficult

12   to navigate through.  It will be prolonged, it will be

13   expensive, because you're necessarily relying on he said/she

14   said, basically.  And so we're going to have to get testimony

15   from every person that spoke in connection with the events

16   leading up to the transaction.  So we think the second prong

17   will be easily met, Your Honor.

18       And then the last prong -- the first prong, if you will --

19   is the likelihood of success on the merits.  We think that the

20   settlement, the economic recovery that's up on the screen

21   here, which ultimately will be less than five percent of the

22   claimed amount, in and of itself shows that the settlement is

23   consistent with the Debtor's perception of its likely success

24   on the merits.  I'm certain that HarbourVest disagrees, but

25   that's okay, we're here today and that's the Debtor's view,

1   and the Court is here to assess the Debtor's business judgment

2   and whether the Debtor has properly analyzed the issues and

3   gone through the process.  And the evidence will show

4   conclusively that it will.  That it has.

5       Mr. Seery will testify at some length as to the risks that

6   he saw.  I think that you'll hear counsel for Mr. Dondero ask

7   both Mr. Seery and Mr. Pugatch a number of questions designed

8   to elicit testimony about this defense or that defense.  And

9   it's a little -- it's a little ironic, Your Honor, because,

10  really, every defense that they're going to try to suggest to

11  the Court was a valid defense is a defense that the Debtor

12  considered.  In fact, it's, you know, it's a little spooky,

13  how they've -- how they've been able to identify kind of the

14  arguments that the Debtor had already considered in the

15  prosecution of their objections here.

16      But be that as it may, the evidence will conclusively show

17  that the Debtor acted consistent with its fiduciary duties,

18  acted in the best interests of the Debtor's estate, acted

19  completely appropriately here in getting yet another very

20  solid achievement for the Debtor, leaving very few claims that

21  are disputed at this point, all but one of which I believe are

22  in the hands of Mr. Dondero.

23      So, that's what we think that the evidence will show.

24      I do want to express my appreciation to Mr. Kane for

25  reflecting on the arguments that we made with respect to the

1  ability of the Debtor to engage in the transfer or the

2  acquisition of the asset from HarbourVest.  I would -- I would

3  respectfully request that we just enter into a short

4  stipulation on the record reflecting that the Debtor's

5  acquisition of HarbourVest's interests in HCLOF is compliant

6  with all of the applicable agreements between the parties.

7      And with that, Your Honor, I look forward to putting Mr.

8  Seery on the stand and presenting the Debtor's case.

9          THE COURT:  All right.  Other opening statements?

10         OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11         MR. KANE:  Yes, Your Honor.  Sorry.  John Kane on

12  behalf of CLO Holdco.

13     In response to Mr. Morris, I'm not going to enter into a

14  stipulation on behalf of my client, but the Debtor is

15  compliant with all aspects of the contract.  We withdrew our

16  objection, and we believe that's sufficient.

17         THE COURT:  All right.  Well, I'm content with that.

18     Other opening statements?

19          OPENING STATEMENT ON BEHALF OF HARBOURVEST

20         MS. WEISGERBER:  Your Honor, Erica Weisgerber on

21  behalf of HarbourVest.

22     HarbourVest joins in Mr. Morris's comments in support of

23  the settlement, and we believe that the question of whether

24  the settlement between HarbourVest and the Debtor satisfies

25  the Rule 9019 standard is not even a close one.

1    Some Objectors have made arguments about the merits of

2    HarbourVest's claims, which is why we're here.  As Your Honor

3    will hear this morning, HarbourVest has meaningful and

4    meritorious claims against Highland, but made the business

5    decision to avoid the time, expense, and inherent risk of

6    litigation in the interest of preserving value, both for

7    itself and for the estate.

8    Today, Michael Pugatch, a managing director of

9    HarbourVest, will testify before the Court.  He'll explain

10   that HarbourVest claims against Highland arise out of certain

11   misrepresentations and omissions by Highland to HarbourVest in

12   connection with HarbourVest's purchase of an interest in

13   HCLOF, one of Highland's managed funds.  Those

14   misrepresentations and omissions, as Your Honor will hear,

15   relate to Highland's litigation with its former employee,

16   Joshua Terry, and transfers that were conducted in 2017 to

17   strip Acis of value and prevent Mr. Terry from collecting on

18   an $8 million judgment.

19   Mr. Pugatch will further explain that HarbourVest would

20   not have invested in HCLOF had it known the underlying facts

21   about those Acis transfers.

22   Mr. Pugatch will also testify that not only did

23   HarbourVest not know about those transfers, it learned about

24   those transfers when it was accused of orchestrating the

25   transfers itself in the Acis bankruptcy.  Your Honor will hear

1  that the Acis trustee sought extensive discovery from

2  HarbourVest after numerous accusations that HarbourVest was

3  behind the transfers.

4      Mr. Pugatch will also testify that Highland charged legal

5  fees for itself and its affiliates to HCLOF, essentially

6  forcing HCLOF to fund the litigation involving the Acis

7  bankruptcy and Mr. Terry.

8      In total, HarbourVest's claims for damages are over a

9  hundred million dollars in investment-related losses, lost

10  profits, legal fees inappropriately charged to HCLOF, its own

11  legal fees.  And that's before interest or trebling damages.

12      But HarbourVest stands ready to litigate its claims, but

13  following hard-fought and extensive negotiations with the

14  Debtors, the parties reached the settlement that's now before

15  the Court.  Mr. Pugatch's testimony regarding the strong

16  factual bases for HarbourVest's claims against Highland and

17  its recoverable damages will further underscore the risks that

18  the Debtors faced if they chose to litigate these claims, and

19  why this settlement is fair, equitable, and in the best

20  interest of the estate.

21          THE COURT:  All right.  Thank you, Counsel.

22      Other opening statements?

23    OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24          MR. DRAPER:  Your Honor, this is Douglas Draper on

25  behalf of one of the Objectors.  I'd like to just make a few

1   comments with respect to what I've heard and what the Court is

2   going to hear.

3       The first issue I'd like to address is the comment by

4   counsel for the Debtor that no other party has objected. The

5   9019 motion is one of the issues that this Court has to rule

6   on, whether or not there was an objection or not. So the fact

7   that this may be -- bankruptcy is not a popularity contest and

8   not an issue of who votes for what and doesn't vote. This,

9   along with the 1129(a) tests, are clearly within your

10  province, and you need to listen carefully because you'll have

11  to make your own independent analysis whether my objection is

12  correct or incorrect.

13      Two other points I'd like to make that I think are very

14  salient. Number one is, if you look at the Debtor's

15  disclosure statement, it basically took the position that the

16  HarbourVest claim is of little or no value. And lo and

17  behold, thirty days later, there's a settlement that brings

18  about a significant recovery to HarbourVest. The timing is

19  interesting, and I think the Court needs to pay careful

20  attention to what transpired between the two dates.

21      And then the last point I'd like to make is, as you listen

22  to the evidence, and what I learned abundantly clear from

23  hearing the depositions, is that the claim of HarbourVest, if

24  there is a claim at all, is probably one hundred percent --

25  should be subordinated in that it appears to arise out of the

1   purchase or sale of a security. And, again, I would ask the

2   Court to listen carefully to this because that's what it

3   appears to be and that's what the evidence is going to show to

4   the Court.

5           THE COURT: All right. Mr. Draper, let me clarify

6   something I'm not sure if I heard you say or not. Were you

7   saying that the Court still needs to drill down on the issue

8   of whether the Debtor can acquire HarbourVest's interest in

9   HCLOF?

10          MR. DRAPER: No.

11          THE COURT: Okay. I was confused whether you were

12  saying I needed to take an independent look at that, now that

13  the objection has been withdrawn of Holdco. You are not

14  pressing that issue?

15          MR. DRAPER: No, I am not. Basically, I think it's

16  the fairness of the settlement. I think the transferability

17  of the interest is separate and apart from the fairness of the

18  settlement itself. I think the fairness -- the

19  transferability was a contractual issue between two parties

20  that the Court does not have to drill down on.

21          THE COURT: All right. I have another question for

22  you. I want to clarify your client's standing. Tell me --

23  I'm looking through a chart I printed out a while back. I

24  guess Dugaboy Investment Trust filed a couple of proofs of

25  claim; is that right?

1             MR. DRAPER:  Yes.

2             THE COURT:  Okay.  What --

3             MR. DRAPER:  And objections are pending.

4             THE COURT:  Pardon?

5             MR. DRAPER:  Objections to those claims are pending

6    before the Court, Your Honor, --

7             THE COURT:  Okay.

8             MR. DRAPER:  -- and have not been litigated.

9             THE COURT:  And what about Get Good Trust?

10            MR. DRAPER:  Get Good Trust has a proof of claim also

11   that objections are pending to.  Pending.

12            THE COURT:  Okay.  I don't want to get too

13   sidetracked here, but I know standing was -- was mentioned as

14   a legal argument today.  What is the basis for those proofs of

15   claim?

16            MR. DRAPER:  The first one is, with respect to the

17   proof of claim for Dugaboy, there is an investment that

18   Dugaboy made that was then funneled, we believe, up to the

19   Debtor.  And the -- the loan that exists, we believe is a

20   Debtor loan, as opposed to a loan to the entity that we made

21   the loans to.

22        And, again, it's a matter that the Court is going to hear.

23   The claim may or may not be allowed.  It has not been

24   disallowed yet.

25        The second part to the Dugaboy ownership is we own an

1  interest in the Debtor.  And so we are, in fact, a party in

2  interest.

3            THE COURT:  Okay.

4            MR. DRAPER:  It may be a small interest, but it is an

5  interest.

6            THE COURT:  It has a limited partnership interest in

7  the Debtor?

8            MR. DRAPER:  Yes.

9            THE COURT:  Is that correct?

10           MR. DRAPER:  Yes.

11           THE COURT:  Okay.  Well, I'll move forward.  Thank

12  you.

13      Does that cover -- any other opening statements?  I think

14  that covered everyone who was -- who filed some sort of

15  pleading today.  No.

16           MR. WILSON:  Your Honor, John Wilson on behalf of --

17           THE COURT:  I'm sorry.  I'm sorry.

18           MR. WILSON:  -- Mr. Dondero.

19           THE COURT:  I missed Mr. Dondero's counsel.  I knew

20  we had visited at some point this morning.  I just got

21  confused there.  Go ahead, Mr. Wilson.

22           MR. WILSON:  No problem, Your Honor.  I was just

23  going to say that we will reserve our comments until after the

24  conclusion of the testimony.

25           THE COURT:  All right.  Very well.

1      Mr. Morris, you may call your first witness.

2           MR. MORRIS:  Thank you, Your Honor.  Before I do,

3   just two very, very quick points.

4           THE COURT:  Okay.

5           MR. MORRIS:  To be clear, Dugaboy's interest in the

6   Debtor is 0.1866 percent.  Less than two-tenths of one

7   percent.

8      Secondly, the argument that Mr. Draper just made with

9   respect to subordination is one that appears in nobody's

10  papers.  And, in fact, not only doesn't it appear in anybody's

11  papers, but Mr. Dondero, I believe, specifically took issue

12  with the fact that a portion of the consideration that

13  HarbourVest would receive would be on a subordinated basis,

14  and he would -- and I think he took the position there is no

15  basis to give them a subordinated claim.

16     So, I just wanted to point those items out to the Court,

17  not that I think either one makes a large difference today,

18  but I do want to deal with the facts.

19          THE COURT:  Thank you.

20          MR. MORRIS:  The Debtor would call -- you're welcome,

21  Your Honor.  The Debtor calls Mr. James Seery.

22          THE COURT:  All right.  Mr. Seery, welcome back to

23  virtual court.  If you could say, "Testing, one, two" so I can

24  see you and swear you in.

25          MR. SEERY:  Testing, one, two.

Seery - Direct                          26

1          THE COURT:  All right.  I heard you but I'm not yet

2    seeing your video.  Is your video turned on?

3          MR. SEERY:  Video is on.  Yes, Your Honor.

4          THE COURT:  Okay.  I see you now.  Please raise your

5    right hand.

6          JAMES SEERY, DEBTOR'S WITNESS, SWORN

7          THE COURT:  Thank you.  Mr. Morris?

8          MR. MORRIS:  Thank you, Your Honor.

9                      DIRECT EXAMINATION

10   BY MR. MORRIS:

11   Q    Good morning, Mr. Seery.  Can you hear me?

12   A    I can.  Thank you, Mr. Morris.

13   Q    Okay.  Let's just cut to the chase here.  Are you familiar

14   with HarbourVest's claims filed against the Debtor?

15   A    I am, yes.

16   Q    And did you personally review them?

17   A    I did, yes.

18   Q    Do you recall that over the summer the Debtor objected to

19   HarbourVest's claim?

20   A    Yes, we did.

21   Q    Why -- can you explain to the judge why Harbour -- why the

22   Debtor objected to HarbourVest's claim last summer?

23   A    Sure.  The HarbourVest claims, I believe there are about

24   six of them, initially were filed, and they were -- they were

25   relatively vague in terms of what the specifics of the claims

1   were.

2       So, we saw the claims but didn't, frankly, pay a lot of

3   attention to the underlying transaction that was referred to

4   in the proofs of claim and the losses that HarbourVest had

5   claimed to suffer -- to suffer with respect to their purchase

6   of securities related to HCLOF and the damages caused by the

7   Acis case.  So we filed a pretty pro forma objection.  I

8   believe it was a simply stated objection that we didn't have

9   any record that there was anything in the Debtor's books and

10  records that they had a valid claim for any amount against the

11  Debtor.

12  Q   Are you aware that HarbourVest subsequently filed a

13  response to the Debtor's objection to their claims?

14  A   Yes.  Yes, I am aware.

15  Q   And did you familiarize yourself with that particular

16  response?

17  A   I did indeed.  It was a pretty extensive response, really

18  developing the full panoply of their claims, which included

19  claims for expenses relating to the Acis case, which

20  HarbourVest viewed as being improperly charged to HCLOF by its

21  manager, which is effectively Highland.  Those expenses,

22  HarbourVest took the view, were excessive, had nothing to do

23  with the investment, and were simply a pursuit of a personal

24  vendetta against Mr. Terry and his interests by Mr. Dondero,

25  and using HCLOF's money to actually pursue those interests.

1    In addition, and this was the first time we saw that,

2    HarbourVest brought forth its claims that it was entitled to

3    effectively rescind the transaction.  And I say rescind the

4    transaction:  In security parlance, they claim that they were

5    induced by fraud, I think as most are -- to enter into the

6    transaction.

7       As most are aware, the liability limitations in the OMs

8    and the exculpation in the documents are pretty broad, and

9    HarbourVest's position was that they weren't going to be

10   subject to those limitations because the actual transaction

11   that they entered into was a fraud on them, designed by Mr.

12   Dondero, Mr. Ellington, and the Highland team.

13   Q   All right.  Let's talk about your understanding, the

14   Debtor's understanding of the factual background to

15   HarbourVest's claim.  What is your understanding of the

16   investment that HarbourVest made?

17   A   Well, HarbourVest made an investment in the Highland CLO

18   business.  The Highland CLO business was -- was Acis.  And

19   effectively, the business had been separated, but in name

20   only.  Acis was just a shell, with a few partners --

21   obviously, Mr. Terry as well -- but it was all Highland

22   personnel doing all the work.

23       And what they were trying to do with Acis was, in essence,

24   resuscitate a business that had been in a bit of a decline

25   from its pre-crisis heyday.

1    They were looking to take additional outside capital.

2    They would -- they would pay down or take money out of the

3    transaction, Highland would, or ultimately Mr. Dondero, and

4    they would -- they would seek to invest in Acis CLOs,

5    Highland's 1.0 CLOs.  And then with respect to the Acis CLOs,

6    and potentially new CLOs, but with the Acis CLOs, they'd seek

7    to reset those and capture what they thought would be an

8    opportunity in the market to -- to really use the assets that

9    were there, not have to gather assets in the warehouse but be

10   able to use those assets to reset them to market prices for

11   the liabilities and then make money on the equity.

12   Q    Do you have an understanding --

13   A    Then --

14   Q    I'm sorry.  Go ahead.

15   A    Why don't I continue?  So, the transaction, they found

16   HarbourVest as a potential investor, and the basis of the

17   transaction was that they would make an investment into Acis.

18       Shortly before the transaction, and while they were doing

19   diligence, Mr. Terry received his arbitration award.  I

20   believe that was in October of 2017.  The transaction with

21   HarbourVest closed in mid- to late November of 2017.  But Mr.

22   Terry was not an integral part.  Indeed, he wasn't going to be

23   a key man.  He had been long gone from Highland by that time.

24       What the -- I think you asked me originally what the basis

25   of their claim was.  The transaction went forward, and the

1   basis of their claim is that they really were never -- nothing

2   was disclosed to them about the nature of the dispute with Mr.

3   Terry other than in the highest-level terms; the animosity

4   with respect to which that dispute was held by Highland and

5   potentially Mr. Terry; and really, how those costs would be

6   borne and risks be borne by the investment that they were

7   making.

8        That was, in essence, the transaction and the high-level

9   view of their claim.

10  Q   Okay.  Just a few very specific facts.  Do you have an

11  understanding as to how much HarbourVest invested and what

12  they got in exchange for that investment?

13  A   Yeah.  HarbourVest invested in a couple tranches, and I

14  forget the exact dates, but approximately $75 million

15  originally, and then they added another five.  Some

16  distributions were made in the first half of 2018, putting

17  their net investment in the mid-seventies on the investment,

18  which now is worth about 22-1/2 million bucks.

19  Q   And what percentage interest in HCLOF did HarbourVest

20  acquire, to the best of your knowledge?

21  A   They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22  -- the Court is, I think, well aware of this, but to refresh,

23  is a Guernsey entity.  Not -- not atypical for structures of

24  this type to use offshore jurisdictions and sell the

25  securities under -- at least to U.S. -- can't sell them to

 1  U.S. investors unless they qualify, and these are sold under

 2  Reg S to -- to investors that otherwise qualify.  And

 3  HarbourVest was investing in that transaction through the

 4  Guernsey structure.

 5  Q    And do you have an understanding as to who owned the 50-

 6  plus percent of HCLOF that HarbourVest was not going to

 7  acquire?

 8  A    Yeah.  There's -- you can tell by the name.  HCLOF is

 9  Highland CLO Funding.  This is a Highland vehicle.  So

10  Highland owned and controlled the vehicle.  The DAF, which is

11  -- which is Dondero-controlled trusts, have the -- 49 percent.

12  Highland has, I believe, around .63-65 percent directly.  And

13  then Highland employees at the time who were involved in the

14  business owned another small percentage.

15       So the majority was going to be controlled by Highland

16  through its control of DAF and its control of the employees

17  that worked for it.  HarbourVest would be a minority investor.

18  Q    Okay.  And I believe you testified that the investment was

19  made in mid-November; is that right?

20  A    That's correct.  I think it was the 15th, may have been

21  the 17th of November.

22  Q    And do you recall when in October the Terry arbitration

23  award was rendered?

24  A    It was about a month before.  I think it was right around

25  the 20th, the 17th to the 20th.  I may be slightly wrong on

1    each of those dates.

2    Q    Okay.  What is your understanding as to what happened

3    after the issuance of the award that is the basis or at least

4    one of the bases for HarbourVest's claim?

5    A    I don't think there's -- I don't think there's any

6    dispute.  And there certainly are judicial findings.  Dondero

7    and Highland went about stripping Acis of all of its assets.

8    So, remember that Acis is not a separate standalone company,

9    in any event.  It's controlled and dominated completely by

10   Highland at the time.  But it did have contracts.  And those

11   contracts had value.

12        So the first idea was to strip out the management contract

13   and put it into a separate vehicle, which we called HCF

14   Advisor, which Highland still owns.  The second piece was to

15   strip out some valuable assets, the risk retention piece,

16   which was a loan that in essence was equity that Highland had

17   put into Acis but structured as a loan, as many of the

18   transactions we'll see down the road are, in order to deal

19   with some -- avoid taxes in any way possible.  And that

20   structure, that value moved value out of Acis for the express

21   purpose of trying to run, in essence, the Highland business

22   back in Highland.

23        Remember, as I said, Acis is just a Highland business

24   moved to a separate shell.  When Mr. Terry got his arbitration

25   award against Acis and was seeking to enforce it, it was

1  pretty straightforward, let's take all the assets -- Dondero

2  scheme -- let's take all the assets and move them back into

3  Highland so Terry can't get anything.

4  Q    And how does that scheme relate to the HarbourVest claim,

5  to the best of your knowledge?

6  A    Well, HarbourVest -- HarbourVest's position is that they

7  invested in Acis and -- and whether Acis was called Acis or

8  called Highland, it doesn't really matter; there were valuable

9  assets in the -- in the entity that they were going to be

10 investing in through the equity in these CLOs and some of the

11 debt securities in those CLOs.

12     And then the stripping out and the fraudulent conveyances

13 out of Acis caused them damages because that's what left the

14 damage to Mr. Terry.

15     The quick math on Acis, by the way, is Acis has probably

16 lost, total damages, 175 million bucks.  And that's pretty

17 easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of

18 fees charged to HCLOF.  Another five million of fees, at

19 least, incurred by Mr. Terry.  Ten million that went to Mr.

20 Terry, 15 to Highland fees, another five, plus Mr. Terry's

21 settlement in this case, over eight million bucks.

22     So HarbourVest's position, which, on a factual basis, you

23 know, is problematic for the estate, is, wait a second, we

24 invested in this vehicle with Highland.  That was supposed to

25 invest in Highland CLOs.  They were called Acis, but they were

1    Highland CLOs.  And then you went about causing tremendous

2    damage to that vehicle that we ultimately were investing in,

3    and then charge us for the pleasure.

4    Q    You used the phrase earlier "OM," I believe.

5    A    Offering memorandum.

6    Q    Offering memorandum?  Can you just explain to the Court

7    your understanding of what an offering memorandum is?

8    A    Typically, under U.S. law, and foreign jurisdictions have

9    similar laws, you have to have a document that explains the

10   securities that you're selling.  And it goes into extreme

11   detail about the securities and the risks related to those

12   securities.

13        And the idea is not to have a document that tells you

14   whether it's a good investment or a bad investment, but it's a

15   document that discloses to the potential investor all of the

16   risks with respect to that security or related to the

17   investment over the duration of the security.  It doesn't

18   predict the future, but it's supposed to make sure that it

19   gives you a very clean view of the past and a very clean view

20   of what the facts from the past are and how they would

21   implicate the future of the investment.

22   Q    And in the course of its diligence, did the Debtor have an

23   opportunity to review the offering memorandum in the context

24   of the claims that were being asserted by HarbourVest?

25   A    Oh, absolutely.  It was originally effectively -- it's an

 1    HCLOF offering memorandum.  But as I said, HCLOF was managed

 2    and controlled by Highland, and Highland originally prepared

 3    it.  And then, of course, in connection with -- with this

 4    dispute and these claims, we reviewed it, both myself and my

 5    legal team.

 6    Q    All right.

 7            MR. MORRIS:  Your Honor, the offering memorandum is

 8    on the Debtor's exhibit list, and I think this is an

 9    appropriate time to move into evidence Debtor's Exhibits A

10    through EE, all of which appear at Docket No. 1732.

11            THE COURT:  1732?

12            MR. MORRIS:  It's the Debtor's Second Amended Witness

13    and Exhibit List.

14            THE COURT:  All right.  Any objection to admission of

15    A through EE?

16            MR. DRAPER:  Douglas Draper.  No objection, Your

17    Honor.

18            THE COURT:  All right.  Mr. --

19            MR. MORRIS:  May I proceed?

20            THE COURT:  Yeah.  Mr. Wilson, did you want to

21    confirm no objection?

22        (Echoing.)

23            THE COURT:  All right.  Hearing no objection,

24    Debtor's A through EE are admitted.

25        (Debtor's Exhibits A through EE are received into

1   evidence.)

2           THE COURT:  Go ahead, Mr. Morris.

3           MR. MORRIS:  Thank you, Your Honor.  The offering

4   memorandum itself is one of the documents that we filed under

5   seal, and we did so at the request of counsel to HCLOF.  But

6   HCLOF has consented to our sharing up on the screen certain

7   very limited provisions of the document, without waiving the

8   request that the agreement otherwise be maintained under seal.

9           THE COURT:  All right.

10          MR. MORRIS:  So may I proceed on that basis, Your

11  Honor?

12          THE COURT:  You may.  Uh-huh.

13          MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14  on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15  is there a way to just expand that just a bit, Ms. Canty?

16  Thank you very much.  And if we could just scroll it up?

17  Thank you very much.  Perfect.

18       Okay.  So, Your Honor, this, as the footnote says, is an

19  excerpt from the offering memorandum that can be found at

20  Debtor's Exhibit AA.  Double A.  And this particular portion

21  of the offering memorandum is at Page 35.

22          THE COURT:  Okay.

23  BY MR. MORRIS:

24  Q   Mr. Seery, have you seen this portion of the offering

25  memorandum before?

1   A    Yes, I have.  But before I continue, I just -- I should

2   have checked.  Are you able to hear me clearly?  Am I speaking

3   too quickly or am I cutting out?  I just want to make sure.

4   I'm using a different set of audio today.

5              THE COURT:  All right.

6              MR. MORRIS:  That's fine.

7              THE COURT:  I hear you very well.

8              MR. MORRIS:  Yeah.

9              THE COURT:  So I think we're good right now.  Thank

10  you.

11             THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12  just checking.

13             THE COURT:  Okay.

14             THE WITNESS:  In response to your question, Mr.

15  Morris, yes, I have seen this before.

16  BY MR. MORRIS:

17  Q    Okay.  And can you -- did you form a view in doing the due

18  diligence as to the adequacy of this disclosure?

19  A    Yes, I did.

20  Q    Can you share your -- or share with Judge Jernigan the

21  Debtor's view as to the adequacy of this disclosure concerning

22  the litigation between Highland and Acis?

23  A    With respect to the litigation between Highland and Acis,

24  or, really, between Acis, Highland, and Highland's principals

25  and Acis's principal, totally inadequate.  The disclosure here

1   is very high-level.  And if there were no other litigation

2   going on, it might serve to suffice.  It basically says, In

3   our business, because we invest in distressed loans, there's a

4   lot of litigation around distressed investments, and that's

5   what we have.  And then it says, We've talked with the

6   investor about other things and we're -- we think that's

7   enough.

8   Q    Is there anything in this portion or anywhere in the

9   offering memorandum that you're aware of that disclosed to

10  HarbourVest that in the weeks leading up to the investment

11  Highland was engaged in the fraudulent transfer of assets away

12  from Acis?

13  A    No.  And I apologize, because I think it's -- I've

14  conflated two provisions.  This one only deals with the very

15  high-level nature of the business.  It doesn't give any

16  indication that there's any material litigation going on

17  elsewhere with respect to Acis.

18       I believe there's another provision that says, We -- we

19  have talked to -- oh, here -- I'm sorry.  It is here.

20  Shareholders have had an opportunity to discuss with Highland

21  to their satisfaction all litigation matters against Highland

22  and its affiliates unrelated to its distressed business.

23       That, in my opinion, is wholly inadequate.

24  Q    Okay.

25            MR. MORRIS:  And let's put up -- actually, let's just

1  move on.

2  BY MR. MORRIS:

3  Q    Let's go to the settlement itself.

4        MR. MORRIS:  Can we put back up Demonstrative Exhibit

5  #3?

6  BY MR. MORRIS:

7  Q    Mr. Seery, can you see that?

8  A    Yes, I can.

9  Q    Does this generally describe the net economic recovery of

10  the HarbourVest settlement based on estimated recoveries for

11  general unsecured creditors as of November 2020?

12  A    As of November 2020, it does.  And you alluded to this in

13  your opening, but to be clear, the numbers have shifted.

14  Costs have increased.  The -- so the -- effectively, the

15  numerator, in terms of distributable value that we estimate,

16  is lower.  And settlements, the denominator, have also

17  increased.  So the claims against the estate that have been

18  recognized have increased.  And that, that probably takes it

19  down closer, in our view, to about seventy cents distribution,

20  a number closer to nine to ten million, maybe a little bit

21  less.

22        However, there's also some additional value that we -- we

23  believe we will recover directly.  There are north of $150

24  million of intercompany notes owed by Dondero entities to

25  Highland.  A number of those notes are demand notes, and we've

1    already made demand.  We'll be initiating actions next week.

2    So those are -- those value, we believe, we'll recover

3    directly from Mr. Dondero and from related entities.

4        To the extent those related entities don't have value, we

5    feel very strongly about our ability to pierce the veil and

6    reach in to Mr. Dondero.  And then his assets, either his

7    personal assets or the assets that he claims are in trusts.

8        In addition, there are a significant amount of notes that

9    were extended in two -- I believe around 2017, for no

10   consideration.  Those notes were demand notes, I believe, and

11   then extended it 30 years.  So they have 2047 maturities.

12   Those were probably going to have to be subject to fraudulent

13   conveyance type actions or -- or some sort of sale at a very

14   discounted value because third parties wouldn't want long-

15   dated notes with Mr. Dondero as the counterparty for very much

16   money.

17       Those -- they defaulted on some of those parties, so we

18   effectively turned them into demand notes.  We've accelerated,

19   and we'll be bringing actions against those entities next week

20   as well.

21       So I think (garbled) have come up, so I apologize.  One

22   way of saying I think the sixteen and a half is a bit high

23   right now, based upon what we know, but the value is going to

24   be higher than our estimate a couple of weeks ago because we

25   do believe we'll be able to recover on the notes.

Seery - Direct                              41

1      One additional caveat, just to be fully transparent here.

2   This summary with the 16.8 doesn't include the subordinated

3   piece of this -- of this claim and our resolution.  That --

4   recovery of that piece will be dependent upon the success of

5   litigations.

6      In order for the subordinated piece to get paid, all

7   general unsecured claims in Class -- Classes 7 and 8 will have

8   to be paid in full.  And then -- and then the subordinated

9   class in Class 9, which we believe UBS will have a piece of,

10  and HarbourVest will have a piece of by this settlement, those

11  will be able to recover, and those will be based upon other

12  claims of action against -- primarily against related parties.

13  Q    And then that last point, is that what's reflected in

14  Footnote 3 on this page?

15  A    That's correct, yes.

16  Q    Okay.  And just for the record, there's a reduction in

17  value of $22-1/2 million.  Do you see that?

18  A    Yes.

19  Q    And can you just explain to the Court what that is and how

20  that value was arrived at?

21  A    Yes.  I may be getting slightly ahead of you, Mr. Morris.

22  But to give the Court a reflection of the transaction -- and

23  we can go into the details in a moment -- ultimately, the

24  transaction we structured we think is very fair both

25  economically to the Debtor, but there -- there is some

1   complexity to it to satisfy some of HarbourVest's concerns

2   that they be able to effectively rescind the transaction, at

3   least from an optical perspective.  Value was important, but

4   optics were as well.  The twenty-two and a half is the current

5   -- actually, the November value of HCL -- the HarbourVest

6   interests in HCLOF.  And that's based upon Highland's

7   evaluation of those interests.

8        So we do believe that that is a fair value as of that

9   date.  It has not gone done.  It hasn't gone up explosively,

10  either, but it hasn't gone down.  We think that's good, real

11  value.  That value is in the Acis CLOs, the equity in those

12  CLOs, which is 2 through 6, that we -- we will be working with

13  the HCLOF folks to get Mr. Terry to monetize those assets and

14  those longer-dated CLOs.

15       In addition, I think it's 85 percent of the equity in Acis

16  7 -- Acis 7 is managed by Highland -- that is also beyond its

17  reinvestment period.  And in talking to the directors -- and

18  they're new directors, and I'll get to that in a minute, for

19  HCLOF -- they'll seek to push Highland, which is the

20  reorganized Highland, to monetize that asset, with due regard

21  to fair value.

22       In addition, Harbour -- HCLOF owned a significant amount

23  of the preferred or equity pieces, if you will, in the

24  Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25  really CLOs.  Those are effectively closed-end funds with

1   illiquid assets, primarily illiquid assets in them.  We've had

2   some dispute in front of the Court about selling the liquid

3   assets in them, which we can go into it another time.  Those

4   are being liquidated in the market at fair value.

5       But HCLOF also is a significant holder of those preferred

6   shares, and those directors would -- have indicated to me that

7   they would like to see those interests also monetized.

8   Q    All right.  Let's shift gears for a moment to talk about

9   the diligence that the Debtor did before entering into this

10  agreement.  Can you just describe for the Court generally the

11  diligence that was undertaken at your direction?

12  A    Well, when we first received the reply to our objection,

13  we dug into that reply and the specifics in it very

14  aggressively.  So we reviewed all of the underlying documents

15  related to the original transaction.  We discussed with

16  counsel the legal basis for the HarbourVest claims.  We

17  interviewed our own HCMLP employees who were involved in the

18  transaction and tested their recollection, specifically around

19  who dealt with HarbourVest, who had the discussions with

20  HarbourVest, what was disclosed to HarbourVest with respect to

21  the Terry dispute and the Acis litigation.

22      We also had done, as I think the Court is well aware from

23  prior 9019 testimony, extensive work around the transfers and

24  the issues related to Acis.  So we were familiar with their

25  impact on HCLOF.

1    We also did extensive work valuing the remaining HCLOF

2  interests to get a good feel of not only how much HarbourVest

3  originally invested, but how much they actually lost in this

4  transaction.  And as I said, their original investment was

5  around, in total, in two tranches, about $80 million, of which

6  they got about $5 million back, and they've lost $22 million.

7  So it -- I mean, remaining with $22 million.  So they've lost,

8  you know, in excess of $50 million.

9  Q    Do you recall whether the Debtor reviewed and analyzed all

10  of the documents that were cited in HarbourVest's response to

11  the Debtor's objection to the HarbourVest proofs of claim?

12  A    Yeah.  I think -- I forget, to be honest, which -- exactly

13  what documents were in there.  But we went through their

14  objection with a fine-toothed comb, not only with respect to

15  the issues related to the Acis case, but also their references

16  to Guernsey law, other U.S. law, any of the documents between

17  the parties.  And obviously, as I mentioned before, the

18  offering memorandum.

19         MR. MORRIS:  Your Honor, I would just note for the

20  record that Debtor's Exhibits I through X are all of the

21  documents that are cited in HarbourVest's response to the

22  Debtor's objection to the HarbourVest proofs of claim, and

23  those are the documents that Mr. Seery just referred to.

24         THE COURT:  All right.

25         MR. MORRIS:  Just, they're in evidence now, and I

Seery - Direct                                45

1  just wanted the Court to understand why they're in evidence.

2           THE COURT:  Okay.  Thank you.

3           MR. MORRIS:  You're welcome.

4  BY MR. MORRIS:

5  Q    Let's talk about the Debtor and whether or not it had or

6  has any viable defenses.  Did the Debtor form any views as to

7  whether or not it had any defenses to the HarbourVest claims?

8  A    Yes, we did.

9  Q    Can you describe for the Court the defenses that were

10 reviewed and analyzed by the Debtor?

11 A    Yeah.  I think we -- we had very significant defenses.

12 So, first and foremost, with respect to the original proof of

13 claim, as I mentioned earlier, it alluded to the expenses and

14 the overcharge.  And I think with respect to the 15 million of

15 fees that were charged to HCLOF by Highland, we didn't have a

16 lot of defenses to that claim.

17      It's pretty clear, by any fair view of the Acis case, that

18 HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19 had no real responsibility for fighting with Acis and Josh

20 Terry and shouldn't have been charged those fees.  I don't --

21 I don't think there's a legitimate investor that would

22 actually think that that was an appropriate amount to be

23 charged to a fund.

24      However, the claim was not as broad -- the proof of claim

25 was not as fulsome in terms of discussing and only vaguely

Seery - Direct                                    46

1   referred to other damages.  So we did -- we did, as a

2   threshold matter, think about whether we could argue that it

3   was time-barred because they had not met their obligations to

4   fully disclose under the proof of claim.

5       Secondly, we considered the defenses to the overall claim

6   of fraudulent inducement.  Our perspective was that if we

7   could stop the claim of fraudulent inducement, the damages

8   would likely be limited to the 15 and maybe some -- some other

9   damages.  With respect to the 15, again, the problem that we

10  had when we got past -- past motions for summary judgment is

11  the factual predicate for our defense was going to be that we

12  divulged these things to HarbourVest and that they did not

13  reasonably -- it was -- reasonably rely on some failure to

14  divulge because they're a sophisticated investor.

15      The problem with that defense is that our witnesses, which

16  really would have primarily been Mr. Dondero and Mr.

17  Ellington, and one other employee who runs the CLO business,

18  Mr. Covitz, would not be pretty good.  They've been -- two of

19  them have been in front of this Court and they're not viewed

20  favorably and their testimony would be challenged and

21  potentially suspect.

22      So that gave us a real focus on trying to make sure that

23  we could, if we had to litigate, that we would litigate around

24  the fraudulent inducement.

25      As I said, reasonable reliance, what was disclosed, lack

1   of digging into the public record, because you don't have to

2   go far on Google to find "fraud" within two words of

3   "Highland," and the tremendous, you know, litigious nature of

4   Highland.  You know, even at that point, when this investment

5   was made, aside from Mr. Terry's arbitration, which by that

6   point, at least by the time (inaudible) was public, there was,

7   you know, significant public disclosure around the Credit

8   Strat and the litigation, the Crusader litigation, the UBS

9   litigation, the, gosh knows, the Daugherty litigation.

10       So our defense was going to be that you should have

11  figured this out, you're a sophisticated investor, and you

12  should have been able to figure out that there was significant

13  risk that, with respect to Mr. Terry, that Mr. Dondero would

14  not stop litigating and that those costs would put significant

15  risk on the investment.

16       The problem with that, as I mentioned earlier, is that the

17  OM is wholly deficient.  If you have a typical risk factor in

18  the offering memorandum, you would have disclosed that there

19  was a litigation with Mr. Terry, a former partner in the

20  business, and that the Debtor had no intention of settling it.

21  There was no intention of settling.  That litigation would go

22  on.  It could go on for years and it could result in

23  bankruptcy or attachments and other risks to the business, and

24  that the investor should be fully aware that the Offeror does

25  not intend to be involved in any -- or the manager, in any

Seery - Direct                                    48

1    settlement with Mr. Terry, and the fact it undermined the

2    investment.  That wasn't there.

3         But that was our preliminary focus, to try to stop fraud

4    in the inducement.  And then we -- we had specific facts

5    related to that.  You know, once they knew about the

6    bankruptcy in HarbourVest of -- I'm sorry, of Acis,

7    HarbourVest made a second funding, which was there was a -- it

8    was an initial $75 million draw, and then a second, I believe,

9    about a $5 million draw, which was in -- I believe in

10   February.  And they made it without -- without objection, and

11   that was after the commencement of the bankruptcy.

12        In addition, they were -- they were active in the

13   bankruptcy, so the -- some of the things that happened in the

14   bankruptcy, there were many opportunities to settle that case,

15   from our examination, all of which were turned down to -- by

16   Mr. Dondero.  But you don't see HarbourVest pounding the table

17   to settle, either, either with respect to the Oaktree

18   transaction or any other transaction.

19        Now, HarbourVest's defense to that is, well, we were

20   taking advice and all of our information from Highland, and we

21   were getting that information directly from senior folks at

22   Highland why -- what the value was and why we shouldn't do

23   those things.  We thought that that would mitigate some of the

24   arguments that -- some of the damages that we might have, I'm

25   sorry, if we -- if we lost.

Seery - Direct                                  49

1        But the focus at that point, you know, our legal strategy,

2   was can we stop HarbourVest at the very forefront to say,

3   You've got to come into the factual realm and get out of the

4   fraud in the inducement realm.  And then the defenses and the

5   exculpations and the liability limitations in the documents

6   would also come into play.

7        So that -- those are some of the defenses that we focused

8   on and our analytical thinking around them.

9   Q    So, if the Debtor had viable defenses, why is it settling?

10  A    Well, this is a significant claim.  And we -- we looked at

11  it with respect to both the impact on the case, but, really,

12  the merits of the claim.

13       As I said, there's really little dispute that the legal

14  fees should not have been charged to HarbourVest.  We think

15  based upon the testimony in Acis, the suspect credibility of

16  those who would have been our witnesses, and the experience in

17  Acis that the Court has had in terms of the completely hell-

18  bent on litigation, it would be hard for anyone to justifiably

19  defend those fees being charged.  So, as an initial matter, we

20  had exposure there.

21       In addition, if HarbourVest got by our defense of -- was

22  able, for example, to claim fraud in the inducement, then we

23  were open to significant damages.

24       We really didn't put much value, frankly, on the RICO part

25  of it.  We think that that's waved around often to show treble

Seery - Direct                          50

1  damages.  Although in this case certainly somebody could lay

2  out the predicate acts and put forth a RICO-type argument, we

3  just didn't think that that had real merit in this commercial

4  dispute, even with a fraud claim.

5      But even without the trebling of the damages, there's no

6  dispute that HarbourVest lost more than $50 million in this

7  investment.  You know, we -- we thought about that risk as

8  well.

9      In addition, because the case would really be fact-based,

10 even if we had a high degree of confidence based upon our

11 discussions with our employees and the factual testimony, it

12 was going to be expensive to litigate this case, and time-

13 consuming.

14     And so we looked at the economic value, the potential

15 risks, and the actual value that we were giving up, and found

16 this to be an extremely, extremely reasonable settlement.

17     Importantly, and I think what drove it, you -- one of --

18 one of the things that drove it is another one of our defenses

19 on why, notwithstanding their -- what they held out as

20 meritorious claims, I don't think HarbourVest really wanted to

21 publicly litigate this claim.  And we were aggressive in our

22 discussions with HarbourVest of how we would litigate it,

23 which would be quite publicly.

24     Now, that may or may not be fair, but that does put risk

25 on the counterparty.  And so I think that helped drive the

1  settlement.

2      In addition, the structure of the settlement we think is

3  extremely favorable to the Debtor and to the estate because,

4  rather than taking the full claim and putting it into a senior

5  unsecured position, we have bifurcated it.  We did think about

6  whether this was a claim that could be subordinated under 510.

7  There won't be any arguments, I would be surprised if there's

8  arguments today that we didn't actually give to the Highland

9  employees who have given them to Mr. Dondero's respective

10  counsel.

11      We did structure it in a way that we thought gave

12  HarbourVest the opportunity to effectively claim a rescission,

13  even though that's not really what it is, and then be able to

14  claim that their recovery is based on the bankruptcy, which it

15  is, but not really dilute all the other stakeholders in the

16  case.

17      (Pause.)

18          THE COURT:  Mr. Morris?  Anything else?

19          MR. MORRIS:  I can hear you, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  I can hear you.

22          THE COURT:  Okay.  Now can you --

23          MR. MORRIS:  I got cut off from Mr. Seery for a

24  moment.

25          THE COURT:  Okay.

1    BY MR. MORRIS:

2    Q    Okay.  I appreciate that.  Are you done giving the

3    Debtor's basis for entering into this settlement, Mr. Seery,

4    if you can hear me?

5    A    I think so, but I think as the Court has probably seen, I

6    can go on.

7    Q    Yes.

8    A    So I will try to be -- I'll try to be more concise.  But

9    this was a -- this was a difficult settlement.  We felt good

10   about our defenses.  Felt that we could -- we could try them.

11   But it would be extremely expensive, time-consuming, and there

12   would be a lot of risk.  And settling at a level which we

13   believe is actually below the damages that were clearly caused

14   only by the fees was a -- was a -- is a -- is a very

15   reasonable settlement.

16   Q    Okay.  Let's just talk about the process by which we got

17   to the settlement.  Do you recall generally when the

18   settlement negotiations have -- were commenced?

19   A    I believe it was -- was late summer, early -- early fall.

20   Q    Okay.  Before I move on, I just want to go back to the

21   Acis matter that you were talking about, one last issue.  Do

22   you know how, if at all, the injunction that was entered in

23   the Acis bankruptcy impacted or related to the HarbourVest

24   claims?

25   A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

1    think there's an argument, and we analyzed it thoroughly, that

2    the injunction effectively caused a lot of the damages.

3    Because if you look at the values of the equity that

4    HarbourVest had, the -- and HCLOF had in the CLOs, it went

5    down dramatically after the Trustee in the Acis case took over

6    and then subsequently, when the case was reorganized and Mr.

7    Terry took over, you know, with Brigade as the sub-advisor.

8        Now, that would -- you know, we would -- we could

9    certainly attempt to throw, in our defense, the causation at

10   Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's

11   retort is that none of this would have occurred but for the

12   burn-it-down litigation that Mr. Dondero engaged in with

13   Highland.

14       In addition, in Mr. Terry's defense, you know, he did try

15   multiple times with HCLOF, tried to petition, if you will, the

16   HCLOF entity to -- and directors, former directors, to reset

17   the CLOs to make them more economically viable, based upon the

18   current level of asset returns versus the debt costs in the

19   CLOs.  And that was rejected by the HCLOF and the Debtor as

20   the controlling party of HCLOF.  So, we thought about those

21   risks.

22       You know, similarly, the economic values in Acis 7 went

23   down pretty significantly from that date as well.  So I think

24   there's -- there are some defenses, but that's really Mr.

25   Terry's issue, not our issue.  So we thought about those

1  issues, we analyzed them, and we certainly did all the work

2  around month-to-month reductions in NAVs and how different

3  events in the Acis case might have -- might have caused those

4  and was that some sort of break from the original

5  transgression that HarbourVest claims, which was the

6  fraudulent inducement.

7  Q    Do you recall that in November HarbourVest's motion under

8  3018 was scheduled to be heard?

9  A    Yes.

10 Q    And can you just tell the Court your understanding of what

11 the 3018 motion was about?

12 A    Well, the 3018 motion was going to be on voting.  And we

13 took the view that it really was not -- it shouldn't have been

14 that big an issue and HarbourVest should have been content

15 with just taking their actual losses of roughly a $50-$60

16 million claim for voting purposes and then we would move on.

17     HarbourVest was very insistent that they have a $300

18 million claim, because they took the position -- and with

19 extensive documentation; not only the pleadings they filed,

20 but also detailed decks that were prepared by their counsel,

21 which they had presented to us on the merits of their claim --

22 that they were going to litigate for -- the 3018 and for the

23 full $300 million value.

24     And that became the genesis, if you will, of the

25 negotiations to settle.

1      So, we started talking about the 3018.  It was very

2   contentious.  My apologies to Ms. Weisgerber and her counsel,

3   her partners, because it was a significant and contentious

4   negotiating call.  But the reasons for that I think were that

5   -- their insistence on litigating the 3018 and our view that

6   this was just, you know, another -- another of a series of

7   delays and costs in this case that we really were hoping to

8   avoid.

9      That led to Mr. Pugatch and I stepping away from counsel,

10  no offense to counsel, you know, ours and his, to begin

11  negotiations around the potential for a settlement.  First, it

12  started with a 3018, and then, you know, argued that we would,

13  if we got past the 3018, we were going to litigate this,

14  because we effectively had -- thought we could get everyone

15  else done at -- in and around that time.  And I think we were

16  also probably a little bit optimistic about UBS at that time

17  and the mediation, which subsequently we have settled.  But

18  that was the genesis of those settlements.

19  Q   And how did the structure, how did the Debtor and

20  HarbourVest derive at the structure whereby there is a general

21  unsecured claim, there is a subordinated piece, and there's

22  the takeback of the HCLOF interest?

23  A   Well, as I outlined, we -- we aggressively set forth our

24  various defenses.  Their position was that they -- they should

25  never have been in this transaction before.  And they --

Seery - Direct                              56

1   HarbourVest is, in essence, a fund of funds, and they have

2   investors, and it certainly wouldn't be their, I'm sure, the

3   best-performing asset in their portfolio, to have made this

4   investment and lost $50 million over this period of time.  So

5   they felt strongly that they should never have been in this

6   investment, and but for the failure to disclose and the

7   improper disclosures, they would not have been in this

8   investment.

9        So, optically, getting out of it was important to them,

10  and that led to our idea and construction of a subordinated

11  claim and the transfer of the HCLOF interests to the estate.

12       Importantly, the HCLOF interests, as I mentioned, are --

13  the investments are in the Acis CLOs controlled by Acis and

14  Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15  the Acis 7.

16       So we were keenly focused on, if we were going to get that

17  interest, would we then have the majority control in HCLOF,

18  which we will, and would we be able to drive the recoveries,

19  as opposed to what Highland typically does in these

20  investments is use other people's money, drive down the value,

21  and then try to buy back the interest on the cheap.

22  Q    Just in terms of timing, because I think there was a

23  suggestion in one of the openings that there was something

24  untoward about the timing here:  At the time the liquidation

25  analysis was prepared on November 24th, had the Debtor reached

Seery - Direct                    57

1  any agreement in principle with HarbourVest?

2  A    If we had, it would have been reflected, so I don't -- I

3  don't think we were agreed by then.  I don't recall the

4  specific dates, but if we had, it would have -- it would have

5  been reflected.

6  Q    If I can refresh your recollection that the motion was

7  filed on December 24th, does that help form your understanding

8  or refresh your recollection that there was no agreement in

9  principle on November 24th?

10 A    Yeah.  Well, I'm quite sure there was no agreement in

11 principle or we would have reflected it minimally by a

12 footnote.  There's -- there's no chance.  It's a material

13 reduction in the claims pool that we were previously telling

14 people that, at least for purposes of distribution, like UBS

15 and a couple others we said we thought we would get to zero

16 on.  So we didn't calculate in that amount.  So I'm quite sure

17 we didn't have a deal when we filed the disclosure statement.

18      In terms of the timing, anyone who's done this business

19 for any degree of time knows that the crucible of bankruptcy

20 brings people to the settlement when they see something

21 happening in the case, and not before.  I think HarbourVest

22 looked at our -- this is my supposition -- HarbourVest looked

23 at our plan, our ability to get this done, our settlement with

24 Redeemer, our settlement with Mr. Terry and Acis, and saw that

25 this plan was coming together, and if they didn't think about

1   the settlement, they were going to think about not only the

2   risks that we laid forth for them with respect our defenses,

3   but also the opportunity to litigate with the Claimant Trustee

4   over a long period of time, which couldn't have been

5   particularly appetizing.

6   Q    Can you describe for the Court the role played by the

7   independent board of Strand, the general partner of the

8   Debtor, in analyzing and participating in the approval

9   process?

10  A    Yes.  I think, as the Court is aware and I've testified

11  before, Mr. Russell Nelms and Mr. John Dubel are fellow

12  independent directors with me, appointed pursuant to the Court

13  order.  They are kept abreast of every detail, and -- along

14  the way, not just in a summary form at the end.  We have

15  reviewed and analyzed collectively each of the issues.  Mr.

16  Dubel has extensive experience in these types of litigation

17  matters.  Obviously, Mr. Nelms, from his -- both his practice

18  and his time on the bench, has a keen insight into how to

19  resolve and what the risks and benefits are from settling

20  litigation.  So I consult them every step of the way.

21  Q    And as part of this process, did the Debtor reach out to

22  the directors of HCLOF?

23  A    Yes, we did.  So, we reached out and we've had several

24  conversations on video chats with the directors.  The

25  directors of HCLOF are two new gentlemen, Mr. Richard Boleat

1    and Mr. Dicky Burwood.  They are extremely professional.  They

2    are exceptionally well-informed.  They are truly careful, and

3    I would say very experienced professional not only directors,

4    but experienced in -- in these matters, both in respect of

5    structured finance as well as these types of vehicles and

6    litigation.

7          They were appointed by the old directors, Scott and

8    Bestwick, and they have been in control.  They have outside

9    counsel, which is King & Spalding in the U.S.  They have

10   Guernsey counsel.  They have accountants and professional

11   advisors, and are being, in my opinion, exceptionally careful.

12   I've got -- very quickly developed a lot of respect for them,

13   and we consulted with them on this settlement and how it would

14   work.

15         They've been very clear that they represent HCLOF and they

16   work for the benefit of the equity, whomever owns it, and

17   taking a view that they would like to see these assets

18   monetized swiftly, with due regard to value, for the benefit

19   of the equity.

20   Q    And is it your understanding that the directors of HCLOF

21   approved of this transaction?

22   A    They -- I don't know that their approval was required.

23   It's really -- there are a number of hoops to jump through

24   under the documentation, including opinion of outside counsel

25   that we received from WilmerHale in terms of the effectiveness

1  of the transfer under the documents.  We had a negotiation

2  with -- with those directors, and making sure that we did

3  everything correct -- correctly, excuse me -- with respect to

4  the requirements for the transfer under the documents.  And

5  they've indicated their support and acknowledgement that we're

6  doing it correctly.

7      I don't know if it's fair to say they approved it.  I'd

8  just have to go check the documents.  But they certainly

9  support it.  And I think they generally support our position

10  with respect to how to move forward with the assets.

11 Q   I appreciate that.  I guess I meant approval with a small

12 a and not a capital A.

13     You mentioned WilmerHale.  Who do they represent in all of

14 this?

15 A   WilmerHale is the Debtor's outside corporate counsel, in

16 particular with respect to the fund issues that we don't

17 handle in-house.  We have significant support for fund issues

18 from the expertise of Mr. Surgent, who's been the CCO, and he

19 is also a lawyer, with respect to, you know, some of the

20 difficult fund issues that Highland has.  But when we use

21 outside counsel, we use WilmerHale for that, and they've been

22 -- they've been exceptional.

23 Q   Okay.  Just the last two points that were made in Mr.

24 Dondero's objection, I believe.  Did the Debtor overpay in

25 this settlement in order to gain the support of HarbourVest in

1   connection with its -- with the Debtor's attempt to get its

2   plan confirmed?

3   A    Not in any way.  My -- I believe the settlement is

4   extremely reasonable.  As I testified, it's -- it's less than

5   the -- the actual value going out, depending on unless there's

6   successful litigation, and there well could be, is less than

7   on a pro forma basis the fees that were taken and charged to

8   HCLOF.  We didn't do this for votes.  We will have Class 2,

9   Class 7, Class 8, and Class 9.  So I don't think that's a --

10  there's no vote purchasing, I think you called it.  No, not at

11  all.

12  Q    Yeah.  Well, on that topic, I think the phrase that was

13  used was gerrymandering.  Are you aware of the argument that's

14  been made that the subordinated claim was dropped in there in

15  order to gerrymander a positive vote for the impaired class of

16  Class 9, I believe?

17  A    In a word, I would say that's preposterous.  The -- as I

18  said, we have a number of classes that will vote for the plan.

19  The plan is -- the plan is a monetization plan.  And if -- if

20  the creditors determine that they don't want to pursue this

21  plan, we'll go forward with another -- we'll try to get

22  another plan.  We tried to have a grand bargain plan.  We

23  tried to have a pot plan, as I've testified previously.  I'm

24  quite certain that I've done more work on that than anyone

25  else, including Mr. Dondero and anybody who works for him.

Seery - Direct                          62

1  And he hasn't been willing to do that.

2      This is a -- this is a plan that's come together.  We

3  think it's going to be in the best interests of the estate.

4  That'll be confirmation next week.  Or two weeks, I guess.

5  But I don't see how this is any way related -- this settlement

6  is not any way related to the voting on that -- on that -- on

7  that plan.

8  Q    Just to put the finest point on it, is the Debtor relying

9  on Class 9 to be the impaired consenting class?

10  A    No.  I think -- I think what I've -- as I said, I believe

11  we already have the votes in Class -- I think it's 2 or 3, 7,

12  8, and -- and 9 will vote in favor as well.  So that won't be

13  an issue.

14          MR. MORRIS:  Your Honor, I have no further questions

15  of Mr. Seery.

16          THE COURT:  All right.  Pass the witness.  I'll ask

17  HarbourVest counsel first:  Do you have any questions of Mr.

18  Seery?

19          MS. WEISGERBER:  No, Your Honor.

20          THE COURT:  All right.  Thank you.

21      What about cross-examination?  Mr. Dondero's counsel?

22                      CROSS-EXAMINATION

23  BY MR. WILSON:

24  Q    Mr. Seery, how are you doing today?

25  A    I'm well, thank you.

1   Q    I'm John Wilson, and I represent Jim Dondero.  I have a

2   few questions for you today.

3        Now, the HarbourVest proof of claims were filed on April

4   8th, 2020; is that your recollection?

5   A    I believe that's correct.  I don't recall the specific

6   date.

7   Q    Okay.  And do you know when you first became aware of the

8   HarbourVest claims?

9   A    I believe it was early in the summer when we filed the

10  omnibus objection.  It may have been in late spring, shortly

11  after that.  I don't recall the specific date of the filing.

12  Q    And before the time of the filing of the omnibus

13  objection, did Highland educate itself regarding the

14  HarbourVest proof of claims?

15  A    I'm sorry, could you say that again?  I didn't quite

16  understand it.

17  Q    Before the omnibus objection was filed, did HarbourVest --

18  I'm sorry, did Highland educate itself on the HarbourVest

19  proof of claims?

20  A    Not especially, no.

21  Q    Okay.  And -- but at some point, Highland did investigate

22  those proofs of claim, correct?

23  A    That's correct.

24  Q    And when would you -- when do you recall that that

25  investigation began?

1    A    I don't recall the date, but the triggering event was

2    HarbourVest's response to our omnibus objection.

3    Q    Okay.  And that would have been filed September 11th of

4    2020?

5    A    I'll take your representation.  I don't -- I don't recall

6    the specific date.

7    Q    Okay.  And so when you began to investigate the

8    HarbourVest claims, what was your initial reaction?

9    A    My initial reaction was that the -- the larger claims that

10   they were asserting -- the fraud in the inducement, the RICO

11   -- that those claims were, in my view, attorney-made and that

12   when we dug in and did the work, we saw that HarbourVest

13   clearly lost north of $50 million on the investment.  We had

14   just started to uncover the fee issue and saw the risk we had

15   there.

16       But I thought the bulk of those claims were attorney-made.

17   Clever, but attorney-made, as opposed to what I would think

18   are more legitimate.  And so we started to develop our

19   defenses around that.

20   Q    And was your initial reaction that the HarbourVest claims

21   were largely worthless?

22   A    I think with respect to the claim around the fees, I

23   believed there was significant risk.  With respect to the

24   other claims, I thought our defenses would make them

25   worthless, yes.

1  Q   And did you ever represent to any party that the

2  HarbourVest claim was worth, at most, $5 million?

3  A   I think I represented often, including to HarbourVest,

4  that it was worth nothing.  I don't recall if I specifically

5  said $5 million.  $5 million would have been a nominal amount

6  to -- which is litigation costs.  So it may -- it may have

7  been in my models that I put in that as a settlement amount,

8  but I -- I thought that there were valid and good defenses to

9  those larger claims.

10  Q   And you recognize that HarbourVest was a large,

11  sophisticated investor, correct?

12  A   Yes.  I think they manage north of -- right around a

13  hundred billion dollars.

14  Q   And you recognize that HarbourVest routinely structured

15  complex customized investments, correct?

16  A   I believe that -- I don't know the intricate part of their

17  businesses, but as a fund of funds who does creative

18  investments, I think that they do do quite a bit of that.

19  This, I believe, was their first investment in the CLO space.

20  Q   And it was not -- or I should say, you did not believe

21  that HarbourVest was simply a passive investor in HCLOF,

22  correct?

23  A   I don't think that that's true, no.

24  Q   You don't -- you don't believe that you denied their claim

25  to be a passive investor?

1   A    Oh, I think -- I'm sure that in defense of their claims I

2   would argue that they were -- they were more than a passive

3   investor.  But it was pretty clear when you look at the

4   structure of what they invested that there was an intent that

5   they be passive on their part.  They didn't take a majority

6   interest.

7        In fact, Highland made it clear in the structure of the

8   deal that they couldn't -- it would be hard for them to get a

9   majority interest because Highland entities would control that

10  and Dondero-controlled entities or individuals would control

11  the majority.

12       I think that they -- they had hoped to be a passive

13  investor.

14  Q    But was it not your position that HarbourVest was actually

15  an active, involved investor?

16  A    I think our defense was going to be that they knew exactly

17  what was going on, that they participated, that they were

18  active, and that, indeed, that they were in and around some of

19  the subsequent issues in the Acis case.

20  Q    And you understood that HarbourVest played a material role

21  in the various outcomes in the Acis bankruptcy case, correct?

22  A    I don't believe that to be correct, no.

23  Q    Have you ever made that representation to anyone before?

24  A    Not -- not that I recall.

25  Q    Well, do you recall giving statements to a reporter named

Seery - Cross                                    67

1  Syed Khaderi?

2  A    I've never spoken to a reporter named Syed Khaderi in my

3  life.

4  Q    Well, did you participate in the preparation of statements

5  to be given to Syed Khaderi?

6  A    I've never heard of Syed Khaderi, nor have I participated

7  in any preparation of statements.  I don't know who that is.

8         MR. WILSON:  All right.  I'm going to have Bryan

9  Assink put on the screen a document.

10        And Bryan, can you go to Page 7?  Bottom of -- the top of

11  Page 7.  Well, actually, before you do that, go to the very

12  top of the document.

13  BY MR. WILSON:

14  Q    Now, Mr. Seery, are you familiar with Lucy Bannon?

15  A    Yes.

16  Q    And who is Lucy Bannon?

17  A    She is the Highland public relations person.

18        MR. WILSON:  Okay.  Now go back to Page 7.

19  BY MR. WILSON:

20  Q    Now, do you -- do you see on your screen an email of

21  September 14th from Syed Khaderi that says, Hi, Lucy, how are

22  you?

23  A    Yes.

24  Q    Have you seen this email before?

25  A    Not that I recall, no.

1   Q   All right.  It continues on that, I saw the filing on

2   Friday about HarbourVest claims against Highland for a CLO

3   investment, and I'm looking to put out a report tomorrow

4   morning London time.  Ahead of that, I wanted to check if

5   Highland would like to comment on the matter.

6          MR. MORRIS:  Your Honor, this is -- the Debtor

7   respectfully objects.  A, this document is not in evidence.

8   B, it's rank hearsay.

9          THE COURT:  Response, Mr. Wilson?

10         MR. WILSON:  Your Honor, I am attempting to

11   authenticate this document, but I'm using it in rebuttal to

12   the testimony that Mr. Seery just offered.

13         THE COURT:  All right.  I'll allow it.  Overrule the

14   objection.

15         MR. WILSON:  All right.  Thank you, Your Honor.

16   BY MR. WILSON:

17   Q   All right.  Now, if we -- and oh, that September 14th

18   date, that was three days after the September 11th date that

19   we discussed was the date that HarbourVest filed its response

20   to the omnibus objection, correct?

21   A   Yes.  If that's the date that they filed it, then I -- if

22   you're representing that, I concede that the 14th is three

23   days after the 11th.

24   Q   All right.  And if you go back to the first page of this,

25   it looks like, on the following day, Lucy Bannon sends an

1  email to you, and is that your email address,

2  jpseeryjr@gmail.com?

3  A    That's correct, yes.

4  Q    And do you recall receiving this email from Lucy Bannon?

5           MR. MORRIS:  Your Honor, I renew my objection that

6  this is hearsay.  He's not rebutting anything that Mr. Seery

7  testified to.  He testified that he'd never heard of the

8  gentleman at the bottom of the document.  There's nothing in

9  this document that rebuts Mr. Seery's testimony at all.

10          THE COURT:  Response, Mr. Wilson?

11          MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12 his statement that he hadn't -- that he hadn't heard of Syed

13 Khaderi.  My rebuttal is attempted to -- attempting to show

14 that he has made various statements that he denied.

15          THE COURT:  I'll overrule the objection.

16 BY MR. WILSON:

17 Q    All right.  So, back to this exhibit, Mr. Seery.  You

18 recall receiving this email from Lucy Bannon on Tuesday,

19 September 15, 2020?

20 A    Not specifically.  But to be clear, I recall talking to

21 Lucy Bannon about the HCMLP dispute with HarbourVest.

22 Q    Okay.  And --

23          MR. WILSON:  Bryan, can you go down to the next page?

24 Scroll down to where -- the James Seery email.

25 BY MR. WILSON:

1    Q    Do you see this email on your screen that's dated

2    September 15, 2020 at 10:33 p.m.?

3    A    Yes, I do.

4    Q    And do you recall sending this email to Lucy?

5    A    Not specifically, no.

6    Q    Well, do you deny that you sent this email to Lucy?

7    A    It appears to be my email.

8            MR. WILSON:  Your Honor, we would move to admit this

9    document into evidence as Dondero Exhibit Letter N.

10            THE COURT:  Any objections?

11            MR. MORRIS:  I would consent to the admission of Mr.

12    Seery's email, but the balance of it ought to be excluded as

13    hearsay.

14            THE COURT:  What about that?

15            MR. WILSON:  Well, Your Honor, I think that this

16    document -- and I'll get into this in a little more detail in

17    a second -- but I think this document is a combination of the

18    work product of Lucy Bannon and Mr. Seery in preparing a

19    response for the reporter who requested comment from Highland.

20            THE COURT:  Okay.  I --

21            MR. MORRIS:  Your Honor, um, --

22            THE COURT:  Go ahead.

23            MR. MORRIS:  I just -- I do question how they got

24    this document, but that's for another day.  That's number one.

25    Number two, in addition to the hearsay argument, I just --

1   relevance grounds.

2        THE COURT:  Okay.  I'll allow the portion that is the

3   communication of Seery, that portion of Exhibit N.  All right?

4        MR. WILSON:  Okay.  With due -- thank you, Your

5   Honor.  With due respect, I -- to use that portion, I need to

6   refer to the portion below it, because he says, Good to submit

7   with your final edit/revisions.  And so we need to know what

8   those final edit/revisions are, which are contained in the

9   email directly below that on the document that was four

10  minutes earlier in time.

11       THE COURT:  All right.  Fair enough.  That'll be

12  allowed.

13       MR. WILSON:  All right.  Thank you, Your Honor.

14    (James Dondero's Exhibit N is received into evidence as

15  specified.)

16       MR. WILSON:  So, Bryan, now can you scroll to the

17  next page?  Oh, actually, let's just -- let's just stop at the

18  top -- at the bottom of the page.  What's this statement?

19  BY MR. WILSON:

20  Q    So, to be clear, Mr. Seery, when -- in response to Mr.

21  Khaderi's request for information and comment, you prepared

22  actually two responses, and one of those was a statement on

23  the record attributed to a spokesperson for HCMLP or something

24  along those lines.  And then --

25       MR. WILSON:  Can you scroll down to that next page?

1  BY MR. WILSON:

2  Q    And this says -- I think part of this got cut off for some

3  reason, but it looks like the official statement is in

4  quotation marks.  It says, "We dispute the allegations made in

5  the filing and believe the underlying claims are invalid and

6  will be found to be without merit.  Our focus continues to be

7  treating all valid claims in a transparent, orderly, and

8  equitable manner, and vigorously disputing meritless in the

9  court.  That focus will assure that HCMLP's reorganization

10 process -- progress is towards an efficient and equitable

11 resolution."

12      And then below that there's another section of this email

13 that says, Background/Clarification, Not for Attribution.  And

14 do you know the purpose of this second section of the

15 response?

16 A    Do I know the purpose of that?  Yes.

17 Q    And what would that purpose be?

18 A    Ms. Bannon was speaking on background to reporters.  As I

19 said earlier, I've -- I never heard of the gentleman from

20 London.  If he's at the bottom of the email, I didn't pay any

21 mind, never heard of him.  Nor have I heard it since.  Ms.

22 Bannon didn't ever reference the specific person.

23      But she is the public relations person.  So, as I

24 testified earlier, she does communicate with the press.  And

25 as I previously testified when Mr. Morris questioned me, one

1   of our tactics and our defenses for HarbourVest was going to

2   be that we were going to be very public and aggressive about

3   the investment and it would have a negative impact or negative

4   perspective for viewers, in our opinion, about HarbourVest's

5   investment.

6   Q    All right.  Well, look with me in the middle of that

7   paragraph right after the closed parenthetical, where it says,

8   "But it's important to note the background of HarbourVest's

9   active and deep involvement in the investment of which it now

10  complains."

11       And so it was your position that HarbourVest had an active

12  and deep involvement in the investment, correct?

13  A    No.  I don't think that's correct.  Ms. Bannon prepared

14  the statement, it was a litigation defense on background, and

15  that's our -- that was our position for this purpose.  It was

16  not my view that they were active and deeply involved.  They

17  were certainly involved.  There's no doubt about it.  But they

18  got all their information, in our estimation and our research,

19  from Highland.

20  Q    But in any event, you would agree with me that four

21  minutes after receiving this email, you approved this

22  statement to go out to the reporter, correct?

23  A    No, that's not correct.  That's -- this portion is on

24  background.  That statement doesn't go out.  The previous

25  statement was the official statement.  This is the background

1  discussion that she would have.  So, no, she was not

2  authorized in any way whatsoever to send that out.  She was

3  authorized to have conversations with those general facts.

4          MR. WILSON:  Okay.  Bryan, go to the top, or the

5  bottom of the page immediately preceding that.  That's it.

6  Yes, that's it right there.

7  BY MR. WILSON:

8  Q   Now, you'll see that this email from Lucy Bannon on

9  September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10 what you think of the below.  And, again, the first would be

11 on the record and the second will be sent for information

12 purposes to ensure accuracy, not for attribution."

13     So the intent was that this -- that this entire statement

14 be sent to the reporter, correct?

15 A   I don't believe that's correct.  I think when she goes on

16 background she doesn't send them a written doc.  It's got to

17 be clear to the reporter, at least my understanding is that

18 what on background means -- I've been involved with this

19 before -- is that typically that's done orally.  I don't know

20 if she's done it in a written statement before.  I have never

21 seen that done in a written statement before.  You give the

22 official statement and then you walk the reporter through your

23 other views on background.  And you're not quoted.  And it's

24 usually attributed to a source with knowledge.

25 Q   Okay.  We'll come back to that in a minute.  The next

Seery - Cross                          75

1    sentence after the one I just read to you --

2              MR. WILSON:  Go back to where we were on the

3    background.

4    BY MR. WILSON:

5    Q   Now, we just read you the sentence that starts with, "Then

6    it's important."  The following sentence says, "HarbourVest

7    was not simply invested in HCLOF as an ignorant,

8    unsophisticated, passive investor, but was an active and

9    informed participant in the inception of its investment

10   through all of the Acis bankruptcy proceedings, and

11   HarbourVest played a material role in various outcomes related

12   to that case and its impact on HCLOF."

13        And is it -- did you not just tell me before we

14   investigated this document that HarbourVest did not play a

15   material role in the various outcomes of the Acis bankruptcy?

16   A   I don't know exactly what I said, but I think that's

17   correct, after we'd done the research on it, yeah.

18   Q   But you took the position in this email that you approved

19   to go out to a reporter that says that -- that HarbourVest was

20   an active and informed participant in the inception of -- of

21   its investment through all of the Acis bankruptcy proceedings

22   and played a material role in various outcomes related to that

23   case and its impact on HCLOF.  Can we agree with that?

24   A   Yes.

25   Q   And then the final sentence of this paragraph says that,

1  We believe that neither the facts nor the law support

2  HarbourVest's, quote, We-were-too-lazy-to-know allegations.

3      Whose words were those, "We-were-too-lazy-to-know

4  allegations"?

5  A   I don't recall.  They may be mine.  It's aggressive the

6  way I am, so that -- that may well be the case.

7           MR. WILSON:  All right.  Go -- go down to the next

8  page.

9  BY MR. WILSON:

10 Q   And with respect your comment that that second paragraph

11 would not have gone to the reporter, look at this email in the

12 middle of the page from Lucy Bannon to Syed Khaderi, September

13 16, 2020, at 1:51 a.m.  And --

14           MR. MORRIS:  Your Honor, this I will object to as

15 hearsay.  There is no witness here to testify to anything on

16 this document.

17           THE COURT:  All right.  How about that?

18           MR. WILSON:  Well, it's -- well, scroll up just a

19 little bit.  This email at the top of the page is three

20 minutes after the one in the middle of the page, where Lucy

21 Bannon is forwarding this to James Seery, saying, See below

22 for responses sent to *Creditflux*.  Will follow up with the

23 story when it runs or with any other updates.

24           MR. MORRIS:  Your Honor, these --

25           MR. WILSON:  So I think this --

1          MR. MORRIS:  These documents don't appear on the

2    witness list.  They're not being offered to impeach anything.

3    They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5    trying to rebut the statements that Mr. Seery made.  In fact,

6    he told me just a minute ago that that second paragraph would

7    not have gone out to the reporter.  However, this email from

8    Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10    questioning, with an undisclosed document, is to rebut the

11    earlier testimony he gave before you even put this exhibit in

12    front of him.

13          MR. WILSON:  I'm trying to rebut multiple statements

14    that Mr. Seery has made today, and I think it -- you know, if

15    he's going to testify that this information did not go out to

16    a reporter, I think I'm allowed to rebut that to demonstrate

17    that it did.

18          THE COURT:  All right.  Why didn't you disclose this

19    in advance?  It's feeling less and less like an impeachment

20    document the more we go through it.

21          MR. WILSON:  Your Honor, I did not -- I did not

22    actually have this document at the time we filed our witness

23    and exhibit list, but I would also say that I didn't have any

24    purpose to use it if I didn't need it for rebuttal.

25          THE COURT:  Okay.  First off, you're supposed to

Seery - Cross                              78

1  disclose all exhibits you anticipate using except those for

2  purposes of impeachment.  Okay?  Not rebuttal, to be

3  technical.

4      So, if you didn't disclose this exhibit, the only way you

5  can use it, subject to other possible objections, is if you're

6  impeaching a statement.  And I'm just saying I think we're

7  going beyond trying to impeach the original statement and now

8  we're trying to impeach statements he's made after seeing

9  portions of the document.

10     What did you mean, you didn't have this document in time

11 to disclose it?

12         MR. WILSON:  Well, I actually just received this

13 document this morning, Your Honor.

14         THE COURT:  Where did you receive it from?

15         MR. MORRIS:  From who?

16         MR. WILSON:  I -- I honestly do not know the source

17 of this document, although it was provided to me by my client.

18         MR. MORRIS:  Your client being Mr. Dondero?

19         THE COURT:  Could you answer that, Mr. Wilson?

20         MR. WILSON:  Yes, that's -- yes, that's correct.

21         THE COURT:  All right.  I will -- that's --

22         MR. MORRIS:  Your Honor, I'd like to --

23         THE COURT:  That's a different can of worms.  But for

24 now, I sustain the objection.  You're done questioning on this

25 document.

Seery - Cross                              79

1          MR. WILSON:  That's fine, Your Honor.  I can move on.

2     BY MR. WILSON:

3     Q    Now, Mr. Seery, you would agree with me that whether or

4     not HarbourVest played an active role in the Acis bankruptcy,

5     it was kept apprised of the -- of the ongoings in the

6     bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?

7     A    Yes.  My understanding is that -- that they were.

8     Q    And in fact, did Highland have weekly conference calls

9     with HarbourVest during the Acis bankruptcy to discuss what

10    was going on in the bankruptcy?

11    A    I don't know if they were weekly.  I've been told that

12    they had regular calls updating HarbourVest, yes.

13    Q    Okay.  And did Highland produce over 40,000 pages of

14    documents to HarbourVest related to the Acis bankruptcy?

15    A    I'm not aware of that, no.

16    Q    Have those documents been provided to you?

17    A    I hope not.

18    Q    So, in your role --

19    A    I'm sorry.  I don't -- I didn't receive 40,000 documents

20    from anybody.

21    Q    Well, did you receive any number of documents that were

22    provided by Highland to HarbourVest during the Acis

23    bankruptcy?

24    A    I wasn't involved in this during the Acis bankruptcy.  I'm

25    sorry.

1    Q    Well, I'm referring to, after you became involved in this

2    Highland bankruptcy, whether you were provided with these

3    documents that were sent from Highland to HarbourVest.

4    A    I don't -- I don't know what the documents are.  I've

5    reviewed tons of documents with respect to the HarbourVest

6    claims, but I don't know of the documents to which you're

7    referring.

8    Q    Okay.  And after you performed your investigation into the

9    HarbourVest claim, what was your opinion as to the cause in

10   the reduction in value of HarbourVest's investment in HCLOF?

11   A    I think the main cause of the reduction in the investment

12   was the imposition of the Trustee and the failure of Highland

13   HCLOF and then subsequently with the injunction to reset the

14   CLOs.

15        You know, these are -- these are some of the worst-

16   performing CLOs in the market because they weren't reset.  And

17   when the liabilities of the CLOs are set at a level to match

18   assets, and then liability -- the assets run off, and the

19   asset financings or the new deals come in at much lower

20   levels, and the obligations of the CLO are not reset, the

21   arbitrage that is the CLO shrinks.  And that's what happened

22   to these CLOs.

23   Q    And during the course of the Acis bankruptcy, Acis and

24   Brigade were given management responsibilities over the CLOs

25   and HCLOF, correct?

Seery - Cross                              81

1    A    I believe that the Trustee had the overall, and then

2    subsequently, with the confirmation of the plan, they took it

3    over.  So I think that ultimately Mr. Terry had the management

4    authority, full management authority, and some advice through

5    Brigade.  But I think technically it wasn't actually during

6    the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

7    Phelan had the actual authority.

8         (Echoing.)

9    Q    I'm sorry.  And so your testimony is that Mr. Phelan had

10   the actual authority but he delegated that authority to Josh

11   Terry and Brigade?

12   A    I think that's fair, yes.

13   Q    And do you know when that occurred?

14   A    I believe that the control of the CLOs was in July of

15   2018, and then the ultimate confirmation of the case was at

16   the very beginning of '19.

17   Q    So, after being instituted as portfolio manager, and

18   during the time when Acis and Brigade were working under the

19   direction of the Trustee, who would have receive the fees for

20   managing those portfolios?

21   A    I believe -- I don't know.  I believe the -- that the Acis

22   estate would have received those fees.

23   Q    And who -- and so is that your testimony, that prior to

24   confirmation the Acis estate would have received the

25   management fees?

Seery - Cross                                    82

1  A    I believe that -- I believe they would have if they were

2  the manager, yeah.

3  Q    Okay.  And who would have received the fees after

4  confirmation?

5  A    Acis.

6  Q    Okay.  And who would have had the discretion to set the

7  amount of those management fees?

8  A    They would be agreed to in the -- in the investment

9  management agreement.

10 Q    They would be agreed to?

11 A    Yes.  As far as I've seen, I've -- I haven't seen

12 unilateral ability of a manager to set fees at its -- at its

13 whim.

14 Q    So is it your understanding that Acis and Brigade ended up

15 charging substantially more fees than Highland had charged

16 when it was under Highland's management?

17 A    I think the fees were -- the fees were -- the fees were

18 set by the agreement.

19         MR. MORRIS:  Your Honor, I just object to the line of

20 questioning on relevance grounds.  This is a 9019 hearing,

21 Your Honor.  How -- I just don't think this has any relevance

22 at all.

23         THE COURT:  All right.  Mr. Wilson, what is the

24 relevance?

25         MR. WILSON:  The relevance is that Mr. Seery has

1  testified that these Acis CLOs were among the worst-performing

2  in the market, and frankly, we would agree with that, and I'm

3  trying to get his understanding as to why, because I think

4  there's direct relevance in the reason that the value of the

5  HarbourVest investment diminished.

6       MR. MORRIS:  I don't think that was his testimony,

7  Your Honor.  But at the end of the day, Your Honor has heard

8  the litany of reasons why the Debtor is entering into this

9  agreement.  I just, I just think it's irrelevant, Your Honor.

10       THE COURT:  All right.  Mr. Wilson, I barely think

11  this is relevant.  I mean, I'm going to give you some benefit

12  of the doubt on that because of, you know, the testimony that

13  HarbourVest lost $50 million of value and --

14     (Echoing.)

15       THE COURT:  -- maybe that shouldn't, you know, lie at

16  the feet of Highland.  I think the compromise reflects that

17  they don't -- it doesn't lie entirely at the feet of Highland.

18  But, you know, maybe two or three more questions.

19       MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20  didn't have very much more on this point.  But to be a hundred

21  percent honest, I can't remember my question right before the

22  objection.

23       THE WITNESS:  I think you were asking me about the

24  fees and somehow alluding or implying that the manager could

25  unilaterally set fees.

1      The fees are set in the investment management contract.

2   The manager doesn't get to wake up on Wednesday and say, you

3   know, I'd like another half a basis point.  It doesn't work

4   that way.

5   BY MR. WILSON:

6   Q    But you would agree with me that the fees and expenses

7   charged to an investment would impact the performance of that

8   investment in the market?

9   A    Absolutely.

10  Q    Would you also agree with me that there was one CLO -- and

11  I think you referred to it in your direct testimony -- but CLO

12  7, which continued to be managed by Highland?

13  A    That's correct.

14  Q    And is it fair to say that CLO 7 exceeded the performance

15  of the CLOs that were managed by Acis and Brigade?

16  A    I think that's fair.  I don't -- I don't recall the

17  magnitude, but I think it's outperformed those -- those CLOs,

18  yes.

19  Q    All right.  Well, thank you.  I want to turn your

20  attention to the portion of the settlement agreement that

21  deals with voting of the HarbourVest claim.  How did

22  HarbourVest's commitment to vote for the plan become a part of

23  the settlement?

24  A    Pretty straightforward negotiation.  We -- in negotiating

25  the settlement, one of the key factors was the cost and

Seery - Cross                    85

1   expense of the litigation, in addition to the risk on the --

2   on the fees, and whether we could wrap this up in a global

3   settlement now.  So in my experience, it's fairly typical, we

4   would try to do this in every settlement, have the settling

5   party, be that the claimant, agree to support the case and the

6   plan.

7       You know, we did not do that with the Committee members,

8   although we wanted to.  (Echoing) I frankly still wish I had.

9   Those little -- little bits that have been difficult

10  (echoing).  The Committee members have a different interest in

11  (echoing) than their more global interest for creditors at

12  large, which is more difficult than traditionally in

13  bankruptcy cases, less likely to have a Committee member, a

14  sitting Committee member, actually support the (echoing) of

15  the plan.

16          THE COURT:  Mr. Wilson, could you be careful to put

17  your device on mute every time you're not talking?  Because

18  we're getting some feedback loop from you when Mr. Seery

19  answers your questions.  Okay?

20      (Echoing continues.)

21          THE COURT:  Like right now.  I'm hearing feedback of

22  my own voice through your speakers.

23      Right, Mike?  Isn't that what --

24          A VOICE:  I am, too.

25          THE COURT:  Yes.  Okay.  So please be sure you put

1   your device on mute whenever you are not speaking.  All right.

2   Go ahead.

3   BY MR. WILSON:

4   Q   I mean, I think you just answered this question, but there

5   was -- there was no similar voting provision in the Acis or

6   the Redeemer settlements, correct?

7   A   There is not, no.  And just as a -- by way of explanation,

8   if it's okay, the reason was my counsel advised against it.  I

9   did ask for it.

10  Q   Your counsel advised against putting that voting

11  requirement in the Acis and Redeemer settlements?

12  A   For the reasons I stated.  And in my experience, that's

13  consistent, where sitting members of Committees don't

14  generally sign up to resolve their own claims and support the

15  plan because of their larger fiduciary duties to the creditor

16  body as a whole.

17  Q   And during the settlement negotiations of the HarbourVest

18  claim, was this commitment to vote a topic of discussion?

19  A   Not -- not particularly, no.  It was pretty clear that

20  HarbourVest, if they were going to agree to the settlement and

21  the numbers, could see structure.  Obviously, it wanted to

22  understand what the potential distributions would be under the

23  plan, but this was not a hotly-negotiated point.

24  Q   And would you consider HarbourVest's commitment to vote

25  for the plan an important part of the settlement?

1    A    I think it's an important part of the settlement, that the

2    part of the settlement is the subordinated claim.  We could

3    put that into presumably any plan.  But our plan does -- does

4    have a Class 9 for that.  So I think it's a -- it's a part of

5    the settlement that is important or we wouldn't have included

6    it.  It clearly wraps everything up and moves us towards

7    confirmation.

8    Q    And would you have made the deal with HarbourVest if they

9    had pushed back on the commitment to vote for the plan?

10   A    Yeah, I would have.

11   Q    All right.  Thank you.

12            MR. WILSON:  No further questions.

13            THE COURT:  All right.  Mr. Draper, anything from

14   you?

15            MR. DRAPER:  Yes, Your Honor.

16                         CROSS-EXAMINATION

17   BY MR. DRAPER:

18   Q    Mr. Seery, I may not understand the settlement, and I

19   apologize, but the way I think the settlement reads, the

20   interest that you're acquiring, you have the right to place in

21   any entity.  Is that my -- is that correct?

22   A    I don't recall the -- the specifics, but just from a

23   structural standpoint, we wanted to be able to put it into a

24   subsidiary as opposed to putting it directly in HCMLP.  If we

25   couldn't do that, we would -- we would put it into HCMLP.  So

1  there wasn't a -- I don't recall the actual specifics, but we

2  certainly thought about holding that interest in a -- in a

3  subsidiary, just to have a cleaner hold.

4  Q    Why aren't you putting it into the Debtor so the Court and

5  the estate have jurisdiction over that?

6  A    I think the Court certainly has jurisdiction over an

7  entity that the estate owns a hundred percent of.  I don't

8  think that's -- that's even a close call.  So the important --

9  Q    Now, --

10  A   Can I finish?

11  Q   Sure.

12  A   You asked me why.  To the extent that somebody thinks that

13  problematic, I will consent to the Court having complete

14  jurisdiction over it, since I control it a hundred percent.

15  Q    No.  The real reason is, if I remember correctly, Mr.

16  Dondero and Judge Lynn filed a motion to have some say or some

17  information as to sales by subsidiaries, and I think you took

18  the position that they weren't entitled to it.  And so my

19  concern was that putting this in a subsidiary in a sense gave

20  you unfettered control without any review of the item.

21  A    I don't -- I don't think that's the case where we --

22  there's a directly-held subsidiary where we own a hundred

23  percent of it.  I don't think that that's the case.

24  Q    Okay.  But you're willing to (a) put this into the Debtor,

25  number one; and number two, have the estate and have the Court

1  have complete control over the disposition of it and its

2  actions, correct?

3  A    That's not correct, no.

4  Q    What -- what is incorrect about my statement?

5  A    The debtor-in-possession has control of its assets.  The

6  Court doesn't have complete control over its assets.  There's

7  --

8  Q    Well, --

9  A    -- issues -- hold on a second.  This is not -- this is not

10  a game and a trap.  We put it in a subsidiary for specific

11  reasons.  You asked why.  I'm giving you the why.  It's not to

12  hide it from anybody.  We're not going to sell the asset

13  unless somebody comes up with a great price for it.  We're

14  going to monetize the assets.  We're going to control HCLOF by

15  a majority.

16  Q    But, again, the issue is, if it's in the estate, the Court

17  has supervision over it.  If it's not in the estate, the Court

18  has no supervision of it.

19  A    I don't think that's correct, because the Court has

20  supervision over the estate, which owns a hundred percent of

21  the special-purpose entity that will own the shares.

22  Q    Okay.  All right.  Now, let's talk about the $15 million

23  that you discussed and the legal fees that were incurred.  Is

24  that the total amount that was spent, or is -- or is that --

25  was the total amount $30 million and HarbourVest was only

1   responsible for one half of it or functionally took the brunt

2   of one half of it?

3   A    I think the total amount is between $15 and $20 million.

4   I don't have the exact numbers.

5   Q    So, in fact, the HarbourVest loss due to its ownership

6   would have been one half of that, not $15 million?

7   A    Well, the vehicle lost the money.  HarbourVest owned 49.98

8   percent of it, and Highland controlled the rest.  So if you

9   allocate it that way, I suppose that would be a -- that's how

10  you would divide it, in -- roughly in half, yes.

11  Q    And so HarbourVest's actual dollar loss due to the legal

12  fees is really the 49-point-whatever percent of $15 million,

13  not $15 million?

14  A    I don't know if -- I certainly would argue that.  I don't

15  think that HarbourVest has that position.

16  Q    Okay.  Now, in connection -- you were asked a question

17  about the documentation that was provided by Highland to

18  HarbourVest both during the bankruptcy of Acis and before.

19  You have control over the Harbour -- over the Highland server,

20  correct?

21  A    I'm sorry.  Can -- can we do two things?  One is, Mr.

22  Draper, I can't see you, so it would be better if I could see

23  you during the questioning.

24  Q    Okay.

25  A    And could you repeat the question?

1    Q    All right.  I'll be happy to.  You were asked a question

2    about the documentation that was provided by Highland to

3    HarbourVest during the Acis bankruptcy and meetings that took

4    place between the parties.  Correct?

5    A    Yes.

6    Q    And you stated you were unaware of the material that was

7    sent over?

8    A    I think I testified that I didn't receive the 40,000

9    documents that were mentioned.

10    Q    Did you do any search or order a search of the Highland

11    server to see what material was sent over by any party to

12    HarbourVest to analyze what -- what information they had

13    available to them and what was provided to them?

14    A    Yes, we did a search.

15    Q    And did you review the documentation that was sent over?

16    A    The -- the documentation that we looked at was very

17    specific to the investment and to the OM.  So we didn't look

18    for the -- the supposed 40,000 documents, no.

19    Q    Did you look for the material that was provided to them

20    during the Acis bankruptcy and the periodic meetings that you

21    discussed?  Or that you testified to earlier?

22    A    The answer is no.

23    Q    One last question.  I think, and just so I understand your

24    testimony, you've broken out the HarbourVest claim into two

25    pieces.  One is the legal fee amount that we've just

Seery - Cross                                    92

1  discussed, and I gather the other piece of that is the fraud

2  in the inducement to enter into the CLO purchase?

3  A    It's -- it's more -- it's much more than that.

4  Q    Okay.  Well, let me say it in a different way.  The other

5  part of it is the losses as a result of the fraud in the

6  inducement to purchase the interest?

7  A    I don't think that's -- that's fair.  If I could explain?

8  Q    Sure.

9  A    Yeah.  The legal fee piece is pretty clear.  The other

10 piece starts with fraud in the inducement, but it's extensive

11 fraud claims.  Fraud in the inducement, as I testified

12 earlier, would get them around the exculpation and liability

13 limitations in the OM.  You don't get around all of those with

14 just the fraud.  And so that's -- that's the split of that

15 claim.  So the fraud in the inducement contains fraud

16 allegations.  Even if you didn't have inducement, you'd have

17 other potential fraud claims.

18 Q    But let me state it in a different fashion.  But for the

19 investment, the fraud that you allege wouldn't have occurred?

20 A    I -- HarbourVest alleges it.

21 Q    No, I'm just -- in your analysis of the claim, but for the

22 inducement, the rest of the damages wouldn't have flowed?

23 A    That's HarbourVest's position, yes.  But for the fraud,

24 they wouldn't have made the investment.

25 Q    All right.

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  Any redirect, Mr. Morris?

3          MR. MORRIS:  Just a few very questions, Your Honor.

4     Just a very few questions.

5                         REDIRECT EXAMINATION

6     BY MR. MORRIS:

7     Q    Mr. Seery,  you were asked about that document that Lucy

8     prepared.  Do you remember that?

9     A    Yes, I do.

10    Q    In your experience, don't defendants often deny liability

11    before entering into settlements, or even worse, getting

12    adverse judgments entered against them?

13    A    Of course.  Yes.

14    Q    Okay.  And in response to Mr. Draper's questions, isn't

15    the Guernsey claim another claim that the Debtor took into

16    account in assessing the potential risks of this settlement?

17    A    There's a number of claims contained in it.  As I

18    mentioned earlier, I mentioned the RICO claim.  But there is a

19    Guernsey shadow director claim, which is not dissimilar to

20    U.S. claims that somebody effectively controls an enterprise,

21    notwithstanding them not having the official role.

22    Q    Okay.

23          MR. MORRIS:  I have nothing further, Your Honor.

24          THE COURT:  All right.  Any recross on that redirect?

25    All right.

1          MR. WILSON:  No, Your Honor.

2          MR. DRAPER:  No, Your Honor.

3          THE COURT:  Thank you.  Mr. Seery, that concludes

4   your testimony.  Thank you.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  We need to take a bathroom break.  Before

7   we do, I just want to be clear with what we have left.  As I

8   understood it, we were having Mr. Pugatch from HarbourVest.

9   Mr. Morris, will that conclude the Debtor's evidence?

10  (Pause.)  Okay.  You were on mute, but I think you were saying

11  yes.

12         MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13  going to be putting their witness on the stand.

14         THE COURT:  Okay.

15         MR. MORRIS:  But it's part of the evidence in support

16  of the motion.

17         THE COURT:  All right.  Do the Objectors have any

18  witnesses today?

19         MR. WILSON:  Your Honor, Mr. Dondero intends to

20  examine Mr. Pugatch, but if he's going to be called by his

21  counsel, then we will do that as a cross-examination.

22         THE COURT:  All right.

23         MR. DRAPER:  This is Douglas Draper.  I have no

24  witnesses.

25         THE COURT:  Okay.  All right.  Well, I'm asking --

1   well, I do want to ask:  Can we get a time estimate

2   potentially for Mr. Pugatch?

3          MS. WEISGERBER:  For my examination, Your Honor,

4   twenty minutes, perhaps.

5          THE COURT:  Okay.

6          MS. WEISGERBER:  Or less.

7          THE COURT:  All right.  Well, let me tell you what

8   we're going to do.  We're going to take a ten-minute bathroom

9   break.  But I have a 1:30 hearing and I have a 2:00 o'clock.

10  Well, I have a 1:30 docket, multiple matters, and a 2:00

11  o'clock docket.  So, you know, I'm really intending that we

12  get finished in time to give me and my staff a little bit of a

13  lunch break before launching into the 1:30 docket, so I'm

14  hopeful we can get done around 1:00-ish.  If we can't, then

15  we're going to have to reconvene, I'm going to say probably

16  3:00-ish Central time.  So let's hope we can get through

17  everything.  All right?  Ten-minute break.

18         THE CLERK:  All rise.

19    (A recess ensued from 11:58 a.m. until 12:08 p.m.)

20         THE CLERK:  All rise.

21         THE COURT:  All right.  Please be seated.  We're

22  going back on the record in the Highland matters.  Do we have

23  everyone?  It looks like we do.  Ms. Weisgerber is going to

24  call the next witness; is that correct?

25         MS. WEISGERBER:  Yes, Your Honor.  We call Michael

1   Pugatch of HarbourVest to the stand.

2           THE COURT:  All right.  Mr. Pugatch, if you could

3   turn on your video and say, "Testing one, two."

4           MR. PUGATCH:  Two.

5           THE COURT:  All right.  There you are.  Please raise

6   your right hand.

7           MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

8           THE COURT:  Thank you.  You may proceed.

9           MS. WEISGERBER:  Thank you, Your Honor.

10                      DIRECT EXAMINATION

11  BY MS. WEISGERBER:

12  Q    Good morning.  Can you please state your name for the

13  record?

14  A    Sure.  It's Michael Pugatch.

15  Q    And where do you work, Mr. Pugatch?

16  A    HarbourVest Partners.

17  Q    And what is your title?

18  A    I'm a managing director in our secondary investment

19  group.

20  Q    Did HarbourVest file claims in the Highland bankruptcy,

21  Mr. Pugatch?

22  A    We did, yes.  Several claims, in fact.

23  Q    What was the basis for those claims?

24  A    Yeah.  Among other things, fraudulent inducement based on

25  misrepresentations and omissions on the part of Highland in

Pugatch - Direct                    97

1   connection with our original investment, mismanagement at the

2   HCLOF level, including inappropriate fees that were charged

3   to investors, among a number of other items as well.

4   Q   Can you explain what you mean by misrepresentations made

5   to HarbourVest by Highland?

6   A   Yeah, sure.  So, you know, based on a number of

7   statements that were made to us around the litigation

8   involving Mr. Terry, some of the intentions found, the

9   structural changes that came to light with respect to HCLOF

10  and our investment, as well as the fact that the arbitration

11  award specifically against Mr. Terry would have no impact or

12  implication on Highland's sale or business.

13  Q   And can you explain what you mean by omissions made by

14  Highland to HarbourVest?

15  A   Sure.  So I would say, really, the implications behind

16  the structural changes that were made at the time of our

17  investment into HCLOF.  Also, the intention, clear intentions

18  that Highland had to never, in fact, pay the arbitration

19  award that came to light during our due diligence period to

20  Mr. -- to Mr. Terry as part of the investment.  And

21  ultimately the -- what Highland went about doing in terms of

22  stripping assets of Acis that led to the material value

23  declines and destruction of value that we've experienced

24  since our investment.

25  Q   You mentioned a diligence period.  Did HarbourVest

1  conduct diligence on the investment?

2  A   We did.  We conducted very detailed due diligence, as we

3  do for all of our investments.  That diligence period lasted

4  several months ahead of our investment decision.

5  Q   And did HarbourVest conduct that diligence by itself?

6  A   No.  So, in addition to internal investment professionals

7  at HarbourVest, we engage with outside advisors, both

8  consultants as well as legal advisors, in connection with

9  that due diligence.

10 Q   And did Highland answer all of HarbourVest's questions

11 during that diligence period?

12 A   They did.  And they were numerous.  But yes, they

13 answered all the questions that we had for them.

14 Q   Was the Terry dispute part of HarbourVest's diligence?

15 A   It was.  That came up as one of the outstanding items of

16 litigation as part of our due diligence.

17 Q   I'm going to ask my colleague to pull up on the screen an

18 exhibit that was on our exhibit list as Items -- Exhibits 34

19 and 35.  It's an August 15, 2017 email from Brad Eden to

20 Dustin Willard.  Mr. Pugatch, do you recognize this document?

21 A   I do, yes.

22 Q   And what is it?

23 A   This was an email sent to us during our due diligence

24 period in response to a request for more information on the

25 outstanding litigation that Highland was involved with.

Pugatch - Direct                        99

1        MS. WEISGERBER:  And if my colleague can just scroll

2   to the attachment to that email.

3   BY MS. WEISGERBER:

4   Q   And do you recall the attachment as well, Mr. Pugatch?

5   A   Yes, I do.

6        MS. WEISGERBER:  And if you can scroll back up to the

7   first email.

8   BY MS. WEISGERBER:

9   Q   Who is Dustin Willard?

10  A   Yes.  Dustin is a colleague of mine at HarbourVest who

11  worked closely with me on this investment.

12  Q   And you said that this document was shared with

13  HarbourVest during the diligence period before the HCLOF

14  investment?

15  A   It was, correct.

16  Q   Is it typical during diligence to receive a description

17  of litigation such as this?

18  A   It is.  It's a question that we always ask.  Certainly a

19  component of our diligence to understand any outstanding

20  litigation on the part of our counterparty or manager that

21  we're investing in.

22       MS. WEISGERBER:  Your Honor, I'd move to offer this

23  exhibit into evidence.

24       THE COURT:  Any objection?

25       MR. DRAPER:  No objection, Your Honor.

1          MR. MORRIS:  No objection from the Debtor, Your

2     Honor.

3          THE COURT:  All right.  What is the letter or number

4     for this exhibit?

5          MS. WEISGERBER:  It's HarbourVest Exhibit 34.

6          THE COURT:  All right.  So HarbourVest Exhibit 34 is

7     admitted.

8        (HarbourVest's Exhibit 34 is received into evidence.)

9          THE COURT:  And I need to be clear where it appears

10    on the docket.  Can someone tell me?

11         MS. WEISGERBER:  So, it's identified on our exhibit

12    list, not -- it's not attached to the exhibits.  It is on the

13    docket.  We were -- when we initially filed the exhibit list,

14    we were working out confidentiality issues.  But it was

15    subsequently filed with our reply last night.  It's at Docket

16    No. 1735 --

17         THE COURT:  All right.

18         MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19         THE COURT:  All right.  Very well.  Thank you.

20    BY MS. WEISGERBER:

21    Q   Mr. Pugatch, we'll just scroll down to the second page of

22    the attachment.  Can you describe generally what the

23    litigation says regarding the Terry dispute?

24    A   Yes.  Generally speaking, this dispute was described as

25    an employee dispute, employment agreement dispute, with Mr.

1  Terry, who was a former employee of Highland involved in

2  their CLO business, and is described by Highland to us really

3  having to do with a series of false claims, in their opinion,

4  but having to do with a disgruntled former employee.

5  Q    And did it strike you as an unusual or significant

6  dispute?

7  A    No.  I would say we often -- we'll see, you know, former

8  employees with, you know, claims against a former employer in

9  connection with wrongful termination.  I wouldn't say it's

10 extremely common, but certainly not entirely out of the

11 ordinary.  And based on the explanations that we'd received

12 from Highland, seemed to be more of an ordinary-course type

13 former employee litigation suit.

14 Q    Based on what you now know about the Terry dispute, do

15 you believe that this was an adequate disclosure regarding

16 the dispute?

17 A    I would say very clearly not, you know, based on the

18 facts that came to light subsequently, the various rulings in

19 connection with the Acis bankruptcy case.  What was very

20 clearly not stated are the actual facts and implications of

21 the ongoing litigation with Mr. Terry.

22        MS. WEISGERBER:  I'd ask my colleague to put up the

23 next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24 list, which is Document No. 1723.  It's Exhibit 36 on that.

25 Same issue with respect to initially not filed, but it is on

1    the docket at our response last evening at ECF No. 1735 at

2    Page A351.

3              THE COURT:  Page what?

4              MS. WEISGERBER:  A351.

5              THE COURT: A351.  Thank you.

6              MS. WEISGERBER:  You're welcome.

7    BY MS. WEISGERBER:

8    Q    Mr. Pugatch, I just put up a November 29, 2017 email from

9    Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10   Bellisario.  Do you recall this document?

11   A    I do, yes.

12   Q    And what is this document?

13   A    This was an email sent to us by Highland a couple weeks

14   after we closed on our investment on the (inaudible) in

15   response to a *Wall Street Journal* article that had come out

16   regarding Highland, a number of actions that they had taken,

17   and what Highland was articulating to us, a number of false

18   claims that had been made about Highland's prior actions, and

19   specifically trying to explain some of that and also share

20   with HarbourVest a letter that was being sent to the editor

21   of the *Wall Street Journal* highlighting, in their view, some

22   of the inaccuracies around the reporting.

23   Q    And did you receive this document?

24   A    We did, yes.

25             MS. WEISGERBER:  I'd move to offer this, so

1  HarbourVest Exhibit 36, into evidence.

2          THE COURT:  Any objections?

3          MR. WILSON:  Your Honor, John Wilson.  I would object

4  as to the relevance of this document.

5          THE COURT:  All right.  What's your response?

6          MS. WEISGERBER:  Your Honor, it shows

7  misrepresentations that the witness will testify how it

8  relates back to prior representations prior to HarbourVest's

9  investment, as well as misrepresentations at that time.

10          THE COURT:  Okay.  I overrule the objection.  I'm

11  going to admit it.

12      (HarbourVest's Exhibit 36 is received into evidence.)

13  BY MS. WEISGERBER:

14  Q   Mr. Pugatch, can you describe generally -- we spoke about

15  this a little bit -- just what this communication from

16  Highland was conveying to HarbourVest at the time?

17  A   Yes.  Specifically, again, responding to this *Wall Street*

18  *Journal* article that had been published, trying to defend,

19  again, Highland's own views why there were inaccuracies in

20  the reporting.  But importantly, from our perspective, trying

21  to reassure us as to the fact that, you know, these

22  accusations would have no bearing and any results from it

23  would have no bearing on their ongoing business or

24  partnership or the investment that we had made in HCLOF.

25          MS. WEISGERBER:  And if you can scroll to the second

1  page.

2  BY MS. WEISGERBER:

3  Q   We'll just look at the last paragraph of another email

4  from Mr. Covitz.  Can you just read that first sentence of

5  the last paragraph?

6  A   Sure.  (reading)  While the dispute has no impact on our

7  investment activities, as always, we welcome any questions

8  you may have.

9  Q   Mr. Pugatch, was this email and the discussion regarding

10  the Terry dispute consistent with the representations made to

11  you prior to HarbourVest's investment into HCLOF?

12  A   It was, yes.  Both the message, the lack of any impact

13  that ultimately the dispute with Mr. Terry, the arbitration

14  award would have around Highland's ongoing CLO business, or

15  HCLOF specifically, was all, you know, very clear in this

16  document, but all consistent with the representations that

17  had been made to us leading up to our investment in the

18  middle of November 2017 as well.

19  Q   Thank you.

20       MS. WEISGERBER:  And you can take down the exhibit,

21  Emily.  Thank you.

22  BY MS. WEISGERBER:

23  Q   You mentioned, Mr. Pugatch, an arbitration award to Mr.

24  Terry.  How did you learn about that arbitration award?

25  A   That was initially disclosed to us by Highland as we were

Pugatch - Direct                                    105

1  in the late stages of our diligence and closing process on

2  the investment into HCLOF.

3  Q    And generally, what did Highland tell you about the

4  arbitration award?

5  A    We were aware of its existence.  We were aware of the

6  quantum of the award, I think it was around an $8 million

7  arbitration award in the favor of Mr. Terry, and that was

8  following the litigation around the wrongful termination and

9  employee dispute that Highland had described to us

10 previously.

11 Q    Did you ask to see a copy of the arbitration award?

12 A    No, we did not.

13 Q    Why not?

14 A    Ultimately, we -- you know, the explanations that

15 Highland had provided to us all seemed very reasonable.  We

16 relied on their representations that this was, again, nothing

17 more than a dispute with a former disgruntled employee, in

18 their words, that had no bearing or, you know, would not have

19 any bearing on our investment in HCLOF or their ongoing CLO

20 business, which all very clearly was not the case, as

21 we've -- as we've learned over the last several years.

22 Q    Following learning about the arbitration award, did

23 HarbourVest do other diligence?

24 A    We did.  So, in addition to asking questions related to

25 the arbitration award and any impact that it would have, we

1   also spent some time diligencing a couple of structural

2   changes that were proposed by Highland, and, in fact, ended

3   up delaying the closing of our investment by about two weeks

4   as we vetted some of those structural changes that Highland

5   had proposed.  Vetted those both, you know, internally with

6   Highland directly and with external counsel in order to make

7   sure that those structural changes were in fact legally sound

8   in ultimately making our investment.

9   Q    And were those changes proposed following the arbitration

10  award?

11  A    They were, yes.

12  Q    Did Highland tell you the reason for the structural

13  changes?

14  A    Yeah.  So, so some of this -- and specifically, this

15  involved a change of the portfolio manager at the HCLOF level

16  that was really in connection with a rebranding as Highland

17  was going through a rebuild of its CLO business and wanting

18  to align, from a brand perspective, their business on an

19  ongoing basis with the Highland brand as opposed to the Acis

20  brand.  But more specifically, in the case of a late change

21  from a structured standpoint, the -- part of the intention

22  and the investment thesis of HCLOF was to pursue a reset, a

23  refinancing of all the underlying CLOs as they approached the

24  end of their investment period or came out of their

25  investment period.

1    And in connection with that, in light of the arbitration

2   award, Highland's view was that there may be difficulties in

3   the market in resetting certain of those Acis CLOs with the

4   Acis brand associated with them, given, again, the existence

5   of the arbitration award and concerns in the market around

6   the Acis brand reputation.

7   Q    And what did they tell you was the market view of Acis,

8   or the Acis brand?

9   A    Yeah.  Their view or their concern was that the, you

10  know, because of the existence of that arbitration award, the

11  brand would be viewed as toxic.

12  Q    Didn't this put you on notice that perhaps there was

13  something wrong with the structural changes?

14  A    I mean, we -- I mean, short answer, no.  We ultimately

15  asked questions, we diligenced the legal structure, but

16  relied on the representations that were made to us by

17  Highland around the rationale for the structural changes,

18  that these are all changes that were within a Highland-

19  managed vehicle or sat below the vehicle that we were

20  investing in, and so ultimately were in Highland's purview,

21  was the representations that we relied on.

22  Q    And did HarbourVest alone do that diligence of the

23  structural changes?

24  A    So, no.  I mean, in connection with the diligence that we

25  did internally and with Highland directly, we engaged with

1  outside counsel who was working with us at the time to vet

2  those structural changes as well.

3  Q    Did HarbourVest rely on Highland's representations

4  regarding the arbitration award and the structural changes in

5  making its investment in HCLOF?

6  A    We did, absolutely.

7  Q    If Highland had disclosed the nature of the structural

8  changes, of removing Acis as the portfolio manager and

9  related transfers, would HarbourVest have proceeded with its

10 investment?

11 A    Definitively, no, we would not have.

12 Q    Why not?

13 A    I think the reality is if we had understood the intent,

14 you know, that Highland was ultimately undertaking here, we

15 would not have wanted to be any part of this, and certainly

16 getting dragged into all of this, the hassle, the value

17 destruction that we've seen on behalf of the investors and

18 the funds that we manage.  And I would say, lastly, we just

19 full stop would not have done business with a firm who

20 engages with this type of behavior, had we actually known the

21 truth.

22 Q    Mr. Pugatch, are you familiar with the bankruptcy that

23 followed of Acis?

24 A    Yes.

25 Q    And what was your -- or, did HarbourVest participate in

1   that bankruptcy?

2   A    So, initially, no.  Subsequently, we ended up getting

3   dragged into that on account of a number of misstatements by

4   Highland about the role that HarbourVest had played as part

5   of our investment into HCLOF and some of that structure and

6   the structural changes that I alluded to.

7   Q    How did HarbourVest learn about those misstatements in

8   the bankruptcy about HarbourVest's role?

9   A    So, ultimately, those came to light on -- you know, on

10  account of the ongoing proceedings within the Acis bankruptcy

11  process, and specifically brought to light to us by the Acis

12  trustee at the time, who decided to pursue, you know, further

13  diligence or discovery around the claims that Highland had

14  made around HarbourVest's involvement in those changes.

15  Q    And what is your understanding of what the allegations

16  were that caused the Acis trustee to investigate HarbourVest?

17  A    Sure.  So, you know, our understanding was that Highland

18  had made statements, again, false statements that HarbourVest

19  had actually instructed some of those structural changes,

20  that we were the ones that had said that we would not do

21  business with Acis and had ordered some of the underlying

22  transfer of assets or, again, structural changes, that, you

23  know, very clearly I would say were not the case.  Also, that

24  HarbourVest was -- was calling the shots as it relates to any

25  of the ongoing management or future resets of the CLOs.

1   Q    Did HarbourVest instruct any of those structural changes

2   or transfers to occur?

3   A    We did not.  Absolutely not.

4   Q    Why didn't HarbourVest itself appear in the Acis

5   bankruptcy and file a claim?

6   A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7   passive investor in a Highland-managed company.  We had no

8   direct interaction with or relationship with Acis.  There was

9   really no reason for us to be directly involved until we were

10  subsequently dragged into involvement on account of those

11  misstatements.  And then at that point our focus really

12  pivoted to, you know, whether we needed to defend ourselves

13  against those accusations that had been made by Highland and

14  after a request for further information in discovery by the

15  Acis trustee.

16  Q    Did HCLOF participate in the Acis bankruptcy?

17  A    They did, yes.

18  Q    Did HCLOF incur fees for participating in the Acis

19  bankruptcy?

20  A    Yes.  In fact, very meaningful fees, to the tune of well

21  in excess of $15 million of legal fees, as we understand it,

22  that have been incurred, largely in connection with the

23  ongoing Acis bankruptcy and Highland's continued pursuit of

24  and in connection with the litigation with Mr. Terry, which

25  we firmly believe was entirely inappropriate that HCLOF and

1  ultimately investors in HCLOF bear those expenses, which were

2  not just expenses of HCLOF but of Highland and a number of

3  other Highland affiliates.

4  Q   Do those expenses form a basis of separate claims filed

5  by HarbourVest against Highland?

6  A   They do, yes.  One of the multiple claims that we had

7  filed against Highland.

8  Q   And a few more questions, just for the record, Mr.

9  Pugatch.  How much did HarbourVest initially invest in HCLOF?

10  A   Sure.  So, our initial investment in November of 2017 was

11  right about $73-1/2 million, I believe.

12  Q   Did HarbourVest invest any additional money in HCLOF?

13  A   We did.  There was a subsequent capital call investment

14  of about $5 million, bringing our total investment to just

15  under $80 million in aggregate.

16  Q   When HarbourVest initially made the investment, did it

17  anticipate making a profit on it?

18  A   We did, yes.

19  Q   How much did HarbourVest anticipate earning from the

20  investment?

21  A   Yeah.  So, our -- based on the original $73-1/2 million

22  investment, we had expected a total return of about $137

23  million on that -- on that investment.

24  Q   What was that projection based on?

25  A   So, that projection was based on materials that we had

1  received from Highland, their internal projection models on

2  the future performance of the underlying CLOs that we were

3  acquiring exposure to through our investment in HCLOF, and

4  was one of the inputs or formed the basis in connection with

5  our diligence that we ultimately ran different sensitivities

6  -- projections around and helped employ -- helped inform our

7  investment thesis.

8  Q    Do you know the current value of HarbourVest's investment

9  in HCLOF?

10  A    Yes.  The current value is right around $22-1/2 million.

11  Q    So roughly how much has the investment itself decreased

12  from HarbourVest's initial investment?

13  A    So, net of what was about $4-1/2 million of distributions

14  that we received early on in the investment, we've lost, to

15  date, in excess of $50 million on our original investment.

16  Q    And just for -- to close out, Mr. Pugatch, knowing all

17  that you know, if HarbourVest had known that -- about the

18  nature of the transfers by Acis or Highland's intent with

19  respect to the arbitration award, would HarbourVest have made

20  this investment?

21  A    No.  The reality is, had we known the truth, or even had

22  a sense of the truth, the true intentions behind some of

23  those transfers and ultimately what would have happened, we

24  never would have made this investment, full stop.

25  Q    Thank you, Mr. Pugatch.

1           THE COURT:  All right.  I didn't hear you, Ms.

2   Weisgerber.  Do you pass the witness?

3           MS. WEISGERBER:  Yes, I pass the witness.

4           THE COURT:  All right.  Thank you.

5       Mr. Morris, any examination from you?

6           MR. MORRIS:  No, thank you, Your Honor.

7           THE COURT:  All right.

8       (Interruption.)

9           THE COURT:  All right.  I'm not sure whose voice that

10  was, but please, again, mute your devices when you're not

11  talking.

12      Any cross-examination of Mr. Pugatch?  I'll start with

13  you, Mr. Wilson.

14          MR. WILSON:  Yes, Your Honor.

15          THE COURT:  Okay.

16                        CROSS-EXAMINATION

17  BY MR. WILSON:

18  Q   How are you -- I guess we're afternoon now.  How are you

19  this afternoon, Mr. Pugatch?

20  A   I'm doing well.  Yourself?

21  Q   I'm doing well as well.  Do you recall that on Monday of

22  this week I took your deposition?

23  A   Yes, I do.

24  Q   And so you understand that my name is John Wilson and I

25  represent Jim Dondero, who has filed an objection to the 9019

1  motion filed by the Debtor?

2      I've got a few questions for you today.  Has HarbourVest

3  been around for over 35 years?

4  A    We have, yes.

5  Q    And does HarbourVest have ten offices around the world?

6  A    Correct, yes.

7  Q    And does HarbourVest employ over 150 investment

8  professionals?

9  A    Yes.

10 Q    Does HarbourVest have over $74 billion in assets under

11 management?

12 A    Correct, yes.

13 Q    And is HarbourVest's client base largely comprised of

14 institutional investors?

15 A    Also correct.

16 Q    And you would agree with me that HarbourVest is a

17 sophisticated investor, right?

18 A    I would, yes.

19 Q    How long have you worked for HarbourVest?

20 A    I've been employed by HarbourVest for 17 years now.

21 Q    And how long have you been a managing director?

22 A    I've been a managing director for approximately six

23 years.

24 Q    And you were, in fact, the managing director for the

25 investment that HarbourVest made in Highland CLO Funding,

1  Ltd., which has been referred to today as HCLOF, correct?

2  A    I was, correct.

3  Q    And HarbourVest, I think you just testified, invested

4  approximately $73 million as its initial investment in HCLOF?

5  A    Yes, correct.

6  Q    And before HarbourVest made that investment, it had made

7  many investments of this type, correct?

8  A    Yeah.  We've made hundreds of investments into

9  partnerships over our history, correct.

10  Q    So HarbourVest was well-experienced in evaluating and

11  deciding whether to invest in large investments, correct?

12  A    It was, yes.

13  Q    Now, in your -- and by your, I mean HarbourVest -- in the

14  response to the Debtor's omnibus objection, it says that by

15  summer 2017 HarbourVest was engaged in preliminary

16  discussions with Highland regarding the investment.  Is that

17  a correct statement?

18  A    Correct, yes.

19  Q    And, in fact, those talks began in the second quarter of

20  2017, correct?

21  A    Yes.

22  Q    And so the investment closed ultimately on November 15th,

23  2017?

24  A    Yes, that's correct.

25  Q    So it's fair to say that HarbourVest considered and

1   evaluated this transaction for over six months before

2   investing its $73 million, right?

3   A    From the time of the initial conversations that we had

4   with Highland, yes.

5   Q    And one of the reasons that it took over six months to

6   complete the investment is that HarbourVest performs due

7   diligence before it makes an investment, correct?

8   A    Correct.

9   Q    And when you're performing due diligence -- well, first

10  off, you would agree with me that that's a common practice

11  amongst sophisticated investors such as HarbourVest, correct?

12  A    To perform due diligence?

13  Q    Yes.

14  A    Yes.

15  Q    And describe -- describe what HarbourVest does in a

16  general sense when it performs its due diligence.

17  A    Sure.  So, we spend time with the manager -- in this

18  case, Highland -- certainly around the investment thesis, the

19  opportunity, receive materials around the underlying assets.

20  We take that and perform our own independent due diligence

21  around the value of those assets, perform due diligence on

22  the manager itself, the go-forward opportunity.  In many

23  cases, and certainly in this case, engage with outside

24  advisors to assist with that due diligence.  It's a very

25  robust and thorough process.

Pugatch - Cross                    117

1   Q    And by outside advisors, are you referring to the outside

2   counsel that you testified about earlier?

3   A    Yes.  Both outside counsel and outside consultants.

4   Q    Okay.  And so did you say that it's typical to engage

5   outside counsel when performing due diligence?

6   A    Yes.

7   Q    And which outside counsel did you retain with respect to

8   this due diligence?

9   A    Debevoise and Plimpton as well as Milbank.

10  Q    And during the course of HarbourVest's due diligence, did

11  it identify some items of concern?

12  A    As with any investment, there are always items that are

13  identified that require further diligence, risks that are

14  identified that we look to mitigate through our due

15  diligence, et cetera.

16  Q    And if Harbour -- I'm sorry, did you say something else?

17  A    No.

18  Q    You were finished?  Okay.  Now, if HarbourVest identifies

19  an item of concern, is it typical to request additional

20  information regarding those items of concern?

21  A    It is, yes.

22  Q    And so that actually happened with respect to the HCLOF

23  investment, correct?

24  A    In certain cases, yes.

25  Q    HarbourVest identified several litigation matters that it

1  had questions about, correct?

2  A    Correct.  As we would with any investment.

3  Q    And it went back to Highland and asked them to explain

4  their position on those litigation matters?

5  A    Correct.

6  Q    And one of those litigation matters was the Joshua Terry

7  litigation, correct?

8  A    Yes.

9  Q    And at the time that HarbourVest was considering this

10  investment, beginning in the second quarter and continuing

11  through the summer, that Josh Terry litigation had not

12  resulted in an award or a final judgment, correct?

13  A    Correct.

14  Q    And I think we looked earlier at a document that your

15  counsel admitted as HarbourVest Exhibits 34 and 35.  There

16  was an email from a HarbourVest -- or, I'm sorry, from a

17  Highland representative to a HarbourVest representative that

18  was discussing Highland's position on the litigation,

19  including the Terry litigation, correct?

20  A    Are you referring to the document that we looked at

21  earlier?

22  Q    I am.  And I can put it on the screen if we need to.

23  A    No.  Right, I recall that, and yes, that's correct.

24  Q    Okay.  And just to be clear, that document, which stated

25  Highland's positions on the -- and summaries of the

1  litigation, was issued months before the arbitration award to

2  Josh Terry, correct?

3  A    I don't remember the exact timing, but it was certainly

4  during our due diligence period and prior to the arbitration

5  award, yes.

6  Q    Well, it seems to me that that email that you -- your

7  counsel admitted as an exhibit was issued in August of 2017.

8  Does that sound right to you?

9  A    If that's what the email said, yes.

10 Q    And if the Terry arbitration award came out in October,

11 then you would agree with me that that is several months

12 prior to the -- or at least two months prior to the

13 arbitration award?

14 A    Yes.

15 Q    And so when HarbourVest made requests of Highland to

16 provide information regarding its items of concern, Highland

17 complied with those requests, correct?

18 A    It did, correct.

19 Q    And was there ever a time when HarbourVest requested

20 Highland to provide information and that information was not

21 provided?

22 A    Our requests for information, or at least, you know,

23 responses or color to a question, were always met either

24 with, you know, written or verbal communication back to us,

25 yeah.

1  Q   And you would agree with me that, in fact, HarbourVest

2  delayed the closing of the investment by two weeks to

3  continue its due diligence, correct?

4  A   Correct, related to the structural changes that were made

5  close to closing.  That's right.

6  Q   And after conducting that due diligence, HarbourVest

7  satisfied itself that the investment was sound?

8  A   That the legal structure that had been put in place in

9  connection with those proposed changes by Highland was -- was

10  legally sound, yes, and on the back of, again, statements and

11  misrepresentations on the part of Highland around the nature

12  and potential impact to their ongoing CLO business and HCLOF.

13          MR. WILSON:  Well, I'm going to object to the latter

14  part of your response as nonresponsive.

15          THE COURT:  Sustained.

16  BY MR. WILSON:

17  Q   Now, after you conducted the due diligence, HarbourVest

18  made the investment of $73 million on November 15th, 2017,

19  correct?

20  A   Correct.

21  Q   And so I think you testified earlier that prior to that

22  investment HarbourVest had become aware that that Josh Terry

23  litigation had resulted in an arbitration award, correct?

24  A   Yes.

25  Q   But I think you've also testified that HarbourVest did

 1  not request that Highland provide a copy of the arbitration

 2  award, correct?

 3  A    That's correct.

 4  Q    And you further testified that you were represented by

 5  outside counsel at the time, correct?

 6  A    Correct.

 7  Q    And as of Monday of this week, you had not reviewed that

 8  arbitration award; is that correct?

 9  A    That's correct.

10  Q    Have you reviewed that arbitration award since Monday of

11  this week?

12  A    I have not.

13  Q    But in any event, you testified that Highland told you

14  about the award?

15  A    Yes.

16  Q    And they told you the amount of the award?

17  A    Yes.

18  Q    And then they told you that the award had been converted

19  to a judgment?

20  A    When you say the award had been converted to a judgment,

21  can you be more specific?

22  Q    Well, I don't know how familiar you are with the

23  litigation process, but in this instance, that award was

24  taken to a court and the court entered a judgment on the

25  arbitration award.  Did you -- were you aware of that?

1   A   I don't recall the specific legal terms of judgment

2   against it.  I was award of the existence of the arbitration

3   award and the -- and the obligation for Highland to comply

4   with that arbitration award.

5   Q   And HarbourVest did not make an appearance in the Acis

6   bankruptcy, right?

7   A   We did not.

8   Q   But you were aware of the Acis bankruptcy, correct?

9   A   Yes.

10   Q   And you were kept apprised of the Acis bankruptcy by

11   Highland individuals, correct?

12   A   We had conversations with a couple of Highland

13   individuals throughout the Acis bankruptcy process, yes.

14   Q   Right.  And in fact, you testified that you participated

15   in regular conference calls with Highland regarding that

16   bankruptcy?

17   A   That's correct, yes.

18   Q   And do you recall having been provided with over 40,000

19   documents by Highland related to the Acis bankruptcy?

20   A   I do not recall that, no.

21   Q   Would those documents have been provided to your outside

22   counsel, had you received them?

23   A   I don't know the answer to that.

24   Q   Did the outside counsel that represented you in the due

25   diligence continue to represent you throughout the Acis

1  bankruptcy?

2  A    They did.  One of the counsels did, correct.

3  Q    And which counsel was that?

4  A    Debevoise.

5  Q    So was your counsel actively involved with monitoring the

6  Acis bankruptcy?

7  A    They were, yes, particularly after we were ultimately

8  accused of having something to do with the original structure

9  and -- as a result of misstatements by Highland.

10  Q    Did your counsel attend hearings in the Acis bankruptcy?

11  A    I don't recall.

12  Q    Are you familiar with the PACER system?

13  A    I am not.

14  Q    Now, I think that HarbourVest has been described as a

15  passive investor.  You recall that description of HarbourVest

16  in this instance?

17  A    Yes.

18  Q    But, in fact, HarbourVest invested substantial assets

19  such that it owned a 49.98 percent share of HCLOF.  Would you

20  agree with that?

21  A    That's correct.

22  Q    And in fact, the next largest investor was CLO Holdco,

23  which owned 49.02 percent of the shares, correct?

24  A    That sounds right.

25  Q    And there was an advisory board that was created pursuant

1   to the formation documents of this investment, correct?

2   A    That's correct.

3   Q    And in fact, that advisory board only had two members,

4   and one was a representative of HarbourVest and one was a

5   representative of CLO Holdco, correct?

6   A    Correct.

7   Q    And the advisor -- I'm sorry, the portfolio manager was

8   not allowed to disregard the recommendations of the advisory

9   board, correct?

10  A    With respect to the limited set of items that the

11  advisory board could opine on, that is correct.

12  Q    All right.  I want to go over a couple of the

13  misrepresentations that HarbourVest has identified in its

14  filings related to its claim.  The first one is -- and just

15  for the record, I'm reading from Docket No. 1057 filed on

16  September 11, 2020, HarbourVest Response to Debtor's First

17  Omnibus Objection.

18       But the first misrepresentation identified in that

19  document says that Highland never informed HarbourVest that

20  Highland had no intention of paying the arbitration award.

21  And was -- was Highland obligated to pay the Josh Terry

22  arbitration award against Acis?

23          MR. MORRIS:  Objection to the question to the extent

24  it calls for a legal conclusion.

25          THE COURT:  Sustained.

 1          MS. WEISGERBER:  Join in that objection.

 2          THE COURT:  Sustained.  I think --

 3   BY MR. WILSON:

 4   Q    Your understanding was --

 5          MR. WILSON:  I'm sorry, Judge?

 6          THE COURT:  I sustained the objection as calling for

 7   a legal conclusion.  So, next question.

 8          MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

 9   Honor.

10   BY MR. WILSON:

11   Q    In your understanding, was Highland responsible for

12   paying the arbitration award to Josh Terry?

13   A    My understanding is on the account of the fact that Acis

14   --

15          MS. WEISGERBER:  Objection, Your Honor.  Objection,

16   Your Honor, same basis.

17          THE COURT:  Sustained.  It was essentially the same

18   question.

19          MR. WILSON:  Well, Your Honor, I didn't ask --

20          THE COURT:  It was essentially the same question, Mr.

21   Wilson.  Move on.

22          MR. WILSON:  Okay.

23   BY MR. WILSON:

24   Q    The next misrepresentation identified by HarbourVest said

25   that Highland did not inform HarbourVest that it undertook

1   the transfers to siphon assets away from Acis, LP and that

2   such transfers would prevent Mr. Terry from collecting on the

3   arbitration award.  So the basis for that allegation would be

4   that Highland was siphoning assets from Acis to avoid having

5   Acis pay the arbitration award, correct?

6   A    That -- that would be the implication, yes.

7   Q    Okay.  And then that misrepresentation continues on and

8   says that Highland represented to HarbourVest that it was

9   changing the portfolio manager because Acis was toxic.  And

10  do you recall that representation being made to you?

11  A    Yes, I do.

12  Q    And would you agree with me that whether or not Acis is

13  toxic in the industry would be an opinion?

14  A    I suppose it would be an opinion, but by the manager of

15  the vehicle responsible for managing the HCLOF investment and

16  the underlying CLOs.  Yeah, we viewed the Acis name and the

17  Highland name as synonymous, if you will.  I mean, Acis was a

18  subsidiary of Highland.  For all intents and purposes, it was

19  the same from our perspective as we made the investment into

20  HCLOF.

21  Q    So did HarbourVest have an independent understanding of

22  whether or not the Acis name was toxic in the industry?

23  A    We did not, no.  We relied on Highland's views of that as

24  manager of HCLOF.

25          MR. WILSON:  Your Honor, just a brief housekeeping

1    item.  Did you say that we need to be done at 1:00 o'clock?

2            THE COURT:  Well, I said I really wanted you to be

3    done by 1:00 o'clock because I have a 1:30 docket and a 2:00

4    o'clock docket and I'd rather not have to hang up 70-

5    something people and reconnect them again at 3:00 o'clock.

6    How close are you to being finished?

7            MR. WILSON:  Well, --

8            THE COURT:  This is going at a very slow pace.

9            MR. WILSON:  Well, I apologize for that, Your Honor.

10   I think I've got at least ten more minutes, but -- but I know

11   we also have closing remarks.  And I was just going to ask if

12   Your Honor had a preference of --

13           THE COURT:  Keep going.

14           MR. WILSON:  -- of breaking now --

15           THE COURT:  Keep -- let's --

16           MR. WILSON:  -- or keep going?  Okay.

17           THE COURT:  Let's talk fast and try to get through.

18   You know, even if I'm sacrificing lunch today, I don't want

19   to inconvenience 75 people this way.  So we'll just probably

20   start our 1:30 hearing a little late and inconvenience those

21   people.

22      All right.  Go ahead.

23           MR. WILSON:  All right.  Thank you, Your Honor.

24   BY MR. WILSON:

25   Q    Did Acis form its -- I can't recall if you answered this

 1   question, but did Acis form its own opinion on whether or not

 2   -- I'm sorry, strike that.  Did HarbourVest form its own

 3   opinion on whether or not the Acis name was toxic in the

 4   industry?

 5            MS. WEISGERBER:  Objection, --

 6            THE WITNESS:  We did not.  We didn't have a basis.

 7            THE COURT:  I'm sorry, did I have an objection?

 8   BY MR. WILSON:

 9   Q   You did not --

10            THE COURT:  Did I have an objection?

11            MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,

12   asked and answered, Your Honor.

13            THE COURT:  Overruled.  He can answer.

14   BY MR. WILSON:

15   Q   Okay.  But --

16   A   We did not.

17   Q   Did Highland have the ability to investigate the Acis

18   name and make its own determination of whether that name was

19   toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.

20   A   HarbourVest had the ability to do that, yes.

21   Q   I apologize I misspoke.  I meant HarbourVest.  Did

22   HarbourVest have the ability to investigate that name and

23   determine if it was toxic?

24   A   It was irrelevant to our investment thesis.  And as I

25   said before, Acis was a subsidiary of Highland.  We viewed

1  them as interchangeable in the context of our investment.

2  Q   Okay.  The next misrepresentation that you refer to says

3  that Highland indicated to HarbourVest that the dispute with

4  Mr. Terry would have no impact on its investment activities.

5  Would you agree with me that that is also an opinion?

6  A   It was a statement that --

7          MS. WEISGERBER:  Your Honor, I'm going to object to

8  the extent these questions are seeking a legal conclusion

9  regarding, you know, if something's an opinion or not.

10          THE COURT:  Okay.  Overruled.  He can answer.

11          THE WITNESS:  It was -- it was a statement that was

12  made to us by Highland and represented in multiple different

13  formats as fact.  And a representation that we relied on in

14  connection with our investment.

15  BY MR. WILSON:

16  Q   And finally, the misrepresentation, the last

17  misrepresentation identified, is that Highland expressed

18  confidence in the ability of HCLOF to reset or redeem the

19  CLOs.  Would you agree with me that that statement is an

20  opinion?

21  A   On the basis that it was the core investment thesis of

22  the -- of the investment of HCLOF.  Again, whether that's

23  legally viewed as an opinion or a fact, it  was -- it was

24  certainly the investment thesis that we made the investment

25  predicated upon.

1    Q    And you just testified that you thought that Acis and

2    Highland were interchangeable from the perspective of the

3    investment opportunity, correct?

4    A    Correct.

5    Q    But you also accepted Highland's recommendation because

6    HarbourVest agreed that the change in the -- to a Highland

7    manager made commercial sense, correct?

8    A    We took at face value what Highland recommended because

9    this all had to do with the structuring of an entity that

10   they fully managed with respect to multiple underlying

11   subsidiaries that weren't managed by Highland.

12   Q    But would you agree that, at the time, you -- HarbourVest

13   thought that made commercial sense?

14   A    It did not seem unreasonable to us based on the

15   explanation we were given.

16   Q    Okay.

17          MR. WILSON:  I want to refer to HarbourVest Exhibit

18   39.

19       (Pause.)

20          THE COURT:  What are we waiting on?  What are we

21   waiting on?

22          MR. WILSON:  I'm trying to get the document on the

23   screen, Your Honor.

24       (Pause.)

25          THE COURT:  We can't hear you.  We can't hear you.

1     MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

2 speaking with my --

3     THE COURT:  Okay.

4     MR. WILSON:  -- co-counsel here.

5     THE COURT:  All right.

6   (Pause.)

7     MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

8 you're referring to?

9     MR. WILSON:  39.  HarbourVest 9019 motion on the

10 main -- on the Dondero file.  And then there's the -- it's --

11 it's John  -- and then there's the HarbourVest, and then the

12 exhibits are all in one file.

13     MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14 was subject to confidentiality based on HCLOF's request.

15 HCLOF's counsel is present.  I think they know it's an

16 excerpt.  But I'd just -- that for HCLOF's counsel.

17     MR. WILSON:  Well, is there an objection to showing

18 this document on the screen?  Yes.  All right.  We're not

19 going to put Document 39 on the screen.

20     A VOICE:  Yes.

21     MR. WILSON:  All right.  Scroll down to the next

22 page.

23 BY MR. WILSON:

24 Q   This is a -- this is a document that was produced to us

25 this week, the Highland production.  It appears to be a

1  Highland CLO Funding, Ltd. Statement of Operations for the

2  Year Ended 31 December 2017.  Do you see at the top of that --

3  at the top of that document where it says total investment

4  income of $26 million?

5  A    I do, yes.

6  Q    And total expenses were roughly $1.8 million?

7  A    Yes.

8  Q    And then net change and unrealized depreciation on

9  investments and net realized loss on investments was $4.26

10 million cumulative, resulting in a net increase in net assets

11 resulting from operations of $20.224 million.  Do you agree

12 with that?

13 A    Yes.

14 Q    Okay.

15         MR. WILSON:  Go to the next one.

16 BY MR. WILSON:

17 Q    And you understand that, in the course of the Acis

18 bankrupcy, the portfolio managers for certain of the CLOs

19 were changed by the Trustee, correct?

20 A    Yes, around the underlying CLOs.  That's -- that's my

21 understanding, yes.

22 Q    And, in fact, Mr. Seery testified earlier today that that

23 occurred in the summer of 2018, correct?

24         MR. WILSON:  Scroll.

25         THE WITNESS:  I don't recall the timing, but that's

Pugatch - Cross                          133

1  what he testified to.

2  BY MR. WILSON:

3  Q    Well, this document is HarbourVest Exhibit 40, and this is

4  the statement of operations for the financial year ended 31

5  December 2018.  Here, the total investment income is only

6  $11.1 million.  Do you see that?

7  A    I do.

8  Q    And do you see where the expenses have increased to $13.6

9  million?

10  A    I do, yes.

11        MR. WILSON:  Okay.  Scroll down some more.

12  BY MR. WILSON:

13  Q    And do you see where it says net change and unrealized

14  loss on investments of $48.47 million?

15  A    Yes.

16  Q    And so after Acis and Brigade took over the managements of

17  these CLOs, we had a net decrease in net assets resulting from

18  operations of $52.483 million in the year 2018, correct?

19        MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20  fact not in evidence.

21        THE COURT:  Overruled.  He --

22        MR. WILSON:  Your Honor, --

23        THE COURT:  We're just looking at this statement and

24  testifying about it says, so I overrule the objection.

25        MR. WILSON:  Thank you, Your Honor.  Thank you, Your

1    Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

2    right.  I'll --

3    BY MR. WILSON:

4    Q    Did you answer the question, Mr. Pugatch?

5    A    No, I -- I would agree with the second part of your

6    statement that for the year 2018 the -- the loss was $52

7    million.  I don't -- I don't believe that jives with the first

8    part of your statement that that was after Acis and Brigade

9    took over.  As I understand, that was in the middle of the

10   year.

11   Q    But in any event, Acis and Brigade had been managing this

12   for at least six months of 2018 when that loss occurred,

13   correct?

14   A    They had been managing a portion of the underlying CLO

15   portfolio held by Highland CLO Funding.

16   Q    All right.  We're now looking at Exhibit #41, which is the

17   Draft Unaudited Statement of Comprehensive Income, 31 December

18   2019.  Total income has now dropped to $4.664 million.

19            MR. WILSON:  And scroll down.

20   BY MR. WILSON:

21   Q    Expenditures are at $3.645 million.  And then it says

22   investment gains and losses net out to $11.493 million, a

23   negative $11.493 million.  And --

24            MR. WILSON:  Scroll down to the --

25   BY MR. WILSON:

1    Q    And so would you agree with me that in the year 2019,

2    HCLOF showed a net loss of $10.476 million?

3    A    Yes, that's what the financial statements say.

4    Q    And in this year, the Acis CLOs were solely managed by

5    Acis and Brigade, correct?

6    A    The Acis CLOs were.  Yes, correct.

7    Q    All right.

8         MR. WILSON:  Now, go to 42.

9    BY MR. WILSON:

10   Q    Now, this is HarbourVest #42.

11        MR. WILSON:  Go down to the next page.

12   BY MR. WILSON:

13   Q    And this is the Highland CLO Funding, Ltd. Unaudited

14   Condensed Statement of Operations for the Financial Period

15   Ended 30 June 2020.  And so this is just half a year of

16   operations.  And would you -- and this actually has a

17   comparison between 2019 and 2020.  But do you see where it

18   says investment income has dropped from a million dollars in

19   the first half of 2019 to $381,000 in the first half of 2020?

20   A    Yes.

21        MR. WILSON:  Okay.  Scroll down.

22   BY MR. WILSON:

23   Q    And do you see where, in the first half of 2019, total

24   expenses were $1.85 million, and then in the first half of

25   2020 total expenses were $2.16 million?  Do you see that?

1  A    I do.

2  Q    And if you go down below that, where it says Net Realized

3  and Unrealized Gain/Loss on Investments, the first half of

4  2019 HCLOF lost $12 million, and in the first half of 2020 it

5  lost $39.472 million?

6           MR. MORRIS:  Your Honor, I'm going to object.  It's

7  John Morris for the Debtor.  I'm happy to stipulate.  In fact,

8  he can offer this document into evidence.  There's no

9  foundation that Mr. Pugatch has any particularized knowledge

10 about any of the numbers behind this.  All he's asking him to

11 do is to confirm what the document says.  It says what it

12 says.  But this -- I'll object on that basis, Your Honor.

13          THE COURT:  All right.  Mr. Wilson, what about it?

14 You're just getting him to read numbers off of these exhibits.

15          MR. WILSON:  Well, --

16          THE COURT:  Shall we just --

17          MR. WILSON:  -- I understood --

18          THE COURT:  -- by stipulation get them into evidence?

19          MR. WILSON:  Well, --

20          MR. MORRIS:  No objection, Your Honor.

21          MS. WEISGERBER:  No objection.

22          THE COURT:  All right.  So these are exhibits what?

23 We've gone through 39, 41, and I don't know what else.  40,

24 maybe?

25          MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

Pugatch - Cross                    137

1  were on the HarbourVest exhibit list.

2          THE COURT:  All right.  Those will be admitted, and

3  we've already discussed what docket entry number they appear

4  at.

5      (HarbourVest's Exhibits 39 through 42 are received into

6  evidence.)

7          THE COURT:  All right.  Anything else?  You told me

8  you had 10 more minutes about 15 minutes ago.

9          MR. WILSON:  Well, I'm sorry if I -- I think I had

10 said I had at least ten more minutes, and I was looking at the

11 -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12 have longer than that.  I'm sorry, Your Honor.

13         THE COURT:  Well, --

14         MR. WILSON:  But --

15         THE COURT:  -- I feel like I'm being --

16         MR. WILSON:  -- I'll try to proffer --

17         THE COURT:  Okay, Mr. Wilson, let me just tell you

18 something.  I feel like I'm being disrespected now, and the

19 parties are.  We really need to pick up the pace.  I've told

20 you I've got a 1:30 docket -- with four or five matters on it,

21 by the way.  I've got a 2:00 o'clock docket.  I'm starting

22 them late.  No one advised my courtroom deputy that we were

23 going to need all day today for this, okay?  So you've got

24 five more minutes to wrap it up, and then, of course, I have

25 to go to Mr. Draper and see if he has cross.  All right?  So

 1  please don't test my patience any more.  Five minutes to

 2  finish.

 3          MR. DRAPER:  Judge, I have no questions.

 4          THE COURT:  I didn't hear you, Mr. Draper.  What did

 5  you say?

 6          MR. DRAPER:  I have no questions.

 7          THE COURT:  All right.  Very good.

 8          MR. WILSON:  I apologize, Your Honor.  I was actually

 9  trying to be respectful of your time when I informed you that

10  I had at least ten more minutes left at 12:50, but I will try

11  to be as expedient as I can as I finish up.

12  BY MR. WILSON:

13  Q   And I don't see you on my screen.

14          MR. WILSON:  You can take that document down.

15          THE WITNESS:  Here.

16  BY MR. WILSON:

17  Q   Mr. Pugatch, do you have an opinion as to what caused

18  these incredible losses of value at HCLOF?

19          MS. WEISGERBER:  Objection to the extent it calls for

20  a legal conclusion.

21          THE COURT:  Overruled.  He can answer.

22          THE WITNESS:  I would say that there's no one cause

23  for the decline in value.  I can point to a number of

24  different things, including the exorbitant fees that were

25  charged to HCLOF, including the inability to be able to re --

1    refinance the CLOs on the part of HCLOF, all of which stems

2    from the actions that Highland took prior to our investment in

3    HCLOF.

4    BY MR. WILSON:

5    Q    And you've -- I think it's been referenced several times

6    in HarbourVest's arguments that -- that the reset was a

7    fundamental -- the inability to get a reset was a fundamental

8    cause of the loss in value.  Is that -- is that HarbourVest's

9    position?

10   A    That -- that is a part of the -- the cause in the

11   declining value of the CLOs, yes.

12   Q    And you would agree with me that a reset is fundamentally

13   a reset of interest rates, correct?

14   A    Of the interest rates of the liabilities of the -- the

15   timing for repayment of those liabilities, yes.

16   Q    Now, just say with -- for the sake of a hypothetical

17   example.  If you had a home that was valued at $5 million, or

18   let's just say $500,000, let's make it more realistic.  If you

19   had a $500,000 home and you had a mortgage on that home at

20   five percent interest, your inability to refinance that home

21   at a lower interest rate would not affect the underlying value

22   of that home, correct?

23          MS. WEISGERBER:  Objection, Your Honor. Hypothetical.

24   And objection to relevance as well.

25          THE COURT:  Sustained.

Pugatch - Cross                    140

1           MS. WEISGERBER:  Calls for speculation.

2           THE COURT:  Sustained.

3   BY MR. WILSON:

4   Q   Is there any reason to believe that the change in the

5   interest rate would have prevented the massive losses of

6   investment value that occurred in HCLOF?

7           MS. WEISGERBER:  Object on the same grounds.

8           THE COURT:  Sustained.

9           THE WITNESS:  The short -- the short answer is yes,

10  with a -- with the amount of leverage --

11          MS. WEISGERBER:  I --

12          THE WITNESS:  -- that exists.  Oh, sorry.

13          MS. WEISGERBER:  The objection was sustained.

14          THE COURT:  Yeah, I sustained the objection.  That

15  means you don't answer.

16          THE WITNESS:  I'm sorry, Your Honor.

17  BY MR. WILSON:

18  Q   So, would you agree with me that if the expenses and the

19  fees charged by the portfolio manager increased dramatically,

20  that would -- that would impact the value of the investment,

21  correct?

22          MS. WEISGERBER:  Objection on the same grounds, and

23  relevance.  This is a 9019 hearing, Your Honor.  We are not

24  here to try every minutia.  And in fact, we're trying to avoid

25  a trial on the merits.  And it feels like we're getting a bit

1    far afield now.

2            THE COURT:  I sustain.

3            MR. WILSON:  All right.  I'll pass the witness.

4            THE COURT:  All right.  Mr. Draper said he had no

5    cross.  So, any redirect, Ms. Weisgerber?

6            MS. WEISGERBER:  No, Your Honor.

7            THE COURT:  All right.  Mr. Morris, did you have any

8    redirect?

9            MR. MORRIS:  I do not, Your Honor.  I have a very

10   brief closing and then some additional remarks if -- if we

11   finish.

12           THE COURT:  All right.  So, Mr. Pugatch, that

13   concludes your testimony.  Thank you.  You're excused if you

14   want to be.

15       All right.  So, as I understood it, there would be no more

16   evidence after this.

17           MR. WILSON:  Well, Your Honor, along those lines, as

18   a housekeeping measure, I think everything on my exhibit list

19   is included on someone else's exhibit list, but just for belt

20   and suspenders I would move to admit all of the exhibits on

21   the -- on Mr. Dondero's exhibit list.

22           THE COURT:  Well, is that agreed or not?  Because we

23   didn't have a witness to get them in.

24           MR. MORRIS:  No objection, Your Honor.

25           THE COURT:  Any objection?  All right.  If there's no

1    objection, I'll --

2         MR. MORRIS:  Your Honor, --

3         THE COURT:  I'm sorry.  Was there an objection?  I

4    will admit Dondero Exhibits A through M, and those appear at

5    Docket Entry 1721, correct, Mr. Wilson?

6         MR. WILSON:  That is correct, Your Honor.

7         THE COURT:  All right.

8         MR. WILSON:  That is correct, Your Honor.

9       (James Dondero's Exhibits A through M are received into

10   evidence.)

11        MR. WILSON:  And one final matter is, during the

12   examination of Mr. Seery, you at least partially admitted

13   Dondero's Exhibit N, and I was wondering if we need to -- how

14   we'd need to submit that for the record.

15        THE COURT:  Okay.  First, I'm confused.  I think you

16   said Mr. Terry's testimony.  You --

17        MR. WILSON:  I said Seery.  I'm sorry.

18        THE COURT:  Oh, Seery?

19        MR. WILSON:  Or I may have said Terry, but I meant to

20   say Seery.

21        THE COURT:  Okay.  Maybe you said it.  Okay.  During

22   Mr. Seery's testimony -- oh, the email that I admitted a

23   portion of?

24        MR. WILSON:  That is -- that's correct, Your Honor.

25        THE COURT:  What -- what are you asking?  It's not in

1    your notebook.  Are you asking do you need to separately

2    submit it or what?

3           MR. WILSON:  Yeah, I was just asking what the Court's

4    preference on how we submit that for the -- put it in the

5    record.

6           THE COURT:  Okay.  That was so garbled I didn't hear

7    you.  You need to file that on the docket as a supplemental

8    exhibit that was admitted, okay?

9           MR. WILSON:  Okay.  Thank you, Your Honor.

10          THE COURT:  All right.  Closing arguments?  Mr.

11   Morris?

12               CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13          MR. MORRIS:  Yes, very briefly, Your Honor.  The

14   Debtor easily meets the standard here.  The settlement

15   consideration relative to the claim establishes and reflects

16   the likelihood of success on the merits.

17       You know, I've never -- I did hear Mr. Pugatch in the

18   deposition the other day, but I otherwise haven't heard from

19   him.  I found him to be incredibly credible, Your Honor, and I

20   regret the fact that he and HarbourVest are being blamed twice

21   here.  The fact that they got 40,000 documents or didn't read

22   the arbitration award, it's just -- it's a shame that they're

23   being dragged through this yet again.

24       The fact is, Your Honor, there is no evidence that they

25   made the disclosures that HarbourVest claims -- complains

 1  about.  They just don't.  The fraudulent transfers led to the

 2  bankruptcy, led to the appointment of a trustee, led to --

 3  right?  So, so it's -- that's why -- but they're getting

 4  something for their claim.

 5      It was a hard negotiation, Your Honor.  There is no

 6  dispute that if we litigated this it would be complex.  It

 7  would fact-intensive.  The Debtor would be forced to rely upon

 8  witnesses who are no longer employed by it.  That it would be

 9  expensive, for sure.  There's no dispute about any of that.

10  There's no dispute that the creditor body has spoken loudly

11  here by unanimously refraining from objecting except for Mr.

12  Dondero and the entities controlled by him.

13      And you heard Mr. Seery's testimony.  I think he

14  exhaustively informed the Court as to the process by which the

15  transaction was analyzed and negotiated, and there's no

16  evidence to the contrary that this was an arm's-length

17  negotiation.

18      Unless Your Honor has any questions, we would request that

19  the motion be granted.

20          THE COURT:  Thank you.  Ms. Weisgerber, your closing

21  argument?

22          CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23          MS. WEISGERBER:  Sure.  Thank you, Your Honor.  I'll

24  also be brief.  We again join in Mr. Morris's arguments and

25  comments.

1    The Court has now heard testimony from Mr. Pugatch

2  regarding the factual detail underlying HarbourVest's claims.

3  The Court has also heard about the significant damages that

4  HarbourVest stands to recover for those claims.  And

5  HarbourVest came to this Court ready to litigate.  It would --

6  it's ready to do so if needed.  It believes it would prevail

7  on its claims if it had to do so.

8    But the Court also heard from Mr. Seery about his

9  understanding of HarbourVest's claims, his calculus, and his

10  decision to settle them.  And we submit that nothing further

11  is needed by this Court in order to approve the settlement.

12  This is a question of the Debtor's business judgment.  We're

13  not here to have a trial on the merits of HarbourVest's

14  claims.  The Objectors have made various arguments, including

15  about the cause of HarbourVest's damages.  But even the nature

16  of the legal claims that HarbourVest is asserting, some do not

17  require a loss causation.  So we submit that's not even

18  relevant to the merits of the claims.

19    The settlement is clearly in the best interest of the

20  estate, and we respectfully request that the Court approve it.

21    THE COURT:  Thank you.  All right.  Mr. Wilson, your

22  closing argument?

23    MR. LYNN:  Michael Lynn.  I will give the closing

24  argument, if that's satisfactory to the Court.

25    THE COURT:  All right.  Go ahead.

CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

1

2          MR. LYNN:  Good afternoon, Your Honor.  I just want

3    to make a few points, and I'll try to do it as quickly as

4    possible.

5        First, I feel compelled to address the argument of the

6    Debtor that Mr. Dondero is repeating his litigious behavior

7    from the Acis case.  I don't know about the Acis case.  I

8    wasn't involved except very, very peripherally.  But with

9    respect to this case, we have only taken positions in court

10   that we believed -- that is, his lawyers -- believed were

11   warranted by law, facts as we knew them, and that are

12   consistent with professionalism.  I'd be glad to explain any

13   position we took.

14       Often, through the Debtor's very persuasive powers, we

15   never had the chance to explain our position previously to the

16   Court.  In fact, for the most part, as today, we have been

17   reactive rather than commencing proceedings.  In fact, during

18   the first seven months of this case, we only appeared in court

19   a few times, when we felt we had to -- for example, when

20   discovery was being sought by the Creditors' Committee that we

21   feared might invade privilege.  Then, much to the Debtor's

22   fury, we opposed the Acis 9019.  We did so because we thought

23   it was too much.

24       Since, as the Court can see, the principal instigators of

25   litigation have been the Debtor, and to a lesser extent, the

1  Committee.

2      Indeed, in an apparent effort to drown Mr. Dondero and his

3  counsel in litigation, the Debtor has repeatedly sought court

4  action on a very short fuse, claiming need for expedited

5  hearing.

6      Perhaps the most startling example of this is the recent

7  contempt motion, for which there is no good reason for a quick

8  hearing.  Resolution of that motion is not necessary to reach

9  the confirmation hearing.  The motion could be heard after the

10  confirmation hearing.  There is no need to put Mr. Dondero and

11  his professionals in a position where they have to respond in

12  a couple of days, two business days, and then will have two

13  days to prepare for trial.

14      Second, Your Honor, Mr. Seery has repeatedly asserted,

15  contrary to today's motion, that the HarbourVest claim was of

16  no merit.  That is why, when he came in to settle for tens of

17  millions of dollars, we opposed this motion.  It appears that

18  the motion is occurring without any cross-party discovery.

19  There is no consideration, apparently, of trying dispositive

20  -- dispositive motions first.  There is no consideration for

21  junior classes of equity, which Mr. Seery has previously

22  opined were in the money.  This, even though there's no reason

23  that this settlement is necessary pre-confirmation, unless Mr.

24  Seery wants HarbourVest's vote.

25      Third, for whatever reason, that seems to be the driving

1  factor for settling.  On its face, the vote seems to be a key

2  factor of the settlement.  About the longest provision of the

3  settlement agreement relates to voting.  The motion itself --

4  in the motion itself, five of seven bullet points cited by the

5  Debtor for approval of the settlement deal with and emphasize

6  support of the plan or the vote that is to be cast for the

7  plan.

8      If the settlement is a good deal, it didn't need to have

9  as one of its parts the requirement that HarbourVest vote for

10  the plan.

11      Your Honor, I'll stop there.  I know Your Honor would like

12  to get just a few minutes before your 1:30 docket.  I've been

13  there and I understand that, and I do apologize for taking the

14  time we have, but I think that responsibility is shared with

15  the Debtor and HarbourVest.

16      Thank you, Your Honor.

17          THE COURT:  All right.  Thank you for that.

18      Mr. Draper, any closing argument from you?

19    CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

20          MR. DRAPER:  Yes, I have three comments.  The first

21  is the claim -- the loss claim, absent the fraud claim, is, at

22  best, $7 million.  I think Mr. Seery's argument that a hundred

23  -- one hundred percent is attributable to there is just wrong.

24  If he and I both invested in a company 50-50 and it goes

25  broke, we only lost 50 cents each.

1        Number two, I think the Court heard the evidence.  I think

2   this is, at best, a subordinated claim under 5 -- under the

3   Bankruptcy Code.  It's really a "But for the

4   misrepresentations, we wouldn't have invested."

5        And the last one is the -- Judge Lynn represented the

6   voting, so I won't deal with that.  But the one that troubles

7   me the most is the fact that this asset that is ultimately

8   being paid for in claim dollars that's being transferred over

9   to the Debtor and being put it outside the estate, outside the

10  purview of this Court, and placed in some subsidiary, this --

11  this transaction, if it is approved, must -- should contain a

12  provision that the asset that's being acquired come into the

13  Debtor and be owned by the Debtor.

14            THE COURT:  All right.

15            MR. DRAPER:  I have nothing further, Your Honor.

16            THE COURT:  Thank you, Mr. Draper.

17       Mr. Morris, you get the last word since it's your motion.

18            MR. MORRIS:  Very quickly, Your Honor.  The

19  subordination argument doesn't hold water.  This is not a

20  claim against the Debtor for the security; it's a claim for

21  fraud.  Okay?  So, so 510(b), if it was a claim against HCLOF,

22  that might make sense, but this is a claim against the Debtor.

23  And it's a Debtor -- it's a claim for fraud.  That's number

24  one.

25       Number two, we need to keep this exactly as it's been

1  structured in order to avoid litigation.  Mr. Seery told the

2  Court.  I'm sure the Court can make its own assessment as to

3  Mr. Seery's credibility as to whether or not the Debtor is

4  intending to somehow get this asset beyond the Court.

5      But there are reasons why we've done this, Your Honor.

6  They could have made an objection on that basis.  In fact, if

7  they did, it would be overruled, because there's no -- there's

8  no basis for this Court to find that somehow the Debtor and

9  Mr. Seery are doing something untoward to get assets away from

10  this Court's jurisdiction.

11      You know, I don't know what to say about Mr. Lynn's

12  commentary.  Much of it had nothing to do with any evidence in

13  the record.

14      The fact remains, Your Honor, that this settlement is

15  fair.  It's reasonable.  It's in the best interest of the

16  estate.  And we would respectfully request that the Court

17  grant the motion.

18          THE COURT:  All right.  Thank you.  Well, I

19  appreciate all the arguments and evidence I have heard today.

20  I'm going to be brief in my ruling here, but I reserve the

21  right to supplement in a more fulsome written order, which I'm

22  going to instruct Mr. Morris to submit.  I am approving the

23  motion to compromise the HarbourVest claim today, and I guess

24  subsumed in that is granting the motion to allow their claim

25  for 3018 voting purposes.

1     I in all ways find this compromise to meet the required

2    legal standard set forth in such cases as *TMT Trailer Ferry*,

3    *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4    cases.

5     First, I'm going to specifically say for the record that I

6    found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7    very credible.  Very credible testimony and meaningful

8    testimony was provided to the Court today.  And based on that

9    testimony, I find, first, that this compromise was the product

10    of arm's-length negotiations.  It was a hard-fought

11    negotiation, as far as I'm concerned.  The Debtor objected to

12    these numerous HarbourVest proofs of claim.  The Debtor did

13    not want to allow HarbourVest a significant claim for voting

14    purposes.  I duly note the statements made in the disclosure

15    statement before this compromise was reached suggesting, you

16    know, the Debtor didn't think HarbourVest should have a large

17    claim.

18     That is consistent with everything I typically see in a

19    bankruptcy case when there's a claim objection.  The objector

20    vehemently denies the claimant should have a proof of claim,

21    and then people sit down and think about the risks and rewards

22    of litigating things.  And I believe very fervently that's

23    what happened here.  There were good-faith, arm's-length

24    negotiations that resulted in this proposed compromise.

25     I find the compromise -- and I'll add to that point, on

1   the good-faith point, I find nothing sinister or improper

2   about the fact that the compromise includes a commitment of

3   HarbourVest to vote in favor of the plan.  Again, we see this

4   a lot.  You know, there's even a buzz word that doesn't even

5   exist in the Bankruptcy Code:  "plan support agreement."  You

6   know, we see those a lot -- you know, oftentimes negotiated

7   before the case, but sometimes after.  You know, it may be

8   improper in certain situations, but there was nothing here

9   that troubles me about that component of the compromise.

10      I find the compromise to meet the paramount interest of

11  creditors here.  Notably, we have very large creditors in this

12  case who have not objected.  The *Foster Mortgage* case from the

13  Fifth Circuit tells me I am supposed to consider support or

14  opposition of creditors.  No opposition of UBS.  No opposition

15  of the Redeemer Committee Crusader Fund.  No opposition from

16  Josh Terry or Acis.  No opposition from Daugherty.

17      But moreover, when considering the paramount interest of

18  creditors, I find this compromise to be in all ways fair and

19  equitable and in the best interest of the estate, and

20  certainly within the range of reasonableness.  The evidence

21  showed that HarbourVest asserted over $300 million.  Over $300

22  million.  Granted, that was based on all kinds of legal

23  theories that would be contested and expensive to litigate,

24  but the evidence also showed that they invested over $70

25  million.  You know, close to $75 million.  I forget the exact

1    number.  $75 or $80 million, somewhere in that range.  And now

2    the credible evidence is that investment is worth about $22

3    million.

4        So, certainly, while the claim may not have, at the

5    ultimate end of the day in litigation, resulted in a $300

6    million proof of claim, certainly, certainly there were strong

7    arguments for a very sizeable claim, more than this compromise

8    amount.  So it's certainly fair and equitable and reasonable

9    when considering the complexity and duration of further

10   litigation, the risks and rewards, the expense, delay, and

11   likely success.

12       A couple of last things I'm going to say are these.  I

13   understand, you know, there is vehement disagreement on the

14   part of our Objectors to the notion that Highland might have

15   caused a $50 million loss to HarbourVest.  But I will tell

16   you, for what it's worth -- I want the record clear that this

17   is part of my evaluation of the reasonableness of the

18   settlement -- my reaction is that, indeed, Highland's

19   litigation strategy in the Acis case caused HCLOF to lose a

20   huge portion of its value, to the detriment of HarbourVest.

21   You know, whether all evidence at the end of the day would

22   convince me of that, I don't know, but that's -- that is

23   definitely this judge's impression.

24       I'm very sympathetic to HarbourVest.  It appears in all

25   ways from the record, not just the record before me today, but

1   the record in the Acis case that I presided over, that

2   Highland back then would have rather spent HarbourVest's

3   investment for HCLOF legal fees than let Josh Terry get paid

4   on his judgment.  They were perfectly happy to direct the

5   spending of other people's money, is what the record suggested

6   to me.

7        And then, you know, I have alluded to this very recently,

8   as recently as last Friday:  I can still remember Mr.

9   Ellington sitting on the witness stand over here to my left

10  and telling the Court, telling the parties under oath, that

11  HarbourVest -- he didn't use its name back then, okay?  For

12  the first phase of the Acis case, or most of the Acis case, we

13  were told it was an investor from Boston.  And at some point

14  someone even said their name begins with H.  I mean, it seemed

15  almost humorous.  But Mr. Ellington said it was they,

16  HarbourVest, the undisclosed investor, who was insistent that

17  the Acis name was toxic, and so that's what all of this had

18  been about:  the rebranding, the wanting to extract or move

19  things away from Acis.

20       So, you know, I have heard for the -- well, at least the

21  second time today, from Mr. Pugatch, what I perceive to be

22  very credible testimony that that's just not the way it

23  happened.

24       And I guess the last thing I want to say here today, and

25  you know, I guess I have multiple reasons for saying this, not

 1   just in connection with approving the settlement, you know,

 2   I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

 3   you know, a crazy amount of value, that they underperform in

 4   the market, that, you know, during the Acis/Brigade tenure

 5   and, you know, they should have been reset.  You know, I hope

 6   those who have not been around as long as some of us in this

 7   whole saga know that the -- Mr. Terry, Mr. Phelan, I think

 8   Brigade, they all desperately wanted to reset these things,

 9   but it was HCLOF, I believe directed by Highland, that wanted

10   to redeem, wanted to liquidate, take the pot of money,

11   warehouse it, and then do their own thing.

12       And there was, I think, from my vantage point, a

13   monumental effort to try to get everyone to the table to do

14   reasonable resets that would be good for the stakeholders at

15   HCLOF and be good for the creditors of Acis, including Josh

16   Terry.  That was always the balancing act that most of us were

17   focused on during the Acis bankruptcy.  But Highland, I

18   believe, directing HCLOF's strategy, just did not want the

19   resets to happen.

20       So, again, part of me, I suppose, just wants to make the

21   record clear on something that I fear not everyone is clear

22   about.  And I say that because the comment was made that the

23   injunctions, the preliminary injunctions sought by the Acis

24   trustee caused the plummet in value, and I think that's just

25   not an accurate statement.  I think litigation strategies are

1    what caused the plummet in value, and that's why I think

2    ultimately HarbourVest would potentially have a meritorious

3    claim here in a significant amount if this litigation were to

4    go forward.

5         So, I approve this under 9019.  And again, Mr. Morris,

6    you'll upload an order.

7         It is now 1:41, so let's as quickly as possible hear the

8    other motion that I don't think had any objections.  Mr.

9    Morris?

10            MR. MORRIS:  Your Honor, just -- yes, just very

11   quickly, just four things.

12        With respect to the order, I just want to make it clear

13   that we are going to include a provision that specifically

14   authorizes the Debtor to engage in -- to receive from

15   HarbourVest the asset, you know, the HCLOF interest, and that

16   that's consistent with its obligations under the agreement.

17        The objection has been withdrawn, I think the evidence is

18   what it is, and we want to make sure that nobody thinks that

19   they're going to go to a different court somehow to challenge

20   the transfer.  So I just want to put the Court on notice and

21   everybody on notice that we are going to put in a specific

22   finding as to that.

23            THE COURT:  All right.  Fair --

24            MR. MORRIS:  Number two is --

25            THE COURT:  Fair enough.  I do specifically approve

 1   that mechanism and find it is appropriate and supported by the

 2   underlying agreements.

 3        And just so you know, I spent some time noodling this

 4   yesterday before I knew it was going to be settled, so I'm not

 5   just casually doing that.  I think it's fine.

 6        Okay.  Next?

 7             MR. MORRIS:  Thank you very much, Your Honor.  Number

 8   two, with respect to the motion to pay, there is no objection.

 9   If we can just submit an order.  Or if Your Honor has other

10   guidance for us, we're happy to take it.

11             THE COURT:  Okay.  Does anyone have anything they

12   want to say about that motion?

13        Again, I looked at it.  I didn't see any objections.  I

14   didn't see any problem with it.  It's -- you know, you're

15   going through this exercise because of the earlier protocol

16   order.

17             MR. MORRIS:  Correct.

18             THE COURT:  All right.  Well, if there's nothing,

19   then, I will approve that, finding there is good cause to

20   grant that motion.

21             MR. MORRIS:  Okay.

22             THE COURT:  All right.  Is the only other

23   housekeeping matter --

24             MR. MORRIS:  I --

25             THE COURT:  -- we have the contempt motion?

1          MR. MORRIS:  It is, and I do -- I do have to point

2   out how troubled the Debtor is to learn that Mr. Dondero was

3   still receiving documents from Highland as late as this

4   morning.  It's got to be a violation of both the TRO -- I

5   guess it's now the preliminary injunction.

6      I would respectfully request -- I know that time is what

7   it is -- but maybe Mr. Dondero can answer now where he got the

8   document, who he got the document from, what other documents

9   he's gotten from the Debtor since Your Honor ordered him not

10  to communicate with the Debtor's employees.

11     This is not saying hello in the hallway.  I mean, this is

12  just -- it is really troubling, Your Honor, and it's why we

13  need the contempt motion heard as soon as possible.

14          THE COURT:  Well, Mr. Wilson, do you want to address

15  that?  I think the words I heard were that you just got the

16  document this morning, and you got it from Mr. Dondero, but we

17  don't know where and when Mr. Dondero got it.  Mr. Wilson, are

18  you there?

19          MR. LYNN:  I'm afraid I'm back, Your Honor.

20          THE COURT:  Okay.

21          MR. LYNN:  I am not sure whether Mr. Dondero had it

22  in his files from some -- from back before he was asked not to

23  communicate with members or with employees of the Debtor.  I

24  believe -- I believe he's with us, though I don't think he's

25  available by video.

1      Are you there, Mr. Dondero?

2           THE COURT:  We can't hear you, Mr. Dondero.

3           MR. DONDERO:  Judge?

4           THE COURT:  Oh, go ahead.

5           MR. DONDERO:  Can you hear me now?

6           THE COURT:  Yes.

7           MR. DONDERO:  Yes, I -- I -- when I moved offices, I

8 found it in a stack of paper, and --

9           MR. LYNN:  I understand it shows that his microphone

10 is working.

11           THE COURT:  Okay.  Go ahead.

12           MR. DONDERO:  Can you hear me?

13           THE COURT:  Yes, go ahead.

14           MR. DONDERO:  Yeah, I -- I'm sitting in new offices.

15 I've got everything in boxes.  I was going through everything

16 yesterday, and I found those emails in a stack of papers and I

17 sent them over because I thought they would be relevant

18 relative to Seery's initial impression.

19           THE COURT:  Okay.  Well, let's talk about the timing

20 of this hearing.  Mr. Morris, I'm going to -- I'm going to ask

21 you why --

22           MR. LYNN:  Michael Lynn, Your Honor.  I don't want to

23 waste the Court's time.  We have not made available anything

24 to the Court objecting to the expedited hearing on the

25 contempt motion.  We've been here.

1      I would say to Your Honor that if Mr. Dondero is indeed in

2 contempt, or was in contempt toward the motion, which has

3 nothing to do with the document that was presented as Dondero

4 Exhibit N, there is no need to hear this on an expedited

5 basis.

6      Every time we turn around, Your Honor, the Debtor is

7 asking that something be heard on an expedited basis. And we

8 have not opposed that. We have not fought that, to speak of,

9 to date. But this is getting a little ridiculous. We're

10 within days of confirmation of the Debtor's plan, and it is

11 simply a means of causing pain and suffering to Mr. Dondero

12 and those who are working with him and for him. And he does

13 have employees at NexPoint who are assisting him.

14      So we most strongly object to being put on a schedule

15 where we are expected to get a response to the contempt motion

16 on file by Monday, today being Thursday, and a weekend

17 intervening. And we strongly object to any setting of this

18 contempt motion on Tuesday or Wednesday. It is absurd, and it

19 is done solely, solely, Your Honor, to cause pain.

20           THE COURT: All right.

21           MR. MORRIS: Your Honor, if I may?

22           THE COURT: Please.

23           MR. MORRIS: Just very briefly, we had a hearing the

24 other day. The evidence is the exact same. The evidence is

25 crystal clear that the violations are meaningful, they're

1    substantial, and they are repeated.

2        After the TRO was entered into, Mr. Dondero and only Mr.

3    Dondero chose to interfere with the Debtor's business.  Mr.

4    Dondero and only Mr. Dondero chose to communicate with the

5    Debtor's employees, not about saying hello in the hallway but

6    about coordinating a legal defense strategy against the

7    Debtor.

8        The need is immediate, Your Honor, and I would

9    respectfully request that the hearing be set for Tuesday or

10   Wednesday.  They've had this motion now since the 7th of

11   January.  They had a full evidentiary hearing, so they know

12   most of the evidence that's going to be presented.  They have

13   a whole team of -- they have an army of lawyers, Your Honor,

14   and half a dozen firms working on behalf of Mr. Dondero and

15   his interests.  For him to cry here, for him to cry that this

16   is too much is really -- it's obscene.  It just is.

17              THE COURT:  All right.  I'm going to say a couple --

18              MR. LYNN:  That is absurd.

19              THE COURT:  I'm going to say a couple of things.  One

20   is that I -- well, the one time I remember getting reversed

21   for holding someone in contempt of court, the District Court

22   felt like I had not given enough notice of that.  The District

23   Courts, what they think is reasonable notice, is sometimes

24   very different from what the bankruptcy judges think.  We're

25   used to going very lickety-split fast in the bankruptcy

1  courts.  And the Courts of Appeals, District Court, Courts of

2  Appeals obviously, for good reason, are very concerned about

3  due process in this kind of context.  So I'm sensitive to

4  that.

5      I'm also sensitive to the fact that it is monetary damages

6  that are being sought here to purge the contempt.  Okay?  The

7  shifting of attorneys' fees is basically what I understand is

8  being sought at this point.  You know, we have a preliminary

9  injunction halting behavior at this point, and so I think

10  that's another reason I'm hesitant to give an emergency

11  hearing.  I feel like monetary damages can wait and we can

12  give 21-plus days' notice of the hearing.

13      But I'm going to throw this out there as well.  If I do

14  feel like there is a showing of contempt, if I do feel like

15  the phone -- as I told you the other day, I'm very, very

16  fixated on the phone that may have been destroyed or thrown

17  away, maybe at Mr. Dondero's suggestion.  I mean, the

18  potential monetary sanction here may be very, very large if

19  the evidence plays out in the way I fear it might play out.

20  So I need to make sure everybody has adequate time to prepare

21  for that hearing and make sure I get all the evidence I need

22  to see.  All right?  Contempt of court is very, very, very,

23  very serious, and I don't think anyone would deny that.

24      So, with that, it was filed what day?  January 4th?  Is

25  that what I heard?  Or --

1          MR. MORRIS:  January 7th, I believe, Your Honor.

2          THE COURT:  January 7th?  All right.  Well, Traci,

3   are you there?  Hopefully, you're not in a hunger coma at this

4   point.

5          THE CLERK:  I am here.

6          THE COURT:  Okay.  We have -- we're going to have to

7   go to that first week of February, right?  Because we've got

8   the confirmation hearing that, you know, late in January, and

9   then --

10         THE CLERK:  Yes.  Uh-huh.

11         THE COURT:  Okay.  Do you have an available date to

12  give right now?

13         THE CLERK:  How about -- if you're willing to hear

14  them on Friday, February 5th.

15         THE COURT:  Okay.  I can do that.  February 5th at

16  9:30.  Any -- anybody want to argue about that?

17         MR. MORRIS:  Thank you, Your Honor.  That's

18  acceptable to the Debtor.

19         THE COURT:  Okay.  Mr. Lynn, is that good with you?

20         MR. LYNN:  We'll do that, Your Honor.  I would say,

21  by the way, that I'll be happy to buy Mr. Seery, out of my own

22  pocket, five cell phones, which ought to make up for the one

23  that was lost, though I recognize that those cell phones will

24  not have on them the privileged information, the conversations

25  between his lawyers and Mr. Dondero that I imagine he was

1  looking forward to seeing.

2       THE COURT: Well, I wouldn't want him to see that

3  information, but I do think he's entitled to any nonprivileged

4  information, texting, or calls that are on that phone. So,

5  again, I'm either going to hear good explanations for that or

6  not, but it's something very concerning to me.

7    All right. So we have a game plan.

8    I'm going to ask, Did we have good-faith negotiations

9  between Dondero and the Committee and anything positive to

10  report? I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11       MR. CLEMENTE: Yes, Your Honor. I'll go first, Your

12  Honor. Mr. Lynn and I have exchanged several emails over the

13  weekend, and the message that I sent to Mr. Lynn was very

14  clear. There had been a term sheet that Mr. Seery had sent

15  back to Mr. Dondero. I had asked Mr. Lynn to take a pencil

16  out and be very specific as to what it was Mr. Dondero was

17  prepared to do in connection with the pot plan. I instructed

18  him that some of the issues that the Committee still has is

19  obviously the overall value, along with the concept that's

20  signing up to a promise from Mr. Dondero to comply with

21  (indiscernible) as part of that value. As Your Honor may

22  understand, the Committee is obviously very skeptical of Mr.

23  Dondero's future performance under an agreement that he enters

24  into.

25    Those are but a couple of issues, Your Honor, that I

1  advised Mr. Lynn were very concerning to the Committee.  And I

2  suggested to him that if he wanted to move things forward, the

3  best way to do it would be to come to us with a fulsome term

4  sheet that explained exactly what it was in clear and precise

5  detail that Mr. Dondero was proposing, and that would be the

6  best way to move the process forward, Your Honor.

7           THE COURT:  All right.  Mr. Lynn, anything to add to

8  that?

9           MR. LYNN:  Well, Your Honor, my experience in

10  negotiations is that it is useful to agree on substantive

11  terms, or at least be in the ballpark, before term sheets are

12  exchanged.  Long ago, a term sheet was prepared and presented

13  to the Committee.  Ultimately, I think it was rejected, though

14  I don't know if we ever received a formal rejection.

15     I explained in my emails, which I'm happy to share with

16  the Court if Your Honor wants to see them, why I was reluctant

17  to try to put into a term sheet form the proposal that I

18  suggested to Mr. Clemente.  As I said, I'm more than happy to

19  provide you with that email chain and let you form your own

20  judgment, Your Honor, as to whether we're proceeding in good

21  faith.

22           THE COURT:  All right.  Well I'm not going to ask --

23           MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

24  Pomerantz.

25           THE COURT:  -- to see any of that.  Mr. Pomerantz?

1    MR. POMERANTZ: May I just be heard real quickly?

2    THE COURT: Sure.

3    MR. POMERANTZ: Your Honor, we also took Your Honor's

4    comments to heart. We, Mr. Seery and I, had an over-an-hour

5    conversation with Mr. Lynn and with Mr. Bonds. We provided

6    them with our thoughts as to what they needed to do in order

7    to move forward. Of course, it's not really the Debtor to

8    agree. It's the creditors to agree. But as Mr. Seery has

9    testified many times before and as I have told the Court, we

10   would support a plan that the Committee and Mr. Dondero could

11   get behind.

12       So we again -- I'm not going to divulge the nature of

13   those communications, but we suggested several things that Mr.

14   Dondero could do in order to move the ball forward, and

15   unfortunately, we have not seen any of those things done thus

16   far. So we are, at this point, not optimistic that there will

17   be a grand bargain plan.

18   THE COURT: All right.

19   MR. DONDERO: Your Honor, could I comment for a

20   second? This is Mr. Dondero.

21   THE COURT: If you and your counsel want you to

22   comment, you can comment.

23   MR. DONDERO: I'd love to do a pot plan. I would

24   love to reach some kind of settlement and everybody move on

25   with their lives. The estate started with $360 million of

1  third-party assets and $90 million of notes.  The $360 million

2  of third-party assets are down to $130 million.

3          MR. POMERANTZ:  Again, Your Honor, I must interrupt.

4  I did this at the last hearing, and it's not my practice to

5  interrupt, but issues regarding what the value is or not, it's

6  going to require a response, and that's not really before Your

7  Honor.  I think before Your Honor is --

8          MR. DONDERO:  Okay.

9          MR. POMERANTZ:  -- have there been negotiations?

10  Have they been in good faith?  If Mr. Dondero wanted to

11  address that, that's fine, but I object to having any

12  discussion at this point, especially with Mr. Dondero not even

13  under oath, on what the nature of the value of the assets and

14  why they have changed and what not.

15          THE COURT:  Well, --

16          MR. POMERANTZ:  It's just not appropriate.

17          THE COURT:  I understand --

18          MR. DONDERO:  Okay.  Can I --

19          THE COURT:  Stop.

20          MR. DONDERO:  Can I -- can I finish?

21          THE COURT:  Let me please respond to that.  I

22  understand your concern, but I've heard from Mr. Seery

23  testimony many months ago about the value plummeting during

24  the case.  And I asked why, and I got some explanations.  This

25  is not evidence.  This is just, you know, this is not going to

1  be binding in any way.  Mr. Dondero can speak as to what he

2  thinks, you know, the situation is.

3     Go ahead, Mr. Dondero.

4       MR. DONDERO:  Okay.  I'm not trying to fixate on the

5  numbers.  And as far as the third-party assets are, we would

6  be willing to pay -- I would be willing to pay for those.  I'd

7  be willing to pay more, and even some value for the affiliate

8  notes that were really part of compensation agreements

9  throughout the history of Highland and avoid the POC

10 arguments.  I'd be willing to pay for the assets and I'd be

11 willing to pay even more than that.

12    I have no transparency in terms of what the assets are,

13 and there's no fulsome discussion in terms of, well, here are

14 the assets, here are the notes, here's what we think the

15 values are, can you get to this number?  It's just a -- you --

16 the -- it -- I don't view there is good-faith negotiations

17 going on because it's always just a:  You need to put a big

18 number on a piece of paper; otherwise, you're going to get run

19 over.

20    And there's no back and forth going on, but it's not due

21 to a lack of willingness on my part.  And maybe there needs to

22 be a committee set up.  Maybe there needs to be, I don't know,

23 a mediator or an examiner or somebody to try and push through

24 the pot plan, but there's nothing happening.  People are not

25 returning the judge's calls, I mean, Mr. Lynn's calls, or my

1   calls.  They're -- there's -- despite efforts of our -- of my

2   own and a willingness of my own, there's no negotiations of

3   any sort going on at the moment.

4           THE COURT:  All right.  I don't want anyone to

5   respond to that.  I know people have different views of what's

6   going on.  But let me just say a couple of things, and then

7   we're done.

8       We do have a Committee in this case.  We have a Committee

9   with very sophisticated members and very sophisticated

10  professionals.  Okay?  That's who I wanted you to be talking

11  to before the end of the day Tuesday.

12      We have had co-mediators in this case.  Okay?  And, you

13  know, I identified very sophisticated human beings for that

14  role.  Okay?  And in fact, there ended up being settlements

15  that flowed out of the co-mediator process.

16      We're now 15 months into the case.  There are major,

17  significant compromises now:  HarbourVest, UBS, Acis, Terry,

18  and Redeemer Committee.  I hate to use a worn-out metaphor,

19  but the train is leaving the station.  We've got confirmation.

20  I've pushed out two weeks.  I mean, you all are either going

21  to get there in the next few days or we're just going to go

22  forward with I think what everyone, you know, would rather be

23  a pot plan, but if we can't get there, we're just going to

24  have to consider the plan that's on the table now.  Okay?

25      You know, the Committee, again, they're sophisticated.

1  They can compare apples to oranges and decide whether the plan

2  on the table, with its risks of future litigation and

3  recoveries, whether it's better or worse than whatever

4  consideration you're offering, Mr. Dondero.

5      And you know, as we all know, there is distrust here,

6  there, and everywhere among these parties.  So I can totally

7  understand them, you know, taking a hard line:  We either get

8  all cash or we're just not going to mess with it.  We don't

9  want to risk broken promises.  We'd rather just do litigation.

10      So, anyway, that's as much as I'm going to say except I am

11  going to further direct good-faith negotiations.  It sounds

12  like to me a written term sheet might be the appropriate next

13  step, given where I've heard things are at the moment.  But,

14  you know, I guess we don't have any hearings between now and

15  the 26th, right?  No Highland hearings that I can think of

16  between now and the 26th.

17          MR. POMERANTZ:  I don't think so.

18          MR. MORRIS:  I think that's correct, Your Honor.

19          THE COURT:  So you have all this time --

20          MR. MORRIS:  At the moment.

21          THE COURT:  You have all this time to negotiate and

22  simultaneously get ready for the confirmation hearing without

23  any other battles.  So I know you will use the time well.

24      All right.  We're adjourned.

25          THE CLERK:  All rise.

171

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 2:04 p.m.)

3                          --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                     CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22 above-entitled matter.

23   **/s/ Kathy Rehling**                    **01/16/2021**

24 _____     _____
Kathy Rehling, CETD-444                     Date
25 Certified Electronic Court Transcriber

172

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Morris                                               12
- By Mr. Kane                                                 18
- By Ms. Weisgerber                                           18
- By Mr. Draper                                               20

WITNESSES

Debtor's Witnesses

James Seery
- Direct Examination by Mr. Morris                           26
- Cross-Examination by Mr. Wilson                            62
- Cross-Examination by Mr. Draper                            87
- Redirect Examination by Mr. Morris                         93

HarbourVest's Witnesses

Michael Pugatch
- Direct Examination by Ms. Weisgerber                       96
- Cross-Examination by Mr. Wilson                           113

EXHIBITS

Debtor's Exhibits A through EE                    Received  35

James Dondero's Exhibits A through M              Received 142
James Dondero's Exhibit N (as specified)         Received  71

HarbourVest's Exhibit 34                          Received 100
HarbourVest's Exhibit 36                          Received 103
HarbourVest's Exhibits 39 through 42              Received 137

CLOSING ARGUMENTS

- By Mr. Morris                                              143
- By Ms. Weisgerber                                         144
- By Mr. Lynn                                               146
- By Mr. Draper                                             148

173

1
2

INDEX
Page 2

3

RULINGS

4
5
6

Motion to Compromise Controversy with HarbourVest 2017    150
Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
HarbourVest Dover Street IX Investment L.P., HV
International VIII Secondary L.P., HarbourVest Skew Base
AIF L.P., and HarbourVest Partners L.P. filed by Debtor
Highland Capital Management, L.P. (1625)

7
8
9

Motion to Allow Claims of HarbourVest Pursuant to Rule    150
3018(a) of the Federal Rules of Bankruptcy Procedure for
Temporary Allowance of Claims for Purposes of Voting to
Accept or Reject the Plan filed by Creditor HarbourVest
et al. (1207)

10
11

Debtor's Motion Pursuant to the Protocols for Authority    157
for Highland Multi-Strategy Credit Fund, L.P. to Prepay
Loan (1590)

12

END OF PROCEEDINGS                                        171

13

INDEX                                                172-173

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 10



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 20, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## ORDER APPROVING DEBTOR'S SETTLEMENT
## WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
## AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "<u>Morris Declaration</u>"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "<u>Settlement Agreement</u>"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "<u>Dondero Objection</u>"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "<u>Trusts' Objection</u>"), filed by the Dugaboy Investment Trust ("<u>Dugaboy</u>") and Get Good Trust ("<u>Get Good</u>," and together with Dugaboy, the "<u>Trusts</u>"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "<u>CLOH Objection</u>" and collectively, with the Dondero Objection and the Trusts' Objection, the "<u>Objections</u>"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "<u>Debtor's Reply</u>"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "<u>HarbourVest Reply</u>"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "<u>HarbourVest</u>"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "<u>Hearing</u>"), including assessing the credibility of the witnesses; and (j) the

2

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the Motion are overruled.

3.      The Settlement Agreement, attached hereto as **<u>Exhibit 1</u>**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

4.      All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.      The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.      Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

4

# EXHIBIT 1

EXECUTION VERSION

SETTLEMENT AGREEMENT

      This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

R E C I T A L S

      **WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

      **WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

      **WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

      **WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

      **WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

      **WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

      **WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

      **WHEREAS**, on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

EXECUTION VERSION

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

   (a)   In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

   (i)   an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

   (ii)   an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

   (b)   On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

   (a)   Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

**EXECUTION VERSION**

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)      Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)      Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.      **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

3

4. **Representations and Warranties**. Subject in all respects to Section 3 hereof:

(a) each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b) the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. **Plan Support.**

(a) Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b) In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c) The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

EXECUTION VERSION

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.  **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.  **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.  **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

EXECUTION VERSION

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.      **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.      **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.      **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.      **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

**EXECUTION VERSION**

14.    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

EXECUTION VERSION

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its:     CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:     Managing Director

EXECUTION VERSION

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By: /s/ Michael Pugatch
Name: Michael Pugatch
Its: Managing Director

# Exhibit A

**TRANSFER AGREEMENT**
**FOR ORDINARY SHARES OF**
**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of January ____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following:  HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

c. Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d. Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e. This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>. The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a. This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b. This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c. The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d. The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e. The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

2

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

   Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

b. The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c. This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d. The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e. This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f. Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g. This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

4

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

<u>**TRANSFEREE:**</u>

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its: Member

By: _____

Name: James P. Seery, Jr.

Title: Chief Executive Officer

<u>**PORTFOLIO MANAGER**</u>**:**

**Highland HCF Advisor, Ltd.**

By: _____

Name: James P. Seery, Jr.

Title: President

<u>**FUND**</u>**:**
**Highland CLO Funding, Ltd.**

By: _____

Name:

Title:

*[Additional Signatures on Following Page]*

5

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By: HarbourVest Partners, LLC


By: _____

Name: Michael Pugatch

Title: Managing Director


**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
         Its General Partner

By:     HarbourVest GP LLC
         Its General Partner

By:     HarbourVest Partners, LLC
         Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
Its General Partner


By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest Skew Base AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
         Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
         Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
         Its General Partner


By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 184668980v.2

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
        Its General Partner

By:    HarbourVest GP LLC
        Its General Partner

By:    HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

# EXHIBIT 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| ***Plaintiffs,*** | § | |
| | § | |
| **v.** | § | **Cause No. _____** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| ***Defendants.*** | § | |

---

## ORIGINAL COMPLAINT

---

### I.

### INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126


1934054210506000000000010

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

## III.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.    At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.    On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.    Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.    On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.    On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054,  Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).  Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values  were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.     Typically, the value of the securities reflected by a market price quote.

41.     However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.     There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.     Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.     Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.     It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.     For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47. Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48. Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49. Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50. Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51. That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52. The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

65. This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66. The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67. The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68. HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69. This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70. It also violated HCM's own internal policies and procedures.

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76. Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77. Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78. Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79. Seery's knowledge is imputed to HCM.

80. Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

## SECOND CAUSE OF ACTION
### Breach of HCLOF Company Agreement
**(By Holdco against HCLOF, HCM and HCFA)**

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

---

100.     Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

101.     No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

102.     Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

103.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

104.     Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

105.     Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106.     Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

107.     It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

108.    It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

109.    It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

110.    Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

111.    Defendants' negligence foreseeably and directly caused Plaintiff harm.

112.    Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
#### *Racketeering Influenced Corrupt Organizations Act*
#### (CLO Holdco and DAF against HCM)

113.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

114.    Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

115.    HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121. On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122. Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123. However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124. The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125. On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

126. In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127. Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128. In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129. Seery was at all relevant times operating as an agent of HCM.

130. This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131. The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132. Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133. Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

FIFTH CAUSE OF ACTION
*Tortious Interference*
(CLO Holdco against HCM)

134. Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135. At all relevant times, HCM owned a 0.6% interest in HCLOF.

136. At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137. Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138. HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.    Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

    a.   Actual damages;

    b.   Disgorgement;

    c.   Treble damages;

    d.   Exemplary and punitive damages;

    e.   Attorneys' fees and costs as allowed by common law, statute or contract;

    f.   A constructive trust to avoid dissipation of assets;

    g.   All such other relief to which Plaintiff is justly entitled.

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
     jeb@sbaitilaw.com

**Counsel for Plaintiffs**

# EXHIBIT 12

1               GRANT SCOTT - 1/21/2021

2        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3                  DALLAS DIVISION

4   IN RE:                        )
                                  )     Chapter 11
5   HIGHLAND CAPITAL MANAGEMENT,  )
    L.P.                          )      Case No.
6                                 )   19-34054-sgj11
                     Debtor.      )
7   --------------------------    )
    HIGHLAND CAPITAL MANAGEMENT,  )
8   L.P.,                         )
                     Plaintiff,   )
9                                 )     Adversary
        vs.                       )   Proceeding No.
10                                )    21-03000-sgj
    HIGHLAND CAPITAL MANAGEMENT   )
11  FUND ADVISORS, L.P.; NEXPOINT )
    ADVISORS, L.P.; HIGHLAND      )
12  INCOME FUND; NEXPOINT         )
    STRATEGIC OPPORTUNITIES FUND; )
13  NEXPOINT CAPITAL, INC.; and   )
    CLO HoldCo, LTD.,             )
14                                )
                     Defendants.  )
15  ------------------------------

16

17    VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18         Thursday, 21st of January, 2021

19

20

21

22

23  Reported by: Lisa A. Wheeler, RPR, CRR

24  Job No: 188910

25

Page 2

```
 1              GRANT SCOTT - 1/21/2021
 2                  January 21, 2021
 3                    2:02 p.m.
 4
 5       Videoconference deposition of Grant
 6  SCOTT, pursuant to the Federal Rules of
 7  Civil Procedure before Lisa A. Wheeler,
 8  RPR, CRR, a Notary Public of the State of
 9  North Carolina.  The court reporter
10  reported the proceeding remotely and the
11  witness was present via videoconference.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              GRANT SCOTT - 1/21/2021
 2  REMOTE APPEARANCES:
 3       PACHULSKI STANG ZIEHL & JONES
 4       Attorneys for Debtor
 5            780 Third Avenue
 6            New York, NY 10017
 7       BY:  JOHN MORRIS, ESQ.
 8
 9       LATHAM & WATKINS
10       Attorneys for UBS
11            885 Third Avenue
12            New York, NY 10022
13       BY:  SHANNON McLAUGHLIN, ESQ.
14
15       SIDLEY AUSTIN
16       Attorneys for the Creditors Committee
17            2021 McKinney Avenue
18            Dallas, TX 75201
19       BY:  PENNY REID, ESQ.
20            ALYSSA RUSSELL, ESQ.
21            PAIGE MONTGOMERY, ESQ.
22
23
24
25
```

Page 4

```
 1              GRANT SCOTT - 1/21/2021
 2  REMOTE APPEARANCES:  (Continued)
 3       KING & SPALDING
 4       Attorneys for Highland CLO Funding, Ltd.
 5            500 West 2nd Street
 6            Austin, TX 78701
 7       BY:  REBECCA MATSUMURA, ESQ.
 8
 9       K&L GATES
10       Attorneys for Highland Capital Management
11       Fund Advisors, L.P., et al.
12            4350 Lassiter at North Hills Avenue
13            Raleigh, NC 27609
14       BY:  A. LEE HOGEWOOD, III, ESQ.
15            EMILY MATHER, ESQ.
16
17       HELLER DRAPER & HORN
18       Attorneys for The Dugaboy Investment Trust
19       and The Get Good Trust
20            650 Poydras Street
21            New Orleans, LA 70130
22       BY:  MICHAEL LANDIS, ESQ.
23
24
25
```

Page 5

```
 1              GRANT SCOTT - 1/21/2021
 2  REMOTE APPEARANCES:  (Continued)
 3       KANE RUSSELL COLEMAN & LOGAN
 4       Attorneys for Defendant CLO HoldCo Limited
 5            Bank of America Plaza
 6            901 Main Street
 7            Dallas, TX 75202
 8       BY:  BRIAN CLARK, ESQ.
 9            JOHN KANE, ESQ.
10
11  ALSO PRESENT:  La Asia Canty
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

GRANT SCOTT - 1/21/2021

1  G R A N T   S C O T T,
2      called as a witness, having been duly sworn
3      by a Notary Public, was examined and
4      testified as follows:
5          MR. MORRIS: Good afternoon. My
6      name is John Morris. I'm an attorney with
7      Pachulski Stang Ziehl & Jones, a law firm
8      who represents the debtor in the bankruptcy
9      known as In Re: Highland Capital
10     Management, L.P., and we're here today for
11     the deposition of Grant Scott.
12         Before I begin, I would just like to
13     have confirmation on the record that
14     everybody here who's representing their
15     respective parties agrees that this
16     deposition can be used in evidence in any
17     subsequent hearing, notwithstanding the
18     fact that it's being conducted remotely,
19     and that the witness is not in the same
20     room as the court reporter.
21         Does anybody have an objection to
22     the admissibility of the transcript subject
23     to any reservation of -- of actual
24     objections on the record to using this

Page 7

GRANT SCOTT - 1/21/2021

1  transcript going forward?
2          Okay. Nobody's spoken up, so I --
3  I'd like to begin.
4              EXAMINATION
5  BY MR. MORRIS:
6      Q.  Good afternoon, Mr. Scott. As I
7  mentioned, my name is John Morris, and we're
8  here for your deposition today. Have you ever
9  been deposed before?
10     A.  On two occasions.
11     Q.  And -- and when did the -- when did
12 those depositions take place?
13     A.  This past October and maybe six to
14 eight years ago.
15     Q.  Okay. Can you just tell me
16 generally what the subject matter was of the
17 deposition this past October.
18     A.  It was relating to Jim Dondero's --
19 it was a family law issue in -- in -- with
20 respect to Jim Dondero.
21     Q.  Okay. And did you testify in a
22 courtroom, or was it a deposition like this?
23     A.  I -- right here, actually.
24     Q.  Okay. Super. And -- and what about

Page 8

GRANT SCOTT - 1/21/2021

1  the -- the deposition six to eight years ago,
2  do you have a recollection as to what that was
3  about?
4      A.  Yeah. It was a -- it was a patent I
5  wrote for Samsung Electronics.
6      Q.  Okay.
7      A.  And as being the person that I --
8  that wrote it and the patent was in litigation,
9  not -- not being handled by me, but by virtue
10 of having written the patent, I was -- I was
11 deposed --
12     Q.  Okay. So you --
13     A.  -- on the -- on the patent.
14     Q.  Okay. So you've had a little bit of
15 experience with depositions. But just
16 generally speaking, I'm going to ask you a
17 series of questions. It's very important that
18 you allow me to finish my question before you
19 begin your answer.
20         Is that fair?
21     A.  Absolutely.
22     Q.  And I will certainly try to extend
23 the same courtesy to you, but if I -- if I step
24 on your words, will you let me know that?

Page 9

GRANT SCOTT - 1/21/2021

1      A.  Okay.
2      Q.  And if there's anything that I ask
3  that you don't understand, will you let me know
4  that as well?
5      A.  Yes. I'll try -- I'll do my best.
6      Q.  Okay. So this is a virtual
7  deposition. We're not in the same room. I am
8  going to be showing you documents today. The
9  documents will be put up on the screen. This
10 isn't a -- a trick of any kind. If at any time
11 you see a document up on the screen and either
12 you believe or you have any reason to want to
13 read other portions of the document, will you
14 let me know that?
15     A.  Yes, I -- yes, I will. Uh-huh.
16     Q.  With respect to the Dondero family
17 matter, I really don't want to go into the
18 substance of that, but I do want to know
19 whether you testified voluntarily in that
20 matter or whether you -- whether you testified
21 pursuant to subpoena.
22     A.  I would have done that, but the
23 first time I found out about it was a -- was a
24 subpoena that I received. I wasn't given the

GRANT SCOTT - 1/21/2021

1  choice.
2       Q.    Okay.  And do you recall who served
3  the subpoena on you?  Actually, let me ask a
4  different question because I'm really not
5  interested in the -- in the details.
6            Did Mr. Dondero serve that subpoena
7  on you or did somebody else?
8       A.    His counsel for his ex-wife.
9       Q.    Mr. -- so -- so the lawyer acting on
10 behalf of Mr. Dondero's ex-wife served you with
11 the subpoena?
12      A.    Correct.
13      Q.    Okay.  You're familiar with an
14 entity called CLO HoldCo Limited; is that
15 right?
16      A.    Yes.
17      Q.    Do you know what that entity is?
18      A.    Yes.
19      Q.    What -- what -- can you describe for
20 me what CLO HoldCo Limited is.
21      A.    It's a holding company of assets
22 including collateralized loan obligation-type
23 assets.  That's a portion of the overall
24 portfolio.  It's an organization that is

GRANT SCOTT - 1/21/2021

1  integrated with other entities as part of a
2  charitable -- loosely what we -- what we refer
3  to as a charitable foundation equivalent.
4  Yeah.
5       Q.    All right.  We'll -- we'll get into
6  some detail about the corporate structure in a
7  moment.  Do you personally play any role at CLO
8  HoldCo Limited?
9       A.    Yes.  My technical title is
10 director, but I -- I don't necessarily know
11 specifically what that title means other than I
12 act, as I understand it, as -- as a trustee for
13 those -- for those assets.
14      Q.    And where did you get that
15 understanding?
16      A.    Approximately ten years ago from the
17 group that -- that set up the hierarchy.
18      Q.    And which group set up the
19 hierarchy?
20      A.    Employees at Jim Don- -- as I
21 understand it, employees of Highland along with
22 outside counsel, as I understand it, and also,
23 I guess, input from -- from Jim Dondero.
24      Q.    At the time that you assumed the

GRANT SCOTT - 1/21/2021

1  role of director of CLO HoldCo Limited, was
2  that entity already in existence?
3       A.    I believe so.  I'm not certain.  I'm
4  not certain.
5       Q.    What are your duties and
6  responsibilities as a director of CLO HoldCo
7  Limited?
8       A.    Well, my day-to-day responsibilities
9  are to interface with -- with the manager of
10 the -- of the assets of CLO.  I do have some
11 role in -- with respect to some of the entities
12 that are -- I -- I have a limited role with
13 respect to a subset of the charitable
14 foundations that receive money from the CLO
15 HoldCo structure, which is commonly referred to
16 as the DAF.  There's -- sometimes those are
17 used interchangeably.
18      Q.    What terms are used interchangeably?
19      A.    Well, the DAF and CLO HoldCo are
20 frequently -- by -- by other people they're --
21 it's the short -- it's the -- I guess it's
22 easier to use the acronym DAF than CLO HoldCo
23 Limited, so I'm frequently having to -- there
24 is a DAF entity so -- that's above -- above CLO

GRANT SCOTT - 1/21/2021

1  in terms of the management, and so it's
2  frequently confusing and I'm having to clarify
3  at times which entity we're talking about,
4  but -- but other parties frequently use those
5  terms interchangeably.
6       Q.    Okay.
7            MR. MORRIS:  Lisa, when we use the
8       phrase DAF, because you'll hear that a lot,
9       it's all caps, D-A-F.
10 BY MR. MORRIS:
11      Q.    You mentioned that you interface
12 with the manager of assets of CLOs.  Do I have
13 that right?
14      A.    Well, of all the assets.
15      Q.    Okay.  Who is the manager of the
16 assets that you're referring to?
17      A.    Highland Capital Management.
18      Q.    Highland Capital Management manages
19 all of the assets -- withdrawn.
20            Is it your understanding that
21 Highland Capital Management manages all the
22 assets that are owned by CLO HoldCo Limited?
23      A.    Yes.
24      Q.    Who makes the investment decisions

GRANT SCOTT - 1/21/2021

1 on behalf of CLO HoldCo Limited?
2 A. Highland -- those managers that you
3 mentioned.
4 Q. Okay. I didn't mention anybody in
5 particular.
6 A. Oh, I'm sorry. The -- the -- the
7 money manager -- could you repeat that
8 question? I'm sorry. I'm so sorry.
9 Q. Can you just -- can you just
10 identify for me the person who makes investment
11 decisions on behalf of CLO HoldCo Limited.
12 A. It's -- well, it's -- it's persons
13 as I understand it. I inter- -- interface with
14 a -- with a group, but it's -- it's Highland
15 Capital employee -- Highland Capital Management
16 employees.
17 Q. Okay. Can you just name any of
18 them, please.
19 A. Hunter Covitz, Jim Dondero. Mark
20 Okada's no longer there, but I believe he was
21 involved, and there are others that I interface
22 with.
23 Q. Can you -- can you recall the name
24 of anybody other than Mr. Okada and Mr. Dondero
25

GRANT SCOTT - 1/21/2021

1 and Mr. Covitz?
2 A. Yeah. Over the years I've worked
3 with Tim Cournoyer, Thomas Surgent, but I
4 think -- I think that's the core -- the core
5 group.
6 Q. All right. And is there anybody
7 within that core group who has the final
8 decision-making authority concerning the
9 investments in CLO HoldCo Limited?
10 A. I don't -- I don't know. I'm sorry.
11 Say that again. I just want to -- I'm sorry.
12 I'm trying to be -- I'm not trying to -- I'm
13 trying to be --
14 Q. I understand. And --
15 A. Sorry. If you could just repeat it.
16 Q. Sure. Is there any particular
17 person who has the final decision-making
18 authority for investments that are being made
19 on behalf of CLO HoldCo Limited?
20 A. Amongst that group I am -- I am not
21 sure.
22 Q. Okay. So are there any other
23 directors of CLO HoldCo besides yourself?
24 A. No.
25

GRANT SCOTT - 1/21/2021

1 Q. Is it fair to say that you do not
2 make decisions, investment decisions, on behalf
3 of CLO HoldCo Limited?
4 A. Yes.
5 Q. Does CLO HoldCo Limited have any
6 employees that you know of?
7 A. No.
8 Q. Does CLO HoldCo have any --
9 withdrawn.
10 Does CLO HoldCo Limited have any
11 officers that you know of?
12 A. No.
13 Q. So am I correct that you're the only
14 representative in the world of CLO HoldCo in
15 terms of being a director, officer, or
16 employee?
17 A. Yes.
18 Q. Do you receive any compensation from
19 CLO HoldCo for your services as the director?
20 A. I do now.
21 Q. When did that begin?
22 A. I believe in the middle of 2012.
23 Q. Okay. And had you served as a
24 director prior to that time without
25

GRANT SCOTT - 1/21/2021

1 compensation?
2 A. Yes.
3 Q. And have you been the sole director
4 of CLO HoldCo Limited since the time of your
5 appointment approximately ten years ago?
6 A. Yes.
7 Q. Nobody else has served in that
8 capacity; is that right?
9 A. That is correct.
10 Q. There have been no employees or
11 officers of that entity during the time that
12 you've served as director, correct?
13 A. Yes.
14 Q. Do you know who formed CLO HoldCo
15 Limited?
16 A. I do not.
17 Q. Do you know why CLO HoldCo Limited
18 was formed?
19 A. I believe so.
20 Q. Can you explain to me why -- your
21 understanding as to why CLO HoldCo was formed.
22 A. So as I understand things, Jim
23 Dondero wanted to create a charitable
24 foundation-like entity or entities, and tax
25

Page 18

GRANT SCOTT - 1/21/2021

1  people particularly, I guess, finance people,
2  lawyers, they created this network of entities
3  to carry out that charitable goal.  At one
4  point, I thought it was a novel type of
5  institution, if you want to call it, or a
6  novel -- novel type of group of entities, but
7  over time, I came to understand that although
8  not cookie cutter, it -- it follows a general
9  arrangement of entities for legal and tax
10  purposes, compliance purposes, IRS purposes,
11  various insulating purposes to maintain -- or
12  to meet the necessary requisites to carry out
13  that charitable function.
14      Q.    When did you come to that
15  understanding?
16      A.    Over the last couple of years.  I
17  periodically have to refresh my recollection.
18  It's -- it's fairly complex.
19      Q.    Okay.  In your capacity as the sole
20  director of CLO HoldCo Limited, do you report
21  to anybody?
22      A.    No.
23      Q.    Other than interfacing with the
24  manager of the assets of the CLO, do you have

Page 19

GRANT SCOTT - 1/21/2021

1  any other duties and responsibilities as a
2  director of CLO HoldCo Limited?
3      A.    Yes.  Sorry.  My mouth is a little
4  dry.
5      Q.    By the way, if you ever need to take
6  a break, just let me know.
7      A.    Okay.  Thank you.  Now I forgot your
8  question.  The -- the -- the --
9      Q.    I understand.
10      A.    The answer -- the -- the answer is
11  yes.  I -- why don't you ask -- ask your
12  question again.  I'm sorry.
13      Q.    Sure.  Other than interfacing with
14  the manager of the assets of the CLO, do you
15  have any other duties and responsibilities as
16  the sole director of CLO HoldCo Limited?
17      A.    Yes.  So Highland Capital because of
18  its -- the way it's set up to manage or service
19  CLO HoldCo and the DAF, it has a relatively
20  large group of people that I have to interface
21  with to do everything from -- everything from
22  soup to nuts.  Finances and the money
23  management is one aspect, but most of my
24  time -- on a day-to-day or week-to-week basis,

Page 20

GRANT SCOTT - 1/21/2021

1  most of my time is spent working with the
2  various compliance and other people for
3  addressing issues of get- -- you know, getting
4  taxes filed.  It runs -- it runs the gamut of
5  every aspect of the organization being -- being
6  handled by Highland.
7      Q.    Okay.
8      A.    You know, unlike -- unlike my
9  financial -- unlike a financial planner that
10  might, you know, manage assets, they -- they do
11  it all, and I interface with them regularly to
12  maintain -- mostly to deal with compliance
13  issues.
14      Q.    Who's the com- -- is there a person
15  who's in charge of compliance?
16      A.    I believe Thomas Surgent.  I
17  mentioned him.  I believe he also has that
18  role, but it's -- you know, they do have
19  turnover, I guess, in that.  It's -- I guess
20  they refer to it as the back office.  I've
21  heard that term be used, but -- basically, it's
22  a large number of people that have changed over
23  time, but it's -- it's more -- I believe it's
24  more than one collectively.

Page 21

GRANT SCOTT - 1/21/2021

1      Q.    How much time do you devote -- you
2  know, can you estimate either on a weekly or a
3  monthly basis how many -- how much time do you
4  devote to serving as the director of CLO HoldCo
5  Limited?
6      A.    I thought about that.  Well, let --
7  let's put it this way:  There was the
8  prebankruptcy time I spent per day, and then
9  there was the postbankruptcy time I've spent
10  per -- per -- or per week -- excuse me, or
11  per -- I've estimated it as probably a day --
12  it's so intermittent it's -- it's hard, okay?
13  It's -- I don't dedicate my Mondays to only
14  doing that and then Tuesday through Friday I
15  don't, right?  I -- it's -- I have to piece
16  together everything that occurs during the
17  week.  There might be some weeks where I don't
18  have any contact.  There might be every day of
19  the week I have multiple contact.  There may be
20  days where from morning to night there is so
21  much contact, it precludes me from doing
22  anything else meaningfully.  So -- but I would
23  estimate it's probably three or four -- maybe
24  three days, four days a month when things are

Page 22

GRANT SCOTT - 1/21/2021

1  going well.
2      Q.    And -- and I think you -- you
3  testified just now that there was kind of a
4  difference between prebankruptcy and
5  postbankruptcy.  Do I have that right?
6
7      A.    Yes.
8      Q.    And can you tell me -- is it fair to
9  say that before the bankruptcy, you didn't
10 devote much time to CLO HoldCo, or do I have
11 that wrong?
12     A.    Well, I -- just the time that --
13 that I mentioned just -- I'm sorry.  The -- the
14 time I just mentioned now when you asked me,
15 that was the pre period.  Excuse me.  I haven't
16 talked about the postbankruptcy period.
17     Q.    So are you -- are you -- are you
18 devoting more time or less time since the
19 bankruptcy?
20     A.    Much more.
21     Q.    Much more since the bankruptcy
22 filing?
23     A.    Yes.
24     Q.    And so why did the bankruptcy filing
25 cause you to spend more time as a director of

Page 23

GRANT SCOTT - 1/21/2021

1  CLO HoldCo Limited?
2      A.    Well, initially, and this would
3  be -- this would be late 2019, it was --
4  aft- -- after the bankruptcy was -- was filed
5  and I obtained counsel, who are on the phone
6  now -- or in this deposition now, excuse me,
7  that was -- that transition occurred because
8  CLO was a debtor -- excuse me, a creditor to --
9  to the debtor and had to take steps to
10 establish its -- its claim.  So if I understand
11 the -- things correctly, the -- the debtor
12 identified as part of the filing -- I don't
13 know how bankruptcy works, but if I under- --
14 if my recollection is correct, there's a
15 hierarchy from biggest to smallest, and we were
16 relatively high up.  And when I say we or I,
17 I -- I just mean CLO was relatively high up.
18 And so initially, for the first period of so
19 many months, the -- the exclusive focus was on
20 our position as a creditor -- a creditor having
21 a certain claim against a debtor.
22     Q.    Can you describe for me your
23 understanding of the nature of the claim
24 against the debtor.
25

Page 24

GRANT SCOTT - 1/21/2021

1      A.    It was various obligations that were
2  owed to -- to CLO, things that had been
3  previously donated or -- or agreements that had
4  been set up that transferred certain assets,
5  and it was basically the -- the -- the amounts
6  were derived from those sorts of transactions.
7      Q.    Okay.  You're a patent lawyer; is
8  that right?
9      A.    I -- I'm exclusively a patent
10 attorney, yes.
11     Q.    Have you been a patent lawyer on an
12 exclusive basis since the time you graduated
13 from law school?
14     A.    From law school, yes.
15     Q.    Can you just describe for me
16 generally your educational background.
17     A.    So I'm an electrical engineer by
18 training.  I graduated from the University of
19 Virginia in 1984.  I then went to graduate
20 school at the University of Illinois.  I
21 received my master's degree in 1986, and then I
22 immediately joined IBM Research at the Thomas
23 Watson Institute in New York where I was a --
24 my title was research scientist, but I was -- I

Page 25

GRANT SCOTT - 1/21/2021

1  guess I was more of a research engineer, if
2  that matters.  And I did that until I
3  transitioned -- or I began law school in the
4  fall of 1988, and then I graduated law school
5  in May of 1991.
6      Q.    And where did you go to law school?
7      A.    University of North Carolina.
8      Q.    Do you have any formal training in
9  investing or finance?
10     A.    I do not.
11     Q.    Do you hold yourself out as an
12 expert in any field of investment?
13     A.    None -- none at all.
14     Q.    Have you had any formal training
15 with respect to compliance issues?  You
16 mentioned compliance issues earlier.
17     A.    No.
18     Q.    Now, do you have any knowledge about
19 compliance rules or regulations?
20     A.    Minimal that I've -- that have
21 occurred organically but -- but generally, no.
22     Q.    You don't hold yourself out as an
23 expert in com- -- in the area of compliance,
24 correct?
25

GRANT SCOTT - 1/21/2021

1  
2     A.    No.  No.  I'm -- no.
3     Q.    Do you have any particular
4  investment philosophy or strategy?
5         MR. CLARK:  I'm going to object to
6     the form of the question.  And, John,
7     can -- can we get an agreement that -- I
8     know you were objecting just simply on the
9     form basis yesterday -- that objection to
10    form is sufficient today?
11        MR. MORRIS:  Sure.
12        MR. CLARK:  Okay.  And I object to
13    form.  Grant, you can answer to the extent
14    you can.
15        THE WITNESS:  I forget the question
16    now that you interrupted.  I'm sorry.
17 BY MR. MORRIS:
18    Q.    So -- so -- and I'm going to ask a
19 different question because in hindsight, that's
20 a good objection.
21        In your capacity as the director
22 of -- withdrawn.
23        Do the employees of Highland that
24 you identified earlier, do they make investment
25 decisions on behalf of CLO HoldCo Limited

GRANT SCOTT - 1/21/2021

1  
2  without your prior knowledge on occasion?
3     A.    On occasion, they do.
4     Q.    So there's no rule that your prior
5  approval is needed before investments are made,
6  right?
7     A.    I don't know whether they have an
8  internal guideline as to the amount that
9  triggers when they get in touch with me or
10 whether it's a new -- a change, something new,
11 or -- versus recurring.  So I don't -- I don't
12 know what they use internally for that metric.
13    Q.    Okay.  Are you aware of any
14 guideline that was ever used by the Highland
15 employees whereby they were required to obtain
16 your consent prior to effectuating transactions
17 on behalf of CLO HoldCo Limited?
18    A.    I understand there was one or more,
19 but I do not know that.
20    Q.    Okay.  Did you ever see such a
21 policy or list of rules that would require your
22 prior consent before the Highland employees
23 effectuated transactions on behalf of CLO
24 HoldCo Limited?
25    A.    Possibly some time ago, but I -- I

GRANT SCOTT - 1/21/2021

1  
2  don't recall.
3     Q.    Okay.  So -- withdrawn.  I'll --
4  I'll go on.
5         How did you come to be the director
6  of CLO HoldCo?
7     A.    I was asked either by Jim Dondero
8  or -- directly or indirectly by -- by Jim
9  Dondero.
10    Q.    And who is Jim Dondero?
11    A.    Well, at the time, he was the head
12 or one of the heads of Highland Capital
13 Management, a friend of mine.
14    Q.    How long have you known Mr. Dondero?
15    A.    Since high school so that -- 1976.
16    Q.    Where did you and Mr. Dondero grow
17 up?
18    A.    In northern New Jersey.
19    Q.    Do you consider him among the
20 closest friends you have?
21    A.    I think he is my closest friend.
22    Q.    Did you two go to college together?
23    A.    We actually -- for the last -- last
24 two years I was at UVA, University of Virginia,
25 excuse me, he and I were -- were at UVA.  So we

GRANT SCOTT - 1/21/2021

1  
2  did not start out at UVA initially, but -- but
3  we both transferred -- I transferred my
4  sophomore year.  I was actually a chemical
5  engineer at the University of Delaware when I
6  transferred in, and then he transferred in his
7  junior year.  So we were there at college for
8  two years.
9     Q.    And -- and based on your
10 relationship with him, is it your understanding
11 that one of the reasons he chose to transfer to
12 UVA is -- is to -- because you were there?
13    A.    Oh, no.  He transferred -- he --
14 he -- he transferred there because of the -- so
15 he went to the University of -- he -- he went
16 to Virginia Tech University, which is more
17 known as being an engineering school, which I
18 might have wanted to go to, and less a finance
19 business school.  And if I understand things
20 correctly, and I believe I do, he transferred
21 to UVA because of the well-known
22 business/finance program, accounting program.
23    Q.    And did you -- did you and
24 Mr. Dondero become roommates at UVA?
25    A.    We weren't roommates, but we lived

Page 30

GRANT SCOTT - 1/21/2021

1  in the -- we were housemates.  I'm sorry.  We
2  were housemates.
3      Q.    So you shared a house together.  How
4  would you describe your relationship with
5  Mr. Dondero today?
6      A.    It's -- it's been strained a while,
7  for some time, but -- but generally, very good.
8  Good to very good.
9      Q.    Without -- without getting personal
10  here, can you just generally identify the
11  source of the strain that you described.
12      A.    This -- I think it would be fair to
13  say that this bankruptcy, particularly events
14  in 2020 so some months after the bankruptcy was
15  declared, things have become -- we -- we still
16  have a close friendship, but -- but things
17  are -- are a bit -- are a bit more difficult.
18      Q.    Were you ever married?
19      A.    I've never been married.
20      Q.    Did you serve as Mr. Dondero's best
21  man at his wedding?
22      A.    I did.
23      Q.    Is it fair to say that -- that
24  Mr. Dondero trusts you?

Page 31

GRANT SCOTT - 1/21/2021

1      MR. CLARK:  Objection, form.
2  BY MR. MORRIS:
3      Q.    Withdrawn.
4          Do you believe that Mr. Dondero
5  trusts you?
6      A.    I do.
7      Q.    Over the years, is it fair to say
8  that Mr. Dondero has confided in you?
9      MR. CLARK:  Objection, form.
10  BY MR. MORRIS:
11      Q.    You can answer if you understand it.
12      A.    I think so.
13      Q.    I -- I -- what's your answer?  You
14  think so?
15      A.    Maybe you can de- -- I think of
16  confide as -- could you define confide, please.
17      Q.    Sure.  Is it -- is it fair to say
18  that over the -- let me -- you've known
19  Mr. Dondero for almost 45 years, right?
20      A.    Yes.
21      Q.    And you consider him to be your
22  closest friend in the world, right?
23      A.    Yes.
24      Q.    And is it fair to say over the

Page 32

GRANT SCOTT - 1/21/2021

1  course of those 45 years, Mr. Dondero has
2  shared confidential information with you that
3  he didn't want you to reveal publicly to other
4  people?
5      A.    Yes.
6      Q.    And is it your understanding that
7  because of the nature of your relationship with
8  him, he asked you to serve as the director of
9  CLO HoldCo Limited?
10      A.    Yes.  I believe it's because he --
11  he trusted -- trusted me with -- with assets
12  relating to his charitable vision.  I -- I --
13  yeah.  Yes.
14      Q.    And is it your understanding that he
15  thought you would help him execute his
16  charitable vision?
17      A.    That was the point of attraction
18  initially.  It wasn't for money.  I wasn't
19  being paid.  That was -- the charitable mission
20  was the attraction.
21      Q.    Does Mr. Dondero play any role in
22  the management of the CLO HoldCo Limited asset
23  pool?
24      MR. CLARK:  Objection, form.

Page 33

GRANT SCOTT - 1/21/2021

1      A.    I'm sorry.  Could you repeat that?
2  My -- my screen went small and then big again.
3  I was distracted.
4      Q.    What role does Mr. Dondero play with
5  respect to the management of the CLO HoldCo
6  Limited asset pool?
7      MR. CLARK:  Objection, form.
8      A.    He is with the company that manages
9  that asset pool.  He's one of the people I
10  named previously as managing those assets.
11      Q.    He is -- he -- he is the -- do you
12  understand that he has the final
13  decision-making power with respect to the
14  management of the assets that are held by CLO
15  HoldCo Limited?
16      MR. CLARK:  Objection, form.
17      A.    I believe I ansel -- answered that
18  previously.  I -- I don't know who has -- for
19  certainty I do not know who has that within
20  that company.  I don't.  If -- if -- I -- I
21  don't know, consistent with my prior answer.
22      Q.    Did you ever ask anybody who had the
23  final decision-making authority for investments
24  on behalf of CLO HoldCo Limited?

Page 34

GRANT SCOTT - 1/21/2021

1
2    A.    I -- I did not.
3    Q.    Did you ever make a decision on
4  behalf of -- withdrawn.
5          In your capacity as a director --
6  withdrawn.
7          In your capacity as the sole
8  director of CLO HoldCo Limited, can you think
9  of any decision that you've ever made that
10 Mr. Dondero disagreed with?
11    A.    Since -- prior to the bankruptcy,
12 no, not that I'm aware of.
13    Q.    And since the bankruptcy?
14    A.    There are decisions that I've made
15 that he's disagreed with.
16    Q.    Can you identify them?
17    A.    Yes.
18    Q.    Please do so.
19    A.    Okay.  So the reason I'm pausing is
20 I'm trying to put these in chronological order
21 and, at the same time, identify maybe some of
22 the more important ones versus the lesser
23 important ones.  One of the decisions I made
24 related to a request that I received from the
25 independent board of Highland.  I don't know

Page 35

GRANT SCOTT - 1/21/2021

1  how the request was transmitted to me, but I
2  believe the way it played out is as follows:  I
3  believe I was asked to call Jim Seery, and the
4  other -- and Russell Nelms, and the third
5  independent director, I believe his name is
6  John.  I -- I forget right now what his last
7  name is.  They were in New York, said they were
8  in a conference room.  I called in.  They were
9  very pleasant.  They identified who they were,
10 and they had a request, and the request was
11 that I agree to a transfer -- or that I -- that
12 I agree to allow certain assets that were not
13 Highland's assets but they were CLO's as--
14 assets -- apparently, there was no dispute
15 about that at any point in time, but that I
16 agree to allow certain assets that were due CLO
17 to be transferred to the registry of the
18 bankruptcy court.  And either on that call I
19 immediately agreed or ended the call, called my
20 attorney, and then immediately agreed.  It was
21 a very -- I accommodated the request quickly.
22    Q.    Okay.  And can you just tell me at
23 what point in time you spoke with Mr. Dondero,
24 and what did he say that you recall?

Page 36

GRANT SCOTT - 1/21/2021

1
2    A.    I don't know when he became aware of
3  that decision.  I'm not sure I ever volunteered
4  that the decision was even made, but at some
5  point, it became an issue because he found out
6  through -- if I understand the sequence of
7  events correctly, he found out possibly through
8  his counsel because there was ultimately
9  litigation about that issue.  It became known
10 to everyone at some point what I had done, I --
11 I think.  And subsequent to that, it became an
12 issue because of CLO HoldCo having fairly
13 significant cash flow issues with respect to
14 its expenses and obligations, including payment
15 of management fees as well as some of the
16 scheduled charitable giving that was -- that
17 was by contract already predefined.  My
18 decision to tuck that money -- or to agree
19 to -- my agreement to let that money be tucked
20 away created some -- created some -- created
21 some problems --
22    Q.    And -- and --
23    A.    -- for CLO HoldCo.
24    Q.    Okay.  And I just want you to focus
25 specifically on my question, and that is, what

Page 37

GRANT SCOTT - 1/21/2021

1  did Mr. Dondero say to you that -- that causes
2  you to testify as you did, that this is one
3  issue that he didn't agree with?
4    A.    I believe his concern was that
5  because it was money that was undisputably to
6  flow to CLO HoldCo that -- which had many, many
7  other nonliquid assets -- this was a form of a
8  liquid asset.  It was cash in effect, proceeds.
9  -- that the money should have been allowed to
10 flow to be available for obligations.  He
11 didn't under-- I -- I -- I don't know what he
12 was thinking, but the -- the issue was that the
13 decision to put it into escrow was -- was --
14 was in- -- incorrect, that there was no basis
15 for it.
16    Q.    That -- that's an issue where after
17 learning of your decision, he didn't agree with
18 it; is that fair?
19    A.    That's right.
20    Q.    Okay.  Can you think of any decision
21 that you've ever made on behalf of CLO HoldCo
22 Limited where Mr. Dondero had advance knowledge
23 of what you were going to do and he objected to
24 it, but you nevertheless overruled his

Page 38

GRANT SCOTT - 1/21/2021

1 objection and went ahead and did what -- did
2 what you thought was right?
3
4     A.    Okay.  Let me -- let me -- I have --
5 I'm sorry.
6     Q.    We're here.
7     A.    Oh, I'm sorry.  I'm having some
8 issues with my screen.  So that may have
9 occurred with respect to the original proof of
10 claim.  Then there was a subsequent amendment
11 to the proof of claim, and I -- I believe it --
12 I believe that he might have been aware of both
13 of those and was in disagreement with -- with
14 those.  But after working with my attorney, I
15 just -- you know, we did what we thought was
16 right, and I still think what we did was right.
17 There was an issue with respect to Har- --
18 HarbourVest that occurred relatively recently
19 where he objected to a decision that I had
20 made.  As I understand it, I could have
21 contacted my attorney and changed the decision,
22 but I didn't, and I still think that was the
23 right decision.
24          We have filed plan objections.  I
25 can't say if he has any -- in that regard, I --

Page 39

GRANT SCOTT - 1/21/2021

1 I -- I don't know what his thoughts are on
2 objections.  They would not have been
3 communicated with -- by me to him, but my
4 attorney might have consulted with his
5 attorney, and there -- they may know what that
6 difference is, but I -- that was just another
7 big decision.  I -- I -- maybe that --
8
9     Q.    All right.  Let me see if I can --
10 let me see if I can summarize this.  So two
11 proofs of claim.  Is it fair to say that
12 Mr. Dondero saw those proofs of claim before
13 they were filed?
14          MR. CLARK:  Objection, form.
15 BY MR. MORRIS:
16     Q.    Withdrawn.
17     A.    It --
18     Q.    Do -- do you know whether
19 Mr. Dondero saw the proofs of claim before they
20 were filed?
21     A.    I don't believe he did.
22     Q.    What -- what steps in filing the
23 proofs of claim did he object to that you
24 overruled?  Did he think there was -- something
25 should be different about them?

Page 40

GRANT SCOTT - 1/21/2021

1
2     A.    So we had to interface with Highland
3 employees at some point to get information to
4 support our proof of claim, and my guess, and
5 it's just a guess, is that he was aware of
6 those inquiries.  I -- I'm sorry.  I shouldn't
7 speculate.  I don't know.  But he -- with
8 respect to the original proof of claim, I'm --
9 I'm not aware of what specifically he was
10 objecting to or was -- thought should have been
11 different, but the -- with respect to the
12 amended proof of claim, which reduced the
13 original proof of claim to zero, I think that's
14 where he had a -- an issue.
15     Q.    And did you speak with him about
16 that topic prior to the time the amended claim
17 was filed, or did you only speak with him after
18 it was filed?
19     A.    I'm not sure the timing of that.
20     Q.    And with respect to HarbourVest, did
21 he ask you to object to the settlement on
22 behalf of CLO HoldCo Limited, and is that
23 something that you declined to do?
24          MR. CLARK:  Objection, form.
25     A.    I'm -- I'm sorry.  I was confused

Page 41

GRANT SCOTT - 1/21/2021

1 with the word.  Could you please repeat that?
2     Q.    Yes.  You mentioned HarbourVest
3 before, right?
4     A.    Yes.
5     Q.    And you mentioned that there was an
6 issue with Mr. Dondero and you concerning
7 HarbourVest; is that right?
8     A.    Yes.
9     Q.    And did that have to do with whether
10 or not CLO HoldCo Limited would -- would object
11 to the debtor's motion to get the HarbourVest
12 settlement approved?
13     A.    Would -- would get the
14 HarbourVest --
15     Q.    Settlement approved by the court.
16     A.    I'm not trying to be difficult.
17 I'm -- I'm -- could you just repeat that one
18 more time?  I'm --
19     Q.    What was -- what was --
20     A.    There was --
21     Q.    Let me try again.
22     A.    Okay.
23     Q.    What was the issue with respect to
24 HarbourVest that he objected to and -- and you

Page 42

GRANT SCOTT - 1/21/2021

1    GRANT SCOTT - 1/21/2021
2    overrode his objection and did what you thought
3    was right anyway?
4        A.    Okay.  Okay.  That's -- that's
5    easier for me to understand.  I'm sorry.  So I
6    had worked with my attorney or he did the work
7    and consulted with -- we consulted, but we had
8    filed an objection, motion objecting to the
9    settlement, if I understand the terminology and
10   nomenclature correctly.  Okay.  He had -- we
11   had come to an agreement that we had a very
12   valid argument.  That argument was evidenced
13   by, I guess it was, our motion that was
14   submitted to the court.  On the day of the
15   hearing to resolve this issue, we pulled our
16   request, and that was because I believed it did
17   not have a good-faith basis in law to move
18   forward on.
19       Q.    And did you discuss that issue with
20   Mr. Dondero before informing the court that CLO
21   HoldCo Limited was withdrawing its objection,
22   or did he learn about that for the first time
23   during the hearing --
24            MR. CLARK:  Objection, form.
25   BY MR. MORRIS:

Page 43

1    GRANT SCOTT - 1/21/2021
2        Q.    -- if you know?
3        A.    I -- I understand that he learned it
4    during the hearing.  I don't know the -- I -- I
5    don't know the -- whether there was any -- I --
6    I don't know for certain on the second half of
7    your question.
8        Q.    Let me -- let me try it -- let me
9    try it this way:  Did you speak with
10   Mr. Dondero about your decision to withdraw the
11   objection to the HarbourVest settlement prior
12   to the time your counsel made the announcement
13   in court?
14       A.    I don't -- I don't believe so.  No.
15   No.  No.  I'm sorry.  No.
16       Q.    And did --
17       A.    Okay.  No.  Here -- here's where
18   I'm -- I can clarify, okay?  I'm sorry.  I can
19   clarify.
20       Q.    That's all right.
21       A.    I gave the decision to my
22   attorney -- I -- I agreed with the
23   recommendation of my attorney, okay?  It wasn't
24   my --
25       Q.    Did you have a good --

Page 44

1    GRANT SCOTT - 1/21/2021
2        A.    -- thought, okay?
3            THE REPORTER:  I didn't --
4        A.    Okay.  So he --
5        Q.    It was a recommendation.
6        A.    Yeah.  So he -- he called me with a
7    recommendation.  It was highly urgent.  You
8    know, I was coming out of the men's room, had
9    my phone with me.  I got the call.
10            MR. CLARK:  Hey, Grant, I -- Grant,
11       I just want to caution you not to -- to --
12       and I don't think counsel is looking for
13       this but not to disclose the -- the
14       substance of any of your communications
15       with counsel, okay?
16            THE WITNESS:  Thank you.
17       A.    So --
18            THE WITNESS:  Thank you.  I'm -- I'm
19       sorry.
20   BY MR. MORRIS:
21       Q.    It's -- it's really a very simple
22   question.  Do you recall --
23       A.    He made a recommendation.  I -- I --
24   I think I can answer your question without
25   going off tangent.  I'm sorry.  So he -- my

Page 45

1    GRANT SCOTT - 1/21/2021
2    attorney made a recommendation.  I agreed with
3    it.  We with-- I -- I told him to withdraw --
4    or I authorized him to withdraw.
5        Q.    Okay.
6        A.    Then I received a communication, and
7    I -- I guess the most likely scenario is the
8    motion had been withdrawn by the time Jim
9    Dondero found out.
10       Q.    And -- and did he write to you, or
11   did he call you?  Did he send you a text?
12       A.    He called me.
13       Q.    What did he say?
14       A.    He was asking why, and I explained,
15   and I said I agreed with the decision and I was
16   sticking with the decision.
17       Q.    Let's just -- let's just move on to
18   a new topic, and let's talk about the structure
19   of -- of CLO HoldCo.  Are you generally
20   familiar with the ownership structure of CLO
21   HoldCo?
22       A.    Yeah.  I mean, in terms --
23       Q.    Are -- are you -- are you generally
24   familiar with it?  It's not a test.  I'm just
25   asking do you have a general familiarity --

GRANT SCOTT - 1/21/2021

2    A.    With CLO HoldCo or the entities
3  associated with CLO HoldCo?
4    Q.    The latter.
5    A.    Yes, I believe so.
6    Q.    All right. I've prepared what's
7  called a demonstrative exhibit. It's just --
8    A.    Yes.
9    Q.    -- just -- it's a document that, I
10  think, reflects facts, but I want to ask you
11  about it.
12    MR. MORRIS: La Asia, can we please
13    put up Exhibit 1.
14    (SCOTT EXHIBIT 1, Organizational
15    Structure: CLO HoldCo, Ltd., was marked
16    for identification.)
17  BY MR. MORRIS:
18    Q.    Okay. Can you see that, Mr. Scott?
19    A.    Yes, I can.
20    Q.    Okay. So I think I took the
21  information from resolutions that were attached
22  to the CLO HoldCo proof of claim, and that's
23  why you got that little footnote there at the
24  bottom of the page. But let's start in the
25  lower right-hand corner and see if this chart

GRANT SCOTT - 1/21/2021

1  comports with your understanding of the facts.
3    Do you know that CLO HoldCo Limited
4  was formed in the Cayman Islands?
5    A.    Yes.
6    Q.    And to the best of your knowledge,
7  is CLO HoldCo Limited 100 percent owned by the
8  Charitable DAF Fund, L.P.? If you're not sure,
9  just say you're not sure if you don't know.
10  It's not a test.
11    A.    So the -- the -- the familiarity
12  I -- I'm -- I'm familiar with the different --
13  I'm confused with the arrangement of the boxes
14  and the ownership interest versus managerial
15  interest. I believe that's -- that's right.
16    Q.    Okay. And -- and you're the sole
17  director of CLO HoldCo Limited, right?
18    A.    Yes.
19    Q.    And this whole structure was -- the
20  idea for this structure, to the best of your
21  knowledge, was to implement Mr. Dondero's plan
22  for charitable giving; is that fair?
23    A.    Yes. Ultimately, yes.
24    Q.    And is it fair to say then that
25  he -- he made the decision to establish this

GRANT SCOTT - 1/21/2021

1  particular structure, to the best of your
2  knowledge?
4    A.    I -- I didn't -- I'm sorry. I
5  didn't hear you very well.
6    Q.    To the best of your knowledge, did
7  Mr. Dondero make the decisions to establish the
8  structure that's reflected on this page?
9    A.    Oh, I don't know if he made the
10  decision to establish this structure, although
11  it's -- it's -- I'm sorry. Strike that. I --
12  if -- if what you're saying is did he approve
13  of this structure, to my knowledge, yes.
14    Q.    Okay. Do you hold any position with
15  respect to Charitable DAF Fund, L.P.?
16    A.    I -- I -- your chart says no. I --
17  I -- I thought I had a role there, too.
18    Q.    I don't know. I don't have
19  information on that. That's why I'm asking the
20  question.
21    A.    I -- I -- I believe -- yes, I
22  believe I have the same role as I do in -- in
23  CLO HoldCo.
24    Q.    And that would be director?
25    A.    Yes.

GRANT SCOTT - 1/21/2021

2    Q.    And to the best of your knowledge,
3  is the Charitable DAF GP, LLC, the general
4  partner of Charitable DAF Fund, L.P.?
5    A.    Yes.
6    Q.    And is it your understanding that
7  you are the managing member of Charitable DAF
8  GP, LLC?
9    A.    Yes.
10    Q.    Does Charitable DAF GP, LLC, have
11  any employees?
12    A.    No.
13    Q.    Does Charitable DAF GP, LLC, have
14  any officers or directors?
15    A.    No.
16    Q.    Are you the only person affiliated
17  with Charitable DAF GP, LLC, to the best of
18  your --
19    A.    I believe so.
20    Q.    Do you receive any compensation for
21  serving as the managing member of Charitable
22  DAF GP, LLC?
23    A.    No. The -- I don't interact with it
24  very often. It's -- no, I don't receive any
25  compensation.

Page 50

GRANT SCOTT - 1/21/2021

1    GRANT SCOTT - 1/21/2021
2        Q.    Can you tell me in your capacity as
3    the managing member of Charitable DAF GP, LLC,
4    what's the nature of that entity's business?
5        A.    It -- it doesn't perform any
6    day-to-day operations.  My understanding is --
7    is that it's -- it's there for purposes of
8    compliance.  I can't recall the last time I had
9    any activity with respect to that.
10       Q.    How about the Charitable DAF Fund,
11   L.P.?  I apologize if I've asked you these
12   questions.
13       A.    It -- it's the same.  I -- I -- my
14   activity is almost exclusively CLO HoldCo.
15       Q.    All right.  Let me just ask the
16   questions nevertheless.  Does Charitable DAF
17   Fund, L.P., have any employees?
18       A.    Employees?  No.
19       Q.    Does it have any officers and
20   directors?
21       A.    No.
22       Q.    Are you the sole director of
23   Charitable DAF Fund, L.P.?
24       A.    Yes, I believe so.
25       Q.    So if we -- if we put under

Page 51

1    GRANT SCOTT - 1/21/2021
2    Charitable DAF Fund, L.P., Grant Scott,
3    director, and we put under CLO HoldCo Limited
4    Grant Scott, director, would everything on the
5    right side of that page be accurate, to the
6    best of your --
7        A.    I believe so.
8        Q.    Well, let's move to the left side of
9    the page.  Have you heard of the entity
10   Charitable DAF HoldCo Limited?
11       A.    Yes.
12       Q.    Are you the sole director of
13   Charitable DAF HoldCo Limited?
14       A.    Yes.
15       Q.    How did you become -- how did you
16   come to be the char-- -- the sole director of
17   Charitable DAF HoldCo Limited?
18       A.    That was when it was established.
19       Q.    And did Mr. Dondero ask you to serve
20   in that capacity?
21       A.    Yes.
22       Q.    And did Mr. Dondero ask you to serve
23   as the managing member of Charitable DA- -- DAF
24   GP, LLC?
25       A.    Yes.

Page 52

1    GRANT SCOTT - 1/21/2021
2        Q.    And did Mr. Dondero ask you to serve
3    as the director of Charitable DAF, L.P. --
4    withdrawn.
5              Did Mr. Dondero ask you to serve as
6    director of Charitable DAF Fund, L.P.?
7        A.    Yes.
8        Q.    To the best of your knowledge, does
9    Charitable DAF HoldCo Limited own 99 percent of
10   the limited partnership interests in Charitable
11   DAF Fund, L.P.?
12       A.    Yes.  The -- the feed -- the -- the
13   feeds -- the -- the three horizontal blocks
14   there that identify Highland Dallas Foundation,
15   Kansas City, Santa Barbara -- there's a fourth
16   of -- relatively de minimus in terms of
17   participation.  There's a fourth entity that's
18   missing.  It's Dallas -- I forget the name.
19   That -- that -- that structure is -- is a bit
20   dated --
21       Q.    Okay.
22       A.    -- as it -- as is shown.
23       Q.    Okay.  So I will tell you and we can
24   look the documents if you want, but attached to
25   CLO HoldCo Limited's claim are a number of

Page 53

1    GRANT SCOTT - 1/21/2021
2    resolutions, and there's one that I have in
3    mind that shows Charitable DAF HoldCo Limited
4    holding 99 percent of the limited partnership
5    interests of Charitable DAF Fund, L.P., and
6    there's another that shows it being a hundred
7    percent.  Do you -- do you know which is
8    accurate at least at this time?
9        A.    There's a 1 percent/99 percent
10   division, and I am -- I believe it's the 99
11   percent, but I'm -- I'm getting confused by
12   the -- by the arrangement.  I'm so used to
13   another arrangement.  I -- I believe the 99
14   percent is correct.
15       Q.    Okay.  Do you have any understanding
16   as to who owns the other 1 percent of the
17   limited partnership interests of Charitable DAF
18   Fund, L.P.?
19       A.    No.  This -- this is confusing to
20   me.  No.
21       Q.    Okay.  There are, at least on this
22   page, three foundations that I think you've
23   identified.  Are those three foundations
24   together with the fourth that you mentioned the
25   owners of the Charitable DAF HoldCo Limited?

Page 54

GRANT SCOTT - 1/21/2021

1
2    A.    Owners?
3    Q.    Yes.
4          MR. CLARK:  Objection, form.
5    A.    They -- they only participate in the
6  money that flows up to them.
7    Q.    And what does that mean exactly?
8    A.    What's that?
9    Q.    What does that -- what do you mean
10  by that?  Do the foundations fund Charitable
11  DAF Fund HoldCo Limited?
12   A.    Initially.  Initially, as I
13  understand it, the money flows downward into
14  the Charitable DAF HoldCo Limited before it
15  ultimately makes its way to CLO HoldCo, and
16  then each of those three entities, the various
17  foundations, obtain participation interest in
18  the money that flows back to them.
19   Q.    And -- and is that par- -- are those
20  participation interests in Charitable -- you
21  know what, let -- let me just pull up one
22  document and see if that helps.
23        MR. MORRIS:  Can we put up -- I
24    think it's Exhibit Number 5.
25        (SCOTT EXHIBIT 2, Unanimous Written

Page 55

GRANT SCOTT - 1/21/2021

1
2    Consent of Directors In Lieu of Meeting,
3    was marked for identification.)
4          MR. MORRIS:  I apologize.  Let's go
5    to --
6          MS. CANTY:  I'm sorry, John.  I
7    can't hear you.  Was that not the exhibit?
8          MR. MORRIS:  4.
9          MS. CANTY:  Okay.
10         THE REPORTER:  And Mr. Morris, you
11   are -- Mr. Morris, you are breaking up just
12   a little bit at the end of your questions.
13  BY MR. MORRIS:
14   Q.    Okay.  Do you see the document on
15  the screen, sir?
16   A.    Yes, I do.
17   Q.    Okay.  And so this is a unanimous
18  written consent of the directors of the
19  Highland Dallas Foundation.  That's one of the
20  entities that was on the chart.
21        MR. MORRIS:  Can we scroll down to
22    the -- the bottom of the document where the
23    signature lines are.  Right there.
24  BY MR. MORRIS:
25   Q.    Are you a director of the Highland

Page 56

GRANT SCOTT - 1/21/2021

1
2  Dallas Foundation?
3    A.    Yes, selected by them.
4    Q.    Selected by whom?
5    A.    By that foundation.
6    Q.    Are you -- are you a director of all
7  of the four foundations that feed into the
8  Charitable DAF HoldCo Limited entities that --
9    A.    No.
10   Q.    Which of the four foundations are
11  you a director of?
12   A.    This and the Santa Barbara -- I'm
13  sorry, Santa Barbara and Kansas City.
14   Q.    So is -- there's one that you're not
15  a director of; is that right?
16   A.    Yes.
17   Q.    And which one is that?
18   A.    The -- could you go back to the --
19   Q.    Yeah.
20        MR. MORRIS:  Go back to the
21    demonstrative.
22   A.    It's the Highland Dallas Foundation
23  and Santa Barbara Foundation.
24   Q.    Those are the two that you're a
25  director of?

Page 57

GRANT SCOTT - 1/21/2021

1
2    A.    Yes.
3    Q.    To the best of your knowledge, does
4  Mr. Dondero serve as the president for each of
5  the foundations that we're talking about?
6    A.    Yes.
7    Q.    To the best of your knowledge, is
8  Mr. Dondero a director of each of the
9  foundations that we're talking about?
10   A.    Say that again.  I'm sorry.
11   Q.    Is he also a director of each of the
12  foundations?
13   A.    Yes.
14   Q.    Do you know whether any of the
15  foundations has any employees?
16   A.    I believe they do, but I -- I -- I
17  can't say for certain.
18   Q.    Does -- withdrawn.
19        Do you know if there are any
20  officers of any of the four foundations other
21  than Mr. Dondero's service as president?
22   A.    I'm sorry.  Say that one more time,
23  please.
24   Q.    Yes.  Do you know whether any of the
25  four foundations has any officers other than

GRANT SCOTT - 1/21/2021

1  Mr. Dondero's service as president?
2     A.    No.
3     Q.    You don't know, or they do not?
4     A.    I -- I don't believe anyone else
5  has.  I -- actually, I should say I don't -- I
6  don't recall.  I -- I don't know.  I don't -- I
7  don't know.
8     Q.    As a director of the Dallas and
9  Santa Barbara foundations, are you aware of any
10 officers serving for either of those
11 foundations other than Mr. Dondero?
12    A.    No.
13    Q.    Do you know who the beneficial owner
14 of the Charitable DAF HoldCo Limited entity is?
15    A.    The beneficial owner?
16    Q.    Correct.
17    A.    The various -- various trusts that
18 were used to -- that were the vehicles by which
19 the money originally was established within --
20 within -- within CLO HoldCo.
21    Q.    Would that be -- would one of them
22 be the Get Good Nonexempt Trust?
23    A.    Yes.
24    Q.    And you're a trustee of the Get Good

GRANT SCOTT - 1/21/2021

1  Nonexempt Trust, right?
2     A.    Yes.
3     Q.    When did you become a trustee of the
4  Get Good Nonexempt Trust?
5     A.    Many years ago.  I -- I don't
6  remember.
7     Q.    Are there any other trustees of the
8  Get Good Nonexempt Trust?
9     A.    No.
10    Q.    Does the Get Good Nonexempt Trust
11 have any officers, directors, or employees?
12    A.    No.
13          MR. CLARK:  Objection, form.  Sorry.
14 BY MR. MORRIS:
15    Q.    Withdrawn.
16          Do you know whether the Get Good
17 Nonexempt Trust has any officers, directors, or
18 employees?
19    A.    It does not.
20    Q.    And I apologize if I asked this, but
21 are you the only trustee of the Get Good
22 Nonexempt Trust?
23    A.    Yes.
24    Q.    Is the Dugaboy Investment Trust also

GRANT SCOTT - 1/21/2021

1  one of the trusts that has an interest in
2  Charitable DAF HoldCo Limited?
3     A.    Yes.
4     Q.    Are you a trustee of the Dugaboy
5  Investment Trust?
6     A.    I am not.
7     Q.    Do you know who is?
8     A.    I believe it's his sister.
9     Q.    And is that -- you're referring to
10 Mr. Dondero's sister?
11    A.    I'm sorry.  Yes.
12    Q.    And what's the basis for your
13 understanding that Mr. Dondero's siv- -- sister
14 serves as the trustee of the Dugaboy Investment
15 Trust?
16    A.    Many years ago there was a -- there
17 was a clerical error that identified me as the
18 trustee of the Dugaboy.  That error was present
19 for approximately two weeks or a week and a
20 half before it was detected and corrected, and
21 so I know from that correction that it's Nancy
22 Dondero.
23    Q.    Are there any other trusts that have
24 an interest in Charitable DAF HoldCo Limited

GRANT SCOTT - 1/21/2021

1  besides those trusts, to the best of your
2  knowledge?
3     A.    No.
4     Q.    Is it your understanding based on
5  what we've just talked about that the Get Good
6  Nonexempt Trust and the Dugaboy Investment
7  Trust are the indirect beneficiaries of CLO
8  HoldCo Limited?
9     A.    Yes.
10    Q.    Can you tell me who the
11 beneficiaries are of the Get Good trust?
12    A.    I mean, Jim Dondero.
13    Q.    And -- and what is that -- is that
14 based on the trust agreement -- your knowledge
15 of the trust agreement?
16    A.    Yes.
17    Q.    Do you have an understanding of who
18 the beneficiary is of the Dugaboy Investment
19 Trust?
20    A.    I don't know anything about that
21 trust.
22          MR. MORRIS:  Okay.  All right.
23 Let's take a short break and reconvene at
24 3:30 Eastern Time.  We've been going for a

Page 62

GRANT SCOTT - 1/21/2021

1
2     while.
3              MR. CLARK:  Thank you.
4              MR. MORRIS:  Okay.  Thank you.
5              (Whereupon, there was a recess in
6         the proceedings from 3:20 p.m. to
7         3:31 p.m.)
8     BY MR. MORRIS:
9         Q.    Mr. Scott, earlier I think you
10    testified that you interfaced with the folks at
11    Highland in connection with your duties as the
12    director of CLO HoldCo Limited, right?
13        A.    Yes.
14        Q.    Are you aware of any written
15    agreement between Highland Capital Management
16    and CLO HoldCo Limited?
17        A.    Yes, the various servicer
18    agreements.
19        Q.    Okay.  Are you aware that
20    Mr. Dondero resigned from his position at
21    Highland Capital Management sometime in
22    October?
23        A.    No.
24        Q.    Have you communicated with anybody
25    at Highland Capital Management about the

Page 63

GRANT SCOTT - 1/21/2021

1
2     affairs of CLO HoldCo Limited at any time since
3     October?
4         A.    Yes.
5         Q.    Anybody other than Jim Seery?
6         A.    Yes.
7         Q.    Okay.  Let's start with Mr. Seery.
8     You've spoken with him before, right?
9         A.    Yes.
10        Q.    Do you have his phone number?
11        A.    Yes.
12        Q.    How many times have you spoken with
13    Mr. Seery, to the best of your recollection,
14    just generally?  It's not a test.
15        A.    Three, maybe four times.
16        Q.    Okay.  Can you identify by name
17    anybody else at Highland that you've spoken
18    with since -- in the last two or three months?
19        A.    I spoke to Jim Dondero.  I've spoken
20    with Mike Throckmorton.  The usual suspects, so
21    to speak.  Mark Patrick, Mel- -- Melissa
22    Schroth.
23        Q.    Can you recall anybody else?
24        A.    No.  No.  Sorry.
25        Q.    Did you -- did you -- withdrawn.

Page 64

GRANT SCOTT - 1/21/2021

1
2              Do you recall the subject matter of
3     your discussions with Mr. Throckmorton?
4              MR. CLARK:  Objection, form.
5     BY MR. MORRIS:
6         Q.    Withdrawn.
7              Do you recall your -- the subject
8     matter of your communications with
9     Mr. Throckmorton?
10             MR. CLARK:  Objection, form.
11    BY MR. MORRIS:
12        Q.    You can answer.
13        A.    I -- I regularly interface with
14    Mr. Throckmorton regarding approvals of
15    expenses, and he's my sort of -- he's my point
16    person for approving wire transfers and things
17    of that nature.
18        Q.    How about Mr. Patrick, what -- what
19    area of responsibility does he have with
20    respect to CLO HoldCo Limited?
21        A.    He -- he doesn't, to my knowledge.
22        Q.    Do you recall the nature of the
23    substance of any communications that you've had
24    with Mr. Patrick since -- you know, the last
25    two or three months?

Page 65

GRANT SCOTT - 1/21/2021

1
2         A.    Yes.  Or -- yes.
3         Q.    And what -- what are the nature of
4     those conversations or the substance?
5         A.    He was -- he was one of the
6     individuals that helped to establish the
7     hierarchy for the -- what I keep referring to
8     as the charitable foundation.
9         Q.    And -- and do you recall why you
10    spoke to him in the last -- or -- withdrawn.
11             Do you recall the nature of your
12    communications in the last two or three months
13    with Mr. Patrick?
14        A.    I --
15             MR. CLARK:  And hold on, Grant.  I'm
16        going to caution -- my understanding -- I
17        believe Mr. Patrick's an attorney, and so
18        I'm going to caution you that you shouldn't
19        disclose the substance of -- of those
20        communications based on the attorney-client
21        privilege.
22             MR. MORRIS:  Well, I'm -- I -- I am
23        the lawyer for the company so -- I guess
24        there are other people on the phone and I
25        appreciate that, but let's see if we can --

Page 66

GRANT SCOTT - 1/21/2021

1    I don't mean to be contentious here, so it
2    wouldn't -- I -- I'd be part of the
3    privilege anyway.
4  BY MR. MORRIS:
5        Q.    But in any event, can you tell me
6  generally -- I'm just looking for general
7  subject matter of your conversations with
8  Mr. Patrick.
9        A.    I asked him how I would go about
10  re- -- resigning my position.
11       Q.    And when did that conversation take
12  place?
13       A.    Within the last two weeks.
14       Q.    Have you made a decision to resign?
15       A.    No.
16       Q.    I think you mentioned Melissa
17  Schroth.  Do I have that right?
18       A.    Yes.
19       Q.    Can you describe generally the
20  communications you had with Ms. Schroth in the
21  last few months.
22       A.    They -- she has e-mailed me certain
23  documents that I needed to sign.  I had a
24  conversation with her about -- about some

Page 67

GRANT SCOTT - 1/21/2021

1  home -- home improvements, home construction
2  with respect to Jim Dondero's home in Colorado,
3  and that's -- I -- I think that's -- that's it.
4        Q.    Okay.  Do you recall communicating
5  with anybody at Highland in the last three
6  months other than Mr. Dondero,
7  Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?
8        A.    I -- I spoke with Jim Seery this
9  week.
10       Q.    Anybody else?
11       A.    I don't -- I don't know.
12       Q.    Okay.
13       A.    I don't think so.
14       Q.    In your communications with
15  Mr. Seery, did you two ever discuss his reasons
16  for making any trade on behalf of any CLO?
17       A.    No.
18       Q.    In your discussions with Mr. Seery,
19  did you ever tell him that you believed that
20  Highland Capital Management had breached any
21  agreement in relation to any CLO?
22       A.    Have I had that discussion with Jim
23  Seery?
24       Q.    Yes.

Page 68

GRANT SCOTT - 1/21/2021

1        A.    No.
2        Q.    In your discussions with Mr. Seery,
3  did you ever tell him that you thought Highland
4  Capital Management was in default under any
5  agreement in relation to the CLOs?
6        A.    No.
7        Q.    I want to focus in particular on the
8  shared services agreement.  In -- in your
9  discussions with Mr. Seery, did you ever tell
10  him that you believed that Highland Capital
11  Management was in default or in breach of its
12  shared services agreement with CLO HoldCo
13  Limited?
14       A.    No.
15       Q.    In your communications with
16  Mr. Seery, did you ever indicate any concern on
17  the part of CLO HoldCo Limited with respect to
18  Highland Capital's Man- -- Highland Capital
19  Management's performance under the shared
20  services agreement?
21       A.    No.
22       Q.    As you sit here today, do you have
23  any reason to believe that Highland Capital
24  Management has done anything wrong in

Page 69

GRANT SCOTT - 1/21/2021

1  connection with its performance as the
2  portfolio manager of the CLOs in which CLO
3  HoldCo Limited has invested?
4            MR. CLARK:  Object to form.
5        A.    In terms of the -- are you saying --
6  please say that again.  I'm sorry.
7        Q.    That's okay.  I ask long questions
8  sometimes so forgive me, but I'm trying to
9  get -- I'm trying to be precise so that's why
10  it's difficult sometimes.  But let me try
11  again.
12            Does CLO HoldCo Limited contend that
13  Highland Capital Management has done anything
14  wrong in the performance of its duties as
15  portfolio manager of the CLOs in which CLO
16  HoldCo has invested?
17            MR. CLARK:  Objection, form.
18       A.    Yes.  It's -- it's outlined in our
19  objections to -- to the plan.
20       Q.    Okay.  Any -- are you aware of
21  anything that's not contained within CLO Holdco
22  Limited's objection to the plan?
23            MR. CLARK:  Objection, form.
24       A.    I don't know if this is responsive

GRANT SCOTT - 1/21/2021

1  to your quest -- request, but two -- two
2  issues, I believe, also pose an in- -- a
3  problem for CLO HoldCo. One is we are paying
4  for services. I think I referred to the
5  services as being soup to nuts, but we are not
6  getting the full services. We haven't been for
7  some time. So we're likely overpaying. There
8  was a Highland Select Equity issue, 11-month
9  payment that was delayed which I was unaware of
10 was due. Normally, I would have interfaced
11 with someone at Highland about that, but my
12 attorney -- but my -- my attorney had to make a
13 request for payment, and that payment was
14 ultimately made. I -- other than that, I -- I
15 don't -- I don't know. I don't believe so.
16     Q.    I want to distinguish between the
17 shared services agreement between Highland
18 Capital Management and CLO HoldCo Limited on
19 the one hand and on the other hand the
20 management agreements pursuant to which
21 Highland Capital Management manages certain
22 CLOs that CLO HoldCo invests in.
23           You understand the distinction that
24 I'm making?
25

GRANT SCOTT - 1/21/2021

1     A.    Now I do. I'm sorry. I didn't
2  appreciate that.
3     Q.    Okay. So let's just take each of
4  those pieces one at a time. You mentioned your
5  concern about services. That's a concern that
6  arises under the shared services agreement,
7  right?
8     A.    Yes.
9     Q.    And you mentioned something about a
10 delayed payment having to do with Highland
11 Select. Do I have that generally right?
12    A.    Correct.
13    Q.    And is that a concern that you have
14 that arises under the shared services
15 agreement?
16    A.    It's not the agreement with respect
17 to the CLOs as I understand it.
18    Q.    Okay. So then let's turn to that
19 second bucket. You were aware -- you are
20 aware, are you not, that Highland Capital
21 Management has certain agreements with CLOs
22 pursuant to which it manages the assets that
23 are owned by the CLOs?
24    A.    I'm so sorry. Could you please --
25

GRANT SCOTT - 1/21/2021

1     Q.    I'll try again.
2     A.    I'm just -- I'm sorry. I was
3  distracted and -- and I -- I'm sorry for asking
4  you to repeat it again. Please --
5     Q.    Okay.
6     A.    Please re- --
7     Q.    Are you aware that CLO HoldCo
8  Limited has made investments in certain CLOs?
9     A.    Oh, yes, certainly.
10    Q.    And are you aware that those CLOs
11 are managed by Highland Capital Management?
12    A.    Yes. As the -- as the servicer,
13 yes.
14    Q.    Okay. Have you ever seen any of the
15 agreements pursuant to which Highland Capital
16 Management acts as a servicer?
17    A.    I've seen a few, yes.
18    Q.    Does CLO HoldCo Limited contend that
19 it is a party to any agreement between Highland
20 Capital Management and the CLOs?
21           MR. CLARK: Object to form. And I
22        just want to note for the record that
23        Mr. Scott is here testifying in his
24        individual capacity, I believe, not as a

GRANT SCOTT - 1/21/2021

1  corporate representative.
2           MR. MORRIS: Fair enough. But he is
3        the only representative so...
4           MR. CLARK: Fair enough. I just
5        want that made -- stated for the record,
6        but I also object as to form.
7           MR. MORRIS: Got it.
8     A.    It's a third-party beneficiary under
9  the agreements.
10    Q.    And is that because of something you
11 read in the document, or is that just your
12 belief and understanding?
13    A.    My belief and understanding.
14    Q.    And is that belief and understanding
15 based on anything other than conversations with
16 counsel?
17    A.    In -- in -- recently it has, but I
18 don't recall from previous interactions over
19 the years how we discussed that or how I came
20 to -- to understand that.
21    Q.    Does HCLO [sic] HoldCo -- did -- in
22 your capacity as the sole director of HCLO
23 HoldCo Limited, are you aware of anything that
24 Highland Capital Management has done wrong in

GRANT SCOTT - 1/21/2021

1  connection with the services provided under the
2  CLO management agreements?
3  MR. CLARK: Objection, form.
4  A.  I -- I don't -- I don't -- I
5  don't -- your answer's no.
6  Q.  In your capacity as the director of
7  CLO HoldCo Limited, are you aware of any
8  default or breach under the CLO management
9  agreements that -- that Highland Capital
10 Management has caused?
11 MR. CLARK: Objection, form.
12 A.  We have raised the issue about
13 ongoing sales in various -- I'm not sure
14 whether they represent a technical breach,
15 though.
16 Q.  Okay.  Are you aware of any
17 technical breach?
18 MR. CLARK: Objection, form.
19 A.  No.
20 Q.  I'm sorry.  You said, no, sir?
21 A.  My answer's no.
22 Q.  Thank you.  Do you know who made the
23 decision to cause the CLO HoldCo Limited entity
24 to invest in the CLOs that are managed by

GRANT SCOTT - 1/21/2021

1  Highland Capital?
2  A.  The select -- ultimately, I had to.
3  Q.  I thought you testified earlier that
4  you didn't make decisions as to investment.  Do
5  I have that wrong?
6  A.  The selection.
7  Q.  Okay.
8  A.  I -- I'm --
9  Q.  So -- so explain to me --
10 A.  I have to approve -- I have to
11 approve the selection.  I'm sorry.  But the
12 people making -- I was putting that in the camp
13 of the people that make the selection.
14 Q.  Okay.  Do you know if -- do you know
15 if there are CLOs in the world that exist that
16 aren't managed by Highland Capital Management?
17 MR. CLARK: Objection, form.
18 A.  Are there CLOs in the -- in the
19 world that are not --
20 Q.  Yes.
21 A.  Yes.  It's -- it's a well-known --
22 it's a well-known --
23 Q.  In your capacity as the director of
24 CLO HoldCo Limited, did you ever consider

GRANT SCOTT - 1/21/2021

1  making an investment in a CLO that wasn't
2  managed by Highland?
3  A.  No.
4  Q.  Is there any particular reason why
5  you haven't given that any consideration?
6  A.  That hasn't been my role.  That's
7  not my expertise.  That's been something
8  Highland has done and, quite frankly, over the
9  years brilliantly so, no.
10 Q.  You're aware that HCM, L.P., has
11 filed for bankruptcy, right?
12 A.  Yes.
13 Q.  When did you learn that Highland had
14 filed for bankruptcy?
15 A.  After the fact sometime in late --
16 late 2019.
17 Q.  Since the bankruptcy filing, have
18 you made any attempt to sell CLO HoldCo
19 Limited's position in any of the CLOs that are
20 managed by Highland?
21 A.  No.
22 Q.  So notwithstanding the bankruptcy
23 filing, you as the director haven't made any
24 attempt to transfer out of the CLOs that are

GRANT SCOTT - 1/21/2021

1  managed by Highland, correct?
2  A.  Correct.
3  Q.  Did you ever give any thought to
4  exiting the CLO vehicles that were managed by
5  Highland in light of its bankruptcy filing?
6  A.  No.
7  Q.  Have you ever discussed with
8  Mr. Seery anything having to do with the
9  management -- withdrawn.
10 Have you ever discussed with
11 Mr. Seery any aspect of the debtor's management
12 of the CLOs in which CLO HoldCo Limited is
13 invested?
14 A.  No.
15 Q.  You mentioned earlier a request to
16 stop trading.  Do I have that right?
17 A.  Yes.
18 Q.  Okay.  And are you aware that a
19 letter was written purportedly on behalf of CLO
20 HoldCo Limited in which a request to stop
21 trading was made?
22 A.  As a cos- -- yeah.  Yes.
23 Q.  Okay.  Have you ever seen that
24 letter before?

Page 78

GRANT SCOTT - 1/21/2021

1
2     A.    Yes.
3           MR. MORRIS:  Can we put up on the
4     screen -- I think it's now Exhibit 6.  It's
5     Exhibit DDDD.
6           (SCOTT EXHIBIT 3, Letter to James A.
7     Wright, III, et al., from Gregory Demo,
8     December 24, 2020, with Exhibit A
9     Attachment, was marked for identification.)
10          MR. MORRIS:  Can we scroll down to,
11    I guess, what's Exhibit A.  Ri- -- right
12    there.
13   BY MR. MORRIS:
14    Q.    You see this is a letter Dece- --
15   dated December 22nd?
16    A.    Yes.
17    Q.    In the first paragraph there there's
18   a reference to the entities on whose behalf
19   this letter is being sent.
20          Do you see that?
21    A.    Yes.
22    Q.    Okay.  So this letter was sent on
23   December 22nd.  Did you see a copy of it before
24   it was sent?
25    A.    A -- a draft -- an earlier draft of

Page 79

GRANT SCOTT - 1/21/2021

1    this I did.
2     Q.    Okay.  Did you provide any comments
3    to it?
4     A.    I did.
5           MR. CLARK:  Well, hold on.  Grant,
6     let me caution you.  To the extent you
7     provided comments to counsel, we're going
8     to assert the attorney-client privilege on
9     those comments.
10          MR. MORRIS:  It's just a yes-or-no
11    question.  I'm not looking for the
12    specifics.
13          MR. CLARK:  Thank you.
14    A.    Yes.
15    Q.    Are you aware that earlier letters
16   were -- withdrawn.
17          Are you aware that prior to December
18   22nd, the entities other than CLO HoldCo
19   Limited that are listed in this pers- -- first
20   paragraph had sent a letter making the same
21   request?
22    A.    With respect to a letter, no.  No,
23   I -- I did not.
24    Q.    Are you aware as you sit here now

Page 80

GRANT SCOTT - 1/21/2021

1
2    that the entities other than CLO HoldCo Limited
3    that are listed in the first paragraph made a
4    motion in the court asking the court for an
5    order that would have prevented Highland from
6    making any transactions for a limited period of
7    time?
8     A.    Yes.
9     Q.    Did you know that motion was being
10   made prior to the time that it was made?
11    A.    I'm not sure.
12    Q.    Did you ever think about whether CLO
13   HoldCo Limited should join that particular
14   motion?
15    A.    I believe we were -- my attorney was
16   aware of it.  I don't recall our discussion
17   about it.  We were aware -- when I say we, I
18   mean collectively -- and did not join it.
19    Q.    Okay.  Can you tell me why you did
20   not join it.
21          MR. CLARK:  And, again, Grant, to --
22    to the extent it's based on communications
23    with counsel, you're free to say that
24    but -- but not to disclose any substance of
25    communications with counsel.

Page 81

GRANT SCOTT - 1/21/2021

1
2     A.    The subject of this letter on the
3    22nd which yielded the original letter you
4    briefly showed me on the 24th as well as an
5    additional letter on the 28th identified two
6    points as I understand it.  The first point is
7    what I believe is the somewhat innocuous
8    request to halt sales, not a demand in any way.
9    And the second more substantive issue has to do
10   with steps to remove Highland or a subsequent
11   derived entity from Highland from the various
12   services agreements that you had previously --
13   we had previously discussed.  Neither of those
14   issues met the require- -- neither of those
15   issues led us to believe that a motion such as
16   what you've just mentioned was -- was right --
17    Q.    Okay.
18    A.    -- because no -- no decision has
19   been made on that.
20    Q.    Okay.
21          MR. MORRIS:  So I want to go back to
22    my question and move to strike as
23    nonresponsive, and I'll just ask my
24    question again.
25   BY MR. MORRIS:

GRANT SCOTT - 1/21/2021

2    Q.    Why did CLO HoldCo Limited decide
3  not to participate in the earlier motion that
4  was brought by the other entities that are
5  identified in Paragraph 1 that asked the court
6  to stop Highland from engaging in trades?
7    A.    John, I'm so sorry.  There was a
8  feedback loop that came up when you started to
9  re- -- re- -- recite -- restate your question.
10  I'm sorry.
11    Q.    That's okay.  Why did CLO HoldCo
12  Limited decide not to join in the earlier
13  motion where the entities listed in Paragraph 1
14  asked the court to order Highland not to make
15  any further trades?  Why did they not join that
16  motion?
17    A.    The -- the issue didn't rise to
18  the -- I don't believe we had formulated a
19  legal basis sufficient to justify such steps.
20  We hadn't laid the foundation necessary to --
21  to do that.
22    Q.    Are you aware of what the court
23  decided?
24    A.    By virtue of the original letter you
25  sent me dated the -- or show -- showed

GRANT SCOTT - 1/21/2021

1  initially dated the 24th, I have a general
2  understanding of what they decided.
3
4    Q.    Did you -- did you ever review the
5  transcript of the hearing where the other
6  parties asked the court to stop Highland from
7  engaging in any further trades on the CLOs?
8    A.    I did not.
9    Q.    Is there anything different about
10  the request in this letter, to the best of your
11  knowledge, from the request that was made of
12  the court just six days earlier?
13    MR. CLARK:  Objection, form.
14    A.    Yes.  There's a -- in -- in my -- my
15  view there's a substantial difference between
16  filing an action converting a request into
17  essentially a demand versus a gentle request
18  with multiple caveats, that that request is not
19  a demand.
20    Q.    Okay.  Let me ask you this:  Are you
21  aware -- what -- when did you first learn that
22  Highland was making trades in its capacity as
23  the servicer of the CLOs?  When -- when did you
24  first learn that Highland was doing that?  Ten
25  years ago, right?  I mean --

GRANT SCOTT - 1/21/2021

1    A.    Oh.  Oh.  Oh, I'm -- yeah.  Yeah.
2  Oh, yes.  I'm sorry.  Of course.
3
4    Q.    Right?  I mean, Highland has been
5  making trades on behalf of CLOs for years,
6  right?
7    A.    Yes.
8    Q.    And Highland was making trades on
9  behalf of CLOs throughout 2020, to the best of
10  your knowledge, right?
11    A.    Yes.
12    Q.    And you know when Jim Dondero was
13  still with Highland, he was making trades on
14  behalf of CLO -- on behalf of the CLOs, right?
15    A.    Yes.
16    Q.    And you never objected when Jim
17  Dondero was doing it; is that right?
18    A.    That is correct.
19    Q.    Okay.  So what changed that caused
20  you in your capacity as the director of CLO
21  HoldCo to request a full stoppage of trading?
22    A.    It was my understanding that because
23  of the bankruptcy and the removal of Jim
24  Dondero that the replacement decision-makers
25  did not have the expertise where I felt

GRANT SCOTT - 1/21/2021

1
2  comfortable with them making those decisions,
3  but...
4    Q.    I thought you testified earlier that
5  you weren't aware that Mr. Dondero left
6  Highland.  Am I mistaken in my recollection?
7    A.    I think you said in October, and
8  I -- as I -- there's some con- -- I have
9  confusion about when he left versus when he was
10  still there but other -- but he was not making
11  those trades.
12    Q.    Okay.  Fair enough.  The bankruptcy
13  has nothing to do with your desire to stop
14  trading, right, because Highland traded for a
15  year after the bankruptcy and never took any
16  action to try to stop Highland from trading on
17  behalf of the CLOs, fair?
18    A.    The -- Highland as of right now
19  isn't the same entity it was -- well, the
20  decision-making team -- the -- the financial
21  decision-making team for CLO Holdco's is no
22  longer the team I have worked with, and upon
23  discussion with counsel, we agreed -- I agreed
24  to this letter, which I did, to just maintain
25  the status quo.

Page 86

GRANT SCOTT - 1/21/2021

```
 2     Q.    How did you form your opinion that
 3  the debtor doesn't have the expertise to
 4  execute trades on behalf of the CLOs today?
 5  What's the basis for that belief?
 6     A.    I -- as I understood it, the -- the
 7  people historically making that decision were
 8  no longer making that decision.
 9     Q.    Who besides Mr. Dondero --
10  withdrawn.
11           Who are you referring to?
12     A.    Well, Mr. Dondero is one.  I don't
13  know the names, but I -- I understood it to
14  mean that the group previously responsible, for
15  exam- -- for example, Hunter Covitz, including
16  Hun- -- him, were no longer involved in the
17  decision-making process, but...
18     Q.    How did you -- how -- how -- who
19  gave you the information that led you to
20  conclude that Hunter Covitz was no longer
21  involved in the decision-making process?
22     A.    Specifically him and that name being
23  mentioned, I -- I -- I wasn't informed of his
24  speci- -- him -- him being removed.  I was
25  under the impression that the team that had
```

Page 87

GRANT SCOTT - 1/21/2021

```
 1  previously been doing that was no longer doing
 2  it.
 3     Q.    And what gave you that impression?
 4     A.    Was communications I had with my
 5  attorney.
 6     Q.    Okay.  Is there any source for your
 7  information that led you to conclude that the
 8  team was no longer there that was able to
 9  engage in the trades on behalf of the CLOs
10  other than your attorneys?
11     A.    Well, this -- this letter -- I -- I
12  think the answer is no.
13     Q.    Thank you.  Do you know if Jim -- do
14  you have an opinion or a view as to whether Jim
15  Seery is qualified to make trades?
16     A.    This --
17           MR. CLARK:  Objection, form.
18     A.    I don't know -- I spoke to Jim Seery
19  earlier this week.  You -- you asked me whether
20  I had his number.  I said I did.  That's only
21  because he called me.  My phone rang with his
22  number.  It was a number I did not recognize,
23  it was not in my contacts, but he left me a
24  voice mail so I called him back.  Then I
```

Page 88

GRANT SCOTT - 1/21/2021

```
 1  updated my contacts to -- to add his name so
 2  now I have his name.  And during that
 3  conversation he informed me that he did have
 4  that expertise --
 5     Q.    And --
 6     A.    -- without me making any inquiry.
 7  He volunteered that.
 8     Q.    But you hadn't made any inquiry
 9  prior to the time that you authorized the
10  sending of this letter; is that fair?
11     A.    That's correct.
12     Q.    Do you know whether Mr. Seery, in
13  fact, engaged in transactions on behalf of the
14  debtor since he was appointed back in January?
15     A.    I do not.
16     Q.    Did you ask that question prior to
17  the time you authorized the sending of this
18  letter?
19     A.    I did not.
20     Q.    Can you identify a single
21  transaction that Jim Seery has ever made that
22  you disagree with?
23     A.    No.
24     Q.    Can you identify any transaction
```

Page 89

GRANT SCOTT - 1/21/2021

```
 1  that the debtor made on behalf of any of the
 2  CLOs since the time that you understand
 3  Mr. Dondero left Highland that you disagree
 4  with?
 5     A.    No.
 6     Q.    Did you have any discussion with any
 7  representative of any of the entities listed on
 8  this document where they told you they believe
 9  Jim Seery didn't have the expertise to engage
10  in transactions on behalf of the whole -- of
11  the CLOs?
12     A.    You -- your question -- I'm -- I'm
13  sorry.  I'm trying to be -- I'm trying to be a
14  hundred perc- -- I'm trying to be accurate
15  here.
16     Q.    Let me interrupt you and just say,
17  I'm very grateful for your testimony.  I know
18  this is not easy, and I do believe that you're
19  earnestly and honestly trying to answer the
20  questions the best you can.  So no apologies
21  necessary anymore.  If you need me to repeat
22  the question or rephrase it, just say that,
23  okay?
24     A.    Please -- yes.
```

GRANT SCOTT - 1/21/2021

2    Q.    Okay.

3    A.    Please -- please repeat that.

4    Q.    Did you ever communicate with any

5  employee, officer, director, representative of

6  any of the entities that are on this page

7  concerning the debtor's ability to service the

8  CLOs?

9    A.    I believe so.

10   Q.    And can you identify the person or

11 persons?

12   A.    I think it's Jim Dondero.

13   Q.    Anybody else other than Mr. Dondero?

14   A.    No.

15   Q.    When did you have that conversation

16 or those conversations with Mr. Dondero?

17   A.    This letter is dated the 22nd --

18   Q.    Correct.

19   A.    -- right?

20   Q.    Yes.

21   A.    I believe that's the Tuesday before

22 Christmas, and this would have been on the

23 21st, the Monday.

24   Q.    What do you recall about your

25 conversation on the 21st regarding the

GRANT SCOTT - 1/21/2021

2  substance of this particular letter?

3    A.    Jim Dondero described why he

4  believed sales being made on an ongoing basis

5  after a request was made to stop was im- --

6  improper.

7    Q.    Do you -- do you rely on what

8  Mr. Dondero said to you during that phone call

9  on December 21st in -- in deciding to join in

10 this particular letter?

11   A.    No.

12   Q.    Did you only then rely on the

13 information you obtained from counsel?

14   A.    Yes.  I -- I -- I -- I considered

15 this letter to be nearly the most gentle

16 request imaginable amongst lawyers to maintain

17 the status quo.

18   Q.    And the request that's made in this

19 letter is perfectly consistent with what

20 Mr. Dondero told you on the 21st of December,

21 correct?

22   A.    I don't -- no.

23   Q.    How --

24        MR. MORRIS:  Can we go to the end of

25    this letter, please.  All right.  Right

GRANT SCOTT - 1/21/2021

2    there.

3  BY MR. MORRIS:

4    Q.    Do you see the request that's in the

5  last sentence?

6    A.    Yes.

7    Q.    Is that the same thing that

8  Mr. Dondero told you should happen, that --

9  that there should be no further CLO

10 transactions at least until the issues raised

11 and addressed by the debtor's plan were

12 resolved substantively?

13   A.    Yes.

14   Q.    Is there anything that he said

15 that's inconsistent with the request that's

16 made here?

17        MR. CLARK:  Objection, form.

18   A.    This -- and can you -- can you show

19 me earlier parts?

20   Q.    Of course.  You know what, I'll

21 withdraw the question.

22        And let me see if I can do it this

23 way:  In your discussion with Mr. Dondero, did

24 he indicate that he had seen a draft of this

25 letter?

GRANT SCOTT - 1/21/2021

2    A.    No.  And I didn't -- I didn't have a

3  discussion with him.  I -- I merely listened to

4  him.  There was no -- I -- I had no input to

5  the conversation.

6    Q.    Okay.  I -- I did -- I didn't --

7  I -- I appreciate that.  So he called you; is

8  that right?

9    A.    We -- we called in.

10   Q.    Oh, was it --

11   A.    I --

12   Q.    Was it --

13   A.    I don't know --

14   Q.    Was it --

15   A.    I don't know the sequence of the

16 calls.  I'm sorry.

17   Q.    Was there anybody on the call other

18 than you and Mr. Dondero, the call that you're

19 describing on December 21st?

20   A.    Yes, my attorney and an attorney --

21 I believe the attorney that signed this letter.

22   Q.    Okay.  And I just want to focus on

23 what Mr. Dondero said.  Did he -- did he say

24 during the call that Highland should not be

25 engaging in any further CLO transactions?

Page 94

GRANT SCOTT - 1/21/2021

2    A.   He took a more -- if I can
3 characterize his mental -- I looked at the
4 issue of maintaining the status quo since there
5 was somebody that was complaining about it,
6 that that -- because it -- it isn't assets of
7 Highland, it doesn't adversely affect Highland.
8 If -- if stopping the sales -- you know, my --
9 my thought was -- is if stopping the sales
10 reduces the likelihood of litigation
11 disputes -- you already saw that there was the
12 one from middle of December.  I -- I thought
13 that would be the more appropriate way to go.
14 I didn't think there'd be any harm.
15    Q.   And was that your --
16    A.   I think -- I think Jim Dondero had a
17 more legalistic view of its impro- -- im- --
18 improper nature.
19    Q.   And did he share that view with you?
20    A.   On Monday, yes.
21    Q.   Can you describe for me your
22 recollection of what he said about the
23 legalistic view?
24    A.   Just the mention of -- all I recall
25 is in terms of -- the law associated with it

Page 95

GRANT SCOTT - 1/21/2021

2 was -- the Advisers Act was mentioned --
3    Q.   Did you have --
4    A.   -- but I don't -- I don't know what
5 that is. You know, I don't know what that is.
6    Q.   And you -- and -- and you never --
7 it never occurred to you to pick up the phone
8 and -- and to speak with Mr. Seery to see why
9 it was he thought he should be engaging in
10 transactions?
11    A.   No.  And -- but I -- my lack of
12 volunteering a phone call to Jim Seery isn't --
13 it's -- it's because of -- I -- I thought any
14 phone call by me to Jim Seery would be
15 inappropriate because he's represented by
16 counsel.  I mean, we were working on claims
17 against him --
18    Q.   Okay.
19    A.   -- right, so...
20    Q.   Did you -- did you -- did you think
21 to instruct your lawyers to reach out to
22 Mr. Seery to actually speak to him instead of
23 just sending a letter like this and to -- and
24 to ask -- and to maybe inquire as to why he
25 thought it was appropriate to engage in

Page 96

GRANT SCOTT - 1/21/2021

2 transactions before they made a request six
3 days after the court threw out their suit as
4 frivolous?  I'll withdraw that.  That's too
5 much.
6        A few days later did you authorize
7 the sending of another letter to the debtor in
8 which you suggested that the -- the entities on
9 behoove -- on -- on whose behalf the letter was
10 sent might take steps to terminate the CLO
11 management agreements?
12    A.   I did not see -- so there is a --
13 there is a December 28th letter.
14        MR. MORRIS:  Let's just go to the
15    next letter, and -- and let's just call
16    that up.
17 BY MR. MORRIS:
18    Q.   I think it's -- I think it's
19 actually dated December 23rd.  It was the next
20 day.
21    A.   Yes.
22        (SCOTT EXHIBIT 4, Letter to James A.
23    Wright, III, et al., from Gregory Demo,
24    December 24, 2020, with Exhibit A
25    Attachment, was marked for identification.)

Page 97

GRANT SCOTT - 1/21/2021

BY MR. MORRIS:
3    Q.   And do you recall that the next day
4 CLO HoldCo Limited joined in another letter to
5 the debtors?  Do you have that recollection?
6    A.   Yes.  Not -- not be- -- yes, I do,
7 but -- yes, I do.
8    Q.   Did you see this letter before it
9 was sent?
10    A.   I don't believe so.
11    Q.   Did you authorize the sending of
12 this letter?
13    A.   I gave -- I relied on my attorney to
14 guide me through this process.
15    Q.   I appreciate that.
16    A.   I let him make that call on this
17 letter, which is -- copies most of the prior
18 letter and then adds another issue.
19    Q.   Okay.  Do you have an understanding
20 of what that issue is?
21    A.   Yes.
22    Q.   And what is your understanding of
23 what that additional issue is?
24    A.   Somewhere in this letter of the 23rd
25 there's an -- there's an -- an inclusion of

GRANT SCOTT - 1/21/2021

1  a -- a statement of an -- a future intent.
2       Q.    A future intent to do what?
3       A.    To remove Highland as the servicer
4  of the agreements you talked to me about
5  previously.
6
7       Q.    Can you tell me whether there's a
8  factual basis on which CLO HoldCo Limited
9  believes that the debtor should be removed as
10  the servicer of the portfolio manager of the
11  CLOs?
12      A.    Yes.  There are -- there are
13  multiple bases to consider subject to all the
14  other conditional language in the request of
15  these letters to consider that going forward
16  but no decision.  That intent is an intent to
17  evaluate, not an intent to take any action.  I
18  haven't authorized any action.  I don't feel
19  comfortable with my knowledge base at this
20  time, but it's something being explored.
21      Q.    So knowing everything that you know
22  as of today, you have not yet formed a decision
23  as to whether CLO HoldCo Limited will take any
24  steps to terminate Highland's portfolio
25  management agreements, correct?

GRANT SCOTT - 1/21/2021

1
2       A.    I don't -- I don't want to be
3  difficult, but I'm -- I'm confused yet again
4  with your question.  But I have not -- there --
5  there are a number of cr- -- a number of issues
6  that with my nonfinance background would
7  suggest to me that they -- they may be bases
8  for -- for cause, to -- to assert a cause.  And
9  I've been conferring with my attorney about
10  that, but it's very preliminary and no -- no
11  decision has been made.  I -- no decision is
12  being made.
13      Q.    So what -- what are the factors that
14  are causing you to consider possibly seeking to
15  begin the process of terminating the CLO
16  management agreements?
17      A.    Well, I guess I would break them
18  down into maybe two categories, maybe more.
19  The one that resonates most with me -- I don't
20  know -- maybe because even though I'm a patent
21  attorney, I guess at one point I was an
22  attorney.  But the thing that resonates most
23  with me --
24      Q.    You are an attorney.
25      A.    -- at the moment -- well, now you

GRANT SCOTT - 1/21/2021

1  know why I'm a patent attorney and not one of
2  you guys.  But the thing that resonates with me
3  the most from a legal substantive, black letter
4  law sort of issue is the plan for
5  reorganization, which we've objected to.  I've
6  re- -- I've reviewed the objection, and that
7  sets forth our -- that sets forth my position,
8  and I consider that to be quite material.  The
9  others are issues of practical effects of
10  what's happened thus far with the bankruptcy,
11  the termination of the experts with a long
12  track record of success, the soon-to-be
13  termination of all employees, the cancellation
14  of various representation agreements, things of
15  that nature looked at from an additive sort of
16  perspective.
17      Q.    You know that -- can we refer to the
18  counterparties under the CLO management
19  agreements as the issuers?  Are you familiar
20  with that term?
21      A.    I -- I am familiar with the term
22  issuers, yes.
23      Q.    Okay.  And do you understand --
24      A.    There's an agreement between the --

GRANT SCOTT - 1/21/2021

1  I'm sorry.
2       Q.    There's an agreement between the
3  issuers and Highland pursuant to which Highland
4  manages the CLO assets, right?
5       A.    With res- -- yes.
6       Q.    Okay.  And do you understand what's
7  going to happen to those management contracts
8  in connection with the plan of reorganization?
9       A.    Partially.
10      Q.    What's your partial understanding?
11      A.    Well, I -- I wouldn't want to
12  characterize it as a partial understanding.  I
13  mean, with respect to part of the agreement.
14      Q.    Okay.
15      A.    Okay.  Our plan objection lays out
16  our basis for objecting to steps that Highland
17  is actively taking to preclude us from the full
18  rights that we have as third-party
19  beneficiaries under that agreement, and they're
20  not de minimus.  They're quite material.  They
21  relate to cause issues and no-cause issues, for
22  example, as out- -- as outlined in our --
23  our -- our objections.
24      Q.    Okay.  Did you ever make any attempt

Page 102

GRANT SCOTT - 1/21/2021

1  to speak with any issuer concerning Highland's
2  performance under the CLO management
3  agreements?
4      A.    No.
5      Q.    Why not?
6      A.    I -- I don't have any facts --
7  understand I -- I get all of the reports
8  periodically from Highland -- from Highland.
9  I -- I don't have a basis that I'm aware of to
10  complain about performance issues.  This is a
11  legal issue that I'm talking about.
12      Q.    So you have no basis to suggest that
13  Highland hasn't performed under the CLO
14  management agreements, correct?
15      A.    Well, Highland as of right now,
16  the -- the issue really is as -- as to what's
17  next, not -- not -- I -- I don't -- I don't
18  believe I have facts that support a com- --
19  a -- an issue right now.  It's -- it's --
20  it's -- it's going forward that is the problem.
21      Q.    I --
22      A.    That's -- you know, that's --
23      Q.    Have you given any thought to
24  speaking with the issuers to try to get their

Page 103

GRANT SCOTT - 1/21/2021

1  views as to what they think is going to happen
2  in the future?
3      A.    No.
4      Q.    They're the -- they're the actual
5  direct beneficiaries under the CLO management
6  agreements, to the best of your understanding,
7  right?
8      A.    Yes.  Their rights may not be
9  impacted; it's CLO Holdco's rights that are
10  going to be adversely impacted.  So it's -- I
11  don't know that our view is in alignment with
12  their view.  But to answer your question, no,
13  we did not contact them.
14      Q.    Do you have any knowledge or
15  information as to any assertion by the issuers
16  that Highland is in breach of any of the CLO
17  management agreements?
18      A.    No.
19      Q.    Do you have any knowledge or
20  information as to whether or not any of the
21  issuers believe that Highland is in default
22  under the CLO management agreements?
23      A.    No, I don't have any of those facts.
24      Q.    Are you aware that the issuers are

Page 104

GRANT SCOTT - 1/21/2021

1  negotiating with Highland to permit Highland to
2  assume the CLO management agreements and to
3  continue operating under them?
4      A.    I believe so --
5      Q.    Is that --
6      A.    -- but they're --
7      Q.    Go ahead.  I'm sorry.
8      A.    As I understand it, Highland
9  wants -- Highland or its subsidiary -- or
10  its -- its -- its postbankruptcy relative --
11  post- -- excuse me, that Highland
12  postbankruptcy -- or postplan confirmation
13  wants to move forward, substitute itself for
14  the prior issuer -- no, sorry, substitute
15  itself for the prior servicer under those
16  agreements to assume those agreements but in
17  the process of assuming those agreements,
18  carving out a bunch of provisions that from a
19  legal standpoint and a potentially future
20  practical and monetary standpoint are quite
21  substantial, and that has to relate to the
22  removal rights based on cause and without
23  cause.  As I understand it, that's all set
24  forth in our plan objection.

Page 105

GRANT SCOTT - 1/21/2021

1      Q.    Okay.  Are you aware of a third
2  letter that was sent to Highland on behalf of
3  CLO HoldCo and the other entities that are
4  listed in this document?
5      A.    The December 28th letter, is that
6  what you mean?
7      Q.    It's actually December 31st, if I
8  can refresh your recollection.
9          MR. MORRIS:  Can we put up Exhibit
10      F?
11          (SCOTT EXHIBIT 5, Letter to Jeffrey
12      N. Pomerantz from R. Charles Miller,
13      December 31, 2020, was marked for
14      identification.)
15  BY MR. MORRIS:
16      Q.    You remember that there was a letter
17  dated on or about December 31st that was
18  sent -- oh, actually, you know, I apologize.
19  If we scroll down to the -- to the next -- to
20  the first box, there actually is no mention of
21  CLO HoldCo.
22          Are you aware that Mr. Dondero was
23  evicted from Highland's offices as of the end
24  of the year?

Page 106

GRANT SCOTT - 1/21/2021

1
2     A.    I -- I didn't know the time, but I
3  understand he's no longer there.
4     Q.    Does CLO HoldCo Limited contend that
5  it was damaged in any way by Mr. Dondero's
6  eviction from the Highland suite of offices?
7           MR. CLARK:  Objection, form.
8     A.    I -- I don't have any information to
9  support that as of this time.
10    Q.    It's not -- it's not a belief that
11 you hold today?
12    A.    I don't have a belief of that, yes.
13          MR. MORRIS:  All right.  Let's take
14    a short break.  I may be done.  I -- I'm
15    grateful, Mr. Scott, and don't want to
16    abuse your time.  Give me -- let -- just
17    let -- let's come back at 4:50, just eight
18    minutes, and if I have anything further, it
19    will be brief.
20          (Whereupon, there was a recess in
21    the proceedings from 4:42 p.m. to
22    4:49 p.m.)
23          MR. MORRIS:  Okay.  Mr. Scott, thank
24    you very much for your time.  I have no
25    further questions.

Page 107

GRANT SCOTT - 1/21/2021

1
2           THE WITNESS:  Thank you.
3           MR. CLARK:  We will reserve our
4  questions.
5           THE WITNESS:  I appreciate it, John.
6           MR. MORRIS:  Take care.  Thanks for
7  your time and your -- and your diligence.
8  I do appreciate it.  Take care, guys.
9           THE REPORTER:  Okay.
10          MR. CLARK:  Thank you.
11          MR. HOGEWOOD:  No questions from us.
12          (Time Noted:  4:50 p.m.)
13
14
15          ---------------------
16          GRANT SCOTT
17
18 Subscribed and sworn to before me
19 this      day of            2021.
20
21 -----------------------------------------
22
23
24
25

Page 108

GRANT SCOTT - 1/21/2021

1
2           C E R T I F I C A T E
3  STATE OF NORTH CAROLINA  )
4                           ) ss.:
5  COUNTY OF WAKE           )
6
7           I, LISA A. WHEELER, RPR, CRR, a
8  Notary Public within and for the State of New
9  York, do hereby certify:
10          That GRANT SCOTT, the witness whose
11 deposition is hereinbefore set forth, having
12 produced satisfactory evidence of
13 identification and having been first duly sworn
14 by me, according to the emergency video
15 notarization requirements contained in G.S.
16 10B-25, and that such deposition is a true
17 record of the testimony given by such witness.
18          I further certify that I am not
19 related to any of the parties to this action by
20 blood or marriage; and that I am in no way
21 interested in the outcome of this matter.
22          IN WITNESS WHEREOF, I have hereunto
23 set my hand this 21st day of January, 2021.
24          -----Lisa Wheeler-----
25          LISA A. WHEELER, RPR, CRR

Page 109

GRANT SCOTT - 1/21/2021

1
2  -------------------I N D E X------------------
3                                         PAGE
4  EXAMINATION BY MR. MORRIS                7
5
6
7  ------------------EXHIBITS-------------------
8                                         PAGE
9  EXHIBIT 1  Organizational Structure:    46
          CLO HoldCo, Ltd.
10 EXHIBIT 2  Unanimous Written Consent of  54
          Directors In Lieu of Meeting
11
   EXHIBIT 3  Letter to James A. Wright,   78
12           III, et al., from Gregory
          Demo, December 24, 2020, with
13           Exhibit A Attachment
14 EXHIBIT 4  Letter to James A. Wright,   96
          III, et al. From Gregory
15           Demo, December 24, 2020, with
          Exhibit A Attachment
16
   EXHIBIT 5  Letter to Jeffrey N.        105
17           Pomerantz from R. Charles
          Miller, December 31, 2020
18
19
20
21
22
23
24
25

**1**

**1** 46:13,14 53:9,16 82:5,13

**1/21/2021** 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1

**100** 47:7

**11-month** 70:9

**1976** 28:15

**1984** 24:20

**1986** 24:22

**1988** 25:5

**1991** 25:6

**2**

**2** 54:25

**2012** 16:23

**2019** 23:4 76:17

**2020** 30:15 78:8 84:9 96:24 105:14

**2021** 107:19

**21st** 90:23,25 91:9,20 93:19

**22nd** 78:15,23 79:19 81:3 90:17

**23rd** 96:19 97:24

**24** 78:8 96:24

**24th** 81:4 83:2

**28th** 81:5 96:13 105:6

**3**

**3** 78:6

**31** 105:14

**31st** 105:8,18

**3:20** 62:6

**3:30** 61:25

**3:31** 62:7

**4**

**4** 55:8 96:22

**45** 31:20 32:2

**4:42** 106:21

**4:49** 106:22

**4:50** 106:17 107:12

**5**

**5** 54:24 105:12

**6**

**6** 78:4

**9**

**99** 52:9 53:4,10,13

**A**

**ability** 90:7

**Absolutely** 8:22

**abuse** 106:16

**accommodated** 35:22

**accounting** 29:22

**accurate** 51:5 53:8 89:15

**acronym** 12:23

**act** 11:13 95:2

**acting** 10:10

**action** 83:16 85:16 98:17,18

**actively** 101:18

**activity** 50:9,14

**acts** 72:17

**actual** 6:24 103:5

**add** 88:2

**additional** 81:5 97:23

**additive** 100:16

**addressed** 92:11

**addressing** 20:4

**adds** 97:18

**admissibility** 6:23

**advance** 37:23

**adversely** 94:7 103:11

**Advisers** 95:2

**affairs** 63:2

**affect** 94:7

**affiliated** 49:16

**aft-** 23:5

**afternoon** 6:6 7:7

**agree** 35:12,13,17 36:18 37:4,18

**agreed** 35:20,21 43:22 45:2,15 85:23

**agreement** 26:7 36:19 42:11 61:15,16 62:15 67:22 68:6,9, 13,21 70:18 71:7,16, 17 72:20 100:25 101:3,14,20

**agreements** 24:4 62:18 70:21 71:22 72:16 73:10 74:3,10 81:12 96:11 98:5,25 99:16 100:15,20 102:4,15 103:7,18,23 104:3,17,18

**agrees** 6:16

**ahead** 38:2 104:8

**alignment** 103:12

**allowed** 37:10

**amended** 40:12,16

**amendment** 38:10

**amount** 27:8

**amounts** 24:6

**announcement** 43:12

**ansel** 33:18

**answer's** 74:6,22

**anymore** 89:22

**apologies** 89:21

**apologize** 50:11 55:4 59:21 105:19

**apparently** 35:15

**appointed** 88:15

**appointment** 17:6

**approval** 27:5

**approvals** 64:14

**approve** 48:12 75:11,12

**approved** 41:13,16

**approving** 64:16

**approximately** 11:17 17:6 60:20

**area** 25:24 64:19

**argument** 42:12

**arises** 71:7,15

**arrangement** 18:10 47:13 53:12,13

**as-** 35:14

**Asia** 46:12

**aspect** 19:24 20:6 77:12

**assert** 79:9 99:8

**assertion** 103:16

**asset** 32:23 33:7,10 37:9

**assets** 10:22,24 11:14 12:11 13:13, 15,17,20,23 18:25 19:15 20:11 24:5 32:12 33:11,15 35:13,14,15,17 37:8 71:23 94:6 101:5

**assume** 104:3,17

**assumed** 11:25

**assuming** 104:18

**attached** 46:21 52:24

**Attachment** 78:9 96:25

**attempt** 76:19,25 101:25

**attorney** 6:7 24:11 35:21 38:14,21 39:5, 6 42:6 43:22,23 45:2 65:17 70:13 80:15 87:6 93:20,21 97:13 99:9,21,22,24 100:2

**attorney-client** 65:20 79:9

**attorneys** 87:11

**attraction** 32:18,21

**authority** 15:9,19 33:24

**authorize** 96:6 97:11

**authorized** 45:4 88:10,18 98:18

**aware** 27:13 34:12 36:2 38:12 40:5,9 58:10 62:14,19 69:21 71:20,21 72:8,11 73:24 74:8,17 76:11 77:19 79:16,18,25 80:16,17 82:22 83:21 85:5 102:10 103:25

105:2,23

**B**

**back** 20:21 54:18 56:18,20 81:21 87:25 88:15 106:17

**background** 24:17 99:6

**bankruptcy** 6:9 22:9,19,21,24 23:5, 14 30:14,15 34:11,13 35:19 76:12,15,18,23 77:6 84:23 85:12,15 100:11

**Barbara** 52:15 56:12, 13,23 58:10

**base** 98:19

**based** 29:9 61:5,15 65:20 73:16 80:22 104:23

**bases** 98:13 99:7

**basically** 20:22 24:6

**basis** 19:25 21:4 24:13 26:9 37:15 42:17 60:13 82:19 86:5 91:4 98:8 101:17 102:10,13

**be-** 97:6

**began** 25:4

**begin** 6:13 7:4 8:20 16:22 99:15

**behalf** 10:11 14:2,12 15:20 16:3 26:25 27:17,23 33:25 34:4 37:22 40:22 67:17 77:20 78:18 84:5,9, 14 85:17 86:4 87:10 88:14 89:2,11 96:9 105:3

**behoove** 96:9

**belief** 73:13,14,15 86:5 106:10,12

**believed** 42:16 67:20 68:11 91:4

**believes** 98:9

**beneficial** 58:14,16

**beneficiaries** 61:8, 12 101:20 103:6

**beneficiary** 61:19 73:9

**big** 33:3 39:8

**biggest** 23:16

**bit** 8:15 30:18 52:19 55:12

**black** 100:4

**blocks** 52:13

**board** 34:25

**bottom** 46:24 55:22

**box** 105:21

**boxes** 47:13

**breach** 68:12 74:9, 15,18 103:17

**breached** 67:21

**break** 19:7 61:24 99:17 106:14

**breaking** 55:11

**briefly** 81:4

**brilliantly** 76:10

**brought** 82:4

**bucket** 71:20

**bunch** 104:19

**business** 29:19 50:4

**business/finance** 29:22

**C**

**call** 18:6 35:4,19,20 44:9 45:11 91:8 93:17,18,24 95:12,14 96:15 97:16

**called** 6:3 10:15 35:9,20 44:6 45:12 46:7 87:22,25 93:7,9

**calls** 93:16

**camp** 75:13

**cancellation** 100:14

**CANTY** 55:6,9

**capacity** 17:9 18:20 26:21 34:5,7 50:2 51:20 72:25 73:23 74:7 75:24 83:22 84:20

**Capital** 6:10 13:18, 19,22 14:16 19:18 28:12 62:15,21,25 67:21 68:5,11,19,24 69:14 70:19,22 71:21 72:12,16,21 73:25 74:10 75:2,17

**Capital's** 68:19

**caps** 13:10

**care** 107:6,8

**Carolina** 25:8

**carry** 18:4,13

**carving** 104:19

**cash** 36:13 37:9

**categories** 99:18

**caused** 74:11 84:19

**causing** 99:14

**caution** 44:11 65:16, 18 79:7

**caveats** 83:18

**Cayman** 47:4

**certainty** 33:20

**change** 27:10

**changed** 20:23 38:21 84:19

**char-** 51:16

**characterize** 94:3 101:13

**charge** 20:16

**charitable** 11:3,4 12:14 17:24 18:4,14 32:13,17,20 36:16 47:8,22 48:15 49:3,4, 7,10,13,17,21 50:3, 10,16,23 51:2,10,13, 17,23 52:3,6,9,10 53:3,5,17,25 54:10,

14,20 56:8 58:15 60:3,25 65:8

**Charles** 105:13

**chart** 46:25 48:16 55:20

**chemical** 29:4

**choice** 10:2

**chose** 29:11

**Christmas** 90:22

**chronological** 34:20

**City** 52:15 56:13

**claim** 23:11,22,24 38:10,11 39:11,12, 19,23 40:4,8,12,13, 16 46:22 52:25

**claims** 95:16

**clarify** 13:3 43:18,19

**CLARK** 26:5,12 31:2, 10 32:25 33:8,17 39:14 40:24 42:24 44:10 54:4 59:14 62:3 64:4,10 65:15 69:5,18,24 72:22 73:5 74:4,12,19 75:18 79:6,14 80:21 83:13 87:18 92:17 106:7 107:3,10

**clerical** 60:18

**CLO** 10:15,21 11:8 12:2,7,11,15,20,23, 25 13:23 14:2,12 15:10,20,24 16:4,6,9, 11,15,20 17:5,15,18, 22 18:21,25 19:3,15, 17,20 21:5 22:10 23:2,9,18 24:3 26:25 27:17,23 28:6 32:10, 23 33:6,15,25 34:8 35:17 36:12,23 37:7, 22 40:22 41:11 42:20 45:19,20 46:2,3,15, 22 47:3,7,17 48:23 50:14 51:3 52:25 54:15 58:21 61:8 62:12,16 63:2 64:20 67:17,22 68:13,18 69:3,13,16,22 70:4, 19,23 72:8,19 74:3,8, 9,24 75:25 76:2,19

77:5,13,20 79:19 80:2,12 82:2,11 84:14,20 85:21 92:9 93:25 96:10 97:4 98:8,23 99:15 100:19 101:5 102:3,14 103:6,10,17,23 104:3 105:4,22 106:4

**CLO's** 35:14

**CLOS** 13:13 68:6 69:3,16 70:23 71:18, 22,24 72:9,11,21 74:25 75:16,19 76:20,25 77:13 83:7, 23 84:5,9,14 85:17 86:4 87:10 89:3,12 90:8 98:11

**close** 30:17

**closest** 28:20,21 31:23

**collateralized** 10:23

**collectively** 20:25 80:18

**college** 28:22 29:7

**Colorado** 67:3

**com-** 20:15 25:24 102:19

**comfortable** 85:2 98:19

**comments** 79:3,8,10

**commonly** 12:16

**communicate** 90:4

**communicated** 39:4 62:24

**communicating** 67:5

**communication** 45:6

**communications** 44:14 64:8,23 65:12, 20 66:21 67:15 68:16 80:22,25 87:5

**company** 10:22 33:9,21 65:23

**compensation** 16:19 17:2 49:20,25

**complain** 102:11

**complaining** 94:5

**complex** 18:19

**compliance** 18:11
20:3,13,16 25:16,17,
20,24 50:8

**comports** 47:2

**con-** 85:8

**concern** 37:5 68:17
71:6,14

**conclude** 86:20 87:8

**conditional** 98:14

**conducted** 6:19

**conference** 35:9

**conferring** 99:9

**confide** 31:17

**confided** 31:9

**confidential** 32:3

**confirmation** 6:14
104:13

**confused** 40:25
47:13 53:11 99:3

**confusing** 13:3
53:19

**confusion** 85:9

**connection** 62:11
69:2 74:2 101:9

**consent** 27:16,22
55:2,18

**consideration** 76:6

**considered** 91:14

**consistent** 33:22
91:19

**construction** 67:2

**consulted** 39:5 42:7

**contact** 21:19,20,22
103:14

**contacted** 38:21

**contacts** 87:24 88:2

**contained** 69:22

**contend** 69:13 72:19
106:4

**contentious** 66:2

**continue** 104:4

**contract** 36:17

**contracts** 101:8

**conversation** 66:12,
25 88:4 90:15,25
93:5

**conversations** 65:4
66:8 73:16 90:16

**converting** 83:16

**cookie** 18:9

**copies** 97:17

**copy** 78:23

**core** 15:5,8

**corner** 46:25

**corporate** 11:7 73:2

**correct** 10:13 16:14
17:10,13 23:15 25:25
53:14 58:17 71:13
77:2,3 84:18 88:12
90:18 91:21 98:25
102:15

**corrected** 60:21

**correction** 60:22

**correctly** 23:12
29:20 36:7 42:10

**cos-** 77:23

**counsel** 10:9 11:23
23:6 36:8 43:12
44:12,15 73:17 79:8
80:23,25 85:23 91:13
95:16

**counterparties**
100:19

**couple** 18:17

**Cournoyer** 15:4

**court** 6:21 35:19
41:16 42:14,20 43:13
80:4 82:5,14,22 83:6,
12 96:3

**courtesy** 8:24

**courtroom** 7:23

**Covitz** 14:20 15:2
86:15,20

**cr-** 99:5

**create** 17:24

**created** 18:3 36:20

**creditor** 23:9,21

**cutter** 18:9

---

**D**

**D-A-F** 13:10

**DA-** 51:23

**DAF** 12:17,20,23,25
13:9 19:20 47:8
48:15 49:3,4,7,10,13,
17,22 50:3,10,16,23
51:2,10,13,17,23
52:3,6,9,11 53:3,5,
17,25 54:11,14 56:8
58:15 60:3,25

**Dallas** 52:14,18
55:19 56:2,22 58:9

**damaged** 106:5

**dated** 52:20 78:15
82:25 83:2 90:17
96:19 105:18

**day** 21:9,12,19 42:14
96:20 97:3 107:19

**day-to-day** 12:9
19:25 50:6

**days** 21:21,25 83:12
96:3,6

**DDDD** 78:5

**de** 52:16 101:21

**de-** 31:16

**deal** 20:13

**debtor** 6:9 23:9,10,
12,22,25 86:3 88:15
89:2 96:7 98:9

**debtor's** 41:12 77:12
90:7 92:11

**debtors** 97:5

**Dece-** 78:14

**December** 78:8,15,
23 79:18 91:9,20
93:19 94:12 96:13,
19,24 105:6,8,14,18

**decide** 82:2,12

**decided** 82:23 83:3

**deciding** 91:9

**decision** 34:3,9 36:3,
4,18 37:14,18,21
38:19,21,23 39:8
43:10,21 45:15,16
47:25 48:10 66:15
74:24 81:18 86:7,8
98:16,22 99:11

**decision-makers**
84:24

**decision-making**
15:9,18 33:14,24
85:20,21 86:17,21

**decisions** 13:25
14:12 16:3 26:25
34:14,23 48:7 75:5
85:2

**declared** 30:16

**declined** 40:23

**dedicate** 21:14

**default** 68:5,12 74:9
103:22

**define** 31:17

**degree** 24:22

**Delaware** 29:5

**delayed** 70:10 71:11

**demand** 81:8 83:17,
19

**Demo** 78:7 96:23

**demonstrative** 46:7
56:21

**deposed** 7:10 8:12

**deposition** 6:12,17
7:9,18,23 8:2 9:8
23:7

**depositions** 7:13
8:16

**derived** 24:7 81:11

**describe** 10:20
23:23 24:16 30:5
66:20 94:21

**describing** 93:19

**desire** 85:13

**detail** 11:7

**details** 10:6

**detected** 60:21

**devote** 21:2,5 22:10

**devoting** 22:18

**difference** 22:5 39:7
83:15

**difficult** 30:18 41:17
69:11 99:3

**diligence** 107:7

**direct** 103:6

**directly** 28:8

**director** 11:11 12:2,7
16:16,20,25 17:4,13
18:21 19:3,17 21:5
22:25 26:21 28:5
32:9 34:5,8 35:6
47:17 48:24 50:22
51:3,4,12,16 52:3,6
55:25 56:6,11,15,25
57:8,11 58:9 62:12
73:23 74:7 75:24
76:24 84:20 90:5

**directors** 15:24
49:14 50:20 55:2,18
59:12,18

**disagree** 88:23 89:4

**disagreed** 34:10,15

**disagreement** 38:13

**disclose** 44:13 65:19
80:24

**discuss** 42:19 67:16

**discussed** 73:20
77:8,11 81:13

**discussion** 67:23
80:16 85:23 89:7
92:23 93:3

**discussions** 64:3
67:19 68:3,10

**dispute** 35:15

**disputes** 94:11

**distinction** 70:24

**distinguish** 70:17

**distracted** 33:4 72:4

**division** 53:10

**document** 9:12,14
46:9 54:22 55:14,22
73:12 89:9 105:5

**documents** 9:9,10
52:24 66:24

**Don-** 11:21

**donated** 24:4

**Dondero** 7:21 9:17
10:7 11:24 14:20,25
17:24 28:7,9,10,14,
16 29:24 30:6,25
31:5,9,20 32:2,22
33:5 34:10 35:24
37:2,23 39:12,19
41:7 42:20 43:10
45:9 48:7 51:19,22
52:2,5 57:4,8 58:12
60:23 61:13 62:20
63:19 67:7 84:12,17,
24 85:5 86:9,12 89:4
90:12,13,16 91:3,8,
20 92:8,23 93:18,23
94:16 105:23

**Dondero's** 7:19
10:11 30:21 47:21
57:21 58:2 60:11,14
67:3 106:5

**downward** 54:13

**draft** 78:25 92:24

**dry** 19:5

**due** 35:17 70:11

**Dugaboy** 59:25 60:5,
15,19 61:7,19

**duly** 6:3

**duties** 12:6 19:2,16
62:11 69:15

---

### E

**e-mailed** 66:23

**earlier** 25:17 26:24
62:9 75:4 77:16
78:25 79:16 82:3,12
83:12 85:4 87:20
92:19

**earnestly** 89:20

**easier** 12:23 42:5

**Eastern** 61:25

**easy** 89:19

**educational** 24:17

**effect** 37:9

**effects** 100:10

**effectuated** 27:23

**effectuating** 27:16

**electrical** 24:18

**Electronics** 8:6

**employee** 14:16
16:17 90:5

**employees** 11:21,22
14:17 16:7 17:11
26:23 27:15,22 40:3
49:11 50:17,18 57:15
59:12,19 100:14

**end** 55:12 91:24
105:24

**ended** 35:20

**engage** 87:10 89:10
95:25

**engaged** 88:14

**engaging** 82:6 83:7
93:25 95:9

**engineer** 24:18 25:2
29:5

**engineering** 29:17

**entities** 11:2 12:12
17:25 18:3,7,10 46:2
54:16 55:20 56:8
78:18 79:19 80:2
82:4,13 89:8 90:6
96:8 105:4

**entity** 10:15,18 12:3,
25 13:4 17:12,25
51:9 52:17 58:15
74:24 81:11 85:19

**entity's** 50:4

**Equity** 70:9

**equivalent** 11:4

**error** 60:18,19

**escrow** 37:14

**essentially** 83:17

**establish** 23:11
47:25 48:7,10 65:6

**established** 51:18
58:20

**estimate** 21:3,24

**estimated** 21:12

**et al** 78:7 96:23

**evaluate** 98:17

**event** 66:6

**events** 30:14 36:7

**evicted** 105:24

**eviction** 106:6

**evidence** 6:17

**evidenced** 42:12

**ex-wife** 10:9,11

**exam-** 86:15

**EXAMINATION** 7:5

**examined** 6:4

**exclusive** 23:20
24:13

**exclusively** 24:10
50:14

**excuse** 21:11 22:15
23:7,9 28:25 104:12

**execute** 32:16 86:4

**exhibit** 46:7,13,14
54:24,25 55:7 78:4,5,
6,8,11 96:22,24
105:10,12

**exist** 75:16

**existence** 12:3

**exiting** 77:5

**expenses** 36:14
64:15

**experience** 8:16

**expert** 25:13,24

**expertise** 76:8 84:25
86:3 88:5 89:10

**experts** 100:12

**explain** 17:21 75:10

**explained** 45:14

**explored** 98:20

**extend** 8:23

**extent** 26:13 79:7
80:22

---

### F

**fact** 6:19 76:16 88:14

**factors** 99:13

**facts** 46:10 47:2
102:7,19 103:24

**factual** 98:8

**fair** 8:21 16:2 22:8
30:13,24 31:8,18,25
37:19 39:11 47:22,24
73:3,5 85:12,17
88:11

**fairly** 18:19 36:12

**fall** 25:5

**familiar** 10:14 45:20,
24 47:12 100:20,22

**familiarity** 45:25
47:11

**family** 7:20 9:17

**feed** 52:12 56:7

**feedback** 82:8

**feeds** 52:13

**feel** 98:18

**fees** 36:15

**felt** 84:25

**field** 25:13

**filed** 20:5 23:5 38:24
39:13,20 40:17,18
42:8 76:12,15

**filing** 22:22,24 23:13
39:22 76:18,24 77:6
83:16

**final** 15:8,18 33:13,24

**finance** 18:2 25:10
29:18

**Finances** 19:23

**financial** 20:10 85:20

**finish** 8:19

**firm** 6:8

**flow** 36:13 37:7,11

**flows** 54:6,13,18

**focus** 23:20 36:24
68:8 93:22

**folks** 62:10

**footnote** 46:23

**forget** 26:15 35:7
52:18

**forgive** 69:9

**forgot** 19:8

**form** 26:6,9,10,13
31:2,10 32:25 33:8,
17 37:8 39:14 40:24
42:24 54:4 59:14
64:4,10 69:5,18,24
72:22 73:7 74:4,12,
19 75:18 83:13 86:2
87:18 92:17 106:7

**formal** 25:9,15

**formed** 17:15,19,22
47:4 98:22

**formulated** 82:18

**forward** 7:2 42:18
98:15 102:21 104:14

**found** 9:24 36:5,7
45:9

**foundation** 11:4
52:14 55:19 56:2,5,
22,23 65:8 82:20

**foundation-like** 17:25

**foundations** 12:15 53:22,23 54:10,17 56:7,10 57:5,9,12,15, 20,25 58:10,12

**fourth** 52:15,17 53:24

**frankly** 76:9

**free** 80:23

**frequently** 12:21,24 13:3,5

**Friday** 21:15

**friend** 28:13,21 31:23

**friends** 28:20

**friendship** 30:17

**frivolous** 96:4

**full** 70:7 84:21 101:18

**function** 18:14

**fund** 47:8 48:15 49:4 50:10,17,23 51:2 52:6,11 53:5,18 54:10,11

**future** 98:2,3 103:3 104:20

**G**

**gamut** 20:5

**gave** 43:21 86:19 87:4 97:13

**general** 18:9 45:25 49:3 66:7 83:2

**generally** 7:17 8:17 24:17 25:22 30:8,11 45:19,23 63:14 66:7, 20 71:12

**gentle** 83:17 91:15

**get all** 102:8

**get-** 20:4

**give** 77:4 106:16

**giving** 36:16 47:22

**goal** 18:4

**good** 6:6 7:7 26:20 30:8,9 43:25 58:23, 25 59:5,9,11,17,22 61:6,12

**good-faith** 42:17

**GP** 49:3,8,10,13,17, 22 50:3 51:24

**graduate** 24:20

**graduated** 24:13,19 25:5

**Grant** 6:1,12 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1,13 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,10 45:1 46:1 47:1 48:1 49:1 50:1 51:1,2,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1, 15 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,6 80:1,21 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,16

**grateful** 89:18 106:15

**Gregory** 78:7 96:23

**group** 11:18,19 14:15 15:6,8,21 18:7 19:21 86:14

**grow** 28:16

**guess** 11:24 12:22 18:2 20:20 25:2 40:4, 5 42:13 45:7 65:23 78:11 99:17,21

**guide** 97:14

**guideline** 27:8,14

**guys** 100:3 107:8

**H**

**half** 43:6 60:21

**halt** 81:8

**hand** 70:20

**handled** 8:10 20:7

**happen** 92:8 101:8 103:2

**happened** 100:11

**Har-** 38:17

**Harbourvest** 38:18 40:20 41:3,8,12,15, 25 43:11

**hard** 21:13

**harm** 94:14

**HCLO** 73:22,23

**HCM** 76:11

**head** 28:11

**heads** 28:12

**hear** 13:9 48:5 55:7

**heard** 20:22 51:9

**hearing** 6:18 42:15, 23 43:4 83:5

**held** 33:15

**helped** 65:6

**helps** 54:22

**Hey** 44:10

**hierarchy** 11:18,20 23:16 65:7

**high** 23:17,18 28:15

**Highland** 6:10 11:22 13:18,19,22 14:3,15, 16 19:18 20:7 26:23 27:14,22 28:12 34:25 40:2 52:14 55:19,25 56:22 62:11,15,21,25 63:17 67:6,21 68:4, 11,19,24 69:14 70:9, 12,18,22 71:11,21 72:12,16,20 73:25

**74:10** 75:2,17 76:3,9, 14,21 77:2,6 80:5 81:10,11 82:6,14 83:6,22,24 84:4,8,13 85:6,14,16,18 89:4 93:24 94:7 98:4 101:4,17 102:9,14,16 103:17,22 104:2,9, 10,12 105:3 106:6

**Highland's** 35:14 98:24 102:2 105:24

**highly** 44:7

**hindsight** 26:19

**historically** 86:7

**HOGEWOOD** 107:11

**hold** 25:12,23 48:14 65:15 79:6 106:11

**Holdco** 10:15,21 11:9 12:2,7,16,20,23 13:23 14:2,12 15:10, 20,24 16:4,6,9,11,15, 20 17:5,15,18,22 18:21 19:3,17,20 21:5 22:10 23:2 26:25 27:17,24 28:6 32:10,23 33:6,16,25 34:8 36:12,23 37:7, 22 40:22 41:11 42:21 45:19,21 46:2,3,15, 22 47:3,7,17 48:23 50:14 51:3,10,13,17 52:9,25 53:3,25 54:11,14,15 56:8 58:15,21 60:3,25 61:9 62:12,16 63:2 64:20 68:13,18 69:4, 13,17,22 70:4,19,23 72:8,19 73:22,24 74:8,24 75:25 76:19 77:13,21 79:19 80:2, 13 82:2,11 84:21 97:4 98:8,23 105:4, 22 106:4

**Holdco's** 85:21 103:10

**holding** 10:22 53:4

**home** 67:2,3

**honestly** 89:20

**horizontal** 52:13

**house** 30:4

**housemates** 30:2,3

**Hun-** 86:16

**hundred** 53:6 89:15

**Hunter** 14:20 86:15, 20

**I**

**IBM** 24:23

**idea** 47:20

**identification** 46:16 55:3 78:9 96:25 105:15

**identified** 23:13 26:24 35:10 53:23 60:18 81:5 82:5

**identify** 14:11 30:11 34:16,21 52:14 63:16 88:21,25 90:10

**Ill** 78:7 96:23

**Illinois** 24:21

**im-** 91:5 94:17

**imaginable** 91:16

**immediately** 24:23 35:20,21

**impacted** 103:10,11

**implement** 47:21

**important** 8:18 34:22,23

**impression** 86:25 87:4

**impro-** 94:17

**improper** 91:6 94:18

**improvements** 67:2

**in-** 37:15 70:3

**inappropriate** 95:15

**including** 10:23 36:14 86:15

**inclusion** 97:25

**inconsistent** 92:15

**incorrect** 37:15

**independent** 34:25 35:6

**indirect** 61:8

**indirectly** 28:8

**individual** 72:25

**individuals** 65:6

**information** 32:3 40:3 46:21 48:19 86:19 87:8 91:13 103:16,21 106:8

**informed** 86:23 88:4

**informing** 42:20

**initially** 23:3,19 29:2 32:19 54:12 83:2

**innocuous** 81:7

**input** 11:24 93:4

**inquire** 95:24

**inquiries** 40:6

**inquiry** 88:7,9

**Institute** 24:24

**institution** 18:6

**instruct** 95:21

**insulating** 18:12

**integrated** 11:2

**intent** 98:2,3,16,17

**inter-** 14:14

**interact** 49:23

**interactions** 73:19

**interchangeably** 12:18,19 13:6

**interest** 47:14,15 54:17 60:2,25

**interested** 10:6

**interests** 52:10 53:5, 17 54:20

**interface** 12:10 13:12 14:14,22 19:21 20:12 40:2 64:13

**interfaced** 62:10 70:11

**interfacing** 18:24 19:14

**intermittent** 21:13

**internal** 27:8

**internally** 27:12

**interrupt** 89:17

**interrupted** 26:16

**invest** 74:25

**invested** 69:4,17 77:14

**investing** 25:10

**investment** 13:25 14:11 16:3 25:13 26:4,24 59:25 60:6, 15 61:7,19 75:5 76:2

**investments** 15:10, 19 27:5 33:24 72:9

**invests** 70:23

**involved** 14:22 86:16,21

**IRS** 18:11

**Islands** 47:4

**issue** 7:20 36:5,9,12 37:4,13,17 38:17 40:14 41:7,24 42:15, 19 70:9 74:13 81:9 82:17 94:4 97:18,20, 23 100:5 102:12,17, 20

**issuer** 102:2 104:15

**issuers** 100:20,23 101:4 102:25 103:16, 22,25

**issues** 20:4,14 25:16,17 36:13 38:8 70:3 81:14,15 92:10 99:5 100:10 101:22 102:11

---

**J**

**James** 78:6 96:22

---

**January** 88:15

**Jeffrey** 105:12

**Jersey** 28:18

**Jim** 7:19,21 11:21,24 14:20 17:23 28:7,8, 10 35:4 45:8 61:13 63:5,19 67:3,9,23 84:12,16,23 87:14, 15,19 88:22 89:10 90:12 91:3 94:16 95:12,14

**John** 6:7 7:8 26:6 35:7 55:6 82:7 107:5

**join** 80:13,18,20 82:12,15 91:9

**joined** 24:23 97:4

**Jones** 6:8

**junior** 29:7

**justify** 82:19

---

**K**

**Kansas** 52:15 56:13

**kind** 9:11 22:4

**knowing** 98:21

**knowledge** 25:19 27:2 37:23 47:6,21 48:3,6,13 49:2 52:8 57:3,7 61:3,15 64:21 83:11 84:10 98:19 103:15,20

---

**L**

**L.P.** 6:11 47:8 48:15 49:4 50:11,17,23 51:2 52:3,6,11 53:5, 18 76:11

**La** 46:12

**lack** 95:11

**laid** 82:20

**language** 98:14

**large** 19:21 20:23

**late** 23:4 76:16,17

---

**law** 6:8 7:20 24:14,15 25:4,5,7 42:17 94:25 100:5

**lawyer** 10:10 24:8,12 65:23

**lawyers** 18:3 91:16 95:21

**lays** 101:16

**learn** 42:22 76:14 83:21,24

**learned** 43:3

**learning** 37:18

**led** 81:15 86:19 87:8

**left** 51:8 85:5,9 87:24 89:4

**legal** 18:10 82:19 100:4 102:12 104:20

**legalistic** 94:17,23

**lesser** 34:22

**letter** 77:20,25 78:6, 14,19,22 79:21,23 81:2,3,5 82:24 83:10 85:24 87:12 88:11,19 90:17 91:2,10,15,19, 25 92:25 93:21 95:23 96:7,9,13,15,22 97:4, 8,12,17,18,24 100:4 105:3,6,12,17

**letters** 79:16 98:15

**Lieu** 55:2

**light** 77:6

**likelihood** 94:10

**limited** 10:15,21 11:9 12:2,8,13,24 13:23 14:2,12 15:10,20 16:4,6,11 17:5,16,18 18:21 19:3,17 21:6 23:2 26:25 27:17,24 32:10,23 33:7,16,25 34:8 37:23 40:22 41:11 42:21 47:3,7, 17 51:3,10,13,17 52:9,10 53:3,4,17,25 54:11,14 56:8 58:15 60:3,25 61:9 62:12, 16 63:2 64:20 68:14, 18 69:4,13 70:19

---

72:9,19 73:24 74:8, 24 75:25 77:13,21 79:20 80:2,6,13 82:2, 12 97:4 98:8,23 106:4

**Limited's** 52:25 69:23 76:20

**lines** 55:23

**liquid** 37:9

**Lisa** 13:8

**list** 27:21

**listed** 79:20 80:3 82:13 89:8 105:5

**listened** 93:3

**litigation** 8:9 36:9 94:10

**lived** 29:25

**LLC** 49:3,8,10,13,17, 22 50:3 51:24

**loan** 10:23

**long** 28:14 69:8 100:12

**longer** 14:21 85:22 86:8,16,20 87:2,9 106:3

**looked** 94:3 100:16

**loop** 82:8

**loosely** 11:3

**lot** 13:9

**lower** 46:25

---

**M**

**made** 15:19 27:5 34:9,14,23 36:4 37:22 38:20 43:12 44:23 45:2 47:25 48:9 66:15 70:15 72:9 73:6 74:23 76:19,24 77:22 80:3, 10 81:19 83:11 88:9, 22 89:2 91:4,5,18 92:16 96:2 99:11,12

**mail** 87:25

**maintain** 18:12
20:13 85:24 91:16

**maintaining** 94:4

**make** 16:3 26:24 34:3
48:7 70:13 75:5,14
82:14 87:16 97:16
101:25

**makes** 13:25 14:11
54:15

**making** 67:17 70:25
75:13 76:2 79:21
80:6 83:22 84:5,8,13
85:2,10 86:7,8 88:7

**man** 30:22

**Man-** 68:19

**manage** 19:19 20:11

**managed** 72:12
74:25 75:17 76:3,21
77:2,5

**management** 6:11
13:2,18,19,22 14:16
19:24 28:13 32:23
33:6,15 36:15 62:15,
21,25 67:21 68:5,12,
25 69:14 70:19,21,22
71:22 72:12,17,21
73:25 74:3,9,11
75:17 77:10,12 96:11
98:25 99:16 100:19
101:8 102:3,15
103:6,18,23 104:3

**Management's**
68:20

**manager** 12:10
13:13,16 14:8 18:25
19:15 69:3,16 98:10

**managerial** 47:14

**managers** 14:3

**manages** 13:19,22
33:9 70:22 71:23
101:5

**managing** 33:11
49:7,21 50:3 51:23

**Mark** 14:20 63:21

**marked** 46:15 55:3
78:9 96:25 105:14

**married** 30:19,20

**master's** 24:22

**material** 100:9
101:21

**matter** 7:17 9:18,21
64:2,8 66:8

**matters** 25:3

**meaningfully** 21:23

**means** 11:12

**meet** 18:13

**Meeting** 55:2

**Mel-** 63:21

**Melissa** 63:21 66:17

**member** 49:7,21
50:3 51:23

**men's** 44:8

**mental** 94:3

**mention** 14:5 94:24
105:21

**mentioned** 7:8 13:12
14:4 20:18 22:13,14
25:17 41:3,6 53:24
66:17 71:5,10 77:16
81:16 86:23 95:2

**met** 81:14

**metric** 27:12

**middle** 16:23 94:12

**Mike** 63:20

**Miller** 105:13

**mind** 53:3

**mine** 28:13

**Minimal** 25:21

**minimus** 52:16
101:21

**minutes** 106:18

**missing** 52:18

**mission** 32:20

**mistaken** 85:6

**moment** 11:8 99:25

**Monday** 90:23 94:20

**Mondays** 21:14

**monetary** 104:21

**money** 12:15 14:8
19:23 32:19 36:18,19
37:6,10 54:6,13,18
58:20

**month** 21:25

**monthly** 21:4

**months** 23:20 30:15
63:18 64:25 65:12
66:22 67:7

**morning** 21:21

**Morris** 6:6,7 7:6,8
13:8,11 26:11,17
31:3,11 39:15 42:25
44:20 46:12,17 54:23
55:4,8,10,11,13,21,
24 56:20 59:15 61:23
62:4,8 64:5,11 65:22
66:5 73:3,8 78:3,10,
13 79:11 81:21,25
91:24 92:3 96:14,17
97:2 105:10,16
106:13,23 107:6

**motion** 41:12 42:8,
13 45:8 80:4,9,14
81:15 82:3,13,16

**mouth** 19:4

**move** 42:17 45:17
51:8 81:22 104:14

**multiple** 21:20 83:18
98:13

**N**

**named** 33:11

**names** 86:13

**Nancy** 60:22

**nature** 23:24 32:8
50:4 64:17,22 65:3,
11 94:18 100:16

**necessarily** 11:11

**needed** 27:5 66:24

**negotiating** 104:2

**Nelms** 35:5

**network** 18:3

**night** 21:21

**no-cause** 101:22

**Nobody's** 7:3

**nomenclature** 42:10

**Nonexempt** 58:23
59:2,5,9,11,18,23
61:7

**nonfinance** 99:6

**nonliquid** 37:8

**nonresponsive**
81:23

**North** 25:8

**northern** 28:18

**Notary** 6:4

**note** 72:23

**Noted** 107:12

**notwithstanding**
6:18 76:23

**number** 20:23 52:25
54:24 63:10 87:21,23
99:5

**nuts** 19:23 70:6

**O**

**object** 26:5,12 39:23
40:21 41:11 69:5
72:22 73:7

**objected** 37:24
38:19 41:25 84:16
100:6

**objecting** 26:8 40:10
42:8 101:17

**objection** 6:22 26:9,
20 31:2,10 32:25
33:8,17 38:2 39:14
40:24 42:2,8,21,24
43:11 54:4 59:14
64:4,10 69:18,23,24
74:4,12,19 75:18
83:13 87:18 92:17
100:7 101:16 104:25
106:7

**objections** 6:25
38:24 39:3 69:20
101:24

**obligation-type**
10:23

**obligations** 24:2
36:14 37:11

**obtain** 27:15 54:17

**obtained** 23:6 91:13

**occasion** 27:2,3

**occasions** 7:11

**occurred** 23:8 25:22
38:9,18 95:7

**occurs** 21:17

**October** 7:14,18
62:22 63:3 85:7

**office** 20:21

**officer** 16:16 90:5

**officers** 16:12 17:12
49:14 50:19 57:20,25
58:11 59:12,18

**offices** 105:24 106:6

**Okada** 14:25

**Okada's** 14:21

**ongoing** 74:14 91:4

**operating** 104:4

**operations** 50:6

**opinion** 86:2 87:15

**order** 34:20 80:5
82:14

**organically** 25:22

**organization** 10:25
20:6

**Organizational**
46:14

**original** 38:9 40:8,13
81:3 82:24

**originally** 58:20

**out-** 101:23

**outlined** 69:19
101:23

**overpaying** 70:8

**overrode** 42:2

**overruled** 37:25 39:24

**owed** 24:3

**owned** 13:23 47:7 71:24

**owner** 58:14,16

**owners** 53:25 54:2

**ownership** 45:20 47:14

**owns** 53:16

---

**P**

**p.m.** 62:6,7 106:21,22 107:12

**Pachulski** 6:8

**paid** 32:20

**par-** 54:19

**paragraph** 78:17 79:21 80:3 82:5,13

**part** 11:2 23:13 66:3 68:18 101:14

**partial** 101:11,13

**Partially** 101:10

**participate** 54:5 82:3

**participation** 52:17 54:17,20

**parties** 6:16 13:5 83:6

**partner** 49:4

**partnership** 52:10 53:4,17

**parts** 92:19

**party** 72:20

**past** 7:14,18

**patent** 8:5,9,11,14 24:8,10,12 99:20 100:2

**Patrick** 63:21 64:18, 24 65:13 66:9 67:8

**Patrick's** 65:17

**pausing** 34:19

**paying** 70:4

**payment** 36:14 70:10,14 71:11

**people** 12:21 18:2 19:21 20:3,23 32:5 33:10 65:24 75:13,14 86:7

**perc-** 89:15

**percent** 47:7 52:9 53:4,7,9,11,14,16

**percent/99** 53:9

**perfectly** 91:19

**perform** 50:5

**performance** 68:20 69:2,15 102:3,11

**performed** 102:14

**period** 22:15,16 23:19 80:6

**periodically** 18:18 102:9

**permit** 104:2

**pers-** 79:20

**person** 8:8 14:11 15:18 20:15 49:16 64:16 90:10

**personal** 30:10

**personally** 11:8

**persons** 14:13 90:11

**perspective** 100:17

**philosophy** 26:4

**phone** 23:6 44:9 63:10 65:24 87:22 91:8 95:7,12,14

**phrase** 13:9

**pick** 95:7

**piece** 21:16

**pieces** 71:5

**place** 7:13 66:13

**plan** 38:24 47:21

69:20,23 92:11 100:5 101:9,16 104:25

**planner** 20:10

**play** 11:8 32:22 33:5

**played** 35:3

**pleasant** 35:10

**point** 18:5 32:18 35:16,24 36:5,10 40:3 64:15 81:6 99:21

**points** 81:6

**policy** 27:21

**Pomerantz** 105:13

**pool** 32:24 33:7,10

**portfolio** 10:25 69:3, 16 98:10,24

**portion** 10:24

**portions** 9:14

**pose** 70:3

**position** 23:21 48:14 62:20 66:11 76:20 100:8

**possibly** 27:25 36:7 99:14

**post-** 104:12

**postbankruptcy** 21:10 22:6,16 104:11,13

**postplan** 104:13

**potentially** 104:20

**power** 33:14

**practical** 100:10 104:21

**pre** 22:15

**prebankruptcy** 21:9 22:5

**precise** 69:10

**preclude** 101:18

**precludes** 21:22

**predefined** 36:17

**preliminary** 99:10

**prepared** 46:6

**present** 60:19

**president** 57:4,21 58:2

**prevented** 80:5

**previous** 73:19

**previously** 24:4 33:11,19 81:12,13 86:14 87:2 98:6

**prior** 16:25 27:2,4,16, 22 33:22 34:11 40:16 43:11 79:18 80:10 88:10,17 97:17 104:15,16

**privilege** 65:21 66:4 79:9

**problem** 70:4 102:21

**problems** 36:21

**proceedings** 62:6 106:21

**proceeds** 37:9

**process** 86:17,21 97:14 99:15 104:18

**program** 29:22

**proof** 38:9,11 40:4,8, 12,13 46:22

**proofs** 39:11,12,19, 23

**provide** 79:3

**provided** 74:2 79:8

**provisions** 104:19

**Public** 6:4

**publicly** 32:4

**pull** 54:21

**pulled** 42:15

**purportedly** 77:20

**purposes** 18:11,12 50:7

**pursuant** 9:22 70:21 71:23 72:16 101:4

**put** 9:10 21:8 34:20 37:14 46:13 50:25

51:3 54:23 78:3 105:10

**putting** 75:13

---

**Q**

**qualified** 87:16

**quest** 70:2

**question** 8:19 10:5 14:9 19:9,13 26:6,15, 19 36:25 43:7 44:22, 24 48:20 79:12 81:22,24 82:9 88:17 89:13,23 92:21 99:4 103:13

**questions** 8:18 50:12,16 55:12 69:8 89:21 106:25 107:4, 11

**quickly** 35:22

**quo** 85:25 91:17 94:4

---

**R**

**raised** 74:13 92:10

**rang** 87:22

**re-** 66:11 72:7 82:9 100:7

**reach** 95:21

**read** 9:14 73:12

**reason** 9:13 34:19 68:24 76:5

**reasons** 29:11 67:16

**recall** 10:3 14:24 28:2 35:25 44:22 50:8 58:7 63:23 64:2, 7,22 65:9,11 67:5 73:19 80:16 90:24 94:24 97:3

**receive** 12:15 16:19 49:20,24

**received** 9:25 24:22 34:24 45:6

**recently** 38:18 73:18

**recess** 62:5 106:20

**recite** 82:9

**recognize** 87:23

**recollection** 8:3 18:18 23:15 63:13 85:6 94:22 97:5 105:9

**recommendation** 43:23 44:5,7,23 45:2

**reconvene** 61:24

**record** 6:14,25 72:23 73:6 100:13

**recurring** 27:11

**reduced** 40:12

**reduces** 94:10

**refer** 11:3 20:21 100:18

**reference** 78:18

**referred** 12:16 70:5

**referring** 13:17 60:10 65:7 86:11

**reflected** 48:8

**reflects** 46:10

**refresh** 18:18 105:9

**regard** 38:25

**registry** 35:18

**regularly** 20:12 64:13

**regulations** 25:20

**relate** 101:22 104:22

**related** 34:24

**relating** 7:19 32:13

**relation** 67:22 68:6

**relationship** 29:10 30:5 32:8

**relative** 104:11

**relied** 97:13

**rely** 91:7,12

**remember** 59:7 105:17

**remotely** 6:19

**removal** 84:23 104:23

**remove** 81:10 98:4

**removed** 86:24 98:9

**reorganization** 100:6 101:9

**repeat** 14:8 15:16 33:2 41:2,18 72:5 89:22 90:3

**rephrase** 89:23

**replacement** 84:24

**report** 18:21

**reporter** 6:21 44:3 55:10 107:9

**reports** 102:8

**represent** 74:15

**representation** 100:15

**representative** 16:15 73:2,4 89:8 90:5

**represented** 95:15

**representing** 6:15

**represents** 6:9

**request** 34:24 35:2, 11,22 42:16 70:2,14 77:16,21 79:22 81:8 83:10,11,16,17,18 84:21 91:5,16,18 92:4,15 96:2 98:14

**require** 27:21

**require-** 81:14

**required** 27:15

**requisites** 18:13

**res-** 101:6

**research** 24:23,25 25:2

**reservation** 6:24

**reserve** 107:3

**resign** 66:15

**resigned** 62:20

**resigning** 66:11

**resolutions** 46:21 53:2

**resolve** 42:15

**resolved** 92:12

**resonates** 99:19,22 100:3

**respect** 7:21 9:17 12:12,14 25:16 33:6, 14 36:13 38:9,17 40:8,11,20 41:24 48:15 50:9 64:20 67:3 68:18 71:17 79:23 101:14

**respective** 6:16

**responsibilities** 12:7,9 19:2,16

**responsibility** 64:19

**responsible** 86:14

**responsive** 69:25

**restate** 82:9

**reveal** 32:4

**review** 83:4

**reviewed** 100:7

**Ri-** 78:11

**right-hand** 46:25

**rights** 101:19 103:9, 10 104:23

**rise** 82:17

**role** 11:8 12:2,12,13 20:19 32:22 33:5 48:17,22 76:7

**room** 6:21 9:8 35:9 44:8

**roommates** 29:24, 25

**rule** 27:4

**rules** 25:20 27:21

**runs** 20:5

**Russell** 35:5

**S**

**sales** 74:14 81:8 91:4 94:8,9

**Samsung** 8:6

**Santa** 52:15 56:12, 13,23 58:10

**scenario** 45:7

**scheduled** 36:16

**school** 24:14,15,21 25:4,5,7 28:15 29:17, 19

**Schroth** 63:22 66:18, 21 67:8

**scientist** 24:25

**scott** 6:1,12 7:1,7 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,14,18 47:1 48:1 49:1 50:1 51:1, 2,4 52:1 53:1 54:1,25 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,9 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,24 73:1 74:1 75:1 76:1 77:1 78:1,6 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1,22 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1,12 106:1,15,23 107:1,16

**screen** 9:10,12 33:3 38:8 55:15 78:4

**scroll** 55:21 78:10 105:20

**seeking** 99:14

**Seery** 35:4 63:5,7,13 67:9,16,19,24 68:3, 10,17 77:9,12 87:16, 19 88:13,22 89:10 95:8,12,14,22

**select** 70:9 71:12 75:3

**selected** 56:3,4

**selection** 75:7,12,14

**sell** 76:19

**send** 45:11

**sending** 88:11,18 95:23 96:7 97:11

**sentence** 92:5

**sequence** 36:6 93:15

**series** 8:18

**serve** 10:7 30:21 32:9 51:19,22 52:2,5 57:4

**served** 10:3,11 16:24 17:8,13

**serves** 60:15

**service** 19:19 57:21 58:2 90:7

**servicer** 62:17 72:13,17 83:23 98:4, 10 104:16

**services** 16:20 68:9, 13,21 70:5,6,7,18 71:6,7,15 74:2 81:12

**serving** 21:5 49:21 58:11

**set** 11:18,19 19:19 24:5 104:24

**sets** 100:8

**settlement** 40:21 41:13,16 42:9 43:11

**share** 94:19

**shared** 30:4 32:3 68:9,13,20 70:18 71:7,15

**short** 12:22 61:24 106:14

**show** 82:25 92:18

**showed** 81:4 82:25

**showing** 9:9

**shown** 52:22

**shows** 53:3,6

**sic** 73:22

**side** 51:5,8

**sign** 66:24

**signature** 55:23

**signed** 93:21

**significant** 36:13

**simple** 44:21

**simply** 26:8

**single** 88:21

**sir** 55:15 74:21

**sister** 60:9,11,14

**sit** 68:23 79:25

**siv-** 60:14

**small** 33:3

**smallest** 23:16

**sole** 17:4 18:20 19:17 34:7 47:16 50:22 51:12,16 73:23

**soon-to-be** 100:13

**sophomore** 29:4

**sort** 64:15 100:5,16

**sorts** 24:7

**soup** 19:23 70:6

**source** 30:12 87:7

**speak** 40:15,17 43:9 63:21 95:8,22 102:2

**speaking** 8:17 102:25

**speci-** 86:24

**specifically** 11:12 36:25 40:9 86:22

**specifics** 79:13

**speculate** 40:7

**spend** 22:25

**spent** 20:2 21:9,10

**spoke** 35:24 63:19 65:10 67:9 87:19

**spoken** 7:3 63:8,12, 17,19

**standpoint** 104:20, 21

**Stang** 6:8

**start** 29:2 46:24 63:7

**started** 82:8

**stated** 73:6

**statement** 98:2

**status** 85:25 91:17 94:4

**step** 8:24

**steps** 23:10 39:22 81:10 82:19 96:10 98:24 101:17

**sticking** 45:16

**stop** 77:17,21 82:6 83:6 85:13,16 91:5

**stoppage** 84:21

**stopping** 94:8,9

**strain** 30:12

**strained** 30:7

**strategy** 26:4

**strike** 48:11 81:22

**structure** 11:7 12:16 45:18,20 46:15 47:19,20 48:2,8,10, 13 52:19

**subject** 6:23 7:17 64:2,7 66:8 81:2 98:13

**submitted** 42:14

**subpoena** 9:22,25 10:4,7,12

**Subscribed** 107:18

**subsequent** 6:18 36:11 38:10 81:10

**subset** 12:14

**subsidiary** 104:10

**substance** 9:19 44:14 64:23 65:4,19 80:24 91:2

**substantial** 83:15 104:22

**substantive** 81:9 100:4

**substantively** 92:12

**substitute** 104:14,15

**success** 100:13

**sufficient** 26:10 82:19

**suggest** 99:7 102:13

**suggested** 96:8

**suit** 96:3

**suite** 106:6

**summarize** 39:10

**Super** 7:25

**support** 40:4 102:19 106:9

**Surgent** 15:4 20:17

**suspects** 63:20

**sworn** 6:3 107:18

---

**T**

**taking** 101:18

**talk** 45:18

**talked** 22:16 61:6 98:5

**talking** 13:4 57:5,9 102:12

**tangent** 44:25

**tax** 17:25 18:10

**taxes** 20:5

**team** 85:20,21,22 86:25 87:9

**Tech** 29:16

**technical** 11:10

74:15,18

**ten** 11:17 17:6 83:24

**term** 20:22 100:21,22

**terminate** 96:10 98:24

**terminating** 99:15

**termination** 100:12, 14

**terminology** 42:9

**terms** 12:19 13:2,6 16:16 45:22 52:16 69:6 94:25

**test** 45:24 47:10 63:14

**testified** 6:5 9:20,21 22:4 62:10 75:4 85:4

**testify** 7:22 37:3

**testifying** 72:24

**testimony** 89:18

**text** 45:11

**there'd** 94:14

**thing** 92:7 99:22 100:3

**things** 17:23 21:25 23:12 24:3 29:19 30:16,17 64:16 100:15

**thinking** 37:13

**third-party** 73:9 101:19

**Thomas** 15:4 20:17 24:23

**thought** 18:5 21:7 32:16 38:3,15 40:10 42:2 44:2 48:17 68:4 75:4 77:4 85:4 94:9, 12 95:9,13,25 102:24

**thoughts** 39:2

**threw** 96:3

**Throckmorton** 63:20 64:3,9,14 67:8

**Tim** 15:4

**time** 9:11,24 11:25 16:25 17:5,12 18:8 19:25 20:2,24 21:2,4, 9,10 22:10,12,14,18, 25 24:13 27:25 28:11 30:8 34:21 35:16,24 40:16 41:19 42:22 43:12 45:8 50:8 53:8 57:22 61:25 63:2 70:8 71:5 80:7,10 88:10,18 89:3 98:20 106:2,9,16,24 107:7, 12

**times** 13:4 63:12,15

**timing** 40:19

**title** 11:10,12 24:25

**today** 6:11 7:9 9:9 26:10 30:6 68:23 86:4 98:22 106:11

**told** 45:3 89:9 91:20 92:8

**topic** 40:16 45:18

**touch** 27:9

**track** 100:13

**trade** 67:17

**traded** 85:14

**trades** 82:6,15 83:7, 22 84:5,8,13 85:11 86:4 87:10,16

**trading** 77:17,22 84:21 85:14,16

**training** 24:19 25:9, 15

**transaction** 88:22, 25

**transactions** 24:7 27:16,23 80:6 88:14 89:11 92:10 93:25 95:10 96:2

**transcript** 6:23 7:2 83:5

**transfer** 29:11 35:12 76:25

**transferred** 24:5 29:3,6,13,14,20 35:18

**transfers** 64:16

**transition** 23:8

**transitioned** 25:4

**transmitted** 35:2

**trick** 9:11

**triggers** 27:9

**trust** 58:23 59:2,5,9, 11,18,23,25 60:6,16 61:7,8,12,15,16,20, 22

**trusted** 32:12

**trustee** 11:13 58:25 59:4,22 60:5,15,19

**trustees** 59:8

**trusts** 30:25 31:6 58:18 60:2,24 61:2

**tuck** 36:18

**tucked** 36:19

**Tuesday** 21:15 90:21

**turn** 71:19

**turnover** 20:20

**type** 18:5,7

### U

**Uh-huh** 9:16

**ultimately** 36:8 47:23 54:15 70:15 75:3

**unanimous** 54:25 55:17

**unaware** 70:10

**under-** 23:14 37:12

**understand** 9:4 11:13,22,23 14:14 15:15 17:23 18:8 19:10 23:11 27:18 29:19 31:12 33:13 36:6 38:20 42:5,9 43:3 54:13 70:24 71:18 73:21 81:6 89:3 100:24 101:7 102:8 104:9,24 106:3

**understanding** 11:16 13:21 17:22 18:16 23:24 29:10 32:7,15 47:2 49:6 50:6 53:15 60:14 61:5,18 65:16 73:13, 14,15 83:3 84:22 97:19,22 101:11,13 103:7

**understood** 86:6,13

**undisputably** 37:6

**University** 24:19,21 25:8 28:24 29:5,15, 16

**unlike** 20:9,10

**updated** 88:2

**urgent** 44:7

**usual** 63:20

**UVA** 28:24,25 29:2, 12,21,24

### V

**valid** 42:12

**vehicles** 58:19 77:5

**versus** 27:11 34:22 47:14 83:17 85:9

**view** 83:15 87:15 94:17,19,23 103:12, 13

**views** 103:2

**Virginia** 24:20 28:24 29:16

**virtual** 9:7

**virtue** 8:10 82:24

**vision** 32:13,17

**voice** 87:25

**voluntarily** 9:20

**volunteered** 36:3 88:8

**volunteering** 95:12

### W

**wanted** 17:24 29:18

**Watson** 24:24

**wedding** 30:22

**week** 21:11,18,20 60:20 67:10 87:20

**week-to-week** 19:25

**weekly** 21:3

**weeks** 21:18 60:20 66:14

**well-known** 29:21 75:22,23

**wire** 64:16

**with-** 45:3

**withdraw** 43:10 45:3,4 92:21 96:4

**withdrawing** 42:21

**withdrawn** 13:20 16:10 26:22 28:3 31:4 34:4,6 39:16 45:8 52:4 57:18 59:16 63:25 64:6 65:10 77:10 79:17 86:10

**word** 41:2

**words** 8:25

**work** 42:6

**worked** 15:3 42:6 85:22

**working** 20:2 38:14 95:16

**works** 23:14

**world** 16:15 31:23 75:16,20

**Wright** 78:7 96:23

**write** 45:10

**written** 8:11 54:25 55:18 62:14 77:20

**wrong** 22:11 68:25 69:15 73:25 75:6

**wrote** 8:6,9

### Y

**year** 29:4,7 85:15 105:25

**years** 7:15 8:2 11:17 15:3 17:6 18:17 28:24 29:8 31:8,20 32:2 59:6 60:17 73:20 76:10 83:25 84:5

**yes-or-no** 79:11

**yesterday** 26:9

**yielded** 81:3

**York** 24:24 35:8

### Z

**Ziehl** 6:8

# EXHIBIT 13

EXECUTION VERSION

Between

CLO HOLDCO, LTD.

And

HARBOURVEST DOVER STREET IX INVESTMENT L.P.

And

HARBOURVEST 2017 GLOBAL AIF L.P.

And

HARBOURVEST 2017 GLOBAL FUND L.P.

And

HV INTERNATIONAL VIII SECONDARY L.P.

And

HARBOURVEST SKEW BASE AIF L.P.

And

HIGHLAND CAPITAL MANAGEMENT, L.P.

And

LEE BLACKWELL PARKER, III

And

QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311

And

QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811

And

QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612

And

QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211

And

HIGHLAND CLO FUNDING, LTD.

And

HIGHLAND HCF ADVISOR, LTD.

MEMBERS AGREEMENT RELATING TO THE COMPANY

TABLE OF CONTENTS

1.    INTERPRETATION ................................................................. 2

2.    THE BUSINESS OF THE COMPANY ........................................ 4

3.    VOTING RIGHTS ................................................................ 4

4.    ADVISORY BOARD ............................................................. 4

5.    DEFAULTING MEMBERS ...................................................... 4

6.    TRANSFERS OR DISPOSALS OF SHARES ............................... 4

7.    CONFIDENTIALITY ............................................................. 4

8.    DIVIDENDS ...................................................................... 9

9.    TERM OF THE COMPANY .................................................... 9

10.   ERISA MATTERS ............................................................... 9

11.   TAX MATTERS .................................................................. 9

12.   AMENDMENTS TO CERTAIN AGREEMENTS .............................. 9

13.   FINANCIAL REPORTS ......................................................... 9

14.   TERMINATION AND LIQUIDATION ......................................... 9

15.   WHOLE AGREEMENT ......................................................... 12

16.   STATUS OF AGREEMENT .................................................... 12

17.   ASSIGNMENTS ................................................................. 12

18.   VARIATION AND WAIVER .................................................... 12

19.   SERVICE OF NOTICE ......................................................... 12

20.   GENERAL ........................................................................ 13

21.   GOVERNING LAW AND JURISDICTION ................................... 14

SCHEDULE ............................................................................. 18
Adherence Agreement ............................................................... 18

THIS AGREEMENT is made the 15th day of November 2017

BETWEEN

(1)     CLO HOLDCO, LTD. whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)     HARBOURVEST DOVER IX INVESTMENT L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)     HARBOURVEST 2017 GLOBAL AIF L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)     HARBOURVEST 2017 GLOBAL FUND L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)     HV INTERNATIONAL VIII SECONDARY L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)     HARBOURVEST SKEW BASE AIF L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)     HIGHLAND CAPITAL MANAGEMENT, L.P. of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)     LEE BLACKWELL PARKER, III of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)     QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311 of 17171 Park Row #100, Houston, Texas 77084, USA

(10)    QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811 of 17171 Park Row #100, Houston, Texas 77084, USA

(11)    QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612 of 17171 Park Row #100, Houston, Texas 77084, USA

(12)    QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211 of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "Members") and

(13)    HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "Company") and

(14)    HIGHLAND HCF ADVISOR, LTD., whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Portfolio Manager").

WHEREAS:

(A)     The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)     The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, the (the "Offering Memorandum"), subject to the restrictions set forth therein.

(C)     The Members are the owners of the entire issued capital of the Company.

(D)     The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

OPERATIVE PROVISIONS

1.     INTERPRETATION

In this Agreement, including the Schedule:

1.1    the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

"Adherence Agreement" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

"Advisers Act" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

"Affiliate" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

"Agreement" means this agreement together with the Schedule;

"Articles" means the articles of incorporation of the Company as amended from time to time;

"Business" means the business of the Company as described in Recital (B);

"Business Day" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

"Directors" means the directors of the Company from time to time;

"CLO Holdco" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Directors" means the directors of the Company from time to time;

"Dover IX" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

"DOL" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"DOL Regulations" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

"Dover IX" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"ERISA Member" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"HarbourVest Entities" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"Highland Principals" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"Law" means the Companies (Guernsey) Law, 2008, as amended;

"Member" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"Parties" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"Shares" means ordinary shares in the Company;

"Subsidiary" shall have the meaning ascribed to it in the Law;

"Subscription and Transfer Agreement" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager.

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2 any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3 any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4 any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5 any reference to time shall be to Guernsey time;

1.6 except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

1.7     unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8     Clause headings are for ease of reference only and do not affect the construction of any provision.

2.      THE BUSINESS OF THE COMPANY

2.1     The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2     The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3     The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

3.      VOTING RIGHTS

3.1     The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto are Members.

3.2     The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

        3.2.1     any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

        3.2.2     any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

        3.2.3     any conversion or redemption of Shares, except pursuant to Clause 5.5,

        3.2.4     any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

        3.2.5     the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

        3.2.6     the suspension of the calculation of the NAV; other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4.    ADVISORY BOARD.

4.1    <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "Advisory Board") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2    <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.  Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3    <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters.  The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

Memorandum. Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4   <u>Term of Members of Advisory Board</u>.   A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5   <u>No Duties to Other Members</u>.   No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.   DEFAULTING MEMBERS

5.1   In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "Outstanding Settlement Amount"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "Default Interest Rate") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5). No such Shares which have failed to be settled will be issued to any Member until settlement of the full amount of the purchase price has been made. In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "Defaulting Member"), the following provisions shall apply:

5.2   Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3   The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

5.4    The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5    The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6    The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7    At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8    The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9    Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6.      TRANSFERS OR DISPOSALS OF SHARES

6.1    No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "Transfer"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1   such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2   such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3   such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4   such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2   Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again.  Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3   No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4   Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer.  The transferor and/or the transferee shall bear all costs of any Transfer.

6.5   The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6   All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

### 7.   CONFIDENTIALITY

7.1   Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2   Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

### 8.   DIVIDENDS

8.1   The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

### 9.   TERM OF THE COMPANY

9.1   Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "Term"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2   Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

### 10.   ERISA MATTERS

10.1   The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold.  In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

### 11.   TAX MATTERS

11.1   <u>PFIC</u>. For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company; provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2   CFC. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3   Other Tax Information. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year  and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4   Withholding and Other Taxes. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12.   AMENDMENTS TO CERTAIN AGREEMENTS

12.1   The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "Management Agreement") without the consent of the Parties.

12.2   The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company.  Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate; provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3   The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13.   FINANCIAL REPORTS

13.1   The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2   After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

14.   TERMINATION AND LIQUIDATION

14.1   Save as provided for in Clause 13.2, this Agreement shall terminate:

14.1.1   when one Party holds all the Shares;

14.1.2   when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

14.1.3   with the written consent of all the Parties.

14.2   The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3   Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4   Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

14.4.1   all existing contracts of the Company are performed to the extent that there are sufficient resources;

14.4.2   the Company shall not enter into any new contractual obligations;

14.4.3   the Company is dissolved and its assets are distributed as soon as practical; and

14.4.4   any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

15.  WHOLE AGREEMENT

15.1  This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2  Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3  Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16.  STATUS OF AGREEMENT

16.1  Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2  If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17.  ASSIGNMENTS

Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18.  VARIATION AND WAIVER

18.1  A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2  A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3  A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19.  SERVICE OF NOTICE

19.1  Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

   19.1.1  to the Company:
           Address:
           First Floor, Dorey Court, Admiral Park
           St Peter Port, Guernsey GY1 6HJ
           Channel Islands

   19.1.2  to CLO Holdco:

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3  to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4  to any other Party: by post or hand delivery only to the address specified in the register of members of the Company.

19.2  Communications sent by post shall be deemed to have been received 24 hours after posting. Communications sent by facsimile transmission shall be deemed to have been received at the time the transmission has been received by the addressee PROVIDED THAT if the facsimile transmission, where permitted, is received after 5.00pm or on a day which is not a Business Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3  In proving service by post it shall only be necessary to prove that the notice was contained in an envelope which was duly addressed and posted in accordance with this Clause and in the case of facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to the correct number.

20.  GENERAL

20.1  Each of the Parties hereby agree not to enter into or abide by any agreement whether written or oral with any one or more of the other Parties in respect of the voting of Shares or the submission of Member resolutions to any Members for voting by them, or otherwise to direct or influence, or attempt to direct or influence, the day-to-day management of the Company, either directly or indirectly, other than in order to comply with the other terms of this Agreement or the Articles.  In this regard, each of the Parties agrees to not to direct or influence or to attempt to direct or influence any of the Directors through any employment relationship that the Directors may have outside of the Company other than in order to comply with the other terms of this Agreement or the Articles.  Each of the Parties hereby agree that this provision shall continue to apply to them whether or not they are or remain a Member.

20.2  Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3  The Parties are not in partnership with each other and there is no relationship of principal and agent between them.

20.4  All transactions entered into between any Party and the Company shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an arm's length basis.

20.5  Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.

20.6   Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7   This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.  This Agreement may not be amended except with the consent of each Party.

21.     STATUS OF AGREEMENT

21.1   The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2   If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.

22.     GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

[Signature Page Follows.]

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written.

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:.................................................................

**Name:** Grant Scott

**Title:** Director

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** ....................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** ....................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:    HarbourVest 2017 Global Associates L.P.,
        its General Partner

By:    HarbourVest GP LLC,
        its General Partner

By:    HarbourVest Partners, LLC,
        its Managing Member

**By:** ....................................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director


SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner
By:     HarbourVest GP LLC
        Its General Partner
By:     HarbourVest Partners, LLC
        Its Managing Member

**By:** ................................................................
**Name:**   Michael J. Pugatch
**Title:**   Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:     HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** ................................................................
**Name:**   Michael J. Pugatch
**Title:**   Authorized Person

**SIGNED**

Lee Blackwell Parker, III

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

Read and approved

By:.............................................................
Name: Emmanuel Maa-el
Title: transactions supervisor

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:.............................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:.............................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:.............................................................
Name:
Title:

SIGNED for and on behalf of
QUEST IRA, INC.
FBO LEE B. PARKER III, ACCT. # 3058311

By:..................................................................
Name:
Title:

SIGNED for and on behalf of
QUEST IRA, INC.
FBO HUNTER COVITZ, ACCT. # 1469811

By:..................................................................
Name: Emmanuel Macre
Title: Transaction supervisor

Read & Approved

SIGNED for and on behalf of
QUEST IRA, INC.
FBO JON POGLITSCH, ACCT. # 1470612

By:..................................................................
Name:
Title:

SIGNED for and on behalf of
QUEST IRA, INC.
FBO NEIL DESAI, ACCT. # 3059211

By:..................................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..................................................................
Name: *Emmanuel Maciej*
Title: *Transactions Supervisor*

*Read and Approved:*

*11/7/17*

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..................................................................
Name:
Title:

SIGNED for and on behalf of
QUEST IRA, INC.
FBO LEE B. PARKER III, ACCT. # 3058311

By:...................................................................
Name:
Title:

SIGNED for and on behalf of
QUEST IRA, INC.
FBO HUNTER COVITZ, ACCT. # 1469811

By:...................................................................
Name:
Title:

SIGNED for and on behalf of
QUEST IRA, INC.
FBO JON POGLITSCH, ACCT. # 1470612

By:...................................................................
Name:
Title:

SIGNED for and on behalf of
QUEST IRA, INC.
FBO NEIL DESAI, ACCT. # 3059211

By:...................................................................
Name: Emmanuel Mace
Title: Transaction Supervisor

Read and approved

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:      Strand Advisors, Inc.,
         its General Partner

By:............................................................

**Name:** James Dondero
**Title:**  President

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

**By**:.................................................................

**Name:** James Dondero
**Title:**   President

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

By:.....................................................................

**Name:** William Scott
**Title:** Director

SCHEDULE

Adherence Agreement

THIS ADHERENCE AGREEMENT is made on [  ] 200[  ]

BETWEEN:

(1)     [  ] of [  ] (the "Covenantor");

(2)     CLO HOLDCO, LTD. of [                              ] (a "Member");

(3)     [  ] of [                            ] (a "Member");

(4)     [  ] of [                            ] (a "Member");

(5)     HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "Company")

(6)     HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Portfolio Manager").


RECITAL

This Agreement is supplemental to the members agreement made on November 15 2017 between the Members, the Portfolio Manager and the Company (the "Members Agreement").

IT IS HEREBY AGREED as follows:

1.     The Covenantor hereby confirms that he has been supplied with a copy of the Members Agreement and hereby covenants with each of the parties thereto to observe, perform and be bound by all the terms of the Members Agreement as if it were a party thereto.

2.     Each of the other parties to the Members Agreement hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he were a party thereto.

3.     This Agreement shall be governed by and construed in accordance with Guernsey law.

IN WITNESS of which this Agreement has been executed by the Covenantor and each of the parties to the Members Agreement on the date shown above.