# EXHIBIT 7

**Appx. 00134**

Page 1

1

2   IN THE UNITED STATES BANKRUPTCY COURT
    FOR THE NORTHERN DISTRICT OF TEXAS
3         DALLAS DIVISION

4  IN RE:

5                     CHAPTER 11

6                     CASE NO.
   HIGHLAND CAPITAL          19-34054-
7  MANAGEMENT, L.P.          SGJLL

8
       Debtor.
9

10

11   Confidential - Under Protective Order

12       REMOTE DEPOSITION OF
         MICHAEL PUGATCH
13       Zoom Videoconference
         01/11/2021
14       1:07 P.M. (EDT)

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  AMANDA GORRONO, CLR
     CLR NO. 052005-01
25   JOB NO. 188591

Page 2

```
 1
 2              01/11/2021
 3            1:07 P.M. (EDT)
 4
 5
 6      REMOTE ORAL DEPOSITION OF MICHAEL
 7  PUGATCH, held virtually via Zoom
 8  Videoconferencing, pursuant to the
 9  Federal Rules of Civil Procedure before
10  Amanda Gorrono, Certified Live Note
11  Reporter, and Notary Public of the State
12  of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S: ∑(Via Remote)
 3  PACHULSKI STANG ZIEHL & JONES
 4  Attorneys for Debtor
 5  780 Third Avenue
 6  New York, New York 10017
 7  BY:  JOHN MORRIS, ESQ.
 8      HAYLEY WINOGRAD, ESQ.
 9
10  BONDS ELLIS EPPICH SCHAFER JONES
11  Attorneys for Jim Dondero
12  420 Throckmorton Street
13  Fort Worth, Texas 76102
14  BY:  JOHN WILSON, ESQ.
15      BRYAN ASSINK, ESQ.
16
17  DEBEVOISE & PLIMPTON
18  Attorneys for HarbourVest
19  919 Third Avenue
20  New York, New York 10022
21  BY:  ERICA WEISGERBER, ESQ.
22      M. NATASHA LABOVITZ, ESQ.
23      EMILY HUSH, ESQ.
24      DANIEL STROIK, ESQ.
25
```

Page 4

```
 1
 2  A P P E A R A N C E S: (Via Remote)
 3  KANE RUSSELL COLEMAN & LOGAN
 4  Attorneys for CLO Holdco Limited
 5  Bank of America Plaza
 6  901 Main Street
 7  Dallas, Texas 75202
 8  BY:  JOHN KANE, ESQ.
 9
10  HELLER, DRAPER, HAYDEN, PATRICK, & HORN
11  Attorneys for The Dugaboy Investment
12  Trust and the Get Good Trust
13  650 Poydras Street
14  New Orleans, Louisiana 70130
15  BY:  DOUGLAS DRAPER, ESQ.
16
17  LATHAM & WATKINS
18  Attorney For UBS
19  885 Third Avenue
20  New York, New York
21  BY: SHANNON MCLAUGHLIN, ESQ.
22
23
24
25
```

