# EXHIBIT 13

Appx. 00459

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 2 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 2 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 2 of 29   PageID 1662

EXECUTION VERSION

Between

CLO HOLDCO, LTD.

And

HARBOURVEST DOVER STREET IX INVESTMENT L.P.

And

HARBOURVEST 2017 GLOBAL AIF L.P.

And

HARBOURVEST 2017 GLOBAL FUND L.P.

And

HV INTERNATIONAL VIII SECONDARY L.P.

And

HARBOURVEST SKEW BASE AIF L.P.

And

HIGHLAND CAPITAL MANAGEMENT, L.P.

And

LEE BLACKWELL PARKER, III

And

QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311

And

QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811

And

QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612

And

QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211

And

HIGHLAND CLO FUNDING, LTD.

And

HIGHLAND HCF ADVISOR, LTD.

---

MEMBERS AGREEMENT RELATING TO THE COMPANY

---

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 3 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 3 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 3 of 29    PageID 1663

TABLE OF CONTENTS

1.      INTERPRETATION ................................................................. 2

2.      THE BUSINESS OF THE COMPANY ........................................... 4

3.      VOTING RIGHTS ................................................................. 4

4.      ADVISORY BOARD .............................................................. 4

5.      DEFAULTING MEMBERS ......................................................... 4

6.      TRANSFERS OR DISPOSALS OF SHARES .................................. 4

7.      CONFIDENTIALITY ............................................................... 4

8.      DIVIDENDS ....................................................................... 9

9.      TERM OF THE COMPANY ...................................................... 9

10.     ERISA MATTERS ................................................................ 9

11.     TAX MATTERS ................................................................... 9

12.     AMENDMENTS TO CERTAIN AGREEMENTS .............................. 9

13.     FINANCIAL REPORTS ........................................................... 9

14.     TERMINATION AND LIQUIDATION ........................................... 9

15.     WHOLE AGREEMENT ........................................................... 12

16.     STATUS OF AGREEMENT ....................................................... 12

17.     ASSIGNMENTS ................................................................... 12

18.     VARIATION AND WAIVER ...................................................... 12

19.     SERVICE OF NOTICE ........................................................... 12

20.     GENERAL ......................................................................... 13

21.     GOVERNING LAW AND JURISDICTION ...................................... 14

SCHEDULE ................................................................................. 18
Adherence Agreement .................................................................. 18

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 4 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 4 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 4 of 29   PageID 1664

THIS AGREEMENT is made the 15th day of November 2017

BETWEEN

(1)     CLO HOLDCO, LTD. whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)     HARBOURVEST DOVER IX INVESTMENT L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)     HARBOURVEST 2017 GLOBAL AIF L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)     HARBOURVEST 2017 GLOBAL FUND L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)     HV INTERNATIONAL VIII SECONDARY L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)     HARBOURVEST SKEW BASE AIF L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)     HIGHLAND CAPITAL MANAGEMENT, L.P. of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)     LEE BLACKWELL PARKER, III of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)     QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311 of 17171 Park Row #100, Houston, Texas 77084, USA

(10)    QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811 of 17171 Park Row #100, Houston, Texas 77084, USA

(11)    QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612 of 17171 Park Row #100, Houston, Texas 77084, USA

(12)    QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211 of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "Members") and

(13)    HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "Company") and

(14)    HIGHLAND HCF ADVISOR, LTD., whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Portfolio Manager").

WHEREAS:

(A)     The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)     The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, the (the "Offering Memorandum"), subject to the restrictions set forth therein.

Appx. 00462

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 5 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 5 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 5 of 29    PageID 1665

(C)     The Members are the owners of the entire issued capital of the Company.

