**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

**APPENDIX IN SUPPORT OF PLAINTIFF'S RESPONSE TO**
**HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION TO DISMISS COMPLAINT**

| Exhibit No. | Description | Bates Range |
|---|---|---|
| | Declaration of Mazin A. Sbaiti | APP_0001 - 0002 |
| 1 | Excerpts from Transcript of Hearing of Application to Employ James P. Seery, Jr. on July 14, 2020 | APP_0003 - 0014 |
| 2 | Highland CLO Funding - Members Agreement Relating to the Company | APP_0015 - 0042 |
| 3 | HarbourVest Settlement Agreement | APP_0043 - 0061 |
| 4 | Order Approving Debtor's Settlement with HarbourVest | APP_0062 - 0084 |
| 5 | HCLOF Offering | APP_0085 - 0206 |
| 6 | Amended and Restated Investment Advisory Agreement | APP_0207 - 0221 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

<u>**DECLARATION OF MAZIN A. SBAITI**</u>

1.      My name is Mazin A. Sbaiti. I am over twenty-one years old and fully competent in all respects to make this Declaration.

2.      I am a partner at Sbaiti & Company PLLC, and am admitted in good standing in this Court. I represent Plaintiffs Charitable DAF Fund, L.P. and CLO Holdco, Ltd. in this matter. The facts stated in this Declaration are based on my personal knowledge and made under penalty of purjury.

3.      Exhibit 1 is a true and correct copy of excerpts from a Transcript of the July 14, 2020 Hearing before the Northern District of Texas Bankruptcy Court, in the *In Re Highland Capital Management, LP,* Cause No. 19-34054-sgj11.

4.      Exhibit 2 is a true and correct copy of the Highland CLO Funding Members Agreement Relating to the Company, executed on November 15, 2017.

5.      Exhibit 3 is a true and correct copy of the HarbourVest Settlement Agreement, entered into between Highland Capital Management and the various Harbourvest entities in the bankruptcy.

6.      Exibbit 4 is a true and correct copy of the Order Approving Settlement with Harbourvest under Rule 9019 (the "<u>9019 Order</u>").

7.      Exhibit 5 is a true and correct copy of the HCLOF Offering Memorandum.

Executed on November 18, 2022.

                                              */s/ Mazin A. Sbaiti*
                                              Mazin A. Sbaiti

**APP_0002**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
 2
                                     )   Case No. 19-34054-sgj11
 3   In Re:                          )
                                     )
 4   HIGHLAND CAPITAL                )   Dallas, Texas
     MANAGEMENT, L.P.,               )   July 14, 2020
 5                                   )   1:30 p.m. Docket
                                     )
 6            Debtor.                )
                                     )   APPLICATIONS TO EMPLOY JAMES
                                     )   P. SEERY AND DEVELOPMENT
 7                                   )   SPECIALISTS, INC. (774, 775)
                                     )
 8   _____)
                         TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
10
     WEBEX/TELEPHONIC APPEARANCES:
11
     For the Debtors:         Jeffrey N. Pomerantz
12                            PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
13                              13th Floor
                              Los Angeles, CA  90067
14                            (310) 277-6910

15   For the Debtors:         John A. Morris
                              Greg Demo
16                            PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
17                            New York, NY  10017-2024
                              (212) 561-7700
18
     For the Debtors:         Ira D. Kharasch
19                            PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
20                              13th Floor
                              Los Angeles, CA  90067-4003
21                            (310) 277-6910

22   For the Debtors:         Zachery Z. Annable
                              Melissa S. Hayward
23                            HAYWARD & ASSOCIATES, PLLC
                              10501 N. Central Expressway,
24                              Suite 106
                              Dallas, TX  75231
25                            (972) 755-7104
```

EXHIBIT

1

Seery - Direct                                16

1    matter as well as financing in distressed matters during that

2    time.

3        In 1999, I went to the business side and I began to manage

4    distressed assets at Lehman Brothers as well as a leverage

5    finance business.  That grew into my running the risky finance

6    business as well as the loan business at Lehman globally,

7    which included high-grade loans, high-yield loans, trading and

8    sales of those products, a big part of distressed, all of

9    restructuring, all of asset management, and all of the hedging

10   of the portfolio that we had.

11       From there, I left Lehman with a small group and sold it

12   to Barclay's.  I moved on and ran a hedge fund with two former

13   partners of mine who are the founding partners called River

14   Birch Capital.  It was a long-short credit fund; mostly

15   credit, though we did structured finance as well, and we also

16   handled some equities.

17   Q   Okay.  Let's spend a few minutes, as a preview, talking

18   about the Debtor and its business.  And let's start with the

19   basics.  Is there a way you can summarize the business of the

20   Debtor?

21   A   I think, from a high level, the best way to think about

22   the Debtor is that it's a registered investment advisor.  As a

23   registered investment advisor, which is really any advisor of

24   third-party money over $25 million, it has to register with

25   the SEC, and it manages funds in many different ways.

Seery - Direct                          17

1       The Debtor manages approximately $200 million current

2   values -- it was more than that at the start of the case -- of

3   its own assets.  It doesn't have to be a registered investment

4   advisor for those assets, but it does manage its own assets,

5   which include directly-owned securities; loans from mostly

6   related entities, but not all; and investments in certain

7   funds which it also manages.

8       In addition, the Debtor manages about roughly $2 billion

9   in -- $2 billion in total managed assets, around $2 billion in

10  CLO assets, and then other entities, which are hedge funds or

11  PE style.

12      In addition, the Debtor provides shared services for

13  approximately $6 billion of assets.  Those are assets that are

14  owned by related entities but not owned by Debtor-owned or

15  managed entities.  And those are a combination of back office

16  services, which include timely reporting, asset management,

17  legal and compliance support, trading and research support,

18  but not the actual management of the assets.

19      The Debtors run -- and I think the way to think about it

20  is on a functional basis; at least, that's the way I think

21  about it -- and there's really six areas.  There's corporate

22  management; finance, accounting and tax; trading and research;

23  private equity and fund investing; compliance and legal; and

24  then structured equity, which really includes all of the CLO

25  businesses.

Seery - Direct                                    18

1      The goals of the Debtor generally are what you'd expect

2    out of an asset manager.  A little bit different than most

3    because the Debtor does own assets, which is a little

4    different than when money asset managers typically hold assets

5    away from the asset manager.  But number one, discharge

6    Highland's, which I'll call Highland (inaudible), LP, duties

7    to investors in the funds.  Those are fiduciary duties under

8    the Investment Advisors Act.  Each day, you've got to make

9    sure that you do that first and foremost.

10      Number two, create positive MPD in each of the funds that

11    we manage, either through sales, purchases, or hedging.

12      Next, make sure that we report timely finances of our own

13    assets, including in the funds, but also, to the third-party

14    investors.  Maximize the value of HCMLP's owned assets.  And

15    then operate as efficiently as possible for the lowest cost.

16      That's essentially how the Debtor -- how we think about

17    the Debtor from a functional perspective.  It's got about 70

18    employees laid out in those areas that I mentioned, and each

19    of those employees every day usually think about those goals

20    and try to discharge their duties by focusing on those goals.

21    Q    Thank you, Mr. Seery.  And can you describe for the Court

22    how those 70 or so employees are organized?  Is there an

23    internal corporate structure that you're working with?

24    A    Yeah.  The way -- the way -- I apologize.  The way we

25    think about it is, as I said, corporate management, which is

Seery - Direct                          19

1    really HR and overseeing the function that it's filling every

2    day, that's been really -- because Mr. Dondero was removed

3    from management.  It used to all roll up to him.  That's been

4    effectively rolling up to me since February.

5        Finance, accounting, and tax.  Each of these businesses

6    every day require certain amounts of liquidity.  Each of them

7    have requirements that they have to pay out to investors.

8    Each of them have expenses.  And all of them have different

9    kinds of tax either obligations or reporting.  Those are

10   managed by Frank Waterhouse as the CFO.  (inaudible), sorry.

11       Trading and research.  With respect to the assets, they're

12   not -- they're not static assets.  Many of them do get traded

13   on a regular basis.  A gentleman, Joe Sowin, heads up the

14   trading of the liquid assets.  John Povish (phonetic) heads up

15   the research and the trading of the more illiquid assets, but

16   not PE.  In addition, we have PE assets that require some

17   management every day, including Board seats.  That's a

18   gentleman by the name of Cameron Baynard, and also he will

19   fund investments in that area.  J.P. Sevilla is responsible

20   for working with Cameron on those investments and leading that

21   team.

22       Importantly, because of the nature of what the Debtor

23   does, the fiduciary obligations, as well as the

24   responsibilities to each investor and the legal overlay, we

25   have a robust compliance and legal department.  That's headed

Seery - Direct                              20

1   by Thomas Surgent and Scott Ellington.  Scott:  more focused

2   on transactional issues with respect to legal.  He is actually

3   general counsel.  Everything that has do with compliance, the

4   interrelatedness of the funds, trading between funds or

5   positions that are shared across funds, which are many, runs

6   through Thomas Surgent and his team.

7        And finally, structured equity.  Sitting on top of the

8   structured finance business that we have, understanding those

9   assets, particularly of two billion-ish assets in CLOs, that's

10  headed by Hunter Covitz.

11  Q    Can you describe for the Court your interaction with each

12  of the department heads that you just identified?

13  A    Well, depending on the nature of the issue each day, I

14  have at least -- I'd say generally at least weekly contact

15  with most, often daily contact with most.  So, for example,

16  when there are trading issues, particularly as the market was

17  extremely volatile with respect to unliquid securities, Joe

18  Sowin and I were on the phone several times a day.

19       Relating to the COVID issues, Brian Collins, who heads the

20  HR group, and I were on the phone several times a day.

21       Relating to structured equity, depending on what's

22  happening with a particular fund or what's happening in loan

23  prices, I speak to Hunter Covitz.  And it goes down the line.

24       So it really depends on each of the areas and what's going

25  on in the business, but I try to touch base with each of those

Seery - Direct                                21

1    department heads on a regular basis.

2        Frank Waterhouse, of course, is at least weekly.  We have

3    a standing call every week to make sure that we're focused on

4    liquidity, which is always a concern in a Chapter 11, and

5    Frank and his team are on that call and prepare weekly

6    materials for us.

7    Q    Okay.

8        MR. MORRIS:  Your Honor, before I move to the next

9    area of questions, the work of the Board, I just wanted to see

10   if the Court had any questions on the corporate organizational

11   structure, the internal structure of the business, or any of

12   the matters that Mr. Seery touched on?

13       THE COURT:  I do not.  And I do have in front of me a

14   demonstrative aid that Mr. Annable sent over ahead of time, so

15   I appreciate that as well.

16       MR. MORRIS:  Okay.  Your Honor, I think Mr. Seery

17   covered much of what's on that document, but if you'd like him

18   to go through that, we're happy to do it.

19       THE COURT:  No, that's fine.

20       MR. MORRIS:  Okay.

21   BY MR. MORRIS:

22   Q    Then let's shift gears a little bit and start talking

23   about the work of the Independent Board itself.  The

24   Independent Board was appointed in mid-January; is that right?

25   A    Yeah.  It was the first -- January 9th, the first week of

Seery - Direct                               22

1   January, and we started working that afternoon.

2   Q    Okay.  Can you describe for the Court what the -- the

3   Board's initial focus?  What were you focused on?

4   A    Well, if you think about the areas that I just mentioned

5   previously, the Board initially, for lack of a better term,

6   gang-tackled everything.  So we tried to make sure that we had

7   a broad base of understanding among the three of us with

8   respect to the business.

9        I, because of my background, had a lot more familiarity

10  with asset management, these type of asset security

11  businesses.  But we wanted to make sure that each of us was at

12  least facile with the main areas that we had to understand.

13  First was operations.  How does the company run each day?

14  Particularly, how was it going to run without Mr. Dondero?

15  And I went through some of those functional areas and how we

16  thought about those and who head each of those.

17       Next in the -- I don't mean to say it's second, because

18  it's always first, but liquidity.  What did the Debtors'

19  liquidity look like?  How are we going to manage that

20  liquidity, not just for the near-term, but also for the

21  medium-term, and then even into the slightly longer-term?  We

22  had to think about what assets are there, what money those

23  assets might need that we would have to invest in them, and

24  whether there was liquidity in those assets that we can create

25  liquidity in order to fund the Debtors' business.

Seery - Direct                                23

1      Personnel, we needed a good opportunity to understand who

2   did what, not just in the senior managers that I mentioned,

3   but deeper into the staff, because we're going to rely on

4   those folks.   Particularly worked through with DSI.

5      As I mentioned, the Debtor, unlike a lot of other asset

6   managers, owns a lot of assets.   It's a disparate group of

7   assets, but getting a feel and understanding for what those

8   assets were, what the critical issues surrounding those assets

9   are, who managed them day-to-day:   We wanted to make sure that

10  each of the directors had a good (inaudible) and understanding

11  of those issues that might arise with respect to those assets,

12  and a good sense of how quickly those issues could, you know,

13  further arise.

14      We also had to get a very good understanding of each of

15  the funds that we manage.   As I said, the Investment Advisors

16  Act puts a fiduciary duty on Highland Capital to discharge its

17  duty to the investors.   So while we have duties to the estate,

18  we also have duties, as I mentioned in my last testimony, to

19  each of the investors in the funds.

20      Now, some of them are related parties, and those are a

21  little bit easier.   Some of them are owned by Highland.   But

22  there are third-party investors in these funds who have no

23  relation whatsoever to Highland, and we owe them a fiduciary

24  duty both to manage their assets prudently but also to seek to

25  maximize value.   And we wanted to make sure we had a good

Seery - Direct                                        24

1    understanding of that.

2         Finally, with respect to the shared service arrangements,

3    we needed to get an understanding of that $6 billion in assets

4    and how our business, HCMLP, worked with those -- those shared

5    service counterparties and exactly who did what for whom.

6    It's very complicated because it had been run much more on a

7    functional basis than on a line basis from each contract.  So

8    it's not as if your employees are allocated to NexBank.  It's

9    the whole panoply of businesses that we enter into, and

10   providing those services to NexBank, not through a central

11   point but through whatever requests come in from the counter-

12   parties.  So we needed a good understanding of what those

13   contracts looked and what those obligations were.

14              A VOICE:  John, you're on mute.

15              MR. MORRIS:  Thank you.

16   BY MR. MORRIS:

17   Q    All of that work was going on in the first weeks of the

18   appointment of the Board?

19   A    Yeah, it would not be fair to say we could do that in a

20   couple weeks.  So it took far longer than that.  But that

21   didn't mean that issues didn't start to arise immediately in

22   February.  And so, while we were learning, we were also

23   starting to get a feel for different things that could happen

24   in the company.

25        As in many companies, immediately, one of the first things

Seery – Direct                                      25

1   you have to deal with is, particularly at the beginning of the

2   year, what does compensation look like; who are the -- what do

3   promotions look like; are you going to be able to hold this

4   team together to service these assets?  And yeah, we had that,

5   with an additional wrinkle that Highland's payment structure

6   defers a significant amount of compensation to its employees,

7   and it vests over time, and it has the very typical provision

8   that if you are not there when it vests -- when it is going to

9   be paid, actually, not when it vests.  Even if you're vested,

10  if you're not there when it gets paid, you're not entitled to

11  it.  And so understanding who was owed what; how the vesting

12  worked; what the compensation structure looked like compared

13  to third parties, was one of the first things we had to do.

14  And Highland has an extremely robust review process.  Brian

15  Collins manages it.  It's first-rate.  It goes through both

16  360 in terms of what other employees think of each other as

17  well as bottoms up, in terms of performance.  And then it has

18  a top-down component, which ultimately ran through Mr.

19  Dondero.  Since he was effectively removed from that role, the

20  Board had to jump in and get a full understanding with Brian

21  about what the process looked like; how it was going to work;

22  how it compared to other firms; and whether we could go

23  forward with it.  And that was one of the motions that was

24  brought early to the Court.

25  A    Let's talk a minute about the transactional work that the

Case 21-03067-sgj    Doc 130-1    Filed 11/18/22    Entered 11/18/22 15:55:14    Desc
Appendix    Page 15 of 222
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 133 of 134

133

1   yesterday counsel for Mr. Dondero filed a joinder in the

2   Debtors' objection to Acis's claim.  So, again, just thinking

3   about this in the context of mediation, I think, with that

4   joinder, they will be a necessary party.  So, going back to

5   Mr. Seery's point, this is not just --

6          THE COURT:  Oh, absolutely.  Mr. Dondero is --

7          MS. PATEL:  -- a two-party --

8          THE COURT:  -- going to be a required party in

9   mediation.  Absolutely.  So, --

10          MS. PATEL:  Thank you, Your Honor.

11          THE COURT:  All right.  Well, if there's nothing

12  further, we'll see you on the 21st.  And, again, my courtroom

13  deputy may be reaching out before then if we've got things

14  nailed down on mediation.

15      (Proceedings concluded at 4:54 p.m.)

16                          --oOo--

17

18

19

20
                          CERTIFICATE
21
        I certify that the foregoing is a correct transcript to
22  the best of my ability from the electronic sound recording of
    the proceedings in the above-entitled matter.
23
    **/s/ Kathy Rehling**                    **07/16/2020**
24
    _____        _____
25  Kathy Rehling, CETD-444                  Date
    Certified Electronic Court Transcriber

EXECUTION VERSION

Between

CLO HOLDCO, LTD.

And

HARBOURVEST DOVER STREET IX INVESTMENT L.P.

And

HARBOURVEST 2017 GLOBAL AIF L.P.

And

HARBOURVEST 2017 GLOBAL FUND L.P.

And

HV INTERNATIONAL VIII SECONDARY L.P.

And

HARBOURVEST SKEW BASE AIF L.P.

And

HIGHLAND CAPITAL MANAGEMENT, L.P.

And

LEE BLACKWELL PARKER, III

And

QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311

And

QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811

And

QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612

And

QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211

And

HIGHLAND CLO FUNDING, LTD.

And

HIGHLAND HCF ADVISOR, LTD.

---

MEMBERS AGREEMENT RELATING TO THE COMPANY

---

EXHIBIT

2

APP_0015

TABLE OF CONTENTS

1.     INTERPRETATION ................................................................. 2

2.     THE BUSINESS OF THE COMPANY ........................................... 4

3.     VOTING RIGHTS .................................................................. 4

4.     ADVISORY BOARD ............................................................... 4

5.     DEFAULTING MEMBERS ........................................................ 4

6.     TRANSFERS OR DISPOSALS OF SHARES ................................. 4

7.     CONFIDENTIALITY ............................................................... 4

8.     DIVIDENDS ........................................................................ 9

9.     TERM OF THE COMPANY ...................................................... 9

10.    ERISA MATTERS ................................................................. 9

11.    TAX MATTERS .................................................................... 9

12.    AMENDMENTS TO CERTAIN AGREEMENTS ............................... 9

13.    FINANCIAL REPORTS ........................................................... 9

14.    TERMINATION AND LIQUIDATION ........................................... 9

15.    WHOLE AGREEMENT ........................................................... 12

16.    STATUS OF AGREEMENT ...................................................... 12

17.    ASSIGNMENTS ................................................................... 12

18.    VARIATION AND WAIVER ...................................................... 12

19.    SERVICE OF NOTICE ........................................................... 12

20.    GENERAL .......................................................................... 13

21.    GOVERNING LAW AND JURISDICTION .................................... 14

SCHEDULE ................................................................................. 18
Adherence Agreement ................................................................... 18

THIS AGREEMENT is made the 15th day of November 2017

BETWEEN

(1)     CLO HOLDCO, LTD. whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)     HARBOURVEST DOVER IX INVESTMENT L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)     HARBOURVEST 2017 GLOBAL AIF L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)     HARBOURVEST 2017 GLOBAL FUND L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)     HV INTERNATIONAL VIII SECONDARY L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)     HARBOURVEST SKEW BASE AIF L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)     HIGHLAND CAPITAL MANAGEMENT, L.P. of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)     LEE BLACKWELL PARKER, III of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)     QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311 of 17171 Park Row #100, Houston, Texas 77084, USA

(10)    QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811 of 17171 Park Row #100, Houston, Texas 77084, USA

(11)    QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612 of 17171 Park Row #100, Houston, Texas 77084, USA

(12)    QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211 of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "Members") and

(13)    HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "Company") and

(14)    HIGHLAND HCF ADVISOR, LTD., whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Portfolio Manager").

WHEREAS:

(A)     The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)     The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, the (the "Offering Memorandum"), subject to the restrictions set forth therein.

23981765.11. BUSINESS                    1

(C)    The Members are the owners of the entire issued capital of the Company.

(D)    The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

OPERATIVE PROVISIONS

1.    INTERPRETATION

In this Agreement, including the Schedule:

1.1    the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

"Adherence Agreement" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

"Advisers Act" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

"Affiliate" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

"Agreement" means this agreement together with the Schedule;

"Articles" means the articles of incorporation of the Company as amended from time to time;

"Business" means the business of the Company as described in Recital (B);

"Business Day" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

"Directors" means the directors of the Company from time to time;

"CLO Holdco" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Directors" means the directors of the Company from time to time;

"Dover IX" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

"DOL" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"DOL Regulations" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

23981765.11. BUSINESS                    2

"Dover IX" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"ERISA Member" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"HarbourVest Entities" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"Highland Principals" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"Law" means the Companies (Guernsey) Law, 2008, as amended;

"Member" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"Parties" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"Shares" means ordinary shares in the Company;

"Subsidiary" shall have the meaning ascribed to it in the Law;

"Subscription and Transfer Agreement" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager.

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2   any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3   any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4   any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5   any reference to time shall be to Guernsey time;

1.6   except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

APP_0019

1.7    unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8    Clause headings are for ease of reference only and do not affect the construction of any provision.

2.    THE BUSINESS OF THE COMPANY

2.1    The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2    The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3    The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

3.    VOTING RIGHTS

3.1    The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto are Members.

3.2    The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

    3.2.1    any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

    3.2.2    any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

    3.2.3    any conversion or redemption of Shares, except pursuant to Clause 5.5,

    3.2.4    any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

    3.2.5    the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

    3.2.6    the suspension of the calculation of the NAV; other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4.    ADVISORY BOARD.

4.1    <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "Advisory Board") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2    <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.  Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3    <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters.  The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

Memorandum. Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4    Term of Members of Advisory Board.  A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5    No Duties to Other Members.  No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.    DEFAULTING MEMBERS

5.1    In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "Outstanding Settlement Amount"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "Default Interest Rate") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5).  No such Shares which have failed to be settled will be issued to any Member until settlement of the full amount of the purchase price has been made.  In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "Defaulting Member"), the following provisions shall apply:

5.2    Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3    The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

5.4    The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5    The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6    The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7    At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8    The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9    Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6.    TRANSFERS OR DISPOSALS OF SHARES

6.1    No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "Transfer"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1   such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2   such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3   such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4   such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2   Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again. Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3   No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4   Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer.  The transferor and/or the transferee shall bear all costs of any Transfer.

6.5   The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6   All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

7.    CONFIDENTIALITY

7.1    Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2    Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

8.    DIVIDENDS

8.1    The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

9.    TERM OF THE COMPANY

9.1    Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "Term"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2    Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

10.    ERISA MATTERS

10.1    The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold.  In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

11.    TAX MATTERS

11.1    PFIC. For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

APP_0025

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company; provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2   CFC. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3   Other Tax Information. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company; provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year  and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4   Withholding and Other Taxes. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12.   AMENDMENTS TO CERTAIN AGREEMENTS

12.1   The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "Management Agreement") without the consent of the Parties.

12.2   The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company.  Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate; provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3   The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13.   FINANCIAL REPORTS

13.1   The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2    After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

14.    TERMINATION AND LIQUIDATION

14.1    Save as provided for in Clause 13.2, this Agreement shall terminate:

14.1.1    when one Party holds all the Shares;

14.1.2    when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

14.1.3    with the written consent of all the Parties.

14.2    The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3    Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4    Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

14.4.1    all existing contracts of the Company are performed to the extent that there are sufficient resources;

14.4.2    the Company shall not enter into any new contractual obligations;

14.4.3    the Company is dissolved and its assets are distributed as soon as practical; and

14.4.4    any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

15.   WHOLE AGREEMENT

15.1   This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2   Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3   Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16.   STATUS OF AGREEMENT

16.1   Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2   If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17.   ASSIGNMENTS

Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18.   VARIATION AND WAIVER

18.1   A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2   A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3   A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19.   SERVICE OF NOTICE

19.1   Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

19.1.1   to the Company:
Address:
First Floor, Dorey Court, Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

19.1.2   to CLO Holdco:

APP_0028

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3    to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4    to any other Party: by post or hand delivery only to the address specified in the register of members of the Company.

19.2    Communications sent by post shall be deemed to have been received 24 hours after posting. Communications sent by facsimile transmission shall be deemed to have been received at the time the transmission has been received by the addressee PROVIDED THAT if the facsimile transmission, where permitted, is received after 5.00pm or on a day which is not a Business Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3    In proving service by post it shall only be necessary to prove that the notice was contained in an envelope which was duly addressed and posted in accordance with this Clause and in the case of facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to the correct number.

20.    GENERAL

20.1    Each of the Parties hereby agree not to enter into or abide by any agreement whether written or oral with any one or more of the other Parties in respect of the voting of Shares or the submission of Member resolutions to any Members for voting by them, or otherwise to direct or influence, or attempt to direct or influence, the day-to-day management of the Company, either directly or indirectly, other than in order to comply with the other terms of this Agreement or the Articles.  In this regard, each of the Parties agrees to not to direct or influence or to attempt to direct or influence any of the Directors through any employment relationship that the Directors may have outside of the Company other than in order to comply with the other terms of this Agreement or the Articles.  Each of the Parties hereby agree that this provision shall continue to apply to them whether or not they are or remain a Member.

20.2    Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3    The Parties are not in partnership with each other and there is no relationship of principal and agent between them.

20.4    All transactions entered into between any Party and the Company shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an arm's length basis.

20.5    Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.

APP_0029

20.6    Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7    This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.  This Agreement may not be amended except with the consent of each Party.

21.     STATUS OF AGREEMENT

21.1    The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2    If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.

22.     GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

[Signature Page Follows.]

APP_0030

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written.

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:............................................................................
**Name:** Grant Scott
**Title:** Director

**APP_0031**

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:    HarbourVest Partners (Europe) Limited,
       its Alternative Investment Fund Manager

**By:** .........................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person

**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
       its Alternative Investment Fund Manager

**By:** .........................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person

**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:    HarbourVest 2017 Global Associates L.P.,
       its General Partner

By:    HarbourVest GP LLC,
       its General Partner

By:    HarbourVest Partners, LLC,
       its Managing Member

**By:** .........................................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner
By:     HarbourVest GP LLC
        Its General Partner
By:     HarbourVest Partners, LLC
        Its Managing Member

**By:**  ...........................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:     HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:**  ...........................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED**

Lee Blackwell Parker, III

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

Read and approved

By:
Name: Emmanuel Magel
Title: transactions supervisor

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

APP_0035

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:..........................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..........................................................
Name: *Emmanuel Maciel*
Title: *Transaction Supervisor*

*Recd & Approved*

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..........................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..........................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:.....................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:.....................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:.....................................................................
Name: *Emmanuel Magey*
Title: *Transactions Supervisor*

*Read and Approved:*

*[signature]* 11/7/17

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:.....................................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:........................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:........................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:........................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:........................................................
Name: *Emmanuel Madej*
Title: *Transaction Supervisor*

*Read and approved*

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:        Strand Advisors, Inc.,
           its General Partner

**By**:..........................................................................
**Name:** James Dondero
**Title:**   President

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

**By**:...............................................................

**Name:** James Dondero
**Title:**   President

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

**By**:...........................................................

**Name:** William Scott
**Title:** Director

APP_0041

SCHEDULE

Adherence Agreement

THIS ADHERENCE AGREEMENT is made on [  ] 200[  ]

BETWEEN:

(1)     [  ] of [  ] (the "Covenantor");

(2)     CLO HOLDCO, LTD. of [                              ] (a "Member");

(3)     [  ] of [                              ] (a "Member");

(4)     [  ] of [                              ] (a "Member");

(5)     HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at
        First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the
        "Company")

(6)     HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited,
        PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Portfolio
        Manager").


RECITAL

This Agreement is supplemental to the members agreement made on November 15 2017 between the
Members, the Portfolio Manager and the Company (the "Members Agreement").

IT IS HEREBY AGREED as follows:

1.      The Covenantor hereby confirms that he has been supplied with a copy of the Members
        Agreement and hereby covenants with each of the parties thereto to observe, perform and be
        bound by all the terms of the Members Agreement as if it were a party thereto.

2.      Each of the other parties to the Members Agreement hereby covenants with the Covenantor that
        the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he
        were a party thereto.

3.      This Agreement shall be governed by and construed in accordance with Guernsey law.

IN WITNESS of which this Agreement has been executed by the Covenantor and each of the parties
to the Members Agreement on the date shown above.

APP_0042

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS,** on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

US-DOCS\115534291.12

EXHIBIT

3

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.  **Settlement of Claims.**

    (a)    In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

        (i)    an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

        (ii)    an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

    (b)    On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests.  The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.  **Releases.**

    (a)    Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

**EXECUTION VERSION**

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.** The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court. The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court. The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

**EXECUTION VERSION**

4.    <u>**Representations and Warranties**</u>. Subject in all respects to Section 3 hereof:

(a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.    <u>**Plan Support.**</u>

**(a)**    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) <u>not</u> (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; <u>provided</u>, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "<u>Support Termination Event</u>"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.     **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.     **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.     **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.      **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

**EXECUTION VERSION**

14.    <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

                                          **HIGHLAND CAPITAL MANAGEMENT, L.P.**

                                          By:     /s/ James P. Seery, Jr.
                                            Name: James P. Seery, Jr.
                                            Its:      CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:    /s/ Michael Pugatch
Name:  Michael Pugatch
Its:    Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:    /s/ Michael Pugatch
Name:  Michael Pugatch
Its:    Managing Director

9

APP_0051

# Exhibit A

**TRANSFER AGREEMENT**

**FOR ORDINARY SHARES OF**

**HIGHLAND CLO FUNDING, LTD.**

This Transfer Agreement, dated as of December **[__]**, 2020 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following:  HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

    a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

    b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

ActiveUS 183646253v.3

c.  Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of  the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d.  Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e.  This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2.  <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b.  This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c.  The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d.  The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e.  The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

2

3.  <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4.  <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5.  <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6.  <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

3

b.  The parties to this Transfer Agreement acknowledge that the terms of this Transfer
    Agreement are the result of arms'-length negotiations between the parties and their
    respective counsel. Each party and its counsel cooperated in the drafting and preparation
    of this Transfer Agreement.  In any construction to be made of this Transfer Agreement,
    the language or drafting of this Transfer Agreement will not be construed against any
    party.

c.  This Transfer Agreement shall be governed by, and construed and enforced in accordance
    with, the internal substantive laws of the state of Delaware, without giving effect to
    conflicts of law principles.

d.  The representations, warranties and covenants of the Transferors and the Transferee shall
    remain in full force and effect following the transfer of the Interest, and the Fund and the
    Portfolio Manager thereafter may rely on all such representations, warranties and
    covenants.

e.  This Transfer Agreement may be executed in multiple counterparts, each of which shall
    be deemed to be an original, but all of which together shall constitute one and the same
    instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be
    used in lieu of the originals of this Transfer Agreement for any purpose.

f.  Captions of sections have been added only for convenience and shall not be deemed to be
    a part of this Transfer Agreement.

g.  This Transfer Agreement is among the parties hereto.  No Person that is not a party
    hereto shall have any right herein as a third-party beneficiary or otherwise except as
    expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

ActiveUS 183646253v.3

APP_0056

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.


**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member


By: _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer


**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**


By: _____

Name:  James P. Seery, Jr.

Title:  President


**FUND:**
**Highland CLO Funding, Ltd.**


By: _____

Name:

Title:

ActiveUS 183646253v.3

*[Additional Signatures on Following Page]*

APP_0058

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of
the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed
Investment Manager

By: HarbourVest Partners, LLC


By: _____

Name: Michael Pugatch

Title: Managing Director

**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

**HarbourVest Skew Base AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
        Its Alternative Investment Fund
Manager

By:     HarbourVest Partners L.P.
        Its Duly Appointed Investment
        Manager

By:     HarbourVest Partners, LLC
        Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

7

**HarbourVest 2017 Global Fund L.P.**

By:    HarbourVest 2017 Global Associates L.P.
       Its General Partner

By:    HarbourVest GP LLC
       Its General Partner

By:    HarbourVest Partners, LLC
       Its Managing Member


By: _____

Name: Michael Pugatch

Title: Managing Director

8

APP_0060

Case 19-34054-sgj11 Doc 1631-1 Filed 12/21/22 Entered 12/21/22 15:35:14 Desc

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | [____] | [____] |
| HarbourVest 2017 Global AIF L.P. | [____] | [____] |
| HarbourVest 2017 Global Fund L.P. | [____] | [____] |
| HV International VIII Secondary L.P. | [____] | [____] |
| HarbourVest Skew Base AIF L.P. | [____] | [____] |

9



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 20, 2021**

_____

**United States Bankruptcy Judge**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

### ORDER APPROVING DEBTOR'S SETTLEMENT
### WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154) AND
### AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "<u>Motion</u>"),[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "<u>Debtor</u>") in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>"); and this Court having considered (a) the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

**EXHIBIT**

**4**

**APP_0062**

Motion; (b) the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1631] (the "Morris Declaration"), and the exhibits annexed thereto, including the Settlement Agreement attached as **Exhibit "1"** (the "Settlement Agreement"); (c) the arguments and law cited in the Motion; (d) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest* [Docket No. 1697] (the "Dondero Objection"), filed by James Dondero; (e) the *Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1706] (the "Trusts' Objection"), filed by the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"); (f) *CLO Holdco's Objection to HarbourVest Settlement* [Docket No. 1707] (the "CLOH Objection" and collectively, with the Dondero Objection and the Trusts' Objection, the "Objections"), filed by CLO Holdco, Ltd.; (g) the *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "Debtor's Reply"), filed by the Debtor; (h) the *HarbourVest Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest and Authorizing Actions Consistent Therewith* [Docket No. 1734] (the "HarbourVest Reply"), filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"); (i) the testimonial and documentary evidence admitted into evidence during the hearing held on January 14, 2021 (the "Hearing"), including assessing the credibility of the witnesses; and (j) the

2

arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed, for the reasons stated on the record, (1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED** that:

1.     The Motion is **GRANTED** as set forth herein.

2.     All objections to the Motion are overruled.

3.     The Settlement Agreement, attached hereto as **Exhibit 1**, is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

4.      All objections to the proofs of claim subject to the Motion[3] are overruled as moot in light of the Court's approval of the Settlement Agreement.

5.      The Debtor, HarbourVest, and all other parties are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

6.      Pursuant to the express terms of the *Members Agreement Relating to the Company*, dated November 15, 2017, HarbourVest is authorized to transfer its interests in HCLOF to a wholly-owned and controlled subsidiary of the Debtor pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.* without the need to obtain the consent of any party or to offer such interests first to any other investor in HCLOF.

7.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

---

[3] This includes the *Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906].

DOCS_NY:41987.4 36027/002

APP_0065

# EXHIBIT 1

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand.  Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

### R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS**, on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.    **Settlement of Claims.**

  (a) In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

    (i) an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

    (ii) an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

  (b) On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2.    **Releases.**

  (a) Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

US-DOCS\115534291.12

**EXECUTION VERSION**

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)    Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii) each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)    Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.    **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

US-DOCS\115534291.12

**EXECUTION VERSION**

4.    **Representations and Warranties**.  Subject in all respects to Section 3 hereof:

(a)    each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b)    the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5.    **Plan Support.**

(a)    Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b)    In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c)    The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

APP_0071

**EXECUTION VERSION**

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.     **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

US-DOCS\115534291.12

**EXECUTION VERSION**

      14.    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

                                    **HIGHLAND CAPITAL MANAGEMENT, L.P.**


                        By:     /s/ James P. Seery, Jr.
                        Name: James P. Seery, Jr.
                        Its:    CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**


By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**


By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**


By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**


By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its
Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed
Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:      /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director


**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General
Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC,
its Managing Member**

By:      /s/ Michael Pugatch
Name: Michael Pugatch
Its:      Managing Director

9

APP_0075

# Exhibit A

APP_0076

## TRANSFER AGREEMENT
## FOR ORDINARY SHARES OF
## HIGHLAND CLO FUNDING, LTD.

This Transfer Agreement, dated as of January _____, 2021 (this "**Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), HCMLP Investments, LLC (the "**Transferee**") and each of the following: HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., and HarbourVest Skew Base AIF L.P. (collectively, the "**Transferors**").

WHEREAS, each Transferor is the record, legal and beneficial owner of the number of ordinary shares ("**Shares**") of the Fund set forth opposite such Transferor's name on Exhibit A hereto (with respect to each Transferor, the "**Transferred Shares**").

WHEREAS the Transferee is an affiliate and wholly owned subsidiary of Highland Capital Management, L.P. ("**HCMLP**") which is one of the initial members of the Fund.

WHEREAS, each Transferor wishes to transfer and assign 100% of its rights, title and interest as a shareholder in the Fund, including the Transferred Shares (the "**Interest**") on the terms set forth in this Transfer Agreement.

WHEREAS, subject to and in connection with the approval of that certain Settlement Agreement, dated on or about the date hereof, by and among HCMLP and the Transferors (the "**Settlement Agreement**"), the Transferee desires that the Interest be transferred to Transferee and that thereafter the Transferee will become a Shareholder and the Transferors will no longer be Shareholders.

WHEREAS, the Portfolio Manager desires to consent to such transfers and to the admission of Transferee as a Shareholder on the terms set forth herein, and the Transferors and Transferee agree to such terms.

WHEREAS, the Fund desires to amend its records to reflect the foregoing transfers.

NOW, THEREFORE, the parties hereto agree as follows:

1. Transfer of Shares and Advisory Board

   a. Each Transferor hereby transfers and assigns all of its rights, title, and interest in its Interest to the Transferee, and the Transferee wishes to be admitted to the Fund as a Shareholder.

   b. In connection with the transfer of the Interest as contemplated herein, the Transferee shall be granted the right to appoint a representative to the Fund's advisory board (the "**Advisory Board**") to replace the Transferors' appointed representative to the Advisory Board.

ActiveUS 184668980v.2

c.  Transferee hereby assumes all of Transferor's rights and obligations in respect of the Interest effective as of the Effective Date (as defined below) and acknowledge that thereafter Transferee shall be subject to the applicable terms and provisions of the Members' Agreement dated as of November 15, 2017 (the "**Members' Agreement**"), the Articles of Incorporation adopted November 15, 2017 (the "**Articles**") and the Subscription and transfer Agreement, dated as of November 15, 2017 among each Transferor, the Fund and the Portfolio Manager (the "**Subscription Agreement**", and together with the Members' Agreement and the Articles, the "**Fund Agreements**") with respect to the Interest. Transferee does not assume any liability or responsibility for any obligations or liabilities incurred by any Transferor prior to the Effective Date of the transfer.

d.  Following the transfer, each Transferor shall have no further rights or obligations to any party hereunder in respect of the Interest under the Fund Agreements.

e.  This Transfer Agreement, and the parties' obligations hereunder, are conditioned in all respects on the approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement, and each of the parties agree that no further action shall be required from any party for the transfer of the Interest to be effective except as described herein.

2. <u>Transferee's Representations and Warranties</u>.  The Transferee represents and warrants to the Transferors, the Portfolio Manager, and the Fund as follows:

a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferee, enforceable against it in accordance with its terms;

b.  This Transfer Agreement has been duly and validly executed and delivered by or on behalf of the Transferee and such execution and delivery have been duly authorized by all necessary trust action of the Transferee;

c.  The Transferee acknowledges receipt of, has read, and is familiar with, the Fund's Offering Memorandum for Placing Shares dated November 15, 2017 (the "**Offering Memorandum**") and the Fund Agreements;

d.  The Transferee hereby accepts and receives the Interest from the Transferors for investment, and not with a view to the sale or distribution of any part thereof, and the Transferee has no present intention of selling, granting participations in, or otherwise distributing the same, but subject nevertheless to any requirement of law that the disposition of the Transferee's property shall at all times be within such Transferee's control; and

e.  The Transferee is an "Eligible U.S. Investor" as defined in the Offering Memorandum.

ActiveUS 184668980v.2

3. <u>Transferors' Representations and Warranties</u>.  Each Transferor represents and warrants to the Transferee, the Portfolio Manager, and the Fund as follows:

    a.  This Transfer Agreement constitutes a valid and binding obligation of the Transferor, enforceable against it in accordance with its terms;

    b.  This Transfer Agreement has been duly authorized, and duly and validly executed and delivered by the Transferor and such execution and delivery have been duly authorized by all necessary action of the Transferor; and

    c.  As of the date hereof, the Transferor has good and valid title to the Transferor's Interest, free and clear of any liens, vesting requirements or claims by others.

4. <u>Consent to Transfer</u>.  Based in part on the representations and warranties of the Transferors and the Transferee which are included herein, and on the terms contained herein, the Portfolio Manager and the Fund hereby consent to the transfers of the Interest, the admission of the Transferee as a Shareholder and the Transferee's appointment of a representative to the Advisory Board, the Portfolio Manager's execution of this Transfer Agreement constituting its prior written consent to the transfers of the Interest for the purposes of article 18.1 of the Articles and this Transfer Agreement constituting express notice in writing to the Fund of the assignment set out at clause 1(c) above for the purposes of the Law of Property (Miscellaneous Provisions) (Guernsey) Law, 1979 (as amended).

5. <u>Completion</u>: As of the date of approval by the Bankruptcy Court for the Northern District of Texas, Dallas Division pursuant to Federal Rule of Bankruptcy Procedure 9019 of (*i*) this Transfer Agreement and (*ii*) the Settlement Agreement (the "**Effective Date**"):

    a.  each Transferor shall deliver or cause to be delivered to the Transferee a transfer instrument relating to the Transferred Shares duly executed and completed by that Transferor in favor of the Transferee; and

    b.  the Transferee shall deliver to the Transferors and the Fund a duly executed and dated Adherence Agreement (as defined in the Members' Agreement).

 Prior to the Effective Date the Transferee shall procure that:

    c.  the board of directors of the Fund shall hold a meeting at which the transfer of the Shares to the Transferee shall be approved and registration in the register of members of the Fund shall be effected on the Effective Date.

6. <u>Miscellaneous</u>.

    a.  Each of the parties hereto agree to execute any further instruments and perform any further acts which are or may become reasonably necessary to carry out the intent of this Transfer Agreement or are reasonably requested by the Portfolio Manager, the Fund or a Transferor to complete the transfer of the Interest.

b.  The parties to this Transfer Agreement acknowledge that the terms of this Transfer Agreement are the result of arms'-length negotiations between the parties and their respective counsel. Each party and its counsel cooperated in the drafting and preparation of this Transfer Agreement.  In any construction to be made of this Transfer Agreement, the language or drafting of this Transfer Agreement will not be construed against any party.

c.  This Transfer Agreement shall be governed by, and construed and enforced in accordance with, the internal substantive laws of the state of Delaware, without giving effect to conflicts of law principles.

d.  The representations, warranties and covenants of the Transferors and the Transferee shall remain in full force and effect following the transfer of the Interest, and the Fund and the Portfolio Manager thereafter may rely on all such representations, warranties and covenants.

e.  This Transfer Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Transfer Agreement for any purpose.

f.  Captions of sections have been added only for convenience and shall not be deemed to be a part of this Transfer Agreement.

g.  This Transfer Agreement is among the parties hereto.  No Person that is not a party hereto shall have any right herein as a third-party beneficiary or otherwise except as expressly contemplated hereby.

*[Remainder of Page Intentionally Blank]*

4

APP_0080

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFEREE:**

**HCMLP Investments, LLC**

By: Highland Capital Management, L.P.

Its:  Member


By:  _____

Name:  James P. Seery, Jr.

Title:  Chief Executive Officer



**PORTFOLIO MANAGER:**

**Highland HCF Advisor, Ltd.**


By:  _____

Name:  James P. Seery, Jr.

Title:  President



**FUND:**
**Highland CLO Funding, Ltd.**


By:  _____

Name:

Title:


*[Additional Signatures on Following Page]*

ActiveUS 184668980v.2

APP_0081

IN WITNESS WHEREOF, the undersigned have executed this Transfer Agreement as of the date first above written.

**TRANSFERORS:**

**HarbourVest Dover Street IX Investment L.P.**

By: HarbourVest Partners L.P., its Duly Appointed Investment Manager

By:  HarbourVest Partners, LLC


By: _____

Name: Michael Pugatch

Title: Managing Director


**HV International VIII Secondary L.P.**

By:     HIPEP VIII Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest 2017 Global AIF L.P.**

By:     HarbourVest Partners (Ireland) Limited
Its Alternative Investment Fund Manager

By:     HarbourVest Partners L.P.
Its Duly Appointed Investment Manager

By:     HarbourVest Partners, LLC
Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director


**HarbourVest Skew Base AIF L.P.**

By:    HarbourVest Partners (Ireland) Limited
       Its Alternative Investment Fund Manager

By:    HarbourVest Partners L.P.
       Its Duly Appointed Investment Manager

By:    HarbourVest Partners, LLC
       Its General Partner

By: _____

Name: Michael Pugatch

Title: Managing Director

ActiveUS 184668980v.2

**HarbourVest 2017 Global Fund L.P.**

By:     HarbourVest 2017 Global Associates L.P.
        Its General Partner

By:     HarbourVest GP LLC
        Its General Partner

By:     HarbourVest Partners, LLC
        Its Managing Member

By: _____

Name: Michael Pugatch

Title: Managing Director

*[Signature Page to Transfer of Ordinary Shares of Highland CLO Funding, Ltd.]*

7

APP_0083

**Exhibit A**

| Transferee Name | Number of Shares | Percentage |
|---|---|---|
| HarbourVest Dover Street IX Investment L.P. | 54,355,482.14 | 71.0096% |
| HarbourVest 2017 Global AIF L.P. | 7,426,940.38 | 9.7025% |
| HarbourVest 2017 Global Fund L.P. | 3,713,508.46 | 4.8513% |
| HV International VIII Secondary L.P. | 9,946,780.11 | 12.9944% |
| HarbourVest Skew Base AIF L.P. | 1,103,956.03 | 1.4422% |

ActiveUS 184668980v.2

APP_0084

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION. If you are in any doubt as to the action you should take or the contents of this document, you are recommended to seek your own independent financial advice immediately from your stockbroker, bank, solicitor, accountant, or other appropriate independent financial adviser, who is authorised under the Financial Services and Markets Act 2000, as amended ("FSMA") if you are in the United Kingdom, or from another appropriately authorised independent financial adviser if you are in a territory outside the United Kingdom.**

**A copy of this document, which comprises an offering memorandum (the "Offering Memorandum") relating to Highland CLO Funding, Ltd. (the "Company") in connection with the issue of Placing Shares in the Company, is available at the Company's registered office upon request.**

**The Placing Shares are only suitable for investors: (i) who understand the potential risk of capital loss and that there may be limited liquidity in the underlying investments of the Company; (ii) for whom an investment in the Placing Shares is part of a diversified investment programme; and (iii) who fully understand and are willing to assume the risks involved in such an investment programme. It should be remembered that the price of the Placing Shares and the income from them can go down as well as up and that investors may not receive, on the sale or cancellation of the Placing Shares, the amount that they invested.**

The Company and its directors (whose names appear in the section of this Offering Memorandum entitled "*Company Directors and Administration*") (the "**Directors**") accept responsibility for the information contained in this Offering Memorandum. To the best of the knowledge of the Company and the Directors (who have taken all reasonable care to ensure that such is the case), the information contained in the Offering Memorandum is in accordance with the facts and contains no omission likely to affect its import. The Directors have taken all reasonable care to ensure that the facts stated in the Offering Memorandum are true and accurate in all material respects, and that there are no other facts the omission of which would make misleading any statement in this Offering Memorandum, whether of facts or of opinion. All the Directors accept responsibility accordingly.

**Potential investors should read the whole of this Offering Memorandum when considering an investment in the Placing Shares and, in particular, attention is drawn to the section of this Offering Memorandum entitled "*Risk Factors*" on pages 18 to 47 of this Offering Memorandum.**

_____

### HIGHLAND CLO FUNDING, LTD.

*(a closed-ended investment company limited by shares incorporated under the laws of Guernsey with registered number 60120)*

**Placing for a target issue of U.S. $153,000,000 of Placing Shares**

_____

This Offering Memorandum does not constitute or form part of any offer or invitation to sell, or the solicitation of an offer to acquire or subscribe for, any securities other than the securities to which it relates or any offer or invitation to sell or issue, or any solicitation of any offer to purchase or subscribe for such securities by any person in any circumstances in which such offer or solicitation is unlawful.

The Placing Shares have not been and will not be registered under the U.S. Securities Act of 1933 (the "**U.S. Securities Act**") or under the securities laws of any state or other jurisdiction of the United States. The Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.

The Company has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "**U.S. Investment Company Act**") and investors will not be entitled to the benefits of the U.S. Investment Company Act. There will be no public offer of the Placing Shares in the United States.

**Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of the Placing Shares or passed upon or endorsed the merits of the offering of the Placing Shares or the adequacy or accuracy of this Offering Memorandum. Any representation to the contrary is a criminal offence in the United States.**

Except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by: (i) investors using assets of: (A) an "employee benefit plan" as defined in Section 3(3)

EXHIBIT

5

P_0085

of the United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the United States Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**"), including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

The distribution of this Offering Memorandum and the offer of the Placing Shares in certain jurisdictions may be restricted by law.  No action has been or will be taken to permit the possession, issue or distribution of this Offering Memorandum (or any other offering or publicity material relating to the Placing Shares) in any jurisdiction where action for that purpose may be required or doing so is restricted by law.  Accordingly, neither this Offering Memorandum, nor any advertisement, nor any other offering material may be distributed or published in any jurisdiction except under circumstances that will result in compliance with any applicable laws and regulations. Persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions.  None of the Company or any of its affiliates or advisors accepts any legal responsibility for any breach by any person, whether or not a prospective investor, of any such restrictions.

**In addition, the Placing Shares are subject to restrictions on transferability and resale in certain jurisdictions and may not be transferred or resold except as permitted under applicable securities laws and regulations. Investors may be required to bear the financial risks of their investment in the Placing Shares for an indefinite period of time.  Any failure to comply with these restrictions may constitute a violation of the securities laws of any such jurisdictions.  For further information on restrictions on offers, sales and transfers of the Placing Shares, please refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".**

In making an investment decision, each investor must rely on their own examination, analysis and enquiry of the Company and the terms of the Placing including the merits and risks involved.  The investors also acknowledge that they have relied only on the information contained in this document.  No person has been authorised to give any information or make any representations other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied on as having been so authorised.  Neither the delivery of this Offering Memorandum nor any subscription or sale made under it shall, under any circumstances, create any implication that there has been no change in the affairs of the Company since the date of this document or that the information in it is correct as of any subsequent time.

None of the Company or any of its representatives is making any representation to any prospective investor in respect of the Placing Shares regarding the legality of an investment in the Placing Shares by such prospective investor under the laws applicable to such prospective investor.

The contents of this Offering Memorandum should not be construed as legal, financial or tax advice.  Each prospective investor should consult his, her or its own legal, financial or tax adviser for legal, financial or tax advice.

The Company is a registered closed-ended collective investment scheme pursuant to The Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended and the Registered Collective Investment Schemes Rules 2015 issued by the Guernsey Financial Services Commission. Neither the Guernsey Financial Services Commission nor the States of Guernsey take any responsibility for the soundness of the Company or for the correctness of any statements made or opinions expressed with regard to it.

If you are in any doubt about the contents of this Offering Memorandum you should consult your accountant, legal or professional adviser or financial adviser.

This Offering Memorandum has not been reviewed by the Guernsey Financial Services Commission and, in granting registration, the Guernsey Financial Services Commission has relied upon specific warranties provided by State Street (Guernsey) Limited, the Company's designated administrator.

It should be remembered that the price of securities and the income from them can go down as well as up.

**You are wholly responsible for ensuring that all aspects of the Company are acceptable to you.  Investment in the Company may involve special risks that could lead to a loss of all or a substantial portion of such investment.**

**Unless you fully understand and accept the nature of the Company and the potential risks inherent in this Company you should not invest in the Company.**

This Offering Memorandum is dated November 15, 2017.

**IMPORTANT NOTICES**

**Investors should rely only on the information contained in this Offering Memorandum.  No person has been authorised to give any information or to make any representations in connection with the Placing other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied upon as having been authorised by or on behalf of the Company.  Neither the delivery of this Offering Memorandum nor any subscription or sale made under this Offering Memorandum shall, under any circumstances, create any implication that there has been no change in the business or affairs of the Company since the date of this Offering Memorandum or that the information contained in this Offering Memorandum is correct as of any time subsequent to its date.**

The contents of this Offering Memorandum are not to be construed as legal, financial, business, investment or tax advice.  Each prospective investor should consult his or her own legal adviser, financial adviser or tax adviser for legal, financial or tax advice in relation to any purchase or proposed purchase of Placing Shares.

An investment in the Placing Shares is suitable only for institutional, professional and high net worth investors, private client fund managers and brokers and other investors who are capable of evaluating the merits and risks of such an investment and/or who have received advice from their fund manager or broker regarding such an investment and who have sufficient resources to be able to bear losses (which may equal the whole amount invested) that may result from such an investment.  An investment in the Placing Shares should constitute part of a diversified investment portfolio.  Accordingly, typical investors in the Company are expected to be institutional, professional and high net worth investors, private client fund managers and brokers and other investors who understand the risks involved in investing in the Company and/or who have received advice from their fund manager or broker regarding investment in the Company.

In making an investment decision, each investor must rely on their own examination, analysis and enquiry of the Company and the terms of the Placing including the merits and risks involved.  Investors who purchase Placing Shares will be deemed to have acknowledged that no person has been authorised to give any information or make any representations other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied on as having been authorised by the Company.

**General**

Prospective investors should not treat the contents of this Offering Memorandum as advice relating to legal, taxation, investment or any other matters.  Prospective investors should inform themselves as to:  (a) the legal requirements within their own countries for the purchase, holding, transfer, redemption or other disposal of Placing Shares; (b) any foreign exchange restrictions applicable to the purchase, holding, transfer, redemption or other disposal of Placing Shares which they might encounter; and (c) the income and other tax consequences which may apply in their own countries as a result of the purchase, holding, transfer, redemption or other disposal of Placing Shares.  Prospective investors must rely on their own representatives, including their own legal advisers, financial advisers and accountants, as to legal, tax, investment or any other related matters concerning the Company and an investment therein.

Statements made in this Offering Memorandum are based on the law and practice currently in force and are subject to changes therein.  This Offering Memorandum should be read in its entirety before making any application for Placing Shares.

Application will be made to the appropriate securities exchange for the Placing Shares to be admitted when deemed appropriate by the Company.

All times and dates referred to in this Offering Memorandum are, unless otherwise stated, references to Guernsey times and dates and are subject to change without further notice.

APP_0088

**Capitalised terms contained in this Offering Memorandum shall have the meanings set out in the Offering memorandum and/or in the section of this Offering Memorandum entitled "*Definitions*", save where the context indicates otherwise.**

**Restrictions on distribution and sale**

The distribution of this Offering Memorandum and the offering and sale of securities offered hereby in certain jurisdictions may be restricted by law. Persons in possession of this Offering Memorandum are required to inform themselves about and observe any such restrictions. This Offering Memorandum may not be used for, or in connection with, and does not constitute, any offer to sell, or solicitation to purchase, any such securities in any jurisdiction in which solicitation would be unlawful.

**For a description of restrictions on offers, sales and transfers of Shares, please refer to the sections of this Offering Memorandum entitled "*Selling restrictions*" below and "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*". Save as set out in these sections, there are no restrictions on the transfer of Shares under the Articles.**

**Forward-looking statements**

This Offering Memorandum includes statements that are, or may be deemed to be, "forward-looking statements". These forward-looking statements can be identified by the use of forward-looking terminology, including the terms "believes", "estimates", "anticipates", "expects", "intends", "plans", "projects", "targets", "aims", "may", "will" or "should" or, in each case, their negative or other variations or comparable terminology. These forward-looking statements include all matters that are not historical facts. They appear in a number of places throughout this Offering Memorandum and include statements regarding the intentions, beliefs or current expectations of the Company concerning, amongst other things, the investment objective and investment policy, investment strategy, financing strategies, investment performance, results of operations, financial condition, prospects, and dividend/distribution policy of the Company, and the markets in which the Company, and their respective portfolios of investments, invest and/or operate. By their nature, forward-looking statements involve risks (including those set out in the section of this Offering Memorandum entitled "*Risk Factors*") and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future. Forward-looking statements are not guarantees of future performance. The Company's actual investment performance, results of operations, financial condition, dividend policy and the development of its investment strategy financing strategies may differ materially from the impression created by the forward-looking statements contained in this Offering Memorandum. In addition, even if the investment performance, results of operations, financial condition of the Company, and the development of its financing strategies, are consistent with the forward-looking statements contained in this Offering Memorandum, those results or developments may not be indicative of results or developments in subsequent periods. Important factors that could cause these differences include, but are not limited to:

- changes in economic conditions generally and the Company's ability to achieve its investment objective and target returns and target dividends for investors;

- the ability of the Company to invest the cash on its balance sheet and the proceeds of the Placing on a timely basis within the investment objective and investment policy;

- foreign exchange mismatches with respect to exposed assets;

- changes in the interest rates and/or credit spreads, as well as the success of the Company's investment strategy in relation to such changes and the management of the un-invested proceeds of the Placing;

- impairments in the value of the investments;

- the availability and cost of capital for future investments;

- the departure of key personnel employed by the Portfolio Manager;

APP_0089

- changes in laws or regulations, including tax laws, or new interpretations or applications of laws and regulations, that are applicable to the Company; and

- general economic trends and other external factors, including those resulting from war, incidents of terrorism or responses to such events.

Given these uncertainties, prospective investors are cautioned not to place any undue reliance on such forward-looking statements. Prospective investors should carefully review the "*Risk Factors*" section of this Offering Memorandum before making an investment decision. Forward-looking statements speak only as at the date of this Offering Memorandum. Although the Company undertakes no obligation to revise or update any forward-looking statements contained herein (save where required by the Offering Memorandum Rules), whether as a result of new information, future events, conditions or circumstances, any change in the Company's expectations with regard thereto or otherwise, prospective investors are advised to consult any communications made directly to them by the Company and/or any additional disclosures through announcements that the Company may make through a website to be created or through the Administrator.

**Selling Restrictions**

**This Offering Memorandum does not constitute, and may not be used for the purposes of, an offer or an invitation to apply for any Placing Shares by any person: (i) in any jurisdiction in which such offer or invitation is not authorised; or (ii) in any jurisdiction in which the person making such offer or invitation is not qualified to do so; or (iii) to any person to whom it is unlawful to make such offer or invitation. The distribution of this Offering Memorandum and the offering of Placing Shares in certain jurisdictions may be restricted. Accordingly, persons into whose possession this Offering Memorandum comes are required to inform themselves about and observe any restrictions as to the offer or sale of Placing Shares and the distribution of this Offering Memorandum under the laws and regulations of any jurisdiction in connection with any applications for Placing Shares, including obtaining any requisite governmental or other consent and observing any other formality prescribed in such jurisdiction.**

*Bailiwick of Guernsey*

The Company has been established in Guernsey as a registered collective investment scheme under the RCIS Rules.

Further information in relation to the regulatory treatment of registered closed-ended investment funds domiciled in Guernsey may be found on the website of the Guernsey Financial Services Commission at www.gfsc.gg.

This Offering Memorandum is prepared, and a copy of it has been sent to the Guernsey Financial Services Commission, in accordance with the RCIS Rules.

The Commission takes no responsibility for the financial soundness of the Company or for the correctness of any statements made or opinions expressed with regard to it.

The applicant is strongly recommended to read and consider this Offering Memorandum before completing an application.

This Offering Memorandum has not been approved by the GFSC and neither the GFSC nor the States of Guernsey Policy Council takes any responsibility for the financial soundness of the Company or for the correctness of any of the statements made or opinions expressed with regard to it.

*European Economic Area*

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), no Placing Shares have been offered or will be offered pursuant to the Placing to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Placing Shares which has been approved by the competent authority in that Relevant Member State, or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that offers of Placing Shares to the public may be made at any time

under the following exemptions under the Prospectus Directive, if they are implemented in that Relevant Member State:

(a)         to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)         to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) in such Relevant Member State; or

(c)         in any other circumstances falling within Article 3(2) of the Prospectus Directive,

**provided that** no such offer of Placing Shares shall result in a requirement for the publication of a prospectus pursuant to Article 3 of the Prospectus Directive or a supplemental prospectus pursuant to Article 16 of the Prospectus Directive or any measure implementing the Prospectus Directive in a Relevant Member State and each person who initially acquires any Placing Shares or to whom any offer is made under the Placing will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of Article 2(1)(e) of the Prospectus Directive.

For the purposes of this provision, the expression an "**offer to the public**" in relation to any offer of Placing Shares in any Relevant Member State means a communication in any form and by any means presenting sufficient information on the terms of the offer and any Placing Shares to be offered so as to enable an investor to decide to purchase or subscribe for the Placing Shares, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "**Prospectus Directive**" means Directive 2003/71/EC (and the amendments thereto, including 2010 PD Amending Directive, to the extent implemented in the Relevant Member State) and includes any relevant implementing measure in each Relevant Member State and the expression "**2010 PD Amending Directive**" means Directive 2010/73/EU.

The distribution of this Offering Memorandum in other jurisdictions may be restricted by law and therefore persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions.

The Company is an alternative investment fund for the purpose of the AIFMD. The Placing Shares may only be marketed to prospective investors which are domiciled or have a registered office in a member state of the European Economic Area ("**EEA Persons**") in which marketing has been registered or authorised (as applicable) under the relevant national implementation of Article 42 of AIFMD and in such cases only to EEA Persons which are Professional Investors or any other category of person to which such marketing is permitted under the national laws of such member state.

This Offering Memorandum is not intended for, should not be relied on by and should not be construed as an offer (or any other form of marketing) to any other EEA Person.

A "Professional Investor" is an investor who is considered to be a professional client or who may, on request, be treated as a professional client within the relevant national implementation of Annex II of Directive 2004/39/EC (Markets in Financial Instruments Directive) and the AIFMD.

Each EEA Person who initially acquires Placing Shares or to whom any offer is made will be deemed to have represented, warranted to and agreed with the entity placing such shares and the Company that (a) it is a "qualified investor" within the meaning of the law in that relevant member state implementing Article 2.1(e) of the Prospectus Directive and (b) , that it is a Professional Investor or other person to whom Placing Shares in the Company may lawfully be marketed under the AIFMD or under the national laws of that relevant member state.

The distribution of this Offering Memorandum in other jurisdictions may be restricted by law and therefore persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions

*Switzerland*

This Offering Memorandum may only be freely circulated and Shares in the Company may only be freely offered, distributed or sold to regulated financial intermediaries such as banks, securities dealers, fund management companies,

APP_0091

asset managers of collective investment schemes and central banks as well as to regulated insurance companies. Circulating this Offering Memorandum and offering, distributing or selling Shares in the Company to other persons or entities including qualified investors as defined in the Federal Act on Collective Investment Schemes ("**CISA**") and its implementing Ordinance ("**CISO**") may trigger, in particular, (i) licensing/prudential supervision requirements for the distributor, (ii) a requirement to appoint a representative and paying agent in Switzerland and (iii) the necessity of a written distribution agreement between the representative in Switzerland and the distributor. Accordingly, legal advice should be sought before providing this Offering Memorandum to and offering, distributing, selling or on-selling Shares of the Company to any other persons or entities. This Offering Memorandum does not constitute an issuance prospectus pursuant to Articles 652a or 1156 of the Swiss Code of Obligations and may not comply with the information standards required thereunder. The Shares will not be listed on the SIX Swiss Exchange, and consequently, the information presented in this document does not necessarily comply with the information standards set out in the relevant listing rules. The documentation of the Company has not been and will not be approved, and may not be able to be approved, by the Swiss Financial Market Supervisory Authority ("**FINMA**") under the CISA. Therefore, investors do not benefit from protection under the CISA or supervision by the FINMA. This Offering Memorandum does not constitute investment advice. It may only be used by those persons to whom it has been handed out in connection with the Shares and may neither be copied or directly/indirectly distributed or made available to other persons.

### *United States*

The Placing Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States. There will be no public offer of the Placing Shares in the United States.

Subject to certain exceptions as described herein, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

In addition, prospective investors should note that, except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by: (i) investors using assets of: (A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

If 25 per cent or more of any class of equity in the Company is owned, directly or indirectly, by U.S. Plan Investors that are subject to Title I of ERISA or Section 4975 of the U.S. Tax Code, the assets of the Company will be deemed to be "plan assets", subject to the constraints of ERISA and Section 4975 of the U.S. Tax Code. This would result, among other things, in: (i) the application of the prudence and fiduciary responsibilities standards of ERISA to investments made by the Company, and (ii) the possibility that certain transactions that the Company and its subsidiaries might enter into, or may have entered into in the ordinary course of business, might constitute or result in non-exempt prohibited transactions under Section 406 of ERISA and/or Section 4975 of the U.S. Tax Code and might have to be rescinded. A non-exempt prohibited transaction may also result in the imposition of an excise tax under the U.S. Tax Code upon a "party in interest" (as defined in ERISA) or "disqualified person" (as defined in the U.S. Tax Code), with whom a plan engages in the transaction. The Company will use commercially reasonable efforts to restrict ownership by U.S. Plan Investors of equity in the Company. However, no assurance can be given that investment by U.S. Plan Investors will not exceed 25 per cent or more of any class of equity in the Company.

For a description of restrictions on offers, sales and transfers of Placing Shares, please refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".

**TABLE OF CONTENTS**

**Page**

IMPORTANT NOTICES. .........................................................................................................................i

SUMMARY. .........................................................................................................................................1

RISK FACTORS. ................................................................................................................................19

COMPANY, ITS INVESTMENT OBJECTIVE, POLICY AND STRATEGY .......................................48

THE CURRENT CLO PORTFOLIO. ..................................................................................................55

MARKET OPPORTUNITY...................................................................................................................56

INVESTMENT PROCESS ...................................................................................................................57

COMPANY DIRECTORS AND ADMINISTRATION. ..........................................................................61

PLACING ARRANGEMENTS. .............................................................................................................65

TAXATION. .........................................................................................................................................70

SHAREHOLDERS OF THE COMPANY. ............................................................................................75

ADDITIONAL INFORMATION ON THE COMPANY. .........................................................................76

TERMS AND CONDITIONS OF THE PLACING. .............................................................................100

PLACING STATISTICS......................................................................................................................105

DEFINITIONS. ..................................................................................................................................106

DIRECTORS, ADVISERS AND SERVICE PROVIDERS. ................................................................113

APP_0093

## SUMMARY

The following is an overview of the transaction structure and is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Offering Memorandum and related documents referred to herein. Capitalised terms not specifically defined in this Offering Memorandum have the meanings set out in the section of this Offering Memorandum entitled "*Definitions*" below. For a discussion of certain risk factors to be considered in connection with an investment in the Shares, see "*Risk Factors*".

**The Company:**

Highland CLO Funding, Ltd. (formerly known as Acis Loan Funding, Ltd.) (the "**Company**") is a closed-ended investment company limited by shares incorporated on 30 March 2015 under the laws of Guernsey with registered number 60120. The Company changed its name from Acis Loan Funding, Ltd. to Highland CLO Funding, Ltd. on October 27, 2017.

The Company holds a partial, indirect ownership in Highland CLO Management, LLC ("**Highland CLO Management**"), a Delaware series limited liability company established to manage Highland CLOs, act as a "majority-owned affiliate" for purposes of the U.S. Risk Retention Rules and as an "originator" for purposes of EU Retention Requirements and to hold with respect to Highland CLOs the required risk retention interests required under, and in accordance with, the U.S. Retention Rules and/or the EU Retention Requirements, as applicable (such interests with respect to any CLO, the applicable "**Retention Interest**"). Highland CLO Management is also partly held (on an indirect basis through Highland HCF Advisor) by Highland Capital Management, L.P. ("**Highland**"), a Delaware limited partnership, which controls the major economic decisions of Highland CLO Management.

The Company holds a partial, indirect ownership in ACIS CLO Management, LLC ("**Acis CLO Management**" and together with Highland CLO Management, the "**Management Companies**" and each, a "**Management Company**"), a Delaware series limited liability company established to manage Acis CLO 2017-7, Ltd. ("**Acis CLO** 7"), act as a "majority-owned affiliate" for purposes of the U.S. Risk Retention Rules and to hold the Retention Interests with respect to Acis CLO 7 required under, and in accordance with, the U.S. Retention Rules. Acis CLO Management is also partly held (on an indirect basis) by Acis Capital Management, L.P. ("**Acis**"), a Delaware limited partnership, which controls the major economic decisions of Acis CLO Management.

Each of Highland or Acis, as applicable, may hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules.

**Investment Objective:**

The Company's investment objective is to provide Shareholders with stable and growing income returns, and to grow the capital value of the investment portfolio through opportunistic exposure to CLO Notes, investments in new issue CLOs sponsored by Highland and Acis CLO 7 through its interests in the Management Companies and CLO Income Notes, respectively, and senior secured loans primarily for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements, on both a direct basis and indirect basis, through the use of the investments described in its investment policy and through use of leverage,

- 1 -

including, any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments.

**Investment policy:**   The Company's investment policy is to focus on synergistic investments in the following areas.

*Loan Investments*

The Company will invest on an indirect basis in a diverse portfolio of predominantly floating rate senior secured loans (or on a direct basis for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements), all of which will have at least one rating, which may be public or private, from Moody's Investor Services, Inc. ("**Moody's**"), Standard & Poor's Financial Services LLC ("**S&P**") or Fitch Group, Inc. ("**Fitch**"). Initially, the Company's loan investments will be focused in the U.S., but depending on market conditions the Company may also invest in similar types of loans in Europe. Accordingly, there is no limit on the maximum U.S. or European exposure. Investments in U.S. or European loans may be made through a U.S or European originator subsidiary of the Company.  The Company intends to invest directly only in those senior secured loans to obligors with total potential indebtedness under all applicable loan agreements, indentures and other underlying instruments at least $250,000,000 that would generally satisfy the eligibility criteria for Highland CLOs and (without limiting the foregoing):

- Such loan is not currently deferring the payment of any accrued and unpaid interest that otherwise would have been due and continues to remain unpaid;

- Such loan provides for a fixed amount of principal payable in cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price less than par;

- Such loan is not an obligation issued by Highland, any of its controlled affiliates that are investment funds or any other investment fund whose investments are primarily managed by Highland or any affiliate or company that is controlled by Highland, an affiliate thereof, or an account, fund, client or portfolio established and controlled by Highland or an affiliate thereof (a "**Related Obligation**");

- Such loan is neither an equity security nor by its terms is convertible into or exchangeable for an equity security and does not include an attached warrant to purchase equity securities;

- Such loan is not a bridge loan; and

**APP_0095**

-    Such loan is not a zero coupon loan.

*Financing of Loan Portfolios / Securitization*

It is intended that the Company will periodically seek to sell or securitise all or a portion of its loan portfolio, held directly or indirectly, into new Highland CLOs where Highland CLO Management acts as CLO Manager.  In doing so, Highland CLO Management may seek to adopt the "originator" model to address the Origination Requirements (as defined below) applicable to such Highland CLOs to the extent such Highland CLOs sought to comply with EU Retention Requirements.  As a result, Highland CLO Management will be required to commit to: (a) establishing the relevant CLO and (b) selling certain loan investments to the relevant CLO which it has purchased for its own account initially.  In addition, under current guidance, prior to closing date of the relevant CLO, Highland CLO Management expects to sell investments to the relevant CLO such that the required percentage of the total securitised exposures held by the CLO issuer will have come from Highland CLO Management (collectively, the "**Origination Requirements**").

*CLO Notes*

The Company will from time to time invest directly or indirectly (through affiliates and subsidiaries, including the Management Companies, as more fully described below) in CLO Notes issued by Acis CLO 7, Highland CLOs, CLOs where Acis is the CLO Manager, ("**Acis Legacy CLOs**"), CLOs where Highland is the CLO Manager, ("**Highland Legacy CLOs**" and together with the Highland CLOs, Acis CLO 7 and the Acis Legacy CLOs, the "**Managed CLOs**") or CLOs managed by other asset managers.

With respect to each such investment, Highland CLO Management, and Acis CLO Management with respect to Acis CLO 7, will acquire the percentages and tranches of CLO Notes necessary to enable the related CLO to meet the U.S. Risk Retention Rules and, if applicable, the EU Retention Requirements.

With respect to any such investments in Highland CLOs where Highland CLO Management acts as CLO Manager, it is expected that Highland CLO Management will be a "relying adviser" of Highland.  With respect to Acis CLO 7, Acis CLO Management is a "relying adviser" of Acis. It is further expected that Highland or Acis, as applicable, will act as a "sponsor" of such Managed CLOs for purposes of the U.S. Risk Retention Rules and will treat the applicable Management Company as its "majority-owned affiliate" under the U.S. Risk Retention Rules.  All management and incentive fees received from such Managed CLO will be paid to the applicable Management Company pursuant to the relevant portfolio management agreement, which will then pay the majority of such fees to Highland or Acis, as applicable, in its roles as Staff and Services Provider and as Sub-Advisor.  The applicable Management Company may also seek to act as "originator" for purposes of the EU Retention Requirements with respect to such Managed CLOs as described above.

Each CLO in which the Company directly or indirectly holds CLO Notes will have its own eligibility criteria and portfolio limits.  These limits are designed to ensure the portfolio of loans within the CLO meets a prescribed level of diversity and quality as set by the relevant rating agencies rating securities issued by such CLO.  The applicable CLO Manager, including Highland CLO Management with respect to new Highland CLOs or Acis CLO Management with respect to Acis CLO 7, intends to identify and actively manage loans

**APP_0096**

which meet those criteria and limits within each CLO. The eligibility criteria and portfolio limits within a CLO will typically include the following required criteria and may include some or all of the following expected criteria:

- a limit on the weighted average life of the portfolio;

- a limit on the weighted average rating of the portfolio;

- a limit on the maximum amount of portfolio assets with a rating lower than B-/B3/B-; and

- a limit on the minimum diversity of the portfolio.

- a limit on the minimum weighted average of the prescribed rating agency recovery rate;

- a limit on the minimum amount of senior secured assets;

- a limit on the maximum aggregate exposure to second lien loans, high yield bonds, mezzanine loans and unsecured loans;

- a limit on the maximum portfolio exposure to covenant-lite loans;

- an exclusion of project finance loans;

- an exclusion of structured finance securities;

- an exclusion on investing in the debt of companies domiciled in countries with a local currency sub investment grade rating; and

- an exclusion of leases.

The above are not intended to be an exhaustive list of the eligibility criteria and portfolio limits within a typical CLO and the inclusion or exclusion of such limits and their absolute levels are subject to change depending on market conditions.

### *Act as Risk Retention Provider*

The Company may also invest in, provide loans to, or purchase performance-linked notes from, asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland, Acis or the Management Companies and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy the U.S. Risk Retention Rules or EU Retention Requirements.

### *Allocation of Investment Opportunities*

Highland CLO Management will serve as CLO Manager to each newly-issued Highland CLO during the Investment Period.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and other clients, including other investment funds and client accounts, including those which follow an investment program substantially similar to that of the Business (such other clients, funds and accounts, collectively, the "**Other Accounts**"). For the avoidance of doubt, the Portfolio

APP_0097

Manager shall otherwise allocate investment opportunities among the Company and Highland and its affiliates and Other Accounts in accordance with its allocation policy which requires allocations among clients to be fair and equitable over time. *See* "*Risk Factors—Risks Relating to Conflicts of Interest—The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*".

**Investment Restrictions:** During the Investment Period, the Company may invest up to $250,000,000 in CLO Income Notes for new Highland CLOs as follows: (a) up to $150,000,000 in the aggregate from new capital contributions; and (b) up to $100,000,000 in the aggregate from proceeds received from existing seed portfolio investments and investments in new Highland CLOs, net of dividends paid, and amortization and interest payments on Company borrowings from committed credit facilities.

The Company may not, without the consent of the Advisory Board, invest in any CLO Notes or CLO Income Notes of new Highland CLOs that are not Qualifying CLOs. A "**Qualifying CLO**" is a Highland CLO (a) pursuant to which Highland, the Portfolio Manager, Highland CLO Management or any of its affiliates does not charge subordinate management fees in excess of 0.00%, senior management fees in excess of 0.15% or incentive management fees in excess of 0.00% and (b) which does not have a reinvestment period longer than 5 years; *provided* that, if the Portfolio Manager has provided reasonable evidence to the Advisory Board that a substantial portion of new issue CLOs have reinvestment periods longer than 5 years (the "**RP Condition**"), the consent of the Advisory Board to invest in any Highland CLO that meets clause (a) of the definition of Qualifying CLOs only shall not be unreasonably withheld, conditioned or delayed.

During the Investment Period, the Company shall be permitted to invest in a refinancing or "reset" with respect to the following CLOs (which may extend the re-investment period and/or term of such CLOs, subject to the proviso below) managed by Highland affiliates (the "**Designated CLO Resets**"):

Acis CLO 2013-1, Ltd.
Acis CLO 2014-3, Ltd.
Acis CLO 2014-4, Ltd.
Acis CLO 2014-5, Ltd.
Acis CLO 2015-6, Ltd.

provided that, with respect to Acis CLO 2014-3, Ltd., Acis CLO 2014-4, Ltd. and Acis CLO 2014-5, Ltd., any such Designated CLO Reset may not extend the re-investment period beyond 2.25 years of the date of such Designated CLO Reset.

During the Investment Period, the Company shall be permitted to invest in a refinancing with respect to Acis CLO 7 (which may not extend the re-investment period or term of such CLO) (the "**Designated CLO Refinancing**").

For the avoidance of doubt, following the expiration of the Investment Period, the Company shall not consummate an investment in any "reset" with respect to CLO Income Notes held by the Company. In addition, the Company shall not permit a reset with respect to any CLO Income Notes of Managed CLOs

**APP_0098**

that it holds, unless such CLO Income Notes of Managed CLOs are fully redeemed.

The Company shall not invest in the CLO Income Notes of a new issue Highland CLO unless it is the 100% owner of the CLO Income Notes not forming part of the Retention Interest acquired by Highland CLO Management.

*Indirect Actions*

Neither the Portfolio Manager nor the Company may take any action indirectly through controlled subsidiaries that either the Portfolio Manager or the Company is not permitted to undertake directly as set forth herein.

**Borrowing:**

It is expected that the Company will have access to one or more committed credit facilities and will use advances under such facilities, together with the proceeds of the Shares, to purchase future senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) or other assets. Such facilities may take the form of any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities.  In addition to such facilities, the Company will be permitted to borrow money for day to day administration and cash management purposes.

*Borrowing Limits*

Notwithstanding the foregoing or anything to the contrary set forth herein, as of the time any such debt is incurred, the Company's maximum gross leverage exposure (excluding the Warehouse Loan Facilities) pursuant to (a) committed secured loan facilities and any other borrowing (other than described in clause (b)) shall not exceed (i) during the Investment Period, the greater of (x) 15% of the Company's gross asset value and (y) $50,000,000 and (ii) after the Investment Period, 15% of the Company's gross asset value, and (b) repurchase agreements shall not exceed 75% of the Company's gross asset value.

For purposes of the limits regarding repurchase agreements set forth in clause (b) above, the "gross asset value" of the Company shall exclude financing for CLO Notes held by a Management Company as part of a "vertical" Retention Interest (including for the Designated CLO Resets), the NexBank Credit Facility, any Warehouse Loan Facilities and cash equivalents.

*Warehouse Loan Facilities*

One or more multi-currency warehouse lending facilities may be entered into from time to time between (i) the Company and (ii) a warehouse provider (the "**Warehouse Loan Facilities**"), pursuant to which the Company is able to draw multi-currency loans from time to time in order to purchase assets for its portfolio.  The Warehouse Loan Facilities will be entered into on market standard terms, as negotiated between the Company and the relevant warehouse provider in each case and will include a senior security package in favour of the warehouse provider.

*Hedging and Derivatives*

APP_0099

Without the consent of the Advisory Board, the Company may only use hedging or derivatives to hedge investments consistent with the Company's investment objectives, and not for speculative purposes.

*Repurchase Agreements*

The Company may not use repurchase agreements to finance the purchase of CLO Income Notes, however, the Company may pledge any already owned CLO Income Notes as additional collateral under repurchase agreements.

*Revolving Credit Facility*

The Company may enter into a secured revolving credit facility with a committed amount of $50,000,000 for working capital purposes (a "**Revolving Credit Facility**")

*NexBank Credit Facility*

The Company currently has a secured term credit facility provided by NexBank SSB, a Texas savings bank, with a principal amount of $22,158,337, as of September 30, 2017 (the "**NexBank Credit Facility**").  The Company may, from time to time, increase its borrowing under the NexBank Credit Facility up to a maximum principal amount of $30,000,000 at any time without the consent of the Advisory Board, but subject to the limitations set forth above in "*—Borrowing Limits*". The terms of the NexBank Credit Facility, and of any increase in the principal amount thereto, shall be at or better than market standard terms and shall be promptly disclosed to the Advisory Board (any such amended terms, the "**Permitted NexBank Credit Facility Amendments**").

**Advisory Board:**    The Company shall form and assemble an advisory board (the "**Advisory Board**") composed of individuals who shall be representatives of certain Shareholders selected by the Portfolio Manager in its sole discretion in order to (a) provide advice to the Portfolio Manager with respect to certain issues involving conflicts of interest in any transaction or relationship between the Company and the Portfolio Manager or any of its employees or affiliates that are presented to the Advisory Board by the Portfolio Manager, and (b) be required to approve the following actions:

-    Any extension of the Investment Period;

-    Any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board);

-    Any allotment of additional equity securities by the Company; and

-    Any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its affiliates, on the other hand.

Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into

APP_0100

new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments.

No voting member of the Advisory Board shall be a controlled affiliate of Highland, it being understood that none of CLO Holdco, Ltd., its wholly-owned subsidiaries or any of their respective directors or trustees shall be deemed to be a controlled affiliate of Highland due to their pre-existing non-discretionary advisory relationship with Highland.

Each member of the Advisory Board shall owe no fiduciary or other duties to the Company or the shareholders and may act solely in the interest of the shareholder that it represents.

Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an affiliate of the Company, the Portfolio Manager or Highland solely by reason of such appointment.

**Investment Period:**

The Company's assets may be invested and, subject to the terms and conditions set forth in the "*Dividend Policy*" section below, reinvested for a period commencing on the Closing Date of the Placing and ending on April 30, 2020 (the "**Investment Period**"), subject to two additional one-year extensions with the consent of the Advisory Board (as hereinafter defined) and the Portfolio Manager; provided that the Term will automatically be extended by an identical length of time in the event of an extension of the Investment Period.

*Termination of Investment Period following Key Person Event*

The Portfolio Manager will promptly provide each Shareholder with written notice in the event that any two of James Dondero, Mark Okada, Trey Parker or Hunter Covitz (collectively, the "**Key Persons**") cease to devote such time to the affairs of the Company as is sufficient to effectively manage the operations of the Company (a "**Key Person Event**"), as determined by the Portfolio Manager in its reasonable discretion, taking into account such factors as it shall deem relevant in its reasonable discretion. The Portfolio Manager will promptly provide each Shareholder with written notice in the event of the termination of employment of any Key Person.

The Investment Period will be terminated immediately upon a Key Person Event. The Investment Period shall resume in the event that (i) the Portfolio Manager obtains or receives notice of the written election or vote of the Advisory Board to reinstate the Investment Period, or (ii) one or more Qualified Replacements (as defined below) are appointed in place of (or in addition to) the then existing Key Persons to cure the Key Person Event, in which event the Investment Period will continue until its termination as otherwise described herein without further regard to such Key Person Event.

For purposes of this Offering Memorandum, a "**Qualified Replacement**" means a person nominated by the Portfolio Manager and approved by the Advisory Board, such approval not to be unreasonably withheld, conditioned or delayed, as a replacement for any existing Key Person or as an additional Key Person; provided that the Advisory Board will provide notice of its

APP_0101

approval or disapproval of any person nominated to be a Qualified Replacement within 10 business days of such nomination.

For the avoidance of doubt, during any cessation of the Investment Period following a Key Person Event, (i) the Portfolio Manager may continue to require Placees to purchase Shares pursuant to the subscription and transfer agreement to fund (a) any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities) or (b) the completion, no later than 180 days after the expiration of the Investment Period, new issue Highland CLOs that were in process at the time of such Key Person Event and (ii) the Company shall not receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs until the Investment Period resumes.

**Term:**

The term of the Company will end (and the Company thereafter will be wound up and dissolved) on the ten-year anniversary of the date of the Placing (the "**Term**"), subject to (a) automatic extension in the event of an extension of the Investment Period and (b) two additional one-year extension with the consent of the Portfolio Manager and the Advisory Board, or such earlier date after the end of the Investment Period on which the Portfolio Manager determines to terminate and wind up the Company following the receipt by the Company of all amounts reasonably expected by the Portfolio Manager to be received with respect to the Company's assets or the sale thereof during the term and in a manner that will not cause the Company, the Portfolio Manager, Highland, Acis, the Management Companies or any subsidiary thereof to violate any applicable law or contract.

The Company has been established as a closed-ended vehicle. Accordingly, there is no right or entitlement attaching to Shares that allows them to be redeemed or repurchased by the Company at the option of the Shareholder.

**Placing Arrangements –
Investment Period Subscription
Commitment:**

The Company is seeking aggregate subscriptions to purchase Placing Shares in an aggregate amount of up to approximately U.S. $153 million.

Placees will commit under a subscription and transfer agreement to purchase Shares to be settled from time to time during the Investment Period. The Portfolio Manager may call such Shares for settlement from time to time on a pro rata basis upon 10 Business Days' notice to the Placees in such amounts as may be specified by the Portfolio Manager.

Upon the expiration of the Investment Period, all Placees will be released from any further obligation with respect to purchase Shares under their subscriptions, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

Shares will be issued at a price per Share based on the most recent quarterly determined NAV of the Company.

APP_0102

The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares. Fractions of Placing Shares will be issued.

On the Closing Date, Placees will acquire Shares of existing Shareholders at a price per Share based on the NAV of the Company as of September 30, 2017, adjusted with respect to a dividend of $9,000,000 on October 10, 2017, and a buyback of the Shares of Acis Capital Management, L.P. on October 24, 2017 (the "**Adjusted NAV**") such that Placees and existing Shareholders will hold currently existing Shares on a *pro rata* basis and existing Shareholders will commit, as Placees under a subscription and transfer agreement, to purchase Shares such that new and existing Shareholders will hold both existing Shares and commitments on *pro rata* basis.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

A Shareholder that defaults in respect of its obligation to purchase Shares pursuant to the terms of the subscription and transfer agreement will be subject to customary default provisions.

The Board may retain any dividend or other monies payable on or in respect of a Share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

*Highland Principal Commitment*

Certain principals of Highland will subscribe, directly or indirectly, for $3,000,000 of Shares in the aggregate.

**Regulatory status:** The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015 under the provisions of the Companies Law, with registered number 60120. The Company is regulated by the GFSC, and is not regulated by any regulator other than the GFSC.

**Typical investors:** Investment in the Company is only suitable for Professional Investors as defined in the AIFMD and any other person to whom the Placing Shares may be lawfully offered.

**Applicant's service providers:** *Portfolio Manager*

Highland HCF Advisor, Ltd. ("**Highland HCF Advisor**") has been appointed as the Portfolio Manager to the Company pursuant to the Portfolio Management Agreement. In that capacity, the Portfolio Manager will select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the origination and ongoing management of the portfolio by the Company. Under the Portfolio Management Agreement, the Company shall pay to the Portfolio Manager an amount equivalent to all reasonable third party costs and expenses incurred by

APP_0103

the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable VAT arising on such costs and expenses.

The Portfolio Manager has entered into a Master Sub-Advisory Agreement (the "**HCF Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**HCF Staff and Services Agreement**", together with the Sub-Advisory Agreement, the "**HCF Services Agreements**") with Highland Capital Management, L.P. under which Highland Capital Management, L.P. provides investment research and recommendations and operational support to the Portfolio Manager, including services that may be used in connection with the Portfolio Manager's recommendations regarding the composition, nature and timing of changes to the Company's portfolio, the due diligence of actual or potential investments, the execution of investment transactions, and certain loan services and administrative services.

Highland CLO Management has a Master Sub-Advisory Agreement (the "**HCLOM Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**HCLOM Staff and Services Agreement**", together with the HCLOM Sub-Advisory Agreement, the "**HCLOM Services Agreements**") in place with Highland, pursuant to which Highland provides credit research and operational support to Highland CLO Management, including services in connection with determining the composition, nature and timing of changes to portfolios of Highland CLOs for which Highland CLO Management acts as CLO Manager, the due diligence of actual or potential investments, the execution of investment transactions approved by the Highland CLO Management, and certain loan services and administrative services.

Acis (an affiliate of Highland) has entered into a Master Sub-Advisory Agreement (the "**ACM Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**ACM Staff and Services Agreement**", together with the ACM Sub-Advisory Agreement, the "**ACM Services Agreements**") with Highland under which Highland provides investment research and recommendations and operational support to Acis, including services in connection with determining the composition, nature and timing of changes to portfolios of Acis CLOs for which Acis acts as CLO Manager, the due diligence of actual or potential investments, the execution of investment transactions approved by Acis, and certain loan services and administrative services.

Acis CLO Management has entered into a Master Sub-Advisory Agreement (the "**ACLOM Sub-Advisory Agreement**", and together with the HCF Sub-Advisory Agreement, the HCLOM Sub-Advisory Agreement and the ACM Sub-Advisory Agreement, the "**Sub-Advisory Agreements**") and a Staff and Services Agreement (the "**ACLOM Staff and Services Agreement**", and the ACLOM Staff and Services Agreement together with the HCF Staff and Services Agreement, the HCLOM Staff and Services Agreement and the ACM Staff and Services Agreement, the "**Staff and Services Agreements**", and the ACLOM Staff and Services Agreement together with the ACLOM Sub-Advisory Agreement, the "**ACLOM Services Agreements**" and the ACLOM Services Agreements with the HCF Services Agreements, the HCLOM Services Agreements and the ACM Services Agreements, the "**Services Agreements**") in place with Acis, pursuant to which Acis provides credit research and operational support to Acis CLO Management, including services in connection with determining the composition, nature and timing of changes to portfolios of Acis CLO 7 for which Acis CLO Management acts as CLO Manager, the due diligence of actual or potential investments, the

- 11 -

execution of investment transactions approved by Acis CLO Management, and certain loan services and administrative services.

No management fees will be payable by the Company pursuant to any Services Agreement; it being understood that each of the Management Companies will pay (i) eleven-fifteenths (11/15ths) of the total 0.15% senior management fee received from Acis CLO 7 and the Highland CLOs to affiliates of Highland pursuant to the applicable Services Agreements, and (ii) following any Designated CLO Reset, a portion of the management fees received from any CLO subject to such Designated CLO Reset to affiliates of Highland pursuant to the applicable Services Agreements, other than an amount equivalent to a senior management fee of 0.04%.

*Administrator*

State Street (Guernsey) Limited has been appointed as administrator to the Company pursuant to the Administration Agreement.  In such capacity, the Administrator is responsible for the day-to-day administration of the Company.    Under  the  terms  of  the  Administration  Agreement,  the Administrator is entitled to an annual administration fee of up to 7 bps per annum of the Net Asset Value of the Company calculated and payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the Administration Agreement.

**Operating Expenses:**     Except as provided below, the Portfolio Manager will pay all of its own Overhead without reimbursement by the Company.

Subject to the following paragraph, the Company shall pay or reimburse the Portfolio  Manager  and  its  affiliates  for  all  Operating  Expenses.    See "Company Directors and Administration—The Portfolio Manager—Highland Fees".

**Exculpation:**     The Portfolio Manager will assume no responsibility under the Portfolio Management  Agreement  other  than  to  render  the  services  called  for thereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence.  The Portfolio Manager will not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager.

The Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative  (e.g.,  executors,  guardians  and  trustees)  of  the  Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to the Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to the Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an "**Indemnified Person**") will incur no liability to the Company or any Shareholder in the absence of a finding by any court  or  governmental  body  of  competent  jurisdiction  in  a  final,  non-appealable judgment that the commission by such person of an action, or the omission by such person to take an action, constitutes bad faith, gross

APP_0105

negligence or wilful misconduct (a "**Triggering Event**"), except as otherwise required by applicable law (including the Companies Law).  Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

| | |
|---|---|
| **Indemnification:** | To the fullest extent permitted by applicable law, the Company will be required to indemnify each Indemnified Person against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, the "**Indemnified Losses**") incurred by such Indemnified Person or to which such Indemnified Person may be subject by reason of its activities in connection with the conduct of the business or affairs of the Company, unless such losses result from an Indemnified Person's Triggering Event. |

The Indemnified Persons shall be entitled to advancement of expenses as they are incurred in connection with the investigation, defence or resolution of any claim that may be subject to indemnification, subject to providing an undertaking to repay any amounts ultimately determined not to be subject to indemnification due to a Triggering Event.

Each member of the Advisory Board and each member of any subcommittee thereof and, solely in connection with matters relating to the Advisory Board or such subcommittee, the Shareholder and/or other person or entity on whose behalf such Advisory Board member or subcommittee member serves, will have the benefit of similar exculpation and indemnification rights unless it has not acted in good faith.

Notwithstanding the foregoing or anything to the contrary set forth herein, the Company will not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent that such liability may not be waived, modified or limited under applicable law.

Under the Companies Law, any indemnity provided (directly or indirectly) by the Company to a Director, or an associated company, or a body corporate which is an overseas company and a subsidiary of the company, against any liability attaching to him in connection with any negligence, default, breach of duty or breach of trust in relation to the Company is void, except in certain circumstances.

| | |
|---|---|
| **Regulatory status of Portfolio Manager:** | Highland HCF Advisor is a relying adviser of Highland Capital Management, L.P., an investment adviser registered under the Investment Advisers Act of 1940, as amended (the "**Investment Advisers Act**") and, as such, is subject to the provisions of the Investment Advisers Act. |
| **Regulatory status of Custodian:** | The Custodian of the Company is State Street Custodial Services (Ireland) Limited, which is authorised as an Investment Business Firm under Section |

APP_0106

10 of the Irish Investment Intermediaries Act, 1995 (as amended), will provide custody and banking services.

**Calculation of Net Asset Value:**

The Company intends to publish the Net Asset Value per Share on a quarterly basis, within 15 Business Days following the relevant quarter-end. Notice will be provided by the Administrator by e-mail.

**Portfolio:**

The Company is currently invested in CLO Income Notes in the following Managed CLOs in the following amounts:

| Acis CLOs: | Aggregate Outstanding Amount (U.S.$) |
|---|---|
| ACIS CLO 2013-1 Ltd. | $18,558,000.00 |
| ACIS CLO 2014-3 Ltd. | $39,750,000.00 |
| ACIS CLO 2014-4 Ltd. | $50,750,000.00 |
| ACIS CLO 2014-5 Ltd. | $53,000,000.00 |
| ACIS CLO 2015-6, Ltd. | $51,850,000.00 |

| Highland Legacy CLOs: | Aggregate Outstanding Amount (U.S.$) |
|---|---|
| Rockwall CDO, Ltd. | $14,000,000.00 |
| Brentwood CLO, Ltd. | $12,000,000.00 |
| Grayson CLO, Ltd. | $5,900,000.00 |
| Liberty CLO, Ltd. | $17,000,000.00 |
| HP CDO, Ltd. | $1,621,542.70 |
| Greenbriar CLO, Ltd. | $18,000,000.00 |
| Gleneagles CLO, Ltd. | $1,250,000.00 |

| ACIS CLO Management | Aggregate Outstanding Amount (U.S.$) |
|---|---|
| Acis CLO 7 | $17,850,000.00 |

**Net Asset Value:**

As of September 30, 2017, the unaudited net asset value per share of the Net Asset Value was US $157,081,118.91. A special dividend in the aggregate amount of US $9,000,000 was paid on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. was made on October 24, 2017, for an aggregate purchase price of $991,180.13.

**Type and class of securities:**

The Shares being offered under the Placing are ordinary shares of no par value in the capital of the Company.

**Currency of the securities issue:**

U.S. Dollar

**Number of securities in issue:**

The issued share capital of the Company (all of which shares have been fully paid) as of the date of this Offering Memorandum consists of 143,454,001 million Shares.

There are no non-paid up Shares in issue.

**Description of the rights attaching to the securities:**

The holders of the Shares shall be entitled to receive, and to participate in, any dividends declared in relation to the Shares that they hold.

On a winding-up or a return of capital by the Company, the net assets of the Company attributable to the Shares shall be divided pro rata among the holders of the Shares.

APP_0107

The Shares shall carry the right to receive notice of, attend and vote at general meetings of the Company.

Unless otherwise authorised by a special resolution, the Company shall not allot equity securities on any terms unless the Company has first made an offer to each person who holds Shares to allot to him, on the same or more favourable terms, such proportion of those equity securities that is as nearly as practicable (fractions being disregarded) equal to the proportion held by the relevant person of the Shares.

**Restrictions on the free transferability of the securities:**

The Company has elected to impose certain restrictions (pursuant to its Articles) on the Placing and on the future trading of the Shares so that the Company will not be required to register the offer and sale of the Shares under the U.S. Securities Act, so that the Company will not have an obligation to register as an investment company under the U.S. Investment Company Act and related rules and to address certain ERISA, U.S. Tax Code and other considerations. These transfer restrictions, which will remain in effect until the Company determines in its sole discretion to remove them, may adversely affect the ability of Shareholders to trade the Shares. Due to the restrictions described below, potential investors in the United States and U.S. Persons (including persons acting for the account or benefit of any U.S. Person) are advised to consult legal counsel prior to making any offer, resale, exercise, pledge or other transfer of the Shares.

Subject to certain exceptions, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

**Dividend policy:**

Whilst not forming part of the investment objective or policy of the Company, dividends will be payable in respect of each calendar quarter, payable in the month following the end of such quarter. During the Investment Period, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio in excess of the dividends paid to Shareholders as provided below will be reinvested by the Company with the objective of growing the NAV.

During the Investment Period, on the 15th of February, May, August and November of each calendar year, beginning May 15, 2018 (each a "**Quarterly Dividend Date**"), after satisfaction of all expenses, debts, liabilities and obligations of the Company, the Company will pay a dividend to each Shareholder at a rate of at least 8% per annum, based on such Shareholder's aggregate capital contributions as of the prior Quarterly Dividend Date (the "**Target Dividend**").

Following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio will be distributed by the Company to the Shareholders as a dividend on each Quarterly Dividend Date in accordance with the distribution priority as follows (the "**Distribution Priority**"):

*First*, 100% to the Shareholders *pro rata* based on the number of Shares held until each Shareholder has received (i) pursuant to this clause (i), aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus (ii) an amount necessary for such Shareholder to

APP_0108

receive a cumulative rate of return of 8.0% per annum, compounded annually, on such Shareholder's aggregate capital contributions;

*Second*, 100% to the Portfolio Manager until the Portfolio Manager has received aggregate distributions from the Company equal to 20% of the sum of all distributions made in excess of aggregate capital contributions made by Shareholders;

*Third*, 80% to the Shareholders *pro rata* based on the number of Shares held and 20% to the Portfolio Manager until each Shareholder has received aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus an amount necessary for such Shareholder to receive a cumulative rate of return of 16% per annum, compounded annually, on such Shareholder's aggregate capital contributions; and

*Thereafter*, 70% to the Shareholders *pro rata* based on the number of Shares held and 30% to the Portfolio Manager.

For purposes of this section, references herein to a "Shareholder" shall include Highland HCF Advisor in its capacity as a shareholder of the Company, if applicable, and references to "aggregate distributions" received by the "Portfolio Manager" shall not include any distributions received by Highland HCF Advisor in its capacity as a Shareholder.

| | |
|---|---|
| **The total net proceeds and an estimate of the total expenses of the issue/offer, including estimated expenses charged to the investor by the issuer or the offeror:** | The Net Placing Proceeds are expected to be approximately U.S. $153 million.<br><br>The initial expenses of the Company are those which are necessary for the Placing, and shall not exceed U.S. $750,000.  These expenses will be paid on or around the Placing and will include, without limitation: the cost of settlement and escrow arrangements; printing, advertising and distribution costs; legal fees; and any other applicable expenses. |
| **Reasons for the offer and use of proceeds:** | The Company is making the offer in order to raise the Net Placing Proceeds which will be invested in accordance with the Company's investment objective and policy, including its indirect investment in the Management Companies. |
| **Expenses related to the Placing:** | All costs associated with the Placing will be borne by the Company after the Placing and therefore the Net Placing Proceeds will be lower than the Gross Placing Proceeds immediately following the Placing. |
| **Ongoing annual expenses:** | The Company currently estimates that its total annual expenses for 2017 will be approximately $525,000 per annum, and will provide the Advisory Board with updated estimates and reasonable detail from time to time upon request. For the avoidance of doubt, except as expressly set forth in the section titled "*Company Directors and Administration—Portfolio Manager—Highland Fees*", the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent without reimbursement by the Company<br><br>These expenses will include the following:<br><br>*The Portfolio Manager, Highland, Acis and the Management Companies* |

APP_0109

Please see below in section titled "*Company Directors and Administration—Portfolio Manager—Highland Fees*".

*Administrator*

Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps of the Net Asset Value of the Company per annum, payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the agreement.

*Custodian*

Under the terms of the Custody Agreement, the Custodian is entitled to receive transaction charges and sub custodian charges will be recovered by the Custodian from the Company as they are incurred by the relevant sub custodian.  All such charges shall be charged at normal commercial rates.

*Directors*

The Directors are remunerated for their services at a fee of £35,000 per annum (£40,000 for the Chairman).  For more information in relation to the remuneration of the Directors, please refer to the section of this Offering Memorandum entitled "Memorandum and Articles" in "Additional Information on the Company".

*Operating Expenses*

All Operating Expenses shall be borne by the Company.  All reasonably and properly incurred out-of-pocket expenses of the Administrator, the Custodian, and the Directors relating to the Company are borne by the Company.

The amount of charges and expenses which are borne by an investor may vary from year to year.

For more information on expenses charged during the most recent financial year, prospective investors should review the Company's annual audited financial statements (if any) for the prior financial year.

**Terms and conditions of the offer:**

An amount of Shares equal to U.S. $153 million are being marketed and are available for subscription of commitments under the Placing until the Closing Date.

Shares will be issued under the Placing at a price per Share based on the most recent quarterly determined NAV of the Company.  The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares.

Placees may acquire Shares pursuant to a combination of issuance and transfer from existing Shareholders.

Placees may also enter into commitments to acquire Shares pursuant to a combination of issuance and transfer from existing Shareholders.

The Placing is not being underwritten.

**Press Releases:**

Neither the Portfolio Manager, the Company nor any Shareholder shall issue or approve any press release or other announcement referring to the identity

APP_0110

of a Shareholder without the prior written consent of the applicable
Shareholder.

APP_0111

## RISK FACTORS

**Investment in the Company should be regarded as long term in nature and involving a high degree of risk. Accordingly, prospective investors should consider carefully all of the information set out in this Offering Memorandum and the risks relating to the Company and the Shares including, in particular, the risks described below which are not presented in any order of priority and may not be an exhaustive list or explanation of all the risks which investors may face when making an investment in the Shares and should be used as guidance only.**

**Only those risks which are believed to be material and currently known to the Company in relation to itself and its industry as at the date of this Offering Memorandum have been disclosed. Additional risks and uncertainties not currently known, or deemed immaterial at the date of this Offering Memorandum, may also have an adverse effect on the business, results of operations, financial conditions and prospects of the Company and its net asset value. Potential investors should review this Offering Memorandum carefully and in its entirety and consult with their professional advisers before making an application to invest in the Shares.**

**Prospective investors should note that the risks relating to the Company and the Shares summarised in the section of this document headed "Summary" are the risks that the Directors believe to be the most essential to an assessment by a prospective investor of whether to consider an investment in the Shares. However, as the risks which the Company faces relate to events and depend on circumstances that may or may not occur in the future, prospective investors should consider not only the information on the key risks summarised in the section of this document headed "*Summary*" but also, among other things, the risks and uncertainties described below.**

## RISKS RELATING TO THE COMPANY

### *The Company is a recently incorporated company incorporated under the laws of Guernsey with limited history*

The Company was incorporated under the laws of Guernsey on 30 March 2015. It commenced operations after the initial Placing in August 2015. As the Company has a limited operating history, investors have limited information on which to evaluate the Company's ability to achieve its investment objective or implement its investment strategy and provide a satisfactory investment return. An investment in the Company is therefore subject to all the risks and uncertainties associated with a recently formed business, including the risk that the Company will not achieve its investment objective and that the value of an investment in the Company could decline substantially as a consequence. Any failure by the Company to do so may adversely affect its business, financial condition, results of operations and/or its NAV.

The Company's returns and operating cash flows depend on many factors, including the price and performance of the investments, the availability and liquidity of investment opportunities falling within the Company's investment objective and policy, the level and volatility of interest rates, readily accessible short-term borrowings, the conditions in the financial markets and economy, the financial performance of obligors under the investments and the Company's ability successfully to operate its business and execute its investment strategy. There can be no assurance that the Company's investment strategy will be successful.

### *The Company's target return and target dividend yield are based on estimates and assumptions that are inherently subject to significant business and economic uncertainties and contingencies, and the actual return and dividend yield may be materially lower than the target return and target dividend yield and could be negative*

The Company's target return and target dividend yield set forth in this Offering Memorandum are targets only and are based on estimates and assumptions concerning the performance of its investment portfolio which will be subject to a variety of factors including, without limitation, the availability of investment opportunities, asset mix, value, volatility, holding periods, performance of underlying portfolio debt issuers, investment liquidity, borrower default, changes in current market conditions, interest rates, government regulations or other policies, the worldwide economic environment, changes in law and taxation, natural disasters, terrorism, social unrest and civil disturbances or the occurrence of risks described elsewhere in this Offering Memorandum, which are inherently subject to significant business, economic and market uncertainties and contingencies, all of which are beyond the control of the Company and which may adversely affect the Company's ability to achieve its target return and target dividend yield. Such

- 19 -

targets are based on market conditions and the economic environment at the time of assessing the proposed targets and the assumption that the Company will be able to implement its investment policy and strategy successfully, and are therefore subject to change.  There is no guarantee or assurance that the target return and/or target dividend yield can be achieved at or near the levels set forth in this Offering Memorandum.  Accordingly, the Company's actual rate of return and actual dividend yield achieved may be materially lower than the targets, or may result in a loss.  A failure to achieve the target return and/or target dividend yield set forth in this Offering Memorandum may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

An investment in the Company will be a speculative investment of a long-term nature and involving a high degree of risk.  Shareholders could lose all or a substantial portion of their investment in the Company.  Shareholders must have the financial ability, sophistication, experience and willingness to bear the risks of an investment in the Company.

***Material changes affecting global debt and equity capital markets may have a negative effect on the Company's business, financial condition, results of operations, and/or its NAV***

The global financial markets have experienced extreme volatility and disruption in recent years, as evidenced by a lack of liquidity in the equity and debt capital markets, significant write-offs in the financial services sector, the repricing of credit risk in the credit market and the failure of major financial institutions.  Despite actions of governmental authorities, these events contributed to general economic conditions that have materially and adversely affected the broader financial and credit markets and reduced, and in certain circumstances, significantly reduced, the availability of debt and equity capital.

Further, within the banking sector, the default of any institution could lead to defaults by other institutions.  Concerns about, or default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, because the commercial soundness of many financial institutions may be closely related as a result of their credit, trading, clearing or other relationships.  This risk is sometimes referred to as "systemic risk" and may adversely affect other third parties with whom the Company deals.  The Company may therefore be exposed to systemic risk when the Company deals with various third parties whose creditworthiness may be exposed to such systemic risk.

Recurring market deterioration may materially adversely affect the ability of an issuer whose debt obligations form part of the Company's portfolio, or an issuer whose debt obligations form part of a CLO in which the Company holds CLO Notes, to service its debts or refinance its outstanding debt.  Further, such financial market disruptions may have a negative effect on the valuations of the investments (and, by extension, on the Company's NAV), and on the potential for liquidity events involving such investments.  In the future, non-performing assets in the Company's portfolio may cause the value of that portfolio to decrease (and, by extension and/or its the NAV to decrease).  Adverse economic conditions may also decrease the value of any security obtained in relation to any of the investments.

Conversely, in the event of sustained market improvement, the Company may have access to a reduced number of attractive potential investment opportunities, which also may result in limited returns to Shareholders.

***The Company's NAV is subject to valuation risk and the Company can provide no assurance that the NAVs it records from time to time will ultimately be realised***

The Company's NAV will be calculated by third parties and will be subject to valuation risk (see the risk factor entitled "*The investments may be difficult to value accurately and, as a result, the Company may be subject to valuation risk*").  If a valuation estimate provided to the Company by a third party subsequently proves to be incorrect, no adjustment to any previously calculated NAV will be made.  Any acquisitions or disposals of Shares based on previous erroneous NAVs may result in losses for shareholders.

The investments held by the Company will be valued quarterly and the Company's Net Asset Value will be calculated based on these values.  Therefore, the actual value of the investments at any given time may be different from the value based on which the Company's latest Net Asset Value has been calculated.

Investors should note that where a loan becomes subject to a Forward Purchase Agreement (described further in the section of this Offering Memorandum entitled "*Additional Information on the Company*") the Company will (subject to certain conditions as set out in the section of this Offering Memorandum entitled  "*Additional Information on the*

- 20 -

*Company*") neither receive the gain nor bear the loss that occurs between the date when the loan is added to the Forward Purchase Agreement and the date when the transfer occurs.

***Each of the Company, the Portfolio Manager, Acis and the Management Companies is reliant on Highland (acting in its different capacities), asset management subsidiaries and other third party service providers to carry on their businesses and a failure by one or more service providers may materially disrupt the business of the Company and or the Management Companies***

The Company has no employees and its directors have all been appointed on a non-executive basis. Highland HCF Advisor will, as part of the services to be provided under the terms of the Portfolio Management Agreement, be responsible for selecting the portfolio of investments and the acquisition, disposition or sale of investments and providing the Company with the necessary personnel, credit research and other resources to perform the functions necessary to the business of the Company. In addition, Highland or its affiliates, including the Portfolio Manager, Acis or the Management Companies, may also act as CLO Manager in respect of the Managed CLOs from time to time. The Company may also invest in, provide debt financing to, or purchase performance-linked notes from, asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland or Acis, including the Management Companies, and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. or European risk retention requirements. Therefore, the Company is reliant upon the performance of Highland and/or its affiliates, asset management subsidiaries of the Company and other third party service providers for the performance of certain functions.

Highland CLO Management relies on Highland for access to its employees (which are shared with Highland). Acis CLO Management relies on Acis for access to its employees (which are shared with Acis). Highland and Acis, as applicable, will, as part of the services to be provided under the terms of the Staff and Services Agreements, be responsible for providing the Company with the necessary credit research, back office and other resources to perform the functions necessary to the business of each of the Management Companies, including its management of CLOs. Therefore, each of the Management Companies is reliant upon the performance of Highland and Acis, as applicable, for the performance of essential functions, and may be unable to properly manage CLOs without the support of Highland or Acis, as applicable.

Failure by any service provider to carry out its obligations to the Company or the applicable Management Company in accordance with the applicable duty of care and skill, or at all, or termination of any such appointment may adversely affect the Company's or the applicable Management Company's, as applicable, business, financial condition, results of operations and/or its NAV.

In the event that it is necessary for the Company or the applicable Management Company to replace any third party service provider, it may be that the transition process takes time, increases costs and may adversely affect the Company's or the applicable Management Company's, as applicable, business, financial condition, results of operations and/or its NAV.

***The Shares will be subordinated to the rights of any secured Warehouse Loan Facility Provider or holder of any other future indebtedness or preference shares of the Company.***

The Company is permitted to issue preference shares and incur indebtedness, including secured debt in the form of one or more Warehouse Loan Facilities or other lending facilities. Such preference shares and indebtedness will rank ahead of the Shares in respect of any distributions or payments by the Company to Shareholders. In an enforcement scenario under any Warehouse Loan Facility, the provider(s) of such facilities will have the ability to enforce their security over the assets of the Company and to dispose of or liquidate (on their own behalf or through a security trustee or receiver) the assets of the Company in a manner which is beyond the control of the Company. In such an enforcement scenario, there is no guarantee that there will be sufficient proceeds from the disposal or liquidation of the Company assets to repay any amounts due and payable on the Shares and this may adversely affect the performance of the Company's business, financial condition, results of operations and/or its NAV.

***Exculpation and Indemnification***

The Articles contain provisions that, subject to applicable law, reduce or modify the duties that the Indemnified Persons would otherwise owe to the Company and the Shareholders. The Portfolio Manager will assume no

responsibility under the Portfolio Management Agreement other than to render the services called for thereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager will not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager. Further, Indemnified Persons will incur no liability to the Company or any Shareholder in the absence of a Triggering Event, except as otherwise required by applicable law (including the Companies Law). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

Under the Articles, the Company, to the fullest extent permitted by applicable law (including the Companies Law), will indemnify each Indemnified Person against all Indemnified Losses to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

The fees, costs and expenses (whether or not advanced) and other liabilities resulting from the Company's indemnification obligations are generally operating expenses and will be paid by or otherwise satisfied out of the assets of the Company. The application of the foregoing standards may result in Shareholders having a more limited right of action in certain cases than they would in the absence of such standards. In particular, a "gross negligence" standard of care has been held in some jurisdictions to involve conduct that is closer to wilful misconduct. Even though such provisions in the Articles will not act as a waiver on the part of any Shareholder of any of its rights under applicable U.S. securities laws or other laws, the applicability of which is not permitted to be waived, the Company may bear significant financial losses even where such losses were caused by the negligence (even if heightened) of such Indemnified Persons.

## RISKS RELATING TO THE INVESTMENT STRATEGY

### General Background relating to the United States and European Risk Retention Requirements

Effective for CLOs on December 24, 2016, the so-called "risk retention" rules promulgated by U.S. federal regulators under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "**Dodd-Frank Act**") require a "securitizer" or "sponsor" (which in the case of a CLO is considered the collateral manager) to retain directly or through a "majority-owned affiliate" at least 5% of the credit risk of the securitized assets. Highland CLO Management is being formed with intention of acting as a "majority-owned affiliate" of Highland as a "sponsor" for purposes of holding the applicable Retention Interest under U.S. Risk Retention Rules with respect to Managed CLOs and to provide a vehicle whereby the Company can invest in Managed CLOs. Acis CLO Management is intended to act as a "majority-owned affiliate" of Acis as a "sponsor" for purposes of holding the applicable Retention Interest under U.S. Risk Retention Rules with respect to Acis CLO 7 and to provide a vehicle whereby the Company can invest in Acis CLO 7.

The CLOs in which the Company invests may be structured with the intent to be compliant with the European risk retention requirements for securitisation transactions, meaning, collectively, (i) Articles 404-410 of Regulation (EU) No 575/2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No. 648/2012 (the "**CRR**") as supplemented by Commission Delegated Regulation (EU) No. 625/2014 (the "**CRR Retention Requirements**") (ii) Articles 51-54 of the Commission Delegated Regulation (EU) No 231/2013 (the "**AIFMD Level 2 Regulation**") implementing Article 17 of Directive 2011/61/EU on Alternative Investment Fund Managers (the "**AIFMD**"), and (iii) Article 254-257 of the Commission Delegated Regulation (EU) 2015/35 implementing Article 135(2) of Directive 2009/138/EC on the taking-up and pursuit of the business of Insurance and Reinsurance, as amended by Directive 201/51/EU (and as supplemented by Articles 254-257 of Commission

- 22 -

Delegated Regulation (EU) 2015/35) (the "**Solvency II Level 2 Regulation**"), each together with any applicable guidance, technical standards and related documents published by any European regulator in relation thereto and any implementing laws or regulations in force in any Member State of the European Union (together with the CRR Retention Requirements and the AIFMD Level 2 Regulation, the "**EU Retention Requirements**" and, together with the risk retention requirements under the U.S. Risk Retention Rules, the "**Retention Requirements**").  Any such Company investments in CLOs intended to be compliant with the EU Retention Requirements will continue to be subject to the EU Retention Requirements. However, it is expected that, going forward, the Company's investments in CLOs will be done primarily on an indirect basis through its indirect interest in the Management Companies. As used herein, any reference to the Company's investments in CLOs or CLO Retention Notes shall be deemed to refer primarily to (i) prior to the formation of the Management Companies, the CLO securities the Company acquired directly and (ii) following the formation of the Management Companies, the indirect interests in CLOs it intends to hold through the applicable Management Company. Furthermore, any reference to Managed CLOs or CLOs managed by Highland, Acis, the Portfolio Manager and the Management Companies shall be deemed to refer primarily to (i) for CLOs formed prior to the formation of Acis, CLOs managed by Highland (ii) for CLOs formed after the formation of Acis and prior to the formation of Acis CLO Management, CLOs managed by Acis, (iii) for CLOs formed following the formation of Acis CLO Management and prior to the formation of Highland CLO Management, CLOs managed by Acis CLO Management and (iv) for CLOs formed following the formation of Highland CLO Management, CLOs managed by Highland CLO Management.

Although the Company, the Portfolio Manager, Highland, Acis and the Management Companies intend to comply with the Retention Requirements, there has been no explicit guidance regarding how entities may be structured for this purpose and therefore the regulatory environment in which the CLOs intend to operate is highly uncertain.  There can be no assurance that applicable governmental authorities will agree that any of the transactions, structures or arrangements entered into by the Company, Highland, Acis or the applicable Management Company, and the manner in which it expects to hold retention interests, will satisfy the Retention Requirements, including any transactions pursuant to which Highland or Acis, as applicable, may hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules. If such transactions, structures or arrangements are determined not to comply with the Retention Requirements, Highland, Acis, the applicable Management Company or the Company (as applicable) could become subject to regulatory action which could in turn materially and adversely affect the Company and/or the potential return to shareholders. The impact of the Retention Requirements on the securitization market is also unclear and such rules may negatively impact the value of the CLOs and their underlying assets.

*The investments may be difficult to value accurately and, as a result, the Company may be subject to valuation risk*

The Company's portfolio may at any given time include, directly and indirectly, securities or other financial instruments or obligations which are very thinly traded, for which no market exists or which are restricted as to their transferability under applicable securities laws.  These investments may be extremely difficult to value accurately. Further, because of overall size or concentration in particular markets of positions held by the Company, the value of its investments which can be liquidated may differ, sometimes significantly, from their valuations. Third party pricing information may not be available for certain positions held by the Company.  Investments to be held by the Company may trade with significant bid-ask spreads.  The Company is entitled to rely, without independent investigation, upon pricing information and valuations furnished by third parties, including pricing services and valuation sources.  In the absence of fraud, gross negligence (under New York law), bad faith or manifest error, valuation determinations in accordance with the Company's valuation policy will be conclusive and binding.

*Market factors may result in the failure of the investment strategy*

Strategy risk is associated with the failure or deterioration of an investment strategy such that most or all investment managers employing that strategy suffer losses.  Strategy-specific losses may result from excessive concentration by multiple market participants in the same investment or general economic or other events that adversely affect particular strategies (for example the disruption of historical pricing relationships).  Furthermore, an imbalance of supply and demand favouring borrowers could result in yield compression, higher leverage and less favourable terms to the detriment of all investors in the relevant asset class.  The investment strategy employed by the Company is speculative

and involves substantial risk of loss in the event of a failure or deterioration in the financial markets, although the Company has certain investment limits which define to a degree how it invests. As a result, the Company's investment strategy may fail, and it may be difficult for the Company to amend its investment strategy quickly or at all should certain market factors appear, which may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***The investment strategy of the Company includes investing predominantly in CLO Notes, and, under certain circumstances, asset management subsidiaries, all of which are subject to a risk of loss of principal***

The investment strategy of the Company consists of investing predominantly in CLO Notes, directly and indirectly through its investment in the Management Companies, and, under certain circumstances, asset management subsidiaries. The company may also invest in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements). Such investments may be considered to be subject to a level of risk in the case of deterioration of general economic conditions, which might increase the risk of loss of principal or investment. This could result in losses to the Company which could have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***In the event of a default in relation to an investment, the Company or the CLO in which the Company holds CLO Notes will bear a risk of loss of principal, and accrued interest***

Performance and investor yield on the Company's investments (including both direct investments by the Company in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and investments in senior secured loans held by CLOs in which the Company holds CLO Notes) may be affected by the default or perceived credit impairment of such investments and by general or sector specific credit spread widening. Credit risks associated with the investments include (among others): (i) the possibility that earnings of an obligor may be insufficient to meet its debt service obligations; (ii) an obligor's assets declining in value; and (iii) the declining creditworthiness, default and potential for insolvency of an obligor during periods of rising interest rates and economic downturn. An economic downturn and/or rising interest rates could severely disrupt the market for the investments and adversely affect the value of the investments and the ability of the obligors thereof or the CLO to repay principal and interest. In turn, this may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

In the event of a default in relation to an investment held by the Company or a CLO in which the Company holds CLO Notes, the Company will bear a risk of loss of principal and accrued interest on that investment. Any such investment may become defaulted for a variety of reasons, including non-payment of principal or interest, as well as breaches of contractual covenants. A defaulted investment may become subject to workout negotiations or may be restructured by, for example, reducing the interest rate, a write-down of the principal, and/or changes to its terms and conditions. Any such process may be extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on the defaulted investment. In addition, significant costs might be imposed on the lender, further affecting the value of the investment. The liquidity in such defaulted investments may also be limited and, where a defaulted investment is sold, it is unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest owed on that investment. This would adversely affect the value of the Company's investment portfolio and, by extension, its business, financial condition, results of operations and/or its NAV.

In the case of secured loans, restructuring can be an expensive and lengthy process which could have a material negative effect on the Company's anticipated return on the restructured loan. By way of example, it would not be unusual for any costs of enforcement to be paid out in full before the repayment of interest and principal. This would substantially reduce the Company's anticipated return on the restructured loan.

***The illiquidity of investments may have an adverse impact on their price and the Company's ability to trade in them or require significant time for capital gains to materialise***

Credit markets may from time to time become less liquid, leading to valuation losses on the investments making it difficult to acquire or dispose of them at prices the Company considers their fair value. Accordingly, this may impair the Company's ability to respond to market movements and the Company may experience adverse price movements upon liquidation of such investments. Liquidation of portions of the portfolio under these circumstances could produce realised losses. The size of the Company's positions may magnify the effect of a decrease in market liquidity for such

instruments. Settlement of transactions may be subject to delay and uncertainty. Such illiquidity may result from various factors, such as the nature of the instrument being traded, or the nature and/or maturity of the market in which it is being traded, the size of the position being traded, or lack of an established market for the relevant securities. Even where there is an established market, the price and/or liquidity of instruments in that market may be materially affected by certain factors.

The investment objective of the Company is to provide investors with stable income returns and capital appreciation from exposure on an indirect basis to a portfolio of predominantly floating rate senior secured loans, CLO Notes and, under certain circumstances, asset management subsidiaries. Investments which are in the form of loans are not as easily purchased or sold as publicly traded securities due to the unique and more customised nature of the debt agreement and the private syndication process. As a result, there may be a significant period between the date that the Company makes an investment and the date that any capital gain or loss on such investment is realised. Moreover, the sale of restricted and illiquid securities may result in higher brokerage charges or dealer discounts and other selling expenses than the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. Further, the Company may not be able readily to dispose of such illiquid investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time, which could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV. See further the risk factor titled "*The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)*" below.

### The Company may hold a relatively concentrated portfolio

The Company may hold a relatively concentrated portfolio. There is a risk that the Company could be subject to significant losses if any obligor, especially one with whom the Company had a concentration of investments, were to default or suffer some other material adverse change. The level of defaults in the portfolio and the losses suffered on such defaults may increase in the event of adverse financial or credit market conditions. Any of these factors could adversely affect the value of the Company's investment portfolio and, by extension, its business, financial condition, results of operations and/or its NAV.

A significant portion of the Company's investment portfolio is expected to comprise directly or indirectly of Managed CLOs advised by Highland, Acis, the Portfolio Manager or a Management Company, as the CLO Manager. The performance of the Company's portfolio depends heavily on the skills of Highland, Acis, the Portfolio Manager and the Management Companies, as applicable, in analyzing, selecting and managing the relevant CLOs. See further the sections titled "*Risks Relating to Highland and Acis*" and "*Conflicts of Interest*" below.

### The Company may be exposed to foreign exchange risk, which may have an adverse impact on the value of its assets and on its results of operations

The base currency of the Company is the U.S. Dollar. Certain of the Company's assets may be invested in securities and other investments which are denominated in other currencies. Accordingly, the Company will necessarily be subject to foreign exchange risks and the value of its assets may be affected unfavourably by fluctuations in currency rates. Although the Company may utilise financial instruments to hedge against declines in the value of such assets as a result of changes in currency exchange rates, it is not obliged to do so and may terminate any hedge contract at any time. Moreover, it may not be possible for the Company to hedge against a particular change or event at an acceptable price or at all. In addition, there can be no assurance that any attempt to hedge against a particular change or event would be successful, and any such hedging failure could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

### The hedging arrangements of the Company may not be successful

The Company's economic risks cannot be effectively hedged. However, in connection with the financing of certain investments, the Company may employ hedging techniques designed to reduce the risks of adverse movements in interest rates, securities' prices and/or currency exchange rates. However, some residual risk may remain as a result of imperfections and inconsistencies in the market and/or in the hedging contract. While such hedging transactions may reduce certain risks, they create others. The Company directly or indirectly (through affiliates and subsidiaries) will not be permitted to enter into hedging with respect to the CLO Retention Notes.

APP_0118

The Company may utilise certain derivative instruments (including, without limitation, single-name credit default swaps, credit default swap and loan credit default swap indexes, equity futures and equity indexes) for hedging purposes. However, even if used primarily for hedging purposes, the prices of derivative instruments are highly volatile, and acquiring or selling such instruments involves certain leveraged risks. There may be an imperfect correlation between the instrument acquired for hedging purposes and the investments or market sectors being hedged, in which case, a speculative element is added to the highly leveraged position acquired through a derivative instrument primarily for hedging purposes. In particular, the investments which are in the form of loans may, in certain circumstances, be repaid at any time on short notice at no cost, and accordingly the hedging of interest rate or currency risk in such circumstances may be less precise than is the case with investments in the public securities market.

Furthermore, default by any hedging counterparty in the performance of its obligations could subject the investments to unwanted credit and market risks. Accordingly, although the Company may benefit from the use of hedging strategies, failure to properly hedge the market risk in the investments and/or default of a counterparty in the performance of its obligations under a hedging contract may have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV, and such material adverse effects may exceed those which may have resulted had no hedging strategy been employed.

***Under certain hedging contracts that the Company may enter into, the Company may be required to grant security interests over some of its assets to the relevant counterparty as collateral***

In connection with certain hedging contracts, the Company may be required to grant security interests over some of its assets to the relevant counterparty to such hedging contract as collateral. Such hedging contracts typically will give the counterparty the right to terminate the agreement upon the occurrence of certain events. Such termination events may include, among others, a failure by the Company to pay amounts owed when due, a failure to provide required reports or financial statements, a decline in the value of the investments secured as collateral, a failure to maintain sufficient collateral coverage, a failure by the Company to comply with its investment policy and any investment restrictions, key changes in the Company's management, a significant reduction in the Company's Net Asset Value, and material violations of the terms, representations, warranties or covenants contained in the hedging contract, as well as other events determined by the counterparty. If a termination event were to occur, there may be a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***The use of leverage by the Company may increase the volatility of returns and providers of leverage would rank ahead of investors in the Company in the event of insolvency***

The Company may employ leverage in order to increase investment exposure with a view to achieving its target return, in the form of one or more committed credit facilities. Leverage may come in the form of CLO securitizations.

While leverage presents opportunities for increasing total returns, it can also have the effect of increasing the volatility of the Shares, including the risk of total loss of the amount invested. If income and capital appreciation on investments made with borrowed funds are less than the costs of the leverage, the Net Asset Value will decrease. The effect of the use of leverage is to increase the investment exposure, the result of which is that, in a market that moves adversely, the possible resulting loss to investors' capital would be greater than if leverage were not used. As a result of leverage, small changes in the value of the underlying assets may cause a relatively large change in the value of the Company. Many financial instruments used to employ leverage are subject to variation or other interim margin requirements, which may force premature liquidation of investments. Investors should be aware that the use of leverage by the Company can be considered to multiply the leverage effect on their investment returns in the Company. As described above, while this effect may be beneficial when markets' movements are favourable, it may result in a substantial loss of capital when markets' movements are unfavourable.

In addition, such leverage may involve granting of security or the outright transfer of specific investments in the portfolio. Since there is no security created in respect of the Shares, any insolvency of the Shareholders could rank behind the Company's financing and hedging counterparties, whose claims will be considered as indebtedness of the Company and may be secured. Leverage does create opportunities for greater total returns on the investments but simultaneously may create special risk considerations by magnifying changes in the total value of the Net Asset Value and in the yield on the investments held by the Company.

APP_0119

In addition, to the extent leverage is employed, the Company may be required to refinance transactions from time to time.  On each refinancing, the applicable counterparty may choose to re-negotiate the terms of each transaction or indeed not to refinance the transaction at all.  To the extent refinancing facilities are not available in the market at economic rates or at all, the Company may be required to sell assets at disadvantageous prices.  Any such deleveraging may result in losses on investments which could be severe and accordingly could have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

### *Interest rate fluctuations could expose the Company to additional costs and losses*

The prices of the investments that may be held by the Company tend to be sensitive to interest rate fluctuations and unexpected fluctuations in interest rates could cause the corresponding prices of a position to move in directions which were not initially anticipated.  In addition, interest rate increases generally will increase the interest carrying costs of borrowed securities and leveraged investments.  Further, the Company may invest in both floating and fixed rate securities and interest rate movements will affect those respective securities differently.  In particular, when interest rates rise significantly the value of fixed interest rate securities often fall.  Furthermore, to the extent that interest rate assumptions underlie the hedging of a particular position, fluctuations in interest rates could invalidate those underlying assumptions and expose the Company to additional costs and losses.  Any of the above factors could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

### *Additional Information about LIBOR*

In a speech on 27 July 2017, Andrew Bailey, the Chief Executive of the Financial Conduct Authority ("**FCA**"), announced the FCA's intention to cease sustaining LIBOR from the end of 2021.

The FCA has statutory powers to compel panel banks to contribute to LIBOR where necessary. The FCA has decided not to ask, or to require, that panel banks continue to submit contributions to LIBOR beyond the end of 2021. The FCA has indicated that the current panel banks will voluntarily sustain LIBOR until the end of 2021. The FCA does not intend to sustain LIBOR through using its influence or legal powers beyond that date.  The FCA's intention is that after 2021, it will no longer be necessary for the FCA to persuade, or to compel, banks to submit to LIBOR due to the development of alternative benchmark rates, which the FCA suggested should be based on transactions and not on reference rates that do not have active underlying markets to support them.  As of the date of this Offering Memorandum, no specific alternative rates have been generally agreed in the CLO market.

It is possible that the LIBOR administrator, ICE Benchmark Administration, and the panel banks could continue to produce LIBOR on the current basis after 2021, if they are willing and able to do so. However, the survival of LIBOR in its current form, or at all, is not guaranteed after 2021 and, if LIBOR in its current form does not survive, it could cause a disruption in the credit markets generally, which could negatively impact the market value and/or transferability of the Notes.

It is currently unclear how LIBOR would be determined pursuant to existing underlying CLO indentures if LIBOR ceased to exist. If an alternative or a successor benchmark rate were determined, it may increase the risk of a mismatch between the interest rate applicable to the underlying loan assets and the interest rate applicable to the underlying collateral obligations of the CLOs held by the Company. Such mismatch could have a material adverse effect on the value and liquidity of the CLO Notes held by the Company.

Investors should be aware that: (a) any of these changes or any other changes to LIBOR could affect the level of the published rate, including to cause it to be lower and/or more volatile than it would otherwise be; (b) if the applicable rate of interest on any collateral obligation held by the Company is calculated with reference to a currency or tenor which is discontinued, such rate of interest will then be determined by the provisions of the affected collateral obligation, which may include determination by the relevant calculation agent in its discretion; (c) the administrator of LIBOR will not have any involvement in the collateral obligations or notes linked to those obligations and may take any actions in respect of LIBOR without regard to the effect of such actions on the collateral obligations or the notes; and (d) any uncertainty in the value of LIBOR or the admissions made by financial institutions that LIBOR has been manipulated or any uncertainty in the prominence of LIBOR as a benchmark interest rate due to the recent regulatory reforms may adversely affect liquidity of the collateral obligations or the notes in the secondary market and their market value.  Any of the above or any other significant change to the setting of LIBOR could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

*In the event of the insolvency of an obligor in respect of an investment, or of an underlying obligor in respect of an investment, the return on such investment to the Company may be adversely impacted by the insolvency regime or insolvency regimes which may apply to that obligor or underlying obligor and any of their respective assets*

In the event of the insolvency of an obligor in respect of an investment (and in the case of the CLO Notes, the obligors of the assets within the relevant CLO's portfolio), the Company's (or the CLO issuer's, in the case of CLO Notes) recovery of amounts outstanding in insolvency proceedings may be impacted by the insolvency regimes in force in the jurisdiction of incorporation of such obligor or in the jurisdiction in which such obligor mainly conducts its business (if different from the jurisdiction of incorporation), and/or in the jurisdiction in which the assets of such obligor are located.  Such insolvency regimes impose rules for the protection of creditors and may adversely affect the ability to recover such amounts as are outstanding from the insolvent obligor under the investment, which may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

Similarly, the ability of obligors to recover amounts owing to them from insolvent underlying obligors may be adversely impacted by any such insolvency regimes applicable to those underlying obligors, which in turn may adversely affect the abilities of those obligors to make payments due under the investment to the Company on a full or timely basis.

In particular, it should be noted that the United States and a number of European jurisdictions operate unpredictable insolvency regimes which may cause delays to the recovery of amounts owed by insolvent obligors or underlying obligors subject to those regimes.  The different insolvency regimes applicable in the different jurisdictions result in a corresponding variability of recovery rates for senior secured loans, entered into or issued in such jurisdictions, any of which may have a material adverse effect on the performance of a CLO and, by extension, the Company's business, financial condition, results of operations and/or its NAV.

*A CLO issuer may be subject to losses on investments as a result of insolvency or clawback legislation and/or fraudulent conveyance findings by courts*

Various laws enacted for the protection of creditors and stakeholders may apply to certain investments that are debt obligations, although the existence and applicability of such laws will vary between jurisdictions.  For example, if a court were to find that an obligor did not receive fair consideration or reasonably equivalent value for incurring indebtedness evidenced by an investment and the grant of any security interest securing such investment, and, after giving effect to such indebtedness, the obligor:  (i) was insolvent; (ii) was engaged in a business for which the assets remaining in such obligor constituted unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court may:  (a) invalidate such indebtedness and such security interest as a fraudulent conveyance; (b) subordinate such indebtedness to existing or future creditors of the obligor; or (c) recover amounts previously paid by the obligor (including to a CLO issuer) in satisfaction of such indebtedness or proceeds of such security interest previously applied in satisfaction of such indebtedness.  In addition, if an obligor in whose debt a CLO issuer has an investment becomes insolvent, any payment made on such investment may be subject to avoidance, cancellation and/or clawback as a "preference" if made within a certain period of time (which for example under some current laws may be as long as two years) before insolvency.

In general, if payments on an investment are voidable, whether as fraudulent conveyances, extortionate transactions or preferences, such payments may be recaptured either from the initial recipient or from subsequent transferees of such payments.  To the extent that any such payments are recaptured from a CLO issuer, there will be an adverse effect on the performance of the CLO issuer and, by extension, on the Company's business, financial condition, results of operations and/or its NAV.

*The due diligence process that the Company plans to undertake in evaluating specific investment opportunities may not reveal all facts that may be relevant in connection with such investment opportunities and any corporate mismanagement, fraud or accounting irregularities may materially affect the integrity of the Company's due diligence on investment opportunities*

When conducting due diligence and making an assessment regarding an investment, the Company will be required to rely on resources available to it, including internal sources of information as well as information provided by existing and potential obligors, any equity sponsor(s), lenders and other independent sources.  The due diligence process may at times be required to rely on limited or incomplete information.

The Portfolio Manager will select investments on the Company's behalf in part on the basis of information and data relating to potential investments filed with various government regulators and publicly available or made directly available to the Portfolio Manager by the entities filing such information or third parties. Although the Portfolio Manager will evaluate all such information and data and seek independent corroboration when it considers it appropriate and reasonably available, the Portfolio Manager will not be in a position to confirm the completeness, genuineness or accuracy of such information and data. The Portfolio Manager is dependent upon the integrity of the management of the entities filing such information and of such third parties as well as the financial reporting process in general.

The value of an investment made by the Portfolio Manager on the Company's behalf may be affected by fraud, misrepresentation or omission on the part of an obligor, underlying obligor, any related parties to such obligor or underlying obligor, or by other parties to the investment (or any related collateral and security arrangements). Such fraud, misrepresentation or omission may adversely affect the value of the investment and/or the value of the collateral underlying the investment in question and may adversely affect the ability of the Portfolio Manager's on the Company's behalf to enforce its contractual rights relating to that investment or the relevant obligor's ability to repay the principal or interest on the investment.

Investment analysis and decisions by the Portfolio Manager may be undertaken on an expedited basis in order to make it possible for the Portfolio Manager to take advantage of short-lived investment opportunities. In such cases, the available information at the time of an investment decision may be limited, inaccurate and/or incomplete. Furthermore, the Portfolio Manager may not have sufficient time to evaluate fully such information even if it is available.

Accordingly, the Portfolio Manager cannot guarantee that the due diligence investigation it carries out with respect to any investment opportunity will reveal or highlight all relevant facts that may be necessary or helpful in evaluating such investment opportunity. Any failure by the Portfolio Manager to identify relevant facts through the due diligence process may cause it to make inappropriate investment decisions, which may have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***The collateral and security arrangements attached to an investment may not have been properly created or perfected, or may be subject to other legal or regulatory restrictions***

The collateral and security arrangements in relation to secured obligations in which the Company may invest (and the security arrangements relating to the underlying assets of CLOs) will be subject to such security or collateral having been correctly created and perfected and any applicable legal or regulatory requirements which may restrict the giving of collateral or security by an obligor, such as, for example, thin capitalisation, over-indebtedness, financial assistance and corporate benefit requirements. If the investments do not benefit from the expected collateral or security arrangements, this may adversely affect the value of, or in the event of a default, the recovery of principal or interest from, such investments. Accordingly, any such failure properly to create or perfect collateral and security interests attaching to the investments may adversely affect the performance of the CLO issuer and/or the Company and, by extension, the Company's business, financial condition, results of operations and/or its NAV.

***The investments will be based in part on valuations of collateral which are subject to assumptions and factors that may be incomplete, inherently uncertain or subject to change***

A component of the Company's analysis of the desirability of making a given investment relates to the estimated residual or recovery value of such investments in the event of the insolvency of the obligor (and in the case of the CLO Notes, the obligors of the assets within the relevant CLO's portfolio). This residual or recovery value will be driven primarily by the value of the anticipated future cash flows of the obligor's business and by the value of any underlying assets constituting the collateral for such investment. The anticipated future cash flows of the obligor's business and the value of collateral can, however, be extremely difficult to predict as in certain circumstances market quotations and third party pricing information may not be available. If the recovery value of the collateral associated with the investments in which the Company or a CLO issuer invests decreases or is materially worse than expected by the Company or a CLO issuer (as applicable), such a decrease or deficiency may affect the value of the investments made by the Company or a CLO issuer. Accordingly, there will be an adverse effect on the performance of the CLO issuer and/or the Company and, by extension, on the Company's business, financial condition, results of operations and/or its NAV.

***CLO Income Notes are volatile and interest and principal payments payable on the CLO Income Notes are not fixed***

CLO Income Notes are the most subordinated tranche of a CLO and all payments of principal and interest on such CLO Income Notes are fully subordinated. Interest and principal payments are not fixed but are based on residual amounts available to make such payments. As a result, payments on such CLO Income Notes will be made by the CLO issuer to the extent of available funds, and no payments thereon will be made until amongst other things (a) the payment of certain costs, fees and expenses have been made and (b) interest and principal (respectively) has been paid on the more senior notes of the CLO. Non-payment of interest or principal on such CLO Income Notes will be unlikely to cause an event of default in relation to the CLO issuer.

CLO Income Notes represent a highly leveraged investment in the underlying assets of the CLO issuer. Accordingly, it is expected that changes in the market value of such CLO Income Notes will be greater than changes in the market value of the underlying assets of the CLO issuer, which themselves are subject to credit, liquidity, interest rate and other risks. Utilisation of leverage is a speculative investment technique and involves certain risks to investors and will generally magnify the CLO Income Notes investors' opportunities for gain and risk of loss. In certain scenarios, the CLO Income Notes may be subject to a partial or a 100 per cent loss of invested capital. CLO Income Notes represent the most junior securities in a leveraged capital structure. As a result, any deterioration in performance of the asset portfolio of a CLO issuer, including defaults and losses, a reduction of realised yield or other factors, will be borne first by holders of such CLO Income Notes prior to the rest of the capital structure.

***CLO Income Notes are a limited recourse obligation of the CLO issuer***

CLO Income Notes are a limited recourse obligation of a CLO issuer and amounts payable on CLO Income Notes are payable solely from amounts received in respect of the collateral of the CLO issuer. Payments on CLO Income Notes prior to and following enforcement of the security over the collateral of a CLO issuer are subordinated to the prior payment of certain costs, fees and expenses of, or payable by, the CLO issuer and to payment of principal and interest on more senior notes of the CLO issuer. The holders of CLO Income Notes must rely solely on distributions on the collateral of the CLO for payment of principal and interest, if any, on the CLO Income Notes. There can be no assurance that the distributions on the collateral of a CLO will be sufficient to make payments on the CLO Income Notes. If distributions are insufficient to make payments on the CLO Income Notes, no other assets of the CLO issuer will be available for payment of the deficiency and following realisation of the collateral and the application of the proceeds thereof, the obligations of the CLO issuer to pay such deficiency shall be extinguished. Such shortfall will be borne in the first instance by the CLO Income Notes.

In addition, at any time whilst the CLO Income Notes are outstanding in a CLO, no CLO Income Notes holder shall be entitled to institute against the related CLO issuer, or join in any institution against such CLO issuer of, any bankruptcy, reorganization, arrangement, insolvency, examinership, winding up or liquidation proceedings under any applicable bankruptcy or similar law in connection with any obligations of the CLO issuer relating to the CLO Income Notes or otherwise owed to the CLO Income Notes holder, save for lodging a claim in the liquidation of the CLO issuer which is initiated by another party or taking proceedings to obtain a declaration as to the obligations of the CLO issuer, nor shall it have a claim arising in respect of the share capital of the CLO issuer.

Furthermore, following the establishment of the Management Companies, CLO Income Notes may not be held directly by the Company. As such the Company's interest in the CLO Income Notes may be indirect, and the Management Company, not the Company, will be entitled to exercise voting rights associated with the CLO Income Notes.

***CLO Notes have limited liquidity***

In addition to the restrictions mentioned in the section titled "*The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)*", there will usually be a limited market for notes representing collateralised loan obligations (including the CLO Notes). There is no guarantee that any party to a CLO transaction will make a secondary market in relation to the CLO Notes. There can be no assurance that a secondary market for any CLO Notes will develop or, if a secondary market does develop, that it will provide the holders of CLO Notes with liquidity of investment or that it will continue for the life of such notes. As a result, the Company may have to hold the CLO Notes for an indefinite period of time or until their early

APP_0123

redemption date or maturity date.  Where a market does exist, to the extent that an investor wants to sell the CLO Notes, the price may, or may not, be at a discount from the outstanding principal amount.  There may be additional restrictions on divestment in the terms and conditions of CLO Notes.

***Investments in asset management subsidiaries may subject the Company to increased regulatory scrutiny or disputes related to CLOs or other investments managed by such asset management subsidiaries***

As part of its business, the Portfolio Manager may advise the Company to invest in asset management subsidiaries, affiliated with the Company, Highland, Acis, the Portfolio Manager or the Management Companies and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. or European risk retention requirements.  Asset managers of U.S. or European CLOs operate in a highly regulated environment, and are subject to a comprehensive statutory and regulatory regime as well as oversight by governmental agencies.  In light of the current conditions in the global financial markets and economy, regulators have increased their focus on the regulation of asset managers in the U.S. and Europe.  New or modified regulations and related regulatory guidance, including under Basel III and the Dodd-Frank Act, may have unforeseen or unintended adverse effects on asset managers of CLOs.  These international regulations could limit an asset management subsidiary from pursuing certain business opportunities and/or impose additional costs, and otherwise indirectly materially adversely affect the Company's business operations and have other negative consequences.

***Investors will not have control over the CLO management activities of the Portfolio Manager, Highland, Acis or the Management Companies in CLOs***

The Portfolio Manager, Highland, Acis and/or the Management Companies, in the capacity of CLO Manager of a CLO, will have the discretion to make collateral management decisions for such CLO, including with respect to asset selection, disposition and amendments of the underlying loans.  In exercising such discretion, the Portfolio Manager, Highland, Acis and/or the applicable Management Company will be responsible to act solely in the best interests of the applicable CLO issuer, not the Company or any Investor.  Any amendment, waiver or modification of an investment could postpone the receipt of payments in respect of such investment and/or reduce distributions to Investors.  The shareholders will have no right to compel the Portfolio Manager, Highland, Acis or the Management Companies, in their roles as CLO Manager to take or refrain from taking any actions or decisions, and the actions or decisions taken by the Portfolio Manager, Highland, Acis or the Management Companies as CLO Manager may expose the Investors to losses on their investment.

***United States retention requirements may affect future actions of the Company and negatively impact the leveraged loan market***

As part of its business, the Company may invest in asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland, Acis or the Management Companies and which may act as the asset manager of certain CLOs in order to satisfy the U.S. Risk Retention Rules.

On October 21, 2014, the U.S. Risk Retention Rules were issued and became effective on December 24, 2016 with respect to asset-backed securities collateralized by assets other than residential mortgages.  The statements contained herein regarding how compliance with the U.S. Risk Retention Rules may be achieved by a CLO are solely based on publicly available information as of the date hereof.  Except with respect to asset-backed securities transactions that satisfy certain exemptions, the U.S. Risk Retention Rules generally require one of the sponsors of asset-backed securities or a "majority-owned affiliate" thereof to retain not less than 5% of the credit risk of the assets collateralizing asset-backed securities.  The preamble to the rule text in the U.S. Risk Retention Rules indicates that a party that organizes and initiates a securitization would be the "sponsor."  In the case of many collateralized loan obligation transactions, the entity acting as collateral manager typically organizes and initiates a transaction and, therefore, would be considered the "sponsor" for U.S. Risk Retention Rules purposes, as further discussed in the preamble.  The U.S. Risk Retention Rules provide that if there is more than one "sponsor" of a securitization transaction, each "sponsor" is to ensure that at least one "sponsor" (or its "majority-owned affiliate") retains the requisite U.S. Retention Interest.

It is expected that Highland or Acis, as applicable, will agree to act as "sponsor" for purposes of Managed CLOs in which the Company invests, but there can be no assurance, and no representation, made that any Governmental Authority will agree that such is the case.  Each of Highland and Acis intends to treat the applicable Management Company as its "majority-owned affiliate" due to holding by it (or by affiliates that are intended to be, directly or

indirectly, majority controlled, are majority controlled by or are under common majority control with Highland or Acis, as applicable) of a controlling financial interest in such Management Company as determined under GAAP, although there can be no assurance that such Management Companies will maintain treatment as a "majority-owned affiliates" of Highland or Acis as "sponsors" given the lack of guidance in the U.S. Risk Retention Rules with respect to such affiliated situations.  Moreover, there can be no guarantee that Highland or Acis will be able to maintain the treatment of such Management Company as a "majority-owned affiliate," particularly if GAAP regulations or interpretations change over time.

Each of Highland or Acis, as applicable, may also hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules.  There can be no assurance that following any such transfer any Governmental entity will agree that the applicable Management Company will remain a "majority-owned affiliate" of Highland or Acis, as applicable.

At this time, each potential investor should understand that there is uncertainty with respect to what is required to comply with the U.S. Risk Retention Rules in certain circumstances, and therefore there can be no assurance that, with respect to any Managed CLO or other CLO in which the Company invests, the applicable credit risk retention and disclosures with respect to such CLO will enable the applicable CLO Manager or U.S. retention holder to comply with the U.S. Risk Retention Rules.

In addition, there are a number of future uncertainties surrounding, U.S. Risk Retention Rules for CLO Managers, including:  (i) the ultimate results of litigation currently in process brought by the Loan Syndications and Trading Association (LSTA), a major industry trade association, challenging, among other things, the regulators' application of U.S. Risk Retention Rules to collateral managers of typical so-called open market CLOs, (ii) proposed legislation designed to exclude from U.S. Risk Retention Rules, collateral managers of certain defined "QCLOs" (qualified CLOs) and (iii) future directives and interpretations by Governmental Authorities with respect to the U.S. Risk Retention Rules.  If such publicly available information is altered as a result of the foregoing (or anything else), there can be no assurance that, with respect to any Managed CLO or other CLO in which the Company invests, the applicable credit risk retention and disclosures would be viewed by any Governmental Authority as sufficient to meet the requirements under the U.S. Risk Retention Rules.  The failure to satisfy the requirements of the U.S. Risk Retention Rules may have a material and adverse effect on the market value and/or liquidity of the applicable CLO Notes and on Highland, Acis and the Management Companies and the Company's investments therein.

***The failure by the Portfolio Manager, Highland, Acis and/or the Management Companies to comply with the U.S. Risk Retention Rules may have a material and adverse effect on the Company and/or the Portfolio Manager***

The failure by the Portfolio Manager, Highland, Acis and/or the applicable Management Company to comply with the U.S. Risk Retention Rules with respect to any Managed CLO may result in regulatory actions and other proceedings being brought against the Portfolio Manager, Highland, Acis and/or the applicable Management Company, which could result in such person being required, among other things, to pay damages, transfer interests and/or acquire additional CLO Notes (which may or may not be available at such time for acquisition) or be subject to cease and desist orders or other regulatory action. In addition, a failure to remedy non-compliance with the U.S. Risk Retention Rules may also trigger a "cause" event under the applicable CLO Management Agreement and/or subject the Portfolio Manager, Highland, Acis and/or the applicable Management Company to adverse publicity and reputational risk resulting from such non-compliance.   In addition, given the lack of clarity under the U.S. Risk Retention Rules with respect to the identity of the party responsible for holding U.S. risk retention interests upon a resignation or removal of a CLO Manager or an if the Portfolio Manager, Highland, Acis and/or the applicable Management Company resigns or the applicable holders of CLO Notes desire to remove the Portfolio Manager in connection with any such "cause" event, there may be no successor CLO Manager willing to accept appointment as such, in which case the Portfolio Manager, Highland, Acis and/or the applicable Management Company will be required to continue to act as CLO Manager under the applicable CLO Management Agreement. Further, given such lack of clarity under the U.S. Risk Retention Rules with respect to the identity of the party responsible for holding U.S. risk retention interests, there can be no assurance that Highland or Acis, as applicable, will be able to maintain compliance with the U.S. Risk Retention Rules following any transfer of ownership interests in an entity holding Retention Interests by Highland or Acis to their respective affiliates that are, directly or indirectly, majority controlled,

APP_0125

are majority controlled by or are under common majority control with, Highland or Acis, as applicable, particularly in situations involving CLOs which have already been issued when the related transfer occurs. As a result of any of the foregoing, the failure of the Portfolio Manager, Highland, Acis and/or the applicable Management Company to comply with the U.S. Risk Retention Rules may have a material and adverse effect on the market value and/or liquidity of the Company's investment in the applicable CLO Notes as well as on the business, condition (financial or otherwise), assets, operations or prospects of the Portfolio Manager, Highland, Acis and/or the applicable Management Company and the Company.

***The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)***

In connection with the intention to comply with the Retention Requirements, each Management Company will need to, amongst other things, (a) on the closing date of a Managed CLO, commit to purchase and retain CLO Notes held in the form and at least the minimum required under the applicable Retention Requirements, as applicable, for the relevant CLO (the "**CLO Retention Notes**") and (b) undertake that, for so long as any securities of the CLO remain outstanding (including the CLO Retention Notes), it will retain its interest in the CLO Retention Notes and will not (except to the extent permitted by the EU Retention Requirements, the accompanying regulatory technical standards or any other related guidance published by the European Securities and Markets Authority) sell, hedge or otherwise mitigate its credit risk under or associated with such CLO Retention Notes. The Company or the applicable Management Company, as applicable, may make certain representations and/or give certain undertakings in favour of Managed CLOs (and/or certain other transaction parties) in respect of its ongoing retention of the CLO Retention Notes and regarding its agreement to sell certain assets to such Managed CLOs from time to time. There are currently transactions in the market which are similar to the Managed CLOs, however if an applicable regulatory authority supervising investors in a Managed CLO were to conclude that the applicable Management Company was not holding the CLO Retention Notes in accordance with the CRR, it is possible, but far from certain, that this may negatively impact the investors in such Managed CLO. If such investors decided to take action against the Company or the applicable Management Company as a result of any negative impact, this may have an adverse effect on the Company's financial performance and prospects.

In addition, with the intention of achieving classification as an "originator" (as defined in the CRR) and complying with the CRR Retention Requirements if applicable to the relevant CLO, the applicable Management Company would be required to meet the Origination Requirements.

As a result of the above commitments, the applicable Management Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption). Consequently, if any shares were to become due and repayable in connection with any resolution for their redemption, the Company, the applicable Management Company will not be obliged to immediately sell, transfer or liquidate the CLO Retention Notes and the proceeds of such CLO Retention Notes (if any) will not be available until the final maturity or early redemption in full of the securities of the relevant CLO. In addition, cash held by the Company will not be able to be used to repay any shares to the extent that such repayment could leave the Company unable to continue to originate and sell assets to the CLO issuers in order to ensure that during the relevant CLO's reinvestment period the Company, the applicable Management Company has met the Origination Requirements.

The Company or the applicable Management Company directly or indirectly, may hold a controlling equity stake in the Managed CLOs; accordingly, upon exercise by the Company or the applicable Management Company an early redemption option will result in a full redemption of the applicable CLO securities. Neither the Company nor the applicable Management Company will generally be able to exercise any early redemption options during a "non-call period" (generally lasting two years) after the closing date of the CLO. As a result of this feature and the EU Retention Requirements, the relevant CLO Retention Notes will not be permitted to be sold, transferred or liquidated during this time. In addition, even after an early redemption option is permitted to be exercised, such an option usually contains a number of conditions to its exercise including, but not limited to, a threshold that the liquidation value of the CLO collateral exceed an amount which would pay (a) all expenses of the CLO and (b) principal and accrued interest on the CLO Notes senior to the CLO Income Notes. If the liquidation value of the portfolio will not achieve this threshold at the time the Company intends to exercise its early redemption option, the CLO will not be able to be optionally redeemed by the Company at such time. In such circumstances, the Company or the applicable Management Company

APP_0126

may not redeem the CLO Retention Notes until their final stated maturity (which may be in excess of 12 years), therefore producing no proceeds to pay to Shareholders until this point.

***Potential non-compliance with or changes to the United States and European risk retention requirements***

The purchase and retention of the CLO Retention Notes in a CLO will be undertaken by the Company or the applicable Management Company with the intention of achieving compliance with the U.S. Risk Retention Rules and/or the EU Retention Requirements by the relevant CLO.

The U.S. Risk Retention Rules and/or EU Retention Requirements may be amended, supplemented or revoked from time to time. There is no guarantee that existing CLOs or future CLOs will be grandfathered into the regime which results from such amendments, supplements or revocations and, as such, the CLOs in which the applicable Management Company is retaining the CLO Retention Notes, may become non-compliant with the U.S. Risk Retention Rules and/or EU Retention Requirements.

***Liability for breach of a risk retention letter***

The arranger of a CLO and certain other parties of a CLO in which a Management Company agrees to hold the CLO Retention Notes (in such capacity, the "**Retention Holder**") will require the applicable Management Company to execute a risk retention letter. Under a risk retention letter the applicable Retention Holder will typically be required to, amongst other things, make certain representations, warranties and undertakings: (a) in relation to its acquisition and retention of the CLO Retention Notes for the life of the CLO; and (b) regarding its agreement to sell assets to the relevant CLO from time to time. If the applicable Retention Holder sells or is forced to sell the CLO Retention Notes prior to the maturity of the relevant CLO, or the applicable Retention Holder holds insufficient cash or investments to continually sell the assets to the CLO as described above or for any other reason the applicable Retention Holder is not considered to be an "originator" (as such term is defined in the CRR), the Company may be in breach of the terms of the related risk retention letter. In such circumstances the arranger of the relevant CLO and the other parties to the related risk retention letter would have recourse to the applicable Retention Holder for losses incurred as a result of such breach. Such claims may reduce, or entirely diminish any cash or assets of the Company which may have been available to make payments on the Shares.

## RISKS RELATING TO HIGHLAND AND ACIS

***Past Performance Not Indicative of Future Results***

The past performance of Highland and Acis and their principals and affiliates in other portfolios or investment vehicles, including, without limitation their outstanding CLO transactions, may not be indicative of the results that the Company may be able to achieve. Similarly, the past performance of Highland, Acis and their principals and affiliates over a particular period may not necessarily be indicative of the results that may be expected in future periods. Furthermore, the nature of, and risks associated with, the Company's investments may differ substantially from those investments and strategies undertaken historically by Highland, Acis and their principals and affiliates. There can be no assurance that Highland's or Acis' investment recommendations will perform as well as past investments of Highland or Acis or their principals and affiliates, that the Company will be able to avoid losses or that the Company will be able to make investments similar to the past investments of Highland, Acis and their principals and affiliates. In addition, such past investments may have been made utilizing a leveraged capital structure, an asset mix and fee arrangements that are different from the anticipated capital structure, asset mix and fee arrangements of the Company. Moreover, because the investment criteria that govern investments in the Company's portfolio do not govern the investments and investment strategies of Highland, Acis and their principals and affiliates generally, such investments conducted in accordance with such criteria, and the results they yield, are not directly comparable with, and may differ substantially from other investments undertaken by Highland, Acis and their principals and affiliates.

***Acis, as CLO Manager, Relies on Highland to Perform Certain Services***

Acis currently relies on Highland, a U.S. SEC-registered investment adviser under common control with Acis, pursuant to the ACM Services Agreements, to provide investment research and recommendations and operational support to Acis, including services in connection with credit research, due diligence of actual or potential investments,

the execution of investment transactions, and certain loan services and administrative services. If Highland does not continue to provide such services to Acis, or there is a departure or inability of certain Highland personnel to provide such services to Acis, there can be no assurances that Acis would be able to find a substitute service provider with the same experience as, or on the same terms as its ACM Services Agreements with, Highland.  The inability of Acis to perform its duties under the applicable CLO Management Agreements or the ACLOM Services Agreements in accordance with the standard of care specified therein due to the termination of the Services Agreements could result in removal of Acis or Acis CLO Management, as applicable, under the applicable CLO Management Agreements for the Acis CLOs and Acis CLO 7.

*Litigation Involving Highland and Acis*

Highland and Acis currently are and have been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. Shareholders have had an opportunity to discuss with Highland to their satisfaction all litigation matters against Highland and its affiliates unrelated to its distressed business. We currently do not anticipate these proceedings will have a material negative impact to the Company.

*Failure to Comply with Investment Advisers Act May Have an Adverse Effect on the Portfolio Manager's Performance*

Highland HCF Advisor and Highland CLO Management are relying advisers of Highland, and Highland is a registered investment adviser registered under the Investment Advisers Act and, as such, is subject to the provisions of the Investment Advisers Act.  Acis CLO Management is a relying adviser of Acis, and Acis is a registered investment adviser registered under the Investment Advisers Act and, as such, is subject to the provisions of the Investment Advisers Act.  Failure to comply with the requirements imposed on the Portfolio Manager, Highland, Acis and/or the Management Companies under the Investment Advisers Act may have a significant adverse effect on the Portfolio Manager, Highland, Acis and/or the applicable Management Company. The Portfolio Manager, Highland's, Acis' and/or the applicable Management Company's ability to act as CLO Manager for Managed CLOs in which the Company holds CLO Notes may also be adversely affected by negative publicity arising from any regulatory compliance failures or other inappropriate behavior attributed to or any other negative publicity related to the Portfolio Manager, Highland, Acis and/or the applicable Management Company, any affiliate thereof or any of their respective investment professionals.

*SEC enforcement actions*

There can be no assurance that the Portfolio Manager, Highland, Acis and/or the Management Companies or their affiliates will avoid regulatory examination and possibly enforcement actions. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including the undisclosed allocation of the fees, costs and expenses related to unconsummated co-investment transactions (i.e., the allocation of broken deal expenses), undisclosed legal fee arrangements affording the applicable adviser with greater discounts than those afforded to funds advised by such adviser. Although each of the Portfolio Manager, Highland, Acis and the Management Companies believe the foregoing practices to have been common historically amongst private fund advisers within the U.S. private funds industry, if the SEC or any other governmental authority, regulatory agency or similar body may take issue with, or in the case of insufficient disclosure regarding acceleration of certain special fees as described below, may continue to take issue with, past or future practices of the Portfolio Manager, Highland, Acis or the Management Companies or any of their affiliates as they pertain to any of the foregoing.  In such instances, the Portfolio Manager, Highland, Acis or the Management Companies and/or such affiliates may be at risk for regulatory sanction.  Even if an investigation or proceeding did not result in a sanction or the sanction imposed against the Portfolio Manager, Highland, Acis or the Management Companies was small in monetary amount, the Portfolio Manager, Highland, Acis and/or the applicable Management Company or their respective affiliates may be subject to adverse publicity relating to the investigation, proceeding or imposition of any such sanction.

*Potential litigation and regulatory actions may materially and adversely affect the Portfolio Manager, Highland, Acis and/or the Management Companies*

APP_0128

There can be no assurance that the Portfolio Manager, Highland, Acis and/or the Management Companies or their affiliates will avoid potential third party or other litigation or regulatory actions under existing laws (including the U.S. Risk Retention Requirements) or laws enacted in the future. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including undisclosed legal fee arrangements affording the applicable adviser with greater discounts than those afforded to funds advised by such adviser and the undisclosed acceleration of certain special fees. In addition, the failure by the Portfolio Manager, Highland, Acis and/or the Management Companies to comply with the U.S. Risk Retention Rules may result in regulatory actions and other proceedings being brought against the Portfolio Manager, Highland, Acis and/or the Management Companies. If the SEC or any other Governmental Authority takes issue with the practices of the Portfolio Manager, Highland, Acis and/or the Management Companies or any of their affiliates as they pertain to any of the foregoing, the Portfolio Manager, Highland, Acis and/or the Management Companies and/or any such affiliates will be at risk for regulatory sanction. Even if an investigation or proceeding did not result in a sanction or the sanction imposed against the Portfolio Manager, Highland, Acis and/or the Management Companies and/or such affiliates was small in monetary amount, the adverse publicity relating to the investigation, proceeding or imposition of these sanctions could harm the Company, the Portfolio Manager, Highland, Acis and/or the Management Companies and/or their respective affiliates' reputations which may adversely affect the market value and/or liquidity of the Debt. There is also a material risk that Governmental Authorities in the United States and beyond will continue to adopt new laws or regulations (including tax laws or regulations), or change existing laws or regulations, or enhance the interpretation or enforcement of existing laws and regulations including the U.S. Risk Retention Rules. Any such events or changes could occur during the term of the Debt and may materially and adversely affect the Portfolio Manager, Highland, Acis and/or the Management Companies and its ability to operate and/or pursue its management strategies on behalf of the Issuer. Such risks are often difficult or impossible to predict, avoid or mitigate in advance.

### Dependence on Highland, Acis and other collateral managers of CLOs

A significant portion of the Company's investment portfolio will comprise of its investment in the Management Companies and in Managed CLOs. The Company's investment portfolio may also include CLOs managed by other asset managers. The performance of the Company's portfolio depends heavily on the skills of the Portfolio Manager, Highland, Acis, the Management Companies or such other asset managers in analyzing, selecting and managing the relevant CLOs. As a result, the Company and the CLOs will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Portfolio Manager, Highland, Acis, the Management Companies and the other asset managers, none of whom is under any contractual obligation to the Company or such CLOs to continue to be associated with the Portfolio Manager, Highland, Acis, the applicable Management Company or such other collateral manager for the term of the Company or any particular CLO. The loss of one or more of these individuals could have a material adverse effect on the performance of the Company and the relevant CLO.

Furthermore, the Portfolio Manager has informed the Company that these investment professionals are also actively involved in other investment activities and will not be able to devote all of their time to the Company's business and affairs. In addition, individuals not currently associated with the Portfolio Manager may become associated with the Portfolio Manager and the performance of the Company and the Managed CLOs may also depend on the financial and managerial experience of such individuals. Moreover, the Portfolio Management Agreement may be terminated under certain circumstances.

### The Company generally may not terminate the Portfolio Management Agreement, even in the event of the Portfolio Manager's poor performance

The Portfolio Management Agreement was negotiated between related parties and its terms may not be as favorable as if it had been negotiated with unaffiliated third parties. The Company may choose not to enforce, or to enforce less vigorously, certain of its rights under the Portfolio Management Agreement in an effort to maintain its ongoing relationship with the Portfolio Manager or Highland Capital Management, L.P., as the case may be.

Termination of the Portfolio Management Agreement is difficult and costly. In order to terminate the Portfolio Management Agreement without cause, the Company must (i) be required to register as an investment company under the provisions of the Investment Company Act of 1940 and it must notify the Portfolio Manager of such

requirement, (ii) the portfolio must be liquidated in full and its financing arrangements must have been terminated or redeemed in full, or (iii) it must reach a mutual agreement with the Portfolio Manager to terminate the agreement. The initial term of the Portfolio Management Agreement is three years, with automatic renewals of three years thereafter. The Company may not choose to not renew the Portfolio Management Agreement.

The Company's ability to terminate the Portfolio Management Agreement for "cause" is limited, including grounds of wilful violation of the Portfolio Management Agreement by the Portfolio Manager and fraud or criminal activity. However, poor performance by the Portfolio Manager is not grounds for termination for cause under the Portfolio Management Agreement.  See "*Material Contracts*"

## RISKS RELATING TO CONFLICTS OF INTEREST

### *Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall investment activity of the Portfolio Manager, Highland, its clients and its affiliates.  The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

### *The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*

The following briefly summarizes certain potential and actual conflicts of interest which may arise from the overall investment activity of the Portfolio Manager, Highland, its clients and its affiliates, but is not intended to be an exhaustive list of all such conflicts.  The scope of the activities of the Portfolio Manager, Highland, its affiliates, and the funds and clients managed or advised by Highland or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Company in the future that cannot be foreseen or mitigated at this time.

As part of their regular business, the Portfolio Manager, Highland, its affiliates and their respective officers, directors, trustees, shareholders, members, partners, personnel and employees and their respective funds and investment accounts (collectively, the "**Related Parties**") hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types.  The Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities.  The Related Parties will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make.  The Related Parties may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Company and/or the Managed CLOs may invest.  In particular, the Related Parties may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Company and/or the Managed CLOs, or in which partners, security holders, members, officers, directors, agents, personnel or employees of such Related Parties serve on boards of directors or otherwise have ongoing relationships.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Company and/or the Managed CLOs and otherwise create conflicts of interest for the Company and/or the Managed CLOs.  In such instances, the Related Parties may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Company's and/or the Managed CLOs' investments. In connection with any such activities described above, the Related Parties may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to be included as investments by the Company and/or Managed CLOs.  Other than with respect to new issue Highland CLOs as described below, the Related Parties will not be required to offer such securities or investments to the Company or Managed CLOs or provide notice of such activities to the Company or Managed CLOs.  In addition, in providing services under the Portfolio Management Agreement and the CLO Management Agreements, the Portfolio Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest.  Furthermore, in connection with actions taken in the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its other clients, the Portfolio Manager may take, or be required to take, actions which adversely affect the interests of the Company and/or Managed CLOs.  Except as otherwise set forth herein, including with respect to Qualifying CLOs, Designated CLO Resets, Designated CLO

Refinancings and the NexBank Facility and any Permitted NexBank Credit Facility Amendments, the consent of the Advisory Board will be required with respect to transactions with any Related Party.

The Related Parties invested and may continue to make investments that would also be appropriate for the Company, the Portfolio Manager, the Management Companies and/or the Managed CLOs.  Such investments may be different from those recommended to the Company or made on behalf of the Managed CLOs or the Management Companies.  Neither the Portfolio Manager nor any Related Entity has any duty, in making or maintaining such investments, to act in a way that is favorable to the Company, the Management Companies and/or the Managed CLOs or to offer any  such opportunity to the Company, other than with respect to new issue Highland CLOs as described below, or the Managed CLOs.  The investment  policies,  fee arrangements and other circumstances applicable to such other parties may vary from those applicable to the Company, the Portfolio Manager, Highland, Acis, the Management Companies and the Managed CLOs.  The Portfolio Manager and/or any Related Entity may also provide advisory or other services for a customary fee to issuers or obligors whose debt obligations or other securities are held by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and neither the Shareholders nor the Company shall have any right to such fees.  The Portfolio Manager, Highland, Acis, the Management Companies and/or any Related Entity may also have ongoing relationships with, render  services  to or engage in transactions  with  other  clients, including  other  issuers  of collateralized loan obligations and collateralized debt obligations, who invest in assets of a similar nature to those of the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and with companies whose securities or loans are acquired by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and may own equity or debt securities issued by obligors of debt held by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs.  In connection with the foregoing activities, the Portfolio Manager, Highland, Acis, the Management Companies and/or any Related Entity may from time to time come into possession of material nonpublic information that limits the ability of the Portfolio Manager to advise the Company or the Management Companies or effect a transaction for Managed CLOs, and the Company's, the Management Companies' and/or the Managed CLOs' investments may be constrained  as a consequence of Highland's or Acis'  inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Company, the Management Companies and/or the Managed CLOs.  In addition, officers or affiliates of the Portfolio Manager, Highland, Acis and/or Related Parties may possess information relating to obligors of debt held by the Company, the Management Companies and/or the Managed CLOs that is not known to the individuals at the Portfolio Manager responsible for monitoring such investments and performing the other obligations under the Portfolio Management Agreement or CLO Management Agreements.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and Other Accounts.  For the avoidance of doubt, the Portfolio Manager shall otherwise allocate investment opportunities among the Company and Highland and its affiliates and Other Accounts in accordance with its allocation policy which requires allocations among clients to be fair and equitable over time as described below. The Portfolio Manager, Highland, Acis and their affiliates may, from time to time, be presented with investment opportunities, other than with respect to new issue Highland CLOs during the Investment Period, that fall within the investment objectives of the Company, the Management Companies and/or the Managed CLOs and other clients, funds or other investment accounts managed by Highland, Acis or their affiliates, and in such circumstances, the Portfolio Manager, Highland, Acis and their affiliates expect to allocate such opportunities among the Company, the Management Companies and/or the Managed CLOs and such other clients, funds or other investment accounts on a basis that the Portfolio Manager, Highland, Acis and their affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the primary mandates of the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the capital available to the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the transaction, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other investments of the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Company, the Management Companies and/or the Managed CLOs and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by the Portfolio Manager, Highland, Acis

and their affiliates in good faith.  Subject to the Company's priority allocation with respect to new issue Highland CLOs, the Portfolio Manager, will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Investment Advisers Act.  The Portfolio Manager, will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy.  However, there is no assurance that such investment opportunities will be allocated to the Company, the Management Companies and/or the Managed CLOs fairly or equitably in the short term or over time and there can be no assurance that the Company, the Management Companies and/or any of the Managed CLOs will be able to participate in all such investment opportunities that are suitable for it.

Although the professional staff of the Portfolio Manager will devote as much time to the Company as the Portfolio Manager deems appropriate to perform its duties in accordance with the Portfolio Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Company and the Portfolio Manager's other accounts.

The directors, officers, personnel, employees and agents of the Portfolio Manager and its Related Parties may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Company or entities that operate in the same or a related line of business as the Company or the Management Companies, or of other clients managed by the Portfolio Manager or its affiliates, or for any obligor or issuer in respect of the debt, equity securities or other investments held by the Company, the Management Companies and/or Managed CLOs, or any affiliate thereof, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Company, such other entities, or any obligor or issuer (or any affiliate thereof) in respect of any of the debt, equity securities or other investments held by the Company, the Management Companies and/or Managed CLOs pursuant to their respective governing instruments, and neither the Company, The applicable Management Company nor the Managed CLOs shall have the right to any such fees.

As further described below, the Portfolio Manager and its Related Parties may effect client cross-transactions where the Portfolio Manager advises the Company or a Management Company, or causes a Managed CLO, to effect a transaction between the Company, the applicable Management Company or such Managed CLO, as applicable, and another client advised by the Portfolio Manager or any of its affiliates.  The Portfolio Manager, may engage in a client cross-transaction involving the Company, the Management Companies and/or Managed CLOs any time that the Portfolio Manager believes such transaction to be fair to the Company, the applicable Management Company and/or the Managed CLOs, as applicable, and such other client.  By purchasing Shares of the Company, a Shareholder is deemed to have consented to such client cross-transactions between the Company, the applicable Management Company and another client of the Portfolio Manager or one of its Related Parties.

As further described below, the Portfolio Manager may effect principal transactions where Highland advises the Company, or causes a Managed CLO, to make and/or hold an investment, including an investment in securities, in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, in each case in accordance with applicable law, which may include the Portfolio Manager obtaining the consent and approval of the Advisory Board of the Company prior to engaging in any such principal transaction between the Company and the Portfolio Manager or its affiliates.  By purchasing Shares of the Company, a Shareholder is deemed to have consented to such procedures relating to principal transactions between the Company and the Portfolio Manager or its Related Entities, subject to consent of the Advisory Board.  In addition, in the event a Managed CLO engages in a principal trade, consent of the client may consist of consent of the board of directors of such Managed CLO (or certain professionals contracted by the board of directors, to the extent relevant), and none of the Company or its Shareholders will have any additional consent rights with respect to such transaction.

The Portfolio Manager may advise the Company, or direct the Managed CLOs, to acquire or dispose of investments in cross trades between the Company or the Managed CLOs, as applicable, and other clients of the Portfolio Manager or its affiliates in accordance with applicable legal and regulatory requirements.  In addition, the Company and/or the Managed CLOs may invest in securities of obligors or issuers in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Company and/or Managed CLOs may enhance the profitability of the Portfolio Manager's own investments in such companies. Moreover, the Company and Managed CLOs may invest in assets originated by the Portfolio Manager or its affiliates.  In each such case, the Portfolio Manager and such affiliates may have a potentially conflicting division

of loyalties and responsibilities regarding the Company or the Managed CLOs, as applicable, and the other parties to such trade. Under certain circumstances, the Portfolio Manager and its affiliates may determine that it is appropriate to mitigate such conflicts by selling an investment at a fair value that has been calculated pursuant to the Portfolio Manager's valuation procedures to another client managed or advised by the Portfolio Manager or such affiliates. In addition, the Portfolio Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Company or a Managed CLO, as applicable, and for the other party to the transaction, to the extent permitted under applicable law. The Portfolio Manager may obtain the Company's written consent as provided herein if any such transaction requires the consent of the Company under Section 206(3) of the Investment Advisers Act.

The Portfolio Manager and/or its Related Parties may participate in creditor committees or other committees with respect to the bankruptcy, restructuring or workout of obligors or issuers of debt obligations or securities held by the Company and/or the Managed CLOs. In such circumstances, the Portfolio Manager may take positions on behalf of itself or Related Parties that are adverse to the interests of the Company or the Managed CLOs in the relevant investment.

The Portfolio Manager and/or its Related Parties may act as an underwriter, arranger or placement or administrative agent, or otherwise participate in the origination, structuring, negotiation, syndication, administration or offering of CLOs or any senior secured loans purchased by the Company. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving CLOs or senior secured loans that are underwritten, originated, arranged or placed by the Portfolio Manager and/or its affiliates and the Company shall not have any right to any such fees.

There is no limitation or restriction on the Portfolio Manager or any of its Related Parties with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Portfolio Manager and/or its Related Parties may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Portfolio Manager's investment committee, the Portfolio Manager or its affiliates have to other clients.

The members of the Portfolio Manager's investment committee serve or may serve as personnel, officers, directors or principals of entities that operate in the same or a related line of business as the Company, or of other clients managed by the Portfolio Manager or its affiliates. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Company. The Company may compete with other entities managed by the Portfolio Manager and its affiliates for capital and investment opportunities.

There are generally no ethical screens or information barriers among the Portfolio Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Portfolio Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or CLO, or have an interest in causing the Company or a Managed CLO to acquire a particular CLO security, the Portfolio Manager may be prevented from causing the Company or Managed CLO to purchase or sell such asset due to internal restrictions imposed on the Portfolio Manager. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Portfolio Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material non-public information could have adverse effects on the Portfolio Manager's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Portfolio Manager's ability to perform its portfolio management services to the Company and the Managed CLOs. In addition, while the Portfolio Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Portfolio Manager's ability to operate as an integrated platform could also be impaired, which would limit the Portfolio Manager's access to personnel of its affiliates and potentially impair its ability to advise the Company and manage the Managed CLOs' investments.

APP_0133

## RISKS RELATING TO AN INVESTMENT IN THE SHARES

***Shareholders have no right to have their Shares redeemed or repurchased by the Company***

The Company has been established as a closed-ended vehicle.  Accordingly, there is no right or entitlement attaching to the Shares that allows them to be redeemed or repurchased by the Company at the option of the Shareholder.

***There is no public market for the Shares, and a market for the Shares may never develop, which could result in Shareholders being unable to monetize their investment.***

The Shares have not been registered under any securities exchange, and, unless so registered, may not be offered or sold except pursuant to an exemption from the applicable securities exchange regulator.  It is not expected that the Shares will be listed on any securities exchange in the future.  The Shares are newly issued securities for which there is no established trading market. In the absence of an active trading market, Shareholders may be unable to resell the Shares at the time and for the price desired or at all. The Company can provide no assurances that the Shares will not subsequently trade below the price at which they are purchased pursuant to this Offering Memorandum.

In connection with the Company filing any registration for any securities exchange, the Company will agree to use commercially reasonable efforts to satisfy the criteria for listing and list and thereafter maintain the listing on such exchange or market so long as it is in the best interests of the Company.  Each market or exchange has initial listing criteria, including criteria related to minimum bid price, public float, market makers, minimum number of round lot holders and board independence requirements that the Company can give no assurance that it will meet.  The Company's inability to list or include the Shares on a securities exchange could affect the ability of Shareholders to sell their Shares subsequent to the declaration of the effectiveness of any registration statement, and consequently adversely affect the value of such Shares.  In such case, Shareholders would find it more difficult to dispose of, or to obtain accurate quotations as to the market value of, the Shares.  In addition, the Company would have more difficulty attracting the attention of market analysts to cover it in their research.  If the Shares are approved for listing or inclusion on a securities exchange, the Company will have no prior reporting history, and thus there is no way to determine the prices or volumes at which the Shares will trade.  The Company can give no assurances as to the development or liquidity of any trading market for the Shares.  Shareholders may not be able to resell their Shares at or near their original acquisition price, or at any price.

***In the event a market for the Shares does develop, the Shares may trade at a discount to the Net Asset Value per Share and Shareholders may be unable to realise their Shares at the Net Asset Value per Share or at any other price***

The Shares may trade at a discount to the Net Asset Value per Share for a variety of reasons, including due to market or economic conditions or to the extent investors undervalue the Company.

Subject to the Companies Law, under its Articles, the Company may issue additional securities, including Shares, for any purpose.  Any additional issuances by the Company, or the possibility of such issue, may cause the price of the Shares to decline.

***The existence of a liquid market in the Shares cannot be guaranteed***

The Shares may be admitted to a securities exchange at some point in the future, however there can be no guarantee that a liquid market in the Shares will develop or be sustained or that the Shares will trade at prices close to the Net Asset Value per Share.  The number of Shares to be issued pursuant to the Placing is not yet known, and there may be a limited number of holders of Shares.  Limited numbers and/or holders of Shares may mean that there is limited liquidity in such Shares which may affect:  (i) a Shareholder's ability to realise some or all of their investment; (ii) the price at which such Shareholder can effect such realisation; and/or (iii) the price at which Shares trade in the secondary market.  Accordingly, Shareholders may be unable to realise their investment at Net Asset Value per Share or at all.

APP_0134

***The Shares will be subject to purchase and transfer restrictions in the Placing and in secondary transactions in the future***

The Company intends to restrict the ownership and holding of its Shares so that none of its assets will constitute "plan assets" under the U.S. Plan Assets Regulations.  The Company intends to impose such restrictions based on deemed representations in the case of a subscription of Shares.  If the Company's assets were deemed to be "plan assets" of any plan subject to Title I of ERISA or Section 4975 of the U.S. Tax Code ("**U.S. Plan**"), pursuant to Section 3(42) of ERISA and U.S. Department of Labor regulations promulgated under ERISA by the U.S. Department of Labor and codified at 29 C.F.R. Section 2510.3-101 as amended by Section 3(42) of ERISA (collectively, the "**U.S. Plan Asset Regulations**") then:   (i) the prudence and other fiduciary responsibility standards of ERISA would apply to investments made by the Company; and (ii) certain transactions that the Company or a subsidiary of the Company may enter into, or may have entered into, in the ordinary course of business might constitute or result in non-exempt prohibited transactions under Section 406 of ERISA or Section 4975 of the U.S. Tax Code and might have to be rescinded.  Governmental plans and certain church plans, while not subject to Title I of ERISA or Section 4975 of the U.S. Tax Code, may nevertheless be subject to other State, local or other laws or regulations that would have the same effect as the U.S. Plan Asset Regulations so as to cause the underlying assets of the Company to be treated as assets of an investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company (or other persons responsible for the investment and operation of the Company assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the U.S. Tax Code.

Each purchaser and subsequent transferee of the Shares will be deemed to represent and warrant that no portion of the assets used to acquire or hold its interest in the Shares constitutes or will constitute the assets of any U.S. Plan.  The Articles of the Company provide that the Board of Directors may refuse to register a transfer of Shares to any person they believe to be a Non-Qualified Holder or a U.S. Plan investor.  If any Shares are owned directly or beneficially by a person believed by the Board of Directors to be a Non-Qualified Holder or a U.S. Plan investor, the Board of Directors may give notice to such person requiring him either (i) to provide the Board of Directors within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Board of Directors that such person is not a Non-Qualified Holder or a U.S. Plan investor, or (ii) to sell or transfer their Shares to a person qualified to own the same within 30 days and within such 30 days to provide the Board of Directors with satisfactory evidence of such sale or transfer.  Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

In addition, the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.  For more information, refer to "Risks relating to regulation and taxation - The Company is not, and does not intend to become, registered in the United States as an investment company under the U.S. Investment Company Act and related rules" in this section of this Offering Memorandum.

For more information on purchase and transfer restrictions, prospective investors should refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".

## RISKS RELATING TO REGULATION AND TAXATION

***Changes in law or regulations, or a failure to comply with any laws or regulations, may adversely affect the respective businesses, investments and performance of the Company***

The Company is subject to laws and regulations enacted by national and local governments.

On June 23, 2016, in a public referendum, the United Kingdom voted to leave the European Union. On March 29, 2017, the United Kingdom triggered Article 50 of the Treaty on European Union ("**Article 50**") by formally notifying the European Council of the United Kingdom's intention to withdraw from the European Union.  In accordance with Article 50, the European Union shall negotiate and conclude a withdrawal agreement with the United Kingdom within 2 years of the United Kingdom triggering Article 50, although the European Council in agreement with the United Kingdom may decide to extend this period.  The United Kingdom's decision to leave the European Union has caused,

APP_0135

and is anticipated to continue to cause, significant new uncertainties and instability in both domestic and global financial markets. These uncertainties could have a material adverse effect on the various obligors' ability to make payments due under the assets within the CLO portfolios, which in turn could have a material adverse effect on the Company's financial condition, results of operations and/or its NAV.

The Company is subject to, and is required to comply with, certain regulatory requirements that are applicable to registered investment schemes which are domiciled in Guernsey.

The laws and regulations affecting the Company are evolving and any changes in such laws and regulations may have an adverse effect on the ability of the Company to carry on its business.  Any such changes may also have an adverse effect on the ability of the Company to pursue the investment policies, and may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Certain income of the Company may be subject to U.S. withholding tax, and changes in tax law may adversely affect the Company***

The Company intends to make loan investments in the United States that will qualify for the "portfolio interest exemption" from U.S. withholding on interest. However, if the Company is not eligible for the portfolio interest exemption with respect to a loan paying U.S.-source interest, interest payments to the Company could be subject to a 30% withholding tax. In addition, there can be no assurance that, as a result of any change in any applicable law, rule or regulation or interpretation thereof, U.S.-source interest or other payments on the loans that were not subject to withholding tax when purchased will not in the future become subject to U.S. or other withholding tax or that the amount or rate of withholding tax to which a payment on a loan is subject might not increase.

In addition, if the Company acquires equity interests in U.S. entities, either as a result of a direct purchase or as a result of loans previously purchased by the Company being converted into equity interests, the Company could be subject to 30% U.S. withholding tax on any U.S.-source dividends. If the Company is deemed to be engaged in a trade or business in the United States as a result of its ownership of an equity interest in an entity treated as fiscally transparent in the United States or certain other investments, the Company could be subject to a tax on net income with respect to income from such equity interest or other investments, as well as a "branch profits" tax, with a combined U.S. tax rate with respect to such equity interest or other investments of approximately 54%.

If the Company is subject to U.S. withholding tax on payments from investments or is subject to U.S. net income tax, such tax would reduce the amounts available to make payments on the Placing Shares.  The extent to which other source country withholding taxes may apply to the Issuer's income will depend on the actual composition of its assets.

***The European Directive on Alternative Investment Fund Managers may impair marketing of the Shares to EU investors***

The AIFMD was transposed into the national legislation of a number of EEA member states on 22 July 2013. The Company will be considered an Alternative Investment Fund ("**AIF**") for the purposes of AIFMD.  AIFMD will allow the continued marketing of AIFs, such as the Company, under national private placement regimes where EEA member states choose to implement AIFMD national private placement regimes.  In relation to the Company, such marketing will be subject to registration under the AIFMD in those EU member states where there will be marketing of the Shares to investors.   To permit marketing, appropriate cooperation agreements must be in place between the supervisory authorities of the relevant EEA member states in which the Shares are being marketed and the jurisdiction of both the Company and the Portfolio Manager, as the AIFM of the Company.

Accordingly, the ability of the Portfolio Manager to market the Shares in the EEA will depend on the relevant EEA state permitting the marketing of non-EEA managed funds, the continuing status of Guernsey and the USA in relation to AIFMD and the Portfolio Manager's willingness to comply with the relevant provisions of AIFMD and the other requirements of the national private placement regimes of individual EEA states, the requirements of which may restrict the Company's ability to raise additional capital from the issue of new Shares in one or more EEA state.

Additionally, it should be noted that what is and what is not "marketing" under AIFMD can vary between EEA member states, in some cases covering most promotional activity in respect of a fund and in some cases covering only material that is sufficiently specific or precise in respect of information relating to the terms of the fund that it could

alone form the basis of a decision to invest in the fund. This in turn means that the type of promotional activity that will require registration under AIFMD can also vary between EEA member states.

However, what is and what is not "marketing" under AIFMD remains a developing area and regulatory guidance in many EEA member states is limited.  It is possible that European Securities and Markets Authority ("**ESMA**") or an EEA national regulator may change its policy approach in the future or that ESMA, the European Commission or another European entity, regulatory or legislative body may have a different interpretation at a later date of what constitutes marketing under AIFMD.

If it was held that certain promotional material in respect of the fund constitutes marketing under AIFMD and was provided to investors in an EEA member state without the Company having been registered in that EEA member state for marketing under AIFMD by the Portfolio Manager, the Portfolio Manager may face regulatory sanctions as a result of non-compliance with AIFMD, and the enforceability of agreements with Shareholders may be affected.

ESMA has also consulted on the possible extension of the passport for marketing and managing under AIFMD to non-EEA based managers (the marketing and managing passports are currently only available to EEA based AIFMs) and delivered advice to the European Commission on 18 July 2016 on whether, amongst other things, the passporting regime should be extended to the management and/or marketing of AIFs by non-EEA based managers.

This advice regarding extending the passport to US domiciled AIFMs was qualified, meaning it is currently not clear if the passporting regime will be extended to the Portfolio Manager as an AIFM, nor is it clear that the European Commission consider that this advice contains a positive assessment of a sufficient number of non-EEA countries to extend the passport to these countries. If the European Commission were to consider there were sufficient grounds to extend the passport and adopted the requisite delegated act extending the passport, the national private placement regimes which are currently applicable to non-EEA AIFMs and non-EEA AIFs in EEA member states will temporarily continue to co-exist with this new non-EEA passport (the "**Third Country Passport**").

However, three years after the adoption of this delegated act, ESMA is required to issue an opinion on the functioning of the Third Country Passport and advise on the potential termination of the current national private placement regimes. If the national private placement regimes were then abolished, an AIF could not be marketed into Europe by a non-EEA AIFM except by way of the Third Country Passport, meaning in this scenario the Portfolio Manager would not be able to market the Shares in the Company in the EEA.

Any regulatory changes arising from implementation of the AIFMD (or otherwise) that limit the Company's ability to carry on its business or to market future issues of its Shares may materially adversely affect the Company's ability to carry out its investment policy successfully and to achieve its investment objective, which in turn may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Final regulations implementing the "Volcker Rule" in the United States of America were issued in December 2013 and became effective by operation of law on 1 April 2014, subject to a conformance period.  The final Volcker Rule regulations revised the November 2011 proposed regulations and include certain changes to the treatment of foreign funds and non-U.S. bank investors.  If the Volcker Rule applies to an investor's ownership of Shares, the investor may be forced to sell its shares, or the continued ownership of such shares may be subject to certain restrictions.***

On 21 July 2010, U.S. President Barack Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act and certain provisions therein known as the "Volcker Rule." On 10 December 2013, the final Volcker Rule regulations (the "**Final Regulations**") were issued by U.S. regulators.  The Final Regulations are effective from 1 April 2014, subject to a conformance period ending on 21 July 2015 (which may be extended).  The Volcker Rule generally restricts certain non-U.S. banks and affiliated financial firms, collectively identified as "banking entities," from investing in and sponsoring "covered funds." In the event that a non-U.S. bank is deemed to be a "banking entity" and the Company is deemed to be a "covered fund" for purposes of the Volcker Rule, the non-U.S. bank's ownership of the Shares may be subject to investment restrictions.  If so, the non-U.S. bank may be required to divest the Shares by the end of the conformance period.  Depending on market conditions and other factors, if an investor is required to liquidate its investment in the Shares during the conformance period, it may suffer a loss from the price at which it purchased the Shares.

APP_0137

***If the Company becomes subject to tax on a net income basis in any tax jurisdiction, including Guernsey or the United Kingdom, the Company's financial condition and prospects could be materially and adversely affected***

The Company intends to conduct its affairs so that it will not be treated as UK resident for taxation purposes, or as having a permanent establishment or otherwise being engaged in a trade or business, in the UK. The Company intends that it will not be subject to tax on a net income basis in any country. There can be no assurance, however, that the net income of the Company will not become subject to income tax in one or more countries, including Guernsey and the United Kingdom, as a result of unanticipated activities performed by the Company, adverse developments or changes in law, contrary conclusions by the relevant tax authorities, changes in the Directors' personal circumstances or management errors, or other causes. The imposition of any such unanticipated net income taxes could materially reduce the post-tax returns available for distributions on the Shares, and consequently may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Changes in taxation legislation, or the rate of taxation, may adversely affect the Company***

Any change in the tax status of the Company, or in taxation legislation or practice in Guernsey, the United Kingdom or elsewhere could affect the value of the investments held by the Company or the Company's ability to achieve its investment objectives or alter the post-tax returns to Shareholders. Statements in this Offering Memorandum concerning the taxation of Shareholders and/or the Company are based upon current Guernsey and United Kingdom law and published practice as at the date of this Offering Memorandum, which law and practice is, in principle, subject to change (potentially with retrospective effect) that could adversely affect the ability of the Company to meet its investment objective and which could adversely affect the taxation of Shareholders and/or the Company.

Potential investors are urged to consult their tax advisers with respect to their particular tax situations and the tax effect of an investment in the Company.

***Possible Financial Transaction Tax***

On 14 February 2013, the European Commission issued proposals, including a draft Directive (the "Commission's Proposal") for a financial transaction tax ("**FTT**") to be adopted in certain participating EU member states (including Belgium, Germany, Estonia, Greece, Spain, France, Italy, Austria, Portugal, Slovenia and Slovakia (the "Participating Member States"), although Estonia has since stated that it will not participate). If the Commission's Proposal was adopted in its current form, the FTT would be a tax primarily on "financial institutions" in relation to "financial transactions" (which would include the conclusion or modification of derivative contracts and the purchase and sale of financial instruments).

Under the Commission's Proposal, the FTT could apply in certain circumstances to persons both within and outside of the Participating Member States. Generally, it would apply where at least one party is a financial institution, and at least one party is established in a Participating Member State. A financial institution may be, or be deemed to be, "established" in a Participating Member State in a broad range of circumstances, including (a) by transacting with a person established in a Participating Member State or (b) where the financial instrument which is subject to the financial transaction is issued in a Participating Member State.

The FTT proposal remains subject to negotiation between the Participating Member States. It may therefore be altered prior to implementation, the timing of which remains unclear. Additional EU member states may decide to participate.

In addition to the FTT, certain countries (such as France and Italy) have unilaterally introduced or announced their own financial transaction tax, and other countries may follow suit. There is therefore a risk that a financial transaction tax may be incurred on certain transactions entered into by the Company. Any such financial transaction tax may adversely affect the cost of investment or hedging strategies pursued by the Company as well as the value and liquidity of certain assets within the Company, such as securities, derivatives and structured finance securities.

***Different regulatory, tax or other treatment of the Company or the Shares in different jurisdictions, or changes to such treatment in different jurisdictions, may adversely impact shareholders in certain jurisdictions***

For regulatory, tax and other purposes, the Company and the Shares may be treated in different ways in different jurisdictions. For instance, in certain jurisdictions and for certain purposes, the Shares may be treated as more akin to

APP_0138

holding units in a collective investment scheme.  Furthermore, in certain jurisdictions, the treatment of the Company and/or the Shares may be uncertain or subject to change, or it may differ depending on the availability of certain information or disclosure by the Company of that information.  The Company may be subject, therefore, to financially and logistically onerous requirements to disclose any or all of such information or to prepare or disclose such information in a form or manner which satisfies the regulatory, tax or other authorities in certain jurisdictions.  The Company may elect not to disclose such information or prepare such information in a form which satisfies such authorities.  Therefore Shareholders in such jurisdictions may be unable to satisfy the regulatory requirements to which they are subject.

***The Company is not, and does not intend to become, registered in the United States as an investment company under the U.S. Investment Company Act and related rules***

The Company has not, does not intend to, and may be unable to, become registered in the United States as an investment company under the U.S. Investment Company Act.  The U.S. Investment Company Act provides certain protections to U.S. investors and imposes certain restrictions on companies that are registered as investment companies.  As the Company is not so registered, and does not intend to so register, none of these protections or restrictions is or will be applicable to the Company.  In addition, to avoid being required to register as an investment company under the U.S. Investment Company Act and to avoid violating the U.S. Investment Company Act, the Company has implemented restrictions on the purchase of the Shares by persons who are located in the United States or are U.S. Persons (or are acting for the account or benefit of any U.S. Person).  For more information, prospective investors should refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in in "*Placing Arrangements*".

***Certain payments to the Company will in the future be subject to 30 per cent withholding tax unless the Company agrees to certain reporting and withholding requirements and certain Shareholders will be required to provide the Company with required information so that the Company may comply with its obligations under FATCA***

Under Sections 1471 through 1474 of the U.S. Internal Revenue Code (commonly referred to as "**FATCA**"), Financial Institutions are required to use enhanced due diligence procedures to identify U.S. persons who have invested in either non-U.S. financial accounts or non-U.S. entities.  Pursuant to FATCA, certain payments of (or attributable to) U.S.-source income, and the proceeds of sales of property that give rise to U.S.-source payments, will be subject to 30 per cent withholding tax with effect from 1 July 2014 unless the Company agrees to certain reporting and withholding requirements.

The United States and Guernsey have entered into an Intergovernmental Agreement ("**US IGA**") to implement FATCA.  Under the terms of the US IGA, the Company may be obliged to comply with the provisions of FATCA as enacted by the Guernsey legislation implementing the US IGA (the "**Guernsey IGA Legislation**"), rather than directly complying with the U.S. Treasury Regulations implementing FATCA.  Under the terms of the US IGA, Guernsey resident entities that comply with the requirements of the Guernsey IGA Legislation will be treated as compliant with FATCA and, as a result, will not be subject to withholding tax under FATCA ("**FATCA Withholding**") on payments they receive and will not be required to withhold under FATCA on payments they make.

The Company expects that it will be considered to be a Guernsey resident financial institution and therefore will be required to comply with the requirements of the Guernsey IGA Legislation.

Under the Guernsey IGA Legislation, the Company will be required to register with the United States Internal Revenue Service ("**IRS**") and report to the Guernsey President of the Policy & Resources Committee certain holdings by and payments made to certain U.S. investors in the Company, as well as to non-U.S. financial institutions that do not comply with the terms of the Guernsey IGA Legislation.  Under the terms of the US IGA, such information will be onward reported by the Guernsey President of the Policy & Resources Committee to the United States under the general information exchange provisions of the United States-Guernsey Agreement for the Exchange of Information Relating to Taxes.

Further, even if the Company is not characterised under FATCA as a Financial Institution, it nevertheless may become subject to such 30 per cent withholding tax on certain U.S.-source payments to it unless it either provides information to withholding agents with respect to its U.S. Controlling Persons or certifies that it has no such U.S. Controlling Persons.

APP_0139

As a result, Shareholders may be required to provide any information that the Company determines necessary in order to allow the Company to satisfy its obligations under FATCA.

Additional intergovernmental agreements similar to the US IGA have been entered into or are under discussion by other jurisdictions with the United States.  Different rules than those described above may apply depending on whether a payee is resident in a jurisdiction that has entered into an intergovernmental agreement to implement FATCA.

In addition to the US IGA, Guernsey and the United Kingdom have entered into an inter-governmental agreement ("**UK IGA**") for the implementation of information exchange arrangements, based on FATCA, whereby relevant financial information held in Guernsey in respect of a person or entity who is resident in the UK for tax purposes will be reported to the Guernsey President of the Policy & Resources Committee for onward reporting to the UK's HM Revenue and Customs.  Under the UK IGA, the Company may be required to provide information to the Guernsey authorities about investors and their interests in the Company in order to fully discharge its reporting obligations and, in the event of any failure or inability to comply with the proposed arrangements, may suffer a financial penalty or other sanction under Guernsey law.

The scope and application of FATCA Withholding and information reporting pursuant to the terms of FATCA and the IGAs are subject to review by the United States, the United Kingdom, Guernsey and other IGA governments, and the rules may change.  Although the UK IGA and US IGA have been ratified by Guernsey's parliament, guidance published to date has been in draft format only and therefore, while the Company intends to comply with applicable law, it cannot be predicted at this time what the full impact on the Company and the Company's reporting responsibilities pursuant to the UK IGA and US IGA will be.  Shareholders should consult with their own tax advisors regarding the application of FATCA to their particular circumstances.

### OECD's Base Erosion Profit Shifting ("BEPS") Action Points

In 2013, the OECD published its report on Addressing Base Erosion and Profit Shifting ("**BEPS**") and its Action Plan on BEPS.  The aim of the report and Action Plan was to address and reduce aggressive international tax planning. BEPS remains an ongoing project. On 5 October 2015, the OECD published its final reports, analyses and sets of recommendations (deliverables) with a view to implementing internationally agreed and binding rules which could result in material changes to relevant tax legislation of participating OECD countries.   The final package of deliverables was subsequently approved by the G20 Finance Ministers on 8 October 2015. On 24 November 2016, the OECD announced that more than 100 jurisdictions concluded negotiations on a multilateral instrument that will amend their respective tax treaties (more than 2,000 tax treaties worldwide) in order to implement the tax treaty-related BEPS recommendations, although the effective date of such multilateral instrument remains uncertain. A first high level signing ceremony took place on 7 June 2017 where 68 countries signed the multilateral instrument. It is currently anticipated that the multilateral instrument will enter into force after five countries have ratified it. The multilateral instrument will then enter into effect for a specific tax treaty after all parties to that treaty have ratified the multilateral instrument. The final actions to be implemented in the tax legislation of the countries in which the Company will have investments, in the countries where the Company is domiciled or resident, or changes in tax treaties negotiated by these countries, could adversely affect the returns from the Company to its investors.

APP_0140

## COMPANY, ITS INVESTMENT OBJECTIVE, POLICY AND STRATEGY

## COMPANY

Highland CLO Funding, Ltd. (formerly known as Acis Loan Funding, Ltd.) (the "**Company**") was incorporated on 30 March 2015 and registered under the laws of Guernsey (registration number 60120) pursuant to the Companies Law. The Company changed its name on October 27, 2017. The Company is an investment company established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy, including through the Management Companies.

The Company is seeking to raise U.S. $153 million through the Placing to invest in accordance with its investment objective and policy. Applications to an appropriate securities exchange may be made when deemed appropriate by the Company.

Investment in the Company is only suitable for institutional, professional and high net worth investors, private client fund managers and brokers and other investors who understand the risks involved in investing in the Company and/or who have received advice from their fund manager or broker regarding investment in the Company.

## INVESTMENT OBJECTIVE

The Company's investment objective is to provide Shareholders with stable and growing income returns, and to grow the capital value of the investment portfolio through opportunistic exposure to CLO Notes, investments in new issue CLOs sponsored by Highland and Acis CLO 7 through its interests in the Management Companies and CLO Income Notes, respectively, and senior secured loans primarily for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements, on both a direct basis and indirect basis, through the use of the investments described in its investment policy and through use of leverage, any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments.

Highland HCF Advisor, in its capacity as the Portfolio Manager under the Portfolio Management Agreement, will manage the Company's investments. In addition, the Portfolio Manager, Highland, Highland CLO Management, or another affiliate of Highland, in the capacity of the CLO Manager, may also manage Highland CLOs and the Portfolio Manager Highland, Acis, Acis CLO Management, or another affiliate of Acis, in the capacity of the CLO Manager, may also manage Managed CLOs, in each case, pursuant to CLO Management Agreements to be entered into from time to time.

## INVESTMENT POLICY

*Overview*

The Company's investment policy is to focus on synergistic investments in the following areas.

*Loan Investments*

The Company will invest on an indirect basis in a diverse portfolio of predominantly floating rate senior secured loans (or on a direct basis for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements), all of which will have at least one rating, which may be public or private, from Moody's, S&P or Fitch. Initially, the Company's loan investments will be focused in the U.S., but depending on market conditions the Company may also invest in similar types of loans in Europe. Accordingly, there is no limit on the maximum U.S. or European exposure. Investments in U.S. or European loans may be made through a U.S. or European originator subsidiary of the Company. The Company intends to invest directly only in those senior secured loans to obligors with total potential indebtedness under all applicable loan agreements, indentures and other

underlying instruments at least $250,000,000 that would generally satisfy the eligibility criteria for Highland CLOs and set forth in "*Summary—Investment Policy—Loan Investments*".

*Financing of Loan Portfolios / Securitization*

It is intended that the Company will periodically seek to sell or securitise all or a portion of its loan portfolio, held directly or indirectly, into new Highland CLOs where Highland CLO Management acts as CLO Manager.  In doing so, Highland CLO Management may seek to adopt the "originator" model to address the Origination Requirements (as defined below) applicable to such Highland CLOs to the extent such Highland CLOs sought to comply with EU Retention Requirements.  As a result, Highland CLO Management, will be required to commit to: (a) establishing the relevant CLO and (b) selling certain loan investments to the relevant CLO which it has purchased for its own account initially.  In addition, under current guidance, prior to closing date of the relevant CLO, Highland CLO Management expects to sell investments to the relevant CLO to satisfy the Origination Requirements.

*CLO Notes*

The Company will from time to time invest directly or indirectly (through affiliates and subsidiaries, including the Management Companies, as more fully described below) in CLO Notes issued by Managed CLOs or CLOs managed by other asset managers as set forth in "*Summary—Investment Policy—CLO Notes*".

The Company is currently invested in CLO Income Notes issued by Managed CLOs managed by Highland, Acis and Acis CLO Management. Following the Placing, the Company will invest indirectly through the Management Companies in CLO Notes.

*Act as Risk Retention Provider*

The Company may also invest in, provide loans to, or purchase performance-linked notes from asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland or Acis and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. Risk Retention Rules or EU Retention Requirements.

**Allocation of Investment Opportunities**

Highland CLO Management will serve as CLO Manager to each newly-issued Highland CLO during the Investment Period.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and Other Accounts as set forth in "*Summary—Investment Policy—Allocation of Investment Opportunities*".

**INVESTMENT RESTRICTIONS**

The Company will, at all times, invest and manage its assets in a way which is consistent with its object of spreading investment risk and in accordance with the investment policy set out in "*—Investment Policy*".

In the event of any breach of the Company's investment policy or of the investment restrictions applicable to the Company, Shareholders will be informed of the actions to be taken by the Company (at the time of such a breach) by an announcement issued by the Administrator.

During the Investment Period, the Company may invest up to $250,000,000 in CLO Income Notes for new Highland CLOs as follows: (a) up to $150,000,000 in the aggregate from new capital contributions; and (b) up to $100,000,000 in the aggregate from proceeds received from existing seed portfolio investments and investments in new Highland CLOs, net of dividends paid, and amortization and interest payments on Company borrowings from committed credit facilities.

The Company may not, without the consent of the Advisory Board, invest in any CLO Notes or CLO Income Notes of new Highland CLOs that are not Qualifying CLOs as set forth in "*Summary—Investment Restrictions*"; provided that, if the Portfolio Manager has satisfied the RP Condition, the consent of the Advisory Board to invest in any

Highland CLO that meets clause (a) of the definition of Qualifying CLOs only shall not be unreasonably withheld, conditioned or delayed.

During the Investment Period, the Company shall be permitted to invest in "resets" with respect to the Designated CLO Resets and refinancings with respect to the Designated CLO Refinancings, each as set forth in "*Summary—Investment Restrictions*".

The Company shall not invest in the CLO Income Notes of a new-issue Highland CLO unless it is the 100% owner of the CLO Income Notes not forming part of the Retention Interest acquired by Highland CLO Management.

## BORROWING

Subject to the limitations set forth in "*Summary-Borrowing*", it is expected that the Company will have access to one or more committed credit facilities.  Such facilities may take the form of any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities.  It is expected that the Company will use advances under such facilities, together with the proceeds of the Shares, to purchase future senior secured loans (acquired for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and other assets.  In addition to such facilities, the Company will be permitted to borrow money for day to day administration and cash management purposes.

## CHANGES TO INVESTMENT OBJECTIVE AND POLICY

Any material change to the investment objective and policy of the Company would be made only with the approval of Shareholders.

## INVESTMENT STRATEGY

Whether the senior secured loans or other assets are held directly by the Company (with respect to senior secured loans for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) or indirectly via CLO Notes or its investment in the applicable Management Company it is the Company's intention that, in any case, the portfolios will be actively managed (by the Portfolio Manager, Highland, Acis, the applicable Management Company, an asset manager subsidiary or the applicable CLO Manager, as the case may be) to minimise default risk and potential loss through comprehensive credit analysis performed by the Portfolio Manager, Highland, Acis, the applicable Management Company or the applicable CLO Manager (as applicable).

Whilst the intention is to pursue an active, non-benchmark total return strategy, Highland HCF Advisor as the Company's Portfolio Manager will be cognisant of the positioning of the loan portfolios against relevant indices. Accordingly, Highland HCF Advisor will track the returns and volatility of such indices, while seeking to outperform them on a consistent basis.  In-depth, fundamental credit research dictates name selection and sector over-weights/under-weights relative to the benchmark, backstopped by constant portfolio monitoring and risk oversight. The Portfolio Manager will typically look to diversify the Company's portfolios to avoid the risk that any one obligor or industry will adversely impact overall returns.  The investment strategy also places an emphasis on loan portfolio liquidity to ensure that if the Company's credit outlook changes, it is free to respond quickly and effectively to reduce or mitigate risk in its portfolio.  The Portfolio Manager believes this investment strategy will be successful in the future as a result of its emphasis on risk management, capital preservation and fundamental credit research.  The Portfolio Manager believes the best way to control and mitigate risk is by remaining disciplined in market cycles, by making careful credit decisions and maintaining adequate diversification.

### *Leverage and Expected Returns*

It is anticipated that any borrowing for the purpose of investing directly in senior secured loans (acquired for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) will be in the form of a term Warehouse Loan Facility, however the Company has entered into the NexBank Credit Facility and may enter into any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps, repurchase agreements or other facilities to facilitate the acquisition or financing of loans.  Loans purchased using such borrowings will typically be held for no more than 12 months before being sold to a Highland

APP_0143

CLO.  Except in relation to the CLO Retention Notes it holds, the Company may enter into hedging and derivatives transactions pursuant to its investment activities, for the purposes of efficient portfolio management.

The Company does not currently grant any guarantee under any leveraging arrangement.  The grant of any such guarantee would be disclosed to investors in accordance with the AIFMD Rules.

Any proposed changes to the Company's investment objective and policy will be subject to the process described in the section titled "*Changes to Investment Objective and Policy*" above in this section of the Offering Memorandum.

*Collateral and Asset Re-use Arrangements*

Any collateral and asset re-use arrangements of the Company will vary according to the brokers and/or trading counterparties which it may use (each a "**Trading Counterparty**").

The Company may be required to deliver collateral from time to time to its Trading Counterparties, under the terms of the relevant trading agreements, by posting initial margin and/or variation margin and on a mark-to-market basis. The Company may also deposit collateral as security with a Trading Counterparty.  The treatment of such collateral varies according to the type of transaction and where it is traded. Under such arrangements, the cash, securities and other assets deposited as collateral will generally become the absolute property of the Trading Counterparty, the Trading Counterparty will have the right to use such collateral.

Where collateral is reused by a Trading Counterparty, the Company will have an unsecured right to the return of equivalent assets and such collateral will be at risk in the event of the insolvency of a Trading Counterparty.

Any changes to the right of re-use of collateral will be disclosed to investors in accordance with the AIFMD Rules.

*Current Investments of the Company*

In order to facilitate a timely investment of the proceeds of the Placing and to take advantage of existing opportunities, the Company is currently invested in CLO Income Notes issued by Managed CLOs managed by the Portfolio Manager, Highland, Acis and Acis CLO Management.  The details of such CLOs are set out in "*The Current CLO Portfolio*".

Following the Placing, the Company will acquire further assets and fund origination by Highland CLO Management of new Highland CLOs and it is expected that the Net Placing Proceeds will be substantially invested in CLO Notes upon closing.  The Company may also, from time to time:  (i) hold assets within its portfolio to maturity; (ii) sell assets within its portfolio to the market; or (iii) sell assets within its portfolio to another CLO which is not Managed CLO.

**TARGET RETURN AND DIVIDEND POLICY**

*Target Total Return*

Whilst not forming part of the investment objective or policy of the Company, on the basis of current market conditions as at the date of this Offering Memorandum, the Company is targeting an annualised mid-teen total return over the medium-term, once the Net Placing Proceeds are substantially invested (through the Company) in CLO Notes (the "**Target Total Return**").  The Company intends to seek to deliver this return through a combination of dividend payments and capital appreciation.

*Target Dividend Yield and Policy*

Whilst not forming part of the investment objective or policy of the Company, dividends will be payable in respect of each calendar quarter, payable in the month following the end of such quarter.

During the Investment Period, on each Quarterly Dividend Date, beginning May 15, 2018, the Company will target the Target Dividend.  During the Investment Period, excess cash or interest from the portfolio will be reinvested by the Company with the objective of growing the NAV.

Following the Investment Period, excess cash, interest and proceeds from the realization of portfolio investments after satisfaction of all expenses, debts, liabilities and obligations of the Company will be distributed by the Company to the Shareholders as a dividend on the Quarterly Dividend Date in accordance with the Distribution Priority as set forth in "*Summary-Dividend Policy*".

To the extent the Company does not have available funds on hand to meet the Target Dividend with respect to any Quarterly Payment Date, the Board of Directors may suspend dividends if, in consultation with the Portfolio Manager, it determines that a sale of assets to produce proceeds to meet the Target Dividend would not be in the best interests of the Company and/or would not produce a sale price reflective of the value of the assets.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

The actual dividend generated by the Company in pursuing its investment objective will, however, depend on a wide range of factors including, but not limited to, general economic and market conditions, fluctuations in currency exchange rates, prevailing interest rates and credit spreads, the terms of the investments made by the Company and the risks highlighted in the "*Risk Factors*" section of this Offering Memorandum. Dividend payments may be suspended by Board of Directors in its absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

The Target Total Return and the Target Dividend should not be taken as an indication of the Company's expected future performance or results. The Target Total Return and the Target Dividend are targets only and there is no guarantee that they can or will be achieved and should not be seen as an indication of the Company's expected or actual return. Target returns are hypothetical and are neither guarantees nor predictions or projections of future performance. Actual events and conditions may differ materially from the assumptions used to establish the Target Total Return and Target Dividend. Accordingly, investors should not place any reliance on the Target Total Return or the Target Dividend in deciding whether to invest in Shares.

Furthermore, the future performance of the Company may be materially adversely affected by the risks discussed in the section of this Offering Memorandum entitled "*Risk Factors*".

**FURTHER ISSUES OF SHARES**

The Directors will have authority to allot further Shares in the share capital of the Company following the Placing subject to the subscription and transfer agreement. Further issues of Shares beyond the issuances contemplated in the subscription and transfer agreement would only be made subject to consent of the Advisory Board, as described in "*Summary—Advisory Board*" if the Directors determine such issues to be necessary to protect the Company, consistent with the Board's duties to the Company, and in the best interests of Shareholders and the Company as a whole. Relevant factors in making such determination include net asset performance, share price rating and perceived investor demand. In the case of further issues of Shares (or sales of Shares from treasury), except as permitted by the Shareholders, such Shares will only be issued at prices which are not less than the then prevailing Net Asset Value per Share (as estimated by the Directors).

There are no provisions of Guernsey law which confer rights of pre-emption in respect of the allotment of Shares. The Articles, however, contain pre-emption rights in relation to allotments of Shares for cash.

APP_0145

## VALUATION

### Net Asset Value

As of September 30, 2017, the unaudited net asset value per share of the Net Asset Value was US $157,081,118.91. A special dividend in the aggregate amount of US $9,000,000 was paid on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. was made on October 24, 2017, for an aggregate purchase price of $991,180.13.

### Publication of Net Asset Value

The Company intends to publish the Net Asset Value per Share as calculated in accordance with the process described below, on a quarterly basis (within 15 Business Days following the relevant month-end). Notice will be provided either by a website to be created or investors may elect to be contacted by the Administrator by e-mail. The Net Asset Value will be calculated by the Administrator on the basis of the valuation policy established by the Directors from time to time.  The Company's initial valuation policy is described below.

### Valuation of the portfolio

It is intended that, in accordance with its investment objective and policy set out above, the Company will invest in: (a) senior secured loans and other debt securities on both a direct basis (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and indirect basis, including through the use of leverage via repurchase facilities and Warehouse Loan Facilities, and for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements; (b) CLO Notes, and any other assets held by management subsidiaries; and (c) interests in the Management Companies, and will value such instruments in accordance with the valuation policy established by the Portfolio Manager from time to time.

The Company (meaning for the purposes of the valuation of assets described herein, the Company itself, the Portfolio Manager or the Administrator under the ultimate supervision of the Board) will generally compute the value of the instruments and other assets of the Company as of the close of business on the last day of each fiscal period and on any other date selected by the Board in its sole discretion.  In addition, the Company must compute the value of the instruments that are being distributed in-kind as of their date of distribution in accordance with the Company's Memorandum and Articles of Association.  In determining the value of the assets of the Company, no value is placed on the goodwill or name of the Company, or the office records, files, statistical data or any similar intangible assets of the Company not normally reflected in the Company's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell instruments pursuant to agreements entered into on or prior to such valuation date.

A copy of the Company's valuation policy is available upon request.

The value of each instrument and other asset of the Company and the net worth of the Company as a whole determined pursuant the Company's Memorandum and Articles of Association are conclusive and binding on all of the members of the Company and all persons claiming through or under them.

### Suspension of the calculation of Net Asset Value

The Directors may at any time, but are not obliged to, temporarily suspend the calculation of the NAV and NAV per Share during any period if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control, as a result of which, in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the shareholders; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be

APP_0146

accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

Shareholders will be informed by e-mail from the Administrator in the event that the calculation of the NAV per Share is suspended as described above.

**REPORTS AND ACCOUNTS**

The accounting period of the Company ends on 31 December, in each year, and the audited annual accounts will be provided to Shareholders within four months of the year end to which they relate. The Company shall report its results of operations and financial position in U.S. Dollars. The Company's first accounts were prepared for the period ending 31 December 2015.

The audited annual accounts will also be available at the registered office of the Administrator and the Company.

The financial statements of the Company will be prepared in accordance with GAAP, and the annual accounts will be audited. The Company's financial statements, which will be the responsibility of its Board, will consist of a statement of comprehensive income, statement of financial position, statement of cash flows, statement of changes in equity, related notes and any additional information that the Board deems appropriate or that is required by applicable law.

It is expected that the CLOs and any Warehouse Loan Facilities established will not be consolidated in the Company's GAAP financial statements, although such assessment will depend on the facts and circumstances.

Any disclosures required to be made to Shareholders pursuant to the AIFMD will be contained either in the Company's periodic reports or communicated to Shareholders in written form.

### THE CURRENT CLO PORTFOLIO

The Company is currently invested in CLO Income Notes in the following Managed CLOs in the following amounts (the "**Current CLO Portfolio**"):

| CLOs: | Aggregate Outstanding Amount (U.S.$) |
|---|---|
| ACIS CLO 2013-1 Ltd. | $18,558,000.00 |
| ACIS CLO 2014-3 Ltd. | $39,750,000.00 |
| ACIS CLO 2014-4 Ltd. | $50,750,000.00 |
| ACIS CLO 2014-5 Ltd. | $53,000,000.00 |
| ACIS CLO 2015-6, Ltd. | $51,850,000.00 |
| Acis CLO 2017-7, Ltd. | $17,850,000.00 |
| Rockwall CDO, Ltd. | $14,000,000.00 |
| Brentwood CLO, Ltd. | $12,000,000.00 |
| Grayson CLO, Ltd. | $5,900,000.00 |
| Liberty CLO, Ltd. | $17,000,000.00 |
| HP CDO, Ltd. | $1,621,542.70 |
| Greenbriar CLO, Ltd. | $18,000,000.00 |
| Gleneagles CLO, Ltd. | $1,250,000.00 |

**Valuation of the Current Portfolio**

Information regarding the Current Portfolio and its valuation as of 30 September 2017 has been made available to all Placees free of charge.

Information on the historic performance of the Company is available upon request from the Portfolio Manager. Such information will be updated periodically in accordance with the AIFMD Rules.

APP_0148

**MARKET OPPORTUNITY**

**INVESTMENT OPPORTUNITY**

The Company intends to invest in CLO Notes of CLOs which are compliant with the U.S. Risk Retention Rules and which may be compliant with the EU Retention Requirements (as defined above) and in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements).  In pursuance of this intention, the Company will invest in each of the Management Companies which will, pursuant to the EU Retention Requirements, need to, amongst other things:  (a) on the closing date of a CLO it establishes, commit to purchase "material net economic interest" equal to at least five per cent of the maximum portfolio principal amount of the assets in the CLO and (b) undertake that, for so long as any securities of the CLO remain outstanding (including any CLO Retention Notes), it will retain its interest in the CLO and will not (except to the extent permitted by the EU Retention Requirements) sell, hedge or otherwise mitigate its credit risk under or associated with such CLO.  This five per cent material net economic interest in the CLO can, amongst other methods, be retained through the holding of a vertical strip of all issued tranches (AAA-rated notes to equity) or a retention holding in the first loss tranche or a combination thereof.  The EU Retention Requirements prohibit many significant European investors from investing in any securitisation which does not comply with them.

In addition, with the intention of achieving classification as an "originator" (as defined in the CRR) and complying with the CRR Retention Requirements with respect to Highland CLOs, Highland CLO Management will be required to meet the Origination Requirements.

Highland CLO Management may seek to adopt the "originator" model to address the EU Retention Requirements for its CLOs and intends to be treated as a "majority-owned affiliated" of Highland in order to comply with the U.S. Risk Retention Rules.

In addition to its current holdings, the Company may buy floating rate senior secured loans from the primary and secondary market before selling the assets to one or more CLOs which it establishes and for which Highland CLO Management will act as a retention provider, thereby offering investors wholesale access to senior secured loans acquired by the Company and retained CLO Income Notes.

The Portfolio Manager will be responsible for selecting and monitoring the performance of the investments.  The Company's purchase and sale decisions (with certain exceptions) will be taken by Highland HCF Advisors as Portfolio Manager pursuant to the Portfolio Management Agreement.  Further details on the investment process are set out in the section of this Offering Memorandum entitled "*Investment Process*".

APP_0149

# INVESTMENT PROCESS

*Highland HCF Advisor as Portfolio Manager and CLO Manager*

The Company has entered into a Portfolio Management Agreement with Highland HCF Advisor as the Portfolio Manager.  Pursuant to the Portfolio Management Agreement, Highland HCF Advisor will, at its discretion, select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support services to the Company.  The performance of the Company's portfolio will depend heavily on the skills of Highland HCF Advisor in analyzing, selecting and managing the investments.  The Portfolio Manager has entered into Services Agreements with Highland Capital Management, L.P. under which the Portfolio Manager has agreed to make its investment research and recommendations and back-office support services available to Highland HCF Advisor.  Further details are set out in the section of this offering memorandum entitled "Investment Process" and "Additional Information on the Company".

Based in Dallas, Texas, Highland is an SEC Registered Investment Adviser founded in 1993 that specializes in senior secured bank loans, high yield bonds, structured products and equities.  Highland issued its first CLO in 1996, and Highland and its affiliates have since issued and managed over U.S. $28 billion of CLOs and CDOs consisting of 40 separate vehicles.  As of August 31, 2017, Highland and its affiliates, managed or serviced approximately U.S. $13.4 billion in senior secured bank loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations and high net worth individuals.

The Portfolio Manager, Highland, Acis and/or the Management Companies, may act as CLO Manager(s) in relation to the Managed CLOs pursuant to CLO Management Agreements.  The Portfolio Manager, Highland, Acis and/or the applicable Management Company as CLO Manager is responsible for purchasing and selling of collateral obligations and performing certain other advisory and administrative tasks for and on behalf of the Managed CLOs in each case subject to the provisions of the applicable CLO Management Agreement and any applicable provisions of the indenture.

Highland HCF Advisor is a relying adviser of Highland. Highland is an SEC Registered Investment Adviser and currently manages CLOs and other managed accounts and investment funds. Highland CLO Management is a relying adviser of Highland and will manage Highland CLOs.  Highland CLO Management has the HCLOM Services Agreements in place with Highland, pursuant to which Highland provides credit research and operational support to Highland CLO Management, including services in connection with determining the composition, nature and timing of changes to the Highland CLO Management portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by Highland CLO Management, and certain loan services and administrative services.

Acis is an SEC Registered Investment Adviser and currently manages CLOs and other managed accounts and investment funds.  Acis CLO Management is a relying adviser of Acis and currently manages ACIS CLO 2017-7. Acis is an affiliate of Highland and is 100% owned by Highland senior management, and was established by James Dondero and Mark Okada to focus on managing traditional CLOs that invest in liquid, broadly syndicated bank loans and secondary CLO investments. Acis has the ACM Services Agreements in place with Highland, pursuant to which Highland provides investment research and recommendations and operational support to Acis, including services in connection with the Portfolio Manager's recommendations with respect to the composition, nature and timing of changes to the Company's portfolio, the due diligence of actual or potential investments, the execution of investment transactions, and certain loan services and administrative services. Acis CLO Management has the ACLOM Services Agreements in place with Acis, pursuant to which Acis provides credit research and operational support to Acis CLO Management, including services in connection with determining the composition, nature and timing of changes to the ACIS CLO Management portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by ACIS CLO Management, and certain loan services and administrative services.  All final credit decisions are made by the Highland individuals referenced below.

## Investment Philosophy

Highland's investment philosophy centers on being investors first. The firm has 25 years of experience investing in alternative strategies through multiple cycles. Highland is a recognized pioneer in bank loan asset management and

APP_0150

CLO issuance. The firm invests a meaningful amount of capital in the portfolios they manage, with market value in excess of $250 million invested alongside our clients, as of September 30, 2017.

Highland's investment philosophy is rooted in a value-driven approach that combines rigorous bottom-up credit underwriting with top-down risk analysis to optimize risk-adjusted performance of portfolios. The firm integrates risk management throughout its investment process and maintains a culture of a high level of compliance. Highland focuses on attractive risk/return arbitrage opportunities where the firm can add value. Highland seeks to generate alpha by implementing checks and balances that allow the firm to identify risks, mitigate volatility, and quickly ascertain and sell losers.

While participating in the larger, liquid bank loan asset class, Highland continues to capture market inefficiencies in this over the counter (OTC) market through mispricings that it identifies via robust fundamental analysis, proactive diligence and monitoring, and nimble trading capabilities. Given the scale of the firm's investment resources, Highland is able to follow and manage investment portfolio names more closely. Highland credit research analysts manage 20-30 credits per analyst versus most peers, who manage 40-50 credits per analyst. In addition, the firm's dedicated trading desk and active dialogue with the Street enable Highland to identify technical dislocations and opportunities. The firm's high conviction investment philosophy and active portfolio management style versus peers have been key drivers of creating alpha for clients over time.

## Investment Monitoring and Risk Management

Risk management is integrated into all levels of the investment process, from research, to portfolio construction and management, to ongoing monitoring. Highland conducts extensive position and portfolio monitoring activities on a daily basis. Portfolio risk is reviewed using internally generated daily, weekly, and monthly reports which measure transaction compliance including investor-mandated metrics such as portfolio concentrations or required test scores, as well as compliance with evolving internal positioning targets. Individual position risk is monitored in a number of ways, including Highland's extensive proprietary intranet system (Highland Online Management Engine or "**HOME**"), which pulls together data from their various data providers (Wall Street Office, LPC, Moody's, S&P, MarkIt, S&P LCD, CSFB Index) to provide a comprehensive portfolio/risk management system. The system allows the CLO team to monitor metrics at any level of aggregation (instrument, issuer, portfolio, fund and across the platform). Additionally, the system is designed to be scalable and with flexibility to enable future data inputs and reporting requirements.

For both Managed CLOs and for the underlying loans, the HOME intranet system allows Highland to monitor portfolios on a real-time, ongoing basis by receiving alerts showing positions with the largest daily/weekly/monthly mark change, as well as alerts on downgrades/upgrades, and when their credit analyst has changed his opinion on a broadly syndicated loan.

## Allocation Policy

Highland and its affiliates may, from time to time, be presented with investment opportunities that fall within the investment objectives of the Company and the Managed CLOs and such other clients, funds or other investment accounts managed by Highland or its affiliates, and in such circumstances, subject to the Company's priority allocation with respect to CLO Income Notes of new issue Highland CLOs Highland and its affiliates expect to allocate such opportunities among the Company, the Managed CLOs and such other clients, funds or other investment accounts on a basis that Highland and its affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Company, the Managed CLOs and such other clients, funds or other investment accounts, the primary mandates of the Company, the Managed CLOs and such other clients, funds or other investment accounts, the capital available to the Company, the Managed CLOs and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the investment, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other collateral obligations of the Company, the Managed CLOs and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Company, the Managed CLOs and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by Highland and its affiliates in good faith. Subject to the Company's priority allocation with respect to CLO Income Notes of new issue Highland CLOs, Highland will allocate investment opportunities across the entities for which such opportunities are

APP_0151

appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Investment Advisers Act. Highland will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Company and the Managed CLOs fairly or equitably in the short term or over time and there can be no assurance that the Company and the Managed CLOs will be able to participate in all such investment opportunities that are suitable for it.

**Biographies of the Highland Key Personnel**

The Portfolio Manager will use the services of the key personnel set forth below, although it may not necessarily continue to use their services during the entire term of the Portfolio Management Agreement. Of these, Trey Parker and Hunter Covitz (and such other personnel as may be determined from time to time) will be made available by the Portfolio Manager to the Company pursuant to the Portfolio Management Agreement.

Although the persons described above are currently employed by Highland and are engaged in the activities of the Portfolio Manager, such persons may not necessarily continue to be employed by the Portfolio Manager during the entire term of the Portfolio Management Agreement and, if so employed, may not remain engaged in the activities of the Portfolio Manager.

**James Dondero, CFA, CMA**

**Co-Founder, President**

Mr. Dondero is President of Highland CLO Management and Acis CLO Management, LLC and Co-Founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments) and Acis Capital Management, L.P. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Under Mr. Dondero's leadership, Highland and Acis have been a pioneer in both developing the collateralized loan obligation (CLO) market and advancing credit-oriented solutions for institutional and retail investors worldwide, including product offerings such as institutional separate accounts, CLOs, hedge funds, private equity funds, mutual funds, REITs, and ETFs. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NXRT), is Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

**Mark Okada, CFA**

**Co-Founder, Co-Chief Investment Officer**

Mr. Okada is Co-Founder of Highland CLO Management and Acis CLO Management, LLC and Co-Founder and Co-Chief Investment Officer of Highland Capital Management, L.P. and Acis Capital Management, L.P. Responsible for overseeing investment activities for various strategies within Highland and Acis, Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience. He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms. Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles. He has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund advisory board.

APP_0152

**Trey Parker**

**Partner, Portfolio Manager and Co-Chief Investment Officer**

Mr. Parker is Partner, Portfolio Manager and Co-Chief Investment Officer at Highland Capital Management, L.P., and serves on the Investment Manager's Investment Committee. Prior to his current role, Mr. Parker was Head of Credit and covered a number of the industrial verticals, as well as parts of tech, media and telecom for the Investment Manager and worked on the Distressed & Special Situations investment team at Highland. Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing. Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries. Prior to joining Hunt, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal. While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions. Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley. Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute. Mr. Parker serves on the Board of Directors of Omnimax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

**Hunter Covitz, CPA**

**Managing Director, Structured Products**

Mr. Covitz is a Managing Director and Portfolio Manager at Highland Capital Management, L.P. He is responsible for all CLOs, separate accounts, and hedge funds managed by Acis Capital Management, L.P., as well as all CLOs managed by Highland. Mr. Covitz serves on Highland's investment committee and leads the structured products investment team. Since joining Highland in 2003, Mr. Covitz has been instrumental in the structuring, warehousing, ramping, and ongoing portfolio management of over 30 Highland and Acis-originated CLOs. Prior to joining Highland, Mr. Covitz served as a tax consultant at Deloitte & Touche and KBA Group LLP, where he focused on high-net worth individuals and middle-market companies. He received both his MS and BBA in Accounting from the University of Oklahoma. Mr. Covitz is a licensed Certified Public Accountant.

**Neil Desai**

**Portfolio Manager, Structured Products**

Mr. Desai is a Portfolio Manager of Structured Products at Highland Capital Management, L.P. He is focused on sourcing and trading structured products for Highland's CLOs, hedge funds, mutual funds and separate accounts in the primary and secondary markets. Prior to joining Highland in August 2015, Mr. Desai was a Director in Pfizer Inc.'s Treasury organization where he built and ran Pfizer's structured products business. Prior to Pfizer, Mr. Desai spent several years structuring and trading various structured products at Barclays Capital and its spin-off hedge fund, C12 capital. Mr. Desai received both a Bachelor's and Master's degree in Computer Science & Electrical Engineering from MIT.

APP_0153

## COMPANY DIRECTORS AND ADMINISTRATION

## DIRECTORS

The Directors are responsible for managing the business affairs of the Company in accordance with the Articles and have overall responsibility for the Company's activities including the appointment of the service providers. The Directors may delegate certain functions to other parties such as the Administrator. The Directors have appointed Highland HCF Advisor as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

The Board comprises two Directors, both of whom are independent of Highland and Acis.

The address of the Directors, all of whom are non-executive, is the registered office of the Company. The Directors of the Company are as follows:

### William Scott (Chairman)

William Scott, a Guernsey resident, acts as an independent non-executive Director of the Company. Mr. Scott also currently serves as independent non-executive director of a number of investment companies and funds. From 2003 to 2004, Mr. Scott worked as Senior Vice President with FRM Investment Management Limited. Previously, Mr. Scott was a director at Rea Brothers (which became part of the Close Brothers group in 1999 and where he was a director of Close Bank Guernsey Limited) (1989-2002) and Assistant Investment Manager with the London Residuary Body Superannuation Scheme (1987-1989). Mr. Scott graduated from the University of Edinburgh in 1982 and is a Chartered Accountant having qualified with Arthur Young (now E&Y) in 1987. Mr. Scott also holds the Securities Institute Diploma and is a Chartered Fellow of the Chartered Institute for Securities & Investment. He is also a Chartered Wealth Manager.

### Heather Bestwick

Heather Bestwick, a Jersey resident, acts as an independent non-executive Director of the Company. She qualified as an English solicitor with Norton Rose, and worked in their London and Athens offices for eight years. In 1999 she joined Walkers in the Cayman Islands, qualifying as a Cayman Islands attorney and Notary Public, and became a partner in 2003. Her practice encompassed hedge funds, private equity, structured finance, secured lending and yacht registration and finance. Ms. Bestwick moved to Jersey in 2007 to become Managing Partner of the Walkers Jersey office. She joined Jersey Finance in 2010 as Technical Director and Deputy Chief Executive, leading the development of finance industry legislation on behalf of industry and liaising with the regulator and government. Ms. Bestwick is a member of the Channel Islands committee of the Association of Investment Companies.

### Management functions of the Board of Directors

As there are no employees of the Company, the Board performs certain management functions, which include the overseeing of the Company's investment policy and investment strategy and the supervision of any delegated responsibilities to third-party service providers, and has the ultimate responsibility for the management and operations of the Company.

The Company has appointed Highland HCF Advisor as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

## CORPORATE GOVERNANCE

The Directors are committed to maintaining high standards of corporate governance. Insofar as the Directors believe it to be appropriate and relevant to the Company, it is their intention that the Company should comply with best practice standards for the business carried on by the Company.

On 1 January 2012, the GFSC's Finance Sector Code of Corporate Governance (the "**GFSC Code**") came into effect. The GFSC has stated in the GFSC Code that companies which report against the UK Corporate Governance Code are

deemed to meet the requirements of the GFSC Code, and need take no further action.  Other than as set out below, the Company currently complies with, and will comply with, the GFSC Code.

The Company does not have a senior independent director because all of its Directors are non-executive and the Company has a Chairman.  There are no other instances of non-compliance with the UK Corporate Governance Code by the Company as at the date of this Offering Memorandum.

**Audit Committee**

The Company has established an Audit Committee, which comprises all the Directors.  The Company's Audit Committee meets formally at least twice a year for the purpose, amongst other things, of considering the appointment, independence and remuneration of the Auditor and to review the Company's annual financial reports.  Where audit-related and/or non-audit services are to be provided by the Auditors, full consideration of the financial and other implications on the independence of the Auditors arising from any such engagement will be considered before proceeding.  Heather Bestwick acts as chairman of the Audit Committee.  The responsibilities of the Audit Committee includes monitoring the integrity of the Company's results and financial statements, reviewing reports received from the Administrator on the adequacy and the effectiveness of the Company's internal controls and risk management systems, considering annually whether there is a need for an effectiveness of the Company's internal audit function and assessing the ongoing suitability of the Auditors and ensuring their co-ordination with any internal audit function.

The chairmanship of the Audit Committee and each Director's performance is reviewed annually by the Chairman and the performance of the Chairman is assessed by the other Directors.

**Advisory Board**

The Company has established an Advisory Board, which composed of individuals who shall be representatives of certain Shareholders.  See "*Summary—Advisory Board*".

# PORTFOLIO MANAGER

Highland HCF Advisor will act as Portfolio Manager to the Company (pursuant to the Portfolio Management Agreement) and may act (either itself or through an affiliate) as the CLO Manager to Managed CLOs.

Pursuant to the Portfolio Management Agreement, the Portfolio Manager will select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and be responsible for the business decisions and carry on the day-to-day management of the Company's business and implementation of its investment objective and policy.

*Highland Fees*

Highland HCF Advisor will receive, in consideration for its services pursuant to the Portfolio Management Agreement, an amount equivalent to all Operating Expenses incurred by the Portfolio Manager in the performance of its obligations thereunder as described below, together with any irrecoverable VAT arising on such costs and expenses.  Except as provided below, the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent ("**Overhead**") without reimbursement by the Company.

The Company shall pay or reimburse the Portfolio Manager and its affiliates for only for reasonable third party costs and expenses related to the services hereunder, including, but not limited to investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, actual out-of-pocket professional fees relating to, trustee, administration, tax, accounting, legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in connection with the Company's compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Company, any taxes imposed upon the Company (including, but not limited to, any

APP_0155

irrecoverable VAT arising on such costs and expenses), fees relating to valuing the financial instruments, extraordinary expenses and the Company's indemnification obligations (including those incurred in connection with indemnifying indemnified persons, including advancing such amounts) (collectively, the "**Operating Expenses**").  In the event any fees or expenses are for services used by, or attributable to, other persons advised by Highland HCF Advisor or its affiliates, including, but not limited to, any fees or expenses for software or subscription-based services, the Company shall only reimburse the Portfolio Manager for its pro rata share of such expenses, as determined by the Portfolio Manager in good faith.

For the avoidance of doubt, (i) the cost of all third party expenses incurred by the Portfolio Manager in connection with the Portfolio Management Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of, a number of Portfolio Manager's advised accounts, such expenses shall be allocated pro rata among such accounts.

To the extent that expenses to be borne by the Company are paid by the Portfolio Manager or by any services provider, the Company shall reimburse the Portfolio Manager (or the relevant services provider, as applicable) for such expenses so long as such expenses are determined on an arm's length basis.

The Portfolio Manager will also receive distributions pursuant to the Distribution Priority following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company and the Shareholders have receive a cumulative rate of return of 8.0% per annum, compounded annually.  See "*Summary—Dividend Policy*".

Further details regarding the Portfolio Manager and Highland are set out in the section of this Offering Memorandum entitled "*Investment Process*".  Further details regarding the Portfolio Management Agreement are set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*".

## CLO MANAGER

In addition, the Portfolio Manager, Highland, Acis and/or the Management Companies (or one of their affiliates), as CLO Manager, may also manage Managed CLOs pursuant to management agreements ("**CLO Management Agreements**") to be entered into from time to time.   The applicable CLO Manager will receive customary fees, in consideration for its services as the CLO Manager, from each of the Managed CLOs it manages.

## ADMINISTRATOR

State Street (Guernsey) Limited has been appointed as Administrator of the Company pursuant to the Administration Agreement (further details of which are set out in the section of this Offering Memorandum entitled "*Material Contracts*" in "*Additional Information on the Company*").  In such capacity, the Administrator is responsible for the day-to-day administration of the Company (including but not limited to the calculation and publication of the estimated quarterly NAV) and general secretarial functions required by the Companies Law (including but not limited to the maintenance of the Company's accounting and statutory records).  Prospective investors should note that it is not possible for the Administrator to provide any investment advice to investors.

The Administrator is a private limited company, created under the laws of Guernsey on 17 March 2000 whose registered office is situated at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands.  The Administrator is licensed under the POI Law, with the GFSC to carry out controlled investment business. The Administrator's principal business activity is providing securities services.

## CUSTODIAN

State Street Custodial Services (Ireland) Limited has been appointed as Custodian of the Company pursuant to the Custody Agreement (further details of which are set out in the section of this Offering Memorandum entitled "*Material Contracts*" in "*Additional Information on the Company*").  In acting as custodian of the Company's investments, the Custodian shall provide for the safekeeping of certificates of deposit, shares, notes and in general any instrument evidencing the ownership of securities and may take custody of cash and other assets.  Assets will be held in a custody account and registered in the name of the Company or the Custodian, its delegate or a nominee.

The Custodian, which is authorised as an Investment Business Firm under Section 10 of the Irish Investment Intermediaries Act, 1995 (as amended), will provide custody and banking services.

**FEES AND EXPENSES**

The expenses of the Company related to the Placing are described in "*Summary—Expenses related to the Placing*".

The Company's ongoing expenses are described in "*Summary—Ongoing annual expenses*".

For more information on expenses charged during the most recent financial year, prospective investors should review the Company's annual audited financial statements (if any) for the prior financial year.

**MEETINGS AND REPORTS TO SHAREHOLDERS**

All general meetings of the Company shall be held in Guernsey.

The Company's audited annual report and accounts will be prepared to 31 December, each year, and it is expected that copies will be sent to Shareholders at the end of April each year.  Shareholders will also receive an unaudited interim report each year covering the six months from 1 January to 30 June, expected to be despatched at the end of August each year.

The Company's accounts are drawn up in U.S. Dollars and in compliance with GAAP.

The following information will be disclosed to investors at the same time as the annual financial statements and may be provided at other times by way of a report and/or letter sent to investors by the Portfolio Manager or the Administrator:

(a)     the percentage of the assets of the Company that are subject to special arrangements arising from their illiquid nature;

(b)     any new arrangements for managing the liquidity of the Company;

(c)     the current risk profile of the Company and the risk management systems employed by the Portfolio Manager to manage those risks; and

(d)     the total amount of leverage employed by the Company.

Any changes to the following information will be provided by the Portfolio Manager or the Administrator to investors without undue delay and may be provided by email:

(a)     the maximum level of leverage which the Portfolio Manager may employ on behalf of the Company;

(b)     the right of re-use of collateral or any changes to any guarantee granted under any leveraging arrangement; and

(c)     activation of liquidity management tools.

APP_0157

## PLACING ARRANGEMENTS

**THE PLACING**

The target number of Placing Shares to be issued pursuant to the Placing is an amount of Shares equal to U.S. $153 million. As at the date of this Offering Memorandum, the actual number of Placing Shares to be issued under the Placing is not known.

The results of the Placing will be released by the Company, including details of the number of Placing Shares allotted (or such other date as may be notified by the Company). The Directors are under no obligation to issue share certificates unless requested to do so by a Shareholder. No temporary documents of title will be issued.

The Company is seeking aggregate subscriptions to purchase Placing Shares in an aggregate amount of US $153 million.

Placees will commit under the subscription and transfer agreement to purchase Shares to be settled from time to time during the Investment Period. The Portfolio Manager may call such Shares for settlement from time to time on a pro rata basis upon 10 Business Days' notice to the Placees in such amounts as may be specified by the Portfolio Manager.

Upon the expiration of the Investment Period, all Placees will be released from any further obligation with respect to purchase Shares under their subscriptions, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

Shares will be issued at a price per Share based on the most recent quarterly determined NAV of the Company.

The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares. Fractions of Placing Shares will be issued.

On the Closing Date, Placees will acquire Shares of existing Shareholders at a price per Share based on the Adjusted NAV such that Placees and existing Shareholders will hold currently existing Shares on a *pro rata* basis and existing Shareholders will commit, as Placees under a subscription and transfer agreement, to purchase Shares such that new and existing Shareholders will hold both existing Shares and commitments on pro rata basis.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

A Shareholder that defaults in respect of its obligation to purchase Shares pursuant to the terms of the subscription and transfer agreement will be subject to customary default provisions.

The Board may retain any dividend or other monies payable on or in respect of a Share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

*Highland Principal Commitment*

Certain principals of Highland will subscribe, directly or indirectly, for $3,000,000 of Shares in the aggregate.

## TIME AND DATE OF THE OPENING AND CLOSING OF THE OFFER

APP_0158

This subscription is open for a fixed offer period only. This period runs from November 15, 2017, the offer opening date, until 17:00 in Guernsey on the Closing Date.  Only fully completed applications received by this date with cleared funds in the Company's nominated account will be acceptable for investment.

## USE OF PROCEEDS

The Net Placing Proceeds will depend on the number of Placing Shares issued pursuant to the Placing.  The Portfolio Manager intends to invest the Net Placing Proceeds in accordance with the Company's investment policy (further details of the Company's investment process and strategy are set out in the section of this Offering Memorandum entitled "*Company, its Investment Objective, Policy and Strategy*").

## DEALINGS

The Company does not guarantee that at any particular time any market maker(s) will be willing to make a market in the Placing Shares, nor does it guarantee the price at which a market will be made in the Placing Shares.  Accordingly, the dealing price of the Placing Shares may not necessarily reflect changes in the Net Asset Value per Share. Furthermore, the level of the liquidity in the Placing Shares can vary significantly.

## SCALING BACK AND ALLOCATION

If aggregate applications for Placing Shares exceed 325 million Shares, being the maximum number of Shares to be issued pursuant to the Placing, it will be necessary to scale back applications under the Placing.  The Company reserves the right to decline in whole or in part any application for Placing Shares pursuant to the Placing.

## GENERAL

Pursuant to anti-money laundering laws and regulations with which the Company must comply in the UK and Guernsey, the Company (and its agents) may require evidence in connection with any application for Placing Shares, including further identification of the applicant(s), before any Placing Shares are issued.

In the event that there are any significant changes affecting any of the matters described in this Offering Memorandum or where any significant new matters have arisen after the publication of this Offering Memorandum, the Company will publish a notice to investors.  Such notice will give details of the significant change(s) or the significant new matter(s). In the event that the Company is required to publish any notice, applicants who have applied for Placing Shares shall have at least two clear business days following the publication of the relevant notice within which to withdraw their offer to subscribe for Placing Shares in its entirety.  The right to withdraw an application to subscribe for Placing Shares in these circumstances will be available to all investors in the Placing.  If the application is not withdrawn within the time limits set out in the relevant notice, any application for Placing Shares will remain valid and binding.

The Directors may, in their absolute discretion, waive the minimum application amounts in respect of any particular application for Placing Shares under the Placing.

Should the Placing be aborted or fail to complete for any reason, monies received will be returned without interest at the risk of the applicant to the bank account from which the money was received forthwith following such abort or failure, as the case may be.

## CLEARING AND SETTLEMENT

Payment for the Placing Shares should be made in accordance with settlement instructions to be provided to Placees by or on behalf of the Company.  To the extent that any application for Placing Shares is rejected in whole or in part (whether by scaling back or otherwise), monies received will be returned without interest at the risk of the applicant.

## PURCHASE AND TRANSFER RESTRICTIONS

This Offering Memorandum does not constitute an offer to sell, or the solicitation of an offer to acquire or subscribe for, Placing Shares in any jurisdiction where such an offer or solicitation is unlawful or would impose any unfulfilled registration, qualification, publication or approval requirements on the Company.

APP_0159

The Company has elected to impose the restrictions described below on the Placing and on the future trading of the Placing Shares so that the Company will not be required to register the offer and sale of the Placing Shares under the U.S. Securities Act, so that the Company will not have an obligation to register as an investment company under the U.S. Investment Company Act and related rules and to address certain ERISA, U.S. Tax Code and other considerations.  The Company and its agents will not be obligated to recognise any resale or other transfer of the Placing Shares made other than in compliance with the restrictions described below.

### *Restrictions due to lack of registration under the U.S. Securities Act and U.S. Investment Company Act*

The Placing Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.  There will be no public offer of the Placing Shares in the United States.

Subject to certain exceptions as described herein, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

In addition, except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by (i) investors using assets of (A) an "employee benefit plan" as defined in section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Code; or (C) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements that is subject to Title I of ERISA or Section 4975 of the U.S. Code; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

### *Subscriber and Shareholder warranties*

By participating in the Placing, each subscriber acknowledges and agrees that it will (for itself and any person(s) procured by it to subscribe for Shares and any nominee(s) for any such person(s)) be further deemed to represent and warrant to the Company that:

(a)     if it is located outside the United States, it is not a U.S. Person, it is acquiring the Shares in an offshore transaction meeting the requirements of Regulation S and it is not acquiring the Shares for the account or benefit of a U.S. Person;

(b)     if it is located inside the United States or is a U.S. Person, it is an Eligible U.S. Investor and has received, read, understood and, prior to its receipt of any Shares pursuant to the Placing, returned an executed a U.S. Investor Letter to the Company;

(c)     it acknowledges that the Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. Persons absent registration or an exemption from registration under the U.S. Securities Act;

(d)     it acknowledges that the Company has not registered under the U.S. Investment Company Act and that the Company has put in place restrictions for transactions not involving any public offering in the United States, and to ensure that the Company is not and will not be required to register under the U.S. Investment Company Act;

(e)     unless the Company expressly consents in writing otherwise, no portion of the assets used to purchase, and no portion of the assets used to hold, the Shares or any beneficial interest therein constitutes or will constitute the assets of (i) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Code, including an individual retirement account

or other arrangement that is subject to Section 4975 of the U.S. Code; or (iii) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements that is subject to Title I of ERISA or Section 4975 of the U.S. Code.  In addition, if an investor is a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Code, its purchase, holding, and disposition of the Shares must not constitute or result in a non-exempt violation of any such substantially similar law;

(f)    that if any Shares offered and sold are issued in certificated form, then such certificates evidencing ownership will contain a legend substantially to the following effect unless otherwise determined by the Company in accordance with applicable law:

"THE COMPANY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT") AND THE SECURITY EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) OUTSIDE THE UNITED STATES TO A NON-US PERSON (AS DEFINED IN RULE 902 OF REGULATION S, "US PERSON") THAT IS NOT A US RESIDENT FOR THE PURPOSES OF THE INVESTMENT COMPANY ACT (A "US RESIDENT") IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT (AND NOT IN A PRE- ARRANGED TRANSACTION RESULTING IN THE RESALE OF SUCH SECURITY INTO THE UNITED STATES) OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND UNDER CIRCUMSTANCES WHICH WILL NOT REQUIRE THE COMPANY TO REGISTER UNDER THE INVESTMENT COMPANY ACT (PROVIDED THAT, IF SUCH TRANSFER PURSUANT TO THIS CLAUSE (B) IS TO A US PERSON OR A US RESIDENT, THE PURCHASER IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) AND, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS.  THE HOLDER OF THIS SECURITY AGREES THAT IT WILL COMPLY WITH THE FOREGOING RESTRICTIONS.  NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THE SECURITY.

THE HOLDER ACKNOWLEDGES THAT THE COMPANY RESERVES THE RIGHT PRIOR TO ANY SALE OR OTHER TRANSFER TO REQUIRE THE DELIVERY OF SUCH CERTIFICATIONS, LEGAL OPINIONS AND OTHER INFORMATION AS THE COMPANY MAY REASONABLY REQUIRE TO CONFIRM THAT THE PROPOSED SALE OR OTHER TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

IF A BENEFICIAL OWNER OF THIS SECURITY WHO IS REQUIRED TO BE A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT IS AT ANY TIME NOT SUCH A QUALIFIED PURCHASER, THE COMPANY MAY (A) REQUIRE SUCH BENEFICIAL OWNER TO SELL THIS SECURITY TO A PERSON WHO IS NOT A US PERSON OR A US RESIDENT OR WHO IS A US PERSON WHO IS ALSO A QUALIFIED PURCHASER AND WHO IS OTHERWISE QUALIFIED TO PURCHASE SUCH SECURITY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR (B) SELL THIS SECURITY ON BEHALF OF THE BENEFICIAL OWNER AT THE BEST PRICE REASONABLY OBTAINABLE TO A PERSON WHO IS NOT A US PERSON OR WHO IS A US PERSON OR A US RESIDENT WHO IS ALSO A QUALIFIED PURCHASER AND WHO IS OTHERWISE QUALIFIED TO PURCHASE SUCH SECURITY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT.

THE HOLDER OF THIS SECURITY IS DEEMED TO HAVE ACKNOWLEDGED THAT THIS LEGEND WILL NOT BE REMOVED FROM THIS SECURITY FOR AS LONG AS THE COMPANY RELIES ON SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT";

(g)     if in the future the investor decides to offer, sell, transfer, assign or otherwise dispose of the Shares, it will do so only in compliance with an exemption from the registration requirements of the U.S. Securities Act and under circumstances which will not require the Company to register under the U.S. Investment Company Act.  It acknowledges that any sale, transfer, assignment, pledge or other disposal made other than in compliance with such laws and the above stated restrictions will be subject to the compulsory transfer provisions as provided in the Articles;

(h)     if in the future it decides to offer, resell, pledge or otherwise transfer any of the Shares, such Shares may be offered, resold, pledged or otherwise transferred only (A) outside the United States to persons not known to be U.S. Persons in an offshore transaction in accordance with Rule 904 of Regulation S under the U.S. Securities Act, (B) in a transaction that does not require registration under the U.S. Securities Act or any applicable United States securities laws and regulations or require the Company to register under the U.S. Investment Company Act, subject to, if requested by the Company, delivery of an opinion of counsel of recognised standing in form and substance reasonably satisfactory to the Company, or (C) to the Company;

(i)     it is purchasing the Shares for its own account or for one or more investment accounts for which it is acting as a fiduciary or agent, in each case for investment only, and not with a view to or for sale or other transfer in connection with any distribution of the Shares in any manner that would violate the U.S. Securities Act, the U.S. Investment Company Act or any other applicable securities laws;

(j)     it acknowledges that the Company reserves the right to make inquiries of any holder of the Shares or interests therein at any time as to such person's status under the U.S. federal securities laws and to require any such person that has not satisfied the Company that holding by such person will not violate or require registration under the U.S. securities laws to transfer such Shares or interests in accordance with the Articles;

(k)     it acknowledges and understands that the Company is required to comply with FATCA and that the Company will follow FATCA's extensive reporting and withholding requirements.  The subscriber agrees to furnish any information and documents the Company may from time to time request, including but not limited to information required under FATCA;

(l)     it is entitled to acquire the Shares under the laws of all relevant jurisdictions which apply to it, it has fully observed all such laws and obtained all governmental and other consents which may be required thereunder and complied with all necessary formalities and it has paid all issue, transfer or other taxes due in connection with its acceptance in any jurisdiction of the Shares and that it has not taken any action, or omitted to take any action, which may result in the Company or its directors, officers, agents, employees and advisers being in breach of the laws of any jurisdiction in connection with the Placing or its acceptance of participation in the Placing;

(m)     it has received, carefully read and understands this Offering Memorandum, and has not, directly or indirectly, distributed, forwarded, transferred or otherwise transmitted this Offering Memorandum or any other presentation or offering materials concerning the Shares to within the United States or to any U.S. Persons, nor will it do any of the foregoing; and

(n)     if it is acquiring any Shares as a fiduciary or agent for one or more accounts, the investor has sole investment discretion with respect to each such account and full power and authority to make such foregoing representations, warranties, acknowledgements and agreements on behalf of each such account.

The Company and its directors, officers, agents, employees, advisers and others will rely upon the truth and accuracy of the foregoing representations, warranties, acknowledgments and agreements.

If any of the representations, warranties, acknowledgments or agreements made by the investor are no longer accurate or have not been complied with, the investor will immediately notify the Company.

APP_0162

# TAXATION

## GENERAL

The information below, which relates only to Guernsey and UK taxation, summarises the advice received by the Board and is applicable to the Company (except insofar as express reference is made to the treatment of other persons) to persons who are resident or ordinarily resident in Guernsey or the United Kingdom for taxation purposes and who hold Placing Shares as an investment. It is based on current Guernsey and UK tax law and published practice, respectively, which law or practice is, in principle, subject to any subsequent changes therein (potentially with retrospective effect). Certain Shareholders, such as dealers in securities, collective investment schemes, insurance companies and persons acquiring their Placing Shares in connection with their employment may be taxed differently and are not considered. The tax consequences for each Shareholder of investing in the Company may depend upon the Shareholder's own tax position and upon the relevant laws of any jurisdiction to which the Shareholder is subject.

**If you are in any doubt about your tax position, you should consult your professional adviser.**

## GUERNSEY

The Directors intend to conduct the Company's affairs such that, based on current law and practice of the relevant tax authorities, the Company will not become resident for tax purposes in any other territory other than Guernsey.

### The Company

The Company has been granted tax exempt status by the Director of Income Tax in Guernsey pursuant to the Income Tax (Exempt Bodies) (Guernsey) Ordinance, 1989. The Company will need to reapply for exempt status, an application that currently incurs a fee of £1,200 per annum. It is expected that the Company will continue to apply for exempt status annually.

Once exempt status has been granted, the Company is not considered resident in Guernsey for Guernsey income tax purposes and will be exempt from tax in Guernsey on both bank deposit interest and any income that does not have its source in Guernsey. It is not anticipated that any income other than bank deposit interest will arise in Guernsey and therefore the Company is not expected to incur any additional liability to Guernsey tax.

### Shareholders

Non-Guernsey resident Shareholders will not be subject to any income tax in Guernsey in respect of or in connection with the acquisition, holding or disposal of any shares owned by them. Such Shareholders will receive dividends without deduction of Guernsey income tax.

Any Shareholders who are resident in Guernsey will be subject to Guernsey income tax on any dividends paid to such persons but will not suffer any deduction of tax by the Company from any such dividends payable where the Company is granted tax exempt status. The Company is however required to provide the Director of Income Tax the names, addresses and gross amount of any income paid to Guernsey resident shareholders during the previous year when renewing the Company's exempt tax status each year.

At present Guernsey does not levy taxes upon capital gains, capital transfer, wealth, sales or turnover (unless the varying of investments and turning of such investments to account is a business or part of a business), nor are there any estate duties save for registration fees and an ad valorem duty for a Guernsey grant of representation where the deceased dies leaving assets in Guernsey which require presentation of such a grant. No stamp duty is chargeable in Guernsey on the issue, transfer, switching or redemption of Shares in the Company.

### FATCA

The US Hiring Incentives to Restore Employment Act resulted in the introduction of legislation in the US known as the Foreign Account Tax Compliance Act (**FATCA**) which has the effect that a 30 per cent withholding tax may be imposed on payments of US source income and certain payments of proceeds from the sale of property that could give rise to US source income unless there is compliance with requirements for the Company to report on an annual basis the identity of, and certain other information about, direct and indirect US investors in the Company to the relevant

APP_0163

Guernsey authority for onward transmission to the US Internal Revenue Service (**IRS**).  An investor that fails to provide the required information to the Company may be subject to the 30 per cent withholding tax with respect to its share of any such payments directly or indirectly attributable to US investments of the Company, and the Company might be required to terminate such investor's investment in the Company.

On 13 December 2013 an intergovernmental agreement was entered into between Guernsey and the US in respect of FATCA (the **IGA**), which agreement was enacted into Guernsey law as of 30 June 2014 by the Income Tax (Approved International Agreements) (Implementation) (United Kingdom and United States of America) Regulations, 2014. Guidance notes currently in draft form have been issued by the relevant Guernsey authority to provide practical assistance on the reporting obligations of affected businesses under the IGA.

Although the Company will attempt to satisfy any obligations imposed on it to avoid the imposition of such withholding tax, no assurance can be given that the Company will be able to satisfy these obligations.  If the Company becomes subject to a withholding tax as a result of FATCA, the return of all Shareholders may be materially affected.

**This summary of Guernsey taxation issues can only provide a general overview of this area and it is not a description of all the tax considerations that may be relevant to a decision to invest in the Company.  The summary of certain Guernsey tax issues is based on the laws and regulations in force as of the date of this document and may be subject to any changes in Guernsey law occurring after such date.  Legal advice should be taken with regard to individual circumstances.  Any person who is in any doubt as to his tax position or where he is resident, or otherwise subject to taxation, in a jurisdiction other than Guernsey, should consult his professional adviser.**

## UNITED KINGDOM

The following statements are intended as a general guide to certain UK tax considerations relating to an investment in Shares and do not purport to be a complete analysis of all potential UK tax consequences of holding Shares. They are based on current UK legislation and current published practice of HMRC, which may change, possibly with retroactive effect. Except insofar as express reference is made to the treatment of non-UK tax residents and non-UK domiciled individuals, they apply only to Shareholders who are resident and domiciled (in the case of individuals) or resident (in the case of companies) for tax purposes in (and only in) the UK, who hold their Shares as an investment (other than under an individual savings account) and who are the absolute beneficial owners of both the Shares and any dividends paid on them.  The statements are not addressed to Shareholders who hold Shares in connection with a trade, profession or vocation carried on in the UK through a branch or agency (or, in the case of a corporate Shareholder, in connection with a trade in the UK carried on through a permanent establishment or otherwise).  The tax position of certain categories of Shareholders who are subject to special rules (such as persons acquiring their Shares in connection with employment, dealers in securities, insurance companies and collective investment schemes) is not considered.

### *Taxation of the Company*

As the Company is an alternative investment fund for the purpose of the Alternative Investment Fund Managers Regulations 2013, it should not be considered to be UK resident for UK tax purposes. Accordingly, and provided that the Company does not carry on a trade in the UK through a permanent establishment situated therein for UK corporation tax purposes or through a branch or agency situated in the UK which would bring it within the charge to income tax, the Company will not be subject to UK corporation tax or income tax on income and capital gains arising to it save as noted below in relation to possible withholding tax on certain UK source income. The Directors intend that the affairs of the Company are conducted so that no such permanent establishment, branch or agency will arise insofar as this is within their control, but it cannot be guaranteed that the conditions necessary to prevent any such permanent establishment, branch or agency coming into being will at all times be satisfied.

Interest and other income received by the Company which has a UK source may be subject to withholding taxes in the UK.

### Disposals of Shares

Each class of Shares will constitute a relevant interest in an "offshore fund" for the purposes of UK taxation. Under the UK's offshore fund legislation, any gain arising on the sale, redemption or other disposal of shares in an offshore

APP_0164

fund (which may include an in specie redemption by the Company) held by persons who are resident in the UK for tax purposes will be taxed at the time of such sale, disposal or redemption as income and not as a capital gain. This does not apply, however, where the relevant offshore fund is accepted by HMRC as a "reporting fund" throughout the period during which the relevant interests were held.

It is not currently intended that the Company will apply for reporting fund status under the offshore funds regime in respect of any Shares. Accordingly, Shareholders who are resident in the UK for taxation purposes may be liable to UK income taxation in respect of gains arising from the sale, redemption or other disposal of their Shares. Such gains may remain taxable notwithstanding any general or specific UK capital gains tax exemption or allowance available to a Shareholder and may result in certain Shareholders incurring a proportionately greater UK taxation charge. Any losses arising on the disposal of Shares by Shareholders who are resident in the UK will be eligible for capital gains loss relief. The Directors may launch one or more classes of Shares in future certified by HMRC as reporting funds for the purposes of UK taxation.

*Dividends*

Any dividends received by UK resident individual Shareholders (or deemed to be received in the case of any future class of Shares with reporting fund status) will generally be subject to UK income tax whether or not such distributions are reinvested.

Dividends received by a UK resident Shareholder (or deemed to be received in the case of any future class of Shares with reporting fund status) within the charge to corporation tax should be exempt from tax in respect of dividends paid by the Company, although it should be noted that this exemption is subject to certain exclusions and specific anti-avoidance rules (particularly in the case of "small companies", as defined in section 931S of the Corporation Tax Act 2009 ("CTA 2009")).

*Other UK taxation considerations*

The attention of non-corporate Shareholders who are resident in the UK is drawn to the provisions of Chapter 2 of Part 13 of the UK Income Tax Act 2007. These provisions are aimed at preventing the avoidance of income tax by individuals through transactions resulting in the transfer of assets or income to persons (including companies) resident or domiciled abroad and may render them liable for income tax in respect of undistributed income and profits of the Company. This legislation will, however, not apply if such a Shareholder can satisfy HMRC that either:

(i)     it would not be reasonable to draw the conclusion from all the circumstances of the case, that the purpose of avoiding liability to taxation was the purpose, or one of the purposes, for which the relevant transactions or any of them were effected;

(ii)    all the relevant transactions are genuine commercial transactions and it would not be reasonable to draw the conclusion, from all the circumstances of the case, that any one or more of the transactions was more than incidentally designed for the purpose of avoiding liability to taxation; or

(iii)   all the relevant transactions were genuine, arm's length transactions and if the Shareholder were liable to tax under Chapter 2 of Part 13 in respect of such transactions such liability would constitute an unjustified and disproportionate restriction on a freedom protected by Title II or IV of Part Three of the Treaty on the Functioning of the European Union or Part II or III of the EEA Agreement.

Chapter 3 of Part 6 of the CTA 2009 provides that, if at any time in an accounting period a corporate Shareholder within the charge to UK corporation tax holds an interest in an offshore fund and there is a time in that period when that fund fails to satisfy the "non-qualifying investments test", the interest held by such a corporate Shareholder will be treated for the accounting period as if it were rights under a creditor relationship for the purposes of the rules relating to the taxation of most corporate debt contained in the CTA 2009 (the "Corporate Debt Regime"). Shares will (as explained above) constitute interests in an offshore fund and, on the basis of the current investment policies of the Company, it is likely that the "non-qualifying investments test" will not be met. In circumstances where the test is not so satisfied (for example where the Company invests in cash, securities or debt instruments or open-ended companies that themselves do not satisfy the "non-qualifying investments test" and the market value of such investments exceeds

60 per cent. of the market value of all its investments at any time), the Shares in the relevant class will be treated for corporation tax purposes as within the Corporate Debt Regime. As a consequence, all returns on the Shares in respect of each corporate Shareholder's accounting period during which the test is not met (including gains, profits and deficits and exchange gains and losses) will be taxed or relieved as an income receipt or expense on a fair value accounting basis. Accordingly, a corporate Shareholder in the Company may, depending on its own circumstances, incur a charge to corporation tax on an unrealised increase in the value of its holding of Shares (and, likewise, obtain relief against corporation tax for an unrealised reduction in the value of its holding of Shares). The provisions relating to non-reporting funds (outlined above) would not then apply to such corporate shareholders and the effect of the provisions relating to holdings in controlled foreign companies (outlined below) would then be substantially mitigated.

Part 9A of TIOPA 2010 subjects UK resident companies to tax on the profits of companies not so resident (such as the Company) in which they have an interest. The provisions, broadly, affect UK resident companies which hold, alone or together with certain other associated persons, shares which confer a right to at least 25 per cent. of the profits of a non-resident company (a "25% Interest") where that non-resident company is controlled by persons who are resident in the UK and is subject to a lower level of taxation in its territory of residence.  The legislation is not directed towards the taxation of capital gains.  In addition, these provisions will not apply if the shareholder reasonably believes that it does not hold a 25% Interest in the Company throughout the relevant accounting period.

The attention of persons resident in the UK for taxation purposes is drawn to the provisions of section 13 of the Taxation of Chargeable Gains Act 1992 ("section 13"). Section 13 applies to a "participator" for UK taxation purposes (which term includes a shareholder) if at any time when any gain accrues to the Company which constitutes a chargeable gain for those purposes, at the same time, the Company is itself controlled by a sufficiently small number of persons so as to render the Company a body corporate that would, were it to have been resident in the UK for taxation purposes, be a "close" company for those purposes. The provisions of section 13 could, if applied, result in any such person who is a "participator" in the Company being treated for the purposes of UK taxation of chargeable gains as if a part of any chargeable gain accruing to the Company had accrued to that person directly, that part being equal to the proportion of the gain that corresponds on a just and reasonable basis to that person's proportionate interest in the Company as a "participator". No liability under section 13 could be incurred by such a person however, where such proportion does not exceed one quarter of the gain.  In addition, exemptions may also apply where none of the acquisition, holding or disposal of the assets had a tax avoidance main purpose or where the relevant gains arise on the disposal of assets used only for the purposes of genuine, economically significant business activities carried on outside the UK.

In the case of UK resident individuals domiciled outside the UK, section 13 applies only to gains relating to UK situate assets of the Company and gains relating to non-UK situate assets if such gains are remitted to the UK.

***Stamp duty and stamp duty reserve tax***

No UK stamp duty or stamp duty reserve tax will be payable on an issue of Shares.  UK stamp duty at the rate of 0.5% of the value of the consideration for the transfer of any Shares (rounded up where necessary to the nearest £5) may become payable on any instrument of transfer of the Shares which is executed within the UK, or which relates to any property situated, or to any matter or thing done or to be done, in the UK. Provided, as is the intention, that the Shares are not registered in any register kept in the UK by or on behalf of the Company and are not paired with shares issued by a body corporate incorporated in the UK, any agreement to transfer the Shares will not be subject to stamp duty reserve tax.

***Inheritance tax***

A liability to UK inheritance tax on Shares may arise in the event of the death of or on the making of certain categories of lifetime transfers by an individual Shareholder domiciled or deemed to be domiciled in the UK for inheritance tax purposes.

***The Common Reporting Standard***

Drawing extensively on the intergovernmental approach to implementing US FATCA, the OECD developed the Common Reporting Standard ("CRS") to address the issue of offshore tax evasion on a global basis. Aimed at maximizing efficiency and reducing cost for financial institutions, the CRS provides a common standard for due

APP_0166

diligence, reporting and exchange of financial account information. Pursuant to the CRS, tax authorities in participating CRS jurisdictions will obtain from reporting financial institutions, and automatically exchange with other participating tax authorities in which the Shareholders of the reporting financial institution are resident on an annual basis, financial account and personal information with respect to all reportable accounts identified by financial institutions on the basis of common due diligence and reporting procedures. The first information exchanges are expected to begin in September 2017. Guernsey has legislated to implement the CRS. As a result, the Company will be required to comply with the CRS due diligence and reporting requirements, as adopted by Guernsey. Shareholders may be required to provide additional information to the Company to enable the Company to satisfy its obligations under the CRS. Failure to provide requested information may subject a Shareholder to liability for any resulting penalties or other charges and/or mandatory termination of its interest in the Company.

If you are in any doubt as to your tax position, you should consult your professional adviser.

APP_0167

## SHAREHOLDERS OF THE COMPANY

So far as the Company is aware, as at November 15 2017 (being the latest practicable date prior to publication of this document) CLO Holdco, Ltd. is the sole Shareholder and holds directly or indirectly 5% or more of the Company's voting rights.

Immediately following the Placing the following persons will hold directly or indirectly the following percentages of the Company's voting rights:

| Name | Immediately prior to the Placing | | Immediately following the Placing | |
|---|---|---|---|---|
| | Number of Shares | % of voting rights in respect of the issued share capital | Number of Shares | % of voting rights in respect of the issued share capital |
| CLO Holdco, Ltd. | 143,454,001.00 | 100.00% | 70,314,387.44 | 49.02% |
| HarbourVest Dover Street IX Investment L.P. | 0.00 | 0.00% | 50,917,791.20 | 35.49% |
| HarbourVest 2017 Global Fund L.P. | 0.00 | 0.00% | 3,478,649.09 | 2.42% |
| HarbourVest 2017 Global AIF L.P. | 0.00 | 0.00% | 6,957,226.48 | 4.85% |
| HV International VIII Secondary L.P. | 0.00 | 0.00% | 9,317,699.94 | 6.50% |
| HarbourVest Skew Base AIF L.P. | 0.00 | 0.00% | 1,034,136.77 | 0.72% |
| Highland Capital Management, L.P. | 0.00 | 0.00% | 898,708.98 | 0.63% |
| Lee Blackwell Parker, III | 0.00 | 0.00% | 94,173.23 | 0.07% |
| Quest IRA, Inc., fbo Lee B. Parker III, Acct. # 3058311 | 0.00 | 0.00% | 58,798.51 | 0.04% |
| Quest IRA, Inc., fbo Hunter Covitz, Acct. # 1469811 | 0.00 | 0.00% | 239,018.34 | 0.17% |
| Quest IRA, Inc., fbo Jon Poglitsch, Acct. # 1470612 | 0.00 | 0.00% | 95,607.34 | 0.07% |
| Quest IRA, Inc., fbo Neil Desai, Acct. # 3059211 | 0.00 | 0.00% | 47,803.67 | 0.03% |

Save as set out above in this section of this Offering Memorandum, the Company is not aware of any person who holds, or who will immediately following the Placing hold, as shareholder directly or indirectly, 5% or more of the voting rights of the Company.

None of the Shareholders referred to in the table set forth in above has voting rights which differ from those of any other Shareholder in respect of any Shares held by them.

Save as set out in this above in this section of this Offering Memorandum, the Company is not aware of any person who immediately following the Placing directly or indirectly, jointly or severally, will own sufficient shares to exercise control over the Company.

APP_0168

## ADDITIONAL INFORMATION ON THE COMPANY

### INCORPORATION AND ADMINISTRATION

The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015 under the provisions of the Companies Law, with registered number 60120.  The Company continues to be registered and domiciled in Guernsey.  The registered office and principal place of business of the Company is First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (telephone number 01481 715601).  The statutory records of the Company are kept at this address.  The Company operates and issues shares in accordance with the Companies Law and ordinances and regulations made thereunder and has no employees.  The Company shall have an unlimited life.

The Company is regulated by the GFSC and is not regulated by any regulator other than the GFSC.

The Company's accounting period will end on 31 December, of each year, with the first year end on 31 December 2015.

PricewaterhouseCoopers CI LLP of Royal Bank Place, 1 Glategny Esplanade, St Peter Port, Guernsey GY1 4ND has been the only Auditors of the Company since incorporation. PricewaterhouseCoopers CI LLP is a member of the Institute of Chartered Accountants of England & Wales.  The Shareholders have the power, under the Companies Law, to appoint the auditor at each AGM or remove the auditor by ordinary resolution.

The annual report and accounts will be prepared according to GAAP.

Save for its entry into the material contracts summarised in "—*Material Contracts*" of this section of this Offering Memorandum and certain non-material contracts, since its incorporation the Company has not incurred borrowings, issued any debt securities, incurred any contingent liabilities or made any guarantees, nor granted any charges or mortgages.

Save as set out in "*Share Capital*" below, there have been no changes to the issued share capital of the Company since incorporation.

### SHARE CAPITAL

On incorporation, the share capital of the Company consisted of one ordinary share of no par value.  The Placing Shares will be issued in the form of participating ordinary shares having the rights set out in the Articles.  Shareholders have no right to have their Shares redeemed.

As at the date of this Offering Memorandum, the Company's issued and fully paid up share capital is 143,454,001 shares of no par value.

None of the Shareholders has voting rights attaching to Shares that they hold which are different to the voting rights attached to any other Shares of the same class in the Company.

As at the date of this Offering Memorandum, the memorandum of incorporation provides that there is no limit on the number of shares of any class which the Company is authorised to issue.

The Directors have absolute authority under the Articles to allot the Shares to be issued pursuant to the Placing and are expected to do so shortly prior to the Placing.

No share or loan capital of the Company is under option or has been agreed, conditionally or unconditionally, to be put under option.

### DIRECTORS' AND OTHER INTERESTS

As at the date of this Offering Memorandum, none of the Directors or any person connected with any of the Directors has a Shareholding or any other interest in the share capital of the Company.  The Directors and their connected persons may, however, subscribe for Shares pursuant to the Placing.

APP_0169

The Directors are not aware of any person or persons who, following the Placing, will or could, directly or indirectly, jointly or severally, exercise control over the Company and there are no arrangements known to the Directors the operation of which may subsequently result in change of control of the Company, other than as disclosed above in "Shareholders of the Company" on page 75 of this Offering Memorandum.

There are no outstanding loans from the Company to any of the Directors or any outstanding guarantees provided by the Company in respect of any obligation of any of the Directors.

The aggregate remuneration and benefits in kind of the Directors in respect of the Company's accounting period ending on 31 December 2017, which will be payable out of the assets of the Company, is not expected to exceed £150,000. No amount has been set aside or accrued by the Company to provide pension, retirement or other similar benefits.

No Director has a service contract with the Company, nor are any such contracts proposed. The Directors have been appointed through letters of appointment which can be terminated in accordance with the Articles and without compensation. The notice period specified in the Articles for the removal of Directors is one month. The Articles provide that the office of Director shall be terminated by, among other things: (i) written resignation; (ii) unauthorised absences from board meetings for 12 months or more; (iii) written request of the other Directors; and (iv) an ordinary resolution.

None of the Directors has, or has had, an interest in any transaction which is or was unusual in its nature or conditions or significant to the business of the Company and which has been effected by the Company since its incorporation.

In addition to their directorships of the Company, the Directors hold or have held the directorships and are or were members of the partnerships, as listed in the table below, over or within the past five years.

| Name | Current directorships/partnerships | Past directorships/partnerships |
|---|---|---|
| **William Scott** | Aberdeen Global Infrastructure GP Limited (name changed from Lloyds Bank Global Infrastructure GP Limited 15 May 2014) | BMS Specialist Debt Fund Limited (applied for voluntary strike-off 29 September 2014) |
| | Aberdeen Global Infrastructure GP II Limited | Cinven Capital Management (G3) Limited |
| | Aberdeen Infrastructure Finance GP Limited (name changed from Uberior Infrastructure Finance GP Limited 7 August 2014) | FCA Catalyst Fund SPC (formerly FCM Catalyst Fund SPC) |
| | Aberdeen Infrastructure Spain Co-Invest II GP Limited | FCA Catalyst Master Fund SPC (formerly FCM Catalyst Master Fund SPC) |
| | Absolute Alpha Fund PCC Limited | FCA Trading SPC (formerly FCM Trading SPC) |
| | AcenciA Debt Strategies Limited | Financial Risk Management Diversified Fund Limited |
| | AHL Strategies PCC Limited | Financial Risk Management Matrio Fund Limited |
| | Axiom European Financial Debt Fund Limited | Financial Ventures Limited |
| | Cinven Capital Management (V) General Partner Limited | FRM Access II Fund SPC |
| | Cinven Capital Management (VI) General Partner Limited | FRM Customised Diversified Fund Limited |
| | Cinven Capital Management (G4) Limited | FRM Diversified II Fund SPC |
| | Cinven Limited | FRM Diversified II Master Fund Limited |
| | Class N AHL 2.5XL Trading Limited | FRM Diversified III Fund PCC Limited |
| | Class P Global Futures EUR Trading Limited | FRM Diversified III Master Fund Limited |
| | Hanseatic Asset Management LBG | FRM Equity Alpha Limited |

APP_0170

| | |
|---|---|
| Highland CLO Funding, Ltd. | FRM Credit Strategies Fund PCC Limited |
| KCSB Properties Limited | FRM Credit Strategies Master Fund PCC Limited |
| MAN AHL Diversified PCC Limited | FRM Global Diversified Fund |
| Pershing Square Holdings Limited | FRM Phoenix Fund Limited (name changed from FRM Financials Limited 10 June 2008) |
| Sandbourne Asset Management  Limited (name changed from Sandbourne Asset Management  Guernsey Limited 26 June 2015) | FRM Sigma Fund Limited |
| Sandbourne PCC Limited | FRM Strategic Fund PCC Limited |
| Savile AD4 Limited | FRM Strategic Master Fund Limited |
| Savile AD7 Limited | FRM Tail Hedge Limited |
| Savile AD8 Limited | FRM Thames Fund General Partner 1 Limited |
| Savile AD9 Limited | Invista European Real Estate Trust SICAF |
| SPL Guernsey ICC Limited (formerly Arch Guernsey ICC Limited) | Land Race Limited |
| The Flight and Partners Recovery Fund Limited | OldCo Limited ( name changed from Axiom European Financial Debt Limited 25 September 2015) |
| 30 St. Mary Axe Management Limited Partnership Incorporated | Principia TR-S 40 Ltd |
| | Property Income & Growth Fund Limited |
| | PSource Structured Debt Fund Limited |
| | PSource Structured Debt SPV II Inc |
| | Sandbourne Fund |
| | Savile AD2 Limited |
| | Savile ANG1 Limited |
| | Savile APG1 Limited |
| | Savile APG3 Limited |
| | Savile Durham 1 Limited |
| | Savile Exeter 1 Limited |
| | Savile ML1 Limited |
| | Secured Real Estate Finance Limited (dormant after unsatisfactory fundraising) |
| | TBH Guernsey Limited |
| | Threadneedle Asset Backed Income Limited (dormant after unsatisfactory fundraising) |
| | UCAP Investment Management Fund PCC Limited (name changed from Uttrup Investment Management Fund PCC Limited 7 February 14) |
| | UCAP Investment Management Limited (name changed from Uttrup Investment Management Limited 7 February 14) |
| | WyeTree RMBS Opportunities Fund Limited (name changed from WyeTree Opportunities |

APP_0171

Fund Limited 29 May 2014)

| Name | Current directorships/partnerships | Past directorships/partnerships |
|---|---|---|
| **Heather Bestwick** | Andium Homes Limited | Jersey Finance Limited |
| | Deutsche International Corporate Services Limited | Walkers Limited |
| | Equiom (Jersey) Limited | Walkers Capital Markets Limited |
| | Highland CLO Funding, Ltd. | Walkers Pension Services (Jersey) Limited |
| | Equiom (Guernsey) Limited | Walkers Property Services (Jersey) Limited |
| | Sole Shipping SO II GP Limited | Homelink (Jersey) Limited |
| | Sole Shipping SO Adviser Limited | Altamas Resources Limited |
| | EPE Special Opportunities plc | BSREP Marina Village (Jersey) Limited |
| | | Altair Partners Limited |
| | | Cyan Blue Topco Limited |
| | | Century Limited |
| | | Fundamental Global  Corporate Secured Loan Fund Limited |
| | | AEP 2003 Limited |
| | | AEP 2008 Limited |
| | | AEP 2012 Limited |
| | | Invision Capital Partners IV Limited |
| | | Invision IV Co-invest General Partner Limited |
| | | Invision Capital Partners V Limited |
| | | Triton Advisers Limited |
| | | GCP Infrastructure OEIC Limited |
| | | Equiom Trust Company (CI) Limited |
| | | Rokos Capital Management (GP) Limited |
| | | Rokos Intermediate (Jersey) Limited |

As at the date of this Offering Memorandum, there are no potential conflicts of interest between any duties to the Company of any of the Directors and their private interests and/or other duties.  There are no lock up provisions regarding the disposal by any of the Directors of any Shares.

Save as set out in immediately following paragraph below, as at the date of this Offering Memorandum:

(a)     none of the Directors has had any convictions in relation to fraudulent offences for at least the previous five years;

(b)     save as detailed above, none of the Directors was a director of a company, a member of an administrative, management or supervisory body or a senior manager of a company within the previous five years which has entered into any bankruptcy, receivership or liquidation proceedings;

(c)     none of the Directors has been subject to any official public incrimination and/or sanctions by statutory or regulatory authorities (including designated professional bodies) or has been

APP_0172

disqualified by a court from acting as a member of the administrative, management or supervisory bodies of an issuer or from acting in the management or conduct of the affairs of any issuer for at least the previous five years; and

(d)     none of the Directors are aware of any contract or arrangement subsisting in which they are materially interested and which is significant to the business of the Company which is not otherwise disclosed in this Offering Memorandum.

In respect of the declaration in the immediately preceding paragraph above, certain of the Directors have been directors of entities which have been dissolved.  To the best of each Director's knowledge, no such entity, upon its dissolution, was insolvent or owed any amounts to creditors.

The Company maintains directors' and officers' liability insurance on behalf of the Directors at the expense of the Company.

No employees of the Administrator have any service contracts with the Company.

## MATERIAL CONTRACTS

The following are all of the contracts, not being contracts entered into in the ordinary course of business, that have been entered into by the Company since its incorporation and are, or may be, material or that contain any provision under which the Company has any obligation or entitlement which is or may be material to it as at the date of this Offering Memorandum.

### *Administration Agreement*

An administration agreement dated 10 August 2015 between (i) the Company and (ii) the Administrator, whereby the Administrator was appointed to act as administrator of the Company and provide related administrative, compliance and treasury services (the "**Administration Agreement**").

Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps per annum of the Net Asset Value of the Company per annum, payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the Administration Agreement.

The Administration Agreement may be terminated by either party on not less than three months written notice (or such shorter notice as the parties may agree).  The Administration Agreement may be terminated immediately by either party:  (i) in the event that either party shall go into liquidation or receivership or an examiner shall be appointed to the Company (except for a voluntary liquidation for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the notifying party, such approval not to be unreasonably withheld or delayed) or be unable to pay its debts as they fall due or commits any act of bankruptcy under the laws of an applicable jurisdiction; or (ii) if the other party commits any material breach of the provisions of the Administration Agreement and, if such breach is capable of remedy shall not have remedied that within 30 days after the service of written notice requiring it to be remedied; (iii) if it shall become illegal or impossible without breach of any applicable laws and for reasons reasonably outside the control of the relevant party for any party to fulfil its obligations hereunder; or (iv) if any changes to the Administration Agreement are required as a consequence of any financial services regulation which may in the future bind any of the parties thereto and which cannot be agreed between the parties.  The appointment of the Administrator shall also automatically terminate forthwith if the Administrator shall become or be deemed to become resident for tax purposes in the United Kingdom or in any other place or places outside Guernsey in circumstances which cause the Company to become liable to pay any taxes which it would not otherwise be liable to pay.

The Company has given certain market standard indemnities in favour of the Administrator in respect of the Administrator's potential losses in carrying out its responsibilities under the Administration Agreement.

The Administration Agreement is governed by the laws of Guernsey.

*Portfolio Management Agreement*

A Portfolio Management Agreement dated November 15, 2017 between (i) the Company and (ii) the Portfolio Manager (the "**Portfolio Management Agreement**"), pursuant to which the Company appointed the Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.

The Portfolio Management Agreement may be terminated in the event of (A) the Company determining in good faith that the Company or the portfolio has become required to register as an investment company under the provisions of the Investment Company Act (where there is no available exemption), and the Company has given prior notice to the Portfolio Manager of such requirement, (B) the date on which the portfolio has been liquidated in full and the Company's financing arrangements have been terminated or redeemed in full and (C) such other date as agreed between the Company and the Portfolio Manager.

In addition, the Portfolio Management Agreement may be terminated, and the Portfolio Manager removed for "Cause" by the Advisory Board or by the Board of Directors upon 30 business days' prior written notice to the Portfolio Manager.

As defined in the Portfolio Management Agreement, "Cause" means any one of the following events: (a) the Portfolio Manager wilfully violates, or takes any action that it knows breaches any material provision of the Portfolio Management Agreement or the Offering Memorandum applicable to it in bad faith (not including a wilful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions); (b) the Portfolio Manager breaches in any respect any provision of the Portfolio Management Agreement or any terms of the Offering Memorandum applicable to it (other than as covered by clause (a) and except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Company) and fails to cure such breach within 30 days of the Portfolio Manager receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within sixty (60) days after the Portfolio Manager receives notice thereof; (c) the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for sixty (60) days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for sixty (60) days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestrated or attached by court order and the order remains undismissed for sixty (60) days; (d) the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under the Portfolio Management Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services; or (e) any Key Person of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of ten (10) days after such conviction.

The Portfolio Management Agreement provides that if any of the events specified in the definition of "Cause" occurs, the Portfolio Manager will give prompt written notice thereof to the Company upon the Portfolio Manager's becoming aware of the occurrence of such event. The Advisory Board and/or the Board of Directors may waive any event

described in (a), (b), (d), or (e) above as a basis for termination of the Portfolio Management Agreement and removal of the Portfolio Manager under the terms of the Portfolio Management Agreement.

Any resignation or removal of the Portfolio Manager will only be effective on the satisfaction of certain conditions set out in the Portfolio Management Agreement.

Under the Portfolio Management Agreement, the Portfolio Manager agrees to perform its obligations thereunder, with reasonable care (a) using a degree of skill and attention no less than that which the Portfolio Manager exercises with respect to comparable assets that it manages for itself and others having similar investment objectives and restrictions, and (b) to the extent not inconsistent with the foregoing, in a manner consistent with the Portfolio Manager's customary standards, policies and procedures in performing its duties under the Portfolio Management Agreement (the "**Standard of Care**"); provided that the Portfolio Manager will not be liable for any loss or damages resulting from any failure to satisfy the Standard of Care except to the extent any act or omission of the Portfolio Manager constitutes a Portfolio Manager Breach (as defined below). The Standard of Care may change from time to time to reflect changes by the Portfolio Manager to its customary standards, policies and procedures provided that such customary standards, policies and procedures are at least as rigorous as the foregoing.

The Portfolio Manager will not be liable (whether directly or indirectly, in contract or in tort or otherwise) to the Company under the Portfolio Management Agreement for liabilities incurred by the Company as a result of or arising out of or in connection with the performance by the Portfolio Manager under the Portfolio Management Agreement, or for any losses or damages resulting from any failure to satisfy the Standard of Care except to the extent such liabilities were incurred by reason of acts or omissions constituting bad faith, fraud, wilful misconduct or due to the gross negligence (with such term given its meaning under New York law) or reckless disregard of the duties and obligations of the Portfolio Manager (a "**Portfolio Manager Breach**").

Under the Portfolio Management Agreement, the Company will be required to indemnify the Portfolio Manager and its affiliates, managers, directors, officers, secretaries, partners, agents and employees, from and against all liabilities incurred in connection with the Portfolio Management Agreement (except to the extent such liabilities are incurred as a result of any acts or omissions of the Portfolio Manager which constitute a Portfolio Manager Breach).

The Portfolio Manager is able to resign its role under the Portfolio Management Agreement upon 90 days' written notice to the Company. Whilst the resignation will not be effective until the date as of which a successor adviser has been appointed, it may be difficult to locate an alternative adviser as a successor. In addition, the Portfolio Manager may immediately resign by providing written notice to the Company upon the occurrence of certain events relating to the Company such as, amongst others, the failure of the Company to comply in any material respect with any investment policy or investment objective to which it is bound to comply, a wilful breach or knowing violation by the Company of a material provision of the Portfolio Management Agreement or the occurrence of insolvency proceedings in respect of the Company.

Under the Portfolio Management Agreement, the Portfolio Manager agrees to the provision of certain human resources as may be necessary to enable the Company to conduct any matters related to its portfolio of assets.

Under the Portfolio Management Agreement, the Company shall pay to the Portfolio Manager an amount equivalent to all reasonable third party costs and expenses incurred by the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable VAT arising on such costs and expenses.

The Portfolio Management Agreement is governed by the laws of the State of Texas.

### *Predecessor and Interim Portfolio Management Agreements and Terminations*

Prior to the current Portfolio Management Agreement, the Company held a Portfolio Management Agreement dated 22 December 2016 (the "**Predecessor Portfolio Management Agreement**") between (i) the Company and (ii) Acis as the predecessor portfolio manager (the "**Predecessor Portfolio Manager**"), pursuant to which the Company appointed Acis as the Predecessor Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.

The terms of the Predecessor Portfolio Management Agreement were substantially similar to the terms of the Portfolio Management Agreement.

The Predecessor Portfolio Management Agreement was governed by the laws of the State of Texas.

The Predecessor Portfolio Management Agreement was terminated pursuant to a Portfolio Management Agreement dated October 27, 2017 (the "**Interim Portfolio Management Agreement**") between (i) the Company and (ii) the Portfolio Manager and agreed and acknowledged by the Predecessor Portfolio Manager, pursuant to which the Company appointed Highland HCF as the Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio. Pursuant to the Interim Portfolio Management Agreement, (x) the Predecessor Portfolio Management Agreement was cancelled and terminated in its entirety, (y) each party thereto released the other party from all claims, suits or causes of action arising out of or relating to the Predecessor Portfolio Management Agreement and (z) each party ratified prior transactions effected in accordance with the Predecessor Portfolio Management Agreement.

The terms of the Interim Portfolio Management Agreement were substantially similar to the terms of the Portfolio Management Agreement.

The Interim Portfolio Management Agreement was terminated pursuant to the Portfolio Management Agreement. Pursuant to the Interim Portfolio Management Agreement, (x) the Predecessor Portfolio Management Agreement was cancelled and terminated in its entirety and (y) each party ratified prior transactions effected in accordance with the Interim Portfolio Management Agreement.

The Interim Portfolio Management Agreement was governed by the laws of the State of Texas.

### *Subscription and Transfer Agreement*

A Subscription and Transfer Agreement dated November 15, 2017 (the "**Subscription and Transfer Agreement**") entered into by and among the Company, the Portfolio Manager, CLO Holdco, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct. and Quest IRA, Inc., fbo Neil Desai, Acct., pursuant to which CLO Holdco, Ltd., as the existing Shareholder, agrees to transfer a portion of its shares to the new Shareholders listed above.

Under the Subscription and Transfer Agreement, CLO Holdco, Ltd. agreed to provide an indemnity to the new Shareholders relating to certain liabilities arising prior to the date of the transfer of Shares.

Further, each of the Shareholders subscribed to purchase Shares on a pro rata basis pursuant to commitments under the Subscription and Transfer Agreement, to be called for settlement by the Portfolio Manager from time to time during the Investment Period and at such time issued (including in the form of fractional shares).

The Subscription and Transfer Agreement may be terminated by mutual agreement of the parties.

The Subscription and Transfer Agreement is governed by the laws of Guernsey.

### **Members'** *Agreement*

A Shareholders' Agreement relating to the Company dated November 15, 2017 (the "**Shareholder's Agreement**"), among CLO HoldCo, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct., Quest IRA, Inc., fbo Neil Desai, Acct., the Company and the Portfolio Manager, which contemplates certain agreements of commercial terms among the Shareholders with respect to the formation of an Advisory Board, voting matters and the Shareholders' commitments to settle subscriptions for the Placing Shares.

APP_0176

Pursuant to the Shareholders' Agreement, the Shareholders set forth their rights in respect of the Company with respect to their voting rights, the composition and function of the Advisory Board, provisions with respect to Shareholders defaulting on commitments to settle Shares, indemnification and restrictions on the transfers or disposals of Shares.

The Shareholders' Agreement will be terminated when one party holds all the Shares, when a resolution is passed by the Shareholders or creditors of the Company or with the written consent of the parties.

The Shareholders' Agreement is governed by the laws of Guernsey.

### NexBank Credit Facility

The Company currently has the NexBank Credit Facility with a principal amount of $22,158,337, as of September 30, 2017.  The NexBank Credit Facility is governed by an Amended and Restated Loan Agreement dated as of 17 January 2017 that provides for quarterly payments of principal and interest at 5.00% *per annum* and a maturity on November 23, 2021.

### Warehouse Loan Facilities

One or more multi-currency Warehouse Loan Facilities may be entered into from time to time between (i) the Company and (ii) a warehouse provider as described in "*Summary-Borrowing-Warehouse Loan Facilities*".

### Forward Purchase Agreements

Forward Purchase Agreements may be entered into from time to time, between (i) the Company and (ii) a CLO (each, a "**Forward Purchase Agreement**"), pursuant to which the Company may from time to time enter into sale and purchase contracts with a CLO with respect to the assets of the Company ("**Forward Sales**").  Such Forward Sales are with a view to effectively managing its access to wholesale funding and exposure to undesireable market price volatilities of its portfolio.  Such Forward Purchase Agreements may be entered into at the same time or shortly after the origination or acquisition of the relevant asset by the Company, at a later date, or not at all.  Where a loan becomes subject to a Forward Purchase Agreement, the Company will (subject to the conditions set out below) neither receive the gain nor bear the loss that occurs between the date when the loan is added to the Forward Purchase Agreement and the date when the transfer occurs.

Each Forward Sale will be conditional upon:

- the occurrence of the closing date of the relevant CLO; and

- the assets that are the subject of such Forward Sale satisfying a set of eligibility criteria on the closing date of the relevant CLO as agreed between the Company and the relevant CLO.

The Forward Purchase Agreements will contain standard limited recourse and non-petition provisions with respect to the Company and with respect to the relevant CLO.

The governing law of the Forward Purchase Agreements will be English or New York law.

### Custody Agreement

A custody agreement dated 10 August 2015 between (i) the Company and (ii) the Custodian (the "**Custody Agreement**"), whereby the Custodian was appointed to act as custodian of the Company's investments, cash and other assets.

The Custodian provides custody services in respect of such of the property of the Company which is delivered to and accepted by the Custodian as and when such custody services may be required.  Securities are held by the Custodian in one or more accounts registered in the name of the Company or of the Custodian, its delegate or a nominee. The securities are separately designated in the books of the Custodian as belonging to the Company.

APP_0177

Under the terms of the Custody Agreement, the Custodian is entitled to receive transaction charges and sub-custodian charges will be recovered by the Custodian from the Company as they are incurred by the relevant sub-custodian. All such charges shall be charged at normal commercial rates.

The Custody Agreement shall continue for an initial period of six months and thereafter may be terminated by either of the parties hereto on giving ninety (90) days' prior written notice to the other party hereto, provided that the appointment of the Custodian shall not terminate before the appointment of a replacement Custodian provided always if a replacement custodian is not appointed within six months from the date of the relevant termination notice, the Custody Agreement shall terminate in any event. It may be terminated without notice in certain specified circumstances including the insolvency of either party.

The Custodian has a market standard indemnity from the Company in relation to liabilities incurred other than as a result of its negligence, fraud, bad faith, wilful default or recklessness in carrying out its responsibilities under the Custody Agreement.

The Custody Agreement is governed by the laws of Ireland.

## MEMORANDUM AND ARTICLES

### Memorandum of Incorporation

The Memorandum of Incorporation provides that the Company's objects are unrestricted and it shall therefore have the full power and authority to carry out any object not prohibited by the Companies Law, or any other law of Guernsey.

### Articles of Incorporation

The Articles of Incorporation of the Company contain provisions, *inter alia*, to the following effect.

### *Share Capital*

The Company may issue an unlimited number of Shares of no par value each, including Unclassified Shares which may be designated and issued as Ordinary Shares or otherwise as the Directors may from time to time determine.

### *Ordinary Shares*

The rights attaching to the Ordinary Shares shall be as follows:

(a)    As to income – subject to the rights of any Ordinary Shares which may be issued with special rights or privileges, the Ordinary Shares of each class carry the right to receive all income of the Company attributable to the Ordinary Shares, and to participate in any distribution of such income by the Company, pro rata to the relative Net Asset Values of each of the classes of Ordinary Shares and, within each such class, income shall be divided *pari passu* amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of such class held by them.

(b)    As to capital – on a winding up of the Company or other return of capital (other than by way of a repurchase or redemption of Ordinary Shares in accordance with the provision of the Articles and the Companies Law), the surplus assets of the Company attributable to the Ordinary Shares remaining after payment of all creditors shall, subject to the rights of any Ordinary Shares that may be issued with special rights or privileges, be divided amongst the holders of Ordinary Shares of each class pro rata to the relative Net Asset Values of each of the classes of the Ordinary Shares and, within each such class, such assets shall be divided *pari passu* amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of that class held by them.

(c)    As to voting – the holders of the Ordinary Shares shall be entitled to receive notice of and to attend, speak  and vote at general meetings of the Company.

APP_0178

*General*

Without prejudice to any special rights previously conferred on the holders of any existing Shares or class of Shares, any Share (or option, warrant or other right in respect of a Share) in the Company may be issued with such preferred, deferred or other special rights or restrictions, whether as to dividend, voting, return of capital or otherwise, as the Board may determine.

***Offers to Shareholders to be on a pre-emptive basis***

(a)    The Company shall not allot equity securities to a person on any terms unless:

  (i)    it has made an offer to each person who holds equity securities of the same class in the Company to allot to him on the same or more favourable terms a proportion of those securities that is as nearly as practicable equal to the proportion in number held by him of the share capital of the Company; and

  (ii)    the period during which any such offer may be accepted has expired or the Company has received notice of the acceptance or refusal of every offer so made.

(b)    Securities that the Company has offered to allot to a holder of equity securities in accordance with the preceding may be allotted to him, or anyone in whose favour he has renounced his right to their allotment, without contravening the restriction referred to in above.

(c)    Shares held by the Company as treasury shares shall be disregarded for the purposes of the restriction referred to in the second preceding paragraph, so that the Company is not treated as a person who holds equity shares; and the treasury shares are not treated as forming part of the equity share capital of the Company.

(d)    Any offer required to be made by the Company pursuant to the restriction referred to above should be made by a notice (given in accordance with "—*Notices*" below) and such offer must state a period during which such offer may be accepted and such offer shall not be withdrawn before the end of that period.  Such period must be a period of at least 21 days beginning on the date on which such offer is deemed to be delivered or received (as the case may be), pursuant to "—*Notices*" below.

(e)    The restriction referred to above shall not apply in relation to the allotment of bonus shares, nor to a particular allotment of equity securities if these are, or are to be, wholly or partly paid otherwise than in cash.

(f)    The Company may by special resolution resolve that the restriction referred to above shall be excluded or that the restriction referred to in above shall apply with such modifications as may be specified in the resolution:

  (i)    generally in relation to the allotment by the Company of equity securities;

  (ii)    in relation to allotments of a particular description; or

  (iii)    in relation to a specified allotment of equity securities;

and any such resolution must:  (A) state the maximum number of equity securities in respect of which the restriction referred to above is excluded or modified; and (B) specify the date on which such exclusion or modifications will expire, which must be not more than five years from the date on which the resolution is passed.

(g)    Any resolution passed pursuant to the provisions referred to in the preceding paragraph may:

  (i)    be renewed or further renewed by special resolution of the Company for a further period not exceeding five years; and

APP_0179

(ii)    be revoked or varied at any time by special resolution of the Company.

(h)    Notwithstanding that any such resolution referred to in the two preceding paragraphs has expired, the Directors may allot equity securities in pursuance of an offer or agreement previously made by the Company if the resolution enabled the Company to make an offer or agreement that would or might require equity securities to be allotted after it expired.

(i)    In relation to an offer to allot securities, a reference (however expressed) to the holder of shares of any description is to whoever was the holder of shares of that description at the close of business on a date to be specified in the offer and the specified date must fall within the period of 28 days immediately before the date of the offer.

### Issue of Shares

Subject to "*—Offers to Shareholders to be on a pre-emptive basis*", the unissued Shares shall be at the disposal of the Board, which is authorised to allot or grant options, warrants or other rights over or otherwise dispose of them to such persons on such terms and conditions and at such times as the Board determines but so that no Share shall be issued at a discount except in accordance with the Companies Law and so that the amount payable on application on each Share shall be fixed by the Board.

### Variation of class rights

If at any time the share capital is divided into different classes of Shares, the rights attached to any class (unless otherwise provided by the terms of issue) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of three-fourths of the issued Shares of that class or with the sanction of a special resolution of the holders of the Shares of that class.

### Winding up

The term of the Placing will commence on the date of the Placing and will end (and the Company thereafter will be wound up and dissolved) at the end of the Term, subject to extension as described in "*Summary-Term*".

If the Company is wound up whether voluntarily or otherwise the liquidator may with the sanction of a special resolution divide among the Shareholders in specie any part of the assets of the Company and may with the like sanction vest any part of the assets of the Company in trustees upon such trusts for the benefit of the Shareholders as the liquidator with the like sanction shall think fit.

If any of the securities or other assets to be divided as aforesaid involve a liability to calls or otherwise any person entitled under such division to any of the said assets may within fourteen (14) clear days after the passing of the special resolution, by notice in writing, direct the liquidator to sell his proportion and pay him the net proceeds and the liquidator shall, if practicable, act accordingly.

### Disclosure of Third Party Interests in Shares

The Directors shall have power, if required for any regulatory purposes, by notice in writing to require any Shareholder to disclose to the Company the identity of any person (other than the Shareholder) who has an interest in the Shares held by the Shareholder and the nature of such interest.  Any such notice shall require any information in response to such notice to be given in writing within the prescribed period which is 28 days after service of the notice or 14 days if the Shares concerned represent 0.25 per cent or more in value of the issued Shares of the relevant class or such other reasonable period as the Directors may determine.  If any Shareholder has been duly served with such a notice and is in default for the prescribed period in supplying to the Company the information required by such notice, the Directors may serve a direction notice upon such Shareholder. The direction notice may direct that in respect of the Shares in respect of which the default has occurred (the "default Shares") and any other Shares held by the Shareholder, the Shareholder shall not be entitled to vote (either personally or by representative or by proxy) in general meetings or class meetings.  Where the default Shares represent at least 0.25 per cent of the class of Shares concerned, the direction notice may additionally direct that dividends on such shares will be retained by the Company (without interest) and

APP_0180

that no transfer of the Shares (other than a transfer approved under the Articles) shall be registered until the default is rectified.

*Dividends*

Subject to compliance with Section 304 of the Companies Law and the Distribution Priority, the Board may at any time declare and pay such dividends as appear to be justified by the position of the Company.  The Board may also declare and pay any fixed dividend which is payable on any Shares half-yearly or otherwise on fixed dates whenever the position, in the opinion of the Board, so justifies.  Dividend payments may be suspended by the Directors in their absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

The method of payment of dividends shall be at the discretion of the Board and the Portfolio Manager.

No dividend shall be paid in excess of the amounts permitted by the Companies Law or approved by the Board.

Unless and to the extent that the rights attached to any Shares or the terms of issue thereof otherwise provide, all dividends shall be declared and paid pro rata according to the number of Shares held by each Shareholder.  For the avoidance of doubt, where there is more than one class of Shares in issue, dividends declared in respect of any class of Share shall be declared and paid pro rata according to the number of Shares of the relevant class held by each Shareholder.

With the sanction of the Company in general meeting by way of a special resolution, any dividend may be paid wholly or in part by the distribution of specific assets and, in particular, of paid-up Shares of the Company.  Where any difficulty arises in regard to such distribution, the Board may settle the same as it thinks expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets and may determine that cash payments shall be made to any Shareholders upon the basis of the value so fixed in order to adjust the rights of Shareholders and may vest any such specific assets in trustees for the Shareholders entitled as may seem expedient to the Board.

Any dividend interest or other monies payable in cash in respect of Shares may be paid by cheque or warrant sent through the post to the registered address of the holder or, in the case of joint holders, to the registered address of that one of the joint holders who is first named on the register.  Any one of two or more joint holders may give effectual receipts for any dividends, interest or other monies payable in respect of their joint holdings.  In addition, any such dividend or other sum may be paid by any bank or other funds transfer system or such other means and to or through such person as the holder or joint holders (as the case may be) may in writing direct, and the Company shall have no responsibility for any sums lost or delayed in the course of any such transfer or where it has acted on any such directions.  Any one of two or more joint holders may give effectual receipts for any dividends, interest, bonuses or other monies payable in respect of their joint holdings.

No dividend or other monies payable on or in respect of a Share shall bear interest against the Company.

All unclaimed dividends may be invested or otherwise made use of by the Board for the benefit of the Company until claimed and the Company shall not be constituted a trustee in respect thereof.  All dividends unclaimed for a period of six years after having been declared shall be forfeited and shall revert to the Company.

*Transfer of Shares*

No Shareholder shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**", other than to an Affiliate of an initial Shareholder party hereto, without the prior written consent of the Portfolio Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

(a) such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in this Offering Memorandum;

(b) such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the U.S. Investment Company Act;

(c) such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

(d) such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the U.S. Tax Code.

Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Shareholder or, in the case of CLO Holdco or a Highland Principal (as defined in the Members' Agreement), to Highland, its Affiliates or another Highland Principal) a Shareholder must first offer to the other Shareholders a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Shareholders will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Shareholders do not accept the offer, the Shareholder may (subject to complying with the other Transfer restrictions in the Articles) Transfer the applicable Shares that such Shareholders have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Shareholder has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Shareholders have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again. Any Shareholder (other than the Shareholder proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Shareholder (subject to complying with the other Transfer restrictions in the Articles), any initial Shareholder (other than the Shareholder proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in the Articles), and CLO Holdco or the Highland Principals (unless such Shareholder is the Shareholder proposing the Transfer its shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in the Articles).

Subject to the Articles and such of the restrictions of the Articles as may be applicable, any Shareholder may transfer all or any of his certificated Shares by an instrument of transfer in any usual or common form or in any other form which the Board may approve. The instrument of transfer of a certificated Share shall be signed by or on behalf of the transferor and, unless the Share is fully paid, by or on behalf of the transferee. An instrument of transfer of a certificated Share need not be under seal.

The Board may, in its absolute discretion and without giving a reason, decline to transfer, convert or register any transfer of any Share in certificated form which is not fully paid or on which the Company has a lien. The Directors may also refuse to register a transfer of Shares unless it is in respect of only one class of Shares, it is in favour of a single transferee or not more than four joint transferees; and in the case of a Share in certificated form, having been delivered for registration to the Office or such other place as the Board may decide, it is accompanied by the certificate(s) for the Shares to which it relates and such other evidence as the Board may reasonably require to prove the right of the transferor to make the transfer.

The Board may, in its absolute discretion, decline to register a transfer of any Shares to any person whose ownership may result in a person holding Shares in violation of the transfer restrictions published by the Company, from time to time.

The Directors may, in their absolute discretion, refuse to register a transfer of any Shares to a person that they have reason to believe is (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) that is subject to Part 4 of Title 1 of ERISA, (ii) a plan, individual retirement account or other arrangement that is subject to Section

APP_0182

4975 of the U.S. Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**") or any other state, local laws or regulations that would have the same effect as regulations promulgated under ERISA by the U.S. Department of Labor and codified at 29 C.F.R. Section 2510.3-101 to cause the underlying assets of the Company to be treated as assets of that investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company and the Portfolio Manager (or other persons responsible for the investment and operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the U.S. Tax Code, (iii) an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each of (i), (ii) and (iii) in this paragraph a "**Plan**") or (iv) any person in circumstances where the holding of Shares by such person would (a) give rise to an obligation on the Company to register as an "investment company" under the Investment Company Act (as defined in the Articles) (including because the holder of the Shares is not a "qualified purchaser" as defined in the Investment Company Act), (b) preclude the Company from relying on the exception to the definition of "investment company" contained in Section 3(c)(7) of the Investment Company Act, (c) give rise to an obligation on the Company to register its Shares under the Exchange Act, the Securities Act or any similar legislation (each as defined in the Articles), (d) result in the Company not being considered a "Foreign Private Issuer" as that term is defined by Rule 3b-4(c) promulgated under the Exchange Act, (e) give rise to an obligation on the Portfolio Manager to register as a commodity pool operator or commodity trading advisor under the U.S. Commodity Exchange Act of 1974, as amended, (f) cause the Company to be a "controlled foreign corporation" for the purposes of the U.S. Tax Code, or cause the Company to suffer any pecuniary disadvantage (including any excise tax, penalties or liabilities under ERISA or the U.S. Tax Code), or (g) give rise to the Company or the Portfolio Manager becoming subject to any U.S. law or regulation determined to be detrimental to it (each such person in this paragraph a "**Prohibited U.S. Person**"). Each person acquiring Shares shall by virtue of such acquisition be deemed to have represented to the Company that they are not a Prohibited U.S. Person.

If the Board refuses to register the transfer of a Share it shall, within two months after the date on which the transfer was lodged with the Company, send notice of the refusal to the transferee.

The registration of transfers may be suspended at such times and for such periods (not exceeding 30 days in the aggregate in any one calendar year) as the Board may decide on giving notice in *La Gazette Officielle* and either generally or in respect of a particular class of Share.

### Compulsory redemptions of Shares by the Company

The Company may redeem all or any of the Shares at any time subject to and in accordance with the provisions of the Members' Agreement and the Articles.

A Director is authorised to do all such acts and things as shall be necessary or expedient and to execute any documents deemed necessary or desirable in each case to complete any redemption of Shares subject to and in accordance with the Members' Agreement and the Articles.

The redemption of Shares under the Articles shall be deemed to be effective from the close of business on the relevant redemption date at which time any Shares which are so redeemed shall forthwith be cancelled and the name of the relevant Shareholder(s) be removed from the Register. Upon the redemption of a Share being effected pursuant to the Members' Agreement and the Articles, a Shareholder shall cease to be entitled to any rights in respect thereof save for payment of the redemption proceeds.

### Purchase of Shares

The Company may, at the discretion of the Board, purchase any of its own Shares, whether or not they are redeemable, and may pay the purchase price in respect of such purchase to the fullest extent permitted by the Companies Law.

### Notices

A notice or other communication may be given by the Company to any Shareholder by any means as set out in Section 523 of the Companies Law.

APP_0183

Any notice or other document, if served by post (including registered post, recorded delivery service or ordinary letter post), shall be deemed to have been served 48 hours after the time when the letter containing the same is posted and in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly posted.

Any notice or other document that may be sent by the Company by courier will be deemed to be received 24 hours after the time at which it was despatched.

A notice may be given by the Company to the joint holders of a Share by giving the notice to the joint holder first named in the register in respect of the Share.

Any notice or other communication sent to the address of any Shareholder shall, notwithstanding the death, disability or insolvency of such Shareholder and whether the Company has notice thereof, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder and such service shall, for all purposes, be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in any such Share.

All Shareholders shall be deemed to have agreed to accept communication from the Company by electronic means in accordance with sections 524 and 526 and schedule 3 of the Companies Law unless a Shareholder notifies the Company otherwise.  Such notification must be in writing and signed by the Shareholder and delivered to the Company's registered office or such other place as the Board directs.  A Shareholder shall be entitled to require the Company to send him a version of a document or information in hard copy form.

Every person who becomes entitled to a Share shall be bound by any notice in respect of that Share which, before his name is entered in the register of members, has been duly given to a person from which he derives his title.

### *General meetings*

General meetings shall be held once at least in each calendar year in accordance with Section 199 of the Companies Law but so that not more than fifteen (15) months may elapse between one annual general meeting and the next.  At each such annual general meeting shall be laid copies of the Company's most recent accounts, Directors' report and, if applicable, the auditor's report in accordance with Section 252 of the Companies Law.  The requirement for an annual general meeting may be waived by the shareholders in accordance with Section 201 of the Companies Law. Other meetings of the Company shall be called extraordinary general meetings.

All general meetings shall be held in Guernsey.

A shareholder participating by video link or telephone conference call or other electronic or telephonic means of communication in a meeting at which a quorum is present shall be treated as having attended that meeting, provided that the shareholders present at the meeting can hear and speak to the participating shareholder.

A video link or telephone conference call or other electronic or telephonic means of communication in which a quorum of shareholders participates and all participants can hear and speak to each other shall be a valid meeting which shall be deemed to take place where the Chairman is present unless the shareholders resolve otherwise.

Any general meeting convened by the Board, unless its time shall have been fixed by the Company in a general meeting or unless convened in pursuance of a requisition, may be postponed by the Board by notice in writing and the meeting shall, subject to any further postponement or adjournment, be held at the postponed date for the purpose of transacting the business covered by the original notice.

The Board may, whenever it thinks fit, and shall on the requisition of shareholders who hold more than ten per cent (10%) of such of the capital of the Company as carries the right to vote at general meetings (excluding any capital held as treasury shares) in accordance with Sections 203 and 204 of the Companies Law, proceed to convene a general meeting.

APP_0184

### *Notice of general meetings*

A general meeting of the Company (other than an adjourned meeting) must be called by notice of at least 14 clear days.

A general meeting may be called by shorter notice than otherwise required if all the Shareholders entitled to attend and vote so agree.

Notices and other documents may be sent in electronic form or published on a website in accordance with Section 208 of the Companies Law.

Notice of a general meeting of the Company must be sent to every Shareholder (being only persons registered as a Shareholder), every Director and every alternate Director registered as such.

Notice of a general meeting of the Company must state the time and date of the meeting, state the place of the meeting, specify any special business to be put to the meeting (as defined in the Articles), contain the information required under Section 178(6)(a) of the Companies Law in respect of a resolution which is to be proposed as a special resolution at the meeting, contain the information required under Section 179(6)(a) of the Companies Law in respect of a resolution which is to be proposed as a waiver resolution at the meeting, and contain the information required under Section 180(3)(a) of the Companies Law in respect of a resolution which is to be proposed as a unanimous resolution at the meeting.

Notice of a general meeting must state the general nature of the business to be dealt with at the meeting.

The accidental omission to give notice of any meeting to or the non-receipt of such notice by any Shareholder shall not invalidate any resolution or any proposed resolution otherwise duly approved.

### *Conflicts of interest*

A Director must, immediately after becoming aware of the fact that he is interested in a transaction or proposed transaction with the Company, disclose to the Board in accordance with section 162 of the Companies Law the nature and extent of that interest.

The obligation referred to above does not apply if:

(a)     the transaction or proposed transaction is between the Director and the Company; and

(b)     the transaction or proposed transaction is or is to be entered into in the ordinary course of the Company's business and on usual terms and conditions.

A general disclosure to the Board to the effect that a Director has an interest (as director, officer, employee, member or otherwise) in a party and is to be regarded as interested in any transaction which may after the date of the disclosure be entered into with that party is sufficient disclosure of interest in relation to that transaction.

Nothing referred to above in this section applies in relation to:

(a)     remuneration or other benefit given to a Director;

(b)     insurance purchased or maintained for a Director in accordance with Section 158 of the Companies Law; or

(c)     a qualifying third party indemnification provision provided for a Director in accordance with Section 159 of the Companies Law.

Subject to the paragraph below, a Director is interested in a transaction to which the Company is a party if such Director:

(a)     is a party to, or may derive a material benefit from, the transaction;

- 92 -

APP_0185

(b)    has a material financial interest in another party to the transaction;

(c)    is a director, officer, employee or member of another party (other than a party which is an associated company) who may derive a material financial benefit from the transaction;

(d)    is the parent, child or spouse of another party who may derive a material financial benefit from the transaction; or

(e)    is otherwise directly or indirectly materially interested in the transaction.

A Director is not interested in a transaction to which the Company is a party if the transaction comprises only the giving by the Company of security to a third party which has no connection with the Director, at the request of the third party, in respect of a debt or obligation of the Company for which the Director or another person has personally assumed responsibility in whole or in part under a guarantee, indemnity or security.

Save as provided in the Articles, a Director shall not vote in respect of any contract or arrangement or any other proposal whatsoever in which he has any material interest otherwise than by virtue of his interest in Shares or debentures or other securities of or otherwise through the Company.  A Director may be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

A Director shall (in the absence of some other material interest than is indicated below) be entitled to vote (and be counted in the quorum) in respect of any resolution concerning any of the following matters, namely:

(a)    the giving of any guarantee, security or indemnity to him in respect of money lent or obligations incurred by him at the request of or for the benefit of the Company or any of its subsidiaries;

(b)    the giving of any guarantee, security or indemnity to a third party in respect of a debt or obligation of the Company or any of its subsidiaries for which he himself has assumed responsibility in whole or in part under a guarantee or indemnity or by the giving of security;

(c)    any proposal concerning an offer of Shares or debentures or other securities of or by the Company or any of its subsidiaries for subscription or purchase in which offer he is or is to be interested as a participant in the underwriting or sub-underwriting thereof; or

(d)    any proposal concerning any other company in which he is interested, directly or indirectly and whether as an officer or shareholder or otherwise howsoever, provided that he is not the holder of or beneficially interested in one per cent  or more of the issued shares of such company (or of any third company through which his interest is derived) or of the voting rights available to shareholders of the relevant company (any such interest being deemed for these purposes to be a material interest in all circumstances).

Where proposals are under consideration concerning the appointment (including fixing or varying the terms of appointment) of two or more Directors to offices or employment with the Company or any company in which the Company is interested, the Directors may be counted in the quorum for the consideration of such proposals and such proposals may be divided and considered in relation to each Director separately and in such case each of the Directors concerned (if not debarred from voting under the provisions referred to above) shall be entitled to vote (and be counted in the quorum) in respect of each resolution except that concerning his own appointment.

If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by his voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to any other Director shall be final and conclusive except in a case where the nature or extent of the interests of the Director concerned have not been fairly disclosed.

The Company may by ordinary resolution suspend or relax the provisions referred to above to any extent or ratify any transaction not duly authorised by reason of a contravention of any of the paragraphs above.

APP_0186

Subject to the provisions referred to above the Directors may exercise the voting power conferred by the shares in any other company held or owned by the Company or exercisable by them as directors of such other company in such manner in all respects as they think fit (including the exercise thereof in favour of any resolution appointing themselves or any of them director, managing director, managers or other officer of such company or voting or providing for the payment or remuneration to the directors, managing director, manager or other officer of such company).

A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director on such terms as to tenure of office or otherwise as the Directors may determine.

Subject to due disclosure in accordance with the provisions referred to in this section, no Director or intending Director shall be disqualified by his office from contracting with the Company as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested render the Director liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relationship thereby established.

Any Director may act by himself or his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director, provided that nothing herein contained shall authorise a Director or his firm to act as Auditor to the Company.

Any Director may continue to be or become a director, managing director, manager or other officer or member of any company in which the Company may be interested and (unless otherwise agreed) no such Director shall be accountable for any remuneration or other benefits received by him as a director, managing director, manager or other officer or member of any such other company.

### Remuneration and appointment of Directors

The ordinary remuneration of the Directors who do not hold executive office for their services (excluding amounts payable under any other sub-paragraph of the Articles) shall not exceed in aggregate £150,000 per annum or such higher amount as the Company may from time to time by ordinary resolution determine.  Such remuneration shall be deemed to accrue from day to day.  The Directors shall also be paid all reasonable out-of-pocket travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the Directors or any committee of the Directors or general meetings of the Company or in connection with the business of the Company.  In addition, the Board may award additional remuneration to any Director engaged in exceptional work at the request of the Board on a time spent basis.

The Board shall have power at any time to appoint any person eligible in accordance with Section 137 of the Companies Law to be a Director either to fill a casual vacancy or as an addition to the existing Directors but so that the total number of Directors shall not at any time exceed the number, if any, fixed pursuant to the Articles.  Any Director so appointed shall hold office only until the next following annual general meeting and shall then be eligible for re-election.  Without prejudice to the powers of the Board, the Company in general meeting may appoint any person to be a Director either to fill a casual vacancy or as an additional Director.

The Directors may at any time appoint one or more of their body (other than a Director resident in the United Kingdom) to the office of managing director for such term and at such remuneration and upon such terms as they determine.

### Disqualification of Directors

No person other than a Director retiring at a general meeting shall, unless recommended by the Directors, be eligible for election by the Company to the office of Director unless, not less than 14 clear days before the date appointed for the meeting there shall have been left at the Company's registered office notice in writing signed by a Shareholder duly qualified to attend and vote at the meeting for which such notice is given of his intention to propose such person for election together with notice in writing signed by that person of his willingness to be elected.

A Director shall cease to hold office:  (i) if the Director (not being a person holding for a fixed term an executive office subject to termination if he ceases for any reason to be a Director) resigns his office by written notice signed by him sent to or deposited at the registered office of the Company, (ii) if he shall have absented himself from meetings of the Board for a consecutive period of 12 months and the Board resolves that his office shall be vacated, (iii) if he

APP_0187

dies or becomes of unsound mind or incapable, (iv) if he becomes insolvent, suspends payment or compounds with his creditors, (v) if he is requested to resign by written notice signed by all his co-Directors, (vi) if the Company in general meeting shall declare that he shall cease to be a Director, (vii) if he becomes resident in the United Kingdom and, as a result thereof, a majority of the Directors are resident in the United Kingdom, (viii) if he becomes ineligible to be a Director in accordance with section 137 of the Companies Law or (ix) if he becomes prohibited from being a Director by reason of any order made under any provisions or any law or enactment.

## Indemnities

The Directors, company secretary and officers of the Company and their respective heirs and executors shall, to the extent permitted by Section 157 of the Companies Law, be fully indemnified out of the assets and profits of the Company from and against all actions expenses and liabilities which they or their respective heirs or executors may incur by reason of any contract entered into or any act in or about the execution of their respective offices or trusts except such (if any) as they shall incur by or through their own negligence, default, breach of duty or breach of trust respectively and none of them shall be answerable for the acts, receipts, neglects or defaults of the others of them or for joining in any receipt for the sake of conformity or for any bankers or other person with whom any monies or assets of the Company may be lodged or deposited for safe custody or for any bankers or other persons into whose hands any money or assets of the Company may come or for any defects of title of the Company to any property purchased or for insufficiency or deficiency of or defect in title of the Company to any security upon which any monies of the Company shall be placed out or invested or for any loss misfortune or damage resulting from any such cause as aforesaid or which may happen in or about the execution of their respective offices or trusts, except if the same shall happen by or through their own negligence, default, breach of duty or breach of trust.

To the fullest extent permitted by applicable law (including the Companies Law) and subject to compliance with this Offering Memorandum, the Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (including executors, guardians and trustees) of the Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to the Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to the Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an "**Indemnified Person**") shall be fully indemnified against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, the "**Indemnified Losses**") to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

## Borrowing powers

Subject to the restrictions set forth in this Offering Memorandum, the Board may exercise all the powers of the Company to borrow money (in whatever currency the Board determines from time to time) and to mortgage, hypothecate, pledge or charge all or part of its undertaking property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Company or of any third party, subject to any limits on borrowings adopted by the Board from time to time. The Board may exercise all the

powers of the Company to engage in currency or interest rate hedging in the interests of efficient portfolio management.

*Forfeiture and surrender of Shares*

Any Share in respect of which a notice requiring payment of an unpaid call or instalment, together with any interest which may have accrued and any expenses which may have been incurred, has been served may, at any time before payment has been made, be forfeited by a resolution of the Directors to that effect. Such forfeiture shall include all dividends declared in respect of the forfeited Share and not actually paid before the forfeiture.

The Board may accept from any Shareholder on such terms as agreed a surrender of any Shares in respect of which there is a liability for calls. Any surrendered Share may be disposed of in the same manner as a forfeited share.

If any Shares are owned directly or beneficially by a person believed by the Directors to be a Prohibited U.S. Person, the Directors may give notice to such person requiring them either (i) to provide the Directors within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Directors that such person is not a Prohibited U.S. Person or (ii) to sell or transfer their Shares to a person qualified to own the same within 30 days and within such 30 days to provide the Directors with satisfactory evidence of such sale or transfer. Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

## LITIGATION

There are no, and have not been in the last 12 months, any governmental, legal or arbitration proceedings, nor, so far as the Company is aware, are any such proceedings pending or threatened, which may have, or have in the recent past had, a significant effect on the Company's financial position or profitability.

## RELATED PARTY TRANSACTIONS

Other than as set out in the section of this Offering Memorandum entitled "—*Material Contracts*" (including the NexBank Credit Facility), "*Investment Policy—Company Borrowing*" and cross-transactions as described in "*Risk Factors—Risks Relating to Conflicts of Interest—The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*" the Company has not entered into any related party transactions. The consent of the Advisory Board will be required with respect to transactions with any Related Party.

## GENERAL

Highland may be regarded as the promoter of the Company. Save as disclosed in this section of this Offering Memorandum, no amount or benefit has been paid, or given, to the promoter or any of its subsidiaries since the incorporation of the Company and none is intended to be paid, or given. Highland is a limited partnership, established under the laws of the State of Delaware in the U.S. with its registered office at 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801.

The Net Placing Proceeds available for investment by the Company following the Placing will be approximately U.S. $153 million (less any amounts retained for working capital purposes) and these proceeds will be invested in accordance with the Company's investment policy described in the section of this Offering Memorandum entitled "*The Company*". Since incorporation, the Company has not commenced operations, and therefore has not generated earnings. As the Shares do not have a par value, the Placing Price consists solely of share premium.

None of the Shares available under the Placing are being underwritten.

Application will be made to the appropriate securities exchange for the Placing Shares to be admitted when deemed appropriate by the Company.

The Company does not own any premises and does not lease any premises.

**THIRD PARTY SOURCES**

Where third party information has been referenced in this Offering Memorandum, the source of that third party information has been disclosed.  Where information contained in this Offering Memorandum has been so sourced, the Company confirms that such information has been accurately reproduced and, as far as the Company is aware and able to ascertain from information published by such third parties, no facts have been omitted which would render the reproduced information inaccurate or misleading.

Highland has given and not withdrawn its written consent to the issue of this Offering Memorandum with references to its name in the form and context in which such references appear.  Highland accepts responsibility for information attributed to it in this Offering Memorandum and declares that, having taken all reasonable care to ensure that such is the case, the information attributed to it in this Offering Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

Each of the Management Companies has given and, as at the date of this Offering Memorandum, has not withdrawn its written consent to the issue of this Offering Memorandum with references to its name in the form and context in which such references appear.  Each of the Management Companies accepts responsibility for information attributed to it in this Offering Memorandum and declares that, having taken all reasonable care to ensure that such is the case, the information attributed to it in this Offering Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

**WORKING CAPITAL**

The Company is of the opinion that the working capital available to the Group is sufficient for the present requirements of the Company, that is, for at least the next 12 months from the date of this Offering Memorandum.

**CAPITALISATION AND INDEBTEDNESS**

As at the date of this Offering Memorandum, the Company:

      (a)      does not have any secured, unsecured or unguaranteed indebtedness, including indirect and contingent, other than the NexBank Credit Facility;

      (b)      has not granted any mortgage or charge over any of its assets, other than that granted under the NexBank Credit Facility; and

      (c)      does not have any contingent liabilities or guarantees.

As at the date of this Offering Memorandum, the Company's issued and fully paid up share capital consisted of 143,454,001 Shares of no par value.

**DOCUMENTS AVAILABLE FOR INSPECTION**

Copies of the Articles, the constitutional documents of the Company, the material contracts referred to in "—*Material Contracts*" above and this Offering Memorandum will be available for inspection at the registered office of the Company during normal business hours on any weekday (Saturdays and public holidays excepted) up to and including the date of the Placing.

Copies of this Offering Memorandum may be obtained, free of charge during normal business hours on any weekday (bank and public holidays excepted) at the Company's registered office up to and including the date of the Placing.

**RELATIONSHIP BETWEEN SHAREHOLDERS, THE COMPANY AND SERVICE PROVIDERS**

The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015.  While prospective investors will acquire an interest in the Company on subscribing for Placing Shares, the Company is the sole legal and/or beneficial owner of its investments.  Consequently, Shareholders have no direct legal or beneficial interest in those investments.  The liability of Shareholders for the debts and other obligations of the Company is limited to the amount unpaid, if any, on the Placing Shares held by them.

APP_0190

Shareholders' rights in respect of their investment in the Company are governed by the Articles, the Companies Law and the investment terms set out in this Offering Memorandum.

## RIGHTS AGAINST THIRD PARTIES, INCLUDING THIRD PARTY SERVICE PROVIDERS

As the Company has no employees and the Directors have all been appointed on a non-executive basis, the Company is reliant on the performance of service providers listed in this Offering Memorandum (the "**Service Providers**").

Without prejudice to any potential right of action in tort that a Shareholder may have to bring a claim against a Service Provider, each Shareholder's contractual relationship in respect of its investment in Shares is with the Company only. Therefore, no Shareholder will have any contractual claim against any Service Provider with respect to such Service Provider's default.

## JURISDICTION AND APPLICABLE LAW

As noted above, Shareholders' rights are governed by the Articles, the Companies Law and the terms set out in this Offering Memorandum. By subscribing for Placing Shares, investors agree to be bound by the Articles, the Companies Law and the terms set out in this Offering Memorandum.

Information on the existence or not of any legal instruments providing for the recognition and enforcement of judgments in the territory where the Company is established is as follows. A final and conclusive judgement under which a sum of money is payable (not being a sum payable in respect of taxes or other charges of a like nature or in respect of a fine or penalty) obtained in the superior courts in the reciprocating countries set out in the Judgments (Reciprocal Enforcement) (Guernsey) Law 1957 (the ''**1957 Law**'') (which includes the Supreme Court and the Senior Courts of England and Wales, excluding the Crown Court), after a hearing on the merits would be recognised as a valid judgement by the Guernsey courts and would be enforceable in accordance with and subject to the provisions of the 1957 Law.

The Guernsey courts would also recognise, without reconsideration of the merits and assuming proper service of process and assumption of jurisdiction in accordance with the laws of the relevant jurisdiction, any final and conclusive judgement under which affixed or ascertainable sum of money is payable (not being a sum payable in respect of taxes or other charges or a like nature or in respect of a fine or other penalty) obtained in a court not recognised by the 1957 Law provided that the judgment was not obtained by fraud or in a manner opposed to the principles of natural justice and recognition of the judgment is not contrary to public policy as applied by the Guernsey courts.

## FAIR TREATMENT AND PREFERENTIAL TREATMENT OF INVESTORS

The Directors owe certain fiduciary duties to the Company which require them, among other things, to act in good faith and in what they consider to be the best interests of the Company. In doing so, the Directors will act in a manner that ensures the fair treatment of investors.

Under the AIFMD Rules, the Portfolio Manager as AIFM must treat all investors fairly. The Portfolio Manager ensures the fair treatment of investors through its decision-making procedures and organisational structure which (1) identify any preferential treatment, or the right thereto, accorded to investors and (2) ensure that any such preferential treatment does not result in an overall disadvantage to other investors.

In addition, the Portfolio Manager monitors the terms of side arrangements entered into with investors in relation to their investment in the Company to seek to ensure the fair treatment of investors. In so doing, the Portfolio Manager takes into consideration whether such side arrangements are in accordance with side arrangements previously entered into.

The Portfolio Manager may enter into side letters in relation to the Company and its investments with certain individual investors covering, inter alia, *capacity, provision of additional information, fees, most favoured investor commitments, individual investor approval requirements, transfer rights and confirmations of how expenses will be borne*. Such information may provide the recipient greater insights into the Company activities than is included in standard reports to investors. In entering into any side letters, the Company will act in the best interests of the investors as a whole.

APP_0191

Information on such side letters will be disclosed to investors in accordance with the AIFMD.

APP_0192

### TERMS AND CONDITIONS OF THE PLACING

**INTRODUCTION**

Each Placee which confirms its agreement (whether orally or in writing) to subscribe for Placing Shares under the Placing will be bound by these terms and conditions and will be deemed to have accepted them.

The Company may require any Placee to agree to such further terms and/or conditions and/or give such additional warranties and/or representations as it (in its absolute discretion) sees fit and/or may require any such Placee to execute a separate placing letter (a "**Placing Letter**").

**AGREEMENT TO SUBSCRIBE FOR PLACING SHARES**

Any Placee agrees to become a member of the Company and agrees to subscribe for those Placing Shares allocated to it at the Placing Price in respect of the Placing Shares allocated to the Placee.  To the fullest extent permitted by law, each Placee acknowledges and agrees that it will not be entitled to exercise any remedy of rescission at any time.  This does not affect any other rights the Placee may have.

**PAYMENT FOR PLACING SHARES**

Each Placee must pay the Placing Price for the Placing Shares issued to the Placee in the manner and by the time directed by the Company.  If any Placee fails to pay as so directed and/or by the time required, the relevant Placee's application for Placing Shares shall be rejected.

**REPRESENTATIONS AND WARRANTIES**

By agreeing to subscribe for Placing Shares, each Placee which will enter into a commitment to subscribe for Placing Shares will (for itself and any person(s) procured by it to subscribe for Placing Shares and any nominee(s) for any such person(s)) agree, represent and warrant to the Company that:

(a) in agreeing to subscribe for Placing Shares under the Placing, it is relying solely on this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and not on any other information given, or representation or statement made at any time, by any person concerning the Company or the Placing.  It agrees that none of the Company nor any of its respective officers, agents or employees, will have any liability for any other information or representation.  It irrevocably and unconditionally waives any rights it may have in respect of any other information or representation;

(b) if the laws of any territory or jurisdiction outside the United Kingdom are applicable to its agreement to subscribe for Placing Shares under the Placing, it warrants that it has complied with all such laws, obtained all governmental and other consents which may be required, complied with all requisite formalities and paid any issue, transfer or other taxes due in connection with its placing commitment in any territory and that it has not taken any action or omitted to take any action which will result in the Company or any of its respective officers, agents, affiliates or employees acting in breach of the regulatory or legal requirements, directly or indirectly, of any territory or jurisdiction outside the United Kingdom in connection with the Placing;

(c) it does not have a registered address in, and is not a citizen, resident or national of, any jurisdiction in which it is unlawful to make or accept an offer of the Placing Shares and it is not acting on a non-discretionary basis for any such person;

(d) it agrees that, having had the opportunity to read this Offering Memorandum, it shall be deemed to have had notice of all information and representations contained in this Offering Memorandum, that it is acquiring Placing Shares solely on the basis of this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and no other information and that in accepting a participation in the Placing it has had access to all information it believes necessary or appropriate in connection with its decision to subscribe for Placing Shares;

APP_0193

(e)     it acknowledges that no person is authorised in connection with the Placing to give any information or make any representation other than as contained in this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and, if given or made, any information or representation must not be relied upon as having been authorised by the Company;

(f)     it is not applying as, nor is it applying as nominee or agent for, a person who is or may be liable to notify and account for tax under the Stamp Duty Reserve Tax Regulations 1986 at any of the increased rates referred to in section 67, 70, 93 or 96 (depository receipts and clearance services) of the Finance Act 1986;

(g)     it accepts that none of the Placing Shares have been or will be registered under the laws of any Restricted Territory.  Accordingly, the Placing Shares may not be offered, sold, issued or delivered, directly or indirectly, within any Restricted Territory unless an exemption from any registration requirement is available;

(h)     if it is receiving the offer in circumstances under which the laws or regulations of a jurisdiction other than the United Kingdom would apply, that it is a person to whom the Placing Shares may be lawfully offered under that other jurisdiction's laws and regulations;

(i)     if it is a resident in the EEA (other than the United Kingdom), it is a "Qualified Investor" within the meaning of the law in the Relevant Member State implementing Article 2(1)(e)(i), (ii) or (iii) of the Prospectus Directive;

(j)     if it is outside the United Kingdom, neither this Offering Memorandum nor any other offering, marketing or other material in connection with the Placing constitutes an invitation, offer or promotion to, or arrangement with, it or any person whom it is procuring to subscribe for Placing Shares pursuant to the Placing unless, in the relevant territory, such offer, invitation or other course of conduct could lawfully be made to it or such person and such documents or materials could lawfully be provided to it or such person and Placing Shares could lawfully be distributed to and subscribed and held by it or such person without compliance with any unfulfilled approval, registration or other regulatory or legal requirements;

(k)     it acknowledges the representations, warranties and agreements set out in this Offering Memorandum, including those set out in the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*", and further acknowledges that it is not a U.S. Person, it is not located within the United States, it is subscribing for Placing Shares in an "offshore transaction" as defined in Regulation S and it is not acquiring the Placing Shares for the account or benefit of a U.S. Person, and where it is subscribing for Placing Shares for one or more managed, discretionary or advisory accounts, it is authorised in writing for each such account:  (i) to subscribe for the Placing Shares for each such account; (ii) to make on each such account's behalf the representations, warranties and agreements set out in this Offering Memorandum or in any Placing Letter, where relevant; and (iii) to receive on behalf of each such account any documentation relating to the Placing in the form provided by the Company.  It agrees that the provision of this paragraph shall survive any resale of the Placing Shares by or on behalf of any such account;

(l)     it is acting as principal only in respect of the Placing, or, if it is acting for any other person (i) it is and will remain liable to the Company for the performance of all its obligations as a placee in respect of the Placing (regardless of the fact that it is acting for another person), (ii) it is both an "authorised person" for the purposes of FSMA and a "qualified investor" as defined at Article 2.1(e)(i) of Directive 2003/71/EC (known as Prospectus Directive) acting as agent for such person, and (iii) such person is either (1) a FSMA Qualified Investor or (2) its "client" (as defined in section 86(2) of FSMA) that has engaged it to act as his agent on terms which enable it to make decisions concerning the Placing or any other offers of transferable securities on his behalf without reference to him;

(m)     it has not and will not offer or sell any Placing Shares to persons in the United Kingdom, except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their business or otherwise in circumstances which

APP_0194

have not resulted and which will not result in an offer to the public in the United Kingdom within the meaning of section 102B of the FSMA;

(n)     it is an "eligible counterparty" within the meaning of Chapter 3 of the FCA's Conduct of Business Sourcebook and it is subscribing for or purchasing the Shares for investment only and not for resale or distribution;

(o)     it irrevocably appoints any Director of the Company to be its agent and on its behalf (without any obligation or duty to do so), to sign, execute and deliver any documents and do all acts, matters and things as may be necessary for, or incidental to, its subscription for all or any of the Placing Shares for which it has given a commitment under the Placing, in the event of its own failure to do so;

(p)     it accepts that if the Placing does not proceed or such Placing Shares are not admitted to a securities exchange for any reason whatsoever, then none of the Company or any of its affiliates, nor persons controlling, controlled by or under common control with any of them nor any of their respective employees, agents, officers, members, stockholders, partners or representatives, shall have any liability whatsoever to it or any other person;

(q)     it has not taken any action or omitted to take any action which will or may result in the Company or any of its directors, officers, agents, affiliates, employees or advisers being in breach of the legal or regulatory requirements of any territory in connection with the Placing or its subscription of Placing Shares pursuant to the Placing;

(r)     in connection with its participation in the Placing it has observed all relevant legislation and regulations, in particular (but without limitation) those relating to money laundering and countering terrorist financing and that its placing commitment is only made on the basis that it accepts full responsibility for any requirement to identify and verify the identity of its clients and other persons in respect of whom it has applied. In addition, it warrants that it is a person:  (i) subject to the Money Laundering Regulations 2007 in force in the United Kingdom; or (ii) subject to the Money Laundering Directive (2005/60/EC of the European Parliament and of the EC Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing); or (iii) subject to the Guernsey AML Requirements; or (iv) acting in the course of a business in relation to which an overseas regulatory authority exercises regulatory functions and is based or incorporated in, or formed under the law of, a country in which there are in force provisions at least equivalent to those required by the Money Laundering Directive;

(s)     due to anti-money laundering and the countering of terrorist financing requirements, the Company may require proof of identity of the Placee and related parties and verification of the source of the payment before the placing commitment can be processed and that, in the event of delay or failure by the Placee to produce any information required for verification purposes, the Company may refuse to accept the placing commitment and the subscription moneys relating thereto.  It holds harmless and will indemnify the Company against any liability, loss or cost ensuing due to the failure to process the placing commitment, if such information as has been required has not been provided by it or has not been provided timeously;

(t)     any person in Guernsey involved in the business of the Company who knows or suspects or has reasonable grounds for knowing or suspecting that any other person (including the Company or any person subscribing for Placing Shares) is involved in money laundering activities, is under an obligation to report such suspicion to the relevant authorities pursuant to the Guernsey AML Requirements.  Similar disclosures may be required under other legislation;

(u)     it and each person or body (including, without limitation, any local authority or the managers of any pension fund) on whose behalf it accepts Placing Shares pursuant to the Placing or to whom it allocates such Placing Shares have the capacity and authority to enter into and to perform their obligations as a Placee of the Placing Shares and will honour those obligations;

APP_0195

(v)     it confirms that it is not acquiring the Placing Shares using the assets of:  (i)(A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law;

(w)     the representations, undertakings and warranties contained in this Offering Memorandum or in any Placing Letter, where relevant, are irrevocable.  It acknowledges that the Company and its affiliates will rely upon the truth and accuracy of such representations and warranties and it agrees that if any of the representations or warranties made or deemed to have been made by its subscription of the Shares are no longer accurate, it shall promptly notify the Company;

(x)     nothing has been done or will be done by it in relation to the Placing that has resulted or could result in any person being required to publish a prospectus in relation to the Company or to any ordinary shares in accordance with FSMA or the Prospectus Rules or in accordance with any other laws applicable in any part of the European Union or the European Economic Area;

(y)     it accepts that the allocation of Placing Shares shall be determined by the Company in its absolute discretion and that such persons may scale down any placing commitments for this purpose on such basis as they may determine; and

(z)     time shall be of the essence as regards its obligations to settle payment for the Placing Shares and to comply with its other obligations under the Placing; and

(aa)    it has been provided an opportunity to ask questions of, and have received satisfactory answers thereto from, the Company, the Portfolio Manager, Highland, Acis and/or their respective affiliates, as applicable, regarding the Company's assets and the terms and conditions of the offering of the Placing Shares, and it and its representatives have obtained all additional information requested of the Company, the Portfolio Manager, Highland, Acis and/or their respective affiliates, as applicable and to the extent such information is in their possession or reasonably obtainable thereby without undue expense or burden, in order to respond to any inquiries it has made regarding the offering of the Placing Shares.  In connection with the offering of the Shares, it is not relying upon any statements other than those statements contained in the Offering Memorandum. It are not relying on the Company, the Portfolio Manager, Highland, Acis and/or their respective any of its respective affiliates or any of its partners, members, managers, shareholders, officers, employees, shared personnel, representatives, consultants, advisors, attorneys or agents for legal, investment or tax advice.  It has sought independent legal, investment and tax advice to the extent that it has deemed necessary or appropriate in connection with its decision to subscribe for the Placing Shares.

## SUPPLY AND DISCLOSURE OF INFORMATION

If the Administrator or the Company or any of their agents request any information in connection with a Placee's agreement to subscribe for Placing Shares under the Placing or to comply with any relevant legislation, such Placee must promptly disclose it to them.

## DATA PROTECTION

Pursuant to the Data Protection (Bailiwick of Guernsey) Law, 2001, as amended (the "**DP Law**") and any successor legislation, the Company and/or the Administrator may hold personal data (as defined in the DP Law) relating to past and present Shareholders.

Such personal data held is used by those parties in relation to the Placing and to maintain a register of the Shareholders and mailing lists and this may include sharing such data with third parties in one or more of the countries mentioned below when (a) effecting the payment of dividends and redemption proceeds to Shareholders (in each case, where applicable) and, if applicable, the payment of commissions to third parties; and (b) filing returns of Shareholders and their respective transactions in shares with statutory bodies and regulatory authorities.  Personal data may be retained on record for a period exceeding six years after it is no longer used.

The countries referred to above include, but need not be limited to, those in the European Economic Area or the European Union and any of their respective dependent territories overseas, Andorra, Argentina, Canada, State of Israel, New Zealand, Switzerland and the Eastern Republic of Uruguay.

By becoming registered as a holder of Placing Shares in the Company a person becomes a data subject (as defined in the DP Law) and is deemed to have consented to the processing by the Company and the Administrator of any personal data relating to them in the manner described above.

The Company will be the "data controller" in respect of the personal data, but has appointed the Administrator as a "data processor" of such data (each as defined in the DP Law).  Details of the registration of the Company as data controller can be found on the website of the Guernsey Data Protection Commissioner:  www.dpr.gov.gg.

**MISCELLANEOUS**

The rights and remedies of the Company and the Administrator under these terms and conditions are in addition to any rights and remedies which would otherwise be available to each of them and the exercise or partial exercise of one will not prevent the exercise of others.

On the acceptance of their placing commitment, if a Placee is a discretionary fund manager, that Placee may be asked to disclose in writing or orally the jurisdiction in which its funds are managed or owned.  All documents provided in connection with the Placing will be sent at the Placee's risk.  They may be returned by post to such Placee at the address notified by such Placee.

Each Placee agrees to be bound by the Articles (as amended from time to time) once the Placing Shares, which the Placee has agreed to subscribe for pursuant to the Placing, have been acquired by the Placee.  The contract to subscribe for Placing Shares under the Placing and the appointments and authorities mentioned in this Offering Memorandum will be governed by, and construed in accordance with, the laws of England.  For the exclusive benefit of the Company and the Administrator, each Placee irrevocably submits to the jurisdiction of the courts of England and Wales and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum.  This does not prevent an action being taken against a Placee in any other jurisdiction.

In the case of a joint agreement to subscribe for Placing Shares under the Placing, references to a "Placee" in these terms and conditions are to each of the Placees who are a party to that joint agreement and their liability is joint and several.

The Company expressly reserves the right to modify the Placing (including, without limitation, its timetable and settlement) at any time prior to the date of the Placing.

APP_0197

**PLACING STATISTICS**

| | |
|---|---|
| Target Gross Placing Proceeds[*] | U.S. $153 million |
| Minimum expected initial Net Asset Value per Share[**] | U.S. $1.02535 |

---

[*]   The target size of the Placing is U.S. $153 million.  The number of Placing Shares to be issued, and therefore the Gross Placing Proceeds, is not known as at the date of this Offering Memorandum.

[**]   NAV per Share immediately following Placing based on the NAV of the Company as at September 30, 2017, as adjusted with respect to a dividend of US $ 9 million on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. for an aggregate purchase price of $991,180.13 on October 24, 2017.

APP_0198

## DEFINITIONS

The following definitions apply in this Offering Memorandum unless the context otherwise requires:

| | |
|---|---|
| "**2010 PD Amending Directive**" | Directive 2010/73/EU of the European Parliament and of the Council of 24 November 2010 amending Directives 2003/71/EC on the prospectus to be published when securities are offered to the public or admitted to trading and 2004/109/EC on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market |
| "**Accredited Investor**" | an as "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act |
| "**Acis**" | Acis Capital Management, L.P. |
| "**Acis CLO Management**" | Acis CLO Management, LLC |
| "**Acis Legacy CLO**" | a CLO in which Acis is the CLO manager |
| "**Administration Agreement**" | the agreement dated 10 August 2015 between the Company and the Administrator, a summary of which is set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*" |
| "**Administrator**" | State Street (Guernsey) Limited, or such other person or persons from time to time appointed by the Company |
| "**affiliate**" or "**affiliated**" | with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.  For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "affiliate" of the Company solely because the Administrator or its affiliates serve as administrator or share trustee for such entity |
| "**AIF**" | an alternative investment fund, as defined in the AIFMD |
| "**AIFM**" | an alternative investment fund manager, as defined in the AIFMD |
| "**AIFMD**" | Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directive 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010 |

APP_0199

| | |
|---|---|
| **"AIFMD Rules"** | any implementing legislation and regulations under AIFMD including, without limitation, Commission Delegated Regulation (EU) No 231/2013 supplementing the AIFMD with regard to exemptions, general operating conditions, depositaries, leverage, transparency, supervision and other applicable regulations implementing the AIFMD, in each case as may be altered, amended, added to or cancelled from time to time |
| **"Application Form"** | the application form for Shares, which is available upon request; |
| **"Approved Pricing Source"** | in relation to loans, Markit Partners or any other entity appointed from time to time and in relation to CLO Notes, Thomson Reuters or any other entity appointed from time to time |
| **"Articles"** | the articles of incorporation of the Company |
| **"Audit Committee"** | the audit committee of the Company, as more fully described in the section of this Offering Memorandum entitled "*Audit Committee*" in "*Company Directors and Administration*" |
| **"Auditor"** | PricewaterhouseCoopers CI LLP, or such other person or persons from time to time appointed by the Company |
| **"bps"** | basis point |
| **"Business Day"** | a day on which the banks in Guernsey and the United Kingdom are normally open for business |
| **"certificated"** or **"certificated form"** | not in uncertified form |
| **"Chairman"** | the chairman of the Board |
| **"CLO"** | a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans |
| **"CLO Income Notes"** | the most subordinated tranche of debt issued by a CLO (which may be represented by a debt or equity security) |
| **"CLO Manager"** | the entity acting as manager in a CLO pursuant to the relevant CLO Management Agreement |
| **"CLO Notes"** | notes representing tranches of debt issued by a CLO, including CLO Income Notes (which may be represented by a debt or equity security) |
| **"Closing Date"** | November 15, 2017 |
| **"Companies Law"** | the Companies (Guernsey) Law 2008, as amended, extended or replaced and any ordinance, statutory instrument or regulation made thereunder |
| **"Company"** | Highland CLO Funding, Ltd., a closed-ended investment company incorporated in Guernsey under the Companies Law on 30 March 2015 with registration number 60120 |
| **"CRR"** | Regulation 575/2013 of the European Parliament and of the Council on prudential requirements for credit institutions and investment firms |

APP_0200

| | |
|---|---|
| "**CRR Retention Requirements**" | the retention requirements contained in the CRR as amended from time to time and including any guidance or any technical standards published in relation thereto |
| "**Custodian**" | State Street Custodial Services (Ireland) Limited |
| "**Custody Agreement**" | the agreement dated 10 August 2015 between the Company and the Custodian, further details of which are set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*" |
| "**Directors**" or "**Board**" or "**Board of Directors**" | the directors of the Company |
| "**DP Law**" | The Data Protection (Bailiwick of Guernsey) Law, 2001, as amended |
| "**EEA**" | the European Economic Area being the countries included as such in the Agreement on European Economic Area, dated 1 January 1994, among Iceland, Liechtenstein, Norway, the European Community and the EU Member States, as may be modified, supplemented or replaced |
| "**Eligible U.S. Investor**" | a U.S. Person who is reasonably believed to be (x) a Qualified Institutional Buyer and a Qualified Purchaser (y) an Accredited Investor and a Qualified Purchaser or (z) an Accredited Investor and a Knowledgeable Employee with respect to the Company and to whom the Company is privately placing a certain number of the Placing Shares in reliance on exemptions from registration under the U.S. Securities Act and the U.S. Investment Company Act |
| "**ERISA**" | the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the applicable regulations thereunder |
| "**EU**" | the European Union |
| "**EU Member State**" | a member country of the EU |
| "**EU Retention Requirements**" | has the meaning given to it in the section of this Offering Memorandum entitled "*Risk Factors*" |
| "**EU Savings Tax Directive**" | Council Directive 2003/48/EC of 3 June 2003 on taxation of savings income in the form of interest payments |
| "**EURIBOR**" | Euro interbank offered rate, a benchmark interest rate |
| "**Euro**" or "**€**" | the lawful currency of the EU |
| "**FATCA**" | the U.S. Foreign Account Tax Compliance Act 2010 |
| "**FATCA Withholding**" | has the meaning given to it in the section of this Offering Memorandum entitled "*Risk Factors*" |
| "**Financial Conduct Authority**" or "**FCA**" | the UK Financial Conduct Authority and any successor regulatory authority |

APP_0201

| | |
|---|---|
| "**Forward Purchase Agreement**" | agreements which may be entered into from time to time between the Company and a CLO pursuant to which the Company may, from time to time, enter into sale and purchase contracts with a CLO with respect to certain assets of the Company |
| "**FSMA**" | the Financial Services and Markets Act 2000 of the United Kingdom, as amended |
| "**FTT**" | the European Commission's proposal for a Directive for a common financial transaction tax in certain EU Member States |
| "**GFSC**" or "**Commission**" | the Guernsey Financial Services Commission |
| "**GFSC Code**" | the Finance Sector Code of Corporate Governance published by the Commission |
| "**Gross Placing Proceeds**" | the aggregate value of the Placing Shares |
| "**Guernsey AML Requirements**" | The Criminal Justice (Proceeds of Crime) (Bailiwick of Guernsey) Law, 1999, the Criminal Justice (Proceeds of Crime) (Financial Services Businesses) (Bailiwick of Guernsey) Regulations 2007 and the Handbook of Financial Services Business (in each case as amended) and any other regulations relating to prevention of use of the financial system for the purpose of money laundering and made pursuant thereto |
| "**Guernsey IGA Legislation**" | Guernsey legislation implementing the IGA |
| "**Highland**" | Highland Capital Management, L.P. |
| "**Highland CLO**" | a CLO in which Highland or Highland CLO Management (or their affiliate) or a wholly owned subsidiary of the Company advised by Highland is the collateral manager |
| "**Highland CLO Management**" | Highland CLO Management, LLC |
| "**Highland HCF Advisor**" | Highland HCF Advisor, Ltd. |
| "**Highland Legacy CLO**" | a CLO in which Highland is the CLO manager |
| "**HMRC**" | Her Majesty's Revenue and Customs |
| "**IRR**" | internal rate of return |
| "**IRS**" | U.S. Internal Revenue Service |
| "Knowledgeable Employee" | a "knowledgeable employee" as defined in Rule 3c-5 promulgated under the Investment Company Act |
| "**LIBOR**" | London interbank offered rate, a benchmark interest rate |
| "**Managed CLO**" | any Acis Legacy CLO, Acis CLO 7, any Highland CLO or any Highland Legacy CLO |
| "**Market Abuse Directive**" | Directive 2003/6/EC of the European Parliament and of the Council on insider dealing and market manipulation (market abuse) |
| "**Memorandum**" | the memorandum of incorporation of the Company |

APP_0202

| | |
|---|---|
| "**Money Laundering Directive**" | 2005/60/EC of the European Parliament and of the EC Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing |
| "**Net Asset Value**" or "**NAV**" | gross assets less liabilities (including accrued but unpaid fees) determined in accordance with the section of this Offering Memorandum entitled "*Net Asset Value*" in "*The Company*" |
| "**Net Asset Value per Share**" or "**NAV per Share**" | the Net Asset Value divided by the number of Shares in issue at the relevant time |
| "**Net Placing Proceeds**" | the Gross Placing Proceeds less any offering expenses and any amounts retained for working capital purposes |
| "**Non-Qualified Holder**" | any person whose ownership of Shares (i) may result in the U.S. Plan Threshold being exceeded causing the Company's assets to be deemed "plan assets" for the purpose of ERISA or the U.S. Tax Code; (ii) may cause the Company to be required to register as an "investment company" under the U.S. Investment Company Act (including because the holder of the shares is not a "qualified purchaser" as defined in the U.S. Investment Company Act) or to lose an exemption or a status thereunder to which it might be entitled; (iii) may cause the Company to have to register under the U.S. Exchange Act or any similar legislation; (iv) may cause the Company not to be considered a "Foreign Private Issuer" as such term is defined in rule 3b-4(c) under the U.S. Exchange Act; (v) may result in a person holding shares in violation of the transfer restrictions published by the Company, from time to time; and (vi) may cause the Company to be a "controlled foreign corporation" for the purposes of the U.S. Tax Code |
| "**Offering Memorandum**" | this offering memorandum |
| "**Ordinary Shares**" | ordinary shares of no par value each in the capital of the Company |
| "**Placee**" | a person subscribing for Shares under the Placing |
| "**Placing**" | the placing of Placing Shares at the Placing Price to one or more investors |
| "**Placing Price**" | As of a given date, the price per Ordinary Share determined in reference to the most recent quarterly determined NAV |
| "**Placing Shares**" | Shares to be issued by the Company pursuant to the Placing |
| "**POI Law**" | The Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended |
| "**Portfolio Management Agreement**" | the agreement dated 22 December 2016 between the Company and the Portfolio Manager pursuant to which the Portfolio Manager will provide certain support and personnel to the Company |
| "**Portfolio Manager**" | Highland HCF Advisor acting as Portfolio Manager to the Company pursuant to the Portfolio Management Agreement |
| "**Prospectus Directive**" | Directive 2003/71/EC of the European Parliament and of the Council on the prospectus to be published when securities are offered to the public or admitted to trading |
| "**Provider**" | the provider of any Warehouse Loan to the Company |

APP_0203

| | |
|---|---|
| "**Qualified Institutional Buyers**" | has the meaning given in Regulation 144A of the U.S. Securities Act |
| "**Qualified Purchasers**" | has the meaning given in the U.S. Investment Company Act |
| "**RCIS Rules**" | the Registered Collective Investment Schemes Rules 2015 |
| "**Register**" | the register of Shareholders |
| "**Regulation S**" | Regulation S promulgated under the U.S. Securities Act |
| "**Relevant Member State**" | each member state of the European Economic Area which has implemented the Prospectus Directive |
| "**Restricted Shareholders**" | Shareholders who are resident in, or citizens of, a Restricted Territory |
| "**Restricted Territory**" | the United States and any other jurisdiction where the extension or availability of the Placing would breach any applicable law |
| "**RTS**" | the Regulatory Technical Standards, published by the European Commission |
| "**SDRT**" | UK Stamp Duty Reserve Tax |
| "**SEC**" | the U.S. Securities and Exchange Commission |
| "**Services Agreements**" | the Staff and Services Agreement and the Sub-Advisory Agreement |
| "**Share**" | a share in the capital of the Company (of whatever class) and having such rights and being subject to such restrictions as are contained in the Articles |
| "**Shareholder**" | a holder of Shares |
| "**Shareholding**" | a holding of Shares |
| "**UK**" or "**United Kingdom**" | the United Kingdom of Great Britain and Northern Ireland |
| "**UK Corporate Governance Code**" | the UK Corporate Governance Code as published by the Financial Reporting Council |
| "**United States**" or "**U.S.**" | the United States of America, its territories and possessions, any state of the United States of America and the District of Columbia |
| "**U.S. Dollar**" or "**U.S.$**" | the lawful currency of the United States |
| "**U.S. Exchange Act**" | the U.S. Securities Exchange Act of 1934, as amended |
| "**U.S. Investment Company Act**" | the U.S. Investment Company Act of 1940, as amended |
| "**U.S. Person**" | has the meaning given in Regulation S under the U.S. Securities Act |
| "**U.S. Plan**" | any plan subject to Title 1 of ERISA or section 4975 of the U.S. Tax Code |
| "**U.S. Plan Assets Regulations**" | the regulations promulgated by the U.S. Department of Labor at 29 CFR 2510.3-101, as modified by section 3(42) of ERISA |
| "**U.S. Plan Investor**" | (i) an "employee benefit plan" as defined in section 3(3) of ERISA that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or |

APP_0204

|  | (iii) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in the preceding clause (i) or (ii) in such entity pursuant to the U.S. Plan Assets Regulations |
|---|---|
| **"U.S. Plan Threshold"** | ownership by benefit plan investors, as defined under section 3(42) of ERISA, in the aggregate of 25 per cent or more of the value of any class of equity in the Company (calculated by excluding the value of any equity interest held by any person (other than a benefit plan investor, as defined under section 3(42) of ERISA) that has discretionary authority or control with respect to the assets of the Company or that provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person); the term shall be amended to reflect such new ownership threshold that may be established by a change in the U.S. Plan Asset Regulations or other applicable law |
| **"U.S. Risk Retention Rules"** | the United States federal interagency credit risk retention rules, codified at 17 C.F.R. Part 246. |
| **"U.S. Securities Act"** | the U.S. Securities Act of 1933, as amended |
| **"U.S. Tax Code"** | the U.S. Internal Revenue Code of 1986, as amended |
| **"VAT"** | value added tax or a similar consumption tax |

APP_0205

## DIRECTORS, ADVISERS AND SERVICE PROVIDERS

**Directors**
Heather Bestwick
William Scott

*All c/o the Company's registered office*

**Registered Office**
First Floor, Dorey Court
Admiral Park
St Peter Port
Guernsey
GY1 6HJ
Channel Islands

**Portfolio Manager and Adviser**
Highland HCF Advisor, Ltd.
c/o Maples Corporate Services Limited
PO Box 309, Ugland House
Grand Cayman, KY1-1104
Cayman Islands

**Legal Advisers to the Company (as to Guernsey law)**
Mourant Ozannes
PO Box 186
1 Le Marchant Street
St Peter Port
Guernsey GY1 4HP
Channel Islands

**Legal Advisers to the Company**
(as to English law)
Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ
United Kingdom

**Administrator/Company Secretary**
State Street (Guernsey) Limited
First Floor, Dorey Court
Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

**Custodian & Principal Bankers**
State Street Custodial Services (Ireland) Limited
No. 78
Sir John Rogerson's Quay
Dublin
Ireland

**Corporate Services Provider**
State Street Guernsey (Limited)
First Floor, Dorey Court
Admiral Park,
St Peter Port, Guernsey GY1 6HJ
Channel Islands

**Auditors**
PricewaterhouseCoopers CI LLP
Royal Bank Place
1 Glategny Esplanade
St Peter Port
Guernsey
GY1 4ND
Channel Islands

APP_0206

AMENDED AND RESTATED
INVESTMENT ADVISORY AGREEMENT

THIS AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "***Agreement***"), dated to be effective from July 1, 2014 is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "***Fund***"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "***General Partner***"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "***Investment Advisor***").

RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor are parties to that certain Investment Advisory Agreement dated January 1, 2012 (the "***Original Agreement***");

WHEREAS, the parties desire to amend and restate the Original Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Investment Advisory Services</u>.   Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2.    <u>Custody</u>.   The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian").  The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the

EXHIBIT

6

Financial Instruments.  The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

3.    <u>Authority of the Investment Advisor</u>.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

(a)    investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in

APP_0208

real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

(b)    engaging in such other lawful Financial Instruments transactions;

(c)    research and analysis;

(d)    purchasing Financial Instruments and holding them for investment;

(e)    entering into contracts for or in connection with investments in Financial Instruments;

(f)    investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(g)    possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)    lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)    opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)    opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

3

(k)    combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("***Other Accounts***") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)    entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)    organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)    causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)    engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)    voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.    <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the

4

General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)     to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)     to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)     to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)     to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)     to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

APP_0211

5.      Valuation of Financial Instruments.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6.      Status of the Investment Advisor.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

7.      Investments.  ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.      Reimbursement by the General Partner.  The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "*Sub-Advisor*"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; *provided, however*, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries

APP_0212

hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

        9.     <u>Expenses</u>.

        (a)     The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses. In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor. For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

        (b)     To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

        10.     <u>Fees</u>. Without limiting the expense reimbursements set forth above, the Investment Advisor shall provide the Fund with the services described herein for 100 bps per annum (25 bps per quarter) of the market value of the Equity Investments (defined below) and 50 bps per annum (12.5 bps per quarter) of the market value of the Debt Investments (defined

7

below), calculated as of the last business day of each calendar quarter (the "*Calculation Date*"), payable quarterly in arrears by the 45th business day following the end of each quarter, provided that the Investment Advisor shall deliver to the General Partner on or before the 30th business day following the end of each calendar quarter a statement showing the calculation of the fee for such quarter. For purposes hereof, the "*Equity Investments*" shall mean those Financial Instruments which are equity investments held by the Fund (either directly or indirectly through a subsidiary vehicle) on the Calculation Date, and "*Debt Investments*" shall mean those Financial Instruments which are debt investments held by the Fund (either directly or indirectly through a subsidiary vehicle) on the Calculation Date. For the avoidance of doubt, the Financial Instruments shall be valued as of each Calculation Date in accordance with the then current valuation policy of the Investment Advisor. Notwithstanding the foregoing, neither the term "Equity Investments" nor the term "Debt Investments" shall include any Financial Instruments with respect to which the Investment Advisor or any affiliate thereof already receives management fees.

11.    Exculpation; Indemnification.

(a)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "*Covered Person*" and collectively, "*Covered Persons*") shall be subject to the provisions of this Section.

(b)    To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on

8

behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)     Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)     To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "***Indemnified Party***"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).  The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

APP_0215

(e)     Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence.  As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct,

10

fraud or gross negligence or the ability to waive or limit such Losses under applicable law. Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements.  Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

12.    Activities of the Investment Advisor and Others.  The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund.  Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate.  In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund.  The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar.  The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager.  Each of the General Partner and the Fund acknowledges that it has received a copy of Part 2 of the Investment Advisor's Form ADV, which further describes conflicts of interest, including the Investment Advisor, its affiliates and their respective advised accounts.

13.    Term.  This Agreement shall remain in effect through an initial term concluding December 31, 2014 and shall be automatically extended for additional one-year

terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

14.      Miscellaneous.

(a)      Notices.   Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

If to the Investment Advisor, to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Telephone Number:  (972) 628-4100
Facsimile Number:  (972) 628-4147

If to the General Partner or the Fund, to:

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention:  Grant Scott
Telephone Number:  (919) 854-1407
Facsimile Number:  (919) 854-1401

(b)      Entire Agreement.   This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c)      Amendments and Waivers.   No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties.  No amendment to this Agreement may be made without first obtaining the required approval from the Fund.  The failure of a party to insist upon strict adherence to any term of this Agreement on

12

any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)    Binding Effect; Assignment.    This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns.  Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent.  No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; provided; however, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e)    Governing Law.  Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

(f)    Arbitration.  (i) Any controversy or claim or dispute arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (a "***Disputed Matter***") shall be handled exclusively pursuant to the following procedures. In the event of any Disputed Matter, the parties agree that upon written notice of such Disputed Matter sent by one party to the party, the parties shall arbitrate the Disputed Matter pursuant to this Section 14(f) unless the parties expressly agree in writing to resolve the Disputed Matter in another manner through mediation or otherwise.  The arbitration shall be conducted pursuant to the commercial arbitration rules of the American Arbitration Association in Dallas, Texas.  Any arbitration pursuant to this Agreement unless otherwise agreed to by the parties shall be conducted by a panel of three (3) arbitrators mutually selected by the parties from a list of

13

arbitrators determined in accordance with the American Arbitration Association's arbitrator selection procedure.

(ii)    The judgment upon the award rendered in any such arbitration shall be final and binding upon the parties and may be entered in any court having jurisdiction thereof.  All fees and expenses of the arbitrator and all other expenses of the arbitration shall be paid by the non-prevailing party in such arbitration.  The arbitrator shall have no authority to impose any punitive or consequential damages.

(iii)    Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g)    Headings.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)    Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)    Survival.  The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j)    Pronouns.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(k)    Arm's-Length Agreement.  The General Partner and the Fund have approved this Agreement and reviewed the activities described in Section 12 and in the Investment Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

14

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By: _____
Name:  James Dondero
Title:  President
Date:  August 26, 2014

CHARITABLE DAF GP, LLC

By: _____
Name:  Grant J. Scott
Title:  Managing Member
Date:  August 26, 2014

CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general partner

By: _____
Name:  Grant J. Scott
Title:  Managing Member
Date:  August 26, 2014

15

**APP_0221**