BTXN 138 (rev. 09/22)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In Re: | § | |
| Highland Capital Management, L.P. | § | |
| | § | Case No.:    19−34054−sgj11 |
| Debtor(s) | § | Chapter No.:   11 |
| Charitable DAF Fund, LP  et al. | § | |
| Plaintiff(s) | § | Adversary No.:    21−03067−sgj |
| vs. | § | |
| Highland Capital Management, LP  et al. | § | Civil Case No.: |
| Defendant(s) | § | |
| | § | |
| Charitable DAF Fund, LP et al | § | |
| Plaintiff(s) | § | |
| vs. | § | |
| Highland Capital Management, LP et al. | § | |
| Defendant(s) | § | |
| | § | |
| | § | |

## NOTICE OF TRANSMITTAL REGARDING WITHDRAWAL OF REFERENCE

I am transmitting:

- ☑ One copy of the Motion to Withdraw Reference (USDC Civil Action No. – DNC Case) **NOTE**:
  A Status Conference has been set for 01/25/2023 at 1:30PM, in  via WebEx videoconference
  https://us−courts.webex.com/meet/jerniga.  before U.S. Bankruptcy Judge _. The
  movant/plaintiff, respondent/defendant or other affected parties are required to attend the Status
  Conference.

- ☑ One copy of:  Response, Brief and Appendix in Support of Response .

DATED:  12/15/22                          FOR THE COURT:
                                          Robert P. Colwell, Clerk of Court

                                          by: /s/Sheniqua Whitaker, Deputy Clerk

BTXN 116 (rev. 07/08)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# WITHDRAWAL OF REFERENCE SERVICE LIST

## Transmission of the Record

BK Case No.: _19–34054–sgj11_

Adversary No.: _21–03067–sgj_

Received in District Court by: _____

Date: _____

Volume Number(s): _____

cc: Stacey G Jernigan
    Courtney Lauer
    Caroline Nowlin
    Attorney(s) for Appellant
    US Trustee

**Plaintiff** Charitable DAF Fund, LP and CLO Holdco, Ltd.

Jonathan E. Bridges
Sbaiti & Company PLLC
JP Morgan Chase Tower
2200 Ross Avenue, Suite 4900 W
Dallas, TX 75201
(214) 432–2899

Mazin Ahmad Sbaiti
Sbaiti & Company PLLC
JP Morgan Chase Tower
2200 Ross Avenue, Suite 4900 W
Dallas, TX 75201
(214) 432–2899

**Defendant** Highland Capital Management, LP

Zachery Z. Annable
Hayward PLLC
10501 N. Central Expressway
Suite 106
Dallas, TX 75231
(972) 755–7108

Gregory V. Demo
Pachulski Stang Ziehl & Jones L.L.P.
780 Third Avenue
New York, NY 10017–2024
(212) 561–7700

Judith Elkin

Pachulski Stang Ziehl & Jones
780 Third Avenue, 34th Floor
New York, NY 10017
212–561–7781

Robert Joel Feinstein
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017–2024
(212) 561–7700

Melissa S. Hayward
Hayward PLLC
10501 N. Central Expry, Ste. 106
Dallas, TX 75231
972–755–7104

Ira D Kharasch
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067
310–227–6910

John A. Morris
Pachulski Stang Ziehl & Jones, LLP
780 Third Avenue, 34th Floor
New York, NY 10017–2024
(212) 561–7700

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
310–277–6910

Hayley R. Winograd
Pachulski Stang Ziehl & Jones LLP
780 3rd Avenue #36
New York, NY 10017
(212) 561–7700


**Defendant**   Highland HCF Advisor Ltd. (Pro Se)

No contact information

BTXN 150 (rev. 11/10)

| | | |
|---|---|---|
| In Re:<br>Highland Capital Management, L.P. | §<br>§<br>§<br>§ | |
| | Debtor(s) | §<br>§ | Case No.:   19–34054–sgj11<br>Chapter No.:   11 |
| Charitable DAF Fund, LP  et al. | §<br>§ | |
| | Plaintiff(s) | §<br>§ | Adversary No.:   21–03067–sgj |
| vs.<br>Highland Capital Management, LP  et al. | §<br>§<br>§ | |
| | Defendant(s) | § | |

## CIVIL CASE COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**I.  (a)  PLAINTIFF**
Charitable DAF Fund, LP and CLO Holdco, Ltd.

**DEFENDANT**
Highland Capital Management, LP, and Highland HCF Advisor Ltd

   (b)  County of Residence of First Listed Party:
      (EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Party:
(IN U.S. PLAINTIFF CASES ONLY)

   (c)  Attorney's (Firm Name, Address, and Telephone Number)
      See Service List

Attorney's (If Known)
See Service List

---

**II. BASIS OF JURISDICTION**

○ 1  U.S. Government Plaintiff

○ 2  U.S. Government Defendant

◉ 3  Federal Question (U.S. Government Not a Party)

○ 4  Diversity (Indicate Citizenship of Parties in Item III)

---

**III. CITIZENSHIP OF PRINCIPAL PARTIES**

| | | | |
|---|---|---|---|
| Citizen of This State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business In This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business In Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV. NATURE OF SUIT**

○ 422 Appeal 28 USC 158    ◉ 423 Withdrawal 28 USC 157    ○ 890 Other Statutory Actions

---

**V. ORIGIN**

○ 1  Original Proceeding    ○ 2  Removed from State Court    ○ 3  Remanded from Appellate Court    ○ 4  Reinstated or Reopened

○ 5  Transferred from another district    ○ 6  Multidistrict Litigation    ○ 7  Appeal to District Judge from Magistrate Judgment

---

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
423 Withdrawal 28 USC 157

Brief description of cause:
Motion to withdraw the reference

---

**VII. REQUESTED IN COMPLAINT:**

☐  CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23    DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☐ Yes   ☐ No

---

**VIII. RELATED CASE(S) IF ANY**
Judge:                                        Docket Number:

---

DATED:  12/15/22

FOR THE COURT:
Robert P. Colwell, Clerk of Court
by: /s/Sheniqua Whitaker, Deputy Clerk

SBAITI & COMPANY PLLC
Mazin A. Sbaiti (TX Bar No. 24058096)
Jonathan Bridges (TX Bar No. 24028835)
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367

*Counsel for Charitable DAF Fund, L.P.*
*and CLO Holdco, Ltd.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| CHARITABLE DAF FUND, L.P. AND CLO HOLDCO, LTD., DIRECTLY AND DERIVATIVELY | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03067-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING LTD., NOMINALLY | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

### RENEWED MOTION TO WITHDRAW THE REFERENCE

The Charitable DAF Fund, L.P. and CLO Holdco, Ltd., Plaintiffs in the above-referenced

adversary proceeding, file this Motion under 28 U.S.C. § 157(d), Rule 5011 of the Federal Rules

of Bankruptcy Procedure, Rule 5011-1 of the Local Bankruptcy Rules, and this Court's standing

order, Order of Reference of Bankruptcy Cases & Proceedings Nunc Pro Tunc, In re Miscellaneous

Order No. 3:04-MI-00033 (N.D. Tex. Oct. 4, 1982), as to the above-referenced adversary

proceeding. Plaintiffs respectfully re-urge withdrawal of the reference in light of Highland Capital

Management, L.P.'s Renewed Motion to Dismiss and arguments advanced therein.

## I.

## <u>BACKGROUND</u>

1.        Plaintiffs filed this action in district court. In response to Highland's motion seeking

reference to the bankruptcy court [Doc. 1-1], Plaintiffs filed an opposition and cross-motion

seeking withdrawal of the reference [Doc. 36]. The district court granted Highland's motion and

referred the action to the bankruptcy court without addressing the merits of Plaintiff's cross-motion

or the underlying statutory basis for withdrawal [Doc. 64].

2.        In the bankruptcy court, Plaintiffs filed a proposed motion to withdraw the

reference as an exhibit to their Motion for Stay [Doc. 69-1], explaining in the stay motion that they

understood the Plan Injunction to prohibit them from advocating for withdrawal of the reference

at that time, but that they would do so if allowed.

3.        Highland moved to dismiss the action under Rule 12 of the Federal Rules of Civil

Procedure [Doc. 26]. The bankruptcy court granted that motion [Doc. 80]. The district court

reversed [Doc. 99].

4.        Highland now re-urges dismissal under Rule 12 for the same and other reasons

[Doc. 123], relying on arguments that implicate federal statutes and require, Plaintiffs submit,

withdrawal of the reference now.

## II.

## <u>WITHDRAWAL OF THE REFERENCE IS MANDATORY</u>

5.        This adversary proceeding primarily involves fiduciary duties imposed upon

Registered Investment Advisers by the Investment Advisers Act of 1940 ("Advisers Act") and

corresponding state law claims for breach of those duties. As a result, presiding over this action

will require extensive consideration of federal laws regulating interstate commerce, which renders

withdrawal of the reference to bankruptcy court mandatory under 28 U.S.C. § 157(d).

6.     Under § 157(d), withdrawal of the reference is mandatory when a proceeding

"requires consideration" of non-bankruptcy federal laws regulating interstate commerce:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any
> party, for cause shown. The district court shall, on timely motion of a party,
> so withdraw a proceeding if the court determines that resolution of the
> proceeding requires consideration of both title 11 and other laws of the
> United States regulating organizations or activities affecting interstate
> commerce.

28 U.S.C. § 157(d); *cf. TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement*

*Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited

jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157); *LightSquared Inc. v. Deere*

*& Co.*, 2014 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2014) (quoting *Investor Prot. Corp. v. Bernard*

*L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. Jan. 31, 2011), for the proposition that,

"[i]n determining whether withdrawal is mandatory, the Court 'need not evaluate the merits of the

parties' claims; rather, it is sufficient for the Court to determine that the proceeding will involve

consideration of federal non-bankruptcy law'"); *In re Cont'l Airlines Corp.*, 50 B.R. 342, 360 (S.D.

Tex. 1985), *aff'd*, 790 F.2d 35 (5th Cir. 1986) ("While that second clause [of § 157(d)] might not

apply when some 'other law' only tangentially affects the proceeding, it surely does apply when

federal labor legislation will likely be material to the proceeding's resolution.") (emphasis added).

7.     Plainly here, the claims in the Complaint at least involve federal laws "regulating

organizations or activities affecting interstate commerce." The Advisers Act is such a law, and at

least the first count of the Complaint implicates it. *See, e.g.*, Complaint [Doc. 1-1] ¶¶ 57 & n.5, 66,

69, 74 & n.6, 89 (explicitly invoking various provisions of the Advisers Act and accompanying regulations). Defendant's entire argument against withdrawal of the reference thus turns on whether these laws "must be considered."

8.　　It is readily apparent that these statutes must be considered in this adversary proceeding. The briefing already puts at issue significant, hotly contested issues regarding the interplay of bankruptcy law and these federal statutes, including

- Whether Defendant owed federal fiduciary duties under the Advisers Act that are unwaivable;

- To whom such duties are owed and whether they were violated;

- Whether they are actionable under federal law;

- Whether such Advisers Act fiduciary duties can be terminated by a blanket injunction in a bankruptcy plan;

- Whether a contractual jury waiver is enforceable as to claims for breach of unwaivable Advisers Act fiduciary duties;

- Whether such waivers can be enforced as to non-parties to the waiver.

Presiding over this action most certainly will require consideration of these issues.

9.　　Before joining the Fifth Circuit, Judge Clement addressed a similar matter during her time in the Eastern District of Louisiana. There, in *In re Harrah's Entm't*, 1996 U.S. Dist. LEXIS 18097, at *7-8 (E.D. La. 1996), she denied a motion to refer a federal securities action to bankruptcy court, relying on a rationale fully applicable here. Despite finding that the bankruptcy court had related-to jurisdiction, Judge Clement wrote,

> Although "related to" bankruptcy jurisdiction exists over the non-debtor plaintiffs' non-bankruptcy federal securities claims against non-debtor defendants, placing that bankruptcy jurisdiction in the bankruptcy court is inappropriate because plaintiffs would be entitled to a mandatory withdrawal of the reference.

*Id*. at *11.

10.     Judge Clement rejected the argument that the case would "only involve the simple application of established federal securities laws." *Id.* at *7. Instead, she relied on alleged "violations of several federal securities laws" and the plaintiff's attempt "to hold defendants directly liable and secondarily liable based on a 'controlling person' theory for certain acts and omissions." *Id.*

11.     Without any need to analyze how "established" the applicable law might be, Judge Clement concluded, "This federal securities litigation involves more than simple application of federal securities laws and will be complicated enough to warrant mandatory withdrawal under § 157(d)." *Id.* (citing *Rannd Res. v. Von Harten (In re Rannd Res.)*, 175 B.R. 393, 396 (D. Nev. 1994), for the proposition that withdrawal of the reference is mandatory where resolution requires more than simple application of federal securities laws, even though that court's determination was based solely on a review of the complaint's alleged violations of § 12(2) of the Securities Act of 1933, § 10 of the Securities Exchange Act of 1934, and Rule 10b-5).

12.     This authority is on all fours here. In the Complaint, Plaintiffs allege violations of federal securities law (the Advisers Act), as well as the RICO statute. Highland has taken the position that the RICO Statute cannot apply because of exclusions under RICO for claims that raise securities laws violations. Deciding the renewed motion to dismiss will require far more than simple application of these laws. Nothing more is necessary to satisfy § 157(d). *Cf. S. Pac. Transp. Co. v. Voluntary Purchasing Grps.*, 252 B.R. 373, 382-84 (E.D. Tex. 2000) (holding that even the court's "limited" role in approving a CERCLA settlement "necessarily involves the substantial and material consideration of CERCLA" and "will require the court to examine the unique facts of the case in light of those CERCLA provisions which create the causes of action at issue"). *Compare id.* at 382 ("It is well settled that CERCLA is a statute "'rooted in the commerce clause'

and is precisely 'the type of law . . . Congress had in mind when it enacted the statutory withdrawal provision [in § 157(d)].'") *with* the Advisers Act, 15 U.S.C. § 80b-1 ("Upon the basis of facts disclosed by the record and report of the Securities and Exchange Commission made pursuant to section 30 of the Public Utility Holding Company Act of 1935, and facts otherwise disclosed and ascertained, it is hereby found that investment advisers are of national concern, in that, among other things—(1) their advice, counsel, publications, writings, analyses, and reports are furnished and distributed, and their contracts, subscription agreements, and other arrangements with clients are negotiated and performed, by the use of the mails and means and instrumentalities of interstate commerce; (2) their advice, counsel, publications, writings, analyses, and reports customarily relate to the purchase and sale of securities traded on national securities exchanges and in interstate over-the-counter markets, securities issued by companies engaged in business in interstate commerce, and securities issued by national banks and member banks of the Federal Reserve System; and (3) the foregoing transactions occur in such volume as substantially to affect interstate commerce, national securities exchanges, and other securities markets, the national banking system and the national economy.").

13.   Although it is unnecessary to demonstrate that Plaintiffs' Advisers Act allegations will require application of underdeveloped law, that certainly is the case. As the Third Circuit pointed out in 2013, there is considerable "confusion" in the case law stemming from the fact that federal law (the Advisers Act) provides "the duty and the standard to which investment advisers are to be held," but "the cause of action is presented as springing from state law." *Belmont v. MB Inv. Partners, Inc.,* 708 F.3d 470, 502 (3d Cir. 2013). The *Belmont* court further suggests the "confusion [that this situation] engenders may explain why there has been little development in either state or federal law on the applicable standards." *Id.* (emphasis added). "Half a century

---

later," the *Belmont* court tells us, "courts still look primarily to *Capital Gains Research [, Inc.*, ==375 U.S. 180, 192== (1963),] for a description of an investment adviser's fiduciary duties." *Id*. at 503; *see also* Plaintiffs' Response to Renewed Motion to Dismiss (addressing the Debtor's erroneous argument that the Advisers Act creates no private right of action). This observation is bolstered by the necessity of relying extensively on SEC regulations and rulings in the Complaint. *See* Complaint ¶ 57 & n.5 (invoking Investment Advisers Act Release Nos. 3060 (July 28, 2010), and 2106 (Jan. 31, 2003), 66 (17 C.F.R. 275.206(4)-7), 69 (27 C.F.R. part 275 and Rule 10b5-1), 74 & n.6 (Advisers Act Release No. 4197 (Sept. 17, 2015)).

## III.

## THIS ADVERSARY PROCEEDING IS NOT A CORE PROCEEDING

14.     In previous briefing, the Debtor has suggested that this adversary proceeding should remain in bankruptcy court because it is a core proceeding under Title 11. Plaintiffs respectfully submit this is incorrect because the causes of action asserted in the Complaint do not "arise under," or "arise in" Title 11 and therefore cannot be "core" proceedings.

15.     To be clear, Plaintiffs are not seeking and have disclaimed any relief that would literally unwind or reverse any settlement approved by the bankruptcy court. Neither do Plaintiffs attempt an end run around the provisions of any approval. They merely seek vindication of their rights via damages, and they respectfully submit that a proper jurisdictional analysis demonstrates their causes of action are not core proceedings within the bankruptcy court's jurisdiction, for the reasons addressed below.

16.     *__First__*, "the 'core proceeding' analysis is properly applied not to the case as a whole, but as to each cause of action within a case." *Legal Xtranet, Inc. v. AT&T Mgmt. Servs., L.P. (In re Legal Xtranet, Inc.)*, ==453 B.R. 699, 708==–09 (Bankr. W.D. Tex. 2011); *Davis v. Life Inv'rs Ins.*

*Co. of Am.*, 282 B.R. 186, 193 n. 4 (S.D. Miss.2002); *see also In re Exide Techs.*, 544 F.3d 196, 206 (3d Cir. 2008) ("A single cause of action may include both core and non-core claims. The mere fact that a non-core claim is filed with a core claim will not mean the second claim becomes 'core.'").

17.     __*Second*__, the Fifth Circuit has explained that "§ 157 equates core proceedings with the categories of 'arising under' and 'arising in' proceedings; therefore, a proceeding is core under section 157 if it invokes a substantive right provided by title 11[, it 'arises under' the Bankruptcy Code,] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case[, it 'arises in' a bankruptcy case]." *United States. Brass Corp. v. Travelers Ins. Grp., Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 692–93 (Bankr. N.D. Tex. 2020); Stern v. Marshall, 564 U.S. 462, 476 (2011).

18.     __*Third*__, none of the Plaintiffs' five causes of action—breach of fiduciary duty under the Advisers Act, breach of contract related to the HCLOF Company Agreement, negligence, RICO, and tortious interference—arise under title 11. That is, none of the substantive rights of recovery are created by federal bankruptcy law. And plainly so. Because "[a]rising under' jurisdiction [only] involve[s] cause[s] of action created or determined by a statutory provision of title 11," this is indisputably the case. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right, created by federal bankruptcy law, that could not exist outside of bankruptcy).

19.     __*Fourth*__, for similar reasons, none of Plaintiffs' causes of action "arise in" a bankruptcy case. "Claims that 'arise in' a bankruptcy case are claims that by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case." *Legal*

*Xtranet, Inc.*, 453 B.R. at 708–09 (emphasis added) (citing *Stoe v. Flaherty*, 436 F.3d 209, 216 (3d

Cir. 2006). The Debtor has previously argued that, because the factual circumstances giving rise

to the causes of action included the HarbourVest Settlement, which was approved by the

bankruptcy court, this somehow transforms Plaintiffs' causes of action into core claims. But it is

the nature of the causes of action that determines whether they are core, not their "particular factual

circumstance." *Id.*

20.     To illustrate the point, in *Gupta v. Quincy Med. Ctr.*, 858 F.3d 657, 660 (1st Cir.

2017), the bankruptcy court had issued a sale order which approved an asset purchase agreement

whereby the purchaser became obligated to make certain payments to employees. The purchaser

failed to make these payments, so the employees sued the purchaser in bankruptcy court, and the

bankruptcy court rendered a judgment in favor of the employees. On appeal, the district court

concluded that the bankruptcy court lacked subject matter jurisdiction over the claims—claims

plainly related to and existing only because of the approved sale order that gave rise to them. The

First Circuit affirmed, explaining as follows:

> [T]he fact that a matter would not have arisen had there not been a
> bankruptcy case does not ipso facto mean that the proceeding qualifies as
> an 'arising in' proceeding. Instead, the fundamental question is whether the
> proceeding by its nature, not its particular factual circumstance, could arise
> only in the context of a bankruptcy case. In other words, it is not enough
> that Appellants' claims arose in the context of a bankruptcy case or even
> that those claims exist only because Debtors (Appellants' former employer)
> declared bankruptcy; rather, "arising in" jurisdiction exists only if
> Appellants' claims are the type of claims that can only exist in a bankruptcy
> case.

*Id.* at 664–65 (emphasis added).

21.     Like the claims in *Gupta*, the Plaintiffs' causes of action here arose in the context

of a transaction approved in a bankruptcy case. But obviously, the causes of action are not "the

type of claims that can only exist in a bankruptcy case." And that ends the analysis. Because

---

Plaintiffs' causes of action do arise under the Bankruptcy Code, and because they are not claims that could only arise in the context of bankruptcy, this action is not a core proceeding.

**IV.**

**CONCLUSION**

In sum, because 28 U.S.C. § 157(d) mandates withdrawal of the reference here, and because this is not a "core" proceeding, the Court should withdraw the reference as to this adversary proceeding and grant Plaintiffs all additional relief to which they may be entitled.

Dated:  November 18, 2022                    Respectfully submitted,

                                             **SBAITI & COMPANY PLLC**

                                             */s/ Jonathan Bridges*
                                             **Mazin A. Sbaiti**
                                             Texas Bar No. 24058096
                                             **Jonathan Bridges**
                                             Texas Bar No. 24028835
                                             2200 Ross Avenue – Suite 4900W
                                             Dallas, TX  75201
                                             T: (214) 432-2899
                                             F: (214) 853-4367
                                             E: mas@sbaitilaw.com
                                                 jeb@sbaitilaw.com

                                             **Counsel for Plaintiffs**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | |
| Defendants | |

## HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## <u>RESPONSE TO "RENEWED" MOTION TO WITHDRAW THE REFERENCE</u>

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Highland Capital Management, L.P., a defendant in the above-captioned adversary proceeding ("Highland"), hereby submits this response (the "Response") in opposition to the *Renewed Motion to Withdraw the Reference* [D.I. 128] (the "Motion") filed by plaintiffs The Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLOH," and together with DAF, "Plaintiffs"). In support of its Response, Highland states as follows:

## **RELIEF REQUESTED**

1.      Through this Response, Highland respectfully requests that the Court deny the Motion in full, because the Motion is nothing more than another attempt by Plaintiffs to forum shop, delay adjudication, and waste judicial and estate resources.

2.      Pursuant to Rules 7.1(d) and (h) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), a separate brief (the "Brief") is being filed contemporaneously with this Response and is incorporated by reference as if fully set forth herein.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Highland respectfully requests that the Court enter an order (i) denying in whole the relief requested in the Motion, and (ii) granting Highland such further and additional relief as the Court deems just and proper.

Dated:  December 9, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

2

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | Adv. Pro. No. 21-03067-sgj |
| Plaintiffs, | |
| vs. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | |
| Defendants | |

## BRIEF IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## RESPONSE TO "RENEWED" MOTION TO WITHDRAW THE REFERENCE

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................ 6

   I.       There is No Basis for Mandatory Withdrawal of the Reference ........................... 6

        a.     The Motion Is Untimely and Should Be Denied .................................... 7

        b.     The Renewed MTD Does Not Require "Substantial and Material Consideration" of Significant Federal Laws ............................................ 9

        c.     Plaintiffs Cite No Applicable Case Law. ............................................... 14

        d.     Plaintiffs' Additional Arguments Are Meritless. ................................... 15

   II.      The Court Has "Core" Jurisdiction to Adjudicate the Complaint. ........................ 16

CONCLUSION ..................................................................................................... 18

## TABLE OF AUTHORITIES

**CASES**

*Affco Invs. 2001 LLC v. Proskauer Rose L.L.P.*,
  625 F.3d 185 (5th Cir. 2010) ............................................................. 13

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2012) .............................................................. 14

*Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*,
  485 B.R. 604 (Bankr. W.D. Wash. 2013).......................................... 12

*Carter v. Schott (In re Carter Paper Co.)*,
  220 B.R. 276 (Bankr. M.D. La. 1998)............................................... 15

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*
  *(In re Highland Cap. Mgmt., L.P.)*,
  2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022) ........................... passim

*City of N.Y. v., Exxon Corp.*,
  932 F.2d 1020 (2d Cir. 1991) ............................................................. 7

*Connolly v. Bidermann Indust. U.S.A., Inc.*,
  1996 U.S. Dist. LEXIS 8059 (S.D.N.Y. June 13, 1996) ..................... 7

*Corwin v. Marney, Orton Inv.*,
  788 F.2d 1063 (5th Cir. 1986) ........................................................... 11

*Drew v. WorldCom, Inc.*,
  2006 U.S. Dist. LEXIS 52318 (S.D.N.Y. July 26, 2006) ...................... 8

*Dugaboy Inv. Tr. v. Highland Cap Mgmt., L.P.*,
  2022 U.S. Dist. LEXIS 172351 (N.D. Tex. Sept. 22, 2022)................. 10

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006)......................................................... 9, 10

*Gupta v. Quincy Med. Ctr.*,
  585 F.3d 657 (1st Cir. 2017)............................................................. 17

*Harpole Constr., Inc. v. Medallion Midstream, LLC (In re Harpole Constr., Inc.)*,
  565 B.R. 193 (Bankr. D. N.M. 2017) ............................................... 15

*Holzhueter v. Groth (In re Holzhueter)*,
  571 B.R. 812 (Bankr. W.D. Wis. 2017).............................................. 12

*Hupp v. Educ. Credit Mgmt. Corp.*,
  2007 U.S. Dist. LEXIS 68199 (S.D. Cal. Sept. 13, 2007)...................... 8

*In re AI Copeland Enters., Inc.*,
  991 F.2d 233 (5th Cir. 1993) ............................................................ 16

*In re Colo. Place L.P.*,
  2002 Bankr. LEXIS 2000 (Bankr. N.D. Tex. Feb. 5, 2002) ............... 17

*In re Fresh Approach, Inc.*,
  51 B.R. 412 (Bankr. N.D. Tex. 1985).................................................. 7

*In re Harrah's Entertainment*,
   1996 U.S. Dist. LEXIS 18097 (E.D. La. Nov. 26, 1996) ........................................... 13

*In re Highland Cap. Mgmt., L.P.*,
   2021 Bankr. LEXIS 2074 (Bankr. N.D. Tex. Aug. 3, 2021),
   *aff'd* 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022) ................................ 3

*In re Nat'l Gypsum*,
   14 B.R. 188 (N.D. Tex. 1991) ..................................................................................... 6

*In re New York Trap Rock Corp.*,
   158 BR 574 (S.D.N.Y. 1993) ....................................................................................... 8

*In re Pilgrim's Pride Corp.*,
   453 B.R. 691 (Bankr. N.D. Tex. 2011) ...................................................................... 17

*In re Rickel & Assoc., Inc.*,
   2003 U.S. Dist. LEXIS 23136 (S.D.N.Y. Dec. 24, 2003) ........................................... 8

*In re SGS Studio, Inc.*,
   256 B.R. 580 (Bankr. N.D. Tex. 2000) ...................................................................... 17

*In re Taco Bueno Rests., Inc.*,
   606 B.R. 289 (Bankr. N.D. Tex. 2019) ...................................................................... 17

*In re UAL Corp.*,
   386 B.R. 701 (Bankr. N.D. Ill. 2008) ........................................................................ 15

*In re Vicars Ins. Agency, Inc.*,
   96 F.3d 949 (7th Cir. 1996) ......................................................................................... 7

*In re Weblink Wireless, Inc.*,
   2003 Bankr. LEXIS 2312 (Bankr. N.D. Tex. Mar. 12, 2003) ................................... 17

*Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*,
   2015 U.S. Dist. LEXIS 74006 (D. Me. June 8, 2015) ............................................... 15

*King v. Skolness (In re King)*,
   624 B.R. 259 (Bankr. N.D. Ga. 2020) ....................................................................... 12

*Kirschner v. Dondero (In re Highland Cap. Mgmt., L.P.)*,
   2022 Bankr. LEXIS 1028 (Bankr. N.D. Tex. Apr. 6, 2022) ........................................ 6

*Laird v. Integrated Res., Inc.*,
   897 F.2d 826 (5th Cir. 1990) ..................................................................................... 10

*Langenkamp v. Culp*,
   498 U.S. 42 (1990) ..................................................................................................... 15

*Living Benefits Asset Mgmt. v. Kestrel Aircraft Co. (In re Living Benefits Asset Mgmt.)*,
   587 B.R. 311 (N.D. Tex. 2018, *aff'd* 916 F.3d 528 (5th Cir. 2019) ......................... 12

*Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*,
   2009 U.S. Dist. LEXIS 102134 (N.D. Tex. Oct. 1, 2009),
   *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009) ................................. 7

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*,
   651 F.3d 268 (2d Cir. 2011) ...................................................................................... 13

*Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.),*
931 F.3d 432 (5th Cir. 2019) ................................................................................. 16

*NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.,*
48 F.4th 419 (5th Cir. 2022) .................................................................................. 3

*NexPoint Diversified Real Es. Tr. v. Acis Cap. Mgmt., L.P.,*
2022 U.S. Dist. LEXIS 142029 (S.D.N.Y. Aug. 9, 2022) ...................................... 11

*Omega Overseas, Ltd. v. Griffith,*
2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014) ...................................... 11

*Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.),*
256 B.R. 712 (Bankr. N.D. Tex. 2000) ................................................................. 17

*Reading Co. v. Brown,*
391 U.S. 471 (1968) ......................................................................................... 16, 17

*Robare Grp., Ltd. v. SEC,*
992 F.3d 468, 472 (D.C. Cir. 2019) ...................................................................... 10

*SEC v. Cap. Gains Rsch. Bureau, Inc.,*
375 U.S. 180 (1963); .............................................................................................. 10

*SEC v. Northshore Asset Mgmt.,*
2008 U.S. Dist. LEXIS 36160 (S.D.N.Y. May 5, 2008) ......................................... 9

*SEC v. Trabulse,*
526 F.Supp.2d 1008 (N.D. Cal. 2007) .................................................................... 9

*Sec. Farms v. Int'l Bhd. of Teamsters,*
124 F.3d 999, 1007 (9th Cir. 1997) ........................................................................ 7

*Tillman Enters., LLC v. Horlbeck (In re Horlbeck),*
589 B.R. 818 (Bankr. N.D. Ill. 2018) ................................................................... 12

*Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.),*
258 F.3d 385 (5th Cir. 2001) ................................................................................. 16

*Tradex Glob. Master Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui),*
538 B.R. 793 (Bankr. N.D. Cal. 2015) ................................................................. 12

*Transamerica Mortg. Advisors v. Lewis,*
444 U.S. 11 (1979) ................................................................................................ 11

**STATUTES**

11 U.S.C. § 503(b)(1)(A) ....................................................................................... 16

11 U.S.C. § 523(a)(19) ........................................................................................... 12

18 U.S.C.A. § 1964(c) ............................................................................................ 13

28 U.S.C § 157(d) ............................................................................................ passim

28 U.S.C. § 1334 .................................................................................................... 17

28 U.S.C. § 157 .................................................................................................... 4, 7

28 U.S.C. § 157(b) ................................................................................................. 17

**OTHER AUTHORITIES**

iv

9 COLLIER ON BANKRUPTCY ¶ 5011.01[2] ................................................................................... 7

*Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18 (July 12, 2019) .......................................................................... 10

*Prohibition on Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. IA-2628; File No. S7-25-06 (Aug. 3, 2007) ................................................................................................ 9

DOCS_NY:46770.8 36027/003

Highland Capital Management, L.P., a defendant in the above-captioned adversary proceeding ("Highland"), hereby submits this brief in support of its response (the "Response") to the *Renewed Motion to Withdraw the Reference* [D.I. 128] (the "Motion") filed by plaintiffs The Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLOH," and together with DAF, "Plaintiffs").[2]  In opposition to the Motion, Highland states as follows:

### **PRELIMINARY STATEMENT**[3]

1.     This Court should deny Plaintiffs' Motion because it is yet another attempt to forum shop, delay adjudication, and waste judicial and estate resources.

2.     On April 12, 2021, Plaintiffs commenced this action in the District Court by filing its (baseless) Complaint.  After Highland moved to enforce the reference, Plaintiffs cross-moved for a ruling that mandatory withdrawal of the reference was required under 28 U.S.C § 157(d) and that enforcing the reference would therefore be pointless.   On September 29, 2021, notwithstanding Plaintiffs' cross-motion, the District Court enforced the reference and sent this matter to this Court for adjudication.

3.     After referral, Plaintiffs pressed their Stay Motion, and on November 18, 2021, stated that, if their request for a stay were denied, they would file a motion for mandatory withdrawal of the reference.  Plaintiffs' Stay Motion was denied, but Plaintiffs, for unknown reasons, did not move to withdraw the reference at that time.

4.     Now, a year after the hearing on the Original MTD and after resolution of Plaintiffs' appeal of the MTD Order, Plaintiffs filed the Motion to withdraw the reference under 28 U.S.C. § 157(d).  The Motion is untimely.  The Complaint was referred to this Court in September 2021.

---

[2] Concurrently herewith, Highland is filing its *Appendix in Support of Highland Capital Management, L.P.'s Response to Renewed Motion to Withdraw the Reference* (the "Appendix").  Citations to the Appendix are as follows:  Ex. #, Appx. #.

[3] All capitalized used but not defined in this Preliminary Statement have the meanings given to them below.

Plaintiffs could have filed a motion to withdraw at that time; they did not and instead adjudicated the Original MTD on the merits in this Court.  The MTD Order was remanded in early September 2022.  Plaintiffs could have filed a motion to withdraw at that time; they did not.  Instead, Plaintiffs waited to file the Motion until a month after Highland filed the Renewed Motion and after all parties had expended significant resources adjudicating the matter in this Court.  The Motion also fails on the merits.

5.      *First*, the Complaint does not require substantial and material consideration of non-bankruptcy federal law.  Notwithstanding that, Plaintiffs argue mandatory withdrawal is necessary so that the District Court, not this Court, can resolve four fundamental issues: (a) whether Highland owe Plaintiffs a fiduciary duty under the IAA; (b) the scope of such duty and whether breached; (c) remedies and damages for any breach; and (d) whether a violation of the IAA can be a predicate act under RICO.  But the foregoing allegations only require application of well-settled federal law, including law from the Supreme Court.  None warrant withdrawal.

6.      *Second*, the Bankruptcy Court has jurisdiction to adjudicate the Complaint. The facts underlying the Complaint arose *after* the Petition Date but *prior* to confirmation from Highland's ordinary course operation of its estate.  Assuming a viable claim exists, it would be an "administrative expense claim," and this Court has core jurisdiction to adjudicate administrative expense claims.

7.      Ultimately, the Motion is another waste of judicial and estate resources and should be denied as untimely, prejudicial to Highland, and meritless.

## **BACKGROUND**

8.      On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

DOCS_NY:46770.8 36027/003

9.       On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (the "Plan").  The Plan became effective on August 11, 2021 [Bankr. Docket No. 2700] (the "Effective Date").[4]

10.      Pursuant to the Plan, this Court expressly retained jurisdiction to "allow, disallow, determine, liquidate … any Claim … including, without limitation, the resolution of any request for payment of any Administrative Expense Claim …."  Plan, Art. XI.[5]

11.      On April 12, 2021, Plaintiffs filed their *Original Complaint* [D.I. 1] (the "Complaint") in the U.S. District Court for the Northern District of Texas (the "District Court"), in which they alleged that the Bankruptcy Court approved settlement with HarbourVest somehow violated the contractual and extra-contractual duties Highland purportedly owed (i) to CLOH as an investor in Highland CLO Funding, Ltd. ("HCLOF") and (ii) to DAF as an advisee under an investment management agreement.  Complaint ¶¶ 56-112.[6]  Highland's alleged misconduct in settling the HarbourVest claim occurred during the last quarter of 2020 and the first quarter of

---

[4] On September 8, 2022, the U.S. Court of Appeals for the Fifth Circuit affirmed, in material part, the Confirmation Order's factual findings and legal conclusions.  *NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022).

[5] The Plan defines "Administrative Expense Claim," in relevant part, as a:

Claim for costs and expenses of administration of the Chapter 11 Case … pursuant to sections 503(b), 507(a)(2), 507(b) … including … (a) the actual and necessary costs and expense incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor ….

Plan, Art I.B.2.

[6] Plaintiffs subsequently sought to add Mr. Seery as a defendant in violation of two orders entered by this Court.  Plaintiffs' actions resulted in this Court holding Plaintiffs, among others, in contempt.  *In re Highland Cap. Mgmt., L.P.*, 2021 Bankr. LEXIS 2074 (Bankr. N.D. Tex. Aug. 3, 2021), *aff'd* 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022).  The contempt order was affirmed by the District Court, but Plaintiffs have, of course, appealed to the Fifth Circuit.

2021, *i.e.* after the Petition Date but before the Effective Date while Highland was a debtor-in-possession. *Id.* ¶¶ 29-54.

12.     On May 19, 2021, Highland moved for an order to enforce the standing order of reference (Misc. Order No. 33) [D.I. 22] (the "Motion to Enforce") in the District Court arguing that the Complaint asserted claims arising in, arising under, or related to Title 11 and Highland's bankruptcy case.

13.     On May 27, 2021, Highland moved to dismiss the Complaint [D.I. 26] (the "Original MTD").  The Original MTD was fully briefed to the District Court.

14.     On June 29, 2021, Plaintiffs filed their response to the Motion to Enforce [D.I. 36] in which they cross-moved, arguing the Motion to Enforce should be denied because the claims in the Complaint were subject to mandatory withdrawal of the reference, could not be adjudicated in this Court, and that granting the Motion to Enforce would therefore be pointless.  The arguments in Plaintiffs' cross-motion are identical to those in the Motion.

15.     On August 26, 2021, Plaintiffs filed a motion in the District Court to stay all proceedings pending appeal of the Confirmation Order [D.I. 55] (the "Stay Motion"), arguing that the Plan injunction somehow prohibited the prosecution of the Complaint.  The Stay Motion was fully briefed to the District Court.

16.     On September 20, 2021, the District Court—notwithstanding Plaintiffs' cross-motion—granted the Motion to Enforce [D.I. 1] and referred this case to this Court, including the Original MTD, "[p]ursuant to 28 U.S.C. § 157 … to be adjudicated as a matter related to the … Bankruptcy of Highland Capital Management, L.P."  This Court docketed the proceeding and set a hearing for November 23, 2021, on both the Original MTD and Stay Motion.

17.     On November 18, 2021, five days before the scheduled hearing, Plaintiffs filed—

without leave of this Court[7]—an amended motion to stay the proceedings [D.I. 69] and attached a

draft motion to withdraw the reference [D.I. 69-1] (the "Proposed Motion").  Plaintiffs said they

would file the Proposed Motion if this Court denied the Stay Motion.

18.     At the November 23 hearing, this Court denied the Stay Motion from the bench,[8]

finding Plaintiffs' arguments "reflect[ed] frankly, a misunderstanding of how the injunction

language … applies here"[9] and that the injunction did not prevent litigation of the Complaint in

this Court.  Subsequently, Plaintiffs argued the merits of the Original MTD, including their alleged

claims under the Investment Advisers Act (the "IAA") and RICO, to this Court.[10]  Plaintiffs, for

reasons known only to them, never filed the Proposed Motion.

19.     On March 11, 2022, this Court granted the Original MTD [D.I. 100] (the "MTD

Order") and dismissed the Complaint with prejudice.  *Charitable DAF Fund, L.P. v. Highland*

*Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 659 (Bankr. N.D. Tex.

Mar. 11, 2022).  Plaintiffs appealed the MTD Order to the District Court and that appeal was

consolidated with Plaintiffs' appeal of this Court's denial of the Stay Motion.  *See* 3:21-cv-03129-

B, Docket No. 20 (N.D. Tex. Jun. 17, 2022).  Both appeals were fully briefed to the District Court.

Plaintiffs did not raise 28 U.S.C. § 157(d) in the appeals or otherwise argue that this Court lacked

jurisdiction to have entered the MTD Order.

---

[7] Ex. 1, Appx. 12 ("I will say that these last-minute amended motions are not going to be tolerated …. Your firm has
already been sanctioned once in this adversary proceeding …. So, you know, I'm just kind of baffled why you would
take a chance filing an amended motion without leave or somehow getting it to the attention of the Court or running
it by the other parties for their consent to you doing it.")

[8] A formal order denying the Stay Motion was entered on December 7, 2021 [D.I. 81].

[9] Ex. 1, Appx. 30.

[10] Ex. 1, Appx. 65-97.

20.     On September 2, 2022, the District Court remanded the MTD Order to this Court for further proceedings.  *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 166 (N.D. Tex. 2022).  The District Court, in the same opinion, affirmed this Court's denial of the Stay Motion.  *Id.* at 24-28.

21.     On October 14, 2022, Highland filed its renewed motion to dismiss [D.I. 122] (the "Renewed MTD").  Plaintiffs responded to the Renewed MTD on November 18, 2022 (the "Response") but did not include a statement regarding their consent to entry of final orders or judgments as required by Federal Rule of Bankruptcy Procedure 7012(b).

22.     On November 18, 2022, only after the parties expended significant resources adjudicating the Complaint in this Court did Plaintiffs file the Motion seeking mandatory withdrawal of the reference.  Although the Motion is styled as a "renewed" motion, it renews nothing.

## **ARGUMENT**

## I.     **There is No Basis for Mandatory Withdrawal of the Reference**

23.     Under 28 U.S.C. § 157(d), a district court "shall, ***on timely motion*** of a party, so withdraw a proceeding if … resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d) (emphasis added).  Assuming a timely motion, mandatory withdrawal is warranted only if a matter requires "substantial and material consideration" and "significant interpretation of federal laws[,]" rather than a "straightforward application of a federal statute to a particular set of facts." *In re Nat'l Gypsum*, 14 B.R. 188, 192-93 (N.D. Tex. 1991); *Kirschner v. Dondero (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 1028, at *27-28 (Bankr. N.D. Tex. Apr. 6, 2022) (same).

24.     Simply asserting federal law is insufficient and mandatory withdrawal only applies when a matter requires something "more than mere application of existing law to new facts." *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 953-54 (7th Cir. 1996); *City of N.Y. v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (mandatory withdrawal requires "significant interpretation, as opposed to simple application, of federal laws"). "[M]andatory withdrawal is to be applied narrowly" to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist. LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009), *aff'd* 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009).

> *a.     The Motion Is Untimely and Should Be Denied*

25.     A motion to withdraw the reference may only be granted if it is "timely." 28 U.S.C. § 157(d). Section 157(d) does not define "timely," but it has been interpreted as requiring a motion be made at the first reasonable opportunity. *See In re Fresh Approach, Inc*., 51 B.R. 412, 415-16 (Bankr. N.D. Tex. 1985) (finding a motion to withdraw the reference untimely when filed sixteen days after the court entered its decision on the matter); *see also Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1007, n.3 (9th Cir. 1997). ("A motion to withdraw is timely 'if it was made as promptly as possible in light of the developments in the bankruptcy proceeding.'"); *Connolly v. Bidermann Indust. U.S.A., Inc.,* 1996 U.S. Dist. LEXIS 8059, at *8 (S.D.N.Y. June 13, 1996) ("Plaintiff's delay of over eight months renders her motion untimely, and as such it does not meet the threshold requirement set forth in 28 U.S.C. § 157(d)."); 9 COLLIER ON BANKRUPTCY ¶ 5011.01[2] ("[M]otions for mandatory withdrawal must be made as soon as it is apparent that it is necessary for the district court to hear the proceeding").

26.     Failure to timely move for mandatory withdrawal is dispositive, especially when that delay would prejudice the non-movant or is an attempt to delay or forum shop. *See Fresh Approach,* 51 B.R. at 415 ("[A] motion to withdraw reference should not be used as a vehicle to

protract litigation and delay controversies.  'If a motion for withdrawal of reference is not timely

made, it will almost certainly be held that the provisions of the second sentence of section 157(d)

have been waived.'") (citations omitted); *see also Hupp v. Educ. Credit Mgmt. Corp.*, 2007 U.S.

Dist. LEXIS 68199, at *8-10 (S.D. Cal. Sept. 13, 2007) ("Courts have found a motion to withdraw

the reference untimely when a significant amount of time has passed since the moving party had

notice of grounds for withdrawing the reference or where the withdrawal would have an adverse

effect on judicial economy"); *Drew v. WorldCom, Inc.***,** 2006 U.S. Dist. LEXIS 52318, at *8-9

(S.D.N.Y. July 26, 2006) (denying motion to withdraw reference filed eighteen months after

objection to claim, noting "there is no legitimate justification for the length of the delay in this

case," and "the timing of [movants'] motion gives rise to a strong inference that he is attempting

to forum shop").[11]

27.     Here, the Motion is untimely and can only be interpreted as an attempt to forum

shop, delay adjudication, and waste judicial and estate resources.  The Complaint was referred to

this Court on September 20, 2021.  Plaintiffs did not file a motion to withdraw at that time

(although they threatened to file the Proposed Motion), and consequently the parties spent

considerable time and resources adjudicating the MTD Order in this Court on the merits in

November 2021.  Subsequently, the parties spent more time and resources adjudicating the appeal

of the MTD Order.  The MTD Order was remanded to this Court on September 2, 2021.  But

Plaintiffs did not file the Motion until November 18, 2022, after Highland spent more time and

---

[11] *In re Rickel & Assoc., Inc.*, 2003 U.S. Dist. LEXIS 23136, *6 (S.D.N.Y. Dec. 24, 2003) (finding motion to withdraw
reference untimely where "the bankruptcy court had devoted substantial resources to the claim," and "defendants []
seek to retrace in the district court substantially the same journey previously taken in the bankruptcy court," noting
"the potential prejudice … of having a case dislodged from its steady progression in the bankruptcy court's calendar
to be placed on that of the district court."); *In re New York Trap Rock Corp.*, 158 BR 574, 577 (S.D.N.Y. 1993)
(finding untimely a motion to withdraw reference filed after a "short" period of three months where "time span was
rich with events," and the circumstances strongly indicated forum shopping—"[f]orum shopping efforts pursued by
awaiting a decision relevant to the merits and then bypassing or filing a motion to transfer should not be rewarded
with success.").

resources briefing and filing the Renewed MTD.  Instead of timely filing a motion to withdraw the reference, Plaintiffs allowed Highland (and this Court) to expend substantial time, effort, and money briefing and arguing this case **in this Court**.  Plaintiffs' belated attempt to now have the case adjudicated in the District Court is impermissible.  The Motion is untimely and prejudicial to Highland.  It should be denied on that basis alone.

> **b.      The Renewed MTD Does Not Require "Substantial and Material Consideration" of Significant Federal Laws**

28.      Even if the Motion were timely (it is not), the Complaint does not require "substantial and material consideration" and "significant interpretation of federal laws."  Plaintiffs attempt to bootstrap themselves into this stringent standard by exaggerating the complexity of their baseless claims.  But, their claims are simple:  (a)(i) did Highland owe Plaintiffs a fiduciary duty under the IAA; (ii) what was the nature of that duty and was it violated; and (iii), if violated, what are the remedies and potential damages and (b) is the alleged securities fraud a predicate act under RICO?  These are not difficult questions or outside this Court's expertise.

29.      **<u>Fiduciary Duty under the IAA</u>.**  It is well-settled that Section 206 of the IAA creates a fiduciary duty to an investment adviser's "client" (*i.e.* the person or entity that is the counterparty to the investment management agreement) but not to an underlying investor in the "client." *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund [*i.e.*, the client], not to the fund's investors … If the investors are owed a duty and

the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.")[12]

30.     HCLOF is a fund managed by Highland HCF Advisors, Ltd. ("HCFA"), a Highland subsidiary.  CLOH is an investor in HCLOF; DAF is not.  Highland's and HCFA's duties do not run to investors in HCLOF, just to HCLOF itself.  Highland has never had a management agreement or client relationship with CLOH and owes it no fiduciary or other duty.  Highland, at all relevant times, was party to a management agreement with DAF and owed DAF certain duties under that agreement.[13]  This analysis is not complicated and only requires a straightforward application of settled law.

31.     **The Scope of the Fiduciary Duty and Breach.**  An adviser's fiduciary duty is satisfied by disclosure.  "To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship."  *See Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18 (July 12, 2019), Ex. 4, Appx. 170-71.  The law is well-established; includes Supreme Court jurisprudence; is not based solely on interpretation of SEC releases; and was recently opined on by the District Court in one of Mr. Dondero's numerous appeals of this Court's orders.  *See, e.g., SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191-92 (1963); *Laird v. Integrated Res., Inc.*, 897 F.2d 826, 831-36 (5th Cir. 1990); *Robare Grp., Ltd. v. SEC*, 992 F.3d 468, 472 (D.C. Cir. 2019); *Goldstein*, 451 F.3d at 881; *Dugaboy Inv. Tr. v. Highland Cap Mgmt., L.P.*, 2022 U.S. Dist.

---

[12] *See also SEC v. Northshore Asset Mgmt.*, 2008 U.S. Dist. LEXIS 36160, at *18-20 (S.D.N.Y. May 5, 2008) (dismissing a claim that an investment adviser owed a duty to a fund's investors rather than just the fund); *SEC v. Trabulse*, 526 F.Supp.2d 1008, 1016 (N.D. Cal. 2007) (same); *Prohibition on Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. IA-2628; File No. S7-25-06 (Aug. 3, 2007), Ex. 2, Appx. 119 (Rule 206(4)-8 "does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law").

[13] Highland and DAF entered into that certain *Second Amended and Restated Investment Advisory Agreement,* effective from January 1, 2017 (the "DAF Agreement").  Ex. 3, Appx. 126-48.  The DAF Agreement terminated on February 28, 2021.

LEXIS 172351, at *10-11 (N.D. Tex. Sept. 22, 2022).   Adjudicating this issue only requires determining if appropriate disclosures were made (which they were).[14]

32.    **Remedies for Breach of Duty.**   Assuming, *arguendo*, that Highland breached its fiduciary duty to DAF under the IAA, under clear Supreme Court precedent, there is no private right of action for such breach under Rule 206 of the IAA.   *Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 13-14 (1979) ("[W]e hold there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable [on a client]").[15]   There is no unsettled federal law.[16]

33.    **Bankruptcy Courts Apply the IAA.**   Finally, bankruptcy courts routinely analyze federal securities laws.   In fact, this Court reviewed Plaintiffs' claims earlier this year although it did not rule on them.   *Charitable DAF Fund*, 2022 Bankr. LEXIS 659, at *39-40 ("[This Court]

---

[14] Exhibit A to the DAF Agreement includes pages of disclosures, including the following: (1) "[Highland] … is [not] precluded from engaging in or owning an interest in. . . investment activities of any kind, whether or not such ventures are competitive with [DAF]" and (2) "[Highland] … may actively engage in transactions in the same securities sought by [DAF] and, therefore, may compete with [DAF] for investment opportunities or may hold positions opposite to positions maintained by [DAF]." Ex. 3, Appx. 142-43.

[15] *See also Corwin v. Marney, Orton Inv*., 788 F.2d 1063, 1066 (5th Cir. 1986) (affirming dismissal of claims under the Advisers Act "because the investors had no private causes of action"); *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 2780, at *13 n.23 ("the court notes that the … Supreme Court has held [in *Transamerica*] that there is not a private right of action for damages under the IAA."); *NexPoint Diversified Real Es. Tr. v. Acis Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 142029, at *9-10 (S.D.N.Y. Aug. 9, 2022) ("[U]nder the IAA … there is no private right of action to bring a claim pursuant to [Section 206 of the IAA].").

[16] Plaintiffs alleged, for the first time, in their Response to the Renewed MTD that "Section 215 [of the IAA] recognizes a limited private right of action for equitable relief" (even though Section 215 is not mentioned in the Complaint).  Response at 12.  Plaintiffs do not mention Rule 215 in the Motion but will presumably argue it is a basis for mandatory withdrawal of the reference.  It is not.  First, Rule 215 was not pled in the Complaint and cannot be the basis for withdrawal—there is no claim to withdraw.  Second, Rule 215 imposes no fiduciary duty of any kind but simply provides, under clear Supreme Court precedent, "a limited private remedy … to void an investment advisers contract, but … confers no other private causes of action, legal or equitable." *Transamerica*, 441 U.S. at 24; *see also Corwin*, 788 F.2d at 1066 ("The Investors seek damages, not the voiding of an investment advisers contract, and there is no such private cause of action based on [Section 215]").  That remedy applies only when an advisory agreement was made in violation of any provision of the IAA, not for subsequent breaches.  *NexPoint* , 2022 U.S. Dist. LEXIS 142029, at *10 (Section 215 "'voids a contract only where the contract would be invalid under that principle—that is, where the contract was made illegally or requires illegal performance.'") (quoting *Omega Overseas, Ltd. v. Griffith*, 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014)).  Here, the contours of Rule 215 (and its lack of applicability to the Complaint) are well-settled and will only require the application of that settled case law to the facts of this case.

DOCS_NY:46770.8 36027/003

will forego addressing the other arguments of Highland …. While this court is inclined to agree with those arguments, the court will refrain from addressing them until such time as any higher court may instruct this court to address them.")  Further, Highland was heavily involved in the bitterly contested bankruptcy of Acis Capital Management, L.P. ("Acis").  *In re Acis Cap. Mgmt., L.P.*, *et al*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2019).  In *Acis*, Highland (then controlled by Mr. Dondero) brought claims ***in this Court*** alleging Acis was liable to Highland for breach of fiduciary duties under the IAA—nearly identical claims to those in the Complaint.  Ex. 5, Appx. 205-06.

34.     Moreover, 11 U.S.C. § 523(a)(19) requires bankruptcy courts to determine if there were violations of "federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934) …"[17] in connection with discharge.  As part of this analysis, bankruptcy courts look to, among other things, the applicability of the IAA.  *See, e.g., Tillman Enters., LLC v. Horlbeck (In re Horlbeck)*, 589 B.R. 818, 832 (Bankr. N.D. Ill. 2018) ("bankruptcy courts have jurisdiction to determine liability on an underlying securities claim for purposes of § 523(a)(19)" and "liability under § 523(a)(19) cannot be supported by an alleged violation" of the Advisers Act as there is no private remedy or "actionable claim"); *Tradex Glob. Master Fund SPC, Ltd. v. Pui-Yun Chui (In re Pui-Yun Chui)*, 538 B.R. 793, 806-08 (Bankr. N.D. Cal. 2015) (same).[18] Bankruptcy court analysis of the IAA, however, is not limited to Section 523(a)(19).  *See Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*, 485 B.R. 604 (Bankr. W.D. Wash. 2013)

---

[17] Section 3(a)(47) of the Securities Exchange Act of 1934 (the "Exchange Act") defines "securities laws" as "the Securities Act of 1933 (15 U.S.C. 78a et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), the Sarbanes-Oxley Act of 2002, the Trust Indenture Act of 1939 (15 U.S.C. 77aaa et seq.), the Investment Company Act of 1940 (15 U.S.C. 80a-1 et seq.), *the Investment Advisers Act of 1940* (15 U.S.C. 80b et seq.), and the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa, et seq.)" (emphasis added).

[18] *See also King v. Skolness (In re King)*, 624 B.R. 259, 301 (Bankr. N.D. Ga. 2020) (bankruptcy court could determine liability under state and federal securities laws for purposes of § 523(a)(19)); *Holzhueter v. Groth (In re Holzhueter)*, 571 B.R. 812, 822-24 (Bankr. W.D. Wis. 2017) (same).

(dismissing complaint alleging that defendant owed a fiduciary duty to an investor under the IAA for failure to state a claim); *Living Benefits Asset Mgmt. v. Kestrel Aircraft Co. (In re Living Benefits Asset Mgmt.),* 587 B.R. 311, 317-20 (N.D. Tex. 2018) (affirming bankruptcy court's rulings under the IAA), *aff'd* 916 F.3d 528 (5th Cir. 2019); *In re Acis Cap. Mgmt. L.P., et al.*, Case No. 18-30264-sgj11, D.I. 549 (Bankr. N.D. Tex. Sept. 4, 2018) (Ex. 6, Appx. 228-30) (finding the IAA did not prohibit assumption of a management agreement under Section 365).

35.    **The IAA Cannot Be a RICO Predicate**:    Plaintiffs allege that determining whether securities fraud can be a predicate act under RICO requires mandatory withdrawal. Motion ¶ 12.    This argument also fails.    *First*, Plaintiffs concede they have no RICO claim. Response at 23.    Consequently, it should not be a basis for withdrawal of the reference.    *Second*, RICO, by its terms, expressly excludes securities fraud as a predicate act.    18 U.S.C.A. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].")[19]    Because Plaintiffs' RICO claim is premised on an alleged securities fraud, it is barred by the express language of the RICO statute. *See, e.g., MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 273-80 (2d Cir. 2011) (barring RICO claims arising out of the operation of a Ponzi scheme because they involved a purchase or sale of a security despite no private right of action existing); *Affco Invs. 2001 LLC v. Proskauer Rose L.L.P.*, 625 F.3d 185, 189-91 (5th Cir. 2010) (same).    There is no unsettled question of federal law warranting mandatory withdrawal.

---

[19] *See also* H.R. Rep. No. 104-369, at 47 (1995) ("The Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. In addition, the . . . Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.")

DOCS_NY:46770.8 36027/003

### c. *Plaintiffs Cite No Applicable Case Law.*

36.      Plaintiffs' only citations to support their arguments are to two factually inapposite cases. **First**, they cite *In re Harrah's Entertainment*, 1996 U.S. Dist. LEXIS 18097 (E.D. La. Nov. 26, 1996), which has nothing to do with the IAA. *Harrah's* involved a class action arising from the issuance of $435 million in publicly traded debt; claims that the prospectus violated the Exchange Act; and attempts to hold the issuer's partners liable for the issuer's actions under the Exchange Act. The district court ruled that mandatory withdrawal applied because of the foregoing factors, none of which apply here. There is no public issuance; no retail investors; no class action; no derivative liability; no applicability of the Exchange Act; and no complicated factual analysis. Plaintiffs' IAA claims require only the straightforward application of settled law to the facts in a dispute between two private parties.

37.      **Second**, Plaintiffs cite *Belmont v. MB Investment Partners, Inc.*, 708 F.3d 470 (3d Cir. 2012), for the proposition that there is "considerable 'confusion'" because "federal law (the IAA) provides, 'the duty and the standard to which investment advisers are to be held,' but 'the cause of action is presented as springing from state law.'" Motion ¶ 13. *Belmont* confirms no private right of action exists under the IAA. *Belmont*, 708 F.3d at 502. The only "confusion" noted in *Belmont* is if **state, not federal, law** creates a private right. *Id.* (finding the lack of private rights in the IAA "ought to call into serious question whether a limitation in federal law can be circumvented simply by hanging the label 'state law' on an otherwise forbidden federal law claim" but recognizing split on state law claims). But Plaintiffs have not pled a state law claim, and an unpled claim is irrelevant—there is nothing to withdraw under 28 U.S.C. § 157(d). Further, section 157(d) requires mandatory withdrawal only **if material federal law is implicated**; state law claims—even properly pled ones—are not a basis for mandatory withdrawal.

14

### d.   *Plaintiffs' Additional Arguments Are Meritless.*

38.   Plaintiffs' allege two additional arguments to support mandatory withdrawal.  ***First***,

Plaintiffs argue the District Court needs to assess whether a breach of fiduciary duty claim "can

be terminated by a blanket injunction in a bankruptcy plan."  Motion ¶ 8.  But Plaintiffs have been

told **three times** that the Plan's injunction does not prevent Plaintiffs' prosecution of their alleged

IAA claims so long as they are prosecuted in this Court—twice by this Court and once by the

District Court.[20]  ***Second***, Plaintiffs' jury trial waiver argument is premature and irrelevant.  DAF

affirmatively waived its jury trial right in the DAF Agreement (Ex. 3, Appx. 138),[21] but neither

Plaintiff has a jury trial right having availed themselves of the equitable jurisdiction of this Court.[22]

And, importantly for the Motion, Highland has not yet moved to strike Plaintiffs' jury trial

demand.[23]  Accordingly, Plaintiffs' request to withdraw the reference on the jury trial question is

---

[20] Ex. 1, Appx. 30 ("I just don't think that you have shown that … the injunction provisions of the plan somehow tie your hands in arguing the 12(b)(6) motion, defending against the 12(b)(6) motion today or I just think that your arguments reflect, frankly, a misunderstanding of how the injunction language … applies here."); Ex. 7, Appx. 261 (responding to DAF's assertion that it could not prosecute a claim for an IAA breach of fiduciary duty because of the Plan injunction "THE COURT:  Why not?  Why not?  Why not?  There is nothing that would have precluded you from filing a request for allowance of administrative claim."); *Charitable DAF*, 643 B.R. at 176-77 ("The bankruptcy court found the Plan's injunction … did not prevent [DAF] from pursuing its causes of action. … [T]he bankruptcy court held that Charitable DAF could continue to litigate its cause of action and the Court agrees. … Just like the bankruptcy court, this Court does not see how the injunction … prohibit[s] [DAF] from participating [in litigating the Complaint] … [and] [DAF] continued to participate by responding to HCM's motion to dismiss and participating in the hearing regarding the motion to dismiss.")

[21] Plaintiffs argue that the District Court must determine whether DAF's contractual waiver "can be enforced as to non parties [*i.e.*, CLOH] to the waiver" (Motion ¶ 8), but Highland has not argued that CLOH waived its jury trial rights through the DAF Agreement.

[22] The causes of action in the Complaint are administrative expense claims (*see infra* ¶¶ 39-41), and, by pursuing the Complaint, Plaintiffs have triggered the claims allowance process and subjected themselves to this Court's equitable jurisdiction.  *See, e.g., In re UAL Corp.*, 386 B.R. 701, 707 (Bankr. N.D. Ill. 2008) ("[B]y filing a claim … the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power … As such, there is no Seventh Amendment right to a jury trial … Claims for payment of an administrative expense are no different from other claims in this regard.") (citing *Langenkamp v. Culp*, 498 U.S. 42 (1990)); *see also Harpole Constr., Inc. v. Medallion Midstream, LLC (In re Harpole Constr., Inc.)*, 565 B.R. 193, 202 (Bankr. D. N.M. 2017) (same); *Carter v. Schott (In re Carter Paper Co.)*, 220 B.R. 276, 290-311 (Bankr. M.D. La. 1998) (finding breach of fiduciary duty claim against bankruptcy trustee originally filed in state court was an administrative expense claim and no jury trial right existed).

[23] Highland will move to strike the jury trial demand if the Renewed MTD is denied, but if the time comes to adjudicate Plaintiffs' jury trial right, it will be decided by this Court as a matter of core bankruptcy law.  Highland reserves all rights.

premature; there is currently nothing to withdraw.  Plaintiffs' thinly veiled attempt to create

controversy and a federal issue where none exists should be rejected.  *See, e.g., Keach v. World*

*Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.),* 2015 U.S. Dist. LEXIS 74006, at *21-23 (D.

Me. June 8, 2015) (finding no mandatory withdrawal when movant simply "tries to kick up some

dust to make the relevant analysis seem complicated").

## II.    The Court Has "Core" Jurisdiction to Adjudicate the Complaint

39.    The Court has already found that this action "arises in" Highland's bankruptcy case

and is a "core" proceeding.

> [This action] "arises in" a bankruptcy case (making it "core"), in that a claim is
> being asserted against a debtor (which was not yet a "reorganized debtor" …) and
> involves actions of a debtor-in-possession in administering its case.  It involves
> orders of this Bankruptcy Court and activities and litigation over which the
> Bankruptcy Court presided.

*Charitable DAF*, 2022 Bankr. LEXIS 659, at *14-15.  Plaintiffs did not appeal that portion of the

MTD Order, and it is binding.

40.    But even in the absence of a prior ruling, this action involves the adjudication of an

administrative expense claim and is quintessentially "core," having "arisen in" Highland's

bankruptcy.  An administrative expense claim is a priority claim under Section 503(b) for, among

other things, "the actual, necessary costs and expenses of preserving the estate …." 11 U.S.C. §

503(b)(1)(A).  Administrative expense claims include claims arising from a debtor-in-possession's

postpetition negligence, tortfeasance, and malfeasance.  *See Reading Co. v. Brown,* 391 U.S. 471,

478-79 (1968) (holding that if a debtor-in-possession commits a tort or harms a non-debtor

following the petition date, the resulting claim is an administrative expense claim even though

there was no benefit to the debtor's estate); *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt.,*

*L.P. (In re Highland Cap. Mgmt., L.P.),* 2022 Bankr. LEXIS 2780, at *19-21 (Bankr. N.D. Tex.

Sept 30, 2022) (finding Highland's alleged breach of its contractual and extra-contractual duties under the IAA to DAF constituted an administrative expense claim).[24]

41.     Plaintiffs were allegedly harmed by Highland's breach of its duties and obligations (a) *after* the Petition Date, but *before* the Effective Date, *i.e.*, while Highland was a debtor-in-possession, and (b) arising from the ordinary course operation of its estate.  Accordingly, under *Reading* (and this Court's recent precedent), the claims alleged in the Complaint, if valid, would be administrative claims.  This Court retained jurisdiction to adjudicate administrative claims (Plan, Art. XI), and adjudication of an administrative claim is a "core" proceeding.  *See In re Weblink Wireless, Inc.*, 2003 Bankr. LEXIS 2312, at *3 (Bankr. N.D. Tex. Mar. 12, 2003) ("The allowance of an administrative expense to be paid pursuant to a confirmed plan of reorganization constitutes a core matter over which the court has jurisdiction to enter a final order."); *see also In re Taco Bueno Rests., Inc.*, 606 B.R. 289, 292 (Bankr. N.D. Tex. 2019) (finding core jurisdiction to adjudicate administrative claim); *In re Pilgrim's Pride Corp.*, 453 B.R. 691, 692 (Bankr. N.D. Tex. 2011) ("Objections [to administrative expense claims] are subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B)").[25]  This Court has "core" jurisdiction to adjudicate the Complaint and can enter final orders under 28 U.S.C. §§ 157(b) and 1334(b).[26]

---

[24] *See, e.g., Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 388 (5th Cir. 2001); *In re AI Copeland Enters., Inc.*, 991 F.2d 233, 239 (5th Cir. 1993).

[25] *See also In re Colo. Place L.P.*, 2002 Bankr. LEXIS 2000, at *1 (Bankr. N.D. Tex. Feb. 5, 2002) (same); *In re SGS Studio, Inc.*, 256 B.R. 580, 581 (Bankr. N.D. Tex. 2000) (same); *Rand Energy Co. v. Del Mar Drilling Co. (In re Rand Energy Co.)*, 256 B.R. 712, 714 (Bankr. N.D. Tex. 2000) (same).

[26] Plaintiffs cite *Gupta v. Quincy Medical Center*, 585 F.3d 657 (1st Cir. 2017) to support their argument that this Court lacks jurisdiction over the Complaint.  In *Gupta*, the bankruptcy court approved an asset purchase agreement pursuant to 11 U.S.C. § 363, which provided that certain employees would receive severance if terminated.  When they were subsequently terminated, they sought damages for breach of the purchase agreement *in the bankruptcy court*.  The First Circuit held that the severance claims arose "solely" from the alleged breach of the agreement and not from (a) a breach of the order approving the agreement, (b) a question of interpretation of that order, (c) the administration of the bankruptcy estate, or (d) the Bankruptcy Code (*Id.* at 664) and accordingly held there was no bankruptcy jurisdiction.  *Gupta* is irrelevant.  The Complaint asserts administrative expense claims against the estate and thus invokes the claims allowance process and this Court's equitable jurisdiction—a quintessentially core action.

## <u>CONCLUSION</u>

42.     Highland respectfully requests that the Court deny the Motion and grant such further relief as the Court deems just and proper.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

DOCS_NY:46770.8 36027/003

Dated:  December 9, 2022                      **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

19

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | )  Case No. 19-34054-sgj11 ) |
| Reorganized Debtor. | ) ) ) |
| In re: CHARITABLE DAF FUND, L.P., AND CLO HOLDCO LTD., | )  Adv. Pro. No. 21-03067-sgj ) ) |
| Plaintiffs, | ) |
| vs. | ) ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND HCF ADVISOR, LTD., AND HIGHLAND CLO FUNDING, LTD. | ) ) ) ) |
| Defendants | ) ) |

## APPENDIX IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S RESPONSE TO "RENEWED" MOTION TO WITHDRAW THE REFERENCE

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

| Ex. | Description | Appx. # |
|:---:|:---|:---:|
| 1. | Transcript of November 23, 2021 hearing | 1-105 |
| 2. | Securities and Exchange Commission, C.F.R. Parts 275, *Prohibition on Fraud by Advisers to Certain Pooled Investment Vehicles*, Release No. IA-2628; File No. S7-25-06. | 106-125 |
| 3. | *Second Amended and Restated Investment Advisory Agreement*, dated to be effective January 1, 2017, by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and Highland Capital Management, L.P. | 126-148 |
| 4. | Securities and Exchange Commission, C.F.R. Parts 276, *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, Release No. IA-5248; File No. S7-07-18. | 149-191 |
| 5. | *In re Acis Capital Management, L.P.*, et al, Case No. 18-30264-sgj11, D.I. 497 (Bankr. N.D. Tex. Aug. 13, 2018) | 192-223 |
| 6. | *In re Acis Capital Management, L.P.*, et al, Case No. 18-30264-sgj11, D.I. 549 (Bankr. N.D. Tex. Sept. 4, 2018) | 224-231 |
| 7. | Transcript of August 3, 2022 Hearing, Adversary Proc. No. 22-03052-sgj (Bankr. N.D. Tex. August 3, 2022) | 232-277 |

*[Remainder of Page Intentionally Blank]*

Dated:  December 9, 2022                    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:46818.1 36027/003

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                        .    Case No. 19-34054-11(SGJ)
                              .
HIGHLAND CAPITAL              .
MANAGEMENT, L.P.,            .
                              .
                              .
          Debtor.             .
. . . . . . . . . . . . . .
                              .    Adv. No. 21-03067(SGJ)
CHARITABLE DAF FUND, LP,      .
et al.,                       .
                              .
          Plaintiffs,         .    Earle Cabell Federal Building
                              .    1100 Commerce Street
          v.                  .    Dallas, Texas  75242
                              .
HIGHLAND CAPITAL,             .
MANAGEMENT, L.P., et al.,     .
                              .
          Defendants.         .    Tuesday, November 23, 2021
. . . . . . . . . . . . . .         9:40 a.m.


TRANSCRIPT OF HEARING ON
PLAINTIFFS' MOTION TO STAY ALL PROCEEDINGS (55);
PLAINTIFFS' MOTION TO STRIKE REPLY APPENDIX (47); AND
DEFENDANTS' MOTION TO DISMISS COMPLAINT (26)

**BEFORE HONORABLE STACEY G. JERNIGAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**




TELEPHONIC APPEARANCES CONTINUED ON NEXT PAGE.

Audio Operator:          Hawaii S. Jeng

Proceedings recorded by electronic sound recording, transcript
produced by a transcript service.

_____

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

2

```
TELEPHONIC APPEARANCES:

For CLO Holdco, Ltd.:        Sbaiti & Company PLLC
                             BY:  MAZIN AHMAD SBAITI, ESQ.
                             JP Morgan Chase Tower
                             2200 Ross Avenue, Suite 4900 W
                             Dallas, Texas 75201

For Highland Capital         Pachulski Stang Ziehl & Jones LLP
Management:                  BY:  JOHN MORRIS, ESQ.
                             780 3rd Avenue, 34th Floor
                             New York, NY 10017

                             Pachulski Stang Ziehl & Jones LLP
                             BY:  JEFFREY N. POMERANTZ, ESQ.
                             10100 Santa Monica Blvd., 13th Floor
                             Los Angeles, California 90067

For Highland CLO             Brobeck Phleger & Harrison
Funding, Ltd.:              BY:  JONATHAN W. JORDAN, ESQ.
                             4801 Plaza on the Lake
                             Austin, Texas 78746

                             King & Spalding LLP
                             BY:  PAUL RICHARD BESSETTE, ESQ.
                             500 West 2nd Street, Suite 1800
                             Austin, Texas 78701
```

**WWW.LIBERTYTRANSCRIPTS.COM**

**Appx. 00003**

3

**INDEX**

                                                                    **PAGE**

PLAINTIFFS' MOTION TO STAY ALL PROCEEDINGS (55)
  Court's Ruling - Denied                                           29

PLAINTIFFS' MOTION TO STRIKE REPLY APPENDIX (47)
  Court's Ruling - Denied                                           32

DEFENDANTS' MOTION TO DISMISS COMPLAINT (26)
  Court's Ruling - Under Advisement                                103

**Appx. 00004**

4

1          THE COURT:  Good morning.  Please be seated.

2          All right.  We have a setting in the Charitable DAF

3    Fund, et al., v. Highland, Adversary 21-3067.  We have three

4    motions that are set.

5          Let me get appearances from the Plaintiffs' counsel

6    first.  Go ahead.

7          MR. SBAITI:  Good morning, Your Honor.  This is Mazin

8    Sbaiti for the Plaintiffs.

9          THE COURT:  Okay.  Thank you.

10         Now for the Defendants, who do we have appearing?

11         MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

12   Pomerantz and John Morris from Pachulski Stang Ziehl & Jones.

13   Your Honor, before -- I understand Your Honor is going to take

14   up the motion to stay first.

15         Before Your Honor does so, I have a procedural issue

16   relating to that motion that I would like to address the Court

17   after appearances are made.

18         THE COURT:  All right.  I assume that's all the

19   lawyer appearances for this adversary.

20         MR. JORDAN:  Your Honor?

21         THE COURT:  Oh, go ahead.

22         MR. JORDAN:  Your Honor, we are a nominal defendant,

23   but John Jordan on behalf of Highland CLO Funding, Ltd.

24         THE COURT:  Okay.  Thank you.  Sorry about that.

25         MR. BESSETTE:  And, Your Honor, Paul Bessette, Mr.

**Appx. 00005**

5

1 Jordan's colleague is on the phone, as well.

2          THE COURT:  Okay.  Thank you.

3          All right.  Anyone else I missed?

4     (No audible response)

5          THE COURT:  All right.  Mr. Pomerantz, your

6 procedural issue?

7          MR. POMERANTZ:  Thank you, Your Honor.

8          Your Honor, I must once again bring to this Court's

9 attention a violation of the Court Rules by the various counsel

10 representing Mr. Dondero.  This time it's by Mr. Sbaiti.

11          When the district court entered its order granting

12 Highland's motion to enforce the reference and referring this

13 matter to Your Honor, there were three matters on the Court's

14 docket, district court's docket that got transferred.  First

15 was the motion to dismiss, second was the motion to stay, and

16 third was the motion to strike, which essentially has been

17 rendered moot.

18          The briefing was complete with respect to the first

19 two matters, the motion to dismiss and the motion to stay.  And

20 all that remained for the Court to do was to set a hearing and

21 have oral argument.  Your Honor, on October 13th, Your Honor

22 set a hearing for today for each of those two motions.

23 Nevertheless, on November 10th, almost a month after the Court

24 set the matters for hearing and after pleadings were closed,

25 Plaintiffs filed what they called their amended motion to stay.

**WWW.LIBERTYTRANSCRIPTS.COM**

6

 1          As an initial matter, Your Honor, the amended motion

 2   was not even filed in this adversary proceeding initially.  It

 3   was filed in the main case, and there was an error that Mr.

 4   Sbaiti corrected on November 18th, five days before this

 5   hearing.  Plaintiff did not ask for leave of court to file any

 6   further pleadings.  They did not provide the time under the

 7   local rules for response.  And, in fact, they raised additional

 8   arguments in their amended motion.

 9          Well, Your Honor, we can certainly argue to the Court

10   that the amended motion constitutes a new motion, is untimely,

11   and the hearing should be continued to allow us to file a

12   response.  We're not going to do that, Your Honor.  As I will

13   discuss when it's my time to response substantively to the

14   motion, the new arguments to stay the proceedings, the amended

15   motion are equally as frivolous as the arguments contained in

16   the original motion.

17          But I bring this to the Court's attention because,

18   again, it's extremely frustrating to have the lawyers

19   representing Mr. Dondero's related entities continue to act as

20   if the rules do not apply to them.  Your Honor will recall just

21   a week or so ago, Your Honor made a -- we had a similar issue

22   in connection with the motion to dismiss.  Failure to follow

23   the rules is unprofessional, and it's disrespectful not only to

24   Highland's professionals but also to the Court and it

25   interferes with Your Honor's ability to control your docket and

7

1  sufficiently prepare for contested matters.

2          At some point, Your Honor, there should be real
3  consequences for the continued violation of the rules.  Having
4  said that, Your Honor, we are prepared to go forward with the
5  motion to stay today.

6          THE COURT:  All right.  Mr. Sbaiti, what say you?
7  I'm looking at Docket Entry Number 69 in the adversary
8  proceeding that was filed last Thursday.  So, obviously, very,
9  very late in the game, shall we say.  What is your response to
10 this?

11         MR. SBAITI:  Your Honor, that was not filed in the
12 adversary as an error.  When we asked one of our paralegals to
13 file it, we're not as familiar with the bankruptcy court system
14 and it was an error.  It was corrected once the lawyers
15 realized it, which was last -- which was on November the 18th.
16 It was filed in, I guess in the main case.  But it was simply
17 an inadvertent error, Your Honor.

18         MR. POMERANTZ:  I would add, Your Honor, the original
19 motion filed inadvertently was November 10th.  It still was not
20 timely.  I think Mr. Sbaiti needs to answer the question of why
21 that was filed untimely, okay.

22         THE COURT:  All right.  Thank you, Mr. Sbaiti.

23         So, one of my pet peeves in life is people blaming
24 paralegals, by the way.  But be that as it may, as Mr.
25 Pomerantz points out that it was still untimely the motion

8

1  filed in the underlying bankruptcy case November 10th.  So what

2  is your --

3         MR. SBAITI:  Your Honor, when we looked at the motion

4  and looked at the progression of the case, we filed an amended

5  motion simply to clarify our position.  And really I don't

6  think we've changed our arguments all that much.  We simply

7  clarified our position.  We've seen amended motions filed in

8  the bankruptcy in our prior dealings, and so at that point, we

9  felt like there wasn't a rule explicitly saying we couldn't

10 have an amended motion.

11        But if it's untimely, Your Honor, you know, we don't

12 think it changes the underlying arguments.  As Mr. Pomerantz

13 said, we don't think there's any prejudice to Highland either.

14        THE COURT:  All right.  Well, just to be clear, you

15 know, it's one thing in an underlying bankruptcy case to file

16 an amended motion after you've gotten a motion set for hearing

17 that might slightly adjust, you know, facts or relief sought.

18 And, of course, we independently look at it when it happens in

19 an underlying case to see do we need more notice to affected

20 parties.

21        But in an adversary proceeding, you know, you just

22 don't do this.  All right?  If you have some sort of

23 exceptional circumstances, you can file I guess a motion to

24 amend because I got to include this new information that didn't

25 exist.  But you just don't do this, okay?

9

```
 1          So I don't -- could you be clear what was the new
 2  information?  What was the new information that had to be
 3  brought before the Court suddenly?
 4          MR. SBAITI:  Your Honor, there wasn't new
 5  information.  We were simply giving notice of our understanding
 6  of where the legal arguments were going.  The reason being is
 7  that after those motions were filed and recently, the debtor
 8  took the position in two other cases that they should be
 9  dismissed pursuant to the permanent injunction.
10          And so that clarified for us at least a couple of
11  arguments that were unclear to us where the debtor stood on
12  whether or not the permanent injunction would be a basis to
13  dismiss or stay any of the claims that were pending.  There are
14  two other claims pending in district court.  Since we had filed
15  that motion, the debtor filed a motion to reconsider the stays
16  that were granted in those two courts.  And then they also
17  moved to dismiss on the basis of the permanent injunction.
18          And so given that the debtor took the position that
19  they were willing to dismiss those cases based upon the
20  permanent injunction, it in many ways contravenes the position
21  they took in response to our motion which is that the -- for
22  example, they somewhat take the position in Paragraph 22, it
23  wasn't as clear then but it's clear -- it seems clearer now
24  that the permanent injunction is not relevant to whether or not
25  the case can go forward in any capacity.
```

10

1          And so we simply wanted to incorporate that, but it's

2   mainly legal argument about the choices that are before the

3   Court.  That was really it.  I mean, theoretically, I would

4   have made them for the first time during oral argument and we

5   thought we were doing something good by giving -- apprising the

6   Court in writing and giving notice of these arguments to the

7   other side by filing an amended motion.  We didn't add new

8   evidence or anything like that.

9          MR. POMERANTZ:  Your Honor, that argument is

10  completely disingenuous because our motion to dismiss and

11  motion for reconsideration that Mr. Sbaiti refers to is several

12  weeks ago, okay.  It wasn't November 10th.  It was several

13  weeks ago.

14         I will respond substantively why Mr. Sbaiti is wrong

15  and there's no inconsistent positions when it's my time to

16  speak.  But for Mr. Sbaiti to say he was doing us a favor and

17  he was reacting to recent new information is just wrong, Your

18  Honor.  And they should just not be continued to allowed to get

19  away with flouting the rules.

20         THE COURT:  All right.  Well, let me just say I'm

21  confused, maybe I should say baffled, about this amended

22  motion.  You know, the motion to dismiss that is before the

23  Court for oral argument today isn't about the injunction, isn't

24  about the plan injunction.  It's about res judicata and other

25  12(b)(6) arguments.

**WWW.LIBERTYTRANSCRIPTS.COM**

11

1        So I'm confused and I think, you know, it's been

2   clear for many months in this adversary proceeding, in

3   particular, the debtor's position on the plan injunction,

4   particularly, you know, in the whole argument on the motion to

5   leave to add Mr. Seery as a defendant.

6        So I'm confused, but we're going to go forward on the

7   argument today, whatever argument you want to make.  And you've

8   been, I guess, forewarned.  I will say that these last-minute

9   amended motions are not going to be tolerated, are not going to

10  be considered.  And so, you know, I hope you won't do it again.

11  Your firm has already been sanctioned once in this adversary

12  proceeding.  I'm sure we all remember.

13       So, you know, I'm just kind of baffled why you would

14  take a chance filing an amended motion without leave or somehow

15  getting it to the attention of the Court or running it by the

16  other parties for their consent to you doing it.  But we're

17  going to go forward and just hear the arguments, okay.  And so

18  --

19       MR. SBAITI:  Thank you.

20       THE COURT:  -- I'll hear your argument.

21       I'm letting people know I don't know where this time

22  estimate came on the calendar today, three hours.  I don't know

23  if someone specifically expressed that.  But I'm letting you

24  know at noon I have a swearing-in ceremony that I'm doing back

25  in my chambers.  So I will stop at noon Central time.

12

1          And so does anyone think that's going to be a

2   problem?

3          MR. SBAITI:  It should not be, Your Honor, from our

4   perspective.

5          THE COURT:  Mr. Pomerantz?

6          MR. POMERANTZ:  I don't believe so.  Mr. Morris is

7   going to handle the motion to dismiss which is going to be the

8   bulk.  My presentation on the motion to stay is only going to

9   be around ten minutes or so.

10          THE COURT:  Okay.  Thank you.

11          Mr. Sbaiti, your argument on the motion for stay.

12          MR. SBAITI:  Thank you, Your Honor.

13          Your Honor, may I share my screen?

14          THE COURT:  You may.

15          MR. SBAITI:  I have a PowerPoint that can kind of --

16          THE COURT:  Okay.  You may.

17          MR. SBAITI:  -- walk us through.  Thank you.

18          Is Your Honor able to see my screen?

19          THE COURT:  I can, yes.

20          MR. SBAITI:  Thank you, Your Honor.

21          Your Honor, what I would point you to is, first, the

22   injunction language.  This is what Your Honor's permanent

23   injunction says, and this is really what animates our motion to

24   stay.  Out motion to stay is derived specifically because my

25   clients and I feel like our case has been enjoined by this

13

1  injunction, if not completely disposed of.

2          The language says that we're an enjoined:

3          "An enjoined party is permanently enjoined from

4          commencing, conducting, or continuing in any manner

5          any suit, action, or other proceeding of any kind

6          including any proceeding in a judicial, arbitral,

7          administrative, or other forum against or affecting

8          the debtor or the property of the debtor."

9          And then (v) of that injunction says:

10         "or acting or proceeding in any manner in any place

11         whatsoever that does not conform to or comply with

12         the provisions of the plan."

13         One of the things that was suggested in Paragraph 22

14  of their response was that the DAF and Holdco are not enjoined

15  parties.  But the final plan defines an enjoined party in

16  Article 1(b)(56) as any entity who has or -- all entities who

17  have held, hold, or may hold claims against the debtor; any

18  entity that has appeared and/or filed any motion, objection, or

19  other pleading in this Chapter 11 case regardless of the

20  capacity in which such entity appeared and any other party in

21  interest.  And, five, the related persons of each of the

22  foregoing.

23         Article 1(b)(22) defines a claim as any claim that's

24  defined in Section 1015 of the Bankruptcy Code.  And Section

25  1015 of the Bankruptcy Code defines a claim as a right to

Appx. 00014

14

1  payment whether or not such right is reduced to judgment,

2  liquidated, unliquidated, fixed, contingent, matured,

3  unmatured, disputed, undisputed, legal, equitable, secured, or

4  unsecured.

5          So given this definition, when we've read this

6  injunction, we believed that we were enjoined parties, the DAF

7  and Holdco were both enjoined parties.  They had appeared in

8  the -- they have claims.  Obviously, those are the claims being

9  asserted here.

10          And so going back to the injunction language, we

11  believe this lawsuit has been disposed of by this permanent

12  injunction.  We believe there's really only one or two things

13  that should probably happen with this lawsuit.  Either it could

14  be dismissed based upon the permanent injunction or what we

15  proposed in our motion to stay is that the Court exercise its

16  inherent authority to simply stay the case pending the appeal

17  of this language, which is up on appeal in the Fifth Circuit

18  right now.

19          If that language, and if the injunction gets affirmed

20  by the Fifth Circuit, then certainly the dismissal can happen

21  once that affirmance happens and there's no harm, no foul, and

22  no one's wasted any time.

23          If they're not, if it's overturned, then, obviously,

24  the injunction would be vacated, presumably by the Fifth

25  Circuit.  And at some point, if the Court decides not to enter

15

1 a similar injunction that would likewise dispose of this case,

2 then the case could proceed on the merits.

3          The issue we've identified both in our original

4 motion and as we fleshed out in our -- as a matter of law in

5 our amended motion to simply put a finer point on it is that

6 the merits are now -- have been disposed of.  This injunction

7 ends this case, at least as far as we read it.  It ends this

8 case irrespective of the underlying merits of the lawsuit,

9 which means that the lawsuit merits themselves have become moot

10 and any opinion or any attempt to resolve it is obviously an

11 advisory opinion by the Court.

12          So we really only see two ways that this could go

13 right now without either gutting the injunction or

14 circumventing it completely, which is to say that either the

15 case should be dismissed based upon the permanent injunction or

16 the case should be stayed based upon the permanent injunction.

17          Mr. Pomerantz or the debtors' brief suggests that,

18 well, the injunction doesn't prevent hearing pending motions.

19 But I would respectfully disagree with that.  If you look at

20 the language, "commencing, conducting, or continuing in any

21 manner in any suit, action, or other proceeding against or

22 affecting the debtor."

23          As 12(b)(6) hearing, I would imagine, was intended to

24 fall under the umbrella of a proceeding.  And us arguing a

25 12(b)(6) motion would us be conducting and maybe even

**WWW.LIBERTYTRANSCRIPTS.COM**

16

1  continuing the suit because we're trying to protect the merits

2  of the suit, which as I said are at this juncture already moot.

3          And so it comes down to I think a very simple

4  question, which is what do we do at this juncture.  Do we just

5  simply dismiss the lawsuit in light of this permanent

6  injunction or stay the lawsuit in light of this permanent

7  injunction?

8          The debtor makes a lot of hay out of the fact that,

9  well, there are special rules that apply when you're trying to

10 stay a case pending appeal.  But if you look at all of their

11 case law, it has to do with different circumstances where an

12 appeal -- where there's a matter on appeal that could

13 substantially affect the resolution of the case, which here we

14 think it actually could.  But in those cases, those appeals

15 would affect the resolution of the case on the merits; whereas,

16 here, the question goes to whether or not a permanent

17 injunction that really has stopped us all in our tracks.

18         As soon as we understood this injunction and its

19 scope, we're the ones who reached out to the debtor's counsel

20 and asked them on a meet-and-confer whether or not they would

21 just agree to stay the matter.  And we were a little bit

22 surprised by their reaction when they first didn't think that

23 this applied to our case, and we didn't understand how.  And

24 then they changed their mind, said it did apply to our case but

25 they didn't think that we should stay the case.  And they

17

1 didn't suggest let's just dismiss it based upon the permanent

2 injunction.

3        So it kind of comes down to the same small -- same

4 simple issue, Your Honor.  There's this permanent injunction,

5 and I don't think there's any way for us to get around it at

6 this juncture.

7        THE COURT:  Mr. Pomerantz:

8        MR. POMERANTZ:  Yes, Your Honor.

9        I'm going to respond to several of the arguments Mr.

10 Sbaiti made in his motion, which apparently he's abandoned

11 because he only is focused on the injunction.  And I'm also

12 going to tell Your Honor, what our arguments are because

13 despite Mr. Sbaiti's efforts, he's completely misquoted them.

14        So in the motion and the amended motion, the

15 Plaintiffs make several arguments why this Court should stay

16 the matter.  First, they argue they're entitled to a stay

17 because the exculpation provision in the plan prohibits them

18 from proceeding against the Defendants in the action.  And

19 there are several problems with that argument.

20        First, Mr. Sbaiti and the Plaintiffs don't even

21 attempt to meet the Fifth Circuit's standards for a stay

22 pending appeal because, of course, they can't.  Mr. Sbaiti's

23 trying to sidestep the grounds for a stay pending appeal by

24 arguing it doesn't apply just is incorrect.

25        They would have to show that there is a likelihood of

18

1  success on the merits, they would suffer irreparable harm, the

2  debtor wouldn't suffer irreparable harm, and there is -- public

3  interest supports a stay.  They can't do any of them.

4        In fact, as Your Honor is well aware, Your Honor

5  denied the actual appellants in that suit, in that order, the

6  confirmation order, a stay pending appeal and that was denied

7  by the district court and also denied by the Fifth Circuit

8  Court of Appeals.

9        The Plaintiffs didn't object to the plan, they are

10  not parties to the appeal, and they never sought a stay pending

11  appeal.  So they really can't explain why they as really

12  strangers to the appeal are entitled to a stay of the

13  effectiveness of the plan when the actual appellants to that

14  order were denied a stay pending appeal up through the

15  appellate ladder.

16        Second, notwithstanding Mr. Sbaiti's arguments in the

17  motion, the exculpation provision is neither as broad nor does

18  it affect all the parties that are subject to this litigation.

19  There are three Defendants in the complaint.  The only

20  Defendant that is covered by the exculpation provision is the

21  debtor.  The exculpation provision does not apply HCF Advisors,

22  and it does not apply to Highland CLO Funding.

23        Also, while the exculpation provision does apply to

24  the debtor, it only exculpates the debtor from claims of

25  negligence.  The complaint raises a variety of causes of action

**WWW.LIBERTYTRANSCRIPTS.COM**

19

 1  that have nothing to do with negligence and would not be

 2  covered by the exculpation provision.

 3          But, Your Honor, the biggest problem with their

 4  argument that the exculpation provision supports a stay is that

 5  the exculpation -- the appeal of the exculpation provision has

 6  nothing to do with this case.  Why?  Because the Fifth Circuit

 7  appeal concerns whether the exculpation provision is

 8  appropriate for parties other than the debtor.  The debtor is

 9  the only Defendant in this case that obtains the benefit of the

10  exculpation.

11          And there is no dispute, there was no dispute at

12  confirmation, there's no dispute in the case law, there's no

13  dispute in Pacific Lumber, there's no dispute in the appeal

14  that a plan can exculpate the debtor.  So the Fifth Circuit

15  appeal doesn't implicate the exculpation provision and cannot

16  support a basis for a stay.

17          The next argument Mr. Sbaiti makes is the injunction

18  provision, and the injunction provision is on appeal to the

19  Fifth Circuit.  But the aspect of the appeal of the injunction

20  is not the provision that Mr. Sbaiti points to.

21          And, again, as with the exculpation provision, the

22  same arguments about failure to obtain a stay, failure to be

23  party to the appeals, and failure to object to the plan apply,

24  as well.  But as is the case with the exculpation provision,

25  the resolution of the appeal of the injunction provision will

20

1   not affect this case in any way.

2        They point to the portion of the injunction that

3   prohibits enjoined parties from directly or indirectly

4   continuing, commencing, or conducting in any manner any suit or

5   action proceeding against the debtor.  They argue that they

6   cannot proceed without violating the injunction because the

7   injunction was intended to put all litigation against the

8   debtor to an end.

9        But, of course, Your Honor, that is not true.  That

10  is not what the injunction is.  The issue on appeal before the

11  Fifth Circuit as it relates to the injunction is whether the

12  injunction impermissibly enjoins parties from enforcing their

13  rights with respect to post-effective date commercial

14  relationships with the reorganized debtor.  And, of course, we

15  argue that it's appropriate, but it has nothing to do with the

16  provision Mr. Sbaiti identified.

17       The appeal does not impact in any way whether a plan

18  can enjoin prosecution of claims that arose prior to the

19  effective date.  And, of course, such a plan provision is

20  completely appropriate and is customary.  The plan provided the

21  debtor as the plan provides all debtors with a fresh start and

22  enjoins litigation against the debtor.

23       But importantly, Your Honor, that does not mean as

24  Plaintiffs argue that any liability for pre-effective date

25  conduct just goes away and that creditors are left without a

21

1  remedy to pursue claims against the debtor for pre-effective

2  date conduct.

3          Rather, if they have a pre-petition claim in lieu of

4  their litigation that's pending, they file a pre-petition claim

5  against the estate and that matter is resolved in the claims

6  objection procedure.  Or, as in the case here, when they make

7  an allegation that there is a post-petition claim, what do they

8  do?  They file a request for payment of an administrative

9  claim, and this Court addresses the validity of the

10 administration claim.  The lawsuit pending in another

11 jurisdiction stops, but the claim has to be resolved in the

12 bankruptcy court.

13         The only conduct that the injunction really prohibits

14 is them from proceeding with actions in other courts.  It does

15 not deny them a remedy.  Accordingly, their argument that they

16 cannot proceed with claims against the debtor because of the

17 injunction provision just lacks any merit and can't form the

18 basis for a stay.

19         Plaintiffs' next argument in their briefing is that

20 if the Court refuses to stay the complaint, they will file a

21 motion to withdraw the reference of this matter to the district

22 court.  Your Honor, this is the biggest head-scratcher of them

23 all given how this complaint ended up before Your Honor.  This

24 exact issue and Plaintiffs' arguments as to why the reference

25 should be withdrawn have already been fully briefed and decided

22

1  by the district court.

2          As Your Honor may recall, the Plaintiff filed this
3  action in the district court, conveniently failing to include
4  the bankruptcy case as a related case or mentioning that the
5  bankruptcy courts have related jurisdiction in the filings.
6  Your Honor may have had occasion to review the underlying
7  complaint when the debtor brought a motion for contempt against
8  counsel for Plaintiffs for pursuing a claim against Mr. Seery
9  in violation of Your Honor's January 9th, 2020 and July 16th,
10 2020 orders.

11         Your Honor issued an order finding counsel and
12 various parties in contempt which order is, of course, subject
13 to appeal.  At the time we were litigating the contempt motion,
14 we filed two motions in district court.  The first was a motion
15 to enforce the reference and have the district court send that
16 complaint to Your Honor.  And that motion to enforce the
17 reference is now on Your Honor's docket at Number 22 and 23.

18         The second was the motion to dismiss which is before
19 Your Honor today.  Plaintiffs oppose the motion to enforce the
20 reference arguing that mandatory withdrawal was required
21 because the matter involved consideration of non-bankruptcy
22 federal law, specifically federal securities laws and the
23 Investment Advisors' Act.

24         Plaintiffs further argue to the district court why
25 would you refer the case to the bankruptcy court if it's only

**WWW.LIBERTYTRANSCRIPTS.COM**

23

1  going to end up back in the district court upon mandatory

2  withdrawal of the reference.  They argue to the district court

3  that would be a complete waste of time.

4         We filed our reply at Docket Number 42 explaining to

5  the district court why mandatory withdrawal of the reference

6  did not apply and why this case should be referred to Your

7  Honor.  And what did the district court subsequently do?  It

8  entered an order referring this action to Your Honor which is

9  why we are here today.

10        Plaintiffs now flout the district court's order of

11  reference by telling the Court that if the Court does not stay

12  the matter, they will file a motion to withdraw the reference

13  before Your Honor, and they attach virtually identical pleading

14  that they filed in opposition to our motion to enforce the

15  reference.

16        Plaintiffs did not disclose in their amended motion

17  that there was a fully-briefed motion to enforce the reference

18  before the district court.  Plaintiffs' argument is

19  disingenuous and designed to mislead the Court.

20        The district court has only agreed that mandatary

21  withdrawal of the reference does not apply and this case

22  belongs in Your Honor.  And while we cannot stop the Plaintiffs

23  from filing any motion before this Court, we want to put them

24  on notice that if they do file a motion for withdrawal of the

25  reference in light of the facts as I just stated them, we will

**WWW.LIBERTYTRANSCRIPTS.COM**

24

1  seek sanctions.

2        In any event, Your Honor, the fact that they may file

3  a motion for withdrawal of the reference at some point in the

4  future is not grounds to stay the matter.

5        Lastly, Your Honor, Plaintiffs argued in the opening

6  that Highland's position today in opposing the motion to stay

7  is inconsistent with positions Highland has taken in two other

8  lawsuits commenced by the Sbaiti firm.  Like all of their other

9  arguments, they misrepresent the facts and are frivolous.

10       The Sbaiti firm filed a complaint on behalf of the

11  DAF in the district court arguing that Highland mismanaged

12  (audio drop).  That complaint followed in the heels of an

13  almost identical complaint filed by Dugaboy asserting the same

14  claims.

15       And Your Honor may recall questioning Mr. Sbaiti at a

16  hearing in June how Dugaboy could pursue such a claim in the

17  district court if Dugaboy had a pending proof of administrative

18  claim on file in the bankruptcy case.  Well, soon after that

19  hearing, Your Honor, the Dugaboy complaint was dismissed, and a

20  few days later the DAF complaint was filed.  That complaint has

21  never been served on Highland.

22       The second lawsuit is also a lawsuit filed by the

23  Sbaiti firm on behalf of an entity called PCMG in the district

24  court.  And PCMG previously held less than five one-hundredths

25  of a percent interest in a certain fund managed by highland.

**WWW.LIBERTYTRANSCRIPTS.COM**

25

1  The lawsuit alleges that Highland acted improperly to sell
2  certain assets of the fund, thereby damaging PCMG.  That
3  complaint has also never been served on Highland.

4          The Plaintiffs sought a stay of those matters before
5  Highland could file a response, and the court -- the district
6  court's entered stays in those matters.  And Highland has filed
7  motions for reconsideration and the motions to dismiss because
8  they violate the injunction.

9          But, importantly, Your Honor, if you read the
10 motions, Highland does not argue that Plaintiffs do not have a
11 remedy for the alleged wrongs they say they suffer.  Rather,
12 Highland's argument is that any claims alleged in those
13 lawsuits, just like any claims alleged in the lawsuit before
14 Your Honor today, must proceed in bankruptcy court as part of
15 the claims objection process.  That's where they will have
16 their day in court.  The lawsuits don't go away.  The
17 injunction prevents them from continuing on in district court.

18         Accordingly, Highland is being totally consistent in
19 all matters, and the litigations may not proceed there but must
20 proceed before Your Honor.  And, of course, none of these three
21 matters are implicated by the Fifth Circuit appeal.

22         Your Honor, the amended motion was procedurally
23 improper and is substantively without merit.  And for all these
24 reasons, we request that the Court deny the stay motion and
25 proceed with the hearing on the motion to dismiss.

26

1          Thank you, Your Honor.

2          THE COURT:  All right.

3          Mr. Sbaiti, you get the last word.

4          MR. SBAITI:  Thank you, Your Honor.

5          Your Honor, the administrative claim process that was

6    described as being the way that these claims were supposed to

7    proceed, by the language of the order that we read, does not

8    allow for these claims.  Those claims are limited to a specific

9    category of claims that don't include the claims that are

10   alleged in this lawsuit.

11         And in any event, this lawsuit wasn't filed as an

12   administrative claim.  So if that's the case and it needs to be

13   refiled or reasserted as an administrative claim, then I think

14   that's a subject for another day.  All I know is that we have

15   this injunction right now that either should stay this case

16   pending the appeal, which I'll address the issue on appeal in a

17   moment, or it should be dismissed, perhaps without prejudice so

18   that it can be refiled properly as an administrative claim if

19   that's what's supposed to happen, because I guess this converts

20   the matter.

21         The appeal, the subject of the appeal as to the

22   injunction, Your Honor, the appeal actually encompasses many of

23   the issues that we're talking about in this case.  Now Mr.

24   Pomerantz tries to narrow the scope of what's up on appeal, and

25   that may indeed be the argument that they're going to present

27

1  to the Fifth Circuit or that they've presented to the Fifth

2  Circuit.

3          But the actual issue up on appeal is the

4  enforceability and validity of the order for a variety of

5  reasons which includes the provision that we're talking about

6  and the enforceability of the provision that we're talking

7  about because it gets rid of particular claims.  And I guess

8  the argument back is, no, it doesn't because there's now an

9  alternative means of going there.

10         Mr. Pomerantz says that we shouldn't have proffered a

11 motion to enforce the reference.  That proffer, however, was

12 because Judge Boyle's reference to this Court didn't deal with

13 our motion to -- our cross-motion to withdraw the reference.

14 All it dealt with was their motion to enforce the reference as

15 a -- to enforce the standing order in the district court.  And

16 that's all she ordered was she cited the standing order and the

17 statutes, I think it's 157(a), and that's really all it did.

18         So it left open the question of whether she wanted

19 Your Honor to deal with the withdrawal of the reference

20 specifically as to the 12(b)(6) issue in the first instance.

21 It didn't resolve the question.  It doesn't purport to resolve

22 that question.  And it's not unheard of for the district court

23 then to send the matter to the bankruptcy court and then to

24 piecemeal which proceedings the withdrawal of the reference is

25 applicable to and then all the other proceedings would stay

28

 1  with Your Honor or with the bankruptcy court.

 2          So we weren't flouting the district court's order,

 3  and we certainly weren't flouting any of the previous orders.

 4  And the threat of a sanction for simply exercising our rights

 5  in due course is not well taken.

 6          Now Mr. Pomerantz says, well, the DAF and CLO Holdco

 7  are not parties to the appeal.  I don't think that's relevant

 8  because if the provision is struck by the Fifth Circuit, it's

 9  not only struck for the appellants, it's struck as to all.

10  It's either valid or it's invalid.  And even if it's declared

11  to be invalid only as to the appellants, it's not suddenly

12  valid as to everyone else who didn't appeal.  That's not

13  generally how these appeals have worked.

14          If the Court doesn't stay this matter, Your Honor,

15  and doesn't dismiss it, we still maintain, Your Honor, that as

16  it stands today, the question on the merits have been mooted

17  and we cannot proceed.  I think what Mr. Pomerantz is hoping

18  for or the debtor is hoping for is a provision where our hands

19  are potentially tied to argue the motion.

20          And if the Court tells us they're not, then we'll

21  certainly argue the 12(b)(6).  But what I don't want to do is

22  argue a 12(b)(6) motion that on its face appears to violate the

23  permanent injunction and then be held in contempt for violating

24  that injunction.

25          And so that's why we've asked for the Court to either

29

1  stay the matter under its inherent jurisdiction or to -- if

2  you're going to -- if it's not going to be stayed, then we

3  believe it has to be dismissed according to the permanent

4  injunction as it stands right now.

5          THE COURT:  All right.

6          The motion to stay is denied.  The amended motion to

7  stay is likewise denied.  This is an odd argument.  I guess one

8  might say the traditional four-factor test for a stay of a

9  proceeding has really not been the subject of the argument here

10 for a stay.

11         So suffice it to say the four-prong test for a stay,

12 you know, hasn't been met here.  There hasn't been a showing of

13 substantial likelihood of success on the merits or irreparable

14 injury if the stay's not granted or a stay will not

15 substantially harm others or the stay would serve a public

16 interest.

17         But going on to the arguments that were focused on by

18 movant, I just don't think that you have shown that, you know,

19 either the exculpation clause or the injunction provisions of

20 the plan somehow tie your hands in arguing the 12(b)(6) motion,

21 defending against the 12(b)(6) motion today or I just think

22 that your arguments reflect, frankly, a misunderstanding of how

23 the injunction language and exculpation language applies here.

24         So the motion for stay is denied, and I will ask Mr.

25 Pomerantz to submit an order reflecting the Court's ruling.

30

1        So it looks like we have another procedural matter,

2   Mr. Sbaiti.  You filed a motion to strike reply appendix of the

3   Plaintiffs quite a while back.  So did you want to present

4   that?

5        MR. SBAITI:  Yes, Your Honor.  I think it's a very

6   simple procedural issue.

7        Generally, a party that files a 12(b)(6) is limited

8   to the four corners of the complaint.  And if there's a

9   contract incorporated or a document incorporated as an

10  intrinsic part of the complaint, you know, that's usually

11  considered under the 12(b)(6) motion.

12       What the Defendants did, what the debtor here did is

13  they filed a bunch of evidence in their 12(b)(6), essentially

14  attempting to argue it as a summary judgment.  We raised that

15  in our response.  So as part of our response, we objected to

16  all the evidence.  But then on the reply, they filed a bunch

17  more evidence both without leave and improperly, basically

18  sandbagged us.

19       And so we raised two points for striking that

20  evidence.  One was akin to the first argument, which is it's

21  not an evidentiary hearing.  It's not an evidentiary process in

22  the first instance.  A 12(b)(6) motion has to assume that the

23  facts pled are true, and then the question is whether they

24  state a claim.

25       And, secondly, adding them to the reply is especially

31

1  egregious because the reply is the last word.  And we didn't

2  have an opportunity to respond, and we also don't think it's

3  relevant nor should we have to respond to a whole bunch of

4  extra evidence that was attached.

5          That's essentially the basis of our motion, Your

6  Honor.

7          MR. POMERANTZ:  Your Honor, the simple answer to the

8  issue is we filed the reply of the appendix in connection with

9  the motion to enforce the reference.  We didn't file it in

10  connection with the motion to dismiss.  The motion to enforce

11  the reference is moot.  So what Mr. Sbaiti, his whole argument

12  doesn't make any sense.

13          As a substantive matter, just there wasn't any

14  evidence.  It was pointing to court pleadings, orders, and

15  stuff.  So it's irrelevant.  I don't know why it's still on the

16  docket.  It shouldn't be on the docket since it related to the

17  motion to enforce the reference.

18          THE COURT:  All right.  Mr. Sbaiti, did you just

19  simply --

20          MR. SBAITI:  Your Honor, much of that evidence was --

21          THE COURT:  -- misunderstand or what?

22          MR. SBAITI:  I think we might have because it was

23  filed as a separate item, and it may have been miscalendared or

24  misapplied on our system.  But the way it was presented to us

25  when we got it was it appeared to be evidence in support of,

32

1  well, I guess both, but certainly evidence that was averted to

2  in the reply.

3          But if they're saying that the Court's not going to

4  consider it, then that moots the motion and I think we can move

5  on.

6          MR. POMERANTZ:  Yes, Your Honor.  I had nothing to do

7  with his motion.  I guess there was another mistake on their

8  end.  I guess that stuff happens occasionally.

9          THE COURT:  Okay.  All right.  So I'll deny it as

10 based on a mistake that's been acknowledged here.  And so with

11 that, let's have an order cleaning that up, as well, Mr.

12 Pomerantz, please.

13         With that, we'll move on to the Defendants' motion to

14 dismiss complaint.  I think, Mr. Pomerantz, you said Mr. Morris

15 will be making this argument?

16         MR. POMERANTZ:  That is correct, Your Honor.

17         THE COURT:  All right.

18         Mr. Morris, I'll hear your argument.

19         MR. MORRIS:  Good morning, Your Honor.  John Morris

20 for Pachulski Stang Ziehl & Jones for the reorganized debtor.

21 Can you hear me okay?

22         THE COURT:  I can.  Thank you.

23         MR. MORRIS:  Okay.

24         Your Honor, this is a bit like Groundhog's Day.  I

25 believe that we're going to spend the next half hour or an hour

33

1  discussing the very issues that were before the Court earlier

2  this year on the HarbourVest 9019 motion.

3          As the Court will recall from the June 8 hearing,

4  there is a complaint that's been filed ostensibly by the DAF

5  and CLO Holdco.  As Your Honor will recall, the testimony

6  established that Mark Patrick had just been installed as the

7  trustee, had no knowledge of the prior events, and Mr. Dondero

8  and Mr. Sbaiti spent quite some time together formulating this

9  particular complaint that is nothing less than a collateral

10 attack on the Court's prior order.

11         I'd like to, if I can, just walk through a PowerPoint

12 presentation to try to make the debtor's position quite clear,

13 if I may.

14         THE COURT:  You may.

15         MR. MORRIS:  And I would ask my assistant, Ms. Canty

16 (phonetic), to put up the first slide.

17         Your Honor, you'll recall that last December, the

18 debtor filed its motion under Rule 9019 for court approval of a

19 settlement.  The debtor was completely and utterly transparent

20 in what the terms of the settlement were.

21         Very briefly, as set forth in Appendix 2 or Exhibit 2

22 which was the motion itself, in Paragraph 32, Your Honor, the

23 debtor set forth the terms of the transaction for which it was

24 seeking approval.  Those terms included in the very first

25 bullet point a statement that HarbourVest shall transfer its

34

1  entire interest in CLOF to an entity to be designated by the

2  debtor.

3          And that's an important point that we'll talk about

4  in a number of different contexts, Your Honor.  The debtor made

5  it very clear at the very first moment of this matter that it

6  was not going to acquire the asset but the asset was going to

7  be transferred to an entity to be designated by the debtor.

8  The debtor's motion filed last December clearly stated the

9  value of the interest that it would be acquiring in return.

10 That was also set forth in Paragraph 32 in a footnote.

11         It didn't say that it was the fair market value.  It

12 said the method of valuation was the net asset value and gave a

13 valuation date of December 1st so that all parties in interest

14 who received the motion understood the economics of the deal.

15 And the deal that the debtor was asking the Court to approve

16 was one whereby HarbourVest would receive certain claims and in

17 exchange for those claims, they were going to transfer their

18 interest in CLO -- HCLOF.

19         The debtor also filed on the docket for all to see a

20 copy of the settlement agreement.  The settlement agreement

21 sets forth the terms of the deal, including again the statement

22 that HarbourVest "will transfer all of its rights, title, and

23 interest in HCLOF."  It actually says to an affiliate or an

24 entity to be designated by the debtor.  And the transfer

25 agreement itself was also put on the docket.

35

1          So that's where things stood just before Christmas.

2   I know that there's some due process and other type arguments

3   that are in the Plaintiffs' opposition to the motion.  But, of

4   course, the undisputed facts are that the debtor timely filed

5   the motion.  The time period was consistent with all applicable

6   rules.  Nobody ever asked the debtor for an extension of time.

7   Nobody ever filed a motion for an extension of time.  And so

8   those due process arguments I think carry no weight at all.

9          So the debtor filed the motion.  And if we can go to

10  the next slide, we see what the responses were, and there were

11  several.  All of the responses, the only responses were

12  objections to the motion filed by Mr. Dondero and his certain

13  of his affiliated entities.

14         Mr. Dondero's objection can be summarized as follows.

15  He made the following observations and asserted the following

16  objections to the proposed settlement.  The first thing he said

17  is that the settlement far exceeds the bounds of

18  reasonableness.  Now, of course, one cannot make a

19  determination of reasonableness without having an understanding

20  of value.  The debtor was giving something and it was getting

21  something.

22         And so Mr. Dondero understood that the issue of value

23  was front and center.  If there was any mistake about it, he

24  also noted that he understood that as part of the settlement

25  and, again, I've written this incorrectly, HarbourVest will

36

1  transfer its entire interest in HCLOF to the debtor.  That is

2  not what Mr. Dondero understood.  In fact, Mr. Dondero

3  understood that it would transfer its entire interest in HCLOF

4  "to an entity to be designated by the debtor," again, making it

5  clear that he knew exactly what the debtor was doing here.  And

6  that can be found at Appendix 4 in Footnote 3 on Page 1 if you

7  want the exact quote from Mr. Dondero's pleading.

8          In the same footnote, he also specifically

9  acknowledges that he understood the valuation.  He understood

10 the method valuation.  He understood the valuation date of

11 December 1st.  And he urged the Court in his pleading to

12 scrutinize the settlement to make clear that the available

13 value of the investment should be realized by the debtor's

14 estate.

15         And this is such a critical point, Your Honor.  His

16 concern was that by placing the value in an entity other than

17 the debtor itself, that the Court wouldn't have jurisdiction

18 over that asset.  That was his concern.  So not only did he

19 understand that the asset was going to be transferred to an

20 affiliate, he wanted to make sure that this Court had

21 jurisdiction over the asset.

22         And, of course, Mr. Seery in his testimony and

23 otherwise, we provided the Court with all the comfort it needed

24 to know that even though it was being assigned to a special-

25 purpose vehicle wholly-owned by the debtor, it would

37

1  nevertheless be subject to the Court's jurisdiction.

2          Mr. Dondero's trusts also filed an objection if we

3  can go to the next slide.

4          Dugaboy and Get Good represented by Douglas Draper

5  made the following observations and asserted the following

6  objections to the HarbourVest Settlement.  They, too, made

7  clear that they understood that the asset was going to be

8  transferred to an entity designated by the debtor.  They, too,

9  acknowledge that they understood that the debtor was valuing

10  the asset at approximately $22 million as of December 1st.  And

11  their objection was that the Court couldn't evaluate the

12  settlement without knowing how the asset was valued, without

13  knowing whether the debtor could acquire the asset, very

14  critical point.

15          These are the points that are made in the complaint.

16  These are the exact same points that are made in the complaint.

17  And also the Court couldn't evaluate the settlement unless they

18  understood that the value would be inure to the benefit of the

19  debtor's estate, again, mimicking Mr. Dondero's concern that by

20  placing the asset in an affiliate of the debtor, that it might

21  not be subject to the Court's jurisdiction.

22          Finally, and most importantly, if we can go to the

23  next slide.  The Plaintiff, CLO Holdco, filed an objection to

24  the 9019 motion.  And this is just so critical.  And this is

25  the Groundhog Day aspect that I specifically speak of.  CLO

38

1  Holdco's objection was based solely on its assertion that it

2  had a superior right to the opportunity to acquire the asset

3  that was being transferred by HarbourVest.  It only made one

4  argument in support of its contention that it had a superior

5  right, but that argument was specifically premised on the

6  membership agreement, Section 6.1 and 6.2 of the membership

7  agreement.

8          CLO Holdco, the Plaintiff in the underlying action,

9  argued to this Court that HarbourVest had no authority to

10  transfer the asset without complying with the right of first

11  refusal that would give CLO Holdco the opportunity to take the

12  asset for itself.  That's what this Court was told.  CLO Holdco

13  didn't make this argument fleetingly.  They provided an

14  extraordinarily detailed analysis of Sections 6.1 and 6.2 of

15  the membership agreement and concluded "that HarbourVest must

16  effectuate the right of first refusal before it can transfer

17  its interest in HCLOF.  That was the objection.  Objections

18  have consequences, as Your Honor knows.

19          If we can go to the next slide.

20          By filing an objection, CLO Holdco and the trusts and

21  Mr. Dondero became participants in the litigation.

22  Notwithstanding the Plaintiffs' arguments to the contrary, when

23  they file the objections, they participate in what's called a

24  contested matter.  And in a contested matter, they had every

25  right to take all discovery on any issue that was related to

39

1  the 9019 motion, including the transfer, the disposition of the

2  asset to an affiliate of the debtor, the valuation of the asset

3  that's being received, the merits of the settlement itself, the

4  causes of action, whether, you know, what communications that

5  were, the negotiations, what did Mr. Seery and Mr. Pugatch

6  discuss?  Right?

7          They could have taken any discovery they wanted.  And

8  they did avail themselves of discovery, in fact.  They did -- I

9  don't know why they did what they did, but they chose to take

10 one deposition, and that was Mr. Pugatch, okay.

11         His deposition transcript, I think is at Exhibit 7,

12 or Appendix Number 7, and it was a long deposition.  It really

13 was.  And they asked Mr. Pugatch at the deposition if he knew

14 what the value of the asset that was being transferred was.

15 And he said $22.5 million.  So it wasn't just Mr. Seery or the

16 debtor who was subscribing to this valuation.  The party on the

17 other side of an arm's length negotiation was subscribing to

18 the exact same valuation.

19         The Plaintiffs could have taken whatever discovery

20 they wanted.  This is a full and fair opportunity to

21 participate in the litigation.  We proceeded to trial.  Before

22 we got there, actually, the debtor filed its response to CLO

23 Holdco's objection and proffered its own very detailed and

24 apparently very persuasive analysis that CLO Holdco's objection

25 was without merit, that CLO Holdco had no right of first

40

1  refusal under the facts and circumstances as they existed, and

2  with Grant Scott, Mr. Dondero's childhood friend at the helm,

3  we got to Court for the contested hearing on the debtor's 9019

4  motion, and CLO Holdco withdrew their objection.

5         And I've put up on the screen just an excerpt of the

6  transcript because, you know, when we talk about whether or *res*

7  *judicata* should apply, because was there a hearing on the

8  merits?  Was there a decision on the merits?  Just look at the

9  words of CLO Holdco's lawyer.  "CLO Holdco has had an

10 opportunity to review the reply briefing and after doing so has

11 gone back and scrubbed the HCLOF corporate documents based on

12 our analysis of Guernsey law."

13        And some of the arguments of counsel in those

14 pleadings and our review of the appropriate documents, counsel

15 obtained the authority from Mr. Scott to withdraw the CLO

16 Holdco objection based on the interpretation of the member

17 agreement.  We were grateful for that and the Court

18 specifically said in response, "That eliminates one of the

19 major arguments that we had anticipated this morning."

20        Apparently, the Plaintiffs believe that those events

21 have no meaning and that this Court's reliance on CLO Holdco's

22 substantive withdrawal of its objection has no meaning.  I

23 think they're wrong, and we'll get to that in a moment.

24        We proceeded with the hearing.  Mr. Seery and

25 Mr. Pugatch testified at length.  If you look at Footnote 3,

41

1   you'll see Mr. Seery testified for almost 70 pages of

2   testimony.  Mr. Pugatch testified for almost 45 pages of

3   testimony.  His testimony was exhaustive.  And, again, any of

4   the objecting parties had the right to ask whatever questions

5   they want.

6            But I do want to just note a few things that aren't

7   up on the screen right now.  If you go to Appendix 9, Your

8   Honor, which is the transcript of the hearing, at Page 13, you

9   will see that the very first thing I discussed in my opening

10  statement was the economics and how with a valuation of $22.5

11  million this deal made sense for the debtor.

12           You will see from Pages 30 to 42 there is extensive

13  testimony from Mr. Seery about the amount and the value of the

14  asset.  But the most important part of Mr. Seery's testimony is

15  that he explains how it came to be that HarbourVest agreed to

16  transfer its interest in HCLOF to an affiliate of the debtor.

17  And that came about, not because Mr. Seery or the debtor was

18  initially at all interested in doing this.  The whole idea

19  originated with HarbourVest.

20           They wanted to extract themselves from the Highland

21  platform.  They wanted to give this piece up.  So there's no

22  conspiracy going on here.  The unrebutted testimony that all of

23  the objecting parties had an opportunity to challenge was that

24  the whole idea originated with Mr. Pugatch and with

25  HarbourVest.  I think that's an important point to take into

42

1  account.

2          And finally, again, from the hearing, if you look at

3  at Appendix 9, you'd also find that Mr. Pugatch, again,

4  testified, as he had in his deposition, as to the value of the

5  interest being transferred.  So we completed the testimony.  We

6  rested our case having had a full and fair opportunity to

7  contest the motion.  The objecting parties rested as well.  And

8  we got to the point where we had to prepare the notice, and we

9  were discussing that at the hearing, if we can go to the next

10  slide.

11          And it's very important, because again, this was all

12  done transparently, and it was all done on the record.  And

13  after the close of evidence, I addressed the order that was

14  going to be prepared.  I specifically said that I wanted to

15  make clear that we were going to include a provision, "that

16  specifically authorizes the debtor to engage in, to receive

17  HarbourVest the asset, you know, the HCLOF interest," right.  I

18  wanted everybody to know that was what was going to happen, and

19  then I said, "The objection has been withdrawn."  I think the

20  evidence is what it is and we want to make sure that nobody

21  thinks they're going to go to a different court somehow to

22  challenge the transfer.  But yet, that is exactly what the

23  complaint seeks to do.

24          Having put everybody on notice as to where we were

25  going, as to what the evidence showed, the debtor drafted and

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 09/15/22   Page 47 of 280   PageID 89

43

1  the Court adopted an order, and the order says, among other

2  things, that HarbourVest was authorized to transfer its

3  interest to the debtor.  Actually, it says, "to a wholly owned

4  and controlled subsidiary of the debtor," pursuant to the

5  transfer agreement, "without the need to obtain the consent of

6  any party or to offer such interest first to any other investor

7  in HCLOF."  So the Court heard the 9019 motion pursuant to a

8  Bankruptcy Rule and entered and order that was unambiguous and

9  that the Plaintiffs did not appeal from.

10        We can go to the next slide.

11        At a very high level, Your Honor, it is just crystal

12  clear that the complaint is just inextricably intertwined with

13  the 9019 proceedings and the order itself.  I think Mr. Sbaiti

14  would agree with me that but for the order that approved the

15  transfer of the asset and the testimony about the value of that

16  asset, they have no claims.

17        Every single claim is predicated on what happened in

18  the 9019 hearing.  Every single claim is predicated on the

19  Court's order approving the transfer of the asset and the

20  testimony and evidence that was adduced in relation to that

21  asset.

22        There were really only two issues that the Court -- I

23  mean, if you want to think about it at its most simplistic

24  level, the Court was being asked to assess, is it fair, is it

25  reasonable, is it legally permissible for the debtor to give

44

1  something.  In this case, allowed claims and releases, and to

2  get something in return.  In this case, HarbourVest's interest

3  in HCLOF and releases in return.  And that is really the

4  gravamen of the complaint.

5          The complaint is based whether it's breach of

6  fiduciary duty or RICO or breach of contract or tortious

7  interference, whatever the claim is, none of them exist if the

8  debtor doesn't get this.  They just don't exist.  And that is

9  why the complaint and the proceeding are inextricably

10 intertwined.  And if you just take a look at just one paragraph

11 of the pleading, it says at the core of this lawsuit is the

12 fact that HCM, that's the then debtor, purchased the

13 HarbourVest interests in HCLOF for $22.5 million knowing that

14 they were worth far more than that.  There's not a cause of

15 action that exists in the complaint that isn't dependent on

16 Paragraph 36.

17         So if we can go to the next slide with that

18 background, I'd like to argue why under 12(b), the complaint

19 should be dismissed because the claim should be barred under

20 the doctrine of *res judicata*.  Luckily, Your Honor, there is at

21 least one area of agreement between the parties here, and that

22 is the purpose of the doctrine and the elements that have to be

23 satisfied in order to meet the burden of proof necessary to

24 have the claims barred.  And in Footnote 1, you can -- I've

25 tried to just be helpful to the Court to show that we may not

Appx. 00045

45

1  cite to the exact same cases, but the parties agree that the

2  doctrine is intended to foreclose the re-litigation of claims

3  that were or could have been raised in a prior action and that

4  there's four elements that have to be satisfied for the

5  doctrine to apply.

6        The parties have to be either identical or at least

7  in privity, the judgment in the prior action had to have been

8  rendered by a court of competent jurisdiction.  Number three,

9  the prior action had to have been concluded by a judgment on

10 the merits.  And the last one is that the same claim or cause

11 of action was involved in both suits.  So I just want to spend

12 a few minutes now, Your Honor, going through those four

13 elements to show the Court how easily the reorganized debtor

14 meets this standard.

15       If we can go to the next slide, I can take care of

16 the first two elements very quickly.

17       The first element, the debtor asserted that the

18 Plaintiffs were parties or in privity with parties to the prior

19 proceeding.  That's at Paragraph 17 of the motion to dismiss.

20 The debtor relies on the deposition testimony of Grant Scott,

21 who was then the trustee of the DAF.

22       CLO Holdco is a wholly-owned subsidiary of the DAF,

23 or wholly controlled, in any event, and Mr. Scott's testimony

24 was that he was the only director and there were no employees

25 of either entity.  So we, in our motion, put forth evidence to

46

1  establish the first element, and I don't believe, maybe I've

2  missed it.  I don't believe that the Plaintiffs have contested

3  that element.  If they have, I think Mr. Scott's testimony will

4  carry the day, in any event.

5          The second element as to whether or not a court of

6  competent jurisdiction is the entity or the court that rendered

7  the ruling.  Of course, that's been met, too.  The Plaintiffs,

8  in their opposition to the motion to dismiss, suggested that

9  the bankruptcy court would have lacked jurisdiction if their

10  cross motion to withdraw the reference was granted.  They said

11  if the district court decides that mandatory withdrawal

12  applies, then it cannot find that the bankruptcy courts already

13  entered final judgment was rendered on Plaintiffs' causes of

14  action and had jurisdiction to do so.  I think that's just a

15  clear misstatement of the law.

16          But in any event, Your Honor, at this point, I

17  believe it's irrelevant because the district court, in fact,

18  sent the case back to Your Honor and back to this Court.  And

19  so, at the end of the day, Plaintiffs' argument doesn't hold

20  water because of the district court's ruling, which can be

21  found -- the order of reference can be found at Docket

22  Number 64.  And so I think that easily takes care of the second

23  prong.

24          The third prong is whether -- if we can go to the

25  next slide -- the prior proceeding resulted in a judgment on

Appx. 00047

47

1  the merits.  And this is really the critical point, Your Honor.

2  As the Court knows, the whole doctrine of *res judicata* is

3  designed to prevent, as the parties agree, the re-litigation of

4  claims.  Stated another way, it's to bring finale.  It's to

5  make sure that the Court doesn't hear the same claims and the

6  same issues that either were brought or that could have been

7  brought in a prior proceeding.  And so, we believe that we

8  easily meet the standards set forth in the third prong.  The

9  9019 order necessarily determined that the *quid pro quo* that I

10 described earlier was fair, reasonable, and legally

11 permissible.

12         Notwithstanding their assertions to the contrary, the

13 Plaintiffs are most definitely seeking to unwind at least one

14 half of the Court's order by belatedly claiming that they are

15 entitled to the benefit of the bargain while leaving Highland

16 burdened, frankly, with the claims that HarbourVest got as part

17 of the deal.  I will tell you, Your Honor, and this is

18 argument, the debtor would never have asked for, and I don't

19 believe that the Court would ever have granted, the 9019 motion

20 if they thought that there was a risk in the future that

21 Highland wouldn't get the benefit of the bargain and it was

22 incumbent upon CLO Holdco and the DAF, and frankly, any party

23 in interest, to stand up and be counted and tell the Court and

24 the debtor, why the debtor was not entitled to do this deal and

25 CLO Holdco did that.  They actually did.

Appx. 00048

48

1            They stood up and they filed an objection and they

2    said we have a superior right to this asset in the form of a

3    right of first refusal.  They wound up folding in the face of

4    persuasive argument, and I respect the lawyer who did that.  I

5    just do.  But that was the time to speak up, and that's why it

6    is on the merits because that is exactly what *res judicata* is

7    intended to do.  It's intended to have everybody put your cards

8    on the table.  You don't put one card on the table and say, I'm

9    going to challenge this under 6.2 of the members agreement, but

10   I'm not going to tell you that I also think you owe me a

11   fiduciary duty under the Advisors Act or as the control party

12   or under any other theory that they had.  They can't do that.

13   That's exactly what the problem is here.

14           If we can go to the next slide.  Is it a judgment on

15   the merits?  The debtor and the Court relied on CLO Holdco's

16   representation that it was withdrawing its argument, its claim,

17   its contention, its assertion that it had a superior right to

18   obtain the HarbourVest interest in HCLOF.  Again, they did so

19   not whimsically, not because Mr. Kane was going to be out of

20   town and he couldn't make the hearing.  He did it after, and I

21   don't think this matters frankly, but I think it's worth noting

22   that he did it after an extremely careful analysis.  I would

23   tell you, Your Honor, that -- well, I would argue, Your Honor,

24   that even if Mr. Kane at CLO Holdco had never filed an

25   objection, if they'd never filed -- if they'd gotten notice

Appx. 00049

49

1  that this was happening and they sat silently, that would have

2  been enough for *res judicata* because the issue before the Court

3  was whether it was legally permissible for the debtor to

4  acquire this asset.

5          And if they had an obligation, if they owed a duty to

6  another party, it wouldn't have been legally permissible.  And

7  if somebody believed that it wasn't legally permissible because

8  a duty was owed to them, they had an obligation to speak up.

9  And so I think it's very important, particularly for the

10 collateral estoppel argument that I'll make in a moment, that

11 CLO Holdco did in fact file an objection.  It was based on the

12 breach of contract claim that's in their complaint.  It's the

13 exact same claim.  And they withdrew it.  I think it's very,

14 very important.  I think it highlights why *res judicata*

15 applies.  I think it is the linchpin of the collateral estoppel

16 argument.

17          But at the end of the day, I think if they say

18 nothing, they should be estopped or precluded under *res*

19 *judicata* from now asserting -- it would be like -- I was

20 thinking about this earlier, Your Honor.  If you'll remember

21 earlier this year, Mr. Dondero and his entities have kind of a

22 habit of withdrawing objections at the last minute.  We had a

23 couple of sale hearings earlier this year.  And the issue was

24 valuation, you know, and the process, and could the debtor meet

25 its burden of proving that the sale outside of the ordinary

Appx. 00050

50

1  course of business was in the debtor's best interest.  And they

2  sold that restaurant.  And Mr. Dondero objected.  And at the

3  last second, they withdrew the objection.  Did they sue

4  tomorrow?  Does Your Honor really think that they could bring a

5  lawsuit tomorrow and say they just found a document or theory

6  on which the debtor had an obligation to give them a right of

7  first refusal, even though we've already closed on the

8  transaction, even though they were given notice of the

9  transaction, even though they filed an objection to the

10 transaction, even though they withdrew the objection?  Would

11 the Court tolerate for one second a new pleading tomorrow from

12 Mr. Dondero that the debtor actually had a fiduciary duty to

13 give him a right of first refusal to buy that asset under

14 whatever theory, just because he pleads it and the Court has to

15 accept as true the allegations in the complaint?  I think not.

16 And I think it's worth thinking about that to highlight just

17 how -- just how wrong this is.

18         Continuing on.  You know, the Plaintiffs in

19 opposition say it can't be a trial on the merits because we

20 weren't parties.  Of course they were parties.  Again, they

21 filed an objection.  They were the parties to the contested

22 matter, full stop.  They rely on a case called Applewood and

23 they say, this is the very first point they make in their

24 brief.  Applewood, if it wasn't *res judicata* in Applewood, how

25 could it possibly be *res judicata* here?  But the facts are just

51

1  so inapposite, right?

2          In <u>Applewood</u>, you had a garden variety plan and

3  release where the debtor and the officers and directors got a

4  discharge.  No objection to it.  And a secured lender later on

5  sought to sue guarantors who happened to be officers and

6  directors.  And the court, not surprisingly, said that the

7  confirmation order wouldn't prevent the secured lender from

8  going after the officers and directors, not in their

9  capacities, as such, but in their capacity as guarantors, which

10 were never part of the confirmation order.  That just doesn't

11 apply here because here, we have the debtor making a motion

12 before the Court in which it sought permission and authority to

13 acquire a particular asset.  Anybody who had a claim to that

14 asset should have stepped forward and put their cards on the

15 table.

16         And again, CLO Holdco put their cards on the table

17 and they lost, and they folded.  To use the poker analogy, they

18 folded.  And to hear them come into Court today and say we're

19 going to sue you because I reshuffled the deck, it's not right

20 and <u>Applewood</u> has no relevance.

21         Finally, Your Honor, you know, it's not on the

22 merits, they say, because you know, Mr. Seery and the debtor

23 hid the true value of the asset, and had we only known the true

24 value of the asset, we would have made all of these other

25 claims.  The fact of the matter is, you either have a fiduciary

52

1  duty or you don't.  And if you had a fiduciary duty, they
2  should have spoken up and they did only under 6.2, but they
3  did.

4        But here's the important part, Your Honor.  Take the
5  allegations as true.  You have to take all of the allegations
6  as true, not just some of them.  And if you look at
7  Paragraph 127 of the complaint, and I would ask Ms. Canty to go
8  to Appendix 11 and let's just put Paragraph 127 up on the
9  board.

10        Here's the irony of the whole thing, right.  The
11  whole complaint is based on the fact that somehow Mr. Seery was
12  engaged in insider trading.  They accused him of insider
13  trading, and they say he didn't disclose the full value of the
14  asset.  Just read Paragraph 127.  James Dondero, who was on the
15  board of MGM, is the tippee.  You've got an insider trading
16  case -- I mean, I don't represent MGM.  I'm not with the SEC.
17  I don't know why Mr. Dondero thought he should be telling
18  Mr. Seery in December, 2020.  It's not clear if it was before
19  or after the 9019 motion was filed.  But Mr. Dondero is the
20  very source of information -- you can't make this up.  He's the
21  very source of the information that he now complains Mr. Seery
22  didn't disclose.

23        Of course, Mr. Dondero, the trust, CLO Holdco could
24  have asked Mr. Seery at any time, how did you come up with your
25  valuation?  Mr. Dondero, knowing that he had supplied to

53

1  Mr. Seery, according to Paragraph 27, please take it as true

2  for purposes of this motion only.  He's the source of the

3  inside information.  And now he has the audacity to come to

4  this Court, notwithstanding the Court's approval, all of the

5  time and money and effort spent in the 9019 process, and say,

6  Mr. Seery was wrong because he didn't tell CLO Holdco and the

7  DAF about the information that Mr. Dondero gave to Mr. Seery.

8  It's not right.

9           It was a judgment on the merits.  And if Mr. Dondero

10 or the DAF or CLO Holdco or the trust wanted to challenge the

11 valuation, they had every opportunity to do so.  And based on

12 Paragraph 127, if the Court accepts it as true, shame on them.

13 Shame on them for not pursuing this issue before.  The guy gave

14 Mr. Seery, according to this allegation, and I'm just going to

15 leave it there, inside information.  And he sits there in

16 silence, right?  It says, look at the last sentence: "The news

17 of the MGM purchase should have caused Seery to revalue HCLOF's

18 investment."  Seriously?

19          The third element is (indiscernible).  The fourth

20 element, if we can go to the next slide.

21          Are they the same claims?  Did the claims arise from

22 the same set of operative facts?  I've addressed this pretty

23 clearly already, so I don't want to belabor the point.  But

24 obviously, both the 9019 motion and the complaint arise solely

25 from the debtor's settlement with HarbourVest.  The debtor's

54

1   acquisition of HarbourVest's interest in HCLOF and the debtor's

2   valuation of that interest.  Without those three facts, there

3   is no complaint.  It's just not credible to argue that the

4   fourth element is not met.

5          The case law is clear.  It's quoted in the

6   Plaintiffs' opposition.  It's not just the test of whether the

7   claims are the same.  It's whether the claim is the same as

8   that which was brought or could have been brought.

9          In their opposition, the Plaintiffs contend that the

10  claims "did not write them until after the settlement was

11  consummated," and that the first time the plaintiffs heard

12  about the valuation of HarbourVest's interests was at the

13  January 14, 2021, hearing.  I think I quoted that.  If you

14  look, I don't know if it's Page 10 or Paragraph 10; the way I

15  wrote it, it's probably Page 10.  I think that's a quote right

16  out of there.  But of course, as we saw the debtor disclosed

17  the valuation in its very initial motion, CLO Holdco's counsel

18  elicited valuation testimony directly from Mr. Pugatch, so that

19  was before the hearing.

20         And of course, Mr. Dondero and the trusts both cited

21  in their objections the valuation.  The notion that this was

22  not right, just -- it's contradicted by their own conduct,

23  their objections, their questions in deposition, the

24  information that was contained in the motion that they objected

25  to.

**WWW.LIBERTYTRANSCRIPTS.COM**

55

1          I do want to go off-script for just a minute, if we

2   could just take that down because I know that this is probably

3   something that Mr. Sbaiti may argue.  And that is, well, gee,

4   but you have to take the allegation as true that Mr. Seery

5   wasn't honest, that Mr. Seery lied to the court.  I don't

6   understand why there's not a fraud cause of action in there,

7   but there's not.  But that's their theory.

8          And gee, how does he get to skate away Scott free if

9   he's allowed to do that with impunity, right?  I will tell you,

10  Your Honor, of course you've seen Mr. Seery many times.  You've

11  made your own assessments of his credibility.  I'm not here to

12  argue the merits, but I will just say that the Defendants, if

13  ever forced to, will contest the allegation.

14         But here's the thing, and here's the important point

15  about, you know, whether or not he could lie with impunity and

16  say, I suspect that's where Mr. Sbaiti is going to want to go.

17         Mr. Seery said what he said.  And he had a reason to

18  speak, and he spoke, and he said what he said and he told

19  everybody who would listen exactly what he was doing and how he

20  was doing it.  For whatever reason, the objectors put the

21  valuation front and center.  It's right in their objections.

22  They noted the objections.  But for whatever reason, they did

23  nothing.

24         Whether they were negligent or whether they were

25  lying in wait is kind of irrelevant.  They had a full and fair

56

1  opportunity to contest this issue.  And if they had done so,

2  and the evidence proved what they're now alleging, they can't

3  tell you what would have happened.  So, you know, HarbourVest

4  may have taken a different position.  The Court may have done

5  something.

6         We're never going to know now because Mr. Seery and

7  the debtor are getting away with something, but because they

8  put in evidence that went unchallenged by Mr. Dondero and the

9  Plaintiffs.  It simply went unchallenged.  And they say, oh,

10  gee, that's because we didn't know.  Well first of all, you

11  didn't ask.  And second of all, again, the source of the inside

12  information, the reason that Mr. Seery should have known the

13  asset was worth more.  The reason that he should have refrained

14  from trading and not engaged in insider information was

15  Paragraph 127.  It was Mr. Dondero.

16         Here's another thing.  If -- if again Mr. Seery had

17  not been honest with the Court and that was ever brought out,

18  Maybe HarbourVest -- maybe HarbourVest would have had a right

19  to complain.  There's a lot in the complaint about oh,

20  HarbourVest was misled.  The actual evidence that's in the

21  record, and this is part of res judicata, Mr. Seery testified

22  very clearly to the arm's length negotiation that took place.

23  He told the Court under oath that the negotiations were

24  contentious.

25         He told the Court under oath that in order to try to

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 10/03/2322   Page 61 of 280   PageID 103

57

1   resolve the case, he and Mr. Pugatch went off and had their own

2   private conversation without lawyers.  They could have taken

3   discovery on any of that, right.  What did you guys talk about?

4   It's certainly not privileged.  They had every opportunity.

5   But what we do know is that Mr. Pugatch under oath, in

6   deposition, and at trial, said the value is $22.5 million.

7            So I don't think Mr. Pugatch or HarbourVest is ever,

8   ever, every going to complain about the transaction they did.

9   Because of what the evidence simply shows.  But again, you've

10  got the Plaintiffs in their complaint saying that somehow the

11  debtor and Mr. Seery in negotiating this transaction has now

12  exposed the debtor to liability.  It just makes no sense.

13           So there was a time and there was a place to

14  challenge Mr. Seery.  Somebody, you know, maybe HarbourVest

15  could have done something, maybe they could still do something.

16  I don't know.  If they really think that there's a problem,

17  maybe we'll hear from HarbourVest someday.  But the Plaintiffs

18  have no right to complain.  They just don't.  They knew

19  everything.  They were the source of the inside information.

20  They sat on their hands, and they shouldn't be allowed to do

21  what they're doing now.

22           If we can go to the next slide.  I want to move to

23  the next theory and try to finish this up.  The next theory is

24  that the Plaintiffs' claims are barred by judicial estoppel.

25  The judicial estoppel argument is really, really very

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 11/04/22   Page 62 of 280   PageID 104
Document 4   Page 104 of 322

58

1  straight-forward.  And it's important because if the Court

2  thinks about this the way I do, it's that the whole issue of

3  valuation is completely irrelevant to the Plaintiffs unless

4  they can show that they were owed some kind of duty, that they

5  had some superior right to acquire the asset.  But that's

6  exactly the issue that CLO Holdco relied upon and withdrew and

7  should now be estopped from pursuing.  Right.

8          The legal standard, again the parties agree on, that

9  in order to be estopped, the party must take an inconsistent

10 position.  And the party must have convinced the Court to

11 accept that position.  Again, both prongs are easily met here

12 in just a few sentences from the January 14 hearing.  You have

13 Mr. Kane saying that he understands and acknowledges and admits

14 that they have no superior right to the investment.  And the

15 Court relying on that very representation in declining to

16 conduct a hearing and render a ruling on the merits of the

17 claim that was withdrawn.  The objection that was withdrawn.

18          And for the avoidance of doubt, after Mr. Draper

19 spoke on behalf of the Trust, the Court, at Page 22 engaged in

20 the following colloquy.  The Court asked Mr. Draper:

21          "THE COURT:  Were you saying that the Court still

22          needs to drill down on the issue of whether the

23          debtor can acquire HarbourVest's interest in HCLOF.

24          "MR. DRAPER:  No.

25          "THE COURT:  Okay.  I was confused whether you were

59

1          saying I needed to take an independent look of that.

2          Now that the objection has been withdrawn of CLO

3          Holdco, you're not pressing the issue.

4          "MR. DRAPER:  No.  I am not."

5          Okay.  You can call it res judicata, you can call it

6     judicial estoppel, collateral estoppel, the two prongs are

7     easily met.  They're taking an inconsistent position today and

8     through all kinds of different theories, including the one that

9     they withdrew, the Plaintiffs assert that they had a superior

10    right to acquire the interest from HarbourVest.

11         And they should have asserted those rights at the

12    hearing.  That was the time.  And they should be estopped now

13    from taking a completely inconsistent position from the one

14    that was before the Court.  And I just do want to point out,

15    the statement from a case called <u>Hall vs. G.E. Plastic</u>.  And

16    it's interesting, Your Honor, because there's only a few cases

17    that I focused on, because this is really more fact intensive.

18    And there isn't a dispute as to the, you know, the elements of

19    these matters.

20         But it is interesting that the Plaintiffs, you know,

21    generally ignore all of the cases that we cite to.  One which

22    is <u>Hall vs. G.E. Plastic</u>, where the Court said that the focus

23    on the prior success or judicial acceptance requirements is to

24    minimize the degree of a party contradicting a Court's

25    determination, based on a party's prior position.  That's the

60

1  whole point of the exercise.  You can't do this.  You can't do
2  this.

3       Just quickly, that leaves the individual arguments as to
4  each of the five causes of action and I just want to go through
5  some highlights.  There's a negligence claim, Your Honor.  And
6  we did not file a pleading, but the Court can certainly take
7  judicial notice of the fact that the effective date has
8  occurred.  Under the effective date, the plan is now effective.
9  That includes the exculpation clause, as Mr. Pomerantz, I think
10 accurately and without contradiction pointed out earlier, the
11 exculpation clause applies specifically to the debtor and to
12 negligence claims.  And that's not a matter that's at all
13 subject to appeal.

14       So I think just to add to the arguments that we have
15 in our papers, which I adopt and do not abandon for any
16 purpose, I would add to the argument on negligence, that it's
17 now precluded, as a result of the plan becoming effective.

18      The fiduciary duty count suffers from numerous defects.  I
19 just want to point out a couple of them.  They don't respond to
20 the argument under Corwin, that under the Advisor's Act, there
21 is no private right of action to sue for damages arising from a
22 breach of fiduciary duty.  This claim rears its head in
23 virtually every single complaint.  They've never addressed
24 Corwin.  Corwin is binding on this Court, and it is unambiguous
25 that there is no private right of action to sue for damages for

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 11/07/2322   Page 65 of 280   PageID 107

61

1 breach of fiduciary duty under the Advisor's Act.

2        They ignore Goldstein.  Goldstein is not from the

3 Fifth Circuit, but it's very persuasive authority that advisors

4 do not owe fiduciary duties to their individual investors.

5 Instead, they owe fiduciary duty to their client.  Their client

6 is the entity with whom they're in contractual privity.  And so

7 in this case, there's no fiduciary duty there, either.

8        The breach of contract claim.  Again I just -- I

9 would just say quickly, Your Honor, it's barred under judicial

10 estoppel.  Even if it wasn't, it's clear based on Mr. James'

11 analysis and admission that the debtor's, or the reorganized

12 debtor's interpretation of 6.2 is accurate.  And you know, I

13 said this in the beginning.  Now let me tie it in a bow because

14 the breach of contract claim, and the tortuous interference

15 claim are both tied to the same thing.  And that is the

16 assertion that the Plaintiffs had a right under the membership

17 agreement, a right of first refusal.

18        And they basically say that the debtor was playing

19 games.  That they shouldn't be able to get through 6.2 by

20 assigning it to an affiliate.  And that's where I go back, Your

21 Honor, and just remind the Court that the debtor told the whole

22 world exactly what they were doing in their motion.  And their

23 objections, Mr. Dondero and the Trusts both acknowledge to the

24 whole world that they understood exactly what was happening.

25        In fact, their concern was not that it was going to

62

1  the debtor, but that it might be going to an affiliate outside
2  of the bankruptcy court's jurisdiction.  And for them to now
3  say, having taken all of those positions -- talk about
4  inconsistent positions.  They should be barred from saying
5  today, that the use of an affiliate to effectuate the
6  transaction was wrongful, because they actually told the Court
7  that they needed to -- that the Court needed to make sure that
8  it had jurisdiction over the very entity they now say somehow
9  shouldn't have been allowed to get the asset.

10          It's a bit much.  So that takes care of the tortuous
11  interference.

12          The RICO claim, Your Honor, again is a motion.
13  There's so many different aspects to it.  But I don't think the
14  Court needs to get past the Supreme Court holdings in HJ, Inc.
15  Again, just simply ignored by the Plaintiffs in their
16  opposition to the motion to dismiss.  In HJ, Inc., the Court --
17  the Supreme Court did an exhaustive analysis to try to
18  determine and ultimately did determine, what a pattern of
19  racketeering activity meant.  And the Supreme Court came to the
20  following formulation.  That it had to have two or more
21  predicate related offenses that amounted to a threat of
22  continued criminal activities.

23          You know, the notion here is that the debtor and Mr.
24  Seery engaged in insider trading.  We've already -- I've
25  already mentioned that according to the complaint, which the

63

1  Court can take as true.  Mr. Dondero, himself, was the tippee.

2  But be that as it may, they don't come close to meeting the

3  very high standards set forth by the Supreme Court in HJ, Inc.

4  to show that whatever conduct Mr. Seery and the debtor engaged

5  in, and if you take the allegations as true, in not telling

6  what the fair value of the asset was, that that doesn't amount

7  to a hill of beans for purposes of RICO.  That you don't have

8  any, I think predicate acts.  I think here's the Court,

9  predicate acts extending over a few weeks or months,

10 threatening no future criminal conduct, do not meet RICO

11 pleading grounds.  Right.

12         Security fraud claims cannot be predicate acts for

13 purposes of RICO.  That is also clear.  And that is really, I

14 mean they say mail, wire and fraud.  But what's really at heart

15 is the 10(b)(5).  Okay, it's the 10(b)(5) claim.  Again, Mr.

16 Seery being -- I mean Mr. Dondero being the tippee.  But those

17 are just some of the reasons.

18         None of, you know, that the RICO claim fails. You

19 know, I'll otherwise rely on the papers, unless the Court has

20 specific questions as to any of the other pieces of the motion

21 to dismiss the RICO claim, or any other aspect of the

22 Defendants' motion.  I think this is clear.  I think we win, no

23 matter how you slice it.  It's just wrong.  It's just wrong.

24     This Court will never, ever have a final order if Mr.

25 Dondero is able to engineer complaints such as this, which seek

**Appx. 00064**

64

1  to assert claims that absolutely positively could have and
2  should have been brought at the time the debtor made its
3  motion.
4          Unless the Court has any questions, I have nothing
5  further.
6          THE COURT:  I do not.  All right.
7          Mr. Sbaiti, I'm going to let you have as much time as
8  Mr. Morris.  He took 55 minutes.  As I mentioned, I have a hard
9  stop at 12:00 to do a swearing in ceremony.  So if you're not
10  finished in 40 minutes, then I'm going to have to take a break
11  and come back and let you finish.  All right?
12          MR. SBAITI:  Thank you, Your Honor.  Although I don't
13  think I'm going to be much longer than 35-ish minutes.
14          THE COURT:  Okay.
15          MR. SBAITI:  if not less.
16          THE COURT:  Okay.
17          MR. SBAITI:  I think you'll be able to be done by --
18  we'll be able to be done by noon.
19          THE COURT:  All right.  Thank you.
20          MR. SBAITI:  Thank you, Your Honor.  Your Honor, may I
21  share my screen?
22          THE COURT:  You may.
23          MR. SBAITI:  Thank you, Your Honor.  Do you see my
24  Power Point, Your Honor?
25          THE COURT:  I do.

65

1          MR. SBAITI:  Thank you, Your Honor.  I don't know

2     what which one you see.  Is it the --

3          THE COURT:  I see presentation.

4          MR. SBAITI:  With the full page?

5          THE COURT:  Yes, uh-huh.

6          MR. SBAITI:  Okay, yeah, great.  I just want to make

7     sure we're on the right page.  Thank you, Your Honor.  So Your

8     Honor, the defendant debtor is a registered investment advisor.

9     And it all begins with that.  And this where the distinctions

10    between what happened in the 9019 and I'll get to the elements

11    of res judicata through argument.

12         But the first thing that has to be identified is that

13    the Defendant is a registered investment advisor.  The

14    objection filed by Holdco back during the 9019 was an objection

15    against HarbourVest selling its interest by filing the right of

16    first refusal.  It did not deal with the investment advisor

17    feature of Highland's relationship.  And I'll get to why the

18    9019 doesn't preclude these arguments today.

19         This is essentially the structure.  Highland was the

20    investment advisor of HCLOF, and Holdco is an investor in

21    HCLOF.  And so Highland would owe a fiduciary duty under the

22    Advisor's Act against -- to CLO Holdco.

23         Highland also had a direct advisor relationship with

24    the DAF.  And so under the Investment Advisor's Act, it owed

25    fiduciary duties to both of those entities.  The law governing

66

1  registered investment advisors is that it's a federally

2  recognized and defined fiduciary duties.  The fiduciary duty to

3   there's a fiduciary duty to affirmatively keep the advisee

4  informed and the fiduciary duty not to self-deal, i.e., not to

5  trade ahead of an advisee and opportunity that an advisee would

6  want or expect and without the advisee's expressed informed

7  consent.

8       This is a federally recognized and defined fiduciary

9  duty and it's actionable under state fiduciary duty laws.

10  While Mr. Morris ended his argument by saying we didn't deal

11  with their case law saying that there's no private right of

12  action under the Advisor's Act, the fact of the matter is that

13  Judge Boyle, about ten years ago, found that a state -- the

14  breach of fiduciary duty claim can be predicated on breaches of

15  federally imposed fiduciary duties under the Advisor's Act.

16  And that's what Douglass v. Beakley held.  And that's actually

17  what we cited in our response.  So I'm not sure why he would

18  argue that we haven't addressed the issue of where does this

19  private right of action come from.

20       Federal Law supplies the rules of the relationship

21  and State Law provides the cause of action for those breaches.

22  Now the scope of that has been expounded upon by many cases.

23  The Fifth Circuit held in Laird, as a fiduciary, the standard

24  of care to which an investment advisor must adhere imposes an

25  affirmative duty of utmost good faith and full and fair

67

1  disclosure to all material facts, as well as an affirmative

2  obligation to employ reasonable care to avoid misleading his

3  clients.

4        The word "affirmative" there is important because it

5  means the investment advisor is not supposed to wait to be

6  asked.  The investment advisor as an affirmative duty to

7  proactively provide the information to the client.

8        The next standard comes from the SEC.  We call it the

9  SEC interpretation letter.  It's a release that came out in

10  2019.  And to meet it's duty of loyalty, an advisor must make

11  full and fair disclosure to its clients of all material facts

12  relating to the advisor relationship.  Material facts relating

13  to the advisor relationship include the capacity at which the

14  firm is acting with respect to the advice provided.

15        The SEC had another release in 2000 -- or excuse me,

16  in that same release, the SEC said the duty of loyalty requires

17  that an advisor not subordinate its clients interests to its

18  own.  In other word, an investment advisor must not place its

19  own interest ahead of its clients' interests.  An advisor has a

20  duty to act in the client's best interest, not its own.

21        The SEC general instruction three to part 2 of Form

22  ADV, that every investment advisor has to pull out.  And this

23  is cited in our papers.  As a fiduciary, you must also seek to

24  avoid conflicts of interest with your clients, and at a

25  minimum, make full disclosure of all material conflicts of

Appx. 00068

68

1  interest between you and your clients that could affect the

2  advisor relationship. This obligation requires that you provide

3  the client with sufficiently specific facts, so that the client

4  is able to understand the conflicts of interest you have, and

5  the business practices in which you engage, and can give

6  informed consent to such conflicts or practices or reject them.

7          And, finally, the Third Circuit in Belmont said:

8          "Under the best interest test, an advisor may benefit

9          from a transaction recommended to a client if, and

10         only if, that benefit, and all related details of the

11         transaction are fully disclosed."

12         These fiduciary duties are unwaivable by the advisor.

13  Any condition, stipulation or provision binding any person to

14  waive compliance with any provision of this subchapter, or with

15  any rule, regulation or order thereunder shall be void.

16         So the lawsuit does not allege that the HarbourVest

17  settlement should be undone or unwound.  I'd like to move to

18  that point.  Mr. Morris says well, you have to unwind half of

19  the settlement.  Maybe HarbourVest doesn't have to give back

20  what it got, but Highland would still be saddled with the cost

21  of the settlement, but not with the benefit of the settlement.

22         Well, actually that's not true.  There's two points

23  that we would make on that.  Number one, our suit is a suit for

24  damages.  In other words, the suit would be a suit for money

25  damages, based on the difference between the value of the asset

69

1  and what HarbourVest or what the actual value of the asset that

2  was represented, $22.5 million.  So the second point, though,

3  is that even under a situation where CLO or Holdco or the DAF,

4  or even HCLOF were to purchase the HarbourVest suit, the

5  expectation would obviously be that they'd pay the $22.5

6  million that Highland paid for it.

7         So Highland is -- so it's not unwinding, and there's

8  no saddling Highland with a burden that they didn't otherwise

9  have, I think that's a misrepresentation.  But we're not

10 seeking to unwind the lawsuit -- or excuse me, unwind the

11 settlement.

12        Now Mr. Morris is correct, the representation of

13 value by Mr. Seery is -- is one of the main points here.  And

14 the representation was that the value of the entire asset.  Not

15 just the shares of MGM, but the value of the entire asset was

16 $22.5 million.  So in other word, nearly half of HCLOF was

17 represented to be worth $22.5 million.  It was argued by

18 counsel on Page 14 of the January 14th transcript, and then on

19 Page 112 of that transcript, Mr. Seery specifically says the

20 current value is right around $22.5 million.

21        Now that was also in some of the filing papers and

22 Mr. Morris put up the evidence to Your Honor that Mr. Pugatch,

23 on behalf of HarbourVest also parroted that number.  But

24 there's not any evidence today about where that number came

25 from, or whether he was simply relying on Highland's

**Appx. 00070**

70

 1  representation of that value.

 2          Now as a general rule, in these 12(B)(6) motions, as

 3  I said before, we don't look at the evidence because the whole

 4  point of discovery is to find out what's behind a lot of the

 5  evidence.  That's been quoted.  The amount of evidence that

 6  went into the 9019 motion as not necessarily full-blown

 7  discovery.

 8          I understand Mr. Morris saying well, they could have

 9  asked the question.  But as I just showed you, they shouldn't

10  have to ask the question.  There should be fair and full

11  disclosure of all the material facts.  And if it turns out,

12  which we believe it is true, that by January, the value of

13  HCLOF was twice what it was represented, or the HarbourVest

14  portion of HCLOF was twice as to what it was represented,

15  that's a material omission that Highland had an affirmative

16  duty to not misrepresent.  Irrespective of the questions being

17  asked.

18          The DAF found out later on that the representation of

19  the value wasn't true.  Now Mr. Morris talked for a very long

20  time about all the opportunities that somebody, Mr. Dondero,

21  somebody other than CLO Holdco.  In addition to CLO Holdco,

22  could have asked the magic question to find out whether or not

23  they were telling the truth.  But that runs right in the face

24  of the standards set forth by the SEC and by the Courts as to

25  the affirmative obligation of an advisor to disclose all the

71

1  material benefits that they're going to get as part of a trade.

2  The idea being that when you're a registered investment advisor

3  and you want to engage in a transaction, you make a full

4  disclosure and say this is the transaction.  It's worth 41, but

5  I'm paying 22-1/2.  But here's why I'd like to be able to do

6  it.  And then that's the discussion that happens.

7        That clearly didn't happen here.  And when it turned

8  out that there was this entirely huge upside that they were

9  gaining the benefit of, and maybe HarbourVest didn't care, that

10  that was a false statement.  Now the reason we don't have a

11  common law fraud claim, or that we don't necessarily hang our

12  hat on a fraud claim is we don't have enough evidence as it

13  stands today, to specifically say that Mr. Seery intentionally

14  misrepresented that.  Although we believe that it was grossly

15  reckless of him to do so.  But we don't really need a fraud

16  claim with a gross recklessness standard.  We have a breach of

17  fiduciary duty, which basically gets us to the same place.

18        So the timeline we have is September 30th was the

19  last valuation of HCLOF assets provided by HCMLP.  And the

20  value of HCLOF, at that time, or the HarbourVest of that value,

21  would have been about 22.5 million.  So what it appears to be

22  is that in January or in late December, the valuation that was

23  being done -- what was being reported, wasn't the current

24  valuation.  It was the valuation as of the end of the third

25  quarter of 2020.

72

1         On December 22nd, the motion to approve the

2    settlement with HarbourVest was filed.  HCMLP should have had

3    or would have had up-to-date valuations of the HCLOF assets,

4    but didn't necessarily disclose them as being different than

5    the 22.5 million.  On January the 14th, Your Honor, held the

6    9019 hearing.  And then that same day, Your Honor entered the

7    approval order.

8         And finally, in March, the DAF learns the true value

9    of HLOF assets as of January 2021 and starts to look into it.

10   Now Mr. Morris makes much of the fact that well, Mr. Dondero at

11   least knew that he had tipped them off, Mr. Seery.  And if you

12   actually read Paragraph 127, you'll see specifically what it's

13   purported that he said.  He said stop trading in the MGM

14   assets, because MGM might be in play.  So you can't trade

15   because I'm an advisor, Mr. Dondero's an insider, he's the

16   tipper, not the tippee.  Mr. Seery becomes the tippee under

17   that theory of the case, and he has to, and is required to,

18   because of their affiliation at the time, he's required to

19   cease trading.  And that was the purpose of saying that.

20        The collateral issue that we point is that he at the

21   very least knew about that, and that should have caused him to

22   revalue, if he hadn't done so at the time.  Not that, knowing

23   that alone is sufficient to know what the value of HCLOF

24   actually was on that date.  That's a complete misrepresentation

25   of the point and purpose of that allegation.

73

1              And as Your Honor knows, under 12(B)(6)

2    jurisprudence, the way this is supposed to go is we get the

3    benefit of every inference based upon the allegations, not the

4    movant.  So the first violation is that the debtor as an IRA

5    failed to affirmatively disclose the true current valuation of

6    HCLOF and failed to keep the DAF and CLO Holdco reasonably

7    informed of the value of the assets.

8              And the debtor as an IRA, failed to obtain CLO

9    Holdco's with the DAF's informed consent before it traded in

10   the asset, because it didn't have all of the information.  The

11   typical remedy for breach of fiduciary duty is typically

12   damages for any loss suffered by the Plaintiff as a result of

13   the breach.  I don't think there's a debate there.

14             So now we get to Mr. Morris' key argument.  His key

15   argument is that we should be talking about res judicata.  The

16   elements of res judicata and I think we agree is you have to

17   have identical parties in the action; the prior judgment was

18   rendered by a Court of competent jurisdiction; the final

19   judgment was final on the merits, and the cases involved the

20   same causes of action or the same transaction and nexus of

21   facts.

22             Now I'm going to skip to three, because I think

23   that's one of the key points that we disagree with them on.

24   There is no case, Your Honor, that we could find, and no case

25   that I read them citing that says an order on an 9019 has

74

1  preclusive effect under res judicata under an objector to the

2  settlement.  We looked.  We looked in the Fifth Circuit.  We

3  looked outside of the Fifth Circuit.  No District Court, no

4  Fifth Circuit Court of Appeals' opinion we could find held that

5  a 9019 order has res judicata effect on an objector's

6  objection.  And I think the reason is pretty simple.  Is it

7  doesn't.

8        Because the Plaintiff's claims, here our claims

9  hadn't even accrued.  We have a four year statute of

10  limitations, but I think more importantly is that, as the Fifth

11  Circuit said, the 9019 motion grants the Court discretion.

12  It's not supposed to be a mini trial.  The Court can approve a

13  settlement over even the valid objection of an objector.  It's

14  not a trial on the merits.  It's not supposed to be a trial on

15  the merits.  It's not supposed to be a disposition on the

16  merits.

17        So the fact that Your Honor could have approved the

18  9019 settlement with HarbourVest, even if we had a valid

19  objection, means this isn't a disposition on the merits, as res

20  judicata would envision.  It wasn't a trial on the merits, even

21  though it was withdrawn.

22        The other elements that we would point out to is that

23  neither the DAV nor Holdco were parties to the dispute between

24  HarbourVest and Highland.  And this keys off of the issue that

25  I just raised.  The cases that are cited by the debtor to Your

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/15/22   Page 79 of 280   PageID 121

75

1   Honor all have to do with where one of the settling parties is

2   trying to undo the settlement for some collateral reason.  And

3   the Courts have held, no, that's res judicata, because you were

4   a party to the action.  HarbourVest brought the claims against

5   Highland.  Highland settled those claims.

6           CLO Holdco was collateral to that settlement, it's

7   not a -- excuse me, collateral to that dispute.  It's not a

8   party to that dispute.  Its claims weren't being resolved by

9   the settlement.  And while you have a notice to all creditors

10  and those objections can be raised, there was not inherently

11  any manner for resolving those objections on their own merits.

12  Only -- it was only resolved in so far as deciding whether or

13  not the settlement was in the best interest of the debtor,

14  which Your Honor decided, and we don't challenge that.  But we

15  do argue that it caused damages and the debtor shouldn't get

16  off for those damages.

17           The fourth element is that the --

18          THE COURT:  Just for the record, the standard in a

19  9019 context is not best interest of the debtor, right?

20          MR. SBAITI:  Your Honor, I mean that's what the rule

21  says and Your Honor's order --

22          THE COURT:  That is not what the rule says.  The rule

23  is actually very sparsely worded and then we have Fifth Circuit

24  case law and U.S. Supreme Court law that talk about what the

25  standard is.

76

1          MR. SBAITI:  Yes, Your Honor.  And there are five --

2          THE COURT:  And it's -- is it fair?

3          MR. SBAITI:  There are five elements.

4          THE COURT:  Is it fair and equitable and in the best

5    interest of the estate given a long list --

6          MR. SBAITI:  Correct, Your Honor.  And I didn't mean

7    to --

8          THE COURT:  -- of considerations that the Court is

9    supposed to consider that "bear on the wisdom of the

10   settlement."  Okay.  So it's actually much more involved, is my

11   point, than is it in the best interest of the estate.  Is it in

12   the best interest of the estate and fair and equitable given

13   all factors bearing on the wisdom of the compromise?  And then

14   we have a long laundry list of things the Court should consider

15   as part of that analysis.

16         MR. SBAITI:  That's a --

17         THE COURT:  I just bring that up because if I'm still

18   -- my brain is still stuck five minutes ago on your comment

19   that you can't find any case saying that an order approving a

20   9019 compromise has res judicata effect on creditors.  And it's

21   -- let me just say it's shocking to me that someone would argue

22   otherwise.  Bankruptcy is a collective proceeding --

23         MR. SBAITI:  Your Honor --

24         THE COURT:  -- where creditors can weigh in and

25   object and raise whatever arguments they think the Court should

**WWW.LIBERTYTRANSCRIPTS.COM**

77

1  consider that bear on the wisdom of the compromise.  And the

2  Fifth Circuit in Foster Mortgage has said the Court should give

3  great deference to the views of the creditors, the paramount

4  interest of creditors.

5       So it's a really sort of shocking proposition that

6  the order approving a 9019 compromise wouldn't have res

7  judicata effect on all parties and interests who got notice of

8  that.  So if you have any elaboration on that, I'd like to hear

9  it.

10      MR. SBAITI:  Your Honor, we looked at the Fifth

11  Circuit cases that they cited, which I believe included that

12  case.  And even in that case, the point that we made in our

13  papers and the point I was trying to arrive at is that among

14  the factors, yes, the Court should give great deference to the

15  creditors.  But among the factors is not that the objections

16  lack merit or are meritless or that they wouldn't be winnable

17  if they were simply standalone claims.

18      And that was really the only point I was trying to

19  make is that Your Honor has discretion.  Granted it's -- as you

20  mentioned, it's not unfettered discretion.  It's bounded by

21  standards and there are -- there is, I know, about five

22  standards Your Honor has to consider or the Court has to

23  consider.  But among those, that laundry list of standards, is

24  not that the Court finds that any objection lacks merit.  And

25  that was really the only point I was making.

78

1        And in terms of the case law, we looked at the Fifth

2  Circuit.  We looked, frankly, outside the Fifth Circuit as much

3  as we could, and because this is actually not an easy one to

4  research, as it turned out, despite the language.  And we also

5  looked for district court opinions in the Fifth Circuit to see

6  did any district court or did any court of appeals give this

7  type of approval to the standard that a 9019 order has res

8  judicata effect on a claim raised in an objection by a

9  creditor.

10        And we couldn't find any and I read all the cases

11  that Mr. Morris cited in his papers, and they didn't cite one

12  that explicitly said that.  They tried to drive at it through

13  insinuation that, well, if the Court has to give great

14  deference or if the Court has to take into account the

15  underlying facts and the fact that there is discovery, surely

16  that must mean this is akin to the trial on the merits.  And I

17  think that's where we simply disagree in good faith.  I'm not

18  ascribing any bad intention.  But we disagree that that's where

19  the law goes.

20        Res judicata is not -- while it's supposed to stop

21  the relitigation of issues, it is predicated on there having

22  been actual litigation of those issues.  And when HarbourVest

23  and Highland settle a case and my clients show up with an

24  objection, even though they withdraw an objection, that, in our

25  opinion -- and we're asking the Court to see it our way -- is

Appx. 00079

79

1  not trial on the merits.  It's not a disposition on the merits

2  of the objection in and of itself.  Some objections we can --

3          THE COURT:  But the context matters.  In the context

4  of a 9019 compromise, the hearing is about look at the bonafide

5  ease of the settlement.  And it's either fair and equitable and

6  in the best interest of the estate or not.  And an objector can

7  say this is a terrible settlement and here's why it's a

8  terrible settlement and let me cross-examine the movant and let

9  me put on my own witness that will enlighten the Court as to

10 why this is a terrible settlement, why I say terrible, why it's

11 not fair and equitable.

12         That's your chance to convince the Court, don't

13 approve this settlement because there are, you know, 14

14 problems with it.  And if you convince the Court, then you

15 convince the Court and it's not approved.  If you don't, you

16 appeal, and we do have an appeal of the settlement order.

17         So, again, I'm not understanding the "res judicata

18 doesn't apply" argument.

19         MR. SBAITI:  Your Honor, if I could riff on two

20 points based upon what you just said, if I could address those.

21         The first is there are clearly two kinds of

22 objections that get -- at least two kinds of objections that

23 get raised in these 9019 approval hearings.  The two that you

24 heard recounted, some were this is bad for the estate.  There's

25 reasons why we don't think the estate will benefit from it and

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/26/22   Page 84 of 280   PageID 126

80

1  it will be harmed from it.

2          And those types of objections, which I believe mostly

3  comprise the objections that Mr. Morris was talking about

4  because they are concerns for the estate.  And so creditors who

5  want to get money from the estate are concerned that the

6  settlement will not enter (phonetic) to the benefit of the

7  estate, and therefore, not enter to their benefit as creditors.

8  That's number one.

9          But those don't adhere in a lawsuit.  Those aren't

10 claims for damages that the settlement is going to create for

11 the person objection or for the party objecting.  There's a

12 whole separate set of objections similar to the ones HCLO

13 Holdco raised where that what inheres in the objection is this

14 is actually going to cause us some kind of damage.

15         And so, the factors though, don't require the Court

16 in those second set of instances to say, well, you know what?

17 Not only do I think you're wrong, but I think that your

18 lawsuit, the underlying causes of action that give rise to this

19 objection, have no merit on their own face, that the discovery

20 is not there to support them, that a jury is not going to find

21 there.  I am now the trier or the Court is now the trier of

22 fact on the merits of the underlying causes of action that

23 animate the objection.

24         And that's where I believe we're diverging with the

25 debtor on the law.  It goes too far to say that a 9019 hearing

**WWW.LIBERTYTRANSCRIPTS.COM**

81

1   where the Court in the end has discretion to approve it, even

2   over a meritorious objection by any party, regardless of what

3   bucket of objections the objection falls into.  It goes -- our

4   argument today, Your Honor, and we're asking the Court to see

5   it our way, is that that would go too far.  That an actual

6   cause of action shouldn't be eradicated simply because of the

7   9019 process because, as you pointed out, the Court does have

8   to go through a litany of factors.

9          And if the Court determines that it's fair and it's

10  more equitable to overrule the objection, the Court has that

11  discretion.  And we're not here to unwind that discretion.

12         But the settlement process did violate certain

13  obligations and did cause my client damages.  And that's what

14  we're saying isn't precluded.

15         THE COURT:  Okay.

16         MR. SBAITI:  The fourth element, Your Honor, which I

17  guess in many ways maps on to the argument I just made to Your

18  Honor is that the cases, the underlying cases, do not involve

19  the same claims.  Plaintiffs' claims arise from the settlement

20  process itself and not from the underlying issues being settled

21  between HarbourVest and Highland.  So that's why we think at

22  least three of the four elements aren't met here.  And we'll

23  reserve on the papers, you know, whether jurisdiction was

24  applicable because I think that's probably water under the

25  bridge at this point in the oral argument.

**WWW.LIBERTYTRANSCRIPTS.COM**

82

1          Now, Mr. Morris attacks the case that we cite,

2    Applewood Chair vs. Three Rivers Planning.  And he argues that,

3    well, this is not applicable.  And the argument he made however

4    was he put it in the context of, well, the parties there, the

5    issue was you had guarantors who were not parties in their

6    capacity as guarantors.  But that's not actually what the Court

7    held.

8          The Court didn't say that the release wasn't

9    applicable to them because they didn't appear as parties in

10   their guarantee capacities.  They -- the Court held that, well,

11   the specific discharge language doesn't enumerate those

12   specific guarantees, and so therefore it's not released.

13         And where this dovetails, we believe, as closely as

14   we can, this isn't a 9019 case.  This is a final confirmed

15   plan.  But where it dovetails with what our argument is, is

16   that the Court there as well was essentially saying the

17   underlying causes of action weren't really presented to us, so

18   we're not -- we -- and the confirmation of the plan didn't

19   involve disposing of them, so we're not going to say that they

20   are precluded.  And we think that that's as close an analogy as

21   we've found in the Fifth Circuit to the issues here today.

22         So I would say, Your Honor, that we believe that

23   dispenses with the res judicata argument.  The judicial

24   estoppel argument, they conflate the language.  I'll go back to

25   this for a second.  They conflate the language of judicial

83

1  estoppel on the success of the claim.  None of the cases they

2  cite on judicial estoppel involved where a party took a

3  position, withdrew their argument, and then the Court moved on.

4         Mr. Morris tries to convert a judicial estoppel claim

5  into a judicial reliance claim, which is not the purpose of the

6  doctrine and is not the doctrine at all.  The doctrine is that

7  if you take a successful position in one court, you can't take

8  the opposite position in another court.  CLO Holdco didn't take

9  a successful position in one court and then change its position

10 later on.  In fact, its positions, as Mr. Morris stated, are

11 remarkably similar.  They're not inconsistent, which is the

12 problem with their judicial estoppel argument.  And we -- I

13 think we fairly briefed that in our papers and we'll otherwise

14 rest on the papers.

15        To deal -- to address the actual claims, again, I

16 come back to the idea of a fiduciary duty claim, which is our

17 lead claim.  And to be clear, it's a state claim predicated on

18 the violation of federally imposed fiduciary duties.

19        And I'm looking for a clock to make sure I'm not

20 abusing Your Honor's time, and I don't have one right in front

21 of me because my screen -- my screen is up.

22        Your Honor, the Douglass v. Beakley case is, like I

23 said, is Judge Boyle's case.  It specifically provides a cause

24 of action based upon violations of the Advisers Act.  We also

25 cite about four or five other cases in footnote 8 of our

84

1   response from other circuits, including the Third Circuit, the

2   Belton case that I referred to earlier, all of which held that,

3   yes, a state fiduciary duty claim can be predicated on breaches

4   of a federal Advisers Act violation.

5           The other point that they make on the fiduciary duty

6   claim is they argue HCMLP doesn't owe fiduciary duties to CLO

7   Holdco.  And the cases they cite, Your Honor, we dealt with in

8   the papers why they were distinguishable, because in those

9   cases they were dealing with the fact that there wasn't any

10  harm or any direct relationship.  But what they ignore is the

11  actual language of the Advisers Act, which is important.

12          Well, first of all, Mr. Seery admitted in his own

13  testimony during the approval hearing in July of 2019 that he

14  says, "We owe."  He says, "There are third party investors in

15  the fund -- in these funds who have no relation whatsoever to

16  Highland, and we owe them a fiduciary duty both to manage their

17  assets prudently, but also to seek to maximize value."  I think

18  Mr. Seery was absolutely correct when he said that.  Highland

19  owes fiduciary duties to the investors in the funds that

20  Highland manages.  The core of our case is that Highland is

21  using or abusing the assets of the funds it managed in HCLOF

22  for its own enrichment, which is a classic breach of fiduciary

23  duty case under the Advisers Act.

24          Now -- excuse me.  The other point that I would say,

25  Your Honor, is that there is a statutory basis for us to argue

85

1  a breach of fiduciary duty.  Excuse me.  I didn't mean to stop

2  sharing.  I apologize.

3              Are you back with me, Your Honor, on my --

4              THE COURT:  Yes.

5              MR. SBAITI:  -- PowerPoint?

6              THE COURT:  Yes.

7              MR. SBAITI:  Sorry about that, Your Honor.  I just

8  hit the wrong thing.  I'm not very technologically savvy.  Here

9  we go.

10             So Holdco is an investor in HCLOF, which is a pooled

11 investment vehicle.  A pooled investment vehicle under the case

12 law we cite is simply defined as an investment vehicle that

13 doesn't publicly solicit investors and has few than 100

14 investors.  Highland advises it.  That's the same holding in

15 TransAmerica Mortgage, by the way, which we also cite.

16             15 U.S. C. Section 80(b)(6) establishes the federal

17 fiduciary standards to govern the conduct of registered

18 investment advisers.  That's also the TransAmerica case.  15

19 U.S.C. Section 80(b)(6)(D) delegated to the SEC the power to

20 decide the scope of those duties that are imposed under the

21 statute.  And so the SEC enacted 17 C.F.R. Section 275.206(4)-

22 8.

23             And it expressly states, and we cite the statute or

24 the regular in full in our papers, that the fiduciary duties

25 are owed to investors in the pooled investment vehicles.  It

**Appx. 00086**

86

1    specifically says that.  It talks about two different duties
2    owed and they're owed to the investors in the vehicles, which
3    means they're owed to Holdco as an investor in HCLOF, which is
4    the vehicle that Highland manages.

5         It's black and white in the regulation.  And we
6    haven't seen any response.  There was no response of that in
7    the reply that was filed, Your Honor.  And so the argument that
8    there's not a fiduciary duty owed to Holdco because it's merely
9    an investor in HCLOF simply doesn't comport with the law.

10        And finally, the petition lays out the basis for our
11   claims including the applicable federal and state law.
12   Plaintiffs' response lays out why the legal arguments aren't
13   opposite at the 12(b)(6) stage and Rule 9(b) is met where
14   necessary under the federal claim.  And I'm trying to unshare
15   so that I can get back to regular argument.

16        I'd like to briefly address Mr. Morris' argument,
17   Your Honor.  Your Honor, I re-raise my argument that I made
18   before, which is that a 12(b)(6) motion and hearing is not the
19   appropriate time for all the evidence that was poured in here.
20   And I understand Mr. Morris' contention, well, it's really hard
21   to ignore all the history of this case.  But a lot of that
22   history really boils down to things that were actually admitted
23   in the complaint.  The complaint recognized there was a 9019.
24   But what Mr. Morris wants to do is go beyond that and to go to
25   what people said and what they must have meant.  What Mr.

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/15/22   Page 91 of 280   PageID 133

87

1  Dondero must have meant in his objection, what Dugaboy must

2  have meant by their objection, what Mr. Pugatch must have meant

3  by his testimony.

4          All of that is highly improper at this stage of the

5  proceeding, Your Honor.  It's outside of the 12(b)(6) confines.

6  It's outside the four corners of the complaint.  And we object

7  to all of that evidence being considered.

8          THE COURT:  Let me --

9          MR. SBAITI:  The question we --

10         THE COURT:  Let me ask you about that procedural

11  point.

12         MR. SBAITI:  Yes, Your Honor.

13         THE COURT:  As we know, 12(d) provides that if

14  matters outside the pleadings are presented to and not excluded

15  by the Court in a 12(b)(6) motion, the motion must be treated

16  as one for a summary judgment under Rule 56 and all parties

17  must be given a reasonable opportunity to present all the

18  material that is pertinent to the motion.

19         Are you -- what are you arguing?  That I should treat

20  it as a motion for summary judgment and give you more time to

21  present other materials?  I mean, you both presented an

22  appendix, okay.  And I'm telling you we're seeing this more and

23  more, I've noticed.  People are going beyond the four corners

24  of a motion to dismiss and attaching things.  And there's some,

25  you know, Fifth Circuit authority that says, well, if what is

**WWW.LIBERTYTRANSCRIPTS.COM**

88

1 attached is integral to understanding, you know, an allegation

2 or whatever in the pleading, you know, there is some discretion

3 to go outside the four corners.

4          So I'm trying to understand the point you're making

5 with this.  Are you saying I should treat it as a motion for

6 summary judgment or do these attachments really -- you know, do

7 I have authority under the Fifth Circuit to consider them as

8 part of the 12(b)(6) motion or not?

9          MR. SBAITI:  Typically, in our experience, Your

10 Honor, is when a summary or when a 12(b)(6) is going to be

11 treated as summary judgment under 12(d), the Court says that

12 and then the parties are given an opportunity, as you said, to

13 go do some discovery in order to put together the evidence and

14 materials to then come back and respond as a summary judgment.

15 We responded to a 12(b)(6) and objected to the evidence.  If

16 the Court wants to treat it as a summary judgment, then we

17 would ask for an opportunity for -- to conduct discovery in

18 order to be able to respond as a summary judgment motion, but

19 we didn't -- because we responded to a 12(b)(6) --

20          THE COURT:  You did the same thing though.  You did

21 the same thing in your response.  You submitted an appendix of

22 evidence, if you want to call it evidence.  As someone pointed

23 out, it's stuff from the bankruptcy court record.  I don't

24 think it went beyond what was already in the bankruptcy court.

25          MR. MORRIS:  And if I -- can I be heard on this, Your

89

 1  Honor?

 2          THE COURT:  You can.  You can.

 3          MR. MORRIS:  Just to respond.  This is really quite

 4  simple.  The motion to dismiss is based on res judicata.  Res

 5  judicata necessarily requires a review of what happened in

 6  connection with the prior hearing.  There's nothing that we

 7  have identified or put forth in the appendix or on our exhibit

 8  list except for the pleadings in the 9019, the transcripts, the

 9  one deposition transcript, the one trial transcript, the

10  settlement agreement, the transfer agreement.  I'd love to know

11  what the Court couldn't or shouldn't take judicial notice of.

12  There is no emails.  There is no -- there is no -- there is no

13  extrinsic evidence, if you will.  All of this is either on the

14  docket or was presented as part of the hearing.

15          THE COURT:  Yeah.  I'm just trying to ferret --

16          MR. MORRIS:  And it's necessary.  And it's necessary

17  for the motion.

18          THE COURT:  Yeah.  I'm just trying to ferret out the

19  procedural position that's being asserted here.  And I don't

20  have the case cites off the top of my brain, but there is

21  authority from at least the Northern District judges, if not

22  the Fifth Circuit, saying in a 12(b)(6) motion I can take

23  judicial notice of items in the record.  And then, you know,

24  there -- I know there's Fifth Circuit authority saying I can go

25  beyond the four corners in a 12(b) context if it's just basic,

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/16/22   Page 94 of 280   PageID 136

90

1  you know, explaining things that are in allegations.  You know,

2  such as --

3          MR. SBAITI:  May I address that, Your Honor?

4          THE COURT:  -- such as if a contract is in dispute,

5  okay.  Like there's no way you can have a cause of action under

6  the contract and here's the contract.  So I'm just trying to

7  nail down your procedural position here.

8          MR. SBAITI:  Your Honor, the distinction I was trying

9  to make that I don't think I put as artfully as I might be able

10 to put now is in a 12(b)(6) if there's a contract, as you said,

11 if there's a legal document, a contract and order that's

12 integral to the case, Your Honor can take judicial notice of

13 that.  Generally, a court can take judicial notice of filings

14 in a bankruptcy, the fact that they were filed.

15         So the transcripts, which Your Honor can't take

16 judicial notice of, is the truth of those.  And that was what I

17 was objecting to is it's one thing for him to say an objection

18 was filed and therefore, because an objection was filed, that

19 should be it.  That was your only chance.  I'm not saying Mr.

20 Morris can't make that argument.

21         But when he goes beyond the fact of the filing or the

22 fact that there was a transcript or the fact that there was a

23 deposition and starts to read from the depositions or read from

24 the filings and say this is what those mean, that goes against

25 the 12(b)(6) parameters because, number one, now it's

91

1  substantive evidence and not simply a judicial notice of

2  something that's right there in front of the Court, i.e.,

3  something on its own docket.  Because those statements and the

4  interpretation of those statements are subject to credibility

5  findings.  They're subject to clarification.  They're subject

6  to rebuttal.  That's the purpose of discovery.

7          And so if Your Honor -- and Mr. Morris is right.

8  Usually, res judicata involves knowing what happened in the

9  prior proceedings.  So if all he wants to do is rest on the

10  fact that an objection was filed by CLO Holdco and maybe even

11  other people, and that should be it and he thinks that's enough

12  for Your Honor to say res judicata applies, then I don't think

13  we have a problem.  It's when he goes beyond that and says,

14  Your Honor, these people must have known and this is what they

15  meant by their argument, that's what I'm asking Your Honor not

16  to consider.  And if Mr. Morris wants you to consider that,

17  that's a summary judgment motion and we should have the

18  opportunity to do discovery at the very least into the issues

19  he has now raised as supporting his res judicata defense which

20  he has the burden of proof on.

21          MR. MORRIS:  Your Honor, this is one of the strangest

22  arguments I have ever heard.  I'm allowed to offer the Court

23  and the Court is allowed to accept the documents, but I'm not

24  allowed to read them.  I'm not allowed to make arguments.  I

25  don't understand what that even means.  If it were a contract,

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/38/2322   Page 96 of 280   PageID 138

92

 1  I would be allowed to put the contract in front of Your Honor,

 2  but I wouldn't be able to argue why the contract doesn't say

 3  what the Plaintiff says.  I don't get it.

 4         THE COURT:  Okay.

 5         MR. MORRIS:  That's --

 6         THE COURT:  Just I've heard enough on this.  I don't

 7  think we have moved into Rule 12(e), that realm of me needing

 8  to treat this as a motion for summary judgment.  I think the

 9  so-called evidence, the appendix that was attached to the

10  motion as well as the appendix that was attached to Plaintiffs'

11  response, it's stuff that I can take judicial notice of that's

12  in the record of this Court and I can look at it.  You know, it

13  is what it is, the record of this Court.

14         All right.  So I have nine people waiting in

15  chambers.  I'm trying to figure out should I take a break now

16  or are you fairly close to wrapping up.  Either answer is fine,

17  Mr. Sbaiti.  I just need to figure out who I make wait here.

18         MR. SBAITI:  I have -- oh, I'm sorry.  I didn't mean

19  to interrupt you, Your Honor.  I was just going to say I have

20  five minutes left, but I know Mr. Morris probably wants to come

21  back.  So if you want to break now and we can come back at

22  whenever the Court wants us to, we can do so.

23         THE COURT:  All right.  Why don't you make your final

24  five minutes and then we'll take a break?

25         MR. SBAITI:  Okay.  Thank you, Your Honor.

93

1        I just wanted to address some of the arguments that

2   Mr. Morris raised in his argument.  The first thing is -- and I

3   addressed this in part -- but Mr. Morris makes a big deal about

4   paragraph 127 of the complaint and essentially suggests that

5   we're the -- or that Mr. Dondero is the perpetrator of a

6   nefarious scheme.  Whereas, what the pleading actually says,

7   and I again encourage Your Honor to re-read -- to read it

8   specifically, is that Mr. Dondero warned Mr. Seery not to trade

9   in the stock and not to make any transactions because the stock

10  was going to appreciate in value.

11       That has two implications for us, Your Honor.  Number

12  one, it means Mr. Seery was a tippee of insider information,

13  and number two, it means that Mr. Seery, if he did trade on

14  that information or if he did pass that information on to

15  someone else, that is a problem from the Advisers Act

16  standpoint, which is really the only purpose of saying that.

17       While paragraph 127 also says that that should have

18  caused Mr. Seery to revalue the NAV of HCLOF, it does not state

19  and we did not plead that the entire value of HCLOF is tied to

20  the MGM stock.  So the insinuation that that somehow gave us

21  inside information about what the true value of HCLOF was and

22  we should have known or that Mr. Dondero should have known is

23  simply untrue.

24       The other argument Mr. -- that Mr. Morris likes to

25  harp on is that CLO Holdco withdrew its argument, but he

**WWW.LIBERTYTRANSCRIPTS.COM**

94

1  characterizes Mr. Kane's withdrawal testimony -- as he says,

2  Mr. Kane admitted that CLO Holdco lacked the superior right to

3  obtain the HarbourVest.  If you read the very language that was

4  highlighted on Mr. Morris' slide, that's not what Mr. Kane

5  says.  Mr. Kane says, "We've gone back to the drawing board.

6  We've read your reply.  And my client has given me permission

7  to withdraw the argument or withdraw the objection."  That's

8  all he said.  There was not an admission that he was wrong.

9  There was not an admission that they had made a mistake.  There

10  was simply an admission that they decided to withdraw the

11  objection for whatever reason.

12         Lastly, on the specific claims --

13         THE COURT:  That's not an accurate description of the

14  record.  He said he looked at --

15         MR. SBAITI:  Your Honor, I was reading it along with

16  him.

17         THE COURT:  -- Guernsey Law.  And I don't know if his

18  words were deep dive.

19         MR. SBAITI:  Yeah.

20         THE COURT:  But he had looked at the agreements

21  extensively.  That's just not what he said.

22         MR. SBAITI:  And he said he was with -- Your Honor,

23  he said he was withdrawing.  He didn't say we were wrong.  He

24  didn't say we don't have a claim.  What he said was, "We're

25  withdrawing the objection."

**WWW.LIBERTYTRANSCRIPTS.COM**

95

1          THE COURT:  After doing an extensive look at the

2    agreements in Guernsey Law, okay, so.

3          MR. SBAITI:  Sure.  But, Your Honor, he might have --

4    he could just as easily thought we have a chance, but it's not

5    a good one.  And frankly, we'll be here for 20 days and we're

6    withdrawing it for that reason because we'll live to fight

7    another day.  Your Honor, there's an innumerable number.  To

8    simply say that he admitted that they didn't have a correct

9    claim, it's just he didn't say that.  That's all.  That's the

10   only point I'm making.

11         Your Honor, I don't disagree with the debtor that the

12   Court's exculpation clause gets rid of the negligence claim

13   which was obviously filed before the effective date, so that

14   claim is gone.

15         And I think the last argument that Mr. Morris makes

16   on the RICO claim is the federal court, the Supreme Court

17   standard for pleading a RICO claim, that acts that only

18   continue for a few weeks are not -- don't set out a RICO claim.

19   Your Honor, in our response to that, we actually submitted an

20   amended complaint that shows that the type of acts we're

21   talking about, the pattern of the debtor using its investor

22   vehicles assets to liquidate is a long pattern and practice

23   than simply the HarbourVest suit.  And so, we move to amend on

24   that basis to satisfy that pleading defect, which is the main

25   one that they focused on.

**WWW.LIBERTYTRANSCRIPTS.COM**

**Appx. 00096**

96

1          That's all I have, Your Honor.

2          THE COURT:  All right.  Thank you.

3          We're going to take a 15 minute break and come back.

4  I'll ask Mr. Jordan and Mr. Bessette did they have anything

5  they wanted to say today.  I know they joined in the debtor's

6  motion.  And then we'll let Mr. Morris have rebuttal.

7          All right.  So we'll be back in 15 minutes.

8          THE CLERK:  All rise.

9          MR. MORRIS:  Thank you, Your Honor.

10     (Recess at 12:05 p.m./Reconvened at 12:23 p.m.)

11          THE CLERK:  All rise.

12          THE COURT:  All right.  Please be seated.

13          We're back on the record in Charitable DAF v.

14  Highland Capital.  All right.  So I promised I was going to go

15  back to counsel for Highland CLO Funding, Ltd.  So Mr. Jordan,

16  Mr. Bessette, is there anything you wanted to say for oral

17  argument?

18          MR. JORDAN:  Thank you, Your Honor.  John Jordan on

19  behalf of HCLOF.

20          Our points are two procedural points.  The first is

21  as the Court anticipated, in our motion to dismiss filed back

22  in August, we joined in the motion to dismiss of Highland.  And

23  so to the extent that the Court after deliberation is inclined

24  to grant that motion, we would ask that as a joining party,

25  HCLOF be pulled along with that.

**WWW.LIBERTYTRANSCRIPTS.COM**

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/15/22   Page 101 of 280   PageID 143

97

1          The second procedural point is that back in our

2  motion to dismiss, we pointed out that the complaint does not

3  actually allege anything against HCLOF.  In the story, we're

4  essentially the football and neither Oklahoma nor UT.  And we

5  pointed that out as an additional argument to what you've heard

6  today.  That motion was never responded to.  The deadline by

7  agreement was extended to October 11th.  And the lack of

8  response was, we believe, not inadvertent but simply an

9  acknowledgment that HCLOF is not a party that anything is being

10 claimed against.

11         It particularly makes sense since effectively and in

12 rough numbers, they're half owned by both sides.  So for every

13 dollar that HCLOF spends hanging around the case, the parties

14 are paying essentially 100 cents collectively.  So for that

15 reason, we would ask, and subject to Mr. Sbaiti's input,

16 whether the Court would ask us or direct us to upload an order

17 granting our motion as unopposed.  We just feel like we don't

18 have any role in this case.

19         THE COURT:  All right.

20         Mr. Sbaiti, what about that?

21         MR. SBAITI:  Your Honor, they were originally added

22 as a nominal party.  And as a nominal party, because of the

23 potential need to have a derivative action, I think that based

24 upon Highland's arguments and the arguments that we had, I

25 don't think the derivative action is necessary for us to

98

1  maintain on a go-forward basis.  And so we don't oppose them

2  being dismissed.

3          THE COURT:  All right.  Then I assume, Mr. Morris,

4  you don't have any problem with this, correct?

5          MR. MORRIS:  No, Your Honor.

6          THE COURT:  Okay.  So I'll look for the parties to

7  submit an agreed order of dismissal of HCLOF after the hearing.

8  All right?

9          MR. JORDAN:  Thank you, Your Honor.

10          THE COURT:  All right.  Mr. Morris, you get the last

11  word.

12          MR. MORRIS:  Thank you, Your Honor.  I hope to be

13  relatively brief.  I really just want to focus on the arguments

14  concerning whether or not the order that was entered by this

15  Court was an order that was entered on the merits.

16          As the Court is well aware, a 9019 motion filed by a

17  debtor is done so on notice.  It is to give all parties in

18  interest an opportunity to be heard, not just as to whether or

19  not the debtor meets its burden of proof under Rule 9019 but

20  whether or not the Court can find, as it must, that the

21  proposed settlement is in the best interest of the estate.

22          The purpose of -- I mean that is the purpose of the

23  giving notice so that everybody has a chance to be heard.  The

24  questions that the Court asked, the questions that every

25  bankruptcy court asks in a 9019 is can the debtor do this deal,

**Appx. 00099**

99

1   should the debtor do this deal, is it in the best interest of

2   the estate to do this deal.

3            And, you know, the idea that a 9019 order is somehow

4   res judicata only to the parties to a settlement is just

5   something that doesn't make any sense to me because it

6   abrogates so many rules that exist that allows and encourages

7   and requires parties who have objections to be heard.

8            Mr. Sbaiti's clients filed an objection.  They

9   initiated a contested matter.  They obtained rights.  They were

10  litigants.  They are litigants in a contested matter where

11  they're required to tell the Court what objections they have to

12  the settlement, and they did that.

13           Mr. Sbaiti, you know, told me that I wasn't allowed

14  to characterize the words that are used in the documents that

15  have now been admitted by the Court.  And, yet, I heard him say

16  that maybe Mr. Kane (phonetic) really meant to tell Your Honor

17  that he was withdrawing the claim because he was going to save

18  it for another day.

19           I'd just ask the Court to look at the transcript.  I

20  don't have to interpret it at all.  And I'd ask the Court to

21  read the words.  I can put them back up on the screen, but

22  they're pretty short.  It's at Pages 7 and 8 of the transcript

23  of what Mr. Kane told you and what you said in response.  It's

24  on the page, not my interpretation, and what the import of that

25  was.

100

1    Mr. Sbaiti believes, I guess, if one is allowed to

2  engage in such conduct without consequence, that one is allowed

3  to allow to file objections, cause the Court and the litigants

4  to participate, to give discovery, to write briefs, to do

5  analyses, withdraw it on the basis of their own good faith

6  analysis of Guernsey law of the documents and somehow say it's

7  irrelevant.  Not what the law is, not what res judicata is

8  intended to do.

9    He should have put all of his cards on the table.  In

10  fact, I think that Mr. Kane believed he was putting all of his

11  cards on the table because that's what he did.  He filed a very

12  comprehensive objection.  He asserted a right to the

13  opportunity that the debtor was proposing to take in the 9019

14  motion.  That's what he was doing.  He was objecting on the

15  basis that he claimed his client had a superior right to this

16  asset.

17    And he didn't -- like I said earlier, Your Honor, I

18  don't think he would be permitted, I don't think these claims

19  would fly today if no objection was filed.  But the fact that

20  there was renders, I think, indisputable that there was a

21  finding on the merits, right.  And the only reason that the

22  Court didn't rule on Mr. Kane's motion, the only reason the

23  Court didn't rule on it is because Mr. Kane withdrew it.

24    Is that really the way this process is supposed to

25  work, that one can tell the Court that after a review of the

**WWW.LIBERTYTRANSCRIPTS.COM**

101

1  documents, I'm going to withdraw the objection and then file a

2  claim for damages three months later with a different client,

3  with a different control person, with a different lawyer?

4  That's okay under doctrine of res judicata?  I don't think so.

5       They had a full and fair opportunity.  The fact that

6  this was somehow -- you know, they're denigrating the fact that

7  this was a 9019 motion.  There's not supposed to be a mini-

8  trial.  Your Honor had discretion as to what to do.  Every

9  court in every bench trial has discretion as to what to do and

10 whether or not to overrule objections and whether or not to

11 substain [sic] objections.  That's what judges to.

12      And there's nothing offensive about the fact that it

13 happened in the context of a 9019 motion.  They don't get to

14 sit on their hands and wait to fight another day.  If they

15 believed that the debtor was exposing itself to liability, and

16 that's what they actually say in the opposition, that's what I

17 actually think they say in the complaint, accept it as true,

18 they believe that the debtor created liability for itself by

19 rendering -- by entering into this transaction.

20      Shouldn't they have raised their hand and said you

21 can't do this deal, right?  And the only response to that --

22 they have to that is they had no idea about value.  Paragraph

23 127, Your Honor, Mr. Dondero, the architect of this complaint,

24 as was proven on June 8th, knew very well about value.  And it

25 doesn't matter that it was only MGM.  Your Honor commented on

102

1  that at the June 8th hearing in a different context.  But
2  everybody knows, right, it is.  He sits on the board of MGM.
3          And I'm sorry if I called him a tippee instead of a
4  tipper.  But if this complaint goes forward, we'll dig into
5  that real deep.  But there's no reason it ought to, Your Honor.
6  This case ought to be dismissed on res judicata grounds.  It
7  should be dismissed on judicial estoppel grounds.  And it
8  should be dismissed for all the reasons that I said in my
9  argument in my brief.
10         But I do just want to close with one point, and that
11 is to read from a case called Goldstein, which I think I
12 alluded to earlier on this issue of whether there's a fiduciary
13 duty that's owed by an advisor to an investor and a fund:
14             "At best, it is counterintuitive to characterize the
15             investors in a hedge fund as the clients of the
16             advisors.  The advisor owes fiduciary duties only to
17             the fund, not to the fund's investors."
18         There's a lot of discussion about fiduciary duties,
19 Your Honor.  But to the extent that they have any basis to
20 defeat the motion to dismiss on res judicata or collateral
21 estoppel grounds, we hope and we trust and we know the Court
22 will review the case law vigorously to test some of the
23 assertions to that.
24         I have nothing further, Your Honor.
25         THE COURT:  All right.  Well, thank you to all of

103

1  you.

2          As a reminder, I don't think you need it, but as a

3  reminder, I am essentially acting as a magistrate for Judge

4  Boyle in this action.  And whichever way I go on whichever

5  theories, I think she would expect a thorough write-up.  It

6  would, of course, be in the form of a report and recommendation

7  for her to either adopt or not if I dispose of some or all of

8  the counts in the lawsuit.

9          Even to the extent I deny dismissal, even though the

10  rule typically does not require a court to make detailed

11  findings and conclusions in connection with a denial of a

12  motion to dismiss, again, since I'm sitting as a magistrate, I

13  think Judge Boyle would expect some thorough explanations and

14  reasoning from me.

15          So that's my way of saying I'm taking this under

16  advisement.  I am going to drill down on some of the cases that

17  have been argued.  I think some important issues are raised

18  here that need some thorough reasoning.

19          So I will do the best to get this out without too

20  much delay.  I think there's probably zero chance, zero chance

21  I'm going to get it done by the end of the year.  We're just

22  too behind with some of our under-advisements.  But I will try

23  earnestly to get it out fairly soon after the first of the

24  year.  All right?

25          Thank you.  You all have a good holiday.

**WWW.LIBERTYTRANSCRIPTS.COM**

104

1          THE CLERK:  All rise.

2       (Proceedings concluded at 12:37 p.m.)

3                    * * * * *

4

5              **C E R T I F I C A T I O N**

6          We, DIPTI PATEL, KAREN WATSON, CRYSTAL THOMAS, AND

7  PATTIE MITCHELL, court approved transcribers, certify that the

8  foregoing is a correct transcript from the official electronic

9  sound recording of the proceedings in the above-entitled

10 matter, and to the best of my ability.

11

12 /s/ Dipti Patel

13 DIPTI PATEL, CET-997

14

15 /s/ Karen Watson

16 KAREN WATSON, CET-1039

17

18 /s/ Crystal Thomas

19 CRYSTAL THOMAS, CET-

20

21 /s/ Pattie Mitchell

22 PATTIE MITCHELL

23 LIBERTY TRANSCRIPTS              DATE: November 23, 2021

24

**WWW.LIBERTYTRANSCRIPTS.COM**

Appx. 00105

# EXHIBIT 2

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 275**

**[Release No. IA-2628; File No. S7-25-06]**

**RIN 3235-AJ67**

**Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles**

**AGENCY:**  Securities and Exchange Commission.

**ACTION:**  Final rule.

**SUMMARY:**  The Securities and Exchange Commission is adopting a new rule that prohibits advisers to pooled investment vehicles from making false or misleading statements to, or otherwise defrauding, investors or prospective investors in those pooled vehicles.  This rule is designed to clarify, in light of a recent court opinion, the Commission's ability to bring enforcement actions under the Investment Advisers Act of 1940 against investment advisers who defraud investors or prospective investors in a hedge fund or other pooled investment vehicle.

**EFFECTIVE DATE:** September 10, 2007.

**FOR FURTHER INFORMATION CONTACT:**  David W. Blass, Assistant Director, Daniel S. Kahl, Branch Chief, or Vivien Liu, Senior Counsel, at 202-551-6787, Division of Investment Management, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549-5041.

**SUPPLEMENTARY INFORMATION:**  The Commission is adopting new rule 206(4)-8 under the Investment Advisers Act of 1940 ("Advisers Act").[1]

---

[1]   15 U.S.C. 80b.  Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified.

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/15/22   Page 111 of 280   PageID 153

2

## I.   INTRODUCTION

On December 13, 2006, we proposed a new rule under the Advisers Act that would prohibit advisers to pooled investment vehicles from defrauding investors or prospective investors in pooled investment vehicles they advise.[2]  We proposed the rule in response to the opinion of the Court of Appeals for the District of Columbia Circuit in Goldstein v. SEC, which created some uncertainty regarding the application of sections 206(1) and 206(2) of the Advisers Act in certain cases where investors in a pool are defrauded by an investment adviser to that pool.[3]  In addressing the scope of the exemption from registration in section 203(b)(3) of the Advisers Act and the meaning of "client" as used in that section, the Court of Appeals expressed the view that, for purposes of sections 206(1) and (2) of the Advisers Act, the "client" of an investment adviser managing a pool is the pool itself, not an investor in the pool.  As a result, it was unclear whether the Commission could continue to rely on sections 206(1) and (2) of the Advisers Act to bring enforcement actions in certain cases where investors in a pool are defrauded by an investment adviser to that pool.[4]

---

[2]   Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles; Accredited Investors in Certain Private Investment Vehicles, Investment Advisers Act Release No. 2576 (Dec. 27, 2006) [72 FR 400 (Jan. 4, 2007)] (the "Proposing Release").  In the Proposing Release, we also proposed two new rules that would define the term "accredited natural person" under Regulation D and section 4(6) of the Securities Act of 1933 [15 USC 77d(6)] ("Securities Act").  As proposed, these rules would add to the existing definition of "accredited investor" and apply to private offerings of certain unregistered investment pools.  On May 23, 2007, we voted to propose more general amendments to the definition of accredited investor.  Proposed Modernization of Smaller Company Capital-Raising and Disclosure Requirements, Securities Act Release No.    (   , 2007) [72 FR    (   , 2007)].  We plan to defer consideration of our proposal to define the term accredited natural person until we have had the opportunity to evaluate fully the comments we received on that proposal together with those we receive on our May 2007 proposal.

[3]   451 F.3d 873 (D.C. Cir. 2006) ("Goldstein").

[4]   Prior to the issuance of the Goldstein decision, we brought enforcement actions against advisers alleging false and misleading statements to investors under sections 206(1) and (2) of the Advisers Act.  See, e.g., SEC v. Kirk S. Wright, International Management Associates, LLC, Litigation Release No. 19581 (Feb. 28, 2006); SEC v. Wood River Capital Management, LLC,

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 12/15/22    Page 112 of 280    PageID 154

3

In its opinion, the Court of Appeals distinguished sections 206(1) and (2) from section 206(4) of the Advisers Act, which is not limited to conduct aimed at clients or prospective clients of investment advisers.[5]  Section 206(4) provides us with rulemaking authority to define, and prescribe means reasonably designed to prevent, fraud by advisers.[6]  We proposed rule 206(4)-8 under this authority.

We received 45 comment letters in response to our proposal.[7]  Most commenters generally supported the proposal.  Eighteen endorsed the rule as proposed, noting that the rule would strengthen the antifraud provisions of the Advisers Act or that the rule would clarify the Commission's enforcement authority with respect to advisers.[8]  Others, however, urged that we

---

Litigation Release No. 19428 (Oct. 13, 2005); <u>SEC v. Samuel Israel III; Daniel E. Marino; Bayou Management, LLC; Bayou Accredited Fund, LLC; Bayou Affiliates Fund, LLC; Bayou No Leverage Fund, LLC; and Bayou Superfund, LLC,</u> Litigation Release No. 19406 (Sept. 29, 2005); <u>SEC v. Beacon Hill Asset Management LLC</u>, Litigation Release No. 18745A (June 16, 2004).

[5]   <u>See</u> <u>Goldstein</u>, <u>supra</u> note 3, at note 6.  <u>See also</u> <u>United States v. Elliott</u>, 62 F.3d 1304, 1311 (11th Cir. 1995).

[6]   Section 206(4) of the Advisers Act makes it unlawful for an investment adviser to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative" and authorizes us "by rules and regulations [to] define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

[7]   We received over 600 comment letters that addressed the proposed amendments to the term "accredited natural person" under Regulation D and section 4(6) of the Securities Act.  All of the public comments we received are available for inspection in our Public Reference Room at 100 F Street, NE, Washington DC, 20549 in File No. S7-25-06, or may be viewed at www.sec.gov/comments/s7-25-06/s72506.shtml.

[8]   <u>E.g.,</u> Letter of the Alternative Investments Compliance Association (Mar. 5, 2007); Letter of the CFA Center for Financial Market Integrity (Mar. 9, 2007) ("CFA Center Letter"); Letter of the Coalition of Private Investment Companies (Mar. 9, 2007); Letter of the Commonwealth of Massachusetts (Mar. 9, 2007) ("Massachusetts Letter"); Letter of the Department of Banking of the State of Connecticut (Mar. 8, 2007); Letter of the North America Securities Administrators Association (Apr. 2, 2007)  ("NASAA Letter"); and Letter of the U.S. Chamber of Commerce (Mar. 9, 2007).  Another commenter observed that the proposed rules are broadly similar to current U.K. legislation and regulations.  <u>See</u> Letter of Alternative Investment Management Association (Mar. 9, 2007) ("AIMA Letter").

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/15/22   Page 113 of 280   PageID 155

4

make revisions that would restrict the scope of the rule to more narrowly define the conduct or acts it prohibits.[9]

Today, we are adopting new rule 206(4)-8 as proposed.  The rule prohibits advisers from (i) making false or misleading statements to investors or prospective investors in hedge funds and other pooled investment vehicles they advise, or (ii) otherwise defrauding these investors. The rule clarifies that an adviser's duty to refrain from fraudulent conduct under the federal securities laws extends to the relationship with ultimate investors and that the Commission may bring enforcement actions under the Advisers Act against investment advisers who defraud investors or prospective investors in those pooled investment vehicles.

## II.   DISCUSSION

Rule 206(4)-8 prohibits advisers to pooled investment vehicles from (i) making false or misleading statements to investors or prospective investors in those pools or (ii) otherwise defrauding those investors or prospective investors.  We will enforce the rule through civil and administrative enforcement actions against advisers who violate it.

Section 206(4) authorizes the Commission to adopt rules and regulations that "define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."  In adopting rule 206(4)-8, we intend to employ all of the broad authority that Congress provided us in section 206(4) and direct it at adviser conduct affecting an investor or potential investor in a pooled investment vehicle.

---

[9]   E.g., Letter of American Bar Association (Mar. 12, 2007) ("ABA Letter"); Letter of Davis Polk & Wardwell (Mar. 9, 2007) ("Davis Polk Letter"); Letter of Dechert LLP (Mar. 8, 2007) ("Dechert Letter"); Letter of New York City Bar (Mar. 8, 2007) ("NYCB Letter"); Letter of Schulte Roth & Zabel LLP (Mar. 9, 2007) ("Schulte Roth Letter"); and Letter of Sullivan & Cromwell LLP (Mar. 9, 2007) ("Sullivan & Cromwell Letter").

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/15/22   Page 114 of 280   PageID 156

5

### A. Scope of Rule 206(4)-8

Some commenters questioned the scope of the rule, arguing that the Commission should

define fraud.[10]  We believe that we have done so, only more broadly than some commenters

would have us do.  As the Proposing Release indicated, our intent is to prohibit all fraud on

investors in pools managed by investment advisers.  Congress expected that we would use the

authority provided by section 206(4) to "promulgate general antifraud rules capable of

flexibility."[11]  The terms material false statements or omissions and "acts, practices, and courses

of business as are fraudulent, deceptive, or manipulative" encompass the well-developed body of

law under the antifraud provisions of the federal securities laws.  The legal authorities

identifying the types of acts, practices, and courses of business that are fraudulent, deceptive, or

manipulative under the federal securities laws are numerous, and we believe that the conduct

prohibited by rule 206(4)-8 is sufficiently clear and well understood.[12]

---

[10]    E.g., ABA Letter, supra note 9; Letter of Debevoise & Plimpton LLP (Mar. 14, 2007); and NYCB Letter, supra note 9.

[11]    S.Rep. No. 1760, 86th Cong., 2d. Sess. (June 28, 1960) at 4.  See rule 206(4)-1(a)(5) [17 CFR. 275.206(4)-1(a)(5)] under the Advisers Act; rule 17j-1(b) [17 CFR 270.17j-1(b)] under the Investment Company Act of 1940 [15 U.S.C. 80a-1] ("Investment Company Act"); and rule 13e-3(b)(1) [17 CFR 240.13e-3(b)(1)] under the Securities Exchange Act of 1934 [15 U.S.C. 77a] ("Exchange Act").

[12]    Loss, Seligman, & Paredes, Securities Regulation, Chap. 9 (Fraud) (Fourth Ed. 2006); Hazen, Treatise on The Law of Securities Regulation, Vol. 3, Ch. 12 (Manipulation and Fraud – Civil Liability; Implied Private Remedies; SEC Rule 10b-5; Fraud in Connection With the Purchase or Sale of Securities; Improper Trading on Nonpublic Material Information) (Fifth Ed. 2005).  See, e.g., Superintendent of Insurance of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 11 n. 7 (1971) ("'We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.  Novel or atypical methods should not provide immunity from the securities laws.'" (quoting A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (CA2 1967))); Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477 (1977) ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices.").  Moreover, the established legal principles are sufficiently flexible to encompass future novel factual scenarios.  United States v. Brown, 555 F.2d 336, 339-40 (2d Cir. 1977) ("The fact that there is no litigated fact pattern precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved but hardly provides an escape from the penal sanctions of the securities fraud provisions here involved.").

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 12/15/22    Page 115 of 280    PageID 157

6

### 1. Investors and Prospective Investors

Rule 206(4)-8 prohibits investment advisers from making false or misleading statements to, or engaging in other fraud on, investors or prospective investors in a pooled investment vehicle they manage.  The scope of the rule is modeled on that of sections 206(1) and (2) of the Advisers Act, which make unlawful fraud by advisers against clients or prospective clients.  Rule 206(4)-8 prohibits false or misleading statements made, for example, to existing investors in account statements as well as to prospective investors in private placement memoranda, offering circulars, or responses to "requests for proposals," electronic solicitations, and personal meetings arranged through capital introduction services.

Some commenters argued that the rule should not prohibit fraud against prospective investors in a pooled investment vehicle, asserting that such fraud does not actually harm investors until they, in fact, make an investment.[13]  We disagree.  False or misleading statements and other frauds by advisers are no less objectionable when made in an attempt to draw in new investors than when made to existing investors.[14]  For similar policy reasons that we believe led Congress to apply the protections of sections 206(1) and (2) to prospective clients, we have decided to apply those of rule 206(4)-8 to prospective investors.[15]  We believe that prohibiting false or misleading statements made to, or other fraud on, any prospective investors is a means reasonably designed to prevent fraud.

---

[13]     Davis Polk Letter, <u>supra</u> note 9; Dechert Letter, <u>supra</u> note 9; NYCB Letter, <u>supra</u> note 9; Letter of the Securities Industry and Financial Markets Association (Mar. 9, 2007); Sullivan & Cromwell Letter, <u>supra</u> note 9.

[14]     <u>See</u> CFA Center Letter, <u>supra</u> note 8.

[15]     We have used the term "prospective investor" to give the term similar scope to the term "prospective client" in sections 206(1) and (2).  <u>See, e.g.,</u> <u>In the Matter of Ralph Harold Seipel</u>, 38 S.E.C. 256, 257-58 (1958) (the solicitation of clients is part of the activity of an investment adviser and it is immaterial for purposes of an enforcement action under sections 206(1) and (2) that an adviser engaging in fraudulent solicitations was not successful in his efforts to obtain clients).

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 11/30/22   Page 116 of 280   PageID 158

7

### 2. Unregistered Investment Advisers

Rule 206(4)-8 applies to both registered and unregistered investment advisers.[16]  As we noted in the Proposing Release, many of our enforcement cases against advisers to pooled investment vehicles have been brought against advisers that are not registered under the Advisers Act, and we believe it is critical that we continue to be in a position to bring actions against unregistered advisers that manage pools and that defraud investors in those pools.[17]  The two commenters that expressed an explicit view on this aspect of the proposal supported our application of the rule to advisers that are not registered with the Commission.[18]

### 3. Pooled Investment Vehicles

The rule we are adopting today applies to investment advisers with respect to any "pooled investment vehicle" they advise.  The rule defines a pooled investment vehicle[19] as any investment company defined in section 3(a) of the Investment Company Act[20] and any privately offered pooled investment vehicle that is excluded from the definition of investment company by reason of either section 3(c)(1) or 3(c)(7) of the Investment Company Act.[21]  As a result, the rule

---

[16]   A few commenters requested that we clarify how we intend to apply rule 206(4)-8 to offshore advisers' interaction with non-U.S. investors.  See AIMA Letter, supra note 8; Letter of Jones Day (Mar. 9, 2007); Sullivan & Cromwell Letter, supra note 9.  Our adoption of this rule will not alter our jurisdictional authority.

[17]   Proposing Release, supra note 2, at note 14.

[18]   Massachusetts Letter, supra note 8; NASAA Letter, supra note 8.

[19]   Rule 206(4)-8(b).

[20]   15 U.S.C. 80a-3(a).  Unless otherwise noted, when we refer to the Investment Company Act, or any paragraph of the Investment Company Act, we are referring to 15 U.S.C. 80a of the United States Code, at which the Company Act is codified.

[21]   Section 3(c)(1) of the Investment Company Act excludes from the definition of investment company an issuer the securities (other than short-term paper) of which are beneficially owned by not more than 100 persons and that is not making or proposing to make a public offering of its securities.  Section 3(c)(7) of the Investment Company Act excludes from the definition of investment company an issuer the outstanding securities of which are owned exclusively by persons who, at the time of acquisition of such securities, are "qualified purchasers" and that is not making or proposing to make a public offering of its securities.  "Qualified purchaser" is

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 11/29/22   Page 117 of 280   PageID 159

8

applies to advisers to hedge funds, private equity funds, venture capital funds, and other types of

privately offered pools that invest in securities, as well as advisers to investment companies that

are registered with us.[22]

Several commenters supported applying the protection of the new antifraud rule to

investors in all these kinds of pooled investment vehicles, noting, for example, that every

investor, not just the wealthy or sophisticated that typically invest in private pools, should be

protected from fraud.[23]  Some other commenters urged us not to apply the rule to advisers to

registered investment companies, arguing that the rule is unnecessary because other provisions of

the federal securities laws prohibiting fraud are available to the Commission to address these

matters.[24]  They expressed concern that application of another antifraud provision with different

elements would be burdensome.  These commenters claimed that the rule would, for example,

make it necessary for advisers to conduct extensive reviews of all communications with clients.

But the other antifraud provisions available to us contain different elements because they were

not specifically designed to address frauds by investment advisers with respect to investors in

pooled investment vehicles.  In some cases, the other antifraud provisions may not permit us to

---

defined in section 2(a)(51) of the Investment Company Act generally to include a natural person (or a company owned by two or more related natural persons) who owns not less than $5,000,000 in investments; a person, acting for its own account or accounts of other qualified purchasers, who owns and invests on a discretionary basis, not less than $25,000,000; and a trust whose trustee, and each of its settlors, is a qualified purchaser.

[22]   We have brought enforcement actions under the Advisers Act against advisers to these types of funds.  See, e.g., In the Matter of Askin Capital Management, L.P and David J. Askin, Investment Advisers Act Release No. 1492 (May 23, 1995) (hedge fund); In the Matter of Thayer Capital Partners, Investment Advisers Act Release No. 2276 (Aug. 12, 2004) (private equity fund); SEC v. Michael A. Liberty, Litigation Release No. 19601 (Mar. 8, 2006) (venture capital fund).

[23]   E.g., NASAA Letter, supra note 8.

[24]   E.g., ABA Letter, supra note 9; Letter of Investment Adviser Association (Mar. 9, 2007); Letter of Investment Company Institute (Mar. 9, 2007) ("ICI Letter"); Sullivan & Cromwell Letter, supra note 9.  Commenters noted in particular that section 34(b) of the Investment Company Act already prohibits an adviser from making fraudulent material statements or omissions in a fund's registration statement or in required records.

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 01/02/23   Page 118 of 280   PageID 160

9

proceed against the adviser.[25]  As a result, the existing antifraud provisions may not be available to us in all cases.  As we discussed above, before the <u>Goldstein</u> decision we had brought actions against advisers to mutual funds under sections 206(1) and (2) for defrauding investors in mutual funds.[26]  Because, before the <u>Goldstein</u> decision, advisers to pooled investment vehicles operated with the understanding that the Advisers Act prohibited the conduct that this rule prohibits, we believe that advisers that are attentive to their traditional compliance responsibilities will not need to alter their business practices or take additional steps and incur new costs as a result of this rule's adoption.

### B.  Prohibition on False or Misleading Statements

Rule 206(4)-8(a)(1) prohibits any investment adviser to a pooled investment vehicle from making an untrue statement of a material fact to any investor or prospective investor in the pooled investment vehicle, or omitting to state a material fact necessary in order to make the statements made to any investor or prospective investor in the pooled investment vehicle, in the light of the circumstances under which they were made, not misleading.[27]

The provision is very similar to those in many of our antifraud laws and rules that, depending upon the circumstances, may also be applicable to the same investor

---

[25]   This may be the case with respect to section 34(b) of the Investment Company Act, for example, if the adviser's fraudulent statements are not made in a document described in that section, or with respect to rule 10b-5 under the Exchange Act, where the fraudulent conduct does not relate to a misstatement or omission in connection with the purchase or sale of any security.

[26]   <u>See, e.g.</u>, <u>In the Matter of Van Kampen Investment Advisory Corp.</u>, Investment Advisers Act Release No. 1819 (Sept. 8, 1999); <u>In the Matter of  The Dreyfus Corporation</u>, Investment Advisers Act Release No. 1870 (May 10, 2000); <u>In the Matter of Federated Investment Management Company</u>, Investment Advisers Act Release No. 2448 (Nov. 28, 2005).

[27]   A fact is material if there is a substantial likelihood that a reasonable investor in making an investment decision would consider it as having significantly altered the total mix of information available.  <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988); <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976).  <u>See also</u> <u>In the Matter of Van Kampen Investment Advisory Corp.</u>, <u>supra</u> note 26; <u>In the Matter of the Dreyfus Corporation</u>, <u>supra</u> note 26.

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 11/21/22   Page 119 of 280   PageID 161

10

communications.[28]  Sections 206(1) and (2) have imposed similar obligations on advisers since

1940 and, before <u>Goldstein</u>, were commonly accepted as imposing similar requirements on

communications with investors in a fund.  For these reasons, and because the nature of the duty

to communicate without false statements is so well developed in current law, we believe that

commenters' concerns about the breadth of the prohibition or any chilling effect the new rule

might have on investor communications are misplaced.[29]  Advisers to pooled investment vehicles

attentive to their traditional compliance responsibilities will not need to alter their

communications with investors.

Rule 206(4)-8(a)(1) prohibits advisers to pooled investment vehicles from making any

materially false or misleading statements to investors in the pool regardless of whether the pool

is offering, selling, or redeeming securities.  While the new rule differs in this aspect from rule

10b-5 under the Exchange Act, the conduct prohibited is similar.  The new rule prohibits, for

example, materially false or misleading statements regarding investment strategies the pooled

investment vehicle will pursue, the experience and credentials of the adviser (or its associated

persons), the risks associated with an investment in the pool, the performance of the pool or other

funds advised by the adviser, the valuation of the pool or investor accounts in it, and practices

---

[28]  <u>See, e.g.</u>, sections 12 and 17 of the Securities Act [15 U.S.C. 77l, 77q]; section 14 of the
Exchange Act [15 U.S.C. 78n]; section 34 of the Investment Company Act; rules 156, 159, and
610 under the Securities Act [17 CFR 230.156, 230.159, 230.610]; rules 10b-5, 13e-3, 13e-4, and
15c1-2 under the Exchange Act [17 CFR 240.10b-5, 240.13e-3, 240.13e-4, 240.15c1-2]; and rule
17j-1 under the Investment Company Act [17 CFR 270.17j-1]).

[29]  Letter of Managed Funds Association (Mar. 9, 2007) ("MFA Letter"); NYCB Letter, <u>supra</u> note
9; Davis Polk Letter, <u>supra</u> note 9; Dechert Letter, <u>supra</u> note 9; Letter of Seward & Kissel LLP
(Mar. 8, 2007) ("Seward & Kissel Letter").

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/16/22   Page 120 of 280   PageID 162

11

the adviser follows in the operation of its advisory business such as how the adviser allocates investment opportunities.[30]

### C. Prohibition of Other Frauds

Rule 206(4)-8(a)(2) makes it a fraudulent, deceptive, or manipulative act, practice, or course of business for any investment adviser to a pooled investment vehicle to "otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."[31]  As we noted in the Proposing Release, the wording of this provision is drawn from the first sentence of section 206(4) and is designed to apply more broadly to deceptive conduct that may not involve statements.[32]

Some commenters asserted that section 206(4) provides us authority only to adopt prophylactic rules that explicitly identify conduct that would be fraudulent under the new rule.[33] We believe our authority is broader.  We do not believe that the commenters' suggested approach would be consistent with the purposes of the Advisers Act or the protection of investors.  That approach would have us adopt the rule prohibiting fraudulent communications but not fraudulent conduct.[34]  But, section 206(4) itself specifically authorizes us to adopt rules defining and prescribing "acts, practices and courses of business," (*i.e.*, conduct), and does not explicitly refer to communications, which, nonetheless, represent a form of an act, practice, or

---

[30]     We have previously brought enforcement actions alleging these or similar types of frauds.  See Proposing Release, supra note 2, at note 29.

[31]     Rule 206(4)-8(a)(2).

[32]     See Section II.C of the Proposing Release, supra note 2.

[33]     ABA Letter, supra note 9; ICI Letter, supra note 24; Schulte Roth Letter, supra note 9; Sullivan & Cromwell Letter, supra note 9.

[34]     See, e.g., ABA Letter, supra note 9.

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 11/03/22    Page 121 of 280    PageID 163

12

course of business.  In addition, rule 206(4)-8 as adopted would provide greater protection to investors in pooled investment vehicles.

Alternatively, commenters would have us adopt a rule prohibiting identified known fraudulent conduct or would have us provide detailed commentary describing specific forms of fraudulent conduct that the rule would prohibit.[35]  Either approach would fail to prohibit fraudulent conduct we did not identify, and could provide a roadmap for those wishing to engage in fraudulent conduct.  This approach would be inconsistent with our historical application of the federal securities laws under which broad prohibitions have been applied against specific harmful activity.

### D.  Other Matters

We noted in the Proposing Release that, unlike violations of rule 10b-5 under the Exchange Act, the Commission would not need to demonstrate that an adviser violating rule 206(4)-8 acted with scienter.[36]  Commenters questioned whether the rule should encompass negligent conduct, arguing that it would "expand the concept of fraud itself beyond its original meaning."[37]  We read the language of section 206(4) as not by its terms limited to knowing or deliberate conduct.  For example, section 206(4) encompasses "acts, practices, and courses of business as are . . . deceptive," thereby reaching conduct that is negligently deceptive as well as conduct that is recklessly or deliberately deceptive.  In addition, the Court of Appeals for the District of Columbia Circuit concluded that "scienter is not required under section 206(4)."[38]

---

[35]     Id.

[36]     Section II.B of the Proposing Release, supra note 2.

[37]     See ABA Letter, supra note 9 at page 3.

[38]     SEC v. Steadman, 967 F.2d 636, at 647 (D.C. Cir. 1992).  The court in Steadman analogized section 206(4) of the Advisers Act to section 17(a)(3) of the Securities Act, which the Supreme Court had held did not require a finding of scienter, id. (citing Aaron v. SEC, 446 U.S. 680 (1980)).  In discussing section 17(a)(3) and its lack of a scienter requirement, the Steadman court

13

We believe use of a negligence standard also is appropriate as a method reasonably designed to prevent fraud.  As the Supreme Court noted in U.S. v. O'Hagan, "[a] prophylactic measure, because its mission is to prevent, typically encompasses more than the core activity prohibited."[39]  In O'Hagan, the Court held that under section 14(e) "the Commission may prohibit acts, not themselves fraudulent under the common law or §10(b), if the prohibition is 'reasonably designed to prevent . . . acts and practices [that] are fraudulent.'"[40]  Along these lines, the prohibitions in rule 206(4)-8 are reasonably designed to prevent fraud.  We believe that, by taking sufficient care to avoid negligent conduct, advisers will be more likely to avoid reckless deception.  Since the Commission clearly is authorized to prescribe conduct that goes beyond fraud as a means reasonably designed to prevent fraud, prohibiting deceptive conduct done negligently is a way to accomplish this objective.

Rule 206(4)-8 does not create under the Advisers Act a fiduciary duty to investors or prospective investors in a pooled investment vehicle not otherwise imposed by law.  Nor does the rule alter any duty or obligation an adviser has under the Advisers Act, any other federal law or regulation, or any state law or regulation (including state securities laws) to investors in a pooled investment vehicle it advises.[41]  The rule, for example, will permit us to bring an enforcement action against an investment adviser that violates a fiduciary duty imposed by other law if the violation of such law or obligation also constitutes an act, practice, or course of

---

observed that, similarly, a violation of section 206(2) of the Advisers Act could rest on a finding of simple negligence.  Id. at 643, note 5.  But see Aaron at 690-91 (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)); cf. S. Rep. No. 1760, 86th Cong., 2d. Sess. (June 28, 1960) at 8 and H. R. Rep. 2179, 86th Cong., 2d Sess. (Aug. 26, 1960) at 8 (comparing section 206(4) to section 15(c)(2) of the Exchange Act).

[39]   U.S. v. O'Hagan, 521 U.S. 642, 672-73 (1997).

[40]   Id. at 673.

[41]   For example, under the Uniform Limited Partnership Act, advisers who serve as general partners owe fiduciary duties to the limited partners.  UNIF. LIMITED PARTNERSHIP ACT § 408 (2001).

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/16/22   Page 123 of 280   PageID 165

14

business that is fraudulent, deceptive, or manipulative within the meaning of the rule and section 206(4).[42]

Finally, the rule does not create a private right of action.[43]

## III.   PAPERWORK REDUCTION ACT

The Paperwork Reduction Act of 1995 does not apply because rule 206(4)-8 does not impose a new "collection of information" within the meaning of the Paperwork Reduction Act of 1995.  The rule does not create any filing, reporting, recordkeeping, or disclosure requirements for investment advisers subject to the rule.  Accordingly, there is no "collection of information" under the Paperwork Reduction Act that requires the approval of the Office of Management and Budget under 44 U.S.C. 3501.

## IV.   COST-BENEFIT ANALYSIS

The Commission is sensitive to costs imposed by our rules and the benefits that derive from them.  In the Proposing Release, we encouraged commenters to discuss any potential costs and benefits that we did not consider in our discussion.  Three commenters addressed the issue of cost.  Two of them stated their belief that the rule would increase advisers' costs of compliance, by, for example, making it necessary for advisers to conduct extensive reviews of all communications with clients.[44]  One stated that the rule would achieve a reasonable balance of

---

[42]   For example, if an adviser has a duty from a source other than the rule to make a material disclosure to an investor in a fund and negligently or deliberately fails to make the disclosure, the rule would apply to the failure.

[43]   The Supreme Court has held that "there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment adviser's contract, but that the Act confers no other private causes of action, legal or equitable."  Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 at 24 (1979) (footnote omitted).

[44]   NYCB Letter, supra note 9; Seward & Kissel Letter, supra note 29.

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 11/16/22   Page 124 of 280   PageID 166

15

providing important benefits to investors at an acceptable cost.[45]  None of the three commenters, however, provided analysis or empirical data in connection with their statements.

The rule makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) for any investment adviser to a pooled investment vehicle to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle.  The rule also makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) for any investment adviser to a pooled investment vehicle to otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment Center vehicle.  For the reasons discussed, we do not believe that the rule will require advisers to incur new or additional costs.

Investment advisers to pooled investment vehicles should not be making untrue statements or omitting material facts or otherwise be engaged in fraud with respect to investors or prospective investors in pooled investment vehicles today, because federal authorities, state authorities, and private litigants often can, and do, seek redress from the adviser for the untrue statements or omissions or other frauds.  In most cases, the conduct that the rule prohibits is already prohibited by federal securities statutes,[46] other federal statutes (including federal wire fraud statutes),[47] as well as state law.[48]

---

[45]    CFA Center Letter, supra note 8.

[46]    See, e.g., section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and section 17(a) of the Securities Act [15 U.S.C. 77q] which would apply when the false statements are made "in connection with the purchase or sale of a security" or involve the "offer or sale" of a security, and section 34(b) of the Investment Company Act which makes it unlawful "to make any untrue statement of a

16

We recognize that there are costs involved in assuring that communications to investors and prospective investors do not contain untrue or misleading statements and preventing other frauds.  Advisers have incurred, and will continue to incur, these costs due to the prohibitions and deterrent effect of the law and rules that apply under these circumstances.  While each of the provisions noted above may have different limitation periods, apply in different factual circumstances, or require the government (or a private litigant) to prove different states of mind than the rule, as discussed above we believe that the multiple prohibitions against fraud, and the consequences under both criminal and civil law for fraud, should currently cause an adviser to take the precautions it deems necessary to refrain from such conduct.

Furthermore, prior to <u>Goldstein</u>, advisers operated with the understanding that the Advisers Act prohibited the same conduct that would be prohibited by the rule.  Accordingly, we do not believe that advisers to pooled investment vehicles attentive to their traditional compliance responsibilities will need to take steps or alter their business practices in such a way that will require them to incur new or additional costs as a result of the adoption of the rule.

---

material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to [the Investment Company Act] . . . . "

[47]   <u>See, e.g.</u>, 18 U.S.C. 1341 (Frauds and Swindles) and 18 U.S.C. 1343 (Fraud by wire, radio, or television) which make it a criminal offense to use the mails or to communicate by means of wire, having devised a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, and 18 U.S.C. 1957 (Engaging in monetary transactions in property derived from specified unlawful activity) which makes it a criminal racketeering offense to engage or attempt to engage in a transaction in criminally derived property of a value greater than $10,000.

[48]   <u>See, e.g.</u>, <u>Metro Communications Corp. BVI v. Advanced Mobilecomm Technologies</u>, 854 A.2d 121, 156 (Del. Ch. 2004) (court held that plaintiff-former member of LLC had sufficiently alleged a common law fraud claim based on allegation that a series of reports by LLC's managers contained misleading statements; court stated that "[i]n the usual fraud case, the speaking party who is subject to an accusation on the opposite side of a commercial transaction from the plaintiff, who alleges that but for the material misstatements or omissions of the speaking party he would not have contracted with the speaking party").

17

We also recognize that the rule may cause some advisers to pay more attention to the information they present to better guard against making an untrue or misleading statement to an investor or prospective investor and to reevaluate measures that are intended to prevent fraud. As a consequence, some advisers might seek guidance, legal or otherwise, and more closely review the information that they disseminate to investors and prospective investors and the antifraud related policies and procedures they have implemented.  While increased concern about making false statements or committing fraud could be attributable to the new rule, advisers should already be incurring these costs to ensure truthfulness and prevent fraud, regardless of the rule, because of the myriad of laws or regulations that may already apply.

The principal benefit of the rule is that it clearly enables the Commission to bring enforcement actions under the Advisers Act, if an adviser to a pooled investment vehicle disseminates false or misleading information to investors or prospective investors or otherwise commits fraud with respect to any investor or prospective investor.  As noted above, the existing antifraud provisions may not be available to us in all cases.  Through our enforcement actions we are able to protect fund investor assets by stopping ongoing frauds,[49] barring persons that have committed certain specified violations or offenses from being associated with an investment adviser,[50] imposing penalties,[51] seeking court orders to protect fund assets,[52] and to order disgorgement of ill-gotten gains.[53]  Moreover, we believe that rule 206(4)-8 will deter advisers to pooled investment vehicles from engaging in fraudulent conduct with respect to investors in

---

[49]    See section 203(k) of the Advisers Act (Commission authority to issue cease and desist orders).

[50]    See section 203(f) of the Advisers Act (Commission authority to bar a person from being associated with an investment adviser).

[51]    See section 203(i) of the Advisers Act (Commission authority to impose civil penalties).

[52]    See section 209(d) of the Advisers Act (Commission authority to seek injunctions and restraining orders in federal court).

[53]    See section 203(j) of the Advisers Act (Commission authority to order disgorgement).

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 11/09/22    Page 127 of 280    PageID 169
Document    Page 169 of 322

18

those pools and will provide investors with greater confidence when investing in pooled investment vehicles.

## V.       REGULATORY FLEXIBILITY ACT ANALYSIS

The Commission certified, pursuant to section 605(b) of the Regulatory Flexibility Act, that rule 206(4)-8 will not have a significant economic impact on a substantial number of small entities.[54]  This certification was included in the Proposing Release.[55]  While we encouraged written comment regarding this certification, none of the commenters responded to this request.

## VI.      STATUTORY AUTHORITY

We are adopting new rule 206(4)-8 pursuant to our authority set forth in sections 206(4) and 211(a) of the Advisers Act (15 U.S.C. 80b-6(4) and 80b-11(a)).

**List of Subjects**

**17 CFR Part 275**

Reporting and recordkeeping requirements, Securities.

## VII.     TEXT OF RULES

For the reasons set out in the preamble, Title 17, Chapter II of the Code of Federal Regulations is amended as follows:

**PART 275 – RULES AND REGULATIONS, INVESTMENT ADVISERS ACT OF 1940**

1.       The authority citation for Part 275 continues to read in part as follows:

Authority: 15 U.S.C. 80b-2(a)(11)(F), 80b-2(a)(17), 80b-3, 80b-4, 80b-4a, 80b-6(4), 80b-6a, and 80b-11, unless otherwise noted.

*       *       *       *       *

---

[54]        5 U.S.C. 605(b).

[55]        Section VII.A of the Proposing Release, supra note 2.

19

2.        Section 275.206(4)-8 is added to read as follows:

**§206(4)-8  Pooled investment vehicles.**

(a)        <u>Prohibition</u>.  It shall constitute a fraudulent, deceptive, or manipulative act,

practice, or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b-

6(4)) for any investment adviser to a pooled investment vehicle to:

(1)        Make any untrue statement of a material fact or to omit to state a material fact

necessary to make the statements made, in the light of the circumstances under which they were

made, not misleading, to any investor or prospective investor in the pooled investment vehicle;

or

(2)        Otherwise engage in any act, practice, or course of business that is fraudulent,

deceptive, or manipulative with respect to any investor or prospective investor in the pooled

investment vehicle.

(b)        <u>Definition</u>.  For purposes of this section "pooled investment vehicle" means any

investment company as defined in section 3(a) of the Investment Company Act of 1940 (15

U.S.C. 80a-3(a)) or any company that would be an investment company under section 3(a) of

that Act but for the exclusion provided from that definition by either section 3(c)(1) or section

3(c)(7) of that Act (15 U.S.C. 80a-3(c)(1) or (7)).


By the Commission.


                                        Nancy M. Morris
                                        Secretary


August 3, 2007


**Appx. 00125**

# EXHIBIT 3

## SECOND AMENDED AND RESTATED
## INVESTMENT ADVISORY AGREEMENT

THIS SECOND AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "*Agreement*"), dated to be effective from January 1, 2017 (the "*Effective Date*") is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "*Fund*"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "*General Partner*"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "*Investment Advisor*"). Each of the signatories hereto is sometimes referred to herein individually as a "*Party*" and collectively as the "*Parties*."

## RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor entered into that certain Investment Advisory Agreement dated January 1, 2012 (the "*Original Agreement*");

WHEREAS, the Parties amended and restated the Original Agreement in its entirety on the terms set forth in that certain Amended and Restated Investment Advisory Agreement dated July 1, 2014 (the "*Existing Agreement*");

WHEREAS, the parties desire to amend and restate the Existing Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree, and the Existing Agreement is hereby amended and restated in its entirety, as follows:

1.      <u>Investment Advisory Services</u>.   Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2.      <u>Custody</u>.  The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian"). The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the Financial Instruments.  The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

3.     <u>Authority of the Investment Advisor</u>.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

(a)     investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

(b)     engaging in such other lawful Financial Instruments transactions;

(c)     research and analysis;

(d)     purchasing Financial Instruments and holding them for investment;

(e)     entering into contracts for or in connection with investments in Financial Instruments;

(f)     investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

2

(g)    possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)    lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)    opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)    opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)    combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("*Other Accounts*") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)    entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)    organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)    causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)    engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)    voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.    <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)    to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)    to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)    to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)    to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)    to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

5.    <u>Valuation of Financial Instruments</u>.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6.    <u>Status of the Investment Advisor</u>.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

4

7.    <u>Investments</u>.  ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.    <u>Reimbursement by the General Partner</u>.  The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "*Sub-Advisor*"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; *provided, however*, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

9.    <u>Expenses</u>.

(a)    The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

(b)     To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

10.     <u>Fees</u>.

(a)     The Fund shall pay the Investment Advisor a quarterly fee (the "***Management Fee***") equal to 2.0% per annum (0.5% per quarter) of the Net Assets (as defined below) of the Fund, payable in advance at and calculated as of the first business day of each calendar quarter.  For purposes of calculating the Management Fee, the Net Assets of the Fund will be determined before giving effect to any of the following amounts payable by the Fund generally or in respect of any Investment which are effective as of the date on which such determination is made: (i) any fee payable to the Investment Advisor as of the date on which such determination is made; (ii) any capital withdrawals or distributions payable by the Fund which are effective as of the date on which such determination is made; and (iii) withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdback or other amounts specially allocated ending as of the date on which such determination is made.  The Management Fee shall be prorated for partial periods and any applicable excess fees should be returned to the Fund by the Investment Advisor.  Capital contributions made to the Fund after the commencement of a calendar quarter shall be subject to a prorated Management Fee based on the number of days remaining during such quarter.

(b)     Subject to clauses (c) and (d) below, at the end of each Calculation Period (as defined below), an amount equal to 20% of the net capital appreciation of the Fund's Investments (as defined below) after deducting the Management Fee shall be paid to the Investment Advisor (the "***Performance Fee***"); *provided*, *however*, that the net capital appreciation upon which the calculation of the Performance is based shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (as defined below) maintained on the books and records of the Fund. The amount of the unrecovered balance remaining in the Loss Recovery Account at the time of calculating the Performance Fee shall be the amount existing immediately prior to its reduction pursuant to the second clause of the second sentence of clause (c) below.

(c)     There shall be established on the books of the Fund a memorandum account (the "***Loss Recovery Account***"), the opening balance of which shall be zero.  At the end of each Calculation Period, the balance in the Loss Recovery Account shall be adjusted as follows: first, if there has been, in the aggregate, net capital depreciation of the Fund's Investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period (or with respect to the initial Calculation Period, since the Effective Date), an amount equal to such net capital depreciation shall be credited to the Loss Recovery Account, and, second, if there has been, in the aggregate, net capital appreciation of the Fund's investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period, an amount equal to such net capital appreciation, before taking into account any Performance Fee to be paid to the Investment Advisor, shall be debited to and reduce any unrecovered balance in the Loss Recovery Account, but not below zero. Solely for purposes of this paragraph, in determining the Loss Recovery Account, net capital appreciation and net capital

6

depreciation for any applicable Calculation Period shall be calculated by taking into account the amount of the Management Fee paid for such period.

(d)      In the event that all or a portion of the Fund's capital is distributed or withdrawn while there exists an unrecovered balance in the Loss Recovery Account, the unrecovered balance in the Loss Recovery Account shall be reduced as of the beginning of the next Calculation Period by an amount equal to the product obtained by multiplying the balance in such Loss Recovery Account by a fraction, the numerator of which is the amount distributed or withdrawn with respect to the immediately preceding distribution or withdrawal date, and the denominator of which is the total fair value of the Fund's Investment immediately prior to such distribution or withdrawal.

(e)      For purposes of this Section 10, the net capital appreciation and net capital depreciation of the Fund's Investments for any given period will be calculation in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided upon the General Partner's request.  As soon as reasonably practicable following the end of a Calculation Period, the Investment Advisor shall deliver, or cause to be delivered, to the General Partner a statement showing the calculation of the Performance Fee, if any, with respect to such Calculation Period.  The Performance Fee, if any, shall be payable within three (3) business days of the General Partner's receipt of such statement.

(f)      Payments due to the Investment Advisor shall be made by wire transfer to:

| | |
|---|---|
| Bank Name: | Compass Bank |
| ABA#: | 113010547 |
| FBO: | Highland Capital Management, L.P. (Master Operating Account) |
| Acct#: | 0025876342 |

(g)      For purposes of this Section 10, the following terms have the definitions set forth below:

"*Calculation Period*" means the period commencing on the Effective Date (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period, and ending as of the close of business on the first to occur of the following: (i) the last day of a calendar year; (ii) the distribution or withdrawal of capital of the Fund (but only with respect to such distributed or withdrawn amount); (iii) the permitted transfer of all or any portion of a partner's interest in the Fund; and (iv) the final capital distribution of the Fund following its dissolution;

"*Investments*" means all investments, securities, cash, receivables, financial instruments, contracts and other assets, whether tangible or intangible, owned by the Fund;

7

**Appx. 00133**

"*Net Assets*" means, with respect to the Fund as of any date, the excess of the total fair value of all Investments over the total liabilities, debts and obligations of the Fund, in each case, calculated on an accrual basis in accordance with accounting principles generally accepted in the United States and the then current valuation policy of the Service Provider, a copy of which will be provided to the General Partner upon request;  and

"*Services Agreement*" means that certain Second Amended and Restated Service Agreement, dated effective as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

11. Exculpation; Indemnification.

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "*Covered Person*" and collectively, "*Covered Persons*") shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "*Indemnified*

8

*Party*"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence. As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment

9

Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct, fraud or gross negligence or the ability to waive or limit such Losses under applicable law. Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements. Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

12. <u>Activities of the Investment Advisor and Others</u>. The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund. Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate. In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund. The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar. The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager. Each of the General Partner and the Fund acknowledges that it has received, reviewed and had an opportunity with respect to (a) a copy of Part 2 of the Investment Advisor's Form ADV, and (b) the supplemental disclosures attached hereto as <u>Exhibit A</u>, each of which further describes conflicts of interest relating to the Investment Advisor, its affiliates and their respective advised accounts.

13. <u>Term</u>. This Agreement shall remain in effect through an initial term concluding December 31, 2017 and shall be automatically extended for additional one-year terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

14. <u>Miscellaneous</u>.

(a) <u>Notices</u>. Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

If to the Investment Advisor, to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Telephone Number:  (972) 628-4100
Facsimile Number:  (972) 628-4147

If to the General Partner or the Fund, to:

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention:  Grant Scott
Telephone Number:  (919) 854-1407
Facsimile Number:  (919) 854-1401

(b)  <u>Entire Agreement</u>.  This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c)  <u>Amendments and Waivers</u>.  No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties.  No amendment to this Agreement may be made without first obtaining the required approval from the Fund.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)  <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns.  Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent.  No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; <u>provided</u>; <u>however</u>, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e)  <u>Governing Law</u>.  Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

(f)      <u>Jurisdiction; Venue; Waiver of Jury Trial</u>.  The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("**_Dispute_**") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("**_Enforcement Court_**").  Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court.  Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court.  Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g)      <u>Headings</u>.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)      <u>Counterparts</u>.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)      <u>Survival</u>.  The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j)      <u>Pronouns.</u>  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

12

(k)      <u>Arm's-Length Agreement</u>.  The General Partner and the Fund have approved this Agreement and reviewed the activities described in Section 12 and in the Investment Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

13

**Appx. 00139**

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:  6/21/17


CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:


CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general partner

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:


14

Appx. 00140

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:

CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date: 6/21/2017

CHARITABLE DAF FUND, L.P.

By:   Charitable DAF GP, LLC, its general partner

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date: 6/21/2017

14

Appx. 00141

**EXHIBIT A**

**Supplemental Disclosures**

**Potential Conflicts of Interest**

The scope of the activities of Highland Capital Management, L.P. (the "***Investment Adviser***"), its affiliates, and the funds and clients managed or advised by the Investment Adviser or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on Charitable DAF Fund, L.P. and its subsidiaries (collectively, the "***Fund***") in the future that cannot be foreseen or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts. Additional conflicts are described in the Investment Adviser's Form ADV. You are urged to review the Investment Adviser's Form ADV in its entirety prior to investing in the Fund.[1]

*Highland Group & Highland Accounts.* None of the Investment Adviser, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "***Highland Group***") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Adviser is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Adviser or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations and collateralized loan obligations that invest in leveraged loans (collectively, "***CDOs***") and other vehicles managed by members of the Highland Group (collectively, "***Highland Accounts***") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Adviser may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Adviser has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the

---

[1] The Investment Adviser's latest Form ADV filed and Part 2 Brochures can be accessed here: https://adviserinfo.sec.gov/IAPD/IAPDFirmSummary.aspx?ORG_PK=110126

Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained by the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Adviser will devote to the Fund only as much time as the Investment Adviser deems necessary and appropriate to manage the Fund's business.

The Investment Adviser undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities.* It is the policy of the Investment Adviser to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Adviser has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order for any accounts cannot be fully allocated under prevailing market conditions, the Investment Adviser may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Adviser will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the U.S. Investment Advisers Act of 1940, as amended. The Investment Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all investment opportunities that are suitable for it.

The Investment Adviser and/or its affiliates may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day for the Fund, the Highland Accounts or affiliates of the Investment Adviser are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Highland Group Trading.*  As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types. The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets oriented investment activities. The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest. In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund. In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund. The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund. In addition, in managing the Fund's portfolio, the Investment Adviser may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Adviser in accordance with its fiduciary duties to its other clients, the Investment Adviser may take, or be required to take, actions which adversely affect the interests of the Fund.

The Highland Group has invested and may continue to invest in investments that would also be appropriate for the Fund. Such investments may be different from those made by the Fund. The Highland Group does not have any duty, in making or maintaining such investments, to act in a way that is favorable to the Fund or to offer any such opportunity to the Fund, subject to the Investment Adviser's internal allocation policy. The investment policies, fee arrangements and other circumstances applicable to such other accounts and investments may vary from those applicable to the Fund and its investments. The Highland Group may also provide advisory or other services for a customary fee with respect to investments made or held by the Fund, and neither the Fund nor its investors shall have any right to such fees. The Highland Group may also have ongoing relationships with, render services to or engage in transactions with other clients who make investments of a similar nature to those of the Fund, and with companies whose securities or properties are acquired by the Fund.

As further described below, in connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Adviser to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Adviser's inability to use such information for

advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Adviser will devote as much time to the Fund as the Investment Adviser deems appropriate to perform its duties in accordance with the Fund's advisory agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Adviser's other accounts.

*Various Activities of the Investment Adviser and its Affiliates*.  The directors, officers, personnel, employees and agents of the Investment Adviser and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories or provide banking, agency, insurance and/or other services, and receive arm's length fees in connection with such services, for the Fund or its investments or other entities that operate in the same or a related line of business as the, for other clients managed by the Investment Adviser or its affiliates, or for any obligor or issuer in respect of the CDOs, and the Fund shall have no right to any such fees.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund.  The Fund may compete with other Highland Accounts for capital and investment opportunities.

There is no limitation or restriction on the Investment Adviser or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Investment Adviser's investment committee, the Investment Adviser or its affiliates have to other clients.

The Investment Adviser and its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout of an investment of the Fund or another account.  In such circumstances, the Investment Adviser or its affiliates may take positions on behalf of themselves or another account that are adverse to the interests of the Fund.

The Investment Adviser and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CDOs, Highland Accounts and other investments purchased by the Fund. Such transactions shall be subject to fees that are intended to be no greater than arm's-length fees, and the Fund shall have no right to any such fees. There is no expectation for preferential access to transactions involving CDOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Adviser and/or its affiliates and the Fund shall not have any right to any such fees.

*Investments in Highland Accounts Managed by the Investment Manager or its Affiliates*.  The Fund may invest a significant portion of its capital in Highland Accounts.  The Investment Adviser or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Highland Accounts.  If the Fund invests in Highland Accounts in secondary transactions, the Fund will indirectly pay the fees (senior and subordinated) of such Highland Accounts and any

carried interest. If the Fund provides all of the equity for a Highland Account, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis. The Investment Adviser or its affiliates will have conflicting division of loyalties and responsibilities regarding the Fund and a Highland Account, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Fund would not be subordinated to those of a Highland Account or to other interests of the Investment Adviser.

*Multiple Levels of Fees*. The Investment Adviser and the Highland Accounts are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if investors in the Fund were able to invest directly in the Highland Accounts or their respective underlying investments. Investors in the Fund should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a Highland Account may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees).

*Cross Transactions and Principal Transactions.* The Investment Adviser may effect client cross-transactions where the Investment Adviser causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates. The Investment Adviser may engage in a client cross-transaction involving the Fund any time that the Investment Adviser believes such transaction to be fair to the Fund and such other client.

The Investment Adviser may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Adviser and/or its affiliates, in each case in accordance with applicable law, which will include the Investment Adviser obtaining independent consent on behalf of the Fund prior to engaging in any such principal transaction between the Fund and the Investment Adviser or its affiliates.

The Investment Adviser may advise the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Fund may invest in securities of obligors or issuers in which the Investment Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Adviser's own investments in such companies. Moreover, the Fund may invest in assets originated by the Investment Adviser or its affiliates. In each such case, the Investment Adviser and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Fund and the other parties to such trade. Under certain circumstances, the Investment Adviser and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Adviser's valuation procedures to another client managed or advised by the Investment Adviser or such affiliates. In addition, the Investment Adviser may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law. The Investment Adviser may obtain independent consent

in writing on behalf of the Fund, which consent may be provided by the managing member of the General Partner or any other independent party on behalf of the Fund, if any such transaction requires the consent of the Fund under Section 206(3) of the U.S. Investment Advisers Act of 1940, as amended.

*Material Non-Public Information*. There are generally no ethical screens or information barriers among the Investment Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Investment Adviser, any of its personnel or its affiliates were to receive material non-public information about a particular obligor or issuer, or have an interest in causing the Fund to acquire a particular security, the Investment Adviser may be prevented from advising the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material nonpublic information, it is possible that such controls could fail and result in the Investment Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material nonpublic information could have adverse effects on the Investment Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Adviser's ability to perform its portfolio management services to the Fund. In addition, while the Investment Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Investment Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Investment Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

*Conflicts Relating to Equity and Debt Ownership by the Fund and Affiliates*. In certain circumstances, the Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Adviser to reconcile the conflicting interests in the Fund and such other accounts in a way that protects the Fund's interests. Additionally, the Investment Adviser or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Adviser in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Adviser's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Other Fees*. The Investment Adviser and its affiliates are permitted to receive consulting fees, investment banking fees, advisory fees, breakup fees, director's fees, closing fees, transaction fees and similar fees in connection with actual or contemplated investments. Such fees will not reduce

or offset the Management Fee.  Conflicts of interest may also arise due to the allocation of such fees to or among co-investors.

*Soft Dollars*.  The Investment Adviser's authority to use "soft dollar" credits generated by the Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Adviser may give the Investment Adviser an incentive to select brokers or dealers for transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Adviser rather than giving exclusive consideration to the interests of the Fund.

# EXHIBIT 4

*Conformed to Federal Register version*

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 276**

**[Release No. IA-5248; File No. S7-07-18]**

**RIN: 3235-AM36**

**Commission Interpretation Regarding Standard of Conduct for Investment Advisers**

**AGENCY:**  Securities and Exchange Commission.

**ACTION:**  Interpretation.

**SUMMARY:**  The Securities and Exchange Commission (the "SEC" or the "Commission") is publishing an interpretation of the standard of conduct for investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act" or the "Act").

**DATES:**  Effective July 12, 2019.

**FOR FURTHER INFORMATION CONTACT:**  Olawalé Oriola, Senior Counsel; Matthew Cook, Senior Counsel; or Jennifer Songer, Branch Chief, at (202) 551-6787 or *IArules@sec.gov*, Investment Adviser Regulation Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549-8549.

**SUPPLEMENTARY INFORMATION:**  The Commission is publishing an interpretation of the standard of conduct for investment advisers under the Advisers Act [15 U.S.C. 80b].[1]

---

[1]      15 U.S.C. 80b.  Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified, and when we refer to rules under the Advisers Act, or any paragraph of these rules, we are referring to title 17, part 275 of the Code of Federal Regulations [17 CFR 275], in which these rules are published.

# TABLE OF CONTENTS

I.   INTRODUCTION

    A.     Overview of Comments

II.  INVESTMENT ADVISERS' FIDUCIARY DUTY

    A.     Application of Duty Determined by Scope of Relationship

    B.     Duty of Care

          1.     *Duty to Provide Advice that is in the Best Interest of the Client*

          2.     *Duty to Seek Best Execution*

          3.     *Duty to Provide Advice and Monitoring over the Course of the Relationship*

    C.     Duty of Loyalty

III. ECONOMIC CONSIDERATIONS

    A.     Background

    B.     Potential Economic Effects

## I.   INTRODUCTION

Under federal law, an investment adviser is a fiduciary.[2]  The fiduciary duty an investment adviser owes to its client under the Advisers Act, which comprises a duty of care and a duty of loyalty, is important to the Commission's investor protection efforts.  Also important to the Commission's investor protection efforts is the standard of conduct that a broker-dealer owes to a retail customer when it makes a recommendation of any securities transaction or investment strategy involving securities.[3]  Both investment advisers and broker-dealers play an important

---

[2]    *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) ("SEC v. Capital Gains"); *see also infra* footnotes 34–44 and accompanying text; Investment Adviser Codes of Ethics, Investment Advisers Act Release No. 2256 (July 2, 2004); Compliance Programs of Investment Companies and Investment Advisers, Investment Advisers Act Release No. 2204 (Dec. 17, 2003); Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5, 2000).  Investment advisers also have antifraud liability with respect to prospective clients under section 206 of the Advisers Act.

[3]    *See* Regulation Best Interest, Exchange Act Release No. 34-86031 (June 5, 2019) ("Reg. BI Adoption"). This final interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Final Interpretation") interprets section 206 of the Advisers Act, which is applicable to both SEC- and

role in our capital markets and our economy more broadly.  Investment advisers and broker-dealers have different types of relationships with investors, offer different services, and have different compensation models.  This variety is important because it presents investors with choices regarding the types of relationships they can have, the services they can receive, and how they can pay for those services.

On April 18, 2018, the Commission proposed rules and forms intended to enhance the required standard of conduct for broker-dealers[4] and provide retail investors with clear and succinct information regarding the key aspects of their brokerage and advisory relationships.[5]  In connection with the publication of these proposals, the Commission published for comment a separate proposed interpretation regarding the standard of conduct for investment advisers under the Advisers Act ("Proposed Interpretation").[6]  We stated in the Proposed Interpretation, and we continue to believe, that it is appropriate and beneficial to address in one release and reaffirm—and in some cases clarify—certain aspects of the fiduciary duty that an investment adviser owes

---

state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act.  This Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty.  It is not, however, intended to be the exclusive resource for understanding these principles.  Separately, in various circumstances, case law, statutes (such as the Employee Retirement Income Security Act of 1974 ("ERISA")), and state law impose obligations on investment advisers.  In some cases, these standards may differ from the standard enforced by the Commission.

[4]     Regulation Best Interest, Exchange Act Release No. 83062 (Apr. 18, 2018) ("Reg. BI Proposal").

[5]     Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 4888 (Apr. 18, 2018) ("Relationship Summary Proposal").

[6]     Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation, Investment Advisers Act Release No. 4889 (Apr. 18, 2018).

3

to its clients under section 206 of the Advisers Act.[7]  After considering the comments received, we are publishing this Final Interpretation with some clarifications to address comments.[8]

### A.    Overview of Comments

We received over 150 comment letters on our Proposed Interpretation from individuals, investment advisers, trade or professional organizations, law firms, consumer advocacy groups, and bar associations.[9]  Although many commenters generally agreed that the Proposed Interpretation was useful,[10] some noted the challenges inherent in a Commission interpretation covering the broad scope of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act.[11]  Some of these commenters suggested modifications to or withdrawal

---

[7]      Further, the Commission recognizes that many advisers provide impersonal investment advice.  *See, e.g.*, Advisers Act rule 203A-3 (defining "impersonal investment advice" in the context of defining "investment adviser representative" as "investment advisory services provided by means of written material or oral statements that do not purport to meet the objectives or needs of specific individuals or accounts").  This Final Interpretation does not address the extent to which the Advisers Act applies to different types of impersonal investment advice.

[8]      In the Proposed Interpretation, the Commission also requested comment on: licensing and continuing education requirements for personnel of SEC-registered investment advisers; delivery of account statements to clients with investment advisory accounts; and financial responsibility requirements for SEC-registered investment advisers, including fidelity bonds.  We are continuing to evaluate the comments received in response.

[9]      Comment letters submitted in File No. S7-09-18 are available on the Commission's website at https://www.sec.gov/comments/s7-09-18/s70918.htm.  We also considered those comments submitted in File No. S7-08-18 (Comments on Relationship Summary Proposal) and File No. S7-07-18 (Comments on Reg. BI Proposal).  Those comments are available on the Commission's website at https://www.sec.gov/comments/s7-08-18/s70818.htm and https://www.sec.gov/comments/s7-07-18/s70718.htm.

[10]     *See, e.g.*, Comment Letter of North American Securities Administrators Association (Aug. 23, 2018) ("NASAA Letter") (stating that the Proposed Interpretation is a "useful resource"); Comment Letter of Invesco (Aug. 7, 2018) ("Invesco Letter") (agreeing that "there are benefits to having a clear statement regarding the fiduciary duty that applies to an investment adviser").

[11]     *See, e.g.*, Comment Letter of Pickard Djinis and Pisarri LLP (Aug. 7, 2018) ("Pickard Letter") (noting the Commission's "efforts to synthesize case law, legislative history, academic literature, prior Commission releases and other sources to produce a comprehensive explanation of the fiduciary standard of conduct"); Comment Letter of Dechert LLP (Aug. 7, 2018) ("Dechert Letter") ("It is crucial that any universal interpretation of an adviser's fiduciary duty be based on sound and time-tested principles.  Given the difficulty of defining and encompassing all of an adviser's responsibilities to its clients, while also accommodating the diversity of advisory arrangements, interpretive issues will arise in the future."); Comment Letter of the Hedge Funds Subcommittee of the Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association (Aug. 24, 2018) ("ABA Letter") ("We note at

4

of the Proposed Interpretation.[12]  Although most commenters agreed that an investment adviser's

fiduciary duty comprises a duty of care and a duty of loyalty, as described in the Proposed

Interpretation, they had differing views on aspects of the fiduciary duty and in some cases sought

clarification on its application.[13]

Some commenters requested that we adopt rule text instead.[14]  The relationship between

an investment adviser and its client has long been based on fiduciary principles not generally set

forth in specific statute or rule text.  We believe that this principles-based approach should

continue as it expresses broadly the standard to which investment advisers are held while

allowing them flexibility to meet that standard in the context of their specific services.  In our

view, adopting rule text is not necessary to achieve our goal in this Final Interpretation of

reaffirming and in some cases clarifying certain aspects of the fiduciary duty.

---

the outset that it is difficult to capture the nature of an investment adviser's fiduciary duty in a broad
statement that has universal applicability.").

[12]  *See, e.g.*, Comment Letter of L.A. Schnase (Jul. 30, 2018) (urging the Commission not to issue the
Proposed Interpretation in final form, or at least not without substantial rewriting or reshaping); Comment
Letter of Money Management Institute (Aug. 7, 2018) ("MMI Letter") (urging the Commission to "revise
the interpretation so that it reflects the common law principles in which an investment adviser's fiduciary
duty is grounded"); Dechert Letter (recommending that we withdraw the Proposed Interpretation and
instead rely on existing authority and sources of law, as well as existing Commission practices for
providing interpretive guidance, in order to define the source and scope of an investment adviser's
fiduciary duty).

[13]  *See, e.g.*, Comment Letter of Cambridge Investment Research Inc. (Aug. 7, 2018) ("Cambridge Letter")
(stating that "greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability
to craft such policies and procedures, as well as support the elimination of confusion for retail clients and
investment professionals"); Comment Letter of Institutional Limited Partners Association (Aug. 6, 2018)
("ILPA Letter 1") ("Interpretation will provide more certainty regarding the fiduciary duties owed by
private fund advisers to their clients."); Comment Letter of New York City Bar Association (Jun. 26, 2018)
("NY City Bar Letter") (stating that the uniform interpretation of an investment adviser's fiduciary duty is
necessary).

[14]  Some commenters suggested that we codify the Proposed Interpretation.  *See, e.g.,* Comment Letter of Roy
Tanga (Apr. 25, 2018); Comment Letter of Financial Engines (Aug. 6, 2018) ("Financial Engines Letter");
ILPA Letter 1; Comment Letter of AARP (Aug. 7, 2018) ("AARP Letter"); Comment Letter of Gordon
Donohue (Aug. 6, 2018); Comment Letter of Financial Planning Coalition (Aug. 7, 2018) ("FPC Letter").

## II.  INVESTMENT ADVISERS' FIDUCIARY DUTY

The Advisers Act establishes a federal fiduciary duty for investment advisers.[15]  This

fiduciary duty is based on equitable common law principles and is fundamental to advisers'

relationships with their clients under the Advisers Act.[16]  The investment adviser's fiduciary duty

is broad and applies to the entire adviser-client relationship.[17]  The fiduciary duty to which

advisers are subject is not specifically defined in the Advisers Act or in Commission rules, but

reflects a Congressional recognition "of the delicate fiduciary nature of an investment advisory

relationship" as well as a Congressional intent to "eliminate, or at least to expose, all conflicts of

interest which might incline an investment adviser—consciously or unconsciously—to render

advice which was not disinterested."[18]  An adviser's fiduciary duty is imposed under the

---

[15]     *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) ("Transamerica Mortgage v. Lewis") ("§ 206 establishes federal fiduciary standards to govern the conduct of investment advisers.") (quotation marks omitted); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing SEC v. Capital Gains, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); SEC v. Capital Gains, *supra* footnote 2; Amendments to Form ADV, Investment Advisers Act Release No. 3060 (July 28, 2010) ("Investment Advisers Act Release 3060") ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003) ("Investment Advisers Act Release 2106")).

[16]     *See* SEC v. Capital Gains, *supra* footnote 2 (discussing the history of the Advisers Act, and how equitable principles influenced the common law of fraud and changed the suits brought against a fiduciary, "which Congress recognized the investment adviser to be").

[17]     The Commission has previously recognized the broad scope of section 206 of the Advisers Act in a variety of contexts.  *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15; Timbervest, LLC, et al., Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) (" [O]nce an investment advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the advisory relationship."); *see also SEC v. Lauer,* 2008 WL 4372896, at 24 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'"); Thomas P. Lemke & Gerald T. Lins, Regulation of Investment Advisers (2013 ed.), at § 2:30 ("[T]he SEC has … applied [sections 206(1) and 206(2)] where fraud arose from an investment advisory relationship, even though the wrongdoing did not specifically involve securities.").

[18]     *See* SEC v. Capital Gains, *supra* footnote 2; *see also* In the Matter of Arleen W. Hughes, Exchange Act Release No. 4048 (Feb. 18, 1948) ("Arleen Hughes") (Commission Opinion) (discussing the relationship of

Advisers Act in recognition of the nature of the relationship between an investment adviser and a

client and the desire "so far as is presently practicable to eliminate the abuses" that led to the

enactment of the Advisers Act.[19]  It is made enforceable by the antifraud provisions of the

Advisers Act.[20]

    An investment adviser's fiduciary duty under the Advisers Act comprises a duty of care

and a duty of loyalty.[21]  This fiduciary duty requires an adviser "to adopt the principal's goals,

---

    trust and confidence between the client and a dual registrant and stating that the registrant was a fiduciary and subject to liability under the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934).

[19]   *See* SEC v. Capital Gains, *supra* footnote 2 (noting that the "declaration of policy" in the original bill, which became the Advisers Act, declared that "the national public interest and the interest of investors are adversely affected … when the business of investment advisers is so conducted as to defraud or mislead investors, or to enable such advisers to relieve themselves of their fiduciary obligations to their clients.  It is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, *are to mitigate and, so far as is presently practicable to eliminate* the abuses enumerated in this section") (citing S. 3580, 76th Cong., 3d Sess., § 202 and Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28) (emphasis added).

[20]   *Id.*; Transamerica Mortgage v. Lewis, *supra* footnote 15 ("[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations.").  Some commenters questioned the standard to which the Advisers Act holds investment advisers.  *See, e.g.,* Comment Letter of Stark & Stark, PC (undated) ("The duty of care at common law and under the Advisers Act only requires that advisers not be negligent in performing their duties.") (internal citation omitted); Comment Letter of Institutional Limited Partners Association (Nov. 21, 2018) ("ILPA Letter 2") ("The Advisers Act standard is a lower simple 'negligence' standard.").  Claims arising under Advisers Act section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence.  *Robare Group, Ltd., et al. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) ("Robare v. SEC"); *SEC v. Steadman*, 967 F.2d 636, 643, n.5 (D.C. Cir. 1992) (citing SEC v. Capital Gains, *supra* footnote 2) ("[A] violation of § 206(2) of the Investment Advisers Act may rest on a finding of simple negligence."); *SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009) ("the government need not show intent to make out a section 206(2) violation"); *SEC v. Gruss*, 859 F. Supp. 2d 653, 669 (S.D.N.Y. 2012) ("Claims arising under Section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence.").  However, claims arising under Advisers Act section 206(1) require scienter.  *See, e.g.,* Robare v. SEC; *SEC v. Moran*, 922 F. Supp. 867, 896 (S.D.N.Y. 1996*); Carroll v. Bear, Stearns & Co.*, 416 F. Supp. 998, 1001 (S.D.N.Y. 1976).

[21]   *See, e.g.*, Investment Advisers Act Release 2106, *supra* footnote 15.  These duties were generally recognized by commenters.  *See, e.g.*, Comment Letter of Consumer Federation of America (Aug. 7, 2018) ("CFA Letter"); Comment Letter of the Investment Adviser Association (Aug. 6, 2018) ("IAA Letter"); Comment Letter of Investments & Wealth Institute (Aug. 6, 2018); Comment Letter of Raymond James (Aug. 7, 2018); FPC Comment Letter.  *But see* Dechert Letter (questioning the sufficiency of support for a duty of care).

objectives, or ends."[22]  This means the adviser must, at all times, serve the best interest of its

client and not subordinate its client's interest to its own.  In other words, the investment adviser

cannot place its own interests ahead of the interests of its client.  This combination of care and

loyalty obligations has been characterized as requiring the investment adviser to act in the "best

interest" of its client at all times.[23]  In our view, an investment adviser's obligation to act in the

best interest of its client is an overarching principle that encompasses both the duty of care and

the duty of loyalty.  As discussed in more detail below, in our view, the duty of care requires an

investment adviser to provide investment advice in the best interest of its client, based on the

client's objectives.  Under its duty of loyalty, an investment adviser must eliminate or make full

and fair disclosure of all conflicts of interest which might incline an investment adviser—

consciously or unconsciously—to render advice which is not disinterested such that a client can

provide informed consent to the conflict.[24]  We believe this is another part of an investment

adviser's obligation to act in the best interest of its client.

### A.  Application of Duty Determined by Scope of Relationship

An adviser's fiduciary duty is imposed under the Advisers Act in recognition of the

---

[22]   Arthur B. Laby, *The Fiduciary Obligations as the Adoption of Ends*, 56 Buffalo Law Review 99 (2008); *see also* Restatement (Third) of Agency, §2.02 Scope of Actual Authority (2006) (describing a fiduciary's authority in terms of the fiduciary's reasonable understanding of the principal's manifestations and objectives).

[23]   Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that "under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing Investment Advisers Act Release 2106, *supra* footnote 15).  *See SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) ("SEC v. Tambone") ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund…"); *SEC v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y 1996) ("SEC v. Moran") ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").  Although most commenters agreed that an adviser has an obligation to act in its client's best interest, some questioned whether the Proposed Interpretation appropriately considered the best interest obligation as part of the duty of care, or whether it instead should be considered part of the duty of loyalty.  *See, e.g.*, MMI Letter; Comment Letter of Investment Company Institute (Aug. 7, 2018) ("ICI Letter").

[24]   *See infra* footnotes 67-70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

8

nature of the relationship between an adviser and its client—a relationship of trust and

confidence.[25]  The adviser's fiduciary duty is principles-based and applies to the entire

relationship between the adviser and its client.  The fiduciary duty follows the contours of the

relationship between the adviser and its client, and the adviser and its client may shape that

relationship by agreement, provided that there is full and fair disclosure and informed consent.[26]

With regard to the scope of the adviser-client relationship, we recognize that investment advisers

provide a wide range of services, from a single financial plan for which a client may pay a one-

time fee, to ongoing portfolio management for which a client may pay a periodic fee based on

the value of assets in the portfolio.  Investment advisers also serve a large variety of clients, from

retail clients with limited assets and investment knowledge and experience to institutional clients

with very large portfolios and substantial knowledge, experience, and analytical resources.[27]  In

our experience, the principles-based fiduciary duty imposed by the Advisers Act has provided

sufficient flexibility to serve as an effective standard of conduct for investment advisers,

regardless of the services they provide or the types of clients they serve.

    Although all investment advisers owe each of their clients a fiduciary duty under the

Advisers Act, that fiduciary duty must be viewed in the context of the agreed-upon scope of the

---

[25]    *See, e.g.*, Hearings on S. 3580 before Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess. (leading investment advisers emphasized their relationship of "trust and confidence" with their clients); SEC v. Capital Gains, *supra* footnote 2 (citing same).

[26]    Several commenters asked that we clarify that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies through contract.  *See, e.g.*, MMI Letter; Financial Engines Letter; ABA Letter.

[27]    This Final Interpretation also applies to automated advisers, which are often colloquially referred to as "robo-advisers."  Automated advisers, like all SEC-registered investment advisers, are subject to all of the requirements of the Advisers Act, including the requirement that they provide advice consistent with the fiduciary duty they owe to their clients.  *See* Division of Investment Management, Robo Advisers, IM Guidance Update No. 2017-02 (Feb. 2017), *available at* https://www.sec.gov/investment/im-guidance-2017-02.pdf (describing Commission staff's guidance as to three distinct areas under the Advisers Act that automated advisers should consider, due to the nature of their business model, in seeking to comply with their obligations under the Advisers Act).

relationship between the adviser and the client.  In particular, the specific obligations that flow

from the adviser's fiduciary duty depend upon what functions the adviser, as agent, has agreed to

assume for the client, its principal.  For example, the obligations of an adviser providing

comprehensive, discretionary advice in an ongoing relationship with a retail client (*e.g.*,

monitoring and periodically adjusting a portfolio of equity and fixed income investments with

limited restrictions on allocation) will be significantly different from the obligations of an

adviser to a registered investment company or private fund where the contract defines the scope

of the adviser's services and limitations on its authority with substantial specificity (*e.g.*, a

mandate to manage a fixed income portfolio subject to specified parameters, including

concentration limits and credit quality and maturity ranges).[28]

    While the application of the investment adviser's fiduciary duty will vary with the scope

of the relationship, the relationship in all cases remains that of a fiduciary to the client.  In other

words, an adviser's federal fiduciary duty may not be waived, though it will apply in a manner

that reflects the agreed-upon scope of the relationship.[29]  A contract provision purporting to

waive the adviser's federal fiduciary duty generally, such as (i) a statement that the adviser will

not act as a fiduciary, (ii) a blanket waiver of all conflicts of interest, or (iii) a waiver of any

---

[28]    *See, e.g., infra* text following footnote 35.

[29]    Because an adviser's federal fiduciary obligations are enforceable through section 206 of the Advisers Act, we would view a waiver of enforcement of section 206 as implicating section 215(a) of the Advisers Act, which provides that "any condition, stipulation or provision binding any person to waive compliance with any provision of this title. . . shall be void."  *See also* Restatement (Third) of Agency, § 8.06 Principal's Consent (2006) ("[T]he law applicable to relationships of agency as defined in § 1.01 imposes mandatory limits on the circumstances under which an agent may be empowered to take disloyal action.  These limits serve protective and cautionary purposes.  Thus, an agreement that contains general or broad language purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is not likely to be enforceable.  This is because a broadly sweeping release of an agent's fiduciary duty may not reflect an adequately informed judgment on the part of the principal; if effective, the release would expose the principal to the risk that the agent will exploit the agent's position in ways not foreseeable by the principal at the time the principal agreed to the release.  In contrast, when a principal consents to specific transactions or to specified types of conduct by the agent, the principal has a focused opportunity to assess risks that are more readily identifiable.").

specific obligation under the Advisers Act, would be inconsistent with the Advisers Act,[30]

regardless of the sophistication of the client.[31]

---

[30]    *See* sections 206 and 215(a).  Commenters generally agreed that a client cannot waive an investment adviser's fiduciary duty through agreement.  *See* Dechert Letter; Comment Letter of Ropes & Gray LLP (Aug. 7, 2018) ("Ropes & Gray Letter"), at n.20; *see also supra* footnote 29.  In the Proposed Interpretation, we stated that "the investment adviser cannot disclose or negotiate away, and the investor cannot waive, the federal fiduciary duty."  One commenter disputed this broad statement, believing that it called into question "the ability of an investment adviser and client to define the scope of the adviser's services and duties."  ABA Letter; *see also* Financial Engines Letter.  We have modified this statement to clarify that a general waiver of the fiduciary duty would violate that duty and to provide examples of such a general waiver.

[31]    Some commenters mentioned a 2007 No-Action Letter in which staff indicated that whether a clause in an advisory agreement that purports to limit an adviser's liability under that agreement (a so-called "hedge clause") would violate sections 206(1) and 206(2) of the Advisers Act depends on all of the surrounding facts and circumstances.  Heitman Capital Management, LLC, SEC Staff No-Action Letter (Feb. 12, 2007) ("Heitman Letter").  A few commenters indicated that the Heitman Letter expanded the ability of investment advisers to private funds, and potentially other sophisticated clients, to disclaim their fiduciary duties under state law in an advisory agreement.  *See, e.g.*, ILPA Letter 1; ILPA Letter 2.  The commenters' descriptions of the Heitman Letter suggest that it may have been applied incorrectly.  The Heitman Letter does not address the scope or substance of an adviser's federal fiduciary duty; rather, it addresses the extent to which hedge clauses may be misleading in violation of the Advisers Act's antifraud provisions.  Another commenter agreed with this reading of the Heitman Letter.  *See* Comment Letter of American Investment Council (Feb. 25, 2019).  In response to these comments, we express below the Commission's views about an adviser's obligations under sections 206(1) and 206(2) of the Advisers Act with respect to the use of hedge clauses.  Accordingly, because we are expressing our views in this Final Interpretation, the Heitman Letter is withdrawn.

This Final Interpretation makes clear that an adviser's federal fiduciary duty may not be waived, though its application may be shaped by agreement.  This Final Interpretation does not take a position on the scope or substance of any fiduciary duty that applies to an adviser under applicable state law.  *See supra* footnote 3.  The question of whether a hedge clause violates the Advisers Act's antifraud provisions depends on all of the surrounding facts and circumstances, including the particular circumstances of the client (*e.g.*, sophistication).  In our view, however, there are few (if any) circumstances in which a hedge clause in an agreement with a retail client would be consistent with those antifraud provisions, where the hedge clause purports to relieve the adviser from liability for conduct as to which the client has a non-waivable cause of action against the adviser provided by state or federal law.  Such a hedge clause generally is likely to mislead those retail clients into not exercising their legal rights, in violation of the antifraud provisions, even where the agreement otherwise specifies that the client may continue to retain its non-waivable rights.  Whether a hedge clause in an agreement with an institutional client would violate the Advisers Act's antifraud provisions will be determined based on the particular facts and circumstances.  To the extent that a hedge clause creates a conflict of interest between an adviser and its client, the adviser must address the conflict as required by its duty of loyalty.

11

### B. Duty of Care

As fiduciaries, investment advisers owe their clients a duty of care.[32]  The Commission

has discussed the duty of care and its components in a number of contexts.[33]  The duty of care

includes, among other things: (i) the duty to provide advice that is in the best interest of the

client, (ii) the duty to seek best execution of a client's transactions where the adviser has the

responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice

and monitoring over the course of the relationship.

### 1.  Duty to Provide Advice that is in the Best Interest of the Client

The duty of care includes a duty to provide investment advice that is in the best interest

of the client, including a duty to provide advice that is suitable for the client.[34]  In order to

---

[32]    *See* Investment Advisers Act Release 2106, *supra* footnote 15 (stating that under the Advisers Act, "an adviser is a fiduciary that owes each of its clients duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting," which is the subject of the release, and citing SEC v. Capital Gains *supra* footnote 2, to support this point).  This Final Interpretation does not address the specifics of how an investment adviser might satisfy its fiduciary duty when voting proxies.  *See also* Restatement (Third) of Agency, § 8.08 (discussing the duty of care that an agent owes its principal as a matter of common law); Tamar Frankel & Arthur B. Laby, The Regulation of Money Managers (updated 2017) ("Advice can be divided into three stages.  The first determines the needs of the particular client.  The second determines the portfolio strategy that would lead to meeting the client's needs.  The third relates to the choice of securities that the portfolio would contain.  The duty of care relates to each of the stages and depends on the depth or extent of the advisers' obligation towards their clients.").

[33]    *See, e.g.*, Suitability of Investment Advice Provided by Investment Advisers; Custodial Account Statements for Certain Advisory Clients, Investment Advisers Act Release No. 1406 (Mar. 16, 1994) ("Investment Advisers Act Release 1406") (stating that advisers have a duty of care and discussing advisers' suitability obligations); Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 23170 (Apr. 28, 1986) ("Exchange Act Release 23170") ("an adviser, as a fiduciary, owes its clients a duty of obtaining the best execution on securities transactions").  We highlight certain contexts, but not all, in which the Commission has addressed the duty of care.  *See, e.g.*, Investment Advisers Act Release 2106, *supra* footnote 15.

[34]    In 1994, the Commission proposed a rule that would have made express the fiduciary obligation of investment advisers to make only suitable recommendations to a client.  Investment Advisers Act Release 1406, *supra* footnote 33.  Although never adopted, the rule was designed, among other things, to reflect the Commission's interpretation of an adviser's *existing* suitability obligation under the Advisers Act.  In addition, we do not cite Investment Advisers Act Release 1406 as the source of authority for the view we express here, which at least one comment letter suggested, but cite it merely to show that the Commission has long held this view.  *See* Comment Letter of the Managed Funds Association and the Alternative Investment Management Association (Aug. 7, 2018) (indicating that the Commission's failure to adopt the proposed suitability rule means "investment advisers are not subject to an express 'suitability' standard

provide such advice, an adviser must have a reasonable understanding of the client's objectives.

The basis for such a reasonable understanding generally would include, for retail clients, an

understanding of the investment profile, or for institutional clients, an understanding of the

investment mandate.[35]  The duty to provide advice that is in the best interest of the client based

on a reasonable understanding of the client's objectives is a critical component of the duty of

care.

### *Reasonable Inquiry into Client's Objectives*

How an adviser develops a reasonable understanding will vary based on the specific facts

and circumstances, including the nature of the client, the scope of the adviser-client relationship,

and the nature and complexity of the anticipated investment advice.

In order to develop a reasonable understanding of a retail client's objectives, an adviser

should, at a minimum, make a reasonable inquiry into the client's financial situation, level of

financial sophistication, investment experience, and financial goals (which we refer to

collectively as the retail client's "investment profile").  For example, an adviser undertaking to

formulate a comprehensive financial plan for a retail client would generally need to obtain a

---

under existing regulation").  We believe that this obligation to make only suitable recommendations to a client is part of an adviser's fiduciary duty to act in the best interest of its client.  Accordingly, an adviser must provide investment advice that is suitable for its client in providing advice that is in the best interest of its client.  *See* SEC v. Tambone, *supra* footnote 23 ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund…."); SEC v. Moran*, supra* footnote 23 ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").

[35]  Several commenters stated that the duty to make a reasonable inquiry into a client's investment profile may not apply in the institutional client context.  *See, e.g.,* Comment Letter of BlackRock, Inc. (Aug. 7, 2018); Comment Letter of Teachers Insurance and Annuity Association of America (Aug. 7, 2018); Comment Letter of Allianz Global Investors U.S. LLC (Aug. 7, 2018) ("Allianz Letter"); Comment Letter of John Hancock Life Insurance Company (U.S.A.) (Aug. 3, 2018).  Accordingly, we are describing the duty as a duty to have a reasonable understanding of the client's objectives.  While not every client will have an investment profile, every client will have objectives.  For example, an institutional client's objectives may be ascertained through its investment mandate.

range of personal and financial information about the client such as current income, investments, assets and debts, marital status, tax status, insurance policies, and financial goals.[36]

In addition, it will generally be necessary for an adviser to a retail client to update the client's investment profile in order to maintain a reasonable understanding of the client's objectives and adjust the advice to reflect any changed circumstances.[37]  The frequency with which the adviser must update the client's investment profile in order to consider changes to any advice the adviser provides would itself turn on the facts and circumstances, including whether the adviser is aware of events that have occurred that could render inaccurate or incomplete the investment profile on which the adviser currently bases its advice.  For instance, in the case of a financial plan where the investment adviser also provides advice on an ongoing basis, a change in the relevant tax law or knowledge that the client has retired or experienced a change in marital status could trigger an obligation to make a new inquiry.

By contrast, in providing investment advice to institutional clients, the nature and extent of the reasonable inquiry into the client's objectives generally is shaped by the specific investment mandates from those clients.  For example, an investment adviser engaged to advise on an institutional client's investment grade bond portfolio would need to gain a reasonable understanding of the client's objectives within that bond portfolio, but not the client's objectives

---

[36]    Investment Advisers Act Release 1406, *supra* footnote 33.  After making a reasonable inquiry into the client's investment profile, it generally would be reasonable for an adviser to rely on information provided by the client (or the client's agent) regarding the client's financial circumstances, and an adviser should not be held to have given advice not in its client's best interest if it is later shown that the client had misled the adviser concerning the information on which the advice was based.

[37]    Such updating would not be needed with one-time investment advice.  In the Proposed Interpretation, we stated that an adviser "must" update a client's investment profile in order to adjust the advice to reflect any changed circumstances.  We believe that any obligation to update a client's investment profile, like the nature and extent of the reasonable inquiry into a retail client's objectives, turns on what is reasonable under the circumstances.  Accordingly, we have revised the wording of this statement in this Final Interpretation.

within its entire investment portfolio.  Similarly, an investment adviser whose client is a
registered investment company or a private fund would need to have a reasonable understanding
of the fund's investment guidelines and objectives.  For advisers acting on specific investment
mandates for institutional clients, particularly funds, we believe that the obligation to update the
client's objectives would not be applicable except as may be set forth in the advisory agreement.

### *Reasonable belief that advice is in the best interest of the client*

An investment adviser must have a reasonable belief that the advice it provides is in the
best interest of the client based on the client's objectives.  The formation of a reasonable belief
would involve considering, for example, whether investments are recommended only to those
clients who can and are willing to tolerate the risks of those investments and for whom the
potential benefits may justify the risks.[38]  Whether the advice is in a client's best interest must be
evaluated in the context of the portfolio that the adviser manages for the client and the client's
objectives.

For example, when an adviser is advising a retail client with a conservative investment
objective, investing in certain derivatives may be in the client's best interest when they are used
to hedge interest rate risk or other risks in the client's portfolio, whereas investing in certain
directionally speculative derivatives on their own may not.  For that same client, investing in a
particular security on margin may not be in the client's best interest, even if investing in that
same security without the use of margin may be in the client's best interest.  However, for

---

[38]  Item 8 of Part 2A of Form ADV requires an investment adviser to describe its methods of analysis and
investment strategies and disclose that investing in securities involves risk of loss which clients should be
prepared to bear.  This item also requires that an adviser explain the material risks involved for each
significant investment strategy or method of analysis it uses and particular type of security it recommends,
with more detail if those risks are significant or unusual.  Accordingly, investment advisers are required to
identify and explain certain risks involved in their investment strategies and the types of securities they
recommend.  An investment adviser needs to consider those same risks in determining the clients to which
the adviser recommends those investments.

example, when advising a financially sophisticated client, such as a fund or other sophisticated

client that has an appropriate risk tolerance, it may be in the best interest of the client to invest in

such derivatives or in securities on margin, or to invest in other complex instruments or other

products that may have limited liquidity.

Similarly, when an adviser is assessing whether high risk products—such as penny stocks

or other thinly-traded securities—are in a retail client's best interest, the adviser should generally

apply heightened scrutiny to whether such investments fall within the retail client's risk tolerance

and objectives.  As another example, complex products such as inverse or leveraged exchange-

traded products that are designed primarily as short-term trading tools for sophisticated investors

may not be in the best interest of a retail client absent an identified, short-term, client-specific

trading objective and, to the extent that such products are in the best interest of a retail client

initially, they would require daily monitoring by the adviser.[39]

A reasonable belief that investment advice is in the best interest of a client also requires

that an adviser conduct a reasonable investigation into the investment sufficient not to base its

advice on materially inaccurate or incomplete information.[40]  We have taken enforcement action

where an investment adviser did not independently or reasonably investigate securities before

recommending them to clients.[41]

---

[39]     *See* Exchange-Traded Funds, Securities Act Release No. 10515 (June 28, 2018); SEC staff and FINRA,
Investor Alert, Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold
Investors (Aug. 1, 2009); SEC Office of Investor Education and Advocacy, Investor Bulletin: Exchange-
Traded Funds (ETFs) (Aug. 2012); *see also* FINRA Regulatory Notice 09-31, Non-Traditional ETFs –
FINRA Reminds Firms of Sales Practice Obligations Relating to Leveraged and Inverse Exchange-Traded
Funds (June 2009).

[40]     *See, e.g.*, Concept Release on the U.S. Proxy System, Investment Advisers Act Release No. 3052 (July 14,
2010) (indicating that a fiduciary "has a duty of care requiring it to make a reasonable investigation to
determine that it is not basing its recommendations on materially inaccurate or incomplete information").

[41]     *See, e.g.*, In the Matter of Larry C. Grossman, Investment Advisers Act Release No. 4543 (Sept. 30, 2016)
(Commission Opinion) ("*In re* Grossman") (in connection with imposing liability on a principal of a

The cost (including fees and compensation) associated with investment advice would generally be one of many important factors—such as an investment product's or strategy's investment objectives, characteristics (including any special or unusual features), liquidity, risks and potential benefits, volatility, likely performance in a variety of market and economic conditions, time horizon, and cost of exit—to consider when determining whether a security or investment strategy involving a security or securities is in the best interest of the client. When considering similar investment products or strategies, the fiduciary duty does not necessarily require an adviser to recommend the lowest cost investment product or strategy.

Moreover, an adviser would not satisfy its fiduciary duty to provide advice that is in the client's best interest by simply advising its client to invest in the lowest cost (to the client) or least remunerative (to the investment adviser) investment product or strategy without any further analysis of other factors in the context of the portfolio that the adviser manages for the client and the client's objective. Rather, the adviser could recommend a higher-cost investment or strategy if the adviser reasonably concludes that there are other factors about the investment or strategy that outweigh cost and make the investment or strategy in the best interest of the client, in light of that client's objectives. For example, it might be consistent with an adviser's fiduciary duty to advise a client with a high risk tolerance and significant investment experience to invest in a private equity fund with relatively higher fees and significantly less liquidity as compared with a fund that invests in publicly-traded companies if the private equity fund was in the client's best

---

registered investment adviser for recommending offshore private investment funds to clients), *stayed in part,* Investment Advisers Act No. 4563 (Nov. 1, 2016), *response to remand,* Investment Advisers Act Release No. 4871 (Mar. 29, 2018) (reinstating the Sept. 30, 2016 opinion and order, except with respect to the disgorgement and prejudgment interest in light of the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017)).

interest because it provided exposure to an asset class that was appropriate in the context of the client's overall portfolio.

An adviser's fiduciary duty applies to all investment advice the investment adviser provides to clients, including advice about investment strategy, engaging a sub-adviser, and account type.[42]  Advice about account type includes advice about whether to open or invest through a certain type of account (*e.g.*, a commission-based brokerage account or a fee-based advisory account) and advice about whether to roll over assets from one account (*e.g.*, a retirement account) into a new or existing account that the adviser or an affiliate of the adviser manages.[43]  In providing advice about account type, an adviser should consider all types of accounts offered by the adviser and acknowledge to a client when the account types the adviser offers are not in the client's best interest.[44]

---

[42]    In addition, with respect to prospective clients, investment advisers have antifraud liability under section 206 of the Advisers Act, which, among other things, applies to transactions, practices, or courses of business which operate as a fraud or deceit upon prospective clients, including those regarding investment strategy, engaging a sub-adviser, and account type.  We believe that, in order to avoid liability under this antifraud provision, an investment adviser should have sufficient information about the prospective client and its objectives to form a reasonable basis for advice before providing any advice about these matters.  At the point in time at which the prospective client becomes a client of the investment adviser (*e.g.*, at account opening), the fiduciary duty applies.  Accordingly, while advice to prospective clients about these matters must comply with the antifraud provisions under section 206 of the Advisers Act, the adviser must also satisfy its fiduciary duty with respect to any such advice (*e.g.*, regarding account type) when a prospective client becomes a client.

[43]    We consider advice about "rollovers" to include advice about account type, in addition to any advice regarding the investments or investment strategy with respect to the assets to be rolled over, as the advice necessarily includes the advice about the account type into which assets are to be rolled over.  As noted below, as a general matter, an adviser's duty to monitor extends to all personalized advice it provides to the client, including, for example, in an ongoing relationship, an evaluation of whether a client's account or program type (for example, a wrap account) continues to be in the client's best interest.  *See infra* text accompanying footnote 52.

[44]    Accordingly, in providing advice to a client or customer about account type, a financial professional who is dually licensed (*i.e.,* an associated person of a broker-dealer and a supervised person of an investment adviser (regardless of whether the professional works for a dual registrant, affiliated firms, or unaffiliated firms)) should consider all types of accounts offered (*i.e.,* both brokerage accounts and advisory accounts) when determining whether the advice is in the client's best interest.  A financial professional who is only a supervised person of an investment adviser (regardless of whether that advisory firm is a dual registrant or affiliated with a broker-dealer) may only recommend an advisory account the adviser offers when the account is in the client's best interest. If a financial professional who is only a supervised person of an

18

## 2.  Duty to Seek Best Execution

An investment adviser's duty of care includes a duty to seek best execution of a client's

transactions where the adviser has the responsibility to select broker-dealers to execute client

trades (typically in the case of discretionary accounts).[45]  In meeting this obligation, an adviser

must seek to obtain the execution of transactions for each of its clients such that the client's total

cost or proceeds in each transaction are the most favorable under the circumstances.  An adviser

fulfills this duty by seeking to obtain the execution of securities transactions on behalf of a client

with the goal of maximizing value for the client under the particular circumstances occurring at

the time of the transaction.  Maximizing value encompasses more than just minimizing cost.

When seeking best execution, an adviser should consider "the full range and quality of a broker's

services in placing brokerage including, among other things, the value of research provided as

well as execution capability, commission rate, financial responsibility, and responsiveness" to

the adviser.[46]  In other words, the "determinative factor" is not the lowest possible commission

cost, "but whether the transaction represents the best qualitative execution."[47]  Further, an

---

investment adviser chooses to advise a client to consider a non-advisory account (or to speak with other personnel at a dual registrant or affiliate about a non-advisory account), that advice should be in the best interest of the client.  This same framework applies in the case of a prospective client, but any advice or recommendation given to a prospective client would be subject to the antifraud provisions of the federal securities laws.  *See supra* footnote 42 and Reg. BI Adoption, *supra* footnote 3.

[45]  *See* Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, Exchange Act Release No. 54165 (July 18, 2006) (stating that investment advisers have "best execution obligations"); Investment Advisers Act Release 3060, *supra* footnote 15 (discussing an adviser's best execution obligations in the context of directed brokerage arrangements and disclosure of soft dollar practices); *see also* Advisers Act rule 206(3)-2(c) (referring to adviser's duty of best execution of client transactions).

[46]  Exchange Act Release 23170, *supra* footnote 33.

[47]  *Id.*

19

investment adviser should "periodically and systematically" evaluate the execution it is receiving

for clients.[48]

### 3.  Duty to Provide Advice and Monitoring over the Course of the Relationship

An investment adviser's duty of care also encompasses the duty to provide advice and

monitoring at a frequency that is in the best interest of the client, taking into account the scope of

the agreed relationship.[49]  For example, when the adviser has an ongoing relationship with a

client and is compensated with a periodic asset-based fee, the adviser's duty to provide advice

and monitoring will be relatively extensive as is consistent with the nature of the relationship.[50]

Conversely, absent an express agreement regarding the adviser's monitoring obligation, when

the adviser and the client have a relationship of limited duration, such as for the provision of a

---

[48]     *Id.*  The Advisers Act does not prohibit advisers from using an affiliated broker to execute client trades. However, the adviser's use of such an affiliate involves a conflict of interest that must be fully and fairly disclosed and the client must provide informed consent to the conflict.  *See also* Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1732 (Jul. 17, 1998) (discussing application of section 206(3) of the Advisers Act to certain principal and agency transactions). Two commenters requested that we prescribe specific obligations related to best execution.  Comment Letter of the Healthy Markets Association (Aug. 7, 2018); Comment Letter of ICE Data Services (Aug. 7, 2018).  However, prescribing specific requirements of how an adviser might satisfy its best execution obligations is outside of the scope of this Final Interpretation.

[49]     *Cf.* SEC v. Capital Gains, *supra* footnote 2 (describing advisers' "basic function" as "furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments" (quoting Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28)).  *Cf.* Barbara Black, *Brokers and Advisers-What's in a Name?*, 32 Fordham Journal of Corporate and Financial Law XI (2005) ("[W]here the investment adviser's duties include management of the account, [the adviser] is under an obligation to monitor the performance of the account and to make appropriate changes in the portfolio."); Arthur B. Laby, *Fiduciary Obligations of Broker-Dealers and Investment Advisers*, 55 Villanova Law Review 701 (2010) ("Laby Villanova Article") (stating that the scope of an adviser's activity can be altered by contract and that an adviser's fiduciary duty would be commensurate with the scope of the relationship) (internal citations omitted).

[50]     However, an adviser and client may scope the frequency of the adviser's monitoring (*e.g.*, agreement to monitor quarterly or monthly and as appropriate in between based on market events), provided that there is full and fair disclosure and informed consent.  We consider the frequency of monitoring, as well as any other material facts relating to the agreed frequency, such as whether there will also be interim monitoring when there are market events relevant to the client's portfolio, to be a material fact relating to the advisory relationship about which an adviser must make full and fair disclosure and obtain informed consent as required by its fiduciary duty.

one-time financial plan for a one-time fee, the adviser is unlikely to have a duty to monitor.  In

other words, in the absence of any agreed limitation or expansion, the scope of the duty to

monitor will be indicated by the duration and nature of the agreed advisory arrangement.[51]  As a

general matter, an adviser's duty to monitor extends to all personalized advice it provides to the

client, including, for example, in an ongoing relationship, an evaluation of whether a client's

account or program type (for example, a wrap account) continues to be in the client's best

interest.[52]

### C.  Duty of Loyalty

The duty of loyalty requires that an adviser not subordinate its clients' interests to its

own.[53]  In other words, an investment adviser must not place its own interest ahead of its client's

interests.[54]  To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients

---

[51]     *See also* Laby Villanova Article, *supra* footnote 49, at 728 (2010) ("If an adviser has agreed to provide
continuous supervisory services, the scope of the adviser's fiduciary duty entails a continuous, ongoing
duty to supervise the client's account, regardless of whether any trading occurs.  This feature of the
adviser's duty, even in a non-discretionary account, contrasts sharply with the duty of a broker
administering a non-discretionary account, where no duty to monitor is required.") (internal citations
omitted).

[52]     Investment advisers also may consider whether written policies and procedures relating to monitoring
would be appropriate under Advisers Act rule 206(4)-7, which requires any investment adviser registered
or required to be registered under the Advisers Act to adopt and implement written policies and procedures
reasonably designed to prevent violation of the Advisers Act and the rules thereunder by the adviser and its
supervised persons.

[53]     Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating
that "[u]nder the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its
clients, which includes an obligation not to subrogate clients' interests to its own," citing Investment
Advisers Act Release 2106, *supra* footnote 15).  The duty of loyalty applies not just to advice regarding
potential investments, but to all advice the investment adviser provides to an existing client, including
advice about investment strategy, engaging a sub-adviser, and account type.  *See supra* text accompanying
footnotes 42-43.

[54]     For example, an adviser cannot favor its own interests over those of a client, whether by favoring its own
accounts or by favoring certain client accounts that pay higher fee rates to the adviser over other client
accounts.  The Commission has brought numerous enforcement actions against advisers that allocated
trades to their own accounts and allocated less favorable or unprofitable trades to their clients' accounts.
*See, e.g.*, *SEC v. Strategic Capital Management, LLC and Michael J. Breton*, Litigation Release No. 23867
(June 23, 2017) (partial settlement) (adviser placed trades through a master brokerage account and then
allocated profitable trades to adviser's account while placing unprofitable trades into the client accounts in

of all material facts relating to the advisory relationship.[55]  Material facts relating to the advisory

relationship include the capacity in which the firm is acting with respect to the advice provided.

This will be particularly relevant for firms or individuals that are dually registered as broker-

dealers and investment advisers and who serve the same client in both an advisory and a

brokerage capacity.  Thus, such firms and individuals generally should provide full and fair

disclosure about the circumstances in which they intend to act in their brokerage capacity and the

circumstances in which they intend to act in their advisory capacity.  This disclosure may be

accomplished through a variety of means, including, among others, written disclosure at the

beginning of a relationship that clearly sets forth when the dual registrant would act in an

advisory capacity and how it would provide notification of any changes in capacity.[56]  Similarly,

a dual registrant acting in its advisory capacity should disclose any circumstances under which

its advice will be limited to a menu of certain products offered through its affiliated broker-

dealer or affiliated investment adviser.

---

violation of fiduciary duty and contrary to disclosures).  In the Proposed Interpretation, we stated that the duty of loyalty requires an adviser to "put its client's interest first."  One commenter suggested that the requirement of an adviser to put its client's interest "first" is very different from a requirement not to "subordinate" or "subrogate" clients' interests, and is inconsistent with how the duty of loyalty had been applied in the past.  *See* Comment Letter of the Asset Management Group of the Securities Industry and Financial Markets Association (Aug. 7, 2018) ("SIFMA AMG Letter").  Accordingly, we have revised the description of the duty of loyalty in this Final Interpretation to be more consistent with how we have previously described the duty.  *See* Investment Advisers Act Release 3060, *supra* footnote 15 ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own.") (citing Investment Advisers Act Release 2106, *supra* footnote 15).  In practice, referring to putting a client's interest first is a plain English formulation commonly used by investment advisers to explain their duty of loyalty in a way that may be more understandable to retail clients.

[55]     *See* SEC v. Capital Gains, *supra* footnote 2 ("Failure to disclose material facts must be deemed fraud or deceit within its intended meaning."); Investment Advisers Act Release 3060, *supra* footnote 15 ("as a fiduciary, an adviser has an ongoing obligation to inform its clients of any material information that could affect the advisory relationship"); *see also* General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship.").

[56]     *See also* Reg. BI Adoption, *supra* footnote 3, at 99.

Appx. 00171

In addition, an adviser must eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.[57]  We believe that while full and fair disclosure of all material facts relating to the advisory relationship or of conflicts of interest and a client's informed consent prevent the presence of those material facts or conflicts themselves from violating the adviser's fiduciary duty, such disclosure and consent do not themselves satisfy the adviser's duty to act in the client's best interest.[58]  To illustrate what

---

[57]   In the Proposed Interpretation, we stated that an adviser must seek to avoid conflicts of interest with its clients.  Proposed Interpretation, *supra* footnote 6.  Some commenters requested clarity on what it means to "seek to avoid" conflicts of interest.  *See, e.g.,* Comment Letter of Schulte Roth & Zabel LLP (Aug. 8, 2018); ABA Letter (stating that this wording could be read to require an adviser to first seek to avoid a conflict, before addressing a conflict through disclosure, rather than being able to provide full and fair disclosure of a conflict, and only seek avoidance if the conflict cannot be addressed through disclosure).  The Commission first used this phrasing when adopting amendments to the Form ADV Part 2 instructions.  *See* Investment Advisers Act Release 3060, *supra* footnote 15 and General Instruction 3 to Part 2 of Form ADV ("As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship.").  The release adopting this instruction clarifies the Commission's intent that it capture the fiduciary duty described in SEC v. Capital Gains and Arleen Hughes.  *See* Investment Advisers Act Release 3060, *supra* footnote 15, at n.4 and accompanying text (citing SEC v. Capital Gains, *supra* footnote 2, and Arleen Hughes, *supra* footnote 18, as the basis of this language).  Both of these cases emphasized that the adviser, as a fiduciary, should seek to avoid conflicts, but at a minimum must make full and fair disclosure of the conflict and obtain the client's informed consent.  *See* SEC v. Capital Gains, *supra* footnote 2 ("The Advisers Act thus reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested."); Arleen Hughes, *supra* footnote 18 ("Since loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal" but if a fiduciary "chooses to assume a role in which she is motivated by conflicting interests, . . . she may do so if, but only if, she obtains her client's consent after disclosure . . .").  We believe the Commission's reference to "seek to avoid" conflicts in the Form ADV Part 2 instructions is consistent with the Final Interpretation's statement that an adviser "must eliminate or at least expose all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested" as well as the substantively identical statements in SEC v. Capital Gains, *supra* footnote 2, and Arleen Hughes, *supra* footnote 18.  While an adviser may satisfy its duty of loyalty by making full and fair disclosure of conflicts of interest and obtaining the client's informed consent, an adviser is prohibited from overreaching or taking unfair advantage of a client's trust.

[58]   As noted above, an investment adviser's obligation to act in the best interest of its client is an overarching principle that encompasses both the duty of care and the duty of loyalty.  *See* SEC v. Tambone*, supra* footnote 23 (stating that Advisers Act section 206 "imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . . *and includes* an obligation to provide 'full and fair disclosure of all material facts'") (emphasis added) (citing SEC v. Capital Gains*, supra* footnote 2).  We describe

23

constitutes full and fair disclosure, we are providing the following guidance on (i) the appropriate level of specificity, including the appropriateness of stating that an adviser "may" have a conflict, and (ii) considerations for disclosure regarding conflicts related to the allocation of investment opportunities among eligible clients.

In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent.[59]  For example, it would be inadequate to disclose that the adviser has "other clients" without describing how the adviser will manage conflicts between clients if and when they arise, or to disclose that the adviser has "conflicts" without further description.

---

above in this Final Interpretation how the application of an investment adviser's fiduciary duty to its client will vary with the scope of the advisory relationship.  *See supra* section II.A.

[59]  Arleen Hughes, *supra* footnote 18, at 4 and 8 (stating, "[s]ince loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal.  To prevent any conflict and the possible subordination of this duty to act solely for the benefit of his principal, a fiduciary at common law is forbidden to deal as an adverse party with his principal.  An exception is made, however, where the principal gives his informed consent to such dealings," and adding that, "[r]egistrant has an affirmative obligation to disclose all material facts to her clients in a manner which is clear enough so that a client is fully apprised of the facts and is in a position to give his informed consent."); *see also Hughes v. Securities and Exchange Commission,* 174 F.2d 969 (1949) (affirming the SEC decision in Arleen Hughes); General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them"); Investment Advisers Act Release 3060, *supra* footnote 15; Restatement (Third) of Agency §8.06 ("Conduct by an agent that would otherwise constitute a breach of duty as stated in §§ 8.01, 8.02, 8.03, 8.04, and 8.05 [referencing the fiduciary duty] does not constitute a breach of duty if the principal consents to the conduct, provided that (a) in obtaining the principal's consent, the agent (i) acts in good faith, (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and (iii) otherwise deals fairly with the principal; and (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship.").  *See infra* footnotes 67-70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

Appx. 00173

Similarly, disclosure that an adviser "may" have a particular conflict, without more, is not adequate when the conflict actually exists.[60]   For example, we would consider the use of "may" inappropriate when the conflict exists with respect to some (but not all) types or classes of clients, advice, or transactions without additional disclosure specifying the types or classes of clients, advice, or transactions with respect to which the conflict exists.  In addition, the use of "may" would be inappropriate if it simply precedes a list of all possible or potential conflicts regardless of likelihood and obfuscates actual conflicts to the point that a client cannot provide informed consent.  On the other hand, the word "may" could be appropriately used to disclose to a client a potential conflict that does not currently exist but might reasonably present itself in the future.[61]

Whether the disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the material fact or conflict.  Full and fair disclosure for an institutional client (including the specificity, level of detail, and explanation of terminology) can differ, in some cases significantly, from full and fair disclosure for a retail client because institutional clients generally have a greater capacity and more resources than

---

[60]   We have brought enforcement actions in such cases.  *See, e.g.,* In the Matter of The Robare Group, Ltd., et al., Investment Advisers Act Release No. 4566 (Nov. 7, 2016) (Commission Opinion) (finding, among other things, that adviser's disclosure that it *may* receive a certain type of compensation was inadequate because it did not reveal that the adviser actually had an arrangement pursuant to which it received fees that presented a potential conflict of interest); *aff'd in part and rev'd in part on other grounds Robare* v. SEC, *supra* footnote 20; *In re Grossman*, *supra* footnote 41 (indicating that "the use of the prospective 'may' in [the relevant Form ADV disclosures] is misleading because it suggested the mere possibility that [the broker] would make a referral and/or be paid 'referral fees' at a later point, when in fact a commission-sharing arrangement was already in place and generating income").  *Cf. Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) ("The Commission noted the critical distinction between disclosing the risk that a future event *might* occur and disclosing actual knowledge the event *will* occur.") (emphasis in original).  For Form ADV Part 2 purposes, advisers are instructed that when they have a conflict or engage in a practice with respect to some (but not all) types or classes of clients, advice, or transactions, to indicate as such rather than disclosing that they "may" have the conflict or engage in the practice.  General Instruction 2 to Part 2 of Form ADV.

[61]   We have added this example of a circumstance where "may" could be appropriately used in response to the request of some commenters.  *See, e.g.,* Pickard Letter; ICI Letter; Ropes & Gray Letter; IAA Letter.

retail clients to analyze and understand complex conflicts and their ramifications.[62]
Nevertheless, regardless of the nature of the client, the disclosure must be clear and detailed
enough for the client to make an informed decision to consent to the conflict of interest or reject
it.

When allocating investment opportunities among eligible clients, an adviser may face
conflicts of interest either between its own interests and those of a client or among different
clients.[63]  If so, the adviser must eliminate or at least expose through full and fair disclosure the
conflicts associated with its allocation policies, including how the adviser will allocate
investment opportunities, such that a client can provide informed consent.[64]  When allocating
investment opportunities, an adviser is permitted to consider the nature and objectives of the
client and the scope of the relationship.[65]  An adviser need not have *pro rata* allocation policies,
or any particular method of allocation, but, as with other conflicts and material facts, the

---

[62]  *Arleen Hughes, supra* footnote 18 (the "method and extent of disclosure depends upon the particular client involved," and an unsophisticated client may require "a more extensive explanation than the informed investor").

[63]  *See* Restatement (Third) of Agency, § 8.01 General Fiduciary Principle (2006) ("Unless the principal consents, the general fiduciary principle, as elaborated by the more specific duties of loyalty stated in §§ 8.02 to 8.05, also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.").

[64]  The Commission has brought numerous enforcement actions alleging that advisers unfairly allocated client trades to preferred clients without making full and fair disclosure.  *See* Staff of the U.S. Securities and Exchange Commission, *Study on Investment Advisers and Broker-Dealers As Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act* (Jan. 2011), *available at* https://www.sec.gov/news/studies/2011/913studyfinal.pdf, at 23–24 (citing enforcement actions).  This Final Interpretation sets forth the Commission's views regarding what constitutes full and fair disclosure. *See, e.g., supra* text accompanying footnote 59; *see also* Barry Barbash and Jai Massari, *The Investment Advisers Act of 1940; Regulation by Accretion*, 39 Rutgers Law Journal 627 (2008) (stating that under section 206 of the Advisers Act and traditional notions of fiduciary and agency law, an adviser must not give preferential treatment to some clients or systematically exclude eligible clients from participating in specific opportunities without providing the clients with appropriate disclosure regarding the treatment).

[65]  An adviser and a client may even agree that certain investment opportunities or categories of investment opportunities will not be allocated or offered to a client.

26

adviser's allocation practices must not prevent it from providing advice that is in the best interest of its clients.[66]

While most commenters agreed that informed consent is a component of the fiduciary duty, a few commenters objected to what they saw as subjectivity in the use of the term "informed" to describe a client's consent to a disclosed conflict.[67]  The fact that disclosure must be full and fair such that a client can provide informed consent does not require advisers to make an affirmative determination that a particular client understood the disclosure and that the client's consent to the conflict of interest was informed.  Rather, disclosure should be designed to put a client in a position to be able to understand and provide informed consent to the conflict of interest.  A client's informed consent can be either explicit or, depending on the facts and circumstances, implicit.[68]  We believe, however, that it would not be consistent with an adviser's fiduciary duty to infer or accept client consent where the adviser was aware, or reasonably should have been aware, that the client did not understand the nature and import of the conflict.[69]

---

[66]    In the Proposed Interpretation, we stated that "in allocating investment opportunities among eligible clients, an adviser must treat all clients fairly."  Some commenters interpreted this statement to mean that it would be impermissible for an adviser to allocate a particular investment to one eligible client instead of a second eligible client, even when the second client had received full and fair disclosure and provided informed consent to such an investment being allocated to the first client.  *See, e.g.,* Ropes & Gray Letter; SIFMA AMG Letter.  We have removed that sentence from this Final Interpretation and replaced it with this discussion that clarifies our views regarding allocation of investment opportunities.

[67]    *See, e.g.,* Comment Letter of LPL Financial LLC (Aug. 7, 2018); Ropes & Gray Letter.

[68]    We do not interpret an adviser's fiduciary duty to require that full and fair disclosure or informed consent be achieved in a written advisory contract or otherwise in writing.  For example, an adviser could provide a client full and fair disclosure of all material facts relating to the advisory relationship as well as full and fair disclosure of all conflicts of interest which might incline the adviser, consciously or unconsciously, to render advice that was not disinterested, through a combination of Form ADV and other disclosure and the client could implicitly consent by entering into or continuing the investment advisory relationship with the adviser.

[69]    *See* Arleen Hughes, *supra* footnote 18 ("Registrant cannot satisfy this duty by executing an agreement with her clients which the record shows some clients do not understand and which, in any event, does not contain the essential facts which she must communicate.").  In the Proposed Interpretation, we stated that inferring or accepting client consent to a conflict would not be consistent with the fiduciary duty where "the material facts concerning the conflict could not be fully and fairly disclosed."  Some commenters expressed

27

In some cases, conflicts may be of a nature and extent that it would be difficult to provide disclosure to clients that adequately conveys the material facts or the nature, magnitude, and potential effect of the conflict sufficient for a client to consent to or reject it.[70]   In other cases, disclosure may not be specific enough for a client to understand whether and how the conflict could affect the advice it receives.  For retail clients in particular, it may be difficult to provide disclosure regarding complex or extensive conflicts that is sufficiently specific, but also understandable.  In all of these cases where an investment adviser cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent, the adviser should either *eliminate* the conflict or adequately *mitigate* (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and informed consent are possible.

Full and fair disclosure of all material facts relating to the advisory relationship, and all conflicts of interest which might incline an investment adviser—consciously or unconsciously— to render advice which was not disinterested, can help clients and prospective clients in evaluating and selecting investment advisers.  Accordingly, we require advisers to deliver to their clients a "brochure," under Part 2A of Form ADV, which sets out minimum disclosure requirements, including disclosure of certain conflicts.[71]   Investment advisers are required to

---

agreement with this statement.  *See, e.g.,* CFA Letter (agreeing that "advisers should be precluded from inferring or accepting client consent to a conflict" where the material facts concerning the conflict could not be fully and fairly disclosed).  Other commenters expressed doubt that such disclosure could be impossible.  *See, e.g.,* Allianz Letter ("[W]e have not encountered a situation in which we could not fully and fairly disclose the material facts, including the nature, extent, magnitude and potential effects of the conflict.").  In response to commenters, we have replaced the general statement about an inability to fully and fairly disclose material facts about the conflict with more specific examples of how advisers can make such full and fair disclosure.  *See supra* text accompanying footnotes 59-66.

[70]   As discussed above, institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications.  *See supra* text accompanying footnote 62.

[71]   Investment Advisers Act Release 3060, *supra* footnote 15; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of

deliver the brochure to a prospective client at or before entering into a contract so that the prospective client can use the information contained in the brochure to decide whether or not to enter into the advisory relationship.[72]  In a concurrent release, we are requiring all investment advisers to deliver to retail investors, at or before the time the adviser enters into an investment advisory agreement, a relationship summary, which would include, among other things, a plain English summary of certain of the firm's conflicts of interest, and would encourage retail investors to inquire about those conflicts.[73]

## III.    ECONOMIC CONSIDERATIONS

As noted above, this Final Interpretation is intended to reaffirm, and in some cases clarify, certain aspects of an investment adviser's fiduciary duty under the Advisers Act.  The Final Interpretation does not itself create any new legal obligations for advisers.  Nonetheless, the Commission recognizes that to the extent an adviser's practices are not consistent with the Final Interpretation provided above, the Final Interpretation could have potential economic effects.  We discuss these potential effects below.

---

interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship.  This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them.").  *See also* Robare v. SEC, *supra* footnote 20 ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

[72]    Investment Advisers Act rule 204-3.  *See* Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that, "A client may use this disclosure to select his or her own adviser and evaluate the adviser's business practices and conflicts on an ongoing basis.  As a result, the disclosure clients and prospective clients receive is critical to their ability to make an informed decision about whether to engage an adviser and, having engaged the adviser, to manage that relationship.").  To the extent that the information required for inclusion in the brochure does not satisfy an adviser's disclosure obligation, the adviser "may have to disclose to clients information not specifically required by Part 2 of Form ADV or in more detail than the brochure items might otherwise require" and this disclosure may be made "in [the] brochure or by some other means."  General Instruction 3 to Part 2 of Form ADV.

[73]    Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 5247 (June 5, 2019) ("Relationship Summary Adoption").

### A. Background

The Commission's interpretation of the standard of conduct for investment advisers under the Advisers Act set forth in this Final Interpretation would affect investment advisers and their associated persons as well as the clients of those investment advisers, and the market for financial advice more broadly.[74]  As of December 31, 2018, there were 13,299 investment advisers registered with the Commission with over $84 trillion in assets under management as well as 17,268 investment advisers registered with states with approximately $334 billion in assets under management and 3,911 investment advisers who submit Form ADV as exempt reporting advisers.[75]  As of December 31, 2018, there are approximately 41 million client accounts advised by SEC-registered investment advisers.[76]

These investment advisers currently incur ongoing costs related to their compliance with their legal and regulatory obligations, including costs related to understanding the standard of conduct.  We believe, based on the Commission's experience, that the interpretations set forth in this Final Interpretation are generally consistent with investment advisers' current understanding of their fiduciary duty under the Advisers Act.[77]  However, we recognize that as the scope of the

---

[74]   *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A (discussing the market for financial advice generally).

[75]   Data on investment advisers is based on staff analysis of Form ADV, particularly Item 5.F.(2)(c) of Part 1A for Regulatory Assets under Management.  Because this Final Interpretation interprets an adviser's fiduciary duty under section 206 of the Advisers Act, this interpretation would be applicable to both SEC- and state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act.

[76]   Item 5.F.(2)(f) of Part 1A of Form ADV.

[77]   *See supra* section II.B.i.  For example, some commenters asked that we clarify from the Proposed Interpretation that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies, through contract.  *See, e.g.,* MMI Letter; Financial Engines Letter; ABA Letter.  *See supra* footnotes 67–69 and accompanying text, including clarifications addressing these commenters' concerns.  More generally, some commenters requested clarifications from the Proposed Interpretation, and we are issuing this Final Interpretation to address those issues raised by commenters, as discussed in more detail above.

30

adviser-client relationship varies and in many cases can be broad, there may be certain current circumstances where investment advisers interpret their fiduciary duty to require something less, and other current circumstances where they interpret their fiduciary duty to require something more, than this Final Interpretation.  We lack data to identify which investment advisers currently understand their fiduciary duty to require something different from the standard of conduct articulated in this Final Interpretation.  Based on our experience over decades of interacting with the investment management industry as its primary regulator, however, we generally believe that it is not a significant portion of the market.

One commenter suggested that the Proposed Interpretation's discussion of how an adviser fulfills its fiduciary duty appeared to be based in the context of having as a client an individual investor, and not a fund.[78]  This commenter indicated its concerns about the ability of a fund manager to infer consent from a client that is a fund, and that issues regarding inferring consent from funds could significantly increase compliance costs for venture capital funds.[79]  Our discussion above in this Final Interpretation includes clarifications to address comments, and expressly acknowledges that while all investment advisers owe each of their clients a fiduciary duty, the specific application of the investment adviser's fiduciary duty must be viewed in the context of the agreed-upon scope of the adviser-client relationship.[80]  This Final Interpretation, as compared to the Proposed Interpretation, includes significantly more examples of the application of the fiduciary duty to institutional clients, and clarifies the Commission's interpretation of what constitutes full and fair disclosure and informed consent, acknowledging a number of comments

---

[78]    *See* Comment Letter of National Venture Capital Association (Aug. 7, 2018) ("NVCA Letter").

[79]    *Id.*

[80]    *See supra* section II.A.

31

on this topic.[81]  We believe that these clarifications will help address some of this commenter's concerns with respect to increased compliance costs for venture capital funds, in part by clarifying how the fiduciary duty can apply to institutional clients.  We continue to believe, based on our experience with investment advisers to different types of clients, that advisers understand their fiduciary duty to be generally consistent with the standards of this Final Interpretation.

### B.  Potential Economic Effects

Based on our experience as the long-standing regulator of the investment adviser industry, the Commission's interpretation of the fiduciary duty under section 206 of the Advisers Act described in this Final Interpretation generally reaffirms the current practices of investment advisers.  Therefore, we expect there to be no significant economic effects from this Final Interpretation.  However, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, we acknowledge that affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them.  Further, to the extent certain investment advisers currently understand the practices necessary to comply with their fiduciary duty to be different from those discussed in this Final Interpretation, there could be some economic effects, which we discuss below.

*Clients of investment advisers*

The typical relationship between an investment adviser and a client is a principal-agent relationship, where the principal (the client) hires an agent (the investment adviser) to perform

---

[81]     In particular, this Final Interpretation expressly notes our belief that a client generally may provide its informed consent implicitly "by entering into or continuing the investment advisory relationship with the adviser" after disclosure of a conflict of interest.  *See supra* footnote 68.

some service (investment advisory services) on the principal's behalf.[82]  Because investors and

investment advisers are likely to have different preferences and goals, the investment adviser

relationship is subject to agency problems, including those resulting from conflicts: that is,

investment advisers may take actions that increase their well-being at the expense of investors,

thereby imposing agency costs on investors.[83]  A fiduciary duty, such as the duty investment

advisers owe their clients, can mitigate these agency problems and reduce agency costs by

deterring investment advisers from taking actions that expose them to legal liability.[84]

To the extent this Final Interpretation causes a change in behavior of those investment

advisers, if any, who currently interpret their fiduciary duty to require something different from

this Final Interpretation, we expect a potential reduction in agency problems and, consequently, a

reduction of agency costs to the client.[85]  For example, an adviser that, as part of its duty of

loyalty, fully and fairly discloses[86] a conflict of interest and receives informed consent from its

client with respect to the conflict may reduce agency costs by increasing the client's awareness

of the conflict and improving the client's ability to monitor the adviser with respect to this

conflict.  Alternatively, the client may choose to not consent given the information the adviser

---

[82]     *See*, *e.g.*, James A. Brickley, Clifford W. Smith, Jr. & Jerold L. Zimmerman, *Managerial Economics and Organizational Architecture* (2004), at 265 ("An agency relationship consists of an agreement under which one party, the principal, engages another party, the agent, to perform some service on the principal's behalf."); *see also* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 Journal of Financial Economics 305-360 (1976) ("Jensen and Meckling").

[83]     *See*, *e.g.*, Jensen and Meckling, *supra* footnote 82.

[84]     *See*, *e.g.*, Frank H. Easterbrook & Daniel R. Fischel, *Contract and Fiduciary Duty*, 36 Journal of Law & Economics 425-46 (1993).

[85]     To the extent that this Final Interpretation clarifies the fiduciary duty for investment advisers, one commenter suggested it may then clarify what clients expect of their investment advisers.  *See* Cambridge Letter (stating that "greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability to craft such policies and procedures, as well as support the elimination of confusion for retail clients and investment professionals").

[86]     As discussed above, whether such a disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the conflict.  *See supra* section II.C.

33

discloses about a conflict of interest if the perceived risk associated with the conflict is too

significant, and instead try to renegotiate the contract with the adviser or look for an alternative

adviser or other financial professional.  In addition, the obligation to fully and fairly disclose a

current conflict may cause the adviser to take other actions, for example eliminating or

adequately mitigating (*i.e.*, modifying practices to reduce) that conflict rather than taking the risk

that the client will not provide informed consent or will look for an alternative adviser or other

financial professional.  The extent to which agency costs would be reduced by such a disclosure

is difficult to assess given that we are unable to ascertain the total number of investment advisers

that currently interpret their fiduciary duty to require something different from the Commission's

interpretation,[87] and consequently we are not able to estimate the agency costs such advisers

currently impose on investors.  In addition, we believe that there may be potential benefits for

clients of those investment advisers, if any, to the extent this Final Interpretation is effective at

strengthening investment advisers' understanding of their obligations to their clients.  Further, to

the extent that this Final Interpretation enhances the understanding of any investment advisers of

their duty of care, it may potentially raise the quality of investment advice and also lead to

increased compliance with the duty to monitor, for example whether advice about an account or

program type remains in the client's best interest, thereby increasing the likelihood that the

advice fits with a client's objectives.

In addition, to the extent that this Final Interpretation causes some investment advisers to

properly identify circumstances in which conflicts may be of a nature and extent that it would be

---

[87]     One commenter did not agree that the discussion of fiduciary obligations in the Proposed Interpretation
applied to advisers to funds as well as advisers to retail investors.  *See* NVCA Letter.  As discussed above,
this Final Interpretation has clarified the discussion to address this commenter's concerns and
acknowledges that the application of the fiduciary duty of an adviser to a retail client would be different
from the specific application of the fiduciary duty of an adviser to a registered investment company or
private fund.

difficult to provide disclosure to clients that adequately conveys the material facts or nature,

magnitude, and potential effect of the conflict sufficient for clients to consent to it or reject it, or

in which the disclosure may not be specific enough for clients to understand whether and how

the conflict could affect the advice they receive, this Final Interpretation may lead those

investment advisers to take additional steps to improve their disclosures or to determine whether

adequately mitigating (*i.e.,* modifying practices to reduce) the conflict may be appropriate such

that full and fair disclosure and informed consent are possible. This Final Interpretation may

also cause some investment advisers to conclude in some circumstances that they cannot fully

and fairly disclose a conflict of interest to a client such that the client can provide informed

consent. We would expect that these advisers would either eliminate the conflict or adequately

mitigate (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and

informed consent would be possible. Thus, to the extent this Final Interpretation would cause

investment advisers to better understand their obligations and therefore to modify their business

practices in ways that (i) reduce the likelihood that conflicts and other agency costs will cause an

adviser to place its interests ahead of the interests of the client or (ii) help those advisers to

provide full and fair disclosure, it would be expected to ameliorate the agency conflict between

investment advisers and their clients. In turn, this may improve the quality of advice that the

clients receive and therefore produce higher overall returns for clients and increase the efficiency

of portfolio allocation. However, as discussed above, we would generally expect these effects to

be minimal because we believe that the interpretations we are setting forth in this Final

Interpretation are generally consistent with investment advisers' current understanding of their

fiduciary duty under the Advisers Act. Finally, this Final Interpretation would also benefit

35

clients of investment advisers to the extent it assists the Commission in its oversight of investment advisers' compliance with their regulatory obligations.

*Investment advisers and the market for investment advice*

In general, we expect this Final Interpretation to affirm investment advisers' understanding of the fiduciary duty they owe their clients under the Advisers Act, reduce uncertainty for advisers, and facilitate their compliance.  Further, by addressing in one release certain aspects of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act, this Final Interpretation could reduce investment advisers' costs associated with comprehensively assessing their compliance obligations.  We acknowledge that, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them.  Moreover, as discussed above, there may be certain investment advisers who currently understand their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation.  Those investment advisers would experience an increase in their compliance costs as they change their systems, processes, disclosures, and behavior, and train their supervised persons, to align with this Final Interpretation.  However, this increase in costs would be mitigated by potential benefits in efficiency for investment advisers that are able to understand aspects of their fiduciary duty by reference to a single Commission release that reaffirms—and in some cases clarifies—certain aspects of the fiduciary duty.[88]  In addition, and as discussed above, in the case of an investment adviser that believed it owed its clients a lower

---

[88]    As noted above, *supra* footnote 3, this Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty.  It is not, however, intended to be the exclusive resource for understanding these principles.

36

standard of conduct, there will be client benefits from the ensuing adaptation of a higher standard of conduct and related change in policies and procedures.

Moreover, to the extent any investment advisers that understood their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation change their behavior to align with this Final Interpretation, there could also be some economic effects on the market for investment advice.  For example, any improved compliance may not only reduce agency costs in current investment advisory relationships and increase the value of those relationships to current clients, it may also increase trust in the market for investment advice among all investors, which may result in more investors seeking advice from investment advisers.  This may, in turn, benefit investors by improving the efficiency of their portfolio allocation.  To the extent it is costly or difficult, at least in the short term, to expand the supply of investment advisory services to meet an increase in demand, any such new demand for investment advisory services could put some upward price pressure on fees.  At the same time, however, if any such new demand increases the overall profitability of investment advisory services, then we expect it would encourage entry by new investment advisers—or hiring of new representatives by current investment advisers—such that competition would increase over time. Indeed, the recent growth in the investment adviser segment of the market, both in terms of number of firms and number of representatives,[89] may suggest that the costs of expanding the supply of investment advisory services are currently relatively low.

Additionally, we acknowledge that to the extent certain investment advisers recognize, as a result of this Final Interpretation, that their fiduciary duty is stricter than the fiduciary duty as they currently interpret it, it could potentially affect competition.  Specifically, this Final

---

[89]    *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A.1.d.

Interpretation of certain aspects of the standard of conduct for investment advisers may result in additional compliance costs for investment advisers seeking to meet their fiduciary duty.  This increase in compliance costs, in turn, may discourage competition for client segments that generate lower revenues, such as clients with relatively low levels of financial assets, which could reduce the supply of investment advisory services and raise fees for these client segments.  However, the investment advisers who already are complying with the understanding of their fiduciary duty reflected in this Final Interpretation, and who may therefore currently have a comparative cost disadvantage, could find it more profitable to compete for the clients of those investment advisers who would face higher compliance costs as a result of this Final Interpretation, which would mitigate negative effects on the supply of investment advisory services.  Further, as noted above, there has been a recent growth trend in the supply of investment advisory services, which is likely to mitigate any potential negative supply effects from this Final Interpretation.[90]

One commenter discussed that, in its view, any statement in the Proposed Interpretation that certain circumstances may require the elimination of material conflicts, rather than full and fair disclosure or the mitigation of such conflicts, could lead to an effect on the market and costs to advisers, if such a requirement would cause advisers who had not shared that interpretation to change their business models or product offerings or the ways in which they interact with

---

[90] Beyond having an effect on competition in the market for investment adviser services, it is possible that this Final Interpretation could affect competition between investment advisers and other providers of financial advice, such as broker-dealers, banks, and insurance companies.  This may be the case if certain investors base their choice between an investment adviser and another provider of financial advice, at least in part, on their perception of the standards of conduct each owes to their customers.  To the extent that this Final Interpretation increases investors' trust in investment advisers' overall compliance with their standard of conduct, certain of these investors may become more willing to hire an investment adviser rather than one of their non-investment adviser competitors.  As a result, investment advisers as a group may become more competitive compared to that of other types of providers of financial advice.  On the other hand, if this Final Interpretation raises costs for investment advisers, they could become less competitive with other financial advice providers.

clients.[91]  We disagree that this Final Interpretation includes a requirement to eliminate conflicts of interest. As discussed in more detail above, elimination of a conflict is one method of addressing that conflict; when appropriate advisers may also address the conflict by providing full and fair disclosure such that a client can provide informed consent to the conflict.[92]  Further, we believe that any potential costs or market effects resulting from investment advisers addressing conflicts of interest may be decreased by the flexibility advisers have to meet their federal fiduciary duty in the context of the specific scope of services that they provide to their clients, as discussed in this Final Interpretation.

The commenter also drew particular attention to the question of whether the Commission's discussion of the fiduciary duty in the Proposed Interpretation applied to advisers to institutional clients as well as those to retail clients.  The same commenter indicated that failing to accommodate the application of the concepts in the Proposed Interpretation to sophisticated clients could risk changing the marketplace or limiting investment opportunities for sophisticated clients, increasing compliance burdens for advisers to sophisticated clients, or chilling innovation.  As explained above, this Final Interpretation, as compared to the Proposed Interpretation, discusses in more detail the ability of investment advisers and different types of clients to shape the scope of the relationship to which the fiduciary duty applies.[93]  In particular, this Final Interpretation acknowledges that while advisers owe each of their clients a fiduciary duty, the specific obligations of, for example, an adviser providing comprehensive, discretionary advice in an ongoing relationship with a retail client will be significantly different from the

---

[91]      *See* Dechert Letter.

[92]      *See supra* section II.C.

[93]      *See supra* footnotes 78-81 and accompanying text.

obligations of an adviser to an institutional client, such as a registered investment company or private fund, where the contract defines the scope of the adviser's services and limitations on its authority with substantial specificity.[94]

Finally, to the extent this Final Interpretation causes some investment advisers to reassess their compliance with their duty of loyalty, it could lead to a reduction in the expected profitability of advice relating to particular investments for which compliance costs would increase following the reassessment.[95]  As a result, the number of investment advisers willing to advise a client to make these investments may be reduced.  A decline in the supply of investment adviser advice regarding these types of investments could affect efficiency for investors; it could reduce the efficiency of portfolio allocation for those investors who might otherwise benefit from investment adviser advice regarding these types of investments and are no longer able to receive such advice.  At the same time, if providing full and fair disclosure and appropriate monitoring for highly complex products (*e.g.*, those with a complex payout structure, such as those that include variable or contingent payments or payments to multiple parties) results in these products becoming less profitable for investment advisers, investment advisers may be discouraged from supplying advice regarding such products.  However, investors may benefit from (1) no longer receiving inadequate disclosure or monitoring for such products, (2) potentially receiving advice regarding other, less complex or expensive products that may be more efficient for the investor, and (3) only receiving recommendations for highly complex or high cost products for which an

---

[94]    *See supra* section II.A.

[95]    For example, such products could include highly complex, high cost products with risk and return characteristics that are hard for retail investors to fully understand, or where the investment adviser and its representatives receive complicated payments from affiliates that create conflicts of interest that are difficult for retail investors to fully understand.

40

investment adviser can provide full and fair disclosure regarding its conflicts and appropriate

monitoring.

**List of Subjects in 17 CFR Part 276**

Securities.

**Amendments to the Code of Federal Regulations**

For the reasons set out above, the Commission is amending Title 17, chapter II of the

Code of Federal Regulations as set forth below:

**PART 276–INTERPRETATIVE RELEASES RELATING TO THE INVESTMENT**

**ADVISERS ACT OF 1940 AND GENERAL RULES AND REGULATIONS**

**THEREUNDER**

1.    Part 276 is amended by adding Release No. IA–5428 and the release date of June 5,

2019, to the end of the list of interpretive releases to read as follows"

| Subject | Release No. | Date | Fed. Reg. Vol. and Page |
|---|---|---|---|
| * * * * * * * | | | |
| Commission Interpretation Regarding Standard of Conduct for Investment Advisers | IA-5248 | June 5, 2019 | [Insert FR Volume Number] FR [Insert FR Page Number] |

Appx. 00190

By the Commission.


Dated: June 5, 2019.


Vanessa A. Countryman,

Acting Secretary.

42

# EXHIBIT 5

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104) (admitted *pro hac vice*)
W. Austin Jowers (GA 405482) (admitted *pro hac vice*)
Paul R. Bessette (TX 02263050)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING**
**LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

### JOINT OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. AND
### HIGHLAND CLO FUNDING, LTD. TO FINAL APPROVAL OF DISCLOSURE
### STATEMENT AND TO CONFIRMATION OF THE JOINT PLAN FOR ACIS CAPITAL
### MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC

Highland Capital Management, L.P. ("**Highland**") and Highland CLO Funding, Ltd.

("**HCLOF**") hereby file their joint objection (the "**Objection**") to final approval of the

disclosure statement [Doc. No. 442] (as amended, the "**Disclosure Statement**") and to

confirmation of the *First Amended Joint Plan for Acis Capital Management, L.P. and Acis*

*Capital Management GP, LLC* [Doc. No. 441] (as amended, the "**Plan**"),[1] and respectfully state

as follows:[2]

# I.
## PRELIMINARY STATEMENT

"If at first you don't succeed, try, try again." –*William Edward Hickson*

1.     In proposing Plans A, B and C, it would appear that the Chapter 11 Trustee has

taken this old adage to heart.  Although originally penned as a motivator to would-be teachers, in

the context of these bankruptcy proceedings, this approach by the Chapter 11 Trustee has proven

to be a colossal waste of time and resources at a cost to the estates that eclipses not only the

value of the estates' assets, but the very pre-petition claims the Chapter 11 Trustee is purportedly

responsible for paying.  The result of this case appears to be nothing more than functionally

administratively insolvent estates with mountains of administrative claims continuing to accrue

daily.

2.     By their literal interpretation, the Chapter 11 Trustee's Plans, supported by

unequivocal admissions in his pleadings, establish that post-petition, he has intentionally

breached pre-petition contractual obligations of the Debtors to create a purported $100 million

post-petition claim against the estates for an entity that had no claims against the estates when

the Orders for Relief were entered.  By his own account, he has rendered the estates

administratively insolvent.  Having thus admitted to putting the estates into this predicament—

which under almost every other measure would be considered a flagrant breach of fiduciary

---

[1] Defined terms herein shall be as set forth in the Plan unless otherwise provided herein.

[2] HCLOF has filed no proof of claim in these cases, seeks no monetary relief from the Debtors, and has moved to amend its pending adversary proceeding claim to reflect that it no longer seeks the equitable claims that it sought previously (such claims are moot in any event).  Nonetheless, HCLOF objects on the basis that the proposed plans propose either to take its property or alter its contractual and legal rights.  HCLOF asserts no creditor standing in any of the objections set forth herein, and makes these objections as a party in interest given the substantial harm the plans propose to impose on it.

**PAGE 2**

4815-0110-1423.4

duty—he is now championing to "fix" the situation by either (i) taking non-estate property from the purported (involuntary) claimant and selling it along with some executory contracts of the estates that are otherwise valueless, then distributing the ill-gotten proceeds after carving off a substantial fee for himself, or (ii) re-writing multiple securities contracts to which the estates are not a party in order to not only insulate the estates from the consequences of his self-proclaimed intentional breach, but to radically alter the bargained-for rights of third party market participants in five collateralized loan obligation funds with over $2 billion at stake, none of which ever belonged to the Debtors.

3.       What the Chapter 11 Trustee is proposing under each of Plans A, B and C violates some of the most basic tenets of Title 11 and ignores the very confines of this Court's jurisdiction.   These Plans are patently unconfirmable with an unconscionable premise: that a Chapter 11 Trustee should be handsomely rewarded for an intentional post-petition breach of the estates pre-petition contractual obligations.   Such a conclusion is beyond the pale no matter how allegedly noble  the cause.   These cases should be either dismissed or, at most, converted back to Chapter 7 liquidation.

## II.
## RELEVANT BACKGROUND

4.       On January 30, 2018, Joshua N. Terry ("**Terry**") filed involuntary petitions for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("**Acis GP**," and with Acis LP, the "**Debtors**").  A Chapter 7 Trustee was thereafter appointed.

5.       On May 4, 2018, the Chapter 7 Trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**").  Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis*

*Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

6.    On May 11, 2018, after a hearing on the matter, the Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206].  Thereafter, the United States Trustee appointed Robin Phelan as Chapter 11 Trustee (the "**Chapter 11 Trustee**").[3]

7.    On July 5, 2018, the Chapter 11 Trustee filed the initial Plan [Doc. No. 383], which proposed three (3) alternatives – Plans A, B and C.  In summary, Plan A of the Chapter 11 Trustee's Plan proposes to transfer HCLOF's Equity Notes, along with the portfolio management agreements (the "**PMAs**") to which Acis LP is a counter-party, to a third party "plan funder," which is Oaktree.  Through this transaction, the Chapter 11 Trustee claims that all creditors will be satisfied in full.  Alternatively, the Chapter 11 Trustee has proposed Plans B and C, which are effectively identical in their treatment of creditors  and call for Acis LP to retain the PMAs and pay out creditors from future cash flow streams therefrom, as well as potential recoveries from estates' causes of action.  Both Plans B and C require radical modification to of the CLO Indentures, ostensibly to ensure the future income stream to the estates.

8.    On July 13, 2018, the Chapter 11 Trustee filed (i) the Disclosure Statement [Doc. No. 405]; (ii) the *First Modification to the Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Doc. No. 406]; and (iii) *the Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan, and Setting Related Deadlines; (C)*

---

[3] Mr. Phelan was initially appointed on May 11, 2018 as the Chapter 11 Trustee of Acis LP and was appointed on May 16, 2018 as the Chapter 11 Trustee of Acis GP.

**PAGE 4**
4815-0110-1423.4

*Approving Forms for Voting and Notice; and (D) Granting Related Relief* [Doc. No. 407] (the "**Motion for Conditional Approval**").

9.      On July 24, 2018, Highland and HCLOF filed respective objections to the Motion for Conditional Approval, [Doc. No. 431] and [Doc. No. 432].  On July 28, 2018, Highland filed a supplement to such objection [Doc. No. 440].  In each objection, Highland and HCLOF reserved rights to object to the final approval of the Disclosure Statement.

10.     On July 29, 2018, the Chapter 11 Trustee amended the Plan and Disclosure Statement following an expedited hearing on the Motion for Conditional Approval held earlier that day.  Thereafter, on July 30, 2018, the Court entered the *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV) Approving Related Matters* [Doc. No. 446] (the "**Conditional Approval Order**"), conditionally approving the Disclosure Statement, setting an August 21, 2018 combined hearing for final approval of the Disclosure Statement and confirmation of the Plan, and setting related deadlines, including a compressed and expedited discovery schedule (the "**Discovery Schedule**").

11.     The Conditional Approval Order required the Chapter 11 Trustee to file a "**Limited Issues Brief**" on or before 4:00 p.m. on August 10, 2018, addressing: (a) issues related to section 1142 of the Bankruptcy Code in connection with the proposed transfer of HCLOF's subordinated notes under the Plan A alternative, and (b) issues related to sections 365 and 1123(a)(5)(F) of the Bankruptcy Code in connection with the proposed modification of the existing Indentures under the proposed Plan B and Plan C (collectively, the "**Limited Issues**").

4815-0110-1423.4

**Appx. 00197**

Also as per the Conditional Approval Order, the deadline for parties to respond to the Limited Issues Brief is 4:00 p.m. on August 16, 2018.

12.    Per the Discovery Schedule, the  Chapter 11 Trustee filed the Limited Issues Brief on August 10, 2018 [Doc. No. 493].  Highland and/or HCLOF intend to timely respond to the Limited Issues Brief per the Discovery Schedule.  As such, while certain Limited Issues are mentioned herein, Highland and HCLOF reserve all rights on those issues for subsequent objection.  Per the Discovery Schedule, this joint objection is to cover matters other than the Limited Issues; provided, however, discovery is actually occurring after the deadline to file this objection.  Thus, Highland and HCLOF reserve their rights to supplement these objections.

### III.
### OBJECTION

13.    In order to confirm the Plan, the Chapter 11 Trustee bears the burden of establishing the various provisions of Bankruptcy Code section 1129 by a preponderance of the evidence.  *See In re Couture Hotel Corp.*, 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015).  The Plan is deficient on almost every applicable subsection of 1129 and, as a result, the Plan is unconfirmable as a matter of law.

**A.    The Bankruptcy Court Lacks Subject Matter Jurisdiction to Confirm the Plan**

14.    The Bankruptcy Court lacks subject matter jurisdiction over this proceeding and, therefore, proceeding with confirmation of any plan will be void *ab initio*.  This Court should have dismissed the involuntary petitions that were filed by Joshua Terry in bad faith, and because this Court lacks subject matter jurisdiction over essentially a two-party dispute subject to arbitration.  *See* Brief of Appellant Neutra (Case No. 3:18-cv-01056 (N.D. Tex.), [Doc. No. 11].

15.    Even assuming this Court has subject matter over this proceeding, the Plans violate the strictures of that jurisdiction in at least two critical and insurmountable ways:

    a.   Plan A is premised on the taking of non-estate property without its owners consent; and

    b.   Plans B and C are premised on radically altering non-estate executory contracts.

16.    The Court's lack of subject matter jurisdiction is so fundamental, that frankly the Court need look no further.  The Chapter 11 Trustee has presented the Court with patently unconfirmable Plans.  Section 1129(a)(1) and (a)(2) require, respectively, that the plan and the plan proponent, comply with the applicable provisions of the Bankruptcy Code.  The Chapter 11 Trustee's Plan A, however, asks this Court to exceed its constitutional and statutory authority to infringe upon the rights of a non-creditor and effect a taking of non-estate property (the "**Equity Notes**") via an equitable subrogation theory that is completely contrary to the law, and convert that non-estate property into "property of the estate," so that he can then sell it to a third party (Oaktree).  This Court cannot approve this scheme because it has no jurisdiction to do so.  Confirming Plan B or C likewise would require the Court to exceed its authority because both plans are premised on the nonconsensual alteration of non-executory contracts.  Worse yet, the amendments will be to the determent of third parties who are not creditors of these estates and who are not remotely implicated in these proceedings.  This Court simply has no such jurisdiction.

17.    It is fundamental that bankruptcy courts do not have subject matter jurisdiction over property that does not belong to a debtor's estate.  *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.),* 764 F.3d 512, 525 (5th Cir. 2014) (bankruptcy court did not have in rem jurisdiction over assets that were not "property of the estate"); *see also Scott v. Bierman,* 429 F. App'x. 225, 231 (4th Cir. 2011) ("[A] bankruptcy court's jurisdiction does not extend to property not part of a debtor's estate."); *see also NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network, Inc.),* 267 B.R. 46, 59

(Bankr. D. Del. 2001) (same); *In re Funneman*, 155 B.R. 197, 199-200 (Bankr. S.D. Ill. 1993) (partnership property was not property of the debtor-partner's estate and, therefore, outside the court's subject matter jurisdiction).

18.    These jurisdictional principles exist to protect the very type of non-debtor property interests that are at issue in this case.  And they apply even when the property would benefit a debtor's estate.  *See, e.g., Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1013 (5th Cir. 1985) (noting the limitations placed on the trustee's strong arm powers by section 541, and stating that "Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own.").

19.    Before the Court can order a transfer of the Equity Notes to Oaktree, it would necessarily have to find that they constitute "property of the estate."  If the Court cannot conclude that the Equity Notes are property of the estate, then it will lack jurisdiction to order their transfer by any means.  *See, e.g., In re Murchison*, 54 B.R. 721, 725 (Bankr. N.D. Tex. 1985). (finding that the court was without jurisdiction to approve the  sale of property that was not property of the estate: "Because the criterion of § 541(a)(1) has not been satisfied, § 363(b)(1) cannot apply.").[4]

20.    Section 541 of the Bankruptcy Code defines "property of the estate" as, in relevant part, (i) "all legal or equitable interests of the debtor in property as of the commence of the case," (ii) "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title," and (iii) "[a]ny interest in property that the estate acquires after the commencement of the case."  11 U.S.C. §§ 541(a)(1), (a)(3), (a)(7).

---

[4] Bankruptcy courts have been held to be without jurisdiction to order the sale of non-estate assets, even where the sale was entirely consensual. *See, e.g., First Nat'l Bank v. Community Trust Bank*, No. 05-1610, 2006 WL 724882, at *4 (W.D. La. Mar. 21, 2006) ("Since the property was not part of the bankruptcy estate, the Bankruptcy Court had no authority or jurisdiction to order the consensual sale and, therefore, the sale was void").

21.     Neither the Chapter 11 Trustee nor his proposed transferee, Oaktree, dispute that the Equity Notes are the property of HCLOF.  *See* July 6, 2018 Hrg. Tr. at 71:19-25; 119:11-18. Nor has the Chapter 11 Trustee obtained an interest in the Equity Notes via any of the Bankruptcy Code sections enumerated in section 541(a)(3).  Thus, for the Equity Notes to be "property of the estate," they would necessarily have to be "property that the estate[s] acquire after the commencement of the case" under section 541(a)(7).[5]

22.     Upon first blush, that would seem to require only that the Chapter 11 Trustee prevail upon his equitable subrogation theory, thereby converting the Equity Notes into "property of the estate."   However, even if the Chapter 11 Trustee successfully can obtain ownership of the Equity Notes, such property acquired post-petition is not "property of the estate" under section 541(a)(7).

23.     Under controlling Fifth Circuit law, section 541(a)(7) only applies to "property interest that are themselves traceable to 'property of the estate' or generated in the normal course of the debtor's business."  *In re TMT Procurement Corp.*, 764 F.3d at 524-25 ("As we previously recognized in *In re McLain*, 'Congress enacted § 541(a)(7) to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate") (citing *In re McLain*, 516 F.3d 301 (5th Cir. 2008)) (emphasis added); *see also In re Cent. Med. Ctr.*, 122 B.R. 568 (Bankr. E.D. Mo. 1990) ("Congress did not intend Section 541 'to enlarge a debtor's rights against others beyond those

---

[5] The Chapter 11 Trustee also does not, and cannot, dispute the axiom that the debtor in possession or trustee steps into the shoes of a debtor and possesses no greater rights than that of the debtor. *See Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 748 (3d Cir. 2013) ("It is a given that the trustee or debtor-in-possession can assert no greater rights than the debtor himself had on the date the bankruptcy case was commenced.") (internal alterations omitted)); *In re Gibralter Res., Inc.*, 197 B.R. 246, 253 (Bankr. N.D. Tex. 1996) ("the general rule is that a trustee has no greater rights than the debtor and stands in the shoes of the debtor"); *In re Brooks*, 60 B.R. 155, 160 (Bankr. N.D. Tex. 1986) ("Of course, a bankruptcy trustee can acquire no greater rights in property than the debtor possessed.") (citation omitted)).  The Debtors had no right to sell the Equity Notes before the commencement of these bankruptcy cases and have no such rights now.

existing at the commencement of the case..'"") (citing *In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir. 1985)). That is not the case with the Equity Notes, which are not traceable to any property of the estate, but under the Chapter 11 Trustee's (unsupportable) theory, are property of the estate as a result of a subrogation right that purportedly vested with the estates post-petition.

24.     The property at issue in *In re TMT Procurement* was certain corporate shares that were pledged by a non-debtor third party into a court-ordered escrow that served as the collateral for the debtors' DIP loan. *In re TMT Procurement Corp.*, 764 F.3d at 524. The shares never belonged to the debtors at issue. *Id.* at 524-25. The corporation whose shares had been pledged appealed the orders of the district court (which had withdrawn the reference from the bankruptcy court), arguing that the district court did not have jurisdiction to issue orders with respect to the shares, which were not "property of the estate." *Id.* at 522-23.

25.     The Fifth Circuit, vacating the district court's order, rejected the debtors' argument that the shares were property of the estate under section 541(a)(7). In doing so, the Fifth Circuit made clear that: "[T]he Vantage Shares are not 'property of the estate' under § 541(a)(7) because they were not created with or by property of the estate, they were not acquired in the estate's normal course of business, and they are not traceable to or arise out of any pre-petition interest included in the bankruptcy estate." *Id.* at 525 (rejecting also the argument that the tracing limitation did not apply to corporate debtors in chapter 11 bankruptcies).

26.     The Plan does not satisfy sections 1129(a)(1) and (a)(2) because it seeks to impermissibly expand the scope of estate property and requires the Court to exceed its jurisdiction. The Equity Notes were not "property of the estate" at the commencement of these cases and the Chapter 11 Trustee has not obtained the Equity Notes through one of the

enumerated sections in Section 541(a)(3).  Nor are the Equity Notes traceable to any property of the estate.  Therefore, the Plan cannot be confirmed.  *See In re Cent. Med. Ctr.*, 122 B.R. at 573 (holding that the plan failed to satisfy section 1129(a) "[b]ecause the Plan violates Section 541(a) due to its improper expansion of the estate's interest" in certain funds in which it only had a reversionary interest at the commencement of the case; the plan "baldly seeks to divest the bondholders of property which is rightfully theirs.").

**B.     Sections 1129(a)(1), (3) – The Plan Violates the Bankruptcy Code and Violates Other Applicable Law**

27.     Bankruptcy Code section 1129(a)(1) requires that a plan comply "with the applicable provisions of this title," and section 1129(a)(3) states that a plan cannot be proposed "by any means forbidden by law."  As to section 1129(a)(1), the Plan violates well-accepted tenets of bankruptcy law because the Chapter 11 Trustee seeks to (i) take possession of non-estate property and (ii) fundamentally alter non-debtor executory contracts.  These are included among the Limited Issues and will be set forth in the response to the Limited Issues Brief.

28.     As to section 1129(a)(3), despite the Chapter 11 Trustee's obfuscations regarding "transfers" and other similar self-serving characterizations, the practical reality is that the Plan A transaction effects a sale of the Equity Notes to Oaktree.  The Equity Notes are undoubtedly securities.  *See Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990); *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542-43 (S.D.N.Y. 2013) (finding sale of CLO notes to be a sale of a security under *Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010)).  Any sale of securities must comport with the requirements of federal securities laws, including the Securities Act of 1933 (the "**'33 Act**").[6]

---

[6] Moreover, none of the Indentures or other relevant documents permit the Chapter 11 Trustee, on behalf of Acis, or otherwise, to market HCLOF's Equity Notes for sale.  The Chapter 11 Trustee cannot sell the Equity Notes in violation of the terms of the Indentures, and seek at the same time to retain the benefits of the Indentures.

29.     Section 77e of the '33 Act makes it unlawful "to offer to sell or offer to buy . . .

any security, unless a registration statement has been filed as to such security."  15 U.S.C.

§ 77e(c).[7]  The Chapter 11 Trustee has not filed a registration statement covering his proposed

sale of the Equity Notes.

30.     Section 1145(a)(1) and (a)(2) do not absolve the Chapter 11 Trustee from

compliance with these requirements because Oaktree is not receiving the Equity Notes on

account of claims against the estates.  *See also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d

412, 425 (S.D.N.Y. 2007) ("[T]he section 1145(a) exemption is available only when the offerees

are receiving the securities, at least in part, in exchange for claims against or interests in the

debtor which they hold." (internal citation omitted)).

31.     The mechanism set forth in the Plan for the transfer of the Equity Notes makes

plain that Oaktree is not the initial transferee (or subrogee).  Instead, the initial transferee are the

bankruptcy estates.  As described, the estates will then transfer the notes to Oaktree.  Because

Oaktree will not be receiving the Equity Notes in exchange for claims or interests that Oaktree

has against the Debtors, the section 1145(a) exemption cannot, and does not, apply.

32.     Bankruptcy Code section 1145 provides a limited exemption when the Chapter 11

Trustee sells a security "of an issuer other than the debtor or an affiliate"  11 U.S.C. §

1145(a)(3).  The exemption allows trustees to raise cash for an estate while protecting purchasers

by requiring that adequate information about the securities is available.  This "portfolio

securities" exemption should be strictly construed because public policy strongly supports the

registration of securities.  *See Quinn & Co. v. S.E.C.*, 452 F.2d 943, 946 (10th Cir. 1971); 8

---

[7] In any litigation or enforcement action, it would be the Chapter 11 Trustee's burden to show the applicability of an
exemption to this requirement.  *E.g.*, *SEC v. Carrillo Huettell LLP*, No. 13 Civ. 1735(GBD)(JCF), 2017 WL
213067, at *3 n.7 (S.D.N.Y. Jan. 17, 2017).  The Chapter 11 Trustee has not argued that any of these exemptions
apply.  *See* 15 U.S.C. § 77d (providing exemptions to registration requirements).

Collier on Bankr. ¶ 1145.02 (16th ed. 2018).  This exemption requires that (1) the debtor own the security on the date the bankruptcy petition was filed; (2) any exempt securities are not securities of the debtor's affiliates; (3) the issuer of the securities is in full compliance with registration and disclosure laws; and (4) the volume of the securities sold be limited to less than 4% of shares outstanding.  11 U.S.C. § 1145(a)(3).

33.    The Chapter 11 Trustee's Plan A transaction clearly does not qualify for this exemption.  First, neither the Chapter 11 Trustee nor the Debtors owned the Equity Notes on the date the bankruptcy petition was filed, nor do they own them now.  Second, the proposed sale would be far in excess of the 4% threshold permitted by the exemption.  Because the section 1145 exemptions do not apply, the Chapter 11 Trustee will be in violation of the '33 Act.

34.    In addition to violating the '33 Act, the Plan violates the Investment Advisors Act of 1940 (the "**IAA**").  It is clear that the Chapter 11 Trustee owes fiduciary duties to HCLOF and its investors.  In agreeing to manage the CLO investments, Acis LP represented to the CLOs that it is "registered as an investment adviser" under the IAA and agreed to perform its portfolio management services consistent with the IAA.  *See, e.g.*, 2013-1 PMA § 17(b)(i).  The IAA imposes a fiduciary duty on Acis LP to act for the benefit of the CLO and its investors, including Equity Noteholders like HCLOF.  *See Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 36 (1979) ("Congress intended to impose enforceable fiduciary obligations" in passing the Act); 15 U.S.C. § 80b-6.[8]  The scope of Acis LP's (and thus the Chapter 11 Trustee's) fiduciary duties is broad.  The Chapter 11 Trustee's obligations include a duty to refrain from conduct that directly harms the CLOs, as well as the more general duty of undivided loyalty.  *See Bullmore v. Banc of*

---

[8]  Acis LP also owes fiduciary duties as an investment advisor under New York's common law.  *See Bullmore v. Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div. 2007) ("Professionals such as investment advisors, who owe fiduciary duties to their clients, 'may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties . . . .'") (citations omitted).

*Am. Sec. LLC*, 485 F. Supp. 2d. 464, 471 (S.D.NY. 2007) (applying New York law). Each of the plans proposed by the Chapter 11 Trustee rest upon a flagrant violation of Acis LP's fiduciary duties: Plan A proposes to sell HCLOF's property without its consent and Plan B and Plan C propose to impermissibly modify the Indentures to strip HCLOF and the other noteholders of their right to call a redemption. These issues will be more thoroughly addressed in HCLOF and Highland's response to the Chapter 11 Trustee's Limited Issues Brief.

35. Moreover, the Chapter 11 Trustee cannot disclaim the duties he owes to the CLOs and the investors under the contracts and securities laws, including the IAA. In one analogous case, *In re New Center Hospital*, 200 B.R. 592 (E.D. Mich. 1996), the chapter 11 trustee sought to escape the duties of the debtor-hospital as the administrator of an employee benefit plan governed by ERISA. The chapter 11 trustee argued that if he were to administer the plan, he would be required to act solely in the interest of the ERISA plan beneficiaries which would be in conflict with his duties to the bankruptcy estates; therefore, he could not serve as an ERISA fiduciary and a bankruptcy estate fiduciary at the same time. *Id.* The district court rejected this argument and overturned the decision of the bankruptcy court, concluding that, "[t]he Bankruptcy Trustee assumes the positon of the debtor as to that debtor's many obligations. Courts have held that statutory obligations that bind the debtor will subsequently bind the bankruptcy estate." *Id.* (internal citations omitted). Likewise, the Chapter 11 Trustee is bound to perform the obligations and duties of Acis LP under relevant contract and applicable law, including the IAA. Because the Chapter 11 Trustee has put forth a Plan that violates such duties, he cannot meet the section 1129(a)(3) standard that the Plan is not "forbidden by law."

## C.    Section 1129(a)(3) – The Plan Was Not Proposed in Good Faith

36. Bankruptcy Code section 1129(a)(3) further provides that a plan must be proposed in good faith. The Chapter 11 Trustee, as proponent of the Plan, bears the burden of

demonstrating that it was filed in good faith.  *In re Barnes*, 309 B.R. 888, 892 (Bankr. N.D. Tex.

2003).  A good faith plan "must fairly achieve a result consistent with the [Bankruptcy] Code."

*Id.* (quoting *In re Block Shim Dev. Co. – Irving*, 939 F.2d 289, 292 (5th Cir. 1991)).  Good faith

itself is "evaluated in light of the totality of the circumstances surrounding establishment of [the]

plan, mindful of the purposes underlying the Bankruptcy Code."  *In re Village at Camp Bowie I,*

*L.P.*, 710 F.3d 239, 247 (5th Cir. 2013).  The ultimate goal of the analysis is to determine the

"subjective motive" of a plan proponent.  *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 694

(Bankr. N.D. Tex. 2013).

37.     The record demonstrates there was virtually no negotiation of the economic terms

of the Oaktree proposal, and in particular there was no effort by the Chapter 11 Trustee to secure

the highest possible price for the Equity Notes.[9]  The purported consideration for the PMAs was

clearly based not on any actual metric of value for those contract rights, but on an amount

necessary to pay Josh Terry's claim.  Certainly as to the Equity Notes, this was not a negotiation

between a willing seller and a willing buyer – the seller was not even present.  It is instead a

scheme, concocted in bad faith, to take property from one party and provide a windfall to other

parties.

38.     Moreover, improper motives have tainted these bankruptcy cases from the

beginning.  Joshua Terry initiated these  proceedings on the eve of a state court hearing to

consider the very relief he then requested from this Court.  From the very beginning, Terry has

made clear  his motivation for initiating the involuntary bankruptcy:  to prevent Acis LP from

---

[9] The Chapter 11 Trustee has testified that he engaged in no substantive negotiation concerning the sale price of the
Equity Notes.  *See* Transcript of July 6, 2018 hearing at 75:14-16; 76:6-8:

  MR. MALONEY.  Was there any negotiation over the price formula that they were proposing for
  the subordinated notes?
  MR. PHELAN.  No . . .
  . . .
  Q.  Now you didn't ask that they increase that at all?
  A.  No.

4815-0110-1423.4

meeting its contractual obligation to effectuate the reset requested by the equity—so that the Debtors could continue to earn management fees they are not entitled to.[10]

39.     The Chapter 11 Trustee has adopted Terry's cause.

40.     At the end of the day, these bankruptcy cases and the Plan amount to nothing but a free option play by Terry, the Chapter 11 Trustee, and Oaktree to monetize PMAs with less than nominal value, at the expense of Highland (who is effectively funding the administrative expenses of these cases on account of the substantial management fees being withheld from it) and HCLOF (who is being denied its contractual rights with non-debtor parties and stripped of its own property against its will to fund that payment).  The Chapter 11 Trustee has nothing to lose from this strategy – he can turn an asset with little or no value into a big pay day for Terry and himself.  Oaktree similarly has nothing to lose – if it doesn't end up getting the Equity Notes, it walks away with all its expenses paid and a $2.5 million break-up fee for its time.

41.     In these circumstances, the Court should not make a good faith finding.

**D.     Section 1129(a)(5) – The Plan Does Not Properly Disclose or Address Insider Issues**

42.     Bankruptcy Code section 1129(a)(5)(A)(i) requires a plan proponent to disclose "The identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."  Under both Plan B and Plan C, Terry is slated to receive 100% of the equity in the Reorganized Debtor (as well as, inexplicably, any residual assets of the Acis Trust upon payment in full of all creditors).  Terry therefore clearly comes within the definition of individuals described in section 1129(a)(5)(A)(i).

---

[10] Among the things acknowledged by Terry at the involuntary trial in March 2018 was the fact that he "had no issues with the rest or refinance transaction. [Rather,] the issue was that these collateral-management agreements were transferred for no consideration to Acis."  March 21, 2018 Hrg. Tr. At 132:16-19.  Note, however, that fees would not continue to be payable under the PMAs following a reset in any circumstance.  *See also Id.* at 27:22-28:1: "Q: And you knew there was an extreme likelihood that the [reset] transaction was not going forward as a result of the bankruptcy filing, correct?  MR. TERRY: Yes, that was our goal on filing the involuntary petitions."

**PAGE 16**

**Appx. 00208**

While Terry's identity is disclosed in Plans B and C, his affiliations are not. Specifically, the Chapter 11 Trustee makes no effort to describe Terry's relationship and affiliations with other parties in interest in this case including (without limitation) Oaktree, Brigade Capital Management, L.P., and Cortland Capital Markets Services LLC. Furthermore, the Chapter 11 Trustee does not disclose or otherwise describe the post-petition affiliation between Terry and the Chapter 11 Trustee himself. Discovery in this matter has revealed, and evidence at the confirmation hearing will further demonstrate, that Terry has essentially acted as the co-trustee in this case. This includes: taking it upon himself to market the Debtors' assets, introducing the Chapter 11 Trustee to Oaktree, participating in most substantive communications with Oaktree, and participating in the formulation of a Plan that (under Plans B and C) hands control of the Debtors over to him. On this record, it is clear that Terry's affiliations have not been disclosed, in violation of section 1129(a)(5)(A)(i).

43.   While Terry's undisclosed affiliations is a significant issue in and of itself, the relationship between Terry and the Chapter 11 Trustee raises yet another, troubling issue. The facts of this case lead inexorably to the conclusion that Terry is an insider of the Plan proponent (i.e., the Chapter 11 Trustee). The term "insider" is defined in Bankruptcy Code section 101(31) to "include" parties who have certain officer, director, or ownership interests in a debtor. However, the concept of a non-statutory insider has been recognized by many courts, including the Supreme Court. *See U.S. Bank N.A. v. Village at Lakeside, LLC*, 138 S. Ct. 960 (2018). The Fifth Circuit has identified the following factors to consider when determining whether a party is non-statutory insider: (1) the closeness of the relationship between the party and the debtor; and (2) whether the transactions between the party and the debtor were conducted at arms-length. *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

PAGE 17

4815-0110-1423.4

Importantly, cases recognize that control over the debtor is <u>not</u> a requirement for determining non-statutory insider status.  *See, e.g., In re The Village at Lakeridge, LLC,* 814 F.3d 993, 1001 (9th Cir. 2016); *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.),* 531 F.3d 1272, 1277 n.5 (10th Cir. 2008).

44.     The ultimate point of analyzing whether any party is an insider is to determine whether such party is using "their privileged position to disadvantage non-insider creditors."  *See In re South Beach Secs., Inc.,* 376 B.R. 881, 888 (Bankr. N.D. Ill. 2007).  Insider status is also critical for determining whether a party's desire to obtain, or maintain, control over a debtor is motivating the party.  *See In re Rexford Props., LLC,* 557 B.R. 788, 799 (Bankr. C.D. Cal. 2016) (noting that insiders seeking to retain ownership of the reorganized debtor were "influenced by totally different considerations from those motivating the other creditors.") (quoting *In re Featherworks Corp.,* 25 B.R. 634, 640 (1st Cir. BAP 1982)).

45.     In this case, the Chapter 11 Trustee is the proponent of the Plan.  Plan proponent insiders should be scrutinized because they, like a debtor insider, may be using a plan process to benefit their "privileged position."  For example, in *In re Allegheny Int'l, Inc.,* 118 B.R. 282 (Bankr. W.D. Pa. 1982), the court found that a non-debtor plan proponent (Japonica Partners, L.P.) was considered an insider because Japonica during the case had access to "voluminous and thorough" information available only to insiders.  Moreover, the court noted that while Japonica "did not have actual control or legal decision making power [over the debtor] . . . [Japonica] attempted to influence, in not very subtle ways, decisions made by the debtor."  *Id.* at 298.

46.     Terry's actions fit perfectly into such a non-statutory insider analysis.  A review of the Plan makes plain Terry's favorable treatment.  His claim is separately classified, the claim is treated the same as an entirely secured claim would be, despite the fact that Terry did not even

alleged his claim was fully secured, he is being permitted to use $1 million to acquire Acis LP's equity, despite the fact that the claim on file is less than $1 million, and the Chapter 11 Trustee has made no indication that Terry's secured claim may be avoided, despite the fact that the garnishment took place well within the 90-day pre-petition preference period.

47.     In addition, while Terry is not in formal "control" of the Chapter 11 Trustee, Terry had access to voluminous insider information during the pendency of this case and he clearly influenced decisions made by the Chapter 11 Trustee.  Nothing about the relationship between Terry and the Chapter 11 Trustee suggests that they acted at arms-length.  Moreover, Terry used his close relationship to further his non-creditor motivation to put into place provisions that will allow him to take sole control over the Reorganized Debtor.  Thus, Terry meets every single element for establishing that he is a non-statutory insider of the Plan proponent in this case.  Moreover, any attempt by the Chapter 11 Trustee to distinguish the facts and cases on the basis that the Chapter 11 Trustee is not the same entity as the Debtors is specious.  Once again, the Chapter 11 Trustee is the Plan proponent in this case.  If a Chapter 11 trustee were able to hide behind an "I am not the debtor" argument, then it would follow that parties could engage in all manner of inside dealing and wrongful acts with a trustee with impunity.  That makes no sense.  The non-statutory insider analysis is designed to identify whether a party has a close relationship that allows the party to influence the process to further non-creditor goals (i.e., control).  Terry meets that test with respect to the Plan proponent in this case.  And, as discussed below, the fact that Terry is a non-statutory insider means the Chapter 11 Trustee cannot cram down the Plan.

4815-0110-1423.4

**E.     Sections 1129(a)(7) and 1129(b) – The Plan Is Not In the Best Interest of Creditors and Is Not Fair And Equitable**

48.     Bankruptcy Code sections 1129(a)(7) and 1129(b) require that a plan be in the best interest of creditors and otherwise fair and equitable.  First and foremost, Plans A, B, and C are premised on actions that are not supported by the law.  How could it ever be in the best interest of creditors for a plan proponent to act outside the law?  The Plan is a legal fallacy and, even if confirmed, will be the subject of years of litigation and ever-increasing administrative expense claims.  That is not in the creditors' best interests.

49.     Also, included in a best interest of creditors analysis is a determination that creditors who have not accepted the plan will receive no less under the Plan then they would in a hypothetical Chapter 7 liquidation.  *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993).  This requires a valuation analysis comparing what the creditor would receive if the property were sold today versus the value such creditor would receive as a creditor in a Chapter 7 case.  *Id.*

50.     The Chapter 11 Trustee cannot meet his burden on this valuation issue with respect to HCLOF.[11]  It is undisputable that HCLOF was not a creditor as of the Petition Date.  That is, the basis for the Chapter 11 Trustee asserting that HCLOF is a creditor is the equitable relief sought in an adversary proceeding brought by HCLOF against the Chapter 11 Trustee after the Petition Date.  In a hypothetical Chapter 7 case, there would simply be an orderly liquidation and therefore no need to twist the law of equitable relief and subrogation to support a plan process and HCLOF would keep its subordinated notes.  As such, any liquidation analysis by the Chapter 11 Trustee is a non-sequitur from the beginning because it would be based on the facially incorrect assumption that HCLOF was a creditor on the Petition Date.  Moreover, even if

---

[11] As noted, HCLOF asserts no creditor standing.

**PAGE 20**

4815-0110-1423.4

**Appx. 00212**

that flaw is simply ignored (and there is no reason to do so), the valuation numbers do not add up.  The Plan proposes to pay HCLOF amounts based entirely on a May 2018 letter sent by Highland.  Evidence has shown in this case that circumstances have changed dramatically since May 2018, and further, that  HCLOF values its Equity Notes  much higher than what is being proposed under the Plan.  The Chapter 11 Trustee bears the burden of rebutting that valuation evidence and, based on the record of this case, he will not be able to meet such burden.  In fact, the Chapter 11 Trustee has not even substantively included HCLOF in its analysis purporting to satisfy section 1129(a)(7)[12] and he has advanced no expert witness to address the valuation issues necessary to do so at the confirmation hearing.  Therefore, the Chapter 11 Trustee cannot satisfy the required test under section 1129(a)(7).

## F.    Sections 1129(a)(8), (10) and 1129(b) – The Plan Does Not Meet the Requirements for Cram Down

51.    Bankruptcy Code sections 1129(a)(8) requires that each impaired class vote in favor of a plan.  Bankruptcy Code section 1129(a)(10) permits a plan proponent to cram down a plan on non-voting classes, as long as one class of impaired creditors votes in favor of the plan. Insider votes are not counted for the purposes of consent under 1129(a)(10).  Section 1129(b), in turn, requires in a cram down plan that the plan not unfairly discriminate and is fair and equitable to the non-voting creditors.  Based on the record of this case, it is assumed that Class 3 (the Terry Secured Claim) will be the only class with the claim amount and numerosity to be deemed (according to the Chapter 11 Trustee) a consenting class.  Therefore, in order to meet the cram down confirmation requirements, the Chapter 11 Trustee has the burden of showing that: (i) Terry is impaired; (ii) Terry is not an insider; and (iii) cramming the Plan down solely on

---

[12] The Chapter 11 Trustee's liquidation analysis is attached as Exhibit 2-D to the Disclosure Statement.  The amount of the Class 2 HCLOF claim is listed as "TBD."  *Id.*

**PAGE 21**
4815-0110-1423.4

Terry's vote does not unfairly discriminate and is fair and equitable to other creditors.  The Chapter 11 Trustee cannot meet such a burden.

52.    The Fifth Circuit interprets the concept of impairment broadly to include any alternation of a creditor's rights.  *In re Village at Camp Bowie I, L.P.*, 710 F.3d at 245. However, a broad interpretation does not mean that the concept of impairment does not exist. The policy reason for requiring an impaired class to accept the plan under a cram down is to ensure that at least one group of creditors that is "hurt . . . nonetheless favors the plan."  *In re One Times Square Assocs. Ltd. P'ship*, 165 B.R. 773, 776-77 (S.D.N.Y. 1994) (emphasis added).

53.    Here, no viable argument can be made that Terry is impaired under Plan A because Plan A proposes to pay Terry in full with interest.  The interest element, of course, compensates Terry for any delay in receiving what he alleges he is owed.  Paying a creditor in full with interest is the very definition of non-impairment.  Using a lone creditor, let alone in insider such as Terry, should not be sufficient to fulfill the section 1129(a)(10) requirement. This is a textbook case of using artificial impairment to generate an impaired accepting class.

54.    Moreover, even if Terry were considered impaired under Plan A, Terry's votes should not be counted under any of the plans (A, B, or C) because Terry is a non-statutory insider.  The basis for deeming Terry a non-statutory insider is set forth above.  Because of his status as such, the Chapter 11 Trustee is prohibited by the plain language of section 1129(a)(10) from relying on Terry's votes to support a plan.

55.    The final requirement for a cram down plan is that it is fair and equitable and does not unfairly discriminate.  Whether a plan is proposed in good faith is a critical element of this determination.  *See In re Village at Camp Bowie I, L.P.*, 710 F.3d at 247 (citing *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989)).  Because, as set forth above, the Chapter 11

4815-0110-1423.4

Trustee is unable to establish that the Plan was proposed in good faith, he likewise will be unable to establish that he meets the cram down standard.  The Plan also unfairly discriminates on a number of different bases.  Moreover, the Chapter 11 Trustee provides no basis for classifying Highland's claims separately under the Plan, other than to gerrymander the classes.

**G.    Section 1129(a)(10) – The Plan's Claim Classifications are Improper**

56.    A further requirement under section 1129(a)(10) and related case law is that claims be properly classified under a plan.  *See, e.g., In re Greystone III Joint Venture,* 995 F.2d 1274, 1279 (5th Cir. 1991) (prohibiting the gerrymandering of classes to create a consenting impaired class).  Claims that are "substantially similar" must be classified together.   Terry's claim treatment under the Plan is a blatant example of gerrymandering.  Terry has alleged a partial secured claim based on pre-petition garnishment of certain funds.  However, the garnishment occurred within the 90-day preference period and is *per se* avoidable.  As such, Terry is nothing more than a general unsecured creditor in this case.  His claim should be classified alongside other general unsecured creditors in Class 4.

57.    Highland is a general unsecured creditor in the case, but its claim has been separately classified from other general unsecured creditors.  Similarly, HCLOF is a Class 2 claimant under Plan A, but is effectively a Class 5B claimant under Plan B and Plan C. Presumably, the Chapter 11 Trustee bases such separate classification and disparate treatment on his allegation that Highland and/or HCLOF are liable for a fraudulent transfer.  However, that matter remains subject to an on-going adversary proceeding.  In other words, the Chapter 11 Trustee has simply made an allegation and is yet to prove his case.  Permitting separate classification based on unproven allegations would seem an invitation for plan proponents to

PAGE 23

**Appx. 00215**

engage in all manner of mischief in order to craft around the requirement that substantially similar claims be classified together.[13]

### H.   Section 1129(a)(11) – The Plan is Not Feasible

58.   Bankruptcy Code section 1129(a)(11) has been interpreted to require a finding that a plan is economically feasible.  This requires the Chapter 11 Trustee to demonstrate that the plan has a "reasonable assurance of commercial viability." *In re Briscoe Enters., Ltd. II,* 994 F.2d at 1166.   Moreover, the Chapter 11 Trustee must "present proof through reasonable projections that there will be sufficient cash flow to funder the [Plan]." *See In re Couture Hotel Corp.,* 536 B.R. 712, 737 (Bankr. N.D. Tex. 2015).

59.   On the record before the Court, the Chapter 11 Trustee has failed to demonstrate sufficient funds to meet all the obligations set forth in the Plan.  That includes the very substantial administrative expense burden that appears to have surpassed the total claims alleged by the Chapter 11 Trustee to be payable in this case.

### I.   The Plan Cannot Effect an Assumption and Assignment of the PMAs Without Consent.

60.   The Plan A transaction cannot be confirmed because it proposes to assume and assign the PMAs to Oaktree (*see* Plan § 2.17(c)) in violation of section 365(c)(1) of the Bankruptcy Code and without the requisite consent.  *See* 11 U.S.C. § 365(c)(1) (trustee "may not

---

[13] HCLOF and Highland object to the Chapter 11 Trustee's apparent attempt to litigate the fraudulent transfer claims currently pending in the adversary proceeding as part of the plan confirmation process.  As set forth in their separately-filed joint motion to strike the expert report of Kevin Haggard of Miller Buckfire, any such attempts are procedurally improper and inconsistent with the parties' understanding and agreed-upon schedule.  Highland and HCLOF have a right under the Bankruptcy Code and applicable rules to litigate the fraudulent transfer claims in a proceeding subject to the heighted procedural protections available in an adversary proceeding—not in the context of a harried and accelerated confirmation process (a process of the Trustee's own making).  *See In re Mansaray-Ruffin,* 530 F.3d 230, 242 (3d Cir. 2008) ("[W]here the Rules require an adversary proceeding—which entails a fundamentally different, and heightened, level of procedural protections—to resolve a particular issue, a creditor has the due process right not to have that issue without one.").  The Court should not condone this type of "litigation by ambush."  *See In re Vidal,* No. 12-11758 BLS, 2013 WL 441605, at *5 (Bankr. D. Del. Feb. 5, 2013) (applying *Mansaray-Ruffin* to avoid "lien-stripping by ambush").

assume or assign any executory contract . . .if applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor . . . and such party does not consent to such assumption or assignment"); *In re Cedar Chem. Corp.*, 294 B.R. 224, 232 (Bankr. S.D.N.Y. 2003) ("a contract otherwise unassignable under § 365(c)(1) can be assumed and assigned if the non-debtor party consents"). The IAA and New York state law provide the relevant "applicable law" prohibiting assignment and excusing HCLOF from accepting performance from anyone other than Acis and/or Highland.

61. The IAA prohibits the assumption and assignment of the PMAs to Oaktree without, among other things, the Equity Noteholders' consent. Section 205(a)(2) of the IAA prohibits investment advisers (i.e., Acis LP) from entering into an investment advisory contract with a client (here, the CLOs) that "fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party by the contract." 15 U.S.C. § 80b–5(a)(2). Section 202(a)(1) of the IAA defines "assignment" generally to include "any direct or indirect transfer . . . of an investment advisory contract" by an adviser. 15 U.S.C. § 80b–2(a)(1) (emphasis added).

62. Section 14 of the PMAs (titled "Delegations/Assignments") provides the provisions intended to satisfy section 205(a)(2) of the IAA. Those sections, in relevant part, prohibit Acis from assigning its responsibilities under the PMAs without the written consent of each relevant CLO, at least a majority of the Equity Notes of each CLO, at least a majority of the Controlling Class (as defined in the indentures), and satisfaction of the Global Rating Agency Condition. *See*, *e.g.*, 2013-1 PMA, § 14(a). Acis cannot transfer, either directly or indirectly, its responsibilities under the PMAs without first satisfying the requisite conditions, including

obtaining the written consent of a majority of the Equity Noteholders of each CLO (which the Chapter 11 Trustee has not obtained).

63.     The *CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, No. 17 Civ. 9463, 2018 U.S. Dist. LEXIS 90174 (S.D.N.Y. May 23, 2018) case does not mandate a different result. First, the language the Trustee quotes is from a decades-old SEC no-action letter. *Id.* at *12 (quoting *SEC No-Action Letter, Am. Century Cos.*, 1997 WL 1879138, at *5 (Dec. 23, 1997)). SEC no-action letters are only binding with respect to the party requesting guidance, have no precedential value unless the SEC agrees to allow a party to rely on them, and the SEC is free to change their interpretation at any time.     *See* SEC, Fast Answers, available at https://www.sec.gov/fast-answers/answersnoactionhtm.html.  Second,  CWCapital did not decide whether the IAA separately requires client consent.  2018 U.S. Dist. LEXIS 90174, at *12-13. Third, a reported case from a court in this District recently found to be well-pleaded a cause of action for "assigning the benefits of [an] agreement to provide investment advisory services to others" based on the IAA.  *Douglass v. Beakley*, 900 F. Supp. 2d 736, 748 (N.D. Tex. 2012).

64.     The proposed assumption and assignment undermines the public policy reasons for section 205(a)(2) of the IAA.  The Chapter 11 Trustee's transfer of portfolio management duties to Oaktree thus violates section 205(a)(2) of the IAA, and in turn, violates section 365(c)(1) of the Bankruptcy Code.  The Chapter 11 Trustee and this Court cannot ignore the dictates of the IAA.  *Cf. In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 78-79 (Bankr. S.D.N.Y. 2007) (local ordinances provided "applicable law" that prohibited assignment).

65.     The PMAs are also a personal services contract that cannot be assigned under New York law without consent.  *See Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 482 (N.Y. 2006) (hotel management contract held below to be personal services contract;

"personal services contracts generally may not be assigned absent the principal's consent") (citing 9 Corbin, Contracts § 865 [interim ed.]; 3 Farnsworth, Contracts §§ 11.4, 11.10 [3d ed]); *Marriott Int'l, Inc. v. Eden Roc, LLLP*, 104 A.D.3d 583, 584 (N.Y. App. Div. 1st Dep't 2013) ("The parties' detailed management agreement places full discretion with plaintiffs to manage virtually every aspect of the hotel.  Such an agreement, in which a party has discretion to execute tasks that cannot be objectively measured, is a classic example of a personal services contract that may not be enforced by injunction"); *see also* 6A N.Y. Jur., Assignments § 11 ("[T]he principle that all ordinary business contracts are assignable is subject to the exception that executory contracts for personal services or those involving a relationship of personal confidence are not assignable by one party unless the other party consents or waives the right to object. Thus, as a general rule, an employment contract for the performance of personal duties or services is not assignable by the employer so as to vest in the assignee the right to the labor of someone who never agreed to such employment.  In fact, generally, no executory contract for personal services can be assigned by either party.").

66.    Under New York law, personal service contracts are generally those that depend on the skill or reputation of the performing party. *See In re Schick*, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999) ("Faced with a state law restricting assignment . . . a court must inquire into its rationale and uphold the restriction under section 365(c) if the identity of the contracting party is material to the agreement").  As one bankruptcy court has stated with respect to New York law on the issue:

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, the debtor-in-possession or trustee is unable to assume or assign the rights of the bankrupt in such contract. . . .  It is patently unfair in such cases to require a non-debtor third party to accept performance from anyone other than the original contract vendee,

unless the contract clearly provides for the right to assign to another contract vendee.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996); *see also Donald Rubin, Inc. v. Schwartz*, 559 N.Y.S. 2d 307, 310 (N.Y. App. Div. 1990) (describing a consulting agreement as being "in the nature of a personal services contract"); *Carbo Indus., Inc. v. Coastal Ref & Mktg., Inc.*, 154 F. App'x 218, 220 (2d Cir. 2005) ("this case does not fall within the limited exception developed for 'personal services contracts'—*e.g.*, consulting contracts.") (citing *Donald Rubin*, 559 N.Y.S. 2d at 310) (emphasis added).

67.    As has been previously explained, HCLOF and its investors invested in reliance on the skill and expertise of Highland to manage the CLOs.  In this case, a witness put on by the Chapter 11 Trustee – Zach Alpern of Stifel, Niocolas – testified to the fact investors pick sub-advisors based on the fact that different advisors "have different styles and make different creditor choices."[14]  Mr. Alpern further testified that "equity holders make an informed decision when they make their investment and their opinion of the advisor is one of the considerations that they may make at the time of their investment, and it's a consideration that they probably take into account whether they hold or sell that investment."[15]

68.    Replacing Acis/Highland with Oaktree/Brigade frustrates the investment objective of the parties, denies them the benefit of their bargain, and undermines and violates the IAA as well as black-letter New York law relating to personal service contracts.  The assumption and assignment of the PMAs cannot be approved.

---

[14] *See* Transcript of August 1, 2018 hearing on the Chapter 11 Trustee's *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC*, at 67:24-25.
[15] *Id.* at 69:9-14.

**J.    The Disclosure Statement Should Not be Finally Approved**

69.    As to the Disclosure Statement, Highland and HCLOF renew their objections to its final approval based on the fact that it describes a patently unconfirmable Plan.  S*ee In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007); *In re Arnold*, 471 B.R. 578, 586 (Bankr. C.D. Cal. 2002).

**IV.**
**RESERVATION OF RIGHTS**

70.    Nothing herein shall be construed as an admission of, or concession to, any fact contained in the Disclosure Statement or the Plan, and Highland and HCLOF reserve all rights to contest and rebut any and all factual allegations at the Confirmation Hearing.  As previously mentioned herein, because discovery is ongoing per the Discovery Schedule, Highland and HCLOF reserve their rights to amend these Objections.

WHEREFORE, Highland and HCLOF respectfully request entry of an order (i) denying confirmation of the Plan; (ii) denying final approval of the Disclosure Statement; and (iii) granting such other and further relief to which Highland and HCLOF are entitled.

Dated:  August 13, 2018

Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas  75201
Telephone:  (214) 999.3000
Facsimile:  (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

Mark M. Maloney (GA 468104) (admitted *pro hac vice*)
W. Austin Jowers (GA 405482)
Paul R. Bessette (TX 02263050) (admitted *pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street NE
Atlanta, GA 30309
Tel: 404-572-4600
Fax: 404-572-5100
mmaloney@kslaw.com

**COUNSEL FOR HIGHLAND CLO FUNDING,**
**LTD.**

**PAGE 30**
4815-0110-1423.4

**Appx. 00222**

<u>**CERTIFICATE OF SERVICE**</u>

      This is to certify that on August 13, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

                              */s/ Melina Bales*
                              Melina Bales

4815-0110-1423.4

# EXHIBIT 6

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 12/15/22    Page 228 of 280    PageID 270

Case 18-30264-sgj11    Doc 549    Filed 09/04/18    Entered 09/04/18 08:52:13    Desc
Main Document        Page 1 of 7

**18-30264-sgj11 Acis Capital Management, L.P. - Court's Ruling on Plan Confirmation**

| | | |
|---|---|---|
| Traci Ellison | to: | jbinford, honeil, emcgee, mbales, BBarnes, srosen, jprostok, rpatel, jwielebinski, achiarello, robin, jenright, mkleinsasser, MHurst, mmaloney, PBessette, RMatsumura, | 08/30/2018 09:24 PM |

From:    Traci Ellison/TXNB/05/USCOURTS

To:    jbinford@foley.com, honeil@foley.com, emcgee@foley.com, mbales@foley.com, BBarnes@lynnllp.com, srosen@forsheyprostok.com, jprostok@forsheyprostok.com, rpatel@winstead.com, jwielebinski@winstead.com, achiarello@winstead.com,

Dear Counsel:

The following is the court's ruling on the request of the Chapter 11 Trustee ("Acis Trustee") of Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC (collectively, the "Debtors") to confirm the *First Amended Joint Plan for the Debtors (the "Plan")*, as modified, which contains therein alternatives Plan A, Plan B, and Plan C.

The court will deny confirmation of Plans A, B, and C. Below is some of the court's reasoning.

<u>Plans B and C</u>

First, Plans B and C are unconfirmable because they contemplate the amendment of the various CLO Indentures to which Acis is not a party. Specifically, Section 3.24 (for Plan B) and Section 4.24 (for Plan C) each provide as follows:

"Amendment of Indentures. The Indentures shall be amended pursuant to section 1123(a)(5)(F) of the Bankruptcy Code to provide that the Acis CLOs cannot be called for redemption until the later of (a) the date on which all Allowed Claims against the Debtors have been paid in full, or (b) three (3) years after the Effective Date. In the event that the Acis CLOs are reset, any new indenture with respect to a reset CLO shall provide the reorganized Acis will continue as the portfolio manager and that the reset CLO cannot be called for redemption until the later of (y) the date on which all Allowed Claims against the Debtors have been paid in full, or (z) three (3) years after the Effective Date."

The court recognizes that section 1123(a)(5)(F) of the Bankruptcy Code provides that a Chapter 11 plan may provide for adequate means for the plan's implementation, *such as cancellation or modification of any indenture* or similar instrument. However, the court concludes that section 1123(a)(5)(F) applies only to an indenture on which the debtor is a party–namely the issuer. While the court understands that oftentimes multiple, intertwined agreements are sometimes read together and treated in many respects as one integrated document, and while the court recognizes that, in this case, the CLO Indentures and CLO PMAs (the latter of which Acis is party to) are very interrelated, the court does not believe that this gives Acis the right to amend the Indentures without every single party thereto otherwise agreeing. For this simple reason, the current Plans B and C will not be confirmed.

<u>Plan A</u>

Next, with regard to Plan A, the issues are much more complicated. But the court finds Plan A unconfirmable because–while HCLOF has repeatedly asked the Bankruptcy Court for relief, and has also made certain demands upon the CLO Issuers, the Indenture Trustee and the Acis Trustee with regard to optional redemptions–HCLOF is *not the holder of a claim* against Acis, as defined in Section 101(5) of the Bankruptcy Code, to which the doctrine of equitable subrogation

**Appx. 00225**

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 12/15/22    Page 229 of 280    PageID 271

Case 18-30264-sgj11    Doc 549    Filed 09/04/18    Entered 09/04/18 08:52:13    Desc
Main Document    Page 2 of 7

can be applied.

Plan A, distilled to its essence, is premised upon: (1) treating HCLOF as an entity with a "claim" against Acis, pursuant to the Bankruptcy Code's definition in section 101(5)(B), that can be provided for in an Acis plan as an unsecured claim (Class 2); (2) monetizing or liquidating that claim–by calculating the amount HCLOF would realize if HCLOF received exactly what it has demanded from the CLO Issuers, the Indenture Trustee, and the Acis Trustee; (3) paying the monetized/liquidated claim of HCLOF in cash in full on the Effective Date of the Plan, with cash that the Acis Trustee would receive from Plan funder Oaktree; (4) after payment of HCLOF on its liquidated/monetized claim, the Acis Trustee would be entitled to step into the shoes of HCLOF, and be the new holder of HCLOF's Sub Notes, via the court's application of the common law doctrine of equitable subrogation to the Acis Trustee–it is argued that this would be equitable, since the Acis Trustee would essentially be paying the CLO Issuers' (a debtor's) obligations on the Sub Notes to HCLOF (a creditor) and, thus, should be able to step into that creditor's shoes to avert HCLOF's double recovery; and (5) the Acis Trustee, after acquiring the Sub Notes through equitable subrogation, would convey those Sub Notes to Oaktree, the plan funder.

HCLOF, Highland Capital Management ("Highland"), and the CLO Issuers object to this use of equitable subrogation–essentially arguing that, no matter what one calls it, this is forcing a non-debtor party to sell its property that is not property of the estate. The court does not find this to be an easy analysis at all. To be sure, this is a novel proposed application of the equitable subrogation doctrine. To be sure, the Acis Trustee's proposal, at first blush–and even after a second or third turn–looks a little like an effort to force a sale of non-debtor property. This would be a novel application of the equitable subrogation doctrine–which, admittedly, has grown from a somewhat narrow to a much broader doctrine over time, with the historical purpose always being to serve the interests of fairness and justice. It is worth noting that, initially, courts in New York attempted to limit the scope of equitable subrogation to apply only to persons standing directly in the place of a surety. Then, as courts in other states expanded the concept of equitable subrogation, so did the courts of New York, eventually expanding the concept to cover third party guarantors. It was further expanded to parties who pay off a mortgage and in the case of refinancing mortgagees. The doctrine essentially went from a narrow remedy only available to sureties, to a broad doctrine available to almost any party regardless of his legal interest.

But the court believes there are at least a couple of reasons the doctrine should not be applied here. First, the court does not believe HCLOF can be construed to have a "claim" against Acis, pursuant to section 101(5)(B) of the Bankruptcy Code.

The evidence (Exh. 38) was that HCLOF made statements in correspondence dated May 4, 2018, from HCLOF to U.S. Bank, the indenture trustee for all five Acis CLOs, arguing that Acis, as portfolio manager under the CLO-PMAs, was breaching its duties, and stating that both the CLO Issuer "and the Subordinated Noteholders have a claim for the losses caused by the actions of the Portfolio Manager and the Chapter 11 Trustee" and claiming setoff right against funds held by the indenture trustee belonging to the Debtors.

Additionally, the evidence was also that HCLOF has twice during the bankruptcy case purported to direct the CLO Issuers, the Indenture Trustee, and Acis "to effect an Optional Redemption of all Secured Notes and the Subordinated Notes in full." Exhs. 20 & 21. In the second notice, HCLOF added language that this would be "for the express purpose of placement of a portion of the portfolio assets held by the Co-issuers into a warehouse arrangement or a total return swap or other derivatives arrangement with Highland Capital Management, L.P." The end result of

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/15/22   Page 230 of 280   PageID 272

Case 18-30264-sgj11   Doc 549   Filed 09/04/18   Entered 09/04/18 08:52:13   Desc
Main Document      Page 3 of 7

this, of course, would be that the Debtor Acis would no longer have any assets to manage and no revenue stream to potentially pay its creditors.

Then, after the Trustee refused to effectuate an optional redemption, both HCLOF and Highland filed, on May 30, 2018, an adversary proceeding against the Acis Trustee, demanding that the Acis Trustee specifically perform and effectuate an optional redemption (the "Adversary"-- Adversary No. 18-03078-sgj).  The Adversary Complaint states:  *"Under the [CLO] funds' governing documents, the investors [e.g. HCLOF] have the right to have their money returned upon demand.  Consequently, to mitigate their on-going losses, the investors have instructed the Indenture Trustee and Acis LP, as the putative portfolio manager of the funds, to sell the funds' assets through a redemption process provided for in the Indenture, and return the investors' money to be invested elsewhere with higher yields . . . . The Debtors, which are controlled by a Chapter 11 Trustee, have refused to authorize the necessary processes to effectuate a redemption of the funds to allow the return of the investors' money  . . . . The investors are suffering daily losses because of the Chapter 11 Trustee's inaction.  . . .  The Plaintiffs file this Complaint to protect their interests and urge the Court to promptly enter a preliminary injunction enjoining the Chapter 11 Trustee from interfering with the redemption process and allowing the investors to have their money returned before they incur further losses."*  Para. 2.

The Original Complaint went on to state that the ACIS CLO PMAs are valid and enforceable contracts between the CLOs and Acis LP.  Under the PMAs, Acis LP provides investment advisory services to the CLOs. "Plaintiff HCLOF, who holds an equity position in the CLO, *is a third-party beneficiary of the PMA*. The Chapter 11 Trustee, as Acis LP's Chapter 11 trustee, has anticipatorily breached the PMA by communicating his refusal to effect the Subordinated Noteholders' requested redemption as required by the PMA. The Chapter 11 Trustee's breach has caused damage to HCLOF." Paragraphs 67-70.  See also paras. 74-77; 81-84; 88-91; 95-98.

Subsequently, HCLOF withdrew its two sets of redemption notices and on August 10, 2018 (after appealing a bankruptcy court preliminary injunction in the Adversary and after also moving to withdraw the reference in the Adversary), moved to amend the Adversary to ask for only the following:  *"Pursuant to 28 U.S.C. § 2201, HCLOF seeks a declaration that the Chapter 11 Trustee has no authority to sell or transfer HCLOF's property without HCLOF's consent.  HCLOF seeks no money damages or other relief not sought in this Amended Complaint."*

Is this all enough for HCLOF to have a "claim" against the Debtor, pursuant to section 101(5)–in other words, does it amount to an assertion of a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment"–particularly when HCLOF has now withdrawn its two notices requesting the Indenture Trustee and Debtor commence an optional redemption process and has also sought to amend the Original Complaint to specify that it is not seeking any damages?

*The court believes no*.  The five CLO PMAs specifically provide that there are *no third party beneficiaries* (except that four of the five CLO PMAs carve out the Indenture Trustee as a third party beneficiary).  Thus, HCLOF–although it alleged in the Original Complaint–that it was an alleged "third party beneficiary," never had any basis to state that or to complain of Acis's alleged "anticipatory breach" of the CLO PMAs, as it purported to do in the Original Complaint. Moreover, there is, of course, no longer a PMA between Acis and HCLOF (f/k/a/ as ALF), as of October 27, 2017, as a result of the series of transactions that "the Highlands" apparently

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 12/13/22    Page 231 of 280    PageID 273

Case 18-30264-sgj11    Doc 549    Filed 09/04/18    Entered 09/04/18 08:52:13    Desc
Main Document    Page 4 of 7

orchestrated after the Josh Terry arbitration award and judgment. Thus, HCLOF cannot claim any breach of contract between Acis and HCLOF. Acis is technically not a party to the Indentures. Thus, as far as the court is aware, *there is no contract between HCLOF and Acis whatsoever. If there is some theory under which HCLOF can assert liability against Acis , it has not been articulated.*

In summary, the court does not believe HCLOF (though it has made many threats and demands and filed an Adversary) has ever articulated a viable claim against Acis. Without a viable claim, the court does not believe the equitable subrogation doctrine asserted by the Acis Trustee works. And, without some sort of claim being validly asserted against Acis, any payment by it on account of the Sub Notes would appear to be voluntary.

The court recognizes that some courts have applied the equitable subrogation doctrine where a party paid a debt on which it had no liability and seemed to do it somewhat voluntarily–despite there being a long-standing exception to the doctrine for "voluntary payment." The strongest example of this is the case of NY Stock Exchange v, Sloan, 1980 U.S. Dist. LEXIS 13316 (S.D.N.Y. Aug. 15. 2018). But it appears to this court that, in any case where a court has allowed equitable subrogation where "voluntariness" was somewhat in existence, *there was a situation where there was a primary obligor who wasn't paying its obligation* . Here, the CLO Issuers are perfectly willing and able to perform their obligations. Thus, applying equitable subrogation here seems a bridge too far. The Acis Trustee would appear to an "officious meddler" (although with good motives) and–with no real exposure to HCLOF, in the court's view–the payment of the Sub Notes obligations would be purely voluntary. The court recognizes that the Acis Trustee would be attempting to  protect an interest of its own (the Acis PMA revenue stream) somewhat like the property developer in the Hamlet case. Hamlet v. Northeast, 64 A.D.3d 85 (N.Y App. Div. Second Dept. 2009). But, in Hamlet, the property developer who paid the Environmental fees to the town of Brookhaven, that the subcontractor had bonded and agreed to pay, was itself primarily liable on the Environmental fees (in other words, the Town had a claim against Hamlet). Again, equitable subrogation under the exact facts and circumstances of this case seems a bridge too far.


Miscellaneous Rulings

The court rules on a few miscellaneous matters that were contested, although it is denying confirmation. This may be useful for any future appeals or for any future proposed plans.

**Assumption and Assignment of the PMAs would not violate section  365 of the Bankruptcy Code.**

The court believes that the assumption of the CLO PMAs by the Acis Trustee and the assignment of the CLO PMAs to a third party (either Oaktree or Brigade or Cortland) would be permissible under section 365 of the Code.  Section 365 of the Bankruptcy Code does not prohibit the Trustee from assigning its rights under the PMAs without the written consent of the CLOs, the Subordinated Noteholders, and others. Section 365(c)(1) of the Bankruptcy Code provides:

"The trustee may not assume or assign any executory contract . . . if . . . applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract . . . prohibits or restricts assignment of rights; and . . . such party does not consent to such assumption or assignment[.]"

11 U.S.C. § 365(c)(1).

The court overrules any objection that there is some applicable law that excuses the

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 12/14/22    Page 232 of 280    PageID 274

Case 18-30264-sgj11    Doc 549    Filed 09/04/18    Entered 09/04/18 08:52:13    Desc
Main Document    Page 5 of 7

counterparties to the PMAs (i.e., the CLO Issuers) from accepting performance from a party other than the debtor.  First, these are not personal services contracts. Assessing whether a contract is a personal service contract "depends upon the subject of the contract, the circumstances of the case and the intent of the parties to the contract."  Leonard v. Gen. Motors Corp. (In re Headquarters Dodge), 13 F.3d 674, 682-83 (3d Cir. 1993) (internal quotation marks omitted); see also In re Compass Van & Storage Corp., 65 B.R. 1007, 1011-12 (Bankr. E.D.N.Y. 1986) ("Ascertaining whether a contract is personal posits on close distinctions, e.g., the nature and subject matter of the contract, the circumstances of the case placed in juxtaposition with the intention of the parties."). Even "clauses in the contract . . . attesting to a personal relationship will not be dispositive." Leonard, 13 F.3d at 683. Ultimately, if "the identity of that person or entity [rendering performance under the contract] is an essential element of the contract, and if the contract is non-assignable under applicable non-bankruptcy law then the estate cannot assign the contract." Grove Rich Realty, 200 B.R. at 507. Accordingly, in order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable.  Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable.  If this were the standard, the exception would swallow the rule—any prudent party contracting for another's services considers the other party's skill, expertise, and reputation—and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party providing services is skilled and reputable–it is whether such services are unique in nature. See Compass Van & Storage Corp., 65 B.R. at 1011. To support its contention, Highland cites New York cases under which hotel management contracts or consulting contracts were found to be personal service contracts.  In the Marriott case cited by Highland, in which the court found the hotel management to be a personal service contract, the court observed that the hotel manager had "full discretion . . . to manage virtually every aspect of the hotel." Marriott Int'l, Inc. v. Eden Roc, LLLP, 104 A.D.3d 583, 584 (N.Y. App. Div. 1st Dep't 2013). Marriott is distinguishable. Here, Acis did not manage virtually every aspect of the CLOs. Pursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs. While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique–as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers.  Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties:  "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii).  And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." Id. § 14(a). Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager." Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." See Compass Van & Storage, 65 B.R. at 1011 (citing RESTATEMENT (SECOND) OF CONTRACTS § 318(2) (1981)). As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." Compass

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 07/25/22    Page 233 of 280    PageID 275

Case 18-30264-sgj11    Doc 549    Filed 09/04/18    Entered 09/04/18 08:52:13    Desc
Main Document    Page 6 of 7

Van & Storage, 65 B.R. at 1011.  Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs.  Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2). Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision–the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs. Indeed, in the Southern District of New York, the court held:

"Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an investment adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2)."

CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC, 2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the counterparties to the PMAs from accepting or rendering performance without such consent. Accordingly, the assignment of the PMAs to Oaktree does not violate the IAA or section 365(c)(1) of the Bankruptcy Code.

<u>Preliminary Injunction</u>

The preliminary injunction in place preventing HCLOF from pursuing optional redemptions will remain in place for now.  The court believes there are automatic stay implications (section 362(a)(3)) with regard to HCLOF pursuing optional redemptions.  The effect of an optional redemption is to *exercise control over the Acis PMAs and revenue stream*  (property of the estate–see, e.g., Hometown Valley View v. Prime, 847 F.3d 302 (5th Cir. 2017)).  While HCLOF is not itself a creditor (and while "the Highlands" entity separateness is not being challenged, and is not being disregarded be either the Acis Trustee, the court, or anyone else at this juncture), the court notes that HCLOF, Highland, and other Highland-related parties seem to work in tandem.  Highland asserts a claim against Acis.  Actions taken by HCLOF could be construed to be actions of Highland, an actual creditor. There is also a basis for keeping the preliminary injunction in place pending determination of the Acis Trustee's fraudulent transfer lawsuits.   The evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value–perhaps even the ability to control its own destiny when the ALF PMA was essentially terminated without cause and Acis was made to sell its shares in ALF/HCLOF back to ALF/HCLOF.  In the face of these facts, the court will be reluctant to terminate the preliminary injunction until this litigation is fully resolved.

End of Ruling



Traci A. Ellison, Courtroom Deputy
to the Honorable Stacey G. C. Jernigan
U.S. Bankruptcy Court, Northern District of Texas
(214)753-2046
sgj_settings@txnb.uscourts.gov

# EXHIBIT 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | August 3, 2022 |
|  | ) | 2:30 p.m. Docket |
| Reorganized Debtor. | ) |  |
| _____ | ) |  |
|  | ) |  |
| CHARITABLE DAF FUND, L.P., | ) | **Adversary Proceeding 22-3052-sgj** |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | MOTION TO DISMISS ADVERSARY |
| v. | ) | PROCEEDING FILED BY DEFENDANT |
|  | ) | HIGHLAND CAPITAL MANAGEMENT, |
| HIGHLAND CAPITAL | ) | LP [19] |
| MANAGEMENT, L.P., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| _____ | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Plaintiff:        Jonathan E. Bridges
                         SBAITI & COMPANY, PLLC
                         JP Morgan Chase Tower
                         2200 Ross Avenue, Suite 4900 W
                         Dallas, TX  75201
                         (214) 432-2899

For the Defendant:        Gregory V. Demo
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

For the Defendant:        Zachery Z. Annable
                         HAYWARD, PLLC
                         10501 N. Central Expressway,
                           Suite 106
                         Dallas, TX  75231
                         (972) 755-7108

2

```
 1   Recorded by:              Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
 2                             1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
 3                             (214) 753-2062

 4   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
 5                             Shady Shores, TX  76208
                               (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

**Appx. 00234**

3

 1              DALLAS, TEXAS - AUGUST 3, 2022 - 2:37 P.M.

 2              THE COURT:  22-3052.  This is a motion to dismiss

 3   adversary proceeding.  For the Movant Highland, who do we have

 4   appearing?

 5              MR. DEMO:  Your Honor, Greg Demo; Pachulski Stang

 6   Ziehl & Jones; on behalf of Highland.  Zachery Annable from

 7   the Hayward firm is here as well.  And we have Jim Seery.

 8              THE COURT:  Okay.  Thank you.

 9      All right.  For Plaintiff/Respondent Charitable DAF, who

10   do we have appearing?

11              MR. BRIDGES:  Jonathan Bridges here, Your Honor.

12              THE COURT:  All right.  Well, I've got the pleadings

13   here in front of me, and I saw an exhibit list of Movant/

14   Debtor, but I think the exhibits were just all of the

15   attachments to the amended motion to dismiss.  Is that

16   correct?

17              MR. DEMO:  That's --

18              THE COURT:  Or the appendix, I should say?

19              MR. DEMO:  That is absolutely correct.

20              THE COURT:  Okay.  All right.  Well, I'll hear

21   Highland's argument.

22              MR. DEMO:  And for the exhibits, we did have a

23   discussion with opposing counsel, counsel for the DAF.

24   Exhibit 17 is Mr. Seery's declaration.  We filed the motion to

25   dismiss under both 12(b)(1) and 12(b)(6), and so Mr. Seery's

4

1   declaration we would like to formally enter into evidence

2   because that goes to what we believe is Plaintiff's lack of

3   standing and thus this Court's lack of jurisdiction.  And we

4   do believe that extrinsic evidence is appropriate for that.

5       With respect to Exhibits 1 through 13 and then Exhibits 21

6   and 22, those are all documents that were filed on this

7   Court's docket and they consist of really three buckets:

8   either complaints or orders, the plan, and then transcripts.

9   All of those are on this Court's docket.  And we would ask

10  your Court to take judicial notice of those.  And I know that

11  Mr. Bridges may have some issues with that, but we do believe

12  that's appropriate for a 12(b)(6) motion.

13          THE COURT:  All right.  So you mentioned 17, the

14  Seery Declaration.  1 through 13, --

15          MR. DEMO:  Yes, Your Honor.

16          THE COURT:  1 through 13, and 21 and 22.  Or did I

17  mishear?

18          MR. DEMO:  Yes.  No, that's exactly right, Your

19  Honor.

20          THE COURT:  So that's the universe of what you're

21  asking the Court to consider?  You're not asking the Court to

22  consider 14, 15, and 18 through 20?  I don't have them in

23  front of me to --

24          MR. DEMO:  14 -- we are not asking Your Honor to

25  consider 14, 15, 16, 18, 19, and 20.

5

```
 1              THE COURT:  Okay.  All right.  Mr. Bridges, what say
 2   you about this?
 3              MR. BRIDGES:  Thank you, Your Honor.  Counsel is
 4   correct.  We have no objection to Exhibit 17.
 5      We do object to the remainder.  And the remainder, our
 6   objection is because they're not referenced in the pleading
 7   and because they aren't actually evidence.  What was filed,
 8   especially what was filed in a different adversarial matter,
 9   isn't evidence in this case.  And that's the basis for our
10   objection.
11              MR. DEMO:  Your Honor, if I may?
12              THE COURT:  You may.
13              MR. DEMO:  I guess the first thing is that they were
14   all referenced in the pleadings, Your Honor.
15      The second thing is that Your Honor can take judicial
16   notice of things on her docket, and all of these things are on
17   Your Honor's docket for purposes of the 12(b)(6) motion.
18      And I'm honestly a little surprised by Mr. Bridges'
19   arguments and by Plaintiff's arguments because they ask you to
20   do the exact same thing in their pleading.  They ask you to
21   take judicial notice of two time entries that were filed in
22   the main docket here as evidence that we, Highland, had
23   knowledge of Plaintiff filing the complaint in the District
24   Court.  And, you know, we're not going to quibble with that
25   because they are on your Court's dockets and we do believe
```

6

```
 1    that you can take judicial notice of those.
 2        And I can cite you Fifth Circuit case law, if you'd like,
 3    but I think it's a fairly standard issue.
 4              THE COURT:  All right.  I'll over --
 5              MR. BRIDGES:  Your Honor, one more thing?
 6              THE COURT:  Go ahead.  Uh-huh.
 7              MR. BRIDGES:  I might be confused, Your Honor.  My
 8    objection was the failure to reference these documents in the
 9    original complaint, the pending complaint in this adversary
10    proceeding, not to -- failure to have referenced them in the
11    briefing of this motion.
12              MR. DEMO:  Your Honor, I don't think that changes it.
13    I mean, Your Honor is entitled to take judicial notice of
14    exhibits -- I mean, I'm sorry, of matters on her docket -- for
15    the purposes of our motion to dismiss.  And all of these
16    pleadings and all of these exhibits and appendices -- the
17    witness and exhibit list were referenced in our motion to
18    dismiss.  I don't think that changes anything.
19              THE COURT:  All right.  I overrule the objection.  I
20    can take judicial notice of these items, and I will.
21              MR. DEMO:  Thank you, Your Honor.
22              THE COURT:  All right.  You may proceed.
23              MR. DEMO:  Thank you.  Again, Your Honor, for
24    purposes of the record, Greg Demo; Pachulski Stang Ziehl &
25    Jones; on behalf of Highland Capital Management.
```

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/14/22   Page 242 of 280   PageID 284

7

1      We were here today on -- originally on two motions to

2  dismiss.  And our two motions to dismiss were generally

3  identical.  The first motion to dismiss, which is going

4  forward today, is the motion -- I'm sorry, the motion to

5  dismiss the complaint filed by the Charitable DAF Fund, which

6  alleges that Highland breached its fiduciary obligations to

7  the DAF as an investor in Multi-Strat during the course of the

8  bankruptcy.

9      The second thing we were supposed to be here today on,

10 Your Honor, was a complaint -- a motion to dismiss the

11 complaint filed by PCMG Trading Partners XXIII.  PCMG is

12 majority-owned by Jim Dondero and wholly controlled by Jim

13 Dondero.  We did have PCMG contact us last week and offer to

14 withdraw that motion.  We were happy to accept that offer

15 because we do think that it should have been dismissed.

16     That said, Your Honor, we were equally frustrated with

17 that offer, because the complaint was filed over a year ago.

18 Highland had to expend substantial resources briefing and

19 responding to motions.  And then, on the eve of trial, when we

20 have a dispositive motion on file, they withdrew it.  And that

21 is frustrating, Your Honor.

22     And it's doubly frustrating because Mr. Dondero has come

23 to this Court and tried to make an issue of the burn rate for

24 legal fees in this Court.  And we think that -- that the

25 filing of the complaint and then the last-minute withdrawal of

8

1   the complaint is emblematic of what Mr. Dondero is doing here,

2   Your Honor.

3        That said, we are here only on one motion to dismiss.  And

4   as I mentioned, it's our motion to dismiss Plaintiff's

5   complaint which alleges that Highland Capital Management

6   breached its fiduciary obligations to Plaintiff and those

7   fiduciary obligations arose under the Investment Advisors Act,

8   common law, and contract.  And those breaches allegedly

9   occurred in mid-2020.  And that was after the petition date,

10  after Your Honor appointed independent directors to manage the

11  bankruptcy, but before confirmation of the plan and before the

12  plan's effective date.  And each of those causes of action

13  primarily revolve around the Plaintiff's contention that

14  Highland sold assets that it wasn't supposed to sell.  In

15  other words, Highland sold assets that Mr. Dondero did not

16  want it to sell.

17       And I realize I mentioned the complaint was originally

18  filed in the District Court for the Northern District of

19  Texas.  The District Court referred the complaint to Your

20  Honor in May of this year, and Highland filed its amended

21  motion to dismiss on May 22nd -- I'm sorry, May 27th, 2022.

22       And our motion to dismiss is simple, Your Honor, and it

23  amounts to one simple question:  Are the causes -- should the

24  Court dismiss the complaint because the causes of action in

25  the complaint are administrative expense claims that should

9

1   have been filed in this Court and served on the Debtor prior

2   to the administrative expense claim bar date, which occurred

3   in September of 2021?

4        We believe the answer to that question is yes, Your Honor.

5   We believe it's unequivocally yes under black letter

6   bankruptcy law.

7        But as a separate and alternative basis for dismissal, we

8   believe that Plaintiff lacks both constitutional and

9   prudential standing, because (1) Plaintiff, the Charitable DAF

10  Fund, is not an investor in Multi-Strat, and that's what Mr.

11  Seery's declaration says; and (2) the Plaintiff did not allege

12  in the complaint how it was harmed by Highland's actions with

13  respect to Multi-Strat when it was not an investor in Multi-

14  Strat.

15       That's it, Your Honor.  And we believe it is and should be

16  a simple matter.

17       Plaintiff, however, has made a belated and what we believe

18  is a procedurally-improper request to have the complaint

19  treated as a late-filed administrative claim by this Court.

20  We believe Your Honor should deny that request.

21       But before addressing the law, I think it's important,

22  Your Honor, to go through the facts and to go through the

23  timeline of this complaint, because what the facts and what

24  the timeline will show is that there was no inadvertent error,

25  Your Honor.  There was a tactical and strategic decision to

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 03/17/23   Page 245 of 280   PageID 287

10

1   file the complaint outside of this Court in the hopes that

2   this Court would not know about it and that it could be

3   adjudicated around Your Honor.

4        And Ms. Canty, can you please put up Slide 1?

5        And as you'll see, Your Honor, this is the timeline that

6   we would like to discuss.  So, first, February 22nd, 2021.

7   Your Honor confirmed Highland's plan of reorganization.

8   Highland's plan, like all plans, included clear procedures for

9   dealing with administrative expense claims and stated --

10  again, we believe clearly -- that all administrative expense

11  claims are required to be filed within 45 days of the plan

12  effective date.

13       The next date we would bring Your Honor's attention to is

14  June 23rd, 2021.  On June 23rd, the Dugaboy Investment Trust

15  filed a complaint in the Northern District of Texas, alleging

16  that Highland breached its fiduciary duties with respect to

17  Multi-Strat.  We did not receive notice of that hearing -- of

18  that motion, of that complaint.  But on June 25th, which is

19  the next day here, we had a hearing in front of Your Honor on

20  the Plaintiff the Charitable DAF's motion to reconsider the

21  order appointing Mr. Seery as Highland's chief restructuring

22  officer.  During that hearing, we discovered that the Dugaboy

23  Investment Trust, Mr. Dondero's family trust, had filed its

24  complaint, and we brought that to Your Honor's attention.

25  Plaintiff's counsel at that June 25th hearing is the same

11

1  counsel in front of Your Honor today.

2      During that hearing, Your Honor rightly asked Plaintiff,

3  Plaintiff's counsel, about why it believed it could file

4  claims rightly before Your Honor in different courts.  And

5  Your Honor rightly told Plaintiff to, and I'm quoting here,

6  "Go back and hit the books and be prepared to defend" filing

7  claims outside of this Court.  After that hearing, Dugaboy

8  withdrew the Dugaboy complaint.

9      The next date I would call Your Honor's attention to is

10 July 22nd, 2021, approximately one month after that June

11 hearing.  That's the date the complaint at issue today was

12 filed, Your Honor.  The complaint -- and the complaint at

13 issue today was never served.  Plaintiff filed a motion to

14 stay that complaint in the Northern District of Texas and

15 never served that motion to stay.

16     Moving forward, Your Honor, November 23rd, 2021.  We are

17 here again in front of Your Honor on Plaintiff's complaint

18 with respect to the HarbourVest settlement.  And Highland had

19 moved to dismiss that complaint.  And again Plaintiff's

20 counsel at that hearing in front of Your Honor was the counsel

21 here today.

22     During that hearing, we also heard Plaintiff's motion to

23 stay the HarbourVest complaint pending resolution and pending

24 the appeal of Highland's plan of reorganization to the Fifth

25 Circuit.

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/09/22   Page 247 of 280   PageID 289

12

1      Plaintiff's arguments concerning the plan injunction at

2  that hearing were essentially the exact same as the arguments

3  they make in the response to our motion to dismiss, that the

4  plan injunction prohibited them from doing anything.  It

5  prohibited them from prosecuting the causes of action in the

6  complaint outside of this Court, which we agree with, but they

7  also argued it prohibited them from prosecuting the causes of

8  action in the complaint inside of this Court.

9      At that hearing, Your Honor -- and I'll backtrack just a

10  second after that -- at that hearing, Your Honor, Highland's

11  counsel was very clear on the record that they agreed that the

12  plan injunction prohibited litigation filed prior to the

13  effective date from occurring outside of this Court.

14  Highland, however, was also clear that Plaintiff did have a

15  remedy, and that remedy was to file the causes of action in

16  the complaint as a motion for allowance of an administrative

17  expense claim in this Court and prosecute them here.

18      At that hearing in November of 2021, Your Honor also told

19  Plaintiff's counsel that their arguments concerning the plan

20  injunction, and I'm quoting here, Your Honor, "reflect,

21  frankly, a misunderstanding of how the injunction language

22  applies."

23      Now, I'm going to backtrack, Your Honor, because I did

24  forget a very important date, and that's the August 11th, 2021

25  effective date of the plan.  It is indisputed, Your Honor,

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/30/22   Page 248 of 280   PageID 290

13

1   that Plaintiff received notice of that effective date, and

2   Plaintiff's counsel was separately noticed with that effective

3   date of the plan.

4       Those certificates of service are in Bankruptcy Docket No.

5   2747, and are included in our witness and exhibit list as

6   Exhibit 8.  Again, it is indisputed that both Plaintiff's

7   counsel and Plaintiff had notice of the effective date of the

8   plan.

9       And it is also indisputed, Your Honor, that that notice

10  disclosed that all administrative expense claims had to be

11  filed with this Court and served on the Debtor within 45 days

12  of the effective date of the plan, which was September 25,

13  2021.

14      It is important to note that at no point in this timeline

15  to date did Plaintiff's counsel -- I'm sorry, did Plaintiff do

16  anything.  Plaintiff did not file an administrative expense

17  claim.  Plaintiff did not file a motion to have their

18  complaint allowed as timely filed.  Plaintiff did nothing.

19      It was not until May of 2022 when the District Court

20  referred this action to Your Honor and after Highland filed

21  its amended motion to dismiss for Plaintiff's failure to

22  comply with the administrative expense claim bar date that

23  Plaintiff came into this Court asking leniency.

24      Plaintiff came into this Court in their response to the

25  motion to dismiss asking Your Honor to treat their claim as a

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/29/22   Page 249 of 280   PageID 291

14

```
 1   timely-filed administrative expense claim.  But what this
 2   timeline shows, Your Honor, and what the facts show, Your
 3   Honor, is, again, that this was not an inadvertent mistake.
 4   Plaintiff chose to file the complaint outside of this Court.
 5   Plaintiff, with notice of the effective date and notice of the
 6   administrative expense claim bar date, chose not to file an
 7   administrative expense claim in this Court.
 8        Plaintiff, with Your Honor's -- Your Honor's direct (audio
 9   gap) in November of 2021 that they misunderstood the plan
10   injunction, still did nothing, Your Honor.  It was not until
11   we moved to dismiss this action that Plaintiff requested, in a
12   procedurally-improper way, to have their claim treated as a
13   late-filed claim.
14        What we believe that shows, Your Honor, is that this was
15   tactical.  That what Plaintiff actually wanted was to file
16   their claim in the District Court, which they did, and which
17   they did not give us notice of; to stay that action in the
18   District Court, which they did, and which they did not give us
19   notice of; and to have that complaint sit there in the
20   District Court until the Fifth Circuit overturned the plan,
21   and then and only then would they litigate that action, again,
22   away from Your Honor.
23        We believe that's highly improper, Your Honor.
24        That said, the legal question here is, again, very simple.
25   Does the complaint include administrative expense claims that
```

15

1    are now time-barred because they were not filed in this Court

2    by the September 2021 administrative expense claim bar date?

3    Again, we believe the answer to that question is a simple yes.

4    These are administrative expense claims.

5        Again, Plaintiff's complaint alleges that Highland

6    violated its fiduciary obligations to Plaintiff in mid-2020,

7    after the petition date, after appointment of independent

8    directors, before confirmation, and before the effective date,

9    at all times while Highland was the debtor-in-possession.

10       And as Your Honor knows, administrative expense claims,

11   generally speaking, are claims that arise under Section 503(b)

12   of the Code for the actual and necessary costs of preserving

13   the estate and that arise from the debtor-in-possession or

14   trustee's postpetition, pre-effective-date, ordinary-course

15   operation of the estate.

16       And the claims in the complaint are administrative expense

17   claims under 503(b) under the *Reading* exception which was

18   created by the Supreme Court in 1968 in *Reading Co. v. Brown*.

19   And as set forth in our brief, Your Honor, *Reading* is still

20   good law.  It's routinely applied in the Fifth Circuit and

21   it's routinely applied in all circuits.

22       And *Reading*, Your Honor, (garbled) it includes not just

23   torts, but other claims arising from intentional or other

24   wrongful or -- wrongful acts as well.  And the claims asserted

25   in the complaint are clearly administrative expense claims

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 1    Filed 12/15/22    Page 251 of 280    PageID 293

16

1   under *Reading*.  They are claims for intentional and/or

2   negligent violations of Highland's alleged fiduciary duty to

3   Plaintiff during the course of the bankruptcy.

4       And Ms. Canty, if you could please put up Slide 2.

5       Now, Plaintiff tries to dodge this by saying that the

6   definition of, quote, administrative expense claims and the

7   plan does not include the types of claims that they allege

8   here.  But that's not the case, Your Honor.  And the defined

9   term "Administrative Expense Claim" is in the middle box of

10  your screen.  And as you'll see, it says it's any claim

11  allowed pursuant to Sections 503(b), 507(a)(2), 507(b), or

12  1114(2) of the Bankruptcy Code.  Those include administrative

13  expense claims under the *Reading* exception, and they include

14  the administrative expense claims asserted in the complaint.

15      Those claims were required under the plan -- and the

16  provisions are all right here -- again to be filed in this

17  Court by September 2021.  They were not.

18      And as I mentioned above, it is indisputed that Plaintiff

19  had notice of the plan, that Plaintiff had notice of the

20  administrative expense claim bar date.  And it's also

21  indisputed that Plaintiff, represented by counsel, did not

22  file with this Court an administrative expense claim by

23  September 25th, 2021.  Plaintiff's claims are now time-barred.

24      And we believe Your Honor's *Taco Bueno* opinion is on all

25  fours.  In *Taco Bueno*, the claimant at least tried to file an

Case 21-03067-sgj    Doc 143    Filed 12/15/22    Entered 12/15/22 16:29:18    Desc Main
Case 3:22-cv-02802-S    Document 4    Filed 12/29/22    Page 252 of 280    PageID 294

17

1    administrative expense claim with this Court by filing a proof

2    of claim on the claims register.  Your Honor held that wasn't

3    good enough and it did not count as an administrative expense

4    claim, and Your Honor barred claimant's claim in *Taco Bueno* as

5    time-barred.

6       Here, similarly, Plaintiff, who's been represented at all

7    times by counsel, indisputably had notice and chose to file

8    the complaint in the District Court rather than complying with

9    the provisions of the plan and with the provisions of the

10   Bankruptcy Code.  Under *Taco Bueno* and various cases, Your

11   Honor, this claim is time-barred.

12      And that should end the discussion, Your Honor, but it

13   doesn't, because Plaintiff, in its response to our motion to

14   dismiss, finally asked this Court for leniency and finally

15   asked this Court to treat the claim as, quote, a request for

16   an order permitting a late claim or otherwise to have it

17   treated as a timely administrative expense claim under ==Federal==

18   ==Rule of Civil Procedure 15==.

19      But that's not how it works, Your Honor.  Section 502 of

20   the Code allows late-filed administrative expense claims only

21   for cause.  But that requires a separate motion, and it

22   requires evidence, Your Honor.  None of that happened here.

23   Instead, Plaintiff filed a one-line request to have it treated

24   as a late-filed claim, and it filed that request 16 months

25   after confirmation, 10 months after the bar date, and 8 months

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 1   Filed 12/05/22   Page 253 of 280   PageID 295

18

1   after Your Honor rejected their argument on the plan

2   injunction.

3       There is no cause here.  Plaintiff has provided no

4   evidence of it.  It just asked for leniency based on a series

5   of what we believe are irrelevant arguments.

6       And that's where the facts again become important.  As

7   Your Honor has said, facts matter.  And the facts here, the

8   indisputed facts (garbled) Plaintiff and bely a finding of

9   cause or excusable neglect under *Pioneer*.  Again, two

10  standards that Plaintiff has not even tried to argue.

11      And, again, Your Honor, what we believe the facts show is

12  that there was no inadvertent technical error here.  There was

13  a considered and strategic plan to file these claims outside

14  of this Court in the hopes of avoiding Your Honor.

15      As in *Houbigant*, which we briefed in our paper, Plaintiff

16  is bound by those tactical decisions.  And the complaint, Your

17  Honor, we would ask be dismissed with prejudice for failure to

18  state a -- I'm sorry, for failure to comply with the

19  administrative expense claim bar date.

20      And lastly, Your Honor, standing.  In our motion to

21  dismiss, we sought an order dismissing this action under

22  12(b)(1) for lack of constitutional standing and also under

23  12(b)(6) for lack of prudential standing.  And as stated in

24  our papers and in Mr. Seery's declaration -- which, again, is

25  Exhibit 17 on our witness and exhibit list -- the DAF, the

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/16/22   Page 254 of 280   PageID 296

19

1   Plaintiff here, is not an investor in Multi-Strat.  And all of

2   the allegations in the complaint, all of the causes of action

3   in the complaint, revolve around the DAF being an investor in

4   Multi-Strat, and Plaintiff did not plead how it could possibly

5   have standing as a non-investor.

6       Consequently, Your Honor, Plaintiff failed to plead

7   constitutional standing, failed to plead an injury, and failed

8   to plead prudential standing because it failed to plead how it

9   was the real party in interest under Section 17.

10      Now, Plaintiff makes various arguments in its response

11  about how it could have direct and/or derivative standing.

12  But, again, Your Honor, one, we believe those arguments are

13  meritless, and we believe that they're irrelevant, because

14  notwithstanding the liberal amendments standard in Federal

15  Rule of Civil Procedure 15 and the language in Federal Rule of

16  Civil Procedure 17, we believe amendment here would be futile.

17  For all the reasons we discussed, the claims are time-barred.

18  And even if Plaintiff were able to amend its complaint to fix

19  the standing issues, Plaintiff in no world can unwind and turn

20  back the clock to be able to file the complaint in this Court

21  as an administrative expense claim by the administrative

22  expense claim bar date, which, again, was on September 25th,

23  2021.

24      For the foregoing reasons, Your Honor, we ask that you

25  dismiss the complaint with prejudice.  And I'm happy to answer

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 12/29/22   Page 255 of 280   PageID 297

20

1  any questions.

2          THE COURT:  Okay.  No questions right now.

3          MR. DEMO:  Thank you.

4          THE COURT:  Mr. Bridges?

5          MR. BRIDGES:  Thank you, Your Honor.  The last time I

6  appeared in this Court was at the June 25th, 2021 hearing that

7  counsel referenced.  It's particularly memorable to me because

8  of being postponed due to symptoms from a cranky gallbladder.

9  The time before that I remember even better.  That was the

10 only other time I was before you, Your Honor.  The

11 particularly painful order that was the result of that

12 previous time is also very memorable to me.

13    My gallbladder is no longer with us, and that order, that

14 painful order, has been expunged at considerable costs.  I was

15 hoping that meant today would be a fresh start.  Apparently, I

16 need to go backwards just a little bit, perhaps.

17    At the June 25th hearing that counsel described, I did

18 argue.  At the end, you did ask about a recently-filed lawsuit

19 that I didn't know anything about and told you so.  You asked

20 if Mr. Sbaiti was available, and I believe we had to go get

21 him, and he answered your questions, and your exchange was

22 with him.

23    I'm afraid that, again, I am unprepared and largely not in

24 the know about the other matters that counsel has referenced.

25 I came to argue the motion that's at issue today in the

21

 1  adversary proceeding that we're here for.

 2      The *Federal Reporters*, Your Honor, I know that you know

 3  this, they're full of opinions admonishing courts to favor

 4  resolving cases on the merits.  Ever since the code pleading

 5  system was abolished, federal courts have expressed their bias

 6  in favor of addressing the merits of cases, and I would be

 7  remiss in failing to mention that here on Highland's motion to

 8  dismiss this case on timeliness and standing grounds.

 9      Rule 15 and Rule 17 of the Federal Rules of Civil

10  Procedure are among those aimed at getting cases to the

11  merits, and we relied on both of those in our brief.

12      The first issue raised in the briefs is the classification

13  of our allegations as an administrative expense claim.  That

14  three-word term is capitalized in the plan, indicating that it

15  is a defined term.  I read in the reply brief and heard

16  counsel argue just moments ago that Highland views this as

17  merely a naming convention and not as a limiting provision,

18  the defined term.  And I see that as a reasonable view of

19  what's in the plan.  But it does quite -- quite plainly appear

20  as a defined term, with a lengthy definition.

21      Although this is not a hill we would choose to die on, and

22  much of our response brief is devoted to alternative

23  arguments, we don't view the allegations in the complaint as

24  administrative in nature, nor as an expense, nor, perhaps most

25  importantly, as the result of an action that benefits the

22

1   estate, as both the plan definition and Section 503(b)

2   require.

3       Section 503(b) concerns only, quote, the costs and

4   expenses of preserving the estate.  What the complaint alleges

5   in this matter is that the acts complained of were against the

6   interests of the estate and depleted the estate's assets.

7       For example, Paragraph 22, which sums up the factual

8   allegations in the complaint, reads as follows.  Quote, "In

9   short, HCMLP caused Multi-Strat to sell the viatical pool at a

10  substantially discounted amount to curry favor with the

11  brokers and buyers in the marketplace, for no apparent benefit

12  to Multi-Strat's investors or the Debtor's estate."

13      This allegation does not on its face appear to be based on

14  the result of an action that benefits the estate.

15      The second issue concerns the consequences if we're wrong

16  about the first issue.

17          THE COURT:  Let me --

18          MR. BRIDGES:  The consequences --

19          THE COURT:  Let me back up.  Let me back up if you're

20  moving off that point.  What about the Supreme Court --

21          MR. BRIDGES:  Yes, Your Honor.

22          THE COURT:  What about the Supreme Court's *Reading*

23  case or *Reading* case?  If my memory -- it's been years since

24  I've read it, but I remember it pretty well.  I believe that

25  involved a fire, right, a fire in a building that a trustee

23

1   was operating.  Certainly, a fire and great damage caused to a

2   third party wouldn't seem on its face to benefit the estate,

3   as that phrasing is used in 503(b).  But the U.S. Supreme

4   Court said something to the effect of, you know, he's doing

5   business and it's a cost of doing business that, you know,

6   you're going to sometimes have things like this happen.  And

7   isn't that exactly the same sort of situation we have here if

8   your allegations are true?

9          MR. BRIDGES:  I don't think so, Your Honor, although

10  I would -- would like to emphasize again this is not a hill

11  that we would choose to die on.  But I think --

12         THE COURT:  Am I correct --

13         MR. BRIDGES:  -- two reasons distinguish --

14         THE COURT:  -- in remembering the facts of that

15  famous U.S. Supreme Court case, that it involved a fire and

16  that the trustee who was operating the business, it was a

17  consequence of him operating the business?  Am I correct in

18  remembering those facts?

19         MR. BRIDGES:  That sounds correct to me, Your Honor,

20  but I don't pretend to remember it well enough to disagree

21  with you.  I would like --

22         THE COURT:  Mr. Demo, --

23         MR. BRIDGES:  -- to distinguish it.

24         THE COURT:  -- can you confirm or tell me if I'm

25  wrong?

24

1          MR. DEMO:  Yeah.  You're absolutely correct, Your

2     Honor.  The trustee in that case accidentally burned down the

3     neighboring building, and the Supreme Court found that it was

4     still an administrative expense claim under the "*Reading*" or

5     "*Reading*" exception.  And that exception provides that even

6     though burning down somebody else's house does not benefit the

7     estate, that it still counts as an administrative expense

8     claim under 503(b).  And we have other case that comes --

9     other case law that comes after that that even broadens that,

10    Your Honor.

11         THE COURT:  Yes.  And I know the Fifth Circuit case

12    has cited that case in different opinions.

13       Okay.  So, going back to that, Mr. Bridges, I mean, you

14    just argued 503(b) doesn't contemplate this type of claim that

15    -- or claims you're alleging in the action, but hasn't the

16    Supreme Court in fact said that it does apply to this kind of

17    thing?

18         MR. BRIDGES:  Your Honor, no, I don't think so.  And

19    the reasons are twofold.  One is because the fire in that case

20    is not, I don't believe, the actions being complained of by

21    the plaintiff.  Rather, actions that are to the benefit of the

22    estate result in negligently, accidentally, causing a fire.

23    And that is a significant difference from here, where the

24    actions allegedly being -- that we're alleging, that are

25    complained of, are actually actions against the interests of

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 09/22/22   Page 260 of 280   PageID 302
Document 1   Page 302 of 322

25

1   the estate, selling out the estate on the cheap.  Your Honor,

2   that is one distinction.

3       The other is that we're relying on the defined term, which

4   has different language from the actual Code, which was not at

5   issue in the other case.

6       Those are the two distinctions that I draw, Your Honor.

7           THE COURT:  Well, if this is not --

8           MR. BRIDGES:  The second issue --

9           THE COURT:  -- a 503-type claim, then what kind of

10  claim would it be?  It has to fit into some sort of category

11  here.

12          MR. BRIDGES:  Your Honor, honestly, our position is

13  that the order itself creates -- the final plan creates a gap

14  by not identifying this as -- as that kind of -- as an

15  administrative priority claim.

16          THE COURT:  Okay.

17          MR. BRIDGES:  The second issue, Your Honor, concerns

18  the consequences if we're wrong about the first issue and that

19  the consequences need not be forfeiture.

20      Counsel raises concerns about the purpose of the

21  administrative claim bar date and the ability to distribute

22  funds.  Those concerns certainly seen valid.  But importantly,

23  they go to priority, not validity.

24      Not one of their policy arguments supports outright

25  dismissal of the complaint, which would amount to a default

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 08/03/22   Page 261 of 280   PageID 303

26

 1   and would have the effect of protecting the interests of

 2   equity in this matter over the interests of a creditor.

 3        Rule 15 allows for relation back of allegations from a

 4   previous filing, and we believe it governs here.  Highland

 5   doesn't deny that it had notice of the complaint, so they

 6   don't have prejudice from the timing of it.  And there is

 7   authority under the Code for allowing timely filing or

 8   treating as timely the filing of one type of claim that was

 9   submitted as another type of claim.

10        And on this, I'd point the Court to the Delaware

11   *Bluestream [sic] Brands* case, ==2021 Bankr. LEXIS 1980==, which

12   cites to the First Circuit and other cases allowing a timely

13   proof of claim to be treated as an administrative expense

14   claim.

15             THE COURT:  Doesn't that --

16             MR. BRIDGES:  I'm truly --

17             THE COURT:  Doesn't that run contrary to my *Taco*

18   *Bueno* opinion?

19             MR. BRIDGES:  Perhaps, Your Honor.  It does cite your

20   opinion in a "*But see*."  And I again would defer to your

21   knowledge of the proceedings in that case.  But I saw in the

22   opinion no argument whatsoever concerning the ability of the

23   creditor to seek relief on its proof of claim regarding the

24   same transaction.  I read it not to exclude that.

25        Although the Court relied -- also, the Court relied on

27

1    prejudice to the creditors in that case if the administrative

2    claim had been allowed.  Importantly, in this case, where

3    creditors can expect to be paid in full, no such prejudice

4    exists, or at least at this stage of the claim -- of the case

5    there is no evidence that any such prejudice to the creditors

6    exists.

7        I'm truly unsure how to respond to the accusation that the

8    decision to file this action in District Court was a strategic

9    one, a strategic decision.  In some regards, certainly, all of

10   our decisions are strategic.  But the implication that this

11   was somehow a nefarious decision that should inflame the Court

12   is simply untrue.

13       I think the timeline supports us in this, that at the time

14   of the filing of this lawsuit the plan was not yet effective,

15   so the route to bring an administrative claim, if that's what

16   this is, did not appear to be available to us without the plan

17   having gone effective.

18       Also, it appeared that it might not go effective for a

19   year or more while the appeal to the Fifth Circuit was

20   pending.

21       A few weeks later, I think it was less than three,

22   approximately 20 days later, when Highland elected to make the

23   plan effective, the injunction as we understand it precludes

24   us from serving them from that point forward, as doing so

25   would have been continuing with this case.  The plan

**Appx. 00259**

28

1   injunction prevented us from doing so.

2        And so the accusation that we intentionally filed the

3   lawsuit and didn't serve them with process is really about a

4   three-week period that before we got them served we were

5   enjoined, as we understand the injunction, from doing so.

6        I have not heard from them that we're wrong on that

7   interpretation of the injunction.  I know from their other

8   pleadings in this matter that they view the injunction as

9   applying to this matter.  The only question I have is whether

10  they agree with our take that serving process would have been

11  continuing with the action.

12             THE COURT:  Let me -- let me --

13             MR. BRIDGES:  The notion that we --

14             THE COURT:  -- double-check that I understand

15  something you said.  I think what I heard you say was, because

16  the plan had not gone effective fee yet, therefore triggering

17  the 45-day deadline for filing administrative expense claims,

18  you had no other avenue here to pursue your claims except to

19  file the District Court lawsuit.  Is that what I heard you

20  say, or am I misunderstanding?

21             MR. BRIDGES:  Well, that's certainly more strongly

22  than I intended to say it.  I don't think so, Your Honor.  But

23  a similar vein, that the idea of filing a claim as required by

24  the final plan was not -- was not something that had gone into

25  effect yet.  So thinking that that --

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 02/06/23   Page 264 of 280   PageID 306

29

1          THE COURT:  What do you mean?  You can file a request

2    for allowance of administrative claim, heck, in the first 30

3    days of a bankruptcy case.  You don't have to wait for the

4    Court to set a deadline.

5          MR. BRIDGES:  Your Honor, --

6          THE COURT:  You can file one at any time.

7          MR. BRIDGES:  -- we did not have an effective

8    deadline.  We did not know when that effective deadline would

9    go effective.  That process, that procedure, did not appear to

10   be the one that was, what, most available to us.

11         THE COURT:  Why not?  Why not?  Why not?  There is

12   nothing that would have precluded you from filing a request

13   for allowance of administrative expense claim.  People file

14   them throughout Chapter 11 cases frequently, --

15         MR. BRIDGES:  The --

16         THE COURT:  -- before there's ever a deadline set.

17         MR. BRIDGES:  Your Honor, the answer to that question

18   is that reading the definition of what it was did not cause us

19   to believe that's what we had here.  That is Issue #1 over

20   again.

21      One question -- again, one question is whether we are

22   right or wrong on Issue 1.  And I'm hearing you loudly and

23   clearly that you don't agree with us on that.

24      But in connection with that, I don't, Your Honor, I don't

25   think a fair conclusion is that we knew better or should have

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 08/07/23   Page 265 of 280   PageID 307

30

1    known better than to read the defined term and think that it

2    does not apply to the case that we brought.

3        Certainly, the final order -- I'm sorry, the plan was not

4    in effect yet, so we weren't governed by it at that time.  And

5    I believe and urge the Court to consider that a plain reading

6    of that plan does not sound like on its face that our claim --

7    our complaint is within its four corners.

8            THE COURT:  Did you worry about the automatic stay?

9            MR. BRIDGES:  Yes, Your Honor.

10            THE COURT:  Okay.  What is your analysis there?

11            MR. BRIDGES:  Your Honor, it was well more than a

12    year ago.  I don't think I can remember that.  It wasn't in

13    the briefing for today, and it's not fresh on my mind.

14            THE COURT:  You're right.  You're right, it wasn't in

15    the briefing.  But, again, I'm just trying to put myself in

16    your brains and, you know, I don't -- I will say it's a gray

17    issue, because these are not prepetition claims, and usually

18    362 stays collection or actions aimed at pursuing prepetition

19    claims.

20        On the other hand, the relief sought in the DAF's

21    complaint asked for, among other things, disgorgement of all

22    ill-gotten gains, and also voiding of certain agreements of

23    Highland.  This sounds potentially like exercising or an

24    attempt to exercise control over property of the estate.  So,

25    again, it's something that weighs on me a little bit.

31

1        But, again, it's not the subject of the hearing today, but

2   I kind of am still interested in what your thought process

3   was.  You know, it's a very risky thing to file a lawsuit

4   against a Chapter 11 debtor as opposed to filing a proof of

5   claim or a request for allowance of administrative claim.  So

6   I just -- it would be helpful to hear what your analysis was

7   on that.

8            MR. BRIDGES:  Perhaps this would be helpful as well,

9   Your Honor.  At least as -- at least in my view and

10  experience, you do not have to be a bankruptcy lawyer to know

11  what the automatic stay is.  An administrative expense claim

12  isn't the same kind of recognized concept, I believe.

13  Certainly, not to me.

14       And so the notion that what we were doing is sitting on

15  our hands rather than serving the complaint because of some

16  ulterior motive is just wrong.  That's untrue.  And generally

17  speaking, in this day and age, cases aren't dismissed without

18  reaching the merits simply because they weren't filed in the

19  right place or with the right forum.

20       Your Honor, that brings us to the third issue, which is

21  standing.  Again, courts in this day and age do not dismiss

22  cases without reaching the merits simply because they were not

23  brought by the real party in interest.  That's what Rule 17

24  says quite clearly.  An opportunity for the real party in

25  interest to join must be provided.  If -- if that's -- let me

32

 1   back up.  If -- because Highland admits that Plaintiff's

 2   subsidiary, CLO Holdco, is an investor who would have

 3   standing, that should end the matter there.

 4        Moreover, the Plaintiff, the DAF, has alleged in

 5   Paragraphs 7 and 11 of the complaint that it is an investor.

 6   And frankly, Your Honor, I don't think that's incorrect when

 7   you view that someone can invest indirectly.  That is not a

 8   peculiar concept, and I don't think it's a stretch to say that

 9   that pleading that we are indirectly an investor is an invalid

10   one.  And in Paragraph 54, it states quite clearly that, if

11   necessary, we are seeking to plead our claim derivatively.

12        That's all I have today, Your Honor.  If there's more I

13   can answer, I will do my best.

14             THE COURT:  Okay.  So, am I hearing that the DAF

15   acknowledges that CLO Holdco, its one-hundred-percent

16   subsidiary, last I knew, that it is actually the investor in

17   Multi-Strat, not DAF?  Am I hearing that?

18             MR. BRIDGES:  Mostly yes, Your Honor.  I'd like to

19   quibble around the edges.  I believe it is not a one-hundred-

20   percent-owned subsidiary.

21             THE COURT:  Okay.

22             MR. BRIDGES:  My recollection is that it's --

23             THE COURT:  Well, forget that hundred percent.  But

24   the point is I'm hearing DAF acknowledge that it's CLO Holdco

25   that it is at least partly an owner of, if not mostly an owner

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 03/10/23   Page 268 of 280   PageID 310

33

1    of, CLO Holdco is the one that invested in Multi-Strat.

2                MR. BRIDGES:  I believe Highland is correct on that,

3    Your Honor.  Yes.

4                THE COURT:  Okay.  So your argument is that the DAF

5    still would have standing because it should be considered an

6    indirect owner of interest in Multi-Strat?

7                MR. BRIDGES:  Slightly different from that, Your

8    Honor.  Not only is it an indirect investor, it also is

9    receiving investment device -- advice from Highland for the

10   purposes of directing its subsidiaries or counsel to these

11   subsidiaries or aiding them in making investment decisions.

12   So that investment advice and the contract claims are still

13   relevant, whether the investment by the DAF is direct or

14   indirect.  The relationship is, in all important aspects, the

15   same, regardless of whether the investment in the ultimate

16   asset is a direct one or an indirect one.

17       And Your Honor, I don't believe there's anything unusual

18   about that relationship between a subsidiary and its -- and

19   its parent.

20               THE COURT:  You don't think there's anything unusual

21   about what?

22               MR. BRIDGES:  About the relationship --

23               THE COURT:  About only naming the parent as a party,

24   not the subsidiary that actually owns the investment?

25               MR. BRIDGES:  No, Your Honor.  That's not what I was

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 03/15/23   Page 269 of 280   PageID 311

34

1   referring to.

2       The relationship between a parent entity that uses

3   subsidiaries to make its investment is a not-unusual corporate

4   arrangement.

5       THE COURT:  Oh, well, certainly.  I wouldn't think it

6   would be.  But I'm more focused on the parent being the

7   Plaintiff in the lawsuit and not the subsidiary.

8       MR. BRIDGES:  Your Honor, I think that's what

9   derivative case law and the statutes that govern it are all

10  about.  This is not a novel thing.

11      THE COURT:  I think you've got it flip-flopped, don't

12  you?  I mean, usually, derivative -- I mean, I guess I -- I

13  see what you're saying.  The entity has a cause of action and

14  it won't bring it for whatever reason, so the shareholders --

15  here, I guess you're saying the DAF -- would ask for standing.

16  It doesn't seem like the same thing we usually -- the same

17  context we usually see derivative litigation brought in.

18  Would you acknowledge that?

19      MR. BRIDGES:  I think in the federal courts what

20  you're referring to is shareholder derivative actions that

21  indeed tend to fit the paradigm you're talking about.

22      It is not unusual at all, however, for a majority owner of

23  an LLC to bring an action that is derivative on behalf of the

24  LLC, or a minority but a significant minority member of an LLC

25  or another type of company to bring such action.  Shareholder

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 03/31/23   Page 270 of 280   PageID 312

35

1  derivatives are not the only kind of derivative action.

2           THE COURT:  Okay.  I think that's all the questions I

3  have.  Anything else?

4      (No response.)

5           THE COURT:  Anything else?  Okay.  I guess -- that

6  was directed to you, Mr. Bridges.  Anything else?

7           MR. BRIDGES:  I'm sorry.  Not from me, Your Honor.

8           THE COURT:  All right.  Mr. Demo, you have the last

9  word.

10           MR. DEMO:  Thank you, Your Honor.  And I'll be fairly

11  brief.

12      Mr. Bridges I think is still -- I'm sorry, not --

13  Plaintiff I think is still confused about what an

14  administrative claim, expense claim is and how the *Reading*

15  exception applies.  In *Reading*, there was no benefit to

16  burning down somebody's house.  In *A.I. [sic] Copeland*, which

17  is a Fifth Circuit case, a debtor improperly failed to turn

18  over tax claims -- I'm sorry, tax distributions, tax payments,

19  to the State of Texas, in violation of Texas statutes.  That

20  was an administrative expense claim.

21      All of the claims here arise from Highland's alleged

22  intentional or negligent breach of its fiduciary duties to the

23  DAF -- again, not an investor in Multi-Strat, but that's what

24  was pled.  All of those fall under the *Reading* exception.

25      And to Plaintiff's point about, you know, there not being

36

1   a benefit to the estate here, I would read you the last line

2   of Paragraph 49, which says that one of the breaches includes

3   utilizing the sale proceeds for its own names, namely -- I'm

4   sorry.  Utilizing -- let me start over, Your Honor.  It says,

5   "utilizing the sale proceeds for its own end, namely, to

6   enrich itself."  That's Mr. Bridges, that's Plaintiff's

7   complaint.  They are alleging that we took these actions to

8   benefit Highland during the course of the bankruptcy.

9        Either way you slice it, Your Honor, this is an

10  administrative expense claim.  We think *Reading* is directly on

11  point, that they have pled a substantial benefit to the

12  estate.  They basically pled that we took these assets and

13  absconded with them.

14       Either way you slice it, under *Reading*, it applies.  Under

15  benefit to the estate, under their complaint, it applies.

16  This is an administrative expense claim and had to be filed by

17  the administrative expense claim bar date.

18       And, again, with respect to the plan injunction, Your

19  Honor, even if Mr. Bridges was right -- I'm sorry.  Even if

20  Plaintiff were right, and they're not, and I do think a point

21  needs to be made here, is that Plaintiff is the only party,

22  Plaintiff and PCBM, are the only parties who did not

23  understand the plan.  Even Mr. Dondero's other affiliates --

24  NexPoint, NexPoint Advisors, Highland Capital Management Fund

25  Advisors, and CPCM -- all were able to file administrative

Case 21-03067-sgj   Doc 143   Filed 12/15/22   Entered 12/15/22 16:29:18   Desc Main
Case 3:22-cv-02802-S   Document 4   Filed 08/29/22   Page 272 of 280   PageID 314

37

1    expense claims in this Court on or substantially before the

2    administrative expense claims bar date.  Plaintiff's

3    interpretation and confusion with the plan injunction applies

4    only to Plaintiff.  They are on an island here.

5        And yes, it's also wrong.  And even if Plaintiff were

6    confused about that when they filed their complaint in the

7    Northern District of Texas, they cannot say they were confused

8    about that after the November 2021 hearing, where Your Honor

9    told them bluntly and blatantly that they misunderstood the

10   plan injunction and where Highland told them that they were

11   not without a remedy, that their remedy was to file an

12   administrative expense claim in this Court.

13       So, even giving Plaintiff the benefit of the doubt that

14   they did innocently misunderstand the plan injunction, that

15   misunderstanding ended in November of 2021, eight months ago.

16   During that eight-month period, Plaintiff again did nothing.

17   Plaintiff only made a request, and a procedurally-improper

18   request, to have the claim treated as late-filed when it

19   responded to our motion to dismiss.

20       With respect to the policy here, Your Honor, I think Your

21   Honor nailed it in *Taco Bueno*.  Bar dates are important.

22   Administrative expense bar dates are extremely important.  And

23   so now I understand under Federal Rule of Civil Procedure 15

24   and all the other Federal Rules you do want to get to the

25   merits, but 503 applies here, Your Honor.  There are separate

38

1   procedures dealing with administrative expense claims, and

2   those procedures are important to protect not just the Debtor

3   but all creditors in this matter.

4        This is not a two-party dispute.  Bankruptcy is not a two-

5   party game.  There are other creditors here who have been

6   waiting ten, ten years, a decade to be paid.  And Plaintiff is

7   coming in and saying, you know what, we should get an

8   administrative expense claim.  We should be able to take

9   a-hundred-cent dollars off the top.  And they're doing that,

10  Your Honor, without any evidence whatsoever.  No evidence of

11  cause under 503(a).  No evidence under *Pioneer*.  And not even

12  an attempt to plead them.

13       The policy here does not favor them.  It favors the

14  estate.  It favors all other creditors in this action who are

15  relying on the confirmed plan that has been confirmed for well

16  over a year now, Your Honor.

17       And the last thing I'll say on standing, I do think

18  Plaintiff's arguments on direct and derivative are just way

19  off.  But I don't think they matter, Your Honor, because,

20  again, regardless of the liberal amendment standards in 15,

21  and regardless of the language in 17, amendment here is

22  futile.  That is our point.  It doesn't matter if they fix the

23  standing issues.  Their complaint is still going to be time-

24  barred.  And they still, like today, they still will have no

25  evidence of cause or excusable neglect to justify that

39

1   complaint.

2        Again, happy to answer any questions, Your Honor, but we

3   do think this is a straightforward matter.  And with that,

4   I'll cede my time.

5        THE COURT:  Okay.  Thank you.

6        The Court is going to grant the motion to dismiss.  And

7   I'm obviously going to write this up.  But there's no question

8   whatsoever that the purported claims against Highland that

9   have been asserted in this action by the DAF concerning the

10  Multi-Strat sales of assets, they arise from postpetition

11  transactions, and to the extent the claims are valid, they

12  would have given rise to postpetition administrative expense

13  claims.  There's just no -- there's no legitimate argument to

14  the contrary on that.

15       And so that means this is a Section 503(b) issue, not a

16  Rule 15 or a Rule 17 issue.

17       Not only did the plan provide a specific procedure for

18  filing administrative expense claims, but 503 of the

19  Bankruptcy Code also contemplates such a procedure.

20       And as this Court held in a lengthy opinion in the *Taco

21  Bueno* case, these procedures have to be strictly complied

22  with.  It's very clear from the language of the Code, and the

23  legislative history, if the language of the Code weren't

24  clear, that proofs of claim are very different things than

25  postpetition claims that arise.  You file a proof of claim, a

40

1   simple form, for a prepetition claim.  It's deemed allowed if

2   no one objects.  You don't even have to get an order.  But,

3   again, as I explained in *Taco Bueno*, a 503 administrative

4   expense claim is a very different animal.  Okay?  You have to

5   put the world on notice.

6        As Mr. Demo said, it's not a two-party dispute.  It's a

7   type of claim that potentially every unsecured creditor in the

8   case would care about and want to weigh in on.  You're held to

9   strict proof.

10       And, again, as I noted from the Supreme Court *Reading*

11  case, the Supreme Court has said technically there doesn't

12  have to be a benefit to the estate.  There are some things

13  that are just a cost of doing business.  A fire to a

14  neighbor's building didn't benefit the estate, but still the

15  victim of that fire was entitled to an administrative expense

16  claim.  But this is not even the stretch that a fire would be.

17  So there's just zero room for argument, I think, here that the

18  claims asserted in this action are of the nature of

19  administrative expense claims, postpetition claims, and a

20  request had to be filed by September 25th.

21       And to the extent a sentence or two in this response filed

22  July 5th, 2022 is a request to file a late-filed

23  administrative expense claim, I mean, it's procedurally

24  improper in every way.  And so I'm not going to grant any

25  relief based on that.

41

1      Last, the standing issue.  While I have the view that CLO

2  Holdco would have been the party aggrieved here if these

3  claims are valid, and there does appear to be a problem with

4  the standing of the Charitable DAF, I think this is a moot

5  point or an irrelevant point.  While under 17 I could, in

6  different circumstances, allow the proper party to substitute

7  in, it would be an exercise in futility here because, again,

8  we're ten months past the deadline for a timely filing of an

9  administrative expense claim.

10     So, I will draft up an opinion and order in this regard.

11     Let me just throw this out here so no one is surprised or

12  on a different page.  I don't think I have to do a report and

13  recommendation on this.  And anyone who wants to weigh in can

14  weigh in, but as you know, --

15         MR. DEMO:  Your Honor?

16         THE COURT:  Oh.

17         MR. DEMO:  I'm sorry.  I was just agreeing with Your

18  Honor.  This is the claims allowance process.  This is a pure

19  core proceeding at this point.

20         THE COURT:  Okay.  And so certainly I'll also hear

21  from Mr. Bridges if he has a comment.

22     But the way I look at this is, okay, we start with the

23  point of Judge Godbey, I think it was, had this one.  He *sua*

24  *sponte* referred this to the Bankruptcy Court.  There wasn't a

25  report and recommendation where I said, I think you should

42

1  either not withdraw or withdraw but let the Bankruptcy Court

2  do pretrial matters.  He just *sua sponte* did that.  Okay?

3      But then a couple of additional points.  Rule 7012(b)

4  says that a responsive pleading to a 12(b)(6) or a 12(b)(1),

5  any -- shall include a statement that the party does or does

6  not consent to the entry of final orders of judgment by the

7  Court.  So I guess we could argue, does that apply to the

8  Movant or does it apply to the Respondent?  But I think it

9  probably applies to the Respondent here, and so there was

10 just nothing in the response as to whether Respondent did or

11 did not consent to entry of a final order, so I would view

12 that as a waiver.

13     But most importantly of all, I guess, my third point on

14 this is I think this is an arising-in core matter, not merely

15 related to, where consent is necessary.  Because certainly

16 the idea of do you need an administrative expense claim or

17 not and were the proper procedures followed, I think that's

18 core arising in.

19     So, for all of these reasons, I'm letting you know I'm

20 not doing this in a report and recommendation.  I'm just

21 doing this in an opinion and order.

22     Mr. Bridges, anything you want to say about that?

23         MR. BRIDGES:  Yes, Your Honor.  If I could back up

24 and correct myself first.  I think I was mistaken about CLO

25 Holdco.  They are indeed, I am told, the hundred-percent

43

 1  subsidiary of the Plaintiff, the Charitable DAF.

 2      Secondly, yes, Your Honor, this is a Rule 12 motion in an

 3  adversary proceeding.  We would object to a final order and

 4  ask you to issue a report and recommendation.

 5          THE COURT:  Well, you didn't put that in your

 6  response.  What is your comment about that?

 7          MR. BRIDGES:  Your Honor, my comment on that is I

 8  feel -- I feel like my hands are tied by the injunction.  We

 9  haven't been able to file any motion for leave on fear of --

10  on pain of getting a ruling from this Court against us as to

11  the injunction, but we don't have clarity as to what we're

12  enjoined from and what we are not.  And I guess that would be

13  my basis.

14          THE COURT:  Okay.  Well, I don't know what that has

15  to do it with putting a sentence in a response that's required

16  by 7012(b) saying whether you consent or don't consent.  I

17  don't know what an injunction has to do with that.

18      But anyway, I do view this as an arising-in matter where

19  consent is probably irrelevant, but I'm just dotting all our

20  I's here.

21      All right.  I will -- I've got one law clerk working on

22  one under-advisement of Highland that I think is pretty close.

23  I've got another law clerk working on another under-advisement

24  in Highland that is getting there.  So I think I'll probably

25  just jot out a pretty fast opinion and order on this one,

44

1   because the facts on it are pretty simple, and I think

2   probably in a few days you'll have it.

3        All right.  We're adjourned.

4             THE CLERK:  All rise.

5             MR. DEMO:  Thank you.

6        (Proceedings concluded at 3:44 p.m.)

7                          --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                    **08/04/2022**

24   _____     _____

     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

**Appx. 00276**

45

INDEX

PROCEEDINGS                                                         3

WITNESSES

-none-

EXHIBITS

Judicial Notice to be Taken                                         6

RULINGS                                                            39

END OF PROCEEDINGS                                                 44

INDEX                                                             45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25