Page 5

```
 1
 2  A P P E A R A N C E S: (Via Remote)
 3  KING & SPALDING
 4  Attorney for Highland CLO Funding, Ltd.
 5  1180 Peachtree Street, NE
 6  Atlanta, Georgia 30309
 7  BY: MARK MALONEY, ESQ.
 8
 9
10
11  ALSO PRESENT:
12  ALIZA GOREN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1
2          I N D E X
3
    WITNESS       EXAMINATION BY      PG
4  MICHAEL PUGATCH    MR. WILSON      10, 148
                MR. KANE        122
5           MS. WEISGERBER    147
6
        E X H I B I T S
7
    EXHIBIT
        DESCRIPTION          PAGE
9  Exhibit 1  Proof of Claim 143 filed    16
10          4/08/2020 nine pages.......
11  Exhibit 2  Proof of Claim 149 filed    17
12          4/08/2020 nine pages.......
13  Exhibit 3  Declaration of Michael      18
14          Pugatch in Support of
15          Motion of HarbourVest
16          Pursuant to Rule 3018(a)...
17  Exhibit 4  Member Agreement 28 pages..  21
18  Exhibit 5  HarbourVest Response to      22
19          Debtor's First Omnibus
20          Objection 617 pages........
21  Exhibit 6  Offering Memorandum 122     61
22          pages.....................
23  Exhibit 7  Share Subscription and      63
24          Transfer Agreement 31
25          pages.....................

1
2  Exhibit 8  E-mail 08/15/2017.......... 68
3  Exhibit 9  11/29/2017 E-mail with     79
4          cover letter Highland
5          Capital Management.........
6  Exhibit 10 2004 Examination of        83
7          Investor in Highland CLO
8          Funding Ltd. 10/10/2018....
9  Exhibit 11 Declaration of John A.     109
10          Morris in Support of the
11          Debtor's Motion For Entry
12          of an Order Approving
13          Settlement With
14          Harbourvest (Claim Nos.
15          143, 147, 149, 150, 153,
16          154) and Authorizing
17          Actions, 82 pages..........
18
19
20          R E Q U E S T S
21  DESCRIPTION                PG
22  Transcript be marked Confidential    10
23  under the Protective Order............
24
25

1
2      MR. WILSON:  I'm John Wilson
3  with the firm of Bonds Ellis Eppich
4  Schafer Jones LP.  And I represent Jim
5  Dondero.
6      MR. MORRIS:  John Morris and
7  Hayley Winograd of Pachulski Stang
8  Ziehl & Jones for the Debtor.
9      MS. WEISGERBER:  Erica
10  Weisgerber from Debevoise & Plimpton
11  for HarbourVest.
12      MR. KANE:  John Kane of Kane
13  Russell Coleman & Logan, for CLO
14  Holdco Limited.
15      MR. DRAPER:  Douglas Draper of
16  Heller Draper & Horn, for The Dugaboy
17  Investment Trust and the Get Good
18  Trust.
19      MS. McLAUGHLIN:  Shannon
20  McLaughlin from Latham & Watkins LLP
21  for UBS.
22      MR. MALONEY:  Mark Maloney from
23  King & Spalding, on behalf of Highland
24  CLO Funding Limited.
25      MS. WEISGERBER:  I'm joined on

1
2  the line by my colleagues from
3  Debevoise, Natasha Labovitz and Emily
4  Hush, and Aliza Goren from HarbourVest
5  is on the line, as well.
6      MR. WILSON:  As a preliminary
7  matter, the witness' counsel has
8  produced some documents to us that
9  they've requested be subject to the
10  confidentiality order or a brief
11  protective order entered at Document
12  Number 382, in this case.
13      And she's also requested that
14  all counsel and participants in this
15  deposition agree to be bound by the
16  terms of that order, because some of
17  the documents that were produced are
18  stamped "confidential," and they want
19  to maintain that confidentially.
20      Do we have an agreement of all
21  counsel and participants on the
22  deposition to be bound by the terms of
23  that agreed protective order?
24      (All agreed.)
25      MS. WEISGERBER:  Okay.  I think

Page 10

1      Confidential - Pugatch
2  that was everyone.  Thank you all for
3  confirming.  And the deposition will
4  be marked "confidential" until and
5  unless HarbourVest designates the
6  testimony otherwise.
7      MR. WILSON:  And that's fine.
8      (Whereupon, a request for
9  Transcript be marked Confidential
10    under the Protective Order was made.)
11 M I C H A E L  P U G A T C H,
12     called as a witness, having been
13 first duly affirmed by a Notary Public of
14 the State of New York, was examined and
15 testified as follows:
16 EXAMINATION
17 BY MR. WILSON:
18    Q.   All right.  Mr. Pugatch, how do
19 you pronounce your name?  I'm sorry.
20    A.   Yep, you've got it.  Pugatch.
21    Q.   Pugatch.  Okay.  Can you state
22 your full name for the record?
23    A.   Yeah.  Michael Pugatch.
24    Q.   Okay.  And you've been
25 designated by HarbourVest to discuss some

Page 11

1      Confidential - Pugatch
2  matters related to the 9019 motion.  And
3  specifically we asked that HarbourVest
4  produce a witness who could talk about the
5  negotiations of the settlement with the
6  Debtor, and also the factual allegations
7  underlying HarbourVest's Proof of Claim,
8  and those described in HarbourVest's
9  response to the claim objection, including
10  without limitation, its investment with
11  Acis/HCLOF in the alleged representations
12  made by the Debtor and/or Acis/HCLOF to
13  HarbourVest, and any and all agreements
14  entered into between HarbourVest and any
15  other party related to its investment.
16     Do you agree that you're the
17  best person to talk about these matters on
18  behalf of HarbourVest?
19    A.   Yes.  Yes.
20    Q.   Okay.  Have you given a
21 deposition before?
22    A.   I have.
23    Q.   Okay.  So you understand how it
24 works that you're under oath, and that I'm
25 going to be asking questions and you're

Page 12

1      Confidential - Pugatch
2  going to be giving answers.  If at any
3  time I ask a question that you don't
4  understand, or we've had some problems
5  with sometimes connectivity issues with
6  Zoom.  But yeah, any time that you don't
7  understand my question or you didn't catch
8  it, I'll be happy to repeat it.
9     Also, one thing I found with
10  Zoom is that it's easier to talk over
11  people.  I'll try not to talk over you.  I
12  would ask that you try to ensure that I've
13  finished asking my question before you
14  start your answer.  And I will likewise
15  try to ensure that you've finished your
16  answer before start my next question.
17     And at any time during this
18  deposition if you feel the need to take a
19  break, that's totally okay with me.  The
20  one thing that I would ask is if I've just
21  asked a question, that you answer the
22  question before requesting the break.
23     And if we have that agreement
24  and the ground rules, then I think I'm
25  ready to start asking you my questions.

Page 13

1      Confidential - Pugatch
2    A.   Sounds good.
3    Q.   What's your current address?
4    A.   47 Wayne Road in Needham,
5 Massachusetts.
6    Q.   Okay.  And where are you located
7 today?
8    A.   At that address.
9    Q.   Okay.  That's your home address?
10    A.   Correct.
11    Q.   And is anyone in the room with
12 you there?
13    A.   No.
14    Q.   And did you talk with anyone
15 about your deposition today?
16    A.   Only counsel.
17    Q.   Okay.  And did you go over the
18 facts of the underlying investment and the
19 settlement negotiations with your counsel?
20    MS. WEISGERBER:  I'm going to
21  object on privilege grounds.  He
22  can -- he prepared for the deposition
23  with counsel.  I don't think you can
24  inquire into specifics of the
25  preparation.

Appx. 00138

Page 14

1    Confidential - Pugatch
2        MR. WILSON:  Okay.  Well, you
3    know, he was designated to talk about
4    these matters, and I'm just asking if
5    he discussed these matters with his
6    counsel his before his testimony.
7    That's all.  I'm not asking the
8    substance of those communications.
9        MS. WEISGERBER:  You're asking
10   about conversations with counsel.  How
11   about you just ask if he's prepared to
12   talk about those topics today?
13       MR. WILSON:  Okay.
14   BY MR. WILSON:
15   Q.   Are you prepared to talk about
16   those topics today?
17   A.   Yes.
18   Q.   Okay.  Now, HarbourVest has
19   filed several proofs of claim in this
20   matter, and it looks like those are
21   numbered 143 on behalf of HarbourVest,
22   217 Global Fund L.P., and 144 HarbourVest
23   2017 Global AIF, 149 HarbourVest Partners
24   L.P., 150 HarbourVest Dover Street, IX
25   Investment L.P., 153 HarbourVest -- or I'm

Page 15

1    Confidential - Pugatch
2    sorry, HV International VIII Secondary
3    L.P., and 154 HarbourVest Skew Base AIF
4    LP.
5        And you're here to talk on
6    behalf of all of those entities, and you
7    have, for purpose of this settlement and
8    you're -- the 9019 motion, these proofs of
9    claim are all lumped together as one
10   claim; is that correct?
11       MS. WEISGERBER:  I'm just going
12   to object quickly and clarify that
13   he's not here as a 30(b)(6) witness,
14   but he is here as someone from
15   HarbourVest who signed those proofs of
16   claim.  So with that, I'll let you
17   continue.
18   A.   I'll just answered the question,
19   yes, as a representative on behalf of all
20   of those entities.  I would defer to
21   counsel, from a legal perspective, whether
22   these are treated as a single or separate
23   claims.
24       MR. WILSON:  Okay.  And we can
25   move on for now.

Page 16

1    Confidential - Pugatch
2        I'm going to submit the first
3    exhibit.  It's going to be Exhibit
4    No. 1 to the deposition.  I'm sending
5    it by E-mail, and I'm also going to
6    use a share screen.
7        (Whereupon, Exhibit 1, Proof of
8    Claim 143 filed 4/08/2020 nine pages,
9    was marked for identification.)
10       MR. WILSON:  So this document
11   right here is Claim Number 143 filed
12   on April 8, 2020, and this one is
13   filed on behalf of HarbourVest 2017
14   Global Fund L.P.
15       If we go down, scroll to the
16   annex to proof of claim, it's Page 5
17   of the document.  It says that the
18   Claimant is a limited partner in one
19   of the Debtor's managed vehicles,
20   Highland CLO Funding, Ltd.
21       And I'm going to now send out an
22   E-mail with Exhibit No. 2.  I'm going
23   to pull this Exhibit No. 2 document up
24   on the share screen, as well.  I guess
25   that's right.

Page 17

1    Confidential - Pugatch
2        (Whereupon, Exhibit 2, Proof of
3    Claim 149 filed 4/08/2020 nine pages,
4    was marked for identification.)
5    BY MR. WILSON:
6    Q.   Can you see the official proof,
7    official form 410 proof of claim on your
8    screen?
9    A.   The first one that you shared?
10   Q.   I'm now on Exhibit No. 2.  Is it
11   showing up on your screen?
12   A.   No.
13   Q.   Okay.  Actually, I'm sorry.  Is
14   it now showing up on your screen?
15   A.   Now, it's showing up, yep.
16   Q.   Okay.  So this one is Proof of
17   Claim 149, filed on the same date.  And
18   this one's filed on behalf HarbourVest
19   Partners L.P.  And I'm going to scroll
20   down to the annex to proof of claim, which
21   looks largely like the annex to the
22   previous proof of claim we looked at.
23       But this one says, in Paragraph
24   No. 2, the Claimant manages investment
25   funds that are limited partners in one of

Page 18

1        Confidential - Pugatch
2    the Debtor's managed vehicles, Highland
3    CLO Funding, Ltd.
4        And can you tell me why this
5    HarbourVest Partners L.P. filed a separate
6    proof of claim, from the entities that
7    were investors in HCLOF?
8        A.    I would only be able to answer
9    that, based on conversations with counsel.
10       Q.    But in any event, HarbourVest
11   Partners L.P. did not invest in HCLOF,
12   correct?
13       A.    Not directly on behalf of
14   itself, no.
15       Q.    All right.  I'm going to stop
16   that share screen.
17            MR. WILSON:  And this is going
18   to be Exhibit Number 3.
19            (Whereupon, Exhibit 3,
20       Declaration of Michael Pugatch in
21       Support of Motion of HarbourVest
22       Pursuant to Rule 3018(a), was marked
23       for identification.)
24            MR. WILSON:  And Exhibit No. 3
25       that I've just submitted via E-mail,

Page 19

1        Confidential - Pugatch
2    and I'm about to put it up on the
3    screen, is the Declaration of
4    HarbourVest.  Let me get it up here,
5    so you can see it.  This is the
6    declaration of Michael Pugatch in
7    support of motion of HarbourVest
8    pursuant to Rule 3018(a).
9    BY MR. WILSON:
10       Q.    Have you seen this document
11   before?
12       A.    Yes.
13       Q.    And, in fact, this is your
14   declaration; is that correct?
15       A.    Yes.
16       Q.    And at the first line of this,
17   of Paragraph 1 says that you're the
18   managing director of HarbourVest Partners
19   LLC?
20       A.    Correct.
21       Q.    And how is HarbourVest Partners
22   LLC connected to these claims?
23       A.    That is the corporate entity or
24   managing member of all of the underlying
25   funds that are managed on behalf of

Page 20

1        Confidential - Pugatch
2    HarbourVest Partners L.P.
3        Q.    And you're the managing director
4    of that entity?
5        A.    A managing director to that
6    entity, yes.
7        Q.    You said "a managing director,"
8    are there others?
9        A.    Yes.
10       Q.    Who are the others?
11       A.    There are over 50 managing
12   directors at HarbourVest Partners LLC.
13       Q.    And are you the managing
14   director that has charge of this
15   particular HarbourVest investment, the one
16   in HCLOF?
17       A.    Yes.
18            MR. WILSON:  All right.  I beg
19   your patience.  I'm trying to conduct
20   this deposition solo.  I've got a lot
21   of stuff I've got to go through.  So
22   I'll do my best to do it efficiently.
23            But this next exhibit I'm going
24   to submit is going to be Exhibit No.
25   4.  I'm sending it in the E-mail now.

Page 21

1        Confidential - Pugatch
2            (Whereupon, Exhibit 4, Member
3       Agreement 28 pages, was marked for
4       identification.)
5    BY MR. WILSON:
6        Q.    Can you see this on your share
7    screen?
8        A.    I can.
9        Q.    This is the Members Agreement
10   relating to the Company.
11       A.    (Nods.)
12       Q.    I'm just going to scroll down.
13   Okay.  So this is the signature page for
14   the HarbourVest entities that were
15   invested in this company.  And it says
16   that you were the authorized person to
17   sign on behalf of the first two entities:
18   HarbourVest Dover Street, HarbourVest 2017
19   Global, and then the next one here it says
20   you're managing director.  And here we see
21   that HarbourVest Partners LLC.
22            And if we scroll down, we see
23   that you're the managing director of
24   HarbourVest Partners LLC, again, on behalf
25   of HV International, and that you're an

Page 22

Confidential - Pugatch

1          Confidential - Pugatch
2    authorized person on behalf of HarbourVest
3    Skew Base.
4          So you signed all these
5    agreements on behalf of the HarbourVest
6    entities, when HarbourVest made its
7    investment in HCLOF.  Would that be
8    correct?
9        A.   Correct.
10       Q.   Okay.  Sorry that was
11   cumbersome, but I needed to get through
12   it.
13           MR. WILSON:  I'm going to now
14       stop that share screen.  And I'll need
15       to go to Exhibit No. 5.  I'm E-mailing
16       out Exhibit No. 5 right now.
17           (Whereupon, Exhibit 5,
18       HarbourVest Response to Debtor's First
19       Omnibus Objection 617 pages, was
20       marked for identification.)
21   BY MR. WILSON:
22       Q.   This is -- I'll do another share
23   screen -- this is Docket 1057 filed in the
24   Highland bankruptcy.  And this is
25   HarbourVest Response to Debtor's First

Page 23

1          Confidential - Pugatch
2    Omnibus Objection.
3          Did you participate in the
4    creation of this document?
5        A.   Yes.
6        Q.   So you had an opportunity to
7    review this document, before it was filed?
8        A.   Correct.
9        Q.   And you agree with the
10   statements and the positions taken in this
11   document?
12       A.   I do.
13       Q.   All right.  So what this says in
14   Paragraph 8, that by the summer of 2017,
15   HarbourVest was engaged in preliminary
16   discussions with Highland, regarding the
17   investment.
18          First off, why was HarbourVest
19   engaged in preliminary discussions with
20   Highland?
21       A.   Highland had approached
22   HarbourVest with an investment
23   opportunity.  This was really borne out of
24   discussions that we had with them around a
25   couple of investment opportunities, that

Page 24

1          Confidential - Pugatch
2    this opportunity with HCLOF being the one
3    that by the summer of 2017, as stated
4    here, was in, was advancing through
5    discussions.
6        Q.   And which individuals at
7    Highland were you engaged in discussions
8    with?  By "you," I mean HarbourVest.
9        A.   Yeah, I mean, originally it was
10   through a couple of members of their
11   investor relations team.  My first point
12   of contact was with Brad Eden, and then
13   subsequently progressed to a larger subset
14   of employees of Highland.
15       Q.   And who on behalf of HarbourVest
16   was engaging in these discussions?
17       A.   It was primarily myself, my
18   colleague, or two -- two colleagues
19   primarily, alongside myself.
20       Q.   I'm sorry.  I didn't catch the
21   last part.
22       A.   Sorry.  Myself and two other
23   colleagues primarily.
24       Q.   And who are these two other
25   colleagues?

Page 25

1          Confidential - Pugatch
2        A.   Dustin Willard and then a more
3    junior member of the HarbourVest team.
4        Q.   When you say "the HarbourVest
5    team," what does that mean?
6        A.   So the broader investment team
7    and specifically in this context, the
8    secondary investment team at HarbourVest,
9    that this was an opportunity for.
10       Q.   So who made the final decision,
11   on behalf of HarbourVest, to make this
12   investment?
13       A.   Ultimately it was a decision
14   made by the investment committee of
15   HarbourVest.
16       Q.   And who's on that investment
17   committee?
18       A.   It's a four-member committee
19   comprised of managing directors within the
20   firm.
21       Q.   And who are those managing
22   directors?
23       A.   I don't recall at the time who
24   the members were.  I can tell you the
25   members now, of that committee.  It has

Page 26

Confidential - Pugatch

1  changed or evolved over time.
2  Q.   And that committee included you?
3  A.   I was involved in the
4  decisionmaking of that, yes, correct.
5  Q.   So you were part of the four-man
6  committee that made this decision?
7  A.   Yes.
8  Q.   All right.  I'm going to go back
9  to what we've marked as Exhibit 3, which
10  is your declaration.  And it says in
11  Paragraph 2, that HarbourVest is a passive
12  minority investor in Highland CLO funds,
13  HCLOF, and by the way, I haven't stated
14  this before, but in this deposition if I
15  say HCLOF, I'm going to be referring to
16  Highland CLO funds.
17  But it says that the vehicle is
18  managed by Highland Capital Management,
19  L.P.
20  And why do you say that that
21  vehicle was managed by Highland Capital
22  Management, L.P.?
23  A.   I believe that is the named
24  investment manager of HCLOF, per the

Page 27

Confidential - Pugatch

1  organization documents of that vehicle.
2  Q.   You believe that that was the
3  investment manager on the organization
4  documents, which --
5  A.   Of the various transaction
6  documents that we entered into, in
7  connection with our investment.
8  Q.   Would those have been the
9  documents that you had entered on November
10  the 15 of 2017?
11  A.   Yes.
12  Q.   Okay.  It says that HarbourVest
13  initially invested $73,522,928 for roughly
14  49 percent interest in HCLOF; and more
15  specifically, that would be a 49.98
16  percent interest in HCLOF, correct?
17  A.   Sounds right, yes.
18  Q.   Okay.  And then HarbourVest
19  contributed an additional $4,998,501
20  following a capital call, and it's
21  received three dividends, each totally
22  $1,570,429.
23  Is all of that correct?
24  A.   Yes.

Page 28

Confidential - Pugatch

1  Q.   And has HarbourVest received any
2  additional dividends, since the making of
3  this declaration?
4  A.   No, we have not.
5  Q.   Now, I want to skip down to
6  Paragraph 3, where it says that
7  HarbourVest expected proceeds from the
8  original HCLOF investment were projected
9  to exceed 135 million.
10  Do you agree with that?
11  A.   That was the original projected
12  value of the investment, yes.
13  Q.   Well, whose expectation was
14  that?
15  A.   Those were figures, as I recall,
16  that were originally provided to us by
17  Highland to form the basis of our due
18  diligence that we went through, and
19  penultimately were included as part of our
20  investment thesis in making the
21  investment.
22  Q.   So your testimony is that
23  Highland told you that your investment
24  would be worth over $135 million?

Page 29

Confidential - Pugatch

1  A.   Yes.
2  MS. WEISGERBER:  Objection to
3  the form.  Misstates testimony.
4  Go ahead, Mike.
5  A.   That was, that was part of our
6  original due diligence, on the investment
7  opportunity.
8  Q.   When you say part of your due
9  diligence, are you saying that the number
10  originated from Highland or that the
11  number originated from your due diligence
12  operations?
13  MS. WEISGERBER:  Objection to
14  form.
15  A.   The number originally came from
16  Highland and formed the basis upon which
17  we conducted due diligence on the
18  investment opportunity.
19  Q.   And after performing due
20  diligence, you were satisfied that that
21  was a reasonable projection?
22  A.   Yes.
23  Q.   And what was the, what was the
24  estimated date, in which the value of your

Page 30

1        Confidential - Pugatch
2   investment would exceed the $135 million?
3        MS. WEISGERBER:  Objection to
4   form.
5        A.   I don't recall exactly.  That
6   would have been over, over several years.
7   And again, this was the -- this was the
8   projected value based on the original
9   investment or the assets that were held by
10   HCLOF, at the time of our investment.
11       Q.   Now, when you talk about a
12   portfolio manager -- I'm sorry, when you
13   talk about investment manager, are you
14   referring to the portfolio manager?
15       A.   No.
16       Q.   So what's the difference in an
17   investment manager and a portfolio
18   manager?
19       A.   So in the context of this
20   investment, the investment manager.  We --
21   we had -- HarbourVest had an investment
22   with HCLOF.  Highland was the investment
23   manager of HCLOF that in turn held equity
24   positions in a variety of CLOs, which had
25   various portfolio managers associated with

Page 31

1        Confidential - Pugatch
2   those, all Highland affiliates.
3        Q.   And so who was the portfolio
4   manager for the HarbourVest investment in
5   HCLOF?
6        MS. WEISGERBER:  Objection to
7   form.
8        A.   There were various underling
9   portfolio managers, depending on the
10   underlying CLO position.
11       Q.   Well, who was the initial
12   portfolio manager?
13       A.   So, again it would depend on
14   which underlying assets we're talking
15   about.  HCLOF was a diversified portfolio
16   of multiple underlying CLO equity
17   positions, all with portfolio managers
18   that were Highland affiliates, as we
19   understood it.
20       Q.   Well, I'm going to go back to
21   Exhibit 1, Paragraph 2, this says, in the
22   second sentence, "Acis Capital Management
23   GP, LLC, and Acis Capital Management,
24   L.P., together Acis, the portfolio manager
25   for HCLOF," and then it continues on,

Page 32

1        Confidential - Pugatch
2   "filed for Chapter 11."
3        Is this proof of claim correct,
4   when it states that Acis Capital
5   Management GP, LLC, and Acis Capital
6   Management, L.P., were the portfolio
7   manager for HCLOF?
8        MS. WEISGERBER:  Objection to
9   form.
10       A.   I know that there was an issue
11   with the portfolio manager for at least
12   the Acis CLOs that were held by HCLOF.
13       Q.   Well, how do you distinguish
14   between the Acis CLOs and the Highland
15   CLOs?  Is that based on who was managing
16   them?
17       MS. WEISGERBER:  Objection to
18   form.
19       A.   Again, they were all underlying
20   investments of HCLOF.  We didn't
21   distinguish the portfolio manager, if you
22   will, of those vehicles, other than again
23   they were Highland affiliates.
24       Q.   But it's fair to say that Acis
25   was managing at least a portion of the

Page 33

1        Confidential - Pugatch
2   HCLOF investment, correct?
3        A.   Correct.  The underlying
4   investments held by HCLOF, correct.
5        Q.   And did anything -- from the
6   time that you -- well, let's just go to
7   the -- I think we had the members
8   agreement up a second ago.  This would
9   have been Exhibit 4.
10       Yeah, right here.  No. 14,
11   Highland HCF Advisor, Ltd. is listed as
12   the portfolio manager on the members
13   agreement.
14       Is that accurate, that Highland
15   HCF Advisor, Ltd. was the portfolio
16   manager?
17       MS. WEISGERBER:  Objection to
18   form.  Can you state as of what date
19   you're asking, Counsel?
20       MR. WILSON:  Well, the date of
21   this memorandum is, it says right
22   here, 15 November 2017.
23   BY MR. WILSON:
24       Q.   So as of the date November 15,
25   2017, who was the portfolio manager for

Appx. 00143

Page 34

Confidential - Pugatch

1 this investment?
2   A.   I don't recall the specific
3 names of the various entities that sat
4 below the HCLOF level or below Highland
5 Capital, as the investment manager of
6 HCLOF.
7   Q.   Well, are you familiar with a
8 company called Brigade?
9   A.   Yes.
10   Q.   And was that company a
11 sub-manager of this investment?
12       MS. WEISGERBER:  Objection to
13   form.
14   A.   Not at the time of our
15 investment.
16   Q.   Not at the time.  Well, when did
17 the portfolio managers begin to change in
18 this investment?
19       MS. WEISGERBER:  Objection to
20   form.
21   A.   Do you mean subsequent to our
22 investment?
23   Q.   Yes.
24   A.   So as I understand it in

Page 35

Confidential - Pugatch

1 connection with the Acis bankruptcy that
2 took place, there was a change in the
3 underling either portfolio manager of
4 certain of the CLOs, the Acis-managed CLOs
5 or Acis-branded CLOs, I should say, and/or
6 sub-advisor of those CLOs.
7   Q.   And was that at the direction of
8 the Chapter 11 trustee?
9       MS. WEISGERBER:  Objection.
10   A.   That's my understanding.
11   Q.   And so when this investment was
12 initially made, was Highland HCF Advisor,
13 Ltd. the portfolio manager of the entire
14 investment?
15       MS. WEISGERBER:  Objection to
16   form.
17   A.   I don't recall the specifics
18 underneath the HCLOF entity.