(D)     The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

OPERATIVE PROVISIONS

1.     INTERPRETATION

        In this Agreement, including the Schedule:

1.1     the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

"Adherence Agreement" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

"Advisers Act" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

"Affiliate" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

"Agreement" means this agreement together with the Schedule;

"Articles" means the articles of incorporation of the Company as amended from time to time;

"Business" means the business of the Company as described in Recital (B);

"Business Day" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

"Directors" means the directors of the Company from time to time;

"CLO Holdco" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Directors" means the directors of the Company from time to time;

"Dover IX" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

"DOL" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"DOL Regulations" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 6 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 6 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 6 of 29   PageID 1666

"Dover IX" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"ERISA Member" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"HarbourVest Entities" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"Highland Principals" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"Law" means the Companies (Guernsey) Law, 2008, as amended;

"Member" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"Parties" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"Shares" means ordinary shares in the Company;

"Subsidiary" shall have the meaning ascribed to it in the Law;

"Subscription and Transfer Agreement" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager.

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2   any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3   any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4   any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5   any reference to time shall be to Guernsey time;

1.6   except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

Appx. 00464

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 7 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 7 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 7 of 29    PageID 1667

1.7    unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8    Clause headings are for ease of reference only and do not affect the construction of any provision.

2.    THE BUSINESS OF THE COMPANY

2.1    The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2    The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3    The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

3.    VOTING RIGHTS

3.1    The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto are Members.

3.2    The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

3.2.1    any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

3.2.2    any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

3.2.3    any conversion or redemption of Shares, except pursuant to Clause 5.5,

3.2.4    any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

3.2.5    the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

3.2.6    the suspension of the calculation of the NAV: other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended: (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 8 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 8 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 8 of 29    PageID 1668

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4.    ADVISORY BOARD.

4.1    <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "Advisory Board") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2    <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.  Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3    <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters.  The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

Appx. 00466

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 9 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 9 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 9 of 29   PageID 1669

Memorandum.  Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4   <u>Term of Members of Advisory Board</u>.   A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5   <u>No Duties to Other Members</u>.   No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.   DEFAULTING MEMBERS

5.1   In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "Outstanding Settlement Amount"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "Default Interest Rate") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5).  No such Shares which have failed to be settled will be issued to any Member until settlement of the full amount of the purchase price has been made.  In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "Defaulting Member"), the following provisions shall apply:

5.2   Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3   The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 10 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 10 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 10 of 29    PageID 1670

5.4     The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5     The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6     The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7     At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8     The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9     Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6.     TRANSFERS OR DISPOSALS OF SHARES

6.1     No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "Transfer"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

**Appx. 00468**

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 11 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 11 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 11 of 29   PageID 1671

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1   such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2   such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3   such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4   such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2   Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again. Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3   No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4   Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer.  The transferor and/or the transferee shall bear all costs of any Transfer.

6.5   The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6   All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 12 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 12 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 12 of 29    PageID 1672

7.   CONFIDENTIALITY

7.1   Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2   Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

8.   DIVIDENDS

8.1   The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

9.   TERM OF THE COMPANY

9.1   Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "Term"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2   Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

10.   ERISA MATTERS

10.1   The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold.  In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

11.   TAX MATTERS

11.1   <u>PFIC.</u> For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 13 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 13 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 13 of 29   PageID 1673

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company; provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2   <u>CFC</u>. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3   <u>Other Tax Information</u>. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year  and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4   <u>Withholding and Other Taxes</u>. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12.   AMENDMENTS TO CERTAIN AGREEMENTS

12.1   The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "Management Agreement") without the consent of the Parties.

12.2   The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company.  Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate; provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3   The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13.   F I N A N C I A L   R E P O R T S

13.1   The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

Appx. 00471

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 14 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 14 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 14 of 29    PageID 1674

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2    After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

14.    TERMINATION AND LIQUIDATION

14.1    Save as provided for in Clause 13.2, this Agreement shall terminate:

14.1.1    when one Party holds all the Shares;

14.1.2    when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

14.1.3    with the written consent of all the Parties.