19   Q.   Well, there aren't any other
20 portfolio managers listed on this
21 document, that I can see.
22       Is there any place in this
23 document that you can point me to that
24 would identify another portfolio manager?

Page 36

Confidential - Pugatch

1       MS. WEISGERBER:  Objection to
2   form.  The document speaks for itself.
3   A.   Again, I think we may be
4 distinguishing here between portfolio
5 manager at the HCLOF level and portfolio
6 manager sub-advisor, again, I'm not sure
7 the proper terminology as it relates to
8 each of the underlying CLOs that were
9 partially owned by HCLOF.
10   Q.   Well, after the Acis bankruptcy
11 was filed, and after the Chapter 11
12 trustee appointed Acis as a portfolio
13 manager of at least part of HCLOF, did
14 Highland HCF Advisor continue to serve as
15 portfolio manager?
16       MS. WEISGERBER:  Objection to
17   form.
18   A.   All of HarbourVest's interaction
19 was with Highland as the investment
20 manager of HCLOF.  My understanding of the
21 change in those entities related to the
22 portfolio management of the underlying
23 Acis CLOs, not a change in the portfolio
24 manager, at the HCLOF level.

Page 37

Confidential - Pugatch

1   Q.   Well, Highland is listed as a
2 member under this -- Highland Capital
3 Management LLP is listed as a member under
4 this Member Agreement; is that correct?
5       MS. WEISGERBER:  Objection to
6   form.
7   A.   If that's what the document
8 says, yes.
9   Q.   I'm going to look -- let me stop
10 my share screen for a second.
11       All right.  I'm now at the top
12 of Page 5 of this Exhibit 4, where it
13 says, "Dover IX shall mean HarbourVest
14 Dover Street IX Investment L.P."
15       And Dover IX was the largest
16 single investor of the HarbourVest Group;
17 is that correct?
18   A.   Correct.
19   Q.   All right.  I'm now going to go
20 down to Paragraph 5.  I'm sorry, it's not
21 Paragraph 5.  Paragraph 4, where it says
22 "Composition of Advisory Board" in
23 Paragraph 4.1, The Company shall establish
24 an Advisory Board composed of two

Appx. 00144

Page 38

1          Confidential - Pugatch
2    individuals, one of whom shall be a
3    representative of CLO Holdco and one of
4    whom shall be a representative of
5    Dover IX.
6          And did this Advisory Board get
7    created?
8      A.    I believe it was created, yes.
9      Q.    And who was the representative
10   for CLO Holdco on the Advisory Board?
11     A.    I don't know.
12     Q.    Who was the representative for
13   Dover IX on the Advisory Board?
14     A.    I can't recall whether it was
15   myself or one other colleague who jointly
16   manages this investment with me.
17     Q.    You don't recall if you were on
18   the Advisory Board?
19     A.    The Advisory Board never met
20   formally under its capacity as an Advisory
21   Board.
22     Q.    Well, if you look down in
23   Paragraph 4.3, I've got my mouse pointed
24   here, I don't know if you can see it.
25   About two-thirds of the way down in this

Page 39

1          Confidential - Pugatch
2    paragraph it says, "The consent of the
3    Advisory Board shall be required to
4    approve the following actions," and then
5    it lists a number of things.
6          Did the Advisory Board not have
7    to -- was it not required that the
8    Advisory Board ever meet, because they
9    didn't take any of these actions?
10         MS. WEISGERBER:  Objection.
11   Objection to form.
12     A.    There may have been one or two
13   actions taken by the Advisory Board, I'm
14   looking at the list here to see what those
15   may even have been, during the duration of
16   our investment; but if so, those would
17   have been written resolutions or written
18   consents, as opposed to any meeting that
19   was convened amongst the entire Advisory
20   Board.
21     Q.    Okay.  And the entire Advisory
22   Board is just two individuals, correct?
23     A.    Correct, that's my
24   understanding.
25     Q.    Okay.  And if you go up a few

Page 40

1          Confidential - Pugatch
2    sentences above that in Paragraph 4.3 it
3    says, The portfolio manager shall not act
4    contrary to advice of the Advisory Board
5    with respect to any action or
6    determination expressly conditioned herein
7    or in the offering memorandum on the
8    consider approval of the Advisory Board.
9          So the portfolio manager did not
10   have the authority to disregard the advice
11   of the Advisory Board; is that correct?
12         MS. WEISGERBER:  Objection to
13     form; misstates the document.
14     A.    With respect to the limited role
15   that the Advisory Board would have to
16   play, yes, that would be my read.
17     Q.    Now, what is your understanding
18   of a reset transaction?
19     A.    Has to do with a refinancing and
20   reset of the investment period of an
21   underlying CLO.
22     Q.    And would a reset transaction be
23   contained within this -- these actions
24   that the Advisory Board's consent is
25   required to approve?

Page 41

1          Confidential - Pugatch
2      A.    No, it would not.
3          MS. WEISGERBER:  Objection.
4          MR. MALONEY:  Join.
5      Q.    It would not?
6      A.    It would not.
7      Q.    Well, if a reset was to be
8    proposed, who would have the discretion to
9    make that decision to enter a reset
10   transaction?
11         MS. WEISGERBER:  Objection to
12     form and foundation.
13         MR. MALONEY:  Join.
14     A.    That would be Highland as the
15   manager of HCLOF, who owns the equity
16   position to the underlying CLOs.
17     Q.    So you're saying that Highland
18   would have the exclusive authority to
19   enter a reset transaction?
20     A.    Correct.
21         MS. WEISGERBER:  Objection to
22     form.
23         MR. MALONEY:  Join.
24     Q.    What if HarbourVest objected to
25   a reset transaction?  Would it have any

Appx. 00145

Page 42

Confidential - Pugatch

1    Confidential - Pugatch
2    rights or remedies, in your understanding?
3        MS. WEISGERBER:  I'm going to
4    object to form.  And also just object
5    to the extent that this is calling for
6    legal conclusions.
7        Mike --
8        MR. WILSON:  I've ask the
9    witness, within his understanding of
10   the way this investment worked.
11       MS. WEISGERBER:  If you have an
12   understanding separate from any other
13   conversations with counsel, Mike, you
14   can certainly answer.
15   A.    Within my understanding,
16   HarbourVest would not have had any ability
17   or rights to object to a reset or for
18   similar actions by Highland, as the
19   manager of the HCLOF.
20   Q.    Okay.  And just to, just for
21   clarity, in 4.2 it says that, All actions
22   taken by the Advisory Board shall be (i)
23   by a unanimous vote of all of the members
24   of the Advisory Board in attendance; or
25   (ii), by written consent in lieu of a

Page 43

1    Confidential - Pugatch
2    meeting signed by all of the members of
3    the Advisory Board.
4        And we've talked about how there
5    were two members, one of which represented
6    CLO Holdco and one of which represented
7    HarbourVest, and it was your testimony
8    that you don't recall a meeting ever being
9    conducted that you believed that there had
10   been some written consents issued by the
11   Advisory Board; is that correct?
12       MS. WEISGERBER:  Objection to
13   form.
14   A.    That is my recollection, yes.
15   Q.    I'm sorry?  I didn't hear your
16   answer.
17   A.    That is my recollection, yes.
18   Q.    Okay.  So what is the Advisory
19   Board's general function in your
20   understanding?
21       MS. WEISGERBER:  Objection to
22   form.
23       You can answer, Mike, if you
24   know, other than, you know, legal
25   conclusions, things like that, legal

Page 44

1    Confidential - Pugatch
2    advice.
3        And also, Mike, you're welcome
4    to look at the document, I think John
5    is E-mailing you the documents as
6    well.  I don't know if you have the
7    full document in front of you.
8        THE WITNESS:  Yeah, I can pull
9    it up here.
10   A.    I mean, my understanding is the
11   Advisory Board, the Advisory Board's
12   involvement is as spelled as in Section
13   4.3 of the agreement that you have on the
14   screen.  And that is the extent of the
15   role that the Advisory Board would play.
16   Q.    Well, but as a practical matter,
17   what did that entail?
18       MS. WEISGERBER:  Objection to
19   form.
20   A.    Again, as a practical matter,
21   the listed items, which I can't see, that
22   are off the screen further down in 4.3 are
23   the items that would require approval by
24   the Advisory Board.
25   Q.    But other than those items, the

Page 45

1    Confidential - Pugatch
2    Advisory Board was not a routine part of
3    the decision-making of the portfolio
4    manager?
5        MS. WEISGERBER:  Objection to
6    form.
7    A.    Not at all.
8    Q.    Did you say "not at all"?
9    A.    Not at all, no.
10   Q.    I'm going to refer back to
11   Exhibit 5, which was Document -- or Docket
12   1057.  I'll put that back on the share
13   screen.  I wanted you to scroll, sorry.
14   It's a long document.
15       I want you to look at
16   Paragraph 37, which should be on your
17   screen.  And it says that these are
18   misrepresentations that HarbourVest
19   alleges were made by Highland.  And the
20   first bullet point states that, "Highland
21   never informed HarbourVest that Highland
22   had no intention of paying the Arbitration
23   Award and was undertaking steps to ensure
24   that Mr. Terry could not collect on his
25   judgment."

Page 46

1        Confidential - Pugatch
2        Now, Mr. Terry did not have an
3    arbitration award against Highland; is
4    that correct?
5        MS. WEISGERBER:  Objection to
6      form and foundation.
7      A.    My understanding is there was an
8    Arbitration Award, awarded for the benefit
9    of Mr. Terry.
10     Q.    But that award was against Acis,
11   correct?
12       MS. WEISGERBER:  Objection to
13     form.
14     A.    I don't know all of the details.
15   I do know that Acis was a subsidiary of
16   Highland, and there was an arbitration
17   award that was for the benefit of
18   Mr. Terry.
19     Q.    But you would agree with me that
20   if, if Highland, or I'm sorry if Mr. Terry
21   had an arbitration award against Acis,
22   then Highland would not have any
23   obligation to pay that award?
24       MR. MORRIS:  Objection to the
25     form of the question.

Page 47

1        Confidential - Pugatch
2        MS. WEISGERBER:  Objection to
3      the form.  Objection to the extent
4      that it calls for a legal conclusion.
5        I don't -- Mike, if you have a
6      layman's understanding of the answer
7      to that question, you're welcome to
8      answer.  But if not, don't answer.
9      A.    My understanding was Acis was a
10   controlled subsidiary of Highland's.
11     Q.    Okay.  Well, the next bullet
12   point says that, "Highland did not inform
13   HarbourVest that it undertook the
14   transfers to siphon assets away from Acis,
15   L.P., and that such transfers would
16   prevent Mr. Terry from collecting on the
17   Arbitration Award."
18       So if your understanding was
19   that Highland was responsible for the
20   arbitration award, then why is it relevant
21   that Highland siphoned assets away from
22   Acis, L.P.?
23       MS. WEISGERBER:  Objection to
24     form.  Misstates testimony.
25       Can you clarify that question,

Page 48

1        Confidential - Pugatch
2    John?  I think the beginning of it was
3    a little muddled.
4    BY MR. WILSON:
5      Q.    Well, this objection says that
6    Highland had -- or response to objection,
7    says that Highland had no intention of
8    paying the arbitration award, but that
9    seems to conflict with the next bullet
10   point that says that it undertook
11   transfers to siphon assets away from Acis,
12   L.P., to prevent Mr. Terry from collecting
13   on the arbitration award.
14       So where were those assets being
15   siphoned to?
16       MS. WEISGERBER:  Objection to
17     form and foundation.
18       If you're capable of answering
19     that question, Mike, you can.
20     A.    I don't know the specific
21   details of where those assets were
22   siphoned off to, other than it was to
23   another Highland affiliate.
24     Q.    The next sentence says that,
25   "Highland simply did not inform

Page 49

1        Confidential - Pugatch
2    HarbourVest and represented to HarbourVest
3    that the reason for changing the portfolio
4    manager for HCLOF was because Acis was
5    toxic in the industry."
6        Do you see that?
7      A.    Yes.
8      Q.    And it seems when I read these
9    documents that have been filed in the
10   Highland bankruptcy, and also the Acis
11   bankruptcy, that there's a difference in
12   position as to which entity, being either
13   Highland or HarbourVest, had the belief
14   that the Acis name was toxic.  Can you
15   shed any light on that?
16       MS. WEISGERBER:  Objection to
17     form.
18     A.    I can unequivocally say that the
19   idea to change the portfolio manager or
20   the idea that the Acis brand was toxic did
21   not come from HarbourVest.
22     Q.    That was not at HarbourVest's
23   suggestion or insistence?
24     A.    Absolutely not.
25     Q.    Well, whose suggestion was it

Appx. 00147

Page 50

1        Confidential - Pugatch
2   that the Acis name was toxic?
3        A.   Somebody at Highland.
4        Q.   Do you know who?
5        A.   I don't recall the conversation
6   where that first came up or who said, or
7   who at Highland said that.
8        Q.   But that conversation did occur
9   prior to HarbourVest's investment?
10       A.   Yes.
11       Q.   So Acis was previously the
12  portfolio manager for HCLOF prior to
13  November 15, 2017, and now November 17 --
14  or 15th, 2017, the portfolio manager was
15  changed.
16       And what is HarbourVest's
17  position as to why that change in
18  portfolio manager damaged it?
19       MS. WEISGERBER:   Objection;
20       form, objection to the extent it calls
21       for a legal conclusion.
22       Mike, you can answer --
23       MR. WILSON:   I'm not asking for
24       a -- with all due respect, I'm not
25       asking for a legal conclusion.  I'm

Page 51

1        Confidential - Pugatch
2   asking for his understanding why the
3   change in the portfolio manager
4   damaged HarbourVest.
5        MS. WEISGERBER:   Same objection.
6        You can provide any
7        non-privileged answer that you have,
8        Mike, if any.
9        A.   Ultimately my understanding is
10  that that change in portfolio manager and
11  the subsequent litigation between Acis,
12  Highland, and Josh Terry led to material
13  diminution in value, as it relates to the
14  underlying assets of HCLOF stemming from
15  Highland's decision not to comply with the
16  arbitration award to Mr. Terry.
17       Q.   Okay.  Now, if you go up to
18  Page 4 in this document, it says that on
19  October 27th, and this is Paragraph 11
20  now, "On October 27, 2017, Acis' portfolio
21  management rights for HCLOF were
22  transferred to Highland HCF"; is that
23  correct?
24       A.   That sounds right, yes.
25       Q.   And this is over two weeks prior

Page 52

1   to HarbourVest's investment, correct?
2        A.   Correct.
3        Q.   So HarbourVest had full
4   knowledge that that the portfolio manager
5   of HCLOF was being changed prior to its
6   investment, correct?
7        A.   Correct.
8        MS. WEISGERBER:   Objection to
9        form.
10       And just to clarify, you're
11       asking him, HarbourVest, he's
12       testifying on behalf of himself.  I
13       could just take a standing objection
14       to that because I know sometimes
15       you're just saying HarbourVest meaning
16       Mike, so...
17  BY MR. WILSON:
18       Q.   Okay.  And just to be clear,
19  HCLOF changed its portfolio manager on
20  October 27, 2017, but after the Acis
21  bankruptcy was initiated the Chapter 11
22  trustee made changes to the portfolio
23  manager, correct?
24       MS. WEISGERBER:   Objection to

Page 53

1        Confidential - Pugatch
2   form, foundation.
3        A.   I know there were changes
4   subsequent to the Acis bankruptcy, to the
5   underlying management of the Acis CLOs.
6        Q.   All right.  I'm going to go back
7   to Paragraph 37, and I want to look at
8   these next two bullet points.
9        It says that, in the third
10  bullet point, that "Highland indicated to
11  HarbourVest that the dispute with
12  Mr. Terry (which appeared on a litigation
13  schedule presented to HarbourVest during
14  diligence) would have no impact on
15  investment activities."
16       And that would be the opinion of
17  Highland, correct?
18       MS. WEISGERBER:   Objection to
19       form.  The opinion of Highland?  Is
20       that what you meant to ask?
21       MR. WILSON:   Right.
22  BY MR. WILSON:
23       Q.   That's Highland expressing its
24  opinion to HarbourVest, correct?
25       MS. WEISGERBER:   Objection to

Page 54

1        Confidential - Pugatch
2     form.
3        A.    I would just say Highland
4     presented that as facts to HarbourVest.
5        Q.    Okay.  And the next one, it says
6     that "Highland expressed confidence in the
7     ability of HCLOF to reset or redeem the
8     CLOs notwithstanding that Highland was
9     using HCLOF as part of its scheme to avoid
10    the pending Arbitration Award."
11       That's again an opinion, right,
12    that Highland expressed confidence in the
13    ability of HCLOF?
14       MS. WEISGERBER:  Objection to
15    form.  Objection to the extent it
16    calls for a legal conclusion.
17       A.    Ultimately, their ability, or
18    HCLOF's ability to reset or redeem the
19    CLOs would be subject to market conditions
20    and the ability to actually affect those
21    transactions, but they expressed their,
22    you know, their belief or view in HCLOF's
23    ability to do that notwithstanding the,
24    that change in portfolio manager.
25       Q.    Well, in Paragraph 39 on that

Page 55

1        Confidential - Pugatch
2     same page, it says, "In reliance on
3     Highland's misrepresentations and
4     omissions, HarbourVest invested in HCLOF."
5        Now, HarbourVest is a
6     sophisticated investor, correct?
7        A.    Correct.
8        Q.    And if we were to go to
9     Paragraph 36, it says, right here in the
10    middle, "These facts were material:
11    indeed, HarbourVest expressed concern and
12    requested further information regarding
13    the Transfers, the Arbitration Award, and
14    their implications for HCLOF, and the
15    investment's closing date was delayed."
16       And the closing date was
17    ultimately November 15, 2017, correct?
18       A.    Correct.
19       Q.    What was the initial closing
20    date that had to be delayed?
21       A.    I believe it was scheduled for
22    November 1st.
23       Q.    So HarbourVest had full
24    knowledge of these facts that it, that it
25    lays out here forming the basis of the

Page 56

1        Confidential - Pugatch
2     alleged misrepresentations, and they
3     requested further information regarding
4     those facts.
5        Did they receive any further
6     information?
7        MR. MORRIS:  Objection to the
8     form of the question.
9        MS. WEISGERBER:  Objection to
10    form.  Misstates testimony.
11       A.    We did have subsequent
12    conversations, and I believe, receive
13    subsequent information describing the
14    intent around, and the, you know, new
15    structure, pro forma structure, of the
16    action that Highland had undertaken.  And
17    part of the reason for the delay in the
18    closing was to ensure that we had adequate
19    time to diligence those changes, ask
20    questions, in connection with a thorough
21    due diligence process, and ensure that the
22    underlying legal structure was still
23    sound.
24       Q.    And HarbourVest was investing
25    over $73 million, correct?

Page 57

1        Confidential - Pugatch
2        A.    Right.
3        Q.    And HarbourVest had made
4     investments of this nature previously,
5     correct?
6        A.    We did.
7        MS. WEISGERBER:  Objection to
8     form.
9        A.    HarbourVest has made hundreds of
10    investment over its years, yes.
11       Q.    And HarbourVest has conducted
12    due diligence regarding its investments in
13    the past, correct?
14       A.    Correct.
15       Q.    And HarbourVest received
16    additional information on items of concern
17    and reviewed that information and
18    satisfied itself that this was an
19    appropriate investment, correct?
20       MS. WEISGERBER:  Objection to
21    form.  Misstates testimony.
22       A.    On the back of
23    misrepresentations by Highland, yes.
24       MR. WILSON:  Well, I think
25    that's nonresponsive and I object.

Page 58

1    Confidential - Pugatch
2    Q.   I'm just, I'm just, reading from
3  your pleading that you filed in the
4  bankruptcy, where you say that these were
5  material facts, and HarbourVest sought
6  more information regarding these facts.
7  And then you've testified that they
8  performed additional due diligence
9  regarding that information they received,
10  and then they determined that the
11  investment was appropriate, correct?
12    MS. WEISGERBER:  Objection to
13    form.  Misstates testimony.
14    Go ahead, Mike.
15    A.   Yeah, that is correct, on the
16  back of the additional information we
17  received from Highland.
18    And I would add, with, you know,
19  with the benefit of external advisors and
20  outside counsel reviewing those structural
21  changes, as well.
22    Q.   All right.  Thank you.
23    Now, going back to your
24  declaration, which we've marked as
25  Exhibit 3, Paragraph 3 says that "The

Page 59

1    Confidential - Pugatch
2  unaudited net asset value of HCLOF, as of
3  August 31, 2020, was $44,587,820."
4    And is that a -- is that a book
5  value, I guess?
6    A.   That is a fair market value, in
7  accordance with the valuation policy of
8  HCLOF.
9    Q.   Do you happen to know the net
10  asset value of HCLOF as of February 1,
11  2019?  And I don't want an exact number, I
12  just want an approximation.
13    A.   No, I do not.
14    Q.   Do you know where I could get
15  that information?
16    A.   Presumably from the Debtor.
17    Q.   We'll come back to this in a
18  minute, but I'm going to --
19    MS. WEISGERBER:  I think we've
20    been going about an hour, John, if we
21    can take a quick break.
22    MR. WILSON:  Yeah, a break is
23    fine.
24    MS. WEISGERBER:  Actually,
25    Mike...

Page 60

1    Confidential - Pugatch
2    MR. WILSON:  I'm sorry?  I
3  didn't hear you.
4    MS. WEISGERBER:  It can be up to
5    Mike.
6    Mike, do you want to take a
7  quick break?  Do you want to keep
8  going?
9    MR. WILSON:  No, we can, if
10  y'all need a break, we can take a
11  break, like 10, 15 minutes.
12    THE WITNESS:  Yeah, why don't we
13  take a break, please.
14    MR. WILSON:  What do y'all
15  prefer?  10, 15?
16    MS. WEISGERBER:  Ten minutes is
17  fine.
18    Mike, is that good with you.
19    THE WITNESS:  Yeah, ten-minute
20  break is fine.
21    MR. WILSON:  Okay.  Well, we'll
22  break till, let's say, 1:20 central
23  time.
24    THE WITNESS:  Perfect.
25    MR. WILSON:  All right.  Thanks

Page 61

1    Confidential - Pugatch
2  guys.
3    (Recess taken.)
4    MR. WILSON:  Yes, I just sent
5  out an E-mail with Exhibit 6, and I'm
6  going to pull that up on the screen
7  share, as well.
8    (Whereupon, Exhibit 6, Offering
9    Memorandum 122 pages, was marked for
10    identification.)
11  BY MR. WILSON:
12    Q.   All right.  So this is the
13  Offering Memorandum, and I'm looking at
14  the bottom of Page 1 -- I mean, the top of
15  Page 1, I'm sorry.
16    The Company that was being
17  invested in is Highland CLO Funding, Ltd.
18  Do you see that, Mr. Pugatch?
19    MS. WEISGERBER:  Objection to
20    form.
21    A.   I do.  Okay.
22    Q.   And then this document defines
23  Highland, as Highland Capital Management,
24  L.P.  Do you see that?
25    A.   Yes.

Page 62

Confidential - Pugatch

1
2     Q.    Okay.  Now, if we go down to, I
3  guess it's Page 8 of this document, and
4  this first full paragraph at the top, it
5  says, "No voting member of the Advisory
6  Board shall be a controlled affiliate of
7  Highland."
8          Do you see that?
9     A.    I do.
10    Q.    And then it also says that, "It
11  being understood that none of CLO Holdco
12  Ltd., it's wholly-owned subsidiaries, or
13  any of their respective directors or
14  trustees shall be deemed to be a
15  controlled affiliate of Highland, due to
16  their preexisting non-discretionary
17  advisory relationship with Highland."
18          Do you see that?
19    A.    Yes.
20    Q.    So there were no affiliates of
21  Highland on the Advisory Board, correct?
22          MS. WEISGERBER:  Objection to
23  form.
24    A.    For voting purposes under the
25  document, that is how this reads, correct.

Page 63

Confidential - Pugatch

1
2          MR. WILSON:  All right.  I'm
3  going to turn to the next exhibit.
4  And this is going to be Exhibit No. 7
5  coming in the E-mail.  I'm also going
6  to put Exhibit No. 7 on the screen.
7          (Whereupon, Exhibit 7, Share
8  Subscription and Transfer Agreement 31
9  pages, was marked for identification.)
10    Q.    All right.  Do you see that?
11  The "Subscription and Transfer Agreement
12  For Ordinary Shares"?
13    A.    Yep.
14    Q.    All right.  So what this
15  document says is that, it repeats that
16  Highland HCLF Advisory Ltd. is the
17  portfolio manager.  Highland CLO Funding
18  Ltd. is the fund, and CLO Holdco Ltd. is
19  the existing shareholder.
20          And if we go down to the bottom
21  half of this page, it says that
22  HarbourVest was acquiring its shares in
23  this investment from CLO Holdco, correct?
24    A.    Yes.
25          MS. WEISGERBER:  Objection to

Page 64

Confidential - Pugatch

1
2  form.
3     Q.    And prior to the date of this
4  document, which I believe is November 15,
5  2017, CLO Holdco held 100 percent of the
6  shares of HCLOF, correct?
7          MS. WEISGERBER:  Objection to
8  form, foundation.
9     A.    I don't recall.  I know they
10  were the largest, the largest investor.  I
11  don't recall if it was 100 percent.
12    Q.    Well, if you look at the chart
13  below Paragraph A, it says that CLO Holdco
14  Ltd. immediately prior to the placing on
15  100 percent share percentage.
16          Do you have any reason to
17  disagree with that?
18    A.    No.
19          MS. WEISGERBER:  Objection to
20  form.
21    Q.    All right.  Now, below CLO
22  Holdco Ltd., these are the five
23  HarbourVest entities that have filed
24  proofs of claim in this bankruptcy,
25  correct?

Page 65

Confidential - Pugatch

1
2          MS. WEISGERBER:  Objection to
3  form.
4     A.    Those are the five HarbourVest