14.2    The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3    Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4    Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

14.4.1    all existing contracts of the Company are performed to the extent that there are sufficient resources;

14.4.2    the Company shall not enter into any new contractual obligations;

14.4.3    the Company is dissolved and its assets are distributed as soon as practical; and

14.4.4    any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

Appx. 00472

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 15 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 15 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 15 of 29    PageID 1675

15.   WHOLE AGREEMENT

15.1  This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2  Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3  Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16.   STATUS OF AGREEMENT

16.1  Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2  If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17.   ASSIGNMENTS

      Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18.   VARIATION AND WAIVER

18.1  A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2  A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3  A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19.   SERVICE OF NOTICE

19.1  Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

      19.1.1   to the Company:
               Address:
               First Floor, Dorey Court, Admiral Park
               St Peter Port, Guernsey GY1 6HJ
               Channel Islands

      19.1.2   to CLO Holdco:

Appx. 00473

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 16 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 16 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 16 of 29   PageID 1676

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3   to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4   to any other Party: by post or hand delivery only to the address specified in the register of members of the Company.

19.2   Communications sent by post shall be deemed to have been received 24 hours after posting. Communications sent by facsimile transmission shall be deemed to have been received at the time the transmission has been received by the addressee PROVIDED THAT if the facsimile transmission, where permitted, is received after 5.00pm or on a day which is not a Business Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3   In proving service by post it shall only be necessary to prove that the notice was contained in an envelope which was duly addressed and posted in accordance with this Clause and in the case of facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to the correct number.

20.   GENERAL

20.1   Each of the Parties hereby agree not to enter into or abide by any agreement whether written or oral with any one or more of the other Parties in respect of the voting of Shares or the submission of Member resolutions to any Members for voting by them, or otherwise to direct or influence, or attempt to direct or influence, the day-to-day management of the Company, either directly or indirectly, other than in order to comply with the other terms of this Agreement or the Articles.  In this regard, each of the Parties agrees to not to direct or influence or to attempt to direct or influence any of the Directors through any employment relationship that the Directors may have outside of the Company other than in order to comply with the other terms of this Agreement or the Articles.  Each of the Parties hereby agree that this provision shall continue to apply to them whether or not they are or remain a Member.

20.2   Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3   The Parties are not in partnership with each other and there is no relationship of principal and agent between them.

20.4   All transactions entered into between any Party and the Company shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an arm's length basis.

20.5   Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.

**Appx. 00474**

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 17 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 17 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 17 of 29    PageID 1677

20.6    Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7    This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.  This Agreement may not be amended except with the consent of each Party.

21.    STATUS OF AGREEMENT

21.1    The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2    If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.


22.    GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

[Signature Page Follows.]

Appx. 00475

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 18 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 18 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 18 of 29    PageID 1678

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written.

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:..............................................................
**Name:** Grant Scott
**Title:** Director

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 19 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 19 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 19 of 29    PageID 1679

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** ............................................................
**Name:** Michael J. Pugatch
**Title:** Authorized Person

**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** ............................................................
**Name:** Michael J. Pugatch
**Title:** Authorized Person

**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:    HarbourVest 2017 Global Associates L.P.,
        its General Partner

By:    HarbourVest GP LLC,
        its General Partner

By:    HarbourVest Partners, LLC,
        its Managing Member

**By:** ............................................................
**Name:** Michael J. Pugatch
**Title:** Managing Director

SIGNATURE PAGE TO MEMBERS' AGREEMENT

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 20 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 20 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 20 of 29   PageID 1680

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner
By:     HarbourVest GP LLC
        Its General Partner
By:     HarbourVest Partners, LLC
        Its Managing Member

**By:** ...................................................................
**Name:**   Michael J. Pugatch
**Title:**   Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:     HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** ...................................................................
**Name:**   Michael J. Pugatch
**Title:**   Authorized Person


SIGNATURE PAGE TO MEMBERS' AGREEMENT


**Appx. 00478**

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 21 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 21 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 21 of 29    PageID 1681

**SIGNED**

Lee Blackwell Parker, III

SIGNATURE PAGE TO MEMBERS' AGREEMENT

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 22 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 22 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 22 of 29   PageID 1682

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

Read and approved

X

By:............................................................
Name: Emmanuel Magel
Title: Transactions supervisor

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:............................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:............................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:............................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**Appx. 00480**