5  entities with a direct investment in
6  HCLOF.
7     Q.    And each one of those entities
8  has filed a proof of claim in this
9  bankruptcy, correct?
10    A.    Yes.
11    Q.    And the largest -- I think we
12  discussed this earlier, but Dover Street
13  IX is the largest of those investors, with
14  a 35.49 percent share percentage, correct?
15          MS. WEISGERBER:  Objection to
16  form.
17    A.    Correct.
18    Q.    And if you take the total of
19  those investments of the HarbourVest
20  entities, you get a 49.98 percent total.
21  Is that your understanding?
22          MS. WEISGERBER:  Objection to
23  form.
24    A.    I know it has 49 percent, and
25  some percentage.  I'll take your math as

1       Confidential - Pugatch
2   correct.
3       Q.   And 49.98 percent is larger than
4   the next largest shareholder, which is CLO
5   Holdco which is 49.02 percent, correct?
6       MS. WEISGERBER:  Objection to
7   form.
8       A.   In taking all of the HarbourVest
9   entities, collectively, yes, correct.
10      Q.   And so I want to go back to
11  earlier where we saw in documents filed by
12  HarbourVest, where it refers to itself as
13  a passive investor.  What do you, I
14  apologize if I've already asked you this
15  question, but what do you mean by passive
16  investor?
17      A.   Meaning we were a minority
18  investor in HCLOF.  HCLOF was fully
19  controlled by Highland as the investment
20  manager.  So HarbourVest did not have any
21  governance, rights, or control as it
22  related to the ongoing investment
23  management and decisionmaking of HCLOF.
24      Q.   HarbourVest has the largest
25  percentage of the shares of any of these

1       Confidential - Pugatch
2   investors, correct?
3       MS. WEISGERBER:  Objection to
4   form.
5       A.   Taken collectively, yes.
6       Q.   And HarbourVest owned one of the
7   two spots on the Advisory Board, correct?
8       MS. WEISGERBER:  Objection to
9   form.
10      A.   Correct.
11      Q.   And if you look down below the
12  HarbourVest entities on this chart, you
13  see that Highland Capital Management, L.P.
14  is purchasing a .63 percent interest,
15  correct?
16      MS. WEISGERBER:  Objection to
17  form.  The document speaks for itself.
18      A.   According to the document, yes.
19      Q.   Do you have any reason to
20  disagree with that document?
21      MS. WEISGERBER:  Objection to
22  form.
23      A.   I do not.
24      MR. WILSON:  All right.  I'm
25  going to stop that screen share.  I'm

1       Confidential - Pugatch
2   going to E-mail out the next exhibit.
3   This was Exhibit 8 that I just sent,
4   and I'll pull it up on the screen
5   share.
6       (Whereupon, Exhibit 8, E-mail
7   08/15/2017, was marked for
8   identification.)
9       Q.   Now, I'll represent to you that
10  I received this document this morning from
11  your counsel.  Do you recognize this
12  E-mail?  Have you seen it before?
13      A.   Yes, I have.
14      Q.   And this E-mail is sent by Brad
15  Eden.  I think you mentioned that he was
16  one of the representatives that was
17  involved in the pre-investment discussions
18  with Highland?
19      A.   Correct.
20      Q.   And I think you told me that
21  Dustin Willard was involved in those
22  discussions on the HarbourVest side,
23  correct?
24      A.   Correct.
25      Q.   And so this is an E-mail sent on

1       Confidential - Pugatch
2   August 15, 2017 from Brad Eden to Dustin
3   Willard.  Are you familiar with Thomas
4   Surgent?
5       A.   Yes.
6       Q.   Was he involved in those
7   discussions with you and HarbourVest as
8   well?
9       A.   In some of those discussions,
10  yes.
11      Q.   Okay.  So when it says, "Dustin,
12  attached is a legal summary.  Of course,
13  Thomas is available to answer any
14  follow-up questions."  Do you know if
15  Thomas was consulted with any follow-up
16  questions?
17      A.   I recall –
18      MS. WEISGERBER:  Objection to
19  form.
20      A.   – having follow-up
21  conversations with Highland, I don't –
22  around these legal summaries.  I don't
23  recall with whom.
24      Q.   Okay.  And just to show you the
25  attachment that's referenced in the

Confidential - Pugatch

1    Confidential - Pugatch
2    E-mail, this says that SEC financial
3    crisis matter crusader, Terry, Daugherty
4    and UBS.  So and then I guess these are --
5    this is information provided by Highland
6    to HarbourVest regarding these matters.
7    Why were these particular matters
8    addressed in this E-mail, to your
9    knowledge?
10        MS. WEISGERBER:  Objection to
11    form and foundation.
12    A.    These were all outstanding
13    litigation matters that we had become
14    aware of in connection with our diligence
15    that we asked for a further explanation
16    from Highland on the underlying substance.
17    Q.    Now, did you become
18    independently aware of these in the course
19    of your due diligence, or were these
20    brought to your attention by Highland
21    first?
22    A.    I don't know.
23        MS. WEISGERBER:  Objection to
24    form.
25    Q.    You don't know?

1    Confidential - Pugatch
2    A.    (Nods.)
3    Q.    Okay.  And particularly with
4    respect to Mr. Terry, is it your opinion
5    that there are any material
6    misrepresentations made in this summary?
7        MS. WEISGERBER:  Objection to
8    form.  Objection to the extent it
9    calls for a legal conclusion.
10        Mike, to the extent you have an
11    answer that does not infringe on
12    conversations with counsel, you can
13    provide it.
14    A.    Yeah, I would say our
15    understanding or interpretation of that,
16    or the answer to that question would be
17    based on conversations with counsel.
18    Q.    Well, this document was provided
19    to you in the course of the discussions
20    prior to HarbourVest's investment, and
21    you've stated that Highland, or you've
22    taken the position that Highland made
23    material misrepresentations to
24    HarbourVest, in the course of these
25    discussions.

1    Confidential - Pugatch
2        Does this document evidence
3    those material misrepresentations?
4        MS. WEISGERBER:  Objection to
5    form.  Objection to the extent it
6    calls for a legal conclusion.
7    A.    Yeah, same answer as previous.
8    Q.    Well, I'm not asking you for a
9    legal conclusion.  I'm asking you are
10    there misrepresentations in this document
11    that you claim Highland made?
12        MS. WEISGERBER:  Same
13    objections.
14        I think misrepresentations calls
15    for a legal conclusion regarding legal
16    misrepresentations, actionable
17    misrepresentations.  So if he doesn't
18    have any non-privileged testimony to
19    give, he can't give any testimony.
20        MR. WILSON:  Well, I'm here
21    today to investigate HarbourVest's
22    claim and one of the basis of
23    HarbourVest's claim is
24    misrepresentation.  So I'm trying to
25    figure out what those

1    Confidential - Pugatch
2    misrepresentations were.
3        And I would ask that the witness
4    tell me if there's a misrepresentation
5    in this document that was provided in
6    this E-mail.
7        MS. WEISGERBER:  Same
8    objections.
9        Mike, if you have a general
10    understanding of, generally,
11    misrepresentations that HarbourVest
12    believes were made in connection or
13    regarding the Terry litigation,
14    et cetera, you can provide that
15    information.
16        THE WITNESS:  Yeah, sure.
17    A.    So in general, my understanding
18    and the way that Highland had
19    characterized the ongoing litigation with
20    Mr. Terry was that it was nothing more
21    than an employment dispute with a former
22    employee and that, you know, the
23    arbitration -- well, actually, it was
24    before the Arbitration Board, but the
25    ongoing litigation had no impact, bearing,

Confidential - Pugatch

1  Confidential - Pugatch
2  or ultimate result on the underlying CLOs
3  that Highland managed, including the Acis
4  CLOs.
5     Q.   So you're saying that
6  Highland --
7        MR. MORRIS:  John, I'm sorry to
8     interrupt.  Before you go on, somebody
9     with the initials DSD just joined the
10    deposition.  Can you please identify
11    yourself?
12       MR. DRAPER:  This is Douglas
13    Draper.  I just changed machines.
14       MR. MORRIS:  Okay.  No problem,
15    Doug.  Thank you.
16  BY MR. WILSON:
17    Q.   So, and I'm not trying to put
18  words in your mouth, but is the gist of
19  what you're telling me that Highland
20  represented that this was a minor dispute
21  with a former employee and it would not
22  affect its CLO business?
23    A.   Correct.
24       MS. WEISGERBER:  Objection to
25    form.

1  Confidential - Pugatch
2     A.   Correct.
3     Q.   Well, are there any more
4  specific E-mails or written
5  communications, that you're aware of, that
6  would contain misrepresentations by
7  Highland to HarbourVest?
8        MS. WEISGERBER:  Objection to
9     form.
10       Are you asking about from
11    today's production, or are you asking
12    about just, in general?
13       MR. WILSON:  Well, you produced
14    two E-mails to us today.  I'm just
15    asking if there's anything else he's
16    aware of where there's written
17    misrepresentations from Highland to
18    HarbourVest.
19       MS. WEISGERBER:  Mike, if you
20    have an answer separate from
21    conversations with lawyers, et cetera,
22    you can certainly answer.
23    A.   Yeah, my understanding of the
24  documents I reviewed that were part of the
25  production to you earlier today, there is

1  Confidential - Pugatch
2  another document that would also include
3  misrepresentations on the part of this,
4  the Terry lawsuit and ultimate impact on
5  the CLO business.
6  BY MR. WILSON:
7     Q.   And what document is that?
8     A.   That was the E-mail, E-mail with
9  an attachment around a response to a Wall
10  Street Journal article and some of the
11  content in the E-mail itself.
12    Q.   Okay.  We'll look at that one.
13       What was the -- HarbourVest had
14  seen the Terry Arbitration Award, correct?
15       MS. WEISGERBER:  Objection to
16    form.
17    Q.   Prior to making its investment
18  in HCLOF?
19    A.   We were aware of the existence
20  and the outcome of the Arbitration Award.
21    Q.   Had you read the Arbitration
22  Award?
23    A.   No.
24    Q.   Well, how did you know the
25  substance of the Arbitration Award without

1  Confidential - Pugatch
2  reading it?
3        MS. WEISGERBER:  Objection to
4     form.
5     A.   We were informed by Highland of
6  the outcome of the ongoing litigation and
7  the outcome of the Arbitration Award.
8     Q.   Was that part of the
9  documentation that you requested Highland
10  provide you to continue your due
11  diligence, before making the investment?
12       MS. WEISGERBER:  Objection to
13    form.
14    A.   We certainly requested more
15  color around the outcome of that, and any
16  impact that it could have to HCLOF or the
17  ongoing viability of Highland's CLO
18  business.
19    Q.   And what, what were you provided
20  with respect to the Terry Arbitration
21  Award?
22       MS. WEISGERBER:  Objection to
23    form.
24    A.   The existence of that award, the
25  quantum of that award, the judgment of

Page 78

Confidential - Pugatch

1  just under $8 million in connection with
2  that award.  That was the information that
3  was disclosed at -- and represented as a
4  settlement or, you know, arbitration
5  ruling, in connection with the employee
6  litigation, wrongful termination suit.
7      Q.   So did HarbourVest not request a
8  copy of the Arbitration Award to review?
9          MS. WEISGERBER:  Objection to
10  form.
11     A.   We did not specifically, no.
12     Q.   And so, to this day, have you
13  read the Arbitration Award?
14     A.   I have not.
15         MS. WEISGERBER:  Objection to
16  form.
17     Q.   You have not?
18     A.   I have not.
19         MR. WILSON:  Okay.  I think my
20  last E-mail went out with Exhibit 9 on
21  it.  I will pull that up.
22     Q.   Can you see that on the screen
23  share?
24     A.   Yes.

Page 79

Confidential - Pugatch

1          (Whereupon, Exhibit 9,
2  11/29/2017 E-mail with cover letter
3  Highland Capital Management, was
4  marked for identification.)
5      Q.   Okay.  So I think this is out of
6  order, but this should have been first in
7  the exhibit.  But this is an E-mail from
8  Hunter Covitz to Dustin Willard, Michael
9  Pugatch and Nick Bellisario, carbon copies
10  to Trey Parker and Brad Eden.
11         And Trey Parker and Brad Eden
12  are Highland affiliates, right?
13     A.   Yes.
14     Q.   And we've talked about Dustin
15  Willard.  Who's Nick Bellisario?
16     A.   He was another member of the
17  HarbourVest team.
18     Q.   And was he on the, the
19  four-member board that you talked about
20  earlier, that made the investment
21  decision?
22     A.   No, he was the junior member of
23  the investment team that I alluded to.
24     Q.   Okay.  And this, this E-mail

Page 80

Confidential - Pugatch

1  came out about two weeks after the
2  HarbourVest investment, correct?
3      A.   Correct.
4      Q.   And it's your opinion or
5  position that this E-mail contains
6  misrepresentations that Highland made to
7  HarbourVest?
8          MS. WEISGERBER:  Objection to
9  form.  Objection to the extent it
10  calls for a legal conclusion.
11     A.   Yes.
12     Q.   And there was a Wall Street
13  Journal article that had come out shortly
14  before this E-mail, correct?
15     A.   Correct.
16     Q.   And how did you became aware of
17  that Wall Street Journal article?
18     A.   I certainly would have seen it.
19  I may have been sent it separately by
20  Highland, I don't recall.
21     Q.   You don't recall if you saw it
22  independently or Highland telling you
23  about it?
24     A.   I don't.

Page 81

Confidential - Pugatch

1      Q.   And what did you -- what was
2  your reaction to receiving these E-mails
3  from Highland regarding that article?
4          MS. WEISGERBER:  Objection to
5  form.
6      A.   The article or the accusations
7  in the article were something that
8  required more explanation from our
9  perspective.
10     Q.   And attached to this E-mail
11  was -- we just scrolled through it a
12  second ago -- but a letter from James
13  Dondero that was sent to the
14  editor-in-chief of the Wall Street
15  Journal, Mr. Gerard Baker, on November
16  28th.
17         And did you read this
18  attachment?
19     A.   Yes.
20     Q.   And did this attachment to this
21  E-mail aleve your concerns that you had
22  regarding the article?
23         MS. WEISGERBER:  Objection to
24  form.

Page 82

Confidential - Pugatch

1
2     A.    I wouldn't say alleviated the
3   concerns but certainly provided an
4   explanation or refute to some of the
5   claims made in the, in the article.
6     Q.    And do you contend that this
7   letter that was written to Gerard Baker
8   and provided later to HarbourVest was a
9   material misrepresentation?
10        MS. WEISGERBER:  Objection to
11   form.
12        Don't answer that, Mike.  It
13   calls for a legal conclusion.
14        MR. WILSON:  I'm asking for his
15   understanding.
16     Q.    Do you contend that there's
17   misrepresentations in this letter?
18        MS. WEISGERBER:  Material
19   misrepresentations absolutely calls
20   for a legal conclusion, John.
21        MR. WILSON:  Well, I've
22   shortened it to misrepresentations.
23   So I just want to know if he thinks
24   there's anything that's misrepresented
25   in this letter.

Page 83

Confidential - Pugatch

1
2        MS. WEISGERBER:  Same
3   objections.
4        Mike, if you have an
5   understanding, separate from
6   conversations with lawyers, you can
7   answer.
8     A.    I would need to reread the
9   letter to definitively answer that outside
10   of conversations with counsel.
11     Q.    But to be clear, this letter was
12   issued two weeks after HarbourVest's
13   investment, correct?
14     A.    Correct.
15        MS. WEISGERBER:  Objection;
16   asked and answered.
17        MR. WILSON:  I'm going to now
18   send out the next exhibit, which is
19   going to be Exhibit No. 10.
20        (Whereupon, Exhibit 10, 2004
21   Examination of Investor in Highland
22   CLO Funding Ltd. 10/10/2018, was
23   marked for identification.)
24        MR. WILSON:  It just went
25   through.  So I'm going to pull it up

Page 84

Confidential - Pugatch

1
2   on my screen share.
3        So this Exhibit 10, the document
4   I received this morning, filed in the
5   Acis bankruptcy, it looks like, well,
6   let's see, dated in, dated October 10,
7   2018.
8   BY MR. WILSON:
9     Q.    Have you seen this document
10   before?
11     A.    Yes.
12     Q.    And it's a motion for 2004
13   Examination of Investor in Highland CLO
14   Funding, Ltd., correct?
15     A.    Sorry.  Was there a question,
16   John?
17     Q.    Yeah.  I was just asking you to
18   confirm that this was the motion for 2004
19   Examination of Investor in Highland CLO
20   Funding?
21     A.    Yes.
22     Q.    And so if I scroll down to
23   Paragraph 6, which is on, it looks like
24   it's on Page 4.  In the second sentence,
25   it says that "Although HCLOF/ALF was a one

Page 85

Confidential - Pugatch

1
2   time wholly-owned by an affiliate of
3   Highland, it did an offering memorandum in
4   November of 2017 and as a result, is now
5   owned 49.985% by certain affiliates of a
6   large investor and manager of private
7   equity funds."
8        And that's defined as investor.
9   So the Investor is the HarbourVest
10   entities collectively, correct?
11     A.    Correct.
12     Q.    All right.  And then the next
13   sentence, says that "Despite its large
14   ownership percentage in HCLOF in the
15   alleged millions in losses that will
16   result if the Acis CLOs are not reset to
17   make them consistent with prevailing
18   market conditions the Investor has not yet
19   appeared in this case or taken any
20   position in this bankruptcy case."
21        Do you see that?
22     A.    I do.
23     Q.    Is that correct?
24        MS. WEISGERBER:  Objection to
25   form.

Appx. 00156

Page 86

1          Confidential - Pugatch
2      A.   Is what correct?
3      Q.   Well, I guess, I'm most
4   concerned with this last part of the
5   sentence.  It starts with "The Investor
6   has not yet appeared in this case or taken
7   any position in the bankruptcy case."
8          Do you agree with that?
9          MS. WEISGERBER:  Objection to
10     form.
11         Mike, if you want to look at the
12     whole document, you're welcome to.
13     This is not a document that's a
14     HarbourVest-prepared document.
15   BY MR. WILSON:
16     Q.   Maybe a better way of asking the
17   question is:  As of the date of this
18   document, which was in October of 2018,
19   had HarbourVest appeared in the Acis
20   bankruptcy?
21     A.   No, we did not.
22     Q.   And had they asserted any
23   positions regarding the Acis bankruptcy?
24     A.   Not through the court.
25         MS. WEISGERBER:  Objection to

Page 87

1          Confidential - Pugatch
2      form.
3      Q.   Okay.  Had Highland encouraged
4   HarbourVest to participate in the Acis
5   bankruptcy?
6          MS. WEISGERBER:  Objection to
7      form.
8      A.   No.
9      Q.   They did not?
10         MS. WEISGERBER:  Objection to
11     form.
12     Q.   Highland did not encourage
13   HarbourVest to participate in the Acis
14   bankruptcy?
15     A.   When you say "participate," can
16   you define that, please.
17     Q.   Well, appear in the case, as
18   stated in this motion.
19     A.   No, they had not.
20     Q.   Did Harbour -- I'm sorry -- did
21   Highland keep HarbourVest apprised of the
22   events that occurred in the Acis
23   bankruptcy?
24         MS. WEISGERBER:  Objection to
25     form.  I'm just going to restate my

Page 88

1          Confidential - Pugatch
2      objection to the extent you're asking
3      questions about HarbourVest.  This is
4      Mr. Pugatch answering, based on his
5      knowledge.
6      A.   We were kept informed from time
7   to time throughout the Acis bankruptcy
8   proceeding.
9      Q.   Well, did you, in fact, have
10   weekly conference calls with Highland
11   representatives regarding the Acis
12   bankruptcy?
13         MS. WEISGERBER:  Objection to
14     form.
15     A.   I don't recall them being
16   weekly, no.
17     Q.   You can agree with me you
18   participated in the conference calls with
19   Highland regarding the Acis bankruptcy?
20     A.   Yes.
21         MS. WEISGERBER:  Same objection.
22     Q.   And on what, on what --
23         MR. WILSON:  Sorry.  Strike
24     that.
25     Q.   With what regularity would you

Page 89

1          Confidential - Pugatch
2   estimate those conference calls occurred,
3   if it's not weekly?
4          MS. WEISGERBER:  Objection to
5      form.
6      A.   From memory, maybe once, once a
7   month on average.  Sometimes more
8   frequently, sometimes less frequently.
9      Q.   Did Highland provide you with
10   documents and evidence that were filed in
11   the Acis bankruptcy?
12         MS. WEISGERBER:  Objection to
13     form.
14         We're really starting to get
15     pretty far afield here, John, from
16     HarbourVest.  You know, I'm not sure
17     where you're going with this.  This is
18     a settlement motion that's teed up for
19     the court.
20         You're welcome to keep going,
21     but at some point we're going to cut
22     it off.
23         MR. WILSON:  Well, I think -- I
24     don't think I'm going to go too far
25     down this path, but I think this

Page 90

1    Confidential - Pugatch
2    directly relates to the claims that
3    HarbourVest has made.  But I'll repeat
4    my question.
5    BY MR. WILSON:
6    Q.    Did Highland provide HarbourVest
7    with documents and evidence that were
8    filed in the Acis bankruptcy?
9         MS. WEISGERBER:  Objection to
10    form.
11    A.    I don't recall what documents
12    Highland may have provided to us, at that
13    point in time.
14    Q.    I don't want you to recall
15    specific documents that were provided, but
16    did, did Highland provide documents from
17    the Acis bankruptcy to HarbourVest?
18         MS. WEISGERBER:  Objection to
19    form.  Asked and answered.
20    A.    I don't recall.
21    Q.    You don't recall?
22    A.    (Nods.)
23    Q.    Would you dispute that between
24    2018 and 2019 that Highland provided over
25    40,000 pages of documents related to the

Page 91

1    Confidential - Pugatch
2    Acis bankruptcy to HarbourVest?
3         MS. WEISGERBER:  Objection to
4    form, foundation.
5    A.    I don't know and I don't recall.
6    Q.    And the Acis plan became
7    effective on February 1st, 2019.  Is that
8    your understanding?
9    A.    I believe so, yes.
10    Q.    And do you -- I asked you this
11    earlier, but I'm going to ask again.  Do
12    you have any understanding of what the
13    value of HCLOF was, at that date?
14    A.    I don't recall.
15         MS. WEISGERBER:  Objection to
16    form.
17    Q.    You don't?
18    A.    I don't recall, no.
19    Q.    And there was an injunction put
20    in place in the Acis bankruptcy that
21    prevented certain actions with respect to
22    HCLOF, correct?
23         MS. WEISGERBER:  Objection to
24    form, foundation.
25         MR. MALONEY:  Join.

Page 92

1    Confidential - Pugatch
2    A.    Yes.
3    Q.    Now, I'm going to go back up to
4    Paragraph 2.  This says that Acis LP
5    manages the Acis CLOs, that certain
6    portfolio management agreement between
7    Acis, and then it goes on.  So what are
8    the Acis CLOs, as it relates to the
9    investment that HarbourVest made?
10         MR. MALONEY:  Objection to the
11    form of the question.
12         MS. WEISGERBER:  Objection to
13    form.
14    A.    The Acis CLOs -- or HCLOF owned
15    equity in certain of the Acis CLOs as a
16    portion of its investment portfolio.
17    Q.    And I think you were trying to
18    distinguish earlier between who the
19    portfolio manager was.  And that would
20    depend on whether it was an Acis CLO or a
21    Highland CLO; is that correct?
22         MR. MALONEY:  Objection to form.
23         MS. WEISGERBER:  Objection to
24    form, misstates testimony.
25    A.    I was referencing the portfolio

Page 93

1    Confidential - Pugatch
2    manager of the underlying CLOs, yes.
3    Q.    But we can agree that Acis had
4    responsibility for managing at least a
5    portion of HCLOF, correct?
6    A.    Highland --
7         MR. WILSON:  Objection to form.
8         MR. MALONEY:  Objection to form
9    as well, foundation, and legal
10    conclusion.
11         (Reporter clarification.)
12    A.    It's my understanding it's
13    Highlands' subsidiaries, yes.
14    Q.    Okay.  Well, I'm going to go
15    down to Paragraph 4, at the top of your
16    screen here where it says, "Recently
17    William Scott, the director of HCLOF,
18    testified that he wants to reset the Acis
19    CLOs to bring them in line with current
20    market interest rates, that the inability
21    to do the reset is causing damages to
22    HCLOF in the amount of approximately
23    $295,000 per week."
24         Is that an accurate statement?
25         MS. WEISGERBER:  Objection to

Appx. 00158

Page 94

1        Confidential - Pugatch
2      form and foundation.
3          MR. MALONEY:  Mark Maloney.
4      Object to form and foundation.
5      A.   I don't know.  You'd have to ask
6    William Scott.
7      Q.   Well, were you aware, I mean,
8    there's a citation to a, well, I don't
9    know if there's a citation on this one.
10   But it says that he recently testified.
11   Were you aware that he testified that he
12   wanted to reset the Acis CLOs?
13         MS. WEISGERBER:  Same objection.
14   We're really getting far afield.
15         MR. WILSON:  I'm just asking if
16     he was aware that this statement
17     occurred.
18     A.   At some point in time, yes, I
19   became aware of that.
20     Q.   Okay.  Do you agree that the
21   inability to do a reset was causing
22   damages in the amount of $295,000 per
23   week?
24         MS. WEISGERBER:  Objection to
25     form and foundation.  This is not a

Page 95

1        Confidential - Pugatch
2      HarbourVest-prepared document.
3          MR. WILSON:  Well, I understand
4      that.  I'm just asking if he agrees
5      with it.
6      A.   I don't have enough information
7    to assess that, specifically the $295,000
8    per week number.
9      Q.   I want to go down to Paragraph 7
10   of this document, and this is going to be
11   at the top of Page 5.  It says
12   "Mr. Ellington also testified that because
13   it would be putting in additional capital
14   in connection with any reset CLOs, the
15   Investor," and we discussed that that's
16   HarbourVest, "had the ability to start
17   'calling the shots' and dictate the terms
18   of any reset transactions."