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 23 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 23 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 23 of 29    PageID 1683

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:..................................................................
**Name:**
**Title:**


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..................................................................
**Name:** Emmanuel Maciel
**Title:** Transaction Supervisor

Read & Approved


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..................................................................
**Name:**
**Title:**


**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..................................................................
**Name:**
**Title:**


SIGNATURE PAGE TO MEMBERS' AGREEMENT

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 24 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 24 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 24 of 29    PageID 1684

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

**By:**................................................................
**Name:**
**Title:**

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

**By:**................................................................
**Name:**
**Title:**

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

**By:**................................................................
**Name:** Emmanuel Magri
**Title:** Transactions Supervisor

Read and Approved:

_11/7/17_

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

**By:**................................................................
**Name:**
**Title:**

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**Appx. 00482**

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 25 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 25 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 25 of 29    PageID 1685

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:..................................................................
**Name:**
**Title:**

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..................................................................
**Name:**
**Title:**

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..................................................................
**Name:**
**Title:**

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..................................................................
**Name:** Emmanuel Macel
**Title:** Transaction Supervisor

Read and approved

SIGNATURE PAGE TO MEMBERS' AGREEMENT

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 26 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 26 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 26 of 29    PageID 1686

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    Strand Advisors, Inc.,
       its General Partner

**By**:......................................................
**Name:** James Dondero
**Title:**  President

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**Appx. 00484**

Case 21-03067-sgj   Doc 124-13   Filed 10/14/22   Entered 10/14/22 15:31:06   Desc
Exhibit 13   Page 27 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21   Entered 09/29/21 17:50:19   Page 27 of 29
Case 3:21-cv-00842-B   Document 28-13   Filed 05/27/21   Page 27 of 29   PageID 1687

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

**By**:..............................................................

**Name:** James Dondero
**Title:**   President

SIGNATURE PAGE TO MEMBERS' AGREEMENT

Case 21-03067-sgj Doc 124-13 Filed 10/14/22 Entered 10/14/22 15:31:06 Desc
Exhibit 13 Page 28 of 29

Case 21-03067-sgj Doc 28-13 Filed 09/29/21 Entered 09/29/21 17:50:19 Page 28 of 29
Case 3:21-cv-00842-B Document 28-13 Filed 05/27/21 Page 28 of 29 PageID 1688

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

**By**:.......................................................

**Name:** William Scott
**Title:** Director

SIGNATURE PAGE TO MEMBERS AGREEMENT

**Appx. 00486**

Case 21-03067-sgj    Doc 124-13    Filed 10/14/22    Entered 10/14/22 15:31:06    Desc
Exhibit 13    Page 29 of 29
Case 21-03067-sgj Doc 28-13 Filed 09/29/21    Entered 09/29/21 17:50:19    Page 29 of 29
Case 3:21-cv-00842-B    Document 28-13    Filed 05/27/21    Page 29 of 29    PageID 1689

SCHEDULE

Adherence Agreement

THIS ADHERENCE AGREEMENT is made on [  ] 200[  ]

BETWEEN:

(1)     [  ] of [  ] (the "Covenantor");

(2)     CLO HOLDCO, LTD. of [                              ] (a "Member");

(3)     [  ] of [                              ] (a "Member");

(4)     [  ] of [                              ] (a "Member");

(5)     HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "Company")

(6)     HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Portfolio Manager").

RECITAL

This Agreement is supplemental to the members agreement made on November 15 2017 between the Members, the Portfolio Manager and the Company (the "Members Agreement").

IT IS HEREBY AGREED as follows:

1.     The Covenantor hereby confirms that he has been supplied with a copy of the Members Agreement and hereby covenants with each of the parties thereto to observe, perform and be bound by all the terms of the Members Agreement as if it were a party thereto.

2.     Each of the other parties to the Members Agreement hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he were a party thereto.

3.     This Agreement shall be governed by and construed in accordance with Guernsey law.

IN WITNESS of which this Agreement has been executed by the Covenantor and each of the parties to the Members Agreement on the date shown above.

**Appx. 00487**