19         Do you agree with that?
20     A.   No.
21         MS. WEISGERBER:  Objection to
22     form.
23     Q.   I want to go down to Paragraph
24   9.
25         It says, "The Trustee also needs

Page 96

1        Confidential - Pugatch
2    information regarding whether the Investor
3    presently has any concerns about pursuing
4    reset transactions with the Reorganized
5    Acis and Brigade, under the plan now that
6    Acis has been able to successfully serve
7    as the portfolio manager for the Acis CLOs
8    on a post-petition basis, and there are no
9    impediments to the ability of the
10   Reorganized Acis and Brigade to pursue a
11   reset on the Acis CLOs."
12         Do you know whether the Investor
13   had any concerns about pursuing a reset?
14         MS. WEISGERBER:  Objection to
15     form, foundation.
16     A.   The context of a reset or
17   refinancing of the various CLOs in HCLOF
18   was part of the original investment
19   thesis.  So there would not have been
20   concerns about the ability to do so.  Our
21   concerns were more in the inability to do
22   so, as a result of the Acis bankruptcy.
23     Q.   But here, you've got the Trustee
24   representing in Paragraph 5, that
25   according to the Trustee's Second Amended

Page 97

1        Confidential - Pugatch
2    Joint Plan, it provides for such a reset
3    to be performed by the Reorganized Acis
4    and supervised by Brigade Capital
5    Management.
6          And it appears to me that the
7    Trustee is trying to get the Investor's
8    position on whether a reset should be
9    pursued.  And I'm just asking you whether
10   HarbourVest objected to a reset at this
11   time?
12         MS. WEISGERBER:  I'm going to
13     object to all of the colloquy before.
14     I'm going to object to any extent
15     Mike's being asked about what the
16     Trustee wanted or viewed.  If you want
17     to ask your question in isolation, go
18     ahead.
19     Q.   What was HarbourVest's position
20   regarding a reset, as of the date that
21   this was filed, and I'll look again,
22   October 10, 2018?
23         MS. WEISGERBER:  Objection to
24     form.  Objection to the extent it's
25     asking HarbourVest's position.  And I

Appx. 00159

1      Confidential - Pugatch
2    cannot conceive how this is relevant
3    to the 9019 motion before the court
4    right now.
5          Nonetheless, Mike, if you have
6    an answer, on behalf of yourself, you
7    can answer.
8      A.   HarbourVest was a passive
9    minority investor in HCLOF.  It had no
10   ability to control the underlying
11   portfolio management or ability to reset,
12   refinance, or call in any of the equity of
13   the underlying CLOs.  That was all under
14   the purview of Highland.
15     Q.   Did you understand that
16   Mr. Ellington had given sworn testimony
17   that the Investor is the party calling the
18   shots for HCLOF, with respect to any reset
19   transactions?
20         MS. WEISGERBER:  Objection to
21     form.
22     A.   I did became aware of it, yes.
23     Q.   When did you become aware of
24   that?
25     A.   At some point subsequent to that

1      Confidential - Pugatch
2    testimony being given.
3      Q.   But was it when you read this
4    motion that we're looking at as
5    Exhibit 10?
6          MS. WEISGERBER:  Objection to
7      form.
8      A.   It may have been.  I don't
9    recall the exact time or medium that I
10   became aware of that.
11     Q.   Was a deposition given as a
12   result of this motion?
13         MS. WEISGERBER:  Objection to
14     form.  If you have the whole document,
15     Mike, that may make sense.
16         MR. WILSON:  Well, this motion
17     at the top says it's a Motion for 2004
18     Examination of Investor.  And then
19     attached to this motion are some
20     document requests, and then deposition
21     topics for a corporate representative
22     of the Investor, and then a proposed
23     order.
24   BY MR. WILSON:
25     Q.   Do you recall whether a

1      Confidential - Pugatch
2    deposition was given, after this motion
3    was filed?
4      A.   Yes.
5      Q.   And who was the designated
6    deponent?
7      A.   I was.
8      Q.   And were documents produced, as
9    a result of this?
10     A.   Yes, there were.
11     Q.   And were you asked at that
12   deposition what the Investor's position on
13   a reset was?
14         MS. WEISGERBER:  Objection to
15     form.
16         If you recall.
17     A.   I don't recall specifically that
18   question being asked.
19     Q.   Well, do you know what
20   the Debtor's position -- I'm sorry, the
21   Debtor's -- the Investor's position on a
22   reset was as of that day?
23         MS. WEISGERBER:  Objection to
24     form.  Asked and answered.
25     A.   I would just say again, in

1      Confidential - Pugatch
2    general, the original investment thesis
3    here was predicated on a refinancing reset
4    of the various CLOs, and we were not in
5    control as a passive minority investor
6    here to --
7      Q.   Well, you said you weren't in
8    control, but what would HarbourVest's
9    preference have been?
10         MS. WEISGERBER:  Objection to
11     form.
12     A.   I do not recall.
13         MS. WEISGERBER:  If you recall.
14     A.   I don't recall the specifics
15   around what Acis CLO were referring to
16   here or what the specific implications of
17   a reset were at that time; but regardless,
18   that was a decision for the investment
19   manager of HCLO.
20     Q.   But was it your opinion, your
21   personal opinion, that a reset was
22   appropriate?
23         MS. WEISGERBER:  Objection to
24     form.
25     A.   Again, we were not the portfolio

Page 102

Confidential - Pugatch

1    manager of HCLOF.  We were not in control
2    of those decisions or making
3    recommendations on those decisions.  That
4    was the delegated authority of Highland,
5    as the investment manager.
6        Q.    I'm not asking for that.  I'm
7    asking for your personal feelings toward a
8    reset.
9        MS. WEISGERBER:  Same objection.
10    He's only answering on behalf of
11    himself, and it's been asked and
12    answered three times since.
13        MR. WILSON:  Well, he hasn't
14    answered the question.  He's just told
15    me they don't have the authority to do
16    the reset.
17        MS. WEISGERBER:  And he told you
18    the other information he'd be required
19    to even have an opinion on it.  So
20    same objection stands.  It's not a
21    specific enough question for him.
22        Mike, you're welcome, if you
23    have, if you have an answer, you're
24    welcome to give it.

Page 103

Confidential - Pugatch

1    A.    Yeah, the investment guidelines
2    of HCLOF, from the documents that we
3    signed at the time we entered into the
4    transaction, laid out the specific, again,
5    investment guidelines that HCLOF would be
6    guided under, including the opportunity to
7    refinance or reset various CLOs over time,
8    in accordance with Highland's, you know,
9    expectations and ultimate decision to do
10    so.
11        Q.    But did you believe, at this
12    time, that a reset was appropriate?
13        MS. WEISGERBER:  Objection to
14    form.  This is asked and answered
15    several times now, I think we should
16    move on.  He's given you an answer.
17        MR. WILSON:  Well, I want to
18    know what his personal opinion was
19    about whether the reset was
20    appropriate.
21    A.    What reset are you referring to?
22        Q.    A reset as of October 10, 2018.
23    At that time, did you believe that a reset
24    was appropriate?

Page 104

Confidential - Pugatch

1    A.    A reset of what?
2        MS. WEISGERBER:  Same objection.
3        Q.    A reset as been discussed all
4    through this motion, the same reset we're
5    talking about.
6        MS. WEISGERBER:  Objection.
7    Same objections.  I just don't see how
8    he could possibly answer this vague
9    question.
10        Q.    Okay.  So William Scott,
11    director of HCLOF, testified that he
12    wanted to reset the Acis CLOs because if
13    they don't, they are losing $295,000 a
14    week.
15        Did you think that a reset was
16    appropriate in line with what Mr. Scott
17    believed?
18        MR. MALONEY:  Objection to form,
19    foundation.
20        MS. WEISGERBER:  Same
21    objections.  And asked and answered
22    numerous times.
23    A.    We were not managing the
24    portfolio.  We were an investor in a

Page 105

Confidential - Pugatch

1    company, an investment company that was
2    managing this.  We were not, I was not
3    proximate enough to any of the underlying
4    happenings of the look through CLO
5    positions of HCLOF to have an informed
6    view on this, at this time.
7        Q.    Is your testimony that you did
8    not have an opinion as to whether the Acis
9    CLO should be reset in late 2018?
10        MS. WEISGERBER:  Objection to
11    form.  Misstates testimony.
12    A.    My view is that the original
13    investment guidelines here called for a
14    reset or refinance of the CLOs and that
15    Highland was subsequently in full control
16    of whether or not to pursue this, and we,
17    HarbourVest, as an investor had no ability
18    to object or to force that on a go-forward
19    basis.
20        MR. WILSON:  Objection.
21    Nonresponsive.
22        Q.    I want to know your personal
23    opinion of whether you thought a reset was
24    appropriate in October of 2018.

Appx. 00161

Page 106

Confidential - Pugatch

1
2    MR. MORRIS:  Objection to the
3  form of the question.  That's been
4  asked and answered.
5    MR. WILSON:  He has yet to give
6  his answer to --
7    MR. MORRIS:  He just told you he
8  didn't have enough information.  He
9  just told you that, crystal clear.
10    MR. WILSON:  Well, I'm not going
11  to argue with you, John, but I just
12  want an answer to my question.
13    His answer, he wouldn't agree
14  with my, with my summation that he had
15  no opinion, so I just want to know
16  what his opinion is.
17    MS. WEISGERBER:  Same
18  objections.
19    You're not giving him enough
20  information to answer the question,
21  and at this point, it would be
22  speculation.  We can just keep going
23  in circles on this, but your --
24    MR. WILSON:  His opinion would
25  be speculation?

Page 107

Confidential - Pugatch

1
2    MS. WEISGERBER:  He said that,
3  he actually testified at some point
4  that he doesn't recall specifics of
5  the time, so that was another piece of
6  the puzzle.
7    I mean, I don't want to be
8  coaching the witness or giving
9  testimony here, but I think you're not
10  listening to the things he's saying,
11  John, just because you don't like it.
12  BY MR. WILSON:
13    Q.   Mr. Pugatch, did you have an
14  opinion, in October of 2019, about whether
15  the Acis CLOs should be reset?
16    MS. WEISGERBER:  Objection to
17  form.
18    A.   I don't recall any definitive
19  opinion I would have had, but as stated,
20  was not proximate enough to have an
21  informed opinion, in any event.
22    Q.   And to your knowledge, have the
23  Acis CLOs ever been reset?
24    MS. WEISGERBER:  Objection to
25  form, foundation.

Page 108

Confidential - Pugatch

1
2    A.   I do not believe that any of the
3  Acis CLOs were ever reset.
4    Q.   All right.  So who negotiated
5  this claim, the settlement of this claim
6  on behalf of HarbourVest?
7    A.   I did.
8    Q.   And who negotiated for the
9  Debtor?
10    A.   Jim Seery.
11    Q.   And when did those negotiations
12  begin?
13    A.   It started sometime in November,
14  I believe.
15    Q.   And are you aware that Jim Seery
16  has ever taken the position that the
17  HarbourVest claim was worthless?
18    MS. WEISGERBER:  Objection to
19  form, foundation.
20    A.   No, I'm not aware of that.
21    Q.   Has Jim Seery ever offered
22  $5 million to settle the HarbourVest
23  claim?
24    A.   Not to my knowledge.
25    MS. WEISGERBER:  Objection to

Page 109

Confidential - Pugatch

1
2  form.
3    MR. WILSON:  I'm going to send
4  out Exhibit 11.
5    (Whereupon, Exhibit 11,
6  Declaration of John A. Morris in
7  Support of the Debtor's Motion For
8  Entry of an Order Approving Settlement
9  With Harbourvest (Claim Nos. 143, 147,
10  149, 150, 153, 154) and Authorizing
11  Actions, 82 pages, was marked for
12  identification.)
13  BY MR. WILSON:
14    Q.   I want pull this up on the
15  screen share.  This Exhibit 11 is the
16  Declaration of John Morris in Support of
17  the Debtor's 9019 Motion, bears
18  Document 1631.  And attached to this
19  exhibit is a trim cut copy of the
20  Settlement Agreement executed December 23,
21  2020.
22    And the Settlement Agreement has
23  Paragraph 1, Settlement of Claims, that
24  HarbourVest is going to receive a
25  $45 million unsecured, general unsecured

Appx. 00162

Page 110

1      Confidential - Pugatch
2  claim, and a $35 million subordinated
3  claim.
4          And then Part B of that
5  paragraph states that HarbourVest is going
6  to transfer all its rights, titles, and
7  interests to its investment in CLOF to the
8  Debtor or its nominee.
9          Is that your understanding of
10  the general terms of this settlement?
11          MS. WEISGERBER:  Objection to
12  form.
13      A.   Yes, it is.
14      Q.   Okay.  And also in Paragraph 5,
15  Each HarbourVest party agrees that it will
16  vote all of HarbourVest claims held by
17  such HarbourVest party to accept the plan.
18          And I won't read all of that.
19  But the gist of this paragraph is that
20  HarbourVest is going to vote for the
21  Debtor's proposed plan; is that correct?
22          MS. WEISGERBER:  Objection to
23  form.
24      A.   Yes, correct.
25      Q.   And how did that term come to be

Page 111

1      Confidential - Pugatch
2  in this Settlement Agreement?
3          MS. WEISGERBER:  Objection to
4  form.
5      A.   I believe it was put there as
6  part of the drafting of the ultimate
7  agreement to the fund.
8      Q.   Well, whose suggestion was it
9  that it be added to the drafting?
10          MS. WEISGERBER:  Objection to
11  form.
12      A.   I believe that it came from
13  Debtor's counsel, as they took the lead on
14  drafting the documentation here.
15      Q.   Did Jim Seery ever tell you that
16  it was important to him that HarbourVest
17  vote in support of the plan?
18          MS. WEISGERBER:  Objection to
19  form.
20      A.   I don't recall that ever being
21  discussed.  Certainly it was not the
22  prominent feature of any of the
23  discussions or negotiations that I ever
24  had with Jim.
25      Q.   Okay.

Page 112

1      Confidential - Pugatch
2          MR. WILSON:  I'm going to take a
3  ten-minute break, and I think I'm
4  almost ready to wrap up.  So I want to
5  stop my screen share.  And let's,
6  well, let's start back at 2:30, and I
7  think I'll be quick.  Thank you.
8          (Recess taken.)
9  BY MR. WILSON:
10      Q.   Mr. Pugatch, earlier you
11  testified that consistent with your
12  declaration you filed that as of August
13  31, 2020, the value of HCLOF was
14  $44.5 million.  And then if we look at --
15  I don't remember which --
16          Okay.  So this would have been
17  Exhibit 7.  I'll do a share screen.
18          As of November 15, 2017 these
19  shares were purchased at $1.02 and change
20  apiece, and there were a total number of
21  143 million shares.
22          Was the value of this investment
23  roughly $150 million, as of November 15,
24  2017?
25          MS. WEISGERBER:  Objection to

Page 113

1      Confidential - Pugatch
2  form.  Foundation.
3          MR. MALONEY:  Join.
4          MS. WEISGERBER:  I don't know,
5  Mike, if you're comfortable doing that
6  math or what.
7      A.   Yes, approximately that's
8  correct.
9      Q.   Okay.  And you know, and I've
10  read your papers and you talk about
11  attorneys' fees that you say weren't
12  appropriate to be charged to HCLOF and
13  that part of it, but as to the loss of
14  value of the actual investment, what's
15  your understanding of what led to that?
16          MS. WEISGERBER:  Objection to
17  form.  Objection to the extent it
18  calls for a legal conclusion.
19          Mike, to the extent you have a
20  nonlegal opinion on that, that's not
21  based on conversations with counsel,
22  you can answer.
23      A.   Yeah, I think a lot of the value
24  erosion was due to the inability to
25  refinance, reset a number of the

Page 114

Confidential - Pugatch

1      Confidential - Pugatch
2  underlying CLOs that was part of the
3  original investment thesis here, largely
4  as a result of the ongoing litigation,
5  that Highland was involved in, and the
6  subsequent Acis bankruptcy.
7      Q.   And so during the period of time
8  when the injunction prohibited certain
9  actions with respect to this investment,
10  is it your opinion that this investment
11  was losing value?
12      MR. MALONEY:  Objection.
13      MS. WEISGERBER:  Objection to
14   form.
15      A.   Can you repeat the question,
16  John?
17      Q.   Well, I guess I want to know,
18  like, in a, on a timeline kind of basis,
19  do you think that the significant
20  reduction of value occurred prior to or
21  after the confirmation of the Acis plan on
22  February 1, 2019?
23      MS. WEISGERBER:  Objection to
24   form.  Objection to the extent it
25   calls for a legal conclusion.

Page 115

1      Confidential - Pugatch
2      You can give your lay opinion,
3  if you have one, Mike.
4      A.   I think it's all been as a
5  result of the events leading up to the
6  Acis bankruptcy, including the inability
7  to refinance or reset the CLOs which would
8  have been to the benefit of the CLO equity
9  holders including HCLOF.
10      Q.   And so what, what was the cause
11  of the inability to reset?
12      MS. WEISGERBER:  Same
13   objections:  form, foundation, legal
14   conclusion.
15      If you have a non-privileged
16   answer, Mike, go ahead.
17      A.   Yeah, my understanding was
18  originally the TRO, preventing Highland
19  and HCLOF from pursuing that, and then
20  subsequent to the Acis bankruptcy ruling,
21  a similar injunction that remained around
22  the inability for the equity holders of
23  those CLOs to redeem or refinances or
24  reset.
25      Q.   So do you -- is there any

Page 116

1      Confidential - Pugatch
2  component, in your opinion, of the loss of
3  value of these investments due to
4  portfolio mismanagement?
5      MS. WEISGERBER:  Objection to
6   form, foundation, legal conclusion, or
7   expert opinion, calling for
8   speculation.
9      If you have a view, Mike.
10      A.   Yeah.  Can you be more specific
11  with the question, John?
12      Q.   Well, I'll ask it a different
13  way.
14      Do you think that portfolio
15  mismanagement was a portion of the cause
16  of the reduction in value?
17      MS. WEISGERBER:  Same objection.
18      A.   I can't speculate as to, you
19  know, the underlying management decisions
20  around the CLOs, but what I do know is
21  that the mismanagement and
22  misrepresentations at the HCLOF level,
23  that would ultimately result in the Acis
24  bankruptcy and subsequent to that, the TRO
25  and the inability to refinance or reset

Page 117

1      Confidential - Pugatch
2  that has been the, far and away, the
3  largest contributor to loss of value
4  within the portfolio.
5      Q.   One of the allegations that
6  HarbourVest has made is that Highland
7  improperly changed the portfolio manager.
8  Is it your opinion that if that had not
9  been done, the portfolio manager had not
10  been changed at the inception of
11  HarbourVest's investment, that that would
12  have preserved any value of this fund?
13      MR. MORRIS:  Objection to the
14   form of the question.
15      MS. WEISGERBER:  Same objection.
16   Calling for speculation, hypothetical
17   lay opinion.
18      If you have testimony, go ahead,
19   Mike.
20      A.   Sorry, could you just repeat the
21  question, John?  I want to make sure I'm
22  answering it correctly.
23      Q.   I guess I just want to know, and
24  I think you kind of hinted at this a
25  little bit earlier today, but I guess what

Page 118

Confidential - Pugatch

1    Confidential - Pugatch
2    I really want to know is do you think that
3    the particular portfolio manager made a
4    difference in the loss of value that HCLOF
5    suffered?
6         MS. WEISGERBER:  Same
7    objections.
8         A.    Again, it sounds like you're
9    asking a different question there than
10    what I thought I understood your question
11    to be initially.  What I would say to you
12    is the decision originally to change the
13    portfolio manager, and ultimately the
14    events that took place following the
15    Arbitration Award for Mr. Terry, resulted
16    in the subsequent Acis bankruptcy, which
17    in turn has led to the destruction of
18    value, because of the inability to
19    refinance or reset, the underlying CLOs.
20         Q.    So HarbourVest is not alleging
21    that the portfolio manager made any
22    particular decisions or participated in
23    any mismanagement that led to reduction in
24    value?
25         MS. WEISGERBER:  Objection to

Page 119

1    form.
2         A.    When you're asking about
3    portfolio manager, are we referring to the
4    portfolio manager at the underlying CLO
5    level or at the HCLOF level?  I think
6    there are two different levels here of
7    portfolio management.
8         Q.    Well, I'm talking about the
9    portfolio manager, and you can tell me
10    which one it is, but which portfolio
11    manager has the ability to, to impact the
12    performance of these funds?
13         MR. MORRIS:  Objection.
14         A.    If you're referring to HCLOF,
15    the --
16         MS. WEISGERBER:  Objection to
17    form.
18         A.    -- investment manager, or the
19    portfolio manager of HCLOF has the ability
20    to drive value creation by virtue of its
21    equity position in the underlying CLOs.
22         Q.    Well, which portfolio manager
23    makes the day-to-day decisions about
24    selling assets, trading assets, that, that

Page 120

1    Confidential - Pugatch
2    I guess --
3         A.    If you're referring to
4    underlaying credits, that would be the
5    portfolio manager in each of the
6    individual CLOs.  The impact in value to
7    the equity investment in the CLOs is a
8    decision at the HCLOF level, where the
9    majority of that value erosion has
10    resulted from the inability to refinance
11    or reset those CLO entities.
12         Q.    And that's what we're talking
13    about when you said that they, that
14    Highland changed the portfolio manager,
15    you're talking about at the HCLOF level,
16    right?
17         MS. WEISGERBER:  Objection to
18    form.
19         A.    Well, I was responding to the
20    question that I thought you asked.  I
21    wasn't necessarily stating that.
22         Q.    I guess all I'm really trying to
23    do here is just understand HarbourVest's
24    position.  And it sounds to me, and
25    correct me if I'm wrong, it sounds to me

Page 121

1    Confidential - Pugatch
2    that what you're saying is that the
3    diminution of value wasn't attributable to
4    poor investment decisions by a portfolio
5    manager, as much as it was the
6    consequences in the Acis bankruptcy of the
7    change in portfolio manager; is that fair?
8         MS. WEISGERBER:  Objection to
9    form.  Misstates testimony.
10         A.    Yes, it is.  That is my general
11    understanding, yes.
12         MR. WILSON:  Okay.  No further
13    questions.
14         MR. MORRIS:  All right.  Well,
15    thank you very much.
16         THE REPORTER:  Does anybody have
17    any other questions?
18         MR. KANE:  Yes.  This is John
19    Kane with CLO Holdco.  I'll jump on
20    video.  I've got some questions, but
21    I'm going to be relatively short.  If
22    anybody else has a little bit heavier
23    schedule, let me know.
24         All right.  I'll take that as a
25    go-ahead.

Page 122

Confidential - Pugatch

1           Confidential - Pugatch
2    EXAMINATION
3    BY MR. KANE:
4        Q.    This is John Kane.  I represent
5    CLO Holdco.
6              Hi, Mike Pugatch.  It's nice to
7    talk to you.
8        A.    Likewise.
9        Q.    I just wanted to briefly
10   confirm.  I believe you testified you
11   participated in negotiations that lead to
12   the Settlement Agreement, that is part of
13   the 9019 motion, before the bankruptcy
14   court; is that correct?
15       A.    Correct.
16       Q.    And did you actively negotiate
17   the terms of that Settlement Agreement?
18       A.    Yes.
19       Q.    As in dollar amounts, what the
20   consideration exchanged, how it would
21   work, that kind of stuff, obviously with
22   the assistance of counsel?
23       A.    Yes.  All of that.  The
24   negotiations were, you know, over the
25   course of a number of weeks and a number

Page 123

Confidential - Pugatch

1    of conversations directly with the Debtor,
2    with counsel, all-hands calls, et cetera.
3        Q.    Okay.  And as part of that in
4    the Settlement Agreement, you say the
5    HarbourVest entities were members in HCLOF
6    are in essence selling their shares to the
7    Debtor, and also in exchange getting some
8    claims back in the Debtor's plan.  Is that
9    a fair summary?
10             MS. WEISGERBER:  Objection to
11   form.  Compound question.
12       Q.    Let me ask it a different way.
13       A.    Can you re-ask that, please?
14       Q.    Yeah.  I'm happy to do that.
15             Why don't you describe for me
16   how you would summarize that settlement?
17       A.    Largely, as I think you just
18   described it, which was in exchange for,
19   in exchange for the, both the unsecured
20   creditors' claim, and subordinated
21   creditors' claim, that settlement value is
22   in exchange for us transferring the
23   interest in HCLOF to the Debtor, as part
24   of that overall negotiating package.
25

Page 124

Confidential - Pugatch

1           Confidential - Pugatch
2        Q.    And what would you estimate, I
3    going to have to imagine, let me rephrase
4    the question.
5              Have you guys done kind of an
6    internal best guess of what your unsecured
7    and subordinated claims would be, under
8    the plan, the value?
9              MS. WEISGERBER:  Objection.
10   Objection to form.
11       A.    Just to be clear, John, are you
12   referring to the expected recovery value
13   of our claims?
14       Q.    Yes, sir.
15             MS. WEISGERBER:  Objection to
16   form.  Can we just clarify, so you're
17   talking about what they'll recover
18   ultimately?  Is that the question,
19   John?  I'm confused myself.  I just
20   want to be sure I am following.
21             MR. KANE:  Yeah.  So I'm asking
22   Mike how much he believes, based on
23   his analysis, that HarbourVest is
24   likely to recover from the $45 million
25   allowed general unsecured claim and

Page 125

Confidential - Pugatch

1           Confidential - Pugatch
2    $35 million allowed subordinated
3    claim, if the settlement is approved
4    and the plan is confirmed.
5              MS. WEISGERBER:  Objection to
6    form.
7              But you can answer, if you have
8    an answer, Mike.
9        A.    We do have a sense.  It's really
10   a range of projected outcomes, as you can
11   imagine, based on the recoveries, largely
12   informed by conversations with the Debtor.
13       Q.    And what is that range of value?
14             MS. WEISGERBER:  Objection to
15   form.
16       A.    Our understanding, again, based
17   on those conversations, is that the
18   general unsecured claim could be valued in
19   a 75 to 80 cents on the dollar recovery.
20   And then a, you know, that the junior
21   class claim is really sort of upside
22   potential, to the extent there is more
23   recovery or more asset value of the
24   estate, for the benefit of creditors over
25   time.

Page 126

Confidential - Pugatch

1
2    Q.    What is your understanding of
3    the current value of the HarbourVest
4    shares in HCLOF that would be transferred
5    under this Agreement?
6    A.    It's roughly $22.5 million of
7    their value.
8    Q.    So doing a little bit of, you
9    know, back-of-the-table-cloth math, how do
10    you allocate value between the releases
11    that you are receiving and the shares that
12    you are transferring?
13        MR. KANE:  I'm sorry.  Let me
14    rephrase that.  Let me ask that
15    question differently.
16    Q.    In addition to the claims under
17    the plan, HarbourVest is providing the
18    Debt -- sorry, in addition to the shares
19    that are being transferred, HarbourVest is
20    providing the Debtor certain releases
21    for its litigation claims; is that
22    correct?
23        MS. WEISGERBER:  Objection to
24    form.
25    A.    Correct.

Page 127

Confidential - Pugatch

1
2    Q.    So how has HarbourVest allocated
3    value, as far as this Settlement Agreement
4    is concerned?
5        And to make sure we're on the
6    same page about what I'm asking,
7    HarbourVest is trading a bundle of sticks,
8    right?  And there's really two things
9    within that bundle of sticks, and please
10    confirm that's correct, you're trading
11    shares, and in addition, releases; is that
12    right?  In exchange you're getting back
13    claims that have a potential future value.
14        So, how have you allocated value
15    among the shares transferred and the
16    releases that are being granted?
17        MR. MORRIS:  Objection.
18        MS. WEISGERBER:  Objection.
19        You can go ahead, Mike.
20    A.    Yeah.  So ultimately we looked
21    at it as a package, and so it was less
22    about the attribution of value between the
23    two different sticks, as you described it,
24    and more about the overall package value
25    in exchange for the transfer of our

Page 128

Confidential - Pugatch

1
2    interest and the release of the claims
3    that we had outstanding as the Debtor.
4        MR. KANE:  Now, I want to turn
5    your attention to what I've included
6    in the chat.  You can pull it down
7    pretty easily if you want.  But it
8    would be Holdco Depo Exhibit 2.  If
9    that would be easier than a screen
10    share, if you'd like, I'm happy to do
11    that as well.
12        MS. WEISGERBER:  Which document
13    is it, John?  Because I just can't
14    pull stuff off the Zoom right now.
15        MR. KANE:  Oh, I'm sorry.  It's
16    the Settlement Agreement with the
17    attached exhibits.  I can share my
18    screen so we're all on the same page.
19        Just to confirm we're looking at
20    the same thing, here's the Settlement
21    Agreement.  There's a docket entry at
22    the top so you can see it, 1631 filed
23    by the Debtor 12/24/20.
24        This is Exhibit 1 to the
25    Declaration of John Morris in Support

Page 129

Confidential - Pugatch

1
2    of Debtor's Motion for an Entry
3    Approving Settlement with HarbourVest.
4    BY MR. KANE:
5    Q.    Now, this Settlement Agreement
6    is a document that you assisted in
7    negotiations; is that correct?
8    A.    Correct.
9    Q.    Okay.  And here in Section 1B,
10    this addresses the transfer of the shares
11    of the HarbourVest entities to a Debtor
12    affiliate; is that correct?
13        MS. WEISGERBER:  Objection to
14    form.
15    A.    Correct.
16    Q.    Is that your understanding,
17    Mr. Pugatch?
18    A.    Yes, correct.
19    Q.    Okay.  Thank you.  Section 4A,
20    and is this your understanding that
21    HarbourVest is representing that it has
22    the authority to enter into this agreement
23    and to transfer the shares to the Debtor's
24    affiliate if this is approved?
25        MS. WEISGERBER:  Objection to

Confidential - Pugatch

1  form.  The document speaks for itself.
2  Is that a question, John?
3  MR. KANE:  Yeah.  I asked if
4  that was his understanding, that this
5  is a representation by HarbourVest
6  that it has the authority to transfer
7  the shares if the Settlement Agreement
8  is approved.
9
10  MS. WEISGERBER:  Objection to
11  form.  Objection to the extent it
12  calls for a legal conclusion.
13  To the extent you have a
14  nonlegal conclusion, non-privileged
15  understanding, Mike, you can share
16  that.
17  A.  Yeah, I'm just saying I can only
18  answer that based on conversations with
19  counsel.
20  MR. KANE:  Okay.  I won't push
21  that.  That's fine.
22  Q.  If we keep going down here as
23  part of this attachment, there's a
24  Transfer Agreement, Exhibit A to the
25  Settlement Agreement.  Are you familiar

Confidential - Pugatch

1  with this document?
2
3  A.  Yes.  I've seen it.
4  Q.  And did you assist with the
5  preparation or negotiation of this
6  Agreement?
7  A.  Yes.
8  Q.  Okay.  Did you understand that
9  HarbourVest would need the consent of the
10  HCLOF portfolio advisor to effectuate the
11  transfer?
12  MS. WEISGERBER:  Objection to
13  form.  Objection to the extent it
14  calls for a legal conclusion.
15  Mike, if you have a view other
16  than from privileged conversation, you
17  can answer, otherwise do not answer.
18  A.  Yeah, I'm sorry.  I can only
19  answer that based on conversation with
20  counsel and the read of the document.
21  Q.  So to make sure I understand
22  that, you have no independent
23  understanding of whether or not consent
24  was required from the portfolio manager
25  before you could effectuate a transfer; is

Confidential - Pugatch

1  that correct?
2
3  MS. WEISGERBER:  Same objection.
4  I think you can give your
5  general understanding, but then not
6  get into specific conversations.
7  A.  My understanding of that is
8  based on conversations with counsel, but
9  yes, that is my understanding, John.
10  Q.  Okay.  I'm going to highlight a
11  passage here.  Can you see this
12  highlighted area?  "Whereas, the Portfolio
13  Manager desires to consent to such
14  transfers and to the admission of
15  Transferee as a shareholder..."
16  Were you aware of that
17  provision?
18  MS. WEISGERBER:  Objection to
19  form.
20  A.  Yes.  It's in the document.
21  Q.  Do you have any understanding of
22  why that provision was included in this
23  agreement?
24  MS. WEISGERBER:  Objection to
25  form.  Objection to the extent it

Confidential - Pugatch

1  calls for a privileged conversation.
2
3  A.  As I answered before, based on
4  conversations with counsel, my
5  understanding is that consent is requiring
6  in connection to transfer.
7  Q.  I'd like to turn your attention
8  now -- this is a document you've seen
9  before during your deposition.  This is
10  the member's agreement related to the
11  Company for HCLOF.  This is previously
12  produced by the Debtor, that's why it's
13  got the Bates stamp on it.  This is dated
14  November 15, 2017.
15  Are you familiar with this
16  document?
17  A.  Yes.
18  Q.  Do you see on Line 14, in the
19  between, on Page 1 shows Highland HCF
20  Advisor, Ltd. as the portfolio manager?
21  A.  Yes, I see that.
22  Q.  I know there was quite a bit
23  of -- quite a few questions about this
24  earlier, but you understand that Highland
25  HCF Advisor, Ltd. is still the HCLOF

Page 134

1      Confidential - Pugatch
2  portfolio manager?
3      MS. WEISGERBER:  Objection to
4  form.
5      A.   Honestly, I don't have -- I
6  don't have enough information to answer
7  that definitively.
8      Q.   Okay.  Going back to the
9  Settlement Agreement, there's a reference
10  in here to a defined term, "portfolio
11  manager."
12      Do you see that?
13      A.   Yep.
14      Q.   And is this the same one that's
15  listed in the Member Agreement, Highland
16  HCF Advisor, Ltd.?
17      A.   I believe that seems to be the
18  position, yes.
19      Q.   Okay.  So when we're talking
20  about down here, "Whereas, the Portfolio
21  Manager desires to consent," this consent
22  provision is referring to the same
23  definition of portfolio manager that's
24  included in this Member Agreement; is that
25  correct?

Page 135

1      Confidential - Pugatch
2      MR. MORRIS:  Objection to the
3  form.
4      MS. WEISGERBER:  Objection --
5  same objections.  Objection to the
6  extent it calls for privileged
7  information.
8      A.   That sounds like a legal
9  conclusion.
10      Q.   I would have thought it was
11  reading, Mr. Pugatch.
12      A.   Well, if you're asking me to
13  definitively confirm that, that sounds
14  like a legal interpretation.
15      Q.   Let me ask that a different way.
16      Do you understand that the
17  portfolio manager is listed as Highland
18  HCF Advisor, Ltd. in the Member Agreement?
19      A.   Yes.
20      Q.   And in this Transfer Agreement,
21  the portfolio manager is listed as
22  Highland HCF Advisor, Ltd.?
23      A.   Yes.
24      Q.   And those are the same entities?
25      A.   Yes.

Page 136

1      Confidential - Pugatch
2      Q.   All right.  Are you familiar
3  with Section 6 of this Member Agreement?
4      A.   (Nods.)
5      Q.   Have you ever read this
6  document?
7      A.   I have.
8      Q.   Okay.  And can you give me your
9  understanding of what must take place
10  under this document for HarbourVest to
11  transfer its shares?
12      MS. WEISGERBER:  Object to the
13  form.  Object to the extent it calls
14  for a legal conclusion.  Object to the
15  extent it calls for any privileged
16  information or conversations.
17      Mike, to the extent you have an
18  independent understanding, separate
19  from conversations with counsel, you
20  can answer the question.
21      A.   I would say my understanding of
22  what's required in connection with the
23  transfer is based on conversations with
24  counsel.
25      Q.   Do you believe that the

Page 137

1      Confidential - Pugatch
2  HarbourVest entities can transfer its
3  shares without obtaining the consent of
4  the portfolio manager?
5      MS. WEISGERBER:  Objection to
6  form.  Objection to the extent it
7  calls for a legal conclusion.
8      Same instruction, Mike, as to
9  privileged conversations.
10      A.   Again, my view on that would be
11  based on conversations with counsel.
12      Q.   Are you aware of whether
13  HarbourVest provided any notice to other
14  members of its intent to transfer its
15  shares to the Debtor's affiliate under the
16  Settlement Agreement, other than the
17  filing of the 9019 motion?
18      MS. WEISGERBER:  Same objection.
19  But there is a factual question in
20  there if you can answer it, Mike, but
21  no privileged conversation.
22      A.   Yeah, I'm not aware of that.
23      Q.   Did you provide members 30 days
24  after the receipt of notice of
25  HarbourVest's intent to transfer its

1       Confidential - Pugatch
2   shares to the Debtor's affiliate and
3   provide those members with an opportunity
4   to purchase their pro rata amount of the
5   shares?
6       MS. WEISGERBER:  Same objection.
7   A.   No.
8   Q.   And just to make sure I'm not
9   asking this question in a way that you
10  don't understand what I'm asking:  Do you
11  see this highlighted provision here?
12  A.   Yes.
13  Q.   I'm asking whether HarbourVest
14  provided members 30 days after the receipt
15  of a notice letter and an opportunity to
16  purchase their entire pro rata share of
17  the shares proposed to be transferred by
18  the HarbourVest entities?
19      MS. WEISGERBER:  Objection to
20  form.  Objection to the extent it
21  calls for privileged conversations or
22  a legal conclusion.  Objection to the
23  extent it's asking about one piece of
24  the document.
25      And you're welcome to look at

1       Confidential - Pugatch
2   the full document if you'd like, Mike.
3   I think it was one of the ones that
4   was E-mailed as well, or maybe you
5   were able to pull it down.
6       THE WITNESS:  Yeah, no, I was.
7   Thank you.
8   A.   And I'm sorry, John, could you
9   just repeat the question?
10  BY MR. KANE:
11  Q.   Yeah, sure, absolutely.  And I'm
12  not calling for any conversations with
13  counsel.  I'm asking you if you know
14  whether HarbourVest did something or not.
15  So let's -- let's keep it to that, because
16  I --
17      MR. KANE:  Erica, I appreciate
18  your concerns, but I really don't want
19  to have any disclosures from Mike
20  about his discussions with you on
21  whether something needed to be done or
22  not.  I'm asking simply the facts of
23  whether HarbourVest did it or not.
24  Q.   So did HarbourVest provide
25  notice, 30 days' notice, to the members

1       Confidential - Pugatch
2   listed under this Member Agreement of
3   HarbourVest's intent to transfer the
4   shares that are the subject to the
5   Settlement Agreement?
6   A.   No.
7   Q.   Has HarbourVest provided any
8   members with a right of first refusal and
9   a cash purchase price for which it would
10  sell its shares instead of transferring
11  those shares to the Debtor or the Debtor's
12  affiliate under the Settlement Agreement?
13      MS. WEISGERBER:  Same
14  objections.  Objection to form.
15  Objection to extent it calls for a
16  legal conclusion or privileged
17  conversations, including -- regarding
18  the specifics of that provision.
19  I don't think that's a purely
20  factual question.
21  Q.   Did HarbourVest offer to sell
22  the shares to the other members?  That's
23  not a factual question?
24      MS. WEISGERBER:  Objection --
25  A.   On the basis of that factual

1       Confidential - Pugatch
2   question, no.
3   Q.   So let me ask this question
4   again, I don't recall if I got an answer
5   or not.
6       Did HarbourVest affirmatively
7   seek to obtain the consent of Highland HCF
8   Advisors to transfer its shares to the
9   Debtor affiliate under the Settlement
10  Agreement?
11      MS. WEISGERBER:  Same
12  objections.  Same instruction
13  regarding the privileged conversation.
14  A.   I mean, as a Highland-affiliated
15  entity, the Debtor, who's obviously the
16  other party here involved in the transfer,
17  you know, was involved in these
18  discussions.
19  Q.   I'm sorry.  Would you mind
20  clarifying?  Did you say that Highland HCF
21  Advisors was involved in those discussions
22  or the Debtor was involved in those
23  discussions and you assume Highland HCF
24  Advisors was?
25      MS. WEISGERBER:  Objection to

Page 142

Confidential - Pugatch

1         Confidential - Pugatch
2     form.  Misstates testimony.
3         A.   Sorry, could you just repeat the
4  question, please, John?
5         Q.   Yes, Mr. Pugatch.
6            I'm actually just trying to get
7  some clarification from you, because I
8  don't think I understood your answer
9  about -- I had asked just -- again, I
10  don't want any correspondence with your
11  counsel or what your counsel advised, I'm
12  asking:  Do you know whether HarbourVest
13  sought written consent from Highland HCF
14  Advisor for its -- or to transfer its
15  shares to the Debtor or the Debtor's
16  affiliate under the Settlement Agreement?
17         MS. WEISGERBER:  Same objection.
18         A.   My understanding is HarbourVest
19  did not explicitly have those
20  conversations or seek that consent.
21         Q.   Okay.  Are you aware of whether
22  HarbourVest received any written consent
23  from Highland HCF Advisors, other than
24  what's in the Transfer Agreement attached
25  to the Settlement Agreement?

Page 143

Confidential - Pugatch

1         Confidential - Pugatch
2         A.   I am not.
3         MS. WEISGERBER:  Same objection.
4         Q.   Do you know if HarbourVest has
5  any written consent?  Not just to seek it,
6  but do you know if HarbourVest has a piece
7  of paper, other than the transfer
8  agreement, in which Highland HCF advisors
9  provided its consent to the transfer of
10  shares to the Debtor's affiliate?
11         MS. WEISGERBER:  Same
12  objections.
13         A.   I would have to speak with
14  counsel.  I am not aware of that directly,
15  no.
16         Q.   Are you aware of whether
17  HarbourVest had any correspondence with
18  HCLOF representatives about effectuating
19  the transfer of the shares to the Debtor's
20  affiliate under the Settlement Agreement?
21         MS. WEISGERBER:  Same objection.
22         You can answer.
23         A.   We have had discussions with
24  them, yes.
25         Q.   Did HCLOF representatives

Page 144

Confidential - Pugatch

1         Confidential - Pugatch
2  provide consent, whether written or
3  otherwise, to the transfer?
4         A.   I am not aware that that consent
5  has been provided as of yet.
6         Q.   Are you aware of whether any
7  HarbourVest representatives have had
8  conversations with the Debtor's
9  representatives about the necessity of
10  consent to the transfer of their shares?
11         MS. WEISGERBER:  Objection to
12  form --
13         MR. KANE:  I'll re-ask the
14  question.  I want to clarify that
15  point.
16  BY MR. KANE:
17         Q.   Mr. Pugatch, are you aware of
18  whether any HarbourVest representatives
19  had conversations with the Debtor's
20  representatives about the necessity of
21  obtaining the HCLOF portfolio manager's
22  written consent before transferring the
23  shares to the Debtor's representative or
24  affiliate under the terms of the
25  Settlement Agreement?

Page 145

Confidential - Pugatch

1         Confidential - Pugatch
2         MS. WEISGERBER:  Objection to
3  form.
4         And, John, I'm sorry to do this,
5  can you just clarify what you mean by
6  "representative"?
7         MR. KANE:  Yeah.  I mean,
8  anybody that has agency authority to
9  act on behalf of the Debtor in
10  negotiations, in the preparation of
11  the documents, in negotiation of the
12  terms of the Settlement Agreement.
13         I mean, I think that it's, you
14  know, a pretty broad term here.
15         MS. WEISGERBER:  Objection to
16  form.  Objection to the extent it
17  calls for discussions with counsel.
18         As a factual matter, if you have
19  an answer, you can give it.
20         A.   I'm aware of conversations that
21  have taken place about all of the terms of
22  the Transfer Agreement in connection with
23  the settlement, with all parties.
24         Q.   Is your understanding based
25  on those conversations that written

Page 146

1    Confidential - Pugatch
2  consent of the portfolio manager as
3  defined in the Transfer Agreement was
4  required before the shares could be
5  transferred under the Settlement
6  Agreement?
7        MS. WEISGERBER:  Objection to
8    the form.  Objection to the extent it
9    calls for a legal conclusion or
10    privileged conversation.  And I think
11    that one does, John.
12    A.    Yeah, I can only answer that
13  based on conversation with lawyers.
14    Q.    Wasn't the question whether --
15  I'm sorry.  Maybe I forgot my own
16  question.
17        But I thought it was based on
18  your conversations with the Debtor's
19  representative, was it your understanding,
20  not based on your conversation with
21  counsel.
22        MS. WEISGERBER:  Can you repeat
23    the whole question because I
24    definitely misunderstood it then too.
25    Q.    Okay.  Based on your

Page 147

1    Confidential - Pugatch
2  conversations with the Debtor's
3  representatives, was it your understanding
4  that the consent of the portfolio manager
5  was required for the shares to be
6  transferred from the HarbourVest entities
7  to the Debtor's affiliate under the terms
8  of the Settlement Agreement?
9        MS. WEISGERBER:  Okay.  Same
10    objections.  Also objection to the
11    extent there is a common interest
12    privilege.
13    A.    I don't recall having that
14  explicit conversation with representative
15  of the Debtor.
16        MR. KANE:  I'll pass the
17    witness.
18        Thank you, Mr. Pugatch.
19        MR. MORRIS:  Anybody else?
20    Thank you, all.
21        MS. WEISGERBER:  Can we --
22    before we break, could we have a
23    two-minute break and then come back
24    before we conclude.
25  BY MS. WEISGERBER:

Page 148

1    Confidential - Pugatch
2    Q.    Mr. Pugatch, during Mr. Wilson's
3  questioning, I believe his last question
4  related to identifying as between two
5  choices the primary source or the cause of
6  HarbourVest's damages.
7        In your opinion, is -- are
8  HarbourVest damages attributable to any
9  one cause?
10    A.    No, I would say there were
11  multiple root causes of the damages and
12  diminution in value that was suffered in
13  connection with the investment.
14        MS. WEISGERBER:  Okay.  I don't
15    have any further questions.
16        MR. WILSON:  I think I'd like to
17    ask a couple more.
18  BY MR. WILSON:
19    Q.    Mr. Pugatch, I think you
20  testified earlier that the investment in
21  HCLOF was comprised of multiple CLOs,
22  correct?
23    A.    Correct.
24    Q.    And some of those CLOs were
25  managed by Acis, to your understanding?

Page 149

1    Confidential - Pugatch
2        MS. WEISGERBER:  Objection.
3    A.    Correct.
4        MS. WEISGERBER:  Just to
5    clarify, John, is this within the
6    scope of the questions I asked
7    Mr. Pugatch?
8        MR. WILSON:  I believe it is.
9    I'm going to be really short.  But
10    so --
11        MS. WEISGERBER:  I would like to
12    have a standing objection to the
13    extent it's not within the scope of
14    the questions that was asked to
15    Mr. Pugatch.
16  BY MR. WILSON:
17    Q.    So some of those CLOs you
18  contend are managed by Acis?
19        MS. WEISGERBER:  Objection to
20    form.
21    A.    A majority.
22    Q.    And just generally, do you
23  contend that Highland managed the balance
24  of those CLOs?
25        MR. MORRIS:  Objection to the

Appx. 00172

Page 150

1     Confidential - Pugatch
2    form of the question.
3       MS. WEISGERBER:  Objection.
4    Same objection.
5    A.   Yes.
6    Q.   Yes.  Okay.  Thank you.
7      And I just had two more
8    questions.
9      So, if there was going to be a
10   reset, that would have to be done at the
11   CLO level, each CLO would have to be
12   reset?
13      MR. MORRIS:  Objection.
14      MS. WEISGERBER:  Objection to
15   form.
16   A.   That is correct.
17   Q.   And do you know of any specific
18   CLO that requested a reset but was not
19   granted a reset?
20      MR. MORRIS:  Objection to form.
21      MS. WEISGERBER:  Same objection.
22   And foundation.
23   A.   When you say "CLOs who requested
24   a reset," can be more clear, please?
25   Q.   We just talked about how this

Page 151

1     Confidential - Pugatch
2    investment is comprised of multiple CLOs
3    and each one of those CLOs would have to
4    be reset, according to its own terms, I
5    guess.  Do you know of any one of those
6    CLOs that requested a reset?
7      MR. MORRIS:  Objection to the
8    form of the question.
9      MS. WEISGERBER:  Same objection.
10   A.   I'm aware of Highland having in
11   its capacity as manager of the HCLOF
12   having requested or pursued resets of
13   certain of the Acis HCLOs.
14   Q.   Your understanding is that
15   Highland requested a reset of the Acis
16   CLOs?
17      MS. WEISGERBER:  Objection to
18   form.
19   A.   I'm sorry.  I'm trying to
20   understand what you said.
21      MS. WEISGERBER:  I'm really
22   wondering how this relates at all to
23   the scope of the questions I asked Mr.
24   Pugatch on follow up.
25      I think it's time to wrap this

Page 152

1     Confidential - Pugatch
2    up, John.
3      MR. WILSON:  This was my last
4    question, I just need an answer to it.
5    And I think he tried to answer, but I
6    didn't understand what he said.
7      MS. WEISGERBER:  Objection.  Can
8    you re-ask the question so we have a
9    clear question.
10      MR. WILSON:  Well, Madam Court
11   Reporter, can you read back his last
12   response?
13      (Record read.)
14   BY MR. WILSON:
15   Q.   Can you repeat what you intended
16   to answer to the last question?
17      MS. WEISGERBER:  Same objection.
18   If you recall, Mike.
19   A.   I'm sorry, John.  Can you just
20   repeat the question, please, make sure I'm
21   answering what you want me to answer.
22   Q.   My question is the same as it's
23   been:  Are you aware of any CLO that
24   requested a reset and was not granted one?
25      MS. WEISGERBER:  Objection to

Page 153

1     Confidential - Pugatch
2    form.  Objection to foundation.
3      MR. MORRIS:  Objection to the
4    form of the question.
5    A.   Again, my understanding is the
6    CLOs do not request the reset.  Highland,
7    as manager of HCLOF in its capacity as
8    majority equity owner of certain of the
9    CLOs, have requested a reset post our
10   original investment.
11   Q.   Okay.
12      MR. WILSON:  I'll pass the
13   witness.
14      MS. WEISGERBER:  I think we're
15   done.
16      THE REPORTER:  Will everyone put
17   their orders on the record, please?
18      MR. MORRIS:  John Morris for the
19   Debtor.  Expedited, please.
20      MR. WILSON:  John Wilson.  I'm
21   not sure what arrangements my office
22   has previously made, but we want an
23   expedited transcript, as well.
24      THE REPORTER:  Do you want a
25   rough too?

Appx. 00173

Page 154

1    Confidential - Pugatch

2      MR. WILSON:  Yes, please.

3      MR. MORRIS:  Yes, please.

4      MS. WEISGERBER:  Same for

5    HarbourVest, please.

6      MR. MALONEY:  I don't need an

7    expedited transcript.  I'd just be

8    happy to get one regular copy.  I'll

9    take whatever you would produce in the

10   ordinary course.  Same as what

11   everyone else ordered.

12     (Time Noted:  4:35 p.m. EDT.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 155

1

2      ACKNOWLEDGEMENT OF DEPONENT

3

4      I, MICHAEL PUGATCH, do hereby

5    acknowledge that I have read and

6    examined the foregoing testimony, and

7    the same is a true, correct and

8    complete transcription of the

9    testimony given by me, and any

10   corrections appear on the attached

11   Errata sheet signed by me.

12

13

14   _____  _____

15   (DATE)        (SIGNATURE)

16

17

18

19

20

21

22

23

24

25

Page 156

1

2    CERTIFICATE OF SHORTHAND REPORTER-NOTARY

3        PUBLIC

4      I, Amanda Gorrono, the officer

5    before whom the foregoing deposition

6    was taken, do hereby certify that the

7    foregoing transcript is a true and

8    correct record of the testimony given;

9    that said testimony was taken by me

10   stenographically and thereafter

11   reduced to typewriting under my

12   direction; and that I am neither

13   counsel for, related to, nor employed

14   by any of the parties to this case and

15   have no interest, financial or

16   otherwise, in its outcome.

17      IN WITNESS WHEREOF, I have

18   hereunto set my hand this 12th day of

19   January, 2021.

20

21   _____

22   AMANDA GORRONO, CLR

     CLR NO:  052005 - 01

23

     Notary Public in and for the State of New

24   York

     County of Suffolk

25

Page 157

1      ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg. No. Now Reads     Should Read  Reason

6    ___ ___ _____  _____  _____

7    ___ ___ _____  _____  _____

8    ___ ___ _____  _____  _____

9    ___ ___ _____  _____  _____

10   ___ ___ _____  _____  _____

11   ___ ___ _____  _____  _____

12   ___ ___ _____  _____  _____

13   ___ ___ _____  _____  _____

14   ___ ___ _____  _____  _____

15   ___ ___ _____  _____  _____

16   ___ ___ _____  _____  _____

17   ___ ___ _____  _____  _____

18   ___ ___ _____  _____  _____

19   ___ ___ _____  _____  _____

20

                    _____

21                  Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ____ DAY OF _____, 20___.

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____

**$**

**$1,570,429** 27:23

**$1.02** 112:19

**$135** 28:25 30:2

**$150** 112:23

**$22.5** 126:6

**$295,000** 93:23
94:22 95:7 104:14

**$35** 110:2 125:2

**$4,998,501** 27:20

**$44,587,820** 59:3

**$44.5** 112:14

**$45** 109:25 124:24

**$5** 108:22

**$73** 56:25

**$73,522,928** 27:14

**$8** 78:2

**(**

**(i)** 42:22

**0**

**08/15/2017** 68:7

**1**

**1** 16:4,7 19:17 31:21
59:10 61:14,15
109:23 114:22
128:24 133:19

**10** 60:11,15 83:19,20
84:3,6 97:22 99:5
103:23

**10/10/2018** 83:22

**100** 64:5,11,15

**1057** 22:23 45:12

**11** 32:2 35:9 36:12
51:19 52:22 109:4,5,
15

**11/29/2017** 79:3

**12/24/20** 128:23

**122** 61:9

**135** 28:10

**14** 33:10 133:18

**143** 14:21 16:8,11
109:9 112:21

**144** 14:22

**147** 109:9

**149** 14:23 17:3,17
109:10

**15** 27:11 33:22,24
50:13 55:17 60:11,15
64:4 69:2 112:18,23
133:14

**150** 14:24 109:10

**153** 14:25 109:10

**154** 15:3 109:10

**15th** 50:14

**1631** 109:18 128:22

**17** 50:13

**1:20** 60:22

**1B** 129:9

**1st** 55:22 91:7

**2**

**2** 16:22,23 17:2,10,24
26:12 31:21 92:4
128:8

**2004** 83:20 84:12,18
99:17

**2017** 14:23 16:13
21:18 23:14 24:3
27:11 33:22,25
50:13,14 51:20 52:21
55:17 64:5 69:2 85:4
112:18,24 133:14

**2018** 84:7 86:18
90:24 97:22 103:23
105:10,25

**2019** 59:11 90:24
91:7 107:14 114:22

**2020** 16:12 59:3
109:21 112:13

**217** 14:22

**23** 109:20

**27** 51:20 52:21

**27th** 51:19

**28** 21:3

**28th** 81:17

**2:30** 112:6

**3**

**3** 18:18,19,24 26:10
28:7 58:25

**30** 137:23 138:14
139:25

**30(b)(6)** 15:13

**3018(a)** 18:22 19:8

**31** 59:3 63:8 112:13

**35.49** 65:14

**36** 55:9

**37** 45:16 53:7

**382** 9:12

**39** 54:25

**4**

**4** 20:25 21:2 33:9
37:13,22 51:18 84:24
93:15

**4.1** 37:24

**4.2** 42:21

**4.3** 38:23 40:2 44:13,
22

**4/08/2020** 16:8 17:3

**40,000** 90:25

**410** 17:7

**47** 13:4

**49** 27:15 65:24

**49.02** 66:5

**49.98** 27:16 65:20
66:3

**49.985%** 85:5

**4A** 129:19

**5**

**5** 16:16 22:15,16,17
37:13,21,22 45:11
95:11 96:24 110:14

**50** 20:11

**6**

**6** 61:5,8 84:23 136:3

**617** 22:19

**63** 67:14

**7**

**7** 63:4,6,7 95:9 112:17

**75** 125:19

**8**

**8** 16:12 23:14 62:3
68:3,6

**80** 125:19

**82** 109:11

**9**

**9** 78:21 79:2 95:24

**9019** 11:2 15:8 98:3
109:17 122:13
137:17

**A**

**ability** 42:16 54:7,13,
17,18,20,23 95:16
96:9,20 98:10,11
105:18 119:12,20

**absolutely** 49:24
82:19 139:11

**accept** 110:17

**accordance** 59:7
103:9

**accurate** 33:14
93:24

**accusations** 81:7

**Acis** 31:22,23,24
32:4,5,12,14,24 35:2
36:11,13,24 46:10,
15,21 47:9,14,22
48:11 49:4,10,14,20
50:2,11 51:11 52:21
53:4,5 74:3 84:5
85:16 86:19,23 87:4,
13,22 88:7,11,19
89:11 90:8,17 91:2,6,
20 92:4,5,7,8,14,15,
20 93:3,18 94:12
96:5,6,7,10,11,22
97:3 101:15 104:13
105:9 107:15,23
108:3 114:6,21
115:6,20 116:23
118:16 121:6 148:25
149:18 151:13,15

**Acis'** 51:20

**Acis-branded** 35:6

**Acis-managed** 35:5

**Acis/hclof** 11:11,12

**acquiring** 63:22

**act** 40:3 145:9

**action** 40:5 56:16

**actionable** 72:16

**actions** 39:4,9,13
40:23 42:18,21 91:21
109:11 114:9

**actively** 122:16

**activities** 53:15

**actual** 113:14

**add** 58:18

**added** 111:9

**addition** 126:16,18
127:11

**additional** 27:20
28:3 57:16 58:8,16
95:13

Index: address..believes

**address** 13:3,8,9

**addressed** 70:8

**addresses** 129:10

**adequate** 56:18

**admission** 132:14

**advancing** 24:4

**advice** 40:4,10 44:2

**advised** 142:11

**advisor** 33:11,15 35:13 36:15 131:10 133:20,25 134:16 135:18,22 142:14

**advisors** 58:19 141:8,21,24 142:23 143:8

**advisory** 37:23,25 38:6,10,13,18,19,20 39:3,6,8,13,19,21 40:4,8,11,15,24 42:22,24 43:3,11,18 44:11,15,24 45:2 62:5,17,21 63:16 67:7

**affect** 54:20 74:22

**affiliate** 48:23 62:6, 15 85:2 129:12,24 137:15 138:2 140:12 141:9 142:16 143:10, 20 144:24 147:7

**affiliates** 31:2,18 32:23 62:20 79:13 85:5

**affirmatively** 141:6

**affirmed** 10:13

**afield** 89:15 94:14

**agency** 145:8

**agree** 9:15 11:16 23:9 28:11 46:19 86:8 88:17 93:3 94:20 95:19 106:13

**agreed** 9:23,24

**agreement** 9:20 12:23 21:3,9 33:8,13 37:5 44:13 63:8,11 92:6 109:20,22 111:2,7 122:12,17

123:5 126:5 127:3 128:16,21 129:5,22 130:8,24,25 131:6 132:23 133:10 134:9, 15,24 135:18,20 136:3 137:16 140:2, 5,12 141:10 142:16, 24,25 143:8,20 144:25 145:12,22 146:3,6 147:8

**agreements** 11:13 22:5

**agrees** 95:4 110:15

**ahead** 29:5 58:14 97:18 115:16 117:18 127:19

**AIF** 14:23 15:3

**aleve** 81:22

**Aliza** 9:4

**all-hands** 123:3

**allegations** 11:6 117:5

**alleged** 11:11 56:2 85:15

**alleges** 45:19

**alleging** 118:20

**alleviated** 82:2

**allocate** 126:10

**allocated** 127:2,14

**allowed** 124:25 125:2

**alluded** 79:24

**alongside** 24:19

**Amended** 96:25

**amount** 93:22 94:22 138:4

**amounts** 122:19

**analysis** 124:23

**and/or** 11:12 35:6

**annex** 16:16 17:20, 21

**answering** 48:18 88:4 102:11 117:22

152:21

**answers** 12:2

**apiece** 112:20

**apologize** 66:14

**appeared** 53:12 85:19 86:6,19

**appears** 97:6

**appointed** 36:13

**apprised** 87:21

**approached** 23:21

**approval** 40:8 44:23

**approve** 39:4 40:25

**approved** 125:3 129:24 130:9

**Approving** 109:8 129:3

**approximately** 93:22 113:7

**approximation** 59:12

**April** 16:12

**arbitration** 45:22 46:3,8,16,21 47:17, 20 48:8,13 51:16 54:10 55:13 73:23,24 76:14,20,21,25 77:7, 20 78:5,9,14 118:15

**area** 132:12

**argue** 106:11

**arrangements** 153:21

**article** 76:10 80:14, 18 81:4,7,8,23 82:5

**asserted** 86:22

**assess** 95:7

**asset** 59:2,10 125:23

**assets** 30:9 31:14 47:14,21 48:11,14,21 51:14 119:25

**assist** 131:4

**assistance** 122:22

**assisted** 129:6

**assume** 141:23

**attached** 69:12 81:11 99:19 109:18 128:17 142:24

**attachment** 69:25 76:9 81:19,21 130:23

**attendance** 42:24

**attention** 70:20 128:5 133:7

**attorneys'** 113:11

**attributable** 121:3 148:8

**attribution** 127:22

**August** 59:3 69:2 112:12

**authority** 40:10 41:18 102:5,16 129:22 130:7 145:8

**authorized** 21:16 22:2

**Authorizing** 109:10

**average** 89:7

**avoid** 54:9

**award** 45:23 46:3,8, 10,17,21,23 47:17,20 48:8,13 51:16 54:10 55:13 76:14,20,22,25 77:7,21,24,25 78:3,9, 14 118:15

**awarded** 46:8

**aware** 70:14,18 75:5, 16 76:19 80:17 94:7, 11,16,19 98:22,23 99:10 108:15,20 132:16 137:12,22 142:21 143:14,16 144:4,6,17 145:20 151:10 152:23

**B**

**back** 26:9 31:20 45:10,12 53:6 57:22 58:16,23 59:17 66:10 92:3 112:6 123:9

127:12 134:8 147:23 152:11

**back-of-the-table-cloth** 126:9

**Baker** 81:16 82:7

**balance** 149:23

**bankruptcy** 22:24 35:2 36:11 49:10,11 52:22 53:4 58:4 64:24 65:9 84:5 85:20 86:7,20,23 87:5,14,23 88:7,12, 19 89:11 90:8,17 91:2,20 96:22 114:6 115:6,20 116:24 118:16 121:6 122:13

**Base** 15:3 22:3

**based** 18:9 30:8 32:15 71:17 88:4 113:21 124:22 125:11,16 130:18 131:19 132:8 133:3 136:23 137:11 145:24 146:13,17,20, 25

**basis** 28:18 29:17 55:25 72:22 96:8 105:20 114:18 140:25

**Bates** 133:13

**bearing** 73:25

**bears** 109:17

**beg** 20:18

**begin** 34:18 108:12

**beginning** 48:2

**behalf** 8:23 11:18 14:21 15:6,19 16:13 17:18 18:13 19:25 21:17,24 22:2,5 24:15 25:11 52:13 98:6 102:11 108:6 145:9

**belief** 49:13 54:22

**believed** 43:9 104:18

**believes** 73:12 124:22

**Bellisario** 79:10,16

**benefit** 46:8,17 58:19
115:8 125:24

**bit** 117:25 121:22
126:8 133:22

**board** 37:23,25 38:6,
10,13,18,19,21 39:3,
6,8,13,20,22 40:4,8,
11,15 42:22,24 43:3,
11 44:11,15,24 45:2
62:6,21 67:7 73:24
79:20

**Board's** 40:24 43:19
44:11

**Bonds** 8:3

**book** 59:4

**borne** 23:23

**bottom** 61:14 63:20

**bound** 9:15,22

**Brad** 24:12 68:14
69:2 79:11,12

**brand** 49:20

**break** 12:19,22
59:21,22 60:7,10,11,
13,20,22 112:3
147:22,23

**briefly** 122:9

**Brigade** 34:9 96:5,10
97:4

**bring** 93:19

**broad** 145:14

**broader** 25:6

**brought** 70:20

**bullet** 45:20 47:11
48:9 53:8,10

**bundle** 127:7,9

**business** 74:22 76:5
77:18

———————

**C**

**call** 27:21 98:12

**called** 10:12 34:9
105:14

**calling** 42:5 95:17
98:17 116:7 117:16
139:12

**calls** 47:4 50:20
54:16 71:9 72:6,14
80:11 82:13,19
88:10,18 89:2 113:18
114:25 123:3 130:12
131:14 133:2 135:6
136:13,15 137:7
138:21 140:15
145:17 146:9

**capable** 48:18

**capacity** 38:20
151:11 153:7

**capital** 26:19,22
27:21 31:22,23 32:4,
5 34:6 37:3 61:23
67:13 79:4 95:13
97:4

**carbon** 79:10

**case** 9:12 85:19,20
86:6,7 87:17

**cash** 140:9

**catch** 12:7 24:20

**causing** 93:21 94:21

**central** 60:22

**cents** 125:19

**cetera** 73:14 75:21
123:3

**change** 34:18 35:3
36:22,24 49:19 50:17
51:3,10 54:24 112:19
118:12 121:7

**changed** 26:2 50:15
52:6,20 74:13 117:7,
10 120:14

**changing** 49:3

**Chapter** 32:2 35:9
36:12 52:22

**characterized** 73:19

**charge** 20:14

**charged** 113:12

**chart** 64:12 67:12

**chat** 128:6

**choices** 148:5

**circles** 106:23

**citation** 94:8,9

**claim** 11:7,9 14:19
15:9,10,16 16:8,11,
16 17:3,7,17,20,22
18:6 32:3 64:24 65:8
72:11,22,23 108:5,
17,23 109:9 110:2,3
123:21,22 124:25
125:3,18,21

**Claimant** 16:18
17:24

**claims** 15:23 19:22
82:5 90:2 109:23
110:16 123:9 124:7,
13 126:16,21 127:13
128:2

**clarification** 93:11
142:7

**clarify** 15:12 47:25
52:11 124:16 144:14
145:5 149:5

**clarifying** 141:20

**clarity** 42:21

**class** 125:21

**clear** 52:19 83:11
106:9 124:11 150:24
152:9

**CLO** 8:13,24 16:20
18:3 26:13,17 31:10,
16 38:3,10 40:21
43:6 61:17 62:11
63:17,18,23 64:5,13,
21 66:4 74:22 76:5
77:17 83:22 84:13,19
92:20,21 101:15
105:5,10 115:8 119:5
120:11 121:19 122:5
150:11,18 152:23

**CLOF** 110:7

**CLOS** 30:24 32:12,
14,15 35:5,6,7 36:9,
24 41:16 53:5 54:8,
19 74:2,4 85:16 92:5,
8,14,15 93:2,19
94:12 95:14 96:7,11,
17 98:13 101:4 103:8
104:13 105:15

107:15,23 108:3
114:2 115:7,23
116:20 118:19
119:22 120:6,7
148:21,24 149:17,24
150:23 151:2,3,6,16
153:6,9

**closing** 55:15,16,19
56:18

**coaching** 107:8

**Coleman** 8:13

**colleague** 24:18
38:15

**colleagues** 9:2
24:18,23,25

**collect** 45:24

**collecting** 47:16
48:12

**collectively** 66:9
67:5 85:10

**colloquy** 97:13

**color** 77:15

**comfortable** 113:5

**committee** 25:14,17,
18,25 26:3,7

**common** 147:11

**communications**
14:8 75:5

**company** 21:10,15
34:9,11 37:24 61:16
105:2 133:11

**comply** 51:15

**component** 116:2

**composed** 37:25

**Composition** 37:23

**Compound** 123:12

**comprised** 25:19
148:21 151:2

**conceive** 98:2

**concern** 55:11 57:16

**concerned** 86:4
127:4

**concerns** 81:22 82:3
96:3,13,20,21 139:18

**conclude** 147:24

**conclusion** 47:4
50:21,25 54:16 71:9
72:6,9,15 80:11
82:13,20 93:10
113:18 114:25
115:14 116:6 130:12,
14 131:14 135:9
136:14 137:7 138:22
140:16 146:9

**conclusions** 42:6
43:25

**conditioned** 40:6

**conditions** 54:19
85:18

**conduct** 20:19

**conducted** 29:18
43:9 57:11

**conference** 88:10,
18 89:2

**confidence** 54:6,12

**confidential** 9:18
10:1,4,9 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1

113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1

**confidentially** 9:10,
19

**confirm** 84:18
122:10 127:10
128:19 135:13

**confirmation** 114:21

**confirmed** 125:4

**confirming** 10:3

**conflict** 48:9

**confused** 124:19

**connected** 19:22

**connection** 27:8
35:2 56:20 70:14
73:12 78:2,6 95:14
133:6 136:22 145:22
148:13

**connectivity** 12:5

**consent** 39:2 40:24
42:25 131:9,23
132:13 133:5 134:21
137:3 141:7 142:13,
20,22 143:5,9 144:2,
4,10,22 146:2 147:4

**consents** 39:18
43:10

**consequences**
121:6

**consideration**
122:20

**consistent** 85:17
112:11

**consulted** 69:15

**contact** 24:12

**contained** 40:23

**contend** 82:6,16
149:18,23

**content** 76:11

**context** 25:7 30:19
96:16

**continue** 15:17
36:15 77:10

**continues** 31:25

**contrary** 40:4

**contributed** 27:20

**contributor** 117:3

**control** 66:21 98:10
101:5,8 102:2 105:16

**controlled** 47:10
62:6,15 66:19

**convened** 39:19

**conversation** 50:5,8
131:16,19 133:2
137:21 141:13
146:10,13,20 147:14

**conversations**
14:10 18:9 42:13
56:12 69:21 71:12,17
75:21 83:6,10 113:21
123:2 125:12,17
130:18 132:6,8 133:4
136:16,19,23 137:9,
11 138:21 139:12
140:17 142:20 144:8,
19 145:20,25 146:18
147:2

**copies** 79:10

**copy** 78:9 109:19

**corporate** 19:23
99:21

**correct** 13:10 15:10
18:12 19:14,20 22:8,
9 23:8 26:5 27:17,24
32:3 33:2,3,4 37:5,
18,19 39:22,23 40:11
41:20 43:11 46:4,11
51:23 52:2,3,7,8,24
53:17,24 55:6,7,17,
18 56:25 57:5,13,14,
19 58:11,15 62:21,25
63:23 64:6,25 65:9,

14,17 66:2,5,9 67:2,
7,10,15 68:19,23,24
74:23 75:2 76:14
80:3,4,15,16 83:13,
14 84:14 85:10,11,23
86:2 91:22 92:21
93:5 110:21,24 113:8
120:25 122:14,15
126:22,25 127:10
129:7,8,12,15,18
132:2 134:25 148:22,
23 149:3 150:16

**correctly** 117:22

**correspondence**
142:10 143:17

**counsel** 9:7,14,21
13:16,19,23 14:6,10
15:21 18:9 33:19
42:13 58:20 68:11
71:12,17 83:10
111:13 113:21
122:22 123:3 130:19
131:20 132:8 133:4
136:19,24 137:11
139:13 142:11
143:14 145:17
146:21

**couple** 23:25 24:10
148:17

**court** 86:24 89:19
98:3 122:14 152:10

**cover** 79:3

**Covitz** 79:9

**created** 38:7,8

**creation** 23:4 119:21

**creditors** 125:24

**creditors'** 123:21,22

**credits** 120:4

**crisis** 70:3

**crusader** 70:3

**crystal** 106:9

**cumbersome** 22:11

**current** 13:3 93:19
126:3

**cut** 89:21 109:19

---

**D**

**damaged** 50:18 51:4

**damages** 93:21
94:22 148:6,8,11

**date** 17:17 29:25
33:18,20,24 55:15,
16,20 64:3 86:17
91:13 97:20

**dated** 84:6 133:13

**Daugherty** 70:3

**day** 78:13 100:22

**day-to-day** 119:24

**days** 137:23 138:14

**days'** 139:25

**Debevoise** 8:10 9:3

**Debt** 126:18

**Debtor** 8:8 11:6,12
59:16 108:9 110:8
123:2,8,24 125:12
126:20 128:3,23
129:11 133:12
140:11 141:9,15,22
142:15 145:9 147:15
153:19

**Debtor's** 16:19 18:2
22:18,25 100:20,21
109:17 110:21
111:13 123:9 129:2,
23 137:15 138:2
140:11 142:15
143:10,19 144:8,19,
23 146:18 147:2,7

**Debtor's** 109:7

**December** 109:20

**decision** 25:10,13
26:7 41:9 51:15
79:22 101:18 103:10
118:12 120:8

**decision-making**
45:3

**decisionmaking**
26:5 66:23

**decisions** 102:3,4
116:19 118:22

119:24 121:4

**declaration** 18:20
19:3,6,14 26:11 28:4
58:24 109:6,16
112:12 128:25

**deemed** 62:14

**defer** 15:20

**define** 87:16

**defined** 85:8 134:10
146:3

**defines** 61:22

**definition** 134:23

**definitive** 107:18

**definitively** 83:9
134:7 135:13

**delay** 56:17

**delayed** 55:15,20

**delegated** 102:5

**depend** 31:13 92:20

**depending** 31:9

**Depo** 128:8

**deponent** 100:6

**deposition** 9:15,22
10:3 11:21 12:18
13:15,22 16:4 20:20
26:15 74:10 99:11,20
100:2,12 133:9

**describe** 123:16

**describing** 56:13

**designated** 10:25
14:3 100:5

**designates** 10:5

**desires** 132:13
134:21

**destruction** 118:17

**details** 46:14 48:21

**determination** 40:6

**determined** 58:10

**dictate** 95:17

**difference** 30:16
49:11 118:4

Index: differently..fact

**differently** 126:15

**diligence** 28:19 29:7,10,12,18,21 53:14 56:19,21 57:12 58:8 70:14,19 77:11

**diminution** 51:13 121:3 148:12

**direct** 65:5

**direction** 35:8

**directly** 18:13 90:2 123:2 143:14

**director** 19:18 20:3, 5,7,14 21:20,23 93:17 104:12

**directors** 20:12 25:19,22 62:13

**disagree** 64:17 67:20

**disclosed** 78:4

**disclosures** 139:19

**discretion** 41:8

**discuss** 10:25

**discussed** 14:5 65:12 95:15 104:4 111:21

**discussions** 23:16, 19,24 24:5,7,16 68:17,22 69:7,9 71:19,25 111:23 139:20 141:18,21,23 143:23 145:17

**dispute** 53:11 73:21 74:20 90:23

**disregard** 40:10

**distinguish** 32:13, 21 92:18

**distinguishing** 36:5

**diversified** 31:15

**dividends** 27:22 28:3

**docket** 22:23 45:11 128:21

**document** 9:11 16:10,17,23 19:10

23:4,7,11 35:22,24 36:3 37:8 40:13 44:4, 7 45:11,14 51:18 61:22 62:3,25 63:15 64:4 67:17,18,20 68:10 71:18 72:2,10 73:5 76:2,7 84:3,9 86:12,13,14,18 95:2, 10 99:14,20 109:18 128:12 129:6 130:2 131:2,20 132:20 133:8,16 136:6,10 138:24 139:2

**documentation** 77:9 111:14

**documents** 9:8,17 27:2,5,7,10 44:5 49:9 66:11 75:24 89:10 90:7,11,15,16,25 100:8 103:3 145:11

**dollar** 122:19 125:19

**Dondero** 8:5 81:14

**Doug** 74:15

**Douglas** 8:15 74:12

**Dover** 14:24 21:18 37:14,15,16 38:5,13 65:12

**drafting** 111:6,9,14

**Draper** 8:15,16 74:12,13

**drive** 119:21

**DSD** 74:9

**due** 28:18 29:7,9,12, 18,20 50:24 56:21 57:12 58:8 62:15 70:19 77:10 113:24 116:3

**Dugaboy** 8:16

**duly** 10:13

**duration** 39:15

**Dustin** 25:2 68:21 69:2,11 79:9,15

---

**E**

**E-MAIL** 16:5,22 18:25 20:25 61:5

63:5 68:2,6,12,14,25 70:2,8 73:6 76:8,11 78:21 79:3,8,25 80:6, 15 81:11,22

**E-MAILED** 139:4

**E-MAILING** 22:15 44:5

**E-MAILS** 75:4,14 81:3

**earlier** 65:12 66:11 75:25 79:21 91:11 92:18 112:10 117:25 133:24 148:20

**easier** 12:10 128:9

**easily** 128:7

**Eden** 24:12 68:15 69:2 79:11,12

**editor-in-chief** 81:15

**effective** 91:7

**effectuate** 131:10,25

**effectuating** 143:18

**efficiently** 20:22

**Ellington** 95:12 98:16

**Ellis** 8:3

**Emily** 9:3

**employee** 73:22 74:21 78:6

**employees** 24:14

**employment** 73:21

**encourage** 87:12

**encouraged** 87:3

**engaged** 23:15,19 24:7

**engaging** 24:16

**ensure** 12:12,15 45:23 56:18,21

**entail** 44:17

**enter** 41:9,19 129:22

**entered** 9:11 11:14 27:7,10 103:4

**entire** 35:14 39:19,21 138:16

**entities** 15:6,20 18:6 21:14,17 22:6 34:4 36:22 64:23 65:5,7, 20 66:9 67:12 85:10 120:11 123:6 129:11 135:24 137:2 138:18 147:6

**entity** 19:23 20:4,6 35:19 49:12 141:15

**entry** 109:8 128:21 129:2

**Eppich** 8:3

**equity** 30:23 31:16 41:15 85:7 92:15 98:12 115:8,22 119:22 120:7 153:8

**Erica** 8:9 139:17

**erosion** 113:24 120:9

**essence** 123:7

**establish** 37:24

**estate** 125:24

**estimate** 89:2 124:2

**estimated** 29:25

**event** 18:10 107:21

**events** 87:22 115:5 118:14

**evidence** 72:2 89:10 90:7

**evolved** 26:2

**exact** 59:11 99:9

**Examination** 10:16 83:21 84:13,19 99:18 122:2

**examined** 10:14

**exceed** 28:10 30:2

**exchange** 123:8,19, 20,23 127:12,25

**exchanged** 122:20

**exclusive** 41:18

**executed** 109:20

**exhibit** 16:3,7,22,23 17:2,10 18:18,19,24 20:23,24 21:2 22:15, 16,17 26:10 31:21 33:9 37:13 45:11 58:25 61:5,8 63:3,4, 6,7 68:2,3,6 78:21 79:2,8 83:18,19,20 84:3 99:5 109:4,5,15, 19 112:17 128:8,24 130:24

**exhibits** 128:17

**existence** 76:19 77:24

**existing** 63:19

**expectation** 28:14

**expectations** 103:10

**expected** 28:8 124:12

**expedited** 153:19,23

**expert** 116:7

**explanation** 70:15 81:9 82:4

**explicit** 147:14

**explicitly** 142:19

**expressed** 54:6,12, 21 55:11

**expressing** 53:23

**expressly** 40:6

**extent** 42:5 44:14 47:3 50:20 54:15 71:8,10 72:5 80:10 88:2 97:14,24 113:17,19 114:24 125:22 130:11,13 131:13 132:25 135:6 136:13,15,17 137:6 138:20,23 140:15 145:16 146:8 147:11 149:13

**external** 58:19

---

**F**

**fact** 19:13 88:9

**facts** 13:18 54:4 55:10,24 56:4 58:5,6 139:22

**factual** 11:6 137:19 140:20,23,25 145:18

**fair** 32:24 59:6 121:7 123:10

**familiar** 34:8 69:3 130:25 133:15 136:2

**feature** 111:22

**February** 59:10 91:7 114:22

**feel** 12:18

**feelings** 102:8

**fees** 113:11

**figure** 72:25

**figures** 28:16

**filed** 14:19 16:8,11,13 17:3,17,18 18:5 22:23 23:7 32:2 36:12 49:9 58:3 64:23 65:8 66:11 84:4 89:10 90:8 97:21 100:3 112:12 128:22

**filing** 137:17

**final** 25:10

**financial** 70:2

**fine** 10:7 59:23 60:17,20 130:21

**finished** 12:13,15

**firm** 8:3 25:20

**follow** 151:24

**follow-up** 69:14,15,20

**force** 105:19

**forgot** 146:15

**form** 17:7 28:18 29:4,15 30:4 31:7 32:9,18 33:18 34:14,21 35:17 36:3,18 37:7 39:11 40:13 41:12,22 42:4 43:13,22 44:19 45:6 46:6,13,25 47:3,24

48:17 49:17 50:20 52:10 53:2,19 54:2,15 56:8,10 57:8,21 58:13 61:20 62:23 64:2,8,20 65:3,16,23 66:7 67:4,9,17,22 69:19 70:11,24 71:8 72:5 74:25 75:9 76:16 77:4,13,23 78:11,17 80:10 81:6,25 82:11 85:25 86:10 87:2,7,11,25 88:14 89:5,13 90:10,19 91:4,16,24 92:11,13,22,24 93:7,8 94:2,4,25 95:22 96:15 97:24 98:21 99:7,14 100:15,24 101:11,24 103:15 104:19 105:12 106:3 107:17,25 108:19 109:2 110:12,23 111:4,11,19 113:2,17 114:14,24 115:13 116:6 117:14 119:2,18 120:18 121:9 123:12 124:10,16 125:6,15 126:24 129:14 130:2,11 131:13 132:19,25 134:4 135:3 136:13 137:6 138:20 140:14 142:2 144:12 145:3,16 146:8 149:20 150:2,15,20 151:8,18 153:2,4

**forma** 56:15

**formally** 38:20

**formed** 29:17

**forming** 55:25

**found** 12:9

**foundation** 41:12 46:6 48:17 53:2 64:8 70:11 91:4,24 93:9 94:2,4,25 96:15 104:20 107:25 108:19 113:2 115:13 116:6 150:22 153:2

**four-man** 26:6

**four-member** 25:18 79:20

**frequently** 89:8

**front** 44:7

**full** 10:22 44:7 52:4 55:23 62:4 105:16 139:2

**fully** 66:18

**function** 43:19

**fund** 14:22 16:14 63:18 111:7 117:12

**Funding** 8:24 16:20 18:3 61:17 63:17 83:22 84:14,20

**funds** 17:25 19:25 26:13,17 85:7 119:13

**future** 127:13

**G**

**general** 43:19 73:9,17 75:12 101:2 109:25 110:10 121:10 124:25 125:18 132:5

**generally** 73:10 149:22

**Gerard** 81:16 82:7

**gist** 74:18 110:19

**give** 72:19 102:25 106:5 115:2 132:4 136:8 145:19

**giving** 12:2 106:19 107:8

**Global** 14:22,23 16:14 21:19

**go-ahead** 121:25

**go-forward** 105:19

**good** 8:17 13:2 60:18

**Goren** 9:4

**governance** 66:21

**GP** 31:23 32:5

**granted** 127:16 150:19 152:24

**ground** 12:24

**grounds** 13:21

**Group** 37:17

**guess** 16:24 59:5 62:3 70:4 86:3 114:17 117:23,25 120:2,22 124:6 151:5

**guided** 103:7

**guidelines** 103:2,6 105:14

**guys** 61:2 124:5

**H**

**half** 63:21

**happen** 59:9

**happenings** 105:5

**happy** 12:8 123:15 128:10

**Harbour** 87:20

**Harbourvest** 8:11 9:4 10:5,25 11:3,13,14,18 14:18,21,22,23,24,25 15:3,15 16:13 17:18 18:5,10,21 19:4,7,18,21 20:2,12,15 21:14,18,21,24 22:2,5,6,18,25 23:15,18,22 24:8,15 25:3,4,8,11,15 26:12 27:13,19 28:2,8 30:21 31:4 37:14,17 41:24 42:16 43:7 45:18,21 47:13 49:2,13,21 51:4 52:4,12,16 53:11,13,24 54:4 55:4,5,11,23 56:24 57:3,9,11,15 58:5 63:22 64:23 65:4,19 66:8,12,20,24 67:6,12 68:22 69:7 70:6 71:24 73:11 75:7,18 76:13 78:8 79:18 80:3,8 82:8 85:9 86:19 87:4,13,21 88:3 89:16 90:3,6,17 91:2 92:9 95:16 97:10 98:8 105:18 108:6,17,22 109:9,24 110:5,15,16,17,20 111:16 117:6 118:20 123:6 124:23 126:3,17,19 127:2,7 129:3,11,21

130:6 131:9 136:10 137:2,13 138:13,18 139:14,23,24 140:7,21 141:6 142:12,18,22 143:4,6,17 144:7,18 147:6 148:8

**Harbourvest's** 11:7,8 36:19 49:22 50:9,16 52:2 71:20 72:21,23 83:12 97:19,25 101:8 117:11 120:23 137:25 140:3 148:6

**Harbourvest-prepared** 86:14 95:2

**Hayley** 8:7

**HCF** 33:11,15 35:13 36:15 51:22 133:19,25 134:16 135:18,22 141:7,20,23 142:13,23 143:8

**HCLF** 63:16

**HCLO** 101:19

**HCLOF** 18:7,11 20:16 22:7 24:2 26:14,16,25 27:15,17 28:9 30:10,22,23 31:5,15,25 32:7,12,20 33:2,4 34:5,7 35:19 36:6,10,14,21 25 41:15 42:19 49:4 50:12 51:14,21 52:6,20 54:7,9,13 55:4,14 59:2,8,10 64:6 65:6 66:18,23 76:18 77:16 85:14 91:13,22 92:14 93:5,17,22 96:17 98:9,18 102:2 103:3,6 104:12 105:6 112:13 113:12 115:9,19 116:22 118:4 119:6,15,20 120:8,15 123:6,24 126:4 131:10 133:11,25 143:18,25 144:21 148:21 151:11 153:7

**HCLOF's** 54:18,22

**HCLOF/ALF** 84:25

**HCLOS** 151:13

**hear** 43:15 60:3

Index: heavier..Kane

**heavier** 121:22

**held** 30:9,23 32:12 33:4 64:5 110:16

**Heller** 8:16

**Highland** 8:23 16:20 18:2 22:24 23:16,20, 21 24:7,14 26:13,17, 19,22 28:18,24 29:11,17 30:22 31:2, 18 32:14,23 33:11,14 34:5 35:13 36:15,20 37:2,3 41:14,17 42:18 45:19,20,21 46:3,16,20,22 47:12, 19,21 48:6,7,23,25 49:10,13 50:3,7 51:12,22 53:10,17, 19,23 54:3,6,8,12 56:16 57:23 58:17 61:17,23 62:7,15,17, 21 63:16,17 66:19 67:13 68:18 69:21 70:5,16,20 71:21,22 72:11 73:18 74:3,6, 19 75:7,17 77:5,9 79:4,13 80:7,21,23 81:4 83:21 84:13,19 85:3 87:3,12,21 88:10,19 89:9 90:6, 12,16,24 92:21 93:6 98:14 102:5 105:16 114:5 115:18 117:6 120:14 133:19,24 134:15 135:17,22 141:7,20,23 142:13, 23 143:8 149:23 151:10,15 153:6

**Highland's** 47:10 51:15 55:3 77:17 103:9

**Highland-affiliated** 141:14

**Highlands'** 93:13

**highlight** 132:10

**highlighted** 132:12 138:11

**hinted** 117:24

**Holdco** 8:14 38:3,10 43:6 62:11 63:18,23 64:5,13,22 66:5 121:19 122:5 128:8

**holders** 115:9,22

**home** 13:9

**Honestly** 134:5

**Horn** 8:16

**hour** 59:20

**hundreds** 57:9

**Hunter** 79:9

**Hush** 9:4

**HV** 15:2 21:25

**hypothetical** 117:16

---

**I**

**idea** 49:19,20

**identification** 16:9 17:4 18:23 21:4 22:20 61:10 63:9 68:8 79:5 83:23 109:12

**identify** 35:25 74:10

**identifying** 148:4

**ii** 42:25

**imagine** 124:3 125:11

**immediately** 64:14

**impact** 53:14 73:25 76:4 77:16 119:12 120:6

**impediments** 96:9

**implications** 55:14 101:16

**important** 111:16

**improperly** 117:7

**inability** 93:20 94:21 96:21 113:24 115:6, 11,22 116:25 118:18 120:10

**inception** 117:10

**include** 76:2

**included** 26:3 28:20 128:5 132:22 134:24

**including** 11:9 74:3

103:7 115:6,9 140:17

**independent** 131:22 136:18

**independently** 70:18 80:23

**individual** 120:6

**individuals** 24:6 38:2 39:22

**industry** 49:5

**inform** 47:12 48:25

**information** 55:12 56:3,6,13 57:16,17 58:6,9,16 59:15 70:5 73:15 78:3 95:6 96:2 102:19 106:8,20 134:6 135:7 136:16

**informed** 45:21 77:5 88:6 105:6 107:21 125:12

**infringe** 71:11

**initial** 31:11 55:19

**initially** 27:14 35:13 118:11

**initials** 74:9

**initiated** 52:22

**injunction** 91:19 114:8 115:21

**inquire** 13:24

**insistence** 49:23

**instruction** 137:8 141:12

**intended** 152:15

**intent** 56:14 137:14, 25 140:3

**intention** 45:22 48:7

**interaction** 36:19

**interest** 27:15,17 67:14 93:20 123:24 128:2 147:11

**interests** 110:7

**internal** 124:6

**International** 15:2 21:25

**interpretation** 71:15 135:14

**interrupt** 74:8

**invest** 18:11

**invested** 21:15 27:14 55:4 61:17

**investigate** 72:21

**investing** 56:24

**investment** 8:17 11:10,15 13:18 14:25 17:24 20:15 22:7 23:17,22,25 25:6,8, 12,14,16 26:25 27:4, 8 28:9,13,21,22,24 29:7,19 30:2,9,10,13, 17,20,21,22 31:4 33:2 34:2,6,12,16,19, 23 35:12,15 36:20 37:15 38:16 39:16 40:20 42:10 50:9 52:2,7 53:15 57:10, 19 58:11 63:23 65:5 66:19,22 71:20 76:17 77:11 79:21,24 80:3 83:13 92:9,16 96:18 101:2,18 102:6 103:2,6 105:2,14 110:7 112:22 113:14 114:3,9,10 117:11 119:19 120:7 121:4 148:13,20 151:2 153:10

**investment's** 55:15

**investments** 32:20 33:4 57:4,12 65:19 116:3

**investor** 24:11 26:13 37:17 55:6 64:10 66:13,16,18 83:21 84:13,19 85:6,8,9,18 86:5 95:15 96:2,12 98:9,17 99:18,22 101:5 104:25 105:18

**Investor's** 97:7 100:12,21

**investors** 18:7 65:13 67:2

**involved** 26:4 68:17, 21 69:6 114:5 141:16,17,21,22

**involvement** 44:12

**isolation** 97:17

**issue** 32:10

**issued** 43:10 83:12

**issues** 12:5

**items** 44:21,23,25 57:16

**IX** 14:24 37:14,15,16 38:5,13 65:13

---

**J**

**James** 81:13

**Jim** 8:4 108:10,15,21 111:15,24

**John** 8:2,6,12 44:4 48:2 59:20 74:7 82:20 84:16 89:15 106:11 107:11 109:6, 16 114:16 116:11 117:21 121:18 122:4 124:11,19 128:13,25 130:3 132:9 139:8 142:4 145:4 146:11 149:5 152:2,19 153:18,20

**Join** 41:4,13,23 91:25 113:3

**joined** 8:25 74:9

**Joint** 97:2

**jointly** 38:15

**Jones** 8:4,8

**Josh** 51:12

**Journal** 76:10 80:14, 18 81:16

**judgment** 45:25 77:25

**jump** 121:19

**junior** 25:3 79:23 125:20

---

**K**

**Kane** 8:12 121:18,19 122:3,4 124:21

126:13 128:4,15
129:4 130:4,20
139:10,17 144:13,16
145:7 147:16

**kind** 114:18 117:24
122:21 124:5

**King** 8:23

**knowledge** 52:5
55:24 70:9 88:5
107:22 108:24

---

**L**

**L.P.** 14:22,24,25 15:3
16:14 17:19 18:5,11
20:2 26:20,23 31:24
32:6 37:15 47:15,22
48:12 61:24 67:13

**Labovitz** 9:3

**laid** 103:5

**large** 85:6,13

**largely** 17:21 114:3
123:18 125:11

**larger** 24:13 66:3

**largest** 37:16 64:10
65:11,13 66:4,24
117:3

**late** 105:10

**Latham** 8:20

**lawsuit** 76:4

**lawyers** 75:21 83:6
146:13

**lay** 115:2 117:17

**layman's** 47:6

**lays** 55:25

**lead** 111:13 122:11

**leading** 115:5

**led** 51:12 113:15
118:17,23

**legal** 15:21 42:6
43:24,25 47:4 50:21,
25 54:16 56:22
69:12,22 71:9 72:6,9,
15 80:11 82:13,20
93:9 113:18 114:25

115:13 116:6 130:12
131:14 135:8,14
136:14 137:7 138:22
140:16 146:9

**letter** 79:3 81:13
82:7,17,25 83:9,11
138:15

**level** 34:5 36:6,25
116:22 119:6 120:8,
15 150:11

**levels** 119:7

**lieu** 42:25

**light** 49:15

**likewise** 12:14 122:8

**limitation** 11:10

**limited** 8:14,24 16:18
17:25 40:14

**list** 39:14

**listed** 33:11 35:21
37:2,4 44:21 134:15
135:17,21 140:2

**listening** 107:10

**lists** 39:5

**litigation** 51:11
53:12 70:13 73:13,
19,25 77:6 78:7
114:4 126:21

**LLC** 19:19,22 20:12
21:21,24 31:23 32:5

**LLP** 8:20 37:4

**located** 13:6

**Logan** 8:13

**long** 45:14

**looked** 17:22 127:20

**losing** 104:14 114:11

**loss** 113:13 116:2
117:3 118:4

**losses** 85:15

**lot** 20:20 113:23

**LP** 8:4 15:4 92:4

**lumped** 15:9

**M**

**machines** 74:13

**Madam** 152:10

**made** 10:10 11:12
22:6 25:10,14 26:7
35:13 45:19 52:23
57:3,9 71:6,22 72:11
73:12 79:21 80:7
82:5 90:3 92:9 117:6
118:3,21 153:22

**maintain** 9:19

**majority** 120:9
149:21 153:8

**make** 25:11 41:9
85:17 99:15 117:21
127:5 131:21 138:8
152:20

**makes** 119:24

**making** 28:3,21
76:17 77:11 102:3

**Maloney** 8:22 41:4,
13,23 91:25 92:10,22
93:8 94:3 104:19
113:3 114:12

**managed** 16:19 18:2
19:25 26:19,22 74:3
148:25 149:18,23

**management** 26:19,
23 31:22,23 32:5,6
36:23 37:4 51:21
53:5 61:23 66:23
67:13 79:4 92:6 97:5
98:11 116:19 119:8

**manager** 26:25 27:4
30:12,13,14,17,18,
20,23 31:4,12,24
32:7,11,21 33:12,16,
25 34:6 35:4,14,25
36:6,7,14,16,21,25
40:3,9 41:15 42:19
45:4 49:4,19 50:12,
14,18 51:3,10 52:5,
20,24 54:24 63:17
66:20 85:6 92:19
93:2 96:7 101:19
102:2,6 117:7,9
118:3,13,21 119:4,5,
10,12,19,20,23

120:5,14 121:5,7
131:24 132:13
133:20 134:2,11,21,
23 135:17,21 137:4
146:2 147:4 151:11
153:7

**manager's** 144:21

**managers** 30:25
31:9,17 34:18 35:21

**manages** 17:24
38:16 92:5

**managing** 19:18,24
20:3,5,7,11,13 21:20,
23 25:19,21 32:15,25
93:4 104:24 105:3

**Mark** 8:22 94:3

**marked** 10:4,9 16:9
17:4 18:22 21:3
22:20 26:10 58:24
61:9 63:9 68:7 79:5
83:23 109:11

**market** 54:19 59:6
85:18 93:20

**Massachusetts**
13:5

**material** 51:12 55:10
58:5 71:5,23 72:3
82:9,18

**math** 65:25 113:6
126:9

**matter** 9:7 14:20
44:16,20 70:3 145:18

**matters** 11:2,17
14:4,5 70:6,7,13

**Mclaughlin** 8:19,20

**meaning** 52:16
66:17

**meant** 53:20

**medium** 99:9

**meet** 39:8

**meeting** 39:18 43:2,
8

**member** 19:24 21:2
25:3 37:3,4,5 62:5
79:17,23 134:15,24
135:18 136:3 140:2

**member's** 133:10

**members** 21:9 24:10
25:24,25 33:7,12
42:23 43:2,5 123:6
137:14,23 138:3,14
139:25 140:8,22

**memorandum**
33:21 40:7 61:9,13
85:3

**memory** 89:6

**mentioned** 68:15

**met** 38:19

**Michael** 10:23 18:20
19:6 79:9

**middle** 55:10

**Mike** 29:5 42:7,13
43:23 44:3 47:5
48:19 50:22 51:8
52:17 58:14 59:25
60:5,6,18 71:10 73:9
75:19 82:12 83:4
86:11 98:5 99:15
102:23 113:5,19
115:3,16 116:9
117:19 122:6 124:22
125:8 127:19 130:15
131:15 136:17 137:8,
20 139:2,19 152:18

**Mike's** 97:15

**million** 28:10,25 30:2
56:25 78:2 108:22
109:25 110:2 112:14,
21,23 124:24 125:2
126:6

**millions** 85:15

**mind** 141:19

**minor** 74:20

**minority** 26:13 66:17
98:9 101:5

**minute** 59:18

**minutes** 60:11,16

**mismanagement**
116:4,15,21 118:23

**misrepresentation**
72:24 73:4 82:9

**misrepresentations**

45:18 55:3 56:2
57:23 71:6,23 72:3,
10,14,16,17 73:2,11
75:6,17 76:3 80:7
82:17,19,22 116:22

**misrepresented**
82:24

**misstates** 29:4
40:13 47:24 56:10
57:21 58:13 92:24
105:12 121:9 142:2

**misunderstood**
146:24

**month** 89:7

**morning** 68:10 84:4

**Morris** 8:6 46:24 56:7
74:7,14 106:2,7
109:6,16 117:13
119:14 121:14
127:17 128:25 135:2
147:19 149:25
150:13,20 151:7
153:3,18

**motion** 11:2 15:8
18:21 19:7 84:12,18
87:18 89:18 98:3
99:4,12,16,17,19
100:2 104:5 109:7,17
122:13 129:2 137:17

**mouse** 38:23

**mouth** 74:18

**move** 15:25 103:17

**muddled** 48:3

**multiple** 31:16
148:11,21 151:2

_____

**N**

**named** 26:24

**names** 34:4

**Natasha** 9:3

**nature** 57:4

**necessarily** 120:21

**necessity** 144:9,20

**needed** 22:11 139:21

**Needham** 13:4

**negotiate** 122:16

**negotiated** 108:4,8

**negotiating** 123:25

**negotiation** 131:5
145:11

**negotiations** 11:5
13:19 108:11 111:23
122:11,24 129:7
145:10

**net** 59:2,9

**nice** 122:6

**Nick** 79:10,16

**Nods** 21:11 71:2
90:22 136:4

**nominee** 110:8

**non-discretionary**
62:16

**non-privileged** 51:7
72:18 115:15 130:14

**Nonetheless** 98:5

**nonlegal** 113:20
130:14

**nonresponsive**
57:25 105:22

**Nos** 109:9

**Notary** 10:13

**notice** 137:13,24
138:15 139:25

**notwithstanding**
54:8,23

**November** 27:10
33:22,24 50:13
55:17,22 64:4 81:16
85:4 108:13 112:18,
23 133:14

**number** 9:12 16:11
18:18 29:10,12,16
39:5 59:11 95:8
112:20 113:25
122:25

**numbered** 14:21

**numerous** 104:23

_____

**O**

**oath** 11:24

**object** 13:21 15:12
42:4,17 57:25 94:4
97:13,14 105:19
136:12,13,14

**objected** 41:24
97:10

**objection** 11:9 22:19
23:2 29:3,14 30:3
31:6 32:8,17 33:17
34:13,20 35:10,16
36:2,17 37:6 39:10,
11 40:12 41:3,11,21
43:12,21 44:18 45:5
46:5,12,24 47:2,3,23
48:5,6,16 49:16
50:19,20 51:5 52:9,
14,25 53:18,25
54:14,15 56:7,9 57:7,
20 58:12 61:19 62:22
63:25 64:7,19 65:2,
15,22 66:6 67:3,8,16,
21 69:18 70:10,23
71:7,8 72:4,5 74:24
75:8 76:15 77:3,12,
22 78:10,16 80:9,10
81:5,24 82:10 83:15
85:24 86:9,25 87:6,
10,24 88:2,13,21
89:4,12 90:9,18 91:3,
15,23 92:10,12,22,23
93:7,8,25 94:13,24
95:21 96:14 97:23,24
98:20 99:6,13
100:14,23 101:10,23
102:10,21 103:14
104:3,7,19 105:11,21
106:2 107:16,24
108:18,25 110:11,22
111:3,10,18 112:25
113:16,17 114:12,13,
23,24 116:5,17
117:13,15 118:25
119:14,17 120:17
121:8 123:11 124:9,
10,15 125:5,14
126:23 127:17,18
129:13,25 130:10,11
131:12,13 132:3,18,
24,25 134:3 135:2,4,
5 137:5,6,18 138:6,

19,20,22 140:14,15,
24 141:25 142:17
143:3,21 144:11
145:2,15,16 146:7,8
147:10 149:2,12,19,
25 150:3,4,13,14,20,
21 151:7,9,17 152:7,
17,25 153:2,3

**objections** 72:13
73:8 83:3 104:8,22
106:18 115:13 118:7
135:5 140:14 141:12
143:12 147:10

**obligation** 46:23

**obtain** 141:7

**obtaining** 137:3
144:21

**occur** 50:8

**occurred** 87:22 89:2
94:17 114:20

**October** 51:19,20
52:21 84:6 86:18
97:22 103:23 105:25
107:14

**offer** 140:21

**offered** 108:21

**offering** 40:7 61:8,13
85:3

**office** 153:21

**official** 17:6,7

**omissions** 55:4

**Omnibus** 22:19 23:2

**one's** 17:18

**ongoing** 66:22
73:19,25 77:6,17
114:4

**operations** 29:13

**opinion** 53:16,19,24
54:11 71:4 80:5
101:20,21 102:20
103:19 105:9,24
106:15,16,24 107:14,
19,21 113:20 114:10
115:2 116:2,7 117:8,
17 148:7

**opportunities** 23:25

**opportunity** 23:6,23
24:2 25:9 29:8,19
103:7 138:3,15

**opposed** 39:18

**order** 9:10,11,16,23
10:10 79:7 99:23
109:8

**orders** 153:17

**Ordinary** 63:12

**organization** 27:2,4

**original** 28:9,12 29:7
30:8 96:18 101:2
105:13 114:3 153:10

**originally** 24:9 28:17
29:16 115:18 118:12

**originated** 29:11,12

**outcome** 76:20 77:6,
7,15

**outcomes** 125:10

**outstanding** 70:12
128:3

**owned** 36:10 67:6
85:5 92:14

**owner** 153:8

**ownership** 85:14

**owns** 41:15

_____

**P**

**Pachulski** 8:7

**package** 123:25
127:21,24

**pages** 16:8 17:3 21:3
22:19 61:3 63:9
90:25 109:11

**paper** 143:7

**papers** 113:10

**paragraph** 17:23
19:17 23:14 26:12
28:7 31:21 37:21,22,
24 38:23 39:2 40:2
45:16 51:19 53:7
54:25 55:9 58:25
62:4 64:13 84:23
92:4 93:15 95:9,23

96:24 109:23 110:5, 14,19

**Parker** 79:11,12

**part** 24:21 26:6 28:20 29:6,9 36:14 45:2 54:9 56:17 75:24 76:3 77:8 86:4 96:18 110:4 111:6 113:13 114:2 122:12 123:4, 24 130:23

**partially** 36:10

**participants** 9:14,21

**participate** 23:3 87:4,13,15

**participated** 88:18 118:22 122:11

**parties** 145:23

**partner** 16:18

**partners** 14:23 17:19,25 18:5,11 19:18,21 20:2,12 21:21,24

**party** 11:15 98:17 110:15,17 141:16

**pass** 147:16 153:12

**passage** 132:11

**passive** 26:12 66:13, 15 98:8 101:5

**past** 57:13

**path** 89:25

**patience** 20:19

**pay** 46:23

**paying** 45:22 48:8

**pending** 54:10

**penultimately** 28:20

**people** 12:11

**percent** 27:15,17 64:5,11,15 65:14,20, 24 66:3,5 67:14

**percentage** 64:15 65:14,25 66:25 85:14

**Perfect** 60:24

**performance** 119:13

**performed** 58:8 97:3

**performing** 29:20

**period** 40:20 114:7

**person** 11:17 21:16 22:2

**personal** 101:21 102:8 103:19 105:23

**perspective** 15:21 81:10

**piece** 107:5 138:23 143:6

**place** 35:3,23 91:20 118:14 136:9 145:21

**placing** 64:14

**plan** 91:6 96:5 97:2 110:17,21 111:17 114:21 123:9 124:8 125:4 126:17

**play** 40:16 44:15

**pleading** 58:3

**Plimpton** 8:10

**point** 24:11 35:24 45:20 47:12 48:10 53:10 89:21 90:13 94:18 98:25 106:21 107:3 144:15

**pointed** 38:23

**points** 53:8

**policy** 59:7

**poor** 121:4

**portfolio** 30:12,14, 17,25 31:3,9,12,15, 17,24 32:6,11,21 33:12,15,25 34:18 35:4,14,21,25 36:5,6, 13,16,23,24 40:3,9 45:3 49:3,19 50:12, 14,18 51:3,10,20 52:5,20,23 54:24 63:17 92:6,16,19,25 96:7 98:11 101:25 104:25 116:4,14 117:4,7,9 118:3,13, 21 119:4,5,8,10,11, 20,23 120:5,14

**121**:4,7 131:10,24 132:12 133:20 134:2, 10,20,23 135:17,21 137:4 144:21 146:2 147:4

**portion** 32:25 92:16 93:5 116:15

**position** 31:10 41:16 49:12 50:17 71:22 80:6 85:20 86:7 97:8, 19,25 100:12,20,21 108:16 119:22 120:24 134:18

**positions** 23:10 30:24 31:17 86:23 105:6

**possibly** 104:9

**post** 153:9

**post-petition** 96:8

**potential** 125:22 127:13

**practical** 44:16,20

**pre-investment** 68:17

**predicated** 101:3

**preexisting** 62:16

**prefer** 60:15

**preference** 101:9

**preliminary** 9:6 23:15,19

**preparation** 13:25 131:5 145:10

**prepared** 13:22 14:11,15

**presented** 53:13 54:4

**presently** 96:3

**preserved** 117:12

**pretty** 89:15 128:7 145:14

**prevailing** 85:17

**prevent** 47:16 48:12

**prevented** 91:21

**preventing** 115:18

**previous** 17:22 72:7

**previously** 50:11 57:4 133:11 153:22

**price** 140:9

**primarily** 24:17,19, 23

**primary** 148:5

**prior** 50:9,12 51:25 52:6 64:3,14 71:20 76:17 114:20

**private** 85:6

**privilege** 13:21 147:12

**privileged** 131:16 133:2 135:6 136:15 137:9,21 138:21 140:16 141:13 146:10

**pro** 56:15 138:4,16

**problem** 74:14

**problems** 12:4

**proceeding** 88:8

**proceeds** 28:8

**process** 56:21

**produce** 11:4

**produced** 9:8,17 75:13 100:8 133:12

**production** 75:11,25

**progressed** 24:13

**prohibited** 114:8

**projected** 28:9,12 30:8 125:10

**projection** 29:22

**prominent** 111:22

**pronounce** 10:19

**proof** 11:7 16:7,16 17:2,6,7,16,20,22 18:6 32:3 65:8

**proofs** 14:19 15:8,15 64:24

**proper** 36:8

**proposed** 41:8 99:22 110:21 138:17

**protective** 9:11,23 10:10

**provide** 51:6 71:13 73:14 77:10 89:9 90:6,16 137:23 138:3 139:24 144:2

**provided** 28:17 70:5 71:18 73:5 77:19 82:3,8 90:12,15,24 137:13 138:14 140:7 143:9 144:5

**providing** 126:17,20

**provision** 132:17,22 134:22 138:11 140:18

**proximate** 105:4 107:20

**Public** 10:13

**Pugatch** 10:1,18,20, 21,23 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1,20 19:1,6 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1,18 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1, 10 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1,4 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,13 108:1 109:1 110:1 111:1 112:1,10 113:1 114:1 115:1 116:1

117:1 118:1 119:1
120:1 121:1 122:1,6
123:1 124:1 125:1
126:1 127:1 128:1
129:1,17 130:1 131:1
132:1 133:1 134:1
135:1,11 136:1 137:1
138:1 139:1 140:1
141:1 142:1,5 143:1
144:1,17 145:1 146:1
147:1,18 148:1,2,19
149:1,7,15 150:1
151:1,24 152:1 153:1

**pull** 16:23 44:8 61:6
68:4 78:22 83:25
109:14 128:6,14
139:5

**purchase** 138:4,16
140:9

**purchased** 112:19

**purchasing** 67:14

**purely** 140:19

**purpose** 15:7

**purposes** 62:24

**pursuant** 18:22 19:8

**pursue** 96:10 105:17

**pursued** 97:9 151:12

**pursuing** 96:3,13
115:19

**purview** 98:14

**push** 130:20

**put** 19:2 45:12 63:6
74:17 91:19 111:5
153:16

**putting** 95:13

**puzzle** 107:6

---

**Q**

**quantum** 77:25

**question** 12:3,7,13,
16,21,22 15:18 46:25
47:7,25 48:19 56:8
66:15 71:16 84:15
86:17 90:4 92:11
97:17 100:18 102:15,

22 104:10 106:3,12,
20 114:15 116:11
117:14,21 118:9,10
120:20 123:12 124:4,
18 126:15 130:3
136:20 137:19 138:9
139:9 140:20,23
141:2,3 142:4 144:14
146:14,16,23 148:3
150:2 151:8 152:4,8,
9,16,20,22 153:4

**questioning** 148:3

**questions** 11:25
12:25 56:20 69:14,16
88:3 121:13,17,20
133:23 148:15 149:6,
14 150:8 151:23

**quick** 59:21 60:7
112:7

**quickly** 15:12

---

**R**

**range** 125:10,13

**rata** 138:4,16

**rates** 93:20

**re-ask** 123:14 144:13
152:8

**reaction** 81:3

**read** 40:16 49:8
76:21 78:14 81:18
99:3 110:18 113:10
131:20 136:5 152:11,
13

**reading** 58:2 77:2
135:11

**reads** 62:25

**ready** 12:25 112:4

**reason** 49:3 56:17
64:16 67:19

**reasonable** 29:22

**recall** 25:23 28:16
30:5 34:3 35:18
38:14,17 43:8 50:5
64:9,11 69:17,23
80:21,22 88:15
90:11,14,20,21 91:5,

14,18 99:9,25
100:16,17 101:12,13,
14 107:4,18 111:20
141:4 147:13 152:18

**receipt** 137:24
138:14

**receive** 56:5,12
109:24

**received** 27:22 28:2
57:15 58:9,17 68:10
84:4 142:22

**receiving** 81:3
126:11

**recently** 93:16 94:10

**recess** 61:3 112:8

**recognize** 68:11

**recollection** 43:14,
17

**recommendations**
102:4

**record** 10:22 152:13
153:17

**recover** 124:17,24

**recoveries** 125:11

**recovery** 124:12
125:19,23

**redeem** 54:7,18
115:23

**reduction** 114:20
116:16 118:23

**refer** 45:10

**reference** 134:9

**referenced** 69:25

**referencing** 92:25

**referring** 26:16
30:14 101:15 103:22
119:4,15 120:3
124:12 134:22

**refers** 66:12

**refinance** 98:12
103:8 105:15 113:25
115:7 116:25 118:19
120:10

**refinances** 115:23

**refinancing** 40:19
96:17 101:3

**refusal** 140:8

**refute** 82:4

**regularity** 88:25

**related** 11:2,15 36:22
66:22 90:25 133:10
148:4

**relates** 36:8 51:13
90:2 92:8 151:22

**relating** 21:10

**relations** 24:11

**relationship** 62:17

**release** 128:2

**releases** 126:10,20
127:11,16

**relevant** 47:20 98:2

**reliance** 55:2

**remained** 115:21

**remedies** 42:2

**remember** 112:15

**Reorganized** 96:4,
10 97:3

**repeat** 12:8 90:3
114:15 117:20 139:9
142:3 146:22 152:15,
20

**repeats** 63:15

**rephrase** 124:3
126:14

**reporter** 93:11
121:16 152:11
153:16,24

**represent** 8:4 68:9
122:4

**representation**
130:6

**representations**
11:11

**representative**
15:19 38:3,4,9,12
99:21 144:23 145:6

146:19 147:14

**representatives**
68:16 88:11 143:18,
25 144:7,9,18,20
147:3

**represented** 43:5,6
49:2 74:20 78:4

**representing** 96:24
129:21

**request** 10:8 78:8
153:6

**requested** 9:9,13
55:12 56:3 77:9,14
150:18,23 151:6,12,
15 152:24 153:9

**requesting** 12:22

**requests** 99:20

**require** 44:23

**required** 39:3,7
40:25 81:9 102:19
131:24 136:22 146:4
147:5

**requiring** 133:5

**reread** 83:8

**reset** 40:18,20,22
41:7,9,19,25 42:17
54:7,18 85:16 93:18,
21 94:12,21 95:14,18
96:4,11,13,16 97:2,8,
10,20 98:11,18
100:13,22 101:3,17,
21 102:9,17 103:8,
13,20,22,23,24
104:2,4,5,13,16
105:10,15,24 107:15,
23 108:3 113:25
115:7,11,24 116:25
118:19 120:11
150:10,12,18,19,24
151:4,6,15 152:24
153:6,9

**resets** 151:12

**resolutions** 39:17

**respect** 40:5,14
50:24 71:4 77:20
91:21 98:18 114:9

**respective** 62:13

Index: responding..subsequently

**responding** 120:19

**response** 11:9 22:18,25 48:6 76:9 152:12

**responsibility** 93:4

**responsible** 47:19

**restate** 87:25

**result** 74:2 85:4,16 96:22 99:12 100:9 114:4 115:5 116:23

**resulted** 118:15 120:10

**review** 23:7 78:9

**reviewed** 57:17 75:24

**reviewing** 58:20

**rights** 42:2,17 51:21 66:21 110:6

**Road** 13:4

**role** 40:14 44:15

**room** 13:11

**root** 148:11

**rough** 153:25

**roughly** 27:14 112:23 126:6

**routine** 45:2

**Rule** 18:22 19:8

**rules** 12:24

**ruling** 78:6 115:20

**Russell** 8:13

**S**

**sat** 34:4

**satisfied** 29:21 57:18

**Schafer** 8:4

**schedule** 53:13 121:23

**scheduled** 55:21

**scheme** 54:9

**scope** 149:6,13

151:23

**Scott** 93:17 94:6 104:11,17

**screen** 16:6,24 17:8, 11,14 18:16 19:3 21:7 22:14,23 37:11 44:14,22 45:13,17 61:6 63:6 67:25 68:4 78:23 84:2 93:16 109:15 112:5,17 128:9,18

**scroll** 16:15 17:19 21:12,22 45:13 84:22

**scrolled** 81:12

**SEC** 70:2

**secondary** 15:2 25:8

**Section** 44:12 129:9, 19 136:3

**seek** 141:7 142:20 143:5

**Seery** 108:10,15,21 111:15

**sell** 140:10,21

**selling** 119:25 123:7

**send** 16:21 83:18 109:3

**sending** 16:4 20:25

**sense** 99:15 125:9

**sentence** 31:22 48:24 84:24 85:13 86:5

**sentences** 40:2

**separate** 15:22 18:5 42:12 75:20 83:5 136:18

**separately** 80:20

**serve** 36:15 96:6

**settle** 108:22

**settlement** 11:5 13:19 15:7 78:5 89:18 108:5 109:8, 20,22,23 110:10 111:2 122:12,17 123:5,17,22 125:3 127:3 128:16,20

129:3,5 130:8,25 134:9 137:16 140:5, 12 141:9 142:16,25 143:20 144:25 145:12,23 146:5 147:8

**Shannon** 8:19

**share** 16:6,24 18:16 21:6 22:14,22 37:11 45:12 61:7 63:7 64:15 65:14 67:25 68:5 78:24 84:2 109:15 112:5,17 128:10,17 130:15 138:16

**shared** 17:9

**shareholder** 63:19 66:4 132:15

**shares** 63:12,22 64:6 66:25 112:19,21 123:7 126:4,11,18 127:11,15 129:10,23 130:8 136:11 137:3, 15 138:2,5,17 140:4, 10,11,22 141:8 142:15 143:10,19 144:10,23 146:4 147:5

**shed** 49:15

**short** 121:21 149:9

**shortened** 82:22

**shortly** 80:14

**shots** 95:17 98:18

**show** 69:24

**showing** 17:11,14,15

**shows** 133:19

**side** 68:22

**sign** 21:17

**signature** 21:13

**signed** 15:15 22:4 43:2 103:4

**significant** 114:19

**similar** 42:18 115:21

**simply** 48:25 139:22

**single** 15:22 37:17

**siphon** 47:14 48:11

**siphoned** 47:21 48:15,22

**sir** 124:14

**Skew** 15:3 22:3

**skip** 28:6

**solo** 20:20

**sophisticated** 55:6

**sort** 125:21

**sought** 58:5 142:13

**sound** 56:23

**sounds** 13:2 27:18 51:24 118:8 120:24, 25 135:8,13

**source** 148:5

**Spalding** 8:23

**speak** 143:13

**speaks** 36:3 67:17 130:2

**specific** 34:3 48:20 75:4 90:15 101:16 102:22 103:5 116:10 132:6 150:17

**specifically** 11:3 25:7 27:16 78:12 95:7 100:17

**specifics** 13:24 35:18 101:14 107:4 140:18

**speculate** 116:18

**speculation** 106:22, 25 116:8 117:16

**spelled** 44:12

**spots** 67:7

**stamp** 133:13

**stamped** 9:18

**standing** 52:14 149:12

**stands** 102:21

**Stang** 8:7

**start** 12:14,16,25 95:16 112:6

**started** 108:13

**starting** 89:14

**starts** 86:5

**state** 10:14,21 33:18

**stated** 24:3 26:14 71:21 87:18 107:19

**statement** 93:24 94:16

**statements** 23:10

**states** 32:4 45:20 110:5

**stating** 120:21

**stemming** 51:14

**steps** 45:23

**sticks** 127:7,9,23

**stop** 18:15 22:14 37:10 67:25 112:5

**Street** 14:24 21:18 37:15 65:12 76:10 80:13,18 81:15

**Strike** 88:23

**structural** 58:20

**structure** 56:15,22

**stuff** 20:21 122:21 128:14

**sub-advisor** 35:7 36:7

**sub-manager** 34:12

**subject** 9:9 54:19 140:4

**submit** 16:2 20:24

**submitted** 18:25

**subordinated** 110:2 123:21 124:7 125:2

**Subscription** 63:8, 11

**subsequent** 34:22 51:11 53:4 56:11,13 98:25 114:6 115:20 116:24 118:16

**subsequently** 24:13 105:16

**subset** 24:13

**subsidiaries** 62:12
93:13

**subsidiary** 46:15
47:10

**substance** 14:8
70:16 76:25

**successfully** 96:6

**suffered** 118:5
148:12

**suggestion** 49:23,
25 111:8

**suit** 78:7

**summaries** 69:22

**summarize** 123:17

**summary** 69:12 71:6
123:10

**summation** 106:14

**summer** 23:14 24:3

**supervised** 97:4

**support** 18:21 19:7
109:7,16 111:17
128:25

**Surgent** 69:4

**sworn** 98:16

**T**

**taking** 66:8

**talk** 11:4,17 12:10,11
13:14 14:3,12,15
15:5 30:11,13 113:10
122:7

**talked** 43:4 79:15,20
150:25

**talking** 31:14 104:6
119:9 120:12,15
124:17 134:19

**team** 24:11 23:3,5,6,
8 79:18,24

**teed** 89:18

**telling** 74:19 80:23

**Ten** 60:16

**ten-minute** 60:19
112:3

**term** 110:25 134:10
145:14

**termination** 78:7

**terminology** 36:8

**terms** 9:16,22 95:17
110:10 122:17
144:24 145:12,21
147:7 151:4

**Terry** 45:24 46:2,9,
18,20 47:16 48:12
51:12,16 53:12 70:3
71:4 73:13,20 76:4,
14 77:20 118:15

**testified** 10:15 58:7
93:18 94:10,11 95:12
104:12 107:3 112:11
122:10 148:20

**testifying** 52:13

**testimony** 10:6 14:6
28:23 29:4 43:7
47:24 56:10 57:21
58:13 72:18,19 92:24
98:16 99:2 105:8,12
107:9 117:18 121:9
142:2

**thesis** 28:21 96:19
101:2 114:3

**thing** 12:9,20 128:20

**things** 39:5 43:25
107:10 127:8

**thinks** 82:23

**Thomas** 69:3,13,15

**thought** 105:24
118:10 120:20
135:10 146:17

**till** 60:22

**time** 12:3,6,17 25:23
26:2 30:10 33:6
34:15,17 56:19 60:23
85:2 88:6,7 90:13
94:18 97:11 99:9
101:17 103:4,8,13,24
105:7 107:5 114:7
125:25 151:25

**timeline** 114:18

**times** 102:13 103:16
104:23

**titles** 110:6

**today** 13:7,15 14:12,
16 72:21 75:14,25
117:25

**today's** 75:11

**told** 28:24 68:20
102:15,18 106:7,9

**top** 37:12 61:14 62:4
93:15 95:11 99:17
128:22

**topics** 14:12,16
99:21

**total** 65:18,20 112:20

**totally** 12:19 27:22

**toxic** 49:5,14,20 50:2

**trading** 119:25
127:7,10

**transaction** 27:6
40:18,22 41:10,19,25
103:5

**transactions** 54:21
95:18 96:4 98:19

**transcript** 10:9
153:23

**transfer** 63:8,11
110:6 127:25 129:10,
23 130:7,24 131:11,
25 133:6 135:20
136:11,23 137:2,14,
25 140:3 141:8,16
142:14,24 143:7,9,19
144:3,10 145:22
146:3

**Transferee** 132:15

**transferred** 51:12
126:4,19 127:15
138:17 146:5 147:6

**transferring** 123:23
126:12 140:10
144:22

**transfers** 47:14,15
48:11 55:13 132:14

**treated** 15:22

**Trey** 79:11,12

**trim** 109:19

**TRO** 115:18 116:24

**Trust** 8:17,18

**trustee** 35:9 36:13
52:23 95:25 96:23
97:7,16

**Trustee's** 96:25

**trustees** 62:14

**turn** 30:23 63:3
118:17 128:4 133:7

**two-minute** 147:23

**two-thirds** 38:25

**U**

**UBS** 8:21 70:4

**ultimate** 74:2 76:4
103:10 111:6

**ultimately** 25:13
51:9 54:17 55:17
116:23 118:13
124:18 127:20

**unanimous** 42:23

**unaudited** 59:2

**underlaying** 120:4

**underling** 31:8 35:4

**underlying** 11:7
13:18 19:24 31:10,
14,16 32:19 33:3
36:9,23 40:21 41:16
51:14 53:5 56:22
70:16 74:2 93:2
98:10,13 105:4 114:2
116:19 118:19 119:5,
22

**underneath** 35:19

**understand** 11:23
12:4,7 34:25 95:3
98:15 120:23 131:8,
21 133:24 135:16
138:10 151:20 152:6

**understanding**
35:11 36:21 39:24
40:17 42:2,9,12,15

43:20 44:10 46:7
47:6,9,18 51:2,9
65:21 71:15 73:10,17
75:23 82:15 83:5
91:8,12 93:12 110:9
113:15 115:17
121:11 125:16 126:2
129:16,20 130:5,15
131:23 132:5,7,9,21
133:5 136:9,18,21
142:18 145:24
146:19 147:3 148:25
151:14 153:5

**understood** 31:19
62:11 118:10 142:8

**undertaken** 56:16

**undertaking** 45:23

**undertook** 47:13
48:10

**unequivocally**
49:18

**unsecured** 109:25
123:20 124:6,25
125:18

**upside** 125:21

**V**

**vague** 104:9

**valuation** 59:7

**valued** 125:18

**variety** 30:24

**vehicle** 26:18,22
27:2

**vehicles** 16:19 18:2
32:22

**viability** 77:17

**video** 121:20

**view** 54:22 105:7,13
116:9 131:15 137:10

**viewed** 97:16

**VIII** 15:2

**virtue** 119:21

**vote** 42:23 110:16,20
111:17

**voting** 62:5,24

---

**W**

---

**Wall** 76:9 80:13,18
81:15

**wanted** 45:13 94:12
97:16 104:13 122:9

**Watkins** 8:20

**Wayne** 13:4

**week** 93:23 94:23
95:8 104:15

**weekly** 88:10,16 89:3

**weeks** 51:25 80:2
83:12 122:25

**Weisgerber** 8:9,10,
25 9:25 13:20 14:9
15:11 29:3,14 30:3
31:6 32:8,17 33:17
34:13,20 35:10,16
36:2,17 37:6 39:10
40:12 41:3,11,21
42:3,11 43:12,21
44:18 45:5 46:5,12
47:2,23 48:16 49:16
50:19 51:5 52:9,25
53:18,25 54:14 56:9
57:7,20 58:12 59:19,
24 60:4,16 61:19
62:22 63:25 64:7,19
65:2,15,22 66:6 67:3,
8,16,21 69:18 70:10,
23 71:7 72:4,12 73:7
74:24 75:8,19 76:15
77:3,12,22 78:10,16
80:9 81:5,24 82:10,
18 83:2,15 85:24
86:9,25 87:6,10,24
88:13,21 89:4,12
90:9,18 91:3,15,23
92:12,23 93:25
94:13,24 95:21 96:14
97:12,23 98:20 99:6,
13 100:14,23 101:10,
13,23 102:10,18
103:14 104:3,7,21
105:11 106:17 107:2,
16,24 108:18,25
110:11,22 111:3,10,
18 112:25 113:4,16
114:13,23 115:12
116:5,17 117:15
118:6,25 119:17
120:17 121:8 123:11
124:9,15 125:5,14
126:23 127:18
128:12 129:13,25
130:10 131:12 132:3,
18,24 134:3 135:4
136:12 137:5,18
138:6,19 140:13,24
141:11,25 142:17
143:3,11,21 144:11
145:2,15 146:7,22
147:9,21,25 148:14
149:2,4,11,19 150:3,
14,21 151:9,17,21
152:7,17,25 153:14

**wholly-owned**
62:12 85:2

**Willard** 25:2 68:21
69:3 79:9,16

**William** 93:17 94:6
104:11

**Wilson** 8:2 9:6 10:7,
17 14:2,13,14 15:24
16:10 17:5 18:17,24
19:9 20:18 21:5
22:13,21 33:20,23
42:8 48:4 50:23
52:18 53:21,22 57:24
59:22 60:2,9,14,21,
25 61:4,11 63:2
67:24 72:20 74:16
75:13 76:6 78:20
82:14,21 83:17,24
84:8 86:15 88:23
89:23 90:5 93:7
94:15 95:3 99:16,24
102:14 103:18
105:21 106:5,10,24
107:12 109:3,13
112:2,9 121:12
148:16,18 149:8,16
152:3,10,14 153:12,
20

**Wilson's** 148:2

**Winograd** 8:7

**witness'** 9:7

**wondering** 151:22

**words** 74:18

**work** 122:21

**worked** 42:10

**works** 11:24

**worth** 28:25

**worthless** 108:17

**wrap** 112:4 151:25

**written** 39:17 42:25
43:10 75:4,16 82:7
142:13,22 143:5
144:2,22 145:25

**wrong** 120:25

**wrongful** 78:7

---

**Y**

---

**y'all** 60:10,14

**years** 30:6 57:10

**York** 10:14

---

**Z**

---

**Ziehl** 8:8

**Zoom** 12:6,10 128